# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

```
CHEMFREE CORPORATION,        )
                             )
          Plaintiff,         )
                             )
v.                           )   Civil Action No.
                             )   1:04-CV-3711 JTC
J. WALTER, INC., and         )
J. WALTER COMPANY, LTD.      )
                             )
          Defendants.        )
```

===================================================================

# INITIAL EXPERT REPORT OF
# JOHN B. DURKEE, PhD, P.E.

===================================================================

Submitted on behalf of Plaintiff


By:  John B. Durkee, PhD, P.E.
     122 Ridge Road West
     Hunt, Texas  78024
     Telephone:  (830) 238-7610
     Email:  *jdurkee@precisioncleaning.com*

# **TABLE OF CONTENTS**

I.   QUALIFICATIONS..........................................2

    A.   EDUCATIONAL BACKGROUND............................. 2

    B.   PROFESSIONAL BACKGROUND AND EXPERIENCE
        PROFESSIONAL BACKGROUND AND EXPERIENCE.............. 2

    C.   LIST OF PUBLICATIONS AND PATENTS................... 7

    D.   PRIOR EXPERIENCE AS AN EXPERT WITNESS.............. 9

    E.   DISCLOSURE OF COMPENSATION ARRANGEMENT............ 11

II.  DATA AND OTHER INFORMATION CONSIDERED IN FORMING
    OPINIONS...............................................12

III. ASSUMPTIONS AS TO MATTERS OF LAW AND LEGAL PRINCIPLES.....17

    A.   ASSUMPTIONS AS TO LEGAL PRINCIPLES................ 17

    B.   ASSUMPTIONS AS TO MATTERS OF FACT................. 26

IV.  SUMMARY OF OPINIONS & CONCLUSIONS......................27

    A.   OVERVIEW OF THE FIELD OF THE INVENTION............ 27

    B.   OVERVIEW OF THE PATENTED INVENTION................ 29

    C.   PATENT PROSECUTION HISTORY........................ 30

        1.   HISTORY OF THE "PARENT" OR '902 APPLICATION.... 30

        2.   PROSECUTION HISTORY OF THE '491 PATENT........ 32

        3.   PROSECUTION HISTORY OF THE '110 PATENT........ 34

        4.   PROSECUTION HISTORY OF THE '125 PATENT........ 35

            A.   THE '439 APPLICATION......................35

            B.   THE '227 APPLICATION......................36

                I.   AMENDMENTS TO ISSUED CLAIM 1
                    (APPLICATION CLAIM 23)............... 37

II.   AMENDMENTS TO ISSUED CLAIM 6
(APPLICATION CLAIM 28). .............................. 38

III.  AMENDMENTS TO ISSUED CLAIM 12
(APPLICATION CLAIM 35). .............................. 39

C.   PROSECUTION HISTORY OF THE '835 PATENT.....41

5.   PROSECUTION HISTORY OF THE '226 PATENT........ 43

A.   CLAIM OF PRIORITY TO THE '902 PARENT
APPLICATION................................43

B.   THE '898 APPLICATION......................44

C.   THE '586 APPLICATION......................47

D.   THE '634 APPLICATION......................49

D.   OVERVIEW OF THE TEACHINGS OF THE SPECIFICATION...... 50

E.   THE MEANING OF DISPUTED CLAIM TERMS................. 52

V.   INFRINGEMENT ANALYSIS....................................53

A.   DESCRIPTION OF THE ACCUSED DEVICES................. 54

1.   THE BR-100.................................... 56

2.   THE BR-200.................................... 59

3.   THE IO-400.................................... 61

4.   THE IO-200.................................... 62

5.   BIO-CIRCLE L CLEANING FLUID................... 65

B.   IDENTIFICATION OF THE ASSERTED CLAIMS.............. 68

C.   CLAIM PREAMBLES.................................... 69

D.   THE CLEANING FLUID LIMITATIONS..................... 71

E.   THE PARTS WASHER WITH BASIN AND TANK CLAIM
LIMITATIONS........................................ 73

F.   THE PUMP AND CONDUIT ASSEMBLY LIMITATIONS.......... 74

G.    THE "MICROORGANISM" LIMITATIONS..................... 75

H.    THE "HEATER" AND "HEATING" LIMITATIONS.............. 77

I.    THE "FLOWPATH" LIMITATIONS.......................... 78

J.    THE "FILTER" AND "POROUS MEDIUM" LIMITATIONS....... 82

      1.    THE BR-100 — "THREE PART FILTER.".............. 86

      2.    THE BR-200 — "COFFEE FILTER.".................. 91

      3.    THE BR-200 AND IO-400 "SEDIMENT TRAP."........ 93

      4.    THE IO-200 "GRATED RECEPTACLE.".............. 94

VI.  FLUID TEMPERATURE CONTROL LIMITATIONS.....................97

      1.    UNDISPUTED LIMITATIONS........................ 98

      2.    TERMS DISPUTED AS TO THE IO-200.............. 100

B.    HEATER / HEATING LIMITATIONS DISPUTED ONLY AS TO
      THE IO-200....................................... 106

            A.    THE LITERAL INFRINGEMENT ANALYSIS........116

            B.    THE ALTERNATIVE DOCTRINE OF EQUIVALENTS
                  INFRINGEMENT ANALYSIS....................117

C.    FLUID LEVEL CONTROL LIMITATIONS................... 119

      1.    UNDISPUTED AS TO BR-100, BR-200, IO-400....... 129

      2.    IO-200 - DESCRIPTION OF ACCUSED LEVEL
            CONTROL SYSTEM............................... 131

D.    IO-200 - '110 PATENT - CLAIM 1 - MEANS PLUS
      FUNCTION......................................... 137

E.    IO-200 - 110 PATENT - CLAIMS 6 AND 8 - "LEVEL
      SENSOR"....................................... 143

F.    IO-200 - 491 PATENT - CLAIM 5 AND 7 - "MEASURING
      THE LEVEL" AND '125 PATENT - CLAIM 17 AND 19 -
      "MEASURING THE LEVEL"............................. 145

G.   THE "SURFACTANT-BASED" LIMITATION OF '226 PATENT,
     CLAIM 3......................................... 147

H.   '110 PATENT - CLAIM 4 - HEATER PARTIALLY IMMERSED
     IN THE FLUID................................... 149

I.   '835 PATENT - CLAIM 5 – "BIODEGRADE" LIMITATION.... 151

J.   '835 PATENT - CLAIM 10 – "SOLE FLOWPATH"
     LIMITATION..................................... 151

K.   '835 PATENT - CLAIM 11 - THE "ENCOUNTER SAID
     FILTER" LIMITATION............................. 153

L.   THE '226 PATENT - CLAIM 1...................... 154

M.   THE '226 PATENT - CLAIM 4...................... 157

N.   '125 PATENT - CLAIM 1 & 6 – "BRINGING INTO
     CONTACT"....................................... 158

O.   '125 PATENT - REMOVING HYDROCARBONS FROM THE
     PART........................................... 160

P.   '125 PATENT - CLAIM 6 - DRAINING THE FLUID......... 161

Q.   '125 PATENT - CLAIMS 1, 6 & 12 – RETAINING
     HYDROCARBONS IN THE TANK ALLOWING THE
     MICROORGANISMS TO BIODEGRADE THE HYDROCARBONS...... 163

R.   LIMITATIONS WHERE HYDROCARBONS AND/OR
     MICROORGANISMS ACCUMULATE PROXIMATE A FLUID
     SURFACE IN TANK................................ 168

     1.   Walter's Change of Position on Infringement
          Contentions............................... 170

     2.   Infringement Analysis of the BR-100.......... 173

     3.   General Scientific Principles Applicable to
          Mixing Hydrocarbons with Aqueous Cleaning
          Fluid..................................... 176

     4.   Empirical Test Procedure for BR-200 and IO-
          200....................................... 178

     5.   Empirical Results Obtained for BR-200......... 184

6.    Empirical Results Obtained for IO-200......... 187

7.    Conclusions as To BR-200..................... 195

8.    Conclusions as To IO-200..................... 197

VII. CONCLUSIONS...........................................198

A.    WALTER'S BIO-CIRCLE[TM] BR-100 PARTS WASHER IN
      COMBINATION WITH BIO-CIRCLE L[TM] CLEANING FLUID...... 198

      1.    United States Patent No. 6,019,110........... 198

      2.    United States Patent No. 6,074,491........... 199

      3.    United States Patent No. 6,374,835........... 199

      4.    United States Patent No. 6,440,226........... 199

      5.    United States Patent No. 6,451,125........... 199

B.    WALTER'S BIO-CIRCLE[TM] BR-200 PARTS WASHER IN
      COMBINATION WITH BIO-CIRCLE L[TM] CLEANING FLUID...... 200

      1.    United States Patent No. 6,019,110........... 200

      2.    United States Patent No. 6,074,491........... 200

      3.    United States Patent No. 6,374,835........... 200

      4.    United States Patent No. 6,440,226........... 201

      5.    United States Patent No. 6,451,125........... 201

C.    WALTER'S BIO-CIRCLE[TM] IO-400 PARTS WASHER IN
      COMBINATION WITH BIO-CIRCLE L[TM] CLEANING FLUID...... 201

      1.    United States Patent No. 6,019,110........... 201

      2.    United States Patent No. 6,074,491........... 202

      3.    United States Patent No. 6,374,835........... 202

      4.    United States Patent No. 6,440,226........... 202

      5.    United States Patent No. 6,451,125........... 202

D.   WALTER'S BIO-CIRCLE<sup>TM</sup> IO-200 PARTS WASHER IN
     COMBINATION WITH BIO-CIRCLE L<sup>TM</sup> CLEANING FLUID...... 203

     1.   United States Patent No. 6,019,110............ 203

     2.   United States Patent No. 6,074,491............ 203

     3.   United States Patent No. 6,374,835............ 204

     4.   United States Patent No. 6,440,226............ 205

     5.   United States Patent No. 6,451,125............ 205

## **INDEX OF EXHIBITS**

| Ex. No. | Description |
|---|---|
| A. | Curriculum Vitae of John B. Durkee, Ph.D., P.E. |
| B. | Joint Claim Construction Statement [Dkt. 114] |
| C. | Walter's May 8, 2007 Letter to Judge Camp [Dkt. 159] |
| D. | Claim Construction Order entered 07/17/2007 [Dkt. 212] |
| E. | Walter's Bio-Circle™ Model BR-100 Owner's Manual |
| F. | Walter's Bio-Circle™ Model BR-200 Owner's Manual |
| G. | Walter's Bio-Circle™ Model IO-400 Owner's Manual |
| H. | Walter's Bio-Circle™ Model IO-200 Owner's Manual |
| I. | Claim Chart |
| J. | Genesis Technologies International Testing Results |

I, John B. Durkee, PhD, P.E. hereby submit the following expert testimony report:

## I.   QUALIFICATIONS.

### A.   EDUCATIONAL BACKGROUND.

I graduated from Lehigh University in 1962, where I obtained a B.S. degree in Chemical Engineering.  Thereafter, I received an M.S. degree in Chemical Engineering from Lehigh University in 1964, and a PhD degree in Chemical  Engineering from Lehigh University in 1969.

### B.   PROFESSIONAL BACKGROUND AND EXPERIENCE PROFESSIONAL BACKGROUND AND EXPERIENCE.

While attending Lehigh University from 1964 to 1969, I was employed part-time by the E. I. Du Pont de Nemours Company in plant sites at Charleston, West Virginia, Seaford, Delaware, and Niagara Falls, New York.

After receiving my Ph.D., I was employed full-time by the E. I. Du Pont de Nemours Company from 1969 to March 1993.  There were various assignments in various locations, which are summarized below.

In 1969, I joined the Electrochemicals Department as a Research Engineer in Niagara Falls, New York. I was in charge of scale-up engineering for polymerization reactions and development of systems for corrosion control in acidic distillation columns.

In 1972, I was transferred to LaPorte, Texas, which was the site where these developments were to be commercialized in a new chemical plant for the production of polyvinyl alcohol adhesives.  I was responsible for development and then operation of granulation polymerization, waste incineration, acid distillation, catalyst testing, reactor optimization, waste injection well design and repair, and process utilities.  I also contributed in training activities around safety and industrial hygiene as well as obtaining environmental permits.

In 1977, I was transferred to the Plastics Department at Orange, Texas, which was a site where various polymerization processes were operated.  I was responsible for development and technical support of various processes for producing polyethylene copolymers: high pressure, low pressure, and extrusion.  I created a position within the research department of managing the transfer of technology for various business centers within the Plastics Department between laboratories and commercial operation.  I practiced this craft for four years at the multiple sites in Orange, Texas; Beaumont, Texas; La Porte, Texas; Victoria, Texas; Corpus Christi, Texas; and Du Pont Canada's site in Sarnia, Ontario, Canada.

In 1983, I was transferred, as the first Du Pont employee, to Du Pont's then wholly-owned subsidiary – Continental Oil Company, in Ponca City, Oklahoma.  My responsibilities were to

provide development and technical support to various chemical and polymer plants operated by Conoco.  This covered operations at more than six plants as well as several pilot plants.

Within Conoco Research and Development, I became a Project Coordinator responsible for new business development.  This included identification and development of businesses where both Du Pont and Conoco shared strategic capabilities and interests. One such business involved a proprietary flow meter device for which a team I led was awarded three U.S. patents.

In 1989, I was assigned by Du Pont and Conoco to develop equipment and chemistry for cleaning technology to replace CFC-113 ("Freon") as a core business.  My work involved extensive contact with end-use customers to learn of their needs and preferences, as well as partner firms who produced equipment for use with Du Pont's proprietary cleaning chemicals.  A significant portion of my time was spent in understanding competitive patent art, as well as that owned by Du Pont, so that a proprietary basis for commercialization could be found. This work involved cleaning operations from critical cleaning in a clean room to metal cleaning in a working machine shop.

In 1993, du Pont sold this business.  At this point, I retired from Du Pont to pursue independent opportunities as a professional consultant in industrial cleaning.

In 1993, along with several associates, I formed Creative EnterpriZes with the mission of providing consulting service to both end-use and supplier firms with technology to replace CFC-113 and other ozone-depleting chemicals.  Nearly all work on the ozone-depletion initiative was confidential for a variety of reasons.  However, it included: cleanliness evaluation and monitoring, product and process selection, market research about industry needs, parts drying, and drying equipment, management of hazardous chemicals, ultrasonic and megasonic cleaning and rinsing, control of particles via hydrodynamic and other means, solvent substitution and selection, and many other affairs.

I have taught cleaning science by invitation to firms and chaired and/or presented technical papers at conferences and seminars such as Clean-Tech, NEPCON West, APEX, the Phoenix Solvent Substitution Workshops, the NASA Aerospace Conferences on Environmental Affairs, the International Conferences on Elimination of CFCs, International Symposia on Particles on Surfaces: Detection, Adhesion and Removal, International Symposia on Contact Angle, Wettability and Adhesion and others.

Clients which can be identified include the Los Angeles South Coast Air Quality Management District (SCAQMD), the U.S. Air Force, the U.S. Army, the U.S. Department of Justice, and the U.S. Environmental Protection Agency.  I am frequently asked to comment on pending environmental regulations.

In 1999, I ceased being part of and managing an organization providing consulting services.  I accepted an assignment which lasted through 2002 to a single client, Flo-Matic, located in Rockford, Illinois.  At Flo-Matic, we developed technology for cleaning machinery parts without use of cleaning solvents or detergents.  This technology is protected by U.S. Patent No. 6,368,414.  Ultrasonic force was applied and controlled for this purpose.  We designed, constructed, and sold several machines to local machine shop customers. The machines provided dry parts through management and application of compressed air, and efficient waste disposal through a unique evaporator.  My assignment with Flo-Matic was terminated in 2002 due to lack of funding.

In 2002, I initiated work to complete a self-generated challenge.  The industrial cleaning industry has little unbiased science-based literature about the foundations of its technology.  Moreover, the industry had little or no literature about management of that technology.  Since 2003, I have endeavored to develop and provide that literature through lasting resources: books, magazine columns, training courses, and occasional papers.

In 2004, I started a self-funded and managed project to invent and develop replacement cleaning technology for users doing, or wanting to do, solvent cleaning. The approach, long

laying fallow, is to use binary azeotropes to replace single solvents.  I have developed, with the University of Massachusetts (Lowell) Toxic Use Reduction Institute, basic data teaching and showing how this technology works.  I have recently filed a U.S. patent application covering a broad-based new approach to solvent cleaning which involves new process technology and new cleaning formulations.  This work is ongoing with more tests being conducted.

A copy of my Curriculum Vitae is attached hereto as Exhibit "A."

**C.   LIST OF PUBLICATIONS AND PATENTS.**

I have written and published more than 300 articles, papers, columns, etc., since 1993.  I have provided technology description, evaluation, and introduction as a monthly or periodic columnist as a:

- Monthly columnist of *Products Finishing* Magazine from 1994 to 1998.

- Periodic Author for *Precision Cleaning* Magazine from 1994 to 1999.

- Periodic Author for *Parts Cleaning* Magazine from 1997 to 1999.

- Monthly columnist of *Metal Finishing* Magazine from 1999 to the present.

- Monthly columnist of *Controlled Environments* Magazine (formerly A2C2 Magazine) from 1999 to the present.

- Monthly columnist of *Galvanotechnik* Magazine, published in Germany, from 2006 to the present.

- Periodic Author for *Process Cleaning* Magazine from 2006 to 2007.

I authored *The Handbook of Parts Cleaning Without CFCs -- How to Manage the Change*, published in 1994 by Hanser-Gardner, ISBN 1569901430.

I wrote the first of three volumes as references about cleaning technology: *Management of Industrial Cleaning Technology and Processes*, published by Elsevier in September 2006, ISBN 0-0804-48887. The second volume, *21st Century Solvent Cleaning Technology*, will be published by Elsevier in 2009, ISBN 1856174328.

I wrote chapter 11 in Charles Hansen's *Hansen Solubility Parameters: A User's Handbook, Second Edition*, CRC, 2007, ISBN 0849372488. The chapter is titled "Use of Hansen Solubility Parameters to Identify Cleaning Applications for 'Designer' Solvents."

I wrote, with Dr. Don Grey, chapter 2.11 in B. F. Kanegsberg's *Handbook for Critical Cleaning*, CRC, 2000, ISBN 0849316553. The Chapter is titled "Enclosed Cleaning Machines."

A list of my U.S. patents includes:

- United States Patent No. 4,718,443 (Mass Flowmeter Apparatus). Issued Jan 12, 1988.

- United States Patent No. 4,962,666 (Mass Flowmeter Apparatus). Issued ct 16, 1990.

- United States Patent No. 4,987,914 (Mass Flowmeter Apparatus). Issued Jan 29, 1991.

- I wrote United States Patent No. 6,368,414 for Flo-matic.

**<u>Relevant Technical Awards.</u>**

- Five special corporate bonuses for extraordinary technical achievement while employed by Du Pont / Conoco. These involved significant financial compensation.

- My flow meter development team received several corporate awards for entrepreneurial achievement.

- Under my leadership, and with an application I filed, Flo-Matic was awarded the prestigious R&D Magazine's "R&D 100" Award for the year 2000, for development of a new cleaning system that cleans without cleaning chemistry.

- In 1981, I was recognized as a Professional Engineer (TX #49848) .

**<u>Relevant Teaching Experience</u>:**

I was appointed to the consulting faculty of the University of Tennessee as a thesis adviser, the advisory board of Precision Cleaning magazine, and as an adviser to the Commonwealth of Massachusetts' Toxic Use Reduction Institute (TURI).

**D.   PRIOR EXPERIENCE AS AN EXPERT WITNESS.**

I have provided consulting service in three legal cases. All were settled without my involvement in trial.

From June 1997 to July 1998, I provided expert witness consulting service to the U.S. Department of Justice (DOJ) in San Francisco. My contact was Mr. Mike Rockett (now with Pillsbury Corporation).  DOJ was concerned about emissions of volatile organic compounds (VOCs) from a machine designed to apply coatings to cans produced by Campbell's Soup (CS). The

project was in two phases – each associated with a different case. The first phase was to provide answers to a list of fifteen questions about control of VOC emissions from machinery. Answers were used to guide DOJ investigation of actions by CS relative to a compliance order. The second phase was to provide guidance, via answers to additional questions, about alternatives to VOC-based coating agents and whether the one chosen by CS was acceptable given the compliance order. Both cases were settled before trial.

In December 1999, I worked with Mr. William D. Wilson of the Mound Cotton & Wollan (MCW) law firm, Newark New Jersey. MCW represented a firm accused of illegally dumping trichloroethylene (TCE) solvent from a vapor degreasing operation. The legal issue was whether or not the soil contamination was due to a continuous leak of pure TCE or frequent dumping of a mixture of TCE and oil from a degreasing operation. The technical issue was whether an analysis of the contaminated soil was more consistent with the deliberate action of illegal dumping, or frequent negligence in not managing control of degreasing fluids. There was an opposing expert witness, also a former Du Pont employee, who testified that the contamination represented nearly pure TCE but couldn't explain the presence of some oil. I modeled the degreasing operation, using published data, and showed that the contamination was

characteristic of normal degreasing of oil from metal parts --
representative of possible negligence but not illegal action. My
work and opinion was reviewed in a deposition by opposing
council. My written report was accepted.  There was a
negotiation to which I was not a party, and I believe there was
no trial.

   In August 2005, I was retained by a Nancy McDonald of the
law firm of Bressler, Amery & Ross (BAR), Florham Park, New
Jersey.  Her client had ordered and later received an aqueous
cleaning machine from a well-known firm.  Her client felt the
machine was not within specifications, did not perform as
expected, and that no business solution was possible.  Her
client wanted me to make a site inspection and write a letter to
that effect.  I proposed a site inspection with operational
testing of the machine against both specifications and normal
industry standards of quality.  Immediately afterward I was told
that my services were no longer required and that I would be
paid for my time.

   **E.   DISCLOSURE OF COMPENSATION ARRANGEMENT.**

   Under my arrangement with plaintiff, I am to be compensated
at my usual rate of $325 per hour.  In addition to such hourly
compensation, I am to be furnished with, or reimbursed for, my
expenses.  No part of my compensation is contingent upon the

outcome of this case, any issue in it, or the positions or opinions that I express.

## II.   DATA AND OTHER INFORMATION CONSIDERED IN FORMING OPINIONS.

I have considered the following data and other information in forming the opinions expressed in this report:

**Patents-in-Suit and Prosecution History:**

- U.S. Patent No. 6,019,110 to McClure and McNally entitled "Parts Washing System" issued February 1, 2000 (the '110 Patent);

- U.S. Patent No. 6,074,491 to McClure and McNally entitled "Parts Washing System" issued June 13, 2000 (the '491 Patent);

- U.S. Patent No. 6,374,835 to McClure, McNally, Marks and Strange entitled "Parts Washing System" issued June 13, 2000 (the '835 Patent);

- U.S. Patent No. 6,451,125 to McClure, McNally, and Strange entitled "Parts Washing System" issued September 17, 2002 (the '125 Patent);

- U.S. Patent No. 6,440,226 to McClure, Strange, McNally, and Marks entitled "Parts Washing System" issued August 27, 2002 (the '226 Patent);

- Non-Provisional Application Number 08/315,902 filed September 30, 1994, abandoned;

- Non-Provisional Application Number 08/577,753 filed December 22, 1995 leading to issuance of the '491 Patent;

- Non-Provisional Application Number 08/841,463 filed April 22, 1997, leading to issuance of the '110 Patent;

- Non-Provisional Application Number 09/097,439 filed June 15, 1998, leading to issuance of U.S. Patent No. 6,095,163;

- Non-Provisional Application Number 09/491,227 filed January 25, 2000, leading to issuance of the '125 Patent;

- Non-Provisional Application Number 09/515,731 filed February 29, 2000, leading to issuance of the '835 Patent;

- Non-Provisional Application Number 08/370,898 filed January 10, 1995, abandoned

- Non-Provisional Application Number 08/511,506 filed August 4, 1995, leading to issuance of U.S. Patent 6,218,387;

- Non-Provisional Application Number 08/867,586 filed June 2, 1997, leading to issuance of U.S. Patent 6,218,387;

- Non-Provisional Application Number 09/925,634 filed August 8, 2001, leading to issuance of the '226 Patent.

**U.S. Patents:**

- U.S. Patent No. 3,522,814 to Olson entitled *Washer for Parts and the Like*;

- U.S. Patent No. 5,376,183 to Gatt entitled *Method for Cleaning Industrial and Domestic Articles and Surfaces Contaminated With Organic or Lipophilic Wastes*;

- U.S. Patent No. 5,401,413 to Gatt entitled *Method for Enhancing The Biodegradation of Biodegradable Organic Wastes*;

- U.S. Patent No. 5,492,139 to Lashmett entitled *Method and Apparatus for Remediating Contaminated Material*;

- U.S. Patent No. 3,960,728 to Otzen entitled *Disposable Filter Apparatus*;

- U.S. Patent No. 5,427,128 to Minkin entitled *Parts Washer Temperature/Pressure Equalization System*.

- U.S. Patent No. 5,561,059 to Kaiser entitled *Substrate Bioavailability Enhancing Chemical Mixture For Use In Bioremediation*.

- U.S. Patent No. 5,128,262 to Lindoerfer entitled *Microbial Decontamination of Soils Contaminated With Hydrocarbons, In Particular Mineral Oils by Microbial Oxidation*.

- U.S. Patent No. 5,132,224 to Meuller entitled *Biological Remediation of Creosote And Similarly Contaminated Sites*.

- U.S. Patent No. 5,217,616 to Sanyal entitled *Process and Apparatus For Removal of Organic Pollutants From Waste Water*.

- U.S. Patent No. 5,364,789 to Guinn entitled *Microbial Cleaner*.

- U.S. Patent No. 5,368,411 to Losack entitled *Method and Apparatus For The On-Site Cleaning of Contaminated Soil*.

- U.S. Patent No. 5,137,694 to Copeland entitled *Industrial Solid Detergent Dispenser And Cleaning System*;

- U.S. Patent No. 5,257,171 to Hara entitled *Electric Control Apparatus For Dishwashing Machine*;

- U.S. Patent No. 7,303,908 to Overland entitled *Bioremediation Assembly;*

- U.S. Patent No. 4,365,383 to Bartlett entitled *Cleaning Apparatus For Components*;

- United States Patent No. 3,813,342 to Cooperman entitled *Cleaning Compositions*;

- United States Patent No. 5133,893 to Thom et al entitled *Enzymatic Detergent Composition*;

- United States Patent No. 5,339,845 to Huddas entitled *Cleaning Apparatus and Method For Fuel and Other Passages*; and

- United States Patent No. 5,454,878 to Bala et al entitled *Method For Removing Hydrocarbon Contaminants From Solid Materials*.

**Foreign Patent Publications:**

- European Patent Application 0 309 432 to Hakansson entitled *A Cleaning Method and Apparatus Therefor* (hereinafter "Hakansson-1");

- WIPO Publication WO 92/16314 to Hakansson entitled *A Device for Cleaning Objects, Preferably of Metal* (hereinafter "Hakansson-2");

**Pleadings and Discovery from the instant Civil Action:**

- Complaint

- First Amended Complaint

- Defendants' Answer and Counterclaim

- Plaintiff's Second Amended & Restated Infringement Contentions – including exhibit attachments

- Defendants' Response to Infringement Contentions [Dkt. 42]

- Defendants' First Amended Response to Plaintiff's Infringement Contentions [Dtk. 53]

- Defendants' Second Amended Response to Plaintiff's Infringement Contentions [Dtk. 83]

- Defendants' Third Amended Response to Plaintiff's Infringement Contentions [Dtk. 157]

- Defendants' Response to Plaintiff's Second Amended Infringement Contentions [Dtk. 191]

- Defendants' Response to Plaintiff's Second Amended Infringement Contentions [Dkt. 209]

- Joint Claim Construction Statement

- Defendants' Memorandum in Support of Defendants' Proposed Claim Construction

- Plaintiff's Initial Claim Construction Brief

- Defendants' Memorandum in Response to Plaintiff's Initial Claim Construction Brief

- Plaintiff's Claim Construction Response Brief

- Plaintiff's Claim Construction Hearing Presentation – PowerPoint Slides

- Defendants' Claim Construction Hearing Presentation – PowerPoint Slides

- The Court's Claim Construction Order dated July 17, 2007

- Defendants' Supplemental Response To Plaintiff's Interrogatories No. 1-6

**Miscellaneous Documents:**

- JWalter's Owner's Manual – Model BR-100 (Exhibit "E" hereto)

- JWalter's Owner's Manual – Model BR-200 (Exhibit "F" hereto)

- JWalter's Owner's Manual – Model IO-400 (Exhibit "G" hereto)

- JWalter's Owner's Manual – Model IO-200 (Exhibit "H" hereto)

**Deposition Testimony:**

I have considered transcripts of the following depositions:

- Deposition transcript of Pascal Lavallee and exhibits;

- Deposition transcript of Claude Vandemeulebrooke and exhibits;

- Deposition transcript of Werner Schudel and exhibits;

- Deposition transcript of Jerry Shields (of Graymills) and exhibits;

- Deposition transcript (rough draft) of Bert Overland.

**Other matters or materials considered:**

- Genesis testing procedures and data (Exhibit "J" hereto)

- Personal observation of the operation of the IO-200 parts washer;

- Personal experience with end users of "sink-on-a-drum" cleaning machines, and with design of oil-water separators.

**Interviews and Personal Knowledge:**

During the course of formulating my opinions and conclusions and preparing my report, I have relied on my personal knowledge and experience in the cleaning industry. In addition, I have personally interviewed the following persons in connection with my engagement:

- Co-inventor Tom McNally

- Co-inventor Francis Marks

**III. ASSUMPTIONS AS TO MATTERS OF LAW AND LEGAL PRINCIPLES**

In conducting my analysis and rendering my opinions and conclusions, I have made the following assumptions. In particular, I have attempted to avoid offering opinions on the state of the law or on matters in dispute between the parties that are questions of law that I am advised by counsel for ChemFree are for the Judge to decide.

In certain instances identified below, Counsel for ChemFree has advised me as to certain legal standards that apply to the overall subject matter of my report. For the purposes of rendering this report, I have assumed that the statements regarding legal standards and principles provided to me by counsel are accurate statements of the law. The citations to legal authority below have all been provided to me by counsel as part of the underlying basis for my assumptions.

**A. ASSUMPTIONS AS TO LEGAL PRINCIPLES.**

**Patent Infringement:** Whoever, without authority, makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent, therefore, infringes the patent.  35 U.S.C.A. § 271.

**Contributory Infringement:** Whoever offers to sell or sells within the United States ... a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer.  35 U.S.C. §  271(c).

**Contributory Infringement - Staple Article of Commerce:** A staple article of commerce is one that was not specifically designed for use with a patented combination and has substantial, efficient, and feasible uses outside of the patent. *Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 576 (E.D. Pa. 1989), *aff'd without opinion*, 889 F.2d 1100 (Fed. Cir. 1989); 4 Patent Law Fundamentals § 20:7 cited in *Mckesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 2005 WL 2346919 (E.D.Cal.).

**Contributory Infringement - Staple Article of Commerce:** A staple article of commerce capable of substantial non-infringing

use is something that has uses other than as a part or component of the patented product and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.  AIPLA's Model Patent Jury Instructions, ©2005, American Intellectual Property Law Association; *see also* 35 U.S.C. 271(c); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365 (Fed. Cir. 2001); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990); *Preemption Devices, Inc. v. Minn. Mining & Mfr. Co.*, 803 F.2d 1170, 1174 (Fed. Cir. 1986); 4 Donald S. Chisum, Patents § 17.03[3], n.6 (2002).

**Inducement to Infringe**:  Whoever actively induces infringement of a patent shall be liable as an infringer.  35 U.S.C.A. § 271(b).

**Patent Infringement Analysis**:  Contains two steps:  (i) construing the claims; and (ii) applying the construed claims to the accused device.  *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1329, 76 U.S.P.Q.2d 1641 (Fed.Cir. 2005).

**Claim Construction**:  The process of construing the claims of a patent is a matter of law for the Court to decide.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-389, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996).

**Patent Infringement Analysis**:  Although the construing of patent claims is a question of law for the Court, applying the properly construed claims to the accused device is a question of

fact that is part of the patent infringement trial. *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1329, 76 U.S.P.Q.2d 1641 (Fed.Cir. 2005).

**Claim Construction**:  The only terms that need to be construed are those that are in controversy, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed.Cir. 1999).

**Claim Construction**:  In construing the claims of a patent, Courts are authorized to receive and consider extrinsic evidence which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises and that, in appropriate circumstances, such extrinsic evidence can shed useful light on the relevant art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317, 75 U.S.P.Q.2d 1321 (Fed.Cir. 2005).

**Claim Construction**:  Generally, extrinsic evidence is less significant than the intrinsic record in determining the legally operative meaning of patent claim language. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317, 75 U.S.P.Q.2d 1321 (Fed.Cir. 2005).

**Claim Construction and Indefiniteness**:  A determination of claim definiteness requires a construction of the claims according to the familiar canons of claim construction. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1340-41 (Fed.Cir. 2003).

**Claim Construction and Indefiniteness**:  An analysis of claim indefiniteness is inextricably intertwined with claim construction.  *Energizer Holdings Inc. v Int'l Trade Comm'n*, 435 F.3d 1366, 1368 (Fed.Cir. 2006).

**Claim Construction and Indefiniteness**:  A claim is not indefinite merely because it poses a difficult issue of claim construction; if the claim is subject to construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness.  *Bancorp Servs., L.L.C. v Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed.Cir. 2004).

**Claim Construction and Indefiniteness**:  A claim is not indefinite merely because it is hard to construe.  *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed.Cir. 2003).  If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, the claim is sufficiently clear to avoid invalidity on indefiniteness grounds.  *Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371, 1375 (Fed.Cir. 2001).

**Patent Infringement**:  Infringement is determined by comparing the accused apparatus, process or device with the properly and previously construed claims.  *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed.Cir. 1985) (*en banc*).

**Patent Infringement - the "all limitations rule":**  An accused product or process is not infringing unless it contains each limitation of the claim, either literally or by an equivalent.  *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed.Cir. 2005).  Thus, to prove infringement, the patentee must show that the accused device meets each claim limitation either literally or under the doctrine of equivalents.  *Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1377 (Fed.Cir. 2005).

**Infringement Under the Doctrine of Equivalents:**  An element in the accused product is equivalent to a claim limitation if the differences between the two are insubstantial to one of ordinary skill in the art.  *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1150 (Fed.Cir. 2004).

**Infringement Under the Doctrine of Equivalents:**  In determining whether the differences between the accused product and the claim limitation are insubstantial, the Court may determine whether the accused product performs the same function, in the same way, with the same result.  *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1150 (Fed.Cir. 2004).

**Patent Infringement - Whether Claim Preamble Limits the Scope of a Claim:**  If the body of the claim sets out the complete invention, the preamble is not ordinarily treated as

limiting the scope of the claim.  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed.Cir. 2006).

**Patent Infringement - Whether Claim Preamble Limits the Scope of a Claim:**  The preamble is regarded as limiting if it recites essential structure that is important to the invention or necessary to give meaning to the claim.  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed.Cir. 2006).

**Patent Infringement - Whether Claim Preamble Limits the Scope of a Claim:**  When the limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed.Cir. 2006).

**Sequence of Steps In Method Claims:**  The steps claimed in a method claim are necessarily listed one after another, the order in which the steps appear in the claim language ordinarily does not impose an implicit limitation that the steps be performed in the same sequence as they appear in the claim.  *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342 (Fed.Cir. 2001).

**Sequence of Steps In Method Claims:**  Steps can be required to be preformed in sequential steps when the method steps implicitly require that they be performed in the order written.  *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed.Cir. 1999).

**Means plus function limitation in a claim:**  An element in a claim for a combination may be expressed as a means or step for

performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.  35 U.S.C. § 112.

**Means plus function limitation in a claim**:  A number of factors may be considered when determining the scope of a means-plus-function limitation, including the language of the claim, the patent specification, the prosecution history of the patent, other claims in the patent, and expert testimony.  This list is not exhaustive and reasonable inferences by the fact finder are appropriate.  *VenTel Inc. v. Hayes Microcomputer Products, Inc.*, 982 F.2d 1527, 1543 (Fed.Cir. 1992).

**Means plus function limitation in a claim**:  Identification of corresponding structure may embrace more than the preferred embodiment.  When multiple embodiments in the specification correspond to the claimed function, proper application of section 112, paragraph 6 generally reads the claim element to embrace each of those embodiments.  *Micro Chemical, Inc. v. Great Plains Chemical Co*. 194 F.3d 1250, 1258 (Fed.Cir. 1999).

**Means plus function limitation in a claim**:  If all other limitations in a claim are literally met, and the accused device is shown to contain an equivalent of the structure which was identified in the means-plus-function limitation of the claim

and disclosed in the specification, infringement is said to be "literal" as distinguished from infringement under the doctrine of equivalents. *Data Line Corp. v. Micro Technologies, Inc.*, 813 F.2d 1196, 1201 (Fed.Cir. 1987).

**Means plus function limitation in a claim**: Drafters of means-plus-function claim limitations are statutorily guaranteed a range of equivalents extending beyond that which is explicitly disclosed in the patent document itself. *McGinley v. Franklin Sports, Inc.*, 262 F.2d 1339, 1347 (Fed.Cir. 2001).

**Means plus function limitation**:  Interchangeability is a useful consideration when determining whether two specific structures are equivalents. *Rite-Hite Corp v. Kelley Co. Inc.*, 819 F.2d 1120, 1124 (Fed.Cir. 1987).

**Means plus function limitation in a claim**:  When all of the claimed features are present in the accused system, the use of additional features does not avoid infringement. *Vulcan, Eng. Co., Inc. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1375 (Fed.Cir. 2002).

**Means plus function limitation in a claim**:  For the relevant structure in the accused device to be equivalent to the structure in the written description, differences between the two must be insubstantial.  The structure in the accused device must perform the claimed function in substantially the same way to achieve substantially the same result as the structure in the

written description.  *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1333 (Fed.Cir. 2005).

**Patent infringement – capable of infringing use**:  A device capable of infringing use constitutes infringement even though it may be capable of some non-infringing uses.  *Sunrise Medical HHG, Inc. v. Airsep Corp.*, 95 F.Supp.2d 348 (W.D.Pa. 2000); *Bell Comm. Research, Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 622-23 (Fed.Cir.1995).

**B.   ASSUMPTIONS AS TO MATTERS OF FACT.**

I have assumed that each and every one of the accused Bio-Circle parts washers, together in combination with the accused Bio-Circle L cleaning fluid, has been:  (i) imported into the United States; (ii) sold in the United States; and/or (ii) used in the United States during the term of each and every one of the patents-in-suit.

With respect to ChemFree's method patents that have been asserted against Walter, i.e., U.S. Patent Nos. 6,074,491; 6,440,226; and 6,451,125; I have assumed that each and every one of the accused Bio-Circle parts washers, together in combination with the accused Bio-Circle L cleaning fluid, has been used for cleaning oil or grease contaminants from parts and bioremediating the contaminants in the United States, either by Walter or by an end user customer.  I have further assumed that such end user customer who cleaned such parts did so in accordance with the instructions for use contained within the

Owner's Manual that Walter has published for each of its respective, accused parts washers.

I have personally inspected a model BR-200 model parts washer.  I have assumed that the IO-400 model parts washer is essentially identical to the BR-200 model except as noted by Walter in its response to Interrogatory Number 10(c).

## IV.   SUMMARY OF OPINIONS & CONCLUSIONS.

### A.   OVERVIEW OF THE FIELD OF THE INVENTION.

The invention at issue in this litigation relates to the field of cleaning and, more precisely, the cleaning of "parts" that have been contaminated with oil, grease, and/or similar organic materials.  The predominant chemical composition of the organic contaminants are relatively long chain hydrocarbon molecules.  In the context of the field of the invention, the term "hydrocarbon" is somewhat of an oversimplification.  Practitioners in the field recognize that "hydrocarbon" contaminants are not comprised exclusively of molecules containing only hydrogen and carbon atoms.  These contaminants are soils removed from parts.  They may be heat transfer agents, cutting or forming fluids, lubricants, rust protectants, or buffing and polishing compounds.  Some soils are derived from crude oil as simple hydrocarbons.  Others are synthetic in that they are produced by chemical reactions where other atoms such as oxygen, chlorine, nitrogen are added to the hydrocarbon

structure to provide certain properties in use.  These synthetic soils may be more difficult to remove from parts than the more simple hydrocarbon soils.  An example is chlorinated paraffins commonly used as lubricants.

The "parts" involved are typically, but not necessarily, metal.  Metal parts can become fouled or contaminated with hydrocarbons in a variety of ways.  Operational machinery in the field typically uses oil and grease as lubricants.  Operational machinery that has been in the field for any length of time will frequently become fouled with excess lubricants, as well as with a variety of soils that come into contact with and adhere to the lubricants during use.  The word "fouled" includes lubricants which have been oxidized under long-term exposure under heat, and these "semi-cured" materials are considerably more difficult to remove.  In addition, newly machined parts may be formed using a variety of cutting and shaping tools.  Many such tools use cutting oil as a coolant and/or lubricant to reduce friction and heating during the cutting or parts manufacturing process.

A used, operating machine taken from the field may need to have its component parts cleaned before undergoing repair. Similarly, newly machined parts may need to be cleaned of cutting or forming or buffing fluids or oils from the manufacturing process before undergoing assembly or painting.

There are at least two aspects of parts cleaning.  The
first aspect, obviously, is removing the contaminant from the
part so that the part is "clean."  The process of doing this
typically generates waste as a by-product.  The "waste" is
comprised of the contamination that has been removed from the
part, the used or "spent" cleaning agent, and often "tramp"
materials from the cleaning machine.  Disposal of such waste by-
product is a second aspect of the cleaning process.  Such waste
disposal frequently raises environmental concerns which are more
difficult to surmount than are the concerns associated with
producing cleaned parts.

**B.   OVERVIEW OF THE PATENTED INVENTION.**

In a broad, general sense, the ChemFree patents disclose
and claim a parts washer, and/or methods for its use, which make
it easy to comply with local environmental regulations.
ChemFree appears to be a company that has been commercially
successful in adapting oil and grease clean-up and
bioremediation technology to a parts washer.  ChemFree's
invention addresses both aspects of the cleaning process
discussed in the preceding section;  i.e., (i) cleaning the
part; and (ii) dealing with the waste by-product generated by
the cleaning process.  The ChemFree patented invention includes:
(i) an apparatus to remove soil from parts that contain it; (ii)
a cleaning fluid to perform that task; and (iii) bioremediation

microorganisms.   The microorganisms biodegrade (oxidize)

hydrocarbon contaminants that are washed off of parts by the

cleaning fluid in the apparatus.   The products of oxidation are

harmless:  $CO_2$ and water.   Use of bioremediation technology

allows the cleaning fluid to be repeatedly used for washing

operations without the fluid becoming saturated with

contaminants so that the fluid loses its cleaning effectiveness.

Use of bioremediation oxidative technology also reduces or

eliminates the environmental problems associated with disposal

of used cleaning fluid.

>    **C.    PATENT PROSECUTION HISTORY.**

I am generally aware, from reviewing the prosecution

history of ChemFree's patents and other materials, that there

was a dispute between co-inventor James McClure and the other

co-inventors over, among other things, ownership and

inventorship of the various ChemFree patents.   Issues regarding

the McClure dispute are outside of the scope of my engagement

and will not be discussed at length in this report.

>    **1.    History of the "Parent" or '902 Application.**

ChemFree's patents all stem from non-provisional patent

application serial number 08/315,902, which was filed on

September 30, 1994.   The '902 Application was initially filed

with 22 claims.   On April 2, 1996, the PTO issued an Office

Action subjecting the claims to a restriction requirement.   On

or about April 29, 1996, the applicant responded to the
restriction requirement by canceling claims 2 through 22.  On
June 24, 1996, the PTO issued an Office Action rejecting claim 1
(the only remaining claim) over U.S. Patent No. 5,492,139 to
*Lashmett*.  An alternative grounds for rejection was given on the
grounds of obviousness over a combination of U.S. Patent No.
3,522,814 to *Olsen* in view of U.S. Patent No. 5,376,183 to *Gatt*.
The applicant responded to the Office Action with an Amendment
in which claim 1 was narrowed by adding a limitation directed to
a filter pad.  The applicant also submitted remarks
distinguishing claim 1 from *Lashmett*, *Olsen*, and *Gatt*. On March 6,
1997, the PTO issued an Office Action rejecting claim 1 (as
amended) as obvious over *Lashmett* in view of either U.S. Patent
No. 3,960,728 to *Otzen*; or U.S. Patent No. 4,365,383 to *Bartlett*; or
U.S. Patent No. 5,339,845 to *Huddas*; or U.S. Patent No. 5,454,878
to *Bala*.  A second grounds for rejection was given as being
obvious over a combination of EPO '432 (hereinafter "*Hakansson-1*")
in view of *Otzen*, *Bartlett*, *Huddas*, or *Bala*.  *Hakansson-1* was recognized
as not possessing a filter.  A third grounds for rejection was
given as being obvious over a combination of *Otzen* in view of
either *Gatt*, *Lashmett* or *Hakansson-1*.  It does not appear that
ChemFree responded to the March 1997 Office Action.  On November
28, 1997, the PTO issued an Office Action notifying ChemFree

that the '902 Application was considered to be abandoned. However, by November of 1997, ChemFree had already filed at least four continuation applications claiming priority to the '902 parent application.  Also, by this time, ChemFree held a fifty percent ownership interest in three additional pending applications filed by Advanced Bioremediation Systems, Inc. ("ABS" a.k.a. "ZYMO").

### 2.  Prosecution History of the '491 Patent.

ChemFree filed non-provisional application number 08/577,753 on December 22, 1995, with the original 22 claims from the parent, '902 Application.  A Preliminary Amendment filed with the application cancelled claim 1 and added claims 23 through 41.

On July 19, 1996, the PTO issued an Office Action rejection claims 23 - 41 as obvious over U.S. Patent No. 5,427,128 to *Minkin* in view of *Gatt* or *Lashmett*.  The applicant filed a response on or about January 21, 1997, cancelling four claims and amending others.  Pending claim 35, which became issued claim 1 was amended by adding the following limitation:

> Accumulating the microorganisms and the hydrocarbons adjacent a fluid surface defined by the fluid in the tank; and biodegrading the hydrocarbons proximate to the fluid surface.

[January 21, 1997 Amendment, p. 3].  Applicant also submitted remarks distinguishing *Minkin*, *Gatt* and *Lashmett*.  Among other

things, Applicant pointed out that *Minkin* employed a high pressure
spray cabinet with no mention of microbial activity.  Applicant
distinguished *Gatt* as employing liposomes rather than
bioremediation microbes.  Also, Applicant distinguished *Lashmett*
as placing parts in a submerged basket and then soaking the
basket full of parts in a heated, agitated bath such that the
oil contaminants float to the surface of the bath where they are
removed by a mechanical skimming operation.

On April 16, 1997, the PTO issued an Office Action
subjecting the pending claims to a restriction requirement.
Applicant eventually responded on or about October 27, 1997, and
elected to pursue a group of claims drawn to a cleaning method
as opposed to an alternative group of claims directed to an
apparatus.  An Examiner's Interview took place on February 6,
1998, indicating that an agreement had been reached as to an
Examiner's Amendment.  On February 23, 1998, the PTO issued a
Notice of Allowability allowing pending claims 35 through 41.
The Notice of Allowability contained an Examiner's Amendment in
which the language "biodegradable, non-toxic, non-caustic,
nonflammable oil dispersant cleaner and degreaser" was inserted
before the word "fluid" in issued claim number 1, the only
independent claim.  Such amendment was necessarily incorporated
by reference into issued claims 2 through 7 which all depend
from claim 1.  The '491 Patent issued on June 13, 2000.

### 3.   Prosecution History of the '110 Patent.

On April 22, 1997, ChemFree filed non-provisional patent application number 08/841,463, which eventually issued as U.S. Patent No. 6,019,110 on February 1, 2000.  The '110 Patent claims priority back to the filing date of the '902 parent application. The application was filed with the original 22 claims from the '902 application.  The application was filed with a Preliminary Amendment cancelling original claim 1 and adding new claims 23 through 37.  The Preliminary Amendment contains a "Remarks" section that states that the application was intended to replace the '753 application (which eventually issued as the '491 Patent).  Apparently, the Applicant was under the misapprehension that the '753 application had been inadvertently abandoned.  In the Remarks section of the Preliminary Amendment, Applicant distinguished the *Minkin* reference as teaching a high pressure spray cabinet that did not employ any bioremediation technology.  Applicant also distinguished *Lashmett* as submerging fouled parts in a heated bath so that oil contaminants would rise to the surface of the bath where they would be mechanically skimmed off.  Finally, the *Gatt* reference was distinguished as using liposomes to aid in the cleaning process, but otherwise having no teaching of using microbes to bioremediate hydrocarbon contamination.

On November 12, 1997, the PTO issued an Office Action

- 34 -

subjecting claims 23 through 37 to a restriction requirement.
Applicant responded on or about December 9, 1997, and elected to
prosecute claims 23 to 30 drawn to a cleaning apparatus.
Thereafter, the Applicant and Examiner conducted a telephone
interview on February 6, 1998, which presumably occurred
contemporaneously with the interview discussed in the preceding
section discussing prosecution of the '491 Patent.  The
Interview Summary indicates that an agreement was reached.  On
February 23, 1998, the PTO issued a Notice of Allowability
indicating the allowance of pending claims 23 through 30.  The
Notice further indicated an agreement to enter an Examiner's
Amendment adding the following language to allowed claim 23
(soon to be issued claim 1), "biodegradable, non-toxic, non-
caustic, nonflammable oil dispersant cleaner and degreaser,"
which was inserted immediately before the word "fluid."  After a
lengthy delay in the patent office, the '110 Patent subsequently
issued on February 1, 2000.  It does not appear that the elected
claims (application claims no. 23 through 30) were ever
subjected to an Office Action rejection over prior art before
being allowed with the above referenced Examiner's Amendment.

### 4.   Prosecution History of the '125 Patent.

#### a. The '439 Application.

On June 15, 1998, ChemFree filed non-provisional
application number 09/097,439, which eventually issued as U.S.

Patent No. 6,095,163.  The file wrapper for the '439 Application
serves as a daughter to the '110 Patent discussed above and as
the immediate parent to U.S. Patent No. 6,451,125.  The '439
Application was initially filed with the original 22 claims from
the parent '902 Application.  Claims 2 through 22 were then
cancelled, leaving only claim 1 pending. On March 15, 1999, the
'439 Application received an Office Action rejection for the
then only pending claim, which was the original claim 1 from the
parent '902 Application.  Claim 1 was rejected under 35 U.S.C. §
102 as being anticipated by *Hakansson-1* and by *Lashmett*.  Eventually,
the Applicant overcame the rejection by cancelling claim 1 and
adding an entirely new set of claims that have not been asserted
against Walter in this litigation and, therefore, will not be
discussed further in this report.

### b. The '227 Application.

Before the Applicant responded to the Office Action in the
'439 Application, the Applicant filed non-provisional
application number 09/491,227, which lead to issuance of the
'125 Patent.  The '227 Application was filed on January 25,
2000, with the original 22 claims from the '902 Application.  On
or about February 23, 2000, the Applicant filed a Preliminary
Amendment, adding new claims 23 through 46.  On September 6,
2000, the PTO issued an Office Action rejecting all pending
claims (23 through 46) as a double patenting rejection over

ChemFree's previously issued patents stemming from the same parent application.  In addition, certain claims were rejected as being obvious over *Lashmett* in view of *Gatt* '183.  Certain other claims were rejected as being obvious over *Lashmett* and *Gatt* further in view of U.S. Patent No. 5,137,694 to *Copeland* or U.S. Patent No. 5,257,171 to *Hara*.  Five dependent claims were considered to contain allowable subject matter, but they were required to be re-written so as not to depend from a rejected base claim.  The Applicant responded to the Office Action with a certain First Amendment on or about December 11, 2000.  A Terminal Disclaimer was submitted to overcome the double patenting rejection.  Certain claims were amended as detailed below.

### i. Amendments to Issued Claim 1 (Application Claim 23).

Original claim 23, which issued as claim 1, was amended by adding certain language as shown below:

> Original Claim 23:  A method or removing hydrocarbons from a part and disposing of the hydrocarbons, the method comprising the steps of:  suspending, in a biodegradable, non-caustic, non-flammable, oil dispersant, cleaning and degreasing fluid, microorganisms to which the fluid is non-toxic; bringing the part into contact with the fluid; allowing the fluid to remove the hydrocarbons from the part, and allowing the microorganisms to biodegrade the hydrocarbons.

> Amended Claim 23 (Issued Claim 1):  A method of removing hydrocarbons from a part and disposing of the hydrocarbons, the method comprising the steps of: suspending, in a biodegradable, non-caustic, nonflammable, oil dispersant,

cleaning and degreasing fluid, microorganisms to which the
fluid is non-toxic; <u>providing a parts washer having at
least a basin for receiving the part and a tank below the
basin for containing the fluid</u>; bringing the part into
contact with the fluid <u>containing the microorganisms</u>;
allowing the fluid to remove the hydrocarbons from the part
<u>and flow into the tank</u>; and allowing the microorganisms
<u>within the fluid</u> to biodegrade the hydrocarbons.

Asserted and issued dependent claims 4 and 5 depend from
the foregoing claim.  Claim 4 adds the limitation – "maintaining
the fluid at a desired temperature, wherein a heater heats the
reservoir."  Claim 5 adds the limitation – "filtering the fluid
after the bringing step."  Apart from amendments to their
supervening independent claim, Claims 4 and 5 were not amended
during prosecution.

  **ii. Amendments to Issued Claim 6 (Application
   Claim 28).**

Original claim 28, which issued as independent claim 6, was
amended by adding certain language as shown below:

Original claim 28:  A method of cleaning hydrocarbons from
an object, said method comprising the steps of introducing
hydrocarbon biodegrading microorganisms into a
biodegradable, non-caustic, non-flammable, oil dispersant
cleaning and degreasing fluid that is non-toxic to the
microorganisms, wherein the fluid is within a washing
apparatus including a tank, a basin, a pump and conduit
assembly, and a flowpath defined between the basin and the
tank through which the fluid flows, and bringing the part
into contact with the fluid.

Amended claim 28 (Issued Claim 6):  A method of cleaning
hydrocarbons from an object, said method comprising the
steps of introducing hydrocarbon biodegrading micro-
organisms into a biodegradable, non-caustic, non-flammable,
oil dispersant cleaning and degreasing fluid that is non-
toxic to the microorganisms, wherein the fluid is <u>contained</u>

within a washing apparatus including a tank, a basin, a
pump and conduit assembly, and a flowpath defined between
the basin and the tank through which the fluid flows <u>from
the basin into the tank</u>, [and] bringing the part into
contact with the fluid <u>and the microorganisms in the basin,
removing hydrocarbons from the part, draining the fluid
with the hydrocarbons and microorganisms contained therein
from the basin to the tank and retaining the hydrocarbons
within the fluid in the tank while the microorganisms
biodegrade the hydrocarbons</u>.

Asserted and issued dependent claim 7, which adds the

limitation – "positioning a filter within the flowpath" -

depends from the foregoing claim.  Apart from amendments to its

supervening independent claim, Claim 7 was not amended during

prosecution.

### iii. Amendments to Issued Claim 12
### (Application Claim 35).

Original claim 35, which issued as independent claim 12,

was amended by adding certain language as shown below:

Original Claim 35 (as of February 23, 2000):  A method of
cleaning hydrocarbons from a part in a parts washer, the
method including the steps of: exposing the part within a
basin to a biodegradable, non-caustic, non-flammable oil
dispersant cleaning and degreasing fluid; and providing a
flowpath for the fluid between the basin and a tank,
wherein microorganisms, to which the fluid is non-toxic,
are disposed within the parts washer for biodegrading
hydrocarbons associated with the part.

Amended Claim 35 (Issued claim 12) A method of cleaning
hydrocarbons from a part in a parts washer, including
exposing the part within a basin to a biodegradable, non-
caustic, non-flammable oil dispersant cleaning and
degreasing fluid <u>to clean the hydrocarbons from the part</u>,
[and] providing a flowpath for the fluid between the basin
and a tank, wherein microorganisms, to which the fluid is
non-toxic, are disposed within the <u>fluid</u> [parts washer] for
biodegrading hydrocarbons associated with the part,

<u>allowing the fluid with the hydrocarbons contained therein
to flow into the tank, and retaining the hydrocarbons
within the tank for sufficient time for the microorganisms
to substantially biodegrade the hydrocarbons.</u>

Asserted and issued dependent claims 16, 17, 18, 19, and 21
depend from the foregoing claim.  Claim 16 incorporates the
following limitation from claim 13 – "heating the fluid" and
further adds the limitation – "wherein the heating step includes
a step of heating the fluid within the tank."  Claim 17
incorporates the following limitation from claim 13 – "heating
the fluid" and further adds the limitation – "measuring the
level of the fluid, wherein the heating step is responsive to
the step of measuring the level."  Claim 18 incorporates the
following limitation from claim 13 – "heating the fluid" and
further adds the limitation – "measuring the temperature of the
fluid, wherein the heating step is responsive to the step of
measuring the temperature."  Claim 19 incorporates the following
limitation from claim 13 – "heating the fluid" - and the
following limitation from claim 18  - "measuring the temperature
of the fluid, wherein the heating step is responsive to the step
of measuring the temperature" - and further adds the limitation
– "measuring the level of the fluid, wherein the heating step is
responsive to the step of measuring the level."  Claim 21
depends directly from independent claim 12 and adds the
following limitation – "interposing a filter within the

flowpath." Apart from amendments to the supervening independent claim 12, Claims 13, 16, 17, 18, 19, and 21 were not amended during prosecution.

In the Amendment of December 11, 2000, the Applicant offered certain Remarks to distinguish the claims, as amended, from the prior art cited by the Examiner in the Office Action of September 6, 2000. Among other things, the Applicant distinguished *Lashmett* as teaching removing oil from the top surface of the cleaning fluid by skimming as opposed to retaining the hydrocarbon contaminants in the tank and biodegrading the contaminants in the tank. Applicant distinguished *Gatt* as teaching the use of liposomes as opposed to bioremediation microorganisms. Finally, the Applicant requested that the Examiner reconsider the rejection over *Copeland* and *Hara* without further comment distinguishing those two references from the amended claims. On May 8, 2001, the PTO issued a Notice of Allowability of the then pending, amended claims. The '125 Patent eventually issued on September 17, 2002.

### c. Prosecution History of the '835 Patent.

On February, 29, 2000, Applicant filed non-provisional application number 09/515,731, which eventually issued as U.S. Patent No. 6,374,835. The '731 Application was filed as a continuation of the '227 Application discussed immediately above, which lead to issuance of the '125 Patent. The '731

Application was filed with the original 22 claims that had been filed with the parent '902 Application in 1994.  A Preliminary Amendment was also filed with the application that cancelled claims 2 though 7 and 11 through 22 and amended original claims 1 and 8.  The Preliminary Amendment also added new claims 23 through 25.

On April 25, 2001, all of the pending claims were rejected on the grounds of double-patenting over previous ChemFree patents and/or patent applications stemming from the same parent application.  Applicant responded to the Office Action on or about July 30, 2001, by substituting amended claims 24 and 25. Applicant also added new dependent claims 26 through 33. Applicant also filed a Terminal Disclaimer to obviate the PTO's double patenting rejection.  On August 13, 2001, the PTO issued a Notice of Allowance as to all pending claims.  The Applicant filed an Information Disclosure Statement on or about August 21, 2001.  The Examiner initialed the reference cited on the IDS on or about December 10, 2001.  On January 15, 2002, the PTO issued a supplemental Notice of Allowability as to all pending claims. The '835 Patent issued on April 23, 2002.  It does not appear that any of the claims of the '835 Patent were ever narrowed by amendment in order to distinguish over a prior art reference cited by the Examiner in an Office Action rejection during prosecution of the '835 Patent.

5.   **Prosecution History of the '226 Patent.**

   a.   **Claim of Priority to the '902 Parent Application.**

As mentioned previously, the ultimate "parent" or '902 Application was filed by or on behalf of ChemFree Corporation on September 30, 1994, and was prosecuted by ChemFree's patent attorney, Lou Isaf.  Although the '902 Application eventually went abandoned, ChemFree, by and through Mr. Isaf, filed a series of continuation applications that eventually issued as the '110 Patent, '491 Patent, '125 Patent, and '835 Patent discussed above.  The succeeding paragraphs are directed at patent applications filed by and prosecuted by ChemFree's co-owner, Advanced Bioremediation Systems, Inc. ("ABS"), otherwise sometimes known as ZYMO International, Inc. ("ZYMO").

### b.   The '898 Application.

On January 10, 1995, non-provisional patent application number 08/370,898 was filed with the PTO.  The '898 Application was filed by or on behalf of ABS and was prosecuted by ABS' patent attorney, Alice Martin.  The '898 Application was filed as a continuation application to the '902 Application and claimed priority back to the filing date of the '902 Application.  Whereas the '902 Application named four individuals as co-inventors, including James McClure, the '898 Application initially named only Mr. James McClure as the sole inventor.

As far as I have been able to determine, the '898 Application is the only patent application of ChemFree that was not examined by PTO Examiner Frankie Stinson.  The '898 Application was examined by Lorna Douyon.

I am advised by counsel for ChemFree that, at the time that the '898 Application was filed, there was a dispute between ChemFree and McClure as to the ownership and/or inventorship of the parts washer invention disclosed in the subject patent applications.  I am further advised by counsel for ChemFree that, particularly during 1995 and 1996, ABS may have deliberately concealed from ChemFree and its patent attorney certain developments that took place before the PTO in connection with prosecution of the '898 Application.  Generally,

however, the facts, circumstances and issues related to the ownership / inventorship dispute with McClure are outside of the scope of my engagement with ChemFree and will not be discussed in any detail in this report.  The '898 Application was originally filed with 16 claims, which claims were not copied from or otherwise identical to any of the original claims from the parent '902 Application.

On July 12, 1995, the PTO issued an Office Action. The Office Action noting that claims 1 through 10 and claims 11 through 16 were drawn to inventions that fit into different classifications and that claims 11 through 16 were withdrawn on account of a restriction requirement.  Claims 1, 3, 4, 7, 8 and 9 were rejected under 35 U.S.C. § 112 as being indefinite.  In addition, Claims 1 through 10 were rejected as anticipated under 35 U.S.C. § 102 or, in the alternative, as obvious under 35 U.S.C. § 103, over U.S. Patent No. 3,813,342 to *Cooperman*.  In addition, Claims 1 through 10 were rejected over U.S. Patent No. 5,133,893 to *Thom*.  Finally, Claims 1 through 10 were rejected over U.S. Patent No. 5,364,789 to *Guinn*.  On July 31, 1995, a personal interview was conducted attended by Alice Martin, James McClure, Rob Whiteman, and two PTO Personnel.  The Interview Summary indicates that an agreement was not reached.

Thereafter, on or about August 4, 1995, the Applicant filed a Response to Office Action adding claims 17 through 20,

cancelling claims 7 through 10, and amending claims 1, 2, 3, and 5.  The Applicant also submitted remarks distinguishing the claims, as amended, over the prior art cited in the Office Action.[1]  On September 22, 1995, another interview with the Examiner took place, this time over the telephone.  The Examiner's Interview Summary indicates that an agreement was reached with respect to some or all of the claims in question.  The interview summary further indicated that the Applicant's representative authorized the patent examiner to cancel certain claims, amend certain claims, and add one new claim.  Thereafter, the PTO issued a Notice of Allowability on October 2, 1995, indicating allowance of pending claims 2-3, 5-6, 19, and 21, as amended.

On or about January 25, 1996, Applicant filed a Supplemental Information Disclosure Statement with the PTO citing and enclosing certain pleadings and papers filed in a state court lawsuit between ChemFree and James McClure.  Thereafter, on March 21, 1996, Applicant's attorney wrote a letter to the PTO Examiner expressing concern that an unidentified person had contacted the PTO and allegedly requested that the '898 Application not be allowed to issue.

---

[1]On August 4, 1995, Applicant for the '898 Application filed a divisional Application which was accorded serial number 08/511,506.  The '506 Application eventually issued as United States Patent No. 6,571,810 on June 3, 2003.

On May 28, 1996, the PTO issued a letter to Applicant's attorney indicating that the application was being withdrawn from issue.  On May 31, 1996, the PTO issued an Office Action rejecting the previously allowed claims in view of ChemFree's pending parent application (i.e., the '902 Application discussed above).  The rejection was made "Final" by the PTO.  On December 2, 1996, Applicant filed an appeal from the final rejection of May 31, 1996.  Thereafter, on June 2, 1997, Applicant filed a Communication to the Board Of Patent Appeals and Interferences, notifying the PTO that Applicant had filed a continuing application in lieu of filing an appeal brief.  Thereafter, on July 15, 1997, the PTO issued a Notice of Abandonment on the grounds of Applicant's failure to timely file an appeal brief.

### c.   The '586 Application.

On June 2, 1997, Applicant for the '898 Application filed a continuing application which was accorded serial number 08/867,586, which eventually issued as U.S. Patent No. 6,318,387 on November 20, 2001.  This application corresponds to the application described in the preceding paragraph wherein Applicant notified the PTO in the '898 Application that it was filing a continuation application in lieu of filing an appeal brief.  Whereas the '898 Application had named only James McClure as the sole inventor and whereas the May 31, 1996, Office Action rejection in the '898 Application recognized a

discrepancy in the named inventorship between the parent application (i.e., the '902 Application discussed above) and the '898 Application, the '586 Application named the same four inventors as were originally named in the '902 parent application.

On June 8, 1999, the PTO issued an Office Action subjecting the application to a restriction requirement.  It further appears that examination of the application changed from Lorna Douyon in the '898 Application to Frankie Stinson in the '586 Application.[2]  The PTO reminded Applicant to petition for a change of inventorship in the event that the elected claims did not have the same scope of inventorship as the originally submitted claims.

On December 8, 1999, Applicant filed a response to the Office Action and elected to pursue claims 1 through 6 and cancelled the remaining claims.  Applicant also petitioned to delete co-inventors McNally and Strange.

On March 2, 2000, the PTO issued an Office Action rejecting claims 1 through 6 as a double patenting rejection over other co-pending applications that were being prosecuted by or on behalf of ChemFree.  On June 2, 2000, Applicant filed a response

---

[2] It should also be noted that Frankie Stinson had also examined the '506 Application, which was another continuing application that stemmed from the '898 Application.

to the Office Action and inquired of the PTO whether it could overcome the double patenting rejection by cancelling claims 1 through 5, or whether a terminal disclaimer should be filed.

Thereafter, on July 18, 2000, the PTO issued a new Office Action that allowed claim 6 and rejected (again) claims 1 through 5.  On or about February 5, 2001, Applicant filed a Response to the July 18, 2000, Office Action and submitted a Terminal Disclaimer to overcome the double patenting rejection as to claims 1 through 5.  Then, on February 26, 2001, the PTO issued a Notice of Allowability indicating the allowance of pending claim 1 through 6.

A supplemental Notice of Allowability issued on April 13, 2001.  A further supplemental Notice of Allowability issued on April 26, 2001.  Yet, a further supplemental Notice of Allowability issued on September 7, 2001.  The '586 Application issued as U.S. Patent No. 6,318,387, on November 20, 2001.  In the meantime, Applicant had filed another continuing application on August 8, 2001.

### d. The '634 Application.

Prior to issuance of the '586 Application as the '387 Patent, Applicant filed application serial number 09/925,634, on August 8, 2001.  The '634 Application was filed with six new claims.  Sometime on or about April 9, 2002, the '634 Application received a first action allowance.  The '634

Application thereafter issued as U.S. Patent No. 6,440,226, on August 27, 2002.

**D.    OVERVIEW OF THE TEACHINGS OF THE SPECIFICATION.**

Although there are five patents asserted by ChemFree against Walter in this litigation, all five patents stem from the same "parent" patent application and, therefore, are based on a common specification.  A typical embodiment of the ChemFree invention has the appearance of a free standing utility sink. There is an open basin towards the top of the unit and a holding tank for fluid resides under the basin.  Dirty parts are placed into the sink or basin for cleaning.  An aqueous cleaning fluid circulates from the holding tank beneath the sink upward into the sink where the parts are washed.  A pump and conduit assembly transports the fluid from the holding tank, upward and through a faucet and into the sink.  The cleaning fluid is typically poured onto or sprayed over the dirty part to wash it. The washing operation may be facilitated by brushing, scrubbing, or similar agitation.  Contaminants removed from the part then flow with the cleaning fluid through a drain aperture in the bottom of the sink and eventually flow into the holding tank.

In certain embodiments of the invention, the fluid and any contaminants flowing with the fluid encounter a filter as they circulate through the parts washer.  The filter traps solid particulate matter of sizes larger than the porous openings of

the filter.   Soluble cleaning fluid with small-sized emulsified or suspended hydrocarbon contaminants pass through the filter. The cleaning fluid eventually returns to the holding tank where it is available to be pumped, once again, to the sink for additional washing operations.

The ChemFree invention uses microorganisms to biodegrade hydrocarbon contaminants washed from the dirty parts.   The primary decomposition products of this process are carbon dioxide ($CO_2$), a harmless gas that is released into the atmosphere, and water ($H_2O$).   The cleaning fluid serves as a beneficial host environment for the microbes.   The ChemFree patent specification teaches that the cleaning fluid is "non-toxic" to the microorganisms.   ['125 Patent, Col 5, line 66 - Col 6, line 3].   Furthermore, by virtue of the bioremediation of the microbes, the cleaning fluid is capable of lasting for an extended period of time.   ['125 Patent, Col 7, line 19 - 21].

Aqueous cleaning fluids with surfactants typically clean better at temperatures above room temperature.   In addition, at least certain species of hydrocarbon digesting microbes exhibit increased metabolic activity at temperatures above room temperature.

One embodiment of the ChemFree invention possesses a temperature and fluid level control system.   A heater, temperature sensor, and thermostat sub-system maintains the

fluid at a desired temperature.  ['125 Patent, Col 7, line 33 -
51].  A fluid level sensor senses the depth of the cleaning
fluid in the holding tank and sends a cut-off signal to the
heater if a fluid low-level condition is detected.  ['125
Patent, Col 7, line 52 - 57].

If the fluid level gets too low, there is a danger that the
parts washer will overheat.  This could mean that oil and grease
contaminants may experience prolonged contact with the heater
element resulting in a fire, or more likely that the oil,
contaminants, and cleaning detergents will degrade on contact
with the hot heater element thereby ruining it as a useful
entity.  The low fluid level cut-off function reduces these
dangers, and further protects workers from being exposed to hot
water and chemicals which could easily burn human skin or eye
tissue.

### E.  THE MEANING OF DISPUTED CLAIM TERMS.

I have been advised by counsel for ChemFree that claim
construction is a question of law for the Court.[3]  I have further
been advised by counsel for ChemFree that the parties have
stipulated to the meaning of many of the claim terms used in the
asserted patents.  Such agreement is embodied in the parties'

------

[3]  See Assumptions; *Markman v. Westview Instruments, Inc.*, 517 U.S.
370, 388-389, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d
1461 (1996).

Joint Claim Construction Statement, a copy of which is attached to this report as Exhibit "B."

On or about May 8, 2007, Walter submitted a letter to the Court advising the Court that Walter was withdrawing its contentions as to certain claim terms and that it was adopting ChemFree's proposed constructions as to such terms.  A copy of that letter is attached to this report as Exhibit "C."

I have been further advised by counsel for ChemFree that the Court issued an Order on July 17, 2007, construing certain disputed claim terms.  A copy of such Order is attached to this report as Exhibit "D."

Throughout my infringement analysis in this report, I have endeavored to apply the meanings of terms as set forth in:  (i) the "stipulated to" section of the Joint Claim Construction Statement; (ii) ChemFree's proposed construction of disputed claim terms set forth in the Joint Claim Construction Statement that were accepted and adopted by Walter in the May 8, letter; and (iii) the July 17, 2007, Claim Construction Order.

### V.   <u>INFRINGEMENT ANALYSIS</u>.

I am advised by Counsel for ChemFree that ChemFree's assertion of patent infringement against Walter is summarized in Plaintiff's Second Amended And Restated Infringement Contentions, filed with the Court on or about June 1, 2007, as Docket No. 168.  Except as expressly stated otherwise in the

remainder of this report, I am in general agreement with ChemFree that all four of Walter's accused parts washers, when combined with Walter's accused cleaning fluid, meet all of the claim limitations of the asserted claims, either literally or under the doctrine of equivalents.

## A.    DESCRIPTION OF THE ACCUSED DEVICES.

In its infringement contentions, ChemFree asserts that Walter has imported into the United States and sold four "models" of parts washers, denominated as the BR-100,[4] BR-200, IO-400, and IO-200, that are accused of infringing ChemFree's asserted patents.

- An owner/operator manual for the BR-100 is attached to this report as Exhibit "E."

- An owner/operator manual for the BR-200 is attached to this report as Exhibit "F."

- An owner/operator manual for the IO-400 is attached to this report as Exhibit "G."

- An owner/operator manual for the IO-200 is attached to this report as Exhibit "H."

It is my understanding based on my review of the owner's manuals and other product literature that Walter publishes for its accused parts washers and further based on conversations

---

[4] I understand that there was initially some confusion as to whether a model designated as the BR-150, which is similar in appearance to the BR-100, was imported into the United States. I have been informed by counsel for ChemFree that Walter has represented to ChemFree that the BR-150 has not been imported into the United States.

with ChemFree's counsel that ChemFree intends to prove at trial that Walter markets and sells its accused parts washers in combination with Walter's Bio-Circle L cleaning fluid.  It is also my understanding based on conversations with counsel that ChemFree has asserted direct infringement against Walter, as well as contributory infringement and inducement to infringe.

In addition, I note that ChemFree's five asserted patents contain both apparatus claims and method claims.  With respect to the apparatus claims, the scope of my engagement with ChemFree is to analyze whether the accused parts washers, when combined with Bio-Circle L cleaning fluid, satisfy the claim limitations of the asserted apparatus claims.  With respect to the method claims, I have been asked to assume that the accused apparatus and cleaning fluid have been combined and used in the United States in accordance with the instructions for use set forth in the respective owner's manual and other product literature, including the Bio-Circle web site.

1.    **The BR-100**



**Figure 1 – Photograph of BR-100.**

I have been informed that Walter sold the Bio-Circle BR-100 model parts washer sometime in the 2003 to 2004 time frame and that sales of this product in the United States were discontinued prior to commencement of this litigation.  I have been informed that the BR-100 is a private label product manufactured by Graymills, a company that I am familiar with that is headquartered in the Chicago area.  I am further informed that Walter's sales of this product in the U.S. were limited.

The BR-100 emulates the external appearance of a "sink-on-a-drum" parts washer.  The lower "drum" portion houses a holding tank for cleaning fluid.  Within the holding tank is a pump and conduit assembly for transporting fluid to the nozzle above the

sink.  The holding tank also houses a heating element,
temperature probe, and float switch.



**Figure 2 – Interior view of BR-100 Tank.**

Cleaning operations in the BR-100 take place in the basin
or sink.  Cleaning fluid is pumped through the nozzle onto a
soiled part in the basin.  The cleaning fluid, together with
contaminants washed from the part, then flow through a drain
hole in the approximate center of the basin.  The cleaning fluid
and contaminants then encounter a "Three part filter" disposed
in the drain hole.

 

Figure 3 – Basin of BR-100 is shown on left with elements
of the "Three part filter.  Note drain hole in center of
the basin.  On the right is a view of the underside of the
basin looking up through the drain hole.


The filter separates and traps particulate matter from the

draining cleaning fluid and hydrocarbon contaminants.  After

passing through the filter, the cleaning fluid and hydrocarbon

contaminants free fall by gravity into the fluid reservoir in

the tank.

## 2.   The BR-200



**Figure 4 – Photograph of BR-200.**

I have been informed that Walter's Bio-Circle BR-200 model parts washer was on sale in the United States at the time that this litigation began in late 2004.   I have been informed that the BR-200 has been discontinued and has been replaced by the IO-400 model discussed below.   I have also been informed that the BR-200 is a private label product manufactured by Denios, a European company.

The BR-200 has a holding tank for cleaning fluid that resides beneath an open basin.   Within the holding tank is a pump and conduit assembly for transporting fluid to the nozzle above the sink.   The holding tank also houses a heating element, temperature probe, and float switch.



**Figure 5 – Interior of BR-200 Tank showing heating element (A), float switch (B), temperature probe (C), pump (D), and pump intake (E).**

Cleaning operations in the BR-200 take place in the basin or sink.  Cleaning fluid is pumped through the nozzle onto a soiled part in the basin.  The cleaning fluid, together with contaminants washed from the part, then flow through a drain hole in the approximate center of the basin.  The cleaning fluid and contaminants then encounter a filter disposed in the drain hole.  The BR-200, depending on the configuration, uses one of two types of filter.  The first configuration uses a plastic "coffee" filter shown below.  A second configuration uses a "Three part filter" as shown above for the BR-100 model.



**Figure 6 – BR-200 Basin. "Coffee" Filter (held up by hand) fits into drain hole in center of basin.**

The filter separates and traps particulate matter from the draining cleaning fluid and hydrocarbon contaminants.  After passing through the filter, the cleaning fluid and hydrocarbon contaminants free fall by gravity into the fluid reservoir in the tank.

### 3.    The IO-400.

I have been informed that Walter's Bio-Circle IO-400 model parts washer was introduced into the United States market after commencement of this litigation as a replacement for the BR-200. I have also been informed that the IO-400 is a private label product manufactured by Denios, a European company.



**Figure 7 – Walter Bio-Circle IO-400 Parts Washer.**

The IO-400 is essentially identical to the BR-200 except for the addition of a second filter, which is located between the pump and the faucet/nozzle.  [Walter's Interrogatory Response No. 10(c)].  Thus, the foregoing discussion regarding the BR-200 is applicable to the IO-400.  The IO-400 uses the "Three part filter" system which is described in connection with the BR-100 above.  The IO-400 owner's manual refers to the "Three part filter" as a "Sediment Trap."

        4.    **The IO-200.**

I have been informed that Walter's Bio-Circle IO-200 model parts washer was introduced into the United States market after

this litigation began.  I have also been informed that the IO-200 is a private label product manufactured by Prado, a Canadian company.



**Figure 8 – Walter Bio-Circle IO-200 Parts Washer**

The IO-200 has a holding tank for cleaning fluid that resides beneath an open basin.  Within the holding tank is a pump and conduit assembly for transporting fluid to the nozzle above the sink.  The holding tank also houses a second pump and conduit assembly for transporting fluid to a heater unit located just outside of the tank.  The holding tank also houses a temperature probe and a float switch.



**Figure 9 – Interior of IO-200 Tank showing two
pumps, a float switch, and a temperature probe.**

Cleaning operations in the IO-200 take place in the basin
or sink.  Cleaning fluid is pumped through the nozzle onto a
soiled part in the basin.  The cleaning fluid, together with
contaminants washed from the part, then flow through a drain
hole in the approximate center of the basin.  The cleaning fluid
and contaminants then encounter a wire mesh screen filter
disposed in the drain hole.



**Figure 10 – Filter components of IO-200 disposed
in drain hole in center of the basin.**

The filter separates and traps particulate matter from the draining cleaning fluid and hydrocarbon contaminants.  After passing through the filter, the cleaning fluid and hydrocarbon contaminants free fall by gravity into the fluid reservoir in the tank.

The IO-200 differs from the BR-100, BR-200, and IO-400 in that the heater is located just outside, rather than inside, the tank.  The IO-200 heater is disposed in a chamber or canister which is supplied with cleaning fluid by a pump that is disposed in the tank adjacent to the pump that supplies fluid to the cleaning faucet/nozzle in the basin.  The heater chamber is furnished with a pressure switch that sends a cut-off signal to the heater if a low pressure condition is detected.  Such a low pressure condition will exist if the level of cleaning fluid in the tank drops below the level of the pump intake that supplies fluid to the heater.

### 5.    Bio-Circle L Cleaning Fluid.

All of the Walter Bio-Circle parts washers use Bio-Circle L$^{TM}$ cleaning fluid.  Walter Bio-Circle L is an aqueous cleaning fluid whose primary constituent by weight and volume is water.



**Figure 11 – Excerpt from Walter Bio-Circle L Cleaning Fluid Web Page.**

The active cleaning agent within the fluid is a surfactant. Walter advertises Bio-Circle L cleaning fluid as a "surfactant-based" cleaner.



# A REVOLUTIONARY NEW WAY TO CLEAN PARTS WITHOUT SOLVENTS

Whether you are in a garage, a mill, a large fabrication shop or a maintenance department, clean parts are an important component to make your business run more efficiently. Parts cleaning is an essential part of this process and while the need for clean parts has not changed, the manner in which we clean them has and will continue to change in the years to come.

One such new technology is bioremediation. Although bioremediation has been taking place for millions of years in nature it has only recently been applied successfully with water-based cleaners as an alternative to industrial parts cleaning with solvents. Bio-Circle's bioremediation process breaks down oil and grease into harmless components of $CO_2$ and $H_2O$.

Achieve the cleaning efficiency of solvents with a high performance surfactant-based cleaner while microorganisms break down the hazardous waste in a self-generating closed-loop cleaning system. Bio-Circle eliminates the need for monthly service calls to haul away your hazardous waste stream of used solvents contaminated with oil and grease.



**Winner of the Wall Street Journal 2006 Technology Innovation Award**



**Cleaning Technology Award "Best Innovation 2005"**

**Figure 12 – Excerpt from Walter USA's 2007 Product Catalog.**

Walter elsewhere advertises that Bio-Circle L is pH neutral, non-toxic, biodegradable, non-flammable, has no flash-point, and is free of volatile organic compounds.

**Cleaning liquid**

2 functions:
- Provides optimal conditions for digestive activity
- Removes oil and grease from parts

Features:
- Powerful cleaning action
- pH neutral, non-toxic, biodegradable
- Non-flammable, no flash-point
- Free of VOCs, alkalines, phosphates and butyls
- Pleasant smell

Synergy between cleaner and microorganisms:
- Maximizes system benefits
- Cleaning agents do the parts cleaning
- Microorganisms keep the fluid clean

**Figure 13 – Excerpt from Bio-Circle Web Site.**

Finally, Walter advertises that Bio-Circle L contains microorganisms for bioremediating hydrocarbons.

**B.   IDENTIFICATION OF THE ASSERTED CLAIMS.**

I have been advised by ChemFree that the following claims are being asserted against both Walter defendants:

- '110 Patent (apparatus claims):  1, 2, 3, 4, 5, 6, 7, and 8.

- '491 Patent (method claims):  4, 5, 6, and 7.

- '835 Patent (apparatus claims): 8, 10, 11, and 12.

- '226 Patent (method claims): 1, 3 and 4.

- '125 Patent (method claims): 4, 5, 7, 16, 17, 18, 19, and 21.

I have been advised by counsel for ChemFree that, in order to prove infringement, the patentee (i.e., ChemFree) must show

that the accused device or method meets each claim limitation either literally or under the doctrine of equivalents.[5]

The following discussion is directed toward the matter of whether the accused Walter parts washers, used in accordance with the owner's manuals published for each respective accused parts washer satisfies each of the various limitations of the asserted claims.  Furthermore, as an alternative means of communicating my infringement analysis on a claim-by-claim basis, I have attached a claim chart to this report as Exhibit "I," which is incorporated herein by reference.

### C.   CLAIM PREAMBLES.

I understand that the "preamble" of a patent claim is an introductory phrase or clause followed by terms such as "comprising" or "including the steps of."  I have been advised by counsel for ChemFree that the preamble of a patent claim, depending on the circumstances, may or may not limit the scope of the claim.[6]

In the present case, I observe that Walter has "Acknowledged" that its accused apparatus or method satisfies the language of the preamble of each and every asserted

---

[5] See Assumptions, *supra*., *Seachange Intern., Inc. v. C-COR*, Inc., 413 F.3d 1361, 1377 (Fed.Cir. 2005).

[6] See Assumptions above; *Bicon, Inc. v. Straumann Co*., 441 F.3d 945 (Fed.Cir. 2006).

independent claim and each and every unasserted independent claim from which an asserted dependent claim depends.

I am advised by counsel for ChemFree that ChemFree is entitled to rely on Walter's acknowledgment such that ChemFree is relieved of separately "proving" that the preamble limitation (if it is indeed limiting) is met.

Otherwise and without reaching any legal conclusion as to whether the preambles should be deemed limiting, I have separately read each and every asserted independent claim, as well as each and every unasserted independent claim from which an asserted dependent claim depends and, it is my opinion that Walter's accused apparatus and/or methods satisfies the respective preambles.

For example, the preamble of Claim 1 of the '110 Patent is – "A system for cleaning hydrocarbons from a part." In my opinion, the accused Walter parts washers are most definitely systems for cleaning hydrocarbons from parts. Similarly, the preamble of claim 1 of the '491 Patent is – "A method of cleaning hydrocarbons from a part in a parts washer." In my opinion, when used in accordance with their respective owner's manuals, use of the accused Walter parts washers most definitely employs a method for cleaning hydrocarbons from a part in a parts washer.

D.   **THE CLEANING FLUID LIMITATIONS.**

The following claim limitations at issue in this litigation are related to the cleaning fluid used in an accused parts washer and/or parts washing method.

> *'110 Patent - claim 1:  a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid;*

> *'491 Patent - claim 1:  exposing the part to a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid within a basin;*

> *'835 Patent - claim 5:  a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid;*

> *'125 Patent - claim 1:  suspending, in a biodegradable, non-caustic, nonflammable oil dispersant cleaning and degreaser fluid, microorganisms to which the fluid is non-toxic;*

> *'125 Patent - claim 6: . . . introducing hydrocarbon biodegrading microorganisms into a biodegradable, non-caustic, nonflammable oil dispersant cleaning and degreaser fluid that is non-toxic to the  microorganisms;*

> *'125 Patent - claim 12:  exposing the part within a basin to a biodegradable, non-caustic, nonflammable oil dispersant cleaning and degreaser fluid to clean the hydrocarbons from the part.*

The parties have stipulated that "biodegradable" means – "capable of predominately undergoing chemical decomposition, i.e., conversion of larger, more complex molecules into smaller, less complex molecules, through microbial action.[7]

The parties have further stipulated that "non-caustic" means that – "the cleaning fluid does not burn or erode organic tissue, such as the skin of the operator, by chemical action."[8]

---

[7] Joint Claim Construction Statement, p. 7.

[8] Joint Claim Construction Statement, p. 6.

The parties have further stipulated that "oil dispersant" –
"is an attribute or characteristic of the cleaning fluid that
causes oil and grease to break up and spread out."[9]

The parties have further stipulated that "non-toxic" means
"not poisonous, not capable of causing injury or death by
chemical means."[10]

The parties have further stipulated that "said fluid is
non-toxic to said microorganisms" means that – "the fluid is
compatible with the microorganisms such that the microorganisms
are capable of living within the cleaning fluid."[11]

The parties have further stipulated that "suspend" means
"cause to be held in suspension in a fluid, to support or keep
from falling without apparent attachment as by buoyancy –
'suspend oneself in the water.'"[12]

The foregoing claim limitations do not appear to be
disputed.  Walter has previously "acknowledged" that these claim
limitations are met.[13]  I am advised by counsel for ChemFree that
ChemFree is entitled to rely on Walter's acknowledgment as an

_____

[9] Joint Claim Construction Statement, p. 2.

[10] Joint Claim Construction Statement, p. 3.

[11] Joint Claim Construction Statement, p. 3.

[12] Joint Claim Construction Statement, p. 3.

[13] Defendants' Amended Response to Plaintiff's Second
Amended Infringement Contentions, filed July 13, 2007.  [Docket
209; pp. 4, 6, 8, 10, 11, 12, 14, 16, 18, 20, 21, 22, 24, 26,
28, 30, 31, 32, 34, 36, 37, 40, 41, 42, 44, 46, 47, 50, 51, 52,]

admission such that no further proof is necessary to establish that the claim limitation is met.

Nevertheless, in my opinion, these claim limitations are met by the accused fluid.  This aspect of the invention relates to Walter's cleaning fluid, known as "Bio-Circle L$^{TM}$."  Based on the materials provided to me for review, it appears that Walter uses the same "Bio-Circle L" cleaning fluid in each of its four accused parts washer machines.  Walter's web site, MSDSs, and product literature advertise Bio-Circle L as "pH neutral," "non-toxic," "biodegradable," "non-flammable," and "no flash-point."

### E.   THE PARTS WASHER WITH BASIN AND TANK CLAIM LIMITATIONS.

The following claim limitations at issue in this litigation are related to a parts washer apparatus with a basin and tank.

'110 Patent - claim 1:  a parts washer including a tank for containing the fluid and a basin for receiving the part;

'491 Patent - claim 1: within a basin . . . between the basin and the tank;

'835 Patent - claim 5:  a parts washer including a tank for containing said fluid and a basin for receiving the part;

'226 Patent - claim 1:  . . . a first chamber . . . the second chamber;

'125 Patent B claim 1:  providing a parts washer having at least a basin for receiving the part and a tank below the basin for containing the fluid.

'125 Patent - claim 6:  . . . a washing apparatus including a tank, a basin . . .

'125 Patent - claim 16:  exposing the part with a basin . . . flow into the tank . . .

The parties have stipulated that "basin" means – "an open vessel used for holding fluids for washing."[14]   I have personally inspected the BR-200 and IO-200 and have reviewed photographs and product literature on the BR-100 and IO-400.   In my opinion, there is no question that each of the accused parts washers has both a "basin" and a "tank" and that, in each instance, the basin resides directly above the tank so that fluid can drain from the basin into the tank via gravity flow.   Walter has acknowledged this to be the case with respect to the BR-100,[15] BR-200,[16] IO-400,[17] and IO-200.[18]   I have been advised by counsel for ChemFree that ChemFree is entitled to rely on Walter's admission such that no further proof is necessary with respect to whether these claim limitations are met.

**F.   THE PUMP AND CONDUIT ASSEMBLY LIMITATIONS.**

The following claim limitations asserted in this litigation are related to a parts washer apparatus with a pump and conduit assembly for pumping the fluid from the tank to the basin:

---

[14]  Joint Claim Construction Statement, p. 1.

[15] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 4.

[16]  Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 24.

[17]  Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 34.

[18]  Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 44.

*'110 Patent - claim 1:  a pump and conduit assembly for pumping the fluid from the tank into contact with the part within the basin;*

*'835 Patent - claim 5:  a conduit assembly,*

*'835 Patent - claim 5: a pump for pumping said fluid from said tank through said conduit assembly and into contact with the part within said basin;*

*'125 Patent - claim 6:  a pump and conduit assembly .*

I have personally inspected the BR-200 and IO-200 and have reviewed photographs and product literature on the BR-100 and IO-400.  In my opinion, there is no question that each of the accused parts washers have a "pump" and a "conduit assembly" within the meaning of asserted claims.  Walter has acknowledged this to be the case with respect to the BR-100,[19] BR-200,[20] IO-400,[21] and IO-200[22].  I have been advised by counsel for ChemFree that ChemFree is entitled to rely on Walter's admission such that no further proof is necessary with respect to whether these claim limitations are met.

G.    THE "MICROORGANISM" LIMITATIONS.

The following claim limitations are related to using microorganisms to bioremediate hydrocarbons:

---

[19] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 4, 8, 12.

[20] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 24, 28, 31.

[21] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 34.37, 41.

[22] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 44, 47, 51.

*'110 Patent - claim 1: microorganisms within the parts washer for biodegrading the hydrocarbons;*

*'110 Patent - claim 1:  the microorganisms substantially sustained within and flowing with the fluid;*

*'491 Patent - claim 1: wherein microorganisms are disposed within the parts washer for biodegrading hydrocarbons associated with the part;*

*'835 Patent - claim 5: microorganisms within said parts washer;*

*'835 Patent - claim 5:  said microorganisms at least partially flowing with substantially sustained within said fluid;*

*'125 Patent - claim 1: suspending, in a biodegradable, non-caustic, non-flammable, oil dispersant, cleaning and degreasing fluid, microorganisms to which the fluid is nontoxic;*

*'125 Patent - claim 6:  introducing hydrocarbon biodegrading microorganisms into a biodegradable, non-caustic, non-flammable, oil dispersant cleaning and degreasing fluid that is non-toxic to the microorganisms,*

*'125 Patent - claim 12: wherein microorganisms, to which the fluid is non-toxic, are disposed within the fluid for biodegrading hydrocarbons.*

I have reviewed product literature on the accused Bio-Circle L cleaning fluid that is used in all of the accused parts washers.  The product literature prominently advertises that the Bio-Circle L cleaning fluid contains microorganisms and that such microorganisms are used to bioremediate hydrocarbon contaminants.  Moreover, Walter has acknowledged this to be the case with respect to the BR-100,[23] BR-200,[24] IO-400,[25] and IO-

---

[23] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 4, 6, 8, 10, 11, 12.

[24] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 24, 26, 28, 30, 31, 32, .

[25] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 34.36, 38, 40, 41. 42.

200.[26]   I have been advised by counsel for ChemFree that ChemFree is entitled to rely on Walter's admission such that no further proof is necessary with respect to whether these claim limitations are met.

### H.   THE "HEATER" AND "HEATING" LIMITATIONS.

The following claim limitations are related to using a heater to warm the cleaning fluid in the accused parts washers:

*'110 Patent - claim 1: the parts washer further includes a heater for heating the fluid;*

*'491 Patent - claim 1: heating the fluid.*

*'125 Patent - claim 13: heating the fluid.*

In its May 8, 2007 letter to Judge Camp, Walter withdrew its proposed construction of "heater for heating the fluid" and advised the Court that it was adopting ChemFree's proposed construction of "*heater for heating the fluid*" as "*an apparatus that heats or provides heat to make the fluid warmer*."   The Court has construed "heating the fluid" to mean - *making the cleaning fluid warmer while the cleaning fluid is in the tank*.

I have personally inspected the BR-200 and IO-200 and have reviewed photographs and product literature on the BR-100 and IO-400.   In my opinion, all four of the accused parts washers have heaters and, in my opinion, the heater, in each instance, is for "heating the fluid," within the meaning of the asserted

---

[26] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 44, 46, 47, 50, 51, 52.

claims.  Walter has acknowledged this to be the case with respect to the BR-100,[27] BR-200,[28] IO-400,[29] and IO-200.[30]  I have been advised by counsel for ChemFree that ChemFree is entitled to rely on Walter's admission such that no further proof is necessary with respect to whether these claim limitations are met.

## I.  THE "FLOWPATH" LIMITATIONS.

The following claim limitations relate to a "flowpath" for the transfer of fluid between the basin and the tank.

*'110 Patent - claim 1:  a flowpath defined between the basin and the tank through which the fluid flows from the basin back to the tank.*

*'491 Patent - claim 1:  providing a flowpath for the fluid between the basin and a tank;*

*'835 Patent - claim 5:  a flowpath defined between said basin and said tank through which said fluid flows between said basin and said tank;*

*'125 Patent - claim 6:  a flowpath defined between the basin and the tank through which the fluid flows from the basin into the tank;*

*'125 Patent - claim 16:  providing a flowpath for the fluid between the basin and a tank.*

From the briefing on *Markman* issues and the Court's *Markman* Order, it appears that the meaning of the term "flowpath" was a matter of serious dispute between the parties.  ChemFree

---

[27] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 4, 7.

[28] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 24, 26.

[29] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 34.36.

[30] Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions, p. 44, 46.

proposed the definition – "*path taken by the fluid*."   Walter proposed the

definition – "*structure establishing a course followed by the fluid*."   The Court

construed flowpath to mean – "*path taken by the cleaning fluid*."

In its discovery responses, Walter has given equivocal

responses as to whether the "flowpath" term is met by the

accused parts washers.   In its initial response to infringement

contentions, Walter stated:

> Defendants state, without any admission as to the proper
> construction of this claim language, that the Walter Parts
> has structure comparable to one of the possible
> constructions of a flowpath defined between a basin and a
> tank through which a fluid flows from the basin back to the
> tank.

[Docket 42].   Then, in its amended responses to Interrogatory

No. 1, dated November 11, 2005, Walter refused to give an

underlying factual basis to support a contention that the claim

limitation was not met, stating:

> Defendants object to this Interrogatory with respect to
> this claim limitation as premature because the meaning of
> this claim limitation is a conclusion of law see Markman,
> supra which has not yet been determined by the Court.
> Further Defendants' List of Proposed Claim Terms identifies
> "flowpath" as a limitation that should be construed by the
> Court.   Defendants therefore deny that the Accused
> Instrumentalities have structure or function meeting this
> limitation, either literally or under the doctrine of
> equivalents, but will supplement this response, if
> necessary, after the Court holds its Markman hearing.

[Defendants' Response to Plaintiff's First Discovery Request,

page 6].

Then, on November 30, 2005, in a further amendment to its response to Interrogatory No. 1, Walter stated:

> The Accused Instrumentalities do not infringe the '835 patent because they lack *inter alia* elements that correspond to the proper construction of the disputed term flowpath.

[Defendants' Second Amended Response to Plaintiff's First Discovery Request, page 4].

Walter's latest responses to infringement contentions was filed with the Court on July 13, 2007.  [Docket 209].  Walter responded to each of the "flowpath" terms with the single word – "Denied."   The Court's *Markman* Order is dated four days later, on July 17, 2007.  I am advised by Counsel for ChemFree that Walter had thirty days following entry of the *Markman* ruling to amend its infringement contentions under the local rules. However, it does not appear that Walter amended any of its infringement contentions in the aftermath of issuance of the *Markman* ruling.

Walter submitted its Defendants' Supplemental Response To Plaintiff's Interrogatories Nos. 1-6 on September 17, 2007. [Docket 255-3].  In its supplemental response to Interrogatory No. 1, Walter offered no underlying factual basis in support of its denial that the "flowpath" terms are met in the accused parts washers.

It is unclear to me whether Walter intended, in its September 17, 2007, interrogatory response, to abandon its

position that the flowpath terms were not met in light of the Court's *Markman* ruling that rejected Walter's proposed claim construction, or whether Walter intends to rely on its statement of November 30, 2005, as the underlying factual basis for denying that the flowpath terms are not met.

I have personally inspected the BR-200 and IO-200 and have reviewed photographs and product literature on the BR-100 and IO-400.  In each case, the only physical structure that separates the sink or basin from the tank beneath is the bottom of the sink itself.  In each of the four accused parts washers there is a circular drain hole situated at or near the center of the sink bottom.  As long as that drain hole is unobstructed, cleaning fluid will exit the sink by gravity flow through the drain hole after which the cleaning fluid will free fall, by gravity flow, into the tank.

In my opinion, each of the four accused parts washers is designed and built so that cleaning fluid will flow from the sink or basin back to the tank via gravity flow after it is used to wash parts in the basin.  As it flows back to the tank, it defines a "path taken by the fluid" as I understand the Court's claim construction order.  In each instance, that "path" happens to be through the drain hole situated in the middle of the sink bottom.  In my opinion the "flowpath" limitation is met by each and every one of the four accused parts washers.  Furthermore,

the physical structure of this particular feature is so similar between the four accused parts washers, that it is not necessary to discuss each one separately.

J.   THE "FILTER" AND "POROUS MEDIUM" LIMITATIONS.

The following claim limitations asserted in this litigation relate to a "filter" for capturing and removing particulate matter that is washed from dirty parts by the cleaning fluid.

'835 Patent - claim 8:  a filter interposed within said flowpath;

'835 Patent - claim 10:  a filter interposed within said flowpath;

'835 Patent - claim 12:  hydrocarbons and fluid pass through said filter, while particulate matter is trapped by said filter;

'226 Patent - claim 1:  passing the cleaning fluid that had contacted the part through a porous medium;

'125 Patent - claim 5: filtering the fluid;

'125 Patent - claim 7: positioning a filter within the flowpath;

'125 Patent - claim 21: interposing a filter within the flowpath.

In their Joint Claim Construction Statement, the parties agreed to the meaning of "particulate matter trapped by said filter" ['835 patent, claim 12] as "particulate matter trapped by said filter refers to the fact that the cleaning fluid flows through the filter while the particulate matter is separated from the fluid by the filter and remains in or with the filter."   [subject to separate construction of the disputed term 'filter'].[31]

---

[31] Joint Claim Construction Statement, page 4.

In addition, the parties appeared to agree that the term filtering the fluid ['125 Patent, claim 5] - means passing a liquid through a filter in order to separate out particulate matter suspended in or carried by the liquid. [subject to separate construction of the disputed term 'filter'.

Apart from the foregoing agreements, it appears from the briefing on *Markman* issues and the Court's *Markman* Order, that the meaning of the term "filter" was a hotly contested issue between the parties.  ChemFree proposed the definition – "*a porous material through which a liquid is passed in order to separate the fluid from suspended particulate matter.*"  Walter proposed the definition – "*a webbed and/or woven material having a spacing of 10 or more microns.*"

In its opening *Markman* claim construction brief, ChemFree advanced the following argument:

> There is no reason to limit the construction of the term "filter" to being made of any particular type of material or having any particular pass through rating beyond what is needed to trap particulate matter as taught by the specification.  "[I]f an apparatus claim recites a general structure without limiting that structure to a specific subset of structures, we will generally construe the term to cover all known types of that structure that are supported by the patent disclosure."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250, 48 U.S.P.Q.2d 1117 (Fed.Cir. 1998).  Under *Renishaw, supra*, the Court should construe "filter" and "porous medium" broadly to encompass all known types and structures of filters as long as they: (i) allow the cleaning fluid, microorganisms, and hydrocarbons to pass through; and otherwise (ii) trap "particulate" matter.

[Docket 115, pp. 30 - 31].

The Court's *Markman* Order construes the two terms "filter" and "porous medium" as "*a porous material through which the cleaning fluid is passed in order to trap particulate matter while allowing the cleaning fluid, hydrocarbons, and microorganisms to pass through*." Thus, it appears to me that the Court adopted ChemFree's proposed construction and underlying rationale and rejected Walter's proposed construction and underlying rationale. Consequently, I understand the Court's construction of "filter" to be a broad construction that covers all known types of "filter" structures that are supported by the patent disclosure.

In inspecting the accused parts washers and reviewing the literature and photographs of the accused parts washers, I have noted several different variations of objects that ChemFree contends are filters. Although I intend to discuss each of these objects separately below, I note that Walter made the following statement in its Infringement Contentions which appears to apply to all of the various objects that Walter interposes in the drain hole or flowpath of its parts washers.

> The fluid then passes through a drain equipped with a grated receptacle, also referred to as two-part straining device, or sediment trap. The grated receptacle has an upper metal screen and a lower metal screen, for removing fine and coarse particulate matter from the Washer fluid received through the drain.

[Docket 209, page 3]. Furthermore, I note the following language from a recently issued patent that I understand is

owned by an affiliate of Walter and that covers the accused IO-200 parts washer.

As best understood by a study of FIGS. 9 and 10, it will be understood that the bioremediation assembly 10 of the present invention includes a plurality of metal screen filters 130 which are positioned downstream of the wash basin drain which will be described hereinafter, and upstream of the opening 43 of the bioremediating reservoir 30, and which are individually operable to remove particulate matter which passes from the wash basin and through the drain thereof from the stream of bioremediating fluid which has been dispensed on an object of interest. As illustrated most clearly by references to FIGS. 9 and 10, the plurality of metal screen filters have a porosity which lie in a range of about 10 to about 40 one thousandths of an inch. Still further, it should be understood that the plurality of metal screen filters 130 have a decreasing porosity when the respective porosities of the metal screen filters are positioned or measured at increasing distances away from the drain of the wash basin, which will be described below. In this regard, the plurality of metal screen filters comprise first, second and third metal screen filters 121, 122 and 123, respectively. As best illustrated by references to FIGS. 9 and 10, the first metal screen filter 121 has a main body 124 which has a porosity of about 40 one thousandths of an inch. The main body is cup shaped, and further includes a circumscribing rim or flange 125 which is operable to rest in mating receipt there against the second metal screen filter 122. The second metal screen filter 122 has a main body 130 which is formed into an elongated an inch. The inside diametral dimension of the second metal screen filter is larger than the outside diametral dimension of the main body 124 of the first metal screen filter 121 thereby allowing the first metal screen filter to be telescopingly received, at least in part, within the second metal screen filter 122. The second metal screen filter 122 has a circumscribing rim or flange 131 which is operable to rest there against the drain of the wash basin which will be described below. Positioned in downstream relation relative to the second metal screen filter 122 is a third metal screen filter 123. The third metal screen filter has a porosity of about 10 one thousandths of an inch, and further is substantially horizontally oriented. In this regard, the third metal screen filter 123 has a main body 132 which is positioned in

spaced relation relative to the porous evaporation barrier
110 by a pair of supporting legs 133.   Still further, the
main body 132 is surrounded by a substantially vertically
disposed, and fluid impervious sidewall 134.   As should be
understood, the individual metal screen filters which have
individual porosities of 40 one thousandths; 20 one
thousandths; and 10 one thousandths of an inch,
respectively, are operable to remove particulate matter from
the bioremediating fluid 54 which drains from the wash basin
as will be described below thereby removing particulate
matter and preventing the contamination of the
bioremediating fluid 54 which is contained within the
reservoir 30.

[U.S. Patent No. 7,303,908, column 7].

Based on the foregoing language, it appears to me that the

inventor of the '908 Patent intended to communicate his

understanding that a "*metal screen filter*" is a structure that is

porous, and that the term "*porous*" may refer to either a metal

screen filter which limits passage of particles of a certain

range of sizes, or a structure containing small voids

distributed throughout a solid material where the voids allow

passage of fluid and the particles of certain ranges of size are

retained in the solid material.

### 1.   The BR-100 – "Three Part Filter."

I have reviewed, among other things, photographs of the BR-

100, a product sheet for the BR-100 identified as Plaintiff's

Exhibit 321 from the Shields deposition and the BR-100 Owner's

Manual identified as Plaintiff's Exhibit 139 from the Claude

Vandemeulebroocke deposition (also Exhibit "E" hereto).



**Figure 14 – BR-100 Basin with 3-part filter elements removed from drain hole.**

In Exhibit 321, in the upper left-hand corner of the second page, there is a graphical depiction of the object that fits into the drain hole of the sink.  The graphical depiction is accompanied by the following text – "*3-part filter system which separates fine and coarse waste particle*."  In the lower right corner of the same page is a graphical depiction of a cylindrically shaped object accompanied by the following text – "*replacement foam sponge filter*."

In the Owner's Manual, on page 3, there is a graphical depiction of item "J" that mimics the graphical depiction in the upper left hand corner of Exhibit 321.  Item "J" is further described as a "*Three part filter*" comprised of:  (i) a stainless steel grating; (ii) a foam sponge filter; and (iii) a grated receptacle.

Page 4 of the Owner's Manual instructs the operator to "*place grated receptacle, foam sponge filter, and stainless steel grating into the sink drain hole.*" Page 6 of the Owner's Manual contains a section captioned "Recommended Maintenance" that states, in part, as follows:

> Inspect grated receptacle, foam sponge filter and stainless steel grating, (J) daily. Sponge and receptacle should be emptied of accumulated solid waste and disposed of outside of the parts washer in order to extend the life of the solution. To assure proper drainage, rinse out foam sponge filter daily using Bio-Circle L solution in the unit and re-install it promptly to minimize loss of solution due to evaporation.

Finally, at page 8 of the Owner's Manual, there is a caption for "Trouble Shooting Guide" with an item under the heading "Sink Stops Up," where it explains that "*Sink will fill up if three-part filter (J) is dirty or clogged.*"

In my opinion, as defined in the Court's construction of the word "filter," the "filter" limitations of the '835, '226, and '125 patents are satisfied by the device referred to in the BR-100 Owner's Manual as the "three part filter." In addition, as defined in the Court's construction of the word "filter," in my opinion, the limitation is satisfied by the "foam sponge filter" considered alone, as well as by the "grated receptacle" considered alone. This is because the sponge and the grated receptacle are each porous materials through which cleaning fluid is passed.

I have reviewed Walter's Interrogatory Responses at pages 27-34, 36-40, and 45-46.  [Docket 255-3].  I consider Walter's Interrogatory Responses, as they relate to the "three part filter" of the BR-100 parts washer to be factually and scientifically in error.

Walter's interrogatory statement that "*the sponge is a dense material that functions as an evaporation barrier and does not filter because the fluid leaks to the sides during operation*" [see e.g. page 27] is belied by the instructions in the Owner's Manual to empty the sponge filter of solid waste on a daily basis and to rinse out the foam sponge filter on a daily basis.  The instructions in the Owner's Manual are a clear indication that the sponge filter, in the course of operation of the parts washer, accumulates a load of trapped particulate matter by functioning as a filter as cleaning fluid passes through it.

Further, I have purchased the "three part filter" from a Walter distributor, and tested its efficacy as a filter.  The three parts were Walter part number 48-D-003 ("grated receptacle"), Walter part number 48-D-002 ("stainless steel grating"), and Walter part number 55-B-023 ("foam sponge").  My simple test was to prepare a stirred slurry of commercial ground pepper in water, and to pour that through the assembled "three part filter" assembly.  Pepper was chosen, despite being somewhat soluble in water because the presence of black granules

would be easily recognized (if present) in water.  The outcome,
presented here as images taken in a kitchen with a cell phone
camera, is simple and straightforward.



**Figure 15 – Slurry of pepper particles**



**Figure 16 – black pepper particles on upper
surface of foam sponge filter**



**Figure 17 – filtered water substantially
clear of pepper particles.**

The slurry filtrate, having passed through the "three part
filter" is substantially free of pepper particles.  The upper
filter surface is laden with pepper particles.  I consider

Walter's Interrogatory Responses, as they relate to the "three part filter" of the BR-100 parts washer, to be plainly incorrect.

###    2.    The BR-200 – "Coffee Filter."

I have seen two different filter configurations in the BR-200.  The first configuration, seen on the BR-200 that ChemFree purchased on the open market, has a white, plastic, funnel shaped device that looks like a filter that might be used on a typical drip-fill coffee maker.



**Figure 18 – Screen grab from Walter's Bio-Circle Web Site referring to two part filter.**

Actually, Walter's internal correspondence refers to the plastic filter as the "coffee" filter.  [Plaintiff's Exhibit 148].  The "coffee" filter device is referred to in Walter's

product literature as a "filter."   [See Docket 168, Appendix "A"

(Item A-4), Appendix "D"].

        In the BR-200 Owner's Manual which accompanied the BR-200

that ChemFree purchased on the open market, item "A" on page 3

is referred as a "2-part filter."

        Page 7 of the Owner's Manual contains the following
        quotation:  3.  Inspect the 2-part filter daily, it should
        be emptied of accumulated solid waste and disposed of
        outside of the parts washer in order to extend the life of
        the solution.  To assure proper drainage, rinse the 2-part
        filter daily using Bio-Circle L$^{TM}$ solution and re-install it
        promptly.

On page 8 of the Owner's Manual is a "Trouble Shooting" Guide

that states that:   "*Sink will fill up if the 2-part filter is dirty or clogged*."

        In my opinion, the "filter" limitations of the '835, '226,

and '125 patents are satisfied by the device referred to in the

BR-200 Owner's Manual as the "2-part filter."   In addition, in

my opinion, the limitation is satisfied by the plastic "coffee

filter" device considered alone, as well as in the "2-part"

configuration.

        I have reviewed Walter's Interrogatory Responses at pages

27-34, 36-40, and 45-46.   [Docket 255-3].   I do not see where

Walter's Interrogatory Responses discuss or mention the "2-part"

filter, at all.   Walter's Owner's Manual instructs the operator

to empty the plastic filter of solid waste on a daily basis and

to rinse it out on a daily basis.   These instructions in the

Owner's Manual are a clear indication that the plastic coffee

filter, in the course of operation of the parts washer, accumulates a load of trapped particulate matter by functioning as a filter as cleaning fluid passes through it.

### 3.   The BR-200 and IO-400 "Sediment Trap."

The second configuration used on the BR-200 employs the "three part filter" discussed in the preceding section on the BR-100.  It appears from the Deposition of Claude Vandmeulebrooke that Walter adapted the BR-100 "three part filter" device to the BR-200 and IO-400 sometime on or after 2005.  [Vandemeulebrooke Deposition, pp. 176-178].  Even though the physical configuration of the filter device appears to remain unchanged from the "three part filter" device in the BR-100, Walter's web site for the IO-400 now refers to this device as a "sediment trap" instead of as a "filter."

However, in Walter's 2007 U.S. product catalog, at page 6, [Vandemeulebrooke deposition, Exhibit 135], Walter identifies its replacement part for the middle piece of the "sediment trap" as a "Foam Sponge Filter."  I have personally inspected several examples of the Foam Sponge Filter, having purchased them from a distributor of Walter's products.



**Figure 19 – Screen grab from Walter Bio-Circle Web Site.**

Notwithstanding the name change from "three part filter" to "sediment trap," or "foam sponge," my opinion is that this claim limitation is met in the BR-200 and IO-400 parts washer models that use the "three part filter" or "sediment trap" instead of the plastic coffee filter.  The underlying rationale is the same as I have set forth in the preceding section on the BR-100 "three-part-filter" device.

### 4.   The IO-200 "Grated Receptacle."

The Walter Bio-Circle model IO-200 parts washer has a device situated over / in the drain hole in the sink that is referred to in the IO-200 Owner's Manual as a "grated receptacle."  On the Walter Bio-Circle web site, the same

element is accompanied by the following text: "*The drop in 3-stage particle trap keeps solids and metal particles out of the tank.*"[32]

I have personally inspected an example of the grated receptacle or "3-stage particle trap," which was furnished with the IO-200 parts washer that ChemFree acquired from Walter during discovery.  The upper piece appears to be a relatively flat piece of stainless steel that has been perforated with a plurality of circular holes.  The bottom piece is a magnet that is shaped like a large, circular metal washer.  The middle piece is a metal wire screen filter.



**Figure 20 – IO-200 "3-Stage Particle Trap" Filter.**

Product literature for the IO-200 parts washer that I inspected had a patent marking on it indicating that it was "patent pending" in connection with U.S. Patent application serial number 11/495,275.  I have reviewed the prosecution

---

[32] http://www.biocircle.com/portal/page?_pageid=73,394253 &_dad=portal&_schema=PORTAL].

history of the '275 application.  The application recently

issued as U.S. Patent No. 7,303,908 to Overland entitled

Bioremediation Assembly.  The bioremediation assembly of the

'908 patent has a basin or sink situated over a tank or

bioremediation reservoir.  A drain hole in the bottom of the

sink allows fluid to drain by gravity from the sink to the tank.

Interposed in the drain hole of the '908 invention is a

plurality of "metal screen filters."  The purpose of the metal

screen filters is revealed in claim 1 as follows:

> . . . a plurality of metal screen filters positioned
> downstream of the wash basin drain, and upstream of the
> opening of the bioremediation reservoir and which removes
> particulate matter which passes from the wash basin and
> through the drain thereof.

['908 Patent, claim 1].  The term "grated receptacle" does not

appear anywhere in the '908 Patent.  In contrast, Walter's

interrogatory responses on the filter limitations in ChemFree's

patents states, in part, as follows:

> The IO-200 only uses a metal receptacle.  The metal
> receptacle and the steel grating, being made of metal, do
> not include "a porous material."

[Docket 255-3, at page 28].

My reading of the *Markman* order is such that I understand

the Court's use of the language "porous material" to be broad

enough to encompass not only the physical substance out of which

the filter is fabricated, but also includes openings or

apertures that are fabricated into the filter.

This also appears to be consistent with common English language dictionary definitions of the word "filter."  This also appears to be consistent with the use of the word "filter" as used in the Overland '908 patent that is now owned by a Walter affiliate.  The metal screen filters of the Overland '908 patent are referred to throughout the specification and the claims as possessing "porosity."  In my opinion, the metal screen that serves as the middle piece of the "3-stage particle trap" on the IO-200 satisfies the filter limitations of the '835 Patent and the '125 Patent, as well as the "porous medium" limitation of the '226 Patent.

### VI.   FLUID TEMPERATURE CONTROL LIMITATIONS.

This section of my report deals with the following claim limitations.

> *'110 Patent - claim 1: means for controlling said heater to maintain the fluid approximately at a desired temperature . . .;*
>
> *'110 Patent - claim 7: said means for controlling said heater further includes a thermostat cooperating with the fluid and said heater for activating and deactivating said heater;*
>
> *'491 Patent - claim 6: step of measuring the temperature of the fluid, wherein the heating step is responsive to the step of measuring the temperature;*
>
> *'125 Patent - claim 4: step of maintaining the fluid at a desired temperature . . .*
>
> *'125 Patent - claim 18: step of measuring the temperature of the fluid, wherein the heating step is responsive to the step of measuring the  temperature.*

The parties have stipulated to the meaning of the following terms:

- Thermostat means - a device that automatically responds to temperature changes and activates switches that control associated equipment;

[Joint Claim Construction Statement, pages 2-3].

- Cooperate means - to work or act together toward a common end or purpose;

[Joint Claim Construction Statement, pages 2-3].

- Cooperating with the fluid - refers to the fact that the thermostat works with the fluid in the tank;

[Joint Claim Construction Statement, pages 2-3].

- Cooperating with . . . said heater refers to the fact that the thermostat works with the heater; Activate means - to make active;

[Joint Claim Construction Statement, pages 2-3].

- Deactivate means to render inactive; or to inhibit, block, or disrupt the action of something;  For activating and deactivating said heater - refers to the fact that the thermostat works with the fluid and responds to temperature changes by activating switches that cause the heater to become either active or inactive.

[Joint Claim Construction Statement, pages 2-3].

- Maintaining the fluid at a desired temperature - the verb to maintain means to keep in an existing state; preserve or retain; thus, in the context of the specification, maintaining the fluid at a desired temperature means to keep, retain, or preserve the fluid at a desired temperature.

[Joint Claim Construction Statement, pages 5-6].

## 1.   Undisputed Limitations.

According to Defendants' Amended Response to Plaintiff's

Second Amended Infringement Contentions [aka Docket 209], Walter

acknowledges that all of the fluid temperature control limitations listed above are satisfied by three of the accused parts washers, namely the BR-100, BR-200 and IO-400.[33,34,35,36,37]

Moreover, Walter has acknowledged that some, but not all of the temperature control limitations are met by the IO-200. The '110 Patent, claim 7 limitation is acknowledged as met by the IO-200 at page 45. The '491 Patent, claim 6 limitation is acknowledged as met by the IO-200 at page 47. The '125 Patent, claim 18 limitation is acknowledged as met by the IO-200 at page 53.

Once again, I am advised by counsel for ChemFree that ChemFree is entitled to rely on Walter's acknowledgments as admissions such that no further proof is necessary to establish that the claim limitations are met. However, in any event, I have studied each of the accused parts washers and have formulated my own opinion that each of the foregoing limitations are met by the Walter parts washers.

---

[33] The '110 Patent, claim 1 limitation is acknowledged as met by BR-100 at p.5, BR-200 at pp.24-25, and IO-400 at p.34.

[34] The '110 Patent, claim 7 limitation is acknowledged as met by the BR-100 at p.6, BR-200 at p.26, and IO-400 at page 35.

[35] The '491 Patent, claim 6 limitation is acknowledged as met by the BR-100 at p.7, BR-200 at p.27, and IO-400 at p. 37.

[36] The '125 Patent, claim 4 limitation is acknowledged as met by the BR-100 at p.11, BR-200 at p.31, IO-400 at p.40.

[37] The '125 Patent, claim 18 limitation is acknowledged as met by the BR-100 at p.13, BR-200 at p.33, and IO-400 at p.43.

###         2.   **Terms Disputed as to the IO-200.**

Walter denies that the two following claim limitations are met by the IO-200.

> *'110 Patent - claim 1: means for controlling said heater to maintain the fluid approximately at a desired temperature . . .;*

> *'125 Patent - claim 4: step of maintaining the fluid at a desired temperature . . . .*

ChemFree's position on the proper construction of the "*means for controlling*" term in the '110 Patent, Claim 1 is set forth at pages 22-23 of the Joint Claim Construction Statement. [Docket 114]. I have been advised by counsel for ChemFree that this limitation is to be analyzed as a "means-plus-function" limitation.[38] It appears to me that the construction of this term was initially contested between the parties, but that Walter withdrew its position and adopted ChemFree's proposed construction in its May 8, letter to Judge Camp.[39] Therefore, I will apply the construction that ChemFree proposed in the Joint Claim Construction Statement and ChemFree's *Markman* briefs.

Therefore, my task, as I understand it, is to determine whether the Bio-Circle IO-200 has a means for controlling its

---

[38] I am advised by counsel for ChemFree that: "[a]n element of a claim for a combination may be expressed as a means or a step for performing a specified function" and that if it is drafted in that form, it "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶6.

[39] See Walter's May 8, 2007, letter to Judge Camp, Docket 159].

heater to maintain the fluid approximately at a desired temperature; and that, in so doing, I may compare the IO-200 heater control subsystem to the corresponding structure recited in the specification of ChemFree's patent to determine whether the IO-200 has either the same or equivalent structure.

I am further advised by counsel for ChemFree that Walter may literally infringe the means-plus-function claim limitations even if it is the equivalent of, not necessarily identical to, the corresponding structure disclosed in the ChemFree patent specification. The "corresponding structure" in the specification is the structure that controls the heater to maintain the fluid at a desired temperature and disables the heater if the fluid drops too low. The "corresponding structure" that performs this particular function is: (i) a heater; (ii) a thermostat, and (iii) a temperature sensor, which is described in the following passages from the patent specification:

> A heater, thermostat, and level control assembly function to maintain the cleaning fluid within a certain temperature range so as to aid in the removal of organic waste and maintain a proper environment for the sustainment of the microorganisms.

['110 Patent, Column 2, lines 24 B 28].

> A heater 76, that is controlled by a thermostat 75, selectively heats the cleaning fluid 72, and the heater 76 is acceptably in the form of an electric heating element that extends from the control panel 30 into the depths of the tank cavity 44. A level probe 35 monitors the depth of

the cleaning fluid 72, and the level probe is acceptably in the form of a float actuated electric switch 78 that includes a magnet equipped float 80.

['110 Patent, Column 4, lines 30 to 37].

In accordance with the preferred embodiment of the present invention, once the off / on switch 32 is in the "on" position, the circuitry, in combination with the thermostat 75, will activate and deactivate the heater 76. While the thermostat 75 senses that the temperature of the cleaning fluid 72 within the tank cavity 44 is below a desired temperature, the heater 76 is on, and while the thermostat 75 senses that the temperature of the cleaning fluid 72 is at or above the desired temperature, the heater 76 is off. The cleaning fluid 72 is preferably maintained in a temperature range which supports the lives of the particular microorganisms employed within the parts washer 10. In accordance with the preferred embodiment of the present invention, the temperature is acceptably maintained in the range of approximately 110.degree. to 115.degree. degrees Fahrenheit. The float actuated electric switch 78 also controls the operation of heater 76. When the magnet equipped float 80 drops downward due to a low level of cleaning fluid 72, the switch 78 is actuated which, in combination with the circuitry, disables the heater 76 and causes the low level warning light 36 to illuminate.

['110 Patent, Column 7, lines 37 to 55.]

As part of my infringement analysis, ChemFree has requested that I analyze whether the IO-200 temperature control subsystem performs the same function, in substantially the same way, to achieve substantially the same result as the structure associated with the "means" described in the ChemFree patent specification.[40]

---

[40]   See Assumptions above.  The structure in the accused device must perform the claimed function in substantially the same way to achieve substantially the same result as the

(Continued…)

Function analysis:  in the claim, the function that is performed by the "means" is "... *to maintain the fluid approximately at a desired temperature...*"  In my opinion, the function performed the IO-200 subsystem is identical to the function performed by the corresponding structure in the ChemFree patent specification. In each case, the heater is thermostatically controlled so that fluid is maintained at a desired temperature in the tank.

Way analysis:  The way the IO-200 performs the function is substantially identical to that described in the ChemFree patent.  A temperature probe located in the tank sends a temperature signal to a thermostat and the thermostat shuts off the heater when the fluid in the tank exceeds a desired temperature.  Similarly, if the temperature falls below a certain temperature, the temperature probe sends a signal to thermostat which, in turn, activates the heater to warm the cleaning fluid in the tank.

The IO-200 Owner's Manual states that:

"... The temperature control is factory set to maintain the solution at 41°C $\pm$ 1° [106°F $\pm$2°].  At this temperature the bioremediation process is at its most efficient level, cleaning is faster, and operator comfort is at its best..."

[IO-200 Owner's Manual, pp. 5 & 12.];

_____

(Continued...)

structure in the written description.  *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1333 (Fed.Cir. 2005).

"...When the solution has reached its proper working temperature of 41°C / 106°F (this will take approx. 2 hours with a liquid at 20°C / 68°F), the red light will go off. Periodically, the heater will turn itself ON to maintain the proper working temperature..."

[IO-200 Owner's Manual, pp. 6 & 12];

"...The bioremediation process requires a favorable environment at all times, even when the unit is not in use. Always keep the solution level topped up and the unit turned on to maintain proper temperature and oxygen supply through the built-in aeration feature- and heater..."

[IO-200 Owner's Manual, pp. 7 & 12.];

"the built in thermostat has been factory set to maintain an ideal environment for the bioremediation process . . ."

[IO-200 Owner's Manual, pp. 8 & 12.]; and

"...If the liquid temperature is below 10°C / 50°F, the liquid will not be energized (however liquid will be circulated)..."

[IO-200 Owner's Manual, pp. 10 & 12.]

In my opinion, the phrase written by Walter "...*ideal environment for the bioremediation process...*" means at least that the temperature within the fluid tank is suitable for life-support of the microorganisms - a level high enough (apparently 41°C / 106°F) to allow population growth as the food supply increases), and not below a level (apparently 10°C / 50°F) which is life-threatening.

In my opinion, the "way" of detecting temperature and then controlling the temperature of the cleaning fluid with a thermostat and heater is substantially the same, if not identical, in the IO-200 as in the corresponding structure

described and taught in the specification of the ChemFree patents.

Result analysis:  In my opinion, the IO-200 system accomplishes the same result as the "corresponding structure" described in the ChemFree specification.  In each case, the heater is activated when a fluid low temperature condition is detected and it is shut down when a fluid high temperature condition is detected.  This operates to maintain the cleaning fluid at a desired level in the tank.

Taking into the account the foregoing "function, way, and result" analysis, it is my opinion that the IO-200 satisfies the subject means-plus-function limitation of the '110 Patent.

Finally, I have been advised by Counsel that the limitation of claim 4 of the '125 Patent – "*step of maintaining the fluid at a desired temperature* ..." is not to be analyzed as a step-plus-function limitation.  Nevertheless, in light of the foregoing statements from the IO-200 Owner's Manual, it is my opinion that the method of using the IO-200 to clean parts includes the step of maintaining the fluid at a desired temperature.

B.   **HEATER / HEATING LIMITATIONS DISPUTED ONLY AS TO THE IO-200.**

This section of my report will address the following claim limitations specifically in connection with the IO-200.[41]

> *'110 Patent - claim 5: the heater is constructed and arranged to add heat to the fluid while the fluid is disposed within the tank;*

> *'491 Patent - claim 4:  the heating step includes a step of heating fluid within the tank.*

> *'125 Patent - claim 4:  the step of maintaining the fluid at a desired temperature, wherein a heater heats the reservoir.*

> *'125 Patent - claim 16: the heating step includes a step of heating the fluid within the tank.*

During the *Markman* phase of the case, the parties disputed the meaning of the phrase – "*measuring the temperature of the fluid, wherein the heating step is responsive to the step of measuring the temperature.*"  The meaning of the phrase was defined by plaintiff as "...*ascertaining the temperature of the fluid*..." while the definition proposed by the defendant was   ".. . *using a thermostat that works in conjunction with the control panel to turn the heater on and off so as to keep the fluid at a desired temperature range*..." while the Court's construction was "...*determining the temperature of the cleaning fluid, wherein the heating step reacts or is responsive to such temperature determination*..."   [Docket 212, page 51].   It appears to me that the Court rejected Walter's

---

[41] These limitations have been acknowledged by Walter as to the other three parts washers. See Docket 209 - BR-100 at pp. 5, 7, 11, & 13.  BR-200 at pp. 25, 27, 31 & 33.  IO-400 at pp. 35, 36, 40 & 42.

narrowly-based definition and adopted a broader-based definition more similar to ChemFree's proposed construction.

I have reviewed and compared Walter's infringement contentions responses, and I have noted that Walter's contentions are identical as to which claim limitations are "acknowledged" and which limitations are "denied" as between the BR-100, the BR-200, and IO-400.  Also, with respect to the IO-200, Walter has denied all of the same limitations that are otherwise denied with respect to the other three parts washers.

However, Walter's infringement contention responses otherwise differ when it comes to the IO-200.  Walter has denied that a number of limitations are met in the IO-200 that are acknowledged as being met by the other three models.  These differences in infringement contentions between the IO-200 and the other three parts washers appear to be focused on physical features of the parts washer apparatus relative to:  (i) the location of the heater; and (ii) the particular electro-mechanical apparatus or device used to shut down the heater if a low-fluid level condition exists in the cleaning fluid tank.

In the Walter parts washer models BR-100, BR-200, and IO-400, the heater element is located in the holding tank for the cleaning fluid so that it is at least partially immersed in the cleaning fluid.



**Figure 21 – BR-200 Tank showing heating element on left.**

Thus, when energy is supplied to the heating element, such energy is immediately transferred to the cleaning fluid in closest proximity to the heating element and then such energy is transferred to the other less proximately situated molecules of cleaning fluid in the tank in accordance with well known and well understood principles of heat transfer within a fluid medium.

In addition, there is a temperature sensor (probe) located in the tank and immersed in the cleaning fluid.  The temperature sensor is in communication with a temperature control device which compares the signal from the temperature sensor or sensor with a similar value representative of the desired operating temperature (41°C $\pm$ 1° [106°F $\pm$ 2°]).  The temperature control device generates "off" and "on" commands to the heater to maintain the fluid at the desired operating temperature.

The Walter IO-200 parts washer differs from the other three Walter washers in that the heater element itself is physically located in a canister or chamber that is adjacent to and outside of the cleaning fluid tank.  Nevertheless, it is clearly the function of the heater to heat the cleaning fluid in the tank. Note the following language from the IO-200 Owner's Manual:

> "... Allow heater to warm the Bio-Circle L solution to working temperature of optimal cleaning efficiency.  A red light will come on the control module (J) indicating that the heater is ON.  When the solution has reached its proper working temperature of 41$^{\circ}$C / 106$^{\circ}$F (this will take approx. 2 hours with a liquid at 20$^{\circ}$C / 68$^{\circ}$F) and the red light will go off.  Periodically, the heater will come on during the heating cycle..."

[IO-200 Owner's Manual, page 6].  Thermostatic process control of the heater is confirmed by the following language from the Owner's Manual.

> "... The temperature control is factory set to maintain the solution at 41°C $\pm$ 1 [106°F $\pm$ 2].  At this temperature the bioremediation process is at its most efficient level, cleaning is faster, and operator comfort is at its best..."

[IO-200 Owner's Manual, pp. 5 & 12.]

> "...The built in thermostat has been factory set to maintain an ideal environment for the bioremediation process as well as preventing skin burns to the user and damage to the pump..."

[IO-200 Owner's Manual, pp. 8 & 12].

> "...If the liquid temperature is below 10°C / 50°F, the liquid will not be energized (however liquid will be circulated)..."

[IO-200 Owner's Manual, pp. 10 & 12].

I have personally inspected the IO-200 and reviewed photographs of the interior of the IO-200.  It is clear to me that for the IO-200, the bioremediation process occurs in the tank.  The microorganisms that do the bioremediation and whose metabolic rate is influenced by temperature reside in the tank.

I have estimated by calculation from unit specifications and observation of photographs of the interior of the IO-200 that at any given moment of time, at least 97 percent or more of the cleaning fluid in the parts washer is located in the tank. I have also observed that the temperature sensor for the thermostat resides in the tank of cleaning fluid adjacent to the intake for the pumps.  The heater unit is in relatively close proximity to cleaning fluid in the tank.

It is clear to me that the temperature control system (thermostat) of the IO-200 is designed in order to monitor and manage the temperature of the cleaning fluid in the tank.  When the measured temperature of the cleaning fluid in the tank falls below 40°C [41°C - 1] or 104°F [106°F - 2], the temperature sensor will signal the heater to turn on.  When the measured temperature of the cleaning fluid in the tank exceeds 42°C [41°C + 1] or 108°F [106°F + 2], the temperature control device (thermostat) will signal the heater to turn off.  These numeric values are based on the IO-200 Owner's Manual, pp. 5 & 12.

Internal energy is an inherent property of a system.  Any system at a given set of conditions (e.g. pressure and temperature) has a certain internal energy content.  One might say that a system or body has been warmed when its internal energy level has been increased; or that a system or body has been cooled when its internal energy level has been reduced. Hence, I take the Court's construction "...*the heater warms the cleaning fluid while the cleaning fluid is in the tank...*" to mean that the internal energy of the cleaning fluid in the tank has been increased.

Heat is a form of energy that is transferred from one body (system) to another body (system or surroundings).  Heat transfer can occur when there is a temperature difference.  If two bodies with different temperatures are brought into contact with each other, heat is transferred from the hotter body to the colder one.  This will continue until the temperature of the bodies are the same (thermal equilibrium).

Heat may transfer across the boundaries of a system, either to or from the system.  Heat transfer changes the internal energy of the system.  Heat is transferred by conduction, convection, and radiation, which may occur separately or in combination.

Hence, I take the court's construction "...*the heater warms the cleaning fluid while the cleaning fluid is in the tank...*" to mean that the heater may warm the cleaning fluid while the cleaning fluid is in the tank

via any combination of the processes of conduction, convection, or radiation.

Conduction is the process of transfer of heat where one body is in contact with another body.  Heat may flow in either direction, depending upon which body has the higher temperature. The rate of heat transfer (energy units per time) is given by the difference in temperature times the area of contact times an empirical constant which represents the efficiency of heat transfer by conduction.  The preceding statement is often called Fourier's Law of Heat Conduction when used to describe heat transfer between solid surfaces, or Newton's Law of Cooling when used to describe heat transfer between a solid surface and a fluid.

Hence, I take the Court's construction "*...the heater warms the cleaning fluid while the cleaning fluid is in the tank...*" to mean that the heater could warm the cleaning fluid in the tank by exposing that fluid to any solid surface warmer than its current temperature.  This surface could be a resistance heater rod such as that shown

at annotated item number 76 in Figure 3 of the ChemFree patents – adjacent hereto.

Other possibilities include:  a band resistance heater applied to the outside walls of the cleaning tank (if the tank walls were metal) or to the tank bottom (if the tank bottom was metal) so that the heat transfer was from tank walls or bottom at a higher temperature to the fluid at a lower temperature; or any solid object placed in the cleaning fluid in the tank where the solid object is maintained at a temperature higher than the cleaning fluid in the tank by external means.  The means by which the solid object is made more warm than the fluid in the tank can be any means.

Convection is the process of transfer of heat where a hotter fluid (more warm) contacts a cooler fluid (less warm), and the cooler fluid receives heat from the more warm one.  This contact may be thought of as one would temper bath water - heating all the fluid in the bath tub (tank) by adding some hot water to all the cooler water in the tub.  After some time, all the water in the bath tub is at the same temperature.  The contact, which produces heat transfer, between hotter and more cool fluids may be enhanced by mechanical means such as a pump, or a mixing device such as a turbine propeller.  This is known as forced convection heat transfer.

The contact may also be made without a mixing device. The more warm fluid may simply be added to the cooler fluid mass as one would add hot water to a cooler tub of bath water. This is known as natural circulation heat transfer.

The main difference between forced circulation and natural circulation heat transfer, other than that the former requires mixing facilities, is in the longer time required to achieve a temperature relatively constant throughout the entire mass of fluid in the tank with natural circulation. This outcome, in either case, is known as thermal equilibrium. As with heat transfer by conduction, the rate of heat transfer (energy units per time) is proportional to the temperature difference between the warmer fluid and the cooler fluid.

A third method of heat transfer to fluid in the tank is by transmission of energy from thermal radiation. This is the energy radiated from hot surfaces as electromagnetic waves. This radiation does not require a solid or liquid medium for transmission. When thermal radiation strikes a body, it can be absorbed by the body, reflected from the body, or transmitted through the body. Energy absorbed by the body, the liquid cleaning fluid in the tank, will raise the level of molecular motion within the fluid which produces an increase of fluid temperature.

Several proven sources of radiation could add heat to the fluid in the tank, including an infrared (IR) or heat lamp mounted on the bottom of the cleaning basin above the fluid surface, or resistance heaters as found in home heating systems similarly mounted. The rate of heat transfer (energy units / time - area) from the radiation source to the fluid in the tank is proportional to the fourth power of the absolute temperature.

In my opinion, each of these three general methods for adding heat to the fluid in the tank is consistent with the court's construction "*...the heater warms the cleaning fluid while the cleaning fluid is in the tank...*" Radiative, convective (whether forced or natural circulation), and conductive heat transfer are all valid means of fulfilling those claim requirements. I find each of these three general methods of heating consistent with the four claims in question.

In my opinion, a method of warming the cleaning fluid which would not be consistent with the court's construction would be if the preponderance of the cleaning fluid were removed from the tank, heated, and then returned to the tank for use. Since, more than 97 percent of the total quantity of cleaning fluid is always present in the tank at any time, the preponderance of the cleaning fluid is not removed from the tank and so consistency with the Court's construction is maintained.

Naturally, each of these three methods of heating the fluid in the tank has different consequences about cost, process control response time, space requirements, safety, etc.  But, these consequences are not part of the four claims noted above.

The foregoing discussion is now brought to bear with respect to the four claim limitations at issue which are repeated immediately below:

> *'110 Patent - claim 5: the heater is constructed and arranged to add heat to the fluid while the fluid is disposed within the tank;*
>
> *'491 Patent - claim 4:  the heating step includes a step of heating fluid within the tank;*
>
> *'125 Patent - claim 4:  the step of maintaining the fluid at a desired temperature, wherein a heater heats the reservoir;*
>
> *'125 Patent - claim 16: the heating step includes a step of heating the fluid within the tank.*

### a. The literal infringement analysis.

In my opinion, all four of these limitations are literally satisfied by the IO-200 parts washer.  Thus, in my opinion, each of the foregoing limitations may properly be considered to be literally satisfied by the IO-200's heating sub-system.

In summary, it is my opinion that '110 Patent - claim 5: the heater is constructed and arranged to add heat to the fluid while the fluid is disposed within the tank; is literally satisfied by the IO-200.  It is further my opinion that the '491 Patent - claim 4:  the heating step includes a step of heating fluid within the tank, is literally satisfied by the IO-200.  It is further my opinion that the '125 Patent - claim 4:  the step

of maintaining the fluid at a desired temperature, wherein a heater heats the reservoir is literally satisfied by the IO-200. Finally, it is my opinion that the '125 Patent - claim 16: the heating step includes a step of heating the fluid within the tank, is literally satisfied by the IO-200.

### b. The alternative doctrine of equivalents infringement analysis.

In the alternative, to the extent that these few limitations are not literally met, they are, in my opinion, met under the doctrine of equivalents.  In my opinion, the equivalency analysis focuses on the overall objective of the heating process, which is to maintain the temperature of the cleaning fluid in the tank at a desirable temperature to facilitate the bioremediation process.  In the patented inventions, the heater performs the <u>function</u> of adding internal energy to molecules of cleaning fluid to raise the temperature of the fluid to a desired level.  The way this function is achieved is to transfer energy from a heating device, or "heater," to the cleaning fluid.  Some molecules of cleaning fluid will come into direct contact with the heating element (heat transfer by conduction), while others will obtain heat energy from coming into contact with other molecules of cleaning fluid that are at a higher energy state (heat transfer by natural or forced circulation).

To the extent that this process in the IO-200 is not perfectly and literally identical to the situation where the heating element is immersed in the fluid in the tank, like the BR-100, BR-200 or IO-400, the cleaning fluid becomes warmer in substantially the same way, i.e., in accordance with the above mentioned principles of heat transfer within a body of fluid.

The result that is obtained is that the cleaning fluid in the tank is warmed to the desired temperature.  This is not only the substantially same result, it is the identical result for this claim element.  Whether the heater element is located inside or outside of the tank, the objective of the temperature control sub-system of the IO-200 is to operate in a way so as to maintain the temperature of the cleaning fluid in the tank at a desired temperature to facilitate the bioremediation process. Relocating the heater from inside the tank to immediately outside the tank but in fluid communication with the cleaning fluid in the tank is, in my opinion, an "insubstantial change" under the doctrine of equivalence.  Chiefly, this is because at least 97 percent, exceeding the preponderance, of the cleaning fluid does not leave the cleaning tank at any one time while heating is done.

Among other things, one of the keys to my opinion and conclusion is the fact that, although Walter moved the heating element outside of the tank, it left the temperature sensor for

the heater system in the tank.  This is a clear indication that the objective of the heating sub-system is to maintain the temperature of the cleaning fluid in the tank at a desired temperature.  The reason for this is simple - the bioremediation occurs in the tank.

C.  **FLUID LEVEL CONTROL LIMITATIONS.**

This section of my report will address the following claim limitations.

'110 Patent - claim 1: *means for controlling said heater . . . for disabling said heater as the fluid drops below a desired level in the tank* ;

'110 Patent - claim 6:  *said means for controlling said heater includes a level sensor cooperating with the fluid in the tank and said heater for deactivating said heater.*

'110 Patent - claim 8:  *said means for controlling said heater includes a level sensor cooperating with the fluid in the tank and said heater for deactivating said heater.*

'491 Patent - claim 5: *step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

'491 Patent - claim 7: *step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

'125 Patent - claim 17:  *step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

'125 Patent - claim 19:  *step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

During the briefing of the *Markman* issues in the case, the parties vigorously disputed the meaning of the various terms related to the fluid level control subsystem in the throughout invention.  Defendants argued that the all of the level control

terms should be narrowly construed and limited to a float switch
that incorporated a magnet.[42]  In contrast, ChemFree argued for a
broad construction of the meaning of "level sensor."  ChemFree's
positions on the level control system terms appears to be
concentrated at pages 31 through 38 of Plaintiff's Initial Claim
Construction Brief.  [Docket 115].

    ChemFree's position on the "means for controlling"
limitation in the '110 Patent, Claim 1 is set forth at pages 22-
23 of the Joint Claim Construction Statement.  [Docket 114].
ChemFree's position on the meaning of the "level sensor" terms
in the '110 Patent, Claims 6 and 8 is set forth in pages 20-21
of the Joint Claim Construction Statement.  Furthermore,
ChemFree's position on the "measuring the level" limitations in
the '491 Patent, Claims 5 and 7 and in the '125 Patent, Claims
17 and 19 is set forth in pages 41-42 of the Joint Claim
Construction Statement.  It appears to me that, on the eve of
the *Markman* hearing, Walter abandoned its positions on the level
control system terms and notified the Court in a letter that it

---

[42] *See* Defendants' Memorandum In Support of Defendants'
Proposed Claim Construction [Docket 116], pp. 29, 40, 49;
Defendants' Memorandum In Response to Plaintiff's Initial Claim
Construction Brief.  [Docket 128, pp. 9-15].

was adopting ChemFree's positions.[43]  I will endeavor to apply these constructions to the following infringement analysis.

Furthermore, ChemFree offered the following argument in its response brief.

> [I]f an apparatus claim recites a general structure without limiting that structure to a specific subset of structures, we will generally construe the term to cover **all known types of that structure** that the patent disclosure supports.

[Plaintiff's Claim Construction Response Brief, p. 28].

I therefore wish to briefly discuss level measurement and control systems from a broad perspective, show how many different types provide equivalent functionality, and show how those skilled in the art of industrial instruments choose among these types based on the details of their application.  There are two excellent resources[44,45] from a well-respected technical journal, which will provide this information for those who wish it in more detail.

There are a variety of approaches to level measurement and control available from nearly two hundred U.S. suppliers.

---

[43] See Walter's May 8, 2007, letter to Judge Camp, Docket 159.

[44] Vass, G., "The Principles of Level Measurement," *Sensors Magazine*, October 1, 2000.

[45] Hambrice, K. And Hopper, H., "A Dozen Ways to Measure Fluid Level and How They Work," *Sensors Magazine*, December 1, 2004.

A sight glass is the oldest, and simplest, approach to
level measurement.  This provides a direct indication of level,
but offers no capability to take control action based on the
level indication - without additional facilities.  Conventional
sight glasses are the weakest link in any facility because of
the fragility of the transparent sight glass.

Floats have also been in long use.  Floats work on the
simple principle of placing a buoyant object into the tank.  Its
specific gravity is intermediate between that of the process
fluid and that of the headspace vapor.  Then one attaches a
mechanical device to the float to read out its position.  The
float sinks to the bottom of the headspace vapor and floats on
top of the process fluid.  While the float itself is a basic
solution to the problem of locating a liquid's surface, reading
a float's position (i.e., making an actual level measurement) is
still problematic.  The reason is that the linkage (mechanical
device) between the float in the tank, and the readout or
control location is often insecure.  Cables, tapes, pulleys,
magnetic couplings, and gears have been used to communicate
level between the tank and the readout or control location.  The
device which communicates the level measurement and a controller
or human operator is called a transmitter.

Magnetic followers, which ride on a vertical shaft, are
popular today because of low cost.  An assortment of various

models of magnetic float switches is shown in the photo at right.[46]



They     **Figure 22 – Examples of**      move upward as the fluid rises, and the reverse.  Float switches often are integrated into a network of resistors and multiple reed switches.  When each switch is activated by movement of the magnetic follower, the transmitter output changes.  This means that level measurement only is responsive to changes in level by an amount equivalent to the spacing between switches.  Unlike continuous level-measuring devices, this type of float switch cannot discriminate level values between steps.  Magnetic float switches used in this way are called single-point sensors.

---

[46] Image courtesy of the Madison Company.

Magnetic float switches are useful in "quiet tanks" where there is negligible turbulence, such as a bioremediation parts washer.  These devices are not highly accurate (perhaps $\pm$ 15% of maximum) and as such often don't need calibration, but they can be fairly reproducible (perhaps $\pm$ 10% of reading).  A chief virtue is price - $50 will purchase most models in the figure above.

A <u>displacer</u> is one of several types of level sensor which is based on a measurement of differential pressure, or force.



Figure 23 – Displacer Type Level Sensor.

One recalls Archimedes' principle which states that an object totally or partially immersed in a fluid (liquid or gas) is buoyed (lifted) up by a force equal to the weight of the fluid

that is displaced.  In the figure at right, the displacer is the solid column (green) immersed in the fluid (orange) and which protrudes into the vapor space above the fluid (blue).  Note in the figure at right that the displacer column is suspended, and the force required to accomplish this is continuously measured by a force transducer.  As the level rises, the displacer is buoyed up a force by equal to the product of the cross-sectional area of the displacer time the length of the displacer (the immersed



level) times the density of the displacer (which is greater than the fluid density).  Thus, the measured force necessary to support the displacer declines as the displacer rises.

Level is calculated from the measured force.  These devices require calibration, can be more accurate than 5% of maximum reading, can interfere with operations in the tank of fluid (intrusive), and cost at least several hundred dollars for the force transducer and installation.

A differential pressure (DP) sensor can be and is readily construed to be a measurement of fluid level[47] in a container. The pressure measurement is not an absolute measurement. Rather, it is of the pressure at the lower section of the fluid container (where the level is considered to be zero) less the pressure somewhere in an upper section of the fluid container (where the level is considered to be 100%). This is shown in the figure at right.

The hydrostatic pressure difference equals the process fluid density multiplied by the height of fluid in the vessel (times a conversion factor for consistency of units). Changes in differential pressure are directly seen as changes in tank level.

A relative (gage) pressure sensor can be useful in measurement of tank level if the pressure of the atmosphere where the sensor is located is the same as the pressure at the upper section of the fluid container, because a relative (gage)

---

[47] This can be stated in equation form as: $p = \rho \times g \times h$ where the pressure (p) exerted by a column of fluid is equal to the fluid density ($\rho$) times the acceleration of gravity (g) times the height (h) of the column of fluid. In English units, a column height of one foot of water produces a measurable pressure at 25°C of 0.433 pounds force per square inch (psi). In this equation h is the height of a column of fluid, or the level of fluid in a tank if the height is measured from the surface. Note also that the relationship between pressure and height (level) is not dependent upon the geometry or shape of the container.

pressure sensor is biased against (compared to) ambient pressure.

Differential pressure sensors are also used as components of control devices where specific action is taken as a result of the sensed differential pressure compared to some value used as a threshold or set-point. Here, there is no interest in knowledge of the physical position or location of the level in the fluid tank; the interest is that the measured pressure is more or less than a value equivalent to the pressure value of interest.

The price of differential pressure sensors includes a broad range of options. So-called "smart" sensors can cost upwards of a thousand dollars; those which don't automatically calibrate against temperature changes cost several hundred dollars; sensors which are simple pressure gages can be purchased for twenty-five dollars; and differential pressure sensors incorporated into control devices may add little or no more than one hundred dollars to the price of the control device. A problem with DP sensors when used as level sensors occurs when the fluid density is not constant, or the same as when the device was calibrated.

Load cells are differential pressure cells upon which a tank of fluid is placed for the purpose of weighing the tank. The measured level is the mass (not volume) of fluid after the

mass of the empty tank and supports are subtracted from the raw measurement.  The load cell must be physically incorporated into the structure of the fluid tank.  Load cells are advantageous in many applications because of their non-contact nature, and their output is in mass units.  But, they are expensive and the vessel support structure and connecting piping must be designed around the load cell's requirements of a floating substructure.

I must note that only one of the types of level measurement devices noted above are capable of producing a direct measurement of fluid level in a tank.  That is the sight glass - because the sight glass is direct communication with the tank. That's the only information needed - that the sight glass is in direct communication with the tank.

ALL of the other devices noted above produce indirect (inferred) measurements of fluid level in the tank.  ALL of the other devices, except the sight glass, require knowledge of some other parameter to produce a measurement of a fluid level in a tank:  to design a float device, one must know the density of the fluid in the tank, to design a displacer device or a DP sensor, one must know the density of the fluid in the tank; differential pressure sensors incorporated into control devices require knowledge of the pressure level (essentially the product of fluid density times threshold height) considered to be the threshold to initiate control action; and load cells require

detailed knowledge of the structure.  And use of ALL of the devices noted above, with the exception of the sight glass requires the assumption that the vapor above the fluid level in the tank has zero mass (negligible density).

Finally, in my opinion, level sensors "...cooperate with the fluid in the tank..." when they are inserted into "...the fluid in the tank..." and then connected to a control circuitry to take some action, or be observable by users.  In this way, the sensor takes information about position of the fluid in the tank and uses it in some control action or to provide knowledge for observers about level.  A level sensor not cooperating with the fluid in the tank would be one not integrated into control circuitry or not providing information to users.

### 1.   Undisputed as to BR-100, BR-200, IO-400.

With respect to the BR-100, Walter has acknowledged that all of the subject claim limitations have been met in the accused system in its Defendants' Response To Plaintiff's Amended Infringement Contentions.

- The '110 Patent claim limitations are acknowledged as met by the BR-100 - claim 1 at page 5, claim 6 at page 5, and claim 8 at page 6.

- The '491 Patent claim limitations (claim 5 and 7) are acknowledged as met at page 7.

- The '125 Patent claim limitations (claims 17 and 19) are acknowledged as met at pages 13 and 14.

With respect to the BR-200, Walter has acknowledged that

all of the subject claim limitations have been met in the
accused system in its Defendants' Response To Plaintiff's
Amended Infringement Contentions.

- The '110 Patent claim limitations are acknowledged as
  met by the BR-200 - claim 1 at pages 24-25, claim 6 at
  page 25, and claim 8, at page 26.

- The '491 Patent claim limitations (claim 5 and 7) are
  acknowledged as met at page 27.

- The '125 Patent claim limitations (claims 17 and 19)
  are acknowledged as met at page 33.

With respect to the IO-400, Walter has acknowledged that
all of the subject claim limitations have been met in the
accused system in its Defendants' Response To Plaintiff's
Amended Infringement Contentions.

- The '110 Patent claim limitations are acknowledged as
  met by the IO-400 - claim 1 at page 34, claim 6 at page
  35, and claim 8, at page 36.

- The '491 Patent claim limitations (claim 5 and 7) are
  acknowledged as met at page 37.

- The '125 Patent claim limitations (claims 17 and 19)
  are acknowledged as met at page 43.

I am advised by counsel for ChemFree that ChemFree is
entitled to rely on Walter's acknowledgment as an admission such
that no further proof is necessary to establish that the claim
limitation is met.

Apart from the admissions, however, I have studied the
level control system on the BR-100, BR-200, and IO-400.  In each
case, the systems have a donut shaped float switch that rides

along a vertical shaft.  If the float switch reaches the bottom of its travel on the shaft, it activates an electrical switch that sends a cut-off signal to the heater.  In my opinion, this structure literally satisfies each of the referenced level control claim limitations as to each of these three accused parts washers.

### 2.   IO-200 - Description of Accused Level Control System.

The IO-200 has two subsystems that respond to and react to a fluid low-level condition experienced in the bioremediation tank. Each is designed to prevent a different consequence.  Each subsystem controls a different pump (of two).

One subsystem, called the cleaning subsystem, feeds pressurized fluid to the nozzle in the basin.  The second subsystem, called the heater system, feeds pressurized fluid to the heater to maintain proper temperature in the fluid tank for bioremediation.

The first control subsystem prompts the operator to manually add fluid so that the volume stays topped off.  The second control subsystem is a safety mechanism built into the IO-200 to avoid electrical energy flowing to a heater empty of liquid to be heated, or a pump rotating without fluid.

Fluid level in the bioremediation tank may fall for a variety of reasons:  drag-out from parts cleaned in the cleaning

basin, spills, or normal evaporation.  Evaporative losses are a
common situation for bioremediation parts washers which operate
at temperatures above ambient.  Any of these reasons can cause
the bioremediation tank to be deficient of fluid when the heater
is turned on, or either pump to be empty of fluid when
activated.

I will now describe in more detail the operation of both
subsystems, which are shown in the figure below:



Figure 24

The cleaning pump supplies cleaning fluid to the brush in the basin.  A control subsystem enables activation of this pump. This safety subsystem comprises a disk-shaped device that floats on the upper surface of the fluid in the tank, but is attached to the wall of the tank.



**Figure 25 – level sensor for cleaning pump on IO-200.**

If the fluid level drops to a point where there is concern about the pump not being fully supplied with fluid, the float device will rotate (tip), causing a steel ball inside the float to move which, in turn, activates a switch that disables the pump transporting fluid from the tank to the cleaning brush in the basin.  Shutdown of this pump requires the operator to manually add cleaning fluid, then manually reset the switch in the float device, and then restart the pump.  The cleaning pump will not start unless the fluid level set point is satisfied.  This subsystem does not disable the heater or the pump which supplies fluid to the heater.  Thus, even though this level control

system interrupts the flow of fluid to the basin for cleaning operations, the heater will continue to operate, if it is already activated, to heat the fluid in the tank.  This protects the health of the microorganisms.

An independent, second level control subsystem enables activation of the second pump which supplies cleaning fluid to the heater, and enables activation of the heater.  The second pump supplies cleaning fluid to the heater, which resides in a chamber outside of the bioremediation tank.

However, prior to energizing the electric heater, it is necessary to prove that there is fluid flowing to the heater. The value of this *proof* is to avoid applying significant energy to an empty heater which could then be destroyed, or worse. "Proving" could be done with a continuous flowmeter whose positive output could only be achieved if the heater pump were producing fluid flow to the heater.  This would constitute proof of pump operation. Instead, Walter has chosen to prove that the heater pump is producing fluid by verifying that there is a suitable value of pressure in the heater chamber.  It is completely conventional in process control strategy to choose this option - to accept that fluid pressure could not be achieved without an operating pump.  The referenced pressure switch is located in the chamber that houses the heater.

A low temperature condition in the bioremediation tank will trigger the thermostat to add heat to the fluid mass in the tank.  But, it can't do so until the pump is proven to be producing fluid flow to the heater.  So the thermostat, which controls activation of the heater, first activates the heater pump.  This pump will pump cleaning fluid, under pressure, into the heater chamber that houses the pressure switch.  The pressure that builds up in the heater chamber is sufficient to activate the pressure switch that, in turns, allows the heater to be activated.

However, when the fluid drops below the pump intake, the heater will not activate - because the heater pump cannot prove that it is producing flow by satisfying the pressure switch. There is a timer built into the control circuitry which will independently de-energize the pump in the event the pressure switch is not satisfied (the heater will not yet have been energized).  This prevents the heater pump from running dry in a continuing and fruitless attempt to prove the pressure condition.  Only when cleaning fluid has been added to the bioremediation tank, and the pump intake covered so that the heater pump can produce pressure by enabling flow, is the heater energized.

Based on interviews with Mr. Tom McNally of ChemFree, who has observed operation of the IO-200 at various fluid level

conditions, I understand that the two level sensors cause control action to occur at two different fluid levels in the tank, and two different circumstances.  The float sensor that enables the cleaning pump has been set by Walter at some value sufficient to call attention to the circumstance that the bioremediation tank is deficient in fluid volume, and needs refilling.

The pressure sensor which enables the heater pump is set by Walter at some alternate value to allow the heater to continue to be energized and maintain the proper temperature for the microorganisms, while the bioremediation tank is being refilled with fluid.  Should that not happen, Walter has determined that the risk to the microorganisms of exposure to low temperatures is less than the safety risk to the machine owner of overheating an empty heater, and uses the pressure sensor to de-energize the heater. The circumstance is that the level of cleaning fluid in the bioremediation tank has been greatly reduced so that the pump has been starved for cleaning fluid and is unable to maintain the value of pressure at which the pressure sensor is set to de-energize the heater.

Thus, in my opinion, Walter has satisfied the level control limitations of ChemFree's claims by designing into the IO-200 system the ability to use measurements of level, via a pressure sensor, to activate or deactivate the heater for the

bioremediation tank.

The level control situations are described, in part, on page 2 of the IO-200 Owner's Manual:

> The liquid and circulation pumps must always be immersed. Failure to keep the solution at the proper level can result in a burned-out pump thereby creating a potential fire hazard. To help prevent this, the unit is equipped with a low liquid level sensor and a pressure switch which will shut off both pumps when the liquid level is low.

[IO-200 Owner's Manual, p. 2].

### D.   IO-200 - '110 PATENT - CLAIM 1 - MEANS PLUS FUNCTION.

*'110 Patent - claim 1: means for controlling said heater . . . for disabling said heater as the fluid drops below a desired level in the tank.*

I have been advised by counsel for ChemFree that this limitation is to be analyzed as a "means-plus-function" limitation.  It appears to me that the construction of this term was initially contested between the parties, but that Walter withdrew its position and adopted ChemFree's proposed construction in its May 8, letter to Judge Camp.  Therefore, I will apply the construction that ChemFree proposed in the Joint Claim Construction Statement and ChemFree's *Markman* briefs.

My task, as I understand it, is to determine whether the Bio-Circle IO-200 has a "*means for controlling its heater . . . for disabling the heater as the fluid drops below a desired level in the tank,*" and that, in so doing, I may compare the IO-200 heater control subsystem to the corresponding structure recited in the specification of ChemFree's patent to

determine whether the IO-200 has either the same or equivalent structure.

I am further advised by counsel for ChemFree that Walter may literally infringe the means-plus-function claim limitations even if it is the equivalent of, not necessarily identical to, the corresponding structure disclosed in the ChemFree patent specification.  The "corresponding structure" in the specification is the structure that controls the heater to maintain the fluid at a desired temperature and disables the heater if the fluid drops too low.  The "corresponding structure" that performs this particular function is: (i) a thermostat, and (ii) a level control assembly, which is described in the following passages from the patent specification:

> A heater, thermostat, and level control assembly function to maintain the cleaning fluid within a certain temperature range so as to aid in the removal of organic waste and maintain a proper environment for the sustainment of the microorganisms.

['110 Patent, Column 2, lines 24 B 28].

> A heater 76, that is controlled by a thermostat 75, selectively heats the cleaning fluid 72, and the heater 76 is acceptably in the form of an electric heating element that extends from the control panel 30 into the depths of the tank cavity 44.  A level probe 35 monitors the depth of the cleaning fluid 72, and the level probe is acceptably in the form of a float actuated electric switch 78 that includes a magnet equipped float 80.

['110 Patent, Column 4, lines 30 to 37].

- 138 -

In accordance with the preferred embodiment of the present
invention, once the off / on switch 32 is in the "on"
position, the circuitry, in combination with the thermostat
75, will activate and deactivate the heater 76. While the
thermostat 75 senses that the temperature of the cleaning
fluid 72 within the tank cavity 44 is below a desired
temperature, the heater 76 is on, and while the thermostat
75 senses that the temperature of the cleaning fluid 72 is
at or above the desired temperature, the heater 76 is off.
The cleaning fluid 72 is preferably maintained in a
temperature range which supports the lives of the
particular microorganisms employed within the parts washer
10. In accordance with the preferred embodiment of the
present invention, the temperature is acceptably maintained
in the range of approximately 110° to 115° Fahrenheit.  The
float actuated electric switch 78 also controls the
operation of heater 76.  When the magnet equipped float 80
drops downward due to a low level of cleaning fluid 72, the
switch 78 is actuated which, in combination with the
circuitry, disables the heater 76 and causes the low level
warning light 36 to illuminate.

['110 Patent, Column 7, lines 37 to 55.]

As part of my infringement analysis, ChemFree has requested
that I analyze whether the IO-200 level control subsystem
performs the same function, in substantially the same way, to
achieve substantially the same result as the structure
associated with the "means" described in the ChemFree patent
specification.[48]

Function analysis:  in the claim, the function that is
performed by the "means" is "...*disabling said heater as the fluid drops below a*

---

[48] *See* Assumptions above.  The structure in the accused
device must perform the claimed function in substantially the
same way to achieve substantially the same result as the
structure in the written description.  *JVW Enterprises, Inc. v. Interact
Accessories, Inc.*, 424 F.3d 1324, 1333 (Fed.Cir. 2005).

*desired level in the tank...*".   In my opinion, the function performed by the IO-200 subsystem is identical to the function performed by the corresponding structure in the ChemFree patent specification.   In each case, the heater is disabled as the fluid drops below a desired level in the tank.   Furthermore, the underlying reason for the function is identical, i.e., as a safety mechanism to prevent damage to the equipment or staff from a run-away heater situation.

Way analysis:  The way the IO-200 performs the function is substantially the same to that described in the ChemFree patent. The common way for both is to use a pressure-activated interlock to de-energize the heater.

In the preferred embodiment of the ChemFree patent specification, the level sensor float switch resides on the surface of the cleaning fluid in the bioremediation tank.[49] However, other "level control assemblies" are known (such as those above) to persons of ordinary skill.

In the preferred embodiment in the ChemFree patent specification, as the liquid level rises and falls, the float

---

[49] *See* Assumptions above.  Identification of corresponding structure may embrace more than the preferred embodiment.  When multiple embodiments in the specification correspond to the claimed function, proper application of section 112, paragraph 6 generally reads the claim element to embrace each of those embodiments.  *Micro Chemical, Inc. v. Great Plains Chemical Co*. 194 F.3d 1250, 1258 (Fed.Cir. 1999).

rises and falls.  If the level of cleaning fluid is suitably
above the desired level, i.e., above the heater, the float will
detect a level that the system associates with being "high
enough" to operate the heater.  If the level of cleaning fluid
is below that desired level, the float will detect a level that
the system associates with being "too low" to operate the
heater.  The heater will then be de-energized.

In the IO-200 machine, the pressure switch is located
outside of the bioremediation tank, in the heater chamber.  I
note in Walter's documentation for the IO-200 machine that U.S.
Patent No. 6,596,951 is displayed.  This patent claims a "Snap
Disc Pressure Switch."  I am informed by Tom McNally of ChemFree
that this device is present and is the operating control for
level which allows safe operation of the heater in the IO-200
machine.  This switch has a disc or diaphragm that moves in one
direction as the pressure near the switch increases, and the
hydrostatic pressure against the disc or diaphragm similarly
increases.  When the pressure against the disc or diaphragm
similarly decreases, the disc or diaphragm moves in the reverse
direction.  The disc or diaphragm has a rear conductive surface
that forms a closed circuit between itself and a conductor when
it is in one shape, and forms an open circuit when in a second
shape.

The shapes are adjustable to allow the switch to form an

open circuit at pressures below a chosen value.  Claim 4 of United States Patent No. 6,596,951 describes "... a spring bias adjustment device for adjusting the pressure set point..."  This is how the relationship is established between minimum allowable pressure and the limit of disc or diaphragm displacement (travel) that will produce an open circuit, de-energizing the heater.



**Figure 26 – Diagram of a snap disc pressure switch.**

When the pressure falls below the chosen value, the disc or diaphragm moves past the preset limit point to produce an open circuit and the heater is de-energized.  In other words, as the level in the bioremediation tank declines, the pressure bearing on the disc or diaphragm declines until a condition occurs when the disc or diaphragm moves to produce an open circuit and de-energize the heater.

In Walter's IO-200 machine the condition, or circumstance, is that the level of cleaning fluid in the tank has fallen so

low that the pump is starved for fluid and cannot continue to maintain the desired value of pressure this moving the disk or diaphragm in the pressure switch and so de-energizing the heater.

In my opinion, the "way" of detecting pressure, via indirectly detecting level, and using its value to de-energize the heater at low fluid levels is substantially the same in the IO-200 as in the corresponding structure described and taught in the specification of the ChemFree patents. The difference between directly detecting level as a volumetric or positional parameter or indirectly as a pressure-based parameter is insubstantial because it is common industrial practice to use pressure measurements as a proxy for volume or positional-based measurements of level.

Result analysis:  In my opinion, the IO-200 system accomplishes the same result as the "corresponding structure" described in the ChemFree specification.  In each case, the heater is shut down when a fluid low level condition is detected in order to avoid a fire hazard.

Taking into account the foregoing "function, way, and result" analysis, it is my opinion that the IO-200 satisfies the subject means-plus-function limitation of the '110 Patent.

**E.   IO-200 - 110 PATENT - CLAIMS 6 AND 8 - "LEVEL SENSOR"**

*'110 Patent - claim 6:  said means for controlling said heater includes a level sensor*

*cooperating with the fluid in the tank and said heater for deactivating said heater.*

*'110 Patent - claim 8:  said means for controlling said heater includes a level sensor cooperating with the fluid in the tank and said heater for deactivating said heater.*

ChemFree's position on the meaning of the "level sensor" terms in the '110 Patent, Claims 6 and 8, which has been adopted by Walter, is set forth in pages 20-21 of the Joint Claim Construction Statement, where it states:

> a <u>level sensor</u> is a device that receives and responds to a signal or stimulus relating to a position along a vertical axis; <u>cooperate</u> means to work or act together toward a common end or purpose; <u>cooperating with the fluid in the tank</u> refers to the fact that the level sensor works together with the vertical height of the fluid in the tank; <u>cooperating with . . . said heater</u> refers to the fact that the level sensor works together with the heater; <u>deactivate</u> - means to render inactive, or to inhibit, block, or disrupt the action of something; <u>for deactivating said heater</u> refers to the fact that the level sensor works together with the vertical height of the fluid to cause the heater to become inactive/to disrupt its action of heating the fluid.

[Docket 114, pages 20-21].

Using the foregoing construction for "level sensor," it is my opinion that the IO-200 subsystem of a heater and pump combined with a pressure switch within a heater chamber is a "*device that receives and responds to a signal or stimulus relating to a position along a vertical axis*." The IO-200 system receives and responds to a stimulus (pressure generated by fluid under action of the pump) that is related to the position of the fluid level in the tank along a vertical axis, i.e., above or below the height of the heater pump in-take.  Thus, in my opinion, these two limitations are

literally met by the IO-200.

In the alternative, it is my opinion that this limitation is satisfied under the doctrine of equivalents.  The function is the same - deactivate the heater if the fluid level gets too low.  The way the function is achieved is substantially the same, which is essentially the same "way" analysis that I have recited immediately above in connection with the claim 1 "means" limitation.  Finally, the result is identical - the system is protected from damage due to the heater continuing to operate when the fluid is too low, and a fire hazard from the same condition is averted.

### F.   IO-200 - 491 PATENT - CLAIM 5 AND 7 - "MEASURING THE LEVEL" AND '125 PATENT - CLAIM 17 AND 19 - "MEASURING THE LEVEL"

*'491 Patent - claim 5: step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

*'491 Patent - claim 7: step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

*125 Patent - claim 17:  step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

*'125 Patent - claim 19:  step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

In its May 8 letter to Judge Camp, Walter adopted ChemFree's proposed construction of the measuring the level terms, which are recited below:

the verb to 'measure' means to ascertain the dimensions, quantity, or capacity of something.  Thus, in the context of the specification, measuring the level of the fluid refers to ascertaining the height of the surface of the

cleaning fluid in the tank along the vertical axis
responsive to - means that the latter (i.e., the heating
step) responds or reacts to the former (i.e., the step of
measuring).  Thus, in the context of the specification,
measuring the level of the fluid, wherein the heating step
is responsive to the step of measuring the level refers to
ascertaining the height of the fluid along the vertical
axis, wherein the heating step responds or reacts to
ascertainment of the height of the fluid along the vertical
axis.

[Joint Claim Construction Statement, pp. 41-42; ChemFree's

Initial Claim Construction Brief, p. 44].

It is my opinion, that these limitations are literally

satisfied by the IO-200 heater-control, level control subsystem.

The IO-200 "measures" whether the fluid level is above or below

the heater pump in-take.  This measurement is accomplished

through the pressure switch, which associates pressure with a

fluid level height above or below the pump intake.  The heating

step is most definitely responsive to such measurement.  If the

level is measured as high enough, the heater is activated

(subject to also receiving an activation signal from the

thermostat) and if the level is measured as too low, the heater

is deactivated.

In the alternative, it is my opinion that these limitations

are satisfied under the doctrine of equivalents.  The function

is the same - to deactivate the heater if the fluid level gets

too low.  The way the function is achieved is substantially the

same, which is essentially the same "way" analysis that I have

recited above in connection with the '110 Patent, claim 1 "means" limitation.  Finally, the result is identical - the system is protected from damage due to the heater continuing to operate when the fluid is too low, and a fire hazard from the same condition is averted.

### G.   THE "SURFACTANT-BASED" LIMITATION OF '226 PATENT, CLAIM 3.

This section of my report will address the following claim limitation specifically in connection with the '226 Patent, Claim 3.

*The method of claim 1, wherein the cleaning liquid is surfactant-based.*

During the *Markman* phase of the case, the parties disputed the meaning of the phrase - "*surfactant-based*."  The meaning of the phrase was defined by plaintiff as "...*the cleaning fluid contains one or more surface active agents ....*" while the definition proposed by the defendant was "*...the cleaning liquid is more than eighty percent surfactant....*" while the Court's construction was "*...a cleaning fluid whose active cleaning agent is one or more surfactants*"..." [Document 212, page 51].

It appears to me that the Court rejected Walter's narrowly-based claim construction language and adopted a broader-based claim construction more similar to ChemFree's proposed construction.[50]

---

[50] Walter's proposed claim construction would be almost

(Continued…)

Walter's public statements and literature speak about a cleaning agent which would contain one or more surfactants. This cleaning agent is "Bio-Circle L (liquid)."

> In the video "Bio-Cleaner" located on the internet as a subtopic "Green" under the topic "Videos" on the web site "Jay Leno's Garage," A corporate representative of Bio-Circle, Mr. Tim Houghton, is interviewed by Mr. Leno and says that "...the secret is in the solution..."; that Bio-Circle is "...a process of microscopic organisms *sitting in surfactants*..."; and that "...*surfactants* break the oils down...".

[http://www.jaylenosgarage.com/video/video_player.shtml?vid=190181]

In Walter's product catalog #13-1007, page 4, effective January 1, 2007, the Bio-Circle L product is described as "...achieve(ing) the cleaning efficiency of solvents with a high performance *surfactant-based cleaner* ..." [Plaintiff's Exhibit 135 , 7/06/2007].

Walter has denied that this limitation was met in its infringement contentions. [See Docket 209 at pages 10, 30, 39, and 49]. However, I find that Walter failed to give any underlying factual basis for its contention in its response to Interrogatory number 1. [Docket 255-3].

_____

(Continued…)

useless in industrial cleaning operations. A cleaning solution with a surfactant concentration of eighty percent would leave substantial surfactant residue on supposedly "clean" parts after the cleaning operation is completed. In other words, Walter's proposed cleaning agent that would not infringe ChemFree's patent is one which replaces one soil (hydrocarbon oils) on parts with another (surfactants), and does so by adding more total soil to the supposedly clean parts.

In summary, I find considerable evidence provided by the defendant that at least one of the components of Bio-Circle L (liquid) is a surfactant and that the surfactant is the active cleaning agent in the Bio-Circle L cleaning fluid within the meaning of the Court's claim construction order.  Docket 212, page 51. I find that the claim limitation is met by the accused Bio-Circle L cleaning fluid.

**H.    '110 PATENT - CLAIM 4 - HEATER PARTIALLY IMMERSED IN THE FLUID.**

The '110 Patent - claim 4 - is a dependent claim that depends from claim 1 and adds the following limitation – *"wherein the heater is at least partially immersed in the fluid."*  Walter has admitted that this limitation is met by each and every one of the accused parts washers.  In Defendants' Amended Response To Plaintiff's Second Amended Infringement Contentions [Docket 209], this limitation is acknowledged as met by the BR-100 at page 5, the BR-200 at page 25, the IO-400 at page 35 and the IO-200 at page 45.

I am advised by Counsel for ChemFree that ChemFree is entitled to rely on Walter's acknowledgments as conclusively establishing that such limitations are satisfied such that no further proof is required.  However, I have inspected physical examples of the BR-200 and IO-200 and have observed photographs of the BR-100 and IO-400.  In the BR-100, BR-200, and IO-400,

the heater elements are at least partially immersed in the cleaning fluid in the tank whenever the tank is filled sufficiently to allow for the system to operate.

The IO-200 heater is situated in a plastic canister outside of the tank.  The heater element situated within such canister transfers heat to the fluid by direct contact (conduction) as the fluid is pumped through the heater canister.

I note that there is an interlock control switch which requires (after a pre-set delay time) a pre-set level of pressure to be present in the heater before the pump can be energized.  In other words, if the heater element (surface) in its canister is energized, the heater is filled with fluid, and the level of fluid in the bioremediation tank is sufficient to at least flood (overfill) the pump suction.

I further note that the term "immersed" was not contested by the parties in the *Markman* Hearing (Document 212].  In my opinion, this means that the immersed heater could be either the metal element (surface) providing heat to the fluid by conduction, or the immersed heater could be the canister in which that metal element (surface) is housed.

Hence, it is my opinion that when the heater canister is full of fluid, it is completely immersed in the fluid during times when the heater is energized - if the item being immersed is the surface providing heat to the fluid.

**I.   '835 PATENT - CLAIM 5 – "BIODEGRADE" LIMITATION.**

The '835 Patent - claim 5 - contains a final limitation
that reads:   *"said fluid being non-toxic to said microorganisms, whereby the
microorganisms biodegrade the hydrocarbons while retained within said tank."*   In
Defendants' Amended Response To Plaintiff's Second Amended
Infringement Contentions [Docket 209], this limitation is
acknowledged as met by the BR-100 at page 8, the BR-200 at page
28, the IO-400 at page 38 and the IO-200 at page 48.

I am advised by Counsel for ChemFree that ChemFree is
entitled to rely on Walter's acknowledgments as conclusively
establishing that such limitations are satisfied such that no
further proof is required.

**J.   '835 PATENT - CLAIM 10 – "SOLE FLOWPATH" LIMITATION.**

The '835 Patent - claim 10 - is a dependent claim that
contains the following two limitations:   (i) *"said flowpath being the sole
flowpath for fluid flowing from said basin to said tank;"* and (ii) *"said parts washer
further including a filter interposed within said flowpath."*

I have previously discussed the "filter interposed within
said flowpath" limitation in connection with the other claims
that have filter limitations.   Thus, I will devote this section
of my report to just the "sole flowpath" limitation.

It is unclear to me that Walter disputes that there is more
than one flowpath between the basin and the tank.   In its
interrogatory responses, Walter does not identify any underlying

facts to support a contention that there are multiple flowpaths between the basin and the tank.  [Defendants' Supplemental Response to Interrogatory No. 1, September 17, 2007, pp. 28-29].

I have inspected physical examples of the BR-200 and IO-200 and have observed photographs of the BR-100 and IO-400.  It is clear to me that they are designed so that, during normal operation, all of the cleaning fluid will exit the basin through the drain hole in the center of the basin.

The IO-200 appears to have some secondary drain holes in the basin that are raised above the level of the main drain hole.  These appear to be designed to act as overflow protection in the event that the main drain hole flowpath becomes obstructed, such as by the wire screen filter becoming clogged with accumulated particulate matter.

I am advised by counsel for ChemFree that making a device capable of infringing use constitutes infringement even though it may be capable of some non-infringing use.[51]  Consequently, inasmuch as the drain hole flowpath serves as the "sole" flowpath for the IO-200 during normal operation, it is my opinion that the IO-200 satisfies the "sole" flowpath limitation.

---

[51] *See* Assumptions above, *Sunrise Medical HHG, Inc. v. Airsep Corp.*, 95 F.Supp.2d 348 (W.D.Pa. 2000); *Bell Comm. Research, Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 622-23 (Fed.Cir.1995).

K.    '835 PATENT - CLAIM 11 - THE "ENCOUNTER SAID FILTER" LIMITATION.

The '835 Patent - claim 11 - is a dependent claim that contains the following limitation:  "*substantially all hydrocarbons cleaned from a part in the basin and substantially all fluid flowing from the basin encounter said filter in route to said tank.*"  I have previously discussed whether the accused parts washers have a "filter" in connection with the other claims that have filter limitations.  Thus, I will devote this section of my report to just the "substantially all hydrocarbons . . . and substantially all fluid . . . encounter" aspects of this limitation.

In its interrogatory responses, Walter does not identify any underlying facts to support its contention that this limitation is not met apart from its denial that the accused parts washers have "filters."  [Defendants' Supplemental Response to Interrogatory No. 1, September 17, 2007, pp. 29-31].

I have inspected physical examples of the BR-200 and IO-200 and have observed photographs of the BR-100 and IO-400. It is clear to me that they are designed so that, during normal operation, all of the cleaning fluid will exit the basin through the drain hole in the center of the basin.  Inasmuch as each of the four accused parts washers have a device that, in my opinion, is a "filter," and, inasmuch as this filter is definitely situated in the drain hole / flowpath, it is

abundantly clear to me that substantially all of the hydrocarbons cleaned from the part and substantially all of the fluid will encounter the "filter" device as they drain from the basin to the tank.  Consequently, in my opinion this limitation is met by each of the four parts washers.

The IO-200 does appear to have some secondary drain holes in the basin that are raised above the level of the main drain hole and fluid that escapes the basin through these secondary holes does not encounter the filter.  However, these secondary drain holes appear to be designed to act as overflow protection in the event that the main drain hole flowpath becomes obstructed, such as by the wire screen filter becoming clogged with accumulated particulate matter.  I am advised by counsel for ChemFree that making a device capable of infringing use constitutes infringement even though it may be capable of some non-infringing use.[52]

Consequently, inasmuch as this limitation is met by the IO-200 during normal operation, it is my opinion that the IO-200 satisfies this limitation.

### L.   THE '226 PATENT - CLAIM 1.

The '226 Patent, claim 1 reads as follows:

---

[52] *See* Assumptions above; *Sunrise Medical HHG, Inc. v. Airsep Corp.*, 95 F.Supp.2d 348 (W.D.Pa. 2000); *Bell Comm. Research, Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 622-23 (Fed.Cir.1995).

> *A method of washing parts comprising the steps of:*
> *(a) placing at least one part in a first chamber;*
> *(b) circulating a cleaning fluid from a second chamber to the first chamber to wash the surfaces of the part in contact with the fluid, said cleaning fluid removing organic matter;*
> *(c) __passing the cleaning fluid that had contacted the part through a porous medium__;*
> *(d) draining the cleaning liquid from the first chamber into the second chamber;*
> *(e) removing organic matter in the cleaning fluid in the second chamber wherein the step of removing the organic matter from the fluid comprises biologically degrading the organic matter; and*
> *(f) re-circulating the cleaning liquid from the second chamber to the first chamber to be available for washing parts.*

In its Third Amended Response To Plaintiff's Infringement Contentions [Docket 157, dated May 9, 2007], Walter acknowledged that each and every claim limitation of claim 1 of the '226 Patent was met as to the BR-150 parts washer (which I am advised by counsel for ChemFree is a Canadian version of the BR-100), the BR-200, and the IO-400.  As for the IO-200, Walter acknowledged that each and every limitation was met except for the "porous medium" limitation in bold and underlined above.

Then, in its Defendants' Response to Plaintiff's Second Amended Infringement Contentions [Docket 191, July 2, 2007], Walter acknowledged all claim limitations of the '226 Patent, claim 1, were met by the BR-100 (page 8); and that all claim limitations of the '226 Patent, claim 1, were met by the BR-200 (page 28); and that all claim limitations of the '226 Patent, claim 1, were met by the IO-400 (page 38).  As for the IO-200, Walter acknowledged that each and every limitation was met

except for the "porous medium" limitation in bold and underline above.

Then, less than two weeks later, in its Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions [Docket 209, July 13, 2007], Walter, without any underlying explanation, changed its position as to the BR-100, BR-200, and IO-400, so as to DENY that the "porous medium" limitation was met.

Otherwise, Walter's Docket 209 Contentions acknowledge that the all of the claim limitations of the '226 Patent, claim 1 are met.

I have already discussed the "porous medium" limitation above in this report in connection with the other "filter" limitations.  Otherwise, I have reviewed and studied all four of the accused parts washers and compared them to the claim limitations of claim 1 of the '226 Patent, and I am in agreement with Walter that all of such claim limitations are met.  I am advised by ChemFree that it may rely on Walter's acknowledgments as admissions such that no further proof is necessary.  However, to the extent I am called upon to testify, it is my opinion that these limitations are, indeed, met.

In cleaning a part with any of the Walter parts washers, an operator first places a soiled part in the basin or "first chamber."  The parts washer pump is then activated so that fluid

is pumped from the tank ("second chamber") to the basin ("first chamber") where washing occurs.  During the washing operation, the cleaning fluid removes organic and inorganic matter from the soiled part.  After the fluid contacts the part, the fluid, together with hydrocarbons washed from the part, exit the Walter parts washers through the drain hole and returns to the tank, which satisfies the "draining the cleaning fluid" step of claim 1.

In the process, the cleaning fluid and hydrocarbons encounter the filter such that they "pass through a porous medium" within the meaning of the claim.  After the cleaning fluid and hydrocarbons return to the tank, the organic matter washed from the part is biologically degraded by the action of bioremediation microorganisms, which satisfies the "removing organic matter" limitation.

Finally, the cleaning fluid of the Walter parts washers is re-circulated from the tank to the basin for additional cleaning operations, which satisfies the final limitation.  There is no need to discuss each Walter parts washer separately as the cleaning procedure is essentially identical for all four parts washers.

**M.  THE '226 PATENT - CLAIM 4.**

Claim 4 of the '226 Patent depends from claim 3 and contains the following limitations:

*Wherein the cleaning fluid is water-based.*

Walter has acknowledged that this limitation is met as to all four accused parts washers:  BR-100 [Docket 209, page 10]; BR-200 [Docket 209, page 30]; IO-400 [Docket 209, page 40]; and IO-200 [Docket 209, page 49].

This limitation is met by the Bio-Circle L cleaning fluid that is used in all four accused parts washers.  The primary constituent of Bio-Circle L cleaning fluid by both weight and volume is water.  This limitation is unquestionably met.

**N.   '125 PATENT - CLAIM 1 & 6 – "BRINGING INTO CONTACT".**

This section of my report addresses the following claim limitations:

*'125 Patent - claim 1 - bringing the part into contact with the fluid containing the microorganisms.*

*'125 Patent - claim 6 - bringing the part into contact with the fluid and the microorganisms in the basin.*

There does not appear to be any dispute between the parties as to whether these two claim limitations are met by the accused parts washers.  With respect to the BR-100, the '125 Patent, claim 1, "bringing the part" limitation is acknowledged as met at Docket 209, page 11.  The '125 Patent, claim 6, "bringing the part" limitation is acknowledged as met by the BR-100 at Docket 209, page 12.

With respect to the BR-200, the '125 Patent, claim 1, "bringing the part" limitation is acknowledged as met at Docket

209, page 30.  The '125 Patent, claim 6, "bringing the part" limitation is acknowledged as met by the BR-200 at Docket 209, page 31.

With respect to the IO-400, the '125 Patent, claim 1, "bringing the part" limitation is acknowledged as met at Docket 209, page 40.  The '125 Patent, claim 6, "bringing the part" limitation is acknowledged as met by the IO-400 at Docket 209, page 41.

With respect to the IO-200, the '125 Patent, claim 1, "bringing the part" limitation is acknowledged as met at Docket 209, page 50.  The '125 Patent, claim 6, "bringing the part" limitation is acknowledged as met by the BR-100 at Docket 209, page 51.

Apart from the foregoing acknowledgments, I have inspected physical examples of the BR-200 and IO-200 and have observed photographs of the BR-100 and IO-400.  The normal and typical use of these machines entails bringing a soiled part into contact with the accused Bio-Circle L cleaning fluid, that contains microorganisms, in the basin of the parts washers. This process is essentially the same for each of the four accused parts washers such that there is no need to discuss each one separately.  In my opinion, these limitations are met by the accused parts washers.

### O.   '125 PATENT - REMOVING HYDROCARBONS FROM THE PART.

This section of my report addresses the following claim limitations:

*'125 Patent - claim 1 - allowing the fluid to remove the hydrocarbons from the part and flow into the tank*

*'125 Patent - claim 6 - removing hydrocarbons from the part.*

In their Joint Claim Construction Statement, the parties agreed that *"allowing the fluid to remove the hydrocarbons"* means – *"to let or permit the fluid to remove (i.e., move from a place or position occupied as in to move from being on the part and into the tank) the hydrocarbons - which are organic chemical compounds comprised predominately of carbon and hydrogen atoms."* [Docket 114, page 6].

Walter has acknowledged that the '125 Patent, claim 1 limitation is met with respect all four of the accused parts washers. The acknowledgment as to the BR-100 is found at Docket 209, page 11. The acknowledgment as to the BR-200 is found at Docket 209, page 30. The acknowledgment as to the IO-400 is found at Docket 209, page 40. The acknowledgment as to the IO-200 is found at Docket 209, page 50.

Walter has also acknowledged that the '125 Patent, claim 6 limitation is met with respect all four of the accused parts washers. The acknowledgment as to the BR-100 is found at Docket 209, page 12. The acknowledgment as to the BR-200 is found at Docket 209, page 31. The acknowledgment as to the IO-400 is

found at Docket 209, page 41.  The acknowledgment as to the IO-200 is found at Docket 209, page 51.

Apart from the foregoing acknowledgments, I have inspected physical examples of the BR-200 and IO-200 and have observed photographs of the BR-100 and IO-400.  The normal and typical use of these machines entails bringing a soiled part into contact with the accused Bio-Circle L cleaning fluid in the basin of the parts washers and then allowing the cleaning fluid to remove the hydrocarbon contamination from the part so that the cleaning fluid and hydrocarbon contamination then flows down through the drain hole in the bottom of the basin and then into the tank.  This process is essentially the same for each of the four accused parts washers such that there is no need to discuss each one separately.  In my opinion, these limitations are met by the accused parts washers.

P.   '125 PATENT - CLAIM 6 - DRAINING THE FLUID.

This section of my report addresses the following claim limitation.

'125 Patent - claim 6 - draining the fluid with the hydrocarbons and microorganisms contained therein from the basin to the tank.

In their Joint Claim Construction Statement, the parties agreed that "draining the fluid with the hydrocarbons and microorganisms contained therein from the basin to the tank" ['125 patent, claim 6] means that "the cleaning fluid drains from the basin into the tank, and the hydrocarbons that were washed off of

*the part flow with the cleaning fluid as it so drains, and that the microorganisms that had flowed with the cleaning fluid as it was pumped from the tank into contact with the part continue to flow with the cleaning fluid as it so drains.*"   [Docket 114, page 4].

Walter has acknowledged that the '125 Patent, claim 6 "draining" limitation is met with respect all four of the accused parts washers.  The acknowledgment as to the BR-100 is found at Docket 209, page 12.  The acknowledgment as to the BR-200 is found at Docket 209, page 31.  The acknowledgment as to the IO-400 is found at Docket 209, page 41.  The acknowledgment as to the IO-200 is found at Docket 209, page 51.

Apart from the foregoing acknowledgments, I have inspected physical examples of the BR-200 and IO-200 and have observed photographs of the BR-100 and IO-400.  The normal and typical use of these machines entails bringing a soiled part into contact with the accused Bio-Circle L cleaning fluid in the basin of the parts washers and then allowing the cleaning fluid to remove the hydrocarbon contamination from the part so that the cleaning fluid and hydrocarbon contamination then flows down through the drain hole in the bottom of the basin and then into the tank.  This process is essentially the same for each of the four accused parts washers such that there is no need to discuss each one separately.  In my opinion, this limitation is met by the accused parts washers.

Q.   '125 PATENT - CLAIMS 1, 6 & 12 – RETAINING
     HYDROCARBONS IN THE TANK ALLOWING THE MICROORGANISMS
     TO BIODEGRADE THE HYDROCARBONS.

This section of my report addresses the following claim

limitations:

*'125 Patent - claim 1 - allowing the microorganisms within the fluid to biodegrade the
hydrocarbons.*

*'125 Patent - claim 6 - retaining the hydrocarbons within the fluid in the tank while the
microorganisms biodegrade the hydrocarbons.*

*'125 Patent - claim 12 - retaining the hydrocarbons within the tank for sufficient time for
the microorganisms to substantially biodegrade the hydrocarbons.*

There was a vigorous debate concerning the meaning of the

terms in the foregoing claim limitations during the claim

construction proceeding.   ChemFree argued that "*allowing the*

*microorganisms within the fluid to biodegrade the hydrocarbons*" - means to "*let or*

*permit the microorganisms within the fluid to chemically decompose the hydrocarbons, i.e.,*

*convert larger, more complex organic chemical compounds comprised predominately of carbon*

*and hydrogen atoms molecules into smaller, less complex molecules, through microbial action.*"

[Joint Claim Construction Statement, page 51.

Walter argued that it should be taken to mean – "*placing the*

*bacteria in close proximity to the hydrocarbons floating* <u>*at the top of the fluid*</u> *so that the*

*bacteria can break down the hydrocarbons into predominantly environmentally safe by-*

*products*" (emphasis added).

In it claim construction ruling, the Court rejected

Walter's attempt to impose a "*floating at the top of the fluid*" restriction

on the scope of the claim term.   The Court's construction is –

"*let or permit the microorganisms within the cleaning fluid to biodegrade the hydrocarbons.*" [Docket 212, p. 51].

Similarly, ChemFree argued that "*retaining the hydrocarbons within the fluid in the tank while the microorganisms biodegrade the hydrocarbons*" - refers to "*the hydrocarbons (i.e., organic chemical compounds comprised of predominately of carbon and hydrogen atoms) remaining in the fluid that is in the tank while the microorganisms chemically decompose them.*" [Joint Claim Construction Statement, page 53].

Walter argued that it should be taken to mean – "*allowing the bacteria to break down the hydrocarbons into predominantly environmentally safe by-products at a location that is <u>at the top of the fluid in the tank</u>.*" [Joint Claim Construction Statement, page 53-54 (emphasis added)].

In it claim construction ruling, the Court rejected Walter's attempt to impose a "*top of the fluid*" restriction on the scope of the claim term.  The Court's construction is – "*the hydrocarbons remain in the cleaning fluid while the microorganisms biodegrade them.*" [Docket 212, p. 51].

In the latest version of its Infringement Contentions [Docket 209], Walter has denied that any of these three limitations is met my any of the four accused parts washers. However, Walter's infringement contentions were submitted on July 13, 2007, before the Court issued its claim construction order on July 17, 2007.

After issuance of the Court's claim construction order, Walter submitted an amended response to Interrogatory No. 1 which sought Walter's underlying factual basis for denying that the asserted claim limitations were met by the accused parts washers. [Docket 255-3, September 17, 2007].  In its response, Walter was totally silent and offered no underlying basis whatsoever for denying the '125 Patent, claim 1, limitation of "allowing" biodegradation of the hydrocarbons.  [See Docket 255-3, pp. 35-36].  Similarly, Walter was totally silent and offered no underlying basis whatsoever for denying the '125 Patent, claim 6, limitation of "retaining" hydrocarbons while they are biodegraded.  [See Docket 255-3, pp. 35-36].

Walter offered the following explanation for denying the '125 Patent, claim 12 limitation – *"retaining the hydrocarbons within the tank for sufficient time for the microorganisms to substantially biodegrade the hydrocarbons."*

> Walter Parts Washers do not literally infringe this limitation because they do not retain the hydrocarbons within the tank for sufficient time for the microorganisms to substantially biodegrade the hydrocarbons.  In the Walter Parts Washers, the cleaning fluid in the tank is mixed therefore bioremediation occurs everywhere.  Therefore, the fluid circulated to the basin also contains the hydrocarbons and microorganisms.  As such, the hydrocarbons are not retained within the tank as required by this limitation.  Furthermore, IO-400 and IO-200 include a filtering system through which the solution passes through when pumped back to the basin.  In this manner, hydrocarbons are moved through the filter system prior to biodegradation ...

[Docket 255-3, page 40].

The Walter Bio-Circle parts washers are designed so that hydrocarbons that have been washed from soiled parts will be biodegraded by microorganisms wherever there are microorganisms. Since Walter acknowledges that bioremediation occurs everywhere, bioremediation must occur in the remediation tank, the pump and hose connecting it to the cleaning nozzle, the cleaning nozzle, and whatever volume is retained in the cleaning basin when in use. The volume retained in these fluid handling elements is tiny relative to the volume of fluid retained in the bioremediation tank. The amount of fluid not in the bioremediation tank at any one time is no more than about two to three percent[53] of the total volume of fluid in the IO-200 cleaning system.

Notwithstanding Walter's arguments from its interrogatory responses, in my opinion the claim 12 limitation (and the claim 1 and the claim 6 limitation) is met by each and every one of the four Walter parts washers.

---

[53] Based on Walter's IO-200 operating manual, the total system volume is 110 liters. If, for example, there are twenty-four inches of one-half inch inside diameter hose connecting the cleaning pump to the hand-held cleaning nozzle; and if the cleaning nozzle is ten inches long with an inside diameter or one-half inch; and if the cleaning basis is holding, at maximum, a depth of one-half inch of undrained fluid; the total volume included in these fittings is about 1.2 gallons or about two and one-half percent of the total system volume.

Moreover, the amount of hydrocarbons that might be trapped in the up-stream filter of the IO-200 and IO-400 is even less significant.

With respect to Walter's contention that infringement is avoided simply because some negligibly small percentage of the hydrocarbon contaminant may be re-circulated to the basin for washing operations, I am advised by counsel for ChemFree that making a device capable of infringing use constitutes infringement even though it may be capable of some non-infringing use.[54]   Thus, the Walter parts washers are "capable" of infringing use even under Walter's theory, which I cannot support.

I am advised by ChemFree that Walter's contention is as much a legal argument as it is a matter of science and fact.  As for strictly facts, even if additional washing operations continue while hydrocarbons are in the tank, the amount of hydrocarbons that would be temporarily pumped out of the tank would be negligible in amount.  Similarly, the amount of hydrocarbons that would be trapped in Walter's upstream filters and then physically removed from the parts washer without being biodegraded would be insignificant.  It is clear that the preponderance of the bioremediation occurs in the tank.

As for matters of law and legal argument, I am advised by counsel for ChemFree that, among other things, because the

---

[54] *See* Assumptions above; *Sunrise Medical HHG, Inc. v. Airsep Corp.*, 95 F.Supp.2d 348 (W.D.Pa. 2000); *Bell Comm. Research, Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 622-23 (Fed.Cir.1995).

preamble to the subject claim contains the word "comprising," as a matter of law, Walter cannot avoid infringement by momentarily pumping some of the hydrocarbons to the basin and then draining them back to the tank as long as the claim limitation is literally satisfied by at least some of the hydrocarbons in the tank.  However, I am not a patent lawyer and, apart from relying on certain principles of law that I have received from counsel for ChemFree, strictly legal arguments are outside the scope of my engagement in this matter.

### R.   LIMITATIONS WHERE HYDROCARBONS AND/OR MICROORGANISMS ACCUMULATE PROXIMATE A FLUID SURFACE IN TANK.

This section of my report will address the following claim limitations:

> *'110 Patent - claim 2 - the fluid defines a fluid surface in the tank, and wherein a substantial portion of the microorganisms live in the fluid proximate to said fluid surface.*

> *'110 Patent - claim 3 - a substantial portion of the microorganisms and hydrocarbons accumulate proximate to said fluid surface such that a substantial amount of biodegradation takes place proximate to said fluid surface.*

> *'491 Patent - claim 1 - accumulating the microorganisms and the hydrocarbons adjacent a fluid surface defined by the fluid in the tank;*

> *'491 Patent - claim 1 - biodegrading the hydrocarbons proximate to the fluid surface.*

The parties have agreed to the meaning of certain of the terms from these limitations, including:

With respect to "*a fluid surface in the tank*" ['110 patent, claim 2]:

    A surface is the topmost boundary of an object;  fluid
    surface in the tank refers to the topmost boundary of the
    cleaning fluid that is in the tank.

[Joint Claim Construction Statement, page 2].

With respect to *"accumulate proximate to said fluid surface"* ['110

patent, claim 3]:

Accumulate proximate to said fluid surface - means to
gather or amass, close or next to the topmost boundary of
the cleaning fluid.

[Joint Claim Construction Statement, page 5].

With respect to *"adjacent a fluid surface"* ['491 patent, claim 1]:

Proximate to the fluid surface ['491 patent, claim 1]
adjacent a fluid surface means close to or next to the
topmost boundary of the cleaning fluid; and proximate to
the fluid surface also means close to or next to the
topmost boundary of the cleaning fluid.

[Joint Claim Construction Statement, page 5].

With respect to *"live in the fluid proximate to said fluid surface"* ['110

patent, claim 2]:

"live in the fluid proximate to said fluid surface" - means
to exist, close or next to the topmost boundary of the
cleaning fluid.

[Joint Claim Construction Statement, page 5].

Apart from the foregoing agreements, the parties had a

vigorous dispute over the meaning of *"substantial."*  ChemFree

proposed that *"substantial"* means *"considerable in extent"* such that *"a*

*substantial portion is a part of a whole that is considerable in extent relative to the whole."*

In contrast, Walter argued that *"substantial"* meant *"majority."*

The Court appeared to adopt ChemFree's construction and

rejected Walter's proposed construction by construing the term

*"substantial"* to mean *"a portion or amount that is considerable in quantity."*  [July

17, 2007, Order, page 51].

### 1.   Walter's Change of Position on Infringement Contentions.

Walter served its initial responses to ChemFree's infringement contentions on or about September 28, 2005. [Docket No. 42].  At the time, the only parts washer accused of infringement was the BR-200.  In its September 28, 2005 responses, Walter declined to take a position as to whether the '110 Patent, claim 2 and 3 limitations were met, stating:

> Defendants submit that contentions regarding this claim are premature and irrelevant to the purposes of Patent L.R.4.2, because the Walter Parts Washer and Fluid, and the system embodied by these, lacks elements of its base claim 1.

[Docket 42, page 6].  However, with respect to the '491 Patent, claim 1 limitations, Walter stated:

> Defendants deny that the Walter Parts Washer and Fluid perform any function within the meaning of this claim element.

[Docket 42, page 9].

Walter served its First Amended Response to Plaintiff's Infringement Contentions on or about October 25, 2005.  [Docket 53],  In its October, 2005, responses, Walter again declined to take a position as to whether the '110 Patent, claim 2 and 3 limitations were met, stating:

> Defendants object to this request for admission as premature because the meaning of this claim limitation is a conclusion of law, *see Markman, supra*, which has not yet been determined by the Court. Further, Defendants' List of Proposed Claim Terms identifies "substantial portion" and "live in the fluid proximate to said fluid surface" as terms that should be construed by the Court. Defendants

therefore deny that the Accused Instrumentalities have structure or function meeting this limitation, either literally or under the doctrine of equivalents, but will supplement this response, if necessary, after the Court holds its *Markman* hearing.

[Docket 53, p. 10].  Furthermore, with respect to the '491 Patent, claim 1 limitations, Walter, once again, raised the foregoing objection.  [Docket 53, page 17].

Walter served its Second Amended Response to Plaintiff's Infringement Contentions on or about November 30, 2005.  [Docket 83],  In its November, 2005, responses, Walter "Denied" that the '110 Patent, claim 2 and 3 limitations were met.  [pages 4 & 5]. Walter also "Denied" that the subject limitations from the '491 Patent were met. [Docket 83, p. 6].

The day before the Court's *Markman* hearing, Walter served its Third Amended Response to Plaintiff's Infringement Contentions on May 9, 2007.  [Docket 157],  In its May 9, 2007, responses, Walter "Acknowledged" that the '110 Patent, claim 2 and 3 limitations were met.  [Docket 157, pp. 3 & 4].  Walter also "Acknowledged" that the subject limitations from the '491 Patent were met. [Docket 157, p. 5].

On July 2, 2007, Walter served its Defendant's Response to Plaintiff's Second Amended Infringement Contentions.  [Docket 191].  By this point in the case, ChemFree had asserted infringement over additional Walter machine models BR-100, IO-400, and IO-200.

BR-100 – July 2, 2007:  In its July 2, 2007, responses, Walter "Acknowledged" that the '110 Patent, claim 2 and 3 limitations were met by the BR-100.  [Docket 191, pp. 3 & 4]. Walter also "Acknowledged" that the subject limitations from the '491 Patent were met by the BR-100. [Docket 191, p. 5].

BR-200 – July 2, 2007:  In its July 2, 2007, responses, Walter "Acknowledged" that the '110 Patent, claim 2 and 3 limitations were met by the BR-200.  [Docket 191, pp. 23 & 24]. Walter also "Acknowledged" that the subject limitations from the '491 Patent were met by the BR-200. [Docket 191, p. 25].

IO-400 – July 2, 2007:  In its July 2, 2007, responses, Walter "Acknowledged" that the '110 Patent, claim 2 and 3 limitations were met by the IO-400.  [Docket 191, pp. 33 & 34]. Walter also "Acknowledged" that the subject limitations from the '491 Patent were met by the IO-400. [Docket 191, p. 35].

IO-200 – July 2, 2007:  In its July 2, 2007, responses, Walter "Denied" that the '110 Patent, claim 2 and 3 limitations were met by the IO-200.  [Docket 191, pp. 33 & 34].  With respect to the '491 Patent, claim 1 limitations at issue, Walter "Acknowledged" that the limitation "*accumulating the microorganisms and the hydrocarbons adjacent a fluid surface defined by the fluid in the tank*" was met by the IO-200. [Docket 191, p. 45].  However, Walter "Denied" that the limitation "*biodegrading the hydrocarbons proximate to the fluid surface*" was met by the IO-200. [Docket 191, p. 45].

Eleven days later, on July 13, 2007, Walter served its Defendants' Amended Response to Plaintiff's Second Amended Infringement Contentions. [Docket 209].  In the Docket 209 paper, Walter changed its position as to all of the "Acknowledgements" on the subject '110 Patent, claim 2 & 3 limitations and the '491 Patent, claim 1 limitations, and "Denied" that any of the subject limitations were met by any/all of the accused parts washers. [Docket 209, pp. 5, 7, 25-27, 34-36, 44-46].  No underlying factual basis or other explanation for the change of position from Docket 157 and 191 to Docket 209 is noted in the Docket 209 papers.

### 2.   Infringement Analysis of the BR-100.

Taking into consideration that the BR-100 has been off the market for about four years, I understand that an operational BR-100 machine was not available to ChemFree for empirical testing to determine whether the "proximate the surface" limitations are met.  Nevertheless, I understand that ChemFree intends to rely on, among other things, the following article published by Walter to establish that these limitations are met.



Figure 27 – Excerpt from Walter January 2002, *"Want Clean Parts?"* Article.

In addition, I note the following testimony from Mr. Shields, President of Graymills. Mr. Shields is testifying about Walter Bio-Circle model BR-100 literature in Graymills' possession as well as the Graymills BIO536 parts washer that is essentially Graymills' own version of the machine that it private label manufactures for Walter as the BR-100.

> Q: Mr. Shields, do you recognize Plaintiff's Exhibit 321 as a document that Graymills produced to me this week in connection with a subpoena.
>
> A. Yeah, it appears to be.
>
> . . .



**Figure 28 – Excerpt from Exhibit 321 from Shields deposition.**

Q: In the bottom right-hand corner of the page, there's a couple of graphic depictions of the machine and then there's text that has a number 4 associated with it.

A: Right.

Q: And that text reads, and I quote, "The microorganisms rise to the top to eat and digest the soil, thus breaking down the contaminants into water and $CO_2$." Do you see that?

A: Yes.

Q: Is that your understanding of how the Graymills' BIO536 works?

A: If you're asking me from a non-chemist's viewpoint, I think that's what I have perceived as bioremediation since we've gotten involved in it in '90, or whatever it was.

[Shields deposition, pp. 158-160].

In addition to the foregoing, there are generally known scientific principles, such as Stokes' Law, discussed below with

respect to my analysis of the BR-200 and IO-200, that tend to support a conclusion that these limitations are met by the BR-100.

### 3. General Scientific Principles Applicable to Mixing Hydrocarbons with Aqueous Cleaning Fluid.

The experience of one skilled in cleaning work would support at least a preliminary acceptance of ChemFree's claims that hydrocarbon contaminants will tend to accumulate proximate the surface of an aqueous/surfactant-based cleaning fluid without empirical proof, based on the conventional understanding that light substances, such as hydrocarbon oils, rise when suspended in heavy substances (water).  This acceptance would be based largely on the principles of hydrodynamics, such as Stokes' Law.  This law relates to the steady state rise (or settling) velocity of spherical liquid "particles" of one substance immiscible within another liquid medium.  The Stokes' law equation, derived from a force balance on the "particle," is shown below:

$$V_t = \frac{g d^2 \left( \rho_p - \rho_m \right)}{18 \mu}$$

Figure 29 – Stokes' Law equation.

The foregoing equation implements the following nomenclature: "$V_t$" is the steady state velocity in units of length divided by

time; "g" is the acceleration of gravity[55] in units of length per
time squared; "d" is the hydraulic diameter of the spherical[56]
"particle" in units of length; $\rho$ is the density of the two solid
or liquid[57] species with the subscript "p" referring to the
particle and the subscript "m" referring to the medium[58]; and "$\mu$"
is the viscosity[59] of the medium in units of mass per length per
time.

---

[55] It is the force of gravity which impels the "particle" to
settle if its density is greater than that of the immiscible
medium, or rise if its density is less than that of the
immiscible medium.

[56] "Particles" of oil, and surfactants, not seen within a
bioremediation parts washer take whatever shape they do.
Thought to be approximately spherical because of surface tension
forces of one liquid upon another, one of ordinary skill would
recognize the assumption of spherical geometry.

[57] Chemists recognize that oil is not soluble in water - the
medium of the bioremediation parts washer.  Surfactants are so.
Surfactants (detergents) bond through van der Waals forces to
oil soils and form an intermediate which is often called a
micelle.  It is this intermediate which is the lighter (less
dense) material which rises as a "particle" in water.  This
intermediate may be so small in size, and so mutually attractive
to other "particles," that it forms an emulsion of oil in water.
Generally, emulsions of oil in water do not spontaneously form.
Usually mechanical force applied as agitation is required to
form an oil-detergent-water emulsion.

[58] It is the difference of density which provides the
buoyant force to lift a "particle" of lighter material in a
heavier medium.

[59] Viscosity is a transport property of liquids.  It relates
frictional shear forces, which oppose movement of "particles" in
a medium to shear stresses (pressures) upon "particles."  In
other words, viscous forces (which oppose upward particle
movement) are those which oppose buoyant forces (which impel
particle movement upward).

Hence, in the absence of external forces to mix and/or emulsify hydrocarbons in an aqueous cleaning fluid sufficient to overcome Stokes' Law, one of ordinary skill would be inclined to accept ChemFree's claims that "*hydrocarbons ... exist... proximate to the fluid surface*" or that "*...microorganisms live in the fluid proximate*[60] *to said fluid surface...*"

### 4.   Empirical Test Procedure for BR-200 and IO-200.

Notwithstanding the foregoing general scientific principles, Walter has asserted, in its interrogatory responses, as follows:

> BR-100, ... BR-200, IO-400, and IO-200 do not literally infringe this limitation because **they mix the solution in the tank either via circulation, using an air pump, or both**.  Therefore, bioremediation takes place everywhere and not only on top.  This means that the microorganisms live everywhere and not only proximate to the fluid surface.

[Interrogatory Response No. 1, Docket 255-3, page 6 (emphasis added)].  However, Walter has freely admitted elsewhere in its interrogatory responses, that its contentions are unsupported by any empirical evidence. [See Interrogatory Response No. 15, dated on or about December 13, 2007].

In order to test the efficacy of Walter's theory that its pump and/or aerator so mix the Bio-Circle L cleaning fluid and hydrocarbons as to overcome Stokes' law, ChemFree sponsored and

---

[60] One skilled in the art would recognize that if hydrocarbons exist proximate to the fluid surface, then microorganisms would as well because they are mobile in water and would tend to congregate where they would find "food" and oxygen.

conducted an empirical study to bioremediate motor oil in Walter's IO-200 and Walter's BR-200 machines, and measure the content of both microorganisms and hydrocarbons when each machine was used in accordance with Walter's owner's manuals.

The study was conducted at an independent biological process development laboratory specializing natural degradation processes - Genesis Technologies International[61], 696 Winer Industrial Way, Lawrenceville, Georgia 30045.  Genesis sought to measure the vertical distribution of microorganisms and oil over a significant portion of the depth of the tank.  The study methodology and the analytical protocol for sample handling are both attached to this report (Exhibit "J").

There are several points associated with the methodology and analytical protocol which deserve special attention:

1.   Since the ChemFree patents claim an accumulation of microorganisms and oil relative to the datum of the fluid surface, fluid sampling was organized to examine the concentration of microorganisms and oil relative to the fluid surface.  Samples were taken at four vertical intervals:  at the surface (actually in one-quarter inch of depth), at one inch depth below the surface, at four inches depth below the surface,

---

[61] Genesis project leader was Julieta G. Archambault.

and at eight inches depth below the surface.  The maximum depth of fluid in the bioremediation tank is about 22 inches.

2.   Anticipating that the distribution of microorganisms and oil might not be laterally (horizontally) uniform at any of the four depths of fluid sampled,[62] the sampling protocol required that each sample at every depth be replicated in four quadrants of the bioremediation tank:  left rear (quadrant 1), right rear (quadrant 2), left front (quadrant 3), and right front (quadrant 4).  Therefore, at each sampling time, sixteen samples were taken - four different quadrants at each of four depths.

3.   Each sample was taken using a peristaltic[63] pump[64] and a length of elastomeric tubing.  First, the tubing was attached to

_____

[62] In other words, it might be that the oil or microorganisms are more concentrated, at any depth, at one side or another of the bioremediation tank or in the front or back of the bioremediation tank.

[63] A peristaltic pump also known as a "tubing pump."  An electric motor turns a set of rollers, which compress and release flexible tubing as they rotate.  This squeezing action creates a vacuum that draws fluid through the tubing.  The pump's name derives from a medical situation where peristalsis is the rhythmic contraction of smooth muscles to propel contents through the digestive tract.

[64] The Masterflex L/S Easy-Load II Pump Head was mounted on to Masterflex Pump Drive (#7554-80).  The sampling rate was done at about one-third of the pump's flow capacity.  The pump was of the "soft start" type, which means that its initial pumping rate was not the maximum value in order to minimize disturbance to the existing environment at the strata being sampled.

a ruler-like device which allowed measurement of length of tubing projecting from the open end.



**Figure 30 - Procedure for extracting samples at various depths.**

The ruler also provided mechanical support for immersing the tubing a chosen distance vertically into the bioremediation fluid.[65]  Attached to the pump, the ruler and open tubing were inserted into the fluid.  With the pump started, samples weighing about 500 grams (about one-half liter) were collected over a period of about two and one-half minutes.  Four samples were taken in each quadrant, at depths of one-quarter inch (representing the "surface"), one inch, four inches, and eight inches.

4.    The samples were, at least potentially, a mixture of water, oil, surfactants, air, and microorganisms.  The sample

---

[65] Since each one one-half liter sample was taken at the required immersion depth, these samples are *not composite* samples, but are representative of the fluid contents at the level of fluid where the tubing end was positioned.

size was one-half liter. The sample was segregated into three
parts:  (1) a 10mL aliquot of the complete sample, (2) the
aqueous portion of the remaining sample when it was allowed to
separate from the hydrocarbon portion after thirty minutes of
undisturbed contact in a one liter separator funnel; and (3) the
hydrocarbon portion after the same separation was completed.



**Figure 31 – Extracted Sample in Separator Funnel.**

All sample materials, except the 10 ml aliquot, were returned to
the bioremediation tank so that the overall volume of fluid in
the tank was not depleted over the course of the experiment.

5.   From item (1), a significant piece of information was
obtained - the concentration (in colony forming units [CFU] per
milliliter) of microorganisms in the entire sample through
dilution plating of the 10 mL sample.

6.   From items (2) and (3), a second piece of information was obtained - the weight fraction of the entire sample which was hydrocarbon oil.



**Figure 32 - Weighing Samples.**

7.   The starting date was considered to be day one.  Then, a charge of one liter of SAE 10W-30 motor oil was added to the mixture of water, surfactants, and microorganisms.  Sampling was completed at twenty-four hour increments[66] for a total of five days (four elapsed days of bioremediation).  So the total samples taken were eighty - sixteen each day for five days.

8.   Oil was added TWICE - on day 1, and on day 3.  One-half liter of 10W30 motor oil was added on both days to the one hundred liters of Bio-Circle L cleaning fluid in the Walter cleaning machine.  The overall weight concentration of oil added to the bioremediation tank in each addition was about 0.8% oil.

---

[66] During each twenty-four hour increment the fluid contents of the bioremediation tank were "circulated" four times with the cleaning pump, each of ten to fifteen minutes duration, to

This volume of oil represents about three times the volume of oil normally-expected to be bioremediated in one day in the Walter bioremediation cleaning machines (about 300 to 350 cc per day).  In other words, this was a substantial single dose of oil – added twice.

9.   Walter Bio-Circle models IO-200 and BR-200 were each tested separately at different times.  The same test protocol was used for both machines.  I personally participated in the development of the test and sampling plans.

### 5.   Empirical Results Obtained for BR-200.

The raw data for the BR-200 study is listed in Tables 1 and 2 below (data combined in Table 2 of Exhibit J):

### TABLE 1 – BR-200 Oil Concentration

| Quadrant | Depth | Day 1 % Oil | Day 2 % Oil | Day 3 % Oil | Day 4 % Oil | Day 5 % Oil |
|---|---|---|---|---|---|---|
| 1 | 0″ | 12.59 | 14.18 | 14.18 | 17.98 | 16.74 |
| 1 | 1" | 0.28 | 1.86 | 1.9 | 1.6 | 2.31 |
| 1 | 4" | 0.23 | 1.68 | 1.76 | 1.56 | 2.18 |
| 1 | 8" | 0.15 | 1.67 | 1.86 | 1.48 | 2.14 |
| 2 | 0″ | 0.25 | 1.44 | 1.81 | 1.64 | 2.06 |
| 2 | 1" | 0.18 | 1.51 | 1.71 | 1.65 | 2.04 |
| 2 | 4" | 0.16 | 1.6 | 1.75 | 1.42 | 2.09 |
| 2 | 8" | 0.16 | 1.49 | 1.91 | 1.42 | 2.04 |
| 3 | 0″ | 16.87 | 18.82 | 26.88 | 11.55 | 25.08 |
| 3 | 1" | 0.57 | 1.6 | 1.963 | 2.14 | 3.73 |
| 3 | 4" | 0.3 | 1.51 | 1.8 | 1.51 | 2.27 |
| 3 | 8" | 0.29 | 1.58 | 1.91 | 1.5 | 2.11 |
| 4 | 0″ | 6.18 | 11.73 | 17.17 | 11.09 | 12.58 |
| 4 | 1" | 0.69 | 1.73 | 1.86 | 1.48 | 2.52 |
| 4 | 4" | 0.55 | 1.63 | 1.99 | 1.56 | 2.11 |
| 4 | 8" | 0.23 | 1.55 | 1.9 | 1.57 | 2.11 |

**TABLE 2 – BR-200 Microbe Concentration**[67]

| Quadrant | Depth | Day 1 CFU | Day 2 CFU | Day 3 CFU | Day 4 CFU | Day 5 CFU |
|---|---|---|---|---|---|---|
| 1 | 0" | 1.33E+08 | 1.33E+08 | 60500000 | 43500000 | 25400000 |
| 1 | 1" | TNTC @ E+4 | 1.35E+08 | 59000000 | 11300000 | 4550000 |
| 1 | 4" | TNTC @ E+4 | 1.61E+08 | 45500000 | 8200000 | 4450000 |
| 1 | 8" | TNTC @ E+4 | 1.52E+08 | 52500000 | 8400000 | 4800000 |
| 2 | 0" | TNTC @ E+4 | 1.46E+08 | 56000000 | 14100000 | 3200000 |
| 2 | 1" | TNTC @ E+4 | 1.58E+08 | 44500000 | 13600000 | 4100000 |
| 2 | 4" | TNTC @ E+4 | 1.59E+08 | 44000000 | 8100000 | 4150000 |
| 2 | 8" | TNTC @ E+4 | 1.68E+08 | 50500000 | 7500000 | 4100000 |
| 3 | 0" | TNTC @ E+4 | 1.48E+08 | 52500000 | 20000000 | 28000000 |
| 3 | 1" | TNTC @ E+4 | 1.71E+08 | 48000000 | 7800000 | 5800000 |
| 3 | 4" | TNTC @ E+4 | 1.56E+08 | 38000000 | 7450000 | 4000000 |
| 3 | 8" | TNTC @ E+4 | 1.53E+08 | 41500000 | 8650000 | 3800000 |
| 4 | 0" | TNTC @ E+4 | 1.63E+08 | 63500000 | 15400000 | 10500000 |
| 4 | 1" | TNTC @ E+4 | 1.68E+08 | 43000000 | 9400000 | 4550000 |
| 4 | 4" | TNTC @ E+4 | 1.49E+08 | 41500000 | 8850000 | 4900000 |
| 4 | 8" | TNTC @ E+4 | 1.51E+08 | 52000000 | 8400000 | 4100000 |

In the Walter BR-200 machine, quadrant 2 was nearly devoid of oil; quadrants 1 and 4 had roughly similar levels of oil; and quadrant 3 had roughly one-half of the measured oil mass. The lateral maldistribution of oil might be considered inefficient use of fluid volume for bioremediation. However, it does not mask the nature of operation of the Walter BR-200 cleaning and bioremediation machine.

It should be clear from Figure 34 below, that average oil concentrations at the various tank depths throughout the five-day test of Walter's BR-200 machine are consistent with the

---

[67] TNTC is an acronym for "too numerous to count."

claims of Chemfree's patents.  It is readily apparent that a substantial amount of the oil is located at, or at least near, the fluid surface of the bioremediation tank.



**Figure 33**

Furthermore, as shown in Figure 34 below (a logarithmic graph), during the final two days of bioremediation testing the concentration of microorganisms is highest at the surface of Walter's BR-200 bioremediation tank.  I note that in this experiment, the initial concentration of microorganisms was too high to count in Walter's Bio-Circle L cleaning fluid.

## LOCATION OF ORGANISMS vs DEPTH in BR-200
### TOTAL of 0.8 % Oil in ALL Quadrants



**Figure 34**

### 6.   Empirical Results Obtained for IO-200.

The raw data for the IO-200 study is listed in Tables 3 and 4 below (data combined in Table 1 of Exhibit J):

### TABLE 3 – IO-200 Oil Concentration

| Quadrant | Depth | Day 1 % Oil | Day 2 % Oil | Day 3 % Oil | Day 4 % Oil | Day 5 % Oil |
|---|---|---|---|---|---|---|
| 1 | 0″ | 8.93 | 6.23 | 6.23 | 2.72 | 0.67 |
| 1 | 1" | 1.73 | 1.41 | 0.66 | 0.29 | 0.27 |
| 1 | 4" | 0.22 | 0.13 | 0.43 | 0.19 | 0.19 |
| 1 | 8" | 0.16 | 0.13 | 0.06 | 0.21 | 0.15 |
| 2 | 0″ | 1.69 | 0.11 | 0.09 | 0.12 | 0.39 |
| 2 | 1" | 0.26 | 0.09 | 0.12 | 0.15 | 0.31 |
| 2 | 4" | 0.13 | 0.11 | 0.1 | 0.14 | 0.21 |
| 2 | 8" | 0.15 | 0.12 | 0.12 | 0.12 | 0.18 |
| 3 | 0″ | 0.11 | 0.1 | 0.12 | 0.12 | 0.15 |
| 3 | 1" | 0.19 | 0.14 | 0.12 | 0.14 | 0.2 |
| 3 | 4" | 0 | 0.15 | 0.07 | 0.13 | 0.04 |
| 3 | 8" | 0 | 0.15 | 0.04 | 0.16 | 0.08 |
| 4 | 0″ | 1.94 | 0.16 | 0.06 | 0.18 | 0.06 |
| 4 | 1" | 0.12 | 0.24 | 0.06 | 0.12 | 0.09 |
| 4 | 4" | 0.09 | 0.11 | 0.04 | 0.13 | 0.11 |
| 4 | 8" | 0.05 | 0.13 | 0.04 | 0.12 | 0.12 |

**TABLE 4 – IO-200 Microbe Concentration**

| Quadrant | Depth | Day 1 CFU | Day 2 CFU | Day 3 CFU | Day 4 CFU | Day 5 CFU |
|---|---|---|---|---|---|---|
| 1 | 0″ | 685000 | 685000 | 1300000 | 110000 | 515000 |
| 1 | 1" | 455000 | 710000 | 138000 | 170000 | 125000 |
| 1 | 4" | 1000000 | 93500 | 82000 | 51000 | 104000 |
| 1 | 8" | 375000 | 43000 | 75000 | 43000 | 97500 |
| 2 | 0″ | 390000 | 270000 | 117000 | 69500 | 90000 |
| 2 | 1" | 595000 | 90500 | 83000 | 88000 | 82000 |
| 2 | 4" | 605000 | 81000 | 114000 | 53500 | 89000 |
| 2 | 8" | 720000 | 93500 | 69000 | 91500 | 98500 |
| 3 | 0″ | 595000 | 84500 | 82000 | 88500 | 63500 |
| 3 | 1" | 910000 | 56500 | 105000 | 41000 | 71500 |
| 3 | 4" | 930000 | 43000 | 72000 | 64000 | 67000 |
| 3 | 8" | 690000 | 70500 | 105000 | 57500 | 72000 |
| 4 | 0″ | 480000 | 365000 | 86000 | 50000 | 56000 |
| 4 | 1" | 900000 | 102000 | 114000 | 52000 | 61000 |
| 4 | 4" | 595000 | 81500 | 60500 | 68000 | 64000 |
| 4 | 8" | 340000 | 63500 | 101000 | 79500 | 61500 |

In the Walter IO-200 machine, quadrants 2, 3, and 4 were nearly devoid of oil; roughly two-thirds of the measured oil mass was found quadrant 1. Once again, the lateral maldistribution of oil might be considered inefficient use of fluid volume for bioremediation. However, it does not mask the nature of operation of the Walter IO-200 parts washer.

It should be clear from Figure 35 below, that average oil concentrations at the various tank-depths throughout the five-day test of Walter's IO-200 machine are consistent with the claims of Chemfree's patents. A substantial amount of the oil is located at, or at least near, the fluid surface of Walter's IO-200 bioremediation tank. This distribution is readily

apparent in Figure 35 below, despite the fact that oil
essentially exists only in one quadrant.  There is little or no
oil a few inches below the fluid surface of Walter's IO-200
bioremediation tank.



**Figure 35**

Furthermore, as shown in Figure 36 below (a logarithmic
graph), during the final four days of bioremediation testing the
concentration of microorganisms is highest at the surface. I
note that on day 5, when the total concentration of organisms is
a decade below that of a few days earlier, the preponderance of
organisms are also found at the fluid surface of the Walter's
IO-200 bioremediation tank.



**Figure 36**

While I was not present during the testing at Genesis, I have reviewed photographs (some of which are displayed above) of the testing procedure and discussed the test protocol, machine operation, and sample processing with the site project leader (Julieta G. Archambault).  My study of available information leads me to note the following about both tests with both Walter machines:

Lateral distribution of oil within both machines was non-uniform within all depths.  In the Walter IO-200 machine, nearly two-thirds of the oil existed at all four depths in quadrant 1. Operation of both machines produced white fluids.



**Figure 37 – Oil Separated from Surface Quadrant 1 of IO-200.**

It is difficult to determine with precision the extent of
separation of the hydrocarbons from the cleaning fluid that took
place during the thirty minute standing time in the separator
funnels.  Ms. Archambault related to me her personal
observations that some samples had free oil floating on top of
the white fluid.  Ms. Archambault also related to me her
personal observations that essentially all eighty samples from
each machine were comprised of this white fluid – more so as the
5-day test progressed. I believe that this white fluid is a
mixture of water, surfactant, organisms, and entrained air.  It
is difficult, however, to determine, with scientific precision,
how much oil is mixed into this white fluid.  Because this white
fluid was noted in both the upper and lower zones of the
separator funnel for nearly all one hundred sixty samples, it is
reasonably likely that the oil content measured by weight of the
upper zone in the separator funnel does not represent the total

oil content in the sample as collected from the cleaning machine.  It was the measured value in the upper zone which was recorded in Tables 1 and 3.

While the IO-200 and BR-200 are similarly-sized machines in terms of fluid capacity, their pumps are different.  The IO-200 has a capacity of 380 liters/hour.  In comparison, the BR-200 has a lower capacity of only 200 liters/hour.

Although both machines used the same commercial source of Bio-Circle L cleaning fluid, the initial, measured level of microorganisms in Walter's Bio-Circle L cleaning fluid was different between the two tests.  Microorganism concentration in the fluid used in the IO-200 was in the range of $10^{+5}$ CFU68 / ml.  Microorganism concentration in the fluid used in the BR-200 was considered "too numerous to count" or greater than $10^{+4}$ CFU / ml.  This is because the sample dilution done for the BR-200 test was based on the assumption that the fluid used in the BR-200 test had an initial microorganisms concentration similar to the fluid that was used in the earlier IO-200 test.

The following is my overall analysis of the data produced in this study.  I believe the proper way to judge performance of these machines, which started with different amounts of microorganisms and produced different lateral distributions of oil, is to examine the distribution of organisms at various depths at the close of the five-day experiments.

My analysis is further based on Figures 39 and 40 below. Each figure refers to the same element of ChemFree's patent claims:  distribution of microorganisms as a function of depth in the bioremediation tank.



**Figure 38 - Distribution of Organisms in BR-200**

In Walter's BR-200 (Figure 38 above) and IO-200 (Figure 39 below) cleaning machines, both figures clearly show that, where non-negligible levels of oil are measured in both cleaning machines, microorganisms are preferentially found at or near the surface of both of Walter's cleaning machines.



**Figure 39 - Distribution of Organisms in IO-200**

I recall that the non-uniform lateral distribution (noted above) of oil within Walter's cleaning machines was: IO-200 – about two-thirds of the oil was present in quadrant 1; BR-200 – quadrant 2 was nearly devoid of oil.

In other words, in quadrants 1, 3, and 4 of Walter's BR-200 machine as well as quadrant 1 of Walter's IO-200 machine, substantial portions of oil were measured (see Tables 1 and 2), and in each of these four quadrants microorganisms are predominately found at the fluid surface.

Clearly, bioremediation does not occur uniformly through the bioremediation tank in Walter's cleaning machines noted above.  It occurs predominately at or near the surface of the vessel – where there is a non-negligible amount of oil to be

bioremediated.   Microorganisms and oil are measured to have

concentrated there, and not throughout the tank.

This nearly incredible displacement between the oil content

at the surface and that below the surface would not be expected

in more than 99.99 percent[68] of cases were the distribution of

non-negligible amounts of oil throughout the bioremediation tank

normally distributed.   Thus, in my opinion, the Genesis study

adequately demonstrates that the preponderance of bioremediation

of non-negligible amounts of oil occurs adjacent to the top of

the fluid surface - as claimed by ChemFree.

### 7.   Conclusions as To BR-200.

With respect to the '110 Patent, claim 2 limitation:

*'110 Patent - claim 2 - the fluid defines a fluid surface in the tank, and wherein a substantial portion of the microorganisms live in the fluid proximate to said fluid surface.*

taking into account the Court's claim construction that

"substantial" means *"a portion or amount that is considerable in quantity."* [July

17, 2007, Order, page 51], it is my opinion that the foregoing

---

[68] The percent value noted above is derived from a statistical analysis. My finding was that the amount of oil measured at the surface was more than six standard deviations above the average of the three measurements of oil content below the fluid surface. These three measurements are at one inch, four inches, and eight inches below the surface. This finding covers quadrant 1 of the Walter's IO-200 and quadrants 1, 2, and 4 of Walters BR-100 machine – where there are found non-negligible amounts of oil. The percent value is the probability that a randomly drawn value would exceed the average value by six standard deviations.

claim limitation is satisfied by the BR-200 (and also by the IO-400 due to its admitted similarity).

With respect to the '110 Patent, claim 3 limitation:

*'110 Patent - claim 3 - a substantial portion of the microorganisms and hydrocarbons accumulate proximate to said fluid surface such that a substantial amount of biodegradation takes place proximate to said fluid surface.*

taking into account the Court's claim construction of "substantial," and the parties agreement that "*accumulate proximate to said fluid surface*" means "*to gather or amass, close or next to the topmost boundary of the cleaning fluid*," it is my opinion that the foregoing claim limitation is satisfied by the BR-200 (and also by the IO-400 due to its admitted similarity).

With respect to the '491 Patent, claim 1 limitations:

*'491 Patent - claim 1 - accumulating the microorganisms and the hydrocarbons adjacent a fluid surface defined by the fluid in the tank;*

*'491 Patent - claim 1 - biodegrading the hydrocarbons proximate to the fluid surface.*

taking into account the parties' agreement that "*adjacent a fluid surface*" means "*close to or next to the topmost boundary of the cleaning fluid*;" and that "*proximate to the fluid surface*" also means "*close to or next to the topmost boundary of the cleaning fluid*" it is my opinion that the foregoing claim limitations are satisfied by the BR-200.

In addition, I note from the deposition of Claude Vandemeulebroocke [page 177, July 6, 2007] that Walter's IO-400 machine is considered to be equivalent to Walter's BR-200 machine, with the exception of the addition of a filter in the

upstream flow from the tank to the basin.  Consequently, I would

expect similar results to the above with the Walter's BR-200

were Walter's IO-400 machine to be similarly tested.

### 8.   Conclusions as To IO-200.

With respect to the '110 Patent, claim 2 limitation:

*'110 Patent - claim 2 - the fluid defines a fluid surface in the tank, and wherein a
substantial portion of the microorganisms live in the fluid proximate to said fluid surface.*

taking into account the Court's claim construction of

"substantial," it is my opinion that the foregoing claim

limitation is satisfied by the IR-200.

With respect to the '110 Patent, claim 3 limitation:

*'110 Patent - claim 3 - a substantial portion of the microorganisms and hydrocarbons
accumulate proximate to said fluid surface such that a substantial amount of
biodegradation takes place proximate to said fluid surface.*

taking into account the Court's claim construction of

"substantial," and the parties agreement as to the meaning of

"*accumulate proximate to said fluid surface,*" it is my opinion that the

foregoing claim limitation is satisfied by the IO-200.

With respect to the '491 Patent, claim 1 limitations:

*'491 Patent - claim 1 - accumulating the microorganisms and the hydrocarbons adjacent
a fluid surface defined by the fluid in the tank;*

*'491 Patent - claim 1 - biodegrading the hydrocarbons proximate to the fluid surface.*

taking into account the parties' agreement for the meanings of

"*adjacent a fluid surface*" and "*proximate to the fluid surface,*" it is my opinion

that the foregoing claim limitations are satisfied by the IO-

200.

## VII.   <u>CONCLUSIONS</u>

Based on the foregoing analysis, it is my opinion and conclusion that, under the "all limitations" rule referenced in the Assumptions section above,[69] each and every one of the claim limitations of the following asserted claims of ChemFree's patents Patent are satisfied, either literally or under the Doctrine of Equivalents, by Walter's Bio-Circle™ parts washers, in combination with Walter's Bio-Circle L™ cleaning fluid. Whenever a dependent claim is listed below as having all of its limitations satisfied by an accused instrumentality, it is understood that the phrase "all of the limitations," when used below, includes the limitations of the dependent claim itself, plus all limitations of any other claims from which such claim depends.

### A.   **WALTER'S BIO-CIRCLE™ BR-100 PARTS WASHER IN COMBINATION WITH BIO-CIRCLE L™ CLEANING FLUID.**

#### 1.   **United States Patent No. 6,019,110.**

- All of the limitations of claim 1 are literally satisfied.

- All of the limitations of claim 2 are literally satisfied.

- All of the limitations of claim 3 are literally satisfied.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

---

[69] *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed.Cir. 2005).

- All of the limitations of claim 6 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

- All of the limitations of claim 8 are literally satisfied.

### 2.   United States Patent No. 6,074,491.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 6 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

### 3.   United States Patent No. 6,374,835.

- All of the limitations of claim 8 are literally satisfied.

- All of the limitations of claim 10 are literally satisfied.

- All of the limitations of claim 11 are literally satisfied.

- All of the limitations of claim 12 are literally satisfied.

### 4.   United States Patent No. 6,440,226.

- All of the limitations of claim 1 are literally satisfied.

- All of the limitations of claim 3 are literally satisfied.

- All of the limitations of claim 4 are literally satisfied.

### 5.   United States Patent No. 6,451,125.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

- All of the limitations of claim 16 are literally satisfied.

- All of the limitations of claim 17 are literally satisfied.

- All of the limitations of claim 18 are literally satisfied.

- All of the limitations of claim 19 are literally satisfied.

- All of the limitations of claim 21 are literally satisfied.

B.   WALTER'S BIO-CIRCLE[TM] BR-200 PARTS WASHER IN COMBINATION WITH BIO-CIRCLE L[TM] CLEANING FLUID.

1.   United States Patent No. 6,019,110.

- All of the limitations of claim 1 are literally satisfied.

- All of the limitations of claim 2 are literally satisfied.

- All of the limitations of claim 3 are literally satisfied.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 6 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

- All of the limitations of claim 8 are literally satisfied.

2.   United States Patent No. 6,074,491.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 6 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

3.   United States Patent No. 6,374,835.

- All of the limitations of claim 8 are literally satisfied.

- All of the limitations of claim 10 are literally satisfied.

- All of the limitations of claim 11 are literally satisfied.

- All of the limitations of claim 12 are literally satisfied.

### 4.   United States Patent No. 6,440,226.

- All of the limitations of claim 1 are literally satisfied.

- All of the limitations of claim 3 are literally satisfied.

- All of the limitations of claim 4 are literally satisfied.

### 5.   United States Patent No. 6,451,125.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

- All of the limitations of claim 16 are literally satisfied.

- All of the limitations of claim 17 are literally satisfied.

- All of the limitations of claim 18 are literally satisfied.

- All of the limitations of claim 19 are literally satisfied.

- All of the limitations of claim 21 are literally satisfied.

### C.   WALTER'S BIO-CIRCLE™ IO-400 PARTS WASHER IN COMBINATION WITH BIO-CIRCLE L™ CLEANING FLUID.

### 1.   United States Patent No. 6,019,110.

- All of the limitations of claim 1 are literally satisfied.

- All of the limitations of claim 2 are literally satisfied.

- All of the limitations of claim 3 are literally satisfied.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 6 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

- All of the limitations of claim 8 are literally satisfied.

### 2.   United States Patent No. 6,074,491.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 6 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

### 3.   United States Patent No. 6,374,835.

- All of the limitations of claim 8 are literally satisfied.

- All of the limitations of claim 10 are literally satisfied.

- All of the limitations of claim 11 are literally satisfied.

- All of the limitations of claim 12 are literally satisfied.

### 4.   United States Patent No. 6,440,226.

- All of the limitations of claim 1 are literally satisfied.

- All of the limitations of claim 3 are literally satisfied.

- All of the limitations of claim 4 are literally satisfied.

### 5.   United States Patent No. 6,451,125.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

- All of the limitations of claim 16 are literally satisfied.

- All of the limitations of claim 17 are literally satisfied.

- All of the limitations of claim 18 are literally satisfied.

- All of the limitations of claim 19 are literally satisfied.

- All of the limitations of claim 21 are literally satisfied.

   D.   WALTER'S BIO-CIRCLE[TM] IO-200 PARTS WASHER IN
        COMBINATION WITH BIO-CIRCLE L[TM] CLEANING FLUID.

       1.   United States Patent No. 6,019,110.

- All of the limitations of claim 1 are literally satisfied.

- All of the limitations of claim 2 are literally satisfied.

- All of the limitations of claim 3 are literally satisfied.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 6 are literally satisfied.
  Alternatively, to the extent that the level sensor limitation
  is not literally satisfied, it is satisfied under the Doctrine
  of Equivalents.

- All of the limitations of claim 7 are literally satisfied.

- All of the limitations of claim 8 are literally satisfied.
  Alternatively, to the extent that the level sensor limitation
  is not literally satisfied, it is satisfied under the Doctrine
  of Equivalents.

       2.   United States Patent No. 6,074,491.

- All of the limitations of claim 4 are literally satisfied.
  Alternatively, to the extent that the limitation of "heating
  fluid within the tank" is not literally satisfied, it is
  satisfied under the Doctrine of Equivalents.

- All of the limitations of claim 5 are literally satisfied. Alternatively, to the extent that the limitation "measuring the level of the fluid ..." is not literally satisfied, it is satisfied under the Doctrine of Equivalents.

- All of the limitations of claim 6 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied. Alternatively, to the extent that the limitation "measuring the level of the fluid ..." is not literally satisfied, it is satisfied under the Doctrine of Equivalents.

### 3. United States Patent No. 6,374,835.

- All of the limitations of claim 8 are literally satisfied.

- All of the limitations of claim 10 are literally satisfied. Alternatively, to the extent that the "sole flowpath" limitation is not literally satisfied, it is satisfied under the Doctrine of Equivalents.

- All of the limitations of claim 11 are literally satisfied. Alternatively, to the extent that the "sole flowpath" limitation in Claim 10 is not literally satisfied, it is satisfied under the Doctrine of Equivalents.

- All of the limitations of claim 12 are literally satisfied. Alternatively, to the extent that the "sole flowpath" limitation in Claim 10 is not literally satisfied, it is satisfied under the Doctrine of Equivalents.

### 4.   United States Patent No. 6,440,226.

- All of the limitations of claim 1 are literally satisfied.

- All of the limitations of claim 3 are literally satisfied.

- All of the limitations of claim 4 are literally satisfied.

### 5.   United States Patent No. 6,451,125.

- All of the limitations of claim 4 are literally satisfied.

- All of the limitations of claim 5 are literally satisfied.

- All of the limitations of claim 7 are literally satisfied.

- All of the limitations of claim 16 are literally satisfied.

- All of the limitations of claim 17 are literally satisfied. Alternatively, to the extent that the "measuring the level of the fluid ..." limitation is not literally satisfied, it is satisfied under the Doctrine of Equivalents.

- All of the limitations of claim 18 are literally satisfied.

- All of the limitations of claim 19 are literally satisfied. Alternatively, to the extent that the "measuring the level of the fluid ..." limitation is not literally satisfied, it is satisfied under the Doctrine of Equivalents.

- All of the limitations of claim 21 are literally satisfied.

**SWORN DECLARATION:**  I solemnly swear under penalty of perjury that the facts in the foregoing report, which are represented as based on my own personal knowledge, are true and accurate and that the foregoing report constitutes my opinion

and conclusion on the matters related herein the same as if
offered as testimony at trial.  I am prepared to testify in
Court to the foregoing upon the trial of this action.

Respectfully submitted, this 29th day of February, 2008.

JOHN B. DURKEE, PhD, P.E.