# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

```
CHEMFREE CORPORATION,          )
                               )
          Plaintiff,           )
                               )
v.                             )  Civil Action No.
                               )  1:04-CV-3711 JTC
J. WALTER, INC., and           )
J. WALTER COMPANY, LTD.        )
                               )
          Defendants.          )
```

===================================================================

# REBUTTAL EXPERT REPORT OF
# JOHN B. DURKEE, PhD, P.E.

===================================================================

Submitted on behalf of Plaintiff

```
By:  John B. Durkee, PhD, P.E.
     122 Ridge Road West
     Hunt, Texas  78024
     Telephone:  (830) 238-7610
     Email:  jdurkee@precisioncleaning.com
```

## **TABLE OF CONTENTS**

I.   INTRODUCTION........................................................... 1

     A.   MATTERS INCORPORATED BY REFERENCE FROM INITIAL
          EXPERT REPORT................................................... 1

     B.   ADDITIONAL QUALIFICATION - PROFESSIONAL
          MEMBERSHIPS..................................................... 2

II.  DATA AND OTHER INFORMATION CONSIDERED IN FORMING
     OPINIONS............................................................... 3

III. OVERVIEW OF THE STATE OF THE ART PRIOR TO CHEMFREE'S
     INVENTION............................................................. 36

     A.   SUMMARY OF THE U.S. AND GLOBAL INDUSTRIAL CLEANING
          MARKET IN THE TIME OF 1993 TO 1996 ................... 37

     B.   EQUIPMENT SITUATION:................................... 38

          1.   Rotating Basket. ................................ 38

          2.   The "Sink-On-A-Drum" Apparatus. ................. 39

          3.   The Vapor Degreaser Apparatus. ................. 42

     C.   AQUEOUS PARTS WASHING................................. 46

     D.   EARLY ATTEMPTS AT BIOREMEDIATION OF HYDROCARBON
          CONTAMINANTS WITHIN PARTS WASHERS.................... 59

     E.   FORWARD ONE DECADE – CIRCA 2004..................... 60

IV.  CHEMFREE'S PATENTS.............................................. 62

     A.   REVIEW OF PROSECUTION HISTORY...................... 62

          1.   Office Actions Involving Lashmett. ............... 62

          2.   Office Actions Involving Hakansson-1. ............ 64

          3.   Office Actions Involving Guinn. .................. 66

          4.   Prosecution History Related to Minkin. ........... 71

          5.   Prosecution History Related to Olson. ............ 72

          6.   Prosecution History Related to Hiss. ............. 72

          7.   Prosecution History Related to Tuttle. ........... 72

          8.   Prosecution History Related to Sims. ............. 73

     B.   OVERVIEW OF THE TEACHINGS OF THE SPECIFICATION OF
          THE CHEMFREE PATENTS................................. 73

          1.   Relationship Between Mechanical, Fluid, and
               Biological Components of the Invention. .......... 74

2. Issues Related to Batch Versus Continuous Processing. ............................................... 75

C. THE MEANING OF DISPUTED CLAIM TERMS. .................. 80

   1. Sensor. .......................................... 80

   2. Hydrocarbons. .................................... 81

   3. Non-Flammable. ................................... 81

   4. Temporal Aspects of "Non-Toxic" and "Non-Caustic." ......................................... 83

   5. Whether Claim Pre-Ambles Are Limiting. ........... 84

V. CRITIQUE OF professor's adriaens' INVALIDITY OBVIOUSNESS CONTENTIONS. ................................ 86

A. SCOPE AND CONTENT OF THE PRIOR ART. .................. 87

   1. The "Art" - the "Field of the Invention" is Parts Washing. ................................... 87

   2. The Asserted Invalidity References. .............. 88

   3. Whether A Reference is "Within" The Scope and Content of the Prior Art. ....................... 89

   4. Whether *Sims, Lashmett,* and *Minkin* Qualify As "Prior Art" In Light of the Date of ChemFree's Invention. ...................................... 91

   5. Opinion and Conclusion on Scope and Content of the Prior Art. ................................. 93

B. LEVEL OF ORDINARY SKILL IN THE ART. .................. 93

   1. Legal Standard Applied. .......................... 93

   2. Educational Level of the Inventor. .............. 96

   3. Type Of Problems Encountered In The Art. ......... 98

   4. Prior Art Solutions To Those Problems. .......... 101

   5. Rapidity With Which Innovations Are Made. ....... 105

   6. Sophistication Of The Technology. .............. 107

   7. Educational Level Of Workers Active In The Field ........................................... 110

   8. Opinion And Conclusion On The Level Of Ordinary Skill In The Art. .............................. 112

C. DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIMED INVENTION. ......................................... 113

   1. Differences between U.S. Patent No. 5,265,633 to Knowlton and the Claimed Invention. .......... 114

2. Differences between Hakansson-1 and the Claimed Invention. ..................................... 119

3. Differences between U.S. Patent No. 5,364,789 to Guinn and the Claimed Invention. ............ 124

4. Differences between U.S. Patent No. 3,522,814 to Olson and the Claimed Invention. ............ 127

5. Differences between U.S. Patent No. 5,322,078 to Tuttle and the Claimed Invention. ........... 128

6. Differences between U.S. Patent No. 5,427,128 to Minkin and the Claimed Invention. ........... 131

7. Differences between U.S. Patent No. 5,232,299 to Hiss and the Claimed Invention. ............. 132

8. Differences between U.S. Patent No. 5,492,139 to Lashmett and the Claimed Invention. ......... 134

9. Differences between U.S. Patent No. 5,656,156 to Sims and the Claimed Invention. ............. 137

10. Differences between U.S. Patent No. 5,561,059 to Kaiser and the Claimed Invention. ........... 138

11. Differences between U.S. Patent No. 3,846,615 to Athey and the Claimed Invention. ............ 140

12. Claim Chart. ................................... 141

D. COMBINABILITY OF REFERENCES. ...................... 142

1. Professor Adriaens Did Not Specify Discrete Combinations of References or Provide Any Reason for Making Such (Unspecified) Combinations. .................................. 142

2. The Problem With Prior Art "Biodegradable" Cleaning Fluids Recognized in Hakansson-1. ...... 146

3. Environmental Contamination Clean-Up Fluids Do Not Overcome The Problems Identified By Hakansson. ..................................... 150

4. Organic Solvent Cleaning Fluids Cannot Be Combined With Microorganisms. ................... 155

5. Someone Skilled In The Art Would Not Be Motivated To Modify Lashmett to Reach The Claimed Invention. ............................ 156

6. Someone Skilled In The Art Would Not Be Motivated To Modify Minkin to Reach The Claimed Invention. ............................ 158

7. Professor Adriaens Did Not Analyze The Ordinary Practitioner's Expectation of Success. .......... 159

E. SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS. ........ 160

1. Skepticism Within the Industry Prior to Invention. ............................ 162

2. Unexpected Results. ........................... 164

a. The Unexpected Results of ChemFree........... 164

b. The Unexpected Nature of ChemFree's Results Are Confirmed By The Later Work of Bert Overland..................................... 165

c. Overland's Deposition Testimony Confirms That ChemFree's Invention Achieved Unexpected Results.......................... 171

d. Opinion and Conclusion That ChemFree's Invention Has Achieved Unexpected Results..... 173

3. Laudatory Statements Of Advantages Of The Invention By Infringer. ...................... 173

4. Attempts To Patent The Same Invention. .......... 176

5. Industry Acclaim and Awards Post Invention. ..... 180

6. Copying by Others. ............................ 182

a. Graymills.................................... 183

b. Walter Bio-Circle........................... 185

c. Denios, CB Chemie, and Foreign Distributors... 186

d. ForBest...................................... 187

e. Clean[3] .................................... 189

f. ATEC, Nature's Way Eco-Systems, and Clean Earth Ltd................................... 190

g. KleenTec..................................... 193

h. Wynn's Belgium EPC Parts Washer.............. 194

i. ZYMO – United States and Europe.............. 195

j. Concluding Remarks, Opinion, and Conclusion On Copying................................. 197

7. Commercial Success. ........................... 198

VI. INVALIDITY BY ANTICIPATION DEFENSE..................... 198

VII. ENABLEMENT DEFENSE.................................... 199

1.  Critique of Enablement Issue Number 1 - Changing the Filter. ........................... 201

2.  Critique of Enablement Issue Number 2 – Number of Microorganisms Affixed to Filter Pad. ........ 203

3.  Critique of Enablement Issue Number 3 – Length of Time for Microorganisms to Adapt. ............ 207

4.  Critique of Enablement Issue Number 4 – Concentration of Replacement Fluid. ............. 209

5.  Critique of Enablement Issue Number 5 Related to "Biodegradable Fluid." ....................... 211

6.  Critique of Enablement Issue Number 6 - Dredging Sludge. ............................... 213

7.  Critique of Enablement Issue Number 7 – The 3M Super 77 Spray Adhesive Issue. ................. 215

8.  Critique of Enablement Issue No. 8 - Comments on the Experiments Described in the '226 Patent. ....................................... 216

9.  Opinion and Conclusion on Enablement. ........... 218

VIII. THE INEQUITABLE CONDUCT DEFENSE. ...................... 219

A.  THE "OUT" REFERENCES. ............................... 224

B.  HAKANSSON-2. ........................................ 224

C.  KAISER. ............................................. 230

1.  Manbeck and Adriaens on Kaiser. ................ 230

2.  Kaiser is cumulative of Guinn. ................. 232

3.  Kaiser is cumulative of Hakansson-1 ............ 233

D.  NON-CUMULATIVE ANALYSIS OF REMAINING NINE REFERENCES FROM PARAGRAPHS 47 AND 49. ............... 233

1.  U.S. Patent No. 5,322,078 to *Tuttle* ............ 235

2.  U.S. Patent No. 5,427,128 to *Minkin* ............ 235

3.  DE 2449056 – NANNINGA, ONNO G. ................. 236

4.  EPO 116 151 (also U.S. Patent 4,609,488) to *Geke* ........................................... 236

5.  JP 7-75795 – Kondo, Toshihito. ................. 237

6.  U.S. Patent No. 5,246,023 to *Breunsbach* and U.S. Patent No. 4,784,169 to *Striedieck* ......... 238

7.  U.S. Patent No. 5,133,893 to *Thom* .............. 238

8.  U.S. Patent No. 3,813,342 to *Cooperman* .......... 239

IX.  OPINIONS AND CONCLUSIONS................................ 240

    A.  OBVIOUSNESS........................................ 240

        1.  The "Art" is Parts Washing. .................... 240

        2.  Graham Factor No. 1 - Scope and Content of the
            Prior Art. ..................................... 241

        3.  Graham Factor No. 2 - Level of Ordinary Skill
            in the Art. .................................... 241

        4.  Graham Factor No. 3 - Differences Between the
            Prior Art and the Claimed Invention. ........... 241

        5.  Graham Factor No. 4 - Secondary Considerations
            of Non-Obviousness. ............................ 242

        6.  Ultimate Conclusion – Not Obvious. ............. 243

    B.  ANTICIPATION....................................... 243

    C.  ENABLEMENT......................................... 243

X.   INEQUITABLE CONDUCT.................................... 243

XI.  ULTIMATE OPINION AND CONCLUSION........................ 244

My name is John Durkee.  I previously submitted an expert report in this litigation dated on or about February 29, 2008, which was largely devoted to patent infringement issues.  The within rebuttal report is submitted in response to the Expert Report of Peter Adriaens dated February 28, 2008.  In addition, the within report will address certain matters raised in the Expert Report of Harry F. Manbeck, Jr. dated February 29, 2008.  In addition, this report will address certain matters raised in Walter's:

(i) interrogatory responses number 16 and 17 related to inequitable conduct issues; and

(ii) response brief and accompanying declarations submitted in opposition to ChemFree's motion for partial summary judgment on inequitable conduct that were filed with the Court on or about February 5, 2008.

## I.   INTRODUCTION

### A.   MATTERS INCORPORATED BY REFERENCE FROM INITIAL EXPERT REPORT.

I am informed by Counsel for ChemFree that expert witness disclosures in federal patent cases is governed, at least in part, by the following rule:

(2) *Disclosure of Expert Testimony*: . . .

(B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the

party regularly involve the giving of expert testimony, be
accompanied by a written report prepared and signed by the
witness.  The report shall contain a complete description
of all opinions to be expressed and the basis and reasons
therefor; the data or other information considered by the
witness in forming the opinions; any exhibits to be used as
a summary of or support for the opinions; the
qualifications of the witness, including a list of all
publications authored by the witness within the preceding
ten years; the compensation to be paid for the study and
the testimony and a listing of any other cases in which the
witness has testified as an expert at trial or be
deposition within the preceding four years.

[Federal Rule of Civil Procedure 26(a)(2)(B)].  Pursuant to the

foregoing rule, my disclosures relative to: (i) data and other

information considered in forming opinions; (ii) my

compensation; (iii) qualifications; (iv) publications within the

preceding ten years; and (v) prior experience as an expert

witness, are set forth in my initial expert report and are

incorporated herein by reference.  To the extent I considered

additional data and information in reaching my opinions and

conclusions on invalidity and inequitable conduct issues that is

not identified in my February 29, initial report, I have listed

such information in this report.

**B.   ADDITIONAL QUALIFICATION - PROFESSIONAL MEMBERSHIPS.**

I am, or recently have been, a member of the following

professional associations:

- American Society for Testing and Materials - ASTM

- American Chemical Society - ACS

- American Institute of Chemical Engineers - AIChE

• Institute of Environmental Sciences and Technology - IEST.

## II. <u>DATA AND OTHER INFORMATION CONSIDERED IN FORMING OPINIONS</u>

In addition to the materials that I considered in connection with my initial expert report of February 29, 2008, I have considered the following data and other information in forming the opinions expressed in this report:

### *Expert Reports and Declarations of Defendants' Experts:*

• Initial Expert Report of Peter Adriaens, PhD, P.E. dated on or about February 28, 2008, and exhibits thereto.

• Initial Expert Report of Harry F. Manbeck, Jr. dated on or about February 29, 2008, and exhibits thereto.

• Declaration of Harry F. Manbeck, Jr. dated on or about February 5, 2008.

### *Motion Papers and Briefs from the instant Civil Action :*

• Brief In Support Of Plaintiff's Motion For Partial Summary Judgment On Inequitable Conduct Issues, Docket 286-2.

• Defendants' Opposition To Plaintiff's Motion For Partial Summary Judgment On Inequitable Conduct Issues, Docket 300.

• Plaintiff's Reply Brief In Support Of Its Motion For Partial Summary Judgment On Inequitable Conduct Issues, Docket 304.

### *United States and Foreign Patent Publications*

#### *References Asserted in Adriaens and Manbeck Report*

• U.S. Patent No. 5,265,633 to Knowlton entitled *Parts Washer*;

• European Patent Application No. 309 432 to Hakansson entitled *A Cleaning Method and Apparatus Therefor* (aka "*Hakansson-1*");

- U.S. Patent No. 5,364,789 to Guinn et al entitled *Microbial Cleaner*;

- U.S. Patent No. 5,492,139 to Lashmett entitled *Method and Apparatus for Remediating Contaminated Material*;

- U.S. Patent No. 5,561,059 to Kaiser entitled *Substrate Bioavailability Enhancing Chemical Mixture for Use in Bioremediation*;

- U.S. Patent No. 5,656,156 to Sims entitled *Filtration System for Closed Cycle Parts Washer*;

- U.S. Patent No. 3,522,814 to Olson entitled *Washer for Parts and the Like*;

- U.S. Patent No. 5322,078 to Tuttle entitled *Aqueous Parts Washing Apparatus*;

- U.S. Patent No. 5,427,128 to Minkin entitled *Parts Washer Temperature / Pressure Equalization System*;

- U.S. Patent No. 5,232,299 to Hiss entitled *Parts Washer*;

- U.S. Patent No. 3,846,615 to Athey entitled *Liquid Temperature Control and Low Liquid Level Detector.*

### References Asserted in Walter's Amended Counterclaim

### References Asserted in Walter's Amended Counterclaim paragraph 47

- U.S. Patent No. 5,458,747 to Marks et al entitled *Insitu Bio-Electrokinetic Remediation of Contaminated Soils Containing Hazardous Mixed Wastes;*

- U.S. Patent No. 5,368,411 to Losack entitled *Method and Apparatus for on the Site Cleaning of Contaminated Soil*;

- U.S. Patent No. 5,364,789 to Guinn entitled *Microbial Cleaner*;

- U.S. Patent No. 5,322,078 to Tuttle entitled *Aqueous Parts Washing Apparatus*;

- U.S. Patent No. 5,314,620 to Staniec entitled *Cutting Oil Treatment*;

- U.S. Patent No. 5,246,023 to Breunsbach et al entitled *Method and Apparatus to Clean and Cleanliness Test Printed Circuit Boards*;

- U.S. Patent No. 5,217,616 to Sanyal et al entitled *Process and Apparatus for Removal of Organic Pollutants From Waste Water*;

- U.S. Patent No. 5,132,224 to Mueller et al entitled *Biological Remediation of Creosote- and Similarly-Contaminated Sites*;

- U.S. Patent No. 5,128,262 to Lindoerfer et al entitled *Microbial Decontamination of Soils Contaminated With Hydrocarbons in Particular Mineral Oils by Microbial Oxidation*;

- U.S. Patent No. 4,784,169 to Striedieck entitled *Apparatus for Treating Articles With Solution to Remove Solids and Then Filtering the Solution*;

- U.S. Patent No. 4,727,031 to Brown et al entitled *Nutrient for Stimulating Aerobic Bacteria*;

- U.S. Patent No. 4,452,894 to Olsen et al entitled *Pseudomonas Compositions*;

- U.S. Patent No. 4,128,478 to Metzger entitled *Parts Washer*;

- U.S. Patent No. 3,707,404 to Carlson et al entitled *Parts Washer and Method of Solvent Cleaning*;

- U.S. Patent No. 3,476,600 to Morgan et al entitled *Rinsing Machine-Washed Dishes*;

- U.S. Patent No. 3,378,019 to Riolo et al entitled *Parts Washer*;

- European Patent Application No. EPO 116,151

- Japanese Patent Publication No. JP 7-75795

- Japanese Patent Publication No. JP 62543 18

- German Patent Publication No. DE 2449056

### *References Asserted in Walter's Amended Counterclaim paragraph 48*

- WO 92/16314 (aka Hakansson-2)

### *References Asserted in Walter's Amended Counterclaim paragraph 49*

- U.S. Patent No. 5,133,893 to Thom et al entitled *Enzymatic Detergent Composition*;

- U.S. Patent No. 3,813,342 to Cooperman entitled *Cleaning Compositions*;

- U.S. Patent No. 5,427,128 to Minkin entitled *Parts Washer Temperature / Pressure Equalization System*;

### *Selected References Cited During Prosecution*

- U.S. Patent No. 3,352,310 to Doyscher entitled *Parts Washer;*

- U.S. Patent No. 3,522,814 to Olson entitled *Washer for Parts and the Like*;

- U.S. Patent No. 5,376,183 to Gatt entitled *Method for Cleaning Industrial and Domestic Articles and Surfaces Contaminated With Organic or Lipophilic Wastes*;

- U.S. Patent No. 5,401,413 to Gatt entitled *Method for Enhancing The Biodegradation of Biodegradable Organic Wastes*;

- U.S. Patent No. 3,960,728 to Otzen entitled *Disposable Filter Apparatus*;

- U.S. Patent No. 5,137,694 to Copeland entitled *Industrial Solid Detergent Dispenser And Cleaning System*;

- U.S. Patent No. 5,257,171 to Hara entitled *Electric Control Apparatus For Dishwashing Machine*;

- U.S. Patent No. 4,365,383 to Bartlett entitled *Cleaning Apparatus For Components*;

- United States Patent No. 5,339,845 to Huddas entitled *Cleaning Apparatus and Method For Fuel and Other Passages*; and

- United States Patent No. 5,454,878 to Bala et al entitled *Method For Removing Hydrocarbon Contaminants From Solid Materials*.

### Selected References Owned by Walter Affiliates

- U.S. Patent No. 6,057,147 to Overland entitled *Apparatus and Method For Bioremediation of Hydrocarbon Contaminated Objects;*

- U.S. Patent No. 7,303,908 to Overland entitled *Bioremediation Assembly;*

### Discovery and Local Rule Contentions and Discovery Orders from the instant Civil Action:

- Defendants' Invalidity Contentions, dated September 28, 2005, Docket 41.

- Defendants' First Amended Invalidity Contentions, dated October 14, 2005, Docket 48.

- Defendants' Second Amended Invalidity Contentions, dated October 19, 2005, Docket 49

- Defendants' Third Amended Invalidity Contentions, dated August 22, 2007, Docket 236, and accompanying declarations of Knowlton, Bucklin, Brent Lashmett, and William Lashmett.

- Defendants' Response to Plaintiff's First Discovery Request (Interrogatory 1 & 2), dated September 28, 2005.

- Defendants' Amended Response to Plaintiff's First Discovery Request (Interrogatory 1 & 2), dated November 11, 2005.

- Defendants' Second Amended Response to Plaintiff's First Discovery Request (Interrogatory 1 & 2), dated November 30, 2005.

- Defendants' Response to Plaintiff's Seventh Discovery Request (Interrogatory 5), dated November 28, 2005.

- Defendants' Response to Plaintiff's Eighth Discovery Request (Interrogatory 6), dated November 29, 2005.

- Defendants' Supplemental Response To Plaintiff's Interrogatories No. 1-6, dated September 17, 2007.

- Defendants' Response to Plaintiff's Fifteenth Discovery Request (Interrogatory 16 - 18), dated June 14, 2007.

- Defendants' Supplemental Response to Plaintiff's Interrogatories 15 - 19, dated December 13, 2007.

- Defendants' Second Supplemental Response to Plaintiff's Interrogatories 15 - 19, dated February 19, 2008.

- Order dated October 29, 2007, granting ChemFree's motion to strike Walter's Third Amended Invalidity Contentions - striking Prior Use Declarations of Lashmett, Lashmett, Bucklin, and Knowlton, and further striking U.S. Patents Nos. 5,232,299; 5,364,789; and U.S. Patent 5,427,128 from Defendants' Third Amended Invalidity Contentions.

### *Testimony: Depositions and Affidavits*:

I have considered transcripts of the following depositions and affidavits:

- Deposition transcript of Bert Overland, dated February 7, 2008;

- Deposition transcript of Thomas McNally, dated July 27, 2007;

- Deposition transcript of Frank Marks, dated July 20, 2007;

- Deposition transcript of William Lashmett, dated August 20, 2007.

### *Other materials considered*

- Photographs and product literature on the Graymills Biomatic 436 and 536 model bioremediation parts washers (Exhibit A hereto);

- Photographs, product literature and internet website literature of the ATEC "Clean Pro" bioremediation parts washer – circa 1998 - 2000 (Photographs – Exhibit B hereto);

- Photographs, product literature and internet website literature of the ForBest bioremediation parts washer – circa 1998 - 2000 (Photographs – Exhibit C hereto);

- Photographs, product literature and internet website literature on Clean[3]'s bioremediation parts washer and parts washer cleaning fluid (Exhibit D hereto);

- Product literature and internet website literature on KleenTec's bioremediation parts washer and parts washer cleaning fluid (Exhibit E hereto);

- Product literature and internet website literature on American Bioclean's bioremediation parts washer and parts washer cleaning fluid (Exhibit F hereto);

- Product literature and internet website literature on Denios' Bio-Circle parts washer (Exhibit G hereto);

- Product literature and internet website literature on CB Chemie's Bio-Circle parts washer (Exhibit H hereto);

- Internet website literature on the Revolution Advanced Metals and Materials Bio-Circle parts washer and parts washer cleaning fluid (Exhibit I hereto);

- Internet website literature on Regent BioChem India Private Limited's Bio-Circle parts washer (Exhibit J hereto);

- Product literature on Clean Earth's bioremediation parts washer and parts washer cleaning fluid (Exhibit K hereto);

- Photographs and internet website literature on ZYMO's bioremediation parts washer and parts washer cleaning fluid (Exhibit L hereto);

- Product literature and internet website literature on TTA-ZYMO's bioremediation parts washer and parts washer cleaning fluid (Exhibit M hereto);

- Product literature and internet website literature on the Wynn's Eco Parts Cleaner bioremediation parts washer (Exhibit N hereto);

- Product literature, press release and internet website literature on the Nature's Way Eco-Systems bioremediation parts washer (Exhibit O hereto); and

- Product literature on BioRem's bioremediation parts washer (Exhibit P hereto).

- Walter product literature (Exhibit Q hereto).

- Bio-Force Distributor Business Plan.

*Interviews and Personal Knowledge :*

During the course of formulating my opinions and conclusions and preparing my report, I have relied on my personal knowledge and experience gained from over 19 years from my employment in the cleaning industry.  During this time, I have provided professional consulting services or provided technical support for solvent-based, aqueous-based, "non-chemistry" based, plasma-based, blast media-based, ozone-based, and other types of cleaning technology including bioremediation. I have also relied on my 25 years of professional experience as a profession engineer in the employ of DuPont and Conoco.

In addition, I have personally interviewed the following persons in connection with my engagement:

Glenn Nelson, Bio-Force

Arthur Gillman, Unique Equipment

Janice Baker, Northtech Imaging

*Assumptions as to Legal Standards :*

In conducting my analysis and rendering my opinions and conclusions, I have made the following assumptions.  In particular, I have attempted to avoid offering opinions on the

state of the law or on matters in dispute between the parties that are questions of law for the Judge to decide.  In certain instances identified below, counsel for ChemFree has advised me as to certain legal standards that apply to the overall subject matter of my report.  For the purposes of rendering this report, I have assumed that the statements regarding legal standards and principals provided to me by counsel are accurate statements of the law.  The citations to legal authority below have all been provided to me by counsel as part of the underlying basis for my assumptions.

**Patent validity analysis - Presumption of Validity**:  A patent enjoys a presumption of validity, which can be overcome only through clear and convincing evidence.  35 U.S.C. § 282; *Crown Operations Intern., Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed.Cir. 2002).

**Obviousness is a Question of Law for the Court**:  The ultimate determination of whether an invention would have been obvious is a legal conclusion based on the totality of the evidence. *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1124, 56 U.S.P.Q.2d 1456 (Fed.Cir. 2000).

**"Expert" Opinion on Ultimate Legal Conclusion of Obviousness is not Evidence**:  An expert's opinion on the ultimate legal conclusion of obviousness is neither required nor indeed

"evidence" at all.  *Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.,* 853 F.2d 1557, 1564 (Fed.Cir.1988).

**Invalidity Analysis - 2-step process**:  Patent invalidity analysis is a 2-step process.  The first step involves the proper interpretation of the claims.  The second step involves determining whether the limitations of the claims as properly interpreted are met by the prior art.  *TI Group Automotive Systems (North America), Inc. v. VDO North America, L.L.C.,* 375 F.3d 1126, 1139 (Fed.Cir. 2004).

**Claim Construction**:  The  process of construing the claims of a patent is a matter of law for the Court to decide.  *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 388-389, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996);

**Claim Construction**:  The only terms that need to be construed are those that are in controversy, and only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.,* 200 F.3d 795, 804 (Fed.Cir. 1999);

**Claim Construction - terms given the same meaning for infringement and validity analysis**:  Claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses.  *Amazon.com, Inc. v. BarnesandNoble.com, Inc.* 239 F.3d 1343, 1351 (Fed.Cir. 2001).

**Patent Infringement - Whether Claim Preamble Limits the Scope of a Claim:** If the body of the claim sets out the complete invention, the preamble is not ordinarily treated as limiting the scope of the claim. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed.Cir. 2006).

**Patent Infringement - Whether Claim Preamble Limits the Scope of a Claim:** The preamble is regarded as limiting if it recites essential structure that is important to the invention or necessary to give meaning to the claim. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed.Cir. 2006).

**Patent Infringement - Whether Claim Preamble Limits the Scope of a Claim:** When the limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed.Cir. 2006).

**Novelty of an Invention**: A person shall be entitled to a patent unless—

> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102 (a) & (b).

- 13 -

**Anticipation of an Invention by a Prior Art Reference**:  The "All

Limitations" rule:

> To anticipate a claim under 35 U.S.C. § 102, it is
> necessary that a single anticipatory prior art
> reference disclose each limitation of the claimed
> device either expressly or inherently.

*Hazani v. United States Int'l Trade Comm'n*, 126 F.3d 1473, 1479 (Fed.Cir.
1997).

**Obviousness**:  The legal standard of obviousness is:

> A patent may not be obtained though the invention is not
> identically disclosed or described as set forth in section
> 102 of this title, if the differences between the subject
> matter sought to be patented and the prior art are such
> that the subject matter as a whole would have been obvious
> at the time the invention was made to a person of ordinary
> skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which
> the invention was made.

35 U.S.C. § 103(a).

**Prior Art**:  For purposes of determining what is "prior art" for

purposes of an obviousness invalidity analysis under 35 U.S.C.

§ 103, courts look to 35 U.S.C. § 102 sub-sections (a), (e),

(f), and (g):

> The prior art sources ('references') most often relied upon
> to show obviousness are those mentioned in Section 102(a),
> prior knowledge or use, prior patents, and prior
> publications.  However, it is now clear that Section 102(e)
> (description in prior co-pending patent application that
> ripens into a patent), Section 102(g) (prior invention),
> and Section 102(f) (derivation from another) may also be
> relied upon to show obviousness.

> Donald S. Chisum, CHISUM ON PATENTS, § 5.03[3], Matthew Bender
> © 2006.

**Types of Prior Art under 35 U.S.C. § 102(a)**:   A person shall be

entitled to a patent unless the invention was —

- known or used by others in this country before the
  invention thereof by the applicant for patent;

- patented in this or a foreign country before the
  invention thereof by the applicant for patent;

- described in a printed publication in this or a foreign
  country before the invention thereof by the applicant for
  patent;

- patented in this or a foreign country more than one year
  prior to the date of the application for patent in the
  United States;

- described in a printed publication in this or a foreign
  country more than one year prior to the date of the
  application for patent in the United States; or

- in public use or on sale in this country, more than one
  year prior to the date of the application for patent in
  the United States.

35 U.S.C. § 102 (a) & (b).

**Underlying factual inquiries for an obviousness analysis under**

**35 U.S.C. § 103 (the "Graham Factors):"**   An obviousness

analysis is based on four underlying factual inquiries:

(1) the scope and content of the prior art;

(2) the differences between the claims and the prior art;

(3) the level of ordinary skill in the pertinent art; and

(4) secondary considerations of non-obviousness.

*McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed.Cir. 2001)

*citing Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

**Whether reference is "in" the prior art**:  Before answering

*Graham's* 'content' inquiry, it must be known whether a patent

or publication is in the prior art under 35 U.S.C. § 102,

which is a legal question.  *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d

1561, 1568 n. 9 (Fed. Cir. 1987), *cert. denied*, 481 U.S. 1052

(1987).

**Effective Date of U.S. Patent Reference**:  The effective date of

a reference United States patent as prior art is its filing

date in the United States.  *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*,

872 F.2d 978, 983 (Fed.Cir. 1989).

**The "Art:"**  Courts use "*Field of the Invention*" and "*Field of the Applicant's*

*Endeavor*" as synonymous with "*the Art*" in the phrase "*Ordinary Skill in*

*the Art.*"  *In re Dance*, 160 F.3d 1339, 1343 (Fed.Cir. 1998)

(emphasis added).

**Scope and Content of the Prior Art**:  There are two criteria for

determining whether a reference in the prior art is

"analogous" art:

> (1) whether the art is from the same field of endeavor,
> regardless of the problem addressed; and

> (2) if the reference is not within the field of the
> inventor's endeavor, whether the reference is reasonably
> pertinent to the particular problem with which the inventor
> is involved.

*In re Clay*, 966 F.2d 656, 659 (Fed.Cir. 1992).

**Reasonably Pertinent**:  A reference is reasonably pertinent if,

even though it may be in a different field from that of the

inventor's endeavor, it is one which, because of the matter

with which it deals, logically would have commended itself to

an inventor's attention in considering the problem.  *In re Clay*,

966 F.2d 656, 659 (Fed.Cir. 1992).

**Non-Analogous Art - Common Sense Approach**:  It is necessary to

consider the reality of the circumstances, in other words

common sense, in deciding in which fields a person of ordinary

skill would reasonably be expected to look for a solution to

the problem facing the inventor.  *In re Oetiker*, 977 F2d 1443,

1447 (Fed.Cir. 1992); *In re Wood*, 599 F.2d 1032, 1036 (CCPA

1979).

**Adapting Material from a Remote Art to a New Use is Indicative**

**of Non-Obviousness**:

It often requires as acute a perception of the relations
between cause and effect, and as much of the peculiar
intuitive genius which is a characteristic of great
inventors, to grasp the idea that a device used in an art
may be made available in another, as would be necessary to
create the device de novo. And this is not the less true
if, after the thing has been done, it appears to the
ordinary mind so simple as to excite wonder that it was not
thought of before ... . The practiced eye of an ordinary
mechanic may be safely trusted to see what ought to be
apparent to every one ... .

If the new use be so nearly analogous to the former one
that the applicability of the device to its new use would
occur to a person of ordinary mechanical skill, it is only

a case of double use; but if the relations between them be
remote, and especially if the use of the old device
produces a new result, it may at least involve an exercise
of the inventive faculty.  Much, however, must still depend
upon the nature of the changes required to adapt the device
to its new use.

*Potts v. Creager*, 155 U.S. 597, 608, 15 S.Ct. 194, 198, 39 L.Ed.

275 (1895).

**Determination of obviousness is with respect to standard of**

**"ordinary" skill in the art**:  Obviousness is determined by

reference to a person of ordinary skill in the art as opposed

to what may be obvious to a judge, or to a layman, or to those

skilled in remote arts, or to someone of extraordinary skill

in the art.  *Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*, 807 F.2d

955 (Fed.Cir. 1986).

**Level of Ordinary Skill in the Art**:  Factors pertinent to a

determination of the level of ordinary skill in the art

include:  (1) educational level of the inventor; (2) type of

problems encountered in the art: (3) prior art solutions to

those problems; (4) rapidity with which innovations are made;

(5) sophistication of the technology, and (6) educational

level of workers active in the field.  Not all such factors

may be present in every case, and one or more of these or

other factors may predominate in a particular case.

*Environmental Design, Ltd. V. Union Oil Co. of Calif.*, 713 F.2d 693, 696-697

(Fed.Cir. 1983).  These factors are not exhaustive but are

merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. Ltd, Inc. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed.Cir. 2007).

**Level or ordinary skill - skill level of inventor is irrelevant**:

The issue of obviousness is determined with reference to a hypothetical person having ordinary skill in the art. The actual inventor's skill is irrelevant to this inquiry. *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 454 (Fed.Cir. 1985).

**Skill of inventor distinguished from one of ordinary skill**:

Inventors, as a class, possess something which sets them apart from the workers of ordinary skill and one should not go about determining obviousness under § 103 by inquiring into what patentees (i.e., inventors) would have known or would likely have done, faced with the revelation of references. *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 454 (Fed.Cir.1985); *Life Technologies, Inc. v. Clontech Laboratories, Inc.,* 224 F.3d 1320, 1325 (Fed.Cir. 2000).

**Skill of inventor distinguished from skill of one ordinary skill**: The hypothetical person of ordinary skill is not the inventor, but an imaginary being possessing "ordinary skill in the art" created by Congress to provide a standard of patentability. Realistically, courts never have judged patentability by what the real inventor/applicant/patentee could or would do. Real inventors, as a class, vary in their

capacities from ignorant geniuses to Nobel laureates; the courts have always applied a standard based on an imaginary worker of their own devising whom they have equated with the inventor. *Kimberly-Clark Corp.* v. *Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed.Cir. 1984).

**Level of Ordinary Skill in the Art**: In determining the level of ordinary skill in the art, the important consideration lies in the need to adhere to the statute, *i.e.,* to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of ordinary skill in the art-- not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand. *Environmental Design, Ltd. V. Union Oil Co. of Calif.*, 713 F.2d 693, 697 (Fed.Cir. 1983);

**Level of Ordinary Skill in the Art**: A person of ordinary skill in the art is one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448 (Fed.Cir. 1985).

**Level or Ordinary Skill in the Art**: A person of ordinary skill is also a person of ordinary creativity, not an automaton. *KSR Int'l Co. v. Teleflex Inc.,* 127 S.Ct. 1727, 1742, 167 L.Ed.2d 705 (2007).

**Level or Ordinary Skill in the Art for Obviousness Analysis is also applied to Section 112 Written Description Analysis**: (in

context of definiteness requirement).  *AllVoice Computing PLC v. Nuance Communications, Inc.*, 504 F.3d 1236 (Fed.Cir. 2007)(*quoting KSR Int'l Co. v. Teleflex, Inc.,* 127 S.Ct. 1727, 1742, 167 L.Ed.2d 705 (2007) ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.")

**Level of Ordinary Skill in the Art**:  The person of ordinary skill in the art is a hypothetical person who is presumed to be aware of all the pertinent prior art.  *Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*, 807 F.2d 955 (Fed.Cir. 1986).

**Level of Ordinary Skill in the Art – determined as of time invention was made**:  The level of skill in the art is measured as of the time the invention was made.  *In re Epstein*, 32 F.3d 1559, 1564, n.4 (Fed.Cir. 1994).

**Level of Skill in the Art rarely supplies missing knowledge**: Rarely will the skill in the art component operate to supply missing knowledge or prior art to reach an obviousness judgment.  *Al-Site Corp v. VSI Int'l, Inc.*, 174 F.3d 1308, 1324 (Fed.Cir. 1999).

**Level of Ordinary Skill in the Art**:  Familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle.  *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1732, 167 L.Ed.2d 705 (2007).

**Obviousness**:  When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, 35 U.S.C. § 103 likely bars its patentability.  For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.  *KSR Int'l Co. v. Teleflex, Inc.,* 127 S.Ct. 1727, 1740, 167 L.Ed.2d 705 (2007).

**Obviousness**:  A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.  *KSR Int'l Co. v. Teleflex, Inc.,* 127 S.Ct. 1727, 1740, 167 L.Ed.2d 705 (2007).

**Obviousness**:  When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  *KSR Int'l Co. v. Teleflex, Inc.,* 127 S.Ct. 1727, 1742, 167 L.Ed.2d 705 (2007).

**Reliance on an Inherent Feature in a Reference for Purposes of an Obviousness Analysis**:  An inherent feature may be relied upon to establish obviousness only if the inherency would have been obvious to one of ordinary skill in the art.  Donald S. Chisum, CHISUM ON PATENTS, § 5.03[3][a][I][A], Matthew Bender © 2006.

**Reference Must Be Taken For All It Teaches**:  A reference must be considered for all it teaches, including disclosures that teach away from the invention as well as disclosures that point toward the invention.  *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 296 (Fed.Cir. 1985) *cert denied* 475 U.S. 1017 (1986).

**Teaching Away**:  A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.  The degree of teaching away will of course depend on the particular facts; in general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant.  *In re Gurley*, 27 F.3d 551, 553 (Fed.Cir. 1994).

**Teaching Away**: Known disadvantages in old devices which would naturally discourage the search for new inventions may be

taken into account in determining obviousness. *United States v. Adams*, 383 U.S. 39, 52, 148 U.S.P.Q. 479, 484 (1966).

**Teaching Away**: References taken in combination may teach away where they would produce a seemingly inoperative device. *In re Sponnoble*, 405 F.2d 578, 587 (CCPA 1969).

**Teaching Away**: A reference teaches away if it leaves the impression that the product would not have the property sought by the applicant. *In re Caldwell*, 319 F.2d 254, 256 (CCPA 1963).

**Combining Multiple References in an obviousness analysis**: In seeking to invalidate a patent under 35 U.S.C. § 103, it is permissible to combine two or more references. *Baxter Int'l v. McGaw Inc.*, 149 F.3d 1321, 1328 (Fed.Cir. 1998).

**Need to Establish the Combinability of References**: The notion that combination claims can be declared invalid merely upon finding similar elements in separate prior patents would necessarily destroy virtually all patents and cannot be the law under the patent statute. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1575, 1 USPQ2d 1593, 1603 (Fed.Cir. 1987).

**Reason for Combining References**: Some kind of reason must be shown as to why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented invention. *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363 (Fed.Cir. 2008).

**Combining References Requires A Reasonable Expectation of Success**:  An obviousness determination requires not only a reason to combine elements from different prior art references, but also that a skilled artisan would have perceived a reasonable expectation of success in making the invention via that combination. *Medichem, S.A., v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed.Cir. 2006).

**Reasonable Expectation of Success**:  To have a reasonable expectation of success, one must be motivated to do more than merely vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful. *Medichem, S.A., v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed.Cir. 2006).

**Reasonable Expectation of Success**:  Prior art fails to provide a reasonable expectation of success where it teaches merely to pursue a general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.  *Medichem, S.A., v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed.Cir. 2006).

**Hindsight Reconstruction not Permitted**:  A fact finder should be aware of the distortion caused by hindsight bias and must be

cautious of arguments reliant upon *ex post* reasoning.  *KSR Int'l Co. v. Teleflex Inc.,* 127 S.Ct. 1727, 1742, 167 L.Ed.2d 705 (2007).

**Hindsight Reconstruction not Permitted**:  Although the suggestion to combine references may flow from the nature of the problem, defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness.  *Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH*, 139 F.3d 877, 880, 45 USPQ2d 1977, 1981 (Fed.Cir.1998).

**Hindsight Reconstruction**:  In conducting an obviousness inquiry, prior art may not be gathered with the claimed invention in mind.  *Pentec, Inc., v. Graphic Controls Corp.*, 776 F.2d 309 (Fed.Cir. 1985).

**Hindsight Reconstruction**:  Obviousness cannot be established by hindsight combination to produce the claimed invention.  It is the prior art itself, and not the applicant's achievement, that must establish the obviousness of the combination.  *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1143 (Fed.Cir. 1985).

**Lack of prior invention - as indicia of non-obviousness**:  That the elements of an invention lay about in the prior art available for years to all skilled workers without suggesting anything like the claimed invention is itself evidence of nonobviousness."  *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561,

1577 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95

L.Ed.2d 843 (1987).

**Simple Inventions May be Patentable**:  The patent system is not

foreclosed to those who make simple inventions.  *Panduit Corp. v.*

*Dennison Mfg. Co.,* 810 F.2d 1561, 1572 (Fed.Cir.), *cert. denied,* 481

U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987);

**Simple Inventions May be Patentable**:  Simplicity of itself does

not negate invention.  *Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.,* 321

U.S. 275, 279, 64 S.Ct. 593, 594, 88 L.Ed. 721 (1944).

**Path that leads inventor to an invention is irrelevant**:  The

path that leads an inventor to the invention is expressly made

irrelevant to patentability by statute.  *See* 35 U.S.C. §

103(a) ("Patentability shall not be negatived by the manner in

which the invention was made.").  *Life Technologies, Inc. v. Clontech*

*Laboratories, Inc.,* 224 F.3d 1320, 1325 (Fed.Cir. 2000).

**Inventor need not comprehend scientific principles underlying**

**the invention**:  An inventor need not comprehend the scientific

principles on which the practical effectiveness of his

invention rests.  *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565,

1570, 219 U.S.P.Q. 1137, 1140 (Fed.Cir. 1983).

**Inventor need not comprehend scientific principles underlying**

**the invention**:  It is certainly not necessary that an inventor

understand or be able to state the scientific principles

underlying his invention, and it is immaterial whether he can stand a successful examination as to the speculative items involved.  *Diamond Rubber Co. v. Consolidated Rubber Tire Co.,* 220 U.S. 428, 435-36, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911):

**Secondary Considerations of non-obviousness**:  Evidence rising out of the so-called `secondary considerations' must always when present be considered en route to a determination of obviousness  ... evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not.  It is to be considered as part of all the evidence, not just when the decision maker remains in doubt after reviewing the art. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538, 218 U.S.P.Q. 871, 879 (Fed.Cir. 1983).

**Secondary Considerations of non-obviousness**:  Secondary considerations include evidence of factors tending to show nonobviousness, such as commercial success of the invention, satisfying a long-felt need, failure of others to find a solution to the problem at hand, and copying of the invention by others.  It is the secondary considerations that are often most probative and determinative of the ultimate conclusion of obviousness or nonobviousness.  *Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed.Cir. 1996).

**Secondary Considerations – attempts to patent the invention by the accused infringer**:  An attempt to patent the same invention by the accused infringer is an appropriate factor to take into account in assessing the non-obviousness of patents. *American Medical Systems  Inc. v. Medical Engineering Corp.*, 794 F. Supp. 1370, 1386 (E.D.Wis. 1992), *aff'd in part, rev'd in part & remanded*, 6 F.3d 1523 (Fed.Cir. 1993) .

**Secondary Considerations – Advertisements of accused infringer touting advantages of patented invention**:  An infringer's advertisements touting advantages provided by the invention is a secondary consideration tending to establish the non-obviousness of an invention.  *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed.Cir. 1997).

**Secondary Considerations – Advertisements of accused infringer touting advantages of patented invention**:  Statements of praise by the accused infringer made prior to the initiation of litigation are a strong indication of the non-obviousness of the invention.  *Libbey-Owens-Ford Co. v. BOC Group Inc.*, 655 F. Supp. 897, 914 (D.N.J. 1987).

**Secondary Considerations – Initial Skepticism**:  Skepticism toward an invention in the prior art and proceeding contrary to the accepted wisdom is evidence of nonobviousness.  *In re Hedges*, 783 F.2d 1038, 1041 (Fed.Cir. 1986).

**Secondary Considerations – Industry Praise**: Industry acclaim, including awards bestowed within an industry, is evidence of nonobviousness. *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc*. 471 F.3d 1369, 1380 (Fed.Cir. 2006).

**Secondary Considerations – Commercial Success**: The commercial response to an invention is a relevant consideration to a determination of obviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1388 (Fed.Cir. 1988), *cert. denied*, 488 U.S. 956 (1988).

**Secondary Considerations – Commercial Success of Walter's infringing device(s)**: The success of an infringing product is considered to be evidence of the commercial success of the claimed invention. *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed.Cir. 2000).

**Enablement**: The specification of a patent shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same. 35 U.S.C. § 112, ¶ 1.

**Enablement**: Whether a patent claim is enabled is a question of law, although based upon underlying factual findings. *National Recovery Technologies, Inc., v. Magnetic Separation Systems, Inc.*, 166 F.3d 1190, 49 U.S.P.Q.2d 1671 (Fed.Cir. 1999).

**Enablement**:  Enablement is determined from the viewpoint of persons of skill in the field of the invention at the time the patent application was filed.  *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1345 (Fed.Cir. 2000).

**Enablement**: A patent need not teach, and preferably omits, what is well known in the art.  *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534 (Fed.Cir. 1987) *cert denied*, 484 U.S. 954 (1987).

**Enablement**:  Enablement is not precluded even if some experimentation is necessary, although the amount of experimentation needed must not be unduly extensive.  *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed.Cir. 1986) *cert denied,* 480 U.S. 947 (1987).

**Enablement**:  A patent is not a scientific treatise, but a document that presumes a readership skilled in the field of the invention.  *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1347 (Fed.Cir. 2000).

**Enablement**: Patents are written to enable those skilled in the art to practice the invention, not the general public.  *W.L. Gore & Assoc, Inc. v. Farlock, Inc.,* 721 F.2d 1540, 1556 (Fed.Cir. 1983).

**Enablement**:  The invention referred to in the enablement requirement of section 112 is the claimed invention.  *Lindemann Maschinenfabrik v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1463 (Fed.Cir. 1984).

**Enablement**:  An inventor need not comprehend the scientific principles behind the invention.  The inventor's theory or belief as to how his invention works is not a necessary element to satisfy the enablement requirement.  *Cross v. Iizuka*, 753 F.2d 1040, 1042 (Fed.Cir. 1985).

**Enablement – the "Wands Factors**:"  Factors to be considered in determining whether a disclosure would require undue experimentation include:  (1) the quantity of experimentation necessary; (2) the mount of direction or guidance presented; (3) the presence or absence of working examples: (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims.  *In re Wands*, 858 F.2d 731, 737 (Fed.Cir. 1988).

**Enablement**:  It is not fatal if some experimentation is needed, for the patent document is not intended to be a production specification.  *Northern Telecom v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed.Cir. 1990).

**Enablement**:  The enablement requirement is met if the description enables any mode of making and using the claimed invention.  *Engel Ind., Inc. v. Lockformer Co.,* 946 F.2d 1528, 1533 (Fed.Cir. 1991).

**Inequitable Conduct – Materiality / Cumulative**:  A prior art reference is cumulative and, therefore, not material to

patentability, if it teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO.  Donald S. Chisum, CHISUM ON PATENTS, § 19.03[b], Matthew Bender © 2006.

**Inequitable Conduct – Materiality / Cumulative:**  An item is not cumulative if it discloses either:  (i) a feature that is not disclosed in the cited references; or (ii) suggests a combination of features that is not disclosed in the cited items.  Donald S. Chisum, CHISUM ON PATENTS, § 19.03[b], Matthew Bender © 2006.

*Assumptions as to Underlying Facts:*

Based on communications I have had with counsel for ChemFree, I understand that ChemFree, among other things, expects to prove the following facts at trial.  I have assumed that each of the following facts is true for purposes of arriving at my opinions and conclusions in this report.

I have assumed that ChemFree will be able to prove at trial that its "date of invention" for all of the claims of its patents that have been asserted against Walter will be at least on or before April 28, 1994.

I have assumed that ChemFree will be able to prove at trial that Graymills had access to ChemFree's bioremediation parts washer technology disclosed in ChemFree's patent applications at the time that Graymills developed its Bio436 and Bio536 parts

washers and Biotene cleaning fluid (shown in Exhibit A to my report).

I have assumed that ChemFree will be able to prove at trial that Graymills made ChemFree's bioremediation cleaning fluid technology disclosed in ChemFree's patent applications to Walter prior to Walter's development of its Bio-Circle L cleaning fluid.

I have assumed that ChemFree will be able to prove at trial that Walter made ChemFree's bioremediation parts washer technology disclosed in ChemFree's patent applications and incorporated into Graymills' Bio436, Bio536, and Walter's BR-100 parts washer available to Denios prior to development of Walter's BR-200 and IO-400 parts washers.

I have assumed that ChemFree will be able to prove at trial that Denios had access to ChemFree's bioremediation parts washer technology disclosed in ChemFree's patent applications at the time that it developed its Bio-Circle parts washer (shown in Exhibit G to my report).

I have assumed that ChemFree will be able to prove at trial that CB Chemie had access to ChemFree's bioremediation parts washer technology disclosed in ChemFree's patent applications at the time that it developed its Bio-Circle cleaning fluid (shown in Exhibit H to my report).

I have assumed that ChemFree will be able to prove at trial that the designers of the Clean[3] Parts Washer system, shown as Exhibit D to my report, had access to ChemFree's bioremediation parts washer technology disclosed in ChemFree's patent applications at the time that they developed their bioremediation parts washer and cleaning fluid.

I have assumed that ChemFree will be able to prove at trial that the designers of the ForBest Parts Washer system, shown as Exhibit C to my report, had access to ChemFree's bioremediation parts washer technology disclosed in ChemFree's patent applications at the time that they developed their parts washer and cleaning fluid.

I have assumed that ChemFree will be able to prove at trial that the designers of the ATEC "Clean Pro" Parts Washer system, shown as Exhibit B to my report, had access to ChemFree's bioremediation parts washer technology disclosed in ChemFree's patent applications at the time that they developed their parts washer and cleaning fluid.

I have assumed that ChemFree will be able to prove at trial that the designers of the CleanEarth Solutions Ltd. Bioremediation Parts Washing Machine, shown as Exhibit K to my report, had access to ChemFree's bioremediation parts washer technology disclosed in ChemFree's patent applications at the time that they developed their parts washer and cleaning fluid.

I have assumed that ChemFree will be able to prove at trial that
the designers of the American BioClean Bioremediation Parts
Washing Machine, shown as Exhibit F to my report, had access
to ChemFree's bioremediation parts washer technology disclosed
in ChemFree's patents at the time that they developed their
parts washer and cleaning fluid.

I have assumed that the Overland '147 Patent is owned by Walter
or an affiliate of Walter and that Walter endorses the
validity and non-obviousness of the Overland '147 Patent.

### III. OVERVIEW OF THE STATE OF THE ART PRIOR TO CHEMFREE'S INVENTION.

An overview of parts cleaning technology just prior to the
date of ChemFree's invention is set forth in my book "*The Parts
Cleaning Handbook – Without CFCs How to Manage the Change*" which was published
in 1994.  Cleaning fluids used in part washers included aqueous,
semi-aqueous, hydrocarbon solvent, and chlorinated solvent.
Cleaning fluid was applied to soiled parts using a variety of
techniques that called for different types of parts washing
machines, including:  (i) immersion without agitation; (ii)
vapor degreaser; (iii) agitated platform immersion; (iv)
enhanced platform immersion; (v) ultrasonic-enhanced immersion;
(vi) low-pressure spray; and (vii) high pressure spray.

## A.   SUMMARY OF THE U.S. AND GLOBAL INDUSTRIAL CLEANING MARKET IN THE TIME OF 1993 TO 1996

From 1989 through 1993, I was employed by Du Pont / Conoco as a project coordinator associated with the development and commercialization of alternatives to Du Pont's CFC-113 when used as a cleaning agent.  In this period, the largest-ever incidence of technical, political, commercial, and psychological disruption was imposed upon the industrial cleaning market – as well as many others.  The technical driver was environmental – based on scientific evidence that use, and therefore release to the atmosphere, of certain chemicals was responsible for the long-term destruction of the Earth's stratospheric ozone layer.  The political driver was the global response to this evidence.  The Montreal Protocol, on Substances that Deplete the Ozone Layer,  was signed by 24 countries on September 16, 1987.  As of this writing, over 185 countries have signed it.

The Montreal Protocol caused considerable disruption in the cleaning industry and created a host of technical problems to be solved by practitioners in the art.  These problems are discussed in more detail below under the section pertaining to the level of ordinary skill in the art.

**B.    EQUIPMENT SITUATION:**

The three most common types of cleaning equipment in the prior art to ChemFree's invention are described and pictured below.

### 1.    Rotating Basket.

A typical example of the "rotating basket" parts washer apparatus is shown in Figure 1 below;



**Figure 1 – Rotating Basket Parts Washer.**

## 2.   The "Sink-On-A-Drum" Apparatus.

The single vessel "sink-on-a-drum" device, pictured below, used hydrocarbon solvents at ambient temperature conditions.



**Figure 2 – Typical "Sink-on-a-drum" Solvent Parts Washer**

The dominant participant in the market for this type of parts cleaning was the Safety-Kleen Company.  Due, in large part, to the waste disposal issues associated with solvent cleaning systems, Safety-Kleen's business model treated parts washing as a service industry.  Safety-Kleen would place a sink-on-a-drum device at a customer's site (for example, an automotive repair facility) and then periodically call on the customer to remove used solvent, fill the parts washer with new solvent, and replace the filter, etc.

A typical solvent, sink-on-a-drum parts washer is described in U.S. Patent No. 3,522,814 to Olson, illustrated below:



**Figure 3 – Olson Drawings of Sink-on-a-Drum Parts Washer.**

The "drum" portion of the apparatus served as a reservoir for the solvent cleaning fluid.  A human-powered (mechanical treadle) or low-pressure electric pump would draw fluid from the reservoir and pump it through a faucet/nozzle disposed above the sink.  The soiled part would first be placed in the flowing stream of solvent which would tend to remove hydrocarbon contaminants from the part.  That tendency for removal was supplemented by soaking (immersing) the still-soiled part in a

level of fluid in the sink.  Further enhancing the tendency for removal was application of mechanical force with a cloth, a stiff-bristle brush, steel wool, or the like.  Most likely, all three treatments would be serially applied – often several times.

The soiled hydrocarbon fluid, usually called mineral spirits or PD-680 by the U.S. military, would then flow through a drain hole, typically disposed in the center of the sink bottom, where it would then drop back into the fluid reservoir in the drum via gravity flow.

This type of cleaning is called cold cleaning – not because heat is never applied, but because it is not done at the boiling point of the solvent.  Cold cleaning was also done with halogenated solvents such as 1,1,1-trichloroethane (TCA) because it: was a solvent matched well to common soils, did evaporate rapidly, was low-priced, was considered not to have a flash point, was exempt from VOC (smog-forming chemicals) classification, and had a relatively high exposure limit. But, TCA was classified, through the Montreal Protocol, as a Class II ozone depletion compound whose manufacture was banned in the us by the 1990 Clean Air Act.

Some prior art solvent washers, including Olson, included a filter device interposed between the sink and the drum that separated particulate matter from the used solvent.  Another

filter for solvent parts washers is disclosed in U.S. Patent No. 3.960,728 to Otzen.

### 3.    The Vapor Degreaser Apparatus.

The vapor degreaser apparatus, an example of which is pictured below, used boiling solvents (usually halogenated) at ambient pressure, but at the solvent boiling point.



**Figure 4 – Typical Vapor Degreaser Configuration.**

Cold cleaning was highly valued by the U.S. military for cleaning of parts and assemblies prior to repair.  The hydrocarbon solvent was one of several mineral sprit mixtures, known as "PD-680."  Cold cleaning with TCA was done with the parts washer of Figures 2 and 3 above, but more commonly with a paint brush and a coffee can of solvent.

There were several drawbacks to solvent parts washers related to their use of mineral spirits cleaning fluids.  Most importantly, they were a fire hazard – in at least two ways. Their flash points were low – between say 74° F and 141°  This

experimental result changed the electrical classification of associated and nearby electrical equipment, and also changed the classification of wastes containing these solvents.  This classification scheme is shown directly in Figure 5, and is superimposed on a plot of flash point vs. boiling point data as Figure 6.



**Figure 5**

Refined mineral spirit products were more expensive when produced with a higher flash point.  Since purchase price was a dominant issue with both customers and suppliers, low-flash materials were commonly used even though they were inherently more likely to produce a fire.

There was a second tradeoff, after price, with flash point. Lower flash point goods evaporated much more rapidly; goods with higher flash points evaporated much more slowly.  This correlation is generally found and believed characteristic of

all solvents (not just mineral spirits).  It is shown in Figure
6 below for paraffinic hydrocarbons.



**Figure 6**

Note for the safer hydrocarbons, those with flash points
above 140°F, relative evaporation rate is extremely low.
Practically, this means that wet parts don't dry quickly in air,
or in some cases at all.  Avoidance of these tradeoffs between
fire safety / waste disposal, solvent price, and ease of parts
drying was greatly desired by many.



**Figure 7**

The second concern involving fire safety was that it was too easy to form aerosols of mineral spirit solvents in air. This happens when solvent is forced through most any nozzle at most any level of differential pressure.  Since solvent-air aerosols lack only a spark from being a high-energy fire, it was essential to avoid this situation by design features.

A great many mineral spirit parts washers did not have electrically-driven pumps as a way of reducing discharge pressure and hence the possibility of an aerosol.  That's why, as noted above, human-powered (mechanical treadle) pumps flooded surfaces with fluid rather than provide any mechanical force with a fluid jet to aid in soil removal.

Additionally, mineral spirit parts washers came equipped with a hinged sink cover that was typically fitted with a fusible link device that would drop the cover over the sink to smother any fire.

Over time, the mineral spirit solvent would build up an accumulation of hydrocarbon contaminants (oil and grease) from the dirty parts that would lower the cleaning effectiveness of the solvent.  This required periodic and routine replacement of the used solvent.  While acceptable cleaning could be attained at accumulated soil levels of perhaps less than ten percent, sites concerned about cost delayed their scheduled solvent change out with Safety-Kleen. Cleaning quality suffered as accumulated soil levels in the solvent occasionally exceeded twenty-five percent.  But budget control was maintained – at the price of poorer cleaning quality.

Of less concern in the early 1990s but of great concern today, the solvent would evaporate, releasing volatile organic compounds (VOCs) into the atmosphere.  Essentially, no mineral spirit components are VOC exempt in the U.S.  Finally, contact with the fluid was unpleasant to the operator, both in terms of skin irritation and noxious fumes.

### C.   AQUEOUS PARTS WASHING.

Aqueous parts cleaning uses a cleaning fluid that is substantially comprised of water – instead of hydrocarbon components.  Both aqueous and solvent cleaning technologies are based on three common principles (pillars): (1) solvency or detergency, (2) application of mechanical force, and  (3) application of heat to attain a desired temperature.

The nature of the chemicals are very different between those used in aqueous and solvent cleaning technologies. The amount of mechanical force used, and the manner of its application, is usually quite different in aqueous and solvent cleaning. And the amount and purpose of addition of heat is different among aqueous and solvent cleaning. Yet the above three principles are common to each.

It matters not if the cleaning process is: "dip-and-dunk" cold solvent cleaning, vaporization of debris by lasers, popular detergent-based aqueous cleaning, dislocation of particles by "energy storms" created by laser energy, ozone oxidation, bioremediation parts washers, or blast cleaning with hulls from vegetable products. The three actions are involved in all.

Although it as not as user-friendly or environmentally friendly as "soap and water," aqueous cleaning technology is the dominant approach to industrial cleaning used by the majority of global users today. Water is the ideal solvent for water-soluble soils – road salt, some food and beverage products, plating salts, organic compounds rich in hydroxyl groups such as glycerin, and stable water emulsions such as water-based or latex paints and heat-transfer agents. However, that extensive and significant list of soils is minuscule compared to the depth and variety of soils found in global applications of industrial

cleaning.  For nearly all oils and greases, water is not the ideal solvent.  In fact, it is usually the worst choice of solvents because the common hydrocarbon is not soluble in water. The basic guidance is that, if the oil or grease was derived from crude oil (hydrocarbons), it is not water soluble.  If the oil or grease was produced synthetically or is derived from vegetable material, it may be water soluble.

It is the three principles of cleaning above which allow aqueous cleaning to very often clean as well as or better than solvent cleaning – despite the fact that the oil may not be soluble in water.

- In solvent cleaning, one dissolves the oil and grease soils into a solution, and mechanical force is seldom used.  Increase of temperature usually promotes soil solubility.

- In aqueous cleaning, one uses a detergent (surfactant, or "tenside") supplemented by mechanical force to liberate the soils from part surfaces.

Oil soils and surfactants don't form a solution in water. Rather, they can form one of several structures, such as a micelle or a colloid.  A diagram of one type of micelle is shown in Figure 8.



**Figure 8 – Diagram of Micelle**

Micelles are usually the structure formed in aqueous cleaning operations.  Here the size of the individual oil particles is super-micron.  Examples of colloids are milk, mayonnaise, or hand cream.  Here the individual oil particles are tiny – sub-micron.  These structures collect the oil from the part, the collection being strongly aided by the additional mechanical force.  Any such structure is an agglomeration of water, oil, and detergent which has different:  sizes of oil particles, levels of mechanical and thermal stability, responses to pH change, ratios of ingredients, and different structural forms.

Temperature changes are usually necessary to make the aqueous process work well, or at all.  Formation of the agglomeration is usually strongly temperature dependent, with the agglomeration only being stable over a narrow range of temperatures.  This is a crucial point.  Temperature controls the formation of the agglomerated structure.  At both too high

and too low a temperature, the agglomerated structure isn't formed and the oil phase is immiscible in the water-surfactant solution.

A former client, operating under the conventional belief that "more is better," increased the temperature of its cleaning bath in order to achieve a better removal of drawing oil from wires.  The outcome was worse than having not cleaned.  The agglomerated oil-surfactant-water structure wasn't stable in the cleaning fluid at the higher temperatures.  It re-deposited on the wires as an oil-surfactant agglomeration – an intractable semi-solid.

Typically, aqueous cleaning is not done at temperatures above 160°F because oil-surfactant-water agglomerates aren't stable at higher temperatures.  Furthermore, aqueous cleaning is typically not done below 115 to 120°F for the same reason.  Both are shown diagrammatically in Figure 9.



**Figure 9**

Decrease of temperature is typically the chief factor one uses to separate oil from surfactants and water – to "break" or "split" the agglomeration (be it a micelle, an emulsion, or whatever).  Simply put, reduction of temperature often returns oil and a solution of surfactants to their original condition – being immiscible in one another.  In summary, the effect of temperature on aqueous cleaning is to enable it, and frame its results as a second and then a third problem.

The second problem is to remove the oil (and whatever materials cling to it) for disposal (or re-use) from the top surface of the cleaning bath.  Oil typically migrates to the surface because oil is lighter than water.  Impact of an ineffective or incomplete solution to this problem is that parts removed from the cleaning bath must pass through the top fluid

surface and so become re-infected with oil contaminants.  Thus, dirty parts, having become clean, are made dirty again.

The conventional solutions to the second problem are to either keep the oil from reaching the top fluid surface or to remove it before it accumulates significantly.  The former involves a device called a gravity-based separator which collects and agglomerates oil droplets onto vertical baffles which funnel the oil to a portion of the fluid surface through which parts do not pass after cleaning.  The latter skims oil from the top fluid surface at least at the rate at which it is produced from below.  Oil skimming is done:  by adsorption onto polypropylene elements (because the structure of polypropylene resembles that of oil), sparging liquid across the top surface to flush oil away as taught in United States Patent No. 5,322,078 to *Tuttle* and others, use of proprietary non-vertical baffles to collect surface oil, or slightly inclining the fluid tank so the oil surface skim is made to flow over a weir (also done by *Tuttle*).  Development of superior oil skimming technology has been a major technical accomplishment of the last decade. The oil-surfactant-water agglomerate can be recovered, concentrated, and suitably disposed as a waste.  A typical oil skimmer is shown in Figure 10 below.



**Figure 10 – Oil Skimmer.**

The third problem is to recover the water-surfactant mixture, and make it available for additional cleaning work. Obviously, the solution to this problem is intertwined with the solution to the second problem.  If the agglomerated phase can be decanted, drawn off, skimmed, etc., then the remaining volume of liquid, once filtered, can probably be re-used for cleaning parts.  There are some exceptions.  If the surfactant is too tightly bound to the oil, it will be lost.  This reduces the "strength" of the cleaning solution.

Surfactants, or surface-active agents (tensides), are a family of organic compounds, both natural and synthetic, that are added to an aqueous composition to enhance cleaning efficiency, lubrication, wetting, solvency and rinsing characteristics of the fluid.  A surfactant is defined as a linear molecule with a hydrophilic (water-loving) head and a

hydrophobic (water-repelling) tail.[1]  The molecules tend to clump together in solution and form a surface layer with the heads in solution and the tails in the air.  Air bubbles in the solution also act as gathering spots for the tails while the heads remain in the solute.



**Figure 11**

As many different types of surfactants exist as there are soils to be cleaned.  Every aqueous cleaning formulation used today, and since the mid-1990s, contains one or more surfactants.  Prior to that time, aqueous cleaning was more commonly known as alkaline aqueous cleaning.  These formulations were based on caustic ingredients with a pH of 10 to 11 and occasionally above.

A typical surfactant is nonylphenol ethoxylate.  The molecular structure of one example of this type of surfactant is shown in Figure 10.  Its use is described in *Hakansson-1*, page 7, line 15), *Guinn*, column 2, line 43), and *Kaiser*, column 2, line

---

[1] Quitmeyer, J.A., "Surfactants in Aqueous Solution," *Clean-Tech Magazine*, October 2005.

62).  This type of surfactant is called nonionic because when it dissolves in water it does so as a molecule and not as positive or negative ions.

The hydrophilic (water-loving) head is at the bottom of the figure (with the red symbols as Oxygen atoms).  This portion makes the surfactant water soluble or compatible.  The hydrophobic (water-repelling) tail is the portion of the surfactant which is attracted to the hydrocarbon oil.



**Figure 12**

The combination of both portions, water-repelling (oil-loving or hydrophobic) and water-loving (oil-hating or hydrophilic) is what enables aqueous parts washing technology. The assembly of three types of molecules (one of oil, one of the surfactant from Figure 10, and many of water) are shown in Figure 11.  At low concentrations of surfactant, structures such as that displayed in Figure 11 are formed.  At higher

concentrations of surfactant, the micelle structure (shown above in Figure 8) is formed.

A machine practicing aqueous (or solvent) cleaning technology with industrial parts, with any set of surfactants or soils, is basically a tank holding cleaning fluid.  The parts can be immersed in the fluid, sprayed with the fluid, rubbed with the fluid, rinsed with the fluid, and set aside to where they can be dried of the fluid.  The cleaning fluid, contained within the tank, is made "dirty" by transfer of soil from parts using a surfactant(s) as the carrier, and recycled when the level of retained soil is not too high to re-infect parts on contact.  The boundary condition for re-use of the cleaning fluid to clean additional parts is that it doesn't make cleanliness worse.

More than solvent cleaning technology, because aqueous cleaning fluids hold less than one percent soil and solvent cleaning fluids hold more than ten or twenty percent, aqueous cleaning technology is practiced in multiple stages.  In many operations, two, three, and more stages of cleaning are provided.  Each stage is a repeat of the others.  Contact can be immersion, spray, mechanical contact, or whatever is necessary. Between stages, parts are drained to separate dirty cleaning fluid from the previous stage from the parts to be wetted in the

next cleaning stage.  Fresh cleaning fluid is used in the
successive stages.

Both simple and complicated aqueous cleaning machines are
useful in industry.  Two are shown below in Figures 12 (simple
and single stage) and 13 (complicated and three stage).



**Figure 13 – Typical Small Parts Washer**



**Figure 14 – Large Industrial Parts Washer.**

Generally speaking, the nature of the cleaning machine is
more affected by the nature of the parts being cleaned, than by
the nature of the soil being removed from them.  A major trend

in aqueous cleaning technology, since the 1980s, is "neutralization" of aqueous cleaning agents.  Specialized detergents have slowly but surely replaced highly alkaline cleaning agents.  One reason is to avoid potential exposure by workers to hazardous material – caustic in warm or hot water. Today, seldom is a high pH cleaning agent used.  Most aqueous cleaning applications employ a combination in water of detergents, emulsifiers, solvents, corrosion inhibitors, biocides, anti-foam agents, and fragrances.

A crucial function provided in current aqueous cleaning products is to "split out" oil from whatever agglomerate is formed with the surfactant, soil, and water.  The enabling event or characteristic, which causes the oil to be released, is a change in temperature.  This "split out" function is a strong function of soil loading and surfactant concentration.  In other words, the formulation can be fragile in use because it is designed to function in both cleaning and soil management operations.

Operating pH is reduced in these formulations (as diluted in water) – perhaps from values between 10 and 11 to values between 8.5 and 9.  Considering that pH is a logarithmic function of concentration, that change is considerable.

Protection of workers from exposure to caustic chemicals was and is generally done with personal protective equipment

(goggles, face shields, gloves, gauntlets, aprons, etc.) and specific local procedures for handing hazardous chemicals.  The local procedures are derived from instructions by suppliers of the chemicals through their Material Safety Data Sheet (MSDS), specific regulation from authorities such as the US Occupational Safety and Health Administration (OSHA), and from local preference by site management.  The latter often dominates.  While MSDS information is accepted as being published in a document designed for marketing, it is also accepted as being guidance from suppliers who have consulted with their legal departments.

The role of process equipment in worker protection from chemical hazards is less significant.  This is because cleaning machines are seldom designed to use only one type of cleaning fluid.  Aqueous cleaning machines are frequently enclosed to contain emissions and keep the environment from being contaminated with evaporated water.  There will be splash guards where machines are open to accept or eject parts.  For example, cabinet washers are enclosed completely to contain valuable chemicals, and keep site operation sanitary.

    **D.    EARLY ATTEMPTS AT BIOREMEDIATION OF HYDROCARBON
          CONTAMINANTS WITHIN PARTS WASHERS.**

In the time period before ChemFree's date of invention, bioremediation technology was generally not incorporated within

individual parts washers.  This is evidenced, among other things, by the overall dearth of patents and scientific literature on the use of bioremediation technology in parts washers prior to ChemFree's invention.

Prior to ChemFree's invention, probably the most notable contribution to the scientific literature on bioremediation in parts washers was the work of the Swedish inventor L.A.K. Hakansson.  Hakansson published two European patent documents prior to ChemFree's invention:  (i) EP0 309 432 ("*Hakansson-1*"); and (ii) WO 92/16314 ("*Hakansson-2*").  As discussed in more detail elsewhere in this report, Hakansson was a relatively crude attempt at bioremediation in a parts washer.  Hakansson's designs suffered from a fundamental incompatibility between his cleaning tensides and his microorganisms.  Hakansson sought to overcome these problems with complex monitoring and metering subsystems, resulting in an apparatus that was relatively complex compared with ChemFree's later invention.

**E.   FORWARD ONE DECADE – CIRCA 2004.**

The outcome of the CFC-phase-out has been thoroughly, if not satisfactorily, digested into the mainstream of U.S. manufacturing operations.  Dissatisfaction remains because the values of solvent cleaning have yet to be replaced throughout the cleaning industry.  These values include:

- Surface cleaning done to meet the test specifications of the application.

- Rinsing done to meet the test specifications of the application.

- Effective parts drying to meet the specifications of the application.

- Simple and efficient separation of the cleaning agent(s), and the soils, from the cleaned parts.

- Simple and efficient separation of the cleaning agent(s) for reuse.

- Simple, efficient, and environmentally secure disposal of the soils.

The values of rinsing and drying noted above, are generally not needed by those doing industrial cleaning with "small distributed machines."

Note that attainment of cleaning capability for hydrocarbon soils is only one of four required values. It is not nearly enough to remove oil-based soils from parts, one also needs separation and disposal systems. One needs more than a cleaning fluid which removes hydrocarbon oils; one needs a process in which this fluid is enabled to fulfill the remaining three values.

All four values are provided by technology found in ChemFree's patents – which include both a cleaning fluid and a process.  In other words, ChemFree's patented technology returns to a significant segment of the industrial cleaning market the simplicity, flexibility, and capability previously provided by banned cleaning solvents.

IV.  <u>CHEMFREE'S PATENTS</u>.

**A.   REVIEW OF PROSECUTION HISTORY.**

I provided a summary of the prosecution history of ChemFree's patents in my Initial Expert Report, which summary is incorporated herein by reference.  The following discussion will serve to supplement my previous comments regarding the prosecution history.

**1.   Office Actions Involving Lashmett.**

Professor Adriaens' report relies on eleven references, including U.S. Patent No. 5,492,139 to *Lashmett*.  The filing date of *Lashmett* is August 1, 1994, only eight weeks before ChemFree's filing date.  *Lashmett* is cited on the face of all five ChemFree patents.  *Lashmett* was cited by Examiner Stinson in the very first Office Action rejection over prior art in the '902 Application, the ultimate "parent" case to all of the ChemFree patents asserted in this litigation.

During prosecution, *Lashmett* was distinguished from the ChemFree invention in that ChemFree performs cleaning operations

in a basin and then allows bioremediation to take place in a
separate tank.  In contrast, *Lashmett* placed dirty parts in a
basket and then lowers the basket containing the dirty parts
directly into a tank – there is no separate wash basin.
Hydrocarbon contaminants loosened from the dirty parts rises to
the surface of the tank in *Lashmett*, where they are then
mechanically separated from the cleaning fluid by a skimming
step.  In other words, hydrocarbon contaminants in *Lashmett* are
physically removed from the tank before they can be
substantially bioremediated by microorganisms.  ChemFree
overcame rejections based on *Lashmett* to obtain allowed claims in
the '491 Patent, the '110 Patent, and the '125 Patent.

   During prosecution of the '491 Patent, Examiner Stinson
issued an Office Action rejection on July 19, 1996, rejecting
all pending claims as obvious over a combination of *Minkin* in view
of either *Gatt* '183 or *Lashmett*.  Other prior art considered
pertinent but not relied upon included *Mansur, Hilgren, Staniec,
Breunsbach, Tuttle, Striedieck*, and *Morgan*.  The Applicant responded with
an amendment to the pending claims and submitted certain remarks
to distinguish the ChemFree invention over *Minkin, Gatt*, and *Lashmett*.
Thereafter, an Examiner Interview took place on February 6,
1998.  The Interview Summary indicates that an Agreement was
reached, which agreement was incorporated into an Examiner's

Amendment.  In pending claim 35, which became issued claim 1, the phrase "*biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser*" was inserted before the word "fluid."

During prosecution of the '110 Patent, Examiner Stinson held an interview with the Applicant on February 6, 1998, apparently at the same time as the interview for the '491 Patent.  The Interview Summary indicates that an Agreement was reached, which agreement was incorporated into an Examiner's Amendment.  In pending claim 23, which became issued claim 1, the phrase "*biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser*" was inserted before the word "fluid."

### 2.   Office Actions Involving Hakansson-1.

Another of Professor Adriaens' eleven references is *Hakansson-1*. *Hakansson-1* is also cited on the face of all five ChemFree patents.  *Hakansson-1* was also cited by Examiner Stinson in an Office Action rejection in the '902 "Parent" Application. *Hakansson-1* was also cited in an Office Action rejection during prosecution of U.S. Patent No. 6,095,163, which is in the priority chain of the '125 Patent.

*Hakansson-1* was also cited by Examiner Stinson in the ZYMO/Alice Martin chain of patent applications.  In an Office Action dated March 7, 1997, in Application number 08/511,506 leading to issuance of U.S. Patent No. 6,571,506, Examiner

Stinson rejected all of the then pending claims over either *Lashmett*, *Hakansson-1*, or a combination of the two.   In response, Applicant distinguished over *Hakansson-1* by pointing out that *Hakansson-1* was not designed to maintain microorganisms without the constant metering of nutrients.   *Hakansson-1* was further distinguished as requiring continuous metering of fresh tensides [aka "surfactants"] after reaching certain pH levels.   An Examiner's Interview took place on February 6, 1998, via telephone.   The Interview Summary indicates that an agreement was reached.   The PTO subsequently allowed the applicant's claims, as amended, in an Office Communication dated February 23, 1998.

Examiner Stinson cited *Hakansson-1* on a PTO form 892 during prosecution of the '226 Patent.   No Office Action rejections over prior art were made during prosecution of the '226 Patent.

*Hakansson-1* and *Hakansson-2* came before Examiner Stinson in ChemFree's continuation application number 11/089,305 on November 1, 2005, which prompted the Examiner to make the following remarks in an interview summary.

> It was noted by the examiner that WIPO'314 ["*Hakansson-2*"] and EPO'342 ["*Hakansson-1*"] fail to specifically or inherently disclose in a parts washer, a fluid that is a "biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser".   WIPO'314 and EPO'342 fail to specifically or inherently teach the same even though employing water.   WIPO'314 and EPO'342 also fail to teach specifically or inherently the limitations of the

heater being responsive to measured fluid level and of being disabled when the fluid drops below a desired level. The level control system in WIPO'314 provides for the addition of extra water and does not teach a level sensor in the chamber from which the fluid is pumped into contact with the part.  WIPO'314 and EPO'342 also fail to disclose the use of a filter.  The examiner also is of the opinion that the tank (14) in WIPO'314 is not in the circulation as instantly claimed.  For example, inter alia, fluid is not pumped from the tank (chamber 2) to the basin (chamber 1) as claimed.

### 3.   Office Actions Involving Guinn.

Another of Professor Adriaens' eleven references is U.S. Patent No. 5,364,789 to Guinn et al entitled *Microbial Cleaner*.   *Guinn* was cited by Examiner Douyon in an Office Action dated July 10, 1995, during prosecution of the '898 Application.  This appears to be the very first Office Action over prior art that was made by the PTO after any of the ChemFree applications were filed.

Guinn et a1 teach the claimed microbial cleaner which comprises at least one hydrocarbon-ingesting microbe strain of Pseudomonas and Bacillus and a biocatalyst containing a nonionic surfactant (see abstract, column 2 lines 15-30, claims 1, 2 and 6).  The microbial cleaner is an excellent cleaner removing hydrocarbons from equipment (see column 3 line 40 to column 4 line 3).  It should be noted that the nonionic surfactant inherently acts as an emulsifier. Hence, Guinn et al, anticipates the claims.  Even if the teachings of Guinn et a1 are not sufficient to anticipate the claims it would have been nonetheless obvious to one of ordinary skill in the art to prepare a cleaning system or solution taught by Guinn et a1 containing surfactant/ emulsifier and microorganisms in their optimum proportions since their broad teachings encompass these ingredients and proportions thereof.

['898 Application, Office Action, July 12, 1995].

First, it must be noted that the claims under rejection in the '898 Application were considerably different than any of the claims asserted in this litigation.  Original independent claim 1 of the '898 Application read as follows:

> 1. A system for cleaning an object fouled with organic and/or particulate matter, the system comprising:
> (a) a fluid which removed organic matter from an object; and
> (b) a microorganism that biodegrades the organic matter, wherein the fluid is not toxic to the microorganisms.

Original independent claim 8 of the '898 Application read as follows:

> 8. A cleaning solution comprising a surfactant and microorganisms that biodegrade organic matter.

Note that the original independent claims of the '898 Application contained no limitations directed to a parts washing apparatus – i.e., no basin, no tank, no conduit and pump, no flowpath, no heater, no thermostat, no level control system, no filter.  In response to Examiner Douyon's rejection to the foregoing claims, Applicant offered the following remarks.

> Claims 1-10 were rejected under 35 U.S.C. § 102 (e) and 103 over Guinn, U.S. Pat. No. 5,364,789. Like the other primary reference, Guinn does not anticipate the present invention because it does not contain all the elements of the present invention.  Thus, Guinn does not relate a use of live microorganisms, or microorganisms on a solid support, nor does it deal with a closed re-circulating system.  Claims 1 and 8 are amended and new claims 17-19 are added to clarify these differences between Guinn and the present invention.
>
> Other differences between the present invention and the invention of Guinn, are that Guinn teaches nutrients to support microbial growth and a chlorine absorbing salt,

which are not necessary in the present invention.  Another
difference is that Guinn relates only Pseudomonam and
Bacillus as microbes, in contrast to the broad list in the
present application (see, for example, claim 6).

Guinn does not disclose or suggest cleaning the type of
organic matter found on the metal and plastic parts cleaned
by the present invention.  The "liquid hydrocarbons"
mentioned in Guinn, "oil, solvents ... [and] gasoline"
(column 1, line 9), are of significantly lower molecular
weight than the hydrocarbons cleaned off metal parts in the
present invention.

Microbial cleaners which may incorporate microbes and
surfactants such as in the Guinn patent, require time after
mixing, from two to 24 hours or more "for greatest
effectiveness" (line 55).  Also, because the bioremediation
occurs while the cleaner is in contact with the parts, the
cleaner must "stay on the area for thirty minutes" (lines
45 and 46).

Waiting for a cleaner to become effective up to a day
and then requiring a further half hour of cleaning time is
not productive in industry today.  Mechanics want to walk
up to a machine, spend a couple of minutes or less washing
a part, and walk away to use the cleaned part.

The fact is that the process of biodegrading
hydrocarbons such as those cleaned by the present invention
is a much slower process than the "thirty minute" time
related by Guinn. In the present invention, however, it
does not matter to the user that the microorganisms take
time to biodegrade the matter cleaned off the parts because
the biodegradation occurs in a separate area and does not
interfere with the parts washing per se.  If water also had
to be added to "keep the area wet," as Guinn describes,
there would be a tendency to rinse the microbial cleaner
off of some portions of the surface being cleaned thereby
decreasing effectiveness.

In addition, the Guinn patent would tend to create
emissions of hydrocarbons into the environment if the
biodegradation was not complete at the time the parts or
surface is "rinsed with water." Guinn line 46-47.  Guinn
is not a closed loop system but rather a "one-shot"
process. By contrast, the present invention is a closed
loop, re-circulating system which prevents such unwanted
and harmful emissions.  Results presented in the

specification "suggested a compartment of washing system that could be used to treat fluid and re-circulate it to the compartment wherein objects are being washed" (page 16, lines 15-17).

['898 Application, Response to Office Action Dated July 112, 1995, pages 10-13]. The Applicant eventually cancelled both claim 1 and claim 8. The PTO eventually considered and allowed six claims that were substantially different from the original proposed claims. For example, allowed application claim 19, after amendments, read as follows:

19. A conversion kit for parts washers that clean fouled organic matter from metal and plastic parts, said kit consisting essentially of:

(a) a receptacle that contains a surfactant cleaning fluid which is suitable for cleaning said parts;

(b) a filter pack comprised of a solid support, wherein microorganisms that biodegrade said organic matter are affixed to the support; and

(c) adaptive fittings to create a recirculating biodegrading system wherein the cleaning fluid cleans parts and, in a separate location, nurtures the biodegrading organisms, said fluid recirculating between said receptacle and a biodegrading location.

In addition, allowed claim 21, which was allowed in connection with an examiner's amendment, read as follows:

21. A closed system for cleaning automotive parts, equipment parts, and machinery parts with fouled organic matter, the systems consisting essentially of

(i) microorganisms that biodegrade organic matter in a surfactant fluid following activation, said microorganisms affixed to

(ii) a filter pack having a solid support prior to activation and

(iii) a surfactant fluid that cleans organic matter from the part to produce

(iv) a composition of surfactant fluid, microorganisms ad organic matter, where said surfactant fluid activates and feeds the microorganisms that biodegrade the organic matter from the filter pack into

(v) a receptacle, having a thermostatic heating element attached thereto to heat the cleaning fluid, said receptacle containing surfactant fluid, microorganisms and fouled organic matter, and

(vi) adaptive fittings to create a recirculating biodegrading system to reform a surfactant fluid without fouled organic matter, and nurture the biodegrading organisms in a separate location, said surfactant fluid and said microorganisms being recycled to be available for cleaning of parts.

The claims that were initially rejected over *Guinn* were essentially directed to just a cleaning fluid with microorganisms.  The claims that were allowed contained apparatus limitations in addition to a fluid and microorganisms. In short, the PTO considered it to be non-obvious and patentable to combine a surfactant fluid similar to *Guinn* in a parts washing apparatus.

*Guinn* is otherwise cited on the face of the '110, '491, '835, and '125 Patents.  Although *Guinn* is not cited on the face of the '226 Patent, it appears in the prosecution history of applications in the chain of priority leading to issuance of the '226 Patent.

## 4.   Prosecution History Related to Minkin.

Another of Professor Adriaens' eleven references is U.S. Patent No. 5,427,128 to Minkin entitled *Parts Washer Temperature / Pressure Equalization System*.   *Minkin* is cited on the face of the '110 Patent, the '491 Patent, the '835 Patent, and the '125 Patent. *Minkin* was cited in an Office Action rejection during prosecution of the '491 Patent on July 19, 1996.   *Minkin* discloses a closed cabinet parts washer that sprays high temperature / high pressure fluid onto parts in an enclosed chamber.   *Minkin* was specifically directed to solving a problem related to the differential pressure and temperature between two enclosed chambers:

> ... Due to this temperature differential, when the pump system is started and the first charge of heated, pressurized cleaning fluid is discharged from the fluid spray structure, the air in the cabinet will experience a rapid increase in temperature thereby expanding the air in the cabinet.  This sudden expansion of air can cause a water-hammer effect such that potentially damaging pressure waves in the cleaning fluid may be formed.   The sudden air expansion can also cause a wve of heated cleaning fluid to be forced out of the cabinet and into the access reservoir with such force as to cause the removable cover to dislodge thereby allowing significant quantities of heated fluid to spill out onto the floor surrounding the parts washer . . . The present invention is specifically directed to overcoming the above enumerated problems in a novel and simple manner.

[*Minkin* '128, Column 1].  During prosecution of the '491 Patent, ChemFree overcame the rejection based on *Minkin* by pointing out that *Minkin* employed the use of high pressure and did not use

microbial activity.   A similar argument was used to successfully distinguish *Minkin* during prosecution of the '110 Patent.

### 5.   Prosecution History Related to Olson.

Another of Professor Adriaens' eleven references is U.S. Patent No. 3,522,814 to *Olson* entitled *Washer for Parts and the Like*. *Olson* was cited by Examiner Stinson in the very first Office Action rejection in the parent '902 Application.   *Olson* is directed to a *circa* 1970 sink-on-a-drum mineral spirits solvent parts washer.   *Olson* appears as a reference on the face of the '110 Patent, the '835 Patent, and the '125 Patent.

### 6.   Prosecution History Related to Hiss.

Another of Professor Adriaens' eleven references is U.S. Patent No. 5,232,299 to *Hiss* entitled *Parts Washer*.   *Hiss* discloses a parts washer that uses a water-based, biodegradable, preferably alkaline detergent cleaning solution that is heated to the range of 140 to 180°F, and used at a pressure designed for maximum spray impact.   *Hiss* separates oil and grease contaminants from the cleaning fluid by mechanical means.   *Hiss* appears as a reference on the face of the '835 Patent and the '125 Patent.

### 7.   Prosecution History Related to Tuttle.

Another of Professor Adriaens' eleven references is U.S. Patent No. 5,322,078 to *Tuttle* entitled *Aqueous Parts Washing Apparatus*. *Tuttle* uses an oil-skimming weir to remove contaminants from the

cleaning fluid after cleaning operations.  *Tuttle* appears as a reference on the face of the '491 Patent, '110 Patent, '125 Patent, and '835 Patent.

### 8.   Prosecution History Related to Sims.

Another of Professor Adriaens' eleven references is U.S. Patent No. 5,656,156 to Sims entitled *Filtration System for Closed Cycle Parts Washer*.  Sims came before Examiner Stinson in one of ChemFree's continuation applications during 2005, which prompted the Examiner to make the following remarks in an interview summary.

> In regard to the Sims reference, the same employs a solvent and microfiltration.  It is the examiner's opinion that the solvent is therefore flammable and harmful to the microorganism and the microfiltration system would collect the microorganisms on the filter.  The combining of features, such as filter systems and level sensing systems from either Minkin or Sims with WIPO'314 or EPO'432 or DE'052 is, in the examiner's opinion, not suggested or motivated and thusly not obvious.

[Application No. 11/089,305, Examiner Interview Summary, dated November 1, 2005].

### B.   OVERVIEW OF THE TEACHINGS OF THE SPECIFICATION OF THE CHEMFREE PATENTS.

The following comments are submitted to supplement my previous remarks describing the ChemFree invention and the teachings of the specification of the ChemFree patents in my earlier report, which previous remarks are incorporated herein by reference.

1.   **Relationship Between Mechanical, Fluid, and Biological Components of the Invention.**

The ChemFree bioremediation parts washer improved the state-of-the-art over the parts washing technology disclosed in the Swedish *Hakansson* publications by eliminating the need for continuous monitoring of the pH, nutrient, and tenside levels of the cleaning fluid in the bioremediation tank and the responsive metering of necessary materials into the tank to balance each at the desired level.  ChemFree overcame the problems of *Hakansson* by discovering a biodegradable, non-toxic, non-caustic, non-flammable oil dispersant and degreaser fluid that remained stable over time during repeated washing cycles.

In the patented invention, a mechanical component and a fluid component, and a biological component interact harmoniously to provide a beneficial environment for bioremediation microorganisms that does not require outside maintenance or support and also provides continual and effective cleaning for soiled parts.

In various embodiments, the ChemFree invention provides a temperature control sub-system to maintain a more-or-less ideal temperature for metabolic activity of the microbes.  In addition, the temperature is also comfortable for the human operator.  The cleaning fluid is non-toxic to the microorganisms.  The cleaning fluid is also effective at

removing hydrocarbons from soiled parts while, at the same time, it is not harsh to the skin or eyes of the operator (i.e., "non-caustic").

In one embodiment of the ChemFree invention, there is a level control sub-system that is integrated with the temperature control sub-system so that the heater is deactivated when a low fluid level condition is detected.

In another embodiment of the ChemFree invention, a filter is disposed in the flowpath between the basin and the sink.  The filter traps particulate matter before it flows into the tank, where it could otherwise accumulate into a sludge deposit.

### 2.   Issues Related to Batch Versus Continuous Processing.

Professor Adriaens' expertise appears to lie in the areas environmental clean-up and bioremediation of waste hydrocarbon materials.  However, his analysis, opinions and conclusions do not appear to appreciate the substantial differences that exist between *in situ* remediation of soil contamination compared to the design and operation of a parts washer.

Clean-up of an environmental contamination site is essentially a one-pass process, typically referred to as a "batch" process.  In contrast, a bioremediation parts washer is designed and intended to continuously add new contaminants to the system at or about the same rate that old contaminants are

remediated.  In addition, the cleaning fluid is re-used – over and over again, for repeated cleaning cycles.  Thus, parts washing may be considered a "continuous" as opposed to a "batch" process.

Professor Adriaens' belief that batch processes translate readily to continuous parts cleaning processes is unfounded and ignores four key concepts.  The first one is rate.  In a parts washing operation, the user needs to bioremediate hydrocarbon oils at or about the same rate that new contaminants enter the systems from soiled parts.  If one could just ignore rates of processing, one could imagine breaking the sound barrier in a biplane, breaking a steel I-beam with their bare hands, or breaking rocks with a kitchen mixer.

The "batch processing" soil decontamination references cited by Professor Adriaens (Guinn and Kaiser) include no information about rate or any information about how they might be controlled in a parts washer application.  Since Professor Adriaens cites no information about biooxidation rate, I cannot comment on his opinion except to write that I see no basis to support it.

A second concept ignored by Professor Adriaens is recovery, or re-use.  One needs to recover, and repeatedly continue to recover, the cleaning fluid with microorganisms so as to be able to continue to use it in parts cleaning.  Walter's consultant,

Bert Overland, speaks to this need for recovery and re-use in his U.S. Patent No. 6,057,147:

> The optimum combination of properties for a method, apparatus, and composition effective in the degradation of hydrocarbons, particularly one based in the utilization of microorganisms, is such that
>
> ".... (2) the method and composition must be long-acting and rapid in the onset of its initial activity and require no further support or sustaining activities after initiation;
>
> (3) the method and composition must be self-sustaining, so as to require no additional provision for nutrients or other supporting chemicals;
>
> (4) the method and composition, together with the degraded, solubilized crude hydrocarbon product, must be self-dissipating after the substantial completion of the degradation of the hydrocarbon constituents, so as to require no retrieval from the environment and disposal...".

[Overland '147 Patent, column 2 lines 60 to 67 and column 3 lines 2 to 4].

Users of parts cleaning facilities cannot afford to purchase the materials of a cleaning fluid and throw them away after one use – which essentially is what happens in soil decontamination situations.  Recovery and re-use of the cleaning fluid is essential because this industry is so highly sensitive to cost.

The only application in parts cleaning of which I am aware where the "launch and leave" scheme is practiced is by NASA's contractors in the cleaning of tubing for oxygen service.  Here, the cleaning fluid is ultra pure water.  NASA often will not re-

purify the water because they wish to take no chance of re-infecting the tubing with particles.[2]  Furthermore, users of parts cleaning facilities cannot afford the storage space to inventory one unit of cleaning fluid for every unit of parts to be cleaned.

A third concept ignored by Professor Adriaens is process control.  Users who bioremediate toxic or unsanitary spills only wish the undesired materials to disappear.  Users who clean parts want efficient use of the materials for which they have paid, such as microorganisms, and repeatable performance with the components of their cleaning fluid.  In the former case, temperature and concentration are not controlled variables.  In the latter case, they are.  The cleaning fluids of *Kaiser* and *Guinn* do not teach temperature control, much less disclosure of a functioning apparatus to effectuate such process control.

A fourth concept, and perhaps the most commercially significant, is that parts washing is the implementation of a process.[3]  A process is the integration of a selected cleaning agent into selected piece of process equipment.[4]  One cannot

---

[2] Shortages of water have forced rethinking by NASA and others of this policy.
[3] *See* footnote 32, which refers to a paper presented by me in the time period of concern relative to development of prior art (1995).
[4] 4. This topic was covered by me in the time period of concern relative to development of prior art (1994).  See The

merely "throw" any cleaning agent into any parts washer and expect it to perform properly.  Generally, one selects the process to match the characteristics of the parts being washed. And one selects the cleaning agent to perform in the chosen process equipment AND to match the solvency properties of the soil materials.  As a trivial example, in 1994 if one added CFC-113 to the open-basin style parts washers of *Olson* or *Knowlton* it would evaporate within an hour because of its volatility.  This concept is well known to those skilled in the parts washing art.

The foregoing is not to suggest that it is impossible to adapt soil contamination technology to parts washing.  Rather, it is to emphasize that the adaptation is not so easy to achieve that one would have expected such to be within the repertoire of the person of mere ordinary skill in 1994.  Research, development, and experimentation is required – things that we associate with innovation and inventiveness – and tend to award patents for when new discoveries are made.

In summary, the art of parts washing takes into consideration system design requirements that are outside of the purview of environmental clean-up systems, such as: (i) rates for soil inflow and bioremediation must match approximately; (ii) parts washers are used in economically-sensitive industry

Parts Cleaning Handbook Without CFCs: How to Manage the Change, Hanser Gardner Publications, ISBN 1569901430.

applications and all cleaning fluid components cannot be abandoned after application but must be recovered and re-used to the maximum degree possible; (iii) at least some process control is necessary to manage operation of a parts washer; and finally (iv) the parts washer and the cleaning fluid are integrated into a process based on the needs of the application.

### C.   THE MEANING OF DISPUTED CLAIM TERMS.

#### 1.   Sensor.

Professor Adriaens offered his own proposed construction of "sensor" and "hydrocarbons" at pages 5 and 6 of his report. Professor Adriaens report does not appear to list, among the materials that he reviewed in reaching his opinion, the Joint Claim Construction Statement submitted by the parties on January 24, 2006. [Docket 114-1]. Neither does it appear to list the letter that Walter submitted to Judge Camp on May 8, 2007, offering to stipulate to ChemFree's proposed construction of "level sensor." [Docket 159]. Thus, the parties have already stipulated to the following construction of the term – "level sensor."

    a level sensor is a device that receives and responds to a
    signal or stimulus relating to a position along a vertical
    axis.

[Joint Claim Construction Statement, page 31]. This is the construction that I have used in my report.

### 2.   Hydrocarbons.

With respect to the meaning of hydrocarbons, I am advised by counsel for ChemFree that the only terms that need to be construed are those that are in controversy, and only to the extent necessary to resolve the controversy.[5]   I have not been apprised that there has ever been any dispute in this case as to the meaning of "hydrocarbon."   As I mentioned in my earlier report, in the field of parts washing, practitioners routinely refer to soil / contaminants as "hydrocarbons" even though they are well aware of the fact that the chemical composition of oil and grease is not strictly limited to molecules comprised of only hydrogen and carbon molecules.

### 3.   Non-Flammable.

However, one term that has not yet been construed by the Court is "non-flammable."   At the time of the *Markman* claim construction hearing, ChemFree was already in possession of Walter product literature advertising that its Bio-Circle L cleaning fluid was "non-flammable."   Also at the time of the *Markman* hearing, the only prior art reference that Walter had asserted with an accompanying claim chart was *Hakansson-2*, to which the PTO Examiner had already commented:

> It was noted by the examiner that WIPO'314 [*Hakansson-2*] and EPO'342 [*Hakansson-1*] fail to specifically or inherently

---

[5]   *See* Assumptions section above, *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed.Cir. 1999).

disclose in a parts washer, a fluid that is a
"biodegradable, non-toxic, non-caustic, nonflammable oil
dispersant cleaner and degreaser". **WIPO'314 and EPO-342
fail to specifically or inherently teach the same even
though employing water**.

['305 Application, November 1, 2005, Interview Summary (emphasis
added)]. On October 29, 2007, Judge Camp entered an Order
striking all of Walter's invalidity contentions except for the
prior art references of *Hakansson-2* and *Athey*. Thus, there was no
real need to construe "non-flammable" in this case prior to
submission of Professor Adriaens' report on February 29, 2008.
In any event, it appears that Examiner Stinson understood that
not all water-based cleaning fluids fit within the category of
being "biodegradable, non-toxic, non-caustic, and non-
flammable."

I am advised by counsel that a patent invalidity analysis
involves a 2-step process. The first step involves the proper
interpretation of the claims. The second step involves
determining whether the limitations of the claims as properly
interpreted are met by the prior art.[6] Professor Adriaens,
throughout his report, has applied the term "non-flammable" to
numerous items of prior art without articulating the
construction of such term that he was using. Moreover,
Professor Adriaens has read the phrase "biodegradable, non-

---

[6] *See* Assumptions above, *TI Group Automotive Systems (North America), Inc.
v. VDO North America, L.L.C.*, 375 F.3d 1126, 1139 (Fed.Cir. 2004).

toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid" onto numerous items of prior art, including *Hakansson-1*, in a manner that is directly contradicted by Examiner Stinson in the November 2005, interview summary above.

>    **4.    Temporal Aspects of "Non-Toxic" and "Non-Caustic."**

Professor Adriaens argues that ChemFree's patent claims are not enabled because the patent specification does not teach someone what concentration of replacement fluid should be used after fluid is lost through evaporation.  [See e.g., Adriaens' report at page 11, paragraph 4].  The unstated assumption beneath Professor Adriaens' remarks about the concentration of replacement fluid is that enablement of ChemFree's invention is not merely analyzed at a single point in time, such as initial start-up conditions, but also extends throughout the normal operational cycle of the invention.  This appears to me to be a new issue that was not contemplated by either party or the Court during the original claim construction proceeding.  Does "non-toxic" mean "non-toxic" at the point in time when the cleaning fluid is first poured into the parts washer, or does it mean "non-toxic" throughout its duration of use in the parts washer. A similar issue arises regarding the meaning of "non-caustic."

ChemFree's patent specification teaches that "... the cleaning fluid 72 has the potential to last for extended periods

of time." ['110 Patent, Col 7, lines 19-20]. ChemFree's invention combining SeaWash-7 Fluid and LRC-1 microbes is enabled to meet this requirement if read into the claims. Professor Adriaens' prior art references, including particularly *Hakansson-1*, are not. In contrast to ChemFree's invention, *Hakansson-1* discloses that its cleaning fluid can become toxic to the microbes unless closely monitored and adjusted by intermittent additions of chemicals. Similarly, the pH of *Hakansson-1* can change over time unless monitored and adjusted, resulting in a pH that is potentially harmful to human tissue and thus not "non-caustic."

### 5. Whether Claim Pre-Ambles Are Limiting.

Fifty-three of the 81 pages of Professor Adriaens report consist of claim charts. However, none of Professor Adriaens' claim charts list the claim preambles as possibly limiting the scope of the claims.

I am advised by Counsel for ChemFree that if the body of the claim sets out the complete invention, the preamble is not ordinarily treated as limiting the scope of the claim. However, I am also advised that the preamble is regarded as limiting if it recites essential structure that is important to the invention or necessary to give meaning to the claim. Moreover, I am advised that when the limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then

the preamble may act as a necessary component of the claimed invention.[7]

It does not appear to me that Judge Camp was confronted, during the claim construction proceeding, with an issue as to whether the preamble of any of ChemFree's claims limited the scope of the claims. ChemFree's preambles typically contain language such as – "*a system for cleaning hydrocarbons from a part*" – or – "*a method of cleaning hydrocarbons from a part*." I note, however, that Professor Adriaens frequently relies on references from environmental contamination technology that are directed to removal of hydrocarbons from soil, waste-water, ship bilges, etc. Professor Adriaens' report fails to address whether such references satisfy the claim preambles if the preambles are, indeed, limiting. I have not been asked, at this time, to advance an opinion or conclusion as to whether the preambles should be treated as limiting. I merely point out that Professor Adriaens' report has failed to address the issue and that his reliance on new references that were not in contemplation at the time of the claim construction proceeding may have interjected a new issue into the case.

In summary, Professor Adriaens' argument and contentions appear to have interjected multiple new issues into this

---

[7] See Assumptions above. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed.Cir. 2006).

litigation that were not considered during the initial claim
construction proceeding.

**V.   CRITIQUE OF PROFESSOR'S ADRIAENS'
INVALIDITY OBVIOUSNESS CONTENTIONS.**

Counsel has provided me with the following legal standard
for non-obviousness of an invention:

> A patent may not be obtained though the invention is not
> identically disclosed or described as set forth in section
> 102 of this title, if the differences between the subject
> matter sought to be patented and the prior art are such
> that the subject matter as a whole would have been obvious
> at the time the invention was made to a person of ordinary
> skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which
> the invention was made.[8]

For purposes of this report, I have also been asked to
assume that an obviousness analysis is based on four underlying
factual inquiries, known as the "Graham factors" which are:  (1)
the scope and content of the prior art; (2) the level of
ordinary skill in the pertinent art; (3) the differences between
the claims and the prior art; and (4) secondary considerations
of non-obviousness.[9]  Each of the four "Graham Factors" is
discussed below.

---

[8] *See* Assumptions section above, 35 U.S.C. § 103(a).
[9] *See* Assumptions section above, *McGinley v. Franklin Sports, Inc.*, 262
F.3d 1339, 1349 (Fed.Cir. 2001) *citing Graham v. John Deere Co. of Kansas
City*, 383 U.S. 1, 17-18 (1966).

A.   **SCOPE AND CONTENT OF THE PRIOR ART.**

1.   **The "Art" - the "Field of the Invention" is Parts Washing.**

I have been advised by counsel for ChemFree that in determining what is the "pertinent art" for purposes of scope and content of the "prior art" and ordinary skill in "the art," courts use "*Field of the Invention*" and "*Field of the Applicant's Endeavor*" as synonymous with "*the Art*."[10]   In this particular case, the inventors adequately identified the Field of the Invention in the "Background of the Invention Section" of the Patents-in-Suit.

> The present invention relates generally to the field of cleaning and more particularly to the field of parts washers.

['110 Patent, Col. 1, lines 7-8].   Conventional parts washing technology is briefly summarized in Column 1 as follows:

> Parts washers are well known and are often employed in the cleaning of parts that are contaminated with organic waste products such as, for example and not limitation, hydrocarbons, oils, and greases.   For background and understanding, the type of parts normally being discussed as washed in a parts washer are, for example, automotive parts such as valves, pistons, transmission parts, covers, and so forth.   Most conventional parts washers include a basin mounted to the top of a tank.   The tank is partially filled with a mineral spirits solvent that is pumped from the tank through a conduit that discharges into the basin where the parts are washed.   The mineral spirits solvent drains from the basin back to the tank for reuse.   A filter is sometimes interposed in the solvent flowpath to collect organic waste products and particulates washed from the parts.

---

[10] *See* Assumptions section above, *In re Dance*, 160 F.3d 1339, 1343 (Fed.Cir. 1998).

While mineral spirits are an effective cleaning solvent, there are many drawbacks to the employment of parts washers that utilize mineral spirits.  For example, some mineral spirit solvents are presently classified by government regulatory agencies as hazardous materials because of their low flash point and potential health concerns.  Because of this classification, mineral spirits must be used, handled, and disposed of in compliance with extensive governmental regulations.  Further, mineral spirits that are not properly contained can have a negative impact on the environment, and it is not uncommon for workers to have dermatitis and respiratory problems exacerbated by unprotected use of mineral spirits.  Additionally, many users of mineral spirits find it necessary to dispose of used mineral spirits by having a waste disposal company pick up the used mineral spirits so that the used mineral spirits can be disposed of in compliance with the various governmental guidelines and regulations, such disposal can be expensive.

['110 Patent, Col 1, lines 11 – 44].  It is my opinion that the pertinent "art" or field of endeavor for the ChemFree Patent is the art of making parts washers that remove hydrocarbon contaminants from parts.

### 2.   The Asserted Invalidity References.

Based on my review of the Peter Adriaens and Harry Manbeck expert reports, it appears that Walter is directly asserting the eleven below-listed references as prior art invalidity references to the ChemFree Patents:

- U.S. Patent No. 5,265,633 to Knowlton entitled *Parts Washer*;

- European Patent Application No. 309,432 to Hakansson entitled *A Cleaning Method and Apparatus Therefor* ("Hakansson-1");

- U.S. Patent No. 5,364,789 to Guinn entitled *Microbial Cleaner*;

- U.S. Patent No. 3,522,814 to Olson entitled *Washer for Parts and the Like*;

- U.S. Patent No. 5,322,078 to Tuttle entitled *Aqueous Parts Washing Apparatus*;

- U.S. Patent No. 5,427,128 to Minkin entitled *Parts Washer Temperature / Pressure Equalization System*;

- U.S. Patent No. 5,232,299 to Hiss entitled *Parts Washer*;

- U.S. Patent No. 5,492,139 to Lashmett entitled *Method and Apparatus for Remediating Contaminated Material*;

- U.S. Patent No. 5,656,156 to Sims entitled *Filtration System for Closed Cycle Parts Washer*;

- U.S. Patent No. 5,561,059 to Kaiser entitled *Substrate Bioavailability Enhancing Chemical Mixture for Use in Bioremediation*;

- U.S. Patent No. 3,846,615 to Athey entitled *Liquid Temperature Control and Low Liquid Level Detector*.

### 3.   Whether A Reference is "Within" The Scope and Content of the Prior Art.

I note that Professor Adriaens' report does not discuss, analyze, or offer any opinion as to whether or why his references fall within the scope and content of the prior art. Thus, Professor Adriaens did not give me anything to rebut on this subject.

I have been informed by counsel for ChemFree that considerations of the scope and content of the prior art take into account factors such as: (i) when a reference became available to someone of ordinary skill in the art; (ii) where such availability first occurred; and (iii) the degree of relatedness of the reference to the patent applicant's field of endeavor. As to item (iii), I am further advised by counsel

that there are two criteria for determining whether a reference is sufficiently analogous to the subject matter of the invention that it falls within the scope and content of the prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed; and (2) if the reference is not within the field of the inventor's endeavor, whether the reference is reasonably pertinent to the particular problem with which the inventor is involved.[11]  I am further informed by counsel that a reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering the problem.[12]  I am further advised by counsel that it is necessary to consider the reality of the circumstances in deciding in which fields a person of ordinary skill would reasonably be expected to look for a solution to the problem facing the inventor.[13]

Taking the foregoing legal standards into account, it is my opinion that *Knowlton, Hakansson-1, Guinn, Lashmett, Sims, Olson, Tuttle, Minkin*, *Kaiser*, *Athey*, and *Hiss* are sufficiently analogous to the subject

---

[11] *See* Assumptions above, *In re Clay*, 966 F.2d 656, 659 (Fed.Cir. 1992).

[12] *See* Assumptions above, *In re Clay*, 966 F.2d 656, 659 (Fed.Cir. 1992).

[13] *See* Assumptions above, *In re Oetiker*, 977 F2d 1443, 1447 (Fed.Cir. 1992); *In re Wood*, 599 F.2d 1032, 1036 (CCPA 1979).

matter of the ChemFree patents that they would be considered to be within the scope and content of the prior art on a subject matter (but not necessarily temporal) basis.

**4.   Whether *Sims, Lashmett,* and *Minkin* Qualify As "Prior Art" In Light of the Date of ChemFree's Invention.**

With respect to the "when" and "where" aspects of whether a reference is within the scope and content of the prior art, I have been asked by counsel for ChemFree to assume, as a legal standard, that 35 U.S.C. Section 102(a) imposes both geographic and temporal requirements on certain materials in order for them to be considered "prior art."  According to the statute, in order to qualify as "prior art" under Section 102(a), a United States patent reference must have an effective filing date that predates the **date of invention** of ChemFree's patents in conformity with the following description:

- the invention was patented in this or a foreign country **before the invention thereof** by the applicant; and/or

- the invention was described in a printed publication in this or a foreign country **before the invention thereof** by the applicant.[14]

I have personally interviewed co-inventor Tom McNally and have otherwise assumed that ChemFree will establish a date of invention for all of the asserted claims in ChemFree's five asserted patents of at least as early as April 28, 1994.

---

[14] *See* Assumptions section above.

The effective date of a United States patent as a prior art reference is its filing date in the United States.[15]  In comparison to ChemFree's date of invention, the filing date of *Minkin '128* is April 29, 1994; the filing date of *Sims* is June 10, 1994; and the filing date of *Lashmett* is August 1, 1994. Consequently, *Minkin '128*, *Sims*, and *Lashmett* post-date the date of invention of ChemFree's patents.  I am advised by counsel that, consequently and as a matter law, they do not fall within the "scope and content of the prior art."

Counsel for ChemFree has directed my attention to Walter's invalidity contentions and Walter's summary judgment papers and has shown me that Walter contends that James McClure independently conceived and reduced the parts washer invention to practice before he commenced work at ChemFree in the fall of 1993.[16]  If this is true  (*and I understand that ChemFree vigorously contests the truth of Walter's contention*), such would establish a date of ChemFree's invention as early as September 30, 1993.  I do not see in his report that Professor Adriaens has adopted Walter's invalidity contentions on such an early date of invention.  Neither do I see, however, that Professor Adriaens and Walter have expressly

---

[15] *See* Assumptions above, *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F.2d 978, 983 (Fed.Cir. 1989).

[16] "The documentation regarding the conception and reduction to practice of the parts washer, including the technical drawings and reports by James McClure that show McClure was the sole inventor . . ."  [Docket 296, page 2].

abandoned such a contention.  In any event, it strikes me as inconsistent that, on the one hand, Professor Adriaens can assert *Minkin*, *Sims*, and *Lashmett* as being within the scope and content of the prior art while simultaneously asserting that McClure conceived the subject matter of ChemFree and ZYMO's patents and reduced it to practice prior to the effective dates of *Minkin*, *Sims* and *Lashmett*.

### 5.   Opinion and Conclusion on Scope and Content of the Prior Art.

Based on the underlying assumption that ChemFree can establish a "date of invention" that predates *Minkin '128*, *Sims* and *Lashmett*, the scope and content of the prior art that should be imputed to the knowledge of the hypothetical person of ordinary skill for purposes of an obviousness analysis should not include either *Minkin '128*, *Sims* or *Lashmett* on temporal grounds.

### B.   LEVEL OF ORDINARY SKILL IN THE ART.

### 1.   Legal Standard Applied.

In the following analysis, I have been guided by the following legal standards provided to me by counsel for ChemFree.  The issue of obviousness is determined with reference to a hypothetical person having <u>only</u> "ordinary" skill in the art.[17]  The hypothetical person of ordinary skill is not the inventor, but an imaginary being possessing only "ordinary

---

[17] *See* Assumptions section above, *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 454 (Fed.Cir.1985).

skill" in the art who has been created by Congress to provide a standard of patentability.[18]  Courts have never judged patentability by what the real inventor/applicant/patentee could or would do.[19]

In contrast, real inventors vary in their capacities from ignorant geniuses to Nobel laureates.[20]  Inventors, as a class, possess something which sets them apart from the workers of mere "ordinary skill" and one should not go about determining obviousness by inquiring into what patentees (i.e., inventors) would have known or would likely have done, faced with the revelation of the same references.[21]

I am informed by counsel for ChemFree that, on the one hand, a person of ordinary skill in the art is one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate.[22]  However, on the other hand, I am

---

[18] *See* Assumptions above, *Kimberly-Clark Corp.* v. *Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed.Cir. 1984).

[19] *See* Assumptions above, *Kimberly-Clark Corp.* v. *Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed.Cir. 1984).

[20] *See* Assumptions above, *Kimberly-Clark Corp.* v. *Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed.Cir. 1984).

[21] *See* Assumptions above, *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985); *Life Technologies, Inc. v. Clontech Laboratories, Inc.*, 224 F.3d 1320, 1325, 56 U.S.P.Q.2d 1186 (Fed.Cir. 2000).

[22] *See* Assumptions above, *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448 (Fed.Cir. 1985).

informed that a person of ordinary skill is also a person of ordinary creativity, not an automaton.[23]

The factors pertinent to a determination of the level of ordinary skill in the art include:  (1) educational level of the inventor; (2) type of problems encountered in the art: (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology, and (6) educational level of workers active in the field.  Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case.[24] In determining the level of ordinary skill in the art, the important consideration lies is whether an invention, as a whole, would or would not have been obvious when it was made, to a person of ordinary skill in the art -- not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand.[25]

Professor Adriaens' offers an unsubstantiated, conclusory opinion that a person of ordinary skill in "*the art*" has a B.S. Degree in Environmental Engineering or equivalent work experience in biological water treatment plus three years

---

[23] *See* Assumptions above, *KSR Int'l Co. v. Teleflex Inc.,* 127 S.Ct. 1727, 1742, 167 L.Ed.2d 705 (2007).

[24] *See* Assumptions above, *Environmental Design, Ltd. v. Union Oil Co. of Calif.,* 713 F.2d 693, 696-697 (Fed.Cir. 1983).

[25] *See* Assumptions above, *Environmental Design, Ltd. v. Union Oil Co. of Calif.,* 713 F.2d 693, 697 (Fed.Cir. 1983).

experience with equipment in the automotive or equivalent industries.  [Adriaens, p. 9].  I have spent more than 15 years in the field of parts washing and critical cleaning and have met, at most, only one or two practitioners with a degree in environmental engineering.  I have yet to meet a practitioner with any significant amount of expertise in waste water treatment technology.  In my experience, as of 1994, there was very little, if any, technical expertise (or even interest) in micro-biology, the biological sciences, and/or waste water treatment within the parts washing industry.

Professor Adriaens' report contains no analysis or discussion on the underlying basis for his opinion and conclusion.  Neither is there any analysis or discussion of what the applicable field of "art" that the person of "ordinary skill" purportedly practices in.  Professor Adriaens simply opines as to what is the level of "ordinary skill" in "the" art, without ever analyzing what "the" art is.  There is no discussion whatsoever, in Professor Adriaens' report, of the six factors from the *Environmental Design* case.  In this regard, Walter's expert gave me very little to rebut.

### 2.   Educational Level of the Inventor.

The inventors of the five ChemFree patents are Tom McNally, James McClure, Frank Marks, and Leland Strange.  As I understand it, Mr. McNally's educational background is a B.S.B.A. in

Economics from Old Dominion University plus post-graduate studies in business management; Mr. McClure' educational background is a B.S. in Industrial Engineering, plus post-graduate studies in psychology; Mr. Marks' educational background is a B.S. in Economics from the Wharton School of Business; and Mr. Strange's educational background is a B.S. in Industrial Management from Georgia Tech. and an M.B.A. from Georgia State University.

I am advised by counsel that the actual inventor's skill is irrelevant to the inquiry into ordinary skill in the art.[26]  On the other hand, I am advised that the education level of the inventor is one of the factors that may be considered in determining the level of ordinary skill.  In this particular case, the fact that:  (i) the inventors did not possess advanced degrees directed to the underlying technology related to the invention; (ii) the inventors, at the time of the invention, did not regularly practice in the parts washer industry and instead, undertook to develop new technology to support a venture capital investment; militate in the direction of setting the level of "ordinary skill" in the parts washer art at a relatively low level.  Thus, in my opinion, the factor of the actual education level of the inventors in this case should be given little

---

[26] *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985).

weight and, to the extent that it receives any weight at all, it should be in the direction of assessing the level of ordinary skill in the parts washer art at a relatively low level.

### 3.   Type Of Problems Encountered In The Art.

In the time period of consideration for this report (mid-1990s), most of the problems encountered in the parts washer art were related to coping with the requirements of the Montreal Protocol.  In this period, the largest-ever disruption was imposed upon the industrial cleaning market – as well as many others.  The nature of the problems encountered in the art of industrial parts washing were produced by four drivers: technical, political, commercial, and psychological.

The *technical* driver was environmental – based on convincing scientific evidence that use, and therefore release to the atmosphere, of certain chemicals was responsible for the long-term destruction of the Earth's stratospheric ozone layer.

The *political* driver was the global response to this evidence. The Montreal Protocol, on Substances that Deplete the Ozone Layer, was signed by 24 countries on September 16, 1987.  As of this writing, over 185 countries have signed it.  The Parties recognized that a ban on local use would be unfair, difficult to enforce, and ultimately unproductive, and thus chose the more productive step of banning manufacture.  The ban is progressive, favoring "developing" countries, who are given additional time

to develop an infrastructure which can produces suitable alternatives to CFCs.

The *commercial* driver was the global phase-out of manufacture of chlorofluorocarbon-based (CFCs) chemicals.  While not strictly a CFC, 1,1,1-trichloroethane (TCA) was also treated so – because of its extremely high use volume as an ozone-depleting chemical.  Use of either chemical was a dominant commercial choice, although other choices were also known.

The *psychological* driver was the pace (about one-half decade) and extent (complete reversal) of change to an activity whose details were settled art, for a reason not accepted by all affected.

In a general chronological sense, the first primary problem produced by these drivers was to find a way to provide clean parts without using solvents banned by the Montreal Protocol. These solvents were familiar, low-priced, well-matched to soils, and didn't require significant process equipment.  Some firms were cleaning with aqueous cleaning technology which required significant customization; substantial facilities for washing and rinsing, as well as the floor space to hold them; additional drying facilities with associated energy cost, and time for development and training; as well as facilities for management of water-soil wastes.  The marketplace was probably split 80% to

20% for solvent vs. aqueous technology.  Today, the ratio is at least reversed.

In the same chronological context, the second problem produced by these drivers was a consequence of the main solution to the first problem.  Simply put, water doesn't dry well relative to organic solvents.  Water requires about five times as much energy to vaporize – the most common mechanism by which parts drying was done.  Films of water are more difficult to breakup from surfaces because the surface tension of water is about three times higher than that of the banned solvents.  I have witnessed major companies doing valued cleaning work with TCA using a coffee can, a paint brush, and no emission control facility.  Since these solvents evaporated rapidly, parts "dried themselves" in ambient air.  This highly-valued trait was not replicated in any of the commonly-chosen replacement solutions.

The third problem, whose solution is more valued in this decade rather than the previous, is to identify and implement environmentally and financially acceptable means for disposal of removed soils and spent cleaning agents.  Another dimension to this problem is increased awareness via recent epidemiological data of health issues associated with halogenated solvents.

ChemFree's invention offers a significant contribution to the solution of the third problem.  That problem had remained

largely unsolved in some application segments until ChemFree's patented parts washer was invented.

### 4.    Prior Art Solutions To Those Problems.

It is important to recognize that the cleaning industry has, for the past half-decade, been segmented by issues surrounding cleaning quality.  Three segments are commonly recognized.  Solutions to the problems noted above were different, and were developed / implemented by persons with different levels of skills.

(1) *Critical cleaning* – where the cost of cleaning is easily justified by the high cost of cleaning failure – such as in optics, semiconductors, aerospace, or surface research,

(2) *Precision cleaning* – where there is a narrow balance between cleaning effectiveness and the cost its achievement, as in medical, food and beverage, instruments, or machinery, and --

(3) *Metal cleaning* – where the cost of cleaning is not weighed against results of cleaning tests, which are seldom done, but weighed against its effect upon the financial health of the enterprise, such as in maintenance or repair cleaning, intermediate cleaning before inspection, removal of protective coatings from stored goods, or some surface preparation for painting or coating.

It is this latter market segment into which cleaning machines manufactured according to ChemFree's patent claims are

valued.  Users within this segment are characterized by:  using
the "sink-on-a-drum" (SOAD) stand-alone parts washer, cleaning
parts one-at-a-time by hand, having small parts contaminated
with non-complex hydrocarbons, not being demanding of a high
level of cleaning quality as they seldom test for cleaning
quality, often being an enterprise with just a few employees,
being especially cost-conscious, and being able to provide labor
for hand-washing of parts vs. automated processing.  Three
commercial examples of operations in this market segment are
automotive repair shops, small machine shops, and mobile
operations.  This market segment might be named "small
distributed machines" (SDM), and it is found nationwide at tens
of thousands of sites.

In addition, and most importantly, users in the SDM segment
don't have the technical sophistication to efficiently separate
the small volume of removed hydrocarbon soils from their
cleaning agent, or the resources to be burdened with waste
treatment facilities for soils removed from their parts.
Various types of solutions were developed and offered to the SDM
segment by commercial firms, who in some cases also developed
their own solutions.

The first type of solution was continued use of solvent-
based (mineral spirits) SOAD parts washers.  This solution was
an anathema to many (especially in California and most

especially in the South Coast Air Quality Management District
[SCAQMD] of Los Angeles), but barely acceptable in some shops.
Mineral spirit solvents are volatile organic compounds (VOCs)
whose emission became increasingly regulated.  They are
flammable or combustible – depending upon their flash point.
Workers generally weren't fond of using them because of their
odor and propensity to inflict skin irritation to some.  But
they did solve the main problem – parts cleaning without
violating the Montreal Protocol.  They were highly valued by the
U.S. military for cleaning of parts and assemblies prior to
repair.  The hydrocarbon solvent they used was one of several
mineral sprit mixtures, known as "PD-680."  Safety-Kleen was the
main national supplier.  An example of these washers is United
States Patent No. 3,522,814 (Olson).

     The second type of solution was use of the same (or
similar) Sink-on-a-drum parts washer with an aqueous cleaning
fluid (called "juice").  Regional distributors such as Hubbard-
Hall in New England, Phillips Environmental Services in Los
Angeles, and Van Waters Rogers in the Northwest, attempted to
solicit business from customers purchasing mineral spirits from
Safety-Kleen by offering a surfactant-based aqueous cleaning
fluid for use in SOAD machines.  The replacement offering
included, as did that of Safety-Kleen, fresh cleaning agent and
disposal of spent solution.  A parts washer intended to compete

with the offering from Safety-Kleen was that claimed in United States Patent No. 5,265,633 to Knowlton.

Yet there were at least two core differences between these two offerings – mineral spirit solvent cleans by dissolving the oil and grease soils into a solution; the aqueous cleaning fluid cleans by combining mechanical force with surfactants to release the soils from parts.  The former worked well; the latter was problematic.  This was because the provided surfactant was not always appropriate for the chemical character of the soil.  I know from personal experience that Hubbard-Hall had difficulty in merchandising these goods, and I understand, from anecdotal information available to members in the industry, Phillips did as well.

The second core difference was that the insoluble oil-surfactant agglomerate floated to the top of the cleaning bath and, unless removed, infected cleaned parts on removal from the cleaning bath.  Considerable development work was expended against resolution of this problem.  It was not solved during the time period under consideration here.

Other types of solutions attempted in this period were a choice to not clean the parts, use of solid blast media to dislodge soils, use of abrasive materials such as cob grit to dislodge soils, or a contract with an outside firm to clean their parts.  It is these users who value the invention(s)

described in ChemFree's patent claims who would look forward with anticipation to additional types of solutions.

### 5.    Rapidity With Which Innovations Are Made.

In a "normal" environment, industrial parts washing is fairly slow to adopt innovation.  This is because industrial parts washing, especially in the metal cleaning sector, is not highly valued by the management of the firms who purchase equipment and hire workers to do it.  Those providing technical guidance within user firms are often younger and less technically skilled / appreciated / recognized than those providing other technical support within the enterprise.  The cleaning line is not an assignment ordinarily leading to promotion.

However, in the time period considered here, change was rampant.  The U.S. Clean Air Act (CAA) required the phase-out of manufacture (not use) of ozone-depleting chemicals (ODCs) by the end of 1995.  Since my industry didn't fully accept that this phase-out would retain governmental support until the early 1990s, the time period for most change was around three years - not the nine between 1987 (when the Montreal Protocol was signed) and the end of the phase-out.

Change brings uncertainty, which was commonly felt.  Early in this time period, or before, the U.S. EPA announced that it would require a label of some kind on goods cleaned with ozone-

depleting cleaning agents; and that label would be carried on those goods throughout their commercial lifespan.  To the relief of nearly all, this requirement was cancelled.

In the time period considered here (the 1990s), selection of an alternate cleaning technology which was not perceived as satisfactory by management, was often a ticket to the unemployment line.  I know that it happened many times.  During the latter period of the CFC-phase-out, say 1993 to 1995,[27] many users were willing to try anything that would make them compliant with the Clean Air Act.  Suppliers could easily gain attention with valid or invalid claims.  During this time, the pace of claimed (real or actual) innovation was rapid, if not long-lasting.

After January 1, 1996, the pace of innovation slowed to almost zero.  It was normal for humans to relax after a strenuous effort to pass a threshold.  Nevertheless, this hiatus was not expected by most suppliers who found business difficult to obtain.  Many closed or were purchased by others.

Since that time, the driving forces enabling change over the past decade are: (1) dissatisfaction with the choice made of CFC-replacements, (2) increasing national focus on health and

---

[27] The phase-out actually extended beyond the stated deadline of January 1, 1996 because many firms stockpiled supplies of the solvents whose manufacture was banned, or purchased legally (or illegally) imported goods from developing countries who were allowed to continue manufacture.

safety issues, and (3) strengthening regional and national environmental regulations (or expectation of same).  One factor limiting the pace of change is budgets and the attitude of management to them.  After all, if significant scarce resources have recently been spent on new cleaning facilities that did not prove satisfactory, why fund additional ones recommended by the same people that made the previous recommendation?

In other words, the pace of innovation is somewhat driven by human psychological reactions.  This psychological injury is still felt by many users.  They, dissatisfied with aqueous cleaning technology and its suppliers, remember the forgiveness of solvent cleaning and long for its return.  One large supplier firm, with which I am quite familiar, currently has no resources available for any work other than preparing proposals for sales of new solvent cleaning equipment using either n-propyl bromide or trichloroethylene.  Use of both solvents raise serious health concerns, and require significant cost for environmental compliance.

### 6.    Sophistication Of The Technology.

The parts washer manufacturing industry, in the industry segment in which clients of ChemFree and Walter practice, is a relatively low tech industry.  While the techniques associated with the manufacturing or repair operations producing dirty

parts may be quite sophisticated, those associated with use of the parts washers are less so.

The reason, as noted above, is that cleaning work is not highly valued.  Manufacturers do not see a high correlation between cleaning quality and enterprise profit.  Most managers, in the industry segment in which ChemFree and Walter practice, do not even measure the contamination level on cleaned surfaces. In critical cleaning operations, this would be heresy.

As a consultant with more than fifteen years experience, I teach, endorse, and support this approach.  One wastes money when one removes contamination beyond a level necessary to fulfill all downstream demands of the next user of the part.

Yet, developments starting from the primitive level of technology which is solvent cleaning using CFC-113 or TCE, are not easily achieved.  If so, they would be easily recognized across the spectrum of industrial cleaning applications.  They are not so.

Solvent cleaning technology,[28] as it was normally used, provided a powerful suite of capabilities: washing with an effective cleaning fluid, rinsing with a fluid which had a high holding (solutioning power) for soil, rapid drying[29] because

---

[28] Baker, J. And Durkee, J.B., "Degreasing Solvents, Old and New," *Products Finishing Magazine,* July 1996.

[29] Durkee, J. B., "Parts Drying Made Easy," *Products Finishing Magazine*, February 1995, Volume 59, No. 5, pp. 60-67.

evaporation required little energy,[30] straightforward proven capability for recovery of pure solvent from waste material by atmospheric distillation, and a high level of rejection or concentration of the soil materials removed from parts thereby allowing efficient disposal.

Conventional aqueous cleaning technology[31] did not provide these capabilities,[32] which are significant.  Aqueous cleaning needed to be combined with other technologies (some undeveloped at that time) to provide those capabilities.

Many industrial applications, such as those within the industry segment where ChemFree and Walter provide goods, do not require completion of the rinsing and drying steps, which are significantly more difficult to complete with aqueous cleaning technology.[33]  In these situations, the main issues associated with industrial cleaning are reduced to soil removal from parts, and recovery of spent cleaning fluid for re-use.[34]

---

[30] Durkee, J. B., "Why Is Drying So Hard with Aqueous Cleaning Technology?" *Products Finishing Magazine,* September 1995.
[31] A good reference about aqueous technology of this period is United States Patent No. 4,651,762, Bowden, D., *Agitation Parts Degreaser,* March 24, 1987.
[32] Durkee, J.B., "Changing from Chemicals to Processes," presented at the *ACS National Meeting*, Chicago, Illinois, August 24, 1995.
[33] Quitmeyer, J.A., "Aqueous Cleaning: When to Rinse and Dry," *Precision Cleaning Magazine,* June 1995, pages 11 to 14.
[34] Durkee, J.B., "New Process Developments in Replacement Cleaning Systems," presented at the *1995 CFC/Halons Conference,* Washington, DC, October 25, 1995.

The latter was done in two different process steps:

(1) *Separation of soils* from spent cleaning fluid.[35]  This meant efficient collection of immiscible oil-based residues – skim. Various coalescers (often made of polypropylene), gravity-based baffled separators, and surface skimmers were developed, patented,[36] commercialized, sold, and more than occasionally replaced.

(2) *Recycle* or disposal of the water phase (containing purchase soluble cleaning detergents).  The latter was usually to a POTW (Publicly Owned Treatment Works), or by treatment in the centralized treatment system of larger sites.  Seldom was the former done because of concern about re-infection of cleaned parts with the soil from previous cleaning work.

In my opinion, the relative lack of sophistication of the technology employed in the parts washer industry militates in favor of setting the level of ordinary skill of *those who use it* at a low level.

### 7.   Educational Level Of Workers Active In The Field

The vast majority of workers in the parts washer industry are manufacturing laborers who typically have no more than a high school education.  Workers who are engaged in science and

---

[35] Berg, M., "Aqueous Cleaner Maintenance," *Products Finishing Magazine,* October 1996.

[36] United States Patent No. 5,849,100, Bowden, D., " *Method for Cleaning Oily Objects*," December 15, 1998.

engineering aspects of developing and manufacturing products typically have no more than a Bachelors Degree.  Such Bachelors Degreed persons would rarely, if ever, have more than one year of Chemistry and/or one year of Biology.  Certainly, they would have little or no formal training in the area of bioremediation. Cleaning firms do not throw off huge streams of cash.  Recruits are added, but seldom highly-valued.

I would like to describe my experience, without being critical to anyone of my acquaintance or to my industry.  I participated in associations such as ASTM and the Replacement Solvents Alliance.  I have served on the editorial boards of Precision Cleaning Magazine and Products Finishing Magazine.  I have supported more than one hundred customers.  I have attended more than one hundred trade shows.  I am known by and have friends in most major supplier firms.  Through those contacts, I became very familiar with the level of education within the parts washing industry.

I am personally familiar with the following persons who have spent their careers in the parts cleaning industry: Jeff Hilbert, Chuck Sexton, Bob Polhamus, Carroll Smiley, Rich Stewart, Greg Albert, Art Gillman, Janice Baker, Eddie Marks, Bill Kenyon, Don Bowden, Gary Horton, Walt Johnson, Mike Goodson, Kenny Dishart, Vasily Pekun, Gary Kauffman, and Chuck Bangasser.  These people have significant experience in various

segments of the industrial cleaning market and have each worked for several firms.  I would consider these people to have a skill level above the level of "ordinary" skill.  They have each been part of innovating or using technology to solve the problems mentioned above.  Their educations vary.  Their mean level of education is that of a bachelor's degree.  Two do not have high school diplomas.  The most common type of education is business, some have technical degrees in science and engineering.  The most commercially successful of the group is a lawyer.  In my opinion, the education level of workers active in the field militates in favor of setting the level of "ordinary" skill at a relatively low level.

> **8.  Opinion And Conclusion On The Level Of Ordinary Skill In The Art.**

In reaching my opinion and conclusion, I am guided by the following legal standards given to me by counsel:  *A person of ordinary skill in the art is one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate,*[37] while, on the other hand, *a person of ordinary skill is a person of ordinary creativity, not an automaton.*[38]  To me, these are people who are competent at practicing the art of parts cleaning and making parts washers at the current state-of-the-art, but are not inclined to try to advance the state-of-the-art by creative

---

[37] *See* Assumptions above, *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448 (Fed.Cir. 1985).

[38] *See* Assumptions above, *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1742 (2007).

and innovative thinking beyond an "ordinary" level of creativity.

In my experience with interviewing, hiring, training, and working with such people, I have found that it takes about one-half to three years of on-the-job training and experience to train someone with a Bachelors Degree in nearly any discipline to handle most of the typical engineering and chemical problems that are encountered in practicing the parts washer art at the current state-of-the-art.  Thus, in taking this factor into account, in my opinion, the education level of those of ordinary skill providing technology in the parts washing industry in 1994 was no more than a Bachelors Degree, including no more than one year of college level classes in Chemistry and/or Biology and little or no formal education in the area of bioremediation and such person would also have somewhere in the range of one-half to three years of practical experience in working with parts washing technology.

**C.   DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIMED INVENTION.**

Professor Adriaens discussed only what was present in the eleven cited references.  He offered no discussion of the various elements of ChemFree's invention that were missing from the references.  Furthermore, he did not appear to discuss various features in his eleven references that taught away from

ChemFree's invention.  I am advised by counsel that the third "Graham" factor in the obviousness is an analysis and evaluation of the <u>differences</u> between the prior art and the claimed invention, not just the similarities, if any.

> **1.   Differences between U.S. Patent No. 5,265,633 to Knowlton and the Claimed Invention.**

Glenn Knowlton, whose business interest was the manufacture of aqueous parts cleaning equipment, directed an invention to certain mechanical improvements to the typical "sink-on-a-drum" parts washer.  *Knowlton*'s parts washer has an open basin and a reservoir below the basin.  Cleaning fluid is stored in the reservoir.  It is pumped through a conduit to the basin where it is used for parts cleaning.  The fluid then exits the basin through a drain aperture.  [Column 7].  A filter is interposed in the drain aperture to remove foreign material from the fluid. [Column 7].  After passing through the drain aperture and filter, the cleaning fluid drains back into the reservoir. [Column 7].  *Knowlton* teaches the use of "suitable provisions" to heat the cleaning fluid such as a "heating element," however, there is no mention that such "suitable provisions" include a thermostat or a fluid low-level cut-off switch to disable the heater.



**Figure 15 – Knowlton Figures**

Improved manufacturing and use of these machines is the intent of his teachings; he wants parts washers that can be quickly assembled in modular fashion from vacuum-formed metal; be quickly assembled or dissembled without the use of tools; and are economical to manufacture, service, and operate.  They include a novel fastener to make all of the above possible.

*Knowlton*'s mechanical parts washer is formed of "non-corrosive material" to handle "*water based alkaline detergents and like biodegradable washing solutions*."  [Knowlton, Column 3].  Devices made compliant to *Knowlton*'s patent claims feature useful capabilities not found in ChemFree's patents.  But these capabilities, not claimed by ChemFree, basically relate to the design and

manufacture of metal cleaning machines.  Other capabilities *Knowlton* provides include an air insulation barrier between the heated cleaning fluid and the environment to retain heat, and an air space underneath the washing solution in the reservoir to prevent the typically cold concrete from cooling the washing solution.

*Knowlton* does not possess, expressly or inherently, any of the following elements corresponding to the following claim limitations of ChemFree's patents.

Non-toxic, Non-Caustic Cleaning fluid:  *Knowlton* contemplates use of a water based "alkaline" detergent.  There is no teaching in *Knowlton* that such a cleaning fluid would be non-toxic to microorganisms or that it would be non-caustic to human operators.  Thus, *Knowlton* fails to satisfy any of the following limitations:

> *'110 Patent - claim 1:  a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid;*

> *'491 Patent - claim 1:  exposing the part to a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid within a basin;*

> *'835 Patent - claim 5:  a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid;*

> *'125 Patent - claim 1:  suspending, in a biodegradable, non-caustic, nonflammable oil dispersant cleaning and degreaser fluid, microorganisms to which the fluid is non-toxic;*

> *'125 Patent - claim 6:  . . . introducing hydrocarbon biodegrading microorganisms into a biodegradable, non-caustic, nonflammable oil dispersant cleaning and degreaser fluid that is non-toxic to the  microorganisms;*

*'125 Patent - claim 12: exposing the part within a basin to a biodegradable, non-caustic, nonflammable oil dispersant cleaning and degreaser fluid to clean the hydrocarbons from the part.*

<u>Fluid Temperature and Level Controls</u>:  Although *Knowlton* teaches heating, it does not teach or disclose any means for controlling the temperature of the fluid or shutting off the heater if the fluid gets too low.  Thus, *Knowlton* fails to satisfy any of the following limitations.

*'110 Patent - claim 1: means for controlling said heater to maintain the fluid approximately at a desired temperature and for disabling said heater as the fluid drops to below a desired level in the tank.;*

*'110 Patent - claim 6:  said means for controlling said heater includes a level sensor cooperating with the fluid in the tank and said heater for deactivating said heater.*

*'110 Patent - claim 7: said means for controlling said heater further includes a thermostat cooperating with the fluid and said heater for activating and deactivating said heater;*

*'110 Patent - claim 8:  said means for controlling said heater  includes a level sensor cooperating with the fluid in the tank and said heater for deactivating said heater.*

*'491 Patent - claim 5: step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

*'491 Patent - claim 6: step of measuring the temperature of the fluid, wherein the heating step is responsive to the step of measuring the temperature;*

*'491 Patent - claim 7: step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

*'125 Patent - claim 4: step of maintaining the fluid at a desired temperature . . .*

*'125 Patent - claim 17:  step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

*'125 Patent - claim 18: step of measuring the temperature of the fluid, wherein the heating step is responsive to the step of measuring the  temperature.*

*'125 Patent - claim 19:  step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level.*

<u>Microorganisms</u>:  Knowlton does not teach or disclose using microorganisms to bioremediate hydrocarbons.  Thus, Knowlton fails to satisfy any of the following limitations:

*'110 Patent - claim 1: microorganisms within the parts washer for biodegrading the hydrocarbons;*

*'110 Patent - claim 1:  the microorganisms substantially sustained within and flowing with the fluid;*

*'110 Patent - claim 2 - the fluid defines a fluid surface in the tank, and wherein a substantial portion of the microorganisms live in the fluid proximate to said fluid surface.*

*'491 Patent - claim 1: wherein microorganisms are disposed within the parts washer for biodegrading hydrocarbons associated with the part;*

*'835 Patent - claim 5: microorganisms within said parts washer;*

*'835 Patent - claim 5:  said microorganisms at least partially flowing with substantially sustained within said fluid;*

*'125 Patent - claim 1: suspending, in a biodegradable, non-caustic, non-flammable, oil dispersant, cleaning and degreasing fluid, microorganisms to which the fluid is nontoxic;*

*'125 Patent - claim 6:  introducing hydrocarbon biodegrading microorganisms into a biodegradable, non-caustic, non-flammable, oil dispersant cleaning and degreasing fluid that is non-toxic to the microorganisms,*

*'125 Patent - claim 12: wherein microorganisms, to which the fluid is non-toxic, are disposed within the fluid for biodegrading hydrocarbons.*

*'491 Patent - claim 1 - accumulating the microorganisms and the hydrocarbons adjacent a fluid surface defined by the fluid in the tank;*

<u>Bioremediation</u>:  Knowlton teaches typical, well-known aqueous parts cleaning in a supposedly improved mechanical apparatus.  It does not teach bioremediation of hydrocarbon contaminants cleaned from parts.  Thus, *Knowlton* fails to satisfy any of the following limitations.

*'110 Patent - claim 3 - a substantial portion of the microorganisms and hydrocarbons accumulate proximate to said fluid surface such that a substantial amount of biodegradation takes place proximate to said fluid surface.*

*'491 Patent - claim 1 - biodegrading the hydrocarbons proximate to the fluid surface.*

*'835 Patent - claim 5 "said fluid being non-toxic to said microorganisms, whereby the microorganisms biodegrade the hydrocarbons while retained within said tank."*

*'226 Patent – claim 1 - removing organic matter in the cleaning fluid in the second chamber wherein the step of removing the organic matter from the fluid comprises biologically degrading the organic matter;*

*'125 Patent - claim 1 - allowing the microorganisms within the fluid to biodegrade the hydrocarbons.*

*'125 Patent - claim 6 - retaining the hydrocarbons within the fluid in the tank while the microorganisms biodegrade the hydrocarbons.*

*'125 Patent - claim 12 - retaining the hydrocarbons within the tank for sufficient time for the microorganisms to substantially biodegrade the hydrocarbons.*

**2.   Differences between Hakansson-1 and the Claimed Invention.**

Professor Adriaens cites *Hakansson-1* nineteen times as being relevant to his understanding of the evolution of the patent claims in ChemFree's United States Patent No. 6,019,110. Hakansson's patent defines ten chemical method and mechanical apparatus claims.  Four of the ten parts of Hakansson's chemical method are:

- Continuous or periodic addition of detergents (tensides, surfactants) to replace those lost through unintended biooxidation by microorganisms, with the active concentration of detergent being 2 to 5 percent by weight;

- Continuous or periodic addition of a buffer (alkaline) chemical to maintain the pH between 8.5 and 9.7, to keep from blocking the growth of the microorganisms;

- Continuous or periodic addition of nutrients (Camex Bio 104-1) to support growth of the microorganisms so that the detergent concentration in solution is substantially unaffected, and

- Continuous or periodic withdrawal of sludge or slime (dead microorganisms and undigested hydrocarbons) from the separator compression zone.  In addition, Hakansson's mechanical apparatus contains an air injection system ("blow" and/or "blower") to aerate the bath contents. The apparatus claimed by Hakansson is not simple.  It requires nearly a dozen valves for managing fluid level and composition.

The apparatus of *Hakasson-1* contains a valuable feature not found in ChemFree's technology:  the ability to rinse spent cleaning fluid, oil, and microorganisms from parts, using clean water.  *Hakasson-1* teaches away from simplicity and towards the complexity of a conventional aqueous cleaning process with various set-points for composition and flow rate.

*Hakansson-1* uses bacteria indigenous to mineral oils.  These bacteria have a high mortality rate, apparently turning acidic

on death, which enhances their native tendency toward biooxidation of detergents; their replacement must be stimulated by the addition of nutrients beyond the oil present.

*Hakansson-1* teaches process control as applied to bioremediation parts washers through the necessity of controlling the composition of detergents, microorganisms, alkali, and nutrients. *Hakansson-1* also teaches nearly uncontrolled and certainly incomplete biooxidation. For every liter of oil that is oxidized, one-third of a liter of detergent is consumed through collateral biooxidation, and slightly more than one-half liter of water laden with dead, presumably odorous microorganisms and some oil are produced as waste products. Apparently, the unintentional consumption of detergents by microorganisms must reduce capacity to bioremediate oil, since the volumetric space-time yield (volume of oil consumed per day per vessel volume) stated by *Hakansson-1* is only 0.71 liter oil per liter vessel-day vs. 3.41 in the same units as claimed by J Walter's BR-200 machine. That is, *Hakansson-1*'s apparatus is only 20 per cent as efficient on a reactivity basis as is Walters' BR-200 machine.

*Hakansson-1* does not possess, expressly or inherently, any of the following elements corresponding to the following claim limitations of ChemFree's patents.

<u>Cleaning fluid</u>:  *Hakansson-1* contemplates use of alkaline tensides (surfactants):

> The inventive apparatus will now be described with reference to Fig. 3. When using the illustrated apparatus, goods or objects A to be cleaned are placed in the cleansing tank 1, e.g. with the aid of a basket.  The valve 6 is opened and a pump activated, whereupon washing liquid comprising tenside and alkali is pumped up from the tank 2 and applied to the objects or goods under powerful pressure.

[Hakansson-1, page 10].

> In order to initiate a cleaning process of this kind, it is necessary first to accumulate a given amount of organic substances such as oil and accompanying bacteria, prior to activation of the bacteriological life.  The oil is preferably accumulated in the cleaning bath, by adding thereto a tenside solution of basic pH 7-14, particularly by adding a basic tenside solution of pH 9-11.

[*Hakansson-1*, page 2].

> When the pH-value has fallen to about 9.2-9.4, careful metering of nutrient solution to the bath can be commenced so as to activate the latent bacteria culture in the bath.

[*Hakansson-1*, page 3].  There is no teaching in *Hakansson-1* that the cleaning fluid would be non-caustic to human operators.  The foregoing statement was confirmed by Examiner Stinson while examining one of ChemFree's continuation patent applications:

> It was noted by the examiner that WIPO'314 ["*Hakansson-2*"] and EPO'342 ["*Hakansson-1*"] fail to specifically or inherently disclose in a parts washer, a fluid that is a "biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser".  WIPO'314 and EPO'342 fail to specifically or inherently teach the same even though employing water.

['305 Application, Interview Summary, above].  I tend to agree with Examiner Stinson on this point.  It does not appear to me that Professor Adriaens was apprised of Examiner Stinson's foregoing statement before publishing his expert report.  In any event, I disagree with Professor Adriaens' opinion that *Hakansson-1* discloses a "biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid."  In particular, I disagree that the quoted passage he relies on from *Hakansson-1* ("tenside solution of pH 9-11" from page 2) is within a pH range that persons in the cleaning industry would consider "non-caustic" to a human operator.  Thus, *Hakansson-1* fails to satisfy any of the following limitations:

> *'110 Patent - claim 1:  a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid;*
>
> *'491 Patent - claim 1:  exposing the part to a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid within a basin;*
>
> *'835 Patent - claim 5:  a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid;*
>
> *'125 Patent - claim 1:  suspending, in a biodegradable, non-caustic, nonflammable oil dispersant cleaning and degreaser fluid, microorganisms to which the fluid is non-toxic;*
>
> *'125 Patent - claim 6:  . . . introducing hydrocarbon biodegrading microorganisms into a biodegradable, non-caustic, nonflammable oil dispersant cleaning and degreaser fluid that is non-toxic to the  microorganisms;*
>
> *'125 Patent - claim 12:  exposing the part within a basin to a biodegradable, non-caustic, nonflammable oil dispersant cleaning and degreaser fluid to clean the hydrocarbons from the part.*

<u>Fluid Temperature and Level Controls</u>:  Although *Hakansson-1* teaches heating, it does not teach or disclose any means for

shutting off the heater if the fluid gets too low.  My

observation on this matter is confirmed by the following

statement by Examiner Stinson.

> WIPO'314 and EPO'342 also fail to teach specifically or
> inherently the limitations of the heater being responsive
> to measured fluid level and of being disabled when the
> fluid drops below a desired level.

['305 Application, Interview Summary, above].  Thus, *Hakansson-1*

fails to satisfy any of the following limitations.

> *'110 Patent - claim 1: means for controlling said heater to maintain the fluid
> approximately at a desired temperature and for disabling said heater as the fluid drops to
> below a desired level in the tank.;*
>
> *'110 Patent - claim 6:  said means for controlling said heater includes a level sensor
> cooperating with the fluid in the tank and said heater for deactivating said heater.*
>
> *'110 Patent - claim 8:  said means for controlling said heater includes a level sensor
> cooperating with the fluid in the tank and said heater for deactivating said heater.*
>
> *'491 Patent - claim 5: step of measuring the level of the fluid, wherein the heating step is
> responsive to the step of measuring the level.*
>
> *'491 Patent - claim 7: step of measuring the level of the fluid, wherein the heating step is
> responsive to the step of measuring the level.*
>
> *'125 Patent - claim 17:  step of measuring the level of the fluid, wherein the heating step
> is responsive to the step of measuring the level.*
>
> *'125 Patent - claim 19:  step of measuring the level of the fluid, wherein the heating step
> is responsive to the step of measuring the level.*

### 3. Differences between U.S. Patent No. 5,364,789 to Guinn and the Claimed Invention.

L.J. Guinn, whose business interest appears to have been

cleanup of contaminated soil and treating oil spills on soil and

water, claims a composition as a cleaning fluid and methods of

applying it to plowed soil, contaminated water, hydrocarbon

materials, or solid surfaces.  The cleaning fluid includes microorganisms as well as a mixture, identified as a "biocatalyst," consisting of a salt which will chelate ("scavenge") with any Chlorine liberated in the decontamination so as to keep the Chlorine from inhibiting microbiological action; a nonionic surfactant to break down hydrocarbons physically (but not chemically) into very small globules to bring them into contact with the water in the biocatalyst; nutrients (Phosphorous and Nitrogen) for the microorganisms; and water.  The preferred method of application is to spray the cleaning fluid on the contaminated soil (or water) in a way that allows Oxygen to dissolve in the water-based fluid so it can support the action of the microorganisms.  After application, the cleaning fluid is allowed to sit for two to twenty-four hours to allow the population of microorganisms to increase to a useful level, and then be allowed to act quietly for a period of one to two weeks to complete biological oxidation.  Although *Guinn* does briefly mention use of the cleaning fluid in general janitorial and parts washing applications, the contact time requirements for implementation of *Guinn*'s claims would not be acceptable to users of parts cleaning equipment who demand surfaces be cleaned in seconds to minutes and the removed oil bioremediated in one or two days.

The teaching of *Guinn* is limited to a combination of fluid and microorganisms.  Although *Guinn* makes a passing reference to using his fluid in a parts washer, *Guinn* does not disclose or claim a parts washing apparatus of any kind, much less an apparatus with the features disclosed and claimed in ChemFree's patents.

There is no process control as found in ChemFree's U.S. patents (including 6,019,110).  There is no disclosure of temperature to assure optimum life of the microorganisms or a means to maintain such temperature.  There is no disclosure of fluid level control to avoid pump failure or heater burnout.  There is no mention of a pump and conduit assembly to transport fluid from a basin to a tank.  In other words, there is no basin, no tank, no filter, no conduit, no flowpath, no heater, no thermostat, no level sensor, and no preferred location of where most of the microorganisms and hydrocarbon oils are to be found.

There is no teaching in *Guinn* from which a person of mere ordinary skill in the art in 1994 could discern that *Guinn*'s cleaning fluid would provide a "*biodegradable, non-toxic, non-caustic, nonflammable oil dispersant and degreasing fluid*" in continuous use in a parts washer application over an extended period of time.  In particular, there is no teaching in *Guinn* that would lead an

ordinary practitioner to believe that *Guinn* would not suffer from the same problems of changing pH and toxic build-up identified in *Hakansson-1*, if *Guinn* were used in a parts washing apparatus.

> **4.   Differences between U.S. Patent No. 3,522,814 to Olson and the Claimed Invention.**

*Olson*, supporting the business interests of the Safety-Kleen Corporation in 1968, claimed what appears to be the quintessential sink-on-a-drum parts washer for use with mineral spirit-based solvents.  *Olson* claims use of the sink portion as a filter matrix which could be easily exposed for periodic clean out and solvent replacement by a Safety-Kleen technician.  The technician would replace the drum, also referred to as a barrel, into which the filter was placed.  The filter had a perforated bottom wall, which performed the filtration function.  *Olson* claims use of a cleaning fluid, without being specific as to type, though he also describes use of a solvent.

The teachings of *Olson* are almost moot to the issues associated with ChemFree's patent claims.  The claimed machinery is a solvent parts washer, not an aqueous parts washer, and not a biooxidation aqueous parts washer.  Separation of the soil and replacement of the cleaning fluid were not taught to be done through the capability of the cleaning machine, as done with machines built in accordance with the claims of ChemFree's

patents.   Rather, *Olson* taught replacement by Safety-Kleen service technicians.

*Olson* does not satisfy any of claim limitations of ChemFree's patents directed toward:

- a biodegradable, non-toxic, non-caustic, nonflammable cleaning fluid;

- use of microorganisms;

- filtering that allows pass-through of microorganisms;

- bioremediation;

- fluid heating;

- fluid temperature control; and/or

- fluid level control.

### 5.   Differences between U.S. Patent No. 5,322,078 to Tuttle and the Claimed Invention.

I am personally familiar with Geoff Tuttle and his work. Mr. Tuttle's business interest was supporting development and sales of aqueous parts washers for the Kleer-Flo Company.  He claims a parts washer which could clean by either immersion in a an aqueous cleaning fluid (with a mild level of fluid agitation) or by spraying and hand brushing as is done with machines produced by ChemFree.

*Tuttle's* device has two tanks, one inside the other.  The inside tank was called as "submersion tank;" the outside tank was called the "main tank" which was partially filled with fluid

and / or oil soils. The inside tank could be rotated ninety degrees upward to allow cleanout of the outside tank.

The flowpath between the two tanks was flow over a weir from one side of the inside tank downward into the outside tank. However, the purpose of this flowpath was quite different from the flowpath in ChemFree's invention. *Tuttle's* flow was not to return used cleaning fluid from the submersion tank to the main tank, rather it was to skim oils and other soils that had risen to the top surface of the submersion tank and forced toward the weir by a sparging action using a set of nozzles, a pump, and gravity.

*Tuttle's* parts washer had a filter, however, the filter was not situated within a flowpath between the two tanks. *Tuttle* also has a heater situated external to the main tank. *Tuttle* does not disclose any level control system.

*Tuttle* does not fully teach conventional aqueous cleaning technology, especially the influence of mechanical force on the successful removal of oil, grease, and particles from metal parts, because that was only available through one of the two modes of operation of this parts washer. *Tuttle* teaches how oil and grease contaminants rise to the top of an aqueous cleaning bath and must be "skimmed off" to prevent clean parts being removed from the inside tank from becoming re-infected and made dirty. This teaching is away from ChemFree's claims, where the

cleaned parts are never exposed to the surface of the cleaning tank because they are not cleaned in an immersion cleaning bath.

*Tuttle* also teaches that, in order to obtain improved cleaning, there is a need to heat the cleaning solution at a temperature range considerably higher than the preferred temperatures taught in ChemFree's specification.  This is away from the teachings of ChemFree which provides a temperature of the cleaning solution that is best suited to maintain microorganism stability and enhance bioremediation activity.

The device of *Tuttle* is incompatible with ChemFree's claims of a bioremediation parts washer.  It does not teach bioremediation or the use of microorganisms.  It does not teach a cleaning fluid that must serve as an acceptable host environment for microorganisms.  It does not teach a fluid temperature for an acceptable host environment for microorganisms.  It does not teach a level control subsystem.  It does not teach a non-caustic cleaning fluid that can be used by a human operator without gloves or safety goggles.  It does not circulate cleaning fluid from a tank to a basin, drain the fluid back to the tank, or filter the fluid as it drains from the basin to the tank.  In short, *Tuttle*'s apparatus and cleaning method is completely different from:  (i) the ChemFree apparatus; and (ii) the ChemFree method of removing hydrocarbons from dirty parts; and (iii) ChemFree's method of bioremediating hydrocarbons.

### 6.   Differences between U.S. Patent No. 5,427,128 to Minkin and the Claimed Invention.

J. Minkin, supporting the business interests of a firm manufacturing spray cabinet parts washers, teaches a way of overcoming a known problem with pressure-jet cabinet washers. The problem is that thermal expansion of a hot jet of sprayed cleaning fluid can create a pressure wave in the cleaning chamber at start-up.  The value of a hot aqueous cleaning agent, probably caustic-based, is to enhance cleaning via enabling a modest and acceptable amount of surface corrosion of metal.  The hot jet has this effect when the machine is started – that is, when the machine is cold.  The solution to this problem, as taught by *Minkin*, is to use a second fluid to create a temporary static situation in the cleaning chamber where the second fluid is at a temperature higher than that of the first fluid to be sprayed on parts.  This avoids the thermal expansion of a hot fluid into a cold one.

*Minkin* teaches management of a conventional pressure-jet cabinet washer using hot fluid, and another fluid still hotter. This is away from the teachings of ChemFree's patents, which do not clean with hot fluid, do not have pressurized sprays, do not have a second fluid, and do not operate with two different temperatures of cleaning fluid.

*Minkin* does not teach bioremediation with microorganisms. *Minkin* does not teach a cleaning fluid that is also an acceptable host environment for microbes.  The high temperatures and pressures at which *Minkin* operates are fundamentally incompatible with the open basin, hand washing method taught in ChemFree's patents.  *Minkin*'s operating temperatures would probably kill most bioremediation microorganisms.  *Minkin* does not teach use of cleaning fluid that would be effective at cleaning hydrocarbons from parts at operating temperatures that would be compatible with using microorganisms to bioremediate hydrocarbons or would be compatible with performing manual cleaning operations in an open basin.

> **7.   Differences between U.S. Patent No. 5,232,299 to Hiss and the Claimed Invention.**

Like *Minkin*, K. W. Hiss also supports the interests of a well-known manufacturer of cabinet spray washers.  The cleaning machine provided by *Hiss* adds additional mechanical force to the aqueous cleaning process as normally implemented in sink-on-a-drum parts washers.  This machine implements mechanical force in two ways: (1) the conventional hard-bristle brush is provided for hand application of mechanical force, and (2) a conventional set of jet nozzles provides for spray application of mechanical force.  Aqueous cleaning fluid to implement both means of applying mechanical force is provided by the same pump.  Both

means are applied in a sink or basin which drains into a holding tank.  Since the layout is compact, this would appear to be a useful platform for implementing aqueous cleaning technology in small-scale industrial applications.  *Hiss* teaches that "a water-based parts washer which will adequately replace the solvent sink is not available" and hence strives to add mechanical force to a water-based cleaning fluid to compensate for the cleaning "power" of mineral spirit solvents.  He further teaches that:

> The preferred cleaning solution for washer 100 is water with an alkaline detergent.  A suitable alkaline detergent is NATURAL ORANGE$^{TM}$, which is available from Better Engineering Mfg, Inc.  It is preferred that the cleaning solution be heated to a temperature in the range of 140° to 180°F for optimal cleaning.

[*Hiss*, column 10].  The foregoing statement indicates that *Hiss*' aqueous cleaning method involved a relatively caustic (alkaline) cleaner at relatively high temperatures.  Both of these factors are fundamentally incompatible with providing an acceptable host environment for microorganisms while also offering comfort to a human operator.  Thus, *Hiss* does not teach a biodegradable, non-toxic, non-caustic, non-flammable oil dispersant and degreaser fluid as claimed in four of ChemFree's five patents.  A person of ordinary skill in the art would not be inclined to use *Hiss*' cleaning fluid at the operating temperatures taught in ChemFree's patents and have a reasonable expectation of achieving acceptable cleaning performance.

*Hiss* teaches a conventional aqueous cleaning technology, which produces a water-immiscible waste, which is away from ChemFree's method of biooxidation of the oil and grease removed from parts, which eliminates waste disposal.

### 8.   Differences between U.S. Patent No. 5,492,139 to Lashmett and the Claimed Invention.

B. Lashmett, et. al., whose business interest was soil remediation, teaches a cleaning apparatus and a cleaning method. The contamination can be oil, PCBs, or other hydrocarbons. The material can be granulated absorbent materials, filters, industrial mats, or any article capable of absorbing such contamination. The apparatus is basically a contactor vessel ("dunk tank") with an adjacent rotary dryer. The contact is between the contaminated material and a water-based oxygenated cleaning fluid which contains microorganisms. The method is to circulate cleaning fluid through the contaminated material held in a basket, separate the removed contamination from the vessel top surface with a skimmer, and then evaporate the attached fluid with a rotary dryer.

The teachings of *Lashmett* are specifically directed toward the removal of contamination **ab**sorbed onto and beneath surfaces, which is away from the teachings of ChemFree's patents, which teach removal of contaminants usually **ad**sorbed on (but not beneath) surfaces. The teachings of *Lashmett* are also directed

away from the teachings of ChemFree's patents as implementation of *Lashmett*'s approach produces a chemical (oil)-based waste product while implementation of ChemFree's approach produce no chemical waste product.  Finally, the teachings of *Lashmett* are directed to the use of microorganisms to separate contamination from materials (cleaning), which is away from the teachings of ChemFree's patents, which teach that the use of microorganisms is to biologically oxidize the hydrocarbon contamination to harmless waste products (post-cleaning).

*Lashmett* differs significantly from ChemFree in that it does not teach bioremediation in the cleaning fluid tank.  Instead, it teaches removal of oil through a skimming step.



**Figure 16**

Tank 12 includes two side walls 22, 24 two end walls 26, 28
and a bottom wall 30. An elongated horizontal skimming slot
32 is provided in end wall 28.  Outside end wall 28 is a
skimming container 33 having a skimming chamber 34 which in
fluid communication with the skimming slot 32.  Skimming
chamber 34 includes at its lower end an outlet 36 having a
valve 38 which may be opened or closed to remove the
contents of the skimming chamber 34.

[*Lashmett*, column 2].  *Lashmett* is a single chamber apparatus and

thus does not cycle and recycle cleaning fluid between a

separate basin and a tank with a filter interposed in a flowpath

between the two chambers.  *Lashmett's* cleaning fluid is 16 percent

alcohol, which persons of skill in the art would recognize as

flammable.   Thus, *Lashmett* does not teach the use of a "*biodegradable, non-toxic, non-caustic, non-flammable oil dispersant and degreaser fluid*" as claimed in four of ChemFree's five patents.   A person of mere ordinary skill in the art would not be expected to have the expertise to modify *Lashmett's* cleaning fluid so as to reduce the alcohol content to reduce the flammability factor and still have a reasonable expectation of achieving acceptable overall performance for both cleaning and sustainment of microorganisms.

### 9.   Differences between U.S. Patent No. 5,656,156 to Sims and the Claimed Invention.

The teachings of *Sims* are about solvent parts washers, apparently using mineral spirit-based cleaning fluids. Specifically, they are about keeping solvent parts washers free of sub- and super-micron sized particles which can contaminate surfaces well-cleaned of oil and grease.   *Sims* teaches that "parts washers are of a fairly uniform design."

*Sims* uses a filter that removes tiny particles not by forcing them to pass through a tortuous path whose openings are smaller than the size of the particles, but by exposing the particles to a microscopically rough surface for a relatively long time so that the particles can **ab**sorb (though one suspects Sims meant **ad**sorption) on the rough surface of the filter material.   Because a filter based on sorption has much less flow capacity than does one based on screening (such as those found

in ChemFree's teachings), *Sims* teaches that the filter should always be in use at a low flow rate whether or not the cleaning fluid is being applied to parts.

In a sense, the teachings of *Sims* are toward a commercial dead end.  Solvent parts washers based on use of mineral spirits (a hydrocarbon blend) are being replaced for safety (fire) and environmental (VOCs) reasons by aqueous parts washers.  Further, removal of particles down to sub-micron sizes is almost never necessary to meet the specifications of cleaning quality required by users of ChemFree's parts washers.

### 10.  Differences between U.S. Patent No. 5,561,059 to Kaiser and the Claimed Invention.

C. Kaiser's business interest is biodegrading hydrocarbon environmental contamination from soil, boat bilges, and large wastewater containers.  The hydrocarbons may be simple or complex -- for example, polychlorinated biphenols (PCBs), synthetic oils, fats, or paraffinic oils.  The cleanup is done by application of active microorganisms to the oil-based contaminants, where the action of the microorganisms is supplemented by the action of additional specific chemicals.

*Kaiser*, like *Guinn*, teaches use of a host fluid for the microorganisms.  *Kaiser's* aqueous host fluid does contain surfactants which gives it some potential as an oil dispersant and degreasing fluid.  *Kaiser* teaches that its cleaning fluid

enhances the bioavailability (that is, to make oxidation by organisms more easily done) through emulsification of hydrocarbon-based soils.  The teaching aims to produce soils segmented into droplets smaller than the organisms and held in suspension in a colloidal state.  To effect this transformation from films to tiny droplets, *Kaiser* employs an emulsifier, an emulsifying surfactant, and an emulsifying solvent.  Because emulsification is often dependent upon the acidity/alkalinity balance (pH), *Kaiser* teaches use of a buffering agent and a metal chelating salt to chelate ("scavenge") metal ions which may interfere with emulsification. *Kaiser* also teaches that water may participate in the biooxidation reaction.

*Kaiser* contains no express teaching that would suggest to the ordinary practitioner that its fluid has direct application in a parts washing system.  The teachings of *Kaiser* are away from the operation of parts cleaning, which is the fundamental teaching of ChemFree.  No matter how efficient the removal of soils from substrates may be, parts cleaning requires more capability – not taught by *Kaiser*.  Parts cleaning requires the liberation of soils from surfaces in seconds, not days (as when soils are consumed by biooxidation); separation of the soils from the cleaning fluid; economical recovery of the cleaning fluid for re-use; and environmentally secure disposal of the recovered soils.  None of

these outcomes are taught by use of *Kaiser*'s cleaning fluid.  *Kaiser* teaches no examples of its fluid in use as promoting biooxidation.

There is no express teaching in *Kaiser* that it provides a "*biodegradable, non-toxic, non-caustic, non-flammable oil dispersant and degreaser fluid*" as claimed in four of five ChemFree patents.  Someone of mere ordinary skill would not find it obvious that such properties are inherently present.  In fact, water solutions of Kaiser's buffer material (sodium silicate) routinely control pH at values of 9 and above – hardly a non-caustic condition.  If anything, a practitioner with a working knowledge of chemistry would strongly suspect that *Kaiser* is inherently caustic at concentration levels of use.

> **11. Differences between U.S. Patent No. 3,846,615 to Athey and the Claimed Invention.**

S.E. Athey, whose business interest is home or commercial dishwashers, teaches management of washing liquid in a single tank.  This management involves a temperature sensor for controlling an immersed heater and a means for verifying that the liquid level in the tank is not below a desired value.  The liquid level detector is a float.  Movement of the float can actuate a reed switch which can disable the immersed heater.  Because inherent transient turbulence in the washing tank can temporarily distort the measurement of fluid level, a timer is

provided to prevent cyclic fluctuation of heater power in synchronization with the transient changes in liquid level.

The stated aim of *Athey*'s control circuitry is to prevent damage to the heater.  The apparatus in which this control scheme is installed is a closed cabinet dishwasher.  *Athey* teaches improved process control of cleaning fluid in a single tank.

*Athey* fails to teach or disclose almost all of the limitations of ChemFree's patent claims, including most of the electro-mechanical limitations, all of the cleaning fluid limitations, and all of the biological limitations.  It appears to be cited by Walter merely as a secondary reference to supply certain components of the heating and level control sub-system claimed in certain ChemFree claims.

### 12.  Claim Chart.

In addition to the foregoing discussion, I have attached to my report a claim chart that summarizes whether, in my opinion, the various claim limitations that have been asserted by Professor Adriaens, are indeed met by the above references.  The claim chart may be found at Exhibit R hereto and is incorporated herein by reference.

### D.   COMBINABILITY OF REFERENCES.

#### 1.   Professor Adriaens Did Not Specify Discrete Combinations of References or Provide Any Reason for Making Such (Unspecified) Combinations.

Counsel has advised me of a legal standard that provides that in seeking to invalidate a patent under 35 U.S.C. § 103, it is permissible to combine two or more references.[39] However, in order to combine references under Section 103, one must show a reason to combine the prior art references, coupled with an expectation of success.[40] The requirement of expectation of success is a reasonable expectation of success.[41] Broad conclusory statements regarding the teaching of multiple references, standing alone, are not evidence.[42]

In my opinion, Professor Adriaens has failed to show that ChemFree's patented claims would be obvious to someone of ordinary skill in the parts washer industry, whether by any combination of the asserted references, or through a reason to modify a single stand-alone reference.

Walter and Professor Adriaens have asserted 11 references. However, Professor Adriaens has offered no analysis as to why

---

[39] *See* Assumptions above, *Baxter Int'l v. McGaw Inc.*, 149 F.3d 1321, 1328 (Fed.Cir. 1998).

[40] *See* Assumptions above, *Innogenetics, N.V. v. Abbott Labs*, 512 F.3d 1363 (Fed.Cir. 2008).

[41] *See* Assumptions above, *Medichem, S.A. v. Ralabo, S.L.*, 437 F.3d 1157, 1165 (Fed.Cir. 2006).

[42] *See* Assumptions section above, *In re Dembiczak*, 175 F.3d 994, 999 (Fed.Cir. 1999).

someone of ordinary skill in the art would have had a reason to combine all eleven references.  Even trying to discern Professor Adriaens' claim charts as a clue, out of the 11 possible references:

- all 11 references are asserted against all of the claims of the '110 Patent;

- all 11 references are asserted against all of the claims of the '491 Patent;

- all 11 references are asserted against all of the claims of the '835 Patent;

- 10 references (all but Sims) are asserted against claim 4 of the '125 Patent;

- all 11 references are asserted against claim 7 of the '125 Patent;

- 4 references are asserted against only one element of claim 12 of the '125 Patent and otherwise Professor Adriaens neglected to address the remaining elements of claim 12 in his claim chart;

- 6 references are asserted against claims 16, 17, 18, and 19, of the '125 Patent which all depend from claim 12 and where Professor Adriaens otherwise neglected to address all but one element of claim 12 in his claim chart;

- 8 references are asserted against claim 21 of the '125 Patent which depends from claim 12 and where Professor Adriaens otherwise neglected to address all but one element of claim 12 in his claim chart;

- 9 (or 10?) references are asserted against claim 1 of the '226 Patent;

- 10 (or 11?) references are asserted against claims 3 and 4 of the '226 Patent.

In light of Professor Adriaens' use of so many references in the manner presented, the following comments are in order.

First, Professor Adriaens provided no "reason" why someone of ordinary skill in the art would combine <u>all</u> of the asserted references in a single combination to achieve ChemFree's invention with a reasonable expectation of success.  Since, Professor Adriaens gave no reason or underlying analysis for such reason, I have not been given anything to rebut other than to observe that he must not have any reason because he did not give one.

Second, Professor Adriaens' approach appears to be vague and equivocal as to whether he may have actually intended to assert one or more smaller sub-sets of the asserted references as combinations.  Note the following language from page 32 of his report.

> Claim 1 is invalid because it would have been obvious for one of ordinary skill to use the fluids described in Guinn, Hakansson, Lashmett **<u>and/or</u>** Kaiser with the part washer components described in Athey, Hakansson, Knowlton, Lashmett, Olson, Sims **<u>and/or</u>** Tuttle.

It is difficult to ascertain precisely what is meant by the two different uses of "and/or" in that statement.  His statement could be interpreted in a myriad of ways.

First, I cannot determine if Professor Adriaens means combinations of Guinn <u>or</u> Hakansson <u>or</u> Lashmett <u>or</u> Kaiser with either Athey <u>or</u> Hakansson <u>or</u> Knowlton <u>or</u> Lashmett <u>or</u> Olson <u>or</u> Sims <u>or</u> Tuttle.

Second, I cannot determine if Professor Adriaens means combinations of Guinn <u>and/or</u> Hakansson <u>and/or</u> Lashmett <u>and/or</u> Kaiser with either Athey <u>and/or</u> Hakansson <u>and/or</u> Knowlton <u>and/or</u> Lashmett <u>and/or</u> Olson <u>and/or</u> Sims <u>and/or</u> Tuttle.

Third, I cannot determine if Professor Adriaens means combinations of Guinn <u>and</u> Hakansson <u>and</u> Lashmett <u>and/or</u> Kaiser with Athey <u>and</u> Hakansson <u>and</u> Knowlton <u>and</u> Lashmett <u>and</u> Olson <u>and</u> Sims <u>and/or</u> Tuttle.

A similar exercise can be conducted for all of the asserted claims in this litigation, but the foregoing example is sufficient to make the point. The number of various combinations and permutations starting with such a large number of references is easily in the hundreds. Professor Adriaens left ChemFree (and me) to speculate as to which of the hundreds of combinations and permutations he intended to assert.

Furthermore, since Professor Adriaens did not specify discrete combinations, he also did not provide any opinion or any underlying analysis as to the <u>reason</u> why someone of ordinary would make any of the possible combinations, much less each and every possible combination. There was no reason given anywhere in Professor Adriaens' report for combining any two or more references against any of ChemFree's claims.

ChemFree's counsel has advised me that an obviousness determination is governed, at least in part, by the following

two overriding principles:  (1) A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art;[43] and (2) Some kind of reason must be shown as to why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented invention.[44]  In the absence of providing any reason to make combinations of references, Professor Adriaens' analysis appears incomplete and I am not in any position to comment on the correctness of any "reasons" to combine that were never offered.

### 2. The Problem With Prior Art "Biodegradable" Cleaning Fluids Recognized in *Hakansson-1*.

There are a number of problems with Professor Adriaens' conclusion that his 11 eleven references are combinable, whether as a single combination of 11 references, or as smaller subsets of the 11 references.  However, I believe that the first and foremost problem centers around technological issues identified in *Hakansson-1*.

*Hakansson-1* teaches the need to continuously monitor the contents of the "washing liquid tank" which is the analog of

---

[43] *See* Assumptions section above, *KSR Int'l Co. v. Teleflex, Inc.,* 127 S.Ct. 1727, 1740, 167 L.Ed.2d 705 (2007).

[44] *See* Assumptions section above, *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363 (Fed.Cir. 2008).

ChemFree's "tank."  *Hakansson-1* observed that its microorganisms

consumed the tensides (or surfactants) in the washing liquid.

> Because organic substances such as oil and grease are
> emulsified continuously in the bath, the pH-value will
> decrease as a result of tensides being consumed and bound
> by the emulsified substances.  When the pH-value has fallen
> to about 9.2-9.4, careful metering of nutrient solution to
> the bath can be commenced so as to activate the latent
> bacteria culture in the bath.  In the case of systems
> having a volumetric capacity of 2 m$^3$, the system should be
> activated immediately, whereas systems having volumetric
> capacities in the order of 50-100 m$^3$ should not be activated
> until the oil content of the bath has risen to about 500-
> 1000 mg/liter.
>
> **It is also important that fresh tensides are metered
> continuously to the bath, such as to maintain a constant
> tenside content** and emulsifying capacity.  The tenside
> content is preferably maintained at between 1-15% by
> weight, preferably between 2-5% by weight in the case of
> objects soiled to normal levels, and between 5 and 10% by
> weight in the case of heavily soiled or contaminated
> objects.  When the cleaning and biodegradation processes
> are carried out separately from one another, the tenside
> content of the cleaning bath may be maintained at a high
> level, while the bath in which biogradation takes place is
> maintained at the aforesaid tenside level.

[*Hakansson-1*, page 3].

> In the case of large bacteria populations, the pH-value may
> fall rapidly due to high consumption of emulsifying
> chemicals and to the generation of acid by dead bacteria.
> Consequently, **in order to prevent the tenside-consumption
> from becoming excessive**, the nutrient solution introduced
> to the bath may also contain a pH-increasing substance
> suitable for tensides, e.g. one of the aforementioned.

[*Hakansson-1*, page 8 (emphasis added)].

> Tensides are metered to the bath continuously from a tank
> 26 at the same rate as the tensides are consumed.  Nutrient
> solution, Camex Bio 104-1, is metered to the bath
> intermittently from a tank 27, so as to maintain the set-
> point values set on the pH-meter constant.

[*Hakansson-1*, page 10].



Monitoring and Metering Subsystems for Nutrients and Tensides

**Figure 17 – Hakansson-1, Figure 1, With Metering Containers for Nutrients and Tensides Annotated.**

Thus, someone of ordinary skill in the parts washer art, armed with the knowledge imparted by *Hakansson-1*, would be <u>discouraged</u> from pursuing a simple, sink-on-a-drum style bioremediation parts washer that used an aqueous, surfactant-based cleaning fluid because of the perceived need to augment the system with complex monitoring and metering sub-systems for nutrients and tensides.

Hakansson's later publication, *Hakansson-2*, which advances the state of the art from 1988 to 1992, fails to provide any new teaching to overcome the foregoing problems recognized in

*Hakansson-1*.   Indeed, *Hakansson-2* expressly provides monitoring and metering sub-systems for nutrients and tensides.



Monitoring and Metering Subsystems for Nutrients and Tensides

**Figure 18 – Hakansson-2**

In summary, the conventional wisdom in the parts washing art as of ChemFree's date of invention was that bioremediation technology, to the extent it might even be considered by users or suppliers at all, could not be incorporated into parts washing systems without complex subsystems to control for instability in the chemical and biological conditions in the holding tank.

3.   **Environmental Contamination Clean-Up Fluids Do Not Overcome The Problems Identified By Hakansson.**

Practitioners of ordinary skill in the parts washer art that were familiar with *Hakansson-1* & *-2* would not be inclined to modify the traditional, solvent or aqueous, sink-on-a-drum (or similar) parts washer apparatus by combining it with a fluid that had been developed to transport microorganisms to an environmental clean-up site.  Environmental clean-up products are designed for a single application.  Once the nutrients and/or surfactants in the carrier fluid have served their purpose of transporting the microbes to the clean-up site, it matters not that the surfactants are biologically digested by the microbes along with the hydrocarbon contaminants.  Indeed, it is desirable that the microbes biodegrade the surfactants *in situ*, or else the party dumping the fluid onto a contaminated site would merely be substituting one contaminant for another.

Literature from the environmental clean-up bioremediation field at the time of ChemFree's invention would discourage the combination of bioremediation technology with parts washer technology, due to known problems of managing pH balance identified in *Hakansson-1*.

> Most common environmental microbes metabolize contaminants most efficiently in pH environments between 6 and 8.  In conjunction with microbial growth, pH may decline in response to the generation of organic acids from metabolic activity.

Hicks, Brian N., Bioremediation: A Natural Solution, *Pollution Engineering*, January 15, 1993.

There is no teaching in either *Guinn* or *Kaiser* from which an ordinary practitioner, in 1994, would discern that either *Guinn* or *Kaiser* avoided the pH control issues identified in Hicks, above. Furthermore, there is no teaching in *Guinn* or *Kaiser* that suggests that the pH balance problems identified in *Hakansson* had been solved. This fact is further underscored by a parts washing patent application that was filed in 1997 by Walter's inventor, Bert Overland.

> (3) the method and composition must be self-sustaining, so as to require no additional provision for nutrients or other supporting chemicals;

[Overland '147 Patent, column 2]. Neither *Guinn* nor *Kaiser* contain any teaching or other disclosure by which an ordinary practitioner would understand that incorporation of *Guinn* or *Kaiser* fluid in a parts washer would result in a parts washing solution that was "... *self-sustaining, so as to require no additional provision for nutrients or other supporting chemicals*." Thus, there is no reason why a person of ordinary skill would consider modifying a prior art parts washer apparatus with the *Guinn* or *Kaiser* fluid and have a reasonable expectation of achieving a result other than what one would have expected based on *Hakansson*.

The foregoing principle was observed during prosecution of the '898 Application.  Applicant's original claims directed only to a fluid and microbes were rejected over *Guinn*.  After adding claim limitations to also disclose a parts washing apparatus, so that the fluid cleaned parts in a parts washing apparatus and the microbes bioremediated organic contaminants, in a parts washing apparatus, claims were allowed over *Guinn*.

ChemFree never claimed to have discovered bioremediation. The existence of bioremediation technology was acknowledged from the beginning of prosecution of the ChemFree patents.  Some of the prior art publications that ChemFree submitted to the PTO early in the prosecution process included:

- Oberemer et al. "Effect of the Addition of Microbial Surfactants on Hydrocarbon Degradation in A soil Population in A Stirred Reactor" Appl. Microb Biotechnol, 32:485-489 1990.

- Brochure entitled "GSA, General Services Administration", Nature Sorb of Louisiana, inc., believed to be published before Apr. 1, 1993.

- Taylor Environmental Products, Inc., papers/brochures describing "Big Red Taylor Gator Absorbent" & "Entretech", believed to be published before Sep. 1994.

- Geoffrey H. Swett--Bioremediation: Myths vs. Realities-- 1992--pp. 23-26 Environmental Protection Magazine.

- Brian N. Hicks & Jason A. Caplan, Ph.D.--Bioremediation: A Natural Solution, Jan. 15, 1993, Pollution Engineering Magazine, pp. 30-33.

- Microorganisms Sold As Part #LRC-1 by Louisiana Remediation Co. of Metairie, Louisiana.

['110 Patent, "Other Publications"].  Moreover, Examiner Stinson had before him a plethora of prior art references that taught bioremediation as a means to clean-up soil and water contamination.  In addition to *Guinn*, the references included:

- U.S. Patent No. 5,128,262 to Lindoerfer et al entitled *Microbial Decontamination of Soils Contaminated With Hydrocarbons in Particular Mineral Oils by Microbial Oxidation*;

- U.S. Patent No. 5,132,224 to Mueller et al entitled *Biological Remediation of Creosote- and Similarly-Contaminated Sites*;

- U.S. Patent No. 5,217,616 to Sanyal et al entitled *Process and Apparatus for Removal of Organic Pollutants From Waste Water*;

- U.S. Patent No. 5,368,411 to Losack entitled *Method and Apparatus for on the Site Cleaning of Contaminated Soil*;

[references cited on the face of ChemFree patents examined by Frankie Stinson].  What ChemFree accomplished was a new and unique solution to the *Hakansson* problem that finally allowed bioremediation parts washers to become a commercially feasible reality for the small parts washer owner-operator.

Taking into account the number of applications that ChemFree has prosecuted and the number of times ChemFree's various applications have been examined by Examiner Frankie Stinson, I think it is fair to conclude that Examiner Stinson considered whether it was proper to combine a prior art parts washer apparatus (solvent or aqueous) with environmental clean-up or waste-water treatment bioremediation technology.  It is also abundantly clear that Examiner Stinson rejected such

proposition in light of the fact that he has allowed at least 11 patents to issue on ChemFree's original patent specification to date.

Furthermore, it appears to me that Walter's own so-called *"Father of Bioremediation Parts Washers"* inventor – Bert Overland, agrees with Examiner Stinson and with me that it was not obvious to combine soil remediation technology with parts washing technology in 1994. Note the following testimony from Mr. Overland:

> Q: Would you expect to be able to use the type of bioremediating fluid and microbes that you would customarily use in a soil setting in a bioremediating parts washer?
>
> A: A modification of it.
>
> Q: What type of modification is required?
>
> A: That I don't' know. It's very secretive. It's patented formulas.

[Overland deposition, page 31]. The point here is that – if an "inventor" did not know how to modify a soil remediation fluid, like *Kaiser*, to use it in a parts washer application before 1997 (the filing date of Overland's patent application), someone of mere ordinary skill could not be expected to accomplish such a feat in 1994. It does not appear to me that Professor Adriaens had the benefit of Mr. Overland's testimony or insight into the situation when he reached his opinion and conclusion in his

initial report.  In any event, Professor Adriaens' report is silent on the matter.

In my opinion, the two technologies (environmental contamination remediation and parts washing) were not combinable by someone of mere ordinary skill in the parts washing art in 1994.

### 4.    Organic Solvent Cleaning Fluids Cannot Be Combined With Microorganisms.

Professor Adriaens asserts that two parts washer apparatus references that teach organic solvent parts washing are combinable with bioremediation microorganisms to achieve ChemFree's inventions, namely *Sims* and *Olson*.  This position has already been considered and rejected by Examiner Stinson specifically as to the *Sims* reference.

> In regard to the Sims reference, the same employs a solvent and microfiltration.  It is the examiner's opinion that the solvent is therefore flammable and harmful to the microorganism and the microfiltration system would collect the microorganisms on the filter.  The combining of features, such as filter systems and level sensing systems from either Minkin or Sims with WIPO'314 or EPO'432 or DE'052 is, in the examiner's opinion, not suggested or motivated and thusly not obvious.

['305 Application Interview Summary, above].  In my opinion, Examiner Stinson is correct on this point.  I note that Professor Adriaens offers no underlying analysis or justification for reaching a contrary conclusion.  Examiner

Stinson's reasoning regarding *Sims* should apply with equal force to the *Olson* reference.

> **5.    Someone Skilled In The Art Would Not Be Motivated To Modify Lashmett to Reach The Claimed Invention.**

Professor Adriaens' asserts that someone of ordinary skill in the art would find it obvious to modify Lashmett by combining the teachings of up to 10 other references to achieve ChemFree's invention. Again, no reason is given for making such a combination.

I disagree with Professor Adriaens for a number of reasons, two of which can be stated quickly and succinctly. First, assuming that ChemFree can establish a date of invention prior to August of 1994, *Lashmett* is not in the prior art and, therefore, would not have been considered by a hypothetical person of ordinary skill on ChemFree's date of invention.

Secondly, even if *Lashmett* were considered, it teaches away from ChemFree's invention. *Lashmett* discloses an apparatus with only a single chamber. Dirty parts are lowered into that chamber in a basket. Professor Adriaens treats the basket as a separate chamber, but it isn't, because during cleaning, the two entities share a common location.

*Lashmett* does not bioremediate hydrocarbon contaminants in this single chamber. Instead, *Lashmett* uses biological action to

liberate (clean) soils from part surfaces.  Then, *Lashmett* removes
the contaminants from the chamber via a mechanical skimming
operation.  *Lashmett* next deposits the oil into a skimming chamber
(34) that is separated from the cleaning fluid tank.  It is
clear to me that the hydrocarbon contaminants are not
bioremediated in the cleaning fluid chamber because they have
been physically removed from the cleaning fluid chamber and
deposited in a separate "skimming chamber."

Someone of ordinary skill would not be motivated to leave
the hydrocarbon contaminants floating on the surface of *Lashmett*
because the floating oil scum would re-contaminate the clean
parts as they were lifted out of the cleaning chamber in the
basket.  Moreover, *Lashmett* does not teach that hydrocarbons are
bioremediated in the chamber.  Thus, someone of ordinary skill
who would consider combining *Lashmett* with a traditional sink-on-
a-drum parts washer would still understand and apply *Lashmett* to
remove the hydrocarbons from the tank by mechanical skimming.
This is something entirely different from leaving the
hydrocarbons in the tank and allowing microorganisms to
bioremediate them.

There is no teaching in *Lashmett* that overcomes the process
control limitations of bioremediation technology in a parts
washer application acknowledged by *Hakansson*.  Therefore, someone

of ordinary skill who contemplated leaving the hydrocarbon contaminants in the tank instead of removing them by mechanical skimming, would reasonably expect to encounter the same problems that plagued *Hakansson*.   Therefore, there would have been no reason to modify *Lashmett* to get to ChemFree's invention in 1994, with a reasonable expectation of success.

### 6.   Someone Skilled In The Art Would Not Be Motivated To Modify Minkin to Reach The Claimed Invention.

Professor Adriaens' asserts that someone of ordinary skill in the art would find it obvious to modify *Minkin '128* by combining the teachings of up to 10 other references to achieve ChemFree's invention.  Again, no reason is given for making such a combination.

I disagree with Professor Adriaens for at least two reasons.  First, assuming that ChemFree can establish a date of invention prior to April 29, 1994, *Minkin '128* is not in the prior art and, therefore, would not have been considered by a hypothetical person of ordinary skill on ChemFree's date of invention.

Secondly, Examiner Stinson considered a close cousin of *Minkin '128* during prosecution of the '305 Application and rejected the notion that it could be combined with bioremediation technology.

In regard to Minkin [*Minkin '080*], the same refers to heating the fluid near boiling, which the examiner believes

- 158 -

> prevents the system from being combined with a
> bioremediation system.

['305 Application Interview Summary, above].  *Minkin '080* shares

the same drawings with *Minkin '128*.  Both patents teach a high

temperature cleaning operation.  *Minkin '128* is directed to a high

temperature / high temperature, enclosed-cabinet style parts

washer.  I agree with Examiner Stinson that someone of ordinary

skill in the art would not be inclined to combine *Minkin '128* with

an environmental clean-up fluid like *Guinn* or *Kaiser* to achieve

ChemFree's invention.

### 7.   Professor Adriaens Did Not Analyze The Ordinary Practitioner's Expectation of Success.

Professor Adriaens finds it obvious to combine the

teachings of 11 disparate references to reach the claimed

invention.  However, Professor Adriaens failed to go to the next

step to analyze whether the ordinary practitioner would

undertake to make this combination with a "reasonable

expectation of success."

As discussed in more detail above, someone of ordinary

skill in the art would not have a reasonable expectation of

successfully achieving the ChemFree invention by combining

conventional, prior art, parts washer apparatus technology with

environmental clean-up bioremediation technology, due to, at

least: (i) the problems identified in the *Hakansson* publications;

and (ii) *Guinn's* teaching that bioremediation takes 30 to 60 days to complete, which would make the volumetric size of any such parts washer enormous in order to hold the volume of soiled cleaning fluid produced in that time.

However, the point here is not whether Professor Adriaens is correct or not with respect to an opinion regarding the ordinary practitioner's reasonable expectation of success and his underlying analysis and justification for such opinion. Instead, the point here is that Professor Adriaens did not even appear to address the topic, leaving me with nothing to address by way of rebuttal other than observe his silence on the matter.

### E.   SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS.

I am advised that there are four "Graham Factors" in the traditional obviousness analysis.  The first three factors:  (i) scope and content of prior art; (ii) level of skill in the art; and (iii) differences between prior art and claimed invention; can lead to a *prima facie* showing of obviousness.

The fourth of the four Graham Factors is secondary considerations of non-obviousness, sometimes called "objective evidence" of non-obviousness.  I am advised by counsel that such objective evidence of non-obviousness may be used to rebut a *prima facie* case of obviousness based on prior art references.[45]

---

[45] *See* Assumptions section above, *WMS Gaming Inc. v. International Game Technology*, 184 F.3d 1339, 51 U.S.P.Q.2d 1385 (Fed.Cir. 1999).

I am further advised by counsel that, although they are called "secondary," they are not considered secondary in importance to the other three Graham Factors in determining whether a patent is obvious or not.  Counsel has advised me that controlling legal standards maintain that secondary considerations are often the most probative and determinative of the ultimate conclusion of obviousness or nonobviousness.[46]  I am advised by counsel, that analysis of the secondary considerations is mandatory, not optional, as controlling law mandates that courts <u>must</u> take secondary considerations into account in making its determination of obviousness.[47]

ChemFree has directed me to Walter's discovery of ChemFree, including Interrogatory No. 8.  [Plaintiff's Response to Defendants' First Set of Interrogatories (Nos. 1-19), December 14, 2005].  In the interrogatory responses, ChemFree identified a number of "secondary considerations of non-obviousness" including: (1) commercial success of the invention; (2) satisfying long-felt, unmet need; (3) copying of the invention by others; (4) praise - industry awards and accolades; and (5) laudatory statement made by an infringer, or others, regarding a commercial

---

[46] *See* Assumptions section above, *Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573, 37 U.S.P.Q.2d 1626 (Fed.Cir. 1996).

[47] *See* Assumptions section above, *Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*, 807 F.2d 955, 1 U.S.P.Q.2d 1196 (Fed.Cir. 1986) ("Under *Graham* . . . such objective evidence must be considered.").

embodiment of an invention.  It does not appear that Professor Adriaens listed ChemFree's discovery responses as materials that he reviewed and considered in reaching his opinions and conclusions.

Furthermore, my review Professor Adriaens' report indicates that he failed to take secondary considerations of non-obviousness into account in reaching his ultimate opinion and conclusion that the ChemFree patent claims are all obvious.  At least, Professor Adriaens' report is silent on the subject.  In that regard, it appears that he has only reached an opinion that there may be a *prima facie* case of obviousness based on the first three Graham Factors, subject to rebuttal based on the "secondary considerations," which he did not consider at all.

I am informed by counsel that ChemFree plans to present evidence at trial on the following secondary considerations of non-obviousness, which evidence will be augmented by the following comments from me as an expert in the field of parts washing.

### 1. Skepticism Within the Industry Prior to Invention.

I am informed by counsel for ChemFree that skepticism toward an invention in the prior art and proceeding contrary to the accepted wisdom is evidence of non-obviousness.[48]  As

---

[48] *See* Assumptions section above, *In re Hedges*, 783 F.2d 1038, 1041 (Fed.Cir. 1986).

discussed above in this report, *Hakansson-1* and *Hakansson-2*
identified a major problem that needed to be overcome before
parts washing with bioremediation technology could be
commercialized to the "small distributed machines" market
segment.  The problem was that microorganisms that biodegraded
hydrocarbons also tended to biodegrade the surfactants in the
cleaning fluid, thus destroying the cleaning power of the fluid.
This process, in turn, tended to kill the microorganisms as
degradation of the surfactants produced chemical changes in the
cleaning fluid rendering it toxic to the microorganisms.

        According to Tom McNally's deposition testimony, ChemFree's
inventors encountered considerable skepticism from suppliers in
the cleaning fluid industry that a cleaning fluid could be found
that would not be toxic to the microorganisms or alternatively,
that a cleaning fluid without a biocide could be found that
would not be destroyed by microorganisms.  The initial
skepticism encountered by McClure and McNally indicates that the
conventional wisdom at the time of the invention was that
ChemFree's invention "could not be done."

        In my opinion, the fact that McClure and McNally persisted
in the face of this skepticism and, through trial and error,
eventually discovered a combination of cleaning fluid and
microbes that:  (i) did not destroy each other; (ii) cleaned
effectively; and (iii) bioremediated hydrocarbons effectively,

is a factor that should be weighed heavily in favor of finding ChemFree's invention to be non-obvious.

### 2.   Unexpected Results.

A close cousin of the "initial skepticism in the industry" factor discussed above is whether an invention achieved "unexpected results."  I have been advised by counsel that an additional secondary consideration of non-obviousness is whether the invention achieved unexpected results.

> One way for a patent applicant to rebut a *prima facie* case of obviousness is to make a showing of 'unexpected results,' *i.e.*, to show that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected.[49]

In my opinion, the ChemFree's invention has achieved unexpected results.

### a.  The Unexpected Results of ChemFree.

At the time of the invention, the "expected results" to be achieved from attempting to combine an aqueous degreaser fluid with hydrocarbon digesting microorganisms are the results obtained by *Hakansson*.

> The content of organic substances should not fall beneath 50 mg/ml in the biodegradation process, since bacteria can begin to consume the tensides at lower contents of organic contaminants.  In the case of large bacteria populations, the pH-value may fall rapidly as a result of the high consumption of emulsifying chemicals and also as a result of acid generation by dead bacteria.

---

[49] *See* Assumptions section above, *In re Geisler*, 116 F.3d 1465, 1469 (Fed.Cir. 1997).

[*Hakansson-1*, page 3].   After considerable research, McClure and McNally discovered a combination of cleaning surfactants and microorganisms, i.e., Seawash-7 and LRC-1, that did not suffer from microbe attack on the cleaning surfactants.   This result would have been unexpected to ordinary practitioners in the parts cleaning art at the time of the invention.

> **b.   The Unexpected Nature of ChemFree's Results Are Confirmed By The Later Work of Bert Overland.**

In 1997, more than two years after ChemFree's patent-pending SmartWasher™ had been introduced into the U.S. market, Bert Overland filed a patent application leading to issuance of the Overland '147 Patent.   The following discussion comes from the background section of Overland's patent describing the state-of-the-art of parts washing technology in 1997 that Overland supposedly improved by contributing his "invention."

> The optimum combination of properties for a method, apparatus, and composition effective in the degradation of hydrocarbons, particularly one based in the utilization of microorganisms, is such that:
>
> (1) the method, apparatus and composition must demonstrate acceptable efficacy in actual non-laboratory environments, yet be in such a form as to itself be non-toxic and non-deleterious, and in such a form so as not to generate deleterious products or chemicals harmful to, or befouling to the environment;
>
> (2) the method and composition must be long-acting and rapid in the onset of its initial activity and require no further support or sustaining activities after initiation;

(3) **the method and composition must be self-sustaining, so as to require no additional provision for nutrients or other supporting chemicals**;

(4) the method and composition, together with the degraded, solubilized crude hydrocarbon product, must be self-dissipating after the substantial completion of the degradation of the hydrocarbon constituents, so as to require no retrieval from the environment and disposal; and

(5) the method, apparatus and composition must be easy to effect and manufacture, while safe to personnel using the composition or carrying out the process, at all stages and times in its preparation and use.

U.S. Pat. No. 3,152,983 to Davis, et. al., discloses the microbial disposal of oily wastes. The method of Davis, et. al., is designed for large industrial waste separation and disposal, beginning with an oil water separator. **The method suggests processing one batch at a time and is not a continuous, on-going method which preserves the microbes**.

U.S. Pat. No. 3,838,198 to Bellamy, et. al., is directed at conditioning raw waste input for digestion by thermophylic aerobic microorganisms. **The process is geared towards animal waste and is not a self-perpetuating process**.

U.S. Pat. No. 3,871,956 to Azarowicz features a method for cleaning accidental oil spills on water or in soil. The method of the '956 patent does not utilize temperature or oxygen controls and **is not a self-perpetuating process**.

U.S. Pat. No. 3,899,376 to Azarowicz features microbial action for cleaning industrial effluent.  This Azarowicz patent does use one batch at a time, **using a new microbial solution in each bath, however it is not a continuous accelerated method**.

U.S. Pat. No. 4,401,569 to Jhaveri, et. al., describes a method and apparatus for treating hydrocarbons and halogenated hydrocarbon-contaminated ground and ground water.

U.S. Pat. No. 5,494,580 to Baskys, et. al., relates to a method for decontamination of a hydrocarbon-polluted environment by the use of certain bacterial compositions.

> **The above prior art is silent regarding the apparatus and bioremediation method of the present invention**. Accordingly, there is a need for a process that will rapidly decontaminate hydrocarbon-contaminated objects in an efficient and environmentally acceptable manner. That need is now satisfied by the invention described below.

[Overland '147 Patent, Columns 2 and 3 (emphasis added)]. Note that Overland distinguishes between "batch" processes used in environmental contamination sites like soil and ground water contamination sites as opposed to the "continuous" processing required in a parts washer.

Furthermore, in addition to prior art distinguished in columns 2 and 3 of his patent summarized above, Overland elsewhere acknowledges that U.S. Patent 5,561,015 to *Kaiser* also exists in the prior art. [Overland '147 Patent, column 5]. Professor Adriaens relies heavily on *Kaiser* as invalidating ChemFree's patents. However, Overland claims patentable novelty of his much later invention while specifically incorporating the teachings of *Kaiser*. Overland discussed his *circa* 1997 purportedly "novel" invention, **using the cleaning fluid of Kaiser**, in the following terms:

> The microbial cleaning solution used in the present invention is a product of NATURES WAY, INC. sold under the trademark of PC$^{TM}$ and protected under U.S. Pat. No. 5,561,059 to Kaiser, et. al., "Substrate Bioavailability Enhancing Chemical Mixture for Use in Bioremediation". The NATURES WAY PC$^{TM}$ cleaning solution contains the following natural hydrocarbon-degrading aerobic microorganisms: Achromobacter, Actinotobacter, Alcaligenes, Arthrobacter, Bacillus, Nocardia, Flavobacterium and Pseudomonas spp. The PC$^{TM}$ parts aqueous cleaning solution is an innovative,

cost-effective solution that had been under development and extensive field testing under industrial standards for several years.  The solution does not contain any harmful ingredients and is user-friendly to humans and the environment.

The naturally occurring microbes comprising the solution feed on hydrocarbons transforming oil and grease to harmless carbon dioxide and water.  The microbes are not genetically developed but gathered from oil spills that were being cleaned by a natural process.  The aerobic microbes of $PC^{TM}$ thrive on hydrocarbons.  If their food source or oxygen supply is depleted they will die and become part of the biomass.  The $PC^{TM}$ cleaning solution bioremediates oil, grease, varnished parts and other petroleum products with ease.  Petroleum-based solvent processes are harsh to both workers and the environment.

The cleaning of objects and subsequent bioremediation ability of the present invention is superior to any other apparatus or method presently used for that purpose. Because chemical solvents are avoided, there are no harsh or sensitizing chemicals that can irritate human skin. The $PC^{TM}$ cleaning solution, when optimally heated and aerated, washes hard varnish with ease without the presence of strong odors commonly associated with solvents.  When using the $PC^{TM}$ solution, harmful volatile chemicals are immediately neutralized.

The $PC^{TM}$ cleaning solution, as used in the present invention, is a heavy duty water-based bioremediating cleaner that degreases contaminated objects and hydrocarbon-contaminated fluids.  Said solution was developed to eliminate concerns associated with health, safety, disposal and transportation of liquid hydrocarbon wastes (liquid and sludge) found in petroleum-based cleaning solvents in use today throughout the world.

Since bioremediation of all contaminates is dependent on the presence of specific natural microbes capable of degrading the pollutant, applied bioremediation (bio-augmentation using selected microbes) assures the presence of effective microbe colonies.  Microbial transformation of organic contaminates occurs because the organisms use the contaminates for their own energy needs, growth and reproduction.  With the addition of environment-friendly enhancing agents that support the microbes and increase the bio-availability of the hydrocarbon contaminates,

bioremediation cleanup (transformation to water and carbon dioxide) proceeds at an accelerated rate.

The limiting factors of microbe population growth, and therefore accelerated degradation of contaminates, are crowding, toxicity, accumulated wastes that form oxygen-starving sludge and nutrient exhaustion (food and/or oxygen). Since efficient, nontoxic emulsifiers are put to use in conjunction with the naturally customized enzymes produced by microbes, the contaminates (oil and grease) are so sufficiently dispersed, that crowding does not occur. The long chain hydrocarbons are immediately broken down to micron size colloids for the microbes. Enhanced applied bioremediation will occur and continue indefinitely with no hazardous waste trail as long as the solution is used in a device comprising all of the necessary support qualities.

[Overland '147, Columns 5 & 6]. Walter has apparently endorsed Overland's claims to novelty by publishing Overland's patent, biography, and picture on the Bio-Circle web-site, referring to Overland as the "*Father of Bioremediation Parts Washers*."



**Figure 19 -**

Walter's published biography of Overland emphasizes Overland's personal and collegial relationship with Kaiser.  The biography further credits "**the idea to combine bioremediation and parts cleaning**" to Overland.  The biography further emphasizes that Overland spent "many years" perfecting his system in the field and through testing and validation, before filing his patent application.

The 1997 filing of a patent application by Overland and the subsequent endorsement of the novelty of that patent application by Walter are, in my opinion, inconsistent with Professor

Adriaens' opinion that someone of ordinary skill in the art
would have found it obvious to combine the *Kaiser* fluid with a
parts washer apparatus to derive ChemFree's invention in 1994
with a "reasonable expectation of success."  To the contrary,
Overland's filing of a patent application tends to confirm that
ChemFree's 1994 results were "unexpected," not "reasonably
expected."

It does not appear to me that Professor Adriaens reviewed
Mr. Overland's '147 Patent in connection with reaching his
opinion and conclusion.  Furthermore, it does not appear to me
that Professor Adriaens reviewed or considered Walter's web-site
materials endorsing the novelty of Overland's '147 Patent before
reaching his opinion and conclusion.  Actually, I do not see
where Professor Adriaens considered the fourth Graham Factor of
"secondary considerations of nonobviousness" at all in reaching
his opinions and conclusions.

> **c. Overland's Deposition Testimony Confirms That ChemFree's Invention Achieved Unexpected Results.**

I have reviewed Mr. Overland's deposition taken on February
7, 2008.  In his deposition, Mr. Overland gave the following
testimony:

> Q: Would you expect to be able to use the type of
> bioremediating fluid and microbes that you would
> customarily use in a soil setting in a bioremediating
> parts washer?

```
A: A modification of it.

Q: What type of modification is required?

A: That I don't know.  It's very secretive.  It's patented
   formulas.
```

[Overland deposition, page 31].

From the foregoing two questions and two answers, we can reasonably deduce the following from the putative "*Father of Bioremediation Parts Washers*."  First, someone of ordinary skill in the art of part washing would not reasonably expect to successfully create a bioremediation parts washer by simply combining a soil remediation fluid (i.e., *Kaiser*) with a prior art parts washer apparatus.  Secondly, owing to the "secret" nature of the modifications that were made to Kaiser's/Nature's Way soil remediation fluid so that it could be adapted to overland's parts washer at or, even possibly after, the date of ChemFree's invention, someone of ordinary skill in the art at the time of ChemFree's invention would not know how to modify soil remediation fluid to make it effective for use in a parts washer.  Overland was unable to establish that the necessary but secret "modification" to the *Kaiser* soil remediation fluid (i.e., "Nature's Way") that he incorporated into his 1997 invention even existed prior to ChemFree's date of invention, much less that it was recognized as being effective in a parts washer application.

In my opinion, Overland's deposition testimony confirms
that someone of ordinary skill in the art would not have
combined a soil remediation fluid with a parts washer with a
"reasonable expectation of success" as of the date of ChemFree's
invention.  First ChemFree, and then two and one half years
later Overland, combined bioremediation technology with parts
washing technology.  When they did, they both sought patent
protection.  In my opinion, Overland's situation reinforces the
fact that ChemFree's efforts in 1994 achieved unexpected
results.

### d.  Opinion and Conclusion That ChemFree's Invention Has Achieved Unexpected Results.

In my opinion, taking into account the initial skepticism
of the industry, the notable performance improvement that
ChemFree achieved over *Hakansson*, and the situation involving
Overland, ChemFree's invention has achieved unexpected results.
This factor deserves considerable weight in evaluating the non-
obviousness of ChemFree's patented invention.

### 3.  Laudatory Statements Of Advantages Of The Invention By Infringer.

Counsel has advised me that laudatory statements made by an
infringer regarding a commercial embodiment of an invention is

an indicia of the non-obviousness of an invention.[50]   I have
reviewed some advertisements and marketing literature of Walter
and note that it prominently features the novel aspects of
ChemFree's invention as its primary selling point.[51]



**Figure 20**

The text featured in Figure 20 above basically parrots the
advantages of ChemFree's invention described in the
specification of ChemFree's patents.   It touches upon safety to
the user (non-caustic / non-flammable).   It is environmentally
friendly.   It eliminates the waste in the form of used solvents

---

[50] *See* Assumptions above, *Libbey-Owens-Ford Co. v. BOC Group Inc.*, 655
F. Supp. 897 (D.N.J. 1987); *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110
F.3d 1573, 1579 (Fed.Cir. 1997).
[51] *See* Exhibit Q to this report.

saturated with hydrocarbons.  It touts that combining bioremediation with water-based cleaning solution is better than using traditional water-based cleaners without bioremediation.



**Figure 21**

Figure 21 above is an excerpt from Walter's Bio-Circle web-site.  Note Walter's emphasis on the environmental benefits of using its accused cleaning fluid, particularly the freedom from emitting volatile organic compounds (VOCs) into the atmosphere.



**Figure 22**

Figure 22 above is another excerpt from Walter's Bio-Circle web-site.  The emphasis here appears to be on the commercial advantage of using a cleaning fluid that is continuously cleaned

by a bioremediation process so that the fluid does not lose its cleaning effectiveness over time.  Compare the foregoing figure with the following statement from ChemFree's patent specification.

> By virtue of the microorganisms digesting the organic waste within the tank **12,** the cleaning fluid **72** is "recycled" within the parts washer **10,** whereby the cleaning fluid **72** has the potential to last for extended periods of time.

['110 Patent, Column 7].

From the advertising and promotion that I have seen, Walter does not emphasize its pricing vis-à-vis other bioremediation parts washers.  Neither does Walter appear to emphasize its product quality, durability, warranty, or maintenance reliability vis-à-vis ChemFree or other direct competitors. Instead, it appears to me that the emphasis of Walter's advertising and promotion is directed to the features of ChemFree's invention.

In my opinion, Walter's advertising appears to be a public acknowledgement of the innovativeness of using bioremediation in a parts washer.  I believe that this factor should be given considerable weight in evaluating the non-obviousness of ChemFree's invention.

### 4.    Attempts To Patent The Same Invention.

I have reviewed the Overland '147 Patent, which I understand is now owned by a Walter affiliate.  ChemFree's

patent application filing date of September 30, 1994, predates

Mr. Overland's filing date of January 21, 1997, by almost 28

months.  Although there are a few superficial differences

between the Overland '147 patent and ChemFree's patent claims,

the two patents essentially disclose and claim the same basic

invention.  Claim 4 of Overland '147 is recited below:

> 4. An apparatus for continuous bioremediation of a hydrocarbon-contaminated object comprising:
> (i) a washer basin for continuously cleaning said hydrocarbon-contaminated object, said washer basin having means for introducing and recycling a microbe cleaning solution comprising microorganisms of the genus selected from the group consisting of Achromobacter, Actinobacter, Alcaligenes, Arthrobacter, Bacillus, Nocardia, Flavobacterium, Pseudomonas and mixtures thereof, for washing said hydrocarbon-contaminated object, means for draining microbe cleaning solution containing hydrocarbons from said washer basin into a biochamber reservoir and means for screening said microbe cleaning solution upon entry into said biochamber reservoir; and
> (ii) said biochamber reservoir having a means for temperature control between about 90° to 112°F to maximize microbial growth in said microbe cleaning solution for degrading hydrocarbons in said solution, means for aerating said microbe cleaning solution, means for agitating and circulating said microbe cleaning solution, an outlet means to direct said microbe cleaning solution to a plurality of filters for filtering said microbe cleaning solution to remove sediment of less than 10 microns, an inlet means to return said microbe cleaning solution from said filters to said biochamber reservoir or to said washer basin and then to said reservoir; means for trapping and removing sediment from said microbe cleaning solution, and means for supporting said washer basin and biochamber reservoir.

[U.S. Patent No. 6,057,147 to Overland, Claim 4].  Note the

similarity between ChemFree's '835 Patent, claims 5 and 8

compared to claim 4 of Overland's '147 Patent.

| 5. '835 Patent, Claims 5 & 8 | Overland '147 Patent, Claim 4 |
|---|---|
| A system for cleaning hydrocarbons from a part, the system comprising | An apparatus for continuous bioremediation of a hydrocarbon-contaminated object comprising |
| a biodegradable, non-toxic, non-caustic, nonflammable, oil dispersant cleaning and degreasing fluid, | a microbe cleaning solution ... for washing said hydrocarbon-contaminated object, |
| a parts washer including a tank for containing said fluid and a basin for receiving the part, | a washer basin for continuously cleaning said hydrocarbon-contaminated object, ... [and] a biochamber reservoir |
| a conduit assembly, | means for introducing and recycling a microbe cleaning solution |
| a pump for pumping said fluid from said tank through said conduit assembly and into contact with the part within said basin, | means for introducing and recycling a microbe cleaning solution |
| a flowpath defined between said basin and said tank through which said fluid flows between said basin and said tank, | means for draining microbe cleaning solution containing hydrocarbons from said washer basin into a biochamber reservoir |
| and microorganisms within said parts washer, | comprising microorganisms of the genus selected from the group consisting ... |
| said microorganisms at least partially flowing with and substantially sustained within said fluid, | recycling a microbe cleaning solution comprising microorganisms |
| said fluid being non-toxic to said microorganisms, | ... to maximize microbial growth |
| whereby the microorganisms biodegrade the hydrocarbons while retained within said tank. | said biochamber reservoir ... for degrading hydrocarbons in said solution |
| 8. The system of claim 5, and said parts washer further including a filter interposed within said flowpath. | means for screening said microbe cleaning solution upon entry into said biochamber reservoir |

As shown above, the subject matter of Overland's claims was essentially disclosed in ChemFree's patent specification and differ from ChemFree's actual claims only in claiming: (i) a specific size of particulate matter that is filtered (less than 10 microns); and (ii) specifically claiming a desired fluid temperature range (90 ° to 112° F).  Someone of even ordinary skill in the art would view these changes over ChemFree as trivial in comparison to the much greater differences between ChemFree and the references cited by Professor Adriaens.



Bert Overland with copy of US Patent

I am advised by counsel that an attempt by a competitor to patent the same invention is an additional secondary consideration of non-obviousness that may be taken into account in determining the non-obviousness of an invention.[52]  It may be true that Bert Overland did not work for Walter at the time that he filed for protection of the '147 Patent.  Nevertheless, Walter apparently endorsed the novelty and validity of Overland '147 by paying money to license the patent.  Moreover, Walter continues to endorse the novelty and

---

[52] *See* Assumptions section above, *Mosinee Paper Corp. v. James River Corporation of Virginia*, 22 U.S.P.Q.2d 1657, 1661 (E.D.Wis. 1992)(Validity challenger's prior attempt to patent the same concept was telling evidence of the nonobviousness of the patentee's invention).

validity of the Overland '147 Patent on its web-site, referring
to Mr. Overland as the "*Father of Bioremediation Parts Washers*."   From my
perspective, I find it inconsistent and contradictory that
Walter would take the position that ChemFree's invention is
obvious and not worthy of patent protection, while endorsing
patent protection for Overland's later and seemingly trivial
variation thereof.

In my opinion, the amount of technological advancement by
ChemFree over the state-of-the-art in 1994 is a much greater
advancement than the relatively trivial advancement (if any) of
Overland compared to the state-of-the-art in 1997, which, by
then, included ChemFree.   Walter's obvious bias aside, it is
difficult to see how any objective observer would not
immediately recognize the considerably more significant
contribution to parts washing technology advanced by ChemFree in
1994, compared to Overland in 1997.   In my opinion, Walter's
public position on the novelty of the Overland '147 Patent is
deserving of considerable weight in evaluating the non-
obviousness of ChemFree's patent claims.

### 5.   Industry Acclaim and Awards Post Invention.

I am advised by counsel that industry acclaim, including
awards bestowed within an industry, is evidence of non-

obviousness.[53]  I have been informed by ChemFree that its commercial SmartWasher, which embodies its invention, has received the following industry awards:  (i) the 1998 Plant Engineering Award; (ii) the 1999 Client of the Year Award in the Manufacturing Category by the National Business Incubation Association; (iii) the 2001 MRO Solution Award, Product of the Year Silver Award, Plant Services and MRO; (iv) the 2000 Cleaning Technology Award, Most Outstanding Product; and (v) the 1996 Australian Automotive Aftermarket Association - Certificate of Achievement - Best New Aftermarket Product.

ChemFree has also informed me that its invention has received praise and recognition in various industry publications, such as: (i) Reynolds Metals Company published an article as part of its "AWARE" program in the Fall of 1999 praising the ChemFree SmartWasher; (ii) Lockheed Martin Aeronautical Systems published an article in the October, 1998, edition of its "Star" publication praising the ChemFree SmartWasher; (iii) Automotive News published an article dated September, 1995, entitled Machine Cleans Parts and Cuts Pollution praising the ChemFree SmartWasher.

I also note that Walter's Bio-Circle parts washer, which practices ChemFree's invention (See my initial expert report on

_____

[53] *See* Assumptions above, *Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.* 471 F.3d 1369, 1380 (Fed.Cir. 2006).

infringement) received the 2005 CleanTech Award.  In my opinion,
The recognition within the cleaning industry given to ChemFree's
invention as being technologically innovative is deserving of at
least some weight in evaluating the non-obviousness of
ChemFree's patent claims.  Furthermore, in my opinion, Walter's
public promotion in connection with receiving the 2005 Clean-
Tech Award is deserving of considerable weight in evaluating the
non-obviousness of ChemFree's patent claims.

## Bio-Circle™ Wins 2005 Clean-Tech Award





*We are proud to announce that our Bio-Circle™ Parts Cleaning system has been selected as the winner of the respected American CleanTech magazine's 2005 Cleaning Technology Award (www.cleantechcentral.com), which recognizes various technological innovations in the industrial and precision cleaning markets.*

The award was presented to Manfred Thiede, President and Mike Marshall, National Sales Manager at the WALTER US facilities in Hartford on June 2, 2005.

"All of us in the WALTER organization feel very honored that the Bio-Circle™ System has been awarded Clean Tech's Cleaning Technology Award for 2005. The Bio-Circle™ System has proven to be a safe, high performance and very cost-effective alternative to cleaning with solvents, in addition to offering bioremediation as the most suitable environmentally sound system for a wide range of parts cleaning applications".

**Figure 23**

### 6.   Copying by Others.

I am advised by counsel that copying of a patented
invention by others is evidence that the invention is not

obvious.[54]  Counsel for ChemFree has advised me that ChemFree intends to prove at trial that the following companies had access to ChemFree's technology, either from published patent applications or from working commercial embodiments of ChemFree's invention prior to their development of competing products with substantially similar features.

Counsel for ChemFree has further advised me that ChemFree will argue that if a competitor had access to ChemFree technology (physical product or patent publication disclosure) prior to developing a competing product, and the later developed product incorporated features claimed in ChemFree's patents, that one may infer that copying occurred.

### a. Graymills.

According to ChemFree, Graymills got started in the bioremediation parts washing business by entering into a business relationship with ChemFree in the mid-1990's.  At first, ChemFree did "private-label" manufacturing for Graymills of parts washing machines, cleaning fluid, and filter containing microbes.  After gaining experience from re-selling ChemFree machines, Graymills developed its Bio-436 and Bio-536 Parts Washers, which continued to use ChemFree-supplied fluid and

---

[54] *See* Assumptions section above, *Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966); *Ruiz v. Chance*, 234 F.3d 654, 662-663, 57 U.S.P.Q.2d 1161 (Fed.Cir. 2000).

filters.  Graymills continues to sell bioremediation parts washing machines, cleaning fluids, and microbes, but has obtained an alternative source of supply and no longer obtains key components from ChemFree.

I have reviewed product literature, photographs, and the deposition of Jerry Shields, Graymills president.  I have the following comments about the Graymills Bio-436 parts washer, pictured below.



**Figure 24 – Graymills Bio-436 Parts Washer.**

The Bio-436 has a standard sink-on-a-drum configuration. It has an open basin where washing takes place.  A holding tank for cleaning fluid resides in the "drum" portion beneath the sink.  A pump and conduit assembly transports fluid from the tank to the basin through a faucet for cleaning parts.  After use, the cleaning fluid drains through a hole in the center of the basin where it drops back into the tank via gravity flow.  A

combination wire-mesh screen and sponge filter is interposed in the drain hole for capturing particulate matter so that it does not enter the tank. An electronic heating element is immersed in the cleaning fluid in the tank. A donut-shaped float switch and a temperature probe are situated in the tank. The float switch and temperature probe are integrated into a control system that includes a thermostat for regulating the fluid temperature and cutting off the heater if a low fluid level condition is detected.

Early Graymills product literature discloses that microbes were attached to the filter so that the filters were used as a transport medium to introduce microbes into the system. Later Graymills product literature mixes the microbes into the Biotene™ fluid. The Graymills Bio-436 and Bio-536 are essentially identical to the Walter BR-100 parts washer discussed in my initial expert report. They practice ChemFree's asserted patent claims to the same extent as the BR-100.

### b. Walter Bio-Circle.

According to the deposition of Jerry Shields, Graymills helped Walter get started in the bioremediation parts washing market by private label manufacturing first its Bio-436, then its Bio-536 parts washer for Walter. Walter resold the Bio-536 model into the U.S. as the BR-100.

Thus, it is reasonable for me to conclude that Walter had access to ChemFree's bioremediation parts washer technology prior to its entry into the market.



**Figure 25 – Walter Parts Washers.**

I have previously discussed whether Walter's parts washers practice ChemFree's asserted claims in my initial expert report, which discussion is incorporated herein by reference.

### c.   Denios, CB Chemie, and Foreign Distributors.

I have been advised by counsel for ChemFree that Walter representatives have testified that Walter obtains its BR-200 and IO-400 parts washers from Denios under a private label arrangement and that Walter obtains its Bio-Circle L cleaning fluid with microbes from CB Chemie under a private label arrangement.



**Figure 26 – Denios and CB Chemie "Bio-Circle" Parts Washers**

I have reviewed product literature for Walter, Denios, and CB Chemie and for two foreign distributors of Bio-Circle products – Revolution Advanced Metals and Materials of Australia; and Regent Bio-Chem of India.  It appears to me that all four entities are selling either identical products or trivial variations of the Walter BR-200/IO-400 parts washer combined with Bio-Circle L cleaning fluid.

Thus, these products would appear to practice ChemFree's asserted patent claims to the same extent as I have discussed for the Walter BR-200/IO-400 and Bio-Circle L in my initial expert report on infringement.

### d.  ForBest.

I am informed by ChemFree that ForBest is a company that was formed by Charlie Warren of Warren Chemical Company sometime after ChemFree successfully commercialized the SmartWasher.

Warren Chemical Company was the supplier of SeaWash-7 cleaning
fluid disclosed in ChemFree's patent specification.



**Figure 27 – Graphic from Forbest Web-Site.**

I have inspected an example of a Forbest parts washer at
ChemFree's business premises.  Photographs of that parts washer
are included in Exhibit C to my report.  I have also reviewed
product literature published by Forbest for the SeaWash-70
cleaning fluid with bioremediation microbes used in the Forbest
parts washer.

The Forbest parts washer is a bioremediating adaptation of
the classic sink-on-a-drum parts washer and has all of the
following features claimed in ChemFree's asserted patent claims:

- Basin for washing parts;

- Tank for holding cleaning fluid;

- Pump and conduit assembly for delivering fluid to the basin for cleaning;

- Drain hole for returning used cleaning fluid to the tank;

- A filter (or porous medium) interposed in the drain hole for capturing particulate matter as the cleaning fluid drains back to the tank;

- A float switch level sensor

- A thermostatically controlled heater;

- An oil dispersant and degreasing cleaning fluid that is biodegradable, non-toxic, non-caustic, and non-flammable; and

- Microbes for remediating hydrocarbon contaminants.

The Forbest system's features are essentially identical to the Graymills Bio-536 and Walter BR-100 systems.  It practices ChemFree's asserted patent claims to the same extent as the Bio-536 and BR-100.

### e.  Clean[3].

Clean[3] (pronounced "Clean Cubed" – as the "3" is expressed as a numerical exponent).  From my review of Clean[3] product literature and photographs of a Clean[3] parts washer given to me by ChemFree, it appears that Clean[3] possesses:

- Basin for washing parts;

- Tank for holding cleaning fluid;

- Pump and conduit assembly for delivering fluid to the basin for cleaning;

- Drain hole for returning used cleaning fluid to the tank;

- A filter (or porous medium) interposed in the drain hole for capturing particulate matter as the cleaning fluid drains back to the tank;

- A level sensor for sending a cut-off signal to the heater if a low level condition is detected.

- A thermostatically controlled heater;

- An oil dispersant and degreasing cleaning fluid that is biodegradable, non-toxic, non-caustic, and non-flammable; and

- Microbes for remediating hydrocarbon contaminants.



**Figure 28 – Clean[3] Photo from Clean[3] Web-Site.**

ChemFree informs me that Clean[3] competes with ChemFree in Europe but is not imported into the United States. Nevertheless, it shares all of the claimed features of ChemFree's asserted patent claims.

> **f.   ATEC, Nature's Way Eco-Systems, and Clean Earth Ltd.**

I am informed by ChemFree that the ATEC CleanPro bioremediating parts washer appeared on the market sometime

around 1997 or 1998, well after the ChemFree SmartWasher had been demonstrated at tradeshows around the country for several years.  It was marketed by the ATEC Trans Tool company of San Antonio, Texas.  I cannot find any evidence that it is still on the market in 2008.



**Figure 29 – ATEC CleanPro Parts Washer.**

Based on the outward physical similarity of the equipment, it appears that variations of this machine were marketed for a time in Canada by a company named Clean Earth Ltd.  [Exhibit K to my report].  A substantially similar, if not identical machine, called the ES20 Parts Washer, is shown and described in *circa* 1998 product literature of Nature's Way Eco-Systems, Inc. [Exhibit O to my report].  I understand that Nature's Way Eco-Systems was a company associated with Bert Overland, aka the

*"Father of Bioremediation Parts Washers"* according to Walter product literature.  I further understand that Overland's company became insolvent and went out of business sometime around 1998. [Exhibit O].

ChemFree showed me an example of an ATEC CleanPro machine when I visited ChemFree's business premises in 2007. Photographs of the CleanPro machine that I inspected are included in Exhibit B to my report.  The ATEC CleanPro system possesses:

- Basin for washing parts;

- Tank for holding cleaning fluid;

- Pump and conduit assembly for delivering fluid to the basin for cleaning;

- Drain hole for returning used cleaning fluid to the tank;

- A filter (or porous medium) interposed in the drain hole for capturing particulate matter as the cleaning fluid drains back to the tank;

- A float switch level sensor for sending a cut-off signal to the heater if a low level condition is detected.

- A thermostatically controlled heater;

- An oil dispersant and degreasing cleaning fluid that is advertised as "completely biodegradable," non-toxic, "mild on hands" (i.e., non-caustic), and non-flammable; and

- microbes for remediating hydrocarbon contaminants.

It has essentially the identical features of the ChemFree SmartWasher and Walter BR-200 products that practice all of the asserted claims of ChemFree's patents.

### g.  KleenTec.

In contrast to ATEC CleanPro, KleenTec's bioremediation parts washers remain on the market in the United States as of the date of preparation of this report.  Examples of KleenTec's parts washers are pictured in Figure 30 below.



**Figure 30**

KleenTec's products possess:

• Basin for washing parts;

• Tank for holding cleaning fluid;

• Pump and conduit assembly for delivering fluid to the basin for cleaning;

• Drain hole for returning used cleaning fluid to the tank;

- Thermostatically controlled heater;

- An oil dispersant and degreasing cleaning fluid that is biodegradable, non-toxic, non-caustic, and non-flammable; and

- microbes for remediating hydrocarbon contaminants.

KleenTec practices all of the asserted claims of ChemFree's patents except that I cannot positively determine whether KleenTec's filter is disposed "in the flowpath" or whether KleenTec's KT4000 and 5000 Bio units have a level sensor that cuts-off the heater.

### h.  Wynn's Belgium EPC Parts Washer.

ChemFree has informed me that it has had, in the past, a business relationship with Wynn's Belgium for the sale and distribution of bioremediation parts washers in certain countries in Europe.  Wynn's EPC bioremediation parts washer is pictured below.



**Figure 31 – Wynn's Belgium EPC Parts Washer.**

According to ChemFree, the Wynn's EPC parts washer used ChemFree cleaning fluid, microbes, and filters that Wynn's obtained through ChemFree's European distributor, Rozone. Wynn's outsourced the manufacture of the parts washer apparatus to a small manufacturing concern in Italy.  ChemFree provided some technical assistance to the Italian manufacturer as part of the agreement.

I have not personally studied, reviewed or analyzed the Wynn's EPC washer.  I understand that ChemFree's principles are quite familiar with this product and can establish, from personal knowledge, that it possess all of the features of ChemFree's asserted patent claims.

### i.    ZYMO – United States and Europe.

According to ChemFree, the ZYMO parts washer arose out of a dispute between ChemFree and co-inventor McClure over compensation.  McClure formed Advanced Bioremediation Services, Inc. in 1995 and introduced the ZYMO parts washer in competition with ChemFree.  I have not personally studied, reviewed or analyzed the ZYMO washer.  I understand that ChemFree's principals are quite familiar with ZYMO and can establish, from personal knowledge, that at least some models of ZYMO's parts washers possess all of the features of ChemFree's asserted patent claims.



**Figure 32 – the ZYMO Parts Washer.**

ChemFree has further informed me that, shortly after ChemFree had substantially curtailed its relationship with Wynn's Belgium, that a French distributor began distributing the parts washer shown below in Europe.



**Figure 33 – ZYMO European Parts Washer**

I have not personally studied, reviewed or analyzed the ZYMO European parts washer.  I understand that ChemFree's principals are familiar with the above pictured machine and can

establish, from personal knowledge, that it is essentially the same parts washer apparatus made by the same Italian manufacturer that made the EPC machine for Wynn's Belgium, but now is being sold with ZYMO fluid and microbes.

### j. Concluding Remarks, Opinion, and Conclusion On Copying.

I do not believe that I have seen any evidence that anyone had ever manufactured, sold, or used a bioremediating parts washer prior to introduction of the ChemFree SmartWasher. *Hakansson* appears to have attempted to develop a bioremediation parts washer, but I have been shown no evidence that anyone has ever been successful at commercializing Hakansson's complex and cumbersome parts washing system.

Thus, while there do not appear to be any commercial forerunners to ChemFree's patented invention, there appear to be quite a number of followers.  There appears to me to be enough evidence of copying by a number of competitors that the "copying" secondary consideration of non-obviousness factor should be given considerable weight in evaluating the obviousness of ChemFree's patents.

Finally, I note that Professor Adriaens has, once again, failed to take secondary considerations of non-obviousness into account in arriving at his opinion and conclusion – including evidence of copying by numerous competitors.

### 7.   Commercial Success.

Counsel has advised me that "commercial success" of products incorporating the claimed invention is one of the secondary considerations of non-obviousness.  Counsel has further advised me that the commercial success of an infringing product may be used to establish the commercial success of the invention.[55]  A thorough analysis of the commercial success of products practicing the ChemFree's Patented invention is outside of the scope of my expertise and engagement, and I have not reviewed any sales or market penetration studies for the ChemFree product.

I have been informed by counsel for ChemFree that ChemFree may introduce evidence of commercial success of its patented invention at trial, including evidence of the commercial success of Walter's Bio-Circle products.

## VI.   INVALIDITY BY ANTICIPATION DEFENSE.

There is no need to spend a lot of time or space on Walter's anticipation defense.  Counsel has provided me with the following legal standard on this issue:

> To anticipate a claim under 35 U.S.C. § 102, it is necessary that a single anticipatory prior art

---

[55] *See* Assumptions section above, *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130, 56 U.S.P.Q.2d 1456, 1464 (Fed.Cir. 2000) (the success of an infringing product is considered to be evidence of the commercial success of the claimed invention.)

> reference disclose each limitation of the claimed
> device either expressly or inherently.[56]

Walter initially asserted a Section 102 anticipation defense in its initial invalidity contentions, asserting anticipation over only the *Hakansson-2* reference.  [Docket 41].  As near as I can tell, there is no mention of *Hakansson-2* in Professor Adriaens' report whatsoever – whether as an anticipation reference or as an obviousness reference.  Thus, it appears to me that Walter has abandoned its anticipation defense, in general, and anticipation over *Hakansson-2*, in particular.

It should be abundantly clear from my discussion of the various prior art references above that there is no single prior art reference that discloses each and every limitation of the asserted claims of the ChemFree Patents.  In my opinion, Professor Adriaens' expert report fails to make out a case for invalidity by anticipation on any of the asserted claims.

## VII. <u>ENABLEMENT DEFENSE</u>.

I am advised by counsel that the question of whether a patent claim is enabled is a question of law for the court to decide, although it is based upon underlying factual findings.[57] I am further advised by counsel that the specification of a

---

[56] *Hazani v. United States Int'l Trade Comm'n*, 126 F.3d 1473, 1479 (Fed.Cir. 1997).

[57] *See* Assumptions above, *National Recovery Technologies, Inc., v. Magnetic Separation Systems, Inc.*, 166 F.3d 1190, 49 U.S.P.Q.2d 1671 (Fed.Cir. 1999).

patent should contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same.[58]

I am advised by counsel that enablement is determined from the viewpoint of persons of skill in the field of the invention at the time the patent application was filed.[59]  In this case, Professor Adriaens has directed his opinion to someone who is skilled in the art of environmental sciences and wastewater treatment.

In my opinion Professor Adriaens has misidentified the applicable art or field of the invention.  My opinions are directed more toward someone who is skilled in the art of parts washers.  Professor Adriaens' appears to approach his analysis from the standpoint of someone in the art of environmental contamination clean-up that views a parts washer as just another environmental contamination site that needs to be cleaned up.  I view the situation differently.  I view ChemFree's invention as stemming from the parts washing art and advancing the art of parts washing by incorporating unique bioremediation technology in order to: (1) dispose of the soil removed from parts in a way

---

[58] *See* Assumptions above, 35 U.S.C. § 112, ¶ 1.
[59] *See* Assumptions above, *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1345 (Fed.Cir. 2000).

which is both environmentally compliant and safe, and (2) re-cycle and thus extend the useful life of the cleaning fluid.

I am advised by counsel that enablement is determined from the viewpoint of persons of skill in the field of the invention <u>at the time the patent application was filed</u>.[60]  In this case, I note that Professor Adriaens has repeatedly applied scientific literature that post-dates ChemFree's date of invention.

### 1.   Critique of Enablement Issue Number 1 - Changing the Filter.

Professor Adriaens levels the same seven assertions of enablement against all five of ChemFree's patents.  Since all of ChemFree's patents stem from a common specification, I will group my rebuttal to Professor's Adriaens' comments together.

The first non-enablement assertion of Professor Adriaens is re-stated below:

> [ChemFree's patents do not] discuss how often the filter should be replaced, or what indicators might inform an operator that the filter would need to be changed.

[Adriaens' Report at pp. 10, 13, 16, 19, 23].

I am advised by counsel for ChemFree that enablement must be analyzed only on a claim-by-claim basis for each patent.[61] There are no limitations of any kind in the asserted claims of

---

[60] *See* Assumptions above, *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1345 (Fed.Cir. 2000).

[61] *See* Assumptions above, *Lindemann Maschinenfabrik v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1463 (Fed.Cir. 1984) (The invention referred to in the enablement requirement of section 112 is the claimed invention).

the '110 Patent or the '491 Patent directed to a "filter."
Thus, Professor Adriaens' remarks would not appear to apply to
any of the asserted claims of the '110 or '491 Patents.

Furthermore, there are no asserted claims in any of the
five patents that contain limitations with respect to
microorganisms being affixed to the filter medium.  Thus,
Professor Adriaens' opinion about "changing the filter" as it
relates to "microorganisms affixed to the filter" do not impact
the validity of any of the asserted claims in this litigation.

I am further advised by counsel for ChemFree that patents
are written to enable those skilled in the art to practice the
invention, not the general public.[62]  I am similarly advised that
a patent is not a scientific treatise, but a document that
presumes a readership skilled in the field of the invention.[63]  I
am similarly advised that a patent need not teach, and
preferably omits, what is well known in the art.[64]

Filters have been used in the parts washing art for decades
before the date of ChemFree's invention.  A person of ordinary
skill in the art of parts washing would have a technical degree
plus six months to three years of practical experience in the

_____

[62] *See* Assumptions above, *W.L. Gore & Assoc, Inc. v. Farlock, Inc.,* 721
F.2d 1540, 1556 (Fed.Cir. 1983).
[63] *See* Assumptions above, *Ajinomoto Co., Inc. v. Archer-Daniels-Midland
Co.,* 228 F.3d 1338, 1347 (Fed.Cir. 2000).
[64] *See* Assumptions above, *Spectra-Physics, Inc. v. Coherent, Inc.,* 827
F.2d 1524, 1534 (Fed.Cir. 1987) *cert denied,* 484 U.S. 954 (1987).

operation and design of parts washers.  Such a person would be expected to have experience with the principles of dynamic fluid flow and filtration.  Such practitioners of ordinary skill in the parts washing art would know how to recognize whether a filter has become sufficiently saturated with contaminants so that it needs to be cleaned.  With respect to replaceable filters, practitioners would know how to recognize whether a filter has become sufficiently saturated with contaminants so that it needs to be replaced.

> **2.   Critique of Enablement Issue Number 2 – Number of Microorganisms Affixed to Filter Pad.**

The second non-enablement assertion of Professor Adriaens is re-stated below:

> [ChemFree's patents do not] . . . teach how a cleaning fluid or filter should be should be made to ensure sufficient abundance of active microorganisms for the part washer to function as intended in the claims.  How many microorganisms are required per unit volume or area?  The "'226" patent states that "approximately 7x109 colony forming units were affixed to a filter of dimensions of approximately 12x21 inches" (column 9, lines 5-6), however, this teaching is incompatible with part 2 ("toxicity of glue to microorganisms") of section "Enablement to make and use the part washer" below.

[Adriaens' Report at pp. 11, 13, 16, 19, 24].

Keeping in mind that enablement must be analyzed only on a claim-by-claim basis[65] I repeat my previous observations that

---

[65]  *See* Assumptions above, *Lindemann Maschinenfabrik v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1463 (Fed.Cir. 1984) (The invention

there are no "filter" limitations of any kind in the asserted
claims of the '110 Patent, or the '491 Patent, and that there
are no "microorganisms affixed to the filter" limitations in any
of the asserted claims in any of the five asserted ChemFree
patents.   Thus, Professor Adriaens' remarks as they relate to
affixing microorganisms to the filter do not impact the validity
of any of the asserted claims in this litigation.

I am advised by counsel for ChemFree that a patent may be
sufficiently enabled even if some experimentation is needed, for
the patent document is not intended to be a production
specification.[66]   I am further advised by counsel for ChemFree
that enablement is not precluded where some experimentation is
necessary, provided that the amount of experimentation needed is
not unduly extensive.[67]

The preferred mode of practicing ChemFree's invention is to
use a combination of LRC-1 microbes from Louisiana Remediation
Company with the cleaning fluid Seawash-7 from Warren Chemical
Company.   In my conversations with ChemFree inventor, Tom
McNally, I learned that Louisiana Remediation Company sales reps
volunteered that "a teaspoon" of LRC-1 would probably be "too

referred to in the enablement requirement of section 112 is the
claimed invention).
      [66] *See* Assumptions above, *Northern Telecom v. Datapoint Corp.*, 908 F.2d
931, 941 (Fed.Cir. 1990)
      [67] *See* Assumptions above, *Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
802 F.2d 1367, 1384 (Fed.Cir. 1986), *cert denied* (480 U.S. 947
(1987).

much" for the volume of cleaning fluid and contaminants contemplated during development of the SmartWasher.  Thus, it appears that information, recommendations, and suggestions regarding the initial concentration of microbes was readily available to practitioners in the parts washer art from supply companies at the time of the invention.

I am advised by counsel for ChemFree that an inquiry into whether experimentation would be "undue" requires consideration of the so-called "Wands Factors," which include:  (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples: (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims.[68]  I have read Professor Adriaens' report quite carefully and can state categorically and without hesitation that:  (i) it contains no acknowledgement that an enablement inquiry involves an analysis of whether "undue experimentation" is required; and (ii) there is absolutely no mention of, much less analysis under, any – much less all of – the "Wands Factors."

---

[68] *See* Assumptions above, *In re Wands*, 858 F.2d 731, 737 (Fed.Cir. 1988).

The practitioner of ordinary skill would be expected to have a college level education in a scientific or business discipline.  Thus, he or she would have received instruction in analytical and scientific methods such as how to set up and perform routine experiments.  In my opinion, a practitioner, that had  such a background and also had ready access to suppliers' recommended concentration levels, could practice ChemFree's invention without "undue" experimentation.  For example, the person of ordinary skill would likely conduct a first experiment with "a teaspoon" of microbes.  If the experimental results suggested an insufficient amount, the concentration could be doubled for a second experiment.  If the results of the first experiment suggested excess concentration, the amount could be cut in half for the second experiment.  Using this simple approach, which is well within the capabilities of the defined person of "ordinary skill," an effective initial concentration of microbes could be readily and quickly determined.  The amount of experimentation required could, in no sense, be considered "undue" – in my opinion.  This is especially true because no harm can come to personnel, equipment, or the environment in the course of such experimentation.  There is no risk or unacceptable consequence of making a wrong choice.

3.   **Critique of Enablement Issue Number 3 — Length of Time for Microorganisms to Adapt.**

The third non-enablement assertion of Professor Adriaens is re-stated below:

> [ChemFree's patents do not] . . . indicate the length of time required for the microorganisms to adapt before the system will operate as taught in the specifications.

[Adriaens' Report at pp. 11, 14, 16, 19, 24].  This assertion by Professor Adriaens is, in my opinion, absurd.

The Best Mode disclosed in ChemFree's specification entails a combination of SeaWash-7 and LRC-1 microbes.  Any skilled practitioner could arrive at a starting concentration of SeaWash-7 and water using readily known surfactant-to-water ratios practiced in the prior art for aqueous parts cleaning, i.e., from about one to ten percent.  This would not require "undue experimentation."  One of ordinary skill would know this or could readily learn it by:  perusing MSDS from suppliers of other aqueous cleaning agents, making telephone contact with them, contacting suppliers of cleaning equipment, or by asking an editor at a magazine such as Products Finishing (Tom Robison) or Precision Cleaning (Brad Kent).

Then one warms the fluid to between 110 and 115°F.  Then one introduces LRC-1 microbes at a starting concentration that can be determined, as described above, without undue experimentation.  The value of this concentration is not

critical because, as Professor Adriaens knows, microbes reproduce based on the level of food (hydrocarbon soils) available to them.  After that, one can start washing parts.

If soil removal is not as efficient as anticipated, it is likely that a higher concentration of Sea Wash-7 is needed.  It is my opinion that one of ordinary skill should be able to recognize unacceptable performance and adjust the surfactant-to-water ratio accordingly.  If the concentration of surfactant is too high, and the bioremediation tank foams unacceptably, one of ordinary skill should be able to add water to dilute the concentration, and drain off some fluid if water addition would overflow the bioremediation tank.

I am further of the opinion that adjustment of organism content is a trivial exercise for one of even ordinary skill. The organism population adjusts itself to the available food supply. Should, for a time, an excess of surface oil be noted (because an unusually high level of soil has been added), a "pinch" of LRC-1 microorganisms could be added without risk or substantial cost.  In one embodiment of ChemFree's invention specifically disclosed in the specification, the user would simply replace the old filter with a new one and turn on the cleaning pump so that warm cleaning fluid passes through the new filter.  This procedure will replenish the microbe population.

I am advised by counsel for ChemFree that the enablement requirement is met if the description enables any mode of making and using the claimed invention.[69]  I understand from speaking with the inventors that ChemFree's pre-filing "beta test" units and its first commercial SmartWasher sales used Seawash-7 and LRC-1 in accordance with ChemFree's patent specification and that they operated effectively without any reported instances of inoperability due to "lag phase."  Thus, ChemFree's empirical evidence at the time of the invention would appear to trump Professor Adriaens' 2008 untested, academic theory based on scientific literature that was published six years after ChemFree's filing date.

### 4.   Critique of Enablement Issue Number 4 – Concentration of Replacement Fluid.

The fourth non-enablement assertion of Professor Adriaens is re-stated below:

> [ChemFree's patents contain] . . . no discussion on the appropriate concentration of cleaning fluid in water when cleaning fluid is added so as to not impact biodegradation.

[Adriaens' Report at pp. 11, 14, 17, 19, 24].

Professor Adriaens' assertion on this issue is, in my opinion, trivial if not totally absurd.  The person of ordinary skill is not helpless, he has "skill" albeit at an "ordinary" level.

---

[69] *See* Assumptions above, *Engel Ind., Inc. v. Lockformer Co.,* 946 F.2d 1528, 1533 (Fed.Cir. 1991).

Here, I am reminded that a person of ordinary skill is a person of ordinary creativity, not an automaton.[70]  I noted above how someone could select a starting concentration of Sea Wash-7 cleaning fluid, and adjust it to achieve an acceptable level of cleaning capability.  The ordinarily-skilled practitioner, faced with the situation of "topping off" the parts cleaner after fluid has been lost due to evaporation and/or drag out, would consider replacing lost fluid at the same concentration used for initial start-up conditions.  Cleaning efficiency could thereafter be easily adjusted by either adding concentrated SeaWash-7 or water depending on whether the surfactant-to-water ratio need to be adjusted up or down.  He or she would notice this because cleaning efficiency has declined, because there is no other variable to adjust in the simple ChemFree system, and because one of ordinary skill would know that it is the SeaWash-7 that provides the cleaning capability.  He or she would follow the same procedure noted above by which the effective concentration was initially determined.  One of ordinary skill would be expected to do this without supervision, ingenuity, or applause.

Moreover, Professor Adriaens' remarks fail to comprehend the relationship between cleaning fluid concentration and

---

[70] *See* Assumptions above, *KSR Int'l Co. v. Teleflex Inc.,* 127 S.Ct. 1727, 1742, 167 L.Ed.2d 705 (2007).xx

overall system effectiveness.  Slightly increasing or decreasing the concentration of the active cleaning agent by adding either water or Sea Wash-7 cleaning fluid may slightly improve or impair cleaning efficiency depending on the particular type of soil being removed.

It was noted earlier that parts cleaning is not an art with a defined recipe for soil, a specification for the amount of it present, or knowledge of how it is attached to parts.  One of ordinary skill would know that in some circumstances some "elbow grease" may have to be applied using the hard-bristle brush to remove soils.

Such issues of system optimization involve decisions relative to specific product applications made in the field.  I am advised by counsel that a patent document is not intended to be a production specification.[71]

### 5.   Critique of Enablement Issue Number 5 Related to "Biodegradable Fluid."

The fifth non-enablement assertion of Professor Adriaens is re-stated below:

> [ChemFree's Patent] . . . states that the cleaning fluid has "the potential to last for extended periods" as it can be "recycled" within the system through the assistance of microorganisms degrading the hydrocarbons from the parts. However, the cleaning fluid is described in column 6, line 9 to be "biodegradable."  As the term biodegradable suggests that the fluid can be decomposed by micro-

---

[71] *See* Assumptions above, *Northern Telecom v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed.Cir. 1990).

organisms, it is unclear how the cleaning fluid can be
long-lived in an environment with microorganisms actively
biodegrading hydrocarbons.

[Adriaens' Report at pp. 11, 14, 17, 20, 24].

ChemFree's patent specification discloses a combination of
SeaWash-7 cleaning fluid and LRC-1 microbes that accomplishes
the "last for extended periods" aspect of the invention.  I am
advised by counsel that the enablement requirement is met if the
description enables any mode of making and using the claimed
invention.[72]  This requirement is met by the combination of
SeaWash-7 and LRC-1.  Both products were commercially available
on the market at the time of the invention.  A practitioner
seeking to practice ChemFree's invention need only contact these
suppliers and place an order.

I am advised by counsel that an inventor need not
comprehend the scientific principles behind his or her invention
and that the inventor's theory or belief as to how his invention
works is not a necessary element to satisfy the enablement
requirement.[73]  In 1994, ChemFree's inventors discovered a
combination of commercially available products for a cleaning
fluid and microbes that resulted in the cleaning lasting "for
extended periods" in a parts washer.  They filed a patent

---

[72] *See* Assumptions above, *Engel Ind., Inc. v. Lockformer Co.,* 946 F.2d
1528, 1533 (Fed.Cir. 1991).
[73] *See* Assumptions above, *Cross v. Iizuka*, 753 F.2d 1040, 1042
(Fed.Cir. 1985).

application on their discovery and were awarded a patent.

Professor Adriaens appears to be operating under the impression

that Messrs. McClure and McNally are not entitled to a patent

unless, in 1994, they first understood and could explain why

SeaWash-7 lasted for extended periods in parts washer using LRC-

1 microbes.  I am advised by counsel that the law does not

require such.

### 6.   Critique of Enablement Issue Number 6 - Dredging Sludge.

The sixth non-enablement assertion of Professor Adriaens is

re-stated below:

> [ChemFree's patents] . . . suggest that dredging will
> seldom be needed and that any sludge will recirculate
> within the system to the filter.  There is no description
> of the type of pump most appropriate for this task or
> performance parameters required to recirculate the sludge
> to the faucet to be subsequently captured by the filter.
> This system is similar to the conventional activated sludge
> process in wastewater treatment, which generates solids
> that include organic matter, living microorganisms, and
> dead microorganisms (Maier et al., 2000, p510).  Aerobic
> treatment generates secondary sludge that is not activated,
> which in the unit described in the patent would need to be
> removed by a method not taught in the patent.

[Adriaens' Report at pp. 12, 14, 18, 20, 25].

I am advised by counsel for ChemFree that enablement must

be analyzed only on a claim-by-claim basis.[74]  There are no

limitations of any kind in any of the asserted claims of any of

---

[74] *See* Assumptions above, *Lindemann Maschinenfabrik v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1463 (Fed.Cir. 1984) (The invention referred to in the enablement requirement of section 112 is the <u>claimed</u> invention).

the five asserted patents that contain limitations with respect to dredging sludge from the bottom of the tank.  Professor Adriaens' criticism is directed at unclaimed subject matter. His remarks do not impact the validity of any of the asserted claims in this litigation.

I am further advised by counsel for ChemFree that patents are written to enable those skilled in the art to practice the invention, not the general public.[75]  I am similarly advised that a patent is not a scientific treatise, but a document that presumes a readership skilled in the field of the invention.[76]  I am similarly advised that a patent need not teach, and preferably omits, what is well known in the art.[77]  Practitioners in the parts washing art had been using pumps to move cleaning fluid from one chamber to another in parts washers for many years before ChemFree's invention.  In my opinion, a practitioner of ordinary skill in 1994 would have had no difficulty in selecting a commercially available pump to practice ChemFree's invention as claimed in any/all of the asserted claims.

---

[75] *See* Assumptions above, *W.L. Gore & Assoc, Inc. v. Farlock, Inc.,* 721 F.2d 1540, 1556 (Fed.Cir. 1983).
[76] *See* Assumptions above, *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.,* 228 F.3d 1338, 1347 (Fed.Cir. 2000).
[77] *See* Assumptions above, *Spectra-Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524, 1534 (Fed.Cir. 1987) *cert denied*, 484 U.S. 954 (1987).

7.   **Critique of Enablement Issue Number 7 – The 3M Super 77 Spray Adhesive Issue.**

The seventh non-enablement assertion of Professor Adriaens is re-stated below:

> [ChemFree's patents teach that] . . . an acceptable method for attaching microorganisms to the filter is the Super 77 Spray Adhesive from 3M.  The material safety data sheet (MSDS) for this adhesive lists several types of hydrocarbons 3M MSDS, 2007).  High concentrations of these compounds are known to degrade the cell membrane (Maier et al, 2000, p373).  This degradation of the membrane is related to the accumulation of the compounds inside the membrane, which is dependent upon the degree a compound is lipophilic (Sikkema et al, 1994).  The concentrations of hydrocarbons found in the 3M Super 77 Spray Adhesive is toxic to most microbial physiologies.  As quoted from Isken et al. (1998):  "Hydrophobic organic solvents are toxic for living organisms because they accumulate in and disrupt cell membranes (emphasis added).  The toxicity of a compound correlates with the logarithm of its partition coefficient with octanol and water (log Pow).  Substances with a log Pow value between 1 and 5 are, in general, toxic for whole cells."  These substances include those found at percent concentrations in the Spray Adhesive.

[Adriaens' Report at pp. 12, 14, 18, 20, 25].

As with the "dredging" issue discussed immediately above, I am advised by counsel for ChemFree that enablement must be analyzed on a claim-by-claim basis.[78]  There are no limitations of any kind in any of the asserted claims of any of the five asserted patents with respect to using a spray adhesive of any kind on microorganisms, or filters, or a combination of the two.

---

[78] *See* Assumptions above, *Lindemann Maschinenfabrik v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1463 (Fed.Cir. 1984) (The invention referred to in the enablement requirement of section 112 is the claimed invention).

While use of a spray adhesive is noted in the specification of the ChemFree patents, its specific use is not claimed in any asserted claims in the patents at issue in this lawsuit.  Thus, Professor Adriaens' criticism is directed at <u>unclaimed subject matter</u>.[79]  I am advised by counsel that, as a matter of law, his remarks do not impact the validity of any of the asserted claims in this litigation.

As an aside, I am informed by ChemFree's principals that the tens of thousands of ChemFree satisfied customers that have, over the past 13 years, consumed multiple hundreds of thousands of filters imbedded with microbes and spray-on adhesive, would be quite surprised to learn that Professor Adriaens has 'proved' that ChemFree's filters are inoperable.

### 8. Critique of Enablement Issue No. 8 - Comments on the Experiments Described in the '226 Patent.

The eighth non-enablement assertion of Professor Adriaens is re-stated below, in his comments about "Working Examples":

> Patent 6440226 B2 presents a series of experiments to help satisfy the enablement requirement pertaining to the claim related to the benefits of introducing the microorganisms into the parts washer and their biodegradation of hydrocarbons.  Examination of the experiments indicates that the data present an argument construed from three independent illustrative experiments, which may be misleading.  This independence impacts their interpretation particularly as to the causative role of the microorganisms, and may not be easily understood by a person of ordinary skill in the art.

---

[79] ChemFree has claims directed at this subject matter, but they are not asserted in this litigation.

[Adriaens' Report at pp. 21].

As with the "dredging" and "spray adhesive" issues discussed immediately above, I am advised by counsel for ChemFree that enablement must be analyzed on a claim-by-claim basis.[80]   Nowhere does Professor Adriaens indicate which of the claims of the '226 Patent is supposedly not enabled, taking into account the entire specification, including the referenced example.

The example, at column 9, line 5, does give the reader an indication or suggestion as to how many microbes to put on a filter mat, which tends to augment the teachings of the remainder of the specification, which already enables the invention for the reasons already discussed above in response to Professor Adriaens' other criticisms.   However, this teaching, with respect to affixing microbes to the filter pad, is irrelevant to this litigation because the only claim in the '226 patent that includes a limitation of microorganisms being affixed to the porous medium is claim 6, which is not asserted in this litigation.   Thus, to the extent that Professor Adriaens is attacking the enablement of claim 6, his criticism is directed to unclaimed subject matter.

---

[80] *See* Assumptions above, *Lindemann Maschinenfabrik v. American Hoist and Derrick Co.*, 730 F.2d 1452, 1463 (Fed.Cir. 1984) (The invention referred to in the enablement requirement of section 112 is the claimed invention).

Otherwise, the example merely demonstrates that, if you practice the ChemFree invention as otherwise taught in the specification, using the microbe concentration on the filter pad as per the example, the invention is shown to be operable.  The example further demonstrates that the invention is effective at cleaning parts compared to prior art forms of parts cleaning, i.e., use of mineral spirits.  In my opinion, all five of the ChemFree patents are fully enabled without the need to refer to the example that was added to the '226 Patent specification.  That example, in my opinion, certainly does not detract from the overall enablement of the invention by the remainder of ChemFree's specification.  If anything, it assists slightly in the overall enablement by suggesting an initial concentration of microbes to affix to the filter pad.

### 9.    Opinion and Conclusion on Enablement.

In summary, I note that Professor Adriaens appears to characterize the hypothetical person having ordinary skill in the art as actually having an extraordinarily low level of skill when it comes to enablement, which is in marked contrast to the level of skill required to combine Professor Adriaens' 11 prior art references in order to achieve ChemFree's invention in an obviousness analysis.

Furthermore, I believe that Professor Adriaens has underestimated the capabilities of someone with a "...*B.S. degree in*

*Environmental Engineering or having equivalent work experience in biological water treatment, and having three years experience equipment in the automotive and equivalent industries...*" . Professor Adriaens' report contains no discussion of what someone of such skill could likely accomplish through the exercise of ordinary creativity and "due" (as opposed to "undue") experimentation.

I consider the ChemFree asserted claims to be fully enabled.  My opinion is confirmed by, among other things, the substantial number of entrants into the market, including Walter, that have apparently copied ChemFree's invention since introduction of the ChemFree SmartWasher in late 1994, including market entrants that introduced competing products before publication of ChemFree's U.S. patents in 2000.

## VIII.  THE INEQUITABLE CONDUCT DEFENSE.

ChemFree has given me a task of limited scope with respect to Walter's "Inequitable Conduct" defense.  I am advised by counsel for ChemFree that, in connection with a patent applicants' duty to disclose material information to the patent office during prosecution, that information is "material to patentability" when it is not cumulative to information already of record before the patent office.[81]  The task given me by ChemFree is, specifically for those patent references that

---

[81] Counsel has advised me that such standard is recited in 37 C.F.R. § 1.56.

Walter has asserted were known to ChemFree but were intentionally not disclosed to the Patent Office, I am to evaluate whether such references are "non-cumulative" vis-à-vis other prior art that was before the Patent Examiner during prosecution.

I have been advised by counsel for ChemFree that a prior art reference is cumulative and, therefore, not material to patentability, if it teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO.[82]  I am further advised by counsel that an item is not cumulative if it discloses either:  (i) a claimed feature that is not disclosed in the cited references; or (ii) suggests a combination of claimed features that is not disclosed in the cited items.[83]

I have reviewed Walter's amended counterclaim and taken note that Walter has alleged that there were at least 24 prior art references that ChemFree knew about, yet intentionally failed to disclose to the PTO with an intent to deceive the patent examiner.  Twenty references were listed and alleged in paragraph 47.  One additional reference was listed and alleged in paragraph 48.  Three additional references were listed and

---

[82] See Assumptions above.  Donald S. Chisum, CHISUM ON PATENTS, § 19.03[b], Matthew Bender © 2006.
[83] See Assumptions above.  Donald S. Chisum, CHISUM ON PATENTS, § 19.03[b], Matthew Bender © 2006.

alleged in paragraph 49 of the counterclaim.  These references are the first twenty-four references listed on Table 1 below.

I have also reviewed Walter's responses to ChemFree Interrogatories No. 16 and 17, dated December 13, 2007.  I have also reviewed the Declaration of Harry Manbeck that Walter submitted in response to ChemFree's motion for summary judgment on inequitable conduct issues.  I have also reviewed the Initial Expert Reports of Mr. Manbeck and Professor Adriaens specifically with a view to ascertain whether Professor Adriaens and Mr. Manbeck have offered any analysis, opinion, or conclusion as to whether any alleged undisclosed prior art reference was "non-cumulative" over the prior art that was before the Examiner.

To assist in my analysis, I have prepared the following chart.  The chart lists 32 references.  The first 24 references are the undisclosed references recited in paragraphs 47, 48, and 49 of the Counterclaim.  The next reference, *Kaiser*, was included in Walter's December, 2007, response to Interrogatory 16.  The final seven references are from Professor Adriaens' invalidity analysis (*Hakansson-1*, *Hiss*, *Lashmett*, *Olson*, *Athey*, *Sims*, and *Knowlton*).

The first two of four right hand columns are labeled "In" and "Out" respectively.  References listed in Walter's amended counterclaim <u>and</u> also were included in Walter's December, 2007, interrogatory responses, are denoted with an "X" in the "In"

column (*"new" denotes that it appeared for the first time in December of 2007*).   If the reference was listed in Walter's amended counterclaim, but then <u>not</u> included in Walter's December, 2007, interrogatory responses, it is given an "X" in the "Out" column.

The third column is labeled - "Adr."   Professor Adriaens' eleven invalidity references are marked in this column with either a "c" or a "un."   The "c" indicates that it was cited during prosecution of at least one ChemFree patent application. The "un" indicated that it was not cited during prosecution of any ChemFree application.   The final column "Man" identifies the one and only reference for which Mr. Manbeck has rendered an opinion of "material to patentability."

## TABLE 1

| Paragraph 47 References | IN | OUT | Adr | Man |
|---|---|---|---|---|
| U.S. Patent 5,458,747 – Marks | | X | | |
| U.S. Patent 5,368,411 – Losack | | X | | |
| U.S. Patent 5,364,789 – Guinn | | X | c | |
| U.S. Patent 5,322,078 – Tuttle | X | | c | |
| U.S. Patent 5,314,620 – Staniec | | X | | |
| U.S. Patent 5,246,023 – Breunsbach | X | | | |
| U.S. Patent 5,217,616 – Sanyal | | X | | |
| U.S. Patent 5,132,224 – Mueller | | X | | |
| U.S. Patent 5,128,262 – Lindoerfer | | X | | |
| U.S. Patent 4,784,169 – Striedieck | X | | | |
| U.S. Patent 4,727,031 – Brown | | X | | |
| U.S. Patent 4,452,894 – Olsen | | X | | |
| U.S. Patent 4,128,478 – Metzger | | X | | |
| U.S. Patent 3,707,404 – Carlson | | X | | |
| U.S. Patent 3,476,600 – Morgan | | X | | |
| U.S. Patent 3,378,019 – Riolo | | X | | |
| Europe  - EPO 116 151 – Geke | X | | | |
| Japan   - JP 7-75795 | X | | | |
| Japan   - JP 62543 18 | | X | | |
| Germany - DE 2449056 | X | | | |
| **Paragraph 48 Reference** | | | | |
| WIPO 92/16314       - Hakansson-2 | X | | | |
| **Paragraph 49 Reference** | | | | |
| U.S. Patent 5,427,128 – Minkin | X | | c | |
| U.S. Patent 5,133,893 – Thom | X | | | |
| U.S. Patent 3,813,342 – Cooperman | X | | | |
| **Interrogatory No. 17 & Manbeck** | | | | |
| U.S. Patent 5,561,059 – Kaiser | new | | un | x |
| **Professor Adriaens** | | | | |
| E.P.O.     309,432   – Hakansson-1 | | | c | |
| U.S. Patent 5,232,299 – Hiss | | | c | |
| U.S. Patent 5,492,139 – Lashmett | | | c | |
| U.S. Patent 3,522,814 – Olson | | | c | |
| U.S. Patent 3,846,615 – Athey | | | Un | |
| U.S. Patent 5,656,156 – Sims | | | un | |
| U.S. Patent 5,265,633 – Knowlton | | | un | |

A. **THE "OUT" REFERENCES.**

Of the 24 references alleged as material and undisclosed in Walter's counterclaim, 14 references were omitted from Walter's interrogatory responses.  Of the 14 "Out" references, none of them were included among Professor Adriaens' invalidity references and none of them were mentioned by Mr. Manbeck as being non-cumulative or otherwise material to patentability.

Based on Walter's failure to mention these 14 "Out" references in its interrogatory responses and/or expert reports, ChemFree has concluded that Walter has abandoned its contention that ChemFree committed inequitable conduct with respect to these references.  Accordingly, ChemFree has instructed me not to perform a detailed analysis of these 14 references and/or render a written report containing opinions and conclusions as to whether or not they are cumulative at this time.  ChemFree has requested that I be prepared to undertake such a project if and when Walter indicates that it intends to move forward with re-asserting these references in this litigation.

B. **HAKANSSON-2.**

*Hakansson-2* is alleged in paragraph 48 of Walter's counterclaim as being a material, withheld reference during prosecution of ChemFree's applications.  *Hakansson-2* is also identified as a material, undisclosed reference in Walter's responses to Interrogatory nos. 16 and 17.

With respect to all of its invalidity contentions and amended invalidity contentions submitted during 2005, Walter provided a claim chart for one, and only one, prior art reference.  That reference was *Hakansson-2*.

In my opinion, some of Walter's invalidity claim chart contentions and some of Walter's inequitable conduct claim chart contentions in response to Interrogatory No. 17 could never be supported by a knowledgeable, qualified practitioner with expertise in the parts washing art.  For example, in its invalidity contentions claim chart, Walter asserts that: *Hakansson-2* discloses a biodegradable, non-toxic, non-caustic, non-flammable oil dispersant and degreaser fluid – "inherently." [Docket 41, pp. 4-5].  This assertion was directly contradicted by Examiner Stinson in November of 2005.

> It was noted by the examiner that WIPO'314 ["*Hakansson-2*"] and EPO'342 ["*Hakansson-1*"] fail to specifically or inherently disclose in a parts washer, a fluid that is a "biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser".  WIPO'314 and EPO'342 fail to specifically or inherently teach the same even though employing water.

I believe Examiner Stinson recognized that *Hakansson-1* speaks to preferred operation within a pH range of 9.0 to 9.5 which does not represent operation with a "non-caustic" fluid.  I further believe that Examiner Stinson recognized that *Hakansson-2* does not specify any new or different characteristics of a washing liquid vis-à-vis *Hakansson-1*, but rather that *Hakansson-2* is

directed to the electro-mechanical components of a parts washer system.  In that regard, I agree with his analysis.

Similarly, in its invalidity contentions claim chart, Walter asserted that:  *Hakansson-2* discloses a method step of measuring the fluid, wherein the heating step is responsive to the step of measuring the level - – "explicitly and inherently." [Docket 41, pp. 14].  This assertion was directly contradicted by Examiner Stinson in November of 2005.

> WIPO'314 and EPO'342 also fail to teach specifically or
> inherently the limitations of the heater being responsive
> to measured fluid level and of being disabled when the
> fluid drops below a desired level. The level control system
> in WIPO'314 provides for the addition of extra water and
> does not teach a level sensor in the chamber from which the
> fluid is pumped into contact with the part.

*Hakansson-1* speaks to the presence of a thermostat (# 36) and a heater (#37), but makes no use of them in the description of the operation of the parts washer system.

"*Hakansson-2*" speaks to:  having:  (i) "…level sensors 30, which sense the level of the washing liquid and provide signals if the level exceeds predetermined limits …"; (ii) "… providing signals from the level sensors 30,…" to supply "… fresh water to the washing liquid container 14 …"; (iii) having in the washing liquid container (#37) a "… heater 28 with the thermostat 29…," but otherwise makes no use of it in the description of operation; and (iv) having in the rinsing liquid container "… a heater 42 with a thermostat 43…" which controls the conditions

in the rinsing liquid container 19 …", though those conditions aren't specified.  However, in all these facilities, I find no situation where the heater is responsive to the measured fluid level and of being disabled when the fluid falls below a desired level.  In summary, I agree with Examiner Stinson's analysis.

Similarly, in its invalidity contentions claim chart, Walter asserted that:  Hakansson-2 "inherently" discloses a filter interposed within the flowpath because the described apparatus purportedly could not operate in the manner disclosed if it lacked such a filter.  [Docket 41, pp. 19-20].  This assertion was directly contradicted by Examiner Stinson in the November, 2005 Examiner Interview Summary.

> WIPO'314 [*Hakansson-2*] and EPO'342 [*Hakansson-1*] also fail to disclose the use of a filter.

I have studied *Hakansson-2* and agree with Examiner Stinson's analysis on this point, finding no basis for asserting that it possesses a filter.  Instead, *Hakansson-2* removes accumulated debris by a process of sedimentation ("…This slurry is allowed to settle in the lower portion of the washing liquid container 14…") in a vessel with a conical or tapered bottom (#14), and then removing sediment through a drain valve (#41). Washing liquid is recovered from vessel #14 from a standpipe ("…the supply line 15 removes washing liquid at a relatively high level from the washing liquid container 14. …").

In summary, Examiner Stinson writes with respect to the then pending claims in the '305 Application:

The WIPO'342 [*Hakansson-2*] reference is less relevant than and at least cumulative to other references (for example EPO'432 [*Hakansson-1*]).

I have reviewed and compared *Hakansson-2* with *Hakansson-1*. *Hakansson-1* discloses a formulation for a cleaning fluid, use of indigenous microorganisms in hydrocarbon contaminants to biodegrade the contaminants, and the use of that formulation with the microorganisms in an apparatus. *Hakansson-2* appears to be mostly about an improved apparatus for use of a bioremediation-type cleaning fluid whose properties are not specified, leaving me to conclude that Mr. Hakansson made no improvements to his fluid, selection of microbes, or combination of fluid and microbes between *Hakansson-1* and *Hakansson-2*. It appears to me that the two apparatuses are slightly different, but not in any manner that impacts the claims of ChemFree's patents.

In relation to ChemFree's asserted patent claims in the '125 and '226 Patents, *Hakansson-2* adds nothing new over *Hakansson-1*. As stated above, nothing in *Hakansson-2* teaches anything new or different about a cleaning fluid than what was previously disclosed in *Hakansson-1*. Also, as stated above, the difference in apparatus claims appear to be about the manner in which the recycled cleaning fluid is to be "decanted" or separated from

the debris (deceased microorganisms, spent cleaning fluid, and the chemical degradation products of bioremediation). In *Hakansson-1*, the recycled cleaning fluid is taken from the bottom of the washing liquid container; in *Hakansson-2*, it is taken from nearly the top, away from where dead microorganisms and sludge accumulate at the bottom of the container.  That difference, while sensible to my mind, adds nothing to *Hakanson-1* relative to the claims of ChemFree's '125 and '226 Patents.  Thus, in my opinion, there is nothing in *Hakansson-2* that a reasonable examiner would not consider to be present in *Hakansson-1* relative to what is claimed in ChemFree's '125 and '226 patents.

Apparently, Professor Adriaens and Mr. Manbeck also agree with Examiner Stinson on this point.  I note that neither Professor Adriaens nor Mr. Manbeck offers an expert opinion that *Hakansson-2* is material and non-cumulative over other prior art that was before Examiner Stinson, including *Hakansson-1*.  I note that, whereas Walter asserted *Hakansson-2* to the exclusion of *Hakansson-1* in its invalidity contentions, Professor Adriaens has asserted *Hakansson-1* to the exclusion of *Hakansson-2* in his expert report on invalidity issues.  I infer from Professor Adriaens' selection of *Hakansson-1* over *Hakansson-2* that Professor Adriaens believes that *Hakansson-1* is the more complete reference of the two, thus rendering *Hakansson-2* cumulative.

C.   KAISER.

Professor Adriaens' report is totally silent on issues relative to inequitable conduct.  Nowhere does he express an opinion that any prior art reference is material to patentability.  Nowhere does he express an opinion that any prior art reference is non-cumulative relative to other prior art before the examiner.  Nowhere does he state that he compared any alleged undisclosed reference against all of the prior art that was before the Examiner for the purpose of determining whether the undisclosed reference was non-cumulative of the art before the examiner.  Nowhere does he state that he was made aware of the applicable legal standards for analyzing materiality/ cumulativeness for purposes of an inequitable conduct analysis.

1.   Manbeck and Adriaens on Kaiser.

On page 25 of his report, Mr. Manbeck opines that *Kaiser* was material to patentability to all of ChemFree's patents because it met the standard "... *establishes in combination with other information a prima facie case of unpatentability*."  However, the standard used by Mr. Manbeck on page 25 of his report omits mention of the requirement that the reference must also not be "*cumulative to information already of record*."

Nowhere in his report does Mr. Manbeck state his qualifications or otherwise show that he has the necessary technical expertise in the parts washing and/or bioremediation

arts to evaluate whether *Kaiser* is a material reference, either alone or in combination with other references.  Furthermore, nowhere in his report does Mr. Manbeck state his qualifications or otherwise show that he has the necessary expertise to evaluate whether *Kaiser* is cumulative of other information already of record before Examiner Stinson.  Moreover, nowhere in his report does Mr. Manbeck state that he actually compared *Kaiser* to other information already of record before Examiner Stinson to determine whether *Kaiser* was cumulative of the other information of record.

At page 25 of his report, Mr. Manbeck defers to Professor Adriaens' technical expertise, stating:   "*Dr. Peter Adriaens, defendant's technical expert in this action has concluded that the '059 Patent [Kaiser] combined with a reference or references of record renders unpatentable at least one claim of each of the patents-in-suit*."  Nowhere does Mr. Manbeck indicate that Professor Adriaens has conducted any "non-cumulative" analysis relative to *Kaiser*.  Nowhere does Mr. Manbeck justify his decision to rely on Professor Adriaens without first ascertaining whether Professor Adriaens had actually compared *Kaiser* to the other art before the Examiner.  From my reading of Professor Adriaens' report, he did not even attempt such an analysis, much less complete one and offer an opinion and conclusion on the matter

What Professor Adriaens did do, however, is furnish a claim chart. I have reviewed this claim chart and have taken note that for each and every ChemFree patent claim limitation that Professor Adriaens asserts is met by *Kaiser*, Professor Adriaens also asserts that the same limitation is also met by *Hakansson-1*, *Lashmett*, and *Guinn*. Thus, if anything, Professor Adriaens' report refutes, not supports, Mr. Manbeck's opinion that Kaiser is a material reference, because Adriaens' claim chart indicates that Kaiser is cumulative of *Hakansson-1*, *Lashmett* and *Guinn*. While personally, I disagree with many of the assertions on Professor Adriaens' claim chart, that does not diminish the fact that Manbeck's reliance on Adriaens, at least from Manbeck's and Adriaens' perspective, is unfounded.

Thus, taken together, neither Manbeck nor Adriaens, whether individually or collectively, has presented any analysis, opinion, or conclusion that *Kaiser* is not cumulative of other information before the Examiner. Consequently, it appears to me that Walter's experts have altogether failed to satisfy the legal standard of - "*information is material patentability when it is not cumulative to information already of record...*" from 37 C.F.R. § 1.56.

## 2.  Kaiser is cumulative of Guinn.

*Kaiser*, like *Guinn*, teaches use of microorganisms to clean surfaces with a proprietary cleaning fluid, without proposing a

mechanical process for doing so or a means for recovering the cleaning fluid for reuse, or a means for waste disposal.

One of ordinary skill cannot determine from the teachings of *Kaiser* if the claimed cleaning fluid is non-caustic, whereas the teachings of *Guinn* speak to a neutral pH (non-caustic) for the microorganisms to function most efficiently.

Furthermore, *Guinn* suggests that the claimed cleaning fluid can be used in a parts washer while *Kaiser* is silent on this issue.

### 3.   Kaiser is cumulative of Hakansson-1

Both *Kaiser* and *Hakansson-1* teach use of cleaning fluids containing microorganisms.  One of ordinary skill cannot determine from the teachings of *Kaiser* if the claimed cleaning fluid is non-caustic, whereas *Hakansson-1* teaches a cleaning fluid which is caustic.  Thus, in my opinion, *Kaiser* adds nothing to *Hakansson-1* with respect to the cleaning fluid and microbe limitations.  The fact that *Hakansson-1* also discloses a parts cleaning apparatus, while *Kaiser* does not renders *Kaiser* cumulative of *Hakansson-1*.

### D.   NON-CUMULATIVE ANALYSIS OF REMAINING NINE REFERENCES FROM PARAGRAPHS 47 AND 49.

Starting with the 24 original references from Paragraphs 47, 48, and 49, and taking into account the 14 "Out" references from Table 1 above and further taking into account the

discussion of *Hakansson-2* above, there remain nine references from Paragraphs 47 and 49 of Walter's counterclaim, for which an interrogatory response was given in December of 2007.  These references are marked under the "In" column in Table 1 above. Of these nine "In" references, only *Tuttle* and *Minkin '128* are dealt with by Professor Adriaens in his report, and that only in the context of an invalidity analysis.  In other words, nowhere in his report does Professor Adriaens indicate that he performed a non-cumulative analysis of *Tuttle* or *Minkin '128* vis-à-vis the information already of record before the Examiner.

*Tuttle* appears as a reference on the face of the '491 Patent, '110 Patent, '125 Patent, and '835 Patent.  Similarly, *Minkin* is cited on the face of the '110 Patent, the '491 Patent, the '835 Patent, and the '125 Patent.  Consequently, *Tuttle* and *Minkin* were only asserted as an inequitable conduct reference by Walter against the '226 Patent.

In view of the fact that neither Professor Adriaens nor Mr. Manbeck offered any analysis, opinion, or conclusion with respect to the other seven "In" references on Table 1, counsel for ChemFree has suggested to me that Walter may have abandoned its contentions of inequitable conduct over these references. In view of this possibility, my analysis and discussion of these additional seven references will be somewhat abbreviated.  In any event, however, in my opinion, all nine of the "In"

references from Table 1, are all less relevant than or at least cumulative of *Hakansson-1*, *Doyscher*, and/or *Guinn* and/or the *SeaWash-7* reference listed as an "Other Publication" on the face of the '110, '491, '835, and '125 patents, as summarized below.

### 1.   U.S. Patent No. 5,322,078 to *Tuttle*

*Tuttle* is cited on the face of the '491 Patent, '110 Patent, '125 Patent, and '835 Patent.  Consequently, *Tuttle* is only asserted as an inequitable conduct reference by Walter against the '226 Patent.  Geoff Tuttle discloses an aqueous parts washing apparatus.  The apparatus cleans less based on the very high level of physical force which can be brought to bear on part surfaces through impact with moving fluid, and more by contact with detergent solutions.  In the time this invention was developed, cleaning fluids were more based on corrosive attack of high-pH caustic detergent solutions on metal surfaces.

Tuttle fails to disclose, among other things the use of bioremediation microorganisms in a parts washer.  It is less relevant than or rendered cumulative by *Lashmett* and *Hakansson-1*.

### 2.   U.S. Patent No. 5,427,128 to *Minkin*

*Minkin* is cited on the face of the '110 Patent, the '491 Patent, the '835 Patent, and the '125 Patent.  Consequently, *Minkin* is only asserted as an inequitable conduct reference against the '226 Patent.  *Minkin* discloses a solution to a problem

that is not addressed in ChemFree's '226 Patent.  The problem addressed by *Minkin* is applicable to high-pressure spray (non-immersion) parts washers.

*Minkin's* solution involves a temperature/ pressure equalization system for use on a high-temperature/high- pressure spray, closed cabinet, parts washer.  It does not teach or disclose bioremediation in a parts washer.  It does not teach anything relative to the claims of the '226 Patent that was not already before the Examiner in *Hakansson-1*.

### 3.   DE 2449056 – NANNINGA, ONNO G.

Nanninga, in German '056, discloses a *circa* 1976 parts washer apparatus for cleaning of automotive parts.  It has both a basin for spray cleaning with or without application of force with a brush, and a tank below for immersion cleaning (as does *Tuttle*).  A major advantage claimed is that the apparatus is mobile and can be moved to where the work is in a large factory.  Control of spills and emissions to the environment is stressed.

It does not teach bioremediation in a parts washer.  It is less relevant than *Hakansson-1* and is cumulative of *Doyscher*.

### 4.   EPO 116 151 (also U.S. Patent 4,609,488) to *Geke*

*Geke* is cited on the face the '110, '835, and '125 Patents and is asserted by Walter only against the '491 and '226 Patents.  *Geke*, in 1986, discloses a process using cationic

surfactants.   These materials dissolve in water to produce positive-charged specie (cat-ions).   The process is for regenerating degreasing solutions contaminated with emulsified oils by adding chemical constituents to break the emulsions, such that contaminants that precipitate can be <u>mechanically separated</u> from the cleaning fluid.   The process only works with emulsions of oils made with anionic emulsifiers (those which dissolve in water to produce negative specie [anions]).

*Geke* fails to disclose, among other things, a parts washer apparatus, and/or the use of bioremediation microorganisms in a parts washer.   It is rendered cumulative by *Hakansson-1 and Guinn*.

### 5.   <u>JP 7-75795 – Kondo, Toshihito</u>.

*JP'795* discloses a method and an apparatus for treating waste water that contains grease.   It uses a rotary disk filter bed on which a biological membrane has been attached.   A film of microorganisms is fixed to the membrane by acclimatization.   An aqueous nitrogen-bearing mixture is washed over the membrane which is exposed in air.   The apparatus consists of tens of disks stacked in an array which is allowed to have waste water flow over half of its surface.   The other half is exposed to air.

*JP'795* does not teach a parts washer, a cleaning fluid, or cleaning contaminants such as grease from soiled parts.   It is

less relevant than or rendered cumulative by *Hakansson-1* and/or *Guinn*.

### 6.   U.S. Patent No. 5,246,023 to *Breunsbach* and U.S. Patent No. 4,784,169 to *Striedieck*

*Breunsbach* and *Striedieck* are cited on the face of the '110, '491, '835 and '125 Patents and are asserted by Walter only against the '226 Patent.  Both references disclose methods and apparatus for cleaning printed circuit boards (PCBs).  The type of apparatus claimed is something known in the art as a "dishwasher."  It is a low-pressure spray apparatus which attempts to apply a high volume of both wash and rinse (separately) fluids to parts with a low tolerance for residue. Cleaning agents used in these machines are caustic so that they can react with and remove acidic solid flux materials from PCBs.

They both fail to disclose, among other things, the use of bioremediation microorganisms in a parts washer.  Neither reference teaches anything relative to the claims of the '226 Patent that was not already before the Examiner in *Hakansson-1*. Thus, they are both cumulative of *Hakansson-1*.

### 7.   U.S. Patent No. 5,133,893 to *Thom*

*Thom* was cited by the Examiner in an Office Action during prosecution of the '898 Application, which is in the priority chain leading to the '226 Patent.  According to Walter's interrogatory responses, *Thom* is asserted against the '110, '491,

'835, and '125 Patents, but not the '226 Patent. *Thom* discloses a laundry detergent. It is based on inorganic (non-biodegradable) salts. The claims speak to the specific builder components (aids to corrosion control, water softening, and solubility control) – including pentasodium tripolyphosphate and sodium carbonate. It would not be understood by someone of ordinary skill in the parts washer art as teaching a non-caustic cleaning fluid, because it uses sodium silicate as a buffer compound.

It does not teach a liquid cleaning fluid for removing hydrocarbon contaminants from parts. It does not teach the use of microorganisms to bioremediate hydrocarbon contaminants, nor does it teach a cleaning fluid that hosts microorganisms. It does not teach a parts washing apparatus of any kind. It is considerably less relevant than *Hakansson-1*, *Guinn*, and *SeaWash-7*.

### 8.    U.S. Patent No. 3,813,342 to *Cooperman*

*Cooperman* was cited by the Examiner in the same Office Action as *Thom* during prosecution of the '898 Application. According to Walter's interrogatory responses, *Cooperman* is asserted against the '110, '491, '835, and '125 Patents, but not the '226 Patent. *Cooperman* discloses a cleaning fluid for removing ink from printing presses. *Cooperman's* compositions

include numerous materials, including enzymes.  However, in my opinion, none of *Cooperman's* compositions are biodegradable.

Printing inks are not hydrocarbons, nor often hydrocarbon-based.  *Cooperman's* compositions contain solvents such as ethylene dichloride, dioxane, and tetrahydrofuran, which are toxic to microorganisms.  Printing inks, depending upon the type, cannot be well-cleaned by aqueous, surfactant-based cleaning fluids – such as those in the patents of ChemFree.  Hence, *Cooperman* does not even teach a cleaning fluid for removing hydrocarbon contaminants from parts.  Moreover, *Cooperman* does not teach a parts washing apparatus of any kind, nor does it teach the use of microorganisms to bioremediate hydrocarbon contaminants.  It does not teach a cleaning fluid as a host environment for microorganisms.

In my opinion, *Cooperman* has absolutely no relevance to the claims of ChemFree's invention in the '491, '110, '835, and '125 Patents.  It is certainly less relevant than and most certainly cumulative of *Hakansson-1* and *Guinn,* and *SeaWash-7.*

### IX.  <u>OPINIONS AND CONCLUSIONS.</u>

**A.   OBVIOUSNESS.**

**1.   The "Art" is Parts Washing.**

The correct field of "art" is parts washing not "Environmental Sciences."  Professor Adriaens' person of

ordinary skill is in the wrong technological field relative to the subject invention.

### 2.  Graham Factor No. 1 - Scope and Content of the Prior Art.

For purposes of this litigation, the scope and content of the prior art should <u>include</u> all of the references cited in Professor Adriaens' report based on the subject matter contained in the references, <u>however</u>, the scope and content of the prior should <u>exclude</u>: (i) *Sims*; (ii) Lashmett and (iii) *Minkin* based on ChemFree's date of invention which predates these three references.

### 3.  Graham Factor No. 2 - Level of Ordinary Skill in the Art.

The pertinent field of endeavor is parts washing.  The ordinary practitioner in this industry has no more than a Bachelors Degree in a technical field with no more than about one year of Chemistry and/or Biology college level class work, and from one-half to three years practical experience in the parts washing industry.  The person of ordinary skill does <u>not</u> have specialized training in Environmental Sciences, waste water treatment, or bioremediation technology.

### 4.  Graham Factor No. 3 - Differences Between the Prior Art and the Claimed Invention.

The prior art does not disclose the use of a biodegradable, non-toxic, non-caustic, non-flammable oil dispersant and

degreaser fluid in combination with a parts washer apparatus that continuously recycles its cleaning fluid.  Professor Adriaens' 11 disparate references are not combinable to achieve ChemFree's patented invention.  Professor Adriaens' obviousness theory, in general, has been rejected by the patent office and his primary references in support of that theory have already been considered and rejected by the patent office for the propositions advanced by Professor Adriaens.

     **5.**   <u>**Graham Factor No. 4**</u> **- Secondary Considerations of Non-Obviousness.**

There appears to be substantial evidence to support the following secondary considerations of non-obviousness:

- Initial skepticism in the industry followed by acceptance;

- Unexpected Results;

- Copying;

- Laudatory Statements of advantages of the invention by the infringer;

- Attempt to Patent the Same Invention by the Infringer;

- Awards and industry acclaim; and

- Commercial success of the patented invention.

In my opinion, the evidence in support of the secondary considerations of initial skepticism and unexpected results should be given considerable weight in determining the non-obviousness issue in this case.

### 6.   Ultimate Conclusion – Not Obvious.

In my opinion, Professor Adriaens' fails to make out a persuasive case for the proposition that ChemFree's invention would have been obvious to someone of ordinary skill in the art of parts washing in 1994.

### B.   ANTICIPATION.

Professor Adriaens' report appears to be silent on the issue of anticipation.  In any event, there is nothing in his report to support an assertion that each and every limitation of any one asserted claim can be found in any single reference.

### C.   ENABLEMENT.

It is my opinion that ChemFree's patents are fully enabled. Professor Adriaens' opinions are, in my opinion, unsupported and conclusory, and fail to take into account that the person of ordinary skill may be expected to conduct some experimentation to practice the invention, as long as the experimentation is not undue.

### X.   INEQUITABLE CONDUCT.

The *Kaiser* reference is cumulative of prior art before the examiner, including *Hakansson-1* and *Guinn*.  Therefore, *Kaiser* is not material to patentability.  *Tuttle* is cumulative of *Hakansson-1* and therefore, not material.  *Minkin* is cumulative of *Hakansson-1* and, therefore, not material.

The other references asserted in Walter's interrogatory responses number 16 and 17, which are not addressed as invalidity references in Professor Adriaens' report are all cumulative of either *Hakansson-1*, *Guinn*, *Doyscher*, or *SeaWash-7*.

### XI.   ULTIMATE OPINION AND CONCLUSION.

From my review of the prior art references asserted by Professor Adriaens in his expert report, it is my opinion that the asserted claims of ChemFree's Patents are clearly distinguishable and an advance on the prior art and are not obvious combinations of available information, hence the basis of a valid patent.

**SWORN DECLARATION:**  I solemnly swear under penalty of perjury that the facts in the foregoing report, which are represented as based on my own personal knowledge, are true and accurate and that the foregoing report constitutes by opinion and conclusion on the matters related herein the same as if offered as testimony at trial.  I am prepared to testify in Court to the foregoing upon the trial of this action.

Respectfully submitted, this 31st day of March, 2008.


/s/ *John B. Durkee*
_____

John B. Durkee, PhD, P.E.
[original signature of file w/ChemFree's counsel]

- 244 -