IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHEMFREE CORPORATION,

    Plaintiff,

      v.

J. WALTER, INC., and
J. WALTER COMPANY, LTD.,

    Defendants.

CIVIL CASE NO.
1:04-CV-3711-JTC

## O R D E R

Plaintiff initiated this patent infringement action, which is presently before the Court on cross motions for partial summary judgment regarding Defendants' 35 U.S.C. § 112 enablement defense.  Defendants argue that the asserted claims of the patents-in-suit do not enable a person of ordinary skill in the art to create the patented device.  [#490]  Plaintiff argues that Defendants fail to create a genuine issue of fact concerning their enablement defense.[1]  [#469]  Because Defendants failed to demonstrate that genuine issues of material fact remain concerning their enablement defense, the Court **GRANTS** Plaintiff's motion [#469] and **DENIES** Defendants' motion [#490].

---

[1] The Court struck the portions of Plaintiff's motion for summary judgment directed to any issues other than enablement.  (See Order, Feb. 13, 2009.)

# I.   Background[2]

### A.   Summary of the Invention

Plaintiff ChemFree Corporation is the co-owner of several patents directed to "environmentally friendly, bioremediation parts washing systems." The four[3] patents-in-suit detail systems and methods for cleaning oil and grease from machine parts in an environmentally friendly manner. The patents-in-suit are U.S. Patent No. 6,019,110 ("the '110 patent"), U.S. Patent No. 6,374,835 ("the '835 patent), U.S. Patent No. 6,440,226 ("the '226 patent"), and U.S. Patent No. 6,451,125 ("the '125 patent").

Plaintiff ChemFree filed the parent application on September 30, 1994, from which each of the patents-in-suit derived. As illustrated in the figure below, ChemFree's invention has three basic components.

---

[2] Because the Court grants Plaintiff's motion for summary judgment and denies Defendants' motion, the Court views the facts in the light most favorable to Defendants and draws all reasonable inferences in their favor. United States v. Four Parcels, 941 F.2d 1428, 1437 (11th Cir. 1991).

[3] Plaintiff originally asserted claims from five different patents. However, Plaintiff recently withdrew the claims from U.S. Patent No. 6,074,491. (See Plaintiff's Partial Withdrawal of Infringement Contentions [#525].)



**FIG. 3**

The first component is a biodegradable, non-caustic, non-toxic, non-flammable, oil-dispersant/degreasing fluid.  The second component involves the use of microorganisms in the fluid that break down and remove grease and oil.  The final component is the physical structure and associated mechanical and electro-mechanical assemblies used to circulate the cleaning solution and contain it while it breaks down the oil and grease.

3

B.    The Asserted Claims

1.    *Claims at Issue*

Plaintiff contends that Defendants' products infringe the following

claims of the patents-in-suit:

| Patent | Asserted Claims | |
|---|---|---|
| | **Independent** | **Dependent** |
| **'110 Patent** | 1 | 4, 5, 6, 7, and 8 |
| **'125 Patent** | *** | 4, 5, 7, 16, 17, 18, 19, and 21 |
| **'226 Patent** | 1 | 3 and 4 |
| **'835 Patent** | *** | 8, 10, 11, and 12 |

(See Plaintiff's Partial Withdrawal of Infringement Contentions.)  Although

Plaintiff did not assert any independent claims from the '125 and '835

patents, Plaintiff asserted dependent claims from those patents.  Thus, the

following claims are also at issue in this case:

| Patent | Non-asserted Claims at Issue |
|---|---|
| **'125 Patent** | 1, 6, and 12 |
| **'835 Patent** | 5 |

Rather than addressing each claim separately, Defendants broadly

argue that a person of ordinary skill in the art would not be able to determine

an appropriate cleaning fluid and microorganism combination without undue

experimentation.  An essential element of each asserted claim is an

acceptable microorganism/cleaning fluid combination.  As such, each of the

claims stand or fall together, and the Court will not conduct a claim by claim

analysis.  See Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1363, 1377 (Fed.

Cir. 1999) (affirming district court's decision not to conduct detailed claim by

claim analysis because the parties addressed the principal claim at issue and

the remaining claims "stand or fall together.").

>    2.    *Scope of the Relevant Claims*

The following claims of the patents-in-suit recite types of cleaning fluids

to use in the parts washers:

| Patent | Claim | Cleaning Fluids Claimed |
|---|---|---|
| '110 Patent | 1 | "a biodegradable, non-toxic, non-caustic, non-flammable oil dispersant cleaner and degreaser fluid" |
| '125 Patent | 1 | "a biodegradable, non-caustic, non-flammable, oil dispersant, cleaning and degreasing fluid" |
| '125 Patent | 6 | "a biodegradable, non-caustic, non-flammable, oil dispersant cleaning and degreasing fluid that is non-toxic to the microorganisms" |
| '125 Patent | 12 | "a biodegradable, non-caustic, non-flammable oil dispersant cleaning and degreasing fluid to clean the hydrocarbons from the part" |
| '226 Patent | 1 | "cleaning fluid" or "cleaning liquid" |

| '835 Patent | 5 | "a biodegradable, non-toxic, non-caustic, nonflammable, oil dispersant cleaning and degreasing fluid" which is "non-toxic to said microorganisms" |

Thus, the asserted claims cover all cleaning fluids that are biodegradable, non-caustic, nonflammable, oil dispersant and degreasing which are not toxic to the microorganisms contained in the fluid.

In addition, the relevant claims of the patents-in-suit recite the following types of microorganisms to use in the parts washers:

| Patent | Claim | Microorganisms Claimed |
|--------|-------|------------------------|
| '110 Patent | 1 | "microorganisms within the parts washer for biodegrading the hydrocarbons" which are "substantially sustained within and flowing with the fluid" |
| '125 Patent | 1 | "microorganisms to which the fluid is non-toxic" which can "biodegrade the hydrocarbons" |
| '125 Patent | 6 | "hydrocarbon biodegrading microorganisms" |
| '125 Patent | 12 | "microorganisms, to which the fluid is non-toxic, are disposed within the fluid for biodegrading hydrocarbons associated with the part" |
| '226 Patent | 1 | "the step of removing the organic matter from the fluid comprises biologically degrading the organic matter" |

| '835 Patent | 5 | "microorganisms within said parts washer . . . at least partially flowing with and substantially sustained within said fluid . . . whereby the microorganisms biodegrade the hydrocarbons while retained within said tank" |
| --- | --- | --- |

Thus, the scope of the asserted claims cover all microorganisms which can biodegrade hydrocarbons and flow with the cleaning fluid.

    C.    <u>Disclosures in the Specifications</u>

Courts consider the amount of guidance provided in the specification and the presence or absence of working examples in determining whether making the patented invention would require undue experimentation.  <u>In re Wands</u>, 858 F.2d 731, 737 (Fed. Cir. 1988).  The patent specifications provide the following guidance with respect to microorganisms and cleaning fluids.

    *1.    Cleaning Fluid Disclosures*

The relevant portions of the specifications in the '110, '125, '226, and '835 patents give the following guidance as to what type of cleaning fluid to use in the patented invention:

- The cleaning fluid must be "compatible with (i.e., is non-toxic to) the microorganisms such that the microorganisms are capable of living within the cleaning fluid." <u>See</u>, <u>e.g.</u>, '835 patent, col. 5, ll. 66 – col. 6, ll. 2.

- "An acceptable cleaning fluid . . . is a mixture of pH neutral emulsifiers and surfactants containing no volatile organic compounds, phosphates, formaldehyde, biocides, or other toxic materials." <u>See</u>, <u>e.g.</u>, '835 patent, col. 6, ll. 4-8.

7

- "The emulsifier and surfactants are blended in liquid form to produce a biodegradable, non-toxic, non-caustic, non-flammable oil dispersant cleaner and degreaser." <u>See</u>, <u>e.g.</u>, '835 patent, col. 6, ll. 8-11.

- The cleaning fluid should contain "no known carcinogens, no OSHA . . . or DOT . . . regulated chemicals, no ingredients requiring SARA . . . Title III reporting, no RCRA . . . hazardous waste chemicals, and no items on the CERCLA . . . hazardous substance list." <u>See</u>, <u>e.g.</u>, '835 patent, col. 6, ll. 12-23.

- The cleaning fluid should be a "freely flowing liquid with a specific gravity of 1.083, a slight pleasant odor, no flash point, a boiling point of 210° Fahrenheit, a pH of approximately seven, and which is infinitely soluble in water." <u>See</u>, <u>e.g.</u>, '835 patent, col. 6, ll. 24-27.

The specifications then state that "an acceptable example of the cleaning fluid is available from Warren Chemical Corporation of Robert, La., as part number SeaWash 7." '835 patent, col. 6, ll. 29-31. SeaWash 7 was the trade name for a cleaning solution that was commercially available at the time of the filing of the patent application. (Pl.'s Resp. to DSMF ¶¶ 31-32.) The patent specifications, however, do not disclose the chemical composition of SeaWash 7. (Defendants' Statement of Material Facts ("DSMF") ¶¶ 45, 54, 56; Pl.'s Resp. to DSMF ¶¶ 45, 54, 56.)

2.    *Microorganism Disclosures*

The specifications give the following guidance on what type of microorganisms to use in the patented parts washer:

8

- "The biological component is preferably in the form of microorganisms that biodegrade organic compounds such as . . . hydrocarbons, oils, greases, petroleum by-products, creolates, polychlorinated biphenols, and other carbon based compositions." See, e.g., '835 patent, col. 4, ll. 49-53.

- The microorganisms should "convert hydrocarbon compounds into elements of water, carbon dioxide, and other digestion products." See, e.g., '835 patent, col. 4, ll. 54-56.

- The microorganisms should also be "resistant to environmental shock and have metabolic versatility." See, e.g., '835 patent, col. 4, ll. 56-59.

- The microorganisms "are preferably nonpathogenic." See, e.g., '835 patent, col. 4, l. 60.

- Appropriate microorganisms include "those from the genera Bacillus, Pseudomonas, and Flavobacterium." See, e.g., '835 patent, col. 4, ll. 60-62.

- "Suitable species" within those genera "are well known and reported in the art." See, e.g., '835 patent, col. 4, ll. 62-63.

- The microorganisms should "range in size from approximately three to five microns." See, e.g., '835 patent, col. 4, ll. 64-66.

The specifications conclude that "an acceptable example of the microorganisms is available from the Louisiana Remediation Company, located in Motaire, La., as part number LRC-1." '835 patent, col. 5, ll. 19-22. LRC-1 was the trade name for a microorganism product that was commercially available at the time of the filing of the patent application. (Pl.'s Resp. to DSMF ¶¶ 31-32.) Again, however, the specifications do not

disclose what microorganisms were contained in LRC-1.  (DSMF ¶¶ 45, 54, 56; Pl.'s Resp. to DSMF ¶¶ 45, 54, 56.)

D.     Products Other than LRC-1 and SeaWash 7 Available in 1994

Because the specifications disclose only LRC-1 and SeaWash 7, and because the scope of the claims cover combinations other than LRC-1 and SeaWash7, the availability of other microorganism and surfactant products in 1994 is relevant to the issue of enablement.

1.     Other Cleaning Fluids Available in 1994

According to one of the inventors of the parts washer, the inventors obtained cleaning fluids to test in the parts washers by searching through the Thomas Register.[4]  (McNally Decl. ¶ 52.)  Defendants offer no evidence to challenge the commercial availability of biodegradable, pH-neutral, oil dispersant and degreaser cleaning fluids other than SeaWash 7 at the time of the filing of the parent application.  (Plaintiff's Statement of Material Facts ("PSMF") ¶ 80; Defs.' Resp. to PSMF ¶ 80.)

Moreover, Defendants' expert acknowledged that persons who needed a cleaning fluid for this invention would be more inclined to buy a commercially

_____

[4] The Thomas Register was an industrial supply catalog that was reasonably accessible to persons of ordinary skill in the art in 1994 and contained information on cleaning fluids, bioremediation microbes, and other parts washer components. (PSMF ¶ 26; Defs.' Resp. to PSMF ¶ 26.)

available fluid rather than formulate one themselves.  (Adriaens Dep. 353:10-355:1, Jan. 28, 2009.)  He also acknowledged that, in 1994, "a number of" biodegradable, pH neutral, non-flammable surfactants were available and a person of ordinary skill in the art could find a cleaning fluid to use in the parts washers by looking in a catalog.  (Id. 353:10-357:18, 359:16-361:23.)

2.     *Other Microbial Products Available in 1994*

By the early 1990s, approximately 50 to 100 distributors in North America sold microbial cocktails for use in bioremediation applications. (PSMF ¶¶ 109, 112; Defs.' Resp. to PSMF ¶¶ 109, 112.)  Such products could have been found by consulting the Thomas Register.  (PSMF ¶ 26; Defs.' Resp. to PSMF ¶ 26.)  Defendants offer no evidence to refute Plaintiff's position that microbial products other than LRC-1 were commercially available at the time of the invention through the Thomas Register.  (PSMF ¶ 79; Defs.' Resp. to PSMF ¶ 79.)

Moreover, Plaintiff's expert testified that a person who was looking for suitable microorganisms to use in the invention would not need to know the exact species or strain of microorganism to use.  (Brickell Dep. 202:1-206:7.) Rather, a person of ordinary skill in the art would call a microorganism vendor, explain what he or she was trying to do, and the vendor could then suggest products to use in the invention, which were typically multi-strain

11

products.  (Id.)

Defendants' expert admitted that multiple multi-strain, hydrocarbon-biodegrading microbial products were on the market in 1994 and multiple vendors sold those products.  (Adriaens Dep. 403:4-407:8, Jan. 28, 2009.)  A person who needed to find a microbial product could locate vendors in available catalogs and consult a sales representative about the microbial products available.  (Id.)  The sales representative would provide product literature that could describe the microbial product in more detail.  (Id.)

 E. State of the Art in 1994

  1. *State of the Art*

Biological processes have been in common use since the early 1900s to treat degradable wastes.  (PSMF ¶ 102; Defs.' Resp. to PSMF ¶ 102.) However, at the time Plaintiff ChemFree filed its patent application, no "bioremediation parts washing industry" existed in the United States.  (PSMF ¶ 4; Defs.' Resp. to PSMF ¶ 4.)

Most of the problems encountered in the parts washing and environmental engineering industries in 1994 related to complying with the requirements of the Montreal Protocol.  (See Brickell Report [#421] at 32; Adriaens Report [#465] at 33.)  Practitioners needed to eliminate ozone depleting chemicals by finding acceptable substitutes for those chemicals and

implementing financially acceptable means for disposal of waste materials.
(Id.)  A specific problem in the parts washing prior art was the need to
periodically have a waste disposal company come and retrieve the used and
contaminated cleaning fluid.  (PSMF ¶ 139; Defs.' Resp. to PSMF ¶ 139.)  The
patented invention sought to overcome these problems by using
bioremediating microorganisms to extend the useful life of a given cleaning
fluid and reduce or eliminate the need to dispose of toxic chemicals.

### 2. Scope and Content of the Prior Art

Both parties' experts agree that there were numerous written materials
available in 1994 which described tests and methods to maintain
bioremediating systems, generally.  Plaintiff's expert identified more than 25
patents, treatises, and professional journal articles in the field of
environmental sciences and engineering which would have been readily
available to the ordinary practitioner as of the filing date of ChemFree's
patent application.  (PSMF ¶ 25; Defs.' Resp. to PSMF ¶ 25; Brickell Report
[#421] at 6-8, 45.)

In explaining the level of ordinary skill in the art, Defendants' expert
testified that "most developers of parts washers [in 1994], or bioremediating
parts washers, were motivated by a lot of the information that was available
out of the bioremediation literature and the ability of microorganisms to

degrade hydrocarbons . . . ."  (Adriaens Dep. 52:7-13, May 19, 2008.)  He stated that, prior to 1994, the controls and tests used to maintain biological wastewater systems were "clearly spelled out in textbooks on environmental microbiology, environmental engineering science, biological process engineering, and wastewater engineering, including those references cited by [Plaintiff's expert]."  (Adriaens Report [#465] at 14-15.)

In addition, the parties do not dispute that Hakansson-1, a European patent application, disclosed an operable combination of microorganisms and cleaning fluids.[5]  (Defs.' Resp. to PSMF ¶ 134.)  Hakansson-1 taught that the proper concentration for surfactant-based cleaning fluids was 2-5% surfactant by weight for normally soiled objects and 5-10% surfactant by weight for heavily soiled objects.  Hakansson-1, page 3, lines 12-14.  (See also PSMF ¶ 67; Defs.' Resp. to PSMF ¶ 67.)  Hakansson-1 also disclosed that, by keeping the hydrocarbon content above 50 mg/liter and keeping the tenside (cleaner) content below 15 percent by weight, "it is ensured that the microorganisms will substantially degrade the organic contaminants present under all conditions and that the tensides are practically unaffected and regenerated

---

[5] Although Defendants contend Hakansson-1 was not well known in the art, Hakansson-1 was disclosed in the parent application (See Fifth Supplemental Disclosure Statement in Patent Application 08/315,902) and it was listed on the face of the '110 and '226 patents.

and can be reused."  Hakansson-1, page 2, lines 54-59.  (See also PSMF ¶ 75;

Defs.' Resp. to PSMF ¶ 75.)

    F.    <u>Level of Ordinary Skill in the Art</u>

The parties agree that a person of ordinary skill in the art of parts

washing could consult a person of ordinary skill in the art of environmental

bioremediation in order to make and use the patented invention.  (Defs.' Resp.

to Pl.'s Mot. Summ. J. at 7.)  <u>See</u> <u>In re Naquin</u>, 398 F.2d 863, 866 (C.C.P.A.

1968) ("The specification need describe the invention only in such detail as to

enable a person skilled in the most relevant art to make and use it.  When an

invention, in its different aspects, involves distinct arts, that specification is

adequate which enables the adepts of each art, those who have the best

chance of being enabled, to carry out the aspect proper to their specialty.");

<u>Enzo Biochem</u>, 188 F.3d at 1373-74 (acknowledging the "well-established

rule" set forth in <u>In re Naquin</u>).

The parties agree as to the level of ordinary skill of persons in the parts

washing and environmental engineering arts.  A person of ordinary skill in

the field of non-bioremediating parts washing on the date of invention had no

more than a Bachelors Degree, including no more than one year of college

level classes in chemistry and/or biology, ½ to 3 years of practical experience

in working with parts washing technology, and little or no formal education

in the area of bioremediation.  (PSMF ¶ 9; Defs.' Resp. to PSMF ¶ 9.)  A

person of ordinary skill in the art of environmental sciences and engineering

on the date of invention had no more than a Bachelors Degree with

approximately two to three years of practical experience.  (PSMF ¶ 10; Defs.'

Resp. to PSMF ¶ 10.)

 G. Amount of Experimentation Required to Practice the Invention

 The parties do not dispute that persons of ordinary skill in the arts of

environmental engineering and parts washing would have to conduct a

certain amount of experimentation to practice the patented invention with

products other than LRC-1 and SeaWash 7.  (DSMF ¶¶ 25, 86; Pl.'s Resp. to

DSMF ¶¶ 25, 86.)  The relevant question is whether it would require "undue

experimentation" to practice the patented invention.  The undisputed facts

concerning the amount of experimentation necessary to practice the invention

are as follows.

 *1. Tests Employed by Inventors*[6]

 The inventors employed the following tests and methodology to

determine operable combinations of microbes and cleaning fluids.  The

inventors contend that they did not have extensive training or experience in

---

 [6] See Pharm. Res., Inc. v. Roxane Labs., 253 F. App'x 26, 31 n.3 (Fed. Cir. 2007) (noting that evidence concerning experiments conducted by the inventors prior to filing the patent application is relevant to the enablement consideration).

the field of environmental microbiology prior to inventing the parts washer.
(See, e.g., McNally Decl. ¶ 10.)

The inventors first located vendors of microbial products and cleaning
fluids through the Thomas Register, which was available at the local library.
(McNally Decl. ¶¶ 10, 45; PSMF ¶ 108; Defs.' Resp. to PSMF ¶ 108.)  They
were able to develop the invention using brand-name, commercially available
microbial products sold in the environmental clean-up and waste water
treatment industries without knowing or needing to know the taxonomic
classification of the particular microbes used in the products.  (PSMF ¶ 121;
Defs.' Resp. to PSMF ¶ 121.)

Next, they selected a surfactant, determined whether it would remove
contamination from dirty parts, and diluted the surfactant using a surfactant
to water ratio of about 5 to 10 %.  They then used a simple agar plating
method – which involves incubating agar plated solutions and visually
observing microbial growth – to determine whether the cleaning fluid was
toxic to the microbes.  After confirming microbial viability in the fluid, the
inventors used standard oil and grease tests – which involve periodically
measuring the amount of oil and grease after adding microbes to
contaminated fluid – to determine whether the resulting combinations would
be operable.  (See McNally Decl. ¶¶ 50, 58-61, 73-75; Whiteman Decl. ¶¶ 23-

17

35; Marks Decl. ¶¶ 9-12.)

If the combinations passed the agar plating and oil and grease tests, which took approximately two to three weeks, the inventors conducted tests to simulate actual field conditions.  (See McNally Decl. ¶ 76.)  Those tests involved filling several parts washers with cleaning fluid, adding microbes to some of the tanks and maintaining others as controls, adding hydrocarbons at a controlled rate, and periodically sending samples to a lab to test the fats, oils, and greases (FOG) concentration.  (Id.)  These tests continued for 2 to 5 weeks.  (Id.)  In conducting these tests, the combinations of microbes and cleaning fluids tended to be operable 75 to 80% of the time.  (McNally Decl. ¶¶ 73, 82.)

### 2. *Plaintiff's Expert's Opinion*

In his expert report, Plaintiff's expert describes certain methods that a person of ordinary skill in the art could employ to identify cleaning fluids and microorganisms other than LRC-1 and SeaWash 7 to use in the patented invention.  The methods described by Plaintiff's expert are very similar to the tests conducted by the inventors.  The Court accepts Defendants interpretation of Plaintiff's expert's methods (see DSMF ¶ 26), which are as

18

follows.[7]

To find acceptable microbial products, a person would identify vendors of the products in the Thomas Register, "identify potential [microorganism] products that would meet the requirements of the application," and obtain samples of those products from the vendors.  (Brickell Report at 36-37, 50-51.) Similarly, to find acceptable cleaning fluids, the person would identify vendors in the Thomas Register, "interact with the vendor's technical representatives to determine if their products were likely to meet the requirements set forth in the patents," and obtain samples for testing.  (Id. at 48.)  The person would also need to determine "the concentrations [of cleaning solutions] required to provide adequate parts cleaning."  (Id. at 51.)

Next, the person would "prepare a solution of microorganisms with a hydrocarbon food source in water," "split the solution into two parts and add the cleaning solution to one of the parts," extract "samples from each part over time," and "hav[e] the samples analyzed for microbial activity."  (Id. at 51-52.)  A comparison of the results from the two parts of the solution would indicate whether the microorganisms can survive in the presence of the cleaning fluid and whether to retain the cleaner/microbe combination for

_____

[7] Because the Court views most favorable to Defendants, the Court accepts as true Defendants' interpretation of Dr. Brickell's proposed tests.

further testing.  (Id.)

The person would then "develop a pilot-test program," wherein the person would run "[a]ll the parts washers . . . simultaneously with a periodic addition of hydrocarbons to simulate operational usage" and take "samples . . . over time on a daily basis."  (Id. at 54.)  The person would send the samples "to a laboratory to be analyzed for hydrocarbon content" by "[a]nalyzing for fats, oils, and greases (FOG)."  (Id.)  The information obtained from the lab would indicate "whether the cleaning solution-microbial product 'works'" or "if further testing [is] required to optimize cleaning solution and microbial concentrations."  (Id. at 54-55.)

### 3. Defendants' Expert's Opinions

Defendants' expert contends that many of the tests proposed by the inventors and Plaintiff's expert are outside the scope of knowledge of a person of ordinary skill in the art; however, he made several admissions to the contrary during his deposition.  For example, he acknowledged that, if a person of ordinary skill in the art was given the benefit of the collective wisdom, reasoning, teaching, and disclosures of the prior art available at the time, that person would be able to find an operable combination of microorganisms and cleaning fluids without undue experimentation. (Adriaens Dep. 202:20-203:21, May, 19, 2008.)  He also admitted that a

20

person of ordinary skill in the art of environmental sciences would have known what tests to perform to determine whether proposed cleaning fluids were toxic to proposed microorganisms.  (Adriaens Dep. 416:15-425:12, Jan. 28, 2009.)

In addition, Defendants' expert stated that "[i]t is commonly accepted that there are multiple lines of either direct or indirect evidence that would indicate whether biodegradation is taking place in a given medium, under specified working conditions."  (PSMF ¶ 152; Defs.' Resp. to PSMF ¶ 152.) Those "lines of evidence" include: (1) measuring a decrease in the mass and concentration (mass/volume) of hydrocarbons over time; and (2) measuring an increase in the number of microbial cells as the hydrocarbon levels decrease. (Id.)  Thus, two of the tests proposed by Defendants' expert are similar to those that were conducted by the inventors.  See supra Section I.G.1.

Defendants' expert also agrees that it would be easy for a person of ordinary skill in the art of parts washing to visually determine whether a cleaning fluid was saturated with contaminants and no longer effective. (Adriaens Dep. 366:4-368:18, Jan. 28, 2009.)  In fact, he stated that "any kid can see when a cleaning fluid goes . . . flat, and when a part is no longer clean . . . ."  (Id. 367:1-4.)  Lastly, he conceded that, if a person is told what surfactant to use and what microorganism to use, that person would be

capable of determining a starting concentration of microbes with little experimentation.  (Adriaens Dep. 240:13-241:4, May 19, 2008.)

## II.    Legal Standards

###    A.    Summary Judgment Standard

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The substantive law applicable to the case determines which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  "The district court should 'resolve all reasonable doubts about the facts in favor of the non-movant,' . . . and draw 'all justifiable inferences . . . in his favor . . . .'"  Four Parcels, 941 F.2d at 1437.  The court may not weigh conflicting evidence nor make credibility determinations.  Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993), reh'g denied, 16 F.3d 1233 (1994) (en banc).

Because patents are presumed valid, Defendants bear the burden of establishing the invalidity of the claims at issue by clear and convincing evidence.  See 35 U.S.C. § 282; Apotex USA, Inc. v. Merck & Co., Inc., 254 F.3d 1031, 1036 (Fed. Cir. 2001).  Accordingly, Plaintiff may but is not required to support its motion for summary judgment with affidavits or other evidence negating Defendants' enablement defense.  Fitzpatrick v. City of

Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  Rather, because Defendants bear

the burden of proof at trial, Plaintiff need only point out that there is an

absence of evidence to support an essential element of Defendants'

enablement defense.  Id.  Defendants must then respond with sufficient

evidence to allow the trier of fact to find by clear and convincing evidence that

the asserted claims of the patents-in-suit fail to meet the elements of

enablement under 35 U.S.C. § 112.  Fed. R. Civ. P. 56(e); Hammer v. Slater,

20 F.3d 1137, 1141 (11th Cir. 1994) (citations omitted).

    B.    Enablement Standard

    35 U.S.C. § 112 provides that a patent specification must:

> contain a written description of the invention, and of the manner
> and process of making and using it, in such full, clear, concise,
> and exact terms as to enable any person skilled in the art to
> which it pertains, or with which it is most nearly connected, to
> make and use the same . . . .

35 U.S.C. § 112, ¶ 1.  The enabling requirements of 35 U.S.C. § 112 require

that a patent specification "enable one skilled in the pertinent art to make or

carry out the full scope of the claimed invention without undue

experimentation."  HERBERT F. SCHWARTZ & ROBERT J. GOLDMAN, PATENT

LAW AND PRACTICE § 4.II.C.2 (6th ed. 2008).  See also Auto. Techs. Int'l, Inc. v.

BMW of N. Am., Inc., 501 F.3d 1274, 1282 (Fed. Cir. 2007); AK Steel Corp. v.

Sollac and Ugine, 344 F.3d 1234, 1244 (Fed. Cir. 2003).  The specification

23

must be enabling at the time the patent application is filed.  PATENT LAW AND PRACTICE § 4.II.C.2.  See also  Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co., 228 F.3d 1338, 1345 (Fed. Cir. 2000).

A specification that requires some experimentation to make or carry out the patented invention can still be enabling, as long as the amount of experimentation necessary is not "undue."  See PATENT LAW AND PRACTICE § 4.II.C.2.  See also In re Wands, 858 F.2d at 736-37 (noting that "[e]nablement is not precluded by the necessity for *some* experimentation . . .").  However, "[a] specification is not enabling if it requires a level of experimentation that is unreasonable under the circumstances."  PATENT LAW AND PRACTICE § 4.II.C.2.

Federal Circuit authority has established several factors to consider in determining whether making the patented invention would require undue experimentation, including: "(1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the presence or absence of working examples; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the art; and (8) the breadth of the claims."  In re Wands, 858 F.2d at 737.  Courts need not consider all of the Wands factors, however, which are illustrative rather than mandatory.  Amgem, Inc. v. Chugai Pharm.

Co., Ltd., 927 F.2d 1200, 1213 (Fed. Cir. 1991).

## III.   Discussion

Defendants argue that the asserted claims of the patents-in-suit are invalid because they fail to meet the enabling requirements of 35 U.S.C. § 112.  However, the undisputed evidence in this case indicates that it would not have required undue experimentation for a person of ordinary skill in the art to make and use the patented parts washer in 1994.  Although the specifications do not describe the process in detail, one of ordinary skill in the art would have either known the procedures to follow or been able to conveniently acquire the necessary information.

### A.   Nature of the Invention

The enabling requirements of § 112 require that a person of ordinary skill be able to practice the patented invention without undue experimentation.  In general terms, the patents-in-suit detail systems for cleaning oil and grease from machine parts in an environmentally friendly manner.  The patented parts washers combine hydrocarbon-degrading microorganisms with biodegradable, non-caustic, nonflammable, oil dispersant and degreasing cleaning fluids, which are not toxic to the microorganisms.  By using microorganisms to break down the oil and grease removed from the parts, the patented invention seeks to extend the useful life

25

of a given cleaning fluid and reduce or eliminate the need to dispose of contaminated cleaning fluids.

   B.   Level of Ordinary Skill in the Art

   The first issue in reviewing enablement is determining the level of ordinary skill in the art.  Is it that of a parts washing practitioner?  Or does it also require, as part of a team, an environmental sciences practitioner?

   The parties agree that a person of ordinary skill in the field of parts washing on the date of invention had no more than a Bachelors Degree, including no more than one year of college level classes in chemistry and/or biology, ½ to 3 years of practical experience in working with parts washing technology, and little or no formal education in the area of bioremediation. See also supra Section I.F.  The parties also agree that, if necessary, a person of ordinary skill in the parts washing industry could consult a person of ordinary skill in the art of environmental sciences and engineering, who had no more than a Bachelors Degree with approximately two to three years of practical experience.[8]

   Thus, a person of ordinary skill in the art is an experienced parts

_____

   [8] Although a person of ordinary skill in parts washing could have consulted an environmental engineer, it likely would not have been necessary to do so.  For example, the inventors were not skilled in bioremediation.  In addition, much of the information necessary to practice the invention could have been obtained from vendors who sold products that were readily available in 1994.

26

washer with a college education and some knowledge of chemistry and/or
biology.  However, this person could consult an experienced environmental
engineer, if necessary, in attempting to make and practice the patented
invention.

     C.    <u>Tests Necessary to Practice the Invention</u>

    Defendants argue that the patents do not adequately disclose
appropriate combinations of hydrocarbon degrading microorganisms and
surfactants which will sustain the microorganisms in the cleaning solution.
Defendants also argue that the patents do not disclose tests to arrive at an
appropriate combination without undue experimentation.

    The specifications disclose one appropriate combination (<u>see</u> <u>supra</u>
Section I.C.), but fail to provide instructions on how to determine other
appropriate combinations.  The testimony of the inventors and the admissions
of Defendants' expert, however, indicate that one of ordinary skill in the art
would have taken the following steps to create an operable combination of
cleaning fluids and microorganisms in 1994.  <u>See</u> <u>supra</u> Section I.G.

    The person would first locate vendors of microbial products and
cleaning fluids through an industrial supply catalog known as the Thomas
Register, which was readily available and known to persons of ordinary skill.
By providing the requirements set out in the specification and that LRC-1

27

and SeaWash 7 worked, the vendor would have been able to recommend brand name, commercially available, microorganisms and surfactants that could be used in the parts washer.  The vendor would also provide samples of the products and written information on those products.

Next, the person would determine whether the selected surfactant could remove contamination from dirty parts.  As admitted by Defendants' expert, any person can visually determine whether a cleaning fluid is actually cleaning the parts.

The person would then dilute the surfactant using a surfactant to water ratio of about 5 to 10 %, a ratio which was disclosed in Hakansson-1 and would have been known to persons of ordinary skill in the art of parts washing.  The person could have used a simple agar plating method – which involves incubating agar plated solutions and visually observing microbial growth – to determine whether the cleaning fluid was toxic to the microbes. Defendants' expert admitted that routine tests to determine microbial viability existed in 1994.  After confirming microbial viability, the person could have used standard oil and grease tests – which involve periodically measuring the amount of oil and grease after adding microbes to contaminated fluid – to determine whether the microorganisms were actually biodegrading the hydrocarbon contaminants.

If the combinations passed the agar plating and oil and grease tests, field tests could then verify that the combination extends the useful life of the cleaning fluid. The person would fill several parts washers with cleaning fluid, add microbes to some of the tanks and maintain others as controls, add hydrocarbons at a controlled rate, and periodically send samples to a lab to test the hydrocarbon concentration. The information obtained from the lab would indicate whether the tested microorganism/surfactant combination works or whether further testing is required to optimize the cleaning solution and microbial concentrations.

> D.   The Wands Factors Indicate that a Person of Ordinary Skill in the Art Could Accomplish the Above Tests Without "Undue" Experimentation

The evidence in this case, when considered pursuant to the <u>Wands</u> factors, indicates that it would not have required undue experimentation for a person of ordinary skill in the art to make and use the patented parts washer in 1994. Accordingly, Defendants failed to create a genuine issue of material fact concerning whether the patents meet the enabling requirements of § 112.

First, the experimentation necessary to practice the invention – as described above – would not have been complicated or unduly time-consuming. See supra Section III.C. Numerous microorganism and cleaning fluid products were readily available to persons of ordinary skill in the art at

29

that time.  The tests described by the inventors, Defendants' expert's proposed tests for confirming biodegradation, and Plaintiff's expert's proposed tests are very similar, require little or no scientific background, and are simple to conduct.  For example, although the inventors did not have extensive bioremediation experience, they were able to come up with operable combinations 75 to 80% of the time and their experiments took only a matter of weeks to conduct.

In addition, the level of ordinary skill in the art was high in 1994.  The parties agree that an experienced parts washer and an experienced environmental engineer could have combined their collective knowledge to practice the invention.  Given the fact that each person had several years of experience in his or her practical field in addition to formal education, the level of ordinary skill in the art was high at the time of the filing of the patent application, which weighs in favor of finding the patented invention enabled. In re Wands, 858 F.2d at 740.

Moreover, the patents include a working example.  The specifications disclose the combination of SeaWash 7 and LRC-1, and Defendants offer no evidence to demonstrate that the combination of LRC-1 and SeaWash 7 is not operable in the patented invention.  (PSMF ¶ 77; Defs.' Resp. to PSMF ¶ 77.)

Lastly, the prior art available in 1994 would have provided guidance to

persons attempting to make the parts washer. The parties' experts agree that there were numerous written materials available in 1994 which discussed using microorganisms to biodegrade wastes. See supra Section I.E.2. In addition, Hakansson-1 disclosed an operable combination of cleaning fluids and microorganisms, proper surfactant to water ratios, and methods for preventing surfactant degradation. Thus, even if combining parts washers with bioremediating microorganisms was somewhat unpredictable in 1994, the art of using microorganisms to biodegrade wastes was well-established and documented at that time.

In summary, the experimentation necessary to practice the invention in 1994 would not have been complicated or unduly time-consuming, the level of ordinary skill in the art was high at the time, the patents included a working example, and the art of using biodegrading microorganisms was well-established in 1994. Accordingly, the Wands factors indicate that the above tests to determine operable microorganism/surfactant combinations could be accomplished by persons of ordinary skill without "undue" experimentation.

E.   Defendants' Specific Arguments

Defendants point to several specific deficiencies in the patent specifications which Defendants contend render the invention not enabled. However, each argument fails to create a genuine issue of material fact for

31

trial.

First, Defendants argue that the "lag phase" of a potential microorganism product – which Defendants define as "how long it will take the inoculated microorganisms to adapt to a new environment and to being to grow and start degrading hydrocarbons" – would impact how a person of ordinary skill in the art would practice the invention. (Defs.' Resp. to Pl.'s Mot. Summ. J. at 9-10.) Defendants do not contend that lag phase renders the parts washer inoperative; rather, Defendants argue that lag phase creates an "additional consideration" for someone who is attempting to practice the patented invention. (Defs.' Resp. to PSMF ¶ 56.) While lag phase may create an "additional consideration," Defendants point to no evidence that lag phase would cause undue experimentation. Moreover, the inventors stated that they did not take into account or even know about "lag phase" when they were developing the invention. (McNally Decl. ¶ 48.) Defendants' lag phase argument fails to create a genuine issue of material fact.

Next, Defendants contend that the fluid in the parts washer will need to be "topped off" periodically to account for water that has evaporated from the invention. (Defs.' Resp. to Pl.'s Mot. Summ. J. at 10-12.) Defendants contend that, because only water evaporates, a person trying to practice the invention would not know what concentration of surfactant to use in the

replacement fluid to avoid increasing the surfactant ratio in the tank to levels which may be toxic to the microbes.  This argument is illogical: if only water evaporates, only water needs to be added.  Topping off with only water will keep the surfactant concentration the same.

Third, Defendants contend that, because the cleaning fluid must be biodegradable, a person attempting to practice the invention would not have known whether the microorganisms were biodegrading the cleaning fluid or the hydrocarbons.  (Defs.' Resp. to Pl.'s Mot. Summ. J. at 12-13.)  The parties do not dispute that hydrocarbon degrading microorganisms exhibit the characteristic of preferential degradation, which means that certain microorganisms prefer to degrade certain materials over others.  (PSMF ¶ 75; Defs.' Resp. to PSMF ¶ 75.)  Even though this is an issue upon which Defendants bear the burden by clear and convincing evidence, Defendants offer no evidence regarding the lack of knowledge in 1994 of the preferential degradation characteristics of various microbes.  (PSMF ¶ 76; Defs.' Resp. to PSMF ¶ 76.)  Furthermore, Defendants' expert admits that he has no data to indicate whether microbes would biodegrade the surfactant enough to impact the surfactant's cleaning ability.  (Adriaens Dep. 639:10-641:15, Jan. 28, 2009.)  In addition, Hakansson-1 recognized that the cleaning surfactants would not be materially degraded as long as sufficient hydrocarbon

contaminants are also present.  See supra Section I.E.2.  Thus, other than conclusory theories, Defendants offer no evidence to support their argument that the lack of microbes identified as exhibiting preferential degradation would require undue experimentation.  This argument also fails to create a genuine issue for trial.

Fourth, Defendants argue that the patent specifications fail to disclose the initial concentration of microbes.  (Defs.' Resp. to Pl.'s Mot. Summ. J. at 13-16.)  However, as noted above, a person of ordinary skill could have determined an acceptable microorganism/cleaning fluid combination without undue experimentation, and Defendants' expert admitted that, if a person knew the cleaning fluid and microorganism to use, the initial concentration of microorganisms could have been found in the prior art.  (See Adriaens Dep. 240:13-241:4, May 19, 2008.)  Defendants' expert also admitted that, if a customer asked a vendor about the initial concentration of microbes to use, the vendor "would tell you how much to add" in terms of "grams or volume or whatever."  (Adriaens Dep. 407:14-408:2, Jan. 28, 2009.)  Also, since microbes reproduce at an exponential rate, the initial concentration of microbes is not critical.  (PSMF ¶¶ 48-50.)  Thus, Defendants' argument concerning the initial concentration of microorganisms also fails to create a genuine issue of material fact for trial.

34

Lastly, Defendants contend that a person attempting to make the invention would not have known how to affix the microbes to a filter without using glue that could be toxic to the microorganisms.  (Defs.' Resp. to Pl.'s Mot. Summ. J. at 16-17.)  However, the asserted claims in this case do not require affixing the microorganisms to a filter.  See '110 patent claims 1, 4-8; '835 patent claims 8, 10-12; '226 patent claims 1, 3-4; '125 patent claims 4-5, 7, 16-19, 21.  Although a preferred embodiment of the patent suggests affixing the microorganisms to the filter prior to placing the filter in the parts washer, an alternative embodiment suggests adding the microorganisms directly to the fluid such that the filter "functions solely as a mechanical filter."  (See, e.g., '110 patent, col. 5, ll. 23-64.)  Moreover, Defendants point to no evidence that using a filter as a vehicle for adding the microbes to the system would create undue experimentation for a person attempting to practice the invention.  Thus, Defendants' filter argument fails to create a genuine issue of material fact for trial.

In summary, Defendants failed to offer sufficient evidence to create a genuine issue of material fact concerning their enablement defense.  By consulting with vendor representatives and an experienced environmental microbiologist, just as the inventors did, one of ordinary skill in the art of parts washing could practice the invention without undue experimentation.

Accordingly, the Court **GRANTS** Plaintiff's motion for summary judgment and **DENIES** Defendants' motion for summary judgment.

## IV.    Conclusion

For the foregoing reasons, Defendants failed to demonstrate a genuine issue of material fact concerning whether the patents-in-suit meet the enabling requirements of 35 U.S.C. § 112.  Therefore, the Court **GRANTS** Plaintiff's motion for summary judgment [#469] with regards to Defendants' enablement defense and **DENIES** Defendants' motion for summary judgment [#490].

**SO ORDERED**, this 19th day of May, 2009.

_____
JACK T. CAMP
UNITED STATES DISTRICT JUDGE