IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHEMFREE CORPORATION,

    Plaintiff,

      v.

J. WALTER, INC., and
J. WALTER COMPANY, LTD.

    Defendants.

CIVIL CASE NO.
1:04-CV-3711-JTC

# O R D E R

## Table of Contents

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    A.    Problems Encountered in the Prior Art . . . . . . . . . . . . . . . . . . . . . 4
    B.    Summary of the Invention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    C.    Development of the ChemFree Version . . . . . . . . . . . . . . . . . . . . . 7
    D.    Walter's Development of Bioremediating Parts Washers . . . . . 10

III.    Procedural History of This Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.    The Asserted Claims of the Patents-in-Suit . . . . . . . . . . . . . . . . . . . . . . 16
    A.    Claims at Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    B.    Claim Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V.    Infringement Claims by Chemfree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    A.    Legal Standard for Infringement . . . . . . . . . . . . . . . . . . . . . . . . . 17
        1.    Direct Infringement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        2.    Indirect Infringement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    B.    Application of the Principles of Infringement . . . . . . . . . . . . . . 20
        1.    Claim 1 of the '110 Patent. . . . . . . . . . . . . . . . . . . . . . . . . 21
        2.    Claim 8 of the '835 Patent. . . . . . . . . . . . . . . . . . . . . . . . . 21
        3.    Claim 1 of the '226 Patent. . . . . . . . . . . . . . . . . . . . . . . . . 22
        4.    Claim 4 of the '125 Patent. . . . . . . . . . . . . . . . . . . . . . . . . 23

        5.      Indirect Infringement of the '226 and '125 patents. . . . . . 24
    C.      Conclusions as to Infringement   . . . . . . . . . . . . . . . . . . . . . . . . . 27

VI.    Walter's Invalidity Defenses   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    A.      Whether the '226 Patent is Invalid as Anticipated by Hakansson-
            2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        1.      Legal Standard   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        2.      Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        3.      Anticipation Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    B.      Whether the Patents-in-Suit are Invalid as Obvious  . . . . . . . . 35
        1.      Legal Standard   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        2.      Obviousness Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
            a.      Scope and Content of the Prior Art   . . . . . . . . . . . . 38
            b.      Level of Ordinary Skill in the Art   . . . . . . . . . . . . . 42
            c.      Differences Between the Prior Art and the Claims at
                    Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
                i.      heater limitations  . . . . . . . . . . . . . . . . . . . . 47
                ii.     fluid limitations  . . . . . . . . . . . . . . . . . . . . . 48
                iii.    structural limitations  . . . . . . . . . . . . . . . . . 50
            d.      Objective Indicia   . . . . . . . . . . . . . . . . . . . . . . . . . 51
        3.      Conclusions as to Obviousness . . . . . . . . . . . . . . . . . . . . . 53
    C.      Inventorship Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    D.      Invalidity Conclusions   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

VII.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Exhibit A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Exhibit B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

# I.Introduction

This is a patent infringement lawsuit involving U.S. Patent No. 6,019,110 ("the '110 patent"), U.S. Patent No. 6,374,835 ("the '835 patent"), U.S. Patent No. 6,440,226 ("the '226 patent"), and U.S. Patent No. 6,451,125 ("the '125 patent"). Plaintiff ChemFree Corporation ("ChemFree") accuses Defendants J. Walter, Inc. and J. Walter Company, Ltd. (collectively "Walter") of infringing the patents-in-suit. Walter denies that its accused devises infringe the patents-in-suit. Alternatively, it contends that the asserted claims of the patents-in-suit are invalid.

The Court tried this case in a non-jury trial, and this Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a).[1] The issues presented at the trial were infringement, the prior art invalidity defenses of anticipation and obviousness, and the inventorship defense. As explained below, the Court finds that Walter's devices infringe the claims of ChemFree's patents, that the '226 patent was not anticipated, but that ChemFree's patents were invalid as obvious. Although the obviousness analysis resolves most of the issues in this case, the parties and the Court

---

[1] To the extent that any of the findings of fact as stated may be deemed conclusions of law, the Court adopts them as conclusions of law. Similarly, to the extent any of the conclusions of law may be deemed findings of fact, the Court adopts them as findings of fact.

spent considerable time arguing and presenting the other issues. The Court will, therefore, include its rulings on all the issues presented at the trial because they have been fully briefed and are ready for decision and may assist in clarifying the Court's ultimate ruling.

## II. Background

ChemFree is a small manufacturing company located in Norcross, Georgia. (Tr. 288:9-24.) J. Walter Co., Ltd., is a Canadian company organized under the laws of Canada which later formed J. Walter, Inc., a Delaware corporation. (Id. at 119:19-120:4.) Chemfree holds patents describing bioremediating parts washing machines and cleaning methods used to clean parts and other small pieces of metal. (Id. at 288:10-18.) ChemFree's entire product line is devoted to parts washing machines. (Id. at 297:8-10.) In the present suit, ChemFree claims that four of Walter's bioremediating cleaning units—the BR-100, BR-200, IO-400, and IO-200—infringe ChemFree's patents.

A.     Problems Encountered in the Prior Art

Parts washing systems historically have used either of two substances to clean soiled parts: solvent cleaning fluids or aqueous cleaning fluids. In solvent-based cleaning, oil or other organic matter is dissolved into a solution. Solvent cleaning fluids pose health risks to their users and are often

flammable.  (Durkee Rebuttal Report [#337] at 44-45.)  When they evaporate they release volatile organic compounds into the atmosphere, which pose environmental hazards. (Id.)  Additionally, solvent cleaning fluids become saturated after repeated use and must be disposed of and replaced.  (Id. at 46.)  Their disposal, in turn, poses environmental hazards.  (Id.)

Mineral spirits are a typical solvent.  Many solvents are presently classified by government regulatory agencies as hazardous materials because of their low flash points and potential health concerns. (Id. at 42-46.) Furthermore, if not properly contained, mineral spirits can have a negative impact on the environment.  (Id.)  Many users find it necessary to employ a waste disposal company to retrieve and dispose of their used mineral spirits to ensure compliance with various government regulations.

In aqueous cleaning fluids, by contrast, a surfactant, which is a surface active substance such as a detergent, separates the organic matter from the part's surface and is rinsed away.  (Id. at 48.)  Aqueous cleaning fluids operate by separating organic matter from a part's surface and forming an agglomeration of water, oil, and detergent.  (Id. at 49.)  An operator then removes the agglomeration from the cleaning solution's surface.  (Id.)  Like solvent cleaning fluids, aqueous cleaning fluids can be dangerous to the operator's skin, need to be replaced periodically, and their disposal also poses

environmental dangers.

During the time period relevant to this suit, the need developed in the parts washing industry to develop a cleaning method that used neither solvent cleaning fluids nor the traditional aqueous cleaning fluids. ChemFree, recognizing the need for an environmentally friendly parts washer that did not endanger its user, sought the patents-in-suit.  (See, e.g., '125 patent, col. 3, ll.44-66.)

B.    Summary of the Invention

ChemFree is the co-owner of several patents directed to "environmentally friendly, bioremediation parts washing systems."  The four[2] patents-in-suit detail systems and methods for cleaning oil and grease from machine parts in a safe and environmentally friendly manner by using an aqueous cleaning fluid containing microorganisms which eliminated the hydrocarbons.

ChemFree filed the parent application on September 30, 1994, from which each of the patents-in-suit derived.  As illustrated in the figure below, ChemFree's invention has three basic components.

---

[2] Plaintiff originally asserted claims from five different patents.  However, Plaintiff recently withdrew the claims from U.S. Patent No. 6,074,491.  (See Plaintiff's Partial Withdrawal of Infringement Contentions [#525].)



**FIG. 3**

The first component is a biodegradable, non-caustic, non-toxic, non-flammable, oil-dispersant/degreasing fluid. The second component involves the use of microorganisms in the fluid to break down and remove grease and oil. The final component is the physical structure and associated mechanical and electro-mechanical assemblies that circulate the cleaning solution and contain it while it breaks down the hydrocarbons.

C.     Development of the ChemFree Version

7

In the fall of 1993, Thomas McNally and James McClure approached Intelligent Systems Corporation ("ISC") to obtain funding to develop an idea they had involving cooling tower technology.  (Tr. at 62:8-63:1.)  McNally and McClure's business plan included other ideas, such as an environmentally friendly aqueous parts washer.  (Id. at 64:20-65:4.)  ISC declined to invest in the cooling tower technology but was interested in the parts washer idea.  (Id. at 63:20-23.)

ISC conducted a market study to determine whether the aqueous parts washer technology would be successful.  (Id. at 65:17-66:9; Def. Ex. 144.)  The market study indicated a demand in the industry for parts washers that were "nontoxic, nonflammable, noncaustic, [and] nonhazardous[.]" (Tr. at 315:1-316:9.)  After the market study, it decided to invest in the parts washer idea, and in October 1993, it formed ChemFree Corporation.  (Tr. at 65:17-67:23.)  McNally and McClure were hired as consultants and were paid on an hourly basis.  (Id. at 67:24-68:16.)

ChemFree's basic device is commonly referred to as a "sink on a drum" small parts washer used in a single-operator work station. (Durkee Rebuttal Report [#337] at 39.)  This consists of a sink fixed atop a drum, which serves as a reservoir for the cleaning fluid.  (Id. at 47.)  The open-topped design allows the operator to constantly observe the operation and to apply

8

mechanical force such as brushing or scrubbing to assist the cleaning process. (Tr. at 564:2-566:2.)  The cleaning fluid, which becomes laden with contaminants during the cleaning process, drains through a hole in the bottom of the cleaning basin and into the tank, where the microorganisms are intended to biodegrade the hydrocarbons. (Durkee Rebuttal Report [#337] at 51.)

The inventors originally obtained the cleaning fluids they used from a company called Enretech.  (Tr. at 338:13-20, 340:12-19.)  The fluids Enretech provided did not include bioremediating microorganisms.  (Id. at 340:12-19.) Sometime around December of 1993, however, an Enretech representative mentioned that it was experimenting with a cleaning fluid containing bioremediating microbes.  (Id. at 335:6-337:12.)  Soon thereafter, ChemFree began using the new microbe-laden fluid in its prototypes.  (See Pl.'s Ex. 527.) At some point, Enretech provided "pillow filters" to McNally and McClure. The pillow filters contained absorbent material and microorganisms, which adhered to the hydrocarbons as they drained through the pillow and into the tank.  McNally and McClure began incorporating the filters containing microorganisms into the parts washer.  (Tr. at 334:3-336:5, 339:3-340:1, 418:25-419:20.)

By the end of March 1994, the inventors had developed working

9

prototypes that contained all of the features claimed in the asserted claims of the patents-in-suit.  (Id. at 295:14-293:11.)  The inventors decided, however, to try other cleaning fluid and microorganism combinations.  (Id. at 344:1-24.) They preferred "LRC-1," a microbal product supplied by Louisiana Remediation Company.  (Id. at 344:1-7.)  They eventually determined that the best combination was LRC-1 microbes with Sea Wash 7 cleaning fluid.  (Id. at 344:1-24.)  This combination was the most viable as of the filing of the parent patent application in September, 1994.  (Id.)

D.    Walter's Development of Bioremediating Parts Washers

By early 1997, ChemFree had begun discussing the possibility of a business relationship with Graymills Corporation, an industrial manufacturer of pumps and parts washers.  (Id. at 357:4-19.)  ChemFree initially sold Graymills parts washers, filters, and fluids, but ChemFree later entered into a private labeling agreement with Graymills.  (Id. at 357:20-24.)

Graymills began selling the BIO777 bioremediating parts washer, which ChemFree manufactured for Graymills.  (Id. at 357:25-364:5; Pl. Exs. 311, 313.)  The BIO777 contained markings stating that it used "ChemFree['s] patented bioremediation technology."  (Pl. Ex. 311.)  Graymills sold Biotene fluid to be used in the BIO777, which ChemFree packaged and labeled for Graymills.  (Tr. at 357:25-364:5.)  The Biotene fluid was

10

essentially the Sea Wash 7 cleaning fluid ChemFree used in its machines.
(Id.)  The BIO777, filters, and Biotene fluid were the only products ChemFree
sold to Graymills.  (Id. at 364:6-12.)

Graymills later began selling another bioremediating parts washer, the
BIO436.  (Tr. at 364:13-371:22; Pl. Exs. 137, 320.)  ChemFree had helped
Graymills develop the BIO436 by modifying one of Graymills' existing
solvent-based parts washers.  (Id.)  ChemFree continued to private label the
Biotene fluid and filters used with the BIO436.  (Id. at 365:19-21.)

Meanwhile, Walter decided to enter the bioremediating parts washing
business.  Walter's owner and the owner of CB Chemie, a European company
affiliated with Walter, agreed to develop a bioremediating parts washer.  (Tr.
at 470:2-10.)  CB Chemie first developed a cleaning fluid containing
microorganisms.  (Id. at 470:21-471:19.)  Walter then began looking for
companies that manufactured parts washers suitable for using the fluid
developed by CB Chemie.  (Id.)  In 1999, Walter purchased a BIO436A parts
washer and Super Biotene fluid from Graymills.  (Pl. Ex. 317; Def. Ex. 990;
Tr. at 471:20-472:17.)  The evidence in the record does not indicate that
Walter knew that ChemFree was developing bioremediating parts washers or
that Walter knew Chemfree had helped Graymills develop the BIO436.  (Tr.
at 472:18-24.)

Walter began developing its own bioremediating parts washer based on the BIO436A. (Id. at 472:3-474:7.)  Walter's first model, the BR-100, made several changes to the BIO436A.  (Id. at 474:8-475:24; Pl. Ex. 139.)  For example, the pump in the BR-100 ran continuously, and Walter added a bypass line to aerate the fluid.  (Tr. at 274:12-276:6, 474:8-475:24.)  In addition, the BR-100 had no lid, and Walter combined the heater and pump into a single unit that could easily be removed from the machine.  (Id.)  A significant change was that the BR-100 used a cleaning fluid containing microorganisms and, therefore, it did not need the flat filter or pillow filter to introduce the microbes.  (Id.)

Walter worked with Graymills to build a prototype, and Graymills became Walter's "manufacturing partner" for the BR-100.  (Id. at 475:25-476:15.)  Walter launched the BR-100 in Europe in October 2000.  (Id. at 477:4-22; Pl. Ex. 101.)  The BR-100 was first available in the United States in November 2002.  (Tr. 699:3-8.)  The model was not especially successful, but Walter sold approximately 50 units.  (Id. at 480:19-25.)

After launching the BR-100, CB Chemie began developing the BR-200 alone.  (Id. at 486:24-487:21; Def. Ex. 672.)  Walter inspected the BR-200 and made suggestions, but CB Chemie was ultimately responsible for its development.  (Tr. at 488:14-19, 694:11-23.)

The BR-200 and the BR-100 differed in several ways.  First, the BR-200 featured a double-walled construction to make it more energy efficient and an air pump to bubble the liquid.  (Id. at 487:22-488:7.)  The BR-200's electronic controls were located on the front of the machine.  (Id.)  The BR-200 first became available in the United States in 2004.  (Id. at 699:14-16, 700:22-23.)

Walter next began the development of a third bioremediating parts washer, the IO-400.  (Id. at 702:23-25; Def. Ex. 674.)  The IO-400 was similar to the BR-200.  (Tr. at 713:10-20.)  The differences between the BR-200 and IO-400 included: (1) a removable control unit on the IO-400; (2) a canister filter on the side of the IO-400; and (3) the IO-400 operated at a hotter temperature.  (Id. at 703:1-24, 713:10-20.)  The IO-400 became available in the United States in October 2005.  (Id. at 127:10, 711:15-17.)

Walter also sells the IO-200, which it developed during this litigation. (Tr. at 705:24-706:14; Def. Exs. 661, 662.)  It developed the IO-200 in order to offer a smaller machine and to design around the patents-in-suit.  (Tr. at 705:24-706:14.)  The IO-200 has several significant differences from the IO-400.  (See Pl. Ex. 116; tr. at 708:12-711:14.)  For example, the IO-200 heater is located in the removable control unit outside the tank.  (Id. at 708:12-22.) As a result, the IO-200 has two pumps: one to circulate the fluid to the washing basin and one to circulate fluid through the heater.  The IO-200 also

13

has a pressure switch that will cut power to the heater if insufficient pressure exists in the heat pump line.  (Id. at 709:14-710:24.)  A loss of pressure could be due to low fluid levels, a clog in the heater line, or any other type of problem that would reduce the pressure in the heater line.  (Id. at 709:14-710:24, 661:4-19.)  The IO-200 also incorporated a flap to prevent evaporation, rather than the sponge used in previous models.  (Id. at 708:3-11.)

The IO-200 became available in the United States in fall 2006.  (Id. at 711:18-20.)  Walter currently sells both the IO-200 and the IO-400 in the United States.  (Id. at 186:1-6.)

### III. Procedural History of This Litigation

On December 20, 2004, ChemFree filed its Complaint alleging that Walter manufactures and sells several parts washers and a cleaning fluid that infringe ChemFree's patents.  (See generally Complaint.)  Specifically, ChemFree alleges that Walter's BR-100, BR-200, IO-400, and IO-200 parts washers, individually and in combination with Walter's BioCircle L cleaning fluid, infringe the '110 patent, the '835 patent, the '226 patent, and the '125 patent.

Walter asserted the usual defenses and counterclaims in a patent suit: (1) that the patents-in-suit are unenforceable due to inequitable conduct by

14

ChemFree before the PTO; (2) that Walter's accused products do not infringe the patents-in-suit; and (3) that the patents-in-suit are invalid under 35 U.S.C. §§ 101, 102, 103, 112 ¶ 1, and 112 ¶ 2.  (<u>See</u> <u>generally</u> Def. First Am. Answer and Counterclaims.)

Unfortunately, like many patent cases, this litigation has been long and contentious.[3]  The Court has previously disposed of significant issues in the case, including Walter's inequitable conduct defense (<u>see</u> Order, June 10, 2008), Walter's non-enablement defense (<u>see</u> Order, May 19, 2009), and a number of Walter's remaining affirmative defenses (<u>see</u> Order, June 10, 2008).

The parties presented their evidence on the remaining issues during a non-jury trial in July of 2009.  The remaining issues included: (1) whether Walter's accused devices infringe the patents-in-suit; (2) whether the '226

---

[3]The docket reflects that twenty-seven different attorneys and six different law firms have participated in this litigation to date.  The docket contains 618 entries.  The parties have filed motions to compel and motions for Rule 11 sanctions.  This case became litigious enough that Defendant's counsel felt it necessary to hire counsel to represent the law firm when Plaintiff filed a novel motion: "Plaintiff's Emergency Request for the Court to Conduct an Investigation into Attorney Misconduct" [# 263].  All of the motions on the merits filed prior to the non-jury trial have been disposed of.  Either the fact that these motions were filed or the conduct that caused them to be filed or both indicate a lack of professionalism in the conduct of this litigation.  This lack of professionalism has made the litigation more expensive for the parties and more troublesome to the Court without contributing to a just resolution of the case.

patent is invalid as anticipated;[4] (3) whether all patents-in-suit are invalid as

obvious; and (4) whether several of the alleged inventors were improperly

named on the face of the patents-in-suit.[5]

### IV. The Asserted Claims of the Patents-in-Suit

A.    Claims at Issue

Plaintiff contends that several of Defendants' products infringe the

following claims of the patents-in-suit:

| Patent | Asserted Claims | |
|---|---|---|
| | **Independent** | **Dependent** |
| **'110 Patent** | 1 | 4, 5, 6, 7, and 8 |
| **'125 Patent** | *** | 4, 5, 7, 16, 17, 18, 19, and 21 |
| **'226 Patent** | 1 | 3 and 4 |
| **'835 Patent** | *** | 8, 10, 11, and 12 |

(See Plaintiff's Partial Withdrawal of Infringement Contentions [#525].)

Although Plaintiff did not assert any independent claims from the '125 and

'835 patents, Plaintiff asserted dependent claims from those patents.  The

---

[4] At trial, Walter clarified that it asserts its anticipation defense against the '226 patent only.  (Tr. at 871:4-6.)

[5] At trial, Walter withdrew its 35 U.S.C. § 102(g) defense, but continues to allege that James McClure was the sole inventor of the patented invention and that the remaining inventors were misnamed on the patents-in-suit under § 102(f).

16

asserted claims from the '125 patent are dependent on claims 1, 6, 12, and 13. The asserted claims from the '835 patents are dependent claim 5 of the '835 patent.  Therefore, although those claims are not asserted in this case, they are at issue in this case.  A table of the relevant claims, together with a description of each claim's language, is attached as Exhibit A of this opinion.

B.    Claim Construction

On July 17, 2007, the Court construed the disputed claim terms in the patents-in-suit.  (Order [# 212] Jul. 17, 2007.)  The Court hereby adopts the constructions set forth in that Order.

## V.Infringement Claims by Chemfree

ChemFree contends that Walter's products infringe the patents-in-suit. ChemFree bears the burden of proving infringement by a preponderance of the evidence.  Laitram Corp. v. Rexnard, Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991) (citing Amstar Corp. v. Envirotech Corp., 823 F.2d 1538, 1545 (Fed. Cir. 1987)).  Walter denies that its machines infringe ChemFree's patents either directly or indirectly.

A.    Legal Standard for Infringement

1.    Direct Infringement.

35 U.S.C. § 271(a) provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States

or imports into the United States any patented invention during the term of
the patent therefor, infringes the patent."  35 U.S.C. § 271(a).  "To prove
[direct] infringement, the patentee must show that the accused device meets
each claim limitation either literally or under the doctrine of equivalents."
Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1378 (Fed. Cir. 2005)
(quoting Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 812
(Fed. Cir. 2002)).

Literal infringement occurs when all limitations recited in the asserted
patent claim are found in the accused device.  TechSearch, L.L.C. v. Intel
Corp., 286 F.3d 1360, 1371 (Fed. Cir. 2002).  A patent is infringed if *any* of its
claims are infringed because "each claim is a separate statement of the
patented invention."  Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211,
1220 (Fed. Cir. 1995).  When a claimed function is performed in the accused
system, infringement of that claim element is established regardless of
"whether the element has capabilities in addition to that stated in the claim."
Vulcan Eng'g Co., Inc. v. Fata Aluminum, Inc., 278 F.3d 1366, 1375 (Fed. Cir.
2002) (citation omitted).

2.    Indirect Infringement.

In addition to direct infringement, 35 U.S.C. § 271 also provides two
forms of indirect infringement: inducement to infringe under § 271(b) and

18

contributory infringement under § 271(c).  Inducement to infringe and contributory infringement both require proof of direct infringement by a third party.  <u>Dynacore Holdings Corp. v. U.S. Phillips Corp.</u>, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement.") (citation omitted).

Under 35 U.S.C. § 271(b), a party may be liable for inducing infringement if that party "actively induces infringement of a patent."  35 U.S.C. § 271(b).  To prove inducement to infringe under § 271(b), the patentee "has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements."  <u>DSU Med. Corp. v. JSM Co., Ltd.</u>, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (en banc) (citation omitted).  To establish the necessary intent, "a patent holder must prove that once the defendants knew of the patent, they actively and knowingly aid[ed] and abett[ed] another's direct infringement."  <u>Id.</u> at 1305 (citation omitted).  However, "[t]he mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven."  <u>Id.</u>

Under 35 U.S.C. § 271(c), a seller will be liable for contributory

19

infringement if:

1.      the seller sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process;

2.      the item sold constitutes a material part of the invention;

3.      the seller knows that the item sold is especially made or adapted for use in the infringement of a patent; and

4.      the item sold is not a staple article or commodity of commerce suitable for substantial noninfringing use.

See 35 U.S.C. § 271(b); HERBERT F. SCHWARTZ & ROBERT J. GOLDMAN, PATENT LAW AND PRACTICE § 6.I.B. (6th ed. 2008).  Federal courts addressing whether the item sold is "a staple article or commodity of commerce suitable for substantial noninfringing use" have suggested that the "noninforming use must not be farfetched, illusory, impractical, or merely experimental."  See 5 DONALD S. CHISUM, CHISUM ON PATENTS, § 17.03(3).

B.      Application of the Principles of Infringement

At trial, the Court granted ChemFree's motion for judgment as a matter of law on a number of ChemFree's claims of infringement.  The evidence at trial demonstrated that the BR-100, BR-200, and IO-400, in combination with the BioCircle L Fluid, infringe at least one claim of each of the '110, '125, and '835 patents.  The IO-200, in combination with the BioCircle L Fluid, infringes at least one claim of the '835 patent.  In addition,

20

the BR-100, BR-200, IO-400, and IO-200 infringe at least one claim of the '226 patent.

### 1.    Claim 1 of the '110 Patent.

In its response to ChemFree's infringement contentions, Walter admitted that the BR-100, BR-200, and IO-400, in combination with the BioCircle L Fluid, meet every element of Claim 1 of the '110 patent except the "flowpath" limitation.  (See Def. Am. Resp. to Infringement Contentions [#209] at 4-5, 24-25, 34.)  At trial, the most senior Walter employee responsible for development of Walter's BioCircle product line, Claude Vandemeulebrooke, admitted that each of the accused devices has a "flowpath," as that term has been interpreted by the Court.  (Tr. at 222:4-224:14, 229:18-231:2.)  In addition, in response to ChemFree's motion for judgment as a matter of law, Walter's counsel acknowledged that the "flowpath" limitation is no longer at issue in the case.  (Id. at 839:6-15.) Accordingly, the BR-100, BR-200, and IO-400 all infringe at least Claim 1 of the '110 patent.

### 2.    Claim 8 of the '835 Patent.

Defendants admitted that the BR-100, BR-200, IO-200, and IO-400, each in combination with the BioCircle L Fluid, meet every element of Claim 8 of the '835 patent except the "flowpath" element, which is no longer at issue,

and the "filter" element.  (See Def. Am. Resp. to Infringement Contentions [#209] at 8, 27-28, 37-38, 47-48.)

With respect to the "filter" element, Walter's product literature states that the accused parts washers contain "filters."  (Pl. Exs. 103, 126, 139 at 3, 192.)  Vandemeulebrooke also testified that, as the fluid flows through the sponge and the wire mesh basket, some particulate matter will be trapped by the sponge and basket.  (Tr. at 234:6-236:16.)  Walter's Vice President for Research and Product development also admitted that the three-part filter will catch particulate matter.  (Id. at 479:19-480:15.)  Lastly, Walter's expert – Dr. Adriaens – admitted that each of the accused parts washers have filters interposed in the flowpath.  (Id. at 808:17-812:3.)  Thus, the BR-100, BR-200, IO-200, and IO-400 all meet the requirement of a "filter," as that term was construed by the Court.  (See Order, July 17, 2007 at 50.)  As such, the BR-100, BR-200, IO-200, and IO-400, each in combination with the BioCircle L Fluid, infringe at least Claim 8 of the '835 patent.

3.     Claim 1 of the '226 Patent.

In its response to ChemFree's infringement contentions, Walter admitted that the BR-100, BR-200, IO-400, and IO-200 devices meet every element of claim 1 of the '226 patent except the requirement that the operator pass the cleaning fluid through a porous medium.  (See Def. Am. Resp. to

22

Infringement Contentions [# 209] at 90,10, 29-30, 39.)  Walter's expert, Dr. Adriaens, admitted that the BR-200, the IO-200 and the IO-400 devices meet the porous medium limitation, as construed by the Court.  (Tr. 811:8-812:3.)  The BR-100 device features a "three-part filter" system comprised of a stainless steel grating, a foam sponge, and a grated receptacle that rests within the drain in the washer basin.  (See Durkee Expert Report [# 312] at 87.)  The Court finds that this three-part filter system satisfies the porous medium limitation.  The BR-100, BR-200, IO-200, and IO-400 parts washing systems all meet the "porous medium" limitation.  Therefore, each of these systems infringes claim 1 of the '226 patent.

    4.  Claim 4 of the '125 Patent.

  Walter admitted that the BR-100, BR-200, and IO-400 meet every element of claim 4 of the '125 patent except the requirement that the user allow the microorganisms in the fluid to biodegrade the hydrocarbons.  (See Def. Am. Resp. to Infringement Contentions [#209] at 10-11, 30-31, 40.)  Walter's expert, Dr. Adriaens, acknowledged that each of the accused devices meets this limitation, as construed by the Court.  (Tr. at 812:8-813:9.)  Additionally, the microorganisms within the Bio-Circle L fluid biodegrade hydrocarbons, and most of the bioremediation takes place in the tank.  (Id. at 212:9-216:22.)  Accordingly, the use of the BR-100, BR-200, and IO-400, in

combination with the BioCircle L Fluid, infringes at least claim 4 of the '125 patent.

     5.     Indirect Infringement of the '226 and '125 patents.

Claim 1 of the '226 patent and claim 4 of the '125 patent are method claims.  Neither party contends that Walter performs the methods claimed in these claims.  Thus, Walter cannot be held liable for direct infringement; rather, in order for Walter to be liable for infringement, the Court must find that Walter either contributed to or induced the infringement of the '226 patent or the '125 patent.

To prove that Walter induced the infringement of the '226 patent and the '125 patent, ChemFree must demonstrate that "once [Walter] knew of the patent[s], they actively and knowingly aid[ed] and abett[ed] another's direct infringement." DSU Med., 471 F.3d at 1305.  "[M]ere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." Id.  Such intent may be proven through circumstantial evidence.  Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1365 (Fed. Cir. 2004) (citation omitted).

Walter provides instruction manuals with each parts washer it sells. (See, e.g., Pl. Exs. 114, 115, 154.  See also Def. Proposed Findings [#603] at 72-73.)  In these manuals, Walter does not advertise or recommend any use

24

for the accused devices other than as bioremediating parts washers.  (Tr. at
164:6-169:24.)  The manuals advise users to "use only genuine Walter Bio-
Circle L cleaning solution" and they state that the Walter parts washers are
"NOT recommended for cleaning . . . non-biodegradable substances."  (See Pl.
Exs. 114 at 6-7, 115 at 5-6, 154 at 7-8.)  Walter also advertises on its website
that customers should "use only Bio-Circle L liquid in the system," (Pl. Ex.
25) and discourages its customers from using the Bio-Circle L liquid in other
machines (Pl. Ex. 27).  Walter was aware that ChemFree had patents on
bioremediating parts washers at least as early as Fall 2000 when Walter
launched the BR-100.  (Tr. at 476:16-483:9, 490:13-492:22, 695:2-10.)

    "'Evidence of active steps taken to encourage direct infringement, such
as advertising an infringing use or instructing how to engage in an infringing
use, show an affirmative intent that the product be used to infringe[.]'"
AdvanceMe Inc. v. RapidPay, LLC, 509 F. Supp. 2d 593, 607 (E. D. Tex.
2007), aff'd, 277 F. App'x 1023 (Fed. Cir. 2008) (quoting Metro-Goldwyn-
Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 915, 125 S. Ct. 2764
(2005)).  See also Metabolite Labs., 370 F.3d 1354, 1365 (Fed. Cir. 2004)
(finding that publications promoting infringing uses were sufficient to
support jury's determination of inducement to infringe).  By actively
encouraging its users to use the products in an infringing manner through

instruction manuals and advertisements, Walter induced users of its parts

washers to infringe the methods disclosed in claim 1 of the '226 patent and

claim 4 of the '125 patent.

Walter contends that it cannot be liable for indirect infringement

because indirect infringement first requires a showing of direct infringement,

which requires that the direct infringer perform every step of the patented

method or process.  See generally Muniauction, Inc. v. Thomson Corp., 532

F.3d 1318 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct. 1585 (2009), BMC Res.,

Inc. v. Paymentech, L.P., 498 F.3d 1373, 1378 (Fed. Cir. 2007).

Walter contends that it, rather than the user, performs the step of

"providing a parts washer having at least a basin for receiving the part and a

tank below the basin for containing the fluid."  However, Walter failed to

explain how the end user of the parts washer does not perform this step.  By

choosing to purchase a bioremediating parts washer from Walter, the end

user has chosen to "provide" a parts washer to clean the part.  ChemFree

offered extensive evidence at trial – in the form of Dr. Durkee's expert reports

– to demonstrate that the Walter parts washers infringe the patents-in-suit,

including claim 1 of the '226 patent and claim 4 of the '125 patent.  Dr.

Durkee's opinions were largely unrebutted, and Walter points to no evidence

to indicate that any step of claim 1 of the '226 patent or claim 4 of the '125

patent are performed by anyone other than the end user.

C.     Conclusions as to Infringement

The BR-100, BR-200, and IO-400, in combination with the BioCircle L Fluid, infringe at least one claim of the '110 patent, the '125 patent, the '226 patent, and the '835 patent.  In addition, the IO-200, in combination with the BioCircle L Fluid, infringes at least one claim of the '835 patent. "A patent is infringed if any claim is infringed . . . for each claim is a separate statement of the patented invention." Pall Corp., 66 F.3d at 1220.  Therefore, each of Walter's accused devices infringes the patents-in-suit.

## VI. Walter's Invalidity Defenses

A.     Whether the '226 Patent is Invalid as Anticipated by Hakansson-2

1.     Legal Standard

In addition to alleging that its accused products do not infringe the patents-in-suit, Walter contends that, under 35 U.S.C. § 102, the '226 patent is anticipated by WIPO 92/16314, known throughout this litigation as "Hakansson-2."[6]  A prior art reference anticipates a patent-in-suit if it expressly or inherently discloses each of the patent-in-suit's claim limitations. Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1334 (Fed. Cir. 2008); 35

---

[6]Hakansson-2 was published on October 1, 1992.  (Joint Ex. 27 at 1.)  Thus, it classifies as prior art for purposes of anticipation.

U.S.C. § 102(b).  Because an issued patent is presumed valid, Walter must

establish that Hakansson-2 anticipates each of the '226 patent's claim

limitations by clear and convincing evidence. 35 U.S.C. § 282; <u>Finisar Corp.</u>,

523 F.3d at 1334.

The Federal Circuit has explained that an inherent limitation is one

that is "necessarily present" in the prior art.  <u>Continental Can Co. v.

Monsanto Co.</u>, 948 F.2d 1264, 1268-69 (Fed. Cir. 1991).  That is to say, an

inherent limitation is one which must appear each time the prior art is

practiced.  <u>Id.</u>; <u>see</u> <u>Rosco, Inc. v. Mirror Lite Co.</u>, 304 F.3d 1373, 1380 (Fed.

Cir. 2002) (holding that an element has been inherently disclosed "if the

missing element is necessarily present in the thing described in the reference,

and that it would be so recognized by persons of ordinary skill") (internal

quotation and citation omitted); <u>see also</u> 3 DONALD S. CHISUM, CHISUM ON

PATENTS, § 3.03(2)(b) ("Federal Circuit decisions emphasize that an

anticipatory inherent feature or result must be consistent, necessary, and

inevitable, not merely possible or probable.").

For example, in <u>Schering Corp. v. Geneva Pharms., Inc.</u>, the patent-in-

suit disclosed DCL as a necessary element.  <u>Schering Corp. v. Geneva

Pharms., Inc.</u>, 339 F.3d 1373, 1375 (Fed. Cir. 2003).  The prior art did not

disclose DCL, but it did disclose loratadine, which metabolized into DCL

28

when ingested in accordance with the method of the patent.  Id.  The Federal
Circuit held that the patent was anticipated because DCL was necessarily
present, not merely possibly present, whenever the prior art was practiced.
Id. at 1378.

> 2.    Relevant Facts

Hakansson-2 and the '226 patent both disclose methods of removing
organic matter from metal parts and the use of bioremediating
microorganisms, but they utilize distinct types of devices to clean metal.  The
'226 patent teaches a device with a circular, single-loop path that begins with
fluid being pumped from a tank to a basin, where it is used for cleaning, and
then drains directly back to the tank, where it is immediately available to be
re-circulated back to the basin for further washing operations.  ('226 patent,
col. 6, l.60 - col. 7, l.56.)

In contrast, Hakansson-2 teaches a device with a more complex fluid
path.  Hakansson-2 has three chambers: (i) a washing fluid chamber (or
tank); (ii) a washing chamber; and (iii) a rinsing fluid chamber.  (Joint Ex. 27,
col. 7, l.1-col. 8, l.10.)  The washing fluid is drained in bulk from the washing
fluid chamber to the washing chamber.  During the cleaning cycle, the
washing fluid is pumped from the bottom of the washing chamber under high
pressure to a pipe loop with nozzles that spray washing fluid onto parts

situated in the washing chamber.  (Id.) At the conclusion of the washing cycle, the washing fluid is pumped back to the washing fluid chamber (or tank) in a bulk transfer.  (Id.)  Together, the fluid and the loose organic matter are pumped back into the external chamber, where bioremediating microorganisms decompose the organic matter. (Tr. at 564:13-19, 570:16.) Finally, the Hakansson-2 method includes a rinsing step and a drying step. (Joint Ex. 27, col. 8, ll.5-10.)

The cleaning techniques each employs is another distinction between Hakansson-2 and the '226 patent. Hakansson-2 uses pressurized liquid to clean metal parts.  The device sprays a fluid containing bioremediating microorganisms onto the part at high pressure.  (Tr. 571:21-572:15, 564:13-19.)  The force of the resulting impact separates the organic matter from the part's surface.  (Tr. at 564:13-19, 570:16.)  Rather than utilizing pressurized liquid to remove organic matter from a piece of metal, the '226 patent employs the "flush and brush" cleaning technique.  (Id. at 564:9-13.)

In the "flush and brush," an operator holds a part, sprays it with a solvent, and then separates organic matter from the part by scouring it with mechanical force and a brush.  (Id. at 564:2-566:2.)  While the operator scrubs the part, it is rinsed with a liquid containing bioremediating microorganisms. (Id. at 564:11-13.)  The liquid carries the loose organic matter through a filter

30

and into a storage tank.  Inside the tank, microorganisms decompose the organic matter not caught in the filter.

A third and determinative difference between Hakansson-2 and the '226 patent is that the '226 patent claims a filter but Hakansson-2 does not. The '226 patent discloses a filter at the mouth of the drain to separate particulate matter from the solvent.  Hakansson-2's inventor knew that filters existed—indeed, filters were common in the parts washing art at the time—but he did not expressly include a filter in the patent or list one among the device's components.  (See Joint Ex. 27; tr. 589:1-10.)  Instead, he provided an alternative means of removing matter from the fluid: a valve located at the bottom of the external chamber through which slurry and other biproducts of the bioremediation are drained. (Joint Ex. 27, col. 9, ll. 25-34.)

3.   Anticipation Analysis

To succeed in its anticipation defense, Walter must prove by clear and convincing evidence that Hakansson-2 explicitly or inherently discloses each limitation of at least one claim of the '226 patent.  Finisar Corp., 523 F.3d at 1334.  As discussed above, Hakansson-2 and the '226 patent disclose substantially different devices that utilize distinct cleaning methods.

The most important distinction for the purposes of this issue, however, is that Hakansson-2 does not expressly or inherently disclose a filter.  The

31

third step of the '226 patent's first claim requires "passing the cleaning fluid that had contacted the part through a porous medium." ('226 patent, col. 10, ll. 28-29.)[7]  The Court construed "porous medium" to mean the same thing as "filter," which the Court defined as "a porous material through which the cleaning fluid is passed in order to trap particulate matter while allowing the cleaning fluid, hydrocarbons, and microorganisms to pass through." (Order, Jul. 17, 2007 [# 212] at 50.)

Hakansson-2 does not expressly disclose a filter.  Accordingly, Walter must establish that Hakansson-2 "inherently" discloses a filter.  To do so, it must show that a filter is "necessarily present" whenever Hakansson-2 is practiced.  Rosco, Inc., 304 F.3d at 1380.  To be inherently disclosed in a prior art reference, "the missing descriptive material [must be] 'necessarily present,' not merely probably or possibly present, in the prior art."  Id. (quoting Trinitec Indus., Inc. v. Top-U.S.A. Corp., 295 F.3d 1292, 1295 (Fed. Cir. 2002)).  The element must be recognized by one of ordinary skill in the art as being necessary; it is not enough that the element be recognized as a

---

[7] ChemFree also asserts claims 3 and 4 of the '226 patent.  However, ChemFree's expert does not dispute that Hakansson-2 discloses the limitations added to the claimed method in claims 3 and 4.  (See Durkee Supp. Report [#467] App. at 14.)  He confirmed this at trial.  (Tr. at 607:8-24.)  Thus, if the Court determines that Hakansson-2 anticipates claim 1 of the '226 patent, it will also anticipate claims 3 and 4.

possible improvement. Continental Can Co., 948 F.2d at 1268-69; Rosco, Inc., 304 F.3d at 1380. The non-toxic cleaning fluid in the '226 patent is a good example of feature that is inherent in a bioremediating parts washer: the fluid in the '226 patent is necessarily non-toxic, or it would kill the microbes necessary for bioremediation. See infra Section VI.B.2. The '226 patent, therefore, inherently discloses a non-toxic liquid.

Walter bases its argument largely on the cross examination of Dr. Durkee. Viewing that testimony in context, however, Dr. Durkee testified that Hakansson-2 could function adequately without a filter.

> It is entirely possible (whether or not desirable) to practice Hakansson-2 without using a filter. Instead, Hakansson-2 teaches the use of a settling tank with a purge valve to remove sediment . . . . In my opinion, a person of ordinary skill would be disinclined to substitute the settling tank and purge valve of Hakansson-2 with a filter. Similarly, a person of ordinary skill would have little reason to add a filter to Hakansson-2's purge valve system as such would be redundant.

(Durkee Supplemental Expert Report [# 467] at 52-53.)

Evidence other than Dr. Durkee's opinion indicates that Hakansson-2's inventor designed a machine that does not require a filter. The inventor was aware filters were used in parts washers, but he did not include one in the claims of his patent, nor did he list one among the device's components. (See Joint Ex. 27; tr. 589:1-10.) In fact, a filter is redundant in this device

because the patent discloses a way to remove the biproducts of bioremediation: through a valve located at the bottom of the chamber where the bioremediation occurs.  (Joint Ex. 27, col. 9, ll. 25-34; Durkee Supplemental Expert Report [# 467] at 52-53.)

Walter misconstrues Dr. Durkee's testimony.  Dr. Durkee testified that filters were commonly known by those skilled in the art at the time.  (Id.)  He also testified that he would prefer to have a filter protecting his pump.  (Id. at 589:1-24.)  Dr. Durkee did not, however, testify that a filter was a necessary part of Hakansson-2.  (Tr. at 587:9-11, 589:1-23.)  Instead, he testified that Hakansson-2 could function adequately without a filter.  (See, e.g., tr. 589:1-23; Durkee Supplemental Expert Report [# 467] at 52-53.)

Walter's argument that Hakansson-2 inherently discloses a filter is similar to the argument rejected by the Federal Circuit in Electro Medical Sys., S.A. v. Cooper Life Sciences, 34 F.3d 1048, 1052 (Fed. Cir. 1994).  There, the patent-in-suit disclosed a method for cleaning teeth wherein a device used "a substantially unpressurized flow of liquid" to clean the teeth.  Id.  Although the prior art described a flow of liquid, it disclosed a device that permitted the user to adjust the pressure of the liquid flow, which could be either substantially unpressurized or pressurized.  Id.  The Federal Circuit held that because the pressure could be manipulated and was not necessarily

34

unpressurized, the prior art did not inherently disclose an unpressurized flow of liquid.  Id.

In the same way,  Hakansson-2 could be practiced with a filter but is not necessarily practiced with one.  Because it is possible to practice Hakansson-2 without using a filter, a filter is not "necessarily present" in Hakansson-2, and Hakansson-2 does not inherently disclose a filter, as required by the third step of claim 1 of the '226 patent.  Rosco, Inc., 304 F.3d at 1380.  The '226 patent is not anticipated by Hakansson-2. In re Schreiber, 128 F.3d at 1477.

      B.     Whether the Patents-in-Suit are Invalid as Obvious

          1.     Legal Standard.

The fact that a patent is not anticipated, of course, does not mean that it was not obvious based on prior art.  A patent application will be denied "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a); see also generally KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 127 S. Ct. 1727 (2007).  Whether an invention "would have been obvious at the time the invention was made" is a question of law based on underlying facts.  Leapfrog Enters.,

Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1160 (Fed. Cir. 2007).

The landmark case of Graham v. John Deere establishes the factual analysis relevant to obviousness: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) objective indicia of obviousness or nonobviousness, which include "secondary considerations" such as the commercial success of the invention, long felt but unsolved needs, unexpected results, and the failure of others to arrive at the invention. Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17, 86 S. Ct. 684, 694 (1966); see also KSR, 550 U.S. at 406-7, 127 S. Ct. at 1734. "While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls. If a court . . . conducts this analysis and concludes the claimed subject matter was obvious, the claim is invalid under § 103." Id.

The Supreme Court recently discussed the standard for obviousness at length in the KSR opinion. KSR, 550 U.S. at 415, 127 S. Ct. at 1739. In that opinion, the Court modified the manner in which the "teaching, suggestion, or motivation" ("TSM") test for determining obviousness should be applied. The Court replaced the rigid application of the TSM test with "an expansive and flexible approach." Id. Under the traditional TSM test, a patent claim could

36

be proved obvious only if "some motivation or suggestion to combine the prior art teachings can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art." Id. at 407, 127 S. Ct. at 1734 (citation omitted). After the KSR opinion, "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." Id. at 418, 127 S. Ct. at 1741.

The Court recognized, however, that the TSM test "capture[s] a helpful insight," Id. at 418, 127 S. Ct. at 1741, and observed that "most, if not all, [inventions] rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." Id. at 418-19, 127 S. Ct. at 1741. Therefore, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." Id. at 418, 127 S. Ct. at 1741. In considering whether an invention would have been obvious, it remains useful to identify some "apparent reason to combine the known elements," either by looking to the teachings of the prior art, the knowledge of one with ordinary skill in the art, or demands present in the marketplace. Id. at 417-18, 127 S. Ct. at 1740-41; see also id. at 418, 127 S.

37

Ct. at 1741 ("[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.").

The Court also discussed cases involving a situation similar to the present case where a patent claims a structure already known in the prior art (the "sink on a drum" parts washer) but which modifies the prior structure by substituting an element (the use of microbes to bioremediate hydrocarbons). To avoid being obvious, "the combination must do more than yield a predictable result." Id. at 416, 127 S. Ct. at 1740. Therefore, "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." Id. at 417, 127 S. Ct. at 1740. The KSR opinion is instructive when applied to the patents-in-suit.

2.    Obviousness Analysis.

In applying the Graham factors, the Court will consider (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the art. KSR, 550 U.S. at 406-7, 127 S. Ct. at 1734. The Court must then look to objective evidence of obviousness and nonobviousness. Graham, 383 U.S. at 17-18, 86 S. Ct. at 694. Each of the Graham factors will be discussed in turn.

a.    Scope and Content of the Prior Art.

38

In order for a patent to be considered prior art under 35 U.S.C. § 102(a), it must have been patented or published before ChemFree invented its bioremediating parts washers.  35 U.S.C. § 102(a).  ChemFree contends that it had invented its parts washers by the end of March 1994, prior to the publication of two references which Walter alleges to be prior art: the Minkin reference (U.S. Patent No. 5,529,080) and the Sims reference (U.S. Patent No. 5,656,156).  ChemFree offered significant evidence that its bioremediating parts washers were invented prior to May 13, 1994, the filing date of the earlier of these references.  Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1576-77 (Fed. Cir. 1996) (noting that, upon presentation of evidence indicating that a prior art document was published before the filing date of a patent-in-suit, the burden shifts to the patent holder to produce evidence that he had invented the patented subject matter before the prior art document was published).

Francis Marks, one of the co-inventors, testified that by March 1994 ChemFree had placed prototypes in the field that contained a sink, a tank, a filter, a heater, a thermostat for controlling the heater, a pump, a fluid level sensor, and microbes capable of bioremediation. (Tr. at 292:15-293:11.)  He also testified that, by March 1994, they had prototypes in the field that contained a tiered basin, flat filters placed in the tiered basin, a level sensor

39

switch, a heater, a thermostat, and microorganisms flowing in the fluid.  (Id. at 356:5-12.)

The documentary evidence also suggests a date of invention prior to May 13, 1994: a February 16, 1994 internal status report indicated that the inventors believed that the "Enretech green solution was highly effective, was bioremediating hydrocarbons, and was the fluid of choice."  (Pl. Ex. 527 at 2. See also Def. Ex. 154, 159, 208, 365.)

In summary, ChemFree offered sufficient evidence to establish a date of invention prior to the publication of the Minkin and Sims references. Defendants failed to rebut this evidence.  Therefore, the Minkin and Sims references will not be considered prior art for purposes of the obviousness analysis.  See Mahurkar, 79 F.3d at 1576-77 (discussing the burden-shifting scheme used by the Federal Circuit to determine a device's date of invention); see PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1305-6 (Fed. Cir. 2008) (approving the district court's application of this burden-shifting scheme).  Accordingly, for purposes of this analysis, the Court will consider references published prior to the end of March 1994, which includes Hakansson-2 (Joint Ex. 27) and U.S. Patent No. 3,846,615 ("Athey") (Joint Ex. 28).  ChemFree does not dispute that these references are within the scope and content of the prior art.  (See Pl. Proposed Findings [#604] at 60.)

40

Perhaps most significantly, Hakansson-2 discloses a bioremediating parts washer.  (Tr. at 522:6-8.)  The washing liquid in Hakansson-2 contains "on the one hand, an active detergent, and, on the other hand, microorganisms for reducing the contaminants transmitted from the objects to the washing liquid."  (Joint Ex. 27 at 14.)  The Athey patent discloses a dishwasher that includes a temperature sensor arranged in the washing tank for "controlling the heating means, and means for sensing that the liquid is above a predetermined level."  (Joint Ex. 28 at 1.)  In the Athey invention, the temperature sensor and the liquid level sensor are contained in a single housing, and the level sensor disables the heater "if the liquid level falls below the liquid temperature sensing means for longer than a predetermined time period."  (Id. col. 1, ll. 55-63.)  The float switch in Athey is intended to protect the heater from "thermal shock and overheating by preventing heater operation when the water level is low," (Id. col. 5, ll. 15-17.), just as the sensor included in the patents-in-suit include "[a] heater, thermostat, and level control assembly function to maintain the cleaning fluid with a certain temperature range so as to aid in the removal of organic waste and maintain a proper environment for the organisms."  '835 patent, abstract.

The specifications of the patents-in-suit acknowledge that "parts washers are well known and are often employed in the cleaning of parts that

41

are contaminated with organic waste products such as . . . hydrocarbons, oils, and greases." <u>See, e.g.</u>, '110 patent Col. 1, ll. 9-12. The specifications explain the physical structure of typical parts washers:

> Most conventional parts washers include a basin mounted to the top of a tank. The tank is partially filled with a mineral spirits solvent that is pumped from the tank through a conduit that discharges into the basin where the parts are washed. The mineral spirits solvent drains from the basin back to the tank for reuse. A filter is sometimes interposed in the solvent flowpath to collect organic waster products and particulates washed from the parts.

<u>Id.</u> col. 1, ll. 16-24. The ChemFree patents mirror this design.

> b.      Level of Ordinary Skill in the Art.

Before determining the level of ordinary skill in the art, the Court must first define the "art." Walter's expert – Dr. Adriaens – contends that the "art" is the art of manufacturing bioremediating parts washers. However, his own testimony indicates that no bioremediating parts washing art existed at the time of the invention. (Tr. 754:4-12.) Dr. Adriaens, a professor of civil and environmental engineering at the University of Michigan, admitted that prior to 1994, he could not name any persons or companies involved in the manufacture and sale of bioremediating parts washers at that time. (<u>Id.</u> at 798:4-799:5.)

The record reflects, however, that in 1994 parts washers were widely

used to clean parts contaminated with organic waste products such as hydrocarbons, oil, and grease.  See, e.g., '110 patent Col. 1, ll. 9-12. Furthermore, Hakansson-2 had existed since 1992, and it disclosed a bioremediating parts washer.  (Joint Ex. 27.)

Thus, the Court finds that the relevant "art" for the purpose of obviousness is the art of developing and manufacturing parts washers for use in cleaning parts contaminated with organic waste such as hydrocarbons, oil, and grease.

Several factors determine the level of ordinary skill in the art, including: (1) the educational level of the inventors; (2) the types of problems encountered in the art; (3) prior art solutions to those problems; (4) how rapidly innovations in the art are made; (5) the sophistication of the technology; and (6) the educational level of active workers in the field.  Envtl. Designs, Ltd. v. Union Oil Col. of Cal., 713 F.2d 693, 696-97 (Fed. Cir. 1983), cert. denied, 464 U.S. 1043, 104 S. Ct. 709 (1984) (citation omitted).  In this case, the parts washing industry faced substantial and rapid changes in the mid-1990's due to the imposition of environmental regulations, as ChemFree's own market study—which indicated strong demand for a safer, non-flammable parts washer that was not harmful to the operator—demonstrated.  See Def. Ex. 144.  The educational level of the

43

inventors, the problems encountered in the art, the sophistication of the technology, and the educational level of active workers in the field are important factors for dealing with these changes.

First, the inventors of the patented invention were college-educated and had knowledge of the fundamentals of biology and chemistry, but they lacked graduate level scientific training. Of the four inventors, two had Bachelor's Degrees in economics and two had Bachelor's Degrees in industrial engineering. (Durkee Rebuttal Report [#337] at 96-97.) None of the primary inventors of the patented invention had prior experience in the parts washing industry. (Tr. at 61:22-62:3, 442:21-25.) Neither McNally nor McClure, the individuals credited with the idea of using microbes in the invention, was a biologist or a chemist. (Id. at 443:1-4.)

Second, the parts washing art encountered a significant new problem in the mid-1990's – aggressive environmental regulation. Widespread concern about the number of chemicals depleting the Earth's ozone layer, many of which were used in parts washers, led to the adoption of the Montreal Protocol. (Durkee Rebuttal Report [#337] at 37, 98-101.) The Montreal Protocol banned many of these solvents, disrupting the manufacture and use of the most popular cleaning products and processes on the market. (Tr. at 645:12-25.) All of these factors motivated practitioners to create new methods

44

to clean metal which were affordable, effective, environmentally friendly, and did not use the banned solvents. (Durkee Rebuttal Report [#337] 99-100.)

The individuals involved in developing and manufacturing parts washers at the time typically had "no more than a Bachelors [sic] Degree" and rarely had "more than one year of Chemistry and/or one year of Biology" at the undergraduate level. (Id. at 110-11.)  However, as the ISC market study indicated, everyone in the industry—from the engineers who designed parts washers to the workers in the field who used them—recognized the pressing need to identify means for cleaning soiled parts and disposing of the removed soils without causing environmental damage.  Def. Ex. 144.  Thus each of these individuals would have been motivated to seek acceptable substitutes for the banned solvents and an alternative means for disposing of environmentally harmful materials.

In summary, a person of ordinary skill in the art of designing parts washers at the time of the invention had no more than a Bachelor's Degree, including no more than one year of undergraduate study in chemistry and biology.  The practitioner would have had little advanced education in the area of bioremediation but would have had three years practical experience working with parts washing technology.  The person of ordinary skill in the art would have felt the need to develop a safe, non-toxic, and environmentally

friendly parts washer as an alternative to the parts washers in service at the time. He would have been aware of bioremediation as an environmentally friendly method for disposing of hydrocarbons because of the media coverage it received during the cleanup of the Exxon Valdez oil spill, and he would have been motivated to use bioremediation because of its environmentally friendly nature.

Walter contends that this level of ordinary skill in the art is inconsistent with the level of ordinary skill as determined by the Court for purposes of Walter's enablement defense. To the contrary, the level of ordinary skill in the art of *parts washing* for purposes of enablement is analogous to that applied here. (Order, May 19, 2009 at 15-16, 26-27.) Just as the person of ordinary skill was not sufficiently trained in environmental science to develop a cleaning agent which would both clean metal and co-exist with microbes in the enablement situation, neither would that person have been able to create an appropriate combination of cleaning fluid and microbes. However, just as the person of ordinary skill practicing the patent would have been highly motivated to consult with an environmental engineer, so would a person of ordinary skill in designing environmentally acceptable parts washers be motivated to contact an environmental engineer for help determining an existing fluid and useable microbes to use in an

46

environmentally friendly parts washer.  The decision to consult with an outsider about a technology disclosed in the prior art does not constitute an inventive leap; rather, it is a decision that a person of ordinary skill in the art would have been motivated to make at that time.

> c.   Differences Between the Prior Art and the Claims at Issue.

ChemFree's expert – Dr. Durkee – acknowledged that Hakansson-2 discloses all limitations of the asserted claims except the heater limitations, some of the fluid limitations, and certain structural limitations, including the use of a filter.  These limitations, which Dr. Durkee has claimed were absent from Hakansson-2, are identified and grouped in Exhibit B of this Order.  Each of these limitations are present in Hakansson-2 or elsewhere in the prior art.

> i.   heater limitations

Athey disclosed each of the heater limitations that are not disclosed in Hakansson-2.  (Durkee Supp. Report [# 467] App. at 2-21.)  ChemFree's expert testified that a person of ordinary skill in the art in 1992 would have used a heater in a parts washer and would have wanted to protect that heater from low fluid levels.  (Tr. at 627:20-629:12.)  Accordingly, all of the heater limitations found in the patents-in-suit were disclosed in the prior art.

ii.     fluid limitations

A person of ordinary skill in the art would have realized that the use of a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid was necessary for the device to function.  Therefore, all of these limitations were inherently disclosed in Hakansson-2.  See 5 CHISUM ON PATENTS, § 5.03(3)(a)(i)(A) ("An inherent feature may be relied upon to establish obviousness only if the inherency would have been obvious to one of ordinary skill in the art.").

As to the toxicity requirement, the parties construed non-toxic to mean that "microorganisms are capable of living within the cleaning fluid."  (Joint Claim Construction Statement [# 114] at 4.)  Hakansson-2 discloses the use of a cleaning fluid that has both "an active detergent" and "microorganisms for reducing the contaminants transmitted form the objects to the washing liquid." (Joint Ex. 27 at 1.)  Hakansson-2 also promotes the fact that the fluid does not contain toxic substances.  (See, e.g., id. at 6.)  Because Hakansson-2 requires that the fluid contain both a detergent *and* microorganisms "capable of living within the cleaning fluid," Hakansson-2 inherently requires the fluid to be non-toxic to the microbes.

Regarding non-caustic, Hakansson-2 states that, by maintaining the fluid at a "controlled pH-value," "an active biological bacteria growth is

obtained feeding on the contaminant supply." (Joint Ex. 27 at 11.)  Thomas McNally admitted that a person would want the Hakansson-2 fluid to be non-caustic in order to not harm the microbes.  (Tr. at 453:16-455:3.)  Moreover, Dr. Adriaens explained that a caustic solution would kill microbes the same way it would break down human tissue.  (Id. at 770:20-771:5.)  A person of ordinary skill using a cleaning fluid at the time of the invention would necessarily use a fluid which does not harm the microbes.  (Id. at 648:23-649:6.)  Thus, Hakansson-2 inherently discloses a non-caustic fluid.

As to the biodegradable requirement, Dr. Durkee admitted that the microorganisms in Hakansson-2 consume the surfactants during operation. (Durkee Supp. Report [#467] at 26.  See also Tr. at 638:20-640:10, 768:16-769:1.)  Accordingly, the fluid in Hakansson-2 is biodegradable.

As to the non-flammable requirement, the Hakansson-2 fluid is surfactant-based (Durkee Supp. Report [#467] App. at 14), and surfactants are not generally flammable (tr. at 771:11-21).  Dr. Adriaens testified that, after some investigation, he was unable to locate any flammable surfactants. (Id. at 771:11-24.)  Furthermore, Hakansson-2 contained a heater, which would make the use of flammable liquids dangerous (Joint Ex. 27 at 10), and a person of ordinary skill in the art in 1993-94 would necessarily use a nonflammable fluid in order to prevent the heater from causing a fire (tr. at

49

648:14-22).  Thus, a person of ordinary skill in the art would understand that the cleaning fluid disclosed in Hakansson-2 was biodegradable, non-toxic, non-caustic, and non-flammable.  As such, Hakansson-2 discloses the fluid limitations listed in Exhibit B.

iii.    structural limitations

The patent specifications themselves state that the patented parts washers use the well known "sink on a drum" configuration of a basin mounted on a tank with a pump and conduit assembly to pump the fluid from the tank to the basin.  <u>See, e.g.</u>, '110 patent, col. 1, ll. 16-24.  Thomas McNally acknowledged that, prior to the development of the invention, conventional parts washers had a basin-on-tank design and they often incorporated the use of pumps and filters.  (Tr. at 404:19-405:15.)   Similarly, the patent specifications also state that filters are "generally incorporated into conventional parts washers to separate the organic waste products and particulates from the solvent."  <u>See, e.g.</u>, '226 patent, col. 1, ll. 49-50.  Dr. Durkee acknowledged that a person of ordinary skill in the art would have wanted to protect his machine's pump through the use of a filter.  (Tr. 589: 22-24.)

Thus, the structure of the parts washers – including the basin mounted on a tank design and the use of a pump and conduit assembly together with a

50

filter – was well known in the art of parts washing prior to the development of the invention.  (See also Durkee Rebuttal Report [#337] at 39-42.)

Hakansson-2 discloses all elements of the claimed invention except the structural limitations and the heater limitations.  Athey discloses the heater limitations, and the structural limitations were well known to persons of ordinary skill in the art.  Thus, taken together, Hakansson-2, Athey, and the general knowledge of a person of ordinary skill in the art disclose all elements of the claimed invention.

### d.    Objective Indicia.

ChemFree's strongest argument on nonobviousness is perhaps its evidence of "secondary considerations."  Secondary considerations, which are objective indicia of obviousness or nonobviousness, help "to give light to the circumstances surrounding the origin of the subject matter sought to be patented."  Graham, 383 U.S. at 17-18, 86 S. Ct. at 694.  Consideration of this evidence serves "to 'guard against slipping into use of hindsight' and to resist the temptation to read into the prior art the teachings of the invention in issue."  Id. at 36, 86 S. Ct. at 703 (quoting Monroe Auto Equipment Co. v. Heckethron Mfg. & Sup. Co., 332 F.2d 406, 412 (6th Cir. 1964)).

ChemFree offered objective evidence of nonobviousness in the form of the recognition bioremediating parts washers received from members of the

51

parts washing industry.  ChemFree's invention received a number of awards in the industry.  (Pl. Ex. 90, 598, 600, 601; tr. at 929:9-933:20.)

Some competitors may have copied ChemFree's invention.  (See Tr. at 916:12-925:4.  See also Durkee Rebuttal Report [#337] at 182-197.)  The evidence indicated that Walter relied heavily on the Graymills BIO436 machine – which Graymills developed with the assistance of ChemFree – in developing their first bioremediating parts washer, the BR-100.  See supra Section I.C-D.  Evidence of copying by others may demonstrate that the invention is not obvious.  Ruiz v. A.B. Chance Co., 234 F.3d 654, 662-63 (Fed. Cir. 2000).

Walter purchased several patents claiming methods and machines almost identical to those claimed in the patents-in-suit.  Walter purchased two patents obtained by Burt Overland: U.S. Patent No. 7,303,908 ("the '908 patent") (Pl. Ex. 371) and U.S. Patent No. 6,057,147 ("the '147 patent") (Pl. Ex. 370).  (Tr. at 255:6-22, 272:2-11.)  The methods claimed in the '147 patent and the parts washers claimed in the '908 patent are very similar to the methods and parts washers claimed in the patents-in-suit.  (Pl. Ex. 370 at 19; Pl. Ex. 371 at 16.)  The IO-200 and IO-400 parts washers – both of which were found to have infringed the patents-in-suit – have placards attached to them which identify the '147 patent.  (Tr. at 272:20-273:2.)

52

Some objective indicia of obviousness also exist, however.  First, ChemFree was not the only company seeking to patent the use of bioremediation in a parts washer at that time.  The Hakansson-2 patent had existed since 1992.  (Joint Ex. 27.)  Burt Overland filed his '147 patent application in early 1997, while ChemFree's applications were pending.  CB Chemie independently developed a bioremediating parts washer.  (Tr. 470:2-10.) Therefore, others in the industry recognized the benefits of incorporating bioremediation technology into parts washers at the same time or before ChemFree.

The record contains other indications that other persons of ordinary skill in the art at the time had the same reason to combine known parts washer elements with bioremediating microorganisms and reached the expected result.  Indeed, ChemFree's own February 16, 1994 status report indicates that, as of that date, at least three of the company's competitors were developing "environmentally benign" machines.  (Pl. Ex. 527.)  Additionally, several companies had already developed, or were in the process of developing, liquids containing bioremediating microbes.  Among these were Louisiana Remediation Company, Enretech, and CB Chemie.  (Tr. 342:21-345:23, 470:21-471:19.)

       3.      Conclusions as to Obviousness.

53

The patents-in-suit appear to be "combination inventions," inventions which consist entirely of prior art elements the combination of which do not result in any "unusual or surprising" consequences.  Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S. Ct. 127, 130 (1950).  Hakansson-2, combined with a person of ordinary skill in the art's knowledge of the structure of open basin parts washers, discloses all elements of the asserted claims of the '226, '835 and '125 patents, with the exception of claims 17 and 19 of the '125 patent.  See supra Section V.C.3.b.ii. In addition, Athey and Hakansson-2, when combined with each other and the knowledge of a person of ordinary skill in the art, disclose all elements of the asserted claims of the '110 patent and the remaining asserted claims of the '125 patent.  See supra id.  Thus, all of the elements of the patented parts washers and methods were known in the prior art in the 1993-94 time frame.

A combination of existing elements can be nonobvious, but it must produce a "new or different function or operation than that theretofore performed or produced . . . ."  Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S. Ct. 662, 664 (1938).  As discussed in KSR, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  KSR, 550 U.S. at 418, 127 S. Ct. at 1741.  Walter identifies an

"apparent reason to combine the known elements" by looking to the teachings of the prior art, the knowledge of one with ordinary skill in the art, or demands present in the marketplace.  Id. at 417-18, 127 S. Ct. at 1740-41.  As shown above, a number of other companies were also motivated by market forces and new regulatory pressures to develop bioremediating parts washers.  See supra VI.B.2.b. The issue, therefore, is not whether the combination improved parts washers.  See Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 60, 90 S. Ct. 305, 307-08 (1969) (holding that the patent-in-suit was obvious despite being "of great convenience" because its combination of prior art elements did not produce a "new or different function.").  The issue is whether the use of new bioremediation technology in a parts washer is "but a natural use" of that new technology.  5 DONALD S. CHISUM, CHISUM ON PATENTS, §5.04 (5)(c)(iv).  If the combination is the obvious technological response to the problem created by the new environmental regulations, the combination is not patentable.  Id.

In this case, Hakansson-2 used bioremediating microorganisms to improve a parts washer.  It would not have been beyond a person of ordinary skill in the art to incorporate the bioremediating aspect of Hakansson-2 into an open-basin parts washer.  The fact that a number of bioremedating parts washers were being developed contemporaneously with ChemFree's indicates

that both the combination and the result were expected.

Market pressures would have motivated a person of ordinary skill in the art to incorporate bioremediation technology into parts washing machines as the patents-in-suit did.  As acknowledged by Dr. Durkee, the Montreal protocol disrupted the manufacture of cleaning products and caused people to look for other solutions because it banned the use of the cleaning products that were formerly used in the industry.  (Tr. at 645:12-25.)

As discussed above, the person of ordinary skill in the art was motivated by the parts washing industry's need to find a safe and environmentally friendly substitute for the newly-banned solvents.  Indeed, others sought patents on bioremediating parts washers not long after ChemFree did.  See, e.g., '147 patent. Furthermore, while ChemFree was developing its parts washers, three of its competitors were also developing "environmentally benign" parts washers.  (Def. Ex. 527.)

As for the composition of the bioremediating fluid, liquids containing bioremediating microbes were available from a number of suppliers at this time (tr. 342:21-345:23, 470:20-471:19), and it was obvious for a person of ordinary skill to try incorporating these fluids into a sink on a drum parts washer.

Moreover, ChemFree's own market research indicated that the users

wanted fluids that were safe, inexpensive, and easy to use.  According to ISC's own market study, consumers thought the "Ideal Parts Washer System" would be one that:

- never breaks down;

- does not produce hazardous wastes;

- has a filter system so that the fluid stays clean; and

- cleans better and quicker than current systems.

(Def. Ex. 144 at 3.)  The market survey indicated that consumers wanted a parts washer that was "nontoxic, nonflammable, noncaustic, [and] nonhazardous[.]"  (Tr. at 315:1-316:9.)  Thus, market pressures would have motivated a person of ordinary skill in the art to make a parts washer that used organic fluids that were nontoxic, nonflammable, noncaustic, and not hazardous.[8]  As with the enablement analysis, any inventor motivated to achieve a cleaning solution like the one described above could have consulted with an environmental engineer or could have gone directly to a vendor such as Sea Wash or Louisiana Remediation Company an purchased one from them.

---

[8] The Court also notes that Sea Wash 7 – the commercially available cleaning fluid ChemFree initially used in its patented parts washers – stated on the label that it was "highly biodegradable," "non-toxic," "neutral ph 7," "non-flammable" and "non-hazardous."  (Pl. Ex. 45.)

The addition of level sensors to control the heaters did not amount to a non-obvious addition to the invention which would make it patentable.  Athey – a patent issued twenty years before the development of the patented invention –  disclosed level sensors used to control the operation of a heater in a parts washer.  (See generally Joint Ex. 28.)  Dr. Durkee testified that a person of ordinary skill in the art in 1992 would have used a heater in a parts washer and would have wanted to protect that heater from low fluid levels.  (Tr. at 627:20-629:12.)  Thus, a person of ordinary skill would have known to include a level sensor to disable the heater in the event the liquid level got too low.

In summary, ChemFree combined a known parts washer design—the "sink on a drum" design—with bioremediating microbes that were available from several vendors in the marketplace.  (Durkee Rebuttal Report [#337] at 39; tr. 342:21-345:23, 470:21-471:19.)  The resulting combination performed precisely as one would expect: it rinsed organic matter from the parts and then biodegraded the organic matter.

The secondary considerations of non-obviousness relied upon by ChemFree are impressive but not sufficient to overcome the other Graham factors.  The subject matter of the patents-in-suit, considered as a whole, were obvious to one having ordinary skill in the art of designing parts washers. 35

U.S.C. § 103(a); <u>KSR</u>, 550 U.S. at 417, 127 S. Ct. at 1740. Accordingly, the asserted claims of the '110 patent, the '125 patent, the '226 patent, and the '835 patent are invalid.

      C.    Inventorship Issues

Walter also contends that several of the alleged co-inventors were misnamed on the face of the patents-in-suit. Specifically, Walter contends that James McClure is the sole inventor of the patented invention and, therefore, the patents-in-suit should have identified McClure as such. At trial, however, the Court granted Plaintiff's motion for judgment as a matter of law on Walter's misjoinder defense because Walter failed to offer sufficient evidence to allow the Court to find that McClure was the sole inventor of the patented invention.

At trial, Leland Strange, Francis Marks, and Thomas McNally all testified that they made significant contributions to the patented invention. Strange testified that his contributions to the invention included: (1) a knee switch on the front of the parts washer; (2) a towel bar on the side of the washer; and (3) adding microorganisms to the system by adhering the microorganisms to a flat filter rather than dumping them directly into the fluid. (Tr. at 73:7-77:4.) Strange obtained a patent – not at issue in this case – for his concept of adhering the microorganisms to the filter. (<u>See</u> Joint Ex.

59

21.)  Strange is the sole inventor named on that patent.  (<u>Id.</u>)  Thomas
McNally corroborated Strange's testimony that Strange developed the concept
of adding the microorganisms to the filter.  (Tr. at 410:13-411:9.)

Francis Marks testified that his primary contribution to the patented
invention was the multi-tiered sink which held the flat filter.  (Tr. at 292:4-
14.)  Strange corroborated Marks's testimony that Marks developed the
multi-tiered sink.  (<u>Id.</u> at 98:1-99:18.)  Marks obtained a patent – not at issue
in this case – that names Marks as the sole inventor of the multi-tiered basin
aspect of the patented invention.  (Joint Ex. 26.)

McNally testified that he developed the level sensor, thermostat,
heater, and the use of microorganisms.  (Tr. at 355:17-21.)  Marks testified
that McNally and McClure were jointly responsible for adding
microorganisms to the system.  (<u>Id.</u> at 332:16-333:14.)  McClure was the
primary person responsible for contacting vendors and locating
microorganisms.  (<u>Id.</u> at 89:17-20, 333:1-14.)

Walter attempted to attack the credibility of McNally, Marks, and
Strange through the use of prior depositions.  However, Walter offered no
affirmative evidence that McClure was the sole inventor of the patented parts
washer.  McClure himself did not testify at trial, and no witness testified that
McClure was the sole inventor of the parts washer or any aspect of the parts

washer.  Because Walter offered insufficient evidence to indicate McClure

was the sole inventor, the Court granted ChemFree's motion for judgment as

a matter of law on Walter's inventorship defense.

      D.     Invalidity Conclusions

In summary, Walter failed to prove by clear and convincing evidence

that the '226 patent was anticipated by the Hakansson-2 reference.  Walter

did demonstrate by clear and convincing evidence, however, that the patents-

in-suit are invalid as obvious.  Lastly, at trial, Walter failed to offer sufficient

evidence with respect to its inventorship defense to withstand a motion for

judgment as a matter of law.  Therefore, the Court finds that the asserted

claims of the patents-in-suit are invalid for obviousness.

## VII. Conclusion

For the reasons discussed, the Court finds that the asserted claims of

the '226, '110, '835, and '125 patents are invalid as obvious.

The parties are **DIRECTED** to file with the Court a statement of any

remaining issues to be determined and a specific schedule, including any

discovery required to present those issues for resolution.  The schedule should

be filed by July 2, 2010.  If the parties are unable to agree on a joint schedule,

each may submit its own version with an explanation for any differences.

The parties are **DIRECTED** to appear for a status conference at 10:00 a.m.

on August 5, 2010 at the U.S. Courthouse, 75 Spring Street, Atlanta, Georgia,

Courtroom 2106.

      **SO ORDERED**, this  _18th_  day of June, 2010.

JACK T. CAMP
UNITED STATES DISTRICT JUDGE

## Exhibit A

The relevant claims of the '110 patent claim the following:

| '110 Patent | |
| --- | --- |
| **Relevant Claim** | **Claim Language** |
| 1 | A system for cleaning hydrocarbons from a part comprising a biodegradable, non-toxic, non-caustic, non-flammable oil dispersant cleaning and degreaser fluid, a parts washer including a tank for containing the fluid and a basin for receiving the part, a pump and conduit assembly for pumping the fluid from the tank into contact with the part within the basin, a flowpath defined between the basin and the tank through which the fluid flows from the basin back to the tank, and microorganisms within the parts washer for biodegrading the hydrocarbons: <br><br> the microorganisms substantially sustained within and flowing with the fluid, the parts washer further includes a heater for heating the fluid; and <br><br> means for controlling said heater to maintain the fluid approximately at a desired temperature and for disabling said heater as the fluid drops to below a desired level in the tank. |
| 4 | The combination of claim 1, wherein the heater is at least partially immersed in the fluid. |
| 5 | The combination of claim 1, wherein the heater is constructed and arranged to add heat to the fluid while the fluid is disposed within the tank. |
| 6 | The combination of claim 1, wherein said means for controlling said heater includes a level sensor cooperating within the fluid in the tank and said heater for deactivating said heater. |

| 7 | The combination of claim 1, wherein said means for controlling said heater includes a thermostat cooperating with the fluid and said heater for activating and deactivating said heater. |
|---|---|
| 8 | The combination of claim 7, wherein said means for controlling said heater further includes a level sensor cooperating with the fluid in the tank and said heater for deactivating said heater. |

The relevant claims of the '125 patent claim the following:

| '125 Patent | |
|---|---|
| **Relevant Claim** | **Claim Language** |
| 1 (non-asserted) | A method of removing hydrocarbons from a part and disposing of the hydrocarbons, the method comprising the steps of:<br><br>suspending, in a biodegradable, non-caustic, non-flammable, oil dispersant, cleaning and degreasing fluid, microorganisms to which the fluid is non-toxic,<br><br>providing a parts washer having at least a basin for receiving the part and a tank below the basin for containing the fluid,<br><br>bringing the part into contact with the fluid containing the microorganisms,<br><br>allowing the fluid to remove the hydrocarbons from the part and flow into the tank, and<br><br>allowing the microorganisms within the fluid to biodegrade the hydrocarbons. |

| 4 | Method of claim 1, further comprising the step of maintaining the fluid at a desired temperature, wherein a heater heats the reservoir. |
|---|---|
| 5 | Method of claim 1, further comprising the step of filtering the fluid after the bringing step. |
| 6 (non-asserted) | A method of cleaning hydrocarbons from an object, said method comprising the steps of introducing hydrocarbon biodegrading microorganisms into a biodegradable, non-caustic, non-flammable, oil dispersant cleaning and degreasing fluid that is non-toxic to the microorganisms, wherein the fluid is contained within a washing apparatus including a tank, a basin, a pump and conduit assembly, and a flowpath defined between the basin and the tank through which the fluid flows from the basin into the tank, bringing the part into contact with the fluid and the microorganisms in the basin, removing hydrocarbons from the part, draining the fluid with the hydrocarbons and microorganisms contained therein from the basin to the tank and retaining the hydrocarbons within the fluid in the tank while the microorganisms biodegrade the hydrocarbons. |
| 7 | Method of claim 6, further comprising the step of positioning a filter within the flowpath. |

| 12 (non-asserted) | A method of cleaning hydrocarbons from a part in a parts washer, the method including the steps of: |
|---|---|
| | exposing the part within a basin to a biodegradable, non-caustic, non-flammable oil dispersant cleaning and degreasing fluid to clean the hydrocarbons from the part, |
| | providing a flowpath for the fluid between the basin and a tank, wherein microorganisms, to which the fluid is non-toxic, are disposed within the fluid for biodegrading hydrocarbons associated with the part, |
| | allowing the fluid with the hydrocarbons contained therein to flow into the tank, and |
| | retaining the hydrocarbons within the tank for sufficient time for the microorganisms to substantially biodegrade the hydrocarbons. |
| 13 (non-asserted) | The method of claim 12, further comprising the step of heating the fluid. |
| 16 | The method of claim 13, wherein the heating step includes a step of heating the fluid within the tank. |
| 17 | The method of claim 13, further comprising a step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level. |
| 18 | The method of claim 13, further comprising a step of measuring the temperature of the fluid, wherein the heating step is responsive to the step of measuring the temperature. |
| 19 | The method of claim 18, further comprising a step of measuring the level of the fluid, wherein the heating step is responsive to the step of measuring the level. |
| 21 | The method of claim 12, further comprising the step of interposing a filter within the flowpath. |

The relevant claims of the '226 patent claim the following:

66

| '226 Patent | |
|---|---|
| **Relevant Claim** | **Claim Language** |
| 1 | A method of washing parts comprising the steps of:<br><br>(a) placing at least one part in a first chamber;<br><br>(b) circulating a cleaning fluid from a second chamber to the first chamber to wash the surface of the part in contact with the fluid said cleaning fluid removing organic matter;<br><br>(c) passing the cleaning fluid that had contacted the part through a porous medium;<br><br>(d) draining the cleaning fluid from the first chamber into the second chamber;<br><br>(e) removing organic matter in the cleaning fluid in the second chamber wherein the step of removing the organic matter from the fluid comprises biologically degrading the organic matter;<br><br>(f) re-circulating the cleaning liquid from the second chamber to the first chamber to be available for washing parts. |
| 3 | The method of claim 1, wherein the cleaning liquid is surfactant-based. |
| 4 | The method of claim 3, wherein the cleaning liquid is water-based. |

The relevant claims of the '835 patent claim the following:

| '835 Patent | |
|---|---|
| **Relevant Claim** | **Claim Language** |

| 5 (non-asserted) | A system for cleaning hydrocarbons from a part, the system comprising a biodegradable, non-toxic, non-caustic, nonflammable, oil dispersant cleaning and degreasing fluid, a parts washer including a tank for containing said fluid and a basin for receiving the part, a conduit assembly, a pump for pumping said fluid from said tank through said conduit assembly and into contact with the part within said basin, a flowpath defined between said basin and said tank through which said fluid flows between said basin and said tank and microorganisms within said parts washer, said microorganisms at least partially flowing with and substantially sustained within said fluid, said fluid being non-toxic to said microorganisms, whereby the microorganisms biodegrade the hydrocarbons while retained within said tank. |
|---|---|
| 8 | The system of claim 5, and said parts washer further including a filter interposed within said flowpath. |
| 10 | The system of claim 5, and said flowpath being the sole flow path for fluid flowing from said basin to said tank, said parts washer further including a filter interposed within said flowpath. |
| 11 | The system of claim 10, and substantially all hydrocarbons cleaned from a part in the basin and substantially all fluid flowing from the basin encounter said filter in route to said tank. |
| 12 | The system of claim 11, wherein hydrocarbons and fluid pass through said filter, while particulate matter is trapped by said filter. |

**Exhibit B**

| Category | Limitation | Asserted Claims |
|---|---|---|
| **Heater Limitations** | means for controlling the heater to maintain a desired temperature and to disable the heater using a level sensor | '110 patent, all asserted claims |
| | a level sensor cooperating with the tank and heater for deactivating the heater | '110 patent, claims 6 and 8 |
| | measuring the level of the fluid, wherein the heating is responsive to the measured level of the fluid | '125 patent, claims 17 and 19 |
| **Fluid Limitations** | a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid | '110 patent, all asserted claims<br><br>'835 patent, all asserted claims<br><br>'125 patent, all asserted claims |
| | microorganisms at least partially flowing with and sustained within the fluid | '835 patent, all asserted claims |
| | fluid is non-toxic to the microorganisms | '835 patent, all asserted claims<br><br>'125 patent, all asserted claims |

69

| **Structural Limitations** | a basin for receiving a part | '110 patent, all asserted claims<br><br>'835 patent, all asserted claims<br><br>'125 patent, all asserted claims |
| --- | --- | --- |
| | a pump and conduit assembly for pumping the fluid from the tank into contact with the part in the basin | '110 patent, all asserted claims<br><br>'835 patent, all asserted claims |
| | allowing the fluid to "flow" or "drain" into the tank | '125 patent, all asserted claims |
| | a filter in the flowpath | '226 patent, all asserted claims |

(<u>See</u> Durkee Supp. Report [#467] App. at 2-21.)