1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3

CHEMFREE CORPORATION,       )
4                        )
            PLAINTIFF,  )
5                        )       CIVIL ACTION
        VS.          )       FILE NO. 1:04-CV-3711-JTC
6                        )
                        )       ATLANTA, GA
7  J. WALTER INC.; J. WALTER  )       JULY 13, 2009
   COMPANY, LTD.,          )
8                        )
            DEFENDANT.  )
9 _____)

10

11                    VOLUME 1

12              PAGES 1 THROUGH 192

13        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
          BEFORE THE HONORABLE JACK T. CAMP
14           UNITED STATES DISTRICT JUDGE

15

APPEARANCES:
16    FOR THE PLAINTIFF:        WILLIAM ARTHUR CAPP
                          LUKE ANDERSON
17                       KLAUS MELARTI
                       ATTORNEYS AT LAW
18
    FOR THE DEFENDANTS:       STEVE SCHAETZEL
19                      JOHN HARBIN
                      DAVID MORELAND
20                     ANTHONY ASKEW
                     ATTORNEYS AT LAW
21

22  LORI BURGESS, OFFICIAL COURT REPORTER
   (404) 215-1528
23

24  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
   PRODUCED BY CAT.
25

## INDEX OF EXAMINATIONS

**WITNESS NAME**                                                  **PAGE**

**LELAND STRANGE**
    DIRECT BY MR. CAPP .................................................57
    CROSS BY MR. HARBIN ................................................80

**TIMOTHY HOUGHTON**
    CROSS BY MR. ANDERSON ............................................115
    DIRECT BY MR. HARBIN .............................................183

1              THE CLERK:  YOUR HONOR, THIS IS THE TIME SET FOR

2     THE BENCH TRIAL IN THE CASE, CHEMFREE CORPORATION VERSUS J.

3     WALTER, INC. ET AL.  CIVIL ACTION NO. 1:04-CV-3711.  WILL

4     COUNSEL PLEASE STAND AND IDENTIFY YOURSELVES AND YOUR

5     CLIENTS FOR THE RECORD?

6              MR. CAPP:  GOOD MORNING, YOUR HONOR.  BILL CAPP.

7     I AM WITH THE LAW FIRM OF DUANE MORRIS HERE FOR THE

8     PLAINTIFF, REPRESENTING PLAINTIFF CHEMFREE CORPORATION.

9     WITH ME TODAY IS MY PARTNER LUKE ANDERSON, MY ASSOCIATE

10    KLAUS MELARTI, MY ASSISTANT AQUANIS JOSHUA, AND I HAVE THREE

11    CLIENT REPRESENTATIVES, THEY ARE WILLIAM STRANGE, WHO IS AN

12    EXECUTIVE OF INTELLIGENCE SYSTEMS THAT OWNS CHEMFREE, THE

13    PRESIDENT OF CHEMFREE CORPORATION IS SCOTT MORRIS, AND TOM

14    MCNALLY IS VICE-PRESIDENT AND GENERAL MANAGER OF CHEMFREE

15    CORPORATION.  AND THEN ASSISTING US WITH THE I.T. SYSTEM IS

16    AN INDEPENDENT CONSULTANT, GARY POOLS, FROM CALIFORNIA.

17             THE COURT:  OKAY.  THANK YOU, MR. CAPP.

18             MR. SCHAETZEL:  YOUR HONOR, STEVE SCHAETZEL WITH

19    KING AND SPALDING.  WITH US HERE TODAY IS MR. HARBIN, MY

20    PARTNER, ALSO, AT KING AND SPALDING.  TO MR. HARBIN'S LEFT

21    IS WALTER'S PRESIDENT OF THE U.S. COMPANY, MR. TIM HAUGHTON.

22    BEHIND ME IS DAVID MORELAND, AN ASSOCIATE OF OURS AT KING

23    AND SPALDING, TO HIS LEFT IS MR. CLAUDE VANDEMEULEBROOCKE,

24    WHO IS THE INTERNATIONAL VICE-PRESIDENT OF RESEARCH AND

25    DEVELOPMENT AT WALTER, AND ALSO STANDING IS MR. ASKEW,

1    BEHIND US.

2              THE COURT:  MR. ASKEW, HOW ARE YOU THIS MORNING?

3              MR. ASKEW:  VERY GOOD.

4              THE COURT:  THANK YOU, MR. SCHAETZEL.  WELL, I

5    SPENT SOME TIME YESTERDAY LOOKING OVER THIS, LOOKS LIKE

6    WE'VE GOT A GOOD BIT OF GROUND TO COVER IN A WEEK, BUT I

7    WOULD LIKE TO FINISH THIS WEEK IF WE CAN.  MR. CAPP, WOULD

8    YOU AND MR. SCHAETZEL LIKE SOME TIME TO MAKE AN OPENING

9    STATEMENT?

10             MR. CAPP:  I WOULD AND I THINK I CAN GET IT DONE

11   IN UNDER 35 MINUTES, YOUR HONOR.

12             THE COURT:  MR. SCHAETZEL.

13             MR. SCHAETZEL:  WE, TOO, WOULD LIKE TO AND I THINK

14   THAT TIME FRAME WILL BE SUFFICIENT.

15             THE COURT:  MR. CAPP, YOU MAY PROCEED.

16             MR. CAPP:  THANK YOU, YOUR HONOR.  CHEMFREE

17   CORPORATION IS LOCATED IN NORCROSS, GEORGIA ON THE NORTH

18   SIDE OF TOWN.  IT IS A SMALL MANUFACTURING CONCERN THAT

19   EMPLOYS ABOUT 30 PEOPLE.  IT WAS FORMED IN 1993.  IT IS A

20   PRIVATELY-HELD COMPANY.  THE PRIMARY SHAREHOLDER IS THE

21   INTELLIGENCE SYSTEMS CORPORATION, WHICH IS A PUBLICLY TRADED

22   COMPANY.  IT HOLDS 11 UNITED STATES PATENTS ON ITS

23   BIOREMEDIATION PARTS WASHING TECHNOLOGY.  FOUR OF THOSE

24   PATENTS ARE BEING ASSERTED AGAINST THE DEFENDANTS IN THIS

25   TRIAL.

1          CHEMFREE ALSO HOLDS PATENTS IN EUROPE, CANADA,

2     SOUTH AMERICA, WHERE CHEMFREE ALSO COMPETES DIRECTLY WITH

3     THE DEFENDANTS.  CHEMFREE LEARNED OF THE DEFENDANTS'

4     INFRINGEMENT IN THE FALL OF 2004, WHEN DEFENDANTS MADE

5     INQUIRIES ABOUT A POSSIBLE MERGER OR ACQUISITION.  THE

6     PARTIES NEGOTIATED FOR ABOUT FOUR MONTHS IN LATE 2004 AND

7     EARLY 2005.  CHEMFREE INVITED THE DEFENDANTS DOWN HERE TO

8     GEORGIA TO VISIT THEIR FACILITIES IN NORCROSS, GEORGIA AS

9     PART OF THE FINANCIAL DUE DILIGENCE FOR A POSSIBLE

10    ACQUISITION.  THEY OPENED THEIR ACCOUNTING BOOKS AND RECORDS

11    SO THAT DEFENDANTS COULD PERFORM FINANCIAL DUE DILIGENCE FOR

12    A POSSIBLE ACQUISITION.  AFTER THAT, THE DEFENDANTS NEVER

13    MADE AN OFFER AND THIS LAWSUIT PROCEEDED.  THE BOTTOM LINE

14    IS, THE DEFENDANTS WENT INTO THIS LAWSUIT KNOWING EXACTLY

15    HOW MUCH MONEY CHEMFREE COULD AFFORD TO SPEND ON THIS

16    LITIGATION.  AND THEY HAVE LITIGATED THIS CASE, OR SHOULD I

17    SAY OVERLITIGATED THIS CASE, ACCORDINGLY.

18         WE HAVE RESOLVED AN AWFUL LOT OF ISSUES, THERE

19    ARE ONLY A FEW REMAINING, BUT LET'S REVIEW THE ISSUES THAT

20    THE COURT HAS ALREADY DISPOSED OF SO WE DON'T WIND UP

21    RE-OPENING ISSUES THAT ARE ALREADY DISPOSED OF.  THE

22    DEFENDANTS STANDING DEFENSE HAS BEEN DISMISSED BY COURT

23    ORDER.  THE JUDGE HAS ALREADY ENTERED A MARKMAN ORDER.

24    INEQUITABLE CONDUCT WAS DISPOSED OF IN 2008.  THE OWNERSHIP

25    DEFENSE WAS DISPOSED OF IN 2008.  THE QUESTION OF WHO OWNS

1    THESE PATENTS IS NO LONGER IN ISSUE IN THIS CASE.  THERE

2    WERE SOME SUGGESTIONS IN THE PROPOSED FINDINGS OF FACT AND

3    CONCLUSIONS OF LAW BY THE DEFENDANTS THAT IT IS STILL AN

4    OPEN ISSUE.  IT IS NOT.  THE COURT HAS GRANTED SUMMARY

5    JUDGMENT THAT CHEMFREE OWNS THESE PATENTS.

6              THE LACHES DEFENSE WAS DISPOSED OF IN 2008.  THE

7    EQUITABLE ESTOPPEL DEFENSE WAS DISPOSED OF IN 2008.  THE

8    PATENT MISUSE UNCLEAN HANDS DEFENSE WAS DISPOSED OF IN 2008.

9    THE SO-CALLED ACQUIESCENCE DEFENSE IN THE SAME ORDER, IN

10   2008.  THE INVENTORSHIP DEFENSE WAS PARTIALLY RESOLVED IN

11   2008.  IN OTHER WORDS, THE SUMMARY JUDGMENT ORDER THAT WE

12   HAVE CLARIFYING THE EARLIER SUMMARY JUDGMENT PROCEEDING

13   DOCKET 413 MAKES IT CLEAR THAT THIS COURT WILL NOT

14   INVALIDATE THESE PATENTS DUE TO IMPROPER INVENTORSHIP.  THAT

15   THE ONLY RELIEF AVAILABLE, IF IT TURNS OUT THE INVENTORSHIP

16   IS INCORRECT, IS FOR THE COURT TO DIRECT THE PTO

17   COMMISSIONER UNDER 35 USC 256 TO CORRECT THE INVENTORSHIP.

18             FINALLY, THE COURT RESOLVED THE ENABLEMENT DEFENSE

19   AT DOCKET 550 ON MAY 20, 2009.  YOUR HONOR, THIS LITIGATION

20   TO DATE WITH THIS MANY ISSUES, IN CHEMFREE'S OPINION, THIS

21   CASE HAS BEEN UNNECESSARILY TIME CONSUMING AND EXPENSIVE,

22   OUT OF ALL PROPORTION TO THE AMOUNT OF CONTROVERSY, WHICH

23   CHEMFREE ATTRIBUTES TO DEFENDANT'S TACTICAL GAMESMANSHIP AND

24   OTHER LITIGATION MISCONDUCT, AND CHEMFREE INTENDS TO SEEK AN

25   AWARD OF STATUTORY ATTORNEYS FEES UNDER THE EXCEPTIONAL

1    CIRCUMSTANCES PROVISIONS OF 35 USC 285 AFTER THE CONCLUSION

2    OF THE TRIAL.

3              WE'VE GONE OVER THE ISSUES THAT HAVE BEEN

4    RESOLVED.  THERE ARE THREE ISSUES REMAINING TO BE TRIED.

5              THE FIRST ISSUE IS INFRINGEMENT.  THE DEFENDANTS

6    HAVE FOUR PARTS WASHERS, THEY ARE LINED UP TO YOUR RIGHT

7    ALONG THE WALL OF THE COURTROOM.  AND IN ADDITION TO THAT,

8    THEY MANUFACTURE CLEANING FLUID THAT IS USED IN THOSE PARTS

9    WASHERS.  THE PARTS WASHERS AND CLEANING FLUID ARE

10   INDIVIDUALLY AND SEPARATELY ACCUSED OF CONTRIBUTORY

11   INFRINGEMENT.  THE PARTS WASHERS AND CLEANING FLUID COMBINED

12   AS A SYSTEM IS ACCUSED OF DIRECT INFRINGEMENT.

13             WITH RESPECT TO THE NEXT DEFENSE, THE DEFENDANTS

14   HAVE RAISED A DEFENSE OF INVALIDITY OVER THE PRIOR ART UNDER

15   TWO CODE SECTIONS IN THE PATENT CODE.  THEY HAVE RAISED THE

16   DEFENSE OF ANTICIPATION UNDER 35 USC 102 OVER A SINGLE

17   REFERENCE, WHICH WE HAVE REFERRED TO IN THIS CASE AS THE

18   HAKANSSAN-2 REFERENCE.

19             THEY HAVE ALSO ASSERTED OBVIOUSNESS UNDER 35 USC

20   103, FIRST, OVER HAKANSSAN-2 AS A STAND-ALONE REFERENCE, AND

21   SECONDLY, HAKANSSAN-2 IN COMBINATION WITH ONE OR TWO OTHER

22   SECONDARY REFERENCES.

23             THE THIRD ISSUE IS THE CORRECTION OF INVENTORSHIP

24   ISSUE, AND I REPEAT, IT IS NOT THE INVENTORSHIP INVALIDITY

25   ISSUE, IT IS THE CORRECTION OF INVENTORSHIP ISSUE.  SECTION

1  256 OF THE PATENT CODE PROVIDES THAT THE COURT MAY ORDER

2  CORRECTION OF INVENTORSHIP ON NOTICE AND HEARING OF ALL

3  PARTIES CONCERNED.  NOW, ALL PARTIES CONCERNED, YOUR HONOR,

4  WOULD INCLUDE ALL OF THE NAMED INVENTORS.  THREE OF THE

5  CO-INVENTORS NAMED ON THE PATENT ARE IN THE COURTROOM TODAY

6  AND THEY ARE STILL AFFILIATED WITH CHEMFREE.  THE FOURTH

7  INVENTOR, CO-INVENTOR, IS THE NOTORIOUS MR. JAMES MCCLUER.

8  WE HAVE TALKED ABOUT HIM A LOT IN THIS CASE.  IT IS MY

9  UNDERSTANDING THAT HE HAS BEEN SUBPOENAED SO THAT IF HE HAS

10  AN OPPORTUNITY TO APPEAR AND TELL HIS STORY, THAT WOULD

11  PROVIDE THE NOTICE AND HEARING OPPORTUNITY FOR ALL PARTIES

12  TO BE CONCERNED SO THAT THE COURT CAN USE THE TRIAL AS THE

13  256 HEARING AN OPPORTUNITY TO BE HEARD IN CASE THE COURT

14  DECIDES IT'S WARRANTED TO DIRECT THE PTO TO CORRECT THE

15  INVENTORSHIP ON THE PATENTS.

16          AS FAR AS OUR ORDER OF PROOF, YOUR HONOR, DURING

17  OUR CASE IN CHIEF, WE WILL PRESENT THE TESTIMONY OF THE

18  THREE CO-INVENTORS, WHO ARE STILL AFFILIATED WITH CHEMFREE.

19  THEY ARE MR. STRANGE, MR. MARKS AND MR. MCNALLY.  DURING THE

20  CASE IN CHIEF, THEIR TESTIMONY WILL BE DIRECTED PRIMARILY IN

21  TWO AREAS:  THE FIRST AREA IS TO GIVE THE JUDGE SOME

22  BACKGROUND ON HOW THE INVENTION WAS CREATED.  SECONDLY, THEY

23  WILL LAY A FOUNDATION FOR THEIR PERSONAL FAMILIARITY WITH

24  THE DEFENDANT'S INFRINGING PRODUCTS, PARTICULARLY THE

25  EARLIEST ONE, WHICH IS THE BR 100 IS THE FARTHEST ONE ALONG

1    THE WALL THERE.  THE EVIDENCE IS GOING TO SHOW THAT THEY

2    PARTICIPATED IN THE UNDERLYING DEVELOPMENT OF THAT SYSTEM

3    THROUGH A PRIVATE LABELING RELATIONSHIP WITH THE COMPANY

4    THAT MANUFACTURED AN EARLIER VERSION OF THAT PARTS WASHER.

5            AFTER THAT, WE WILL CALL THE TWO DEFENDANTS

6    WITNESSES THAT WE HAVE LISTED AS WILL-CALL WITNESSES IN THE

7    PRETRIAL ORDER.  THEY WILL BE CALLED FOR PURPOSES OF CROSS-

8    EXAMINATION.  THEY WILL BE MR. HAUGHTON, WHO IS THE

9    DEFENDANT'S CHIEF EXECUTIVE, AND MR. VANDEMEULEBROOCKE, WHO

10   IS DEFENDANT'S 30(B) DESIGNEE FOR EACH AND EVERY TOPIC THAT

11   WAS ON THE 30(B)(6) NOTICE THAT WAS SERVED IN THIS CASE.

12           WE ALSO INTEND, AT THAT POINT, TO TENDER THREE

13   WITNESSES BY DEPOSITION.  THEY ARE MR. WARNER SCHUDEL, WHO

14   IS A REPRESENTATIVE OF THE DEFENDANTS, I UNDERSTAND HE NOW

15   LIVES IN SWITZERLAND.  THE SECOND WILL BE A MR. PASCAL

16   LAVALEE, WHO IS ALSO A REPRESENTATIVE OF THE DEFENDANTS, WHO

17   RESIDES IN CANADA TO ESTABLISH HIS UNAVAILABILITY UNDER RULE

18   32.  AND THEN THIRD WILL PRESENT THE DEPOSITION OF MR. JERRY

19   SHIELDS, WHO IS PRESIDENT OF GREY MILLS CORPORATION.  AND

20   YOUR HONOR, IT IS GREY MILLS CORPORATION, THAT IS THE

21   MANUFACTURER FOR THE BR 100, WHICH IS THE FARTHEST MACHINE

22   DOWN ON THAT SIDE OF THE COURTROOM.  HE RESIDES AT HIS PLACE

23   OF BUSINESS IN CHICAGO TO ESTABLISH HIS UNAVAILABILITY UNDER

24   RULE 32.

25           FINALLY, BY CONSENT ORDER, WE WILL PRESENT OUR

1    EXPERT WITNESS, DR. DURKEE, WHO IS SITTING IN THE BACK OF

2    THE COURTROOM, BY SWORN DECLARATION IN THE FORM OF HIS

3    EXPERT REPORTS AND, YOU KNOW, WE SHOULD HAVE NICE, CLEAN,

4    PRISTINE COPIES OF HIS REPORTS TO HAND UP TOMORROW.

5            AT THAT POINT, YOUR HONOR, I AM HOPING WE STILL

6    HAVE SOME DAYLIGHT LEFT ON TUESDAY.  IT WOULD BE MY HOPE

7    THAT THE COURT WOULD BE OPEN TO, ONCE I FINISH THE LIVE

8    WITNESSES, TO RECESS THE PROCEEDINGS SO THAT THE COURT CAN

9    REVIEW THE TENDERED DEPOSITIONS AND THE EXPERT REPORTS IN

10   CHAMBERS TO COMPLETE MY PRESENTATION BEFORE I AM ASKED TO

11   REST AND THE DEFENDANT PUTS ON HIS CASE.  BUT YOU ARE IN

12   CHARGE, BUT THAT WOULD BE MY -- THAT WOULD BE MY WISHED

13   DESIRE AND REQUEST TO DO IT THAT WAY.

14           ALL RIGHT.  THESE ARE THE FOUR ACCUSED PARTS

15   WASHERS IN THE CHRONOLOGICAL ORDER IN WHICH THEY WERE

16   INTRODUCED INTO THE UNITED STATES.  WE ALSO HAVE THEM LINED

17   UP IN THE SAME ORDER, PHYSICALLY, ALONG THE WALL.  THEY ARE

18   THE BR 100, WHICH WAS MANUFACTURED BY GRAY MILLS, THE BR 200

19   AND IO 400, WHICH ARE MANUFACTURED BY A COMPANY IN EUROPE

20   CALLED DANIOS.  THE THIRD IS THE IO 200, WHICH I UNDERSTAND

21   IS MANUFACTURED BY A CONCERN IN CANADA NAMED PRADO.

22           IN ADDITION, THEY MAKE A CLEANING FLUID, WHICH IS

23   ACCUSED INFRINGEMENT.  YOUR HONOR, THE DEFENDANTS HAVE

24   ACKNOWLEDGED IN THEIR LOCAL RULE INVALIDITY CONTENTIONS THAT

25   THEIR BIO-CIRCLE L FLUID IS A BIODEGRADABLE, NONCAUSTIC,

1   NONTOXIC, NONFLAMMABLE OIL DISPERSANT AND DEGREASING FLUID,

2   WHICH IS AN ELEMENT OF ALMOST EVERY SINGLE ONE OF OUR

3   CLAIMS.  THAT ELEMENT IS NOT AN ISSUE IN THE CASE.  THE ONE

4   ISSUE THAT ISN'T IN THE CASE IS THAT THE DEFENDANTS DENY

5   BIO-CIRCLE FLUID IS SURFACTANT BASED, AND THAT ELEMENT ONLY

6   COMES INTO PLAY ON CLAIM 3 OF THE 226 PATENT.  YOUR HONOR --

7           THE COURT:  WHICH, LET'S SEE, YOU SAID THAT CAME

8   INTO ISSUE ON CLAIM 3 OF WHICH PATENT?

9           MR. CAPP:  THE 226.  AND THIS WOULD BE HELPFUL TO

10  THE COURT.  WE HAVE FOUR PATENTS.  IF THE COURT REMEMBERS

11  BACK TO SOME OF THE PRIOR HEARINGS, WE TALKED ABOUT THE

12  DISPUTE WHERE MCCLUER SPLIT OFF AND FORMED HIS OWN COMPANY,

13  BOTH COMPANIES STARTED PURSUING THEIR OWN PATENT

14  APPLICATIONS, THE SETTLEMENT AGREEMENT WORKED OUT THAT

15  CHEMFREE KEPT PROSECUTING THEIR PATENT APPLICATIONS THROUGH

16  THEIR PATENT ATTORNEY, LOU ISAF.  ABS ZYMO KEPT PROCESSING

17  THEIR PATENT APPLICATIONS THROUGH THEIR PATENT ATTORNEY,

18  ALICE MARTIN.  THREE OF THE PATENTS, THE 110, THE 835 AND

19  THE 125 COME FROM THE LOU ISAF CHAIN.  THE 226 PATENT COMES

20  THROUGH THE ZYMO ALICE MARTIN CHAIN.  AND THAT'S SURFACTANT

21  BASED LIMITATION WAS ONE OF ALICE MARTIN'S.  THE

22  BIODEGRADABLE, NONCAUSTIC, NONFLAMMABLE, THOSE ARE

23  CHARACTERISTICS OF THE LOU ISAF SIDE.

24          YOUR HONOR, THESE DEFENDANTS HAVE NO GOOD FAITH

25  BASIS FOR CONTESTING INFRINGEMENT IN THIS CASE.  YOU

1    REMEMBER THE MARKMAN HEARING WE HAD HERE TWO YEARS AGO AND

2    HOW THEIR INFRINGEMENTS CONTENTIONS AT THE TIME WERE BASED

3    ON EXTRAORDINARILY TORTURED CLAIM CONSTRUCTIONS, ALL OF

4    WHICH THE COURT REJECTED.

5            WITHIN 30 DAYS AFTER ISSUANCE OF THE MARKMAN

6    ORDER, THEY DID NOT AMEND THEIR INFRINGEMENTS CONTENTIONS,

7    AND TWO YEARS LATER THEY STILL HAVE NEVER AMENDED THEIR

8    INFRINGEMENT CONTENTIONS.  WE TALKED ABOUT SOME OF THOSE AT

9    THE PRETRIAL CONFERENCE.  THERE WERE REPRESENTATIONS MADE

10   THAT SOME OF THE CONTENTIONS WOULD BE WITHDRAWN.  THEY HAVE

11   NOT.

12           POST MARKMAN, ONCE THE COURT REJECTED THE TORTURED

13   CLAIM CONSTRUCTIONS AT THE MARKMAN HEARING, THEIR CURRENT

14   NONINFRINGEMENT POSITIONS ARE NOW BASED ON TORTURED

15   INTERPRETATION AND CONSTRUCTION OF THE COURT'S CLAIM

16   CONSTRUCTION.  AND WE WILL GET INTO THE EVIDENCE.  I EXPECT

17   IT WILL SHOCK THE COURT'S SENSIBILITIES WHEN YOU SEE HOW

18   RIDICULOUS THEY HAVE TRIED TO TWIST YOUR WORDS INTO CLAIM

19   CONSTRUCTION ORDER.

20           THE DEFENDANTS HAVE ELECTED NOT TO ENGAGE IN

21   EXPERT, AND ELECTED NOT TO PRESENT EXPERT TESTIMONY TO TRY

22   AND DEFEND THEIR NONINFRINGEMENT POSITIONS.  WHAT THE COURT

23   WILL FIND WHEN WE LOOK AT THE INFRINGEMENT CASE AND THE

24   INVALIDITY CASE IS THIS, YOUR HONOR:  THEY USE COMPLETELY,

25   TOTALLY, IRRECONCILABLE, INCONSISTENT POSITIONS ON HOW THEY

1    APPLY THE COURT'S CLAIM CONSTRUCTION FOR PURPOSES OF

2    NONFRINGEMENT VERSUS INVALIDITY.  THEY USE AN OVERLY NARROW

3    APPLICATION OF THE COURT'S CLAIM CONSTRUCTION WHEN THEY GET

4    TO THEIR NONINFRINGEMENT CASE, AND THEN THEY USE AN OVERLY

5    BROAD APPLICATION FOR THE INVALIDITY CASE AS IF YOUR HONOR

6    GAVE TWO DIFFERENT SETS OF CLAIM CONSTRUCTIONS, ONE FOR THEM

7    TO USE IN INFRINGEMENT AND THE OTHER FOR THEM TO USE IN

8    INVALIDITY.

9         FINALLY, THE COURT HAS RULED IN LIMINE THAT THE

10   DEFENDANTS ARE BARRED FROM INTRODUCING EVIDENCE TO SUPPORT

11   NONINFRINGEMENT CONTENTIONS ON THREE KEY CLAIM LIMITATIONS,

12   AND I WILL SHOW YOU IN A MINUTE THAT THOSE THREE CLAIM

13   LIMITATIONS ALONE WILL COVER ALMOST THE ENTIRE INFRINGEMENT

14   CASE.  NOT QUITE, BUT ALMOST.  AND I WILL SHOW YOU

15   GRAPHICALLY THAT IN A MINUTE.

16        NOW, HERE IS AN OVERVIEW OF HOW THESE DEFENDANTS

17   GOT INTO THE MARKET.  AFTER CHEMFREE DEVELOPED THEIR

18   INVENTION, WHILE THE PATENTS WERE PENDING, THESE, BECAUSE OF

19   THE MCCLUER SOAP OPERA, IT TOOK FROM SEPTEMBER OF 1994 TO

20   SUMMER OF 2000 FOR THE FIRST PATENT TO ISSUE.  THE

21   PROSECUTION HISTORY IS THREE TIMES AS THICK AS IT NEEDS TO

22   BE WHILE THE PTO WORKED THROUGH THE MCCLUER SITUATION.  SO

23   WHILE THE PATENT WERE PENDING, CHEMFREE ENTERED INTO THE

24   DISTRIBUTION AND PRIVATE LABELING MANUFACTURING RELATIONSHIP

25   WITH GRAY MILLS IN CHICAGO.  WHAT YOU SEE HERE IS WHAT GRAY

1    MILLS SOLD AS THE BIO 777.  THAT IS A PRIVATE LABEL VERSION

2    OF CHEMFREE'S, AT THE TIME, SW 15 SMART WASHER.  CHEMFREE

3    SOLD THE HARDWARE, CHEMFREE SOLD THEIR CLEANING FLUID UNDER

4    PRIVATE LABEL, WHICH GRAY MILLS CALLED BIOTENE FLUID.

5    CHEMFREE PRIVATE LABELED THE FILTERS THAT HAD THE IMBEDDED

6    MICROBES, WHICH GRAY MILLS SOLD AS A PRODUCT CALLED THE BIO

7    FILTER.  NOW, THIS IS IMPORTANT, YOUR HONOR.  CHEMFREE NOT

8    ONLY SUPPLIED FLUID AND FILTERS FOR THE BIO 77, CHEMFREE

9    ALSO HELPED GRAY MILLS DEVELOP THEIR OWN HARDWARE FOR

10   BIOREMEDIATION PARTS WASHER, WHICH IS THE BIO 436 YOU SEE

11   THERE, AND THEN CHEMFREE PROVIDED THE BIOTENE FLUID AND THE

12   BIO FILTER WITH THE MICROBES IN IT TO GRAY MILLS.  SO THAT

13   WHEN GRAY MILLS SOLD AND SHIPPED THE BIO 436, IT CONTAINED

14   SUBSYSTEMS THAT WERE MODIFIED UNDER CONSULTING WITH CHEMFREE

15   TO SUPPORT THE BIOREMEDIATION CAPABILITY AND THEN THEY WERE

16   SOLD TURNKEY WITH CHEMFREE SUPPLIED FLUID, CHEMFREE SUPPLIED

17   FILTERS AND CHEMFREE SUPPLIED MICROORGANISMS.

18          NOW, IN 1999, WALTER BOUGHT A GRAY MILLS BIO 436

19   FROM GRAY MILLS.  AND IT WAS AT A TIME WHEN CHEMFREE WAS

20   STILL SUPPLYING BIOTENE FLUID AND BIO FILTERS TO GRAY MILLS.

21   SO THOSE PRODUCTS, WHICH WOULD HAVE BEEN DELIVERED WITH THE

22   MACHINE, WOULD HAVE INCLUDED "MADE BY CHEMFREE,"

23   "CONTAINED," YOU KNOW, HAVING CHEMFREE PATENT PENDING

24   TECHNOLOGY ON THE LABELS FOR THE FLUID AND THE FILTERS.

25   WALTER BOUGHT THAT, THEN THEY REORDERED THE MACHINE IN THE

1    GREEN COLOR FOR INTRODUCTION IN EUROPE AND THEN THEY

2    OUTSOURCED, THEY OUTSOURCED THE SUPPLY FOR MICROORGANISMS

3    AND FLUID TO A EUROPEAN CONCERN CALLED CB CHEMIE.  AND THEN

4    THEY LAUNCHED THE PRODUCT THAT YOU SEE THERE IN EUROPE IN

5    2000.

6            THE DEFENDANTS DIDN'T LIKE THAT HUGE LID ON THE

7    TOP SO THEY TOLD GRAY MILLS TO GET RID OF IT.  GRAY MILLS

8    DID THAT AND CAME UP WITH THAT MODIFICATION, WHICH IS,

9    ESSENTIALLY, THE BIO 436 WITHOUT THE HINGED LID.  GRAY MILLS

10   CALLS THIS THEIR BIO 536.  THEY HAVE SOLD IT TO THE

11   DEFENDANTS.  THEY CONTINUE TO SELL IT TO THE DEFENDANTS FOR

12   RESALE IN CANADA.  BUT FOR A TIME, THE DEFENDANTS DID IMPORT

13   THE GRAY MILLS BIO 536 UNDER THEIR NAME BRAND AND TRADEMARK,

14   BIO-CIRCLE BR 100, IN THE UNITED STATES.

15           NOW, TO SHOW THE DEFENDANT'S PRIOR KNOWLEDGE OF

16   CHEMFREE'S PATENTS, YOUR HONOR, THIS IS A GRAPHIC OF A BIO

17   FILTER LABEL, WHICH I WAS ABLE TO OBTAIN FROM GRAY MILLS IN

18   DISCOVERY IN THE CASE.  AS YOU CAN SEE, THIS APPLIES TO BIO

19   777.  MR. SHIELDS DIDN'T HAVE ONE FOR THE BIO 436.  THIS IS

20   TEN YEARS AFTER THE FACT.  BUT THE THING I WANT TO POINT OUT

21   TO YOU HERE IS THAT THESE LABELS CONTAIN THE STATEMENT THAT

22   THEY USED CHEMFREE PATENTED BIOREMEDIATION TECHNOLOGY.  NOW,

23   THOSE PRODUCTS, FOR THE FILTERS AND THE FLUID, WHEN THEY

24   WERE SHIPPED FROM NORCROSS, CHEMFREE IS THE ONE THAT WAS

25   RESPONSIBLE FOR THE PACKAGING AND THE LABELING AND INSURING

1    THAT THAT WAS IN THE PRODUCT WHEN IT WENT TO GRAY MILLS FOR

2    THE SUBSEQUENT RESALE FOR CUSTOMERS LIKE THE DEFENDANTS.

3    THROUGHOUT THE HISTORY OF THE RELATIONSHIP WITH CHEMFREE AND

4    GRAY MILLS, CHEMFREE INSISTED ON PATENT OR PATENT PENDING

5    NOTICES ON ALL OF THE PRODUCTS THAT IT SUPPLIED TO GRAY

6    MILLS.

7            NOW, THE DEFENDANTS READILY ADMIT THAT THEIR FLUID

8    MANUFACTURER, CB CHEMIE HAD PRIOR KNOWLEDGE OF CHEMFREE'S

9    PATENTS BEFORE THEY LAUNCHED THEIR PRODUCTS.  CB CHEMIE

10   SUPPOSEDLY ADVISED THE DEFENDANTS THAT THEY WERE CLEAR OF

11   CHEMFREE'S PATENTS BECAUSE THEY DIDN'T ADHERE MICROBES TO

12   THE FILTER.  BUT OF COURSE, AS THE COURT KNOWS, SINCE WE

13   JUST WENT THROUGH THIS IN THE ENABLEMENT DEFENSE, CHEMFREE

14   HAS U.S. PATENT CLAIMS THAT DO NOT REQUIRE ADHERING MICROBES

15   TO THE FILTER.

16           AND IN FACT, OUT OF THE 21 CLAIMS THAT WE ARE

17   ASSERTING AGAINST THE DEFENDANTS, NONE OF THEM HAS A

18   LIMITATION THAT REQUIRES THAT MICROORGANISMS BE ATTACHED TO

19   THE FILTER.  WE HAVE THOSE CLAIMS.  WE HAVE NOT ASSERTED

20   THEM AGAINST THE DEFENDANTS.

21           THEN IN JUNE OF 2001, YOUR HONOR, CHEMFREE'S

22   CO-INVENTOR, TOM MCNALLY, WHO IS HERE IN THE COURTROOM,

23   VISITED THE DEFENDANTS IN CANADA AND OFFERED THEM AN

24   OPPORTUNITY TO DISTRIBUTE OR TO DO A PRIVATE LABEL

25   ARRANGEMENT OF CHEMFREE'S PRODUCTS IN CANADA.  MR. MCNALLY

1    EXPLAINED TO THE DEFENDANTS THAT CHEMFREE'S PRODUCTS WERE

2    PATENT PROTECTED.  THE DEFENDANTS TOLD MR. MCNALLY THAT THEY

3    WERE NOT INTERESTED IN GETTING INTO THE MARKET FOR

4    BIOREMEDIATION PARTS WASHERS.  AT THE TIME, THE DEFENDANTS

5    WERE ALREADY SELLING THE EURO BIO-CIRCLE MACHINE IN EUROPE,

6    AND THE DEFENDANTS CONCEALED FROM MR. MCNALLY THAT THEY HAD

7    ALREADY LAUNCHED A PRODUCT WITH CHEMFREE'S TECHNOLOGY IN

8    EUROPE AND THAT THEY HAD PLANS UNDER WAY TO LAUNCH A SIMILAR

9    PRODUCT IN CANADA AND SHORTLY AFTER THAT THE UNITED STATES.

10   THOSE FACTS FOR THE MOST PART, YOUR HONOR, ARE ADMITTED BY

11   THE DEFENDANTS IN THE WARNER SCHUDLE DEPOSITION.

12              SO THIS IS THE BR 100.  IT WAS MADE BY GRAY MILLS,

13   WHICH WAS COPIED FROM CHEMFREE.

14              THEIR NEXT PRODUCT THAT THEY CAME OUT WITH, THE

15   ONE FROM DANIOS, DANIOS WAS NOT A PARTS WASHING

16   MANUFACTURER.  THEY WERE JUST A ROTO MOLDER MANUFACTURER IN

17   EUROPE WITH NO EXPERIENCE IN MAKING PARTS WASHERS.  SO THE

18   DEFENDANTS WERE GOOD ENOUGH TO SUPPLY THEM WITH THE GRAY

19   MILLS MACHINE SO THEY COULD STUDY IT AND THEY INTRODUCED

20   THIS MACHINE, THE BR 200, WHICH IS THE NEXT ONE DOWN THE

21   WALL IN THE COURTROOM OVER THERE.  SO YOU HAVE THE BR 100,

22   MADE BY GRAY MILLS, COPIED FROM CHEMFREE, AND THEN YOU HAVE

23   THE BR 200 MADE BY DANIOS, COPIED FROM GRAY MILLS.  SO

24   BASICALLY WHEN THEY HIT THE MARKET WITH THE BR 200 IN THE

25   UNITED STATES IN 2004, THEY ARE SELLING A COPY OF A COPY OF

1    A PARTS WASHER, WHICH WAS DESIGNED, CONSULTED AND

2    CONTRIBUTED TO BY CHEMFREE TO ENSURE THAT IT PRACTICED -- IT

3    PRACTICED THE PATENTED INVENTION.

4          YOUR HONOR, I WON'T BOTHER TO READ ALL OF THE

5    LANGUAGE, BECAUSE I KNOW YOU HAVE READ ALL OF THESE CLAIMS

6    BEFORE, BUT THE POINT TO THIS SLIDE IS SIMPLY, WE ARE

7    ASSERTING CLAIM 8 OF THE 835 PATENT AGAINST THE DEFENDANTS.

8    IT IS A DEPENDENT CLAIM SO IT INCORPORATES BY REFERENCE,

9    CLAIM 5, ALL OF THE LIMITATIONS THAT HAVE NO YELLOW

10   BACKGROUND HAVING ACKNOWLEDGED AS BEING PRESENT IN THE

11   PATENT LOCAL RULE INFRINGEMENT CONTENTIONS.  THE ONLY TWO

12   THAT THEY HAVE PLACED IN ISSUE, FOR ANY OF THOSE FOUR

13   MACHINES, IS THE FLOW PATH DEFINED BETWEEN SAID BASIS AND

14   SAID TANK THROUGH WHICH THE SAID FLUID FLOWS BETWEEN SAID

15   BASIN AND SAID TANK, AND THE OTHER ONE IS WHETHER THEY HAVE

16   A FILTER INTERPOSED WITHIN SAID FLOW PATH.

17         SO YOUR HONOR, ALL WE HAVE TO DO, ALL WE HAVE TO

18   DO TO PROVE INFRINGEMENT IN THIS CASE IS TO COME IN HERE AND

19   PERSUADE THE COURT THAT THOSE FOUR MACHINES HAVE A FLOW PATH

20   AND A FILTER.  THAT IS IT.  ONCE WE DO THAT, WE HAVE

21   ESTABLISHED INFRINGEMENT.  IT IS THAT SIMPLE,

22   STRAIGHTFORWARD AND EASY.

23         NOW, HERE IS A SUMMARY OF ALL OF THE DISPUTED

24   CLAIM LIMITATIONS.  THEY DISPUTE SURFACTANT BASED IN THE

25   226.  THEY DISPUTE FLOW PATH, WHICH IS A TERM IN THE 110,

1    THE 835 AND THE 125.  THEY DISPUTE A FILTER LIMITATION IN

2    THE 835 AND THE 125, ALL MODELS.  THEY DISPUTE THE POROUS

3    MEDIUM LIMITATION, WHICH IS JUST ANOTHER WORD FOR FILTER,

4    WHICH ALICE MARTIN USED IN THE 226 INSTEAD OF FILTER.  AND

5    THEN THEY DISPUTE THE ALLOWED BIODEGRADE LIMITATION IN THE

6    125 PATENT AND THE RETAIN AND BIODEGRADE LIMITATION IN THE

7    125 PATENT.  THOSE GO ACROSS ALL FOUR MODELS.

8              IN ADDITION, TO THE IO 200 ONLY -- AND AGAIN, YOUR

9    HONOR, THE IO 200 IS THIS ONE HERE, ALL THE WAY TO THE

10   RIGHT -- THEY ARE ALSO DISPUTING THE MEANS FOR CONTROLLING

11   SAID HEATER LIMITATION IN THE 110 AND THE LEVEL SENSOR

12   LIMITATION, AND I WILL EXPLAIN THE DIFFERENCES IN THE FOUR

13   MACHINES THAT PUT THAT INTO PLAY IN A SECOND.

14             LET ME COVER THE SURFACTANT BASED LIMITATION FIRST

15   BECAUSE THAT APPLIES TO THE FLUID ACROSS ALL FOUR.  THIS IS

16   FROM THEIR PRODUCT CATALOG, YOUR HONOR.  THIS IS PUBLISHED

17   BY THE U.S. DISTRIBUTION SUBSIDIARY, WHICH MR. HAUGHTON IS

18   THE PRESIDENT OF.  THIS IS HIS PRODUCT CATALOG, YOUR HONOR.

19   PAGE 3, LOOK RIGHT HERE WHERE IT IS HIGHLIGHTED IN YELLOW,

20   THEIR OWN CATALOG PAGE SAYS, AND I QUOTE, "ACHIEVE THE

21   CLEANING EFFICIENCY OF SOLVENTS WITH A HIGH PERFORMANCE

22   SURFACTANT BASED CLEANER WHILE MICROORGANISMS BREAK DOWN THE

23   HAZARDOUS WASTE."

24             THERE IS NO ISSUE IN THIS CASE BUT THAT THE

25   DEFENDANT'S CLEANING FLUID DOES CONTAIN SURFACTANTS AND THEY

1    ARE MIXED INTO THE FLUID AT A RATIO OF ROUGHLY FIVE PERCENT.

2         NOW, LET'S TALK ABOUT THE FLOW PATH AND FILTER

3    LIMITATIONS AS TO THE BR 100.  THERE IS YOUR FLOW PATH,

4    THERE IS YOUR FILTER.  THE FLOW PATH IS A CIRCULAR DRAIN

5    HOLE AND YOU CAN SEE RIGHT THROUGH IT, IT GOES RIGHT DOWN

6    INTO THE TANK.  THE FLUID COMES IN, IT ACCUMULATES IN THE

7    TANK AS IT RUNS THROUGH THAT HOLE.  THAT IS A FLOW PATH.

8    THE THREE ITEMS THAT YOU SEE THERE, THE THREE-PART FILTER,

9    THOSE ARE ALL ASSEMBLED INTO A SINGLE UNIT AND THEN DROPPED

10   DOWN INTO THE DRAIN HOLE.  YOU CAN SEE A FLANGE.  AS A

11   MATTER OF FACT, WE WILL INTRODUCE THIS AS EXHIBIT 368, YOUR

12   HONOR.  IT HAS THIS METAL STRAINING DEVICE ON THE TOP, THEN

13   IT HAS THIS HOCKEY PUCK-SHAPED SPONGE THAT SITS DOWN AND

14   THEN THIS WIRE MESH SCREEN DEVICE HERE THAT HAS A METAL

15   FLANGE AROUND IT, WHICH THEN ALLOWS IT TO SIT DOWN IN THAT

16   DRAIN HOLE.  THIS IS NOT A HIGH TECH CASE, YOUR HONOR.  I

17   MEAN, THERE IS YOUR FLOW PATH.  THIS CASE IS THAT SIMPLE.

18        THE SAME ISSUE ON THE BR 200, BECAUSE THAT WHOLE

19   ARRANGEMENT THAT YOU JUST SAW WAS COPIED FROM THE BR 100.

20   THERE IS YOUR FLOW PATH, THE SAME CIRCULAR DRAIN HOLE, YOU

21   LOOK RIGHT THROUGH IT DOWN INTO THE TANK, THAT IS WHERE THE

22   FLUID GOES WHEN IT LEAVES THE SINK, GOES DOWN INTO THE TANK.

23   THERE IS THE FILTER.  THE FILTER SITS DOWN IN THE FLOW PATH

24   SO THAT THE FLUID GETS FILTERED AS THE GRAVITY DRAINS DOWN

25   INTO THE TANK.

1           THE CASE IS THAT SIMPLE, YOUR HONOR.  HERE IS

2    THEIR OWN PRODUCT LITERATURE ON IT.  IT'S NOT JUST ME

3    CALLING IT A FILTER.  THEY CALL IT A FILTER.  THIS IS RIGHT

4    FROM THEIR WEBSITE.  THEY HAVE A TWO-PART FILTER SYSTEM,

5    WHICH SEPARATES FINE AND COURSE WASTE PARTICLES.

6           THEN WHEN THEY GOT TO THE IO 400, YOUR HONOR, IN

7    ORDER TO REDUCE AN EVAPORATION PROBLEM THAT THEY WERE

8    EXPERIENCING WITH THE BR 200, THEY WENT BACK TO THE

9    THREE-PART FILTER SYSTEM FROM THE BR 100.  BUT YOU SEE, THE

10   LAWSUIT HAD ALREADY STARTED BY THIS TIME SO THEY COULDN'T

11   CALL IT A FILTER ANYMORE.  SO NOW THEIR PRODUCT LITERATURE

12   CALLED IT A SEDIMENT TRAP.  IT'S THE SAME THING THEY USED TO

13   CALL A FILTER BUT NOW THEY'RE IN A BOX, SO THEY RENAME IT IN

14   THE PRODUCT LITERATURE AND CALL IT THE SEDIMENT TRAP, EXCEPT

15   THE REPLACEMENT PARTS IN THE CATALOG STILL CALL THE MIDDLE

16   PART A SPONGE FILTER.

17          AND THERE YOU GO, SAME DRAIN HOLE FLOW PATH ON

18   IO 400 AS THE IO 200.  THE IO 200 IS A LITTLE DIFFERENT BUT

19   NOT MUCH.  IF YOU ARE LOOKING DOWN INTO THE MIDDLE OF THE

20   SINK, YOUR HONOR, I WILL PEEL THIS OFF, ONE LAYER AT A TIME

21   FOR YOU.  THE FIRST LAYER IS THE SAME STEEL GRATING THAT

22   THEY HAVE IN THE BR 100, BR 200 AND IO 400.  YOU PEEL THAT

23   OFF AND NOW YOU HAVE A WIRE MESH SCREEN FILTER.  IT IS

24   ROUGHLY 400 MICRONS OR SOMETHING IN TERMS OF ITS CAPACITY

25   RATING.  YOU PEEL THAT OFF, NOW THEY PUT A LITTLE MAGNET IN

1    THERE TO CATCH METAL, FINE OR SMALLER THAN 400 MICRONS.  AND

2    THEN PULL OUT THE MAGNET AND YOU HAVE A NICE LITTLE DRAIN

3    HOLE THERE THAT DROPS RIGHT INTO THE TANK.  THAT IS YOUR

4    FLOW PATH.  SO THERE IS YOUR FLOW PATH, THERE IS YOUR

5    FILTER.

6              NOW, THE OTHER TWO LIMITATIONS THAT THEY PUT IN

7    PLAY WHICH AREN'T IN PLAY IN THE OTHER THREE, ARE THE LEVEL

8    SENSOR AND THE MEAN PLUS FUNCTION ON THE HEATER ELEMENTS,

9    AND I WILL COVER THAT VERY QUICKLY, YOUR HONOR.

10             IN THEIR FIRST THREE PRODUCTS, THEY BASICALLY

11   COPIED EXACTLY WHAT IS IN THE CHEMFREE PATENT AND PRODUCT,

12   WHICH IS A LITTLE DOUGHNUT THAT SLIDES UP AND DOWN ON A ROD,

13   THERE IS THE MAGNET AND WHEN IT HITS THE BOTTOM, IT GETS AN

14   ELECTRICAL CONNECTION AND SENDS A SHUT-OFF SIGNAL TO THE

15   HEATER.  THIS IS THEIR BIG DESIGN-AROUND EFFORT FOR THE IO

16   200.  INSTEAD OF HAVING A SINGLE PUMP, THEY PUT TWO PUMPS

17   IT, AND THEN THEY TOOK THE HEATER AND PUT IT OUTSIDE OF THE

18   TANK IN A CONTAINED CANISTER.  SO THE PUMP THAT SUPPLIES THE

19   HEATER, PUMPS FROM THE TANK AND PUMPS THROUGH THE HEATER

20   UNIT, AND THEN AFTER IT HITS THE HEATER, THEN IT IS RETURNED

21   TO THE TANK.  THEY PUT A LITTLE PRESSURE SWITCH INSIDE THE

22   HEATER CANISTER, SO AS LONG AS THE FLUID IS ABOVE THE INTAKE

23   GOING INTO THE PUMP, THE PUMP WILL SUPPLY ENOUGH PRESSURE TO

24   DEPRESS THAT PRESSURE SWITCH AND THE SYSTEM GOES, OH, THERE

25   IS PLENTY OF FLUID IN THE TANK, LET'S TURN THE HEATER ON.

1          AS THE FLUID DROPS AND GETS BELOW THAT INTAKE, THE

2    PUMP STARTS INGESTING AIR.  AS SOON AS IT DOES THAT, IT

3    CAN'T DELIVER THE PRESSURE TO THE HEATER CANISTER ANYMORE,

4    SO THE LITTLE PRESSURE SWITCH POPS OUT AND SAYS THERE'S NOT

5    ENOUGH FLUID IN THE TANK ANYMORE.  TURN THE HEATER OFF AND

6    IN A FEW SECONDS, TURN THE PUMP OFF, TOO.

7          THEY DISPUTE THAT THAT SYSTEM IS A LEVEL SENSOR.

8    WE DISAGREE.  IT WINDS UP BEING A MEANS PLUS FUNCTION CLAIM,

9    YOUR HONOR.  THE ONLY PARTY THAT HAS RETAINED AN EXPERT, THE

10   ONLY PARTY THAT HAS DONE A FUNCTION WAIVE RESULT ANALYSIS

11   FOR -- I MEAN, PLUS FUNCTION ELEMENT, IS CHEMFREE.

12   DR. DURKEE HASN'T DONE ONE.  THE DEFENDANTS HAVE NOT EVEN

13   RETAINED AN EXPERT TO DO ONE.

14          DR. DURKEE'S ANALYSIS IS UNCONTESTED AND

15   UNCHALLENGED ON WHETHER OR NOT THAT PRESSURE SWITCH, DUAL

16   PUMP SITUATION IS A LEVEL SENSOR OR SATISFIED THE MEANS PLUS

17   FUNCTION.

18          FINALLY, THE LAST ELEMENT THEY PUT IN ISSUE HAS TO

19   DO WITH WHETHER OR NOT THE SYSTEM ALLOWS MICROORGANISMS TO

20   DEGRADE THE HYDROCARBONS AND THE FLUID OR WHETHER THE

21   HYDROCARBONS ARE RETAINED IN THE TANKS SO THEY CAN BE

22   BIOREMEDIATED.  THE EVIDENCE IS GOING TO BE THAT ALL FOUR OF

23   THESE WASHERS HAVE A TANK.  BENEATH THE SINK THAT HOLDS THE

24   CLEANING FLUID, WHICH IS WHERE THE HYDROCARBONS ARE

25   DEPOSITED AFTER THE PARTS ARE CLEAN, THE EVIDENCE WILL BE

1    THAT AT ANY ONE GIVEN MOMENT IN TIME, AT LEAST 97 PERCENT OF

2    THE FLUID IS RESIDENT IN THE TANK AND NOWHERE ELSE IN THE

3    SYSTEM.  AND THE DEFENDANT'S ATTEMPTS TO DISTINGUISH THESE

4    LIMITATIONS ARE SIMPLY FRIVOLOUS.

5         NOW, THERE ARE FOUR ACCUSED INSTRUMENTALITIES, 21

6    ASSERTED CLAIMS.  I AM GOING TO SHOW YOU VERY QUICKLY, IN

7    SORT OF LIKE A FALLING DOMINO SITUATION, HOW RAPIDLY THESE

8    CLAIMS FALL AS WE PROVE ONLY FOUR LIMITATIONS THAT ARE PUT

9    IN DISPUTE.  ONLY FOUR, AND WATCH HOW THESE THINGS DROP LIKE

10    DOMINOES.

11         WE ESTABLISH THEY HAVE A FLOW PATH AND WE GET THIS

12    MANY CLAIMS THAT ARE INFRINGED.  WE ADD A FILTER, THAT MANY

13    CLAIMS ARE INFRINGED.  WE PROVE THAT THE CLEANING FLUID IS

14    SURFACTANT BASED, THAT MANY MORE.  AND THEN WE PROVE UP THE

15    BIO-RETAINED, BIODEGRADE LIMITATIONS, AND THOSE MANY FALL.

16         WHEN THE DEFENDANTS SUBMITTED THEIR PROPOSED

17    FINDINGS OF FACT AND CONCLUSIONS OF LAW, THE ONLY THING THEY

18    ACTUALLY TRIED TO TALK TO THE JUDGE ABOUT IN ANY DETAIL AT

19    ALL ARE A HANDFUL OF THOSE LITTLE LIMITATIONS WHICH DON'T

20    HAVE CHECK MARKS IN THEM ON THE RIGHT-HAND SIDE OF THAT

21    SLIDE.  THEY DIDN'T EVEN BOTHER TO ADDRESS ALL OF THE

22    LIMITATIONS WHICH I GOT ON THAT SLIDE THAT HAVE THE CHECK

23    MARKS IN IT.

24         NOW, LET'S TALK ABOUT THE INVALIDITY DEFENSE FOR A

25    SECOND.  THEY HAVE ASSERTED ANTICIPATION OVER THE

1    HAKANSSAN-2 REFERENCE.  THE EVIDENCE WILL SHOW THAT

2    HAKANSSAN-2 DOES NOT ANTICIPATE CHEMFREE'S CLAIMS.  A COUPLE

3    OF LEGAL PRINCIPLES ARE IN ORDER HERE.  THE FIRST IS, TO

4    ANTICIPATE UNDER 35 USC 102 B, A SINGLE PRIOR ART REFERENCE

5    MUST EXPRESSLY OR INHERENTLY DISCLOSE EACH CLAIM LIMITATION.

6            NOW, IN THIS CASE, YOUR HONOR, AND THIS IS VERY

7    IMPORTANT, THE DEFENDANTS HAVE ALREADY CONCEDED THAT

8    HAKANSSAN-2 DOES NOT EXPRESSLY DISCLOSE ALL OF THE CLAIM

9    LIMITATIONS.  THUS, THEY RELY HEAVILY ON THE PRINCIPLE OF

10   INHERENCY.  HOWEVER, ACCORDING TO THE OELRICH AUTHORITY, AND

11   I QUOTE, "INHERENCY MAY NOT BE ESTABLISHED BY MERE

12   POSSIBILITIES.  THAT SOMETHING MAY RESULT FROM CIRCUMSTANCES

13   IS INSUFFICIENT."

14           SO THEN WE HAVE THE QUESTION ABOUT HOW YOU PROVE

15   INHERENCY, AND THE ANSWER IS, YOU HAVE TO PROVE IT WITH

16   EXTRINSIC EVIDENCE.  AND I WILL CITE YOU THE DAYCO PRODUCTS

17   CASE, WHICH SAYS, AND I QUOTE, "INHERENCY MAY BE ESTABLISHED

18   THROUGH EXTRINSIC EVIDENCE.  HOWEVER, THE EVIDENCE MUST

19   ESTABLISH THAT THE MISSING MATTER IS NECESSARILY PRESENT IN

20   THE REFERENCE."

21           NOW, THE PROBLEM THAT THE DEFENDANTS HAVE WITH THE

22   DAYCO PRODUCTS STANDARD, THAT THEY HAVE TO PUT UP EXTRINSIC

23   EVIDENCE TO ESTABLISH THAT MISSING MATTER IS NECESSARILY

24   PRESENT IN THE REFERENCE, IS THE COURT HAS ALREADY RULED IN

25   LIMINE THAT THE DEFENDANTS CANNOT INTRODUCE EXTRINSIC

1    EVIDENCE OF INHERENCY BECAUSE THEY NEVER ANSWERED AN

2    INTERROGATORY ON THAT THAT WAS PROPOUNDED WAY BACK IN 2005.

3         NOW, AS FAR AS THE MISSING LIMITATIONS IN

4    HAKANSSAN-2, REMEMBER, THEY HAVE TO HIT EVERY SINGLE

5    LIMITATION.  OKAY.  HAKANSSAN-2 YOUR HONOR, TEACHES A HIGH

6    PRESSURE SPRAY IN A CLOSED CABINET, WHICH IS INCOMPATIBLE

7    WITH CLEANING IN AN OPEN BASIN.  THERE IS NO DISCLOSURE OF A

8    LEVEL CONTROL SYSTEM IN HAKANSSAN-2 WHICH IS INTEGRATED WITH

9    THE HEATER SYSTEM.  THERE IS NO DISCLOSURE OF A NONCAUSTIC

10   FLUID.  THERE IS NO DISCLOSURE OF A NONFLAMMABLE FLUID AND

11   THERE IS NO DISCLOSURE OF A FILTER.  AND THEY HAVE NO

12   EXTRINSIC EVIDENCE TO OFFER THE COURT THAT THOSE MISSING

13   ITEMS ARE NECESSARILY PRESENT IN ACCORDANCE WITH THE DAYCO

14   CASE.

15        NOW, IF WE GO ON TO OBVIOUSNESS, THE DEFENDANTS,

16   AGAIN, CANNOT GET OUT OF THE STARTING BLOCKS BECAUSE EVERY

17   OBVIOUSNESS COMBINATION THEY PROPOSE, STARTS WITH

18   HAKANSSAN-2, WHICH REQUIRES MASSIVE MODIFICATION TO GET TO

19   THE CHEMFREE INVENTION.  MASSIVE MODIFICATION.  HAKANSSAN-2

20   IS SO DIFFERENT FROM THE CLAIMED INVENTION THAT SOMEONE OF

21   ORDINARY SKILL WOULD NOT BE ABLE TO MODIFY IT WITHOUT

22   RESORT, WOULDN'T BE ABLE TO MODIFY IT WITH THE EXERCISE OF

23   MERE ORDINARY SKILL.

24        SO FIRST OF ALL, HAKANSSAN-2 CANNOT MAKE THE

25   CHEMFREE PATENT OBVIOUS AS A STAND-ALONE REFERENCE, BUT IF

1    YOU TRY TO MAKE COMBINATIONS, IF YOU LOOK AT THEIR SECONDARY

2    REFERENCES FOR THE COMBINATIONS, ALL THREE OF THEIR

3    SECONDARY REFERENCES TEACH A WAY FOR THE INVENTION.  THEY

4    ALL TEACH A WAY IF THE INVENTION.

5         THE FIRST ONE IS ATHEY, WHICH IS A 1970'S VINTAGE

6    COMMERCIAL DISHWASHER.  CLOSED CABINET, HIGH TEMPERATURE.

7    WELL, DISHWASHERS COMMERCIAL DISHWASHERS ARE NOT KNOWN FOR

8    ATTEMPTING TO CULTIVATE MICROBIAL CULTURES. THEY OPERATE AT

9    TEMPERATURES TO KILL MICROBES, NOT FOSTER THEIR DEVELOPMENT.

10        SIMS IS A SINGLE CHAMBER WASHER, IT DOESN'T HAVE A

11   BASIN AND A TANK, IT IS A SINGLE CHAMBER WASHER, IT USES

12   MINERAL SPIRITS, NOT INAQUEOUS FLUID.  THE MINERAL SPIRITS

13   WOULD KILL MICROBES.  FURTHERMORE, SIMS TEACHES A BYPASS

14   FILTER, WHICH HAS A SUBMICRON RATING.  HALF A MICRON.

15   MICROORGANISMS RUN FROM THREE TO FIVE MICRONS.  SO THE

16   FILTER IN SIMS WOULD CLOG UP ALL OF THE MICROORGANISMS.

17   WOULDN'T GO THROUGH THE BYPASS FILTER.

18        THE THIRD REFERENCE, WHICH TEACHES A WAY, IS

19   MINKIN.  IT IS ALSO A HIGH TEMPERATURE, HIGH PRESSURE,

20   CLOSED CABINET SYSTEM.  AND IT TOO, BECAUSE OF THE

21   TEMPERATURE AT WHICH IT OPERATES WOULD KILL THE MICROBES, IT

22   WOULD NOT BE THE SORT OF THING THAT SOMEONE OF ORDINARY

23   SKILL IN THE ART WOULD MODIFY TO GET TO THE CLAIMED

24   INVENTION BECAUSE IT REQUIRES BOTH HIGH TEMPERATURE AND HIGH

25   PRESSURE TO CLEAN, AND SOMEONE OF ORDINARY SKILL WOULD NOT

1    NECESSARILY RECOGNIZE THAT REDUCING THE TEMPERATURE AND

2    REDUCING THE PRESSURE WOULD GIVE THEM THE CLEANING

3    EFFICIENCY THAT IS NECESSARY.

4           FINALLY, AND THIS BEARS MENTION, THEY HAVE FOUR

5    REFERENCES.  TWO OF THOSE REFERENCES, TWO OUT OF THE FOUR,

6    POSTDATE CHEMFREE'S DATE OF INVENTION, AND THEREFORE, THEY

7    ARE NOT EVEN PRIOR ART.  SIMS AND MINKIN HAVE EFFECTIVE

8    FILING DATES AT THE PATENT OFFICE IN THE TIME FRAME OF

9    AROUND MAY TO JUNE OF 1994.  WE WILL BE ABLE TO SHOW THE

10   COURT, WITH OVERWHELMING EVIDENCE, THAT CHEMFREE HAD A DATE

11   OF INVENTION AT LEAST AS EARLY AS MARCH OF 1994, RENDERING

12   MAKING SIMS NOT PRIOR ART.

13          COMING AROUND THE CLUBHOUSE TURN, YOUR HONOR, THAT

14   ONE PAGE, AND I'M FINISHED -- ACTUALLY, I'M SORRY, THESE ARE

15   THE INSURMOUNTABLE OBSTACLES TO THE DEFENDANT'S CASE.

16   NUMBER ONE, THEY HAVE NO EXPERT WITNESS TO PRESENT

17   HAKANSSAN-2.  NONE.  IT'S BEEN EXCLUDED BY COURT ORDER.

18   SECONDLY, THEY HAVE NO EXTRINSIC EVIDENCE ON INHERENT

19   ANTICIPATION BECAUSE OF A LIMITED RULE.  THIRD, THEY HAVE NO

20   EXPERT TESTIMONY ON COMBINATIONS BECAUSE OF AN ORDER RULING

21   THAT THEIR EXPERT REPORT WAS INADEQUATE AND DIDN'T MEET THE

22   MINIMUM REQUIREMENTS OF RULE 26 (A) (2).  AND THEN FOURTH,

23   TWO OF THEIR FOUR REFERENCES POSTDATE CHEMFREE'S INVENTION.

24   THOSE FOUR HURDLES ARE INSURMOUNTABLE AND THEY WILL NOT BE

25   ABLE TO PROVE OBVIOUSNESS.

```
 1            NOW, WITH RESPECT TO THE INVENTORSHIP DEFENSE,
 2   WHICH IS REALLY THE CORRECTION OF INVENTORSHIP DEFENSE, THE
 3   EVIDENCE ON CORRECTION OF INVENTORSHIP WILL STRONGLY TILT IN
 4   DIRECTION OF LEAVING THE INVENTORSHIP AS IT IS.  AND YOUR
 5   HONOR, THIS IS VERY IMPORTANT.  THIS DISPUTE SURFACED BACK
 6   IN 1995 AND 1996.  CHEMFREE GOT INVOLVED IN A VERY
 7   CONTENTIOUS LAWSUIT WITH AB ZYMO AFTER MCCLUER WENT OVER TO
 8   AB ZYMO.  THEY HAD A LAWSUIT, THE TWO COMPANIES DECIDED TO
 9   SETTLE IT.  ONE OF THE TERMS OF THE SETTLEMENT WAS HEY, ZYMO
10   IS SAYING HEY, CHEMFREE, YOU HAVE FOUR INVENTORS LISTED ON
11   YOUR PATENT APPLICATION.  CHEMFREE IS SAYING HEY, ZYMO,
12   YOU'VE ONLY GOT ONE INVENTOR LISTED ON YOUR PATENT
13   APPLICATION.  WE -- NOW THAT WE HAVE SETTLED, WE DON'T WANT
14   THESE PATENTS BEING ISSUED AND GETTING INTO LITIGATION WHERE
15   THEY ARE GOING TO BE SUBJECTED TO AN INVALIDITY CHALLENGE
16   FOR INCORRECT INVENTORSHIP SO WHAT WE WILL DO IS SPEND A LOT
17   OF MONEY AND GO AND HIRE AN INDEPENDENT PATENT ATTORNEY,
18   WHICH THEY DID.  THEY HIRED DAL SHEFTE, WHO IS A SENIOR
19   PARTNER AT KENNEDY AND COVINGTON IN NORTH CAROLINA, AND THEY
20   PAID HIM A LOT OF MONEY.  BETWEEN WHAT THEY PAID SHEFTE AND
21   WHAT THEY PAID THEIR OWN ATTORNEYS TO GO THROUGH THIS
22   PROCESS, THEY SPENT AT LEAST $50,000 FOR A BRAND NEW
23   START-UP COMPANY, YOUR HONOR, TO DO AN INDEPENDENT
24   INVESTIGATION, WRITE AN ISSUE AND A REPORT TO GIVE TO THE
25   ATTORNEYS SO THEY CAN THEN AMEND THEIR PATENT APPLICATIONS
```

1   TO THOSE INVENTORS, AND THAT IS WHAT THEY DID.

2           SO THIS GROUNDS HAS ALREADY BEEN FILED ONCE.  TO

3   AVOID THE VERY PROBLEM THAT WE'VE GOT HERE, IT WAS DONE WITH

4   A LOT OF MONEY, IT WAS DONE WITH THE UTMOST GOOD FAITH.  AND

5   THAT IS WHAT REFLECTS THE CURRENT INVENTORSHIP ON THESE

6   PATENTS.

7           BASICALLY, THE DEFENDANTS WANT THE COURT TO

8   RECONSIDER THE SAME EVIDENCE, THE SAME DEPOSITIONS, THE SAME

9   TESTIMONY, THE SAME DOCUMENTS THAT WERE GIVEN TO MR. SHEFTE

10  AND THEN COME TO A DIFFERENT CONCLUSION.

11          WE THINK THAT THE EVIDENCE WILL LEAD THE COURT TO

12  THE SAME CONCLUSION THAT MR. SHEFTE REACHED, SUCH THAT THE

13  COURT WILL LEAVE THE INVENTORSHIP UNDISTURBED.  BUT THE KEY

14  POINT TO REMEMBER IN ALL OF THIS, THE KEY POINT TO REMEMBER

15  IS THAT THE INVENTORSHIP DEFENSE CANNOT INVALIDATE THE

16  PATENT.  THE IMPORTANT THING HERE IS THE RELIEF THAT IS

17  AVAILABLE.  THE COURT HAS ALREADY DETERMINED CORRECTLY THAT

18  THE ONLY REMEDY THAT IS AVAILABLE IS TO CORRECT THE

19  INVENTORSHIP, NOT TO RENDER THE PATENTS INVALID.  SO NO

20  MATTER WHAT HAPPENS ON THIS DEFENSE, NO MATTER WHAT HAPPENS,

21  YOUR HONOR, THERE IS NO RELIEF AVAILABLE THAT WILL ALLOW THE

22  DEFENDANTS TO REMAIN IN THE MARKET.

23          AND WHAT I MEAN IS THIS, YOUR HONOR:  OWNERSHIP IS

24  ALREADY DETERMINED ON SUMMARY JUDGMENT, SO NO MATTER WHAT

25  YOU DO WITH THE INVENTORSHIP, EVEN IF YOU WERE TO DETERMINE,

1    I AM GOING TO MAKE JAMES MCCLUER THE SOLE INVENTOR ON THIS

2    PATENT OR THIS PATENT, EVEN IF YOU DO THAT, THAT WILL NOT

3    OPERATE TO RESTORE OWNERSHIP RIGHTS TO MR. MCCLUER SO THAT

4    HE WOULD THEN BE IN A POSITION TO EITHER ASSIGN OR LICENSE

5    TO THE DEFENDANTS, SO THAT THE DEFENDANTS ARE UNABLE TO

6    RENDER THE PATENTS INVALID, THEY ARE UNABLE TO DO ANYTHING

7    TO RESTORE MR. MCCLUER TO A POSITION OF OWNERSHIP WHERE THEY

8    COULD ACQUIRE FROM MCCLUER RIGHTS TO STAY IN THE MARKET.

9    THERE IS NOTHING THAT THEY CAN ACCOMPLISH WITH THIS DEFENSE

10   THAT IS GOING TO ALLOW THEM TO STAY IN THE MARKET AT THE

11   CONCLUSION OF THIS LAWSUIT.

12            SO UNDER THE CIRCUMSTANCES, YOUR HONOR, I THINK IT

13   IS WORTH YOUR WHILE TO ASK MR. SCHAETZEL WHEN HE GETS UP

14   HERE IN A MINUTE TO JUSTIFY WHY THE DEFENDANTS ARE PUTTING

15   YOU AND ME THROUGH THIS EXERCISE TODAY IF THERE IS NO RELIEF

16   AVAILABLE THAT WILL DO THEM ANY GOOD.

17            THE DEFENDANTS SHOULD BE ABLE TO ARTICULATE TO THE

18   COURT THAT THERE IS SOME SORT OF RELIEF, BENEFICIAL RELIEF

19   THAT THEY ARE TRYING TO OBTAIN FROM THE COURT.  BECAUSE AS

20   FAR AS CHEMFREE CAN SEE, THE INVENTORSHIP DEFENSE NO LONGER

21   HAS ANY PURPOSE, OTHER THAN TO HARASS AND INCREASE THE COST

22   OF THIS LITIGATION TO CHEMFREE.  NO OTHER PURPOSE.

23            AND IF THE DEFENDANTS HAVE THEIR WAY, THEY ARE

24   GOING TO TURN THIS COURTROOM INTO A JUDICIAL VERSION OF THE

25   JERRY SPRINGER SHOW FOR ABOUT ONE TO TWO DAYS TO BRING

1    MR. MCCLUER'S CIRCUS ACT INTO THIS COURTROOM, AND WE'VE BEEN

2    DOWN THAT ROAD BEFORE AND SOUNDS LIKE WE ARE GOING TO HAVE

3    TO DO IT AGAIN.  TO NO PURPOSE AND TO NO AVAIL.

4         SO AFTER THE COURT HEARS ALL OF THE EVIDENCE, WE

5    ASK THE COURT TO ENTER A FINAL JUDGMENT AGAINST THE

6    DEFENDANTS THAT CHEMFREE'S PATENT CLAIMS ARE NOT INVALID,

7    AND THAT THEY ARE INFRINGED.  THANK YOU.

8         THE COURT:  THANK YOU, MR. CAPP.  WHO IS GOING TO

9    OPEN FOR THE DEFENDANT?

10        MR. SCHAETZEL:  I AM, YOUR HONOR.

11        THE COURT:  ALL RIGHT.

12        MR. SCHAETZEL:  MAY IT PLEASE THE COURT.  THANK

13   YOU, YOUR HONOR.  YOUR HONOR, AT THE OUTSET, WE WILL STAY

14   FOCUSED ON THE ISSUES THAT ARE TO BE TRIED.  WALTER WILL

15   WELCOME THE OPPORTUNITY AT THE APPROPRIATE TIME TO ADDRESS

16   ISSUES OF WILLFULNESS AND HOW THE CASE HAS BEEN CONDUCTED.

17   BUT AT THIS POINT IN TIME, THE ISSUES TO BE TRIED IN THIS

18   CASE ARE WHAT ARE BEFORE THE COURT, AND THAT IS WHAT WE ARE

19   FOCUSED ON.

20        IN THAT REGARD, WE HOPE THAT THE COURT DOES PAY

21   CAREFUL ATTENTION TO DALBERT SHEFTE'S OPINION BECAUSE

22   MR. SHEFTE FOUND THAT MR. MCCLUER WAS THE SOLE INVENTOR OF

23   THE CORE TECHNOLOGY AND IDENTIFIED HIM AS THE SOLE INVENTOR

24   OF THE CLAIM THAT REFERENCED THAT CORE TECHNOLOGY.  BUT

25   BEFORE WE GET THERE, YOUR HONOR, I WOULD LIKE TO GIVE YOU A

1    LITTLE BIT OF BACKGROUND ON WALTER AND HOW WALTER CONDUCTS

2    ITS BUSINESS.

3          FOR ALMOST 60 YEARS, WALTER HAS CONDUCTED ITS

4    BUSINESS IN MONTREAL AS A FAMILY-OWNED COMPANY THAT HAS

5    LOOKED FOR NEW OPPORTUNITIES IN THE MARKETPLACE AND MET

6    THOSE OPPORTUNITIES BY DEVISING ITS OWN NEW AND DIFFERENT

7    AND BETTER PRODUCTS.  WE HAVE HERE SOME PAGES FROM THE

8    WEBSITE, YOUR HONOR.  THIS IS THE WALTER WEBSITE.  COMPANY

9    WAS FOUNDED IN 1952 BY MR. WALTER J. SOMERS.  HE INVERTED

10   HIS FIRST AND MIDDLE INITIAL TO CREATE THE COMPANY NAME, J.

11   WALTER.  YOU CAN SEE HERE FROM THE WEBSITE A LIST OF

12   TECHNOLOGICAL ACCOMPLISHMENTS OF THE COMPANY.  FOR EXAMPLE,

13   IN 1956, THE STRAIGHT DRILL.  IN 1958, THE D-HANDLE HAMMER

14   DRILL.  IN 1960, THE ELECTROMAGNETIC DEMOLITION HAMMER.  AND

15   SO ON.  1970, TOTAL PERFORMANCE CONCEPT.  1974, FIRST

16   FLEXIBLE GRINDING WHEELS.  AND 1995, THE ABRASIVE FLAT DISC.

17   THESE ARE INDUSTRIAL PRODUCTS THAT WALTER SELLS TO

18   INDUSTRIAL USERS OF METAL SURFACING.  FOR EXAMPLE, ANYTHING

19   THAT IS METAL, WALTER MAKES SOMETHING THAT YOU CAN TREAT.

20   YOU CAN SAND IT, YOU CAN GRIND IT, YOU CAN DO WHATEVER YOU

21   NEED TO DO TO ANY METAL SURFACE DUE TO PRODUCTS THAT WALTER

22   PROVIDES.

23          WALTER HAS IN ITS HISTORY DEVISED MANY OF THE

24   PRODUCTS THAT IT SELLS.  THIS IS THE FIRST TIME WALTER HAS

25   EVER HAD TO FACE A PATENT INFRINGEMENT LAWSUIT IN THAT

1   ENTIRE HISTORY.  WALTER HAS A HISTORY OF DOING ITS OWN WORK

2   AND OF DOING THAT WORK VERY WELL.

3          THAT IS WHAT HAPPENED IN THIS CASE.  WALTER, IN

4   FACT, DID ITS OWN WORK.  NOW, THE ENVIRONMENT WITHIN WHICH

5   THAT WORK OCCURRED, IS VERY IMPORTANT.  THERE WILL BE

6   TESTIMONY IN THE CASE THAT A PRIME MOTIVATOR FOR WHAT SENT

7   BOTH OF THESE PARTIES DOWN THIS DIRECTION OCCURRED IN

8   WALTER'S OWN BACKGROUND, MONTREAL, AND THAT IS THE 1987 AT

9   ADOPTION OF THE MONTREAL PROTOCOL.  PARTS CLEANING, AS WE

10  HAVE HEARD BEFORE, WAS FOR MANY YEARS DONE WITH SOLVENTS.

11  THEY ARE OFTENTIMES REFERRED TO AS VOLATILE ORGANIC

12  COMPOUNDS, VOC'S, BUT IT IS MINERAL SPIRITS.  AND MINERAL

13  SPIRITS ARE BAD, AND THE MONTREAL PROTOCOL SAID WE NEED TO

14  START DOING THINGS IN A MORE ENVIRONMENTALLY CONSCIOUS WAY

15  AND FROM AN ENVIRONMENTALLY FRIENDLY WAY.  WE NEED TO GET

16  RID OF THE SOLVENTS PARTS WASHERS.

17         IN 1989, AS WE HAVE ALREADY HEARD REPEATEDLY IN

18  THIS CASE, WE HAD THE EXXON VALDEZ OIL SPILL.  ONE OF THE

19  WORST OIL SPILLS IN THE WORLD'S HISTORY.  I READ THAT NOW IT

20  HAS FALLEN OUT OF THE TOP 50 IN TERMS OF THE QUANTITY OF OIL

21  THAT WAS DISPERSED, BUT IN TERMS OF THE DAMAGE THAT IT DID

22  TO THE SHORELINE AND SUCH, IT IS STILL VIEWED AS ONE OF THE

23  WORST OIL SPILLS OF ALL TIME.  AND IN THAT CONTEXT, WE SAW

24  BIOREMEDIATION USED TO TRY AND CLEAN UP PARTS OF THAT OIL

25  SPILL, PREDOMINANTLY ON LAND.

1          WITH THOSE TWO THINGS HAPPENING, THE ADOPTION OF

2    THINGS SUCH AS THE MONTREAL PROTOCOL, PEOPLE BECOMING MORE

3    AWARE OF BIOREMEDIATION AND ITS POWER, WE BEGAN TO SEE

4    THINGS IN THE PUBLIC DOMAIN THAT REFLECTED THOSE TWO THINGS.

5    ONE OF THE THINGS THAT WE SAW WAS SOMETHING THAT MR. CAPP

6    HAS ALREADY REFERRED TO, AND THAT'S THE HAKANSSAN-2

7    REFERENCE.  HAKANSSAN-2 IS A PATENT APPLICATION THAT WAS

8    APPLIED FOR IN 1991 AND PUBLISHED, BECAME A PART OF THE

9    PUBLIC DOMAIN, IN 1992.

10          HERE WE HAVE FIGURE 1 FROM THE HAKANSSAN-2

11   REFERENCE.  FIGURE 1 SHOWS CERTAIN THINGS THAT ARE DIRECTLY

12   RELEVANT TO THIS CASE.  OUT TO THE SIDE, AT ITEM 14, WE HAVE

13   THE STORAGE TANK FOR THE CLEANING FLUID.  IN THE CENTER WE

14   HAVE THE WASHING FLUID -- OR THE WASHING TANK.  THERE WILL

15   BE TESTIMONY THAT BY VIRTUE OF A PUMP, WHICH YOU SEE AT THE

16   BOTTOM OF THE TANK AT ITEM 11, HERE, THAT THAT PUMP OPERATES

17   TO MOVE THE FLUID FROM THE STORAGE TANK INTO THE WASHING

18   TANK WHERE IT IS USED TO WASH THE PARTS.  SO HAKANSSAN-2

19   DISCLOSES THINGS LIKE A STORAGE TANK, THE WASHING CHAMBER,

20   THE PUMP, IT DISCLOSES MICROORGANISMS.  IT DISCLOSES USING A

21   HEATER TO KEEP THE FLUID WARM TO SUSTAIN THE MICROORGANISMS.

22   IT DISCLOSES A THERMOSTAT THAT IS USED TO KEEP THE HEATER

23   ACTIVE AT THE RIGHT TIME SO AS TO MAINTAIN THAT TEMPERATURE.

24   IT DISCLOSES A LEVEL CONTROL SYSTEM TO KEEP THE FLUID AT THE

25   APPROPRIATE LEVEL.  ALL OF THAT OCCURS MORE THAN TWO YEARS

1    BEFORE CHEMFREE FILES ITS FIRST PATENT INFRINGEMENT.  THAT

2    IS WHAT IS ALREADY OUT THERE IN THE PRIOR ART.

3         WE COME FORWARD TO SEPTEMBER, 1994.  CHEMFREE

4    FILES ITS PATENT APPLICATION.  IT IS A BIT DIFFICULT TO SEE

5    IN THE UNITS THAT CHEMFREE HAS BROUGHT, BECAUSE WHAT YOU

6    DON'T SEE IS THE SO-CALLED FALSE BOTTOM.  THESE UNITS HAVE A

7    FALSE BOTTOM THAT CAN COME OUT OF THEM, AND BELOW THAT FALSE

8    BOTTOM IN THE CHEMFREE UNITS IS A FILTER THAT GETS PLACED

9    ALONG THE FALSE BOTTOM.  AND THERE IS A SUPPORT STRUCTURE

10   FOR IT, IN THE PARTS WASHER.

11        NOW, WHEN CHEMFREE APPLIED TO PATENT ITS

12   INVENTION, CHEMFREE TOLD THE PATENT OFFICE SEVERAL THINGS IN

13   THE BACKGROUND OF ITS APPLICATION THAT WERE KNOWN IN THE

14   ART.  HERE IS A QUOTE FROM THE BACKGROUND SESSION OF THE

15   CHEMFREE PATENT APPLICATION.  THIS IS FROM THE 110 PATENT.

16   IT STARTS, "PARTS WASHERS ARE WELL KNOWN."  SO AT THE TIME

17   CHEMFREE APPLIED, PARTS WASHING WAS CERTAINLY KNOWN AND

18   OFTEN EMPLOYED IN THE CLEANING OF PARTS THAT ARE

19   CONTAMINATED WITH ORGANIC WASTE PRODUCTS.  SO WE KNEW WE

20   WOULD BE USING PARTS WASHERS TO CLEAN UP HYDROCARBONS AT THE

21   TIME.

22        WE GO FURTHER IN THAT SAME PARAGRAPH.  "THE MOST

23   CONVENTIONAL PARTS WASHERS INCLUDE A BASIN MOUNTED TO THE

24   TOP OF THE TANK.  THE BASIN IS THE SINK, THE TANK IS DOWN

25   BELOW."  THAT WAS DONE.  YOU CARRY ON HERE.  "IN THE

1    APPLICATION THAT THEY FILED IN THE SUBSEQUENT PATENT AT

2    ISSUE, THEY ADMIT THAT THE TANK IS FILLED WITH A CLEANING

3    SOLUTION, THAT THE CLEANING SOLUTION IS PUMPED THROUGH

4    CONDUIT TO GET BACK UP TO THE NOZZLE OR THROUGH THIS HOSE TO

5    BE USED."  AND, VERY IMPORTANTLY IN THE LAST PARAGRAPH ON

6    THIS, "FILTERS ARE OFTEN INCORPORATED INTO CONVENTIONAL

7    PARTS WASHERS TO REMOVE THE ORGANIC WASTE PRODUCTS AND

8    PARTICULATES FROM THE SOLVENT."  FILTERS ARE OFTEN

9    INCORPORATED TO REMOVE PARTICULATES, AND IN THAT CASE, THE

10   SOLVENT WAS THE CLEANING SOLUTION.  BUT THAT IS CERTAINLY

11   TRUE OF ANY SOLUTION, WHATSOEVER.

12           NOW, AGAINST THAT BACKGROUND AS THE PRIOR ART,

13   LET'S LOOK AT WHAT CHEMFREE TOLD THE PATENT OFFICE THIS

14   INVENTION COMPRISED OF.  WHAT WAS THE INVENTION THAT WAS AT

15   ISSUE.  IN THE SUMMARY, THE CHEMFREE PATENT STATES AS

16   FOLLOWS:  "BRIEFLY DESCRIBED, THE PRESENT INVENTION

17   COMPRISES A PARTS WASHING SYSTEM CHARACTERIZED BY

18   COOPERATIVE INTERACTION."  AND NOW WE USE LANGUAGE THAT THE

19   COURT HAS USED IN THE PAST:  "COOPERATIVE INTERACTION AMONG

20   A MECHANICAL COMPONENT, FLUID COMPONENT AND BIOLOGICAL

21   COMPONENT.  THE PARTS WASHER APPARATUS, OR PARTS WASHER OF

22   THE SYSTEM INCLUDES A HOLDING TANK, A CLEANING TANK" -- OR,

23   I'M SORRY, "A HOLDING TANK, CLEANING FLUID RETAINED WITHIN

24   THE TANK, MICROORGANISMS LIVING IN THE CLEANING FLUID, A

25   WASH BASIN AND FLUID DELIVERY SYSTEM AND AN INLINE FILTER."

1          WE HAVE SEEN THE FILTER THAT THEY ARE REFERRING

2     TO.   WHAT IS IT THAT CHEMFREE TOLD THE PATENT OFFICE WAS THE

3     INVENTIVE CONTRIBUTION THAT THEY HAD MADE?   WHAT MADE THIS

4     PATENT GO?   THAT IS IN THE LAST PARAGRAPH ON THE SCREEN.

5     THAT IS IN COLUMN 2, AT LINES 34 AND 38 OF THE 110 PATENT.

6     THEY IDENTIFIED TWO THINGS.   THEY IDENTIFIED THE MULTITIERED

7     SINK, IN OTHER WORDS, THE FALSE BOTTOM, A MULTITIERED SINK,

8     AND THEY IDENTIFIED THE COMBINATION OF THE FLUID COMPONENT

9     AND THE BIOLOGICAL COMPONENT.

10          WHAT WAS NOT POINTED OUT IN MR. CAPP'S OPENING IS

11     THAT IF WE LOOK FOR THE MULTITIERED SINK, IN ANY OF THESE

12     UNITS ALONG THE WALL, IT IS NOT THERE.   THERE IS NO

13     MULTITIERED SINK.   THERE IS NO FILTER UNDER A FALSE BOTTOM

14     IN ANY OF THESE UNITS.

15          THE FLUID COMPONENT AND THE BIOLOGICAL COMPONENT,

16     THAT COMBINATION.   WELL, YOUR HONOR, AS WE WILL SEE IN A FEW

17     MINUTES, THAT IS WHAT HAKANSSAN-2 TAUGHT.   THAT IS EXACTLY

18     WHAT HAKANSSAN-2 TAUGHT.   IT TAUGHT THE USE OF

19     MICROORGANISMS, ALONG WITH A SURFACTANT AND WATER TO OPERATE

20     THE CLEANING MACHINE IN HAKANSSAN-2.

21          SHORTLY AFTER IT FILED IN 1994, CHEMFREE WENT INTO

22     THE MARKETPLACE -- OR AT LEAST AROUND 1994, CHEMFREE GOES

23     INTO THE MARKETPLACE AND IS IN THE MARKETPLACE FOR

24     APPROXIMATELY SEVEN YEARS.   IN THAT SEVEN-YEAR TIME PERIOD,

25     OR FOR APPROXIMATELY SEVEN YEARS BEFORE MR. MCNALLY MADE HIS

1    TRIP TO SEE WALTER IN 2001, AND THERE WILL BE EVIDENCE THAT

2    WHEN HE MADE THAT TRIP IN 2001, MR. MCNALLY INDICATED THAT

3    THE PARTS WASHER MARKET IN THE UNITED STATES AT THAT POINT

4    IN TIME WAS APPROXIMATELY 1.5 MILLION UNITS.  IN OTHER

5    WORDS, THERE ARE 1.5 MILLION SOLVENT PARTS WASHERS OUT THERE

6    THAT COULD BE REPLACED BY BIOREMEDIATION PARTS WASHERS.

7            THERE WILL BE FURTHER TESTIMONY THAT AT THAT

8    PERIOD OF TIME, ROUGHLY 2001, AFTER ABOUT SEVEN YEARS,

9    CHEMFREE HAD SOLD ON THE ORDER OF 30, MAYBE 35,000 UNITS.

10   AND THAT IS ON A WORLDWIDE BASIS.  SO AFTER SEVEN YEARS OF

11   TRYING TO EXPLOIT THE MARKET AT THAT POINT IN TIME, CHEMFREE

12   HAD, IF WE ATTRIBUTE THEIR WORLDWIDE SALES, JUST TO THE

13   U.S., GIVEN CREDIT FOR ALL IN THE U.S., MAYBE TWO PERCENT OF

14   THE MARKET.  THIS HAS NOT BEEN A GREAT COMMERCIAL SUCCESS.

15   IT WAS CERTAINLY NOT A COMMERCIAL SUCCESS IN 2001 WHEN

16   MR. MCNALLY CAME TO CANADA TO SEE THE FOLKS AT WALTER.

17   DESPITE THAT, WALTER SEIZED THE NEED FOR THE BIOREMEDIATED

18   PARTS WASHER.  WALTER IS AWARE OF THE MONTREAL PROTOCOL.

19   WALTER HAS PEOPLE IN THE FIELD WHO ARE SELLING ITS

20   INDUSTRIAL PRODUCTS TO PEOPLE THAT CLEAN THINGS.  AND WALTER

21   GETS FEEDBACK FROM THOSE PEOPLE, SOME OF WHOM HAVE BOUGHT

22   CHEMFREE UNITS, THAT THOSE UNITS DIDN'T WORK VERY WELL.

23   WITHIN THAT ENVIRONMENT, WALTER SAW AN OPPORTUNITY TO DO

24   WHAT IT DOES, SAW THE OPPORTUNITY TO DEVELOP ITS OWN

25   PRODUCT, AND TO MEET THAT MARKET DEMAND WITH A NEW DIFFERENT

1    AND BETTER PRODUCT.

2            SO WHAT DID IT DO?  TWO THINGS.  FIRST, IN THE

3    1999 TIME FRAME, WALTER DID ENGAGE ITS PARTNER IN GERMANY,

4    CB CHEMIE, AND THERE WILL BE SOME TESTIMONY ABOUT A

5    GENTLEMAN BY THE NAME OF ULRICH BERENS, B-E-R-E-N-S.  MR.

6    BERENS IS A CHEMIST.  HE THOUGHT THAT IT WOULD BE NEAT TO

7    TRY TO WORK ON THIS PRODUCT AND SEE IF HE COULDN'T DEVISE

8    SOMETHING.

9            SO CB CHEMIE STARTED WORKING WITH THE FLUID.

10   WALTER IN CANADA STARTED WORKING WITH THE APPARATUS.

11   MR. BERENS DID SOMETHING REMARKABLE.  RATHER THAN HAVING A

12   FILTER THAT WAS LADEN WITH MICROORGANISMS AND HAVE THAT

13   FILTER BE THE DELIVERY VEHICLE FOR THE MICROORGANISMS INTO

14   THE PROCESS, MR. BERENS CONCEIVED AND MADE A PRODUCT, A

15   CHEMICAL PRODUCT, A FORMULA FOR HIS FLUID, WHERE THE

16   MICROBES WERE ALREADY IN THE FLUID, AND IT HAD A SHELF LIFE.

17   YOU COULD PUT IT UP ON THE SHELF AND WAIT FOR SIX MONTHS TO

18   SELL IT OUT TO A CUSTOMER.  AND SO THE MICROORGANISMS WOULD

19   ALREADY BE IN THE FLUID THAT YOU BOUGHT.  THAT WAS A

20   REMARKABLE DIFFERENCE.  BECAUSE WITH THAT DIFFERENCE, IT

21   DOVETAILED NICELY WITH WHAT WALTER WAS DOING IN CANADA TO

22   TRY AND BUILD ITS PARTS WASHER.

23           WALTER NOT ONLY WANTED TO DO AWAY WITH THE FILTER

24   AND THE LOADING OF THE MICROORGANISMS INTO THE FILTER, IT

25   DIDN'T WANT TO USE THE MULTITIERED SINK.  AND IT WANTED TO

1  DO SOME THINGS THAT IT THOUGHT WOULD ENHANCE THE PRODUCT.

2  SO FOR EXAMPLE, IN THE BR 100, THAT IS AT THE FAR LEFT END,

3  THAT HAS A PUMP THAT RUNS 24 HOURS A DAY, SEVEN DAYS A WEEK.

4  AND WHAT HAPPENS IN THAT UNIT, THERE WILL BE TESTIMONY THAT

5  WILL SHOW, IS THAT INSTEAD OF THE FLUID PUMPING UP TO THE

6  NOZZLE, WHICH IT CAN DO, IT CAN ALSO BE RECIRCULATED BACK

7  INTO THE TANK, AND THE FLUID IS THEN DELIVERED TO THE TANK

8  IN SUCH A WAY AS TO AGITATE, AND IN DOING THAT AGITATION, IT

9  AERATES THE MICROORGANISMS, AND THAT PROVIDES A BETTER, MORE

10 ACTIVE ENVIRONMENT SO THAT THE MICROORGANISMS WORK BETTER.

11 IT'S AN EXAMPLE OF WHAT WALTER DID ON ITS OWN TO CREATE ITS

12 OWN NEW AND DIFFERENT PRODUCT.

13        NOW, THERE IS SOME TALK IN MR. CAPP'S OPENING

14 ABOUT AGREEMENTS.  YES, WALTER -- THERE CERTAINLY WILL BE

15 PEOPLE WHO SAY, YES, WE BOUGHT THE MACHINE FROM GRAY MILLS

16 AND GRAY MILLS MANUFACTURED THE BR 100 UNIT.  DOES THAT MEAN

17 THAT CHEMFREE PARTICIPATED IN THE WORK THAT WAS DONE TO

18 DEVELOP THE BR 100?  NO.  IT DOES NOT.  THE BR 100 IS A

19 DRAMATICALLY DIFFERENT MACHINE.  NOT ONLY DOES IT INCLUDE

20 THE AERATION, BUT IT DOESN'T HAVE THE MULTITIERED BASE, IT

21 DOESN'T HAVE THE FILTER, AND THE FLUID ALREADY HAS THE

22 MICROORGANISMS IN IT.  FOR THAT REASON, THERE WILL BE NO

23 EVIDENCE THAT WALTER EVER PURCHASED ANY OF THE FILTERS THAT

24 MR. CAPP MENTIONED FROM GRAY MILLS.  THOSE FILTERS HAD THE

25 MICROORGANISMS GLUED TO THEM.  THAT WAS NOT THE DELIVERY

1    SYSTEM THAT WALTER WANTED TO USE.

2              WALTER NEVER BOUGHT THAT.  WHEN MR. CAPP SAYS,

3    WELL, WALTER BOUGHT SUPER BIOTENE FLUID FROM GRAY MILLS.

4    THE SUPER BIOTENE FLUID IS NOTHING MORE THAN SOAP.  IT'S A

5    BUCKET OF SOAP.  IT DOESN'T HAVE ANY MICROORGANISMS IN IT.

6    IT DOESN'T HAVE ALL OF THE THINGS THAT WALTER PUT IN ITS

7    FLUID SO IT COULD TRY AND SELL THE BR 100.  IT IS A VERY

8    DIFFERENT PRODUCT.

9              EVEN THEN IT DIDN'T WORK AS WELL AS WALTER WANTED.

10   SO WALTER CONTINUED TO TRY AND DEVELOP IT, AND THERE WILL BE

11   TESTIMONY THAT WHEN IT CAME TO THE BR 200 UNIT, THE UNIT

12   THAT IS NEXT ALONG THE WALL, THAT WHAT WAS SOUGHT WAS A UNIT

13   THAT COULD HANDLE MORE WEIGHT, COULD HANDLE BIGGER UNITS,

14   COULD HANDLE BIGGER THINGS TO BE WASHED.  IN ADDITION, AN

15   ENHANCED FLUID WAS CREATED.  IT IS TRUE THAT THE BR 100 WAS

16   FIRST SOLD IN EUROPE IN OCTOBER OF 2000.  IT THEN CAME TO

17   CANADA, AND THEN, APPROXIMATELY 2002, IT CAME TO THE UNITED

18   STATES.  NOW, SALES IN THE UNITED STATES WERE NOT DRAMATIC.

19   FEWER THAN 15 OF THOSE WERE EVER SOLD IN THE UNITED STATES,

20   AND THERE WERE NO SALES OF BR 100 UNITS WHEN THIS LAWSUIT

21   BEGAN.

22             BUT EVEN AT THAT, WALTER WANTED TO IMPROVE IT.  SO

23   THEY MADE A BIGGER UNIT, THE BR 400 -- I'M SORRY, THE

24   BR 200, THE NEXT ONE OVER, AND THEY MADE A BETTER FLUID.

25   ONLY THIS WORK TOOK COMPETING QUITE SOME TIME.  IT WAS AT

1    LEAST A YEAR, PERHAPS AS MUCH AS TWO, BEFORE CB CHEMIE COULD

2    CREATE A FLUID THAT NOT ONLY HAD THE MICROORGANISMS IN IT

3    BUT ALSO THAT WORKED WELL ON BOTH OIL AND GREASE.  BECAUSE

4    THE BR 100 WAS DESIGNED MOSTLY TO WORK ON OIL.  GREASE IS A

5    MUCH DIFFERENT PRODUCT.  AND IT TOOK CB CHEMIE QUITE SOME

6    TIME TO PUT TOGETHER A FLUID THAT WOULD WORK ON BOTH.  THEY

7    PUT THOSE TOGETHER AND MADE THE BR 200.  THAT UNIT DOES NOT

8    INCLUDE THE MULTITIERED BASIN.  THAT UNIT IS USED WITH A

9    FLUID THAT ALREADY HAD THE MICROORGANISMS IN IT.  THERE IS

10   NO FILTER IN THAT UNIT, OR AT LEAST NOT A FILTER THAT IS

11   LADEN WITH MICROORGANISMS AS IN THE CHEMFREE PRODUCTS.

12           IN 2006, WALTER CAME OUT WITH THE IO 400.  THAT IS

13   THE THIRD UNIT ALONG THE WALL.  THERE IS ONE THING YOU CAN'T

14   SEE VERY WELL, YOUR HONOR, THAT AS WE GO FORWARD HERE, WILL

15   BECOME APPARENT.  ON THE LEFT-HAND SIDE OF THIS MACHINE,

16   THERE IS A NEW PRODUCT ATTACHED TO IT AND THAT IS A FILTER.

17   II IS A PLAIN OLD CARTRIDGE FILTER, AND IT LOOKS A LOT LIKE

18   THIS ONE THAT IS ON THE IO 200.  IT IS A FILTER UNIT THAT

19   SITS IN THE STREAM AS THE FLUID COMES FROM THE TANK TO THE

20   NOZZLE.  SO THE PUMP PUSHES FLUID TO THE FILTER.  FROM THE

21   FILTER, IT WORKS ITS WAY UP TO THE NOZZLE.  THAT FILTER

22   CARTRIDGE WAS ON THE IO 400, AND OBVIOUSLY, IT IS ALSO ON

23   THE LAST UNIT, THE IO 200.  THE IO 200 REPRESENTED YET

24   ANOTHER ROUND OF DEVELOPMENT BY WALTER.  MR. CAPP HAS TALKED

25   ABOUT SOME OF THE DIFFERENCES.

1           THE HEATER.  THE HEATER WORKS VERY DIFFERENTLY IN

2    THE IO 200 THAN WHAT WAS DONE BEFORE.  FOR EXAMPLE, IN THE

3    IO 400, THERE IS A CONVENTIONAL -- LIKE YOU WOULD HAVE IN

4    YOUR STOVE HEATER THAT IS IMMERSED DOWN INTO THE TANK.  THIS

5    HEATER, HOWEVER, IS IN THE FLUID LINE THAT IS OUTSIDE OF THE

6    TANK.  SO RATHER THAN HEATING FLUID IN THE TANK, IT IS

7    HEATING FLUID IN THE LINE AS IT PASSES THE HEATER.

8           MR. CAPP MENTIONED THE PRESSURE SWITCH.  THE

9    PRESSURE SWITCH THAT IS IN THAT LINE IS RESPONSIVE TO THE

10   PRESSURE OF FLUID IN THAT LINE.  IN OTHER WORDS, IF THERE IS

11   ENOUGH PRESSURE IN THE LINE THAT IS LEADING TO THE HEATER,

12   THEN THE PRESSURE SWITCH WILL ALLOW THE HEATER TO OPERATE.

13   IF THERE IS NOT ENOUGH PRESSURE, THEN THAT PRESSURE SWITCH

14   WILL CAUSE THE HEATER TO SHUT OFF.  THAT COULD HAPPEN EVEN

15   THOUGH THERE IS A COMPLETELY FULL TANK BUT SOMETHING HAS

16   CLOGGED THAT LINE.  SO IT'S NOT RESPONSIVE TO THE LEVEL OF

17   FLUID OR AT LEAST SOLELY RESPONSIBLE TO THE LEVEL OF FLUID

18   IN THE TANK.

19           ALL OF THOSE ITEMS, EACH OF WHICH WILL BE

20   TESTIFIED TO DURING THE WEEK, SHOW THAT WALTER DID NOT COPY

21   FROM ANYBODY.  THAT IS NOT HOW WALTER DOES BUSINESS AND IT'S

22   NOT THE BUSINESS THAT IT DID HERE.  DID WALTER DO SOME

23   INTELLIGENCE GATHERING?  OF COURSE IT DID.  WALTER WENT OUT

24   TO SEE WHAT THE COMPETITION WAS DOING AND TO LEARN FROM IT.

25   PERFECTLY APPROPRIATE.  THAT IS A VERY DIFFERENT MATTER FROM

1    COPY.  COPYING IS CERTAINLY NOT WHAT HAPPENED HERE.  AND

2    THAT IS WHAT THE EVIDENCE WILL SHOW.

3           DESPITE ALL OF THAT INDEPENDENT DEVELOPMENT,

4    WALTER FINDS ITSELF EMBROILED IN THIS LAWSUIT, AND THERE ARE

5    FOUR PATENTS.  AND IT'S IMPORTANT IN LOOKING AT THOSE FOUR

6    PATENTS THAT WE LOOK AT WHAT THEY COVER.  TWO OF THOSE

7    PATENTS ARE WHAT ARE REFERRED TO AS APPARATUS PATENTS.  THEY

8    RELATE TO THE SYSTEM.  THE APPARATUS PATENTS ARE THE 110

9    PATENT AND THE 835 PATENT.  TWO OTHERS ARE METHOD PATENTS.

10   THE 226 AND THE 125 PATENTS RELATE TO METHODS.  YOU HAVE TO

11   TAKE CERTAIN STEPS IN ORDER TO INFRINGE THOSE CLAIMS.

12          EACH OF THESE FOUR PATENTS ISSUED BETWEEN 2000 AND

13   2002, WHICH THE EVIDENCE WILL SHOW, IS A GOOD FIVE TO SEVEN

14   YEARS BEFORE THE SUPREME COURT'S DECISION IN KSR.  AND THE

15   KSR DECISION TAUGHT US CERTAIN THINGS ABOUT THE OBVIOUSNESS

16   ANALYSIS.

17          THE SUPREME COURT'S DECISION IN KSR SAID THAT YOU

18   TAKE A FLEXIBLE AND EXPANSIVE APPROACH TO THE OBVIOUSNESS

19   EQUATION.  KSR TEACHES THAT WE ARE NOT GOING TO GIVE PATENTS

20   OR SUSTAIN PATENTS ON ADVANCES THAT WOULD OCCUR IN THE

21   ORDINARY COURSE WITHOUT ANY REAL INNOVATION.  KSR TEACHES

22   THAT YOU CAN FIND A REFERENCE INVALID FOR OBVIOUSNESS IN

23   LIGHT OF A SINGLE REFERENCE.  KSR ALSO TEACHES THAT YOU

24   DON'T NEED AN EXPERT FOR A LOT OF THINGS, INCLUDING TO FIND

25   PATENTS OBVIOUS.  THERE IS NO REQUIREMENT THERE.

1          NOW, IN THIS CASE, PRIOR ART THAT IS ADMITTED

2     BETWEEN THE TWO PARTIES IS PRETTY DRAMATIC.  THERE IS NO

3     DISPUTE THAT THEY ARE PARTS WASHERS.  THERE IS NO DISPUTE

4     THAT THERE ARE PARTS WASHERS THAT USE WARM WATER, AQUEOUS

5     BASED PARTS WASHERS.  THERE IS NO DISPUTE THAT THERE IS

6     SOLVENT BASED PARTS WASHERS.  THERE IS NO DISPUTE AS TO THE

7     MECHANISMS THAT WERE USED TO MOVE THE SOLVENT AROUND OR TO

8     MOVE THE WARM WATER AROUND.  SO THIS IS NOT A DISPUTE ABOUT

9     WHETHER THE PRIOR ART SHOWS MICROORGANISMS IN A CLEANING

10    FLUID BECAUSE HAKANSSAN-2 SHOWS THAT WITHOUT QUESTION.  EVEN

11    SO, CHEMFREE SEEKS TO JUSTIFY ITS PATENTS BASED ON

12    RELATIVELY NARROW, INCREMENTAL CHANGES THAT, QUITE FRANKLY,

13    KSR SAYS IT IS NOT ENOUGH, THEY ARE NOT PATENTLY DISTINCT

14    ELEMENTS.  LET'S LOOK AT A COUPLE OF THEM.

15         HAKANSSAN-2, YOUR HONOR, THE WASHING CHAMBER HAS

16    TWO DOORS ACROSS THE TOP.  TO LOAD PARTS INTO IT, YOU DROP

17    THE DOORS OPEN, PUT THE PART IN, AND THEN WHEN YOU RUN THE

18    MACHINE, YOU CLOSE THE DOORS.  CHEMFREE SAYS HAKANSSAN-2

19    DOESN'T DISCLOSE OUR INVENTION BECAUSE WE HAVE AN OPEN

20    CONTAINER.  AN OPEN VESSEL, A SINK.  THERE ARE TWO PROBLEMS

21    WITH THAT.  ONE, HAKANSSAN-2 IS THE MORE SOPHISTICATED

22    EQUIPMENT.  THE EVIDENCE WILL BE THAT IT'S USED IN THE

23    INDUSTRY.  WELL, IN THIS CASE THE PRIOR ART HAS GONE PAST

24    THE SIMPLE OPEN SINK CONTAINER.  IT IS MORE SOPHISTICATED,

25    IT IS MOVED BY IT.  SECOND, EVEN IN THEIR OWN PATENT THEY

1    ADMIT THAT TANKS AND SINKS ON TANKS ARE KNOWN.  SO THERE IS

2    NOTHING INVENTIVE ABOUT HAVING A SINK ON TOP OF A TANK.

3            THEY ARGUE, WELL, IF YOU LOOK AT HACKINSON AS WE

4    WORK THROUGH THIS REFERENCE THIS WEEK, YOUR HONOR, THEY ARE

5    GOING TO SAY HACKINSON CIRCULATES FLUID DIFFERENTLY.

6    HACKINSON USES GRAVITY TO TAKE FLUID FROM ITEM 14 OVER TO

7    THE WASHING CHAMBER AND THEN USES THE PUMP TO PUMP IT BACK

8    INTO THE STORAGE TANK.  WHEREAS OUR PRODUCT AT CHEMFREE USES

9    THE PUMP TO PUMP FROM THE TANK UP TO THE NOZZLE.

10           WELL, ONE IS JUST THE REVERSE OF THE OTHER.  YOU

11   ARE GOING TO HAVE TO ALWAYS PUMP THINGS UPHILL, THAT IS THE

12   NATURE OF GRAVITY.  THERE IS NOTHING INVENTIVE ABOUT THAT

13   CIRCULATION METHOD.

14           THEY ARGUE, WELL, WAIT A MINUTE.  WE HAVE A

15   FILTER.  HAKANSSAN-2 DOESN'T DISCLOSE A FILTER.  HAKANSSAN-2

16   DOESN'T HAVE TO EXPRESS AND DISCLOSE A FILTER.  A PERSON OF

17   ORDINARY SKILL IN THE ART LOOKS AT THIS WASHING CHAMBER AND

18   SAYS THERE IS PARTICULATE MATTER THAT WE ARE GOING TO GET

19   HERE, AND THAT PARTICULATE MATTER IS GOING TO COLLECT DOWN

20   NEAR THE BOTTOM OF THE WASHING CHAMBER AND THERE IS A PUMP,

21   WE NEED TO PROTECT THAT PUMP.  HOW DO YOU PROTECT PUMPS?

22   WELL, THAT IS BACK TO THE CHEMFREE PATENT.  THE CHEMFREE

23   PATENT SAYS IT IS KNOWN TO PUT FILTERS IN THE FLOW PATH TO

24   CATCH PARTICULATE MATTER.  THERE IS NOTHING INVENTIVE IN

25   THOSE STEPS.

```
1              CHEMFREE STRIVES AND THE WITNESSES WILL STRIVE
2    THIS WEEK FOR CHEMFREE TO SAY THAT THERE IS SOMETHING
3    SPECIAL ABOUT THE FLUID.  BIODEGRADABLE, NONFLAMMABLE,
4    NONTOXIC, NONCAUSTIC.  HAKANSSAN-2 ALSO DISCLOSES THOSE
5    ITEMS.  FOR EXAMPLE, THE FLUID IS NONTOXIC TO THE
6    MICROORGANISMS.  OF COURSE THE FLUID IS NONTOXIC TO THE
7    MICROORGANISMS.  IF THE FLUID WEREN'T, IT WOULDN'T WORK.  IF
8    THE FLUID KILLED THE BUGS, THE MICROORGANISMS COULDN'T DO
9    THEIR JOB.  HACKINSON NECESSARILY DISCLOSES THAT.  HACKINSON
10   IS NONCAUSTIC.  THERE WILL BE TESTIMONY THIS WEEK AND
11   HACKINSON ITSELF WILL SPEAK ABOUT HOW IT IS TALKING ABOUT
12   TALKING ABOUT TWO THINGS:  HIGHLY ACIDIC, ALKALINE -- SORRY,
13   ACID METALS THAT ARE LOW PH, ALKALINE METALS THAT ARE HIGH
14   PH.  AND THEN HE TALKS ABOUT THE BIOLOGICAL IN BETWEEN.  IT
15   IS NOT CAUSTIC.  FLAMMABLE BIODEGRADABLE.  YOU COULD LOOK AT
16   THE INGREDIENTS IN HACKINSON AND SEE THEY ARE NOT FLAMMABLE,
17   THEY ARE NOT BIODEGRADABLE.  HACKINSON NECESSARILY DISCLOSES
18   EACH OF THOSE THINGS.  BUT THERE IS A MORE IMPORTANT POINT.
19              MR. CAPP WANTED TO SHOW AND DID SHOW HIS DOMINO
20   EFFECT, AS HE CALLED IT, OF CLAIMS.  WELL, LET'S TALK FOR A
21   MINUTE ABOUT THE 226 PATENT.  THE 226 PATENT IS ONE OF THOSE
22   PATENTS THAT IS A METHOD PATENT.  THE 226 PATENT HAS NO
23   LANGUAGE IN IT, WHATSOEVER, REFERRING TO CLAIM LANGUAGE,
24   BIODEGRADABLE, NONCAUSTIC, NONTOXIC, NONFLAMMABLE.  SO THAT
25   ARGUMENT ISN'T AVAILABLE ON THE 226 PATENT.
```

 1          AND A QUICK ASIDE, YOUR HONOR, IF I MIGHT.  ON THE

 2   226 PATENT, AND IT IS CLAIM 3 OF THAT PATENT THAT MR. CAPP

 3   POINTED OUT, IS SURFACTANT BASED.  ONE OF THE THINGS THE

 4   COURT ASKED THE PARTIES TO DO BEFORE WE CAME TO THE

 5   COURTROOM WAS TO FILE FINDINGS OF FACT AND THEN TO RESPOND

 6   TO THOSE ON A FACT BY FACT AND FINDING BY FINDING BASIS.

 7   THAT WAS A CHALLENGING TASK.  IF THE COURT WILL LOOK AT

 8   MR. CAPP'S FACT NO. 232 AND OUR RESPONSE TO IT.  FINDING

 9   232, I'LL BE GLAD THAT READ IT INTO THE RECORD, YOUR HONOR.

10          THE COURT:  OKAY.

11          MR. CAPP:  "THE COURT FINDS THAT THE SURFACTANT

12   BASED LIMITATION OF THE 125 PATENT, CLAIM 3 IS LITERALLY MET

13   BY THE ACCUSED BIO-CIRCLE L CLEANING FLUID."  WE THINK THEY

14   MEANT CLAIM 3 OF THE 226 PATENT, IT WAS A TYPO AS TO THE 125

15   PATENT.  THE ANSWER IS WHAT MATTERS.  WALTER DOES NOT

16   DISPUTE THAT THE ACTIVE CLEANING AGENT IN THE BIO-CIRCLE L

17   CLEANING FLUID IS A SURFACTANT AND THAT HAS CURRENTLY

18   CONSTRUED THE CLEANING FLUID, MEANING WALTERS'S CLEANING

19   FLUID, IS SURFACTANT BASED.  A LOT WAS MADE OF THAT IN THE

20   OPENING.  WE ALREADY ADMIT THE SURFACTANT LIMITATION.

21          COMING BACK TO HOW KSR INFRINGES, AN IMPASSE IN

22   THIS CASE, YOUR HONOR, KSR WAS NOT IN EXISTENCE WHEN THE

23   PATENT EXAMINER REVIEWED THESE CLAIMS.  KSR WAS NOT IN

24   EXISTENCE WHEN -- OR WHEN THESE PATENTS WERE -- ANY OF THESE

25   PATENTS WERE ISSUED.  KSR IS NEW LAW THAT IMPASSE ON AND

1    TEACHES THAT THE MINIMUM CONTRIBUTIONS THAT ARE BEING

2    ASSERTED AS INVENTIVE OR PATENTABLE, THAT THOSE ARE NOT

3    SUFFICIENT TO AVOID A FINDING OF OBVIOUSNESS.

4          NOW, CHEMFREE, NONETHELESS, DOES TRY TO AVOID THAT

5    AND IT DOES IT IN A VERY INTERESTING WAY.  THERE WILL BE

6    EVIDENCE THAT THE APPROPRIATE LEVEL OF ORDINARY SKILL, AND

7    THIS IS THROUGH OPINION TESTIMONY IN DR. DURKEE'S

8    TESTIMONY, THERE WILL BE EVIDENCE THAT THE APPROPRIATE LEVEL

9    OF ORDINARY SKILL IN THIS ART IS RELATIVELY LOW.  WHAT IS

10   BEING CALLED THE PARTS WASHER, AS OPPOSED TO THE HIGHER

11   LEVEL OF SKILL, FOR LACK OF A BETTER TERM, THAT WOULD BE

12   APPLIED BY SOMEONE, FOR EXAMPLE, IN THE ENVIRONMENTAL

13   ENGINEERING ARTS.

14         BY SETTING THE STANDARD OR THE LEVEL OF ORDINARY

15   SKILL ARTIFICIALLY LOW, CHEMFREE HOPES TO MAKE MOUNTAINS OUT

16   OF VERY SMALL INCREMENTAL ADVANCES, IF THEY CAN BE CALLED

17   ADVANCES.  THAT IS NOT APPROPRIATE AND THE EVIDENCE WILL

18   SHOW TWO REASONS WHY IT IS NOT APPROPRIATE.

19   FIRST, THE CHEMFREE PATENTS THEMSELVES TEACH THAT THE ART

20   HERE IS BROADER THAN JUST PARTS WASHING.  LINE 60 TO 64, THE

21   CHEMFREE 110 PATENTS STATES, "ACCEPTABLE MICROORGANISMS, FOR

22   EXAMPLE, AND NOT LIMITATION ARE THOSE FROM THE GENERA,

23   BACILLUS, PSEUDOMONAS AND FLAVOBACTERIUM.  SUITABLE SPECIES

24   ARE WELL KNOWN AND REPORTED IN THE ART."  WELL, THE ART THAT

25   IS REFERENCED IN CHEMFREE'S OWN PATENT APPLICATION IS AN ART

1   THAT INCLUDES THE SKILL SET WHEREBY SOMEONE CAN IDENTIFY

2   SUITABLE SPECIES OF MICROORGANISMS THAT CAN BE APPLIED AND

3   USED IN THIS ENVIRONMENT.  SO SIMPLY CONFINING THE ART TO

4   THAT OF PARTS WASHING, AND THE EVIDENCE WILL BE THAT THE

5   PARTS WASHING LEVEL OF SKILLED PERSON DOESN'T KNOW VERY MUCH

6   ABOUT MICROORGANISMS, IS ARTIFICIALLY LOW.

7           SECONDLY, AS THE COURT HAS ALREADY SEEN IN THE

8   ENABLEMENT DETERMINATION, IN ORDER TO PRACTICE THIS

9   INVENTION, YOU HAVE TO BE ABLE TO DETERMINE THAT THE

10  MICROORGANISMS CAN BE SUSTAINED BY A SURFACTANT AND THAT THE

11  MICROORGANISMS ARE ACTUALLY DEGRADING THE HYDROCARBONS IN

12  THE TANK.  THAT IS NOT SOMETHING THAT THE PARTS WASHER WOULD

13  DO.  THE PARTS WASHER WOULD NOT BE ABLE TO GO OUT AND

14  MEASURE MICROBIAL ACTIVITY.  THE PARTS WASHER DOESN'T

15  UNDERTAKE THOSE TYPES OF THINGS.  SO NOW WITH THEIR OWN

16  PATENT, THE LIMITATION OF THEIR OWN PATENTS REQUIRES THAT

17  THE LEVEL OF ORDINARY SKILL BE HIGHER THAN THAT THAT WOULD

18  BE ADVOCATED FOR THE OBVIOUSNESS DETERMINATION.

19          MR. CAPP TALKED AT GREAT LENGTH ABOUT

20  INFRINGEMENT, AND AS WE GO FORWARD OVER THE NEXT FEW DAYS,

21  THAT WILL BE A LOT ABOUT INFRINGEMENT.  I WOULD LIKE TO MAKE

22  FOUR BASIC POINTS.

23          FIRST POINT, IN THE INFRINGEMENT CALCULUS, EACH

24  CLAIM HAS GOT TO BE APPLIED TO EACH OF THESE FOUR MACHINES.

25  THAT IS VERY IMPORTANT BECAUSE EACH OF THESE CLAIMS DIFFER.

1    FOR EXAMPLE, LET'S GO BACK TO THE 226 PATENT.  THE 226

2    PATENT IS A METHOD OF USE.  IT TALKS ABOUT HOW FLUID IS

3    GOING TO BE CIRCULATED FROM THE TANK TO THE SINK AND FROM

4    THE SINK BACK TO THE TANK AND SO ON AND SO FORTH.  THAT IS

5    NOT SOMETHING THAT WALTER DOES.  WALTER SELLS THE UNIT TO

6    DISTRIBUTORS.  DISTRIBUTORS THEN SELL IT ON TO CUSTOMERS.

7    THE CUSTOMERS ARE THE ONES WHO WOULD PRACTICE THAT.

8           NOW, THERE WILL BE ISSUES OF CONTRIBUTORY

9    INFRINGEMENT AND INDUCEMENT INFRINGEMENT, AND WE WILL

10   ADDRESS ALL THOSE, BUT THOSE CLAIMS HAVE GOT TO BE APPLIED.

11   IT IS NOT SUFFICIENT TO SIMPLY CHECK ON THE BOARD, YOU HAVE

12   TO LOOK AT WHAT IS IN THE CLAIM AND APPLY IT TO THE

13   SITUATION.

14          THE SECOND POINT, I WOULD LIKE TO USE THE 125

15   PATENT, THE OTHER METHOD PATENT, AS AN EXAMPLE.  CLAIM 1 OF

16   THE 125 PATENT HAS TWO VERY SIMPLE, DON'T NEED TO PUT THEM

17   ON THE BOARD, REQUIREMENTS.  METHOD STEPS.  ONE OF THEM,

18   PROVIDING A PARTS WASHER.  THERE IS SOME ADDITIONAL LANGUAGE

19   BUT THE STEP IS PROVIDING A PARTS WASHER.  WALTER DOES THAT.

20   WALTER GIVES THE PARTS WASHERS TO ITS DISTRIBUTORS.  THE

21   DISTRIBUTORS SELLS TO THE CUSTOMER.  WALTER HAS PROVIDED A

22   PARTS WASHER.

23          THE LAST STEP OF CLAIM ONE, ALLOWING THE

24   MICROORGANISMS WITHIN THE FLUID TO BIODEGRADE THE

25   HYDROCARBONS.  ALLOWING THE MICROORGANISMS IN THE FLUID TO

1    BIODEGRADE THE HYDROCARBONS.  WALTER DOES NOT DO THAT STEP.

2    THAT STEP IS ALWAYS PERFORMED BY THE CUSTOMER.  THERE WILL

3    BE EVIDENCE THAT WALTER HAS NO CONTROL OVER WHAT THAT

4    CUSTOMER DOES.  PATENT LAW REQUIRES THAT IN ORDER TO FIND

5    DIRECT PATENT INFRINGEMENT OF THE 125 CLAIMS, THERE MUST BE

6    A SINGLE ENTITY, A SINGLE CUSTOMER, A SINGLE PERSON, A

7    SINGLE SOMETHING THAT ACTUALLY PERFORMS EACH STEP OF THAT

8    METHOD.  IF IT TAKES MORE THAN ONE PERSON, IF WE HAVE TO

9    COMBINE ACTS OF INDEPENDENT PEOPLE TO MEET THE CLAIM

10   LIMITATION, THERE IS NO DIRECT INFRINGEMENT.  SO ALL OF THE

11   CHECKS ON THE BOARD THAT WENT UP FOR THE 125 PATENT, THOSE

12   ALL COME OFF BECAUSE IN THIS CASE THERE IS NO EVIDENCE OF

13   DIRECT INFRINGEMENT OF THE METHOD CLAIMS FOR THE 125 PATENT.

14           INDUCEMENT INFRINGEMENT.  INDUCEMENT AS IS IN THE

15   PAPERS IS A FUNCTION OF SPECIFIC INTENT.  WALTER HAS TO DO

16   MORE THAN WANT ITS CUSTOMER TO USE ITS PRODUCT.  WALTER HAD

17   TO HAVE THE SPECIFIC INTENT THAT ITS CUSTOMER WILL USE THE

18   PRODUCT TO INFRINGE A CLAIM, AN ASSERTED CLAIM.  ALL OF

19   THESE UNITS, ALL OF THE WORK THAT WENT INTO THEM, ALL OF THE

20   DEVELOPMENTAL COST, ALL OF THEM THAT SHOW NO COPYING, ALL

21   THE THINGS THAT WALTER GOT FROM CB CHEMIE THAT SAID WE DON'T

22   THINK YOU INFRINGED AND ALL OF THE THINGS THAT WALTER DIDN'T

23   THINK ITSELF THAT THEY DID NOT INFRINGE.  ALL OF THOSE

24   THINGS POINT TO THE FACT THAT WALTER NEVER HAD ANY INTENT TO

25   INFRINGE, AND NOT HAVING ANY INTENT TO INFRINGE, WALTER

1    CERTAINLY DIDN'T INTEND FOR ITS CUSTOMER TO INFRINGE.  SO

2    EVEN IF THE COURT FINDS THAT THERE IS DIRECT INFRINGEMENT,

3    FOR EXAMPLE, OF A 226 CLAIM BECAUSE ALL OF THOSE STEPS COULD

4    BE PERFORMED BY A SINGLE CUSTOMER.  THERE IS STILL NO

5    INDUCEMENT TO INFRINGEMENT, WHICH IS JUST A FORM OF

6    INFRINGEMENT.  THERE IS NO INDUCEMENT BECAUSE WALTER NEVER

7    HAD THE INTENT.  WE WILL SHOW THAT WITHOUT DISPUTE.

8            CONTRIBUTORY INFRINGEMENT, ANOTHER FORM OF

9    INFRINGEMENT.  CONTRIBUTORY INFRINGEMENT IS FOUND WHEN THERE

10   IS NO SUBSTANTIAL NONINFRINGING USE.  IT'S IN THE DOUBLE

11   NEGATIVE SO IT IS A BIT COMPLICATED TO WORK WITH.  BUT THERE

12   IS NO SUBSTANTIAL NONINFRINGING USE.  THERE WILL BE EVIDENCE

13   THAT WALTER SELLS THESE MACHINES TO CUSTOMERS, WALTER WILL

14   ALSO SELL FLUID SEPARATELY FROM THE MACHINE, THE CUSTOMER

15   CAN TAKE THAT FLUID, POUR IT INTO THE TANK AND USE IT, AND

16   THE CUSTOMER, AT SOME POINT IN TIME, MAY DECIDE TO REPLACE

17   THAT FLUID.  ONCE THE CUSTOMER DECIDES TO REPLACE THAT

18   FLUID, THEY HAVE A CHOICE.  THEY CAN BUY MORE WALTER

19   SURFACTANT MICROORGANISM FLUID OR THEY CAN DO SOMETHING

20   ELSE.  THERE WILL BE EVIDENCE THAT CUSTOMERS WILL GO OUT AND

21   BUY PLAIN OLD SOAP AND WATER, IF YOU WILL, FROM ZEP OR

22   SOMEBODY ELSE AND PUT THAT IN THIS EQUIPMENT.  AND JUST AS

23   EASY TO WASH OUR HANDS WITH A LITTLE BIT WARMER WATER, IT IS

24   EASIER TO CLEAN PARTS WITH A LITTLE BIT WARMER WATER, AND

25   YOU CAN USE WATER AND SOAP TO CLEAN PARTS.  THAT IS A

1    SUBSTANTIAL NONINFRINGING USE.  THESE PRODUCTS DON'T HAVE TO

2    BE BIOREMEDIATING PARTS WASHERS.  ARE THEY SOLD AS THAT?  OF

3    COURSE THEY ARE.  BUT THAT DOESN'T MEAN THEY DON'T HAVE A

4    NON -- A SUBSTANTIAL NONINFRINGING USE.  THEY DO.

5            THE INVENTORSHIP DEFENSE.  MR. MCCLUER IS EXPECTED

6    TO TESTIFY.  HE HAS BEEN SUBPOENAED.  WHAT WILL COME THROUGH

7    IN THAT DEFENSE IS THAT MR. MARKS, MR. MCNALLY AND

8    MR. STRANGE CONTEND THAT THEY MADE CERTAIN CONTRIBUTIONS.

9    SPECIFICALLY, MR. MARKS CONTENDS THAT HE INVENTED THE FALSE

10   BOTTOM.  THE MULTITIER BASIN.  MR. STRANGE WILL ARGUE THAT

11   HE CONTRIBUTED THE SPRAYING OR THE ADHERING OF MICROBES ONTO

12   THE FILTER.  AND MR. MCNALLY WILL CONTEND THAT HE CAME UP

13   WITH THE THERMOSTAT FLOW SWITCH USE ON THE ROD, AS MR. CAPP

14   DESCRIBED IT, TO DISABLE THE HEATER IN THE CHEMFREE UNITS.

15           TWO POINTS, YOUR HONOR.  FIRST, NONE OF THOSE IS

16   INVENTIVE.  FALSE BOTTOMS HAVE BEEN AROUND FOR A VERY LONG

17   TIME.  USING A THERMOSTAT AND A DOUGHNUT TO EFFECT A CIRCUIT

18   IS A VERY OLD WAY OF GOING ABOUT THIS.  SECOND, WE BELIEVE

19   THE EVIDENCE WILL SHOW THAT WHAT WAS HAPPENING HERE IS THAT

20   THERE WAS AN EFFORT BEING MADE TO CIRCUMVENT OR TO WORK

21   AROUND MR. MCCLUER'S CONSISTENT CLAIM OF SOLE INVENTORSHIP.

22           MR. CAPP ASKED THAT I JUSTIFY WHY WE ARE DOING

23   THIS.  GLAD TO DO THAT.  WE ARE RELYING ON THE COURT'S ORDER

24   ON NOT DISMISSING AND DENYING HIS MOTION FOR SUMMARY

25   JUDGMENT UNDER 102 G AND 102 F, AND WE ARE FOLLOWING THE

1  COURT'S DIRECTION IN EXACTLY HOW WE ARE DOING IT.

2          THERE WERE FOUR OBSTACLES THAT WERE STATED TO BE

3  FATAL TO OUR CASE.  I WOULD LIKE TO ADDRESS EACH OF THEM.

4  FIRST, WE HAVE NO EXPERT ON HAKANSSAN-2.  THAT IS KSR, YOUR

5  HONOR.  KSR SAYS YOU DON'T NEED AN EXPERT ANYMORE ON

6  HAKANSSAN-2.

7          WE HAD NO EXTRINSIC EVIDENCE ON HAKANSSAN-2.  WE

8  DON'T NEED ANY EXTRINSIC EVIDENCE.  YOU CAN READ HAKANSSAN-2

9  BUT YOU HAVE TO READ IT FROM THE VANTAGE POINT OF A PERSON

10  OF ORDINARY SKILL IN THE ART UNDER THE CORRECT STANDARD, AND

11  IN THERE, THERE IS A DISPUTE BECAUSE WE DISPUTE DR. DURKEE'S

12  LEVEL OF ORDINARY SKILL.  WE CONTEND THAT IT IS HIGHER.  WE

13  THINK THAT THE HAKANSSAN-2 TEACHES UNDER EITHER SKILL, BUT

14  WE THINK THE APPROPRIATE STANDARD IS THE HIGHER LEVEL.

15          THIRD, NO EXPERT TESTIMONY ON COMBINATIONS.  YOU

16  DON'T NEED EXPERT TESTIMONY ON COMBINATIONS.  THAT IS

17  ANOTHER KSR FACTOR.

18          AND FINALLY, THAT TWO OF THE FOUR REFERENCES

19  POSTDATE, THAT TWO OF THE FOUR REFERENCES COME AFTER WHEN

20  THEY ARE GOING TO PROVE THEIR DATE OF INVENTION.  FIRST OF

21  ALL, WE CONTEST THAT.  WE THINK THERE IS STILL STRONG

22  EVIDENCE THAT THEY MAY NOT BE ABLE TO PROVE THAT DATE OF

23  INVENTION BUT FOR THIS PURPOSE AND FOR OUR CLOSING COMMENTS

24  IN THIS STATEMENT, WE WILL PRESUME THAT IT WAS TRUE.  WE

25  DON'T NEED THOSE LAST TWO REFERENCES, YOUR HONOR.

1          HAKANSSAN-2 COMBINED WITH THE MARKET PRESSURE AND

2     THE MARKET DEMAND, PUSHING PEOPLE TOWARD ENVIRONMENTALLY

3     FRIENDLY PARTS WASHERS, SAYS THAT THESE PATENTS ARE INVALID.

4     THEY ARE INVALID BECAUSE IT'S NOT AN INVENTION TO SIMPLY

5     THROW A DOUGHNUT ON A ROD AND BE ABLE TO SHUT OFF THE

6     HEATER.  IT IS NOT AN INVENTION TO BE ABLE TO JUST THROW A

7     FALSE BOTTOM IN A SINK.  PATENTS ARE INVALID AND WALTER HAS

8     NOT INFRINGED ANY VALID CLAIM.  THANK YOU.

9          THE COURT:  ALL RIGHT.  THANK YOU, MR. SCHAETZEL.

10     LET'S TAKE OUR MORNING RECESS.  WE WILL GO BY THE COURTROOM

11     CLOCK AND WE WILL RECESS UNTIL 11:30 AND RESUME AGAIN THEN.

12     MR. CAPP, ARE YOU READY TO CALL YOUR FIRST WITNESS AT THAT

13     TIME?

14          MR. CAPP:  WE WILL, YOUR HONOR.  AND IT WILL BE

15     MR. STRANGE.

16          (BREAK FROM 11:13 A.M. UNTIL 11:30 A.M.)

17          THE COURT:  ALL RIGHT.  MR. CAPP.

18          MR. CAPP:  THE PLAINTIFF CALLS AS ITS FIRST

19     WITNESS, MR. LELAND STRANGE.

20          THE COURT:  OKAY.

21                    LELAND STRANGE

22                  PLAINTIFF'S WITNESS

23                        SWORN

24                 DIRECT EXAMINATION

25     BY MR. CAPP:

1    A. MY NAME IS JAMES LELAND STRANGE, LAST NAME S-T-R-A-N-G-E.

2              MR. CAPP:  YOUR HONOR, IF IT PLEASES THE COURT, AS

3    A MATTER OF CONVENIENCE FOR THE COURT, FOR THE WITNESSES

4    THAT I INTEND TO PUT UP ON DIRECT, I HAVE THREE-RING BINDERS

5    OF THE EXHIBITS I INTEND TO USE IN THE ORDER THAT I INTEND

6    TO USE THEM.

7              THE COURT:  THAT WOULD BE VERY HELPFUL.  THANK

8    YOU.

9              MR. CAPP:  BEFORE I BEGIN MY EXAMINATION OF

10   MR. STRANGE, IN LIGHT OF THE OPENING STATEMENT THAT

11   MR. SCHAETZEL HAD, I WOULD LIKE TO BEGIN THE EVIDENCE BY

12   TENDERING INTO EVIDENCE DEFENDANT'S RESPONSE TO PLAINTIFF'S

13   12TH DISCOVERY REQUEST, SPECIFICALLY THEIR RESPONSE TO

14   INTERROGATORY NO. 13, WHICH APPEARS ON PAGE 6.  IT GOES TO

15   THE QUESTION OF SUBSTANTIAL NONINFRINGING USES FOR

16   CONTRIBUTORY NEGLIGENCE INFRINGEMENT.  THERE WAS A

17   INTERROGATORY THAT THEY RESPONDED THAT, "WE ARE NOT AWARE OF

18   ANY SUBSTANTIAL NONINFRINGING USES."  AND I WOULD LIKE TO

19   TENDER THAT IN RESPONSE TO THE EVIDENCE, AND ALERT THE COURT

20   THAT I INTEND TO OBJECT TO THE INTRODUCTION OF TESTIMONY

21   THAT IS NOT IN LINE WITH THAT INTERROGATORY RESPONSE.

22              THE COURT: ANY RESPONSE, MR. SCHAETZEL?

23              MR. SCHAETZEL:  YES, YOUR HONOR.  I AM CERTAINLY

24   AWARE OF THE USE OF AN INTERROGATORY RESPONSE TO IMPEACH,

25   BUT TO HOW THE IMPEACHMENT IS DONE, AND THE APPROPRIATE TIME

1    TO DO IT, IF YOU HAD KNOWN THAT THE WITNESS HAD SAID IT.

2    WITH THAT BEING SAID, WE DO EXPECT OUR WITNESSES TO TESTIFY

3    TO IT, AND I WOULD WANT THE COURT TO UNDERSTAND THAT WE

4    THINK IT IS APPROPRIATE.  SO I DON'T HAVE ANY OBJECTION TO

5    IT BEING TENDERED OR ACEPTED, BUT WE DO INTEND TO GO DOWN

6    THAT DIRECTION, AND IT WAS UNKNOWN AT THAT TIME AND NOW IT

7    IS NOW KNOWN.

8            THE COURT: I WILL ADMIT IT, AND AT THE TIME THAT

9    THAT ARISES, I'LL BE GLAD TO HEAR FURTHER ARGUMENT FROM YOU

10   ON THAT.

11           MR. CAPP: I HAVE A COPY THAT I WOULD LIKE TO

12   TENDER AT THIS TIME.

13           THE COURT:  GIVE IT TO MR. MARTIN AND HE WILL MARK

14   IT.

15           MR. CAPP: OTHERWISE, IT HAS BEEN MARKED FOR

16   IDENTIFICATION ON THE RECORD AS PLAINTIFF'S EXHIBIT 568 ON

17   THE PRETRIAL ORDER.

18           THE COURT:  OKAY.

19   BY MR. CAPP:

20   Q. WHERE DO YOU LIVE?

21   A. LAWRENCEVILLE, GEORGIA.

22   Q. WOULD YOU SUMMARIZE THE EXTENT OF YOUR POST HIGH SCHOOL

23   EDUCATION?

24   A. I'VE GOT A BACHELOR'S OF SCIENCE DEGREE IN INDUSTRIAL

25   MANAGEMENT FROM GEORGIA TECH, I HAVE AN MBA FROM GEORGIA

1    STATE.

2    Q. HOW ARE YOU PRESENTLY EMPLOYMENT?

3    A. AS PRESIDENT OF INTELLIGENCE SYSTEMS, PRESIDENT AND CEO

4    OF THE BOARD.

5    Q. IS INTELLIGENCE SYSTEMS CORPORATION PUBLICLY TRADED?

6    A. YES, IT IS.

7    Q. AND WHAT STOCK EXCHANGE IS IT LISTED ON?

8    A. WE ARE ON THE NEW YORK STOCK EXCHANGE THE AMEX GROUPING.

9    Q. DESCRIBE THE BUSINESS THAT INTELLIGENCE SYSTEMS IS IN.

10   A. WE PRIMARILY INVEST IN START-UPS, YOU COULD CALL US A

11   SMALL TIME CAPITALIST.  WE TRY TO GROW SMALL BUSINESSES.

12   WOULD YOU JUST LOOK BACK OVER THE LAST 20 YEARS AND TELL THE

13   COURT SOME OF THE COMPANIES THAT INTELLIGENCE SYSTEMS HAS

14   OWNED?

15   A. OKAY.  SOME OF THE NAMES WOULD BE PACES, CORE EXPAND,

16   QUADRUM, IDIO7, OR CAD, INTELLIGENT ENCLOSURES, AND I

17   GUESS -- I CAN NAME A LOT MORE, BUT THE BEST KNOWN OF THESE

18   IS PEACHTREE SOFTWARE.  MR. STRANGE, WHAT KIND OF PRODUCT

19   LINES WERE THOSE COMPANIES INVOLVED IN?

20   A. PRACTICALLY ALL OF THEM WERE IN THE SOFTWARE BUSINESS OR

21   A COMPUTER-RELATED HARDWARE.

22   Q. OKAY.  BESIDES SOFTWARE OR DIGITAL ELECTRONICS, DID

23   INTELLIGENCE SYSTEMS, PRIOR TO GETTING INVOLVED WITH

24   CHEMFREE, INVEST IN ANY OTHER TECHNOLOGY AREAS?

25   A. WE ACTUALLY HAD A SMALL COMPANY, AT THE TIME WE INVESTED

1    WITH CHEMFREE, CALLED INTELLIGENT ENCLOSURES, THAT IS A MINI

2    CLEAN ROOM, BUT PRETTY MUCH EVERYTHING WAS IN SOFTWARE AND

3    COMPUTER-RELATED COMPANIES.

4    Q. WOULD YOU TELL THE COURT OVER THE PAST 20 YEARS HOW MANY

5    PEOPLE HAVE APPROACHED INTELLIGENT SYSTEMS TO TRY AND OBTAIN

6    MONEY TO FUND THEIR NEW IDEAS?

7    A. THE EXACT NUMBER OR COMING CLOSE WILL BE HARD BUT, WE

8    TEND TO THINK IN THE 200 PER YEAR RANGE, SO I WOULD SAY IN

9    20 YEARS, OVER 4,000.

10   Q. AND OUT OF THAT NUMBER, HOW OFTEN DOES THE PROCESS RESULT

11   IN INTELLIGENT SYSTEMS ACTUALLY MAKING AN INVESTMENT?

12   A. WE TEND TO SAY IT IS ABOUT ONE OUT OF 100.  I HAVEN'T

13   DONE THE MATH BUT I WOULD SAY THAT IS PROBABLY ROUGHLY

14   CORRECT.

15   Q. AND OF THE 1 IN 100 NEW IDEAS THAT INTELLIGENT SYSTEMS

16   INVESTS IN, HOW OFTEN DOES INTELLIGENT SYSTEMS OBTAIN A

17   PROFITABLE RETURN ON ITS INVESTMENT?

18   A. ABOUT HALF OF THEM.

19   Q. PRIOR TO 1993, HAD INTELLIGENT SYSTEMS EVER INVESTED IN A

20   COMPANY THAT MADE PARTS WASHERS?

21   A. NO, IT HAD NOT.

22   Q. PRIOR TO 1993, DID YOU HAVE ANY PERSONAL EXPERIENCE IN

23   THE PARTS WASHING INDUSTRY?

24   A. WELL, I HAD NONE IN THE INDUSTRY.  BUT I HAD SOME

25   PERSONAL EXPERIENCE WITH THE PARTS WASHER -- I HAD ONE IN MY

1    BASEMENT AND ONE IN MY GARAGE TO CLEAN PARTS FOR MY TRACTOR

2    AND CHAIN SAW AND OTHER TYPES OF THINGS.  SO I HAVE HAD

3    SEVERAL PARTS WASHERS MYSELF OVER THE PAST 30 OR 40 YEARS.

4    Q. IS THERE A CONNECTION BETWEEN INTELLIGENCE SYSTEMS AND

5    CHEMFREE?

6    A. YES.  ISC IS THE PARENT, AND CHEMFREE IS THE WHOLLY-OWNED

7    SUBSIDIARY OF ISC.

8    Q. WHEN DID YOU FIRST MEET JAMES MCCLUER AND TOM MCNALLY?

9    A. SOMETIME IN 1993.

10   Q. AND WHAT WERE THE CIRCUMSTANCES OF THAT MEETING?

11   A. THEY WERE SIGNATURE THIS THE OFFICE OF FRANK MARKS.  WE

12   HAVE A VERY OPEN CUBICLE ENVIRONMENT WITH A LOT OF GLASS.

13   THEY WERE SITTING IN THE OFFICE WITH FRANK MARKS AND PERHAPS

14   WITH BONNIE HERRING IN THE ROOM, AND I WALKED IN AND

15   INTRODUCED MYSELF.

16   Q. WHAT DID MCNALLY AND MCCLUER WANT?

17   A. THEY WANTED MONEY.

18   Q. AND SPECIFICALLY WHAT DID THEY WANT MONEY FOR?

19   A. THEY WERE LOOKING FOR MONEY TO HELP THEM EXPLORE AN IDEA

20   THAT THEY HAD THAT HAD SOMETHING TO DO WITH WATER TOWERS,

21   THESE LARGE INDUSTRIAL TOWERS YOU FIND ON TOP OF BUILDINGS.

22   I DON'T UNDERSTAND THE EXACT TECHNOLOGY THEY WERE LOOKING

23   FOR, BUT IT WAS FOR THAT PURPOSE.

24   Q. DID THEY APPEAR TO HAVE A BUSINESS PLAN FOR DEVELOPMENT

25   OF THAT COOLING TOWER TECHNOLOGY?

1    A. THEY DID HAVE A BUSINESS PLAN FOR THAT.

2    Q. DID ANYTHING STRIKE YOU AS UNUSUAL ABOUT YOUR FIRST

3    ENCOUNTER WITH MR. MCNALLY AND MR. MCCLUER?

4    A. YES.  A COUPLE OF THINGS.  THEY WERE KIND OF AN ODD

5    COUPLE IN THE SENSE THAT MR. MCNALLY WAS A BANKER OR AN

6    EX-BANKER, AND I THINK THAT IS PRETTY MUCH ALL HE HAS DONE.

7    SO HE HAS HAD NO OPERATIONAL EXPERIENCE, AND THAT IS UNUSUAL

8    FOR AN ENTREPRENEUR TO COME IN WITH THAT EXPERIENCE.  AND

9    THEN MR. MCCLUER WAS A GOOD BIT OLDER, AND HE HAD BOUNCED

10   AROUND A LOT OF JOBS OVER A PERIOD OF TIME.  AGAIN, NOT

11   BEING SUCCESSFUL.  SO LOOKING AT THEM, THEY ARE WERE AN ODD

12   COUPLE.  AND THE SECOND THING THAT WAS VERY UNUSUAL IS THAT

13   THE BUSINESS PLAN ALSO HAD ABOUT, I DON'T KNOW, EIGHT TO TEN

14   OTHER IDEAS THAT THEY WERE INTERESTED IN.  AND USUALLY WHEN

15   PEOPLE COME IN THEY HAVE ONE THING THEY ARE PASSIONATE

16   ABOUT, AND THEY HAD KIND OF A MCDONALDS CHOOSE ONE, TWO,

17   THREE, FOUR, FIVE, WHATEVER YOU WANT, ON THE MENU LIST AND

18   WE WILL GO WITH IT IF WE CAN GET MONEY.  SO BOTH OF THOSE

19   THINGS WERE PRETTY ODD.

20   Q. WELL, LET'S GO BACK TO THE COOLING TOWER TECHNOLOGY.  DID

21   INTELLIGENT SYSTEMS MAKE A DECISION TO PURSUE THAT WITH

22   MCNALLY AND MCCLUER?

23   A. NO, IT DID NOT.

24   Q. NOW, THE FIRST TIME THAT YOU MET THEM, DID YOU HAVE ANY

25   DISCUSSIONS WITH MCCLUER OR MCNALLY ABOUT ANYTHING ELSE ON

1   YOUR LIST?

2   A. I DON'T THINK SO.  NO.  AND I DIDN'T MEET THEM THE FIRST

3   TIME THEY WERE IN THE OFFICE.  I THINK THEY HAD ALREADY MET

4   WITH MR. MARKS BEFORE THAT.

5   Q. DID YOU HAVE ANY SUBSEQUENT MEETINGS WHERE YOU EXPLORED

6   OTHER TECHNOLOGIES BESIDES THE COOLING TOWER TECHNOLOGY,

7   WITH MCCLUER AND MCNALLY?

8   A. WELL, I KNOW THAT I THINK MR. MARKS HAD BEEN TALKING WITH

9   THEM AND I HAD SAID, YOU KNOW, THIS PARTS WASHER THING LOOKS

10  INTERESTING, BUT I DIDN'T FOLLOW UP ON A LOT ON IT

11  PERSONALLY.

12  Q. WHAT DID THE PARTS WASHING THING LIKE?

13  A. THEY WANTED TO DO AN AQUEOUS BASED PARTS WASHER THAT USED

14  SOAP.  MY WIFE HAS ALWAYS BEEN LIKE, WHY DO WE HAVE THAT IN

15  OUR GARAGE?  IT IS GOING TO BLOW UP THE HOUSE, AND ALL OF

16  THESE KIND OF THINGS.  AND IF YOU CAN REALLY DO A WATER

17  BASED PARTS WASHER, WHICH I KIND OF DOUBTED, I THOUGHT THAT

18  THAT MIGHT BE A GOOD IDEA.  SO KIND OF A LITTLE PERSONAL

19  INTEREST HERE.

20  Q. WHAT WAS YOUR UNDERSTANDING OF THE CONCEPT THAT MCCLUER

21  AND MCNALLY BROUGHT TO YOU IN TERMS OF ENVIRONMENTALLY

22  FRIENDLY PARTS WASHERS?

23  A. AT THAT POINT IT WAS ONE OF EIGHT TO TEN IDEAS THAT THEY

24  THOUGHT THEY COULD DEVELOP IF THEY HAD SOME MONEY, IF THEY

25  WERE ABLE TO TAKE THE TIME TO EXPERIMENT WITH DIFFERENT

1    TYPES OF SOAPS TO SEE IF THEY COULD MAKE AN AQUEOUS BASED

2    PARTS WASHER.  SO IT IS JUST AN IDEA, IF THEY HAD MONEY.

3    THEY HAD NO MONEY, NO MEANS OF SUPPORT AT THAT TIME.  THEY

4    WERE JUST INTERESTED IN PURSUING IT.

5    Q. DID THEY SHOW YOU A WORKING PROTOTYPE OF THE PARTS

6    WASHER?

7    A. NO, THEY HAD NONE.

8    Q. DID THEY REPRESENT TO YOU THAT THEY HAD A WORKING

9    PROTOTYPE OF A PARTS WASHER?

10   A. NO.  IN FACT, THEY PROBABLY REPRESENTED THEY DIDN'T HAVE

11   ONE, THEY NEEDED MONEY TO TRY TO DEVELOP SOMETHING.

12   Q. AFTER YOU MET MCCLUER AND MCNALLY, DID YOU COME AWAY WITH

13   THE IMPRESSION THAT THEY HAD ALREADY PRE-INVENTED A

14   COMMERCIALLY VIABLE ENVIRONMENTALLY FRIENDLY COMMERCIAL

15   PARTS WASHER?

16   A. NO, I KNEW THEY HAD NOT.

17   Q. WHAT WERE THE INITIAL STEPS THAT INTELLIGENCE SYSTEMS

18   TOOK IN PURSUING THE PARTS WASHING IDEA?

19   A. WELL, SINCE WE DIDN'T KNOW MUCH ABOUT THAT BUSINESS.  WE

20   WERE PRIMARILY IN THE COMPUTER AND SOFTWARE BUSINESS.  WE

21   DECIDED TO PAY SOMEONE WHO KNEW A LITTLE MORE ABOUT IT THAN

22   US TO DO A MARKETING STUDY TO SEE IF IT WAS SOMETHING WE

23   THOUGHT WE OUGHT TO PUT SOME OF OUR MONEY IN.

24   Q. DID YOU PURSUE THE MARKET STUDY?

25   A. WE DID.

1   Q. WHAT WAS THE PURPOSE OF THE MARKET STUDY?

2   A. THE PURPOSE WAS TO SEE IF IT WAS A VIABLE OPTION, THAT IF

3   PEOPLE WOULD BUY AN AQUEOUS BASED PARTS WASHER.  AGAIN, THE

4   INDUSTRY, THAT WAS NOT SOMETHING THAT PEOPLE THOUGHT YOU

5   COULD DO, AND I WASN'T SURE YOU COULD DO IT EITHER.

6   Q. AFTER THE MARKETING STUDY, DID YOU DECIDE TO PROCEED AND

7   GO AHEAD AND FUND, AT LEAST TO SOME EXTENT, THEIR EFFORTS?

8   A. YES.  WE DID DECIDE TO GO FORWARD IN A VERY SLOW

9   DELIBERATE WAY.

10  Q. DESCRIBE THE ACTIVITIES OF MCNALLY AND MCCLUER FROM THE

11  TIME THAT THE COMPANY, AND BY THIS COMPANY I AM REFERRING TO

12  CHEMFREE CORPORATION, FROM THE TIME THE COMPANY WAS FORMED

13  THROUGH THE END OF THE CALENDAR YEAR OF 1993.

14  A. WELL, THE COMPANY --

15  Q. I AM SORRY.  YOUR HONOR, I FLIPPED THE PAGE, AND I MISSED

16  A WHOLE PAGE IN MY NOTES, AND THAT QUESTION WAS OUT OF ORDER

17  AND DIDN'T MAKE ANY SENSE, AND NOW I UNDERSTAND WHY.  MIND

18  IF I JUST BACK UP?

19          THE COURT:  SURE.

20  BY MR. CAPP:

21  Q. SORRY.  MR. STRANGE, DID YOU RECEIVE A REPORT BACK ON THE

22  RESULTS OF THE MARKETING STUDY?

23  A. WE DID.  WE RECEIVED A REPORT.

24  Q. AND WHAT WAS REPORTED TO YOU?

25  A. WELL, IT WAS KIND OF FUNNY.  IN A SENSE, THEY SAID I

1    THINK THAT IF YOU COULD OFFER A WATER BASED PARTS WASHER

2    THAT CLEANED AS WELL AS MINERAL SPIRITS AT LOWER COST, THEN

3    PEOPLE WOULD BUY IT.  I THINK THAT IS SOMETHING THAT YOU

4    COULD PROBABLY GUESS WITHOUT PAYING 15 OR $20,000.

5    Q. WHAT DID INTELLIGENT SYSTEMS DO AFTER RECEIVING THE

6    MARKET STUDY?

7    A. WELL, YOU KNOW, A LOT OF THIS KIND OF INVESTING IS GUT

8    BUSTING AND, AGAIN, WE DIDN'T THINK IT WOULD COST A LOT OF

9    MONEY, SO WE DECIDED TO GO FORWARD.  SO WE HAD -- WE FORMED

10   A COMPANY CALLED CHEMFREE AT THAT POINT IN TIME TO LOOK --

11   WE LOOKED AT SEVERAL NAMES AND TRIED TO -- AND DECIDED TO

12   CALL IT CHEMFREE.

13   Q. WHEN WAS CHEMFREE CORPORATION FORMED?

14   A. I BELIEVE IT WAS OCTOBER OF 1993.

15   Q. WHO WERE THE ORIGINAL OFFICERS?

16   A. WERE MYSELF, FRANK MARKS AND BONNIE HERRON.  WE WERE THE

17   OFFICERS OF INTELLIGENCE SYSTEMS, AND WHEN WE FORM

18   CORPORATIONS LIKE THIS FOR START-UPS, WE WOULD ALSO BE

19   OFFICERS OF THOSE CORPORATIONS.

20   Q. AND WHO WERE THE ORIGINAL DIRECTORS?

21   A. THE SAME AS THE OFFICERS.

22   Q. AND WHO WERE THE ORIGINAL SHAREHOLDERS?

23   A. INTELLIGENT SYSTEMS WAS THE SOLE SHAREHOLDER.

24   Q. SO IF MCNALLY AND MCCLUER WEREN'T OFFICERS, DIRECTORS, OR

25   SHAREHOLDERS, WHAT WAS THE RELATIONSHIP THAT TOM MCNALLY HAD

1    TO CHEMFREE AFTER IT WAS FORMED?

2    A. HE WAS A CONSULTANT TO CHEMFREE.

3    Q. AND WHAT WAS THE NATURE OF HIS COMPENSATION ARRANGEMENT?

4    A. HE WAS PAID, I BELIEVE, ON A BI-WEEKLY BASIS, HE WOULD

5    TURN IN TIME SHEETS, AND WE WOULD PAY HIM BASED ON HOW MANY

6    HOURS HE WORKED AS A CONSULTANT.

7    Q. WAS HE ON SOME SORT OF FIXED SALARY OR PAID ON AN HOURLY

8    BASIS?

9    A. HE WAS PAID ON AN HOURLY BASIS.

10   Q. THE RELATIONSHIP WITH JIM MCCLUER TO CHEMFREE, WHEN IT

11   WAS FORMED?

12   A. JIM MCCLUER WAS A CONSULTANT ALSO.

13   Q. THE SAME COMPENSATION ARRANGEMENT?

14   A. EXACTLY THE SAME.  IF I RECALL, IT WAS THE SAME DOLLARS

15   PER HOUR AND ON THE SAME BASIS WHERE THEY WOULD TURN IN

16   BI-WEEKLY REPORTS.

17   Q. WE ARE ALL FAMILIAR WITH PICTURES OF DOWNTOWN DETROIT AND

18   A HUGE SKYSCRAPER THAT SAYS G. M. OVER THE TOP.  WHEN YOU

19   THINK ABOUT CHEMFREE CORPORATION, IN THE FALL OF 1993,

20   DESCRIBE PHYSICALLY WHAT COMES TO YOUR MIND IN TERMS OF

21   PLANT, EQUIPMENT, FACILITIES, SO ON.

22   A. WELL, UNLIKE DETROIT, WE CONVERTED AN OLD PANASONIC

23   WAREHOUSE, THAT WAS PRETTY LARGE, BUT WE CONVERTED IT INTO

24   VERY LARGE OFFICES, MAYBE, YOU KNOW, TYPICALLY THE SIZE OF

25   THIS COURTROOM, DIFFERENT OFFICES IN THE BUILDING, THEN WE

1    HAD LAB SPACE, WAREHOUSE SPACE, AND WITHIN THE OFFICES WE
2    HAD A BUNCH OF CUBICLES.  SO IT WAS -- THERE WERE CUBICLES
3    THROUGHOUT THE BUILDING.
4            AND TO START COMPANIES, WE WOULD DESIGNATE CERTAIN
5    AREAS IN WHICH THE PEOPLE COULD USE, BOTH FROM A CUBICLE
6    STANDPOINT, AS WELL AS WAREHOUSE AND LAB SPACE.  SO MY
7    PICTURE OF CHEMFREE AT THAT POINT WAS THERE WERE TWO CUBES
8    IN A CORNER THAT MR. MCNALLY AND MR. MCCLUER USED, AND THEN
9    WE GAVE THEM A LITTLE SPACE IN THE WAREHOUSE, THAT IS AN
10   UNAIR-CONDITIONED WAREHOUSE SPACE, THEY COULD USE FOR A LAB
11   TO TRY TO WORK ON THIS STUFF AND DEVELOP WHAT THEY WERE
12   DEVELOPING.
13   Q. DID MCCLUER AND MCNALLY HAVE ANY ACCESS TO ANY OTHER
14   RESOURCES WITHIN INTELLIGENCE SYSTEMS?
15   A. THEY HAD ACCESS TO ALL OF THE RESOURCES.  IN THE SENSE
16   THAT WE AT INTELLIGENCE SYSTEMS WOULD PROVIDE ANY KIND OF
17   ADMINISTRATIVE HELP THEY NEEDED, AND ALSO OTHER COMPANIES IN
18   THE BUILDING, YOU KNOW.  THESE ARE ENTREPRENEURS, THEY LIKE
19   TO HELP EACH OTHER.  OTHER ENGINEERS WOULD TALK ABOUT WHAT
20   ARE YOU DOING, AND THEY WOULD TALK ABOUT, WHAT ABOUT THIS,
21   WHAT ABOUT THAT.  AND IT IS A VERY COLLABORATIVE KIND OF
22   ARRANGEMENT IN THE BUILDING WITH A BUNCH OF OTHER
23   ENTREPRENEURS.
24   Q. GIVE THE JUDGE A WORD PICTURE DESCRIBING THE ACTIVITIES
25   THAT MCNALLY AND MCCLUER WERE ENGAGED IN FROM THE TIME THAT

1    THE COMPANY WAS FORMED IN THE FALL OF 1993, SAY, THROUGH THE

2    END OF CALENDAR YEAR OF 1993.  WHAT WERE THEY DOING?

3    A. THEY WERE DOING A LOT OF EXPERIMENTATION.  I RECALL THEM

4    BEING ON THE COMPUTER LOOKING, AND HAVING A CATALOG BROUGHT

5    IN SO THEY COULD SEE WHAT WAS AVAILABLE IN CATALOGS.  THEY

6    WOULD RUNDOWN THE HOME DEPOT AND YOU KNOW, THEY BOUGHT A

7    TRASH CAN TO BE THE BASIS OF THIS THING.  THEY WOULD ORDER

8    DIFFERENT KIND OF PARTS AND DO WIRING, THEY WERE OUT

9    PHYSICALLY HOOKING THINGS UP AND TRYING TO MAKE THIS WORK,

10   AND I THINK THEY WERE TESTING SOAPS BECAUSE THE BIG ELEMENT

11   HERE IS CAN YOU REALLY HAVE A WATER BASED SOAP CLEAN AS WELL

12   AS A MINERAL SPIRIT.  SO THEY WERE IN THAT PROCESS OF

13   TESTING THOSE.

14   Q. I WANT YOU TO STOP FOR A MINUTE AND PICTURE IN YOUR MIND

15   ONE OF THEIR PROTOTYPES FROM THE FALL OF 1993, AND TELL THE

16   COURT YOUR PERSONAL ASSESSMENT, WHAT YOU THOUGHT OF THE

17   COMMERCIAL VIABILITY OF THE EARLY PROTOTYPES THAT THEY WERE

18   WORKING ON DURING THE FALL OF 1993.

19   A. WELL, I HAVE TO SMILE AS I THINK ABOUT IT, BECAUSE I TRY

20   TO THINK WHAT DOES THE MARKET NEED, WHAT WILL THE MARKET

21   ACCEPT, AND THEY WERE VERY VERY EXCITED, SHOWING ME THIS

22   MACHINE WITH THIS TRASH CAN AND SINK ON TOP, AND HAD A BIG

23   PILLOW ON THE BOTTOM, AND THE BIG PILLOW WAS TO COLLECT THE

24   OIL.  AND YOU TAKE THE SINK OFF, REACH DOWN AND PULL THIS

25   PILLOW UP, AND THEY WERE SHOWING HOW ALL OF THE OIL HAD

1   COLLECTED IN THE PILLOW, WHICH IT HAD DONE.  THEN THEY

2   STARTED WALKING AWAY WITH IT, AND OF COURSE IT WAS DRIPPING

3   EVERYWHERE, AND I WAS THINKING, ONCE AGAIN, THAT IS NOT ONE

4   MY WIFE WOULD LIKE FOR ME TO HAVE IN MY GARAGE NOR WOULD I

5   WANT ANYTHING LIKE THAT IN MY GARAGE, BUT THAT WAS PART OF

6   THE EXPERIMENTATION.  THAT IS THE WAY IT WORKED IN TRYING TO

7   GET TO A PRODUCT THAT IS ACCEPTABLE IN THE MARKETPLACE.

8   Q. AT THIS POINT IN TIME, WAS THERE ANY EXPRESSION TO YOU

9   THAT THERE WAS BIOREMEDIATION TAKING PLACE IN THE FLUID, IN

10  THE TANK, IN THE PARTS WASHER?

11  A. NO.  ABSOLUTELY NOT.  THIS IS A MATTER OF HOW TO COLLECT

12  THE OIL AND HOW TO DISPOSE OF IT, AND QUESTIONS LIKE, WELL,

13  HOW OFTEN DO WE HAVE TO REPLACE THIS PILLOW SO IT DOESN'T

14  HAVE TOO MUCH OIL IN IT SO WE CAN THROW IT AWAY.  AND REALLY

15  THE CONCLUSION WAS YOU CAN'T THROW IT AWAY, YOU HAVE TO HAVE

16  IT HAULED OFF ANYWAY, SO THERE IS NO ADVANTAGE TO THIS PARTS

17  WASHER AT THAT POINT IN TIME IF YOU HAD TO HAUL EVERYTHING

18  AWAY STILL.

19  Q. LOOK NOW AT A TIME FRAME OF THE FIRST YEAR THAT MCCLUER

20  AND MCNALLY WERE WITH CHEMFREE.  SO WE ARE BASICALLY FROM

21  THE END OF SEPTEMBER OF 1993 TO THE END OF SEPTEMBER OF

22  1994.  DURING THAT YEAR, WHAT IF ANYTHING DID YOU DO TO

23  MONITOR THE PROGRESS?

24  A. WELL, YOU TAKE THE PICTURE THAT I DESCRIBED EARLIER OF A

25  LOT OF ENTREPRENEURS IN THE VARIOUS PLACES IN THE BUILDING.

1    AND I LIKE TO TELL THEM WHAT I DO, THEY ALL HAVE THEIR OWN

2    LITTLE FENCE, BECAUSE THEY ARE WORKING IN THEIR OWN LITTLE

3    WORLD.  AND I WALK, I LOOK OVER THE FENCES, AND ARE ABLE TO

4    SEE WHAT EACH ONE ARE DOING.  AND I WILL GO TO ONE AND SAY

5    HAVE YOU THOUGHT ABOUT TALKING TO SO AND SO, OR THESE GUYS

6    ARE WORKING ON SOMETHING, MAYBE THEY CAN GIVE YOU AN IDEA.

7    SO WHAT I WAS DOING WAS MONITORING THEIR PROGRESS ALMOST ON

8    A DAILY -- WELL, IT WAS A DAILY BASIS, IF I WAS IN TOWN.  I

9    WOULD WALK BY FOR FIVE OR TEN MINUTES.  NOT MANY FORMAL

10   MEETINGS, MAYBE ONE OR TWO WEEKS.  SO AT THIS TIME I WAS

11   VERY INTIMATELY INVOLVED WITH WHAT THEY WERE DOING, WHICH

12   WAS EXPERIMENTATION STILL.

13   Q. LET ME SEE IF I CAN BREAK THIS DOWN.  SO YOU WERE

14   INTERACTING WITH THEM INFORMALLY ON HOW FREQUENT A BASIS?

15   A. WELL, SOMETIMES IT IS THREE TIMES A DAY, SOMETIMES I

16   WOULD MISS A DAY OR TWO BECAUSE I WAS TRAVELLING, BUT VERY

17   FREQUENTLY.  PICTURE A BUNCH OF KIDS, I AM JUST WALKING FROM

18   CUBE TO CUBE, AND "HOW ARE THINGS GOING TO TODAY?  ANY

19   PROGRESS?"  THOSE KINDS OF QUESTIONS.

20   Q. INFORMAL INTERACTION, DID YOU ALSO HAVE FORMAL SCHEDULED

21   INTERACTION WITH THEM?

22   A. YES, WE DID.  MOST OF THAT WAS DONE BY FRANK MARKS, AND

23   THEN I WOULD BE IN MOST OF THOSE MEETINGS, BUT ABOUT EVERY

24   TWO WEEKS THEY WOULD HAVE TO BOTH GIVE US A WRITTEN REPORT

25   AND MAYBE SPEND 15 TO 30 MINUTES TELLING US VERBALLY WHAT

1    THEY HAVE DONE.

2    Q. TO WHAT EXTENT, IF ANY, DID YOU PARTICIPATE IN THE

3    PROCESS OF DEVELOPING THE PARTS WASHER?

4    A. WELL, I HAD A LOT OF IDEAS, MANY OF WHICH GOT REJECTED,

5    AND PROBABLY APPROPRIATELY SO IN SOME CASES.  BUT YOU WANT

6    ME TO NAME SPECIFIC THINGS?

7    Q. MY NEXT QUESTION WAS, DO YOU RECALL ANY SPECIFIC

8    SUGGESTIONS OR IDEAS THAT YOU SHARED WITH MR. MCCLUER AND

9    MR. MCNALLY?

10   A. I ONLY REMEMBER MY GOOD ONES.  THE GOOD SUGGESTIONS I

11   THINK I HAD WAS, AGAIN, FROM MY PERSONAL EXPERIENCE, I

12   SUGGESTED PUTTING A KNEE SWITCH ON THE PARTS WASHER BECAUSE,

13   WHEN YOU ARE WALKING IN CARRYING SOMETHING HEAVY AND A LOT

14   OF PARTS, THERE IS NO WAY TO TURN THIS THING ON, SO I HAD A

15   THOUGHT, IF YOU COULD TAKE YOUR KNEE AND JUST HIT IT WITH

16   YOUR KNEE.  AND WE DID DEVELOP IT THAT WAY, THAT WAS IN THE

17   FIRST VERSION.  ANOTHER THING THAT I SUGGESTED WAS A TOWEL

18   BAR.  AGAIN, PERSONAL EXPERIENCE, YOU'VE GOT TO WIPE YOUR

19   HANDS, WIPE THINGS OFF, SO THAT BECAME KNOWN SORT OF AS A

20   JOKE AS A LELAND BAR, WHICH WAS A TOWEL BAR THAT WAS ON

21   THERE.  AND THEN FINALLY I ALSO SUGGESTED HOW TO HANDLE THE

22   BUGS AND THE FILTERING SYSTEM THAT WOULD MAKE IT I THINK A

23   REASONABLE COMMERCIAL PRODUCT.

24   Q. I WANT YOU TO WALK THE COURT THROUGH THE STEPS THAT YOU

25   TOOK IN DEVELOPING A FILTER THAT HAD MICROBES ATTACHED.

1  A. IN ONE OF THE FORMAL MEETINGS, THEY WERE SHOWING US THE

2  PRODUCT AS THEY HAD DEVELOPED IT, AND OF COURSE I WAS AWARE

3  THAT THEY HAD BEEN WORKING WITH WHAT I WOULD CALL BUGS IN

4  EARLY 1994.  THEY WERE PROUD OF THIS PRODUCT.  AGAIN, LIKE

5  THEY WERE EARLIER WITH THE PILLOWS.  AND AS PART OF THIS

6  DEMONSTRATION, THEY WERE -- THEY SHOWED ME THIS LITTLE CAN

7  OR JAR OF BUGS, AND THEY LIFTED UP THE SINK AND POURED THEM

8  IN AND TALKED ABOUT WHAT THIS IS GOING TO DO.  AND I CRINGED

9  AS WELL AS SAID, COME ON GUYS, GIVE ME A BREAK.  THAT IS NOT

10 GOING TO WORK.  THERE HAS GOT TO BE A BETTER WAY.  AND THEY

11 SAID, WELL, WE HAVE TRIED TO FIGURE OUT WHAT TO DO.  WE

12 CAN'T COME UP WITH ANYTHING.  AND WE LEFT IT AT THAT.  I

13 DIDN'T SAY I WAS GOING TO GO OUT AND FIND A BETTER WAY, BUT

14 THAT IS WHAT I TRIED TO DO WHEN I LEFT THERE.

15 Q. AND WHAT DID YOU DO?

16 A. WELL, I WENT BACK TO THE OFFICE AND GOT MY LEGAL PAD AND

17 SCRATCHED AROUND AND TRIED TO THINK OF SOME WAYS TO DO IT.

18 AND I DID WHAT I OFTEN DO, I HAVE A HOME DEPOT ABOUT TWO

19 BLOCKS AWAY.  I DROVE UP TO HOME DEPOT AND I LITERALLY

20 WALKED DOWN THE AISLES JUST, AGAIN, TRYING TO COME UP WITH

21 IDEAS, THINKING WHAT MIGHT WORK.  AND IT HIT ME WHEN I WAS

22 IN THE AIR CONDITIONING AISLE THAT, YOU KNOW, THESE FILTERS,

23 THESE AIR CONDITIONING FILTERS ARE -- PROBABLY SOME WAY TO

24 MAYBE WORK WITH THAT.  I HAD BEEN ON A BOARD OF THE COMPANY

25 THAT HAD CARBON ATTACHED TO AN AIR CONDITIONING FILTER FOR

1   THE PURPOSE OF CLEANING THE AIR, SO I STARTED THINKING THIS

2   THROUGH.  I BOUGHT THESE -- BOUGHT SOME OF THIS FILTERING

3   SYSTEM.  I WENT BACK TO THE OFFICE, AND THEN I, AGAIN, THIS

4   IS OVER TWO TO THREE DAYS OR MAYBE LONGER.  I SORT OF

5   SCRATCHED MY HEAD THINKING, OKAY.  I WENT AND GOT SOME OF

6   THE BUGS, A LITTLE CAN OF THEM.  HOW DO YOU ATTACH THE BUGS.

7   NOBODY HAD THOUGHT OF HOW TO DO THAT EXCEPT THROW THEM IN

8   THE MACHINE.  I HAD SOME SPRAY ADHESIVE THAT I HAD USED FOR

9   TRADE SHOWS, AND I EXPERIMENTED WITH SOME OF IT.  SOME OF IT

10  DIDN'T WORK.  I HAD SOME OTHER KIND, I TRIED THAT, IT DID

11  WORK.  SO BASICALLY I SPRAYED THE WHITE FILTER, SPRINKLED

12  THE BUGS ON IT, SHOOK IT TO SEE IF THEY WOULD COME OFF, THEY

13  DIDN'T, MOSTLY DIDN'T, AND THEN I SPRAYED IT AGAIN AND PUT

14  THE BLUE FILTER ON IT, AND THEN I PROUDLY WENT OUT AND

15  SHOWED THEM WHAT I HAD DONE.

16  Q. DOES CHEMFREE STILL SELL FILTERS THAT HAVE MICROBES THAT

17  ARE ATTACHED TO THE FILTER BY SPRAY ADHESIVE?

18  A. TO MY AMAZEMENT THEY HAVEN'T FOUND A BETTER WAY TO THIS

19  DAY.  THEY STILL SELL EXACTLY THE SAME FILTER.

20  Q. HOW MANY FILTERS WOULD YOU ESTIMATE CHEMFREE HAS SOLD

21  FROM 1994 TO THE PRESENT, INCLUDING NEW MACHINES AND

22  REPLACEMENT?

23  A. HUNDREDS OF THOUSANDS.  I REALLY DON'T KNOW NUMBERS.  BUT

24  HUNDREDS OF THOUSANDS.

25  Q. HOW MANY REPORTS OF PRODUCT FAILURES CAN YOU RECALL IN

1    TERMS OF PRODUCTS WHERE THE MICROBES WERE NOT VIABLE ONCE

2    THE CUSTOMER TRIED TO USE IT?

3    A. I DON'T KNOW OF ANY.

4    Q. LET ME DIRECT YOUR ATTENTION TO WHAT HAS BEEN MARKED FOR

5    IDENTIFICATION AS JOINT EXHIBIT 3.  DO YOU RECOGNIZE THAT AS

6    THE 835 PATENT THAT IS INVOLVED IN THIS LAWSUIT?

7    A. YES, I DO.

8    Q. MR. STRANGE, ARE YOU NAMED AS A CO-INVENTOR ON THIS

9    PATENT?

10   A. YES, I AM.

11   Q. AND WHAT WAS YOUR CONTRIBUTION TO THE INVENTION THAT IS

12   CLAIMED IN THIS PATENT?

13   A. MY CONTRIBUTION WOULD BE THE FILTER.

14   Q. AND SPECIFICALLY LET ME DIRECT YOUR ATTENTION TO THE

15   CLAIMS AT THE BACK OF THE PATENT.  WOULD YOU LOOK AT THE

16   BOTTOM OF COLUMN AND READ CLAIM 9 INTO THE RECORD?

17   A. "THE SYSTEM OF CLAIM 8 AND MICROORGANISMS RELEASABLY

18   ATTACHED TO SAID FILTER.

19   Q. IS THAT WHAT YOU WERE REFERRING TO IN TERMS OF YOU MAKING

20   A CONTRIBUTION TO THE CLAIMS OF THE INVENTION?

21   A. YES.

22   Q. TO GO TO JOINT EXHIBIT 1 NOW WHICH SHOULD BE IN FRONT OF

23   YOU.

24            MR. CAPP:  FOR THE RECORD, THIS IS THE 110 PATENT

25   THAT IS INVOLVED IN THE LAWSUIT.

1    BY MR. CAPP:

2    Q. MR. STRANGE, ARE YOU NAMED AS A CO-INVENTOR ON THIS

3    PARTICULAR PATENT?

4    A. NO, I AM NOT.

5    Q. WOULD YOU TELL THE COURT THE PROCESS THAT CHEMFREE WENT

6    THROUGH THAT RESULTED IN YOU BEING NAMED AS A CO-INVENTOR ON

7    SOME OF CHEMFREE'S PATENTS BUT NOT OTHERS?

8    A. YES.  THERE WAS A DISPUTE, MR. MCCLUER LEFT OUR COMPANY,

9    WENT TO SOME OTHER FOLKS AND SAID HE HAD INVENTED THIS, AND

10   HE HAD INVENTED THE PARTS WASHER.  AND WE WERE IN LITIGATION

11   WITH THEM.  AS A PART OF THAT, WE JOINTLY AGREED THAT THEY

12   WOULD PAY EQUALLY TO WHAT WE PAID TO GET SOMEONE ELSE, AN

13   INDEPENDENT PARTY, TO DETERMINE INVENTORSHIP.

14   Q. AND DID THAT HAPPEN?

15   A. WE DID GET A REPORT, AND THAT REPORT SAID THAT I INVENTED

16   THE FILTER, WHICH OF COURSE IS TRUE, AND SAID I DID NOT

17   INVENT THESE OTHER THINGS.  SO BASICALLY --

18            MR. HARBIN:  OBJECTION, YOUR HONOR.  HEARSAY AS TO

19   WHAT THE COURT SAID.

20            THE COURT:  OVERRULED.  YOU MAY PROCEED.

21   BY MR. CAPP:

22   Q. LET ME JUST ASK ANOTHER QUESTION.  MR. STRANGE, AFTER THE

23   REPORT WAS RECEIVED BY CHEMFREE, WHAT IF ANYTHING WAS DONE

24   WITH RESPECT TO THE INVENTORSHIP ON THE PENDING PATENT

25   APPLICATIONS THAT CHEMFREE'S PATENT ATTORNEY IN ZYMO'S

1   PATENT ATTORNEY WERE PROSECUTING?

2   A. WELL, THESE TWO ADVERSARIES AGREED TO REFILE, IF THAT IS

3   THE CORRECT WORD, REFILE THE PATENTS WITH THE INVENTORS AS

4   DESIGNATED BY THE INDEPENDENT PATENT ATTORNEY.

5   Q. NOW, PERSONALLY WERE YOU IN AGREEMENT WITH THE DECISION

6   OF THE PATENT ATTORNEY?  AND I AM TALKING ABOUT THE

7   INDEPENDENT PATENT ATTORNEY THAT DID THE INVENTORSHIP

8   DETERMINATION.

9             MR. HARBIN:  OBJECTION.  LACK OF FOUNDATION AND

10  HEARSAY, YOUR HONOR.

11            THE COURT:  WHAT WAS THE QUESTION AGAIN?

12            MR. CAPP: I ASKED HIM IF HE AGREED WITH THE

13  DECISION ON INVENTORSHIP THAT THE INDEPENDENT PATENT

14  ATTORNEY HAD MADE.

15            THE COURT:  OVERRULED.  YOU MAY ANSWER.

16            THE WITNESS:  I DON'T KNOW THAT I AGREED OR

17  DISAGREED IN THE SENSE THERE ARE LEGAL NUANCES HERE AND I

18  WAS NOT IN A POSITION TO DETERMINE THOSE LEGAL NUANCES.

19  BY MR. CAPP:

20  Q. DID YOU GO ALONG WITH THE DECISION?

21  A. I DID GO ALONG WITH IT.

22            MR. HARBIN:  SAME OBJECTION, YOUR HONOR, FOR THE

23  RECORD.

24            THE COURT:  OVERRULED.

25  BY MR. CAPP:

1    Q. WHY DID YOU GO ALONG WITH THE DECISION OF THE INDEPENDENT

2    PATENT ATTORNEY?

3    A. I THOUGHT, AND HOPED, THAT THAT WOULD SETTLE, ONCE AND

4    FOR ALL, THE INVENTORSHIP ISSUE AND WE WOULD NOT HAVE TO

5    BE -- THAT WE WOULD NOT HAVE TO KEEP SPENDING MONEY AS AFTER

6    SPENDING THOSE TENS OF THOUSANDS OF DOLLARS TO TRY TO DEFEND

7    THE PATENT.  BUT OBVIOUSLY IT DIDN'T WORK, BECAUSE WE ARE

8    HERE NOW.  BUT I WENT ALONG FOR THIS ONE REASON.

9             MR. CAPP: THAT CONCLUDES MY EXAMINATION OF THE

10   WITNESS, I WILL TENDER THE WITNESS FOR CROSS -- OH, IF I MAY

11   ASK ONE LAST QUESTION.

12   BY MR. CAPP:

13   Q. MR. STRANGE, YOU KEPT SAYING BUGS, BUGS, BUGS DURING YOUR

14   EXAMINATION.  AND WHEN WE HEAR THE WORD "BUGS" WE THINK OF

15   ANTS AND COCKROACHES AND FLIES AND MOSQUITOS.  IS THAT WHAT

16   YOU MEANT BY "BUGS"?

17   A. I CALL MICROORGANISMS "BUGS" BECAUSE THAT IS EASIER TO

18   SAY.

19   Q. WHAT IS THE RELATIONSHIP OF MICROORGANISMS TO A

20   PARTICULAR BIOREMEDIATION ASPECTS OF THE INVENTION?

21   A. THE MICROORGANISMS ARE WHAT I BASICALLY PUT ON THE

22   FILTER, AND THAT IS WHAT IS USED TO BIOREMEDIATE.

23   Q. AND THAT IS WHAT YOU REFER TO WHEN YOU USE THE WORD

24   "BUGS"?

25   A. THAT IS WHAT I WAS REFERRING TO.

1           MR. CAPP:  TENDER THE WITNESS, YOUR HONOR.

2           THE COURT:  MR. HARBIN, ARE YOU GOING TO

3    CROSS-EXAMINE?

4           MR. HARBIN:  MAY I HAVE JUST A MINUTE, YOUR HONOR?

5           THE COURT:  SURE.

6                    (PAUSE.)

7           MR. HARBIN:  I ALSO HAVE SOME EXHIBIT BOOKS, IF I

8    MAY APPROACH THE WITNESS.  I MAY NOT USE ALL OF THESE.

9    THANK YOU, YOUR HONOR.  MAY I PROCEED?

10          THE COURT:  SURE.  PLEASE.

11                  CROSS-EXAMINATION

12   BY MR. HARBIN:

13   Q. MR. STRANGE, GOOD MORNING, OR GOOD AFTERNOON.  MY NAME IS

14   JOHN HARBIN.  I AM ONE OF THE ATTORNEYS REPRESENTING WALTER

15   IN THIS CASE.  I WILL ASK YOU SOME QUESTIONS, AND I KNOW YOU

16   HAVE TESTIFIED ABOUT MANY OF THESE MATTERS MANY TIMES, AND I

17   WILL TRY TO KEEP IT INTERESTING, THERE IS A JOKE ABOUT THAT

18   I WON'T GO INTO, BUT I WILL TRY TOO KEEP IT INTERESTING.

19   THE FIRST THING I WANT TO ASK YOU ABOUT IS THE TESTIMONY

20   ABOUT THE INDEPENDENT ATTORNEY THAT YOU WERE ASKED WHETHER

21   YOU AGREED WITH OR DISAGREED WITH.  THE INDEPENDENT ATTORNEY

22   THAT EVALUATED INVENTORSHIP WAS MR. DAUBERT SHEFFIE;

23   CORRECT?

24   A. THAT IS CORRECT.

25   Q. AND HE DID A REPORT; CORRECT?

1  A. THAT IS CORRECT.

2  Q. AND YOU HAVE NEVER READ THAT REPORT, SIR, HAVE YOU?

3  A. I DO NOT RECALL READING THE REPORT.

4  Q. THEREFORE, YOU DON'T HAVE A BASIS FOR AGREEING OR

5  DISAGREEING WITH MR. SHEFFIE'S CONCLUSIONS, DO YOU, SIR?

6  A. I BELIEVE I SAID I WENT ALONG WITH IT.

7  Q. I BELIEVE WHAT YOU ARE SAYING IS, YOU ARE GOING TO

8  PRESUME THAT THE ATTORNEY GAVE GOOD ADVICE; CORRECT?

9  A. I WILL PRESUME AN ATTORNEY GIVES GOOD ADVICE.  YES.

10 Q. BUT YOU DON'T HAVE A BASIS FOR TESTIFYING UNDER OATH

11 WHETHER MR. SHEFFIE'S CONCLUSIONS WERE RIGHT OR INCORRECT OR

12 CORRECT, DO YOU, SIR?

13 A. I WOULDN'T KNOW WHETHER HE GAVE GOOD ADVICE OR NOT

14 BECAUSE I DON'T KNOW HOW TO ACKNOWLEDGE GOOD ADVICE FROM BAD

15 ADVICE.

16 Q. MORE SPECIFICALLY, YOU HAVEN'T LOOKED AT THE REPORT, HAVE

17 YOU?

18 A. I THINK I WE WERE PROHIBITED FROM LOOKING AT THE REPORT.

19 I AM NOT CERTAIN ABOUT THAT.

20 Q. NOW, YOU WERE ASKED SOME QUESTIONS IN REGARD TO

21 MONITORING THE ACTIVITY OF MR. MCCLUER AND MR. MCNALLY, AND

22 WE TALKED ABOUT THIS IN MORE DETAIL, BUT YOU DO AGREE THAT

23 MR. MCCLUER CONTRIBUTED TO THE PRODUCT, INVENTION OR NOT,

24 THAT CHEMFREE CAME OUT WITH; CORRECT?

25 A. ABSOLUTELY.

1  Q. AND YOU HAVE A HARD TIME YOURSELF DISTINGUISHING BETWEEN

2  WHAT MR. MCNALLY AND MR. MCCLUER DID; CORRECT?

3  A. I DON'T KNOW IF THAT IS THE CORRECT WAY TO SAY IT, BUT I

4  KNOW MR. MCCLUER CONTRIBUTED TO THE PRODUCT SIGNIFICANTLY.

5  Q. YOU DON'T KNOW WHAT MR. MCCLUER DID SPECIFICALLY, DO YOU,

6  SIR?

7  A. I AM NOT SURE OF THAT QUESTION.

8  Q. YOU DON'T KNOW WHAT MR. MCCLUER DID SPECIFICALLY IN

9  REGARD TO DEVELOPING WHAT BECAME CHEMFREE SMART WASH, DO

10  YOU?

11  A. IT WAS DONE COLLABORATIVELY.  THEY WORKED SIDE BY SIDE

12  INVENTING THIS.

13  Q. BUT IT IS TRUE, ISN'T IT, SIR, THAT THOSE TWO WERE THE

14  MOST INVOLVED, THEY WERE MUCH MORE INVOLVED THAN YOU ON A

15  DAY-TO-DAY BASIS, MR. MCCLUER AND MR. MCNALLY?

16  A. THAT IS CORRECT.

17  Q. BUT ISN'T IT TRUE, SIR, THAT BETWEEN THE TWO, YOU SAID

18  THEY WORKED COLLABORATIVELY -- LET ME TAKE A STEP BACK,

19  BECAUSE I BELIEVE YOU TESTIFIED YOU TALKED TO THEM ON A

20  DAILY BASIS, GENERALLY.  NOT ALL THE TIME, BUT IF YOU WERE

21  IN TOWN, I THINK WAS YOUR WORDS; CORRECT?

22  A. I BELIEVE THAT IS CORRECT.

23  Q. AND I BELIEVE YOUR TESTIMONY, WHICH YOU SAID THIS MORNING

24  YOU WALKED BY AND TALKED TO THEM FOR FIVE OR TEN MINUTES.

25  ISN'T THAT A CORRECT ASSESSMENT OF YOUR GENERAL INTERACTION

1    WITH THEM ON A DAILY BASIS?

2    A. MAYBE I STOPPED FOR AN HOUR, MAYBE TWO HOURS, MAYBE TEN

3    MINUTES.  I WAS TRYING TO GIVE THE GENERAL IMPRESSION THAT I

4    WAS AROUND FREQUENTLY AND I HAD INTERACTION WITH THEM.

5    Q. NOT TO BELABOR OBVIOUSLY, SIR, BUT BY DEFINITION YOU

6    COULD NOT TELL US UNDER OATH WHAT MR. MCCLUER DID ON

7    SPECIFIC CONTRIBUTION VERSUS WHAT MR. MCNALLY DID, CAN YOU,

8    SIR?

9    A. I DON'T THINK I WOULD TRY.

10   Q. NOW, YOU WERE ASKED QUESTIONS ABOUT WHETHER OR NOT

11   MR. MCCLUER AND MR. MCNALLEY HAD A WORKING PRODUCT AT THE

12   TIME THEY FIRST MET WITH REPRESENTATIVES OF ISC; CORRECT?

13   A. WHAT WAS YOUR QUESTION?

14   Q. YOU WERE NOT AT THAT MEETING, THE VERY FIRST MEETING;

15   CORRECT?

16   A. I DO NOT BELIEVE SO.

17   Q. AND IT IS TRUE THAT THEY HAD A PROTOTYPE THEY HAD BEEN

18   WORKING ON FOR SEVERAL MONTHS, AN AQUEOUS PARTS WASHER; IS

19   THAT CORRECT?

20   A. I AM NOT FAMILIAR WITH THAT.

21   Q. ISN'T IT TRUE THAT YOU HAD A FILTER ONE WAY OR ANOTHER?

22   A. AGAIN, I WAS NOT FAMILIAR WITH ANYTHING THEY HAD BEEN

23   WORKING ON.  THEY DID NOT TELL ME THAT THEY HAD BEEN WORKING

24   ON ANYTHING.  SO I OBVIOUSLY WAS NOT FAMILIAR WITH IT IF

25   THEY DID NOT TELL ME.

1  Q. YOU DO ACKNOWLEDGE THAT AQUEOUS PARTS WASHERS WERE IN

2  EXISTENCE ON THE MARKET AT THE TIME THAT MR. MCCLUER AND

3  MR. MCNALLY FIRST SPOKE TO YOUR ISC REPRESENTATIVE?

4  A. I THINK I CAN TELL YOU I DID NOT KNOW THAT AT THE TIME.

5  Q. BUT YOU KNOW THAT NOW?

6  A. ACTUALLY NO, I DO NOT KNOW THAT NOW.

7  Q. AND PARTS WASHERS WITH FILTERS WERE ON THE MARKET AT THE

8  TIME THAT THEY CAME TO ISC, WEREN'T THEY?

9  A. I AM TRYING TO THINK IF IT HAD A FILTER OR NOT.  I THINK

10  THE SLUDGE WENT STRAIGHT TO THE BOTTOM.  I WAS NOT FAMILIAR

11  WITH THE PARTS WASHING INDUSTRY AT ALL.

12  Q. NOW, YOU OWN -- I WANT TO GET INTO THE DETAILS OF THE

13  FILTER AND WHAT YOU DID TO CONTRIBUTE, BUT I WANT TO ASK YOU

14  A QUESTION YOU TESTIFIED ABOUT.  YOU ARE NOT AWARE OF

15  PRODUCT FAILURES.  ISN'T IT TRUE, SIR, THAT YOU ARE

16  GENERALLY NOT INVOLVED IN THE DAY-TO-DAY BUSINESS OF

17  CHEMFREE?

18  A. YOU MEAN NOW?

19  Q. WELL, LET'S START WITH NOW.

20  A. I AM NOT INVOLVED DAY TO DAY.  I TALK TO MR. MARKS EVERY

21  DAY.  HE IS PRESIDENT OF THE COMPANY.

22  Q. AND THERE WAS A TIME AT WHICH YOU WERE PRESIDENT OF

23  CHEMFREE EARLY ON WHEN IT WAS FIRST FORMED; IS THAT RIGHT?

24  A. THAT IS CORRECT.

25  Q. AND THEN RELATIVELY SOON WITHIN THE FIRST YEAR MR. MARKS

1    BECAME THE PRESIDENT; CORRECT?

2    A. THAT IS CORRECT.

3    Q. YOU ARE GENERALLY NOT INVOLVED IN THE DAY-TO-DAY

4    OPERATIONS OF CHEMFREE, ARE YOU, IN THE OPERATIONS?

5    A. WELL, YOU WOULD HAVE TO DEFINE "OPERATION" FOR ME.  AS I

6    SAID, I SPEAK TO MR. MARKS EVERY DAY, SEVERAL TIMES A DAY,

7    SO I AM NOT SURE WHAT YOU MEAN.

8    Q. WAS IT TRUE, SIR, IN 2000 YOU WERE NOT INVOLVED IN THE

9    OPERATIONS OF CHEMFREE?

10   A. AGAIN, YOU HAVE TO DEFINE WHAT YOU MEAN BY OPERATION.  I

11   WAS INVOLVED WITH THE COMPANY, BUT I WASN'T A DAY-TO-DAY

12   MANAGER OF THE COMPANY.

13   Q. YOU DON'T TALK TO THE CUSTOMERS OF CHEMFREE, DO YOU?

14   A. I DO NOT TALK TO THE CUSTOMERS OF CHEMFREE.

15   Q. IN 2002, IS IT TRUE YOU WERE NOT INVOLVED IN THE

16   OPERATIONS OF CHEMFREE?

17   A. AGAIN, I DO NOT HAVE ANY MANAGEMENT RESPONSIBILITIES

18   REGULARLY OVER ANYONE AT CHEMFREE.  I WAS ONLY INVOLVED IN

19   TERMS OF HAVING DISCUSSIONS, AS I -- THAT IS THE WAY I

20   MANAGE.

21   Q. LET ME ASK YOU TO LOOK --

22            MR. HARBIN:  IF I MAY APPROACH, YOUR HONOR.

23   BY MR. HARBIN:

24   Q. IT IS A COPY OF THE 2002 DEPOSITION THAT WAS GIVEN IN ONE

25   OF THE OTHER LITIGATIONS FEBRUARY 21 OF 2002.  I DIRECT YOUR

1    ATTENTION TO PAGE 74 AND 75.

2            MR. HARBIN:  YOUR HONOR, I HAVE A COPY, IF YOUR

3    HONOR WOULD LIKE TO SEE IT, BUT I WILL PUT IT UP ON THE

4    SCREEN.

5            THE COURT: THAT WILL BE FINE.

6    BY MR. HARBIN:

7    Q. IS THAT 2002?  YOU WERE ASKED A QUESTION AT THE BOTTOM OF

8    PAGE 74, "YOU DON'T RETAIN ANY OUTSIDE ADVERTISING FIRMS,

9    CORRECT?"  AND YOUR ANSWER WAS, THE TOP OF PAGE 75, "I DO

10   NOT.  I AM NOT INVOLVED IN THE OPERATION OF CHEMFREE."  NOW,

11   WAS THAT UNQUALIFIED STATEMENT THAT YOU GAVE IN 2002 A

12   TRUTHFUL STATEMENT, SIR?

13   A. IT WAS AN ANSWER TO YOUR QUESTION.  DO YOU -- SOMEONE'S

14   QUESTION.  YOU DON'T DON'T RETAIN ANY OUTSIDE ADVERTISING

15   FIRMS, AND MY ANSWER IS I DO NOT.  I DON'T MANAGE CHEMFREE

16   DIRECTLY.

17   Q. SIR, MY QUESTION IS FAIRLY DIRECT, I BELIEVE.  WAS THAT

18   UNQUALIFIED STATEMENT IN 2002 YOUR TESTIMONY IN 2002, I AM

19   NOT INVOLVED IN THE OPERATION OF CHEMFREE.  WAS THAT YOUR

20   STATEMENT?

21           MR. CAPP: YOUR HONOR, I OBJECT TO

22   MISCHARACTERIZING THE WITNESS'S TESTIMONY.  THERE HAS BEEN

23   NO TESTIMONY FROM THE WITNESS THAT WAS AN UNQUALIFIED

24   STATEMENT.

25           THE COURT:  WELL, I THINK THE WITNESS HAS ANSWERED

1   THAT, MR. HARBIN.  ASK YOUR NEXT QUESTION.

2   BY MR. HARBIN:

3   Q. IN FACT, IN 2002 YOU DIDN'T KNOW HOW MANY EMPLOYEES

4   CHEMFREE HAD; CORRECT?

5   A. I DIDN'T KNOW THE PRECISE NUMBER.

6   Q. YOU DIDN'T KNOW IF THEY HAD A MARKETING DEPARTMENT?

7   A. I DIDN'T KNOW IF THEY HAD A SEPARATE MARKETING

8   DEPARTMENT.  THAT IS CORRECT.

9   Q. AND THIS QUESTION WAS, YOU DIDN'T KNOW IF THEY USED

10  OUTSIDE ADVERTISING?

11          NOW, IN REGARD --

12  A. EXCUSE ME.  NO.  WHAT I SAID WAS, I DO NOT RETAIN.  THE

13  QUESTION IS, "YOU DON'T RETAIN ANY OUTSIDE ADVERTISING

14  FIRMS?"  AND I SAID, "I DO NOT RETAIN ANY OUTSIDE

15  ADVERTISING FIRMS.  I DO NOT."

16  Q. AND THEN YOU WERE ASKED, LET ME JUST ASK YOU, IS IT TRUE

17  IN 2002, YOU DID NOT KNOW WHAT THE PRODUCT FAILURE -- AND I

18  AM TALKING ABOUT THE TESTIMONY THAT YOU GAVE ABOUT THE

19  PRODUCT TODAY, THAT YOU ARE NOT AWARE, I THINK YOU SAID, OF

20  FAILURES.

21      NOW, IS IT TRUE THAT AT LEAST IN 2002 YOU DID NOT KNOW

22  WHAT FAILURE RATES WERE OF CHEMFREE PRODUCTS?

23  A. I DO NOT KNOW THE FAILURE RATE.  THAT IS CORRECT.

24  Q. YOU DID NOT KNOW IF CHEMFREE HAD TRIED TO CALCULATE THE

25  PERCENTAGE OF FAILURES, DID YOU?

1   A. I DID NOT KNOW IF THEY TRIED TO CALCULATE THE PERCENTAGE.

2   Q. CAN YOU TELL ME TODAY WHAT THE PERCENTAGE OF FAILURES OF

3   CHEMFREE PARTS WASHER SYSTEMS ARE?

4   A. I CANNOT.

5   Q. LET ME TURN TO SOME OF YOUR TESTIMONY AND THE GENERAL

6   ISSUE OF DEVELOPMENT.  YOU TALKED ABOUT SEEING MR. MCCLUER

7   AND/OR MR. MCNALLY TEST SOAPS; IS THAT RIGHT?

8   A. SORRY?  YOUR QUESTION?

9   Q. YOU MENTIONED YOU SAW OCCASIONALLY MR. MCCLUER OR

10  MR. MCNALLY TEST SOAPS.

11  A. THAT IS CORRECT.

12  Q. YOU CAN'T TELL ME A TIME FRAME WHEN YOU SAW THAT, THE

13  PRECISE TIME, CAN YOU?

14  A. IT WAS IN THE FALL OF 1993.

15  Q. ISN'T IT TRUE, SIR, THAT INITIALLY, IN THE INITIAL

16  PROTOTYPES, CHEMFREE USED FLUID FROM A COMPANY CALLED

17  INRETECH?

18  A. I DON'T BELIEVE THAT IS TRUE IN TERMS OF INITIALLY.

19  Q. WOULD MR. MCNALLY AND MR. MCCLUER HAVE MORE DETAILED

20  INFORMATION ABOUT THAT?

21  A. THEY WOULD.  I DID NOT BUY THE FLUID.

22  Q. NOW, YOU TESTIFIED ABOUT THE PILLOW FILTERS.  IS IT

23  TRUE -- ISN'T IT TRUE THAT THE PILLOWS -- I MAY REFER TO

24  "BUGS" LIKE YOU.  CERTAINLY "MICROORGANISMS" IS TOO LONG OF

25  A WORD.  I LIKE THE WORD "BUGS."  YOU UNDERSTAND WHAT I

1    MEAN, MICROBES OR MICROORGANISMS, WHEN I USE THE WORD

2    "BUGS"?

3    A. YES.

4    Q. BY THE WAY, YOU DON'T RECALL THE DATE YOU WERE USING

5    MICROBES IN PROTOTYPE PARTS WASHERS, DO YOU?

6    A. THEY WERE USED IN THE SPRING -- THEY WERE USED SOMETIME

7    IN EARLY 1994.

8    Q. YOU DON'T KNOW IF IN FACT THEY WERE USED EARLIER THAN

9    THAT IN TESTING, DO YOU?

10   A. REPHRASE THAT QUESTION, I'M SORRY.

11   Q. YOU DON'T KNOW IF WHETHER THEY WERE USED EARLIER THAN

12   THAT IN TESTING.  DO YOU SEE?

13   A. I AM FAIRLY CERTAIN THEY WERE NOT USED IN 1993.

14   Q. ISN'T IT TRUE, SIR, THAT SOME OF THE PILLOW FILTERS HAD

15   MICROBES THAT WERE EVALUATED IN 1993?

16   A. IT IS NOT TRUE, TO MY KNOWLEDGE.

17   Q. MR. MCCLUER WAS THE ONE RESPONSIBLE FOR FINDING SOURCES

18   OF MICROBES; CORRECT?

19   A. HE WAS THE PRIMARY SOURCE OF ALL OF OUR SUPPLIES, I

20   THINK.  HE WAS MAKING VENDOR CONTACTS.

21   Q. LET ME HAND YOU, SIR, YOUR DEPOSITION FROM -- YOU ALREADY

22   HAVE YOUR DEPOSITION FROM 1996?

23   A. IS IT IN THIS BOOK?

24   Q. LET ME HAND YOU A COPY OF IT, SIR, AND DIRECT YOU TO PAGE

25   36.  YOU WERE BEING ASKED, ON PAGE 36, ABOUT USING THE

1    MICROBES IN THE PROTOTYPE PARTS WASHER.  AND IN LINE 7 YOU

2    WERE ASKED, IN THE PROTOTYPES THAT WERE ON SITE AT CHEMFREE

3    CORPORATION.  AND YOU ANSWERED, "I ASSUMED WE WERE USING

4    THEM, OR WE WOULDN'T HAVE KNOWN THE BUGS WERE DYING.  BUT DO

5    I RECALL THE SPECIFIC DATES?  I DO NOT."  AND THAT IS A TRUE

6    STATEMENT, ISN'T IT, SIR?

7    A. I SAID I DID NOT RECALL THE SPECIFIC DATE, AND I BELIEVE

8    I TESTIFIED JUST A FEW MINUTES AGO THAT IT WAS IN THE SPRING

9    OR EARLY 1994.  I STILL CAN'T GIVE YOU THE SPECIFIC DATE AT

10   WHICH THEY STARTED USING MICROBES, SO IT IS A TRUE

11   STATEMENT.

12   Q. LET ME HAND YOU, SIR, YOUR 2007 DEPOSITION.  I DIRECT

13   YOUR ATTENTION TO PAGE 83.  AND YOU TESTIFIED ON PAGE 83,

14   YOU WERE ASKED THE QUESTION ON PAGE -- IT IS A LONG ANSWER

15   ON PAGE 82, ABOUT WHEN MR. MCCLUER PRESENTED REMEDIATION.

16   AND YOU ANSWERED ON PAGE -- PART OF YOUR ANSWER ON PAGE 83

17   WAS, "WAS THERE ANY REMEDIATION?  THERE MAY HAVE BEEN SOME

18   EXTERNAL REMEDIATION.  I REMEMBER A PILLOW THAT HE HAD THAT

19   MAY HAVE BEEN DOING SOMETHING, ALTHOUGH I THINK IT IS JUST

20   COLLECTING OIL."  HE DID EXPERIMENT IN 1993 WITH PILLOWS

21   THAT HAD MICROBES IN THEM, DIDN'T HE, SIR?

22   A. NOT THAT I AM AWARE OF.

23   Q. WHAT WERE YOU REFERRING TO THERE MAY HAVE BEEN EXTERNAL

24   REMEDIATION IN REFERENCE TO THE PILLOWS?

25   A. WELL, I CERTAINLY DIDN'T -- I CERTAINLY DID SAY HE HAD

1   BEEN EXPERIMENTING WITH THEM.  I DON'T --

2   Q. HE HAD BEEN USING, IN 1993, HE HAD BEEN USING PILLOW

3   FILTERS THAT HAD MICROBES; CORRECT?

4   A. THAT IS NOT CORRECT.

5   Q. THAT IS YOUR TESTIMONY UNDER OATH?

6   A. THAT IS CORRECT.  THAT IS MY TESTIMONY UNDER OATH.  NOW

7   WHETHER HE HAD BEEN DOING IT ON DECEMBER THE 17TH OF 1983

8   (SIC.), MAYBE, DECEMBER 10TH, MAYBE.  BUT I DO NOT REMEMBER

9   USING PILLOWS, PERIOD, WITH BIOREMEDIATION.

10  Q. YOU DON'T REMEMBER -- AGAIN, SIR, WE SHOULD DEFER TO

11  MR. MCCLUER AND MR. MCNALLY ABOUT WHAT HAPPENED IN 1993?

12  A. I DON'T THINK I WOULD DEFER TO MR. MCCLUER ON ANYTHING

13  THAT HAPPENED.

14  Q. WHAT ABOUT MR. MCNALLY'S SWORN TESTIMONY?

15  A. MR. MCNALLY WAS MORE INVOLVED, SO HE WOULD PROBABLY HAVE

16  A BETTER VIEW OF IT.

17  Q. YOU DON'T DISPUTE THAT IT WAS MR. MCCLUER'S IDEA TO USE

18  MICROBES, DO YOU?

19  A. WELL, I MAY NOT DISPUTE IT.  I AM NOT GOING TO CONFIRM IT

20  EITHER.

21  Q. YOU ASSUME THAT IS NOT THE CASE; CORRECT?

22  A. I AM NOT MAKING THAT ASSUMPTION.

23  Q. YOU DID IN 1996, DIDN'T YOU, WHEN YOU WERE ASKED THAT

24  QUESTION?

25  A. I DON'T SEE AN ANSWER THAT SAID I DID.  I AM SORRY.

1   Q. YOU LOOK AT PAGE 73 OF YOUR DEPOSITION.

2   A. PAGE WHAT?  PAGE 73?

3   Q. YES, SIR.  PAGE 73, THE FIRST LINE.  YOU WERE ASKED,

4   WHOSE IDEA WAS IT TO USE MICROORGANISMS.  DO YOU SEE YOUR

5   ANSWER?

6   A. I AM SORRY, PAGE 73?

7   Q. PAGE 73, STARTING LINE 1.

8   A. THE TERM IT GAVE, IT THIS SAYS, THE PERSON I GAVE IT TO

9   SAYS -- IS THIS THE LAST ONE YOU GAVE ME, OR IS THERE

10  ANOTHER SET OF DOCUMENTS HERE?

11  Q. THAT IS A 2006 THAT YOU LOOKING AT.  IF YOU CAN LOOK ON

12  THE SCREEN HERE.  "WHOSE IDEA WAS IT TO USE MICROORGANISMS

13  IN THE FIRST PLAN THEN?"  YOUR ANSWER, "IN TERMS OF USING

14  THEM IN A PILLOW, THAT WAS TO CAPTURE OIL AS OPPOSED TO

15  BIOREMEDIATION.  I DON'T KNOW.  I HEARD FROM MR. MARKS AND

16  MR. MCCLUER, I AM ASSUMING IT WAS MR. MCCLUER THAT HAD

17  TALKED TO SOMEBODY ABOUT THAT.  THAT WAS HIS RESPONSIBILITY

18  FOR US."

19  A. CAN I SEE THE QUESTION BEFORE THIS TO SEE WHAT IT IS

20  LEADING UP TO?  I WOULD LIKE TO SEE A BETTER COPY, IF YOU

21  COULD.

22          MR. HARBIN: I WILL WITHDRAW THAT, YOUR HONOR.

23          THE COURT:  ALL RIGHT.

24  BY MR. HARBIN:

25  Q. YOU DON'T KNOW, SIR, THE CHEMICALS THAT GO INTO THE

1   FLUID, DO YOU?

2   A. I DO NOT KNOW THOSE CHEMICALS.

3   Q. YOU HAVE NOT BEEN INVOLVED IN THE CHEMISTRY OF THE FLUID;

4   CORRECT?

5   A. THE CHEMISTRY IS KEPT AS A TRADE SECRET, AND THERE ARE

6   VERY FEW PEOPLE THAT KNOW EXACTLY WHAT GOES IN THE FLUID.

7   Q. PART OF MR. MCCLUER'S JOB, IN ADDITION TO DEVELOPING

8   MICROBES, WAS TO FIND SUPPLIERS TO GO FOR MICROBES; CORRECT?

9   A. PART OF HIS JOB WAS TO FIND SUPPLIERS, CORRECT.

10  Q. BUT AT SOME POINT IN THIS DEVELOPMENT YOU ACTUALLY TALKED

11  TO A FRIEND OR AN ASSOCIATE OF YOURS AT PURAFILL; CORRECT?

12  A. I AM SURE I TALKED TO --

13  Q. A CHEMIST THAT GAVE YOU SEVERAL NAMES OF COMPANIES THAT

14  COULD PROVIDE AQUEOUS CLEANING FLUID; CORRECT?

15  A. I DON'T REMEMBER IF THERE IS SOME TESTIMONY.  IF YOU CAN

16  SHOW IT TO ME, IT MAY REFRESH MY MEMORY.

17  Q. IF YOU LOOK AT PAGE -- IN YOUR 1996 DEPOSITION AGAIN.

18  A. OKAY.

19  Q. IF YOU LOOK AT PAGE 34.  YOU ASKED, THE TOP OF THE PAGE,

20  LINE 2 ON PAGE 34.  "DO YOU REMEMBER THE NAME OF THE CHEMIST

21  WHO REASSURED YOU THIS WAS A FEASIBLE PROJECT?"  YOU

22  ANSWERED, "THE PRESIDENT OF PURAFILL."  YOU SAID, "A COMPANY

23  CALLED PURAFILL.  HE IS A PH.D. CHEMIST."

24  A. I DO.

25  Q. AND YOU SAID YOU TRIED TO GET HIS ADVICE ABOUT WHAT YOU

1    HAD; CORRECT?

2    A. THAT IS CORRECT.

3    Q. HE GAVE YOU SEVERAL NAMES OF SEVERAL COMPANIES WHERE HE

4    THOUGHT YOU COULD GET AN AQUEOUS BASED CLEANER; CORRECT?

5    A. YOU KNOW, I HONESTLY DON'T REMEMBER THAT NOW.  BUT IF YOU

6    CAN SHOW ME A PLACE IN HERE, MAYBE IT WILL REFRESH MY

7    MEMORY, BUT I DON'T RECALL THAT.

8    Q. THAT IS THE TESTIMONY.  YOU DON'T DISPUTE THE ACCURACY OF

9    THE TESTIMONY YOU GAVE IN 1996 --

10   A. NO.  BUT WHAT WAS YOUR QUESTION?  YOU SAID HE GAVE ME THE

11   NAMES OF SEVERAL PEOPLE THAT PRODUCED AQUEOUS BASED

12   CLEANERS.

13   Q. HE GAVE YOU THE NAMES OF SEVERAL COMPANIES TO WHOM HE

14   THOUGHT YOU COULD GET AN EQUIVALENT AQUEOUS BASED CLEANER.

15   A. AND MICROBES.

16   Q. HE ALSO GAVE YOU THE NAMES OF COMPANIES WHERE YOU COULD

17   GO BUY MICROBES?  THAT WAS MY SECOND QUESTION.

18   A. THAT IS CORRECT.

19   Q. AND THAT WAS IN THE FIRST TELEPHONE CALL, WASN'T IT?

20   A. THE FIRST TELEPHONE CALL?

21   Q. YOU CALLED HIM, OR HAD A MEETING WITH HIM, AND HE TOLD

22   YOU RIGHT THERE, THERE ARE SOME COMPANIES; CORRECT?

23   A. I THINK IT WAS PROBABLY AT A BOARD MEETING OF PURAFILL

24   WHERE I ASKED HIM IF HE THOUGHT IT WAS FEASIBLE, BUT I

25   REALLY JUST DON'T RECALL SPECIFICALLY.  THIS IS LIKE, WHAT,

1   13 YEARS AGO.  I CAN'T TELL YOU THE GROOMSMAN IN MY SON'S

2   WEDDING 13 YEARS AGO, AND THIS IS PRETTY SPECIFIC.

3            THE COURT:  MR. HARBIN, THIS WOULD BE A GOOD TIME

4   TO TAKE OUR LUNCH RECESS.  WE ARE WILL TRY TO GET STARTED

5   AGAIN AT 1:30 PLEASE.

6                 (BREAK FROM 12:37 UNTIL 1:30 P.M.)

7            THE COURT:  ALL RIGHT, MR. HARBIN.

8   BY MR. HARBIN:

9   Q. MR. STRANGE, YOU DO HAVE A FINANCIAL INTEREST IN THIS

10  LITIGATION; CORRECT?

11  A. I AM AN OWNER OF INTELLIGENCE SYSTEMS, A LARGE

12  SHAREHOLDER.

13  Q. SO YOU AGREE -- NOW, YOU STILL OWN 16 PERCENT OF THE

14  STOCK IN INTELLIGENCE SYSTEMS?

15  A. YES.  APPROXIMATELY.

16  Q. SINCE.  CHEMFREE IS A SUBSIDIARY OF THIS PUBLIC COMPANY,

17  INTELLIGENCE SYSTEMS; IS THAT CORRECT?

18  A. THAT IS CORRECT.

19  Q. AND THERE IS SOME DISCUSSION IN THE OPENING STATEMENT OF

20  CHEMFREE'S COUNSEL ABOUT MEETING IN 2005 WITH WALTER,

21  ABOUT -- I DON'T WANT TO GET INTO WHAT HAPPENED THERE, BUT

22  ISN'T IT TRUE THAT INTELLIGENCE SYSTEMS IS A PUBLIC COMPANY,

23  REPORTS FINANCIAL INFORMATION QUARTERLY AND ANNUALLY?

24  A. THAT IS CORRECT.

25  Q. AND FOR THE RECENT SEVERAL YEARS, INTELLIGENCE SYSTEMS

1  HAS HAD TWO PRINCIPAL SUBSIDIARY, CHEMFREE AND -- IS IT

2  CORCAR?

3  A. THEY ARE PRINCIPAL SUBSIDIARIES.  IT HAS OTHER COMPANIES

4  ALSO.

5  Q. AND IS IT TRUE THAT INTELLIGENCE SYSTEMS REGULARLY

6  REPORTS THE FINANCIAL PERFORMANCE OF CHEMFREE PUBLICLY IN

7  FAIR DETAIL?

8  A. IT REPORTS CERTAIN THINGS ABOUT CHEMFREE.

9  Q. REPORTS REVENUE, CORRECT?

10  A. IT'S NOT REPORTED AS CHEMFREE BY ITSELF.  I THINK IT IS

11  SEGMENTS.  AGAIN, OUR CFO HANDLES MOST OF THAT.  BUT IT

12  WOULD BE A SEGMENT REPORTING, I RECALL.

13  Q. WELL, BUT YOUR PUBLIC FILINGS MAKE CLEAR, YOU HAVE AN

14  INDUSTRIAL SEGMENT?

15        MR. CAPP: EXCUSE ME, YOUR HONOR.  CAN WE LIMIT

16  CROSS-EXAMINATION TO THE SCOPE OF DIRECT?  THIS IS

17  CROSS-EXAMINING MY OPENING STATEMENT.  THIS SHOULD BE

18  CROSS-EXAMINING WHAT THE WITNESS SAID ON DIRECT.

19        MR. HARBIN:  I CAN MOVE ON, BUT I THOUGHT WITH

20  THESE WITNESSES I WAS GOING TO DEFINITELY GO INTO AN AREA

21  THAT WASN'T COVERED IN DIRECT, I THOUGHT WE WERE GOING TO GO

22  AHEAD AND COVER EVERYTHING THAT WE HAD TO COVER WITH THE

23  WITNESS WHEN THEY WERE ON THE STAND.

24        THE COURT:  WELL --

25        MR. HARBIN:  BUT I CAN MOVE ON FROM THIS

1    PARTICULAR ISSUE.

2              MR. CAPP: CAN WE ADDRESS THAT FOR A MINUTE?

3    BECAUSE THEY HAD ASKED ME LAST WEEK IF I WOULD MAKE LELAND

4    STRANGE AVAILABLE TO BE CALLED IN THEIR CASE IN CHIEF SO

5    THAT THEY WOULDN'T HAVE TO ACTUALLY SERVE HIM WITH A

6    SUBPOENA, SO I AGREED TO THAT.  SO I PUT HIM UP FOR 15

7    MINUTES OF DIRECT.  IT IS THAT HE IS GOING TO BE HERE ALL

8    AFTERNOON ON CROSS, AND HE IS GOING TO GET CALLED IN THEIR

9    CASE IN CHIEF LATER?  CAN WE HAVE SOME REASONABLE LIMITATION

10   ON HOW WE WILL HANDLE THIS?

11             THE COURT:  I TELL YOU WHAT MY NORMAL RULE IS.  I

12   THINK THAT SCOPE IS A VALUABLE RULE, IT ALLOWS THE PLAINTIFF

13   TO MAKE A PRIMA FACIE CASE, AND IT IS SOMETIMES CONFUSING

14   WHEN THE DEFENSE IS PRESENTED OUTSIDE THE SCOPE OF DIRECT.

15   SO, IF THE TWO OF YOU CANNOT AGREE, I WILL ENFORCE SCOPE AND

16   REQUIRE MR. HARBIN TO RECALL THE WITNESS DURING HIS PORTION

17   OF THE CASE.  IF THERE ARE MINOR THINGS THAT MR. HARBIN,

18   THROUGH MOVING THINGS ALONG, CAN ADDRESS NOW AND SAVE THE

19   WITNESS TIME, THEN THAT IS FINE WITH ME.

20             MR. CAPP: YOUR HONOR, IF THEY WANT TO TAKE AND --

21             THE COURT:  IS THAT AN OBJECTION?  WAIT AND SEE IF

22   YOU HAVE A SPECIFIC OBJECTION TO QUESTIONS OUTSIDE THE SCOPE

23   OF DIRECT, AND I WILL RULE ON THEM.

24             MR. CAPP: THANK YOU, YOUR HONOR.

25   BY MR. HARBIN:

1  Q. I ONLY HAVE ABOUT 30 OR 40 MINUTES MOST.  I WILL MAKE A

2  NOTE WHEN I GET TO THIS POINT TO BRING THAT BACK UP.

3  MR. STRANGE, LET ME ASK YOU SOME QUESTIONS ABOUT THE

4  SPECIFIC CONTRIBUTIONS THAT CERTAIN INDIVIDUALS MADE TO THE

5  SMART WASHER PARTS WASHER.  SPECIFICALLY THE CONTRIBUTION

6  THAT MR. MARKS MADE WAS CONCERNING THE SINK; CORRECT?

7  A. THAT IS CORRECT.

8  Q. AND IT WAS TO DENT, IN YOUR WORDS, THE SINK TO SUPPORT

9  THE FILTER, OR SHELF TO HOLD THE FILTER; CORRECT?

10 A. IT WAS THE SINK, THE FALSE BOTTOM SINK.

11 Q. MORE SPECIFICALLY IT WAS TO DENT THE SINK SO THERE WAS A

12 LEDGE TO SUPPORT.  --

13 A. TO DISH IT.

14 Q. -- TO SUPPORT THE FILTER?

15 A. I AM SORRY, I DIDN'T CUT IT TO THAT DEGREE.  I JUST KNOW

16 IT WAS THE SINK, AND HAVE THE ABILITY TO PUT A FILTER UNDER

17 THERE TO ACCOMPLISH WHAT WE WERE TRYING TO ACCOMPLISH.

18 Q. ARE YOU FINISHED?

19 A. I AM FINISHED.

20 Q. LET ME ASK YOU TO LOOK AT PAGE 7 OF YOUR 1996 DEPOSITION,

21 THE EARLIEST DEPOSITION THAT YOU HAVE GIVEN.  PAGE 76 AT

22 LINE 8, BEGINNING AT.  THE QUESTION, "WHO DESIGNED THE

23 SINK?"  YOU ANSWERED, "THE SINK WAS -- WELL, THE SINK IS THE

24 SINK.  HOWEVER, THE MODIFICATION OF THE SINK WERE DESIGNED

25 BY CHEMFREE.  AND MR. MARKS WAS INSTRUMENTAL IN MAKING A

1  VERY KEY SUGGESTION ON HOW TO SUPPORT THE FILTER ON THAT

2  SINK."

3  A. I AM LOOKING AT THE 1996, AND I DON'T HAVE THAT ON

4  PAGE -- SORRY.

5  Q. 76.

6  A. OKAY.  GOT IT.  YOUR QUESTION IS WHAT?

7  Q. MY QUESTION IS, THE NEXT QUESTION YOU WERE SPECIFICALLY

8  ASKED, "WHAT WAS THE KEY SUGGESTION?"  "YOU JUST TESTIFIED

9  THAT MR. MARKS MADE A VERY KEY SUGGESTION.  WHAT WAS THE KEY

10  SUGGESTION?"  YOUR ANSWER WAS, "YOU ARE GOING TO ELIMINATE A

11  COUPLE OF PARTS BY SIMPLY DENTING THE SINK AT THE

12  APPROPRIATE PLACES SO THEY COULD HOLD A WIRE, A BASKET OR

13  SOMETHING THAT WOULD ALLOW THE FILTER TO BE SUSPEND."  I

14  SUPPOSE THAT IS A TYPO.  IS THAT A TRUE STATEMENT YOU GAVE

15  IN 1996, 13 YEARS AGO, BY YOUR UNDERSTANDING OF MR. MARKS'S

16  CONTRIBUTION?

17  A. IT WAS A TRUE STATEMENT IN TERMS OF THAT IS ONE OF HIS

18  SUGGESTIONS AND THAT WAS THE PURPOSE OF THAT.

19  Q. OKAY.  I AM NOT -- I WANT TO ASK YOU ABOUT YOUR

20  CONTRIBUTIONS TO SPECIFIC ONES YOU TALKED ABOUT, I AM NOT

21  GOING TO ASK YOU ABOUT THE KNEE SWITCH BECAUSE I DON'T THINK

22  THAT IS AN ISSUE, OR THE TOWEL RACK.  JUST BRIEFLY ABOUT THE

23  TOWEL RACK, IF WE LOOK AT THIS FIRST CHEMFREE SMART WASHER,

24  THERE IS A ROD, THERE IS A PIECE OF PLASTIC MOLDING ON THE

25  TOP, AND THERE IS AN OVAL, THERE IS A ROD ON THE OUTSIDE AND

1    AN OVAL ON THE INSIDE.  IS THAT YOUR LELAND TOWEL?

2    A. I AM NOT SURE THAT IS THE FIRST ONE.  I MEAN, IN FACT, IT

3    IS NOT THE FIRST ONE.  BUT YEAH, THE LELAND TOWEL BAR WAS

4    KIND OF THE STANDING JOKE.

5    Q. OKAY.  LET'S TALK ABOUT THE FILTER.  THIS IS AN EXAMPLE

6    OF A FLAT FILTER THAT CHEMFREE USES IN ITS PARTS WASHERS?

7    A. THAT APPEARS TO BE SO.  YES.

8    Q. AND YOU DON'T KNOW WHO CAME UP WITH THE IDEAS FOR A FLAT

9    FILTER, DO YOU, SIR?

10   A. FOR A FLAT FILTER?  VERSUS WHAT?

11   Q. VERSUS A CONICAL OR COFFEE TYPE FILTER?

12   A.  THAT WAS DONE JUST IN GENERAL DISCUSSION.  THOSE IDEAS

13   WERE ALL CONSIDERED.

14   Q. GENERALLY SOMEBODY COMES UP WITH THE INITIAL IDEA, RIGHT?

15   LET'S LOOK AT A FLAT FILTER; RIGHT?  IT IS NOT A GROUP-THING

16   MIND-MELD, IS IT?

17   A. IT IS A GROUP THING, BUT I CAN'T TELL YOU THAT SOMEBODY

18   SAID, AHA, LET'S DO A FLAT FILTER.  I DON'T REMEMBER THAT

19   MOMENT, NO.

20   Q. SPECIFICALLY YOU DON'T KNOW WHETHER IT WAS MR. MCCLUER

21   WHO SUGGESTED THE FLAT FILTER, DO YOU, SIR?

22   A. I DO NOT KNOW WHETHER IT WAS MR. MCCLUER, MR. MARKS,

23   MYSELF, OR MR. MCNALLY.  NO, SIR.

24   Q. OKAY.

25   A. OR EVEN SOME OTHER ENGINEERS THAT THEY WERE WORKING WITH

1    AND LOOKING FOR ADVICE FROM --

2    Q. YOU WANT TO TALK ABOUT YOUR SPECIFIC CONTRIBUTION, YOUR

3    CONTRIBUTION TO HOW THE MICROBES ENTER INTO THE MACHINE IS

4    SUGGESTING GLUING THE MICROBES TO THE FILTER; CORRECT?

5    A. IT WAS TO ATTACH THEM IN SOME WAY TO THE FILTER.  YES.

6    Q. AND THEN YOU HAD THE IDEA OF OBTAINING A COVER, TO COVER

7    THAT THE MICROBES WERE IN THERE; CORRECT?  AND CREATE SOME

8    MYSTERY?

9    A. THAT IS CORRECT.

10   Q. AND IN FACT, YOUR IDEA CAME OUT OF A MEETING IN WHICH ONE

11   OF YOUR -- I THINK MR. MARKS WAS THERE?

12   A. I AM NOT SURE WHAT MEETING YOU ARE TALKING ABOUT.

13   Q. THE MEETING THAT LED TO YOUR IDEA OF GLUING THE MICROBES

14   TO THE FILTER.

15   A. WELL, THERE WAS NOT A MEETING THAT LED TO THE IDEA.

16   Q. ISN'T IT TRUE, SIR, THAT YOUR IDEA CAME OUT OF A MEETING

17   IN WHICH MR. MCCLUER'S IDEA OF POURING THE MICROBES INTO THE

18   PARTS WASHER WAS DISCUSSED?

19   A. I DIDN'T COME OUT OF THAT MEETING WITH AN IDEA OF HOW TO

20   DO THIS.  WE CAME OUT OF THAT MEETING WITH AN IDEA OF WE'VE

21   GOT TO FIND A BETTER WAY TO DO THIS.  THAT MAKES NO SENSE.

22   Q. WAS MR. MARKS AT THIS MEETING?

23   A. YES.

24   Q. WAS MR. MCCLUER THERE?

25   A. YES, HE WAS.

1    Q. MR. MCNALLY?

2    A. YES, HE WAS.

3    Q. AND ALSO PRESENT WAS ONE OF YOUR PR PEOPLE, SHARON

4    CUPPETT, I BELIEVE?

5    A. THAT IS CORRECT.

6    Q. AND YOUR RESPONSE WAS TO OBJECT BECAUSE OF MARKETING

7    CONCERNS.  YOU SAID IT WAS A LOUSY MARKETING IDEA; CORRECT?

8    A. I CAN'T REMEMBER MY EXACT WORDS, BUT THAT'S VERY LIKELY

9    SOMETHING I WOULD HAVE SAID.

10   Q. LET ME ASK YOU TO TURN TO PAGE 68 OF YOUR 1996

11   DEPOSITION, SIR.  LOOK AT THE PARAGRAPH, LINE 6 TO 17.  YOUR

12   TESTIMONY WAS THAT THIS CAME OUT OF A MEETING, I AM

13   PARAPHRASING, BUT LINE 9 THROUGH 11 AND 12, MCCLUER'S IDEA

14   OF POURING BUGS INTO THE PARTS WASHER WAS DISCUSSED AND WHO

15   WAS THERE.  AND YOU SAID, NO WAY, IT WON'T FLY, IT'S A LOUSY

16   MARKETING IDEA.  THERE'S GOT TO BE SOME MYSTERY TO THIS.

17        IS YOUR TESTIMONY IN 1996 TRUE, THAT WAS YOUR REACTION

18   THAT LED TO THIS --

19   A. YES.  THAT IS TRUE.

20   Q. AND YOUR IDEA OF GLUING THE BUGS TO THE FILTER WAS TO

21   FIND -- WELL, IN FACT, YOU ALSO HAD THE IDEA TO COME UP WITH

22   CERTAIN COLORS TO MAKE IT MORE DIFFICULT FOR CUSTOMERS TO

23   UNDERSTAND WHAT WAS GOING ON; CORRECT?

24   A. YES.  BUT YOU ARE MIXING THINGS UP HERE.  THEY DID NOT

25   HAPPEN IN THAT MEETING.  THAT'S SOMETHING THAT I WORKED

1    THROUGH AFTER THE FACT.  THAT MEETING, WE LEFT THAT MEETING

2    SIMPLY SAYING THIS IS NOT GOING TO WORK, AND I DIDN'T GO

3    TELL THEM I AM GOING TO GO FIGURE THIS OUT.  I LEFT THE

4    MEETING SHAKING MY HEAD, THIS WON'T WORK.  AND THEN I

5    DECIDED PERSONALLY TO TRY TO FIGURE OUT HOW TO DO IT.

6    Q. YOU SUGGESTED TO MAKE IT MORE DIFFICULT FOR CUSTOMERS TO

7    UNDERSTAND WHAT WAS GOING ON; CORRECT?

8    A. I THINK YOU ARE MIXING UP THE TESTIMONY HERE.  YOU ARE

9    READING INTO THINGS THAT I HAVE SAID HERE THAT I DID, AND

10   TRYING TO READ THEM INTO THE MEETING.  AND THAT IS NOT WHAT

11   THIS SAYS.  IF YOU WILL GO FROM PAGE 67, 68, THAT IS NOT

12   WHAT I SAID.

13   Q. LOOK AT THE TOP OF PAGE 68 IN FACT, SIR, VERY FIRST

14   PARAGRAPH.  YOU SAID, QUOTE, "I SUGGESTED THAT WE GET A GLUE

15   OF A CERTAIN COLOR THAT WOULD MAKE IT MORE DIFFICULT FOR

16   CUSTOMERS TO UNDERSTAND WHAT WAS GOING ON THERE."

17   A. I SAID THAT.  I DID NOT SAY THAT CAME OUT OF THE MEETING.

18   THAT WAS MY ULTIMATE SUGGESTION.

19   Q. AND IN FACT, YOUR COLOR THAT YOU SUGGESTED WAS BLUE;

20   CORRECT?

21   A. THAT WAS MY ULTIMATE SUGGESTION, YES.  BECAUSE THAT WAS

22   THE COLOR OF THE MATERIAL THAT I BOUGHT AT HOME DEPOT.

23   Q. AND YOUR IDEA ABOUT GLUING THE BUGS TO THE FILTER WAS TO

24   FIND A DELIVERY SYSTEM THAT WOULD BE TRANSPARENT TO THE

25   CUSTOMER AND HAVE SOME MYSTERY TO IT; CORRECT?

1    A. THAT WAS THE MARKETING REASONS.

2    Q. AND BY THE WAY, AS I BELIEVE YOU TESTIFIED, YOU WENT TO

3    HOME DEPOT AND YOU DIDN'T GO TO SOME PARTS WASHING SUPPLIER,

4    YOU WENT TO HOME DEPOT AND BOUGHT AN AIR CONDITIONING

5    FILTER?

6    A. THAT IS CORRECT.  AND THIS LOOKS LIKE -- I AM NOT A

7    FILTER EXPERT, BUT IT LOOKS SIMILAR TO AN AIR CONDITIONING

8    FILTER THAT IS ON THIS ONE?  DO YOU KNOW?

9    A. I DON'T KNOW ABOUT THAT ONE, BUT THAT LOOKS THE SAME AS

10   WHAT I BOUGHT, OR VERY SIMILAR.  BY THE WAY, I TOOK IT OUT

11   OF A CONTAINER.  IT WOULD BE A FILTER YOU SLIDE INTO AN AIR

12   CONDITIONING AREA, AND I STRIPPED ALL OF THE CARDBOARD OFF

13   OF IT AND JUST USED THE FILTERING MATERIAL.

14   Q. AND BY THE WAY, YOU DON'T -- YOU SAID YOU MADE SOME

15   NOTES, BUT YOU DON'T HAVE ANY NOTEBOOKS OR DOCUMENTS ABOUT

16   YOUR WORK ON THIS FILTER, DO YOU?

17   A. NO, I DO NOT.

18   Q. NOW, IT WAS YOUR UNDERSTANDING WITH THE DESIRE TO CREATE

19   SOME MYSTERY FOR THE USERS, THAT THE CUSTOMERS WOULD HAVE NO

20   IDEA WHY THEY WERE PUTTING IN A FILTER; IS THAT RIGHT?

21   A. WELL, I THINK YOU ARE MIXING A LITTLE BIT OF MARKETING

22   WITH MECHANICAL HERE.  FROM A MARKETING PERSPECTIVE, THAT IS

23   CORRECT.

24   Q. IN FACT, IT WAS YOUR HOPE WHEN YOU MADE THIS SUGGESTION

25   THAT THE CUSTOMER WOULD NOT HAVE ANY IDEA WHY HE WAS PUTTING

1   IN THE FILTER, THAT HE WOULD THINK IT IS JUST TO FILTER THE

2   PRODUCT; CORRECT?

3   A. AGAIN, THERE ARE TWO PURPOSES HERE.  FROM A MARKETING --

4   Q. IS THAT CORRECT, SIR?

5   A. FROM A MARKETING PERSPECTIVE, I DIDN'T SEE ANY SENSE IN

6   TELLING THE CONSUMER EXACTLY HOW THE BUGS GOT INTRODUCED

7   INTO THE SYSTEM.  FROM AN OPERATIONAL PERSPECTIVE I NEEDED

8   TO MAKE IT EASY TO DO IT IN SOME KIND OF TIME RELEASE

9   METHODOLOGY SO THE BUGS STAYED ALIVE.  SO THERE ARE TWO

10  SIDES TO THE EQUATION THAT YOU ARE DEALING WITH.

11  Q. WITH RESPECT, SIR, IF YOU COULD ANSWER MY SPECIFIC

12  QUESTION.  WAS IT YOUR HOPE THAT THE CUSTOMER WOULD THINK

13  THAT THEY WERE PUTTING IN THE FILTER JUST TO FILTER THE

14  PRODUCT?

15  A. I DON'T KNOW THAT THAT WOULD BE AN ACCURATE

16  REPRESENTATION, BUT I DON'T SEE ANY REASON TO ARGUE WITH IT.

17  Q. LOOK AT PAGE 66 OF YOUR DEPOSITION, SIR, LINES 21 TO 24.

18  A. OKAY.

19  Q. "DOES THE CUSTOMER HAVE TO REPLACE THE FILTERS AT SOME

20  INTERVAL INTO THE MACHINE?"  "HE SHOULD."  "DO YOU DIRECT

21  HIM TO DO SO?"  "YES, WE DO."  "QUESTION:  DOES HE HAVE ANY

22  IDEA WHY HE IS PUTTING THE FILTER IN?"  "I HOPE NOT.  I

23  MEAN, I HOPE HE THINKS IT'S TO FILTER THE PRODUCT."  WAS

24  THAT YOUR HOPE?

25  A. I HOPED HE THOUGHT IT WOULD FILTER THE PRODUCT.  THAT IS

1   CORRECT.  AND IT WAS.

2   Q. WELL, IN FACT, SIR, CHEMFREE DOES TELL CUSTOMERS, AS YOU

3   SAID, DIRECT CUSTOMERS, TO REPLACE THE MATS; CORRECT?

4           MR. CAPP: SORRY, YOUR HONOR.  NONE OF THIS IS

5   RELEVANT.

6           MR. HARBIN:  AT LEAST, YOUR HONOR, I CAN EXPLAIN.

7           THE COURT:  LET'S HEAR IT.

8           MR. HARBIN:  I THINK THE EVIDENCE IS, YOU KNOW,

9   AND EVENTUALLY IS SUPPOSED TO BE USEFUL, YOUR HONOR.  BUT I

10  THINK THE EVIDENCE WILL SHOW, AND FURTHER EVIDENCE WE WILL

11  GET INTO FURTHER, WILL SHOW THAT THIS IDEA OF MR. STRANGE'S

12  WAS FOR MARKETING PURPOSES AND SALES PURPOSES, WHICH IS WHAT

13  I AM GOING TO GET INTO, NOT JUST THE MARKETING MYSTERY, BUT

14  ACTUALLY THE SALES, WHICH IS DIFFERENT THAN HAVING A USEFUL

15  INVENTION IN PATENT TERMS.

16          THE COURT:  ALL RIGHT.  SO YOU ARE SAYING THAT THE

17  MARKETING QUESTIONS THAT YOU ARE ASKING ARE RELEVANT TO

18  WHETHER THIS WAS A VALID PORTION OF THE INVENTION.

19          MR. HARBIN:  YES, YOUR HONOR.  WAS IT NORMAL

20  USEFUL IN TERMS OF PATENT LAW, OR WAS IT A MARKETING

21  CONSTRUCT TO CREATE SOME MYSTERY.

22          THE COURT:  DOES IT MATTER IF IT'S USEFUL?  DOES

23  IT MATTER THAT IT'S A MARKETING CONSTRUCT?  WE ARE NOT

24  TALKING MOTIVE HERE.

25          MR. HARBIN:  WELL, THE ISSUE IS, YOUR HONOR, IS IT

1   USEFUL VERSUS ANY OTHER KIND OF FILTERING SYSTEM.  THAT IS

2   THE ISSUE.

3            THE COURT:  ALL RIGHT.  WELL, YOU MAY ADDRESS IT,

4   MR. HARBIN, BUT LET'S MOVE ON FAIRLY QUICKLY.

5            MR. HARBIN:  THANK YOU.

6   BY MR. HARBIN:

7   Q. BY THE WAY, MR. STRANGE.  IN THAT REGARD, CAN YOU

8   IDENTIFY FOR ME ANY ADVANTAGES OF THIS?  CAN YOU IDENTIFY

9   WHAT THIS FILTER MATERIAL IS SPECIFICALLY?

10  A. I DON'T KNOW WHAT THEY BUY NOW.  I TOLD YOU WHAT I DID.

11  Q. CAN YOU IDENTIFY SPECIFICALLY WHAT IT WAS AT THE TIME

12  THAT YOU, OTHER THAN IT WAS AN AIR CONDITIONING FILTER, THAT

13  YOU PROPOSED?

14  A. I COULD HAVE READ THE LABEL TO IDENTIFY IT.  I CAN'T TELL

15  YOU TODAY WHAT THEY SAID IT WAS MADE OF.  I BELIEVE IT WAS

16  FIBERGLAS, I AM NOT SURE.

17  Q. YOU CAN'T POINT TO ANY ADVANTAGES OF THAT KIND OF FILTER

18  OVER ANOTHER TYPE OF FILTER, CAN YOU?

19  A. I THINK THERE IS A LOT OF ADVANTAGES OVER THAT KIND OF

20  FILTER AS OPPOSED TO ANOTHER KIND OF FILTER.

21  Q. A FLAT FILTER?

22  A. THE ADVANTAGES THAT HAS THE BUGS ATTACHED TO IT, I THINK

23  THERE IS SIGNIFICANT ADVANTAGE, OF COURSE.

24  Q. WELL, DO YOU HAVE ANY DOCUMENTS, SIR -- MY FIRST QUESTION

25  IS ABOUT THE TYPE OF FILTER.  WE WILL GET TO THE BUGS BEING

1    ATTACHED IN A MINUTE.  THE TYPE OF FILTER, ONE VERSUS

2    ANOTHER, THE TYPE OF FLAT FILTER WASN'T SIGNIFICANT, WAS IT?

3    A. AT THE TIME, THE TYPE OF FILTER, MEANING HOW POROUS IT

4    WAS, THOSE KIND OF THINGS, THOSE HAD BEEN DETERMINED BY THE

5    COMPANY IN ORDER TO TAKE CARE OF THE PARTICULATE MATTER.  SO

6    NO, I DIDN'T GO IN AND TRY TO FIGURE OUT WHETHER THEY MADE A

7    MISTAKE OR DID NOT MAKE A MISTAKE IN TERMS OF HOW MANY

8    MICRONS IT WOULD FILTER.  THAT WAS NOT THE OBJECTIVE.  THE

9    OBJECTIVE WAS A WAY TO PUT THE BUGS IN THE FLUID IN A WAY

10   THAT WOULD BE RELEASED OVER TIME, AND THEREFORE I DID THAT

11   USING THE FLAT FILTER.  I COULD HAVE DONE IT SOME OTHER WAY

12   PERHAPS, BUT THAT IS WHAT I CAME UP WITH AS A WAY TO DO IT.

13   Q. OKAY.  AND IF YOU CAN LOOK AT EXHIBIT 589, SIR.  YOU

14   CALLED THE MATS, THE FILTER MATS, OZZY MATS; IS THAT

15   CORRECT?  YOU CALLED THE MATS OZZY MATS?

16   A. YES.

17   Q. AND DO YOU RECOGNIZE THIS AS A PUBLICLY AVAILABLE

18   INSTRUCTION MATERIAL THAT CHEMFREE PROVIDES ABOUT THE PROPER

19   USE AND CARE OF THE SMART WASHER?

20   A. AGAIN, I DON'T READ THEIRS MDS, BUT I WOULDN'T QUARREL

21   WITH THE FACT THAT THIS IS PROBABLY THEIR MDS.

22   Q. IT IS TRUE THAT CHEMFREE INSTRUCTS THE PUBLIC THAT, A,

23   YOU NEED TO REPLACE AN, B, IT IS DESIGNED TO INTRODUCE THE

24   MICROBES INTO THE SMART WASHER SYSTEM.  DO YOU SEE THAT?

25   A. I DO.

1   Q. AND IF YOU LOOK AT EXHIBIT 593, DO YOU RECOGNIZE THAT AS

2   AN OPERATING MANUAL FOR THE SMART WASHER MODEL?

3   A. YES.

4   Q. AND IF YOU LOOK AT THE THIRD PAGE.  SORRY, GO TO EXHIBIT

5   592.  AND IF YOU LOOK AT THE THIRD PAGE OF EXHIBIT 592, THIS

6   IS OTHER INFORMATION THAT CHEMFREE PROVIDES TO ANSWER

7   CUSTOMERS FREQUENTLY ASKED QUESTIONS?

8   A. I SEE IT.

9   Q. AND IF YOU LOOK AT THE THIRD PAGE, THERE IS A DESCRIPTION

10  OF HOW OFTEN TO CHANGE THE OZZY MAT.  592, THIRD PAGE.  IT

11  REPEATS THAT OZZY IS INTRODUCED TO THE SYSTEM THROUGH THE

12  OZZY MAT.  AND IT STATES THAT, "FRESH EVERY TIME YOU

13  CHANGE."  "FRESH OZZYS ARE ADDED TO THE EXISTING COLONY,

14  KEEPING THE SYSTEM WORKING AT OPTIMUM LEVEL."  DO YOU SEE

15  THAT?

16  A. I DO.

17  Q. IT IS TRUE THAT IF YOU DON'T CHANGE THE FILTER MAT IN

18  CHEMFREE'S PART WASHING MACHINE, THAT THE MICROBES WILL LOSE

19  THEIR POWER AND EVENTUALLY DIE?

20  A. I AM NOT ABLE TO ANSWER THAT.  TALKING ABOUT TODAY?

21  Q. YES, SIR.

22  A. I AM NOT ABLE TO ANSWER THAT.

23  Q. IS IT TRUE THAT ANOTHER REASON FOR ATTACHING THE MICROBES

24  TO THE -- LET ME TAKE A STEP BACK.  YOU ALSO INSTRUCT THE

25  USERS TO PERIODICALLY TOP OFF OR REFILL SOME FLUID IF THE

1    FLUID LEVELS DROP; RIGHT?

2    A. YES.

3    Q. AND THE FLUID LEVEL DROPS BASED ON NORMAL USAGE?

4    A. ANYTIME THE FLUID LEVEL IS LOW, YOU NEED TO ADD FLUID.

5    SURE.

6    Q. AND SO ONE OF YOUR SOURCES OF REVENUE IS REPLACEMENT?

7    A. YES.

8    Q. AND ANOTHER REASON TO ATTACH THE MICROBES TO THE MAT IS

9    YOU ALSO GET ONGOING REVENUE FROM PEOPLE, YOUR CUSTOMERS,

10   PURCHASING AND REPLACING OZZY MATS?

11   A. YOUR QUESTION IS, IS IT TRUE THAT WE GET ONGOING REVENUE?

12   YES, IT IS TRUE WE GET ONGOING REVENUE.

13   Q. IS IT THE CASE THAT IN 2009, MORE THAN 50 PERCENT OF

14   CHEMFREE'S REVENUE YEAR TO DATE CAME FROM REPLACEMENT FLUIDS

15   AND REPLACEMENT OZZY MATS?

16   A. YES.  I BELIEVE THAT IS CORRECT, FLUID AND FILTERS.

17            MR. HARBIN:  NOW, YOUR HONOR, THIS IS AN AREA

18   WHERE I WAS GOING TO ASK SOME QUESTIONS THAT ARE NOT ON

19   DIRECT, BUT THERE IS ONLY ABOUT FIVE OR TEN MINUTES OF THEM,

20   DEALING WITH THE SECONDARY CONSIDERATION OF COMMERCIAL

21   SUCCESS.  OUR PURPOSE IS TO TRY TO AVOID CALLING MR. STRANGE

22   BACK, WHICH THAT IS WHAT I UNDERSTOOD WE WERE DOING.  WE CAN

23   WAIT, BUT IT'S BASICALLY THE STUFF HE HAS TESTIFIED ABOUT

24   ALREADY IN HIS DEPOSITIONS THAT I WANT TO PUT IN THE RECORD,

25   BUT IT IS OUTSIDE THE SCOPE OF THE DIRECT.

1          THE COURT:  OKAY.  MR. CAPP, ANY OBJECTION?

2          MR. CAPP: NO.  AND IF I CAN OBVIATE SOME THINGS,

3    YOUR HONOR.  IF WE GET TO THAT PART OF THE CASE WE DO NOT

4    INTEND TO ARGUE TO THE COURT THAT COMMERCIAL SUCCESS IS A

5    SECONDARY CONSIDERATION OF NON-OBVIOUSNESS FOR THE PURPOSES

6    OF THIS TRIAL, SO THAT WILL SHORTEN THINGS UP.  MAYBE HE

7    DOESN'T NEED TO ASK THE QUESTIONS AFTER ALL, BUT I WILL MAKE

8    THE COMMITMENT, WHEN I GET TO MY REBUTTAL CASE, WE WILL NOT

9    PUT ON A CASE OF COMMERCIAL SUCCESS AS A SECONDARY

10   CONSIDERATION OF NON-OBVIOUSNESS.

11         THE COURT:  ALL RIGHT.  DOES THAT SATISFY YOU,

12   MR. HARBIN?

13         MR. HARBIN:  NO, YOUR HONOR.  BECAUSE SECONDARY

14   CONSIDERATION IS GONE BY THE WAY, SO WE WOULD BE PUTTING ON

15   IN OUR OBVIOUSNESS DEFENSE.  THE SECONDARY CONSIDERATIONS

16   ARGUE IN FAVOR OF OBVIOUSNESS, NOT IN FAVOR OF

17   NON-OBVIOUSNESS.  SO WE WOULD BE PUTTING ON -- SO WE EITHER

18   BRING HIM BACK FOR A SHORT FEW MINUTES OF QUESTIONS, OR GO I

19   AHEAD AND COVER IT NOW.  IT IS NOT SIMPLY THE PLAINTIFF THAT

20   GETS TO PUT ON SECONDARY CONSIDERATIONS.

21         THE COURT:  MR. CAPP, DO YOU OBJECT TO HIM GOING

22   INTO THAT NOW?

23         MR. CAPP: WELL, IF HE -- IF HE REALLY FEELS THE

24   NEED.  BUT THE POINT IS, THE ABSENCE OF COMMERCIAL SUCCESS,

25   YOU KNOW, ONE WAY OR THE OTHER, IS A NEUTRAL FACTOR.  SO HE

1   BASICALLY IS ASKING THE COURT TO DO SOMETHING THAT IS

2   IRRELEVANT.  BUT IF HE WANTS TO DO IT, AND YOUR HONOR WANTS

3   TO LET HIM, AND THAT WILL SHORTEN THE TRIAL, I AM ALL FOR

4   IT.

5           THE COURT:  GO AHEAD MR. HARBIN.

6   BY MR. HARBIN:

7   Q. MR. STRANGE, CHEMFREE MADE ITS FIRST COMMERCIAL SALE IN

8   APPROXIMATELY LATE 1994, THE FIRST PARTS WASHER?

9   A. THAT SOUNDS REASONABLE.

10  Q. AND AS OF THE YEAR 2000, YOUR PREDICTION -- WELL,

11  CHEMFREE HAD NOT MADE PROFITS GENERALLY AS OF 2000?

12  A. AS OF 2000, I DO NOT BELIEVE WE HAD.

13  Q. AND YOUR ANTICIPATION OF THE MARKET IN 2000 WAS THAT THE

14  FUTURE MARKET WAS MEDIOCRE; CORRECT?

15  A. I DON'T REMEMBER IF I SAID THAT.  SHOW ME AND I WILL TRY

16  TO LOOK AT WHAT I SAID AROUND IT.

17  Q. IF YOU CAN LOOK AT YOUR 2000 DEPOSITION, SIR, PAGE 32, I

18  THINK.  AND YOU WERE ASKED FOR YOUR PREDICTION OR AS TO THE

19  FUTURE MARKET, WHAT YOU SAW AS A FINANCIAL FUTURE POTENTIAL

20  FOR THE PRODUCT, AND YOU SAID IT IS MEDIOCRE.  CORRECT?

21  A. THE QUESTION WAS FAIRLY LONG, AND IT ALSO WAS PREDICATED

22  BY QUESTIONS, WHAT HAVE YOU AS A POTENTIAL MARKET, WHAT HAVE

23  YOU AS YOUR VIEW OF THE CURRENT MARKET.  AND I SAID

24  BASICALLY I DON'T KNOW, I DON'T KNOW WHAT THE NUMBERS ARE.

25  AND SOMEBODY SAID WHAT YOU VIEW AS POTENTIAL FOR THE FUTURE,

1   AND I AM NOT TALKING ABOUT NUMBERS, I AM TALKING ABOUT A

2   DESCRIPTION OF THE MARKET FOR BIOWASHERS AS TIME GOES BY, IS

3   IT EXCELLENT OR MEDIOCRE.  AND I SAID IT'S MEDIOCRE.  AND HE

4   SAYS, WHY DO YOU SAY IT IS MEDIOCRE?  THE HISTORY OF FIVE

5   YEARS PROVES THAT IS NOT ANYTHING THAT THE MARKET IS

6   STANDING OUT READY TO JUMP AND BUY.  AND THAT IS EXACTLY

7   WHAT I MEANT, THAT THE MARKET IS NOT SAYING GIVE IT TO ME, I

8   AM READY TO RUN WITH IT.  I WASN'T TALKING ABOUT THE FUTURE

9   OF CHEMFREE, I WAS TALKING ABOUT THE MARKET WASN'T SAYING I

10  AM FOR IT LET'S GO RUN WITH IT.

11  Q. AND EVEN TODAY, YOU VIEW YOUR CURRENT MAIN COMPETITOR AS

12  SOLVENT PARTS WASHERS; CORRECT?

13  A. IN TERMS OF NUMBERS, CERTAINLY SOLVENT PARTS WASHERS

14  OVERWHELM THE OTHER PARTS WASHERS.

15  Q. AND EVEN TODAY, CHEMFREE IS FACING RESISTANCE FROM OWNERS

16  OF SOLVENT PARTS WASHERS; CORRECT?  RESISTANCE TO REPLACE A

17  SOLVENT WASHER WITH --

18  A. IT'S ALWAYS DIFFICULT TO GET PEOPLE TO REPLACE WHAT THEY

19  HAVE WITH SOMETHING NEW.

20  Q. IT'S NOT JUST THERE IS STILL A PERCEPTION AMONG MANY

21  SOLVENT WASHERS THAT SOLVENT WASHERS CLEAN BETTER THAN WATER

22  BASED OR AQUEOUS?

23  A. I AM NOT TALKING TO THE CUSTOMERS, SO I CAN'T SAY THAT TO

24  BE ABSOLUTELY CORRECT.

25  Q. DID YOU GIVE AN UPDATE TO ANALYSTS AS A WEEK OR A WEEK

1   AND A HALF AGO?

2   A. I DID.

3   Q. AND THAT IS PUBLICLY AVAILABLE ON CHEMFREE'S WEBSITE,

4   ISN'T IT?

5   A. IT IS PUBLICLY AVAILABLE TO ALL SHAREHOLDERS OR TO

6   ANYBODY.

7   Q. AND DID YOU TELL THE CUSTOMERS THAT THE MAIN COMPETITION

8   REALLY IS TRADITIONAL SOLVENT-BASED MACHINES AND SIMPLY

9   CUSTOMERS' RESISTANCE TO ANY KIND OF CHANGE?

10  A. YOU'VE GOT A RECORDING OF IT.  THAT MAY BE WHAT I SAID.

11  Q. AND THAT THERE IS AN INHERENT BELIEF THAT YOU CAN'T CLEAN

12  AS WELL IF YOU USE A WATER BASED PRODUCT VERSUS A CHEMICAL

13  BASED PRODUCT?

14  A. I THINK THAT IS A GENERAL FEELING, THAT YOU CAN DO BETTER

15  WITH CHEMICALS THAN YOU CAN WITH WATER.

16        MR. HARBIN:  THAT IS ALL I HAVE YOUR HONOR.

17        THE COURT:  ALL RIGHT.  MR. CAPP, ANY REDIRECT?

18        MR. CAPP:  YOUR HONOR, I DON'T HAVE ANY REDIRECT

19  BUT IT WOULD BE PERTINENT -- SO MR. STRANGE CAN STEP DOWN;

20  RIGHT?  IT WOULD BE WORTHWHILE TO POINT OUT AT THIS TIME

21  THAT THE PARTIES HAVE STIPULATED TO A JOINT EXHIBIT LIST.

22  AND THE ONE THAT IS RELEVANT FOR ME TO BRING TO THE COURT'S

23  ATTENTION AT THIS TIME WOULD BE JOINT EXHIBIT 21, WHICH IS

24  UNITED STATES PATENT NO. 5,961,733 WHICH NAMES MR. STRANGE

25  AS THE SOLE INVENTOR AND IS DIRECTED TO THE PARTICULAR

1    FILTER WITH THE MICROORGANISMS ADHERED TO THAT WE JUST HEARD

2    ABOUT IN CROSS-EXAMINATION WITH RESPECT TO THE ARGUMENT THAT

3    IT WASN'T SUFFICIENTLY, YOU KNOW, NOVEL THAT IT WARRANTED

4    HIM BEING NAMED AS AN INVENTOR.

5             THE COURT:  ALL RIGHT.  IF THERE IS NO OBJECTION,

6    THAT EXHIBIT IS ADMITTED.  ALL RIGHT.  MR. STRANGE, YOU MAY

7    STEP DOWN.  THANK YOU.  WHO IS YOUR NEXT WITNESS?

8             MR. ANDERSON:  YOUR HONOR, THE PLAINTIFFS WOULD

9    LIKE TO CALL MR. TIMOTHY HOUGHTON.  YOUR HONOR, IF I MAY

10   APPROACH, WE HAVE A NOTEBOOK WITH EXHIBITS FOR MR. HOUGHTON

11   AND I NOTICE THERE ARE PREVIOUS EXHIBITS LEFT FROM THE

12   PREVIOUS WITNESS THAT I WOULD LIKE TO CLEAR AWAY.

13             THE COURT:  THAT IS FINE.

14                         TIMOTHY HOUGHTON

15                        PLAINTIFF'S WITNESS

16                              SWORN

17                        CROSS-EXAMINATION

18   BY MR. ANDERSON:

19   A. MY NAME IS TIM HOUGHTON, H-O-U-G-H-T-O-N.

20   Q. GOOD AFTERNOON, MR. HOUGHTON.

21   A. GOOD AFTERNOON.

22   Q. MY NAME IS LUKE ANDERSON.  I REPRESENT CHEMFREE IN THIS

23   MATTER.  I BELIEVE YOU AND I HAD AN OPPORTUNITY TO MEET ONCE

24   BEFORE AT YOUR DEPOSITION IN THIS MATTER.  IT IS GOOD TO SEE

25   YOU HERE IN ATLANTA, SIR.  MR. HOUGHTON, COULD WE BEGIN BY

1   HAVING YOU TELL US WHO YOU ARE CURRENTLY EMPLOYED BY?

2   A. YES.  I AM CURRENTLY EMPLOYED WITH WALTER SERVICE

3   TECHNOLOGIES.  OUT OF MONTREAL CANADA.

4   Q. AND I AM SORRY, I DIDN'T HEAR THE FULL NAME.  WALTER

5   SERVICE --

6   A. WALTER SERVICE TECHNOLOGIES.

7   Q. IS THAT COMPANY SEPARATE AND DISTINCT FROM WALTER

8   COMPANY, LIMITED, WHICH IS A DEFENDANT IN THIS ACTION?

9   A. NO.  THE U.S. OPERATION, JUST FROM A BUSINESS STANDPOINT,

10  IS J. WALTER, INC. AND THE CANADIAN OPERATION IS J. WALTER

11  INC., LTD.

12  Q. WHAT IS YOUR POSITION WITH WALTER SERVICE TECHNOLOGIES,

13  SIR?

14  A. I AM THE PRESIDENT AND COO.

15  Q. AND WHAT DO YOUR DUTIES INCLUDE AS PRESIDENT AND COO OF

16  WALTER SERVICE TECHNOLOGIES?

17  A. I AM RESPONSIBLE FOR ALL OF THE NORTH AMERICA AND SOUTH

18  AMERICA OPERATIONS.

19  Q. AND IN YOUR CAPACITY AS PRESIDENT AND COO, ARE YOU

20  RESPONSIBLE FOR GENERATING REVENUE?

21  A. THAT IS CORRECT.

22  Q. CONTROLLING COSTS?

23  A. YES.

24  Q. BRINGING NEW PRODUCTS TO MARKET?

25  A. YES.

1  Q. AND WITHIN WALTER SERVICE TECHNOLOGIES, IS THAT A

2  BUSINESS UNIT THAT IS FOCUSED ON BIOREMEDIATING PARTS

3  WASHERS?

4  A. IS THERE A SEPARATE BUSINESS UNIT?

5  Q. WELL, LET ME WITHDRAW THE QUESTION.  WALTER SERVICE

6  TECHNOLOGIES, WHAT TYPES OF PRODUCTS OR SERVICES DOES THAT

7  PROVIDE?

8  A. WE SELL ABRASIVES AND INDUSTRIAL SOLUTIONS.  THAT IS OUR

9  LEGACY PRODUCTS:  ABRASIVE PRODUCTS, GRINDING WHEELS.  WE

10  ALSO SELL CHEMICAL SOLUTIONS.  IT'S ANOTHER SIDE OF OUR

11  BUSINESS, WHICH INCLUDES BIO-CIRCLE.

12  Q. AND BY "BIO-CIRCLE," YOU ARE REFERRING TO THE

13  BIOREMEDIATING PARTS WASHER SYSTEMS THAT WE ARE HERE ABOUT

14  TODAY?

15  A. CORRECT.

16  Q. PRIOR TO YOUR POSITION WITH WALTER SERVICE TECHNOLOGIES,

17  WHAT POSITION DID YOU HOLD?

18  A. I HELD THE POSITION WITH MSE DISTRICT SUPPLY AS A GENERAL

19  MANAGER.

20  Q. WAS THERE A POINT IN TIME WHEN YOU WERE PRESIDENT OF J.

21  WALTER, INC., THE U.S. DEFENDANT IN THIS LAWSUIT?

22  A. YES, I WAS.

23  Q. AND THE POSITION THAT YOU HOLD NOW AS PRESIDENT AND COO

24  OF WALTER SERVICE TECHNOLOGIES IS A SEPARATE POSITION?

25  A. YES.

1   Q. AND SO YOU HAVE RECEIVED A PROMOTION FROM PRESIDENT OF J.

2   WALTER, INC., WHO IS ONE OF THE DEFENDANTS IN THIS LAWSUIT,

3   TO YOUR CURRENT POSITION?

4   A. THAT IS CORRECT.

5   Q. HOW RECENTLY HAS THAT PROMOTION BEEN?

6   A. IT WAS JULY OF '08 IS WHEN I WAS PROMOTED.

7   Q. LET'S TALK A LITTLE BIT ABOUT YOUR TENURE AS IT BEGAN

8   WITH J. WALTER, INC.  YOUR TENURE WITH J. WALTER, INC. BEGAN

9   ON MAY 16TH OF 2005?

10  A. CORRECT.

11  Q. AT THAT POINT IN TIME, THE LAWSUIT THAT WE ARE HERE ABOUT

12  TODAY WAS CURRENTLY PENDING?

13  A. THAT IS CORRECT.

14  Q. AND SO THROUGHOUT THE DURATION OF YOUR TENURE WITH J.

15  WALTER, INC. AND WALTER SERVICES TECHNOLOGY, THIS LAWSUIT

16  HAS BEEN PENDING?

17  A. CORRECT.

18  Q. WHO DID YOU REPORT TO AS PRESIDENT OF J. WALTER, INC.?

19  A. P. R. SOMERS.

20  Q. AND WHO IS THAT, SIR?

21  A. HE IS THE OWNER OF THE COMPANY.

22  Q. IN YOUR POSITION CURRENTLY AS PRESIDENT AND COO OF WALTER

23  SERVICE TECHNOLOGIES, WHO DO YOU REPORT TO?

24  A. P. R. SOMERS.

25  Q. WHEN WE LOOK BACK TO THE TIME THAT YOU WERE PRESIDENT OF

1   J. WALTER, INC., YOU WERE RESPONSIBLE FOR THE ENTIRE

2   BUSINESS?

3   A. IN THE U.S.A.

4   Q. IN THE U.S.?

5   A. YES.

6   Q. WHICH INCLUDED GROWING THE BUSINESS?

7   A. CORRECT.

8   Q. GENERATING REVENUE?

9   A. YES.

10   Q. REDUCING COSTS?

11   A. YES.

12   Q. AS J. WALTER'S PRESIDENT HERE FOR THE U.S., YOU ALSO

13   APPROVED ADVERTISEMENTS BEFORE THEY WERE RELEASED; IS THAT

14   CORRECT, SIR?

15   A. YES.

16   Q. YOU HAD THE FINAL SAY AS FAR AS THE APPROVAL OF J.

17   WALTER, INC.'S ADVERTISEMENTS?

18   A. YES.

19   Q. YOU ARE AWARE THAT WE HAVE TWO DEFENDANTS IN THIS

20   LAWSUIT, J. WALTER, INC. AND J. WALTER COMPANY, LIMITED.

21   COULD YOU HELP US UNDERSTAND WHAT THE CORPORATE RELATIONSHIP

22   IS BETWEEN THOSE TWO DEFENDANTS, SIR?

23   A. WELL, THE COMPANY STARTED IN 1952 AS J. WALTER AND

24   COMPANY, LTD IN MONTREAL CANADA.  THAT IS BASICALLY THE

25   STARTING POINT OF THE ORGANIZATION.  AS THE ORGANIZATION

1    STARTED TO GROW, WE'VE ADDED COMPANIES IN DIFFERENT

2    COUNTRIES, AND IN THE STATES IT BECAME J. WALTER, INC., AND

3    THAT WAS THE FOOTHOLD AS A SEPARATE ENTITY IN THE UNITED

4    STATES.

5    Q. IS J. WALTER, INC., THE U.S. COMPANY, IS IT A SUBSIDIARY

6    OF J. WALTER COMPANY, LIMITED, THE CANADIAN ENTITY?

7    A. NO, IT'S NOT.

8    Q. HOW ARE THOSE TWO COMPANIES RELATED?

9    A. THEY ARE SEPARATE ENTITIES ALTOGETHER.

10   Q. AS FAR AS J. WALTER, INC., THE U.S. COMPANY, WHAT IS THE

11   PRIMARY PRODUCTS THAT THEY SELL HERE IN THE UNITED STATES?

12   A. VERY SIMILAR TO CANADA, BUT THEY SELL ABRASIVE PRODUCTS

13   INTO THE WELDING MARKET SEGMENT AND THEY SELL CHEMICAL

14   CLEANING PRODUCTS INTO THE WELDING MARKET SEGMENT.

15   Q. AS WELL AS SELLING THE BIOREMEDIATING PARTS WASHERS AND

16   THE CLEANING FLUIDS THAT WE ARE HERE TO TALK ABOUT TODAY,

17   SIR?

18   A. YES.  CORRECT.

19   Q. CURRENTLY, J. WALTER --

20        MR. HARBIN:  YOUR HONOR, CAN WE ASK THAT

21   MR. HOUGHTON OR THE COURT ASK HIM TO PULL THE MIKE A LITTLE

22   CLOSER.  I CAN'T HEAR.

23        MR. ANDERSON:  I WOULD APPRECIATE THAT AS WELL.

24        THE COURT:  HOW IS THAT?

25        MR. HARBIN:  OKAY.

1    BY MR. ANDERSON:

2    Q. MR. HOUGHTON, COMING BACK TO TALK ABOUT J. WALTER, INC.,

3    THE U.S. ENTITY, HOW MANY EMPLOYEES DOES J. WALTER, INC.

4    CURRENTLY HAVE?

5    A. 65.

6    Q. AND HOW HAS THAT NUMBER OF EMPLOYEES CHANGED OVER YOUR

7    TENURE WITH THE COMPANY?

8    A. IT'S LOWER.

9    Q. BY?

10   A. FIVE.

11   Q. BY FIVE?

12   A. BY FIVE.

13   Q. THANK YOU, SIR.  LAST YEAR WHAT WAS THE TOTAL REVENUE FOR

14   J. WALTER, INC. HERE IN THE UNITED STATES?

15   A. JUST UNDER 20 MILLION.

16   Q. AND THAT'S ACROSS ALL THE PRODUCT LINES THAT WE HAVE

17   TALKED ABOUT?

18   A. THAT IS CORRECT.

19   Q. LET'S TRANSITION AND TALK ABOUT J. WALTER, LIMITED, THE

20   CANADIAN ENTITY.  HOW MANY EMPLOYEES DOES J. WALTER, LIMITED

21   HAVE?

22   A. 135.

23   Q. AND HOW HAS THAT NUMBER CHANGED THROUGHOUT YOUR TENURE

24   WITH THE COMPANY?

25   A. IT WAS 139.

1  Q. SO IT HAS ALSO SEEN A MILD HEAD COUNT REDUCTION?

2  A. CORRECT.

3  Q. AND HAS THAT BEEN FAIRLY RECENTLY?

4  A. YES.

5  Q. WHEN WE SPOKE AT YOUR DEPOSITION BACK IN 2007, I HAD

6  ASKED YOU ABOUT THE MARKET SIZE AS YOU UNDERSTOOD IT FOR THE

7  NUMBER OF BIOREMEDIATING PARTS WASHERS.  I BELIEVE AT THE

8  TIME YOU -- SORRY.  LET ME WITHDRAW.  I ASKED YOU FOR THE

9  TOTAL MARKET SIZE OF PARTS WASHERS IN THE UNITED STATES.

10  AND AT THE TIME YOU HAD ESTIMATED FOR ME, I BELIEVE,

11  SOMEWHERE BETWEEN 400,000 AND 600,000 UNITS IN THE UNITED

12  STATES.  DOES THAT SOUNDS ABOUT RIGHT?

13  A. BASED ON MY DEPOSITION, YES.

14  Q. HAS THAT ESTIMATE CHANGED AT ALL HERE IN 2009 FOR THE

15  NUMBER OF UNITS OF PARTS WASHERS IN THE UNITED STATES?

16  A. I WOULD SAY YEAH, THE ESTIMATE IS HIGHER.

17  Q. AND WHAT WOULD THAT ESTIMATE BE?

18  A. IT'S SOMEWHERE BETWEEN A MILLION TWO AND A MILLION FIVE.

19  SOLVENT PARTS WASHERS.

20  Q. THE CUSTOMERS OF J. WALTERS PARTS WASHERS HERE IN THE

21  UNITED STATES ARE MAINLY INDUSTRY MANUFACTURING, GOVERNMENT

22  SERVICES AND THE AUTOMOTIVE SECTOR?

23        MR. HARBIN:  OBJECTION TO THE FORM OF THE

24  QUESTION.  COMPOUND.

25        THE COURT:  WHAT WAS THE OBJECTION?

1    MR. HARBIN:  THAT IT IS COMPOUND, YOUR HONOR.

2    THE COURT:  BREAK IT UP.

3    BY MR. ANDERSON:

4    Q. MR. HOUGHTON, WHAT ARE THE MAJOR MARKET SEGMENTS THAT J.

5    WALTER, INC. SELLS TO HERE IN THE UNITED STATES?

6    A. WE ARE FOCUSED ON THE INDUSTRIAL MANUFACTURING MARKET

7    SEGMENT.  WE ARE FOCUSED ON THE GOVERNMENT MILITARY MARKET

8    SEGMENTS AND AEROSPACE MARKET SEGMENT.

9    Q. ARE YOU FOCUSED ON AUTOMOTIVE?

10   A. NOT AT ALL.

11   Q. HAVE YOU EVER BEEN FOCUSED ON AUTOMOTIVE?

12   A. NO.

13   Q. WHO ARE J. WALTER, INC.'S LARGEST BIO-CIRCLE CUSTOMERS

14   HERE IN THE UNITED STATES?

15   A. MILITARY BASES.  THAT'S WHERE WE'VE BEEN VERY SUCCESSFUL.

16   I WOULD SAY INDUSTRIAL MANUFACTURING FOOD PLANTS LIKE KRAFT

17   FOODS.  I WOULD SAY PRATT & WHITNEY, AEROSPACE.

18   Q. SOME OF YOUR CUSTOMERS ALSO INCLUDE GEORGIA PACIFIC?

19   A. I AM NOT SURE, I DON'T KNOW THAT.

20   Q. COCA-COLA?

21   A. I AM NOT SURE.

22   Q. PEPSI?

23   A. I AM NOT SURE.

24   Q. XEROX?

25   A. PROBABLY.

1    Q. GENERAL ELECTRIC?

2    A. PROBABLY.

3    Q. FORD?

4    A. I AM NOT SURE.

5    Q. LEXUS?

6    A. I AM NOT SURE.

7    Q. TOYOTA?

8    A. MAYBE.

9    Q. BMW?

10   A. I AM NOT SURE.

11   Q. MR. HOUGHTON, LET'S TALK A LITTLE BIT ABOUT THE VARIOUS

12   TYPES OF PARTS WASHERS THAT ARE OUT THERE.  ONE GOES TO LOOK

13   AT OR EVALUATE BUYING A PARTS WASHER, THERE IS SIMPLY A

14   CHOICE OF THREE TYPES OF PARTS WASHERS THAT ARE AVAILABLE ON

15   THE MARKET.  THOSE PARTS WASHERS ARE BIOREMEDIATING, SOLVENT

16   AND AQUEOUS.

17   A. I DIDN'T KNOW IT WAS A QUESTION.

18   Q. ARE THOSE THE THREE TYPES OF PARTS WASHERS THAT ARE

19   GENERALLY AVAILABLE?

20   A. YES.

21   Q. SOLVENT PARTS WASHERS USE CHEMICALS?

22   A. CORRECT.

23   Q. AND THOSE CHEMICALS CAN BE HARSH?

24   A. YES.

25   Q. J. WALTER DOES NOT OFFER FOR SALE ANY SOLVENT PARTS

1    WASHERS, DOES IT?

2    A. NO, WE DO NOT.

3    Q. AQUEOUS PARTS WASHERS ARE WATER BASED?

4    A. NO, WE DO NOT.

5    Q. I AM JUST ASKING IN GENERAL.  AQUEOUS PARTS WASHERS

6    OPERATE ON WATER SYSTEMS?

7    A. CORRECT.

8    Q. AND YOU DON'T OFFER ANY AQUEOUS PARTS WASHERS FOR SALE,

9    DO YOU?

10   A. NO, WE DO NOT.

11   Q. J. WALTER IS STRICTLY OFFERING BIODEGRADING PARTS WASHERS

12   FOR SALE?

13   A. YES.  THAT IS CORRECT.

14   Q. PART OF J. WALTER'S MARKETING STRATEGY IS TO DISPLACE THE

15   SALE OF SOLVENT PARTS WASHERS AND AQUEOUS PARTS WASHERS?

16   A. CORRECT.

17   Q. ONE WAY THAT J. WALTER DIFFERENTIATES ITS BIOREMEDIATING

18   PARTS WASHERS FROM SOLVENT PARKS IS THAT THERE IS NO

19   DISCHARGE OR COLLECTING OF HAZARDOUS SOLVENTS.

20   A. CORRECT.

21   Q. THE REASON THAT J. WALTERS BIOREMEDIATING PARTS WASHERS

22   DOESN'T NEED HAZARDOUS CHEMICALS IS BECAUSE YOU ARE USING

23   THE BIO-CIRCLE L FLUID INSTEAD OF A SOLVENT.

24   A. YES.

25   Q. J. WALTER INC., THE U.S. COMPANY INVOLVED IN THIS

1  LITIGATION, DOES NOT MANUFACTURE THE BIO-CIRCLE PARTS

2  WASHERS ITSELF, DOES IT?

3  A. NO, WE DO NOT.

4  Q. J. WALTER, INC., THE U.S. COMPANY INVOLVED IN THIS

5  LITIGATION, DOES NOT MANUFACTURE THE BIO-CIRCLE L FLUID

6  ITSELF EITHER?

7  A. NO, WE DO NOT.

8  Q. J. WALTER, INC. BUYS THE BIO-CIRCLE PARTS WASHERS FROM J.

9  WALTER, LIMITED.

10  A. THAT IS CORRECT.

11  Q. AND J. WALTER, LIMITED IS THE CANADIAN DEFENDANT IN THIS

12  LAWSUIT; CORRECT?

13  A. TO THE BEST OF MY KNOWLEDGE.  YES.

14  Q. J. WALTER, INC. BUYS THE BIO-CIRCLE L CLEANING FLUID FROM

15  J. WALTER LIMITED AS WELL?

16  A. CORRECT.

17  Q. J. WALTER -- I WILL WITHDRAW THAT QUESTION I STARTED,

18  YOUR HONOR.  WHEN YOU BECAME PRESIDENT OF J. WALTER, INC. IN

19  MAY OF 2005, WHAT WERE THE AVAILABLE BIOREMEDIATING PARTS

20  WASHERS THAT WERE BEING OFFERED FOR SALE AT THAT POINT?

21  A. CLARIFY THAT.  BY US?

22  Q. BY YOU.  YES, SIR.

23  A. WE WERE SELLING THE BIO-CIRCLE, BR 200.

24  Q. AT THE TIME WERE YOU ALSO OFFERING THE BR 100 FOR SALE?

25  A. NO, NOT TO MY KNOWLEDGE.

1  Q. AT THE TIME WERE YOU OFFERING THE IO 200?

2  A. NO, NOT YET.  IT DIDN'T COME OUT.  IT CAME OUT IN THE

3  FALL OF '05.

4  Q. AND WHEN DID THE IO 400 COME OUT?

5  A. IF I RECALL, WHEN I WAS THERE ALREADY.  WHEN I CAME IN.

6  Q. SORRY.  I STILL DIDN'T HEAR YOU.

7  A. WHEN I ARRIVED, WE WERE SELLING THAT, WHEN I CAME IN IN

8  MAY OF '05.

9  Q. THE IO 400 WAS BEING OFFERED FOR SALE AT THAT TIME?

10  A. NO.  THE BR 200.  THE IO 400 CAME OUT IN OCTOBER OF 2005.

11  Q. AT THE TIME THAT YOU BECAME -- ASSUMED THE POSITION OF

12  PRESIDENT OF J. WALTER, INC., WE'VE ALREADY ESTABLISHED THIS

13  LAWSUIT WAS PENDING; CORRECT?

14  A. CORRECT.

15  Q. IT WOULD HAVE BEEN WITHIN YOUR POWER AND AUTHORITY AS

16  PRESIDENT OF J. WALTER, INC. TO PULL THE ALLEGEDLY

17  INFRINGING UNITS FROM THE MARKET?

18  A. NO.

19  Q. AS PRESIDENT OF J. WALTER, INC., YOU DID NOT HAVE THE

20  AUTHORITY TO PULL THE UNITS FROM THE MARKET?

21  A. NO.

22  Q. DO YOU HAVE AN UNDERSTANDING AS TO WHY THE UNITS, THE

23  ALLEGEDLY INFRINGING UNITS IN THIS LAWSUIT WERE NOT PULLED

24  FROM THE MARKET?

25  A. WE DIDN'T FEEL THAT THE --

1      MR. HARBIN:  YOUR HONOR, I AM NOT MOVING FOR A

2  MISTRIAL, BUT THIS QUESTION IS IRRELEVANT.  THE ISSUE OF

3  WILLFULNESS HAS BEEN RESERVED FOR THE SECOND PHASE, IF WE

4  REACH THE SECOND PHASE.  IT HAS NOTHING TO DO, I DON'T

5  THINK, WITH THE INFRINGEMENT OF THE --

6      THE COURT:  WHAT ABOUT THAT, MR. ANDERSON?

7      MR. ANDERSON:  THIS ALSO GOES TO THE ISSUE OF

8  INTENT AS IT RELATES TO CONTRIBUTORY INFRINGEMENT.  UNLIKE

9  DIRECT INFRINGEMENT, WHICH DOES NOT REQUIRE A SHOWING OF

10  INTENT, CONTRIBUTORY INFRINGEMENT DOES HAVE AN INTENT

11  ELEMENT, AND THEREFORE, SINCE WE ARE ALSO INQUIRING INTO

12  THOSE ISSUES, I DO BELIEVE THAT THE INTENT --

13      THE COURT:  OVERRULED.  YOU MAY ANSWER THE

14  QUESTION.

15      THE WITNESS:  CAN YOU REPEAT THE QUESTION?

16      THE COURT:  YEAH.  REPEAT YOUR QUESTION, PLEASE.

17  BY MR. ANDERSON:

18  Q. AT THE TIME THAT YOU -- AS PRESIDENT OF J. WALTER, INC.,

19  WHY DID YOU ELECT TO NOT PULL THE ALLEGEDLY INFRINGING UNITS

20  FROM THE U.S. MARKETPLACE?

21  A. BECAUSE WHEN I JOINED THE COMPANY IN MAY OF 2005, THAT

22  WAS MY FIRST DAY ON THE JOB, AND I WAS JUST BEING -- GETTING

23  FAMILIAR WITH THE PRODUCTS THAT WERE BEING SOLD.  AND AT THE

24  TIME I REALLY WASN'T EVEN BROUGHT UP TO SPEED ON THE LAWSUIT

25  THAT CHEMFREE AND THAT WE CHEMFREE AND WE WERE INVOLVED

1   WITH.  I DIDN'T GET INVOLVED WITH THE LAWSUIT UNTIL PROBABLY
2   THE END OF THE YEAR.  SO I WASN'T ACTIVELY INVOLVED IN THE
3   CHEMFREE CASE.
4   Q. WHEN YOU DID GET INVOLVED WITH IT AT THE END OF THE YEAR,
5   IN 2005, AT THAT POINT DID YOU MAKE ANY CONSCIOUS DECISION
6   TO EITHER CONTINUE SELLING UNITS IN THE U.S. MARKET OR TO
7   WITHDRAW THEM?
8   A. WE FELT THAT WE WERE NOT INFRINGING WITH OUR PARTS
9   WASHERS.  AND ALSO THE SOLUTION.  SO THERE WAS NO REASON TO
10  PULL THE PARTS WASHERS FROM THE MARKETPLACE.  IT'S A
11  SIGNIFICANTLY DIFFERENT SOLUTION.
12  Q. THIS COURT ISSUED ITS MARKMAN CLAIM CONSTRUCTION RULING
13  ON JULY 17TH OF 2007.  AT ANY POINT AFTER THE COURT ISSUED
14  ITS JULY 17TH OF 2007 MARKMAN RULING, WAS THERE A DECISION
15  YOU MADE TO EITHER CONSCIOUSLY CONTINUE SELLING UNITS IN THE
16  UNITED STATES OR TO WITHDRAW THEM?
17  A. AGAIN, WE DO NOT FEEL THAT WE HAVE INFRINGED IN ANY WAY
18  ON THE PRODUCTS, WITH OUR PARTS WASHERS OR THE SOLUTION.
19  THEY ARE COMPLETELY TWO DIFFERENT SOLUTIONS AND MACHINES.
20  Q. SO FOLLOWING THE COURT'S JUNE 10TH -- SORRY, JULY 17TH
21  CLAIM CONSTRUCTION RULING, NO EFFORT WAS MADE TO RE-EVALUATE
22  WALTER'S POSITION ON THE ISSUE OF INFRINGEMENT?
23  A. NO.
24  Q. I BELIEVE YOU INDICATED THAT THE IO 400 WAS CURRENTLY NOT
25  BEING OFFERED FOR SALE IN THE UNITED STATES WHEN YOU JOINED

1    THE COMPANY IN MAY OF 2005; IS THAT CORRECT?

2    A. TO THE BEST OF MY KNOWLEDGE.  YES.

3    Q. IS THE IO 400 AN INTENTIONAL ATTEMPT TO DESIGN AROUND

4    CHEMFREE'S PATENTS IN THIS LAWSUIT?

5    A. I AM NOT INVOLVED WITH THE RESEARCH AND DEVELOPMENT SO I

6    WOULDN'T BE ABLE TO ANSWER THAT.

7    Q. WHO WOULD HAVE BEEN INVOLVED IN THE RESEARCH AND

8    DEVELOPMENT THAT MIGHT BE ABLE TO ANSWER THAT QUESTION?

9    A. WE HAVE A RESEARCH AND DEVELOPMENT TEAM.

10   Q. HEADED BY WHOM?

11   A. CLAUDE VANDEMEULEBROOCKE.

12   Q. MR. HOUGHTON, I WOULD LIKE TO CHANGE TOPICS AND TALK A

13   LITTLE BIT ABOUT THE DISCOVERY THAT WAS TAKEN IN THIS

14   LAWSUIT.  YOU WERE PRESIDENT OF J. WALTER, INC. DURING THE

15   TIME FRAME THAT A LARGE PART OF THE DISCOVERY WAS TAKEN IN

16   THIS CASE.  IS IT YOUR BELIEF THAT J. WALTER FULLY COMPLIED

17   WITH CHEMFREE'S REQUEST FOR THE PRODUCTION OF DOCUMENTS IN

18   THIS MATTER?

19          MR. HARBIN:  YOUR HONOR, AGAIN, I DON'T THINK THIS

20   HAS TO DO WITH THE ISSUES IN THE CASE.

21          THE COURT:  YEAH.  IF WE HAVE ISSUES WITH REGARD

22   TO DISCOVERY AND PRODUCTION, THE COURT WILL TAKE THOSE UP.

23   I AM GOING TO ASK YOU TO MOVE ON, MR. ANDERSON.

24          MR. ANDERSON:  VERY WELL, YOUR HONOR.

25   BY MR. ANDERSON:

1   Q. MR. HOUGHTON, WHEN WAS THE FIRST POINT THAT YOU BECAME

2   AWARE OF THE CHEMFREE'S PATENTS THAT ARE INVOLVED IN THIS

3   LAWSUIT?

4   A. WHEN I WAS DEPOSED.

5   Q. ISN'T IT TRUE THAT YOU BECAME AWARE OF THE PATENTS IN MAY

6   OF 2005 WHEN YOU FIRST JOINED J. WALTER, INC.?

7   A. NO.  WHAT I SAID WAS I WAS AWARE THAT THERE WAS A LAWSUIT

8   WITH CHEMFREE BUT I NEVER SAW THE PATENTS.

9   Q. MR. HOUGHTON, I WOULD LIKE TO DIRECT YOUR ATTENTION TO

10  THE BINDER THERE IN FRONT OF YOU.  WE WILL TALK ABOUT WHAT

11  HAS BEEN MARKED AS PLAINTIFF'S EXHIBIT NO. 166.

12  A. YES.

13  Q. DOES THIS APPEAR TO BE A TRUE AND ACCURATE COPY OF THE

14  WALTER SHARE E-MAIL DATED FEBRUARY 7TH OF 2007?

15          THE COURT:  WHAT WAS THE EXHIBIT NUMBER?

16          MR. ANDERSON:  PLAINTIFF'S EXHIBIT NO. 166.

17          THE WITNESS:  YES, IT APPEARS TO BE.

18          MR. ANDERSON:  I WOULD LIKE TO MOVE PLAINTIFF'S

19  EXHIBIT 166 INTO EVIDENCE.

20          THE COURT:  WOULD YOU OBJECT TO THAT, MR. HARBIN?

21          MR. HARBIN:  NO, YOUR HONOR.

22          THE COURT:  ADMITTED.

23  BY MR. ANDERSON:

24  Q. MR. HOUGHTON, LET'S TALK FIRST ABOUT THE WALTER SHARE

25  TEAM.  THAT IS THE PARTY TO WHOM THIS E-MAIL IS ADDRESSED.

1    CAN YOU TELL US WHO THE WALTER SHARE TEAM IS?

2    A. YES.  WE HAVE AN ELECTRONIC INTRANET WITHIN OUR

3    ORGANIZATION WHICH WE CALL WALTER SHARE.  AND THE WALTER

4    SHARE TEAM IS THE SALES ORGANIZATION.  WE HAVE A DIRECT

5    SALES ORGANIZATION THROUGHOUT THE WORLD SELLING PRODUCT.

6    AND SO WHAT THEY DO IS THEY CREATE SOLUTION REPORTS ARE CALL

7    REPORTS.

8    Q. ARE INDIVIDUALS OUTSIDE OF THE WALTER COMPANIES ON THE

9    WALTER SHARE DISTRIBUTION LIST?

10   A. NO, THEY ARE NOT.

11   Q. IN EXHIBIT 166, WE SEE DISCUSSION OF A VIDEO INVOLVING

12   JAY LENO; CORRECT?

13   A. CORRECT.

14   Q. THAT VIDEO HAS BEEN POSTED ON WALTER'S WEBSITE.

15   A. CORRECT.

16   Q. FOR POTENTIAL CUSTOMERS TO VIEW?

17   A. CORRECT.

18   Q. THE VIDEO HAS ALSO BEEN SHOWN TO POTENTIAL CUSTOMERS

19   DURING IN-PERSON SALES CALLS BY WALTER'S SALESPEOPLE?

20   A. CORRECT.

21   Q. THE VIDEO HAS BEEN USED IN ORDER TO PROMOTE THE SALE OF

22   THE BIO-CIRCLE PARTS WASHERS?

23   A. CORRECT.

24   Q. AND THE BIO-CIRCLE L FLUID?

25   A. CORRECT.

1  Q. IN TERMS OF HOW THE VIDEO CAME INTO EXISTENCE, JAY LENO

2  ACTUALLY CALLED YOU DIRECTLY TO DISCUSS HIS INTEREST IN THE

3  BIO-CIRCLE PARTS WASHER?

4  A. CORRECT.

5  Q. THAT WAS A MEMORABLE PHONE CALL FOR YOU, WASN'T IT?

6  A. FOR THE TEAM.  YES.

7  Q. WELL, AND FOR YOU PERSONALLY.  HE CALLED YOU, DIDN'T HE?

8  A. SURE.

9  Q. IT STANDS OUT VERY DISTINCTLY IN YOUR MIND.

10  A. CORRECT.

11  Q. HE ACTUALLY CALLED YOU ON A FRIDAY AFTER THANKSGIVING IN

12  2006.

13  A. THAT IS CORRECT.

14  Q. HE CALLED YOU ON YOUR CELL PHONE?

15  A. HE CALLED THE OFFICE.

16  Q. DID HE EXPRESS A WILLINGNESS TO SHOOT THE VIDEO REGARDING

17  THE BIO-CIRCLE SYSTEM?

18  A. CORRECT.

19  Q. JAY LENO WAS ALSO WILLING TO POST THE VIDEO ON HIS

20  GARAGE'S WEB PAGE AS WELL?

21  A. CORRECT.

22  Q. AND JAY LENO ENTHUSIASTICALLY ADOPTED THE BIO-CIRCLE

23  SYSTEM TO HANDLE HIS PARTS CLEANING NEEDS?

24  A. CORRECT.

25  Q. IN THE CONVERSATION THAT YOU HAD WITH JAY LENO ON THAT

1   FRIDAY AFTER THANKSGIVING IN 2006, DID YOU EXPLAIN TO

2   MR. LENO AT ANY POINT THAT J. WALTER HAD BEEN SUED FOR

3   PATENT INFRINGEMENT INVOLVING THE PARTS WASHERS THAT HE WAS

4   EXPRESSING A WILLINGNESS TO ENDORSE?

5   A. NO.

6   Q. AT ANY POINT IN TIME HAVE YOU HAD THE COURTESY OF

7   EXPLAINING THAT TO MR. LENO?

8   A. NO.

9   Q. I WOULD LIKE FOR US TO GO AHEAD AN TAKE A LOOK AT THE JAY

10  LENO VIDEO.  IT IS PLAINTIFF'S EXHIBIT NO. 88.  IF I COULD

11  HAVE THAT CALLED UP.

12                      (VIDEO IS PLAYED.)

13  BY MR. ANDERSON:

14  Q. MR. HOUGHTON, LOOKED LIKE YOU WERE HAVING A LOT OF FUN IN

15  THAT VIDEO.  WERE YOU?

16  A. YES.  IT'S VERY NICE TO BE ABLE TO COMMUNICATE ABOUT A

17  PRODUCT THAT'S INNOVATIVE.

18  Q. PLAINTIFF'S EXHIBIT NO. 88, THE VIDEO THAT WE JUST

19  WATCHED, IS A TRUE AND ACCURATE COPY OF THE VIDEO THAT HAS

20  BEEN POSTED ON J. WALTER'S WEBSITE?

21  A. UH-HUH (AFFIRMATIVE).  YES.

22          MR. ANDERSON:  YOUR HONOR, I WOULD LIKE TO MOVE

23  PLAINTIFF'S EXHIBIT 88 INTO EVIDENCE.

24          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

25          THE COURT:  ADMITTED.

1   BY MR. ANDERSON:

2   Q. MR. HOUGHTON, WHICH MODEL OF THE BIO-CIRCLE UNIT DID WE

3   SEE IN THE VIDEO WITH JAY LENO, PLAINTIFF'S EXHIBIT 88?

4   A. I THINK THAT WAS THE 400.

5   Q. THE IO 400?

6   A. CORRECT.  THE IO 400.

7   Q. WALTER'S SALES REPRESENTATIVES HAVE SHOWN THIS PARTICULAR

8   VIDEO TO THEIR PROSPECTIVE CUSTOMERS, HAVE THEY NOT?

9   A. YES.

10  Q. AND IN THIS VIDEO, YOU ARE DISCUSSING THE BIO-CIRCLE'S

11  FEATURES AND THE BENEFITS?

12  A. CORRECT.

13  Q. YOU ARE PROMOTING THE IDEA OF BIOREMEDIATION?

14  A. CORRECT.

15  Q. THE FACT THAT THERE ARE MICROBES THAT DIGEST THE OIL?

16  A. CORRECT.

17  Q. THAT IT IS A SELF-CONTAINED UNIT?

18  A. CORRECT.

19  Q. THAT THE OIL GOES DOWN THE DRAIN INTO THE TANK?

20  A. CORRECT.

21  Q. WHERE THE OIL IS BIOREMEDIATED?

22  A. CORRECT.

23  Q. WAS THIS FILMED IN ALL IN ONE TAKE?

24  A. I AM NOT SURE.  I DON'T THINK SO.  NO.

25  Q. HOW MANY TAKES DID IT REQUIRE?

1   A. IT WAS AT LEAST TWO.

2   Q. BEFORE FILMING STARTED, DID YOU DEMONSTRATE THE

3   BIO-CIRCLE PARTS CLEANER FOR JAY LENO OR ANYONE ELSE THAT

4   WAS PRESENT THERE FOR THE FILMING?

5   A. NO.

6   Q. AND IN THIS VIDEO, WE SEE JAY LENO USING THE PARTS

7   WASHER.

8   A. CORRECT.

9   Q. HE IS CLEANING PARTS IN THE VIDEO?

10  A. CORRECT.

11  Q. AS PRESIDENT OF J. WALTER, YOU ARE AWARE THAT THE

12  BIO-CIRCLE PARTS WASHER THAT YOU SELL IS USED AS A

13  BIOREMEDIATING PARTS WASHER BY YOUR CUSTOMERS?

14  A. YES.

15  Q. HAVE YOU EVER VISITED ONE OF WALTER'S BIO-CIRCLE PARTS

16  WASHER CUSTOMERS?

17  A. YES.

18  Q. DURING YOUR VISIT DID YOU HAVE AN OPPORTUNITY TO VISIT AT

19  ONE OF YOUR CUSTOMER'S FACILITIES?

20  A. YES, I HAVE.

21  Q. HAVE YOU HAD AN OPPORTUNITY TO SEE IT IN USE?

22  A. YES, I HAVE.

23  Q. AND IT WAS BEING USED AS A BIOREMEDIATING PARTS WASHER?

24  A. CORRECT.

25  Q. DID IT CONTAIN THE BIO-CIRCLE L FLUID?

1    A. YES, IT DID.

2    Q. HAVE YOU EVER PERSONALLY DEMONSTRATED FOR A CUSTOMER HOW

3    TO USE ONE OF THE BIO-CIRCLE SYSTEMS?

4    A. YES, I HAVE.

5    Q. DO YOU DO THAT AT THEIR FACILITY?

6    A. YES, WE DO.

7    Q. I WOULD LIKE TO TALK WITH YOU A LITTLE BIT MORE ABOUT THE

8    BIO-CIRCLE L FLUID, THE FLUID THAT IS PUT INTO THE PARTS

9    WASHER.  THE BIO-CIRCLE L SOLUTION CONTAINS THE MICROBES.

10   A. THAT IS CORRECT.

11   Q. WHAT WE'VE BEEN REFERRING TO TODAY AS THE BUGS.

12   A. CORRECT.

13   Q. THE MICROBES DIGEST THE OIL AND THE GREASE.

14   A. CORRECT.

15   Q. THESE MICROBES ARE WHAT CAUSE THE BIOREMEDIATION TO

16   OCCUR.

17   A. CORRECT.

18   Q. WITHOUT THE BIO-CIRCLE L SOLUTION J. WALTER'S PARTS

19   WASHERS CANNOT BIOREMEDIATE.

20   A. CORRECT.

21   Q. WHEN ONE OF YOUR CUSTOMERS BUYS A BIO-CIRCLE PARTS

22   WASHER, IT COMES WITH BIO-CIRCLE L FLUID.

23   A. SEPARATELY.  YES.

24   Q. WHAT DO YOU MEAN BY "SEPARATELY"?

25   A. WELL, THE MACHINE IS SHIPPED WITHOUT THE SOLUTION IN IT.

1  Q. THE SOLUTION ACCOMPANIES THE MACHINE?

2  A. CORRECT.

3  Q. SO WHEN J. WALTER SELLS A NEW BR 100, IT COMES WITH THE

4  BIO-CIRCLE L FLUID?

5  A. IF THE CUSTOMER PURCHASED THE FLUID.  THAT IS RIGHT.

6  Q. SORRY?  IF THE CUSTOMER PURCHASED --

7  A. WHEN THE CUSTOMER PURCHASES THE BIO-CIRCLE, HE PURCHASE

8  THE SOLUTION.  YES.

9  Q. WHEN J. WALTER, INC. SELLS A NEW BR 200, IT ALSO COMES

10  WITH THE BIO-CIRCLE L FLUID WITH IT.

11  A. CORRECT.

12  Q. THE SAME IS TRUE FOR THE IO 400 AND THE IO 200.  CORRECT?

13  A. CORRECT.

14  Q. TO YOUR KNOWLEDGE, J. WALTER HAS NEVER SOLD A PARTS

15  WASHER THAT DID NOT INCLUDE THE BIO-CIRCLE L FLUID ALONG

16  WITH IT?

17  A. CORRECT.

18  Q. ONCE J. WALTER HAS MADE THE INITIAL SALE OF A PARTS

19  WASHER TO A CUSTOMER IT IS CUSTOMARY FOR J. WALTER TO GET

20  THE FELLOWSHIP SALES OF THE BIO-CIRCLE L FROM THOSE SAME

21  CUSTOMERS?

22  A. THAT IS TRUE BUT THROUGH DISTRIBUTION.  WE ONLY SELL THE

23  PRODUCT THROUGH DISTRIBUTION.  SO THE DISTRIBUTOR ACTUALLY

24  GETS THE SALE.  SO.

25  Q. BUT IN RETURN, YOU ARE ALSO SELLING THE FLUID TO

1    DISTRIBUTORS?

2    A. CORRECT.

3    Q. J. WALTER PROMOTES IT BIO-CIRCLE PARTS WASHERS THROUGH

4    ADVERTISEMENT; CORRECT?

5    A. CORRECT.

6    Q. YOU ARE PROMOTING THEM STRICTLY FOR USE AS A PARTS

7    WASHER?

8    A. CORRECT.

9    Q. J. WALTER'S ADVERTISEMENTS -- LET ME WITHDRAW THAT AND

10   START OVER AGAIN, YOUR HONOR.  J. WALTER'S ADVERTISEMENTS,

11   YOU ARE NOT ADVERTISING OR PROMOTING ANY OTHER TYPE OF USE

12   FOR THE BIO-CIRCLE PARTS WASHER OTHER THAN USE AS A PARTS

13   WASHER?

14   A. CORRECT.

15   Q. J. WALTER HAS SALES REPRESENTATIVES HERE IN THE UNITED

16   STATES?

17   A. THAT IS CORRECT.

18   Q. YOU HAVE YOUR OWN SALES FORCE TO HANDLE THE INITIAL

19   SALES?

20   A. CORRECT.

21   Q. HOW MANY SALES REPRESENTATIVES DOES J. WALTER CURRENTLY

22   HAVE IN THE UNITED STATES?

23   A. 35.

24   Q. J. WALTER SALES REPRESENTATIVES ARE RESPONSIBLE FOR

25   PROMOTING AND SELLING THE BIO-CIRCLE SYSTEMS?

1  A. YES.

2  Q. J. WALTER SALES REPRESENTATIVES MAKE IN PERSON SALES

3  CALLS ON PROSPECTIVE CUSTOMERS?

4  A. YES.

5  Q. J. WALTER SALES REPRESENTATIVES ALSO MAKE IN PERSON

6  VISITS TO EXISTING BIO-CIRCLE CUSTOMERS?

7  A. YES.

8  Q. J. WALTER SALES REPRESENTATIVES MAKE IN PERSON VISITS TO

9  EXISTING BIO-CIRCLE CUSTOMERS IN ORDER TO MAKE FOLLOW-ON

10  SALES?

11  A. YES.

12  Q. THEY ALSO WILL MAKE A VISIT IF THERE IS A PROBLEM WITH

13  THE SYSTEM THAT NEEDS TO BE CHECKED AND EVALUATED?

14  A. YES.

15  Q. DURING THESE IN PERSON VISITS, J. WALTER SALES

16  REPRESENTATIVES ALSO HAVE AN OPPORTUNITY TO SEE THE

17  BIO-CIRCLE SYSTEMS IN OPERATION?

18  A. CORRECT.

19  Q. THEY ALSO HAVE AN OPPORTUNITY TO DO ADDITIONAL TRAINING

20  OF THE CUSTOMERS?

21  A. CORRECT.

22  Q. ON HOW TO USE THE BIO-CIRCLE SYSTEM?

23  A. CORRECT.

24  Q. AND THAT TRAINING CAN INVOLVE DEMONSTRATING FOR THE

25  CUSTOMERS HOW TO USE THE BIO-CIRCLE SYSTEM?

1    A. CORRECT.

2    Q. LET'S TALK ABOUT ADVERTISING FOR A MOMENT.  J. WALTER

3    ADVERTISES ITS PARTS WASHERS TO EDUCATION POTENTIAL

4    CUSTOMERS REGARDING THE BENEFITS OF BIOREMEDIATION OVER

5    SOLVENT PARTS WASHERS?

6    A. CORRECT.

7    Q. THAT IS DONE WITH THE INTENT THAT GREATER EDUCATION WILL

8    IN TURN LEAD TO GREATER SALES.

9    A. CORRECT.

10   Q. J. WALTER, INC., THE U.S. COMPANY DEFENDANT IN THIS

11   ACTION, MAINTAINS A WEBSITE AT WWW.JWALTER.COM?

12   A. CORRECT.

13   Q. J. WALTER, LIMITED, THE CANADIAN COMPANY IN THIS ACTION,

14   MAINTAINS THE WEBSITE WWW.WALTER.COM?

15   A. CORRECT.

16   Q. THERE IS ALSO A THIRD WEBSITE, WWW.BIO-CIRCLE.COM, THAT

17   IS ASSOCIATED WITH J. WALTER AS WELL?

18   A. IT'S -- YES.  YES.

19   Q. IS THAT -- IS WWW.BIO-CIRCLE.COM ASSOCIATED WITH WALTER

20   SERVICE TECHNOLOGIES?

21   A. YES.  IT IS WALTER SERVICE TECHNOLOGIES, IT IS NOT JUST

22   ONE COMPANY.

23   Q. I WOULD LIKE US TO TAKE A LOOK, MR. HOUGHTON, AT

24   PLAINTIFF'S EXHIBIT NO. 26, WHICH IS IN YOUR BINDER THERE,

25   SIR.  PLAINTIFF'S EXHIBIT NO. 26 YOU WILL SEE COMES FROM THE

1   BIO-CIRCLE WEBSITE.  YOU WILL SEE THAT IN THE FOOTNOTE

2   NOTATION DOWN AT THE BOTTOM OF THE PAGE.  DO YOU SEE THAT,

3   SIR?

4   A. YES, I DO.

5   Q. DOES THIS APPEAR TO BE A TRUE AND ACCURATE COPY OF

6   MATERIAL THAT IS POSTED ON WALTER'S WEBSITE?

7   A. YES.

8           MR. ANDERSON:  YOUR HONOR, I WOULD LIKE TO MOVE

9   PLAINTIFF'S EXHIBIT NO. 26 INTO EVIDENCE.

10          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

11          THE COURT:  ADMITTED.

12  BY MR. ANDERSON:

13  Q. PLAINTIFF'S EXHIBIT NO. 26 IS POSTED ON WALTER'S WEBSITE

14  IN ORDER TO EDUCATE POTENTIAL CUSTOMERS ABOUT THE ISSUES OF

15  BIOREMEDIATION.

16  A. YES.

17  Q. AND I WOULD LIKE US TO TAKE A LOOK AT THE FIRST

18  PARAGRAPH, FIRST FULL PARAGRAPH, LAST SENTENCE, IT SAYS,

19  "FOR THESE APPLICATIONS A VERY SPECIFIC TYPE OF

20  MICROORGANISM HAS BEEN SELECTED WHICH DIGESTS A VARIETY OF

21  HYDROCARBONS TYPICALLY FOUND IN INDUSTRIAL MRO APPLICATIONS

22  IN THE FORM OF OILS, LUBRICANTS AND GREASES."  DO YOU SEE

23  THAT SIR?

24  A. YES, I DO.

25  Q. LET'S TALK FIRST, WHAT IS "MRO"?

1    A. MAINTENANCE, REPAIR AND OPERATION.

2    Q. AND THAT PASSAGE THAT WE ARE LOOKING AT IS AN EXAMPLE OF

3    PROMOTING THE BIOREMEDIATING FEATURES OF THE BIO-CIRCLE

4    SYSTEM?

5    A. CORRECT.

6    Q. THE VERY SPECIFIC MICROORGANISMS THAT ARE BEING REFERRED

7    TO ARE THE ORGANISMS THAT ARE IN THE BIO-CIRCLE L FLUID?

8    A. CORRECT.

9    Q. AS LONG AS WE ARE IN THE BINDER, I WOULD LIKE US TO GO

10   AHEAD AND LOOK AT PLAINTIFF'S EXHIBIT NO. 25.  ARE YOU

11   FAMILIAR WITH PLAINTIFF'S EXHIBIT 25?

12   A. NOT REALLY.

13   Q. DO YOU RECOGNIZE THAT AS MATERIAL THAT COME FROM THE

14   BIO-CIRCLE WEB PAGE?

15   A. IT IS ATTACHED TO IT.  YEAH.

16   Q. AND THAT IS MATERIAL THAT IS POSTED THERE BY J. WALTER?

17   A. YES.

18           MR. ANDERSON:  YOUR HONOR, I WOULD LIKE TO MOVE

19   PLAINTIFF'S EXHIBIT NO. 25 INTO EVIDENCE.

20           MR. HARBIN:  NO OBJECTION, YOUR HONOR.

21           THE COURT:  IT'S ADMITTED.

22   BY MR. ANDERSON:

23   Q. I WOULD LIKE US TO LOOK AT THE LAST PARAGRAPH DOWN THERE

24   AT THE BOTTOM OF THE PAGE.  IT STATES, "USE ONLY BIO-CIRCLE

25   L LIQUID IN THE SYSTEM.  FOR THE LIQUID TO EFFECTIVELY CLEAN

1    AND DIGEST CONTAMINANTS, USE ONLY WALTER BIO-CIRCLE L LIQUID

2    IN THE SYSTEM."  THAT IS WHAT THE PLAINTIFF'S EXHIBIT NO. 25

3    STATES; CORRECT?

4    A. CORRECT.

5    Q. AND YOU STATE THAT BECAUSE YOU ARE INTENT TO MAKE SURE

6    THAT ONLY BIO-CIRCLE L FLUID IS USED IN THE BIO-CIRCLE

7    SYSTEMS?

8    A. CORRECT.

9    Q. IN LARGE PART BECAUSE WALTER WOULD LIKE TO GENERATE THE

10   FOLLOW-ON SALES FROM THE BIO-CIRCLE L FLUID.

11   A. THAT'S ONE INTERPRETATION.

12   Q. IT'S ONE OF THE OPTIONS?

13   A. YEAH.

14   Q. I WOULD LIKE US TO TAKE A LOOK AT PLAINTIFF'S EXHIBIT NO.

15   135 HERE AS WELL.  IN THE BINDER.  MR. HOUGHTON, DO YOU

16   RECOGNIZE PLAINTIFF'S EXHIBIT NO. 135 AS A WALTER SERVICE

17   TECHNOLOGIES PRODUCT CATALOG?

18   A. CORRECT.

19   Q. AND THIS APPEARS TO BE A TRUE AND ACCURATE COPY OF

20   WALTERS'S CATALOG?

21   A. YES.

22            MR. ANDERSON:  YOUR HONOR, I WOULD LIKE TO MOVE

23   PLAINTIFF'S EXHIBIT NO. 135 INTO EVIDENCE.

24            MR. HARBIN:  NO OBJECTION.

25            THE COURT:  ADMITTED.

1    BY MR. ANDERSON:

2    Q. MR. HOUGHTON, LET'S TAKE A MOMENT AND ORIENT OURSELVES BY

3    TAKING A LOOK AT THE LAST PAGE, PLAINTIFF'S EXHIBIT NO. 135.

4    YOU WILL SEE DOWN AT THE BOTTOM OF THE PAGE THERE WITH ME,

5    THIS IS THE JANUARY 1, 2007 CATALOG; IS THAT CORRECT?

6    BOTTOM OF THE PAGE -- BOTTOM OF PAGE 41?

7    A. RIGHT.  IT SHOWS A COPYRIGHT, YES.

8    Q. IT SAYS EFFECTIVE JANUARY 1, 2007?

9    A. CORRECT.

10   Q. OKAY.  IF YOU WOULD, LET'S TURN IN THE EXHIBIT ITSELF TO

11   WHAT IS MARKED AS PAGE NO. 3.  PAGE NO. 3 WE SEE MATERIAL

12   THAT IS PROMOTING THE BIOREMEDIATION BENEFITS OF THE

13   BIO-CIRCLE PARTS WASHER.

14   A. YES.

15   Q. WE ALSO SEE REFERENCE THAT WALTER WAS THE WINNER OF THE

16   WALL STREET JOURNAL 2006 TECHNOLOGY INNOVATION AWARD.

17   A. CORRECT.

18   Q. WE ALSO SEE REFERENCE THAT WALTER WAS THE WINNER OF THE

19   CLEANING TECHNOLOGY AWARD, BEST INNOVATION IN 2005.

20   A. CORRECT.

21   Q. AND BOTH OF THOSE AWARDS WERE GIVEN TO J. WALTER IN

22   CONNECTION WITH THE BIO-CIRCLE SYSTEM.

23   A. THAT IS CORRECT.

24   Q. WE ALSO SEE REFERENCE TO THE JAY LENO VIDEO WITH A WEB

25   ADDRESS FOR WHERE SOMEONE CAN GO TO VIEW THAT.

1    A. YES.

2    Q. IF YOU WILL TURN WITH ME TO THE NEXT PAGE, MR. HOUGHTON.

3    ON PAGE 4 OF PLAINTIFF'S EXHIBIT NO. 135, HERE WE SEE

4    COMPARISON AND DISCUSSION ABOUT THE NONHAZARDOUS,

5    NONFLAMMABLE CHARACTERISTICS OF THE BIO-CIRCLE L.  IN THE

6    MIDDLE OF THE PAGE.

7    A. CORRECT.

8    Q. ALSO IN THE CHART IN THE CENTER OF THE PAGE, WE SEE A

9    GRAPHICAL DEPICTION OF HOW THE BIO-CIRCLE L CLEANING FLUID

10   SHOULD LAST LONGER THAN THE COMPARATIVE SOLVENT MATERIALS

11   USED IN SOLVENT PARTS WASHERS.

12   A. CORRECT.

13   Q. IF YOU TAKE A LOOK WITH ME, SIR, AT THE NEXT PAGE OF THE

14   EXHIBIT.  PAGE 5 OF EXHIBIT 135.  HERE WE SEE THE OFFERING

15   OF THE IO 200 AND THE IO 400.

16   A. CORRECT.

17   Q. BOTH OF THOSE ARE PARTS WASHERS THAT ARE INVOLVED IN OUR

18   LITIGATION HERE TODAY.

19   A. CORRECT.

20   Q. DOWN AT THE BOTTOM OF PAGE 5, WE SEE SPECIFIC REFERENCE

21   TO PATENT 6057147.  DO YOU SEE THAT?

22   A. YES, I SEE IT.

23   Q. RIGHT UNDER THAT, TO A PATENT PENDING MARKING FOR

24   APPLICATION 11, 495, 275.  TO YOU SEE THAT?

25   A. YES, I DO.

1   Q. FIRST OFF, WITH THAT INFORMATION POSTED DOWN AT THE

2   BOTTOM OF THE PAGE, WHAT IS THE INTENTION -- ARE YOU

3   INTENDING THAT THAT PATENT MARKING GO WITH ONLY THE IO 400,

4   OR IS IT THE IO 400 AND THE IO 200?

5   A. I CAN'T ANSWER.  I DON'T KNOW.

6   Q. DID YOU APPROVE THE PLACEMENT OF THAT PATENT MARKING IN

7   THIS MATERIAL, SIR?

8   A. NO, I DID NOT.

9   Q. DID YOU HAVE KNOWLEDGE THAT IT WAS GOING TO BE PLACED

10  THERE?

11  A. NO.

12  Q. WHO WITHIN WALTER ARE YOU AWARE OF THAT CONDUCTED A

13  REVIEW AND ANALYSIS OF U.S. PATENT NO. 6057147 TO DETERMINE

14  THAT IT WAS APPROPRIATE TO PLACE THAT PATENT MARKING HERE IN

15  WALTER'S PRODUCT CATALOG?

16  A. THE ONLY PERSON I WOULD SAY IS R AND D.  VICE-PRESIDENT

17  OF R AND D.

18  Q. AND WHO IS THAT?

19  A. CLAUDE VANDEMEULEBROOCKE.

20  Q. DO YOU KNOW FOR A FACT THAT MR. VANDEMEULEBROOCKE

21  CONDUCTED SUCH AN INVESTIGATION?

22  A. NO, I DO NOT.  I HAVE NO IDEA.

23  Q. DO YOU HAVE ANY KNOWLEDGE THAT AN INVESTIGATION WAS

24  CONDUCTED REGARDING THE PATENT PENDING APPLICATIONS ENDING

25  IN THE NUMBERS 275?

1    A. NO, I DO NOT.

2    Q. SO TO -- YOU DON'T HAVE ANY SPECIFIC KNOWLEDGE REGARDING

3    ANYONE WITHIN J. WALTER CONDUCTING AN INVESTIGATION TO

4    DETERMINE WHETHER EITHER OF THE PATENT -- PENDING PATENT

5    APPLICATION 275 OR THE U.S. PATENT 147 COVER THE IO 200 AND

6    THE IO 400?

7              MR. HARBIN:  OBJECTION.  ASKED AND ANSWERED BUT

8    ALSO IRRELEVANT.

9              THE COURT:  ALL RIGHT.  ASK YOUR NEXT QUESTION.  I

10   TELL YOU WHAT.  THIS MIGHT BE A GOOD TIME TO TAKE OUR

11   AFTERNOON RECESS.  I NOTICE THE COURTROOM CLOCK IS A LITTLE

12   OFF FROM MY WATCH, SO WE WILL FOLLOW THE COURTROOM CLOCK.

13   SO EVERYBODY WILL BE ON THE SAME TIME.  LET'S RECESS UNTIL

14   3:15.  AND WE WILL START AGAIN AT THAT TIME.

15              (BREAK FROM 3:00 P.M. UNTIL 3:15 P.M.)

16              CROSS- EXAMINATION (RESUMED)

17   BY MR. ANDERSON:

18   Q. BEFORE THE BREAK, WE WERE TALKING ABOUT PLAINTIFF'S

19   EXHIBIT NO. 135 AND I WOULD LIKE TO ASK A FEW QUESTIONS ON

20   THAT BEFORE WE MOVE ON.  IF I COULD DIRECT YOUR ATTENTION TO

21   PAGE 6, PLEASE, SIR.

22   A. YES, SIR.

23   Q. AND IN FRONT OF YOU, THIS IS PLAINTIFF'S EXHIBIT 135,

24   WHICH IS THE JANUARY 1 OF 2007 WALTER PRODUCT CATALOG;

25   RIGHT?

1    A. YES.

2    Q. WILL YOU LOOK AT THE DATE ON PAGE 41, IF YOU WANT TO

3    VERIFY THAT, SIR?

4    A. THAT IS FINE.

5    Q. IN THIS CATALOG WE SEE HERE A SPONGE FILTER; CORRECT?

6    A. CORRECT.

7    Q. THE BOTTOM OF THE PAGE WE ALSO SEE THIS MATERIAL HERE

8    DEALING WITH FREE DEMOS.  AND WE ALSO SEE WITH THAT, IF YOU

9    CAN CAPTURE THAT WHOLE SECTION, THE BIO-CIRCLE TRAILER

10   THERE.

11   A. CORRECT.

12   Q. THE BIO-CIRCLE TRAILER IS ONE OF THE SALES AIDS THAT ARE

13   AVAILABLE TO J. WALTER SALES FORCE; CORRECT?

14   A. CORRECT.

15   Q. THEY CAN USE IT TO DO PRODUCT DEMONSTRATIONS ON SITE FOR

16   A CUSTOMER.

17   A. THAT IS CORRECT.

18   Q. COULD YOU DESCRIBE FOR US WHAT IS INVOLVED WITH THAT TYPE

19   OF ON-SITE DEMONSTRATION, SIR?

20   A. SURE.  THE BIO-CIRCLE IS HOUSED INSIDE THE TRAILER.  AND

21   THE TRAILER IS TAKEN TO AN END USER, INDUSTRIAL

22   MANUFACTURING END USER, TYPICALLY THAT IS THE TARGET

23   CUSTOMER.  WE ARE GOING TO HAVE A DEMONSTRATION ON HOW THEY

24   CAN BIO-CIRCLE IT USING ANOTHER SOLUTION VERSUS A SOLVENT

25   PARTS WASHER AND SO THEY TAKE IT OVER TO AN ACCOUNT

1  REPRESENTATIVE, ATTACHES IT TO HIS CAR AND TAKES IT OVER TO

2  THE QUALIFIED CUSTOMER PROSPECT.

3  Q. AND WHEN THEY GET THERE, THEY ARE ABLE TO --

4  A. OPEN UP THE TRAILER AND THEN THEY PULL IT OUT AND THEY

5  BRING IT IN, PLUG IT IN AND SHOW THEM HOW IT WORKS.

6  Q. ARE THERE MULTIPLE BIO-CIRCLE UNITS THAT YOU ARE ABLE TO

7  PUT INTO THE TRAILER?

8  A. TYPICALLY NOT.  IT'S REALLY DESIGNED TO CARRY ONE.  BUT

9  SOMETIMES THERE HAVE BEEN TIMES WHERE WE HAVE CARRIED TWO.

10  Q. SO WHEN A SALES REPRESENTATIVE DECIDES THEY WANT TO USE

11  THE TRAILER, THEY CAN TAKE IT TO A PROSPECTIVE CUSTOMER?

12  A. CORRECT.

13  Q. ON-SITE, OFF LOAD A BIO-CIRCLE SYSTEM?

14  A. CORRECT.

15  Q. DEMONSTRATE IT FOR THE CUSTOMER?

16  A. CORRECT.

17  Q. START BY POURING IN THE BIO-CIRCLE L FLUID?

18  A. CORRECT.

19  Q. SHOWING THE CUSTOMER HOW TO CLEAN A PART USING THE

20  BIO-CIRCLE SYSTEM?

21  A. TYPICALLY, YEAH, THE CUSTOMER WILL BRING A PART OVER FOR

22  THE DEMO.  YES.

23  Q. AND THE CUSTOMER COULD EVEN USE THE BIO-CIRCLE SYSTEM

24  WHILE IT IS THERE ON-SITE FOR THEMSELVES?

25  A. WELL, MAINLY THE DEMO IS DESIGNED AROUND HAVING THE

1    CUSTOMER USE IT AND CLEAN HIS PARTS.

2    Q. WHILE J. WALTER SALES REPRESENTATIVE STANDS THERE AND

3    WALKS HIM THROUGH WHAT NEEDS TO HAPPEN?

4    A. CORRECT.

5    Q. DID J. WALTER EVER USE THE TRAILER IN ORDER TO DO

6    IN-HOUSE TRAINING FOR A CUSTOMER?

7    A. YES.  WE WILL TAKE THE TRAILER WITH THE PARTS WASHER TO A

8    SPECIFIC CUSTOMER AND TRAIN SEVERAL PEOPLE WITHIN THAT

9    COMPANY ON HOW TO USE THE BIO-CIRCLE.

10   Q. DO YOU ALSO GO TO TRADE SHOWS WITH THE TRAILER?

11   A. TRADE SHOWS, TYPICALLY NOT.  WE TAKE THE TRADE SHOWS, THE

12   BIO-CIRCLE IS SHIPPED TO THE TRADE SHOW.

13   Q. WHEN YOU GO TO A TRADE SHOW WITH ONE OF THE BIO-CIRCLE

14   SYSTEMS, IS IT GENERALLY AN OPERATING SYSTEM THAT YOU TAKE

15   TO THE TRADE SHOW?

16   A. YES.

17   Q. SO YOU FILL IT WITH BIO-CIRCLE L FLUID AT THE TRADE SHOW?

18   A. YES.

19   Q. AND YOU CAN EITHER DEMONSTRATE HOW TO CLEAN PARTS WITH AT

20   THE TRADE SHOW?

21   A. THAT IS CORRECT.

22   Q. OR ALLOW PEOPLE TO WALK UP TO DO IT FOR THEMSELVES?

23   A. YES.

24   Q. PUT THEIR HANDS IN THE FLUID TO SEE THAT IT IS

25   NONCAUSTIC?

1    A. CORRECT.

2    Q. OR NONCORROSIVE, IF IT MIGHT BE?

3    A. YES.

4    Q. I WOULD LIKE US TO TAKE A LOOK AT PLAINTIFF'S EXHIBIT NO.

5    87.  MR. HOUGHTON, IT IS NOT IN YOUR BINDER.  IT IS ANOTHER

6    VIDEO THAT WE ARE GOING TO WATCH, SIR.  A VIDEO THAT CAME

7    FROM J. WALTER'S WEBSITE.

8                        (VIDEO IS PLAYED.)

9    BY MR. ANDERSON:

10   Q. MR. HOUGHTON, YOU'VE HAD AN OPPORTUNITY TO SEE

11   PLAINTIFF'S EXHIBIT 87 BEFORE.  YOU RECOGNIZE THIS VIDEO?

12   A. YES, I RECOGNIZE IT.

13   Q. DO YOU RECOGNIZE IT AS A J. WALTER VIDEO?

14   A. NO, IT IS NOT. IT IS A J. WALTER CANADA VIDEO.  IT IS NOT

15   A J. WALTER, INC. VIDEO.

16   Q. J. WALTER, LIMITED, THE CANADIAN ENTITY?

17   A. CORRECT.

18   Q. DOES THIS APPEAR TO BE A TRUE AND ACCURATE COPY OF THE J.

19   WALTER, LIMITED VIDEO?

20   A. IT APPEARS TO BE.  YES.

21            MR. ANDERSON:  I WOULD LIKE TO MOVE PLAINTIFF'S

22   EXHIBIT NO. 87 INTO EVIDENCE.

23            MR. HARBIN:  NO OBJECTION, YOUR HONOR.

24            THE COURT:  ADMITTED.

25   BY MR. ANDERSON:

1    Q. THE VIDEO THAT WE JUST WATCHED AS PLAINTIFF'S EXHIBIT NO.

2    87 HAS BEEN AVAILABLE ON WALTER'S WEBSITE?

3    A. CORRECT.

4    Q. IT HAS ALSO BEEN SHOWN TO PROSPECTIVE CUSTOMERS?

5    A. I AM NOT SURE.

6    Q. PROSPECTIVE CUSTOMERS HAVE HAD AN OPPORTUNITY TO VIEW IT

7    ON J. WALTER'S WEBSITE?

8    A. I DON'T KNOW THAT.

9    Q. YOU DON'T KNOW THAT?

10   A. NO.  IT IS A CANADIAN VIDEO.

11   Q. THE VIDEO THAT WE JUST WATCHED IS PLAINTIFF'S EXHIBIT NO.

12   87 PROMOTES THE FEATURES AND BENEFITS OF WALTER'S BIO-CIRCLE

13   SYSTEM.

14   A. YES.

15   Q. AND THAT INCLUDES THE BIO-CIRCLE L?

16   A. CORRECT.

17   Q. WHAT TYPES OF PARTS WASHERS DID WE SEE IN THIS VIDEO?

18   A. BIOREMEDIATION.

19   Q. WHAT UNIT NUMBERS, SIR?

20   A. WE SAW THE IO 200 AND THE IO 400.

21   Q. PLAINTIFF'S EXHIBIT NO. 87, THE VIDEO, DOES PROMOTE THE

22   NONTOXIC AND NONFLAMMABLE CHARACTERISTICS OF THE BIO-CIRCLE

23   L FLUID?

24   A. CORRECT.  THIS VIDEO DOES THAT.  YES.

25   Q. WE EVEN SAW THE ACTOR APPEAR TO SNIFF HIS HAND WHEN HE

1    PULLED IT AWAY FROM THE UNIT?

2    A. CORRECT.

3    Q. THE VIDEO ALSO PROMOTES THE BIO-CIRCLE L BIOREMEDIATION

4    IN ASSOCIATION WITH THE NATURAL ORGANISMS THAT BREAK DOWN

5    THE OIL AND GREASE?

6    A. CORRECT.

7    Q. AND IT SEES MICROORGANISMS IN THE BIO-CIRCLE L THAT

8    DIGEST THE OILS AND GREASE?

9    A. CORRECT.

10   Q. WHICH CAUSE THE BIOREMEDIATION?

11   A. CORRECT.

12   Q. WITHOUT THE BIO-CIRCLE L FLUID, BIO-CIRCLE PARTS WASHERS

13   THAT WE SAW WOULD NOT BIOREMEDIATE?

14   A. CORRECT.

15   Q. WALTER IS THE ONLY SOURCE FOR SOMEONE TO PURCHASE THE

16   BIO-CIRCLE L FLUID FROM?

17   A. NO.

18   Q. YOU SELL IT TO SALES REPRESENTATIVES; RIGHT?

19   A. NO.  WE SELL IT THROUGH DISTRIBUTION.  SO WE HAVE A WHOLE

20   NETWORK OF DISTRIBUTORS THAT WE SELL THE BIO-CIRCLE L

21   SOLUTION TO AS WELL AS THE MACHINES.  WE DO NOT SELL DIRECT.

22   Q. BUT YOU ARE THE SOLE SOURCE OF THE BIO-CIRCLE L FLUID?

23   A. CORRECT.

24   Q. WALTER DOES NOT PROMOTE THE USE OF BIO-CIRCLE L FLUID FOR

25   ANY PURPOSE, OTHER THAN USE IN A BIOREMEDIATION PARTS

1    WASHER?

2    A. THAT IS CORRECT.

3    Q. MR. HOUGHTON, I WOULD LIKE US TO TAKE A LOOK BACK AT THE

4    BINDER THERE BEFORE YOU.  PLAINTIFF'S EXHIBIT NO. 90.

5    A. YES.

6    Q. DO YOU RECOGNIZE PLAINTIFF'S EXHIBIT NO. 90 AS AN

7    INTERNAL WALTER DOCUMENT?

8    A. YES, I DO.

9    Q. DOES THIS APPEAR TO BE A TRUE AND ACCURATE COPY OF THE

10   INTERNAL WALTER DOCUMENT?

11   A. YES.

12           MR. ANDERSON:  YOUR HONOR, AT THIS TIME I WOULD

13   LIKE TO MOVE PLAINTIFF'S EXHIBIT NO. 90 INTO EVIDENCE.

14           MR. HARBIN:  NO OBJECTION, YOUR HONOR.

15           THE COURT:  ADMITTED.

16   BY MR. ANDERSON:

17   Q. IN 2005, WALTER WON THE CLEAN TECH AWARD OF THE YEAR.

18   A. CORRECT.

19   Q. THEY WON THAT AWARD FOR THE BIO-CIRCLE L CLEANING SYSTEM.

20   A. THAT IS CORRECT.

21   Q. THERE WERE MANY CONTESTANTS THAT APPLIED FOR THE CLEAN

22   TECH AWARD THAT YEAR?

23   A. NO, THAT IS INCORRECT.

24   Q. HOW MANY CONTESTANTS WERE THERE FOR THE CLEAN TECH AWARD

25   IN 2005?

1    A. EIGHTEEN.

2    Q. EIGHTEEN?

3    A. CORRECT.

4    Q. IT'S AN HONOR OF DISTINCTION TO WIN THE CLEAN TECH AWARD,

5    IS IT NOT?

6    A. WE THOUGHT SO.

7    Q. YOU PROMOTED IT AS SUCH, DIDN'T YOU?

8    A. YES.

9    Q. WHEN WALTER WON THE CLEAN TECH AWARD IN 2005, WAS THAT

10   INFORMATION SHARED THROUGHOUT THE SALES ORGANIZATION?

11   A. YES, IT WAS.

12   Q. AND IT WAS INCORPORATED INTO WALTER'S SALES AND MARKETING

13   MATERIALS?

14   A. CORRECT.

15   Q. MR. HOUGHTON, I WOULD LIKE TO DRAW YOUR ATTENTION TO

16   PLAINTIFF'S EXHIBIT NO. 169, WHICH IS ALSO THERE IN YOUR

17   BINDER.  MR. HOUGHTON, YOU ARE FAMILIAR WITH THE WALL STREET

18   JOURNAL AS A PUBLICATION?

19   A. CORRECT.

20   Q. ITS PREMIER BUSINESS PUBLICATION?

21   A. YES.  CORRECT.

22   Q. IN FRONT OF YOU IS PLAINTIFF'S EXHIBIT NO. 169.  DO YOU

23   RECOGNIZE THIS AS A WALTER SHARE E-MAIL?

24   A. YES, I DO.

25   Q. DOES THIS APPEAR TO BE A TRUE AND ACCURATE COPY OF THAT

1    E-MAIL?

2    A. YES, IT IS.

3          MR. ANDERSON:  YOUR HONOR, AT THIS TIME I WOULD

4    LIKE TO MOVE PLAINTIFF'S EXHIBIT NO. 169 INTO EVIDENCE.

5          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

6          THE COURT:  ADMITTED.

7    BY MR. ANDERSON:

8    Q. PLAINTIFF'S EXHIBIT NO. 169 IS ANNOUNCING THROUGH THE

9    WALTER SHARE -- I MEAN, LET ME WITHDRAW THAT AND START OVER.

10   PLAINTIFF'S EXHIBIT NO. 169 IS AN E-MAIL TO THE WALTER SHARE

11   TEAM, ANNOUNCING THAT WALTER HAD WON A WALL STREET JOURNAL

12   AWARD.

13   A. CORRECT.

14   Q. IN FACT, YOU WERE THE RUNNER-UP THAT YEAR FOR THE AWARD?

15   A. RIGHT.  WE DIDN'T WIN IT, WE WERE RUNNERS-UP.

16   Q. THERE WERE HUNDREDS OF SUBMISSIONS FOR THE WALL STREET

17   JOURNAL AWARD?

18   A. CORRECT.

19   Q. AND AGAIN, WHEN WALTER WON THE WALL STREET JOURNAL AWARD

20   FOR THE BIO-CIRCLE SYSTEM, THAT WAS NEWS THAT IT WANTED TO

21   ANNOUNCE TO THE ENTIRE SALES SYSTEM?

22   A. CORRECT.

23   Q. AS WELL AS INCLUDING YOUR PROMOTIONAL LITERATURE?

24   A. CORRECT.

25   Q. I WOULD LIKE TO DRAW YOUR ATTENTION TO PLAINTIFF'S

1    EXHIBIT NO. 158.  PLAINTIFF'S EXHIBIT NO. 158 IS FROM THE

2    BIO-CIRCLE WEBSITE; IS THAT CORRECT, SIR?

3    A. CORRECT.

4    Q. YOU RECOGNIZE THESE AS TESTIMONIALS FROM BIO-CIRCLE'S WEB

5    PAGE?

6    A. CORRECT.

7    Q. AND THIS APPEARS TO BE A TRUE AND ACCURATE COPY OF THE

8    MATERIAL FROM THE BIO-CIRCLE WEBSITE?

9    A. CORRECT.

10             MR. ANDERSON:  YOUR HONOR, AT THERE POINT I MOVE

11   PLAINTIFF'S EXHIBIT NO. 158 INTO EVIDENCE.

12             MR. HARBIN:  NO OBJECTION, YOUR HONOR.

13             THE COURT:  ADMITTED.

14   BY MR. ANDERSON:

15   Q. AS PART OF J. WALTER'S PROMOTION OF THE BIOREMEDIATION

16   PARTS WASHERS, YOU HAVE UTILIZED TESTIMONIALS FROM EXISTING

17   PARTS WASHER CUSTOMERS.

18   A. CORRECT.

19   Q. IN PLAINTIFF'S EXHIBIT 158, WE SEE A TESTIMONIAL OFFERED

20   BY NORTH AMERICAN CONSTRUCTION GROUP; RIGHT?

21   A. CORRECT.

22   Q. AND THEY ARE LOCATED IN THE UNITED STATES?

23   A. THAT IS CORRECT.

24   Q. WE ALSO SEE A TESTIMONIAL FROM BMW.

25   A. CORRECT.

1    Q. AND A COMPANY CALLED GENTECH?

2    A. CORRECT.

3    Q. LET'S TAKE A LOOK AT THE GENTECH PROMOTION AT THE BOTTOM

4    OF PAGE 1 OF EXHIBIT 158.  GENTECH'S PLANTS ARE LOCATED IN

5    THE UNITED STATES; CORRECT?

6    A. YES.  BOTH IN CANADA AND THE UNITED STATES.

7    Q. BUT THEY HAVE SITES HERE IN THE UNITED STATES?

8    A. YES.

9    Q. THEY BOUGHT A BIO-CIRCLE PARTS WASHING SYSTEM?

10   A. CORRECT.

11   Q. GENTECH USED THE BIO-CIRCLE PARTS WASHING SYSTEM?

12   A. CORRECT.

13   Q. THEY WERE IMPRESSED WITH IT?

14   A. CORRECT.

15   Q. GENTECH GAVE WALTER A TESTIMONIAL ENDORSING THE

16   BIO-CIRCLE L PARTS WASHER?

17   A. CORRECT.

18   Q. J. WALTER POSTED THE GENTECH TESTIMONIAL ON ITS WEBSITE?

19   A. CORRECT.

20   Q. THIS TESTIMONIAL IS UNDATED, AS BEST I CAN TELL.  WOULD

21   YOU AGREE WITH THAT, SIR?

22   A. THE BEST I CAN TELL AS WELL.  YES.

23   Q. THE BOTTOM OF THE PAGE IN THE FOOTER, WE SEE THAT THIS

24   WAS PRINTED IN JUNE OF 2007.  SO WE KNOW THAT AT LEAST AS

25   EARLY AS JUNE OF 2007 WHEN PLAINTIFF'S EXHIBIT NO. 158 WAS

1    PRINTED, J. WALTER KNEW THAT GENTECH WAS USING THE

2    BIO-CIRCLE SYSTEM AS A BIOREMEDIATION PARTS WASHER?

3    A. YES.

4    Q. AND THIS TESTIMONIAL THAT WE SEE IN PLAINTIFF'S EXHIBIT

5    158 IS OFFERED BY J. WALTER TO ADVANCE SALES OF ITS PARTS

6    WASHERS?

7    A. CORRECT.

8    Q. AND THE BIO-CIRCLE L FLUID?

9    A. CORRECT.

10   Q. AT THE TOP OF PAGE 2 OF THIS EXHIBIT, 158, WE SEE UNITED

11   STATES ALLIANCE.  DO YOU SEE WHERE I AM REFERRING TO, SIR?

12   A. NO.  OKAY.  YES.  YEAH, I GOT IT.

13   Q. UNITED STATES ALLIANCE IS LOCATED IN THE UNITED STATES;

14   CORRECT?

15   A. YES.

16   Q. UNITED STATES ALLIANCE HAS PURCHASED BIO-CIRCLE PARTS

17   WASHERS?

18   A. I DON'T KNOW.  I CAN'T TELL FROM THIS.

19   Q. YOU WOULD ASSUME THAT THEY HAVE CLEARLY USED A BIO-CIRCLE

20   PARTS WASHER OR OTHERWISE THEY WOULDN'T HAVE OFFERED YOU A

21   TESTIMONIAL, WOULD THEY?

22   A. BASED ON WHAT I AM LOOKING AT HERE, I DON'T KNOW THAT.  I

23   CAN'T SAY THAT THEY ACTUALLY HAVE PURCHASED IT.  IT DOESN'T

24   SAY THAT THEY PURCHASED IT.  THEY HAVE USED IT.  IT COULD

25   HAVE BEEN A DEMO.

1  Q. YOU HAVE AGREED WITH ME THAT THEY HAVE AT LEAST USED THE

2  BIO-CIRCLE PARTS WASHER?

3  A. YES.  THEY PROBABLY HAD A DEMO.  YEAH.

4  Q. THEY WERE IMPRESSED THE DEMO?

5  A. RIGHT.

6  Q. UNITED STATES ALLIANCE GAVE WALTER A TESTIMONIAL

7  ENDORSEMENT OF THE BIO-CIRCLE PARTS WASHER?

8  A. CORRECT.

9  Q. J. WALTER POSTED UNITED STATES ALLIANCE'S TESTIMONIAL ON

10  ITS WEBSITE?

11  A. CORRECT.

12  Q. AND JUST AS BEFORE, UNITED STATES ALLIANCE'S TESTIMONIAL

13  IS UNDATED, AS BEST WE CAN TELL?

14  A. CORRECT.

15  Q. BUT WE KNOW THAT AT LEAST AS OF JUNE OF 2007, THE DATE

16  THAT PLAINTIFF'S EXHIBIT 158 WAS PRINTED, THAT J. WALTER

17  KNEW THAT UNITED STATES ALLIANCE HAD AT LEAST USED THE

18  BIO-CIRCLE SYSTEM AS A BIOREMEDIATING PARTS WASHER?

19  A. YES.

20  Q. THE TESTIMONY OF UNITED STATES ALLIANCE IS OFFERED BY J.

21  WALTER TO ADVANCE THE SALES OF ITS PARTS WASHERS HERE IN THE

22  UNITED STATES?

23  A. YES.

24  Q. AS WELL AS THE SALE OF BIO-CIRCLE L. FLUIDS?

25  A. YES.

1    Q. MR. HOUGHTON, I WOULD LIKE US TO GO AHEAD AND WATCH

2    ANOTHER VIDEO TOGETHER, SIR.  I WOULD LIKE TO GO TO

3    PLAINTIFF'S EXHIBIT NO. 89.

4                        (VIDEO IS PLAYED.)

5    BY MR. ANDERSON:

6    Q. MR. HOUGHTON, BEFORE WE CONTINUE, I NOTICE YOU COUGHING.

7    IS THERE ANYTHING YOU NEED IN ORDER TO BE MORE COMFORTABLE?

8    WE HAVE COUGH DROPS, I SEE YOU HAVE WATER.

9    A. THANKS.

10   Q. WE JUST WATCHED PLAINTIFF'S EXHIBIT NO. 89.  DO YOU

11   RECOGNIZE THIS AS A WALTER VIDEO?

12   A. YES.

13   Q. DOES THIS APPEAR TO BE A TRUE AND ACCURATE COPY OF A

14   WALTER VIDEO?

15   A. YES.

16           MR. ANDERSON:  YOUR HONOR, AT THIS POINT, I WOULD

17   LIKE TO MOVE PLAINTIFF'S EXHIBIT NO. 89 INTO EVIDENCE.

18           MR. HARBIN:  NO OBJECTION, YOUR HONOR.

19           THE COURT:  ADMITTED.

20   BY MR. ANDERSON:

21   Q. MR. HOUGHTON, WHICH BIO-CIRCLE UNITS DID WE SEE DISPLAYED

22   IN THE VIDEO HERE?

23   A. THE FIRST ONE IN, I THINK IT'S THE -- THE THIRD ONE.

24   Q. THE BR 100, BEING THE FIRST ONE DOWN HERE ON THE FAR END?

25   A. CORRECT.

1    Q. AND YOU'RE GOING TO HAVE TO HELP ME.  IS THIS THE --

2    A. I THINK IT IS THE GREEN GREEN.

3    Q. I'M SORRY?

4    A. I THINK IT IS THE ONE THAT IS GREEN GREEN.  THE SECOND

5    ONE.

6    Q. AND WOULD THAT BE THE BR 200?

7    A. CORRECT.

8    Q. PLAINTIFF'S EXHIBIT NO. 89, THE VIDEO THAT WE JUST

9    WATCHED, THAT HAS BEEN POSTED ON WALTER'S WEBSITE?

10   A. YES.

11   Q. TO PROMOTE THE FEATURES AND BENEFITS OF THE BIO-CIRCLE

12   PARTS WASHER AND THE BIO-CIRCLE L FLUID?

13   A. YES.

14   Q. THE VIDEO SPECIFICALLY PROMOTES THE BENEFITS OF USING A

15   BIOREMEDIATION SYSTEM?

16   A. YES.

17   Q. DUE TO THE BIO-CIRCLE L FLUID?

18   A. YES.

19   Q. THE VIDEO SHOWS US HOW TO CLEAN PARTS USING THE

20   BIO-CIRCLE SYSTEM?

21   A. YES.

22   Q. SHOWS US HOW TO CLEAN THE SPONGE FILTER?

23   A. YES.

24   Q. IT ALSO SHOWS HOW TO FILL THE BIO-CIRCLE PARTS WASHER

25   WITH BIO-CIRCLE L FLUID?

1    A. YES.

2    Q. AND AT THE END OF THE VIDEO, WE ALSO SAW, ONCE AGAIN, A

3    REFERENCE TO THE TRAILER THAT SOMEONE CAN CALL AND HAVE A

4    DEMONSTRATION DONE AT THEIR FACILITY.

5    A. CORRECT.

6    Q. MR. HOUGHTON, I WOULD LIKE TO DIRECT YOUR ATTENTION TO

7    PLAINTIFF'S EXHIBIT NO. 154.  DO YOU RECOGNIZE PLAINTIFF'S

8    EXHIBIT NO. 154 AS BEING THE OWNER'S MANUAL FOR THE

9    BIO-CIRCLE BR 200, SIR?

10   A. YES.

11   Q. AND DOES THIS APPEAR TO BE A TRUE AND ACCURATE COPY OF

12   THE BR 200 OWNER'S MANUAL?

13   A. YES.

14          MR. ANDERSON:  YOUR HONOR, AT THIS POINT I WOULD

15   LIKE TO MOVE PLAINTIFF'S EXHIBIT NO. 154 INTO EVIDENCE?

16          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

17          THE COURT:  ADMITTED.

18   BY MR. ANDERSON:

19   Q. WHEN J. WALTER SELLS A BR 200 UNIT, THE OWNER'S MANUAL

20   WOULD CUSTOMARILY ACCOMPANY THE UNIT?

21   A. CORRECT.

22   Q. J. WALTER PROVIDES OWNER'S MANUALS TO ITS CUSTOMERS TO

23   PROVIDE INSTRUCTIONS ON HOW TO USE ITS PARTS WASHERS?

24   A. CORRECT.

25   Q. MR. HOUGHTON, IF I COULD ASK YOU TO LOOK AT WHAT IS

1    NUMBERED AS PAGE 1 OF THE EXHIBIT, IT APPEARS TO ME THAT IT

2    COMES IN RIGHT AFTER THE TITLE PAGE.

3    A. I HAVE IT.

4    Q. UP AT THE TOP OF THAT PAGE WE HAVE A WARNING.  IT SAYS,

5    "WARNING, BEFORE USING THIS MACHINE, READ ALL SAFETY AND

6    OPERATING INSTRUCTIONS CAREFULLY AND SAVE THIS OWNER'S

7    MANUAL FOR FUTURE REFERENCE."  DO YOU SEE THAT, SIR?

8    A. YES.

9    Q. AND THAT IS WHAT YOUR OWNER'S MANUAL SAYS?

10   A. CORRECT.

11   Q. THE PURPOSE OF THIS WARNING, IT'S INTENDING TO MAKE SURE

12   THAT A PURCHASER OF THE BR 200 UNIT READS THE ENTIRE MANUAL

13   BEFORE USING IT?

14   A. CORRECT.

15   Q. I WOULD LIKE YOU TO LOOK AT PAGE FIVE OF YOUR OWNER'S

16   MANUAL WITH ME.  AND UP AT THE TOP, WE HAVE THE OPERATING

17   INSTRUCTIONS PORTION.  AND IT SAYS, "THE BIO-CIRCLE PARTS

18   CLEANING SYSTEM IS DESIGNED FOR REMOVING AND BIOREMEDIATING

19   OIL AND MINERAL GREASE FROM FERROUS AND NONFERROUS PARTS AND

20   OTHER WASHABLE SURFACES.  IT IS NOT RECOMMENDED FOR CLEANING

21   SYNTHETIC GREASE, GLUE, OR OTHER NONBIODEGRADABLE

22   SUBSTANCES."  THAT IS WHAT THE OPERATING INSTRUCTIONS SAY,

23   ISN'T IT?

24   A. CORRECT.

25   Q. THE BR 200 UNIT IS DESIGNED TO OPERATE AS A

1    BIOREMEDIATING PARTS WASHER?

2    A. CORRECT.

3    Q. ANY OTHER USE OF THE BR 200 IS NOT RECOMMENDED?

4    A. CORRECT.

5    Q. I KNOW WE ARE JUMPING AROUND A LITTLE BIT BUT I WOULD

6    LIKE US TO LOOK AT PLAINTIFF'S EXHIBIT 115, IF WE COULD,

7    SIR.  DO YOU HAVE PLAINTIFF'S EXHIBIT NO. 115 IN FRONT OF

8    YOU?

9    A. YES, I DO.

10   Q. AND YOU RECOGNIZE THAT AS BEING THE OWNER'S MANUAL FOR

11   THE IO 200?

12   A. CORRECT.

13   Q. AND THIS APPEARS TO BE A TRUE AND ACCURATE COPY OF THE IO

14   200 OWNER'S MANUAL?

15   A. TO THE BEST OF MY KNOWLEDGE.  YES.

16          MR. ANDERSON:  YOUR HONOR, AT THIS POINT, I MOVE

17   PLAINTIFF'S EXHIBIT NO. 115 INTO EVIDENCE.

18          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

19          THE COURT:  ADMITTED.

20   BY MR. ANDERSON:

21   Q. J. WALTER PROVIDES THE MODEL IO 200 OWNER'S MANUAL WITH

22   EACH PARTS WASHER THAT IT SELLS?

23   A. CORRECT.

24   Q. THE PURPOSE OF THE OWNER'S MANUAL IS TO EDUCATE A NEW

25   OWNER ON HOW TO USE THE PARTS WASHER?

1    A. CORRECT.

2    Q. IF YOU LOOK AT PAGE 2 WITH ME.  THE MIDDLE OF THE PAGE.

3    WE HAVE THIS WARNING, AGAIN:  "WARNING, BEFORE USING THIS

4    MACHINE, READ ALL SAFETY AND OPERATING INSTRUCTIONS

5    CAREFULLY AND SAVE THIS OWNER'S MANUAL FOR FUTURE

6    REFERENCE."

7    A. CORRECT.

8    Q. AND THE PURPOSE OF THAT WARNING IS TO MAKE SURE THAT A

9    NEW OWNER READS THIS MANUAL IN ITS ENTIRETY BEFORE THEY

10   BEGIN OPERATING THE UNIT?

11   A. CORRECT.

12   Q. IF YOU LOOK AT PAGE 6 OF THIS EXHIBIT WITH ME, SIR.

13   THERE IS A NEW SECTION THAT BEGINS THERE, THE OPERATING

14   INSTRUCTIONS?

15   A. CORRECT.

16   Q. "OPERATING INSTRUCTIONS:  THE BIO-CIRCLE PARTS CLEANING

17   SYSTEM IS DESIGNED FOR THE REMOVAL AND BIOREMEDIATION OF OIL

18   AND GREASE FROM FERROUS AND NONFERROUS PARTS AND OTHER

19   WASHABLE SURFACES.  IT IS NOT RECOMMENDED FOR CLEANING OTHER

20   NONBIODEGRADABLE SUBSTANCES."  YOU SEE THAT, SIR?

21   A. YES.

22   Q. AND THAT IS WHAT IT SAYS?

23   A. CORRECT.

24   Q. THE IO 200 IS DESIGNED TO OPERATE AS A BIOREMEDIATION

25   PARTS WASHER?

1    A. CORRECT.

2    Q. ANY OTHER USE OF THE IO 200 IS NOT RECOMMENDED?

3    A. CORRECT.

4    Q. IF YOU WOULD BE WOULD BE KIND ENOUGH TO LOOK AT

5    PLAINTIFF'S EXHIBIT NO. 114 WITH ME.  IT IS THE OWNER'S

6    MANUAL FOR THE IO 400?

7    A. YES.

8    Q. ARE YOU FAMILIAR WITH THE OWNER'S MANUAL FOR THE IO 400?

9    A. YES.

10   Q. AND THIS APPEARS TO BE A TRUE AND ACCURATE COPY OF THE

11   OWNER'S MANUAL FOR THE IO 400?

12   A. YES, TO THE BEST OF MY KNOWLEDGE.

13            MR. ANDERSON:  YOUR HONOR, AT THIS POINT I MOVE

14   PLAINTIFF'S EXHIBIT NO. 114 INTO EVIDENCE.

15            MR. HARBIN:  NO OBJECTION, YOUR HONOR.

16            THE COURT:  ADMITTED.

17   BY MR. ANDERSON:

18   Q. THE OWNER'S MANUAL FOR THE IO 400 ACCOMPANIES A NEW IO

19   400 PARTS WASHER WHEN J. WALTERS SELLS IT?

20   A. CORRECT.

21   Q. AND IF YOU LOOK AT PAGE 1 OF THIS EXHIBIT WITH ME, WE

22   HAVE A WARNING THAT APPEARS THERE AT THE TOP OF THE PAGE, IT

23   SAYS, "WARNING, BEFORE USING THIS MACHINE READ ALL SAFETY

24   AND OPERATING INSTRUCTIONS CAREFULLY AND SAVE THIS OWNER'S

25   MANUAL FOR FUTURE REFERENCE."

1  A. CORRECT.

2  Q. THAT IS WHAT IT SAYS.  AND THE PURPOSE OF THAT IS TO

3  ENSURE THAT A NEW CUSTOMER READS THE MANUAL BEFORE THEY

4  BEGIN OPERATING THE MACHINE?

5  A. CORRECT.

6  Q. SO THAT THEY CAN OPERATE THE MACHINE IN ACCORDANCE WITH

7  THE INSTRUCTIONS HERE?

8  A. CORRECT.

9  Q. AND IF YOU LOOK AT PAGE 5 WITH ME.  AT THE TOP OF THE

10  PAGE WE HAVE THE OPERATING INSTRUCTIONS.  AND IT SAYS, "THE

11  BIO-CIRCLE PARTS CLEANING SYSTEM IS DESIGNED FOR THE REMOVAL

12  AND BIOREMEDIATING OIL AND GREASES FROM FERROUS AND

13  NONFERROUS PARTS AND OTHER WASHABLE SURFACES.  IT IS NOT

14  RECOMMENDED FOR CLEANING GLUE, PAINT OR OTHER

15  NONBIODEGRADABLE SUBSTANCES."  DO YOU SEE WHERE I AM

16  REFERRING, SIR?

17  A. YES.

18  Q. AND THAT IS WHAT IT SAYS?

19  A. CORRECT.

20  Q. THE IO 400 IS DESIGNED TO OPERATE AS A BIOREMEDIATING

21  PARTS WASHER?

22  A. CORRECT.

23  Q. ANY OTHER USE OF THE IO 400 IS NOT RECOMMENDED?

24  A. CORRECT.

25  Q. MR. HOUGHTON, IF YOU WOULD LOOK AT PLAINTIFF'S EXHIBIT

1   NO. 139 WITH ME, PLEASE, SIR.  HAVE YOU HAD AN OPPORTUNITY

2   TO LOOK AT PLAINTIFF'S EXHIBIT 139, WHICH IS THE OWNER'S

3   MANUAL FOR THE BR 100, SIR?

4   A. IT IS THE FIRST I AM SEEING IT.

5   Q. THIS IS THE FIRST TIME YOU HAVE EVER SEEN THIS?

6   A. THAT IS CORRECT.

7   Q. AS PRESIDENT OF J. WALTER, IT IS YOUR TESTIMONY THAT YOU,

8   IN THAT CAPACITY, YOU NEVER SAW THE OWNER'S MANUAL FOR THE

9   BR 100 BEFORE?

10  A. NO, I NEVER DID.

11  Q. DOES THIS APPEAR TO BE CONSISTENT WITH A J. WALTER

12  DOCUMENT THAT YOU WOULD EXPECT TO SEE?

13  A. IT'S HARD FOR ME TO SAY.

14          MR. HARBIN:  OBJECTION TO THE FORM OF THE

15  QUESTION, YOUR HONOR.

16          THE COURT:  SUSTAINED.  WHAT EXHIBIT NUMBER IS

17  THAT?

18          MR. HARBIN:  139.

19          MR. ANDERSON:  YOUR HONOR, I AM PREPARED TO MOVE

20  ON ANY WAY.  WE WILL OBVIATE THE ISSUE.

21          THE COURT:  OKAY.

22  BY MR. ANDERSON:

23  Q. MR. HOUGHTON, I WOULD LIKE TO ADDRESS YOUR ATTENTION TO

24  PLAINTIFF'S EXHIBIT NO. 165.

25  A. YES.

1  Q. PLAINTIFF'S EXHIBIT 165, ARE THESE REFERRED TO AS

2  SOLUTION REPORTS?

3  A. THAT IS CORRECT.

4  Q. AND CAN YOU EXPLAIN TO US WHAT A SOLUTION REPORT IS, SIR?

5  A. A SOLUTION REPORT IS LIKE A CALL REPORT.  BASICALLY WHEN

6  THE SALES REPRESENTATIVE GOES OUT IN THE FIELD FOR THE WEEK

7  AND COMES BACK, TYPICALLY IT IS DONE ON A FRIDAY OR A

8  SATURDAY OR SUNDAY NIGHT, AND THEY SHARE WITH THE WALTER

9  COMMUNITY THEIR SUCCESS STORIES.

10  Q. AND THESE SOLUTION REPORTS ARE POSTED ON WALTER'S

11  INTRANET?

12  A. YES.  OUR INTRANET WALTER SHARE.

13  Q. AND THAT'S AVAILABLE TO REPRESENTATIVES IN WALTER, INC.

14  AS WELL AS WALTER, LIMITED?

15  A. CORRECT.

16  Q. YOU ARE FAMILIAR WITH PASCAL?

17  A. YES.

18  Q. WHAT COMPANY IS PASCAL LAVALLEE ASSOCIATED WITH?

19  A. J. WALTER COMPANY, LTD IN CANADA.

20  Q. THE CANADIAN ENTITY?

21  A. YES.

22  Q. PLAINTIFF'S EXHIBIT NO. 165, DO THESE APPEAR TO BE A TRUE

23  AND ACCURATE COPY OF THE WALTER SOLUTION REPORTS, SIR?

24  A. YES.

25  Q. YOUR HONOR, AT THIS POINT I WOULD LIKE TO MOVE

1    PLAINTIFF'S EXHIBIT NO. 165 INTO EVIDENCE.

2              MR. HARBIN:  NO OBJECTION, YOUR HONOR.

3              THE COURT:  ADMITTED.

4    BY MR. ANDERSON:

5    Q. AS WALTER'S PRESIDENT, YOU HAD ACCESS TO THE SOLUTION

6    REPORTS?

7    A. CORRECT.

8    Q. HOW FREQUENTLY WOULD YOU REVIEW THESE?

9    A. MONTHLY.

10   Q. WOULD YOU EXPECT YOUR SALES REPRESENTATIVES TO REVIEW

11   THESE MORE FREQUENTLY THAN THAT?

12   A. SALES MANAGEMENT.  SALES MANAGEMENT SHOULD BE DOING IT

13   REGULARLY.

14   Q. IS ONE OF THE FUNCTIONS OF THE SOLUTION REPORT FOR

15   INDIVIDUAL SALES REPRESENTATIVES TO BE ABLE TO SHARE THEIR

16   SUCCESS STORY SO THAT OTHER SALES REPRESENTATIVES CAN LEARN

17   FROM THAT SUCCESS STORY?

18   A. YES.  KNOWLEDGE SHARING.  CORRECT.

19   Q. THE PURPOSE IS TO SHARE THE KNOWLEDGE OF THE SUCCESS

20   THROUGHOUT THE SALES ORGANIZATION?

21   A. CORRECT.

22   Q. MR. HOUGHTON, DOWN AT THE BOTTOM RIGHT-HAND CORNER OF

23   THESE DOCUMENTS WE HAVE NUMBERING THAT I REFER TO AS BATES

24   NUMBERS.  I WOULD LIKE YOU TO LOOK AT WITH ME AT THE PAGES

25   THAT HAVE BEEN MARKED "J. WALTER 4461."

1    A. OKAY.

2    Q. THIS IS A SOLUTION REPORT BY JOHN REED.

3    A. CORRECT.

4    Q. JOHN REED IS A WALTER EMPLOYEE?

5    A. YES, HE IS.

6    Q. AND THIS WALTER SHARE POSTING THAT WE ARE LOOKING AT IS

7    IN CONNECTION WITH THE UNITED STATES MARINE CORPS BASE AT

8    CAMP PENDLETON?

9    A. CORRECT.

10   Q. CAMP PENDLETON IS IN CALIFORNIA?

11   A. CORRECT.

12   Q. UNDER THE PORTION OF THE DOCUMENT ENTITLED "WALTER

13   SOLUTION" HERE IN THE MIDDLE OF THE PAGE --

14   A. CORRECT.

15   Q. -- WE SEE MR. REED SAYING THAT HE DEMONSTRATED THE

16   BIO-CIRCLE TO THEM.  DO YOU SEE THAT?

17   A. CORRECT.

18   Q. HE DEMONSTRATED IT TO THE UNITED STATES MARINE CORPS?

19   A. CORRECT.

20   Q. HE USED IT TO CLEAN WEAPONS?

21   A. CORRECT.

22   Q. AND IN THE LAST SENTENCE OF THAT PARAGRAPH WE SEE THAT

23   THEY LEFT ONE UNIT WITH THEM?

24   A. CORRECT.

25   Q. MEANING THAT THEY LEFT ONE OF THE BIO-CIRCLE UNITS WITH

1    THE MARINES?

2    A. CORRECT.

3    Q. AND THEN AT THE BOTTOM OF THE PAGE, AND GO ON TO THE NEXT

4    PAGE, WE SEE A SERIES OF WHAT ARE REPRESENTATIVES' THUMBNAIL

5    PICTURES TAKEN OF THE CLEANING?

6    A. OKAY.

7    Q. I SEE IT JUST AS PICTURES AND IT IS KIND OF HARD TO MAKE

8    OUT BUT YOU SEE THE REFERENCE THERE; RIGHT, SIR?

9    A. CORRECT.  YES.

10   Q. AND SO THIS WALTER SOLUTION REPORT PROVIDES AN EXAMPLE OF

11   A WALTER SALESMAN DEMONSTRATING HOW TO USE A BIO-CIRCLE

12   UNIT?

13   A. CORRECT.

14   Q. AND HE USED IT TO CLEAN WHAT HE REFERRED TO AS A 9 MM?

15   A. CORRECT.

16   Q. AN M16?

17   A. CORRECT.

18   Q. A 50 CALIBER GUN?

19   A. CORRECT.

20   Q. I WOULD LIKE YOU TO TAKE A LOOK AT, WITHIN THIS SAME

21   EXHIBIT, AT WHAT HAS BEEN BATES NUMBERED, THE NUMBERS AT THE

22   BOTTOM OF THE PAGE IS 4455.

23   A. OKAY.

24   Q. I AM GOING TO NEED SOME HELP WITH THIS GENTLEMAN'S LAST

25   NAME.  THIS IS A SOLUTION REPORT BY JOSEPH DECOSTE?

1    A. DECOSTE.

2    Q. HE IS A WALTER EMPLOYEE?

3    A. CORRECT.

4    Q. AND THIS IS A SOLUTIONS REPORT INVOLVING GEORGIA PACIFIC?

5    A. CORRECT.

6    Q. AND HERE WE SEE IN THE WALTER SOLUTION SECTION OF THE

7    REPORT, WHICH IS FURTHER DOWN, IN THE SECOND LINE, "SIX

8    MONTHS AFTER INSTALLATION THE MACHINE IS PERFORMING WELL."

9    DO YOU SEE THAT REFERENCE, SIR?

10   A. CORRECT.

11   Q. AND SO HERE WE HAVE A SOLUTIONS REPORT THAT IS CONFIRMING

12   THAT SIX MONTHS AFTER INSTALLATION, JOSEPH DECOSTE WAS BACK

13   INTO GEORGIA PACIFIC TO SEE THE BIO-CIRCLE MACHINE.

14   A. CORRECT.

15   Q. IF YOU WOULD LOOK AT WHAT HAS BEEN LABELED AS J. WALTER

16   4463.

17   A. OKAY.

18   Q. AND HERE WE SEE ANOTHER SOLUTION REPORT FROM JOHN REED?

19   A. CORRECT.

20   Q. WHO WE HAD TALKED ABOUT JUST A MOMENT AGO?

21   A. CORRECT.

22   Q. HE IS A WALTER EMPLOYEE?

23   A. CORRECT.

24   Q. AND HERE UNDER THE CURRENT PROCESS HE STATES, "WHILE I

25   WAS MOVING OUR BIO-CIRCLE TRAILER FROM PORTLAND, OREGON TO

```
1    LOS ANGELES, CALIFORNIA THIS PAST WEEKEND, I STOPPED FOR GAS

2    IN BAKERSFIELD, CALIFORNIA AND HAD A MAN APPROACH ME AND

3    INQUIRE ABOUT THE BIO-CIRCLE.  HE MENTIONED TO ME THAT HE

4    HAD A MANUFACTURING FACILITY IN BAKERSFIELD AND WOULD LOVE

5    TO SEE A DEMO ON IT."  THAT IS WHAT MR. REED STATES IN HIS

6    SOLUTION REPORT; RIGHT?

7    A. CORRECT.

8    Q. AND THIS REFERS TO THE BIO-CIRCLE TRAILER THAT WE LOOKED

9    AT IN YOUR PREVIOUS CATALOG?

10   A. CORRECT.

11   Q. AND WE HAVE SEEN IN THE VIDEOS?

12   A. CORRECT.

13   Q. I WOULD LIKE TO LOOK AT WHAT HAS BEEN MARKED AS J. WALTER

14   4464, I BELIEVE SHOULD BE THE NEXT PAGE?

15   A. CORRECT.

16   Q. THIS IS A SOLUTIONS REPORT BY A GENTLEMAN BY THE NAME OF

17   DAVID BAITY.  MR. BAITY IS A WALTER EMPLOYEE?

18   A. CORRECT.

19   Q. AND THIS IS A SOLUTIONS REPORT THAT STEMMED FROM A VISIT

20   TO FORT JACKSON?

21   A. CORRECT.

22   Q. LOCATED IN COLUMBIA, SOUTH CAROLINA?

23   A. THAT IS CORRECT.

24   Q. LET'S TAKE A LOOK AT THE WALTER SOLUTION PASSAGE.  AND

25   HERE, OVER HERE, "THROUGH DISTRIBUTOR, WE PLACED A SINK FOR
```

1    DEMO PURPOSES AND BEGAN TRAINING OF DRILL SERGEANTS.  I

2    RECEIVED HELP FROM DAN KERN AND OTHERS FROM TEST CONDUCTED

3    ON POST AT FORT LEONARD WOOD IN MISSOURI THAT PRODUCED

4    OUTSTANDING RESULTS IN WEAPONS CLEANING."  THAT'S WHAT IS

5    STATED IN THE SOLUTIONS REPORT; CORRECT?

6    A. CORRECT.

7    Q. AND HERE WE SEE A SPECIFIC REFERENCE TO THE TRAINING OF

8    DRILL SERGEANTS?

9    A. CORRECT.

10   Q. USING TRAINING ON HOW TO USE THE BIO-CIRCLE SYSTEM?

11   A. CORRECT.

12   Q. WAS THERE ALSO A DEMONSTRATION THAT WAS MADE AT FORT

13   LEONARD WOOD, MISSOURI?

14   A. YES.

15   Q. AND WAS THAT A DEMONSTRATION ON THE BIO-CIRCLE SYSTEM?

16   A. CORRECT.

17   Q. AND AS WE MOVE DOWN INTO THE COMMENTS SECTION, WE PICK UP

18   HERE, "DEMOS HAD" AND WE GO ON TO THE NEXT PAGE, PLEASE.

19   "DEMOS HAD BEEN GIVEN TO DOZEN OF INDIVIDUALS, BROCHURES

20   PASSED OUT OVER ALL -- OUT -- BROCHURES PASSED OUT ALL OVER

21   POST, SPECS HAD TO BE DEVELOPED ALONG WITH OTHERS INFO TO BE

22   E-MAILED TO, AGAIN, DOZENS OF PEOPLE."  AS BROKEN AS MY

23   READING OF THAT WAS, THAT SENTENCE REFERS TO A DEMONSTRATION

24   THAT HAD TO BE GIVEN TO DOZENS OF INDIVIDUALS?

25   A. CORRECT.

1   Q. AND THAT WOULD HAVE BEEN A DEMONSTRATION OF THE

2   BIO-CIRCLE L SYSTEM?

3   A. CORRECT.

4   Q. IF WE COULD LOOK AT WHAT HAS BEEN MARKED AS J. WALTER

5   4470.

6   A. OKAY.

7   Q. AND IT SPILLS OVER TO PAGE 4471.  THIS IS A SOLUTIONS

8   REPORT BY DANIEL GRANTHAM.  MR. GRANTHAM IS A WALTER

9   EMPLOYEE, SIR?

10  A. YES.

11  Q. AND THIS IS A SOLUTIONS REPORT RELATING TO A COMPANY BY

12  THE NAME OF KMT WATERJET?

13  A. YES.

14  Q. AND ONE OF THE THINGS THAT WE SEE AT THE BOTTOM OF THE

15  PAGE ON 4470 IS COMMENT FROM PASCAL LAVALLEE.  DO YOU SEE

16  THAT, SIR?

17  A. YES.

18  Q. AND AS WE HAVE TALKED ABOUT, MR. PASCAL LAVALLEE IS AN

19  EMPLOYEE OF J. WALTER COMPANY, LIMITED; RIGHT?

20  A. CORRECT.

21  Q. AND MR. LAVALLEE HAD ACCESS TO THE SOLUTION REPORTS?

22  A. CORRECT.

23  Q. AND HE POSTED HIS COMMENTS IN RESPONSE TO DANIEL

24  GRANTHAM'S SOLUTION REPORT?

25  A. CORRECT.

1   Q. NOW, AS WE LOOK IN THE SECTION OF THIS REPORT MARKED

2   "CURRENT PROGRESS," WHICH IS IN THE MIDDLE OF THE PAGE ON

3   4470, WE SEE IN THE SECOND LINE THE SENTENCE, "I DO REGULAR

4   MONTHLY CHECKS AT THIS ACCOUNT TO CHECK THE SOLUTION LEVEL

5   AND TEMPERATURE."  SO WE KNOW THAT MR. GRANTHAM MAKES

6   REGULAR CHECKS OF THE KMT FACILITY?

7   A. CORRECT.

8   Q. AND REGULARLY HAS AN OPPORTUNITY TO SEE THE BIO-CIRCLE

9   SYSTEM AT KMT?

10  A. CORRECT.

11  Q. AS WE READ ON THROUGH THE CURRENT PROGRESS, ABOUT THE

12  MIDDLE OF THAT PARAGRAPH, IT PICKS UP HERE, "I ASKED IF I

13  COULD CLEAN A FEW PARTS AND HAVE THEM -- HAVE HIM INSPECT.

14  HE AGREED AND I CLEANED FOUR PARTS AND BLEW THEM OUT WITH

15  AIR.  I THEN WIPED THE PARTS OFF WITH A TERRY CLOTH AND TOOK

16  THEM TO HIM."  AND SO HERE WE HAVE MR. GRANTHAM PHYSICALLY

17  USING THE BIO-CIRCLE SYSTEM AT KMT'S FACILITY?

18  A. CORRECT.

19  Q. TO CLEAN PARTS?

20  A. HE IS SHOWING THEM HOW TO USE IT.  YES.

21  Q. IF WE COULD TAKE A LOOK TOGETHER AT PLAINTIFF'S EXHIBIT

22  161.  PLAINTIFF'S EXHIBIT NO. 161 IS ANOTHER WALTER SHARE

23  TEAM E-MAIL?

24  A. CORRECT.

25  Q. AND YOU RECOGNIZE THIS TO BE A TRUE AND ACCURATE COPY OF

1   A WALTER SHARE TEAM E-MAIL?

2   A. CORRECT.

3           MR. ANDERSON:  YOUR HONOR, AT THIS POINT, I WOULD

4   LIKE TO MOVE PLAINTIFF'S EXHIBIT NO. 161 INTO EVIDENCE.

5           MR. HARBIN:  NO OBJECTION, YOUR HONOR.

6           THE COURT:  ADMITTED.

7   BY MR. ANDERSON:

8   Q. THIS WALTER SHARE MESSAGE WENT OUT TO WALTER'S SALES

9   ORGANIZATION?

10  A. CORRECT.

11  Q. AND IN ORDER TO ALERT THE SALES ORGANIZATION TO THE

12  INTERVIEW THAT WAS GIVEN WITH A LOCAL T.V. STATION?

13  A. CORRECT.

14  Q. YOU APPEARED IN THAT INTERVIEW?

15  A. THAT IS CORRECT.

16  Q. THE VIDEO OF THIS INTERVIEW WAS POSTED ON WALTER'S

17  WEBSITE?

18  A. CORRECT.

19  Q. IN ORDER TO ALLOW POTENTIAL CUSTOMERS TO SEE THE VIDEO?

20  A. CORRECT.

21  Q. DONE IN CONNECTION WITH PROMOTION OF THE BIO-CIRCLE PARTS

22  WASHER?

23  A. CORRECT.

24  Q. AND THE BIO-CIRCLE L. FLUID?

25  A. CORRECT.

1  Q. IF WE LOOK AT PLAINTIFF'S EXHIBIT NO. 161 AT THE BOTTOM

2  OF THE PAGE, THERE IS A QUOTE THAT IS ATTRIBUTED TO YOU,

3  SIR.  "IT'S CLEANING THE PART OF OILS AND GREASE AND IT'S

4  GOING DOWN INTO THE HOLDING TANK, AND AT THAT POINT, SITTING

5  IN THE HOLDING TANK, THE MICROBES WILL ACTUALLY CONSUME THE

6  OILS AND GREASE," SAID THE COMPANY'S PRESIDENT, TIM

7  HOUGHTON; IS THAT CORRECT, SIR?

8  A. CORRECT.

9  Q. WE'RE GOING TO HAVE AN OPPORTUNITY TO WATCH THE VIDEO IN

10  JUST A MOMENT.  YOU ARE FAMILIAR THAT IN THE VIDEO THERE IS

11  A COMPANY CALLED STANLEY ACCESS THAT WAS ALSO INTERVIEWED?

12  A. CORRECT.

13  Q. YOU ARE FAMILIAR WITH THAT, SIR?

14  A. YES, I AM.

15  Q. WHOSE IDEA WAS IT TO INTERVIEW STANLEY ACCESS AS PART OF

16  THE VIDEO?

17  A. WHOSE IDEA?

18  Q. WHOSE IDEA WAS IT TO INTERVIEW STANLEY ACCESS?

19  A. BASICALLY WHAT THE CONCEPT WAS WAS THAT THE SALES TEAM

20  WAS ASKED TO GO TO THEIR CUSTOMERS AND ASK THEM IF THEY

21  WOULD LIKE TO HAVE THEM VIDEO.  AND THE END USER SAID YES.

22  Q. AND SO STANLEY ACCESS HAD EXPRESSED A WILLINGNESS TO BE

23  INTERVIEWED --

24  A. CORRECT.

25  Q. -- ABOUT THEIR USE OF THE BIO-CIRCLE SYSTEM?

1   A. THEY WANTED TO TELL THEIR STORY ON VIDEO.  CORRECT.  WHY

2   THEY CHOSE WALTER.

3   Q. OKAY.  IF WE COULD GO TO PLAINTIFF'S EXHIBIT NO. 591,

4   PLEASE.  MR. HOUGHTON, IT IS A VIDEO, IT IS NOT IN YOUR

5   BINDER.

6                        (VIDEO IS SHOWN.)

7   Q. YOU'VE HAD AN OPPORTUNITY TO VIEW PLAINTIFF'S EXHIBIT NO.

8   591.  DO YOU RECOGNIZE THIS VIDEO, SIR?

9   A. YES, I DO.

10  Q. IT IS A VIDEO THAT HAS BEEN POSTED ON J. WALTER'S

11  WEBSITE?

12  A. YES.

13          MR. ANDERSON:  YOUR HONOR, I MOVE PLAINTIFF'S

14  EXHIBIT NO. 591 INTO EVIDENCE.

15          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

16          THE COURT:  ADMITTED.

17          MR. ANDERSON:  YOUR HONOR, AT THIS TIME, I HAVE NO

18  ADDITIONAL QUESTIONS FOR MR. HOUGHTON AND I TENDER THE

19  WITNESS.

20          THE COURT:  ALL RIGHT.  MR. HOUGHTON, WHERE IS

21  YOUR OFFICE, PLACE OF BUSINESS?

22          THE WITNESS:  MONTREAL, CANADA.

23          THE COURT:  MR. HARBIN, NORMALLY WHEN A WITNESS

24  OF AN OPPOSING PARTY HAS BEEN CALLED, I LIMIT THE PARTIES'

25  QUESTIONS TO THEIR PORTION OF THE CASE.  BUT SINCE

1   MR. HOUGHTON IS SO FAR FROM HOME, I ASSUME YOU PREFER TO GO

2   AHEAD AND ASK HIM ANY QUESTIONS YOU HAVE TODAY?

3           MR. HARBIN:  YES, SIR, AT LEAST TODAY OR IN THE

4   MORNING, YOUR HONOR.  IF WE COULD.  HE CERTAINLY -- HE

5   WANTS -- HE DOES HAVE TO SLEEP.

6           THE COURT:  HE MIGHT WANT TO GO BACK TO MONTREAL

7   TONIGHT.  I WANT TO REDUCE YOUR QUESTIONS DOWN A LITTLE.

8   ANY OBJECTION TO THAT, MR. ANDERSON?

9           MR. ANDERSON:  NO, SIR.

10          THE COURT:  WHY DON'T WE GET STARTED.  WE WILL

11  QUIT A LITTLE AFTER 4:30.

12          MR. HARBIN:  THANK YOU, JUDGE.

13                  DIRECT EXAMINATION

14  BY MR. HARBIN:

15  Q. MR. HOUGHTON, TO BEGIN WITH, WOULD YOU JUST TELL THE

16  COURT A LITTLE BIT ABOUT YOURSELF, WHERE YOU WENT TO SCHOOL,

17  AND JUST VERY BRIEFLY YOUR WORK HISTORY BEFORE JOINING THE

18  WALTER COMPANY?

19  A. YES.  I GRADUATED FROM RIDER UNIVERSITY DOWN IN NEW

20  JERSEY IN 1979, AND THEN RECEIVED MY MASTERS IN 1986, '87,

21  IN BUSINESS.  AND THEN I WAS WORKING FOR, LIKE I SAID

22  EARLIER, I WAS WORKING FOR MERRILL-LYNCH FOR SEVERAL YEARS,

23  AND THEN I MOVED TO THE U.S. CHAMBER OF COMMERCE AS A

24  BUSINESS LOBBYING GROUP.  THEN I MOVED TO AN INDUSTRIAL

25  MANUFACTURING COMPANY, COPPER COMPANY, PHELPS-DODGE.  SPENT

1    NINE YEARS THERE, TEN YEARS WITH THE CHAMBER IN BETWEEN

2    STARTING MY OWN CONSULTING BUSINESS, AND THEN EVENTUALLY

3    WOUND UP WITH MSC INDUSTRIAL SUPPLY AND MRO INDUSTRIAL

4    DISTRIBUTOR.

5              AND THEN FROM THERE I MOVED TO WALTER, AND I'VE

6    BEEN WITH WALTER SINCE THEN.

7    Q. AND WITH YOUR PROMOTION TO WALTER, HAVE YOU RECENTLY

8    MOVED TO MONTREAL?

9    A. YES, I JUST RECENTLY MOVED TO MONTREAL IN AUGUST OF LAST

10   YEAR.

11   Q. OKAY.  AND TELL THE COURT BRIEFLY WHAT IS THE NATURE OF

12   WALTER COMPANY'S BUSINESS?

13   A. THE NATURE OF THE BUSINESS, WE ARE AN INNOVATIVE COMPANY.

14   THE BUSINESS WAS STARTED IN 1952.  IT IS A FAMILY-OWNED

15   BUSINESS.  AND THE FOCUS OF THE BUSINESS IS TO PUT INTO THE

16   HANDS OF INDUSTRIAL MANUFACTURERS, AND ANY TYPE OF

17   MANUFACTURING, THE HIGHEST QUALITY PRODUCTS FROM A SOLUTIONS

18   STANDPOINT, ESPECIALLY ON A MECHANICAL SIDE, BUT ALSO ON THE

19   CHEMICAL SIDE.

20   Q. AND WHEN YOU SAY THE HIGHEST QUALITY PRODUCT, CAN YOU

21   ELABORATE A LITTLE BIT?

22   A. YES.  WE DO -- WE GIVE OUR MANUFACTURERS THAT WE CHOOSE

23   SPECIFICATIONS OF WHAT WE WOULD LIKE THEM TO MANUFACTURE,

24   AND WE HAVE DONE THAT FOR MANY MANY YEARS.  WE ARE NOT A

25   COMPANY THAT IS A "ME TOO".  WE DON'T OFFER "ME TOO"

1    PRODUCTS.  IT IS VERY HIGH-END, HIGH QUALITY, HIGH MARGIN

2    PRODUCT LINES.

3    Q. AND IN THE TIME YOU'VE BEEN THERE, TO YOUR UNDERSTANDING

4    DOES WALTER HAVE A POLICY REGARDING INTELLECTUAL PROPERTY

5    OR --

6    A. YES.  ON THE INTELLECTUAL PROPERTY SIDE WE ARE VERY

7    CAREFUL AND VERY CONCERNED ABOUT DOING THE RIGHT THING.

8    Q. AND TO YOUR KNOWLEDGE, HAS WALTER BEEN SUED FOR PATENT

9    INFRINGEMENT BEFORE THIS DISPUTE?

10   A. NO.

11   Q. YOU WERE ASKED ABOUT THE JAY LENO VIDEO.  DID YOU PAY

12   MR. LENO ANYTHING FOR THAT ENDORSEMENT?

13   A. NO.  MR. LENO WASN'T PAID AT ALL.

14   Q. AND YOU TESTIFIED THAT YOU DON'T REALLY GO AFTER THE AUTO

15   PARTS REPAIR SHOP BUSINESS.

16   A. NO.

17   Q. CAN YOU EXPLAIN WHY THAT IS?

18   A. THE REASON WE CHOSE NOT TO, OVER MANY YEARS OF EVALUATING

19   AND STUDYING IN THE MARKET, AND LISTENING TO FEEDBACK FROM

20   OUR DIRECT SALES FORCE, IT IS VERY DIFFICULT TO CHANGE THE

21   BEHAVIOR OF AN EMPLOYEE SITTING IN ONE OF THOSE, SAY, SHOPS

22   OR IN THOSE BUSINESSES.  THEY TYPICALLY TAKE PRODUCT LIKE A

23   CARBURETOR OFF OF A CAR AND THROW IT INTO A SOLUTION TANK, A

24   SOLVENT TANK, EVERYTHING THAT GOES ALONG WITH IT, GASOLINE,

25   HEAVY GREASE, HEAVY OIL.  IT DID NOT FILL OUR APPLICATION.

1  Q. NOW, YOU WERE ASKED ABOUT THE PRODUCTS, IN THE VIDEOS,

2  THAT WOULD BE ON THE MARKET, OF THE PRODUCTS AT ISSUE IN

3  THIS CASE, THE BR 100, THE BR 200, THE IO 200 AND THE IO

4  400.  CAN YOU TELL THE COURT WHICH ONES ARE CURRENTLY ON

5  SALE IN THE UNITED STATES?

6  A. THE IO 400 AND THE IO 200 ARE CURRENTLY ON SALE.

7  Q. NOW, YOU WERE ASKED SEVERAL QUESTIONS ABOUT THE

8  INSTRUCTIONS THAT YOU GIVE TO CUSTOMERS, THE RECOMMENDATIONS

9  OF THE -- THE INSTRUCTIONS THAT IS THE INTENDED USE, AND THE

10  RECOMMENDATIONS TO USE THE PRODUCT THAT IS INTENDED TO BE A

11  BIOREMEDIATION PARTS WASHER, FOR EXAMPLE, YOU RECALL THAT,

12  AND IT'S INTENDED TO BE USED WITH THE BIO-CIRCLE FLUID.  AND

13  YOU HAVE TESTIFIED WALTER DOES GIVE THOSE INSTRUCTIONS TO

14  CUSTOMERS; CORRECT?

15  A. CORRECT.

16  Q. BUT DO YOU EXERCISE ANY CONTROL OVER ANY OF YOUR

17  CUSTOMERS, TO YOUR KNOWLEDGE, AS TO WHETHER OR NOT THEY

18  FOLLOW ANY OF THOSE INSTRUCTIONS?

19  A. NO.  MOST OF THEM TYPICALLY DO NOT.

20  Q. TO YOUR KNOWLEDGE, DOES WALTER HAVE ANY FORM OF LEGAL

21  CONTROL OVER ANY OF ITS END USERS CONCERNING ITS PARTS

22  WASHERS?

23  A. NO.

24  Q. NOW, YOU TESTIFIED THAT CUSTOMARILY WHEN A CUSTOMER BUYS

25  THE PARTS WASHER THEY ALSO BUY THE BIO-CIRCLE L FLUID.  DO

1   YOU KNOW IF YOUR CUSTOMERS ALWAYS, ONCE THEY BUY A PARTS

2   WASHER, ALWAYS BUY BIO-CIRCLE L FLUID FOR FOLLOW UP USE?

3   A. NO.  BY FOLLOW UP, YOU MEAN AFTER THE FACT?  NO.  WHAT

4   HAPPENS ACTUALLY, AND WHAT WE'VE BEEN EXPERIENCING, IS THAT

5   THEY WILL BUY BIO-CIRCLE, THEN IT WILL HAVE THE BIO-CIRCLE L

6   IN IT, THEN WE KNOW EVERY ONE OF THE MACHINES ARE LOCATED.

7   WE CAN ACTUALLY TELL, WE LIKE TO SAY WHETHER IT IS DRINKING

8   OR NOT.  WHEN IT'S NOT DRINKING, WE KNOW THERE IS SOMETHING

9   ELSE GOING ON.

10  Q. EITHER THE CUSTOMER HAS STOPPED USING THE PARTS WASHER,

11  OR THEY ARE USING A FLUID OTHER THAN BIO-CIRCLE L?

12  A. CORRECT.

13  Q. TO YOUR KNOWLEDGE, HAVE YOU HAD EXPERIENCE THAT SOME ARE

14  DRINKING AND SOME ARE NOT?

15  A. CORRECT.

16  Q. AND IS THIS SOMETHING YOU LEARNED RELATIVELY RECENTLY?

17  A. YES.  IN MY NEW POSITION, AND GETTING INVOLVED WITH THE

18  ENTIRE ORGANIZATION AND SEEING A BIGGER FOOTPRINT, IT'S

19  PRETTY OBVIOUS WHAT IS GOING ON.  YEAH.

20  Q. IN REGARD TO YOUR TESTIMONY ABOUT WALTER TRYING TO HAVE

21  UNIQUE PRODUCTS, I WANT TO ASK YOU ABOUT SOMETHING SPECIFIC

22  TO THE PARTS WASHER, AND I BELIEVE YOU TESTIFIED ABOUT,

23  MAYBE YOU REFERRED TO IT IN THE JAY LENO VIDEO, ABOUT THE

24  WALTER PARTS WASHERS BEING SELF-REGENERATING AND SELF --

25  A. SELF-RENEWING, SELF-REGENERATING.  AND IT REALLY IS, IN

1  OUR MINDS.  AND THE PEOPLE THAT I AM RESPONSIBLE FOR IN THIS

2  ORGANIZATION, IT IS TRULY THE ONLY SOLUTION OUT THERE THAT

3  IS SELF-RENEWING, SELF-REGENERATING.

4  Q. FIRST OF ALL, CAN YOU EXPLAIN A LITTLE MORE WHAT YOU

5  MEAN, WHAT WALTER MEANS, WHEN YOU TALK ABOUT THE

6  SELF-RENEWING AND SELF-REGENERATE?

7  Q. WHEN I SAY SELF-RENEWING AND SELF-REGENERATING, IT IS --

8  A BIO-CIRCLE PARTS WASHER IS A PROCESS WHERE OILS, GREASES,

9  AND HYDROCARBONS GO OFF THE PART, THROUGH THE SINK INTO THE

10  BASIN, THE OILS AND GREASES ARE CONSUMED AND TURNED INTO OR

11  OR TRANSFERRED INTO $CO_2$ AND $H_2O$.  AND BASICALLY WHAT ELSE IS

12  HAPPENING WITHIN THE RESERVOIR, WITHIN THE BASE, IS THAT

13  THEY ARE REPRODUCING.  ONCE THE SOLUTION IS AT 110 TO 115

14  DEGREES, THEY ACTUALLY ARE REPRODUCING.

15  Q. AND IN REGARD TO THE J. WALTER FLUID, HOW DO YOU COME UP

16  WITH A FLUID -- WHAT ARE THE CHARACTERISTICS THAT ENABLE YOU

17  TO HAVE IT YOURSELF AND --

18  A. THE FLUID IS WHERE THE TECHNOLOGY IS.  IT'S NOT IN THE

19  PARTS WASHER, THE INNOVATION IS IN THE FLUID.  THE FLUID IS

20  THE ONLY ONE OUT THERE THAT HAS MICROBES INSIDE A SURFACTANT

21  SITTING IN ONE BUCKET.  THAT IS THE TECHNOLOGY.  THAT IS THE

22  INNOVATION THAT WE BROUGHT TO THE MARKETPLACE.

23  Q. AND FOR EXAMPLE, IS IT -- CAN YOU TELL THE COURT WHETHER

24  OR NOT WITH THE WALTER BIO-CIRCLE FLUID, THE CUSTOMERS CAN

25  PURCHASE THE FLUID IN A CONTAINER AND PUT IT ON THE SHELF?

```
1    A. YES.  ACTUALLY THE CONTAINER CAN SIT ON THE SHELF FOR A
2    YEAR.  IT HAS TO BE ENGAGED.  THE MICROBES BECOME ENGAGED
3    WITH HEAT.  ONCE THE TEMPERATURE IS RAISED, THEN THEY BECOME
4    ENGAGED AND THEY START TO REPRODUCE.  SO A TYPICAL PARTS
5    WASHER STARTS OUT WITH ABOUT 3 MILLION MICROBES SITTING IN
6    IT.  WITHIN ABOUT FIVE TO SEVEN DAYS IT IS SOMEWHERE AROUND
7    9 MILLION.  SO IT'S STARTING TO CONSUME IN A SELF-RENEWING,
8    SELF-REGENERATING PROCESS.  THAT IS WHY WE CALL IT
9    BIO-CIRCLE, AND THAT IS WHAT THE LOGO IS ABOUT.  BIO-CIRCLE.
10   Q. TO YOUR KNOWLEDGE, DO YOU KNOW WHETHER OR NOT WALTER USES
11   UNIVERSITY RESEARCH HELP, OR OTHER RESEARCH HELP IN ITS
12   FLUIDS?
13   A. YES.  WE GO TO THE OUTSIDE FAIRLY REGULARLY WITH JUST
14   ABOUT EVERY PRODUCT THAT WE DECIDE TO PUT ON THE
15   MARKETPLACE.  WE DON'T TAKE INNOVATION LIGHTLY.  WE GO AND
16   DO OUR HOMEWORK, EXTENSIVE HOMEWORK ON IT, BEFORE THAT
17   PRODUCT ACTUALLY EARNS ITS WAY INTO THE CATALOG.  WE HAVE
18   SEEN PICTURES OF CATALOGS HERE TODAY.  THOSE PRODUCTS THAT
19   ARE IN THOSE CATALOGS HAVE EARNED THEIR WAY INTO THAT
20   CATALOG.
21   Q. NOW, YOU'VE HEARD SOME TESTIMONY TODAY REGARDING
22   CHEMFREE'S DETERMINATION, DECISION TO AFFIX THE MICROBES TO
23   THE FILTER AND HAVE THE SYSTEM WHERE THE CUSTOMERS ARE
24   RECOMMENDED TO REPLACE THE FILTER EVERY FOUR WEEKS OR A
25   MONTH, APPROXIMATELY.  DID YOU HEAR THAT?
```

1   A. YES.  I DID HEAR THAT.

2   Q. TO YOUR UNDERSTANDING, IS THAT A SELF-RENEWING

3   SELF-GENERATING SYSTEM AS WALTER USES, THE TERM AS YOU HAVE

4   USED IT TODAY?

5   A. NO, IT IS NOT.

6   Q. WHO DO YOU CONSIDER YOUR MAIN COMPETITOR TO BE IN YOUR

7   BUSINESS?

8   A. THE MAIN COMPETITOR WE HAVE ALWAYS TARGETED AND HAVE

9   CHASED AFTER IS SAFETY-KLEEN SOLVENT PARTS WASHERS AND ZEPP.

10  Q. DO YOU CONSIDER CHEMFREE TO BE A SIGNIFICANT COMPETITOR?

11  A. NO.

12  Q. TO YOUR KNOWLEDGE, IN THE UNITED STATES, THAT YOU KNOW

13  OF, HAS WALTER EVER LOST A SALE OF A PARTS WASHER TO

14  CHEMFREE?

15  A. NO.

16  Q. TO YOUR KNOWLEDGE, IN THE U.S., HAS WALTER EVER

17  SURPLANTED CHEMFREE OR WON A SALE COMPETING WITH CHEMFREE --

18  A. NO.

19  Q. -- IN THE U.S.?  HAVE THE WALTER PARTS WASHERS, TAKEN AS

20  A WHOLE OR BY INDIVIDUAL MODELS, BEEN A COMMERCIAL SUCCESS

21  IN YOUR OPINION?

22  A. NO.

23  Q. HOW WOULD YOU CHARACTERIZE THE OVER ALL SALES OF PARTS

24  WASHERS OVER THE YEARS THAT WALTER HAS BEEN IN BUSINESS?

25  A. MY EXPOSURE, AS I CAME IN IN MAY OF '05, IN '06 WE SOLD

1    50 OR 48.  IN '07 I THINK WE SOLD 200.  AND THEN '09 -- '08

2    WE SOLD 300.  SO HARDLY A COMMERCIAL SUCCESS.

3    Q. AND IS IT YOUR UNDERSTANDING THAT IN THE YEARS PRIOR TO

4    2005, THE SALES WERE APPROXIMATELY 50 UNITS A YEAR LESS?

5    A. CORRECT.

6    Q. AND SPECIFICALLY, I THINK YOU JUST ANSWERED IT, BUT JUST

7    SO WE ARE CLEAR, IN 2007 WHEN YOU WERE DEPOSED IN THIS CASE,

8    YOU FORECASTED THAT YOU HOPED 500 UNITS OF THE IO 200 WOULD

9    BE SOLD IN 2007.  DID YOU MEET THAT?

10   A. NO, WE DID NOT.

11   Q. YOU FORECAST THAT YOU WOULD SELL 1500 UNITS IN 2008.  DID

12   YOU MEET THAT FORECAST?

13   A. NO, WE DID NOT.

14   Q. TO WHAT DO YOU ATTRIBUTE THE LACK OF COMMERCIAL SUCCESS

15   OF THE WALTERS PARTS WASHERS AND FLUID?

16   A. WE ARE TRYING TO EDUCATE THE MARKETPLACE ON THE RIGHT

17   SOLUTION, AND THE END USERS HAVE BEEN BOMBARDED FOR MANY

18   MANY YEARS WITH THE WRONG SOLUTIONS THAT DO NOT WORK.  SO WE

19   ARE TRYING TO JUMP OVER THESE HURDLES.  AND WHAT IT TAKES IS

20   EDUCATING THEM.  THAT IS WHY THE TRAILERS INVOLVED, THAT

21   THAT IS WHY WE ARE DOING IT ONE END USER AT A TIME.  IT

22   MAKES IT VERY DIFFICULT WHEN YOU ARE DOING IT ONE END USER

23   AT A TIME.

24   Q. WHEN YOU TALK ABOUT END USERS BEING BOMBARDED WITH THE

25   WRONG SOLUTION, IS THERE A PARTICULAR SOLUTION YOU ARE

1    TALKING ABOUT?

2    A. AQUEOUS SYSTEMS, ANYTHING THAT IS WATER BASED HAS BEEN --

3    IT HAS TARNISHED THE MARKETPLACE OR TARNISHED THE END USER.

4    HE IS NOT VERY OPEN TO MAKING A CHANGE.  WE HAVE TO REALLY

5    SELL THEM ON THE FACT THAT OUR FEATURES AND BENEFITS AND

6    VALUABLES ADDED WE BRING ARE FAR MORE SUPERIOR THAN THEY

7    HAVE EVER SEEN BEFORE.

8    Q. DID YOU HEAR THE TESTIMONY TODAY ABOUT RESISTANCE FROM

9    SOLVENT PARTS WASHER USERS TO SWITCH TO BIOREMEDIATED PARTS

10   WASHERS BELIEVING THAT SOLVENTS CLEAN BETTER?

11   A. I DON'T BELIEVE THAT SOLVENTS ARE -- SOLVENTS ARE ON

12   THEIR WAY OUT EVENTUALLY, THEY WILL OVER TIME.  THE REASON

13   BEHIND IT IS THAT IT'S NOT AN ENVIRONMENTALLY SAFE

14   ALTERNATIVE.  AND MORE AND MORE COMPANIES ARE REALIZING IT,

15   AND MORE AND MORE COMPANIES ARE HAVE GREEN INITIATIVES TO

16   DRIVE OR LOWER THEIR CHEMICAL WASTE STREAM WITHIN THEIR

17   FACILITIES.  THAT IS WHY WE HAVE TARGETED THE INDUSTRIAL

18   MANUFACTURING END USERS.  IT IS THE BIGGEST MARKET SEGMENT.

19   Q. DO YOU KNOW WHETHER, WHEN THIS -- THAT'S ALL I HAVE, YOUR

20   HONOR.

21           THE COURT:  ALL RIGHT.  THIS WOULD BE A GOOD TIME

22   TO TAKE OUR RECESS FOR THE DAY.  I ASSUME THAT

23   MR. HOUGHTON'S EXCUSED?

24           MR. ANDERSON:  HE IS YOUR HONOR.

25           MR. HARBIN:  YES, YOUR HONOR.

1          THE COURT:  THANK YOU FOR BEING HERE MR. HOUGHTON.

2    WE WILL START TOMORROW MORNING AT 9:30 AND HAVE A FULL DAY

3    TOMORROW.

4              (HEARING ADJOURNS AT 4:39 P.M.)

5              REPORTER'S CERTIFICATION

6

7       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

8    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9

10                        _____

11                        LORI BURGESS
                          OFFICIAL COURT REPORTER
12                        UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF GEORGIA

13

14                        DATE:  AUGUST 10, 2009

15

16

17

18

19

20

21

22

23

24

25