1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF GEORGIA
2                         ATLANTA DIVISION

3
    CHEMFREE CORPORATION,        )
4                                )
                  PLAINTIFF,     )
5                                )          CIVIL ACTION
             VS.                 )          FILE NO. 1:04-CV-3711-JTC
6                                )
                                 )          ATLANTA, GA
7   J. WALTER INC.; J. WALTER    )          JULY 14, 2009
    COMPANY, LTD.,               )
8                                )
                  DEFENDANT.     )
9   _____ )

10

11                         VOLUME 2

12                  PAGES 193 THROUGH 352

13          TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
             BEFORE THE HONORABLE JACK T. CAMP
14               UNITED STATES DISTRICT JUDGE

15
    APPEARANCES:
16      FOR THE PLAINTIFF:          WILLIAM ARTHUR CAPP
                                    LUKE ANDERSON
17                                  KLAUS MELARTI
                                    ATTORNEYS AT LAW
18
        FOR THE DEFENDANTS:         STEVE SCHAETZEL
19                                  JOHN HARBIN
                                    DAVID MORELAND
20                                  ANTHONY ASKEW
                                    ATTORNEYS AT LAW
21

22  LORI BURGESS, OFFICIAL COURT REPORTER
    (404) 215-1528
23

24  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED BY CAT.
25

INDEX OF EXAMINATIONS

WITNESS NAME                                                        PAGE
CLAUDE VANDEMEULEBROOCK
     DIRECT BY MR. CAPP ................................................207
     CROSS BY MR. SCHAETZEL ...........................................274
     REDIRECT BY MR. CAPP .............................................281
FRANCIS MARKS
     DIRECT BY MR. CAPP ...............................................287
     CROSS BY MR. HARBIN ..............................................296

1          THE COURT:  ALL RIGHT, COUNSEL, WHERE WERE WE

2     YESTERDAY?

3          MR. CAPP:  YOUR HONOR, WE FINISHED WITH

4     MR. HOUGHTON.  WE ARE READY TO CALL MR. VANDEMEULEBROOCKE TO

5     THE STAND.  I TOOK SOME ACTION LAST NIGHT IN JUDGE

6     FORRESTER'S COURT AND I BELIEVE MR. HARBIN AND MR. SCHAETZEL

7     WANT TO BRING THAT TO THE COURT'S ATTENTION THIS MORNING,

8     AND WE ARE HAPPY TO HAVE A DISCUSSION ABOUT THAT THIS

9     MORNING.

10          MR. HARBIN:  LAST NIGHT AT APPROXIMATELY MIDNIGHT

11     WE RECEIVED FROM CHEMFREE'S COUNSEL A COMBINED EMERGENCY

12     MOVE TO SHOW CAUSE FOR THE IMPOSITION OF CIVIL CONTEMPT AND

13     EMERGENCY TRO MOTION CONCERNING THE TESTIMONY OF MR. MCCLUER

14     IN THIS CASE.  YOUR HONOR, THEY ARE ASKING FOR REMEDIES

15     INCLUDING INCARCERATION UNTIL CIVIL CONTEMPT IS PURGED.  WE

16     UNDERSTOOD FROM THIS MORNING THAT CHEMFREE PLANS TO ASK

17     JUDGE FORRESTER FOR A HEARING THIS AFTERNOON.  I THOUGHT

18     THIS WAS TAKEN CARE OF WITH YOUR HONOR'S ORDER.  WE MADE

19     CLEAR, WHENEVER THAT WAS, AT LEAST TWO MONTHS AGO, I THINK,

20     THAT WE PLANNED TO CALL HIM.  WE ARE SUBPOENAING HIM.  SO I

21     DON'T KNOW WHAT THE IMMEDIATE EMERGENCY IS OR WHY THEY WAIT

22     UNTIL LAST NIGHT.  I DON'T WANT TO -- YOU KNOW, I DON'T KNOW

23     WHAT THE ALLEGED IRREPARABLE HARM IS FROM A WITNESS

24     RESPONDING TO A SUBPOENA TO TESTIFY IN COURT.  THAT IS

25     APPARENTLY THEIR COMPLAINT THAT HE IS GOING TO TESTIFY, AND

1    THAT HE HAS DECLINED TO BE INTERVIEWED BY THEM IN ADVANCE,

2    WHICH I BELIEVE A HUMAN BEING IS FREE TO DO.

3          YOUR HONOR, THE COURT REJECTED LAST TIME, DENIED

4    OUR REQUEST THAT CHEMFREE AND ITS COUNSEL BE INSTRUCTED THAT

5    IF THEY HAVE A PROBLEM WITH MR. MCCLUER'S TESTIMONY PURSUANT

6    TO SUBPOENA THAT WE HAD SEVERAL WEEKS AGO IN THIS CASE, THAT

7    THEY ADDRESSED THAT TO YOUR HONOR.  THERE IS NO ISSUE OF

8    DISCLOSURE OF TRADE SECRETS HERE OR CONFIDENTIAL

9    INFORMATION.  AGAIN, THIS WITNESS HAS GIVEN SIX OR SEVEN

10   DEPOSITIONS OVER 15 YEARS.  MY ANTICIPATION TO OUR QUESTIONS

11   WILL BE ELICITING THE EXACT, SAME TESTIMONY.  AGAIN, I DON'T

12   KNOW WHAT THE EMERGENCY RELIEF OR HARM IS.

13         IT IS -- WELL, I AM AT A LOSS FOR WORDS, YOUR

14   HONOR, BUT I WOULD ASK THAT YOUR HONOR RECONSIDER THE RELIEF

15   WE REQUESTED EARLIER.  THANK YOU.

16         THE COURT:  ALL RIGHT.

17         MR. CAPP:  I THOUGHT WHERE WE LEFT IT LAST TIME,

18   THIS WAS A MATTER BETWEEN CHEMFREE AND MR. MCCLUER AND JUDGE

19   FORRESTER.  WE ARE HAPPY TO ALLOW J. WALTER AND THESE

20   COUNSEL TO INTERVENE IN THE HEARING SO THEY CAN BE HEARD IN

21   FRONT OF JUDGE FORRESTER.  BUT UP UNTIL 72 HOURS AGO, I HAD

22   RECEIVED PERIODIC AND REPEATED ASSURANCES FROM MR. MCCLUER'S

23   COUNSEL THAT MR. MCCLUER FULLY INTENDED TO COMPLY WITH HIS

24   OBLIGATIONS UNDER THE CONSENT JUDGMENT AND THE PERMANENT

25   INJUNCTION.  I SCHEDULED AN APPOINTMENT FOR LAST THURSDAY TO

1    MEET WITH MR. MCCLUER AND HIS ATTORNEY MR. BUNCH, WHICH

2    WOULD HAVE BEEN THE FIRST TIME IN MY LIFE I WOULD HAVE HAD

3    AN OPPORTUNITY TO SPEAK DIRECTLY WITH MR. MCCLUER.  I HAVE

4    ALWAYS DEALT WITH HIM THROUGH COUNSEL.

5              THE COURT:  YOU HAVE SPOKEN WITH MR. BUNCH BEFORE?

6              MR. CAPP:  I HAVE KNOWN MR. BUNCH FOR AWHILE.  AND

7    I CAN TELL THAT YOU HAVE, TOO.  THEY BROKE THAT APPOINTMENT,

8    UNSCHEDULED.  I ACQUIRED ON THE FOLLOWING DAY IF THEY WERE

9    INCLINED TO RESCHEDULE.  HE DECLINED.  I WILL GIVE THE COURT

10   AS MUCH DETAIL AS THE COURT REQUIRES OF ME, BUT SUFFICE IT

11   TO SAY THAT AT THAT POINT IN TIME I WAS PUT ON NOTICE, THAT

12   I NO LONGER HAD REASONABLE ASSURANCE THAT MR. MCCLUER WOULD

13   COMPLY WITH HIS OBLIGATIONS UNDER AN INJUNCTION.  THIS

14   CORRESPONDED TIMEWISE TO SHORTLY AFTER MR. MCCLUER RECEIVED

15   HIS LAST PAYMENT OF MONEY FROM US.  SO HE HAS NOW BEEN FULLY

16   PAID.  HE HAS RECEIVED A HALF MILLION DOLLARS FROM US AND

17   ALL WE ASK IN RETURN FOR WHAT WE PAID HIM WAS WARRANTEE OF

18   CLEAN TITLE TO THE PROPERTY THAT HE CONVEYED TO US.  AND WE

19   HAVE NEVER RECEIVED THAT FROM HIM.  SO WE WANT TO BRING THIS

20   UP IN FRONT OF JUDGE FORRESTER, IF FOR NOTHING ELSE, HE

21   STOOD UP, LOOKED A FEDERAL DISTRICT COURT JUDGE IN THE EYE

22   AND AVERRED TO THIS SETTLEMENT AGREEMENT, AND NOW IT IS VERY

23   CLEAR THAT HE DID SO UNDER FALSE PRETENSES.  HE TRIFLED WITH

24   THE UNITED STATES FEDERAL COURT JUDGE, LOOKED HIM STRAIGHT

25   IN THE EYE, AND WITH NO INTENT TO ABIDE WITH HIS WORD,

1    AFFIRMED THE TERMS OF THIS SETTLEMENT AGREEMENT.

2            THE COURT:  WELL, LET ME ASK YOU THIS:  TELL ME

3    WHAT THE TERMS, JUST IN SUMMARY, OF THE INJUNCTION AND THE

4    SETTLEMENT AGREEMENT ARE THAT YOU CLAIM HE HAS VIOLATED.

5            MR. CAPP:  THERE ARE A NUMBER OF TERMS.  THE KEY

6    ONES ARE AT THE TIME WE HAD THE HEARING IN SEPTEMBER, THERE

7    WAS ABOUT $150,000 IMPOUNDED THAT WAS PAID INTO THE REGISTRY

8    OF THE COURT PENDING THE SUIT.  WE WERE PREPARED TO GO TO

9    TRIAL TO RE-OPEN THE JUDGE FORRESTER CASE AND GO TO TRIAL ON

10   THE INVENTORSHIP ISSUE TO SEEK RESCISSION AND RESTITUTION

11   FROM THE 2004 SETTLEMENT AGREEMENT.  WE WERE PREPARED TO SUE

12   MR. MCCLUER IN A SEPARATE ACTION FOR SLANDER OF TITLE, BOTH

13   FOR WHAT HE HAS DONE IN THIS CASE AND SOME ACTIONS THAT HE

14   HAS TAKEN AGAINST OUR -- WITH OUR COMPETITORS IN EUROPE TO

15   TRY AND UNDERMINE THE VALIDITY OF OUR EUROPEAN PATENT RIGHTS

16   BY TURNING OVER FALSE AND MISLEADING INFORMATION TO THEM.

17   SO THAT THE DEAL WAS, WE FOREWENT HAVING JUDGE FORRESTER'S

18   CASE REOPENED, SEEKING RESCISSION OF THE $300,000 THAT WE

19   ALREADY PAID THEM, WE FOREWENT THE SEPARATE ACTION FOR

20   SLANDER OF TITLE, WE RELEASED THE IMPOUNDED FUNDS, AND ALL

21   WE GOT IN RETURN WAS A PROMISE THAT HE WOULD FINALLY FESS UP

22   TO THE TRUTH, WHICH IS THIS WHOLE RUSE ABOUT HIM BEING THE

23   SOLE INVENTOR HAS BEEN FALSE AND MISLEADING, YOU KNOW, FROM

24   THE GET-GO, WHICH HE DID.  HE STOOD UP AND HE LOOKED JUDGE

25   FORRESTER STRAIGHT IN THE EYE AND SAID THIS IS THE TRUTH, I

1    AM STIPULATING TO IT, I AM DOING IT OF MY OWN FREE WILL AND

2    THAT I AM NOT UNDER DURESS.  AND IN RELIANCE ON THAT, JUDGE

3    FORRESTER ENTERED AN ORDER, TURNED OVER THE MONEY, IMPOSED

4    ON US TO FOREGO THE CIVIL ACTION FOR SLANDER OF TITLE, JUDGE

5    FORRESTER DIDN'T RE-OPEN THE CASE, WE DIDN'T GET TO TRY THE

6    INVENTORSHIP ISSUE IN A BILATERAL PROCEEDING AGAINST THE

7    PARTIES THAT WERE REALLY, YOU KNOW, AT ISSUE, AND THE ONLY

8    TINY, LITTLE THING THAT WE GOT IN RETURN DOESN'T LOOK LIKE

9    WE ARE GOING TO GET.  SO THIS IS A MATTER, I THINK, THAT IS

10   BEST HANDLED BETWEEN CHEMFREE, MR. MCCLUER, JUDGE FORRESTER.

11   IF THEY WANT TO INTERVENE, YOU KNOW, LET THEM TRY TO

12   INTERVENE.  BUT MCCLUER IS GOING TO GET THERE AND WHEN HE

13   GETS ON THE STAND, HE IS GOING TO SAY WHATEVER IT IS THAT HE

14   IS GOING TO SAY, AND HE IS GOING TO HAVE TO LIVE WITH THE

15   CONSEQUENCES OF THAT.  BUT IN THE MEANTIME, WE HAVE LEGAL

16   RIGHTS, TOO, INCLUDING THE FACT THIS HE HAS TAKEN A HALF A

17   MILLION DOLLARS FROM US UNDER FALSE PRETENSES, HE HAS NEVER

18   LIVED UP TO HIS WARRANTY OF TITLE FOR THE PROPERTY THAT HE

19   HAS TRANSFERRED FOR US, AND WE ARE ENTITLED TO SEEK REDRESS

20   FOR OUR GRIEVANCES IN A COURT OF LAW.  THAT IS ALL WE ARE

21   DOING HERE, YOUR HONOR.

22           THE COURT:  OF COURSE, YOU DON'T KNOW HOW HE IS

23   GOING TO TESTIFY, DO YOU, MR. CAPP?  HE MAY TESTIFY THE SAME

24   WAY THAT HE REPRESENTED TO JUDGE FORRESTER.

25           MR. CAPP:  YOUR HONOR, I WOULD NOT HAVE FILED THE

1    PAPERS IF I HAD NOT BEEN GIVEN REASON TO BELIEVE THAT HE

2    WOULD NOT LIVE UP TO HIS COMMITMENTS THAT HE MADE TO JUDGE

3    FORRESTER.

4              THE COURT:  OKAY.  MR. HARBIN?

5              MR. HARBIN:  YES, IF I MAY RESPOND, YOUR HONOR.  A

6    FEW THINGS, YOUR HONOR.  NUMBER ONE, I THINK YOUR HONOR

7    ASKED WHAT THE TERMS ARE THAT ARE BREACHED, AND I DON'T

8    THINK THE ANSWER WAS GIVEN DIRECTLY.  I THINK WHAT THEY ARE

9    ASKING, WHAT THEIR COMPLAINT ABOUT IS, HE DECLINED TO MEET

10   WITH THEM AND HE IS GOING TO TESTIFY IN THIS CASE IN

11   RESPONSE TO A SUBPOENA THAT IS COURT ISSUED.  NOW, MR. --

12   CHEMFREE'S COUNSEL WENT ON AND ON ABOUT OWNERSHIP.  AS WE

13   SAID AT THE PRIOR HEARING, AND CHEMFREE'S COUNSEL MENTIONED

14   IN OPENING STATEMENT, WE ARE SCRATCHING OUR HEADS ABOUT --

15   WE ARE NOT CONTESTING OWNERSHIP.  THAT IS WHAT THAT DISPUTE

16   STARTED ON.  THE LAST CONTESTED HEARING IN THAT CASE AT

17   WHICH JUDGE FORRESTER SAID HE PUT IN OUR PRIOR MOTION, EVERY

18   MAN IS ENTITLED TO EVIDENCE AND I CAN'T STOP HIM FROM

19   TELLING HIS VERSION OF THE FACTS.  IT WAS ABOUT OWNERSHIP.

20   THEN CHEMFREE TWISTED IT INTO A CASE ABOUT BRINGING A CLAIM

21   FOR BREACH AND SAYING THEY WANTED TO STOP PAYING HIM AND

22   BROUGHT IN THE INVENTORSHIP ISSUE.  THERE WAS A HEARING.

23   MR. MCCLUER DID GET UP AND SAY I AM NOT UNDER DURESS, BUT

24   MR. BUNCH MADE IT VERY CLEAR TO THE JUDGE, HE IS DESPERATE,

25   HE IS ELDERLY.  HE IS ABOUT TO LOSE HIS HOUSE.  I THINK HE

```
 1    SAID, THIS IS VIRTUALLY A QUOTE, VERY CLOSE, HE WILL DO
 2    ANYTHING, JUDGE, TO GET THIS RESOLVED.  IT IS NOT CORRECT,
 3    YOUR HONOR, THAT THE IMPLICATION THAT ALL OF THIS WAS
 4    REVIEWED WITH JUDGE FORRESTER AND MR. MCCLUER SWORE HE WOULD
 5    DO ALL OF IT, IT IS NOT CORRECT.  AT LEAST AS I'VE MENTIONED
 6    BEFORE, ACCORDING TO THE LAST TRANSCRIPT THAT WAS PREPARED,
 7    THE OWNER'S TERMS OF THIS PROVISION, THAT I HAVE NEVER SEEN
 8    BEFORE, THAT HE HAS TO TELL SOMEBODY HE IS -- HE IS
 9    REPRESENTED BY CHEMFREE'S COUNSEL.  HE CAN'T TALK TO
10    ANYBODY.  THAT IF HE TESTIFIES, THIS IS WHAT HE IS GOING TO
11    SAY, AND IF HE ADMITS TO HIS 15 YEARS OF SWORN TESTIMONY,
12    ALL OF WHICH AGAIN IS VERY CONSISTENT, I CAN PREDICT, YOUR
13    HONOR, WHAT HE IS GOING TO SAY, IT WILL BE VERY SURPRISING
14    IF IT DIFFERS.  BUT THAT THIS ORDER, IF HE TESTIFIES,
15    INCONSISTENT WITH OVERALL THE NEW CONSENT VERSION OF THE
16    FACTS, THIS NEW HISTORY, HE IS GOING TO BE SUBJECT TO
17    $25,000 IN LIQUIDATED DAMAGES.  NOW, LEAVING ASIDE THE ISSUE
18    OF HOW THEY CLAIM IRREPARABLE HARM FROM SOMEBODY TESTIFYING
19    WHEN THEY GOT A MONETARY PENALTY, LEAVE ALL OF THAT ASIDE.
20    NONE OF THAT IN THE TRANSCRIPT WAS REVIEWED WITH JUDGE
21    FORRESTER.  THE ONLY THING THAT WAS SAID IN THIS REGARD TO
22    JUDGE FORRESTER WAS, IF HE WAS CONTACTED, HE WILL NOTIFY --
23    A VERY TRADITIONAL CLAUSE, LIKE IN A NONCONFIDENTIALITY
24    AGREEMENT.  IF HE IS SUBPOENAED OR CONTACTED, HE WILL NOTIFY
25    CHEMFREE AND HE WILL COOPERATE.
```

1          THE COURT:  LET ME ASK YOU THIS, MR. HARBIN.  WHAT

2     IS THE PURPOSE OF HIS TESTIMONY IF YOU ARE NOT CONTESTING

3     OWNERSHIP?

4          MR. HARBIN:  INVENTORSHIP TITLE, YOUR HONOR, WE

5     HAVE NEVER CONTESTED.  THERE HAS BEEN -- WE HAVE NEVER

6     CONTESTED WHETHER IT'S FROM --

7          THE COURT:  THE ISSUE IS INVENTORSHIP.

8          MR. HARBIN:  RIGHT.  AND OBVIOUSLY, IT WAS NOT

9     JUST -- WE ARE GOING TO ALSO -- WE THINK IT WILL HELP OUR

10    OBVIOUSNESS CASE AS WELL.  BUT OWNERSHIP, YOUR HONOR,

11    WHETHER IT IS THE ASSIGNMENT HE GOT, WHETHER IT WAS THEIR

12    DEAL WITH ZYMO, WE ARE NOT CONTESTING, WE DON'T HAVE THE

13    OWNERSHIP OF THESE PATENTS.  THAT WAS RESOLVED AT --

14         THE COURT:  WHAT IS THE RELEVANCE?  IF THERE IS

15    NO -- IF THERE IS NO ISSUE AS TO WHETHER THE PATENTS ARE

16    OWNED BY CHEMFREE, WHAT WOULD BE THE EFFECT OF A FINDING

17    WITH REGARD TO INVENTORSHIP?  TO INVALIDATE THE PATENTS OR

18    TO SHOW A FRAUD ON THE PATENT OFFICE OR --

19         MR. HARBIN:  I THINK, YOUR HONOR, 102 G, AND I CAN

20    COME BACK, I THINK WE BRIEFED THIS AND PUT THIS IN OUR

21    FINDINGS OF FACT, BUT I CAN COME BACK TO THE BRIEF MORE

22    CLEARLY.  BUT TO PARAPHRASE, I DO THINK, AT MINIMUM, THEY

23    CAN BE DIRECTED TO CORRECTED -- YOUR HONOR CAN DIRECT THE

24    PATENT OFFICE BE CORRECTED.  I ALSO THINK THERE IS FEDERAL

25    CIRCUIT AUTHORITIES THAT WITHOUT A SHOWING OF INEQUITABLE

1    CONDUCT, THE FACT CAN BE INVALIDATED, NOT ALWAYS AN

2    AUTOMATIC, OKAY, IT WAS WRONG INVENTORSHIP, AND THEREFORE,

3    JUST CORRECT IT.  IT DOES GO TO -- IT DOES GO TO UNDER 102

4    TO PRIOR INVENTION AND WHO WAS THE INVENTOR AND WHO IS THE

5    PRIOR INVENTOR.  AND AGAIN, WE CAN BRIEF THAT MORE, YOUR

6    HONOR, BUT I DON'T THINK THIS IS -- THERE IS ONE REMEDY, I

7    AGREE, THAT CHEMFREE SAYS THAT THE COURT CAN DIRECT THE

8    PATENT OFFICE TO CORRECT, AND WE AGREE INEQUITABLE CONDUCT

9    IS NOT IN THE CASE BUT I DON'T THINK IT IS THAT SIMPLE A

10   QUESTION.  INCLUDING ASKING, FRANKLY, THE FEDERAL CIRCUIT TO

11   SAY UNDER THIS CASE, IS THERE A BROADER REMEDY THAN THE

12   DISTRICT COURT UNDERSTOOD.

13              THE COURT:  WELL,  THE PLAINTIFF ACKNOWLEDGES THAT

14   HE WAS A., ONE INVENTOR.  SO THE QUESTION IS SIMPLY WHETHER

15   THE OTHERS SHOULD BE REMOVED AS INVENTORS?  IS THAT WHAT YOU

16   WOULD ARGUE AND THERE SHOULD BE SOME REMEDY AS A RESULT OF

17   THAT?

18              MR. HARBIN:  THAT IS PART OF THE ISSUE.  IN FACT,

19   YOUR HONOR, I THINK WE PUT IT IN THE STATE OF THE FACTS, I

20   THINK WE PUT IT IN BRIEFING AT SOME POINT, THERE IS A

21   PROVISION SECTION 103 THAT WE ALSO THINK AFFECTS THE PATENT.

22   IT WAS INACTIVE.  YOU HAVE ONE COMPANY WITH TWO DIFFERENT

23   PEOPLE WORKING ON THE INVENTION AND TWO DIFFERENT

24   OPERATIONS, THAT MAY GIVE PROTECTION TO ONE PATENT BUT WE

25   THINK UNDER THAT STATUTE, CLEARLY DOES NOT GIVE THEM

1    PROTECTION IF HE IS FOUND TO BE THE SOLE INVENTOR, EVEN IF

2    IT IS FOUND HE DID IT WHILE AT CHEMFREE, AS TO THE OTHER

3    PATENTS.  AND AGAIN, I AM HAPPY TO ANSWER THE QUESTION, BUT

4    I DON'T WANT THE COURT TO BE UNDER A MISIMPRESSION, WE DO

5    WANT TO PUT HIS TESTIMONY ON, ALSO ON THE ISSUE OF

6    OBVIOUSNESS.

7                THE COURT:  OKAY.

8                MR. HARBIN:  HE IS VERY PROUD OF THIS.  I DON'T

9    ANTICIPATE HE IS GOING TO SAY THEY ARE OBVIOUS.  I HAVE

10   NEVER ASKED HIM THAT QUESTION.  BUT I DON'T THINK HE IS

11   GOING TO SAY THAT BECAUSE HE IS VERY PROUD OF WHAT HE DID.

12   BUT WE BELIEVE HIS TESTIMONY WILL HELP SHOW THE FACTS THAT

13   WOULD LEAD TO THAT CONCLUSION.  BUT THE FUNDAMENTAL

14   QUESTION, YOUR HONOR, AGAIN, IS, I MEAN, A., JUST THE ISSUE

15   OF HIM BEING INCARCERATED, B., HE IS OVER 80 YEARS OLD,

16   BEING SUBJECT TO FURTHER INCARCERATION WHEN THEY HAVE KNOWN

17   ABOUT THIS FOR A COUPLE OF MONTHS.  THE ONLY THING THAT HAS

18   CHANGED IS HE DECLINED TO TALK TO THEM AND INDICATED, I

19   GUESS, HIS TESTIMONY MIGHT BE CONSISTENT WITH WHAT IT HAS

20   BEEN OVER THE LAST 15 YEARS.  CHEMFREE HAS CONSTANTLY

21   REFERRED TO HIM AS A SIDESHOW.  I THINK YESTERDAY DISPARAGED

22   HIM AS A JERRY SPRINGER SHOW.  SO I AM NOT SURE WHY THEY ARE

23   SO CONCERNED ABOUT IT BUT I THINK THAT --

24                THE COURT:  WELL,  TO CONFIRM WHAT I THINK WAS MY

25   PREVIOUS RULING, I WILL ENFORCE THE SUBPOENA.  I THINK YOU

1  ARE ENTITLED TO SUBPOENA HIM IF HE HAS RELEVANT TESTIMONY OR

2  EVIDENCE TO OFFER IN THIS CASE.  AND THEN IT'S UP TO JUDGE

3  FORRESTER WHETHER HE IS VIOLATING PRIOR COURT ORDER IN JUDGE

4  FORRESTER'S CASE, AND HE IS MUCH BETTER SITUATED TO MAKE

5  THAT DECISION THAN I AM.  SO TO THE EXTENT I CAN, I WILL

6  ENFORCE THE SUBPOENA, AND LEAVE ANY FURTHER ACTION WITH

7  REGARD TO THE LIQUIDATED PENALTY OR INJUNCTION TO JUDGE

8  FORRESTER.

9        MR. HARBIN:  OKAY.

10        THE COURT:  ALL RIGHT.  CALL YOUR NEXT WITNESS.

11        MR. CAPP:  I CALL MR. VANDEMEULEBROOCKE TO THE

12  STAND.  YOUR HONOR, WHILE HE IS COMING TO BE SWORN, CAN WE

13  GO OVER A FEW HOUSEKEEPING ITEMS?

14        THE COURT:  ALL RIGHT.

15        MR. CAPP:  I WOULD LIKE TO TENDER SOME MATERIALS

16  THAT ARE ON THE DOCKET IN THE CASE INTO THE TRIAL RECORD SO

17  THEY ARE AVAILABLE TO GO UP ON APPEAL.  AND CAN I GO THROUGH

18  THOSE ONE AT A TIME?

19        THE COURT:  WELL, I AM GOING TO ASK THAT YOU JUST

20  GIVE THAT TO MR. MARTIN, GIVE A COPY TO DEFENDANT'S COUNSEL,

21  AND IF THERE IS ANY OBJECTION ABOUT THAT, I WILL HEAR IT.

22        MR. CAPP:  IT'S BASICALLY THE INFRINGEMENT

23  CONTENTIONS AND RESPONSES TO IT AND THE APPROPRIATE DOCKET

24  NUMBERS.

25        THE COURT:  REFER TO THEM BY DOCKET NUMBER OR

1    DESCRIBE THEM, MAKE MR. MARTIN AWARE, MAKE COUNSEL FOR

2    DEFENDANT AWARE, AND IF WE NEED TO DISCUSS IT, WE WILL.

3    OTHERWISE, THEY WILL BE ADMITTED.

4         MR. CAPP:  THE OTHER HOUSEKEEPING ITEM I HAD WAS,

5    I WANTED TO TENDER INTO EVIDENCE THE DEFENDANT'S RESPONSE TO

6    INTERROGATORY NO. 1.  IT'S NOT MARKED AS AN EXHIBIT, BUT

7    IT'S FILED OF RECORD AT DOCKET 255-3.  AND AMONG OTHER

8    THINGS, IT GOES TO A NEW NONINFRINGEMENT CONTENTION, WHICH

9    WE HAVE NEVER HEARD OF BEFORE.  WE HEARD ABOUT IT FOR THE

10   FIRST TIME IN OPENING STATEMENT, WHERE THEY SAID THIS

11   PROVIDING THE PARTS WASHER ELEMENT IS NO LONGER MET BECAUSE

12   THEY ACKNOWLEDGED THAT IT WAS MET IN THEIR INFRINGEMENT

13   CONTENTION RESPONSES, SO WE HAD THAT ADMISSION.  AND WHEN WE

14   LOOK AT THEIR INTERROGATORY RESPONSES, THEY GIVE NO

15   UNDERLYING FACTUAL BASIS FOR PUTTING THAT PARTICULAR ELEMENT

16   IN ISSUE.  PLUS --

17        THE COURT:  WHAT IS THE PURPOSE OF ADMITTING IT?

18   ARE YOU ARGUING IT IS SOME SORT OF ADMISSION?

19        MR. CAPP:  YES, I AM, YOUR HONOR.

20        THE COURT:  THAT IS BINDING AS A MATTER OF LAW?

21        MR. CAPP:  YES.  THAT'S THE WHOLE POINT TO THAT,

22   IS ASKING THEM FOR THE UNDERLYING FACTUAL BASIS -- WELL,

23   THAT AND TO LIMIT THE SCOPE OF THE EVIDENCE THEY CAN PUT ON

24   UNDER RULE 37 (C) (1).

25        THE COURT:  I WILL ALLOW YOU TO MAKE THAT PART OF

1   THE RECORD AND I WILL TAKE A LOOK AT IT AND WHEN AND IF THAT

2   BECOMES AN ISSUE, WE WILL DISCUSS IT.

3           MR. CAPP:  YOUR HONOR, THE OTHER SIGNIFICANCE OF

4   THAT IS WE NEVER HAD AN OPPORTUNITY DURING MARKMAN TO

5   CONSTRUE "PROVIDING THE PARTS WASHERS."  IT WAS NEVER PUT

6   INTO ISSUE.  SO NOW I AM HEARING, FOR THE FIRST TIME, A NEW

7   NONINFRINGEMENT THEORY THAT HINGES ON THE NAME OF THAT TERM.

8   IT IS VERY PREJUDICIAL FOR THE PLAINTIFF TO BE HEARING ABOUT

9   THIS IN OPENING STATEMENT WHEN I DON'T EVEN KNOW WHAT THE

10  ISSUES ARE IN THE CASE.

11          THE COURT:  WELL,  WE WILL, WHEN THAT ARISES,

12  WITHIN THE COURSE OF DEFENDANT'S PRESENTATION, I WILL

13  CONSIDER ANY MOTION YOU HAVE IN THAT REGARD.

14          MR. CAPP:  THANK YOU, YOUR HONOR.

15          THE COURT:  IT IS A LOT EASIER TO HANDLE THINGS

16  LIKE THAT WHEN THERE IS NO JURY TO KEEP INFORMATION FROM.

17  ALL RIGHT.

18                  CLAUDE VANDEMEULEBROOCKE

19                     PLAINTIFF'S WITNESS

20                           SWORN

21                     DIRECT EXAMINATION

22  BY MR. CAPP:

23  A. MY NAME IS CLAUDE VANDEMEULEBROOCKE.  THE LAST NAME IS

24  SPELLED V-A-N-D-E-M-E-U-L-E-B-R-O-O-C-K-E.

25          MR. CAPP:  MAY I APPROACH THE WITNESS WITH THE

1    EXHIBIT BOOK?

2              THE COURT:  YES.

3    BY MR. CAPP:

4    Q. WILL YOU TELL THE JUDGE WHERE YOU LIVE, PLEASE?

5    A. I LIVE IN MONTREAL, CANADA.

6    Q. AND YOU WORK FOR J. WALTER COMPANY, LIMITED?

7    A. YES, I DO.

8    Q. YOU WERE EDUCATED IN CANADA?

9    A. YES.

10   Q. AND YOU GRADUATED FROM HIGH SCHOOL?

11   A. YES.

12   Q. AND YOU ATTENDED COLLEGE FOR ABOUT THREE YEARS BUT DID

13   NOT GRADUATE, AND DID NOT RECEIVE A DEGREE?

14   A. YES.

15   Q. YOU WORK FOR THE BIO-CIRCLE DIVISION OF J. WALTER COMPANY

16   LIMITED?

17   A. NO.

18   Q. WHO DO YOU WORK FOR?

19   A. J. WALTER COMPANY, LIMITED, BIO-CIRCLE DIVISION.

20   Q. ARE YOU FAMILIAR WITH THE TERM "BIO-CIRCLE DIVISION"?  IS

21   THERE SUCH A ENTITY WITHIN ANY OF THE WALTER FAMILY OF

22   COMPANIES?

23   A. THERE WAS AT ONE POINT, I BELIEVE, BUT TWO YEARS AGO, A

24   BIO-CIRCLE DIVISION -- A DIVISION OF THE J. WALTER COMPANY,

25   WAS CALLED BIO-CIRCLE.  BUT THAT DOES NOT EXIST ANYMORE, TO

1   MY KNOWLEDGE, ANYHOW.

2   Q. DO YOUR RESPONSIBILITIES AT J. WALTER COMPANY, LIMITED

3   ENCOMPASS DEALING WITH THE BIO-CIRCLE PRODUCT LINE?

4   A. YES.

5   Q. ARE YOU THE MOST SENIOR PERSON DIRECTLY RESPONSIBLE FOR

6   SUPERVISION AND MANAGEMENT OF THE BIO-CIRCLE PRODUCT LINE?

7   A. FOR THE DEVELOPMENT OF THE PRODUCT LINE.  YES.

8   Q. HOW MANY PROFESSIONALS ARE UNDER YOUR SUPERVISION?

9   A. I AM SORRY, FOR THE BIO-CIRCLE DIVISION OR OVERALL?

10  Q. FOR PEOPLE DIRECTLY INVOLVED WITH THE BIO-CIRCLE PRODUCT

11  LINE?

12  A. TWO PEOPLE.

13  Q. WHO ARE THEY?

14  A. MR. PASCAL LAVALLEE, AND MR. DAVID FORTEN.

15  Q. OF THOSE TWO, ARE THEY BOTH GENTLEMEN?

16  A. YES.

17  Q. OF THOSE TWO GENTLEMEN, WHO WOULD YOU SAY HAS ENOUGH

18  SCIENTIFIC EXPERTISE IN THE PARTS WASHER ART TO UNDERSTAND

19  WHAT IS DISCLOSED IN CHEMFREE'S PATENTS?

20  A. THAT WOULD BE MR. LAVALLEE.

21  Q. WOULD IT ALSO INCLUDE YOU?

22  A. YES.

23  Q. HOW MUCH OF YOUR TIME IS DEVOTED TO THE BIO-CIRCLE

24  PRODUCT LINE?

25  A. ABOUT, I WOULD SAY, 30 PERCENT.

1    Q. WOULD YOU TURN IN YOUR EXHIBIT NOTEBOOK TO, PLAINTIFF'S

2    EXHIBIT 123, SIR?  DO YOU REMEMBER THIS FROM YOUR

3    DEPOSITION?

4    A. FRANKLY, NO, I DON'T REMEMBER FROM MY DEPOSITION.  NO.

5    Q. DO YOU RECALL BEING THE CORPORATE RULE 30 (B) (6)

6    REPRESENTATIVE TO GIVE TESTIMONY ON BEHALF OF THE DEFENDANTS

7    IN THIS LITIGATION?

8    A. YES.

9    Q. DO YOU RECALL BEING THE ONLY PERSON THAT WAS DESIGNATED

10   TO TESTIFY ABOUT ANY TOPICS ON WHICH THE PLAINTIFF REQUESTED

11   DEPOSITION TESTIMONY IN THE CASE FROM THE CORPORATE

12   DEFENDANTS?

13   A. YES.

14   Q. ONE OF YOUR RESPONSIBILITIES OF THE COMPANY IS TO ENSURE

15   THAT THE TECHNICAL DATA REGARDING THE BIO-CIRCLE PRODUCT

16   LINE THAT IS PROVIDED ON DEFENDANT'S PRODUCT LITERATURE IS

17   ACCURATE; IS THAT CORRECT?

18   A. YES.

19   Q. WOULD YOU LOOK AT PLAINTIFF'S EXHIBIT 24, PLEASE?  ON

20   PAPER, IT'S THREE PAGES.  BUT DO YOU RECOGNIZE IT AS BEING A

21   SCREEN CAPTURE FROM THE BIO-CIRCLE WEBSITE?

22   A. YES.

23   Q. DOES IT APPEAR TO BE A TRUE AND ACCURATE COPY OF WHAT

24   HAS, AT TIMES DURING THE COURSE OF THIS LITIGATION, APPEARED

25   ON THE BIO-CIRCLE WEBSITE?

1   A. YES.

2    YOUR HONOR, I TENDER EXHIBIT 24 INTO EVIDENCE.

3        THE COURT:  OBJECTION?

4        MR. SCHAETZEL:  YOUR HONOR, I AM NOT CERTAIN THAT

5   I UNDERSTAND.  I AM TRYING TO LOOK AT -- I AM TRYING TO

6   UNDERSTAND THAT THERE HAS BEEN NO REDACTING OR CROPPING OF

7   IT, IT IS JUST ALL PUT ON ONE PAGE OR --

8        MR. CAPP:  THERE SHOULD BE THREE PAGES.

9        THE COURT:  LET'S SEE.

10       MR. SCHAETZEL:  I JUST WANT TO BE CERTAIN THAT

11   WHAT I AM AGREEING TO --

12       MR. CAPP:  ONCE IT WAS PRINTED OFF THE INTERNET,

13   IT WAS THREE PAGES.

14       THE COURT:  WHAT IS YOUR OBJECTION, MR. SCHAETZEL?

15       MR. SCHAETZEL:  I JUST WANT TO BE CERTAIN WHAT WAS

16   ON THE SCREEN ACCURATELY REFLECTED WHAT WAS THE THREE PAGES.

17   I WAS ASKING WHETHER OR NOT ANYTHING HAD BEEN REMOVED OR

18   CHANGED OR TAKEN.

19       MR. CAPP:  THE WITNESS ALREADY TESTIFIED THAT IT

20   WAS TRUE AND ACCURATE.

21       THE COURT:  ALL RIGHT.  ADMITTED.

22   BY MR. CAPP:

23   Q. DO YOUR PRODUCTS ACTUALLY WORK, DO THEY ACTUALLY

24   REMEDIATE BIOCARBONS?

25   A. WILL YOU REPEAT, PLEASE?  I AM NOT SURE I UNDERSTOOD YOUR

1   QUESTION.

2   Q. YOU SEE THAT THERE IS FOUR PARTS WASHERS LINED UP ON THE

3   FAR WALL OF THE COURTHOUSE?

4   A. YES, I DO SEE THAT.

5   Q. AND WHEN THOSE ARE PUT IN OPERATION, THEY ARE PLUGGED

6   INTO AN ELECTRICAL OUTLET OF THE WALL, THEY ARE FILLED UP

7   WITH FLUID; RIGHT?

8   A. UH-HUH (AFFIRMATIVE).

9   Q. AND THEN WHEN THEY ARE TURNED ON AND PARTS ARE CLEANED,

10  DO THEY ACTUALLY WORK AND DOES THE OIL GO INTO THE TANK AND

11  ACTUALLY BE BIOREMEDIATED?

12  A. THESE MACHINES ARE, I WOULD SAY, BIG AQUARIUMS, SO AS

13  LONG AS EVERYTHING IS LINED UP, THAT THERE IS ENOUGH FLUID,

14  THAT THERE IS FOOD FOR THE MICROBES, HEAT, AND OXYGEN, YES.

15  IT WILL -- BIOREMEDIATION WILL HAPPEN.

16  Q. CAN WE GO TO PAGE 3 OF EXHIBIT 24?

17  A. OKAY.

18  Q. WOULD YOU EXPLAIN WHAT INFORMATION THE COMPANY IS

19  ATTEMPTING TO COMMUNICATE TO A POTENTIAL CUSTOMER BY THAT

20  GRAPHIC IN THE UPPER RIGHT-HAND CORNER THAT IS THE GRAPH OF

21  THE BIO-CIRCLE VERSUS SOLVENT OVER TIME?

22  A. WE ARE TRYING TO SHOW THAT OUR PRODUCT, BIO-CIRCLE L, IS

23  A SELF-RENEWING, SELF-REGENERATING, SO WHAT WE ARE

24  EXPLAINING HERE TO WHOEVER IS LOOKING AT THAT IS THAT THE

25  SOLVENT WILL WORK VERY, VERY WELL AT THE BEGINNING, BUT AS

1   THEY ARE GETTING DIRTY, CONTAMINATED BY, HOW DO YOU SAY,

2   HYDROCARBONS OR WHATEVER CONTAMINANTS, THEIR EFFECTIVENESS

3   IS LESS AND LESS.  SO THEY START BEING VERY, VERY AGGRESSIVE

4   BUT AT THE END, AFTER FOUR WEEKS HERE, THE EXAMPLE WE ARE

5   USING, THEY DON'T CLEAN VERY WELL.  AS OUR PRODUCT IS

6   SELF-RENEWING, SELF-REGENERATING, IT WORKS AT THE BEGINNING,

7   BUT IT WORKS JUST AS WELL AFTER FOUR OR FIVE, SIX WEEKS.

8   Q. I AM GOING TO SKIP AN EXHIBIT AND COME BACK.  WOULD YOU

9   GO ONE EXHIBIT FURTHER IN THE NOTEBOOK TO PLAINTIFF'S

10  EXHIBIT 156?

11  A. OKAY.

12  Q. DO YOU RECOGNIZE THIS AS MATERIAL THAT AT TIMES HAS BEEN

13  PUBLISHED ON THE WWW.BIO-CIRCLE.COM WEBSITE?

14  A. ON THE AMERICAN WEBSITE.  YES.

15  Q. DOWN TOWARD THE BOTTOM OF THE PAGE, THERE IS A SIMILAR

16  GRAPHIC TO WHAT WE JUST SAW.  DO YOU SEE ON THE LEFT OF THE

17  BLOWUP IT SAYS, "BIO-CIRCLE L MAINTAINS ITS CLEANING POWER"?

18  A. YES.

19  Q. AND WHEN YOU WERE TESTIFYING BEFORE ABOUT THE BIO-CIRCLE

20  LASTING LONGER THAN SOLVENTS BECAUSE SOLVENTS BECOME

21  SATURATED WITH CONTAMINANTS OVER TIME, IS THAT WHAT YOU WERE

22  REFERRING TO, BIO-CIRCLE L MAINTAINS ITS CLEANING POWER?

23  A. YES.

24  Q. AND HOW DOES THE COMPANY KNOW THAT?  HOW DOES THE COMPANY

25  KNOW THAT BIO-CIRCLE L MAINTAINS ITS CLEANING POWER OVER

1   TIME AS OPPOSED TO SOLVENT PARTS WASHERS?

2   A. BY TESTING.

3   Q. AND WHAT TESTS DO YOU DO TO CONFIRM THAT?

4   A. SEVERAL.  FIRST OF ALL, THE BIO-CIRCLE L IS DEVELOPED FOR

5   US BY A COMPANY CALLED CB CHEMIE FROM GERMANY.  THEY DO

6   THEIR OWN TESTS, WE HAVE ACCESS TO TEST DATA.  AND THEN WE

7   HAVE THE LAB IN MONTREAL WHERE WE HAVE THE SOLVENT TANKS, WE

8   HAVE BIO-CIRCLE MACHINES WITH BIO-CIRCLE L, AND WE ARE

9   CLEANING PARTS, CONTAMINATED PARTS, AND WE OBSERVE WHAT IS

10  HAPPENING, YOU KNOW, AFTER -- THEY'RE WELL DONE, YOU KNOW,

11  WE TIME, WE TAKE PICTURES, WE DO ALL OF THIS.  AND WE SEE

12  AFTER ONE WEEK, AFTER ONE DAY, AFTER TWO DAYS, AFTER ONE

13  WEEK, OR TWO WEEKS, AND SO ON AND SO ON.

14  Q. DO YOU CONSIDER THESE TESTS TO BE SOPHISTICATED OR FAIRLY

15  EASY TO PERFORM?

16  A. WHAT THEY DO IN GERMANY ARE VERY SOPHISTICATED.  WHAT WE

17  DO IN MONTREAL, BECAUSE WE RELY ON THEM VERY MUCH, IS THESE

18  TESTS ARE LESS SOPHISTICATED.  I WOULDN'T SAY EASY TO

19  PERFORM.  BUT LESS SOPHISTICATED, CERTAINLY.

20  Q. HOW MUCH CLEANING FLUID DOES THE BIO-CIRCLE PARTS WASHER

21  TYPICALLY HOLD?

22  A. WHICH ONE?

23  Q. GO AHEAD AND GIVE ME A RANGE ACROSS ALL FOUR OF THE

24  ACCUSED PARTS WASHERS.

25  A. THE BR 100, THAT WAS WAY BEFORE MY TIME IN THIS JOB, SO I

1   DON'T REALLY KNOW.  THAT WOULD BE A GUESSTIMATE.  SO I WILL

2   START WITH THE BR 200.  THE BR 200, AS A MAXIMUM, COULD

3   CONTAIN -- THAT IS A LONG TIME AGO ALREADY, IN CANADA, I AM

4   SORRY, WE USE METRICS, SO I AM GOING TO METRICS, IF IT IS

5   OKAY WITH YOU.  120 LITTERS.

6             THE COURT:  DID YOU SAY 120 LITERS?

7             THE WITNESS:  YES.  SORRY.

8   BY MR. CAPP:

9   Q. AT ANY ONE GIVEN MOMENT IN TIME, WHERE IN THE PARTS

10  WASHERS DOES MOST OF THE FLUID RESIDE?

11  A. MOST OF THE FLUID?  IN THE TANK.

12  Q. IS THAT WHERE MOST OF THE BIOREMEDIATION TAKES PLACE

13  THEN, IN THE TANK?

14  A. BIOREMEDIATION HAPPENS EVERYWHERE.  MICROBES ARE IN THE

15  LIQUID.  SO THE MICROBES, THE LIQUID WHICH IS COMING OUT OF

16  THE FAUCET IS, THE BRUSH, THE FLOW-THROUGH BRUSH, IT IS

17  SATURATED WITH MICROBES AS WELL.  WHILE THE CUSTOMERS ARE

18  CLEANING THE PARTS, YOU KNOW, DEPENDING ON HOW LONG THEY

19  CLEAN THE PARTS, IT IS HAPPENING RIGHT THERE.  IT STARTS

20  THERE.  OKAY.  AND THERE IS LIQUID IN THE TUB AS WELL.  IT'S

21  HAPPENING THERE AS WELL.  SO YOU SAY AT ANY MOMENT, I DON'T

22  KNOW WHAT CUSTOMERS ARE CLEANING.  AT THE BEGINNING, THE

23  PART IS VERY DIRTY, FULL OF OIL, THEY ARE CLEANING, IT MIGHT

24  HAPPEN THERE, AT THIS MOMENT, MORE THAN IN THE TUB.  BUT AT

25  OTHER TIMES, IT COULD BE IN THE TUB.

1   Q. NOW, I REALLY WANT THE JUDGE TO UNDERSTAND YOUR TESTIMONY

2   ON THIS.  ARE YOU SAYING IT'S POSSIBLE --

3   A. I WOULD LIKE THE SAME THING.

4   Q. ARE YOU SAYING IT'S POSSIBLE THAT THE MICROBES THAT ARE

5   IN THE SINK DURING THE CLEANING PROCESS COULD SUDDENLY

6   BECOME SO ACTIVE THAT THEY COULD BE DOING MORE

7   BIOREMEDIATION IN THE SINK THAN THE TOTAL AMOUNT OF

8   BIOREMEDIATION THAT IS TAKING PLACE WITH 97, 98 PERCENT OF

9   THE REST OF THE FLUID IN THE TANK?  IS THAT YOUR TESTIMONY?

10  A. THAT WASN'T YOUR QUESTION.  THAT IS NOT WHAT I

11  UNDERSTOOD.

12  Q. LET ME RE-ASK MY QUESTION.  I SAID AT ANY GIVEN MOMENT IN

13  TIME, WHERE WITHIN THE PARTS WASHER MACHINE DOES MOST OF THE

14  FLUID RESIDE?

15  A. IN THE TUB.

16  Q. ALL RIGHT.  JUST SO WE UNDERSTAND TERMINOLOGY, WHEN YOU

17  SAY "TUB," ARE YOU REFERRING TO THE BASIN OR SINK ON TOP OR

18  ARE YOU REFERRING TO THE TANK UNDERNEATH?

19  A. THE TANK.

20  Q. SO IF MOST OF THE FLUID IS IN THE TANK, ISN'T IT FAIR TO

21  SAY THAT MOST OF THE BIOREMEDIATION TAKES PLACE IN THE TANK?

22  A. FROM THIS POINT OF VIEW, YES.

23  Q. HOW OFTEN DO -- I AM SORRY, LET ME INTRODUCE ANOTHER

24  EXHIBIT.  LET'S GO TO PLAINTIFF'S EXHIBIT 027, PLEASE.  DO

25  YOU RECOGNIZE THIS AS A PRINTOUT FROM CONTENT THAT AT TIMES

1    DURING THIS LITIGATION HAS BEEN DISPLAYED ON THE BIO-CIRCLE

2    WEBSITE?

3    A. YES.  THE AMERICAN WEBSITE.  YES.

4    Q. I WANT TO DIRECT YOUR ATTENTION ON THE SCREEN TO THE

5    FIRST QUESTION AND ANSWER ON THE FAQ, IT STARTS WITH THE

6    WORDS, "SHOULD WE USE BIO-CIRCLE L LIQUID ONLY WITH THE

7    BIO-CIRCLE MACHINE OR CAN WE USE IT WITH OTHER CLEANING

8    PRODUCTS?"  DO YOU SEE THAT?

9    A. YES.

10   Q. AND WHAT IS THE COMPANY'S ANSWER TO THAT FREQUENTLY ASKED

11   QUESTION.  WOULD YOU READ THAT INTO THE RECORD, PLEASE?

12   A. WANT ME TO READ?

13   Q. YES.

14   A. "TO ELIMINATE OIL AND GREASE, BIO-CIRCLE L NEEDS OXYGEN

15   AND A TEMPERATURE OF 37 DEGREES C.  THE BIO-CIRCLE MACHINE

16   PROVIDES THESE CONDITIONS, IN OTHER CLEANING TUBS, THE

17   BRUSH, THE PUMPS AND THE UNIT ITSELF ARE NOT DESIGNED FOR

18   USE WITH WATER-BASED PRODUCTS."

19   Q. IS PLAINTIFF'S EXHIBIT 27 A TRUE AND ACCURATE COPY OF THE

20   MATERIAL THAT IS PUBLISHED ON THE WEBSITE?

21   A. YES.  SEEMS LIKE IT.  YES.

22           MR. CAPP:  WE TENDER PLAINTIFF'S EXHIBIT 27 INTO

23   EVIDENCE.

24           MR. SCHAETZEL:  NO OBJECTION, YOUR HONOR.

25           THE COURT:  IT'S ADMITTED.

```
1              MR. CAPP:  TENDER PLAINTIFF'S EXHIBIT 156 INTO
2    EVIDENCE.
3              MR. SCHAETZEL:  WHICH ONE WAS 156?
4              MR. CAPP:  IT IS THE ONE I USED WITH THE WITNESS
5    RIGHT BEFORE THIS ONE.
6              MR. SCHAETZEL:  NO OBJECTION, YOUR HONOR.
7              THE COURT:  ADMITTED.
8    BY MR. CAPP:
9    Q. TURN NOW TO PLAINTIFF'S EXHIBIT 29, PLEASE.  DO YOU
10   RECOGNIZE PLAINTIFF'S EXHIBIT 29 AS A PRINTOUT FROM MATERIAL
11   DISPLAYED ON THE BIO-CIRCLE WEBSITE AT TIMES DURING THE
12   COURSE OF THIS LITIGATION?
13   A. YES.
14   Q. AND DOES IT APPEAR TO BE A TRUE AND ACCURATE COPY?
15   A. YES.
16             MR. CAPP:  TENDER EXHIBIT 29 INTO EVIDENCE.
17             MR. SCHAETZEL:  NO OBJECTION, YOUR HONOR.
18             THE COURT:  ADMITTED.
19   BY MR. CAPP:
20   Q. WOULD YOU TURN TO PLAINTIFF'S EXHIBIT 144, PLEASE?  DO
21   YOU RECOGNIZE PLAINTIFF'S EXHIBIT 144 AS A SET OF DRAWINGS
22   AND PARTS LIST FOR THE BR 100 PARTS WASHER?
23   A. IT'S NOT.
24   Q. WHAT IS IT?
25   A. IT'S THE BR 150.
```

1    Q. DID YOU BUY THE BR 150 FROM GRAY MILLS IN CHICAGO; IS

2    THAT CORRECT?

3    A. WE USED TO.  WE BOUGHT.

4    Q. WHEN YOU BOUGHT THE BR 150, YOU BOUGHT IT FROM GRAY

5    MILLS; CORRECT?

6    A. YES.

7    Q. THIS THING YOU BOUGHT FROM GRAY MILLS THAT YOU CALLED THE

8    BR 150, IS THAT ANY DIFFERENT FROM THE THING THAT YOU BOUGHT

9    FROM GRAY MILLS THAT YOU CALLED THE BR 100?

10   A. YES.

11   Q. WHAT IS DIFFERENT ABOUT THE BR 150 THAN THE BR 100 IN

12   TERMS OF WHAT IT IS THAT GRAY MILLS MAKES AND SHIPS TO

13   WALTER?

14   A. IT'S GOT -- ONCE AGAIN, I AM NOT SO FAMILIAR WITH THE BR

15   100.  BUT I KNOW I HAVE SEEN IT ENOUGH TO KNOW THE

16   DIFFERENCES.  THE PUMP, THERE IS AN AIR PUMP.  THE CONTROL

17   BOARD, THE PCB IS DIFFERENT.  THERE IS A TIMER ON IT.  THE

18   ATTACHMENT TO HOLD THE SINK TO THE BASE IS DIFFERENT AS

19   WELL.  IT'S NOT SO CUMBERSOME TO OPEN THE MACHINE.  AND

20   ALSO, THERE IS A BETTER FIT BETWEEN THE TANK AND THE SINK TO

21   REDUCE EVAPORATION.

22   Q. DO YOU STILL BUY THE BR 150 FROM GRAY MILLS?

23   A. NO, SIR.

24   Q. DO YOU BUY ANY PARTS WASHING MACHINES FROM GRAY MILLS?

25   A. NO, SIR.

1  Q. WHEN DID YOU DISCONTINUE THAT BUSINESS RELATIONSHIP WITH

2  GRAY MILLS?

3  A. WE WOULD HAVE BOUGHT -- THERE WAS A CANADIAN PRODUCT

4  ONLY.  AND WALTER CANADA WOULD HAVE BOUGHT THE LAST BR 150

5  IN 2006, MORE OR LESS, SIR.

6  Q. WHEN GRAY MILLS MADE A BR 150 AND PUT IT ON THEIR LOADING

7  DOCK FOR SHIPMENT, DID GRAY MILLS RETAIN TITLE TO IT OR DID

8  J. WALTER ASSUME TITLE AT THE TIME THAT GRAY MILLS PUT IT ON

9  THEIR LOADING DOCK FOR SHIPMENT TO WALTER?

10  A. USUALLY IT'S -- WE BUY PRODUCTS FOB, SO THAT MEANS THAT

11  WE TAKE CARE OF THE SHIPPING.  SO AFTER IT HAS LEFT, THE

12  PRODUCT WOULD HAVE LEFT THEIR DOCK, THEN IT BECOMES OURS.

13  Q. SO IN OTHER WORDS, THE BR 150'S BECOME YOURS WHILE THEY

14  ARE STILL IN CHICAGO?

15  A. I WOULD SAY MORE IN TRANSPORT, SIR.  SOMEWHERE.  I AM NOT

16  SO FAMILIAR WITH WHAT -- THE PRODUCTS, I AM NOT INTO THE

17  LOGISTICS.  BUT WHAT I AM TELLING YOU IS WE TAKE CARE OF

18  TRANSPORTATION, USUALLY.  WE PAY FOR IT.  SO....

19  Q. LET'S JUST LEAVE IT AT THIS.  THE TYPICAL WAY THAT YOU

20  ARRANGE YOUR CONTRACT WITH GRAY MILLS IS, YOU PURCHASE THE

21  PRODUCTS, FREE ON BOARD, AT GRAY MILLS'S FACILITY; CORRECT?

22  A. I TOLD YOU THAT -- I'M SORRY.  I TOLD YOU THAT USUALLY WE

23  BUY OUR PRODUCTS FOB FROM GRAY MILLS OR FROM SOMEBODY ELSE.

24  WAS IT SAME CONDITIONS WITH GRAY MILLS?  THIS, I DON'T KNOW,

25  SIR, I'M SORRY.  GENERALLY WE BUY FOB.

1   Q. PLAINTIFF'S EXHIBIT 129, PLEASE.  MR. VANDEMEULEBROOCKE,

2   THIS IS A COPY OF DEFENDANT'S RESPONSE TO INFRINGEMENT

3   CONTENTIONS THAT WERE FILED OF RECORD IN THIS COURT, DOCKET

4   42 ON SEPTEMBER 28TH OF 2005.  HAVE YOU EVER SEEN THESE

5   BEFORE?

6   A. YES.  IN WASHINGTON.  I BELIEVE.  I HAVE SEEN SO MANY

7   PAPERS, BUT I BELIEVE I HAVE SEEN THIS ONE.  YES.

8   Q. LET ME PUT THE QUESTION TO YOU THIS WAY:  DO YOU RECALL

9   REVIEWING AND APPROVING DEFENDANT'S EXHIBIT RESPONSE TO

10  INFRINGEMENT CONTENTIONS BEFORE THEY WERE FILED WITH THIS

11  COURT IN SEPTEMBER OF 2005?

12  A. NO, I DON'T RECALL THAT.

13  Q. WOULD YOU TURN TO PAGE 2, PLEASE?  I AM SORRY, I HAVE

14  LOST MY PLACE.  I JUST NEED A SECOND TO REGROUP.  I

15  APOLOGIZE.  LET ME DIRECT YOUR ATTENTION TO THREE LINES FROM

16  THE BOTTOM, THERE IS A SENTENCE THAT BEGINS TOWARD THE

17  RIGHT-HAND COLUMN.

18  A. STARTING WITH "THE FLUID?"

19  Q. RIGHT.  LET ME READ THAT INTO THE RECORD THEN I AM GOING

20  TO ASK YOU A COUPLE OF QUESTIONS ABOUT IT.  AND I QUOTE,

21  "THE FLUID THEN PASSES THROUGH A RECESSED DRAIN 3 AT THE

22  BOTTOM 1 B OF THE UPPER BASIN 1.  UNDER THE RECESSED DRAIN

23  3, AFFIXED TO THE UPPER WALL OF THE LOWER BASIN, IS A

24  TWO-PART STRAINING DEVICE THAT IS SHOWN IN EXHIBIT 2,"

25  CLOSED QUOTE.  DO YOU SEE THAT?

1  A. UH-HUH.

2  Q. AND DID I ACCURATELY READ THAT INTO THE RECORD?

3  A. YES.

4  Q. I WANT TO ASK YOU ABOUT THE STATEMENT THAT "PASSES

5  THROUGH A RECESSED DRAIN."  WILL YOU TURN TO PAGE FOUR OF

6  EXHIBIT 129?  DOWN TOWARD THE BOTTOM OF THE PAGE IN THE

7  LEFT-HAND COLUMN, DO YOU SEE A CLAIM LIMITATION THAT READS,

8  AND I WILL READ IT INTO THE RECORD, AND I QUOTE, "A FLOW

9  PATH DEFINED BETWEEN THE BASIN AND THE TANK THROUGH WHICH

10  THE FLUID FLOWS FROM THE BASIN BACK TO THE TANK," CLOSED

11  QUOTE.  DO YOU SEE THAT?

12  A. YES.

13  Q. AND THE DEFENDANT'S RESPONSE TO THAT, WHICH IS JUST TO

14  THE RIGHT OF IT IN THE RIGHT-HAND COLUMN, LET ME READ THAT

15  INTO THE RECORD, AND I QUOTE, "DEFENDANTS STATE WITHOUT ANY

16  ADMISSION AS TO THE PROPER CONSTRUCTION OF THIS CLAIM

17  LANGUAGE THAT THE WALTER PARTS HAS STRUCTURE COMPARABLE TO

18  ONE OF THE POSSIBLE CONSTRUCTIONS OF A FLOW PATH DEFINED

19  BETWEEN A BASIN AND A TANK THROUGH WHICH A FLUID FLOWS FROM

20  THE BASIN BACK TO THE TANK," CLOSED QUOTE.  DID I READ THAT

21  CORRECTLY INTO THE RECORD?

22  A. YES.

23  Q. I AM GOING TO ASK NOW TO PULL UP DOCKET 212, WHICH SHOULD

24  BE THE NEXT DOCUMENT IN YOUR EXHIBIT BOOK.  FOR THE RECORD,

25  THIS IS THE COURT'S MARKMAN CLAIM CONSTRUCTION ORDER, WHICH

1    APPEARS IN THE RECORD AT DOCKET 212, ISSUED ON JULY 17TH OF

2    2007.  MR. VANDEMEULEBROOCKE, DID YOU HAVE AN OPPORTUNITY TO

3    SEE THIS ORDER AFTER THE COURT ENTERED IT?

4    A. BEFORE WHAT?

5    Q. THIS IS WHAT WE REFER TO IN PATENT LITIGATION IN THE

6    UNITED STATES AS A MARKMAN ORDER.  IT CAME OUT IN JULY OF

7    2007.  MY QUESTION FOR YOU IS, DID YOU HAVE AN OPPORTUNITY

8    TO REVIEW IT SOMETIME AFTER IT WAS ISSUED BY THE COURT?

9    A. I HAVE SEEN THAT.  YES.

10   Q. HAVE YOU STUDIED IT IN ANY DETAIL?

11   A. CAN I HAVE A MINUTE JUST TO LOOK INTO IT?  (PAUSE.)  I

12   HAVE SEEN THAT BUT I DID NOT REVIEW IT IN GREAT DETAILS.

13   NO.

14   Q. AND MY QUESTION, MY NEXT QUESTION IS VERY, VERY SPECIFIC.

15   IT IS, NEITHER DID YOU REVIEW IT IN DETAIL, BUT YOU ALSO

16   DIDN'T REVIEW IT IN DETAIL WITHIN 30 DAYS AFTER THE JUDGE

17   ISSUED IT; CORRECT?

18   A. NO.

19   Q. WOULD YOU TURN TO PAGE 50, PLEASE?  DO YOU SEE TOWARD THE

20   UPPER PART OF THE PAGE, THERE IS A TABLE AT THE LEFT-HAND

21   COLUMN THAT IS CALLED "CLAIM TERM PHRASE AND DISPUTE"?

22   A. YES.

23   Q. AND ON THE RIGHT, IT GIVES THE COURT'S CONSTRUCTION.  DO

24   YOU SEE THAT?

25   A. UH-HUH (AFFIRMATIVE).

1    Q. AND DO YOU SEE THAT THE COURT CONSTRUED THE TERM "FLOW

2    PATH" OR "FLOW PATH BETWEEN" TO BE, AND I QUOTE, "THE PATH

3    TAKEN BY THE CLEANING FLUID FROM THE BASIN TO THE TANK,"

4    CLOSED QUOTE.  DO YOU SEE THAT?

5    A. YES.

6    Q. NOW, I WANT TO GO BACK TO WHAT IT WAS THAT YOU -- THAT

7    THE DEFENDANTS PUT IN THEIR INITIAL INFRINGEMENT CONTENTIONS

8    AT PLAINTIFF'S EXHIBIT 129 ON PAGE 4.

9    A. OKAY.

10   Q. WHEN THE DEFENDANTS BACK IN 2005 SAID THAT THE BR 200 HAD

11   STRUCTURE THAT WAS COMPARABLE TO ONE OF THE CONSTRUCTIONS

12   FOR FLOW PATH, DID THAT HAPPEN TO BE THE SAME CONSTRUCTION

13   AS THE ONE THAT THE COURT USED IN ITS MARKMAN ORDER?

14   A. THE FLOW PATH IS -- SEEMS -- IT SEEMS LIKE IT.  YES.

15   Q. WHO AT THE COMPANY WITH KNOWLEDGE OF PARTS WASHING

16   TECHNOLOGY ASSISTED IN THE PREPARATION OF THE DEFENDANTS'S

17   RESPONSE TO INFRINGEMENT CONTENTIONS IN THIS CASE?

18   A. HONESTLY, SIR, THE INTERNATIONAL VICE-PRESIDENT FOR

19   PRODUCT DEVELOPMENT, AND I WAS NOT BROUGHT INTO THIS CASE

20   BEFORE I KNEW, YOU KNOW, THE DIFFERENT LAWSUITS AND SO ON

21   AND SO ON.  I KNEW OF, BUT I GOT INVOLVED MORE IN 2007, AND

22   2006 PROBABLY A LITTLE BIT MORE BUT MUCH MORE IN 2007.  IN

23   2005, I WAS NOT INVOLVED IN THIS.  THIS WAS HAPPENING HIGHER

24   THAN ME.

25   Q. PRIOR TO THIS LAWSUIT, HAD J. WALTER COMPANY, LIMITED

1    EVER BEEN SUED FOR PATENT INFRINGEMENT IN THE UNITED STATES?

2    A. NOT TO MY KNOWLEDGE, SIR.

3            THE COURT:  MR. CAPP, I AM GOING TO INTERRUPT YOU

4    THERE.  I AM GOING TO NEED TO TAKE A RECESS FOR ABOUT 15

5    MINUTES.  WE WILL RESUME AT 10:40.

6            (BREAK FROM 10:26 A.M. UNTIL 10:40 A.M.)

7            THE COURT:  COUNSEL, I SPOKE WITH JUDGE FORRESTER

8    DURING THE RECESS, AND HE ASKED ME TO CONVEY TO YOU THAT HE

9    IS NOT GOING TO TAKE THE MATTER UP UNTIL AFTER THIS TRIAL,

10   AND IT'S ESTABLISHED WHAT MCCLUER IS GOING TO TESTIFY TO OR

11   WHAT HE IS NOT GOING TO TESTIFY TO.  SO THAT MAY SAVE YOU

12   SOME TIME, AND IT WON'T DELAY THIS TRIAL IN ANY WAY.

13           MR. CAPP:  THANK YOU, YOUR HONOR.

14   BY MR. CAPP:

15   Q. MR. VANDEMEULEBROOCKE, BEFORE THE BREAK YOU SAID THAT

16   SOMEONE HIGHER THAN YOU WAS MONITORING THIS LITIGATION.  DO

17   YOU RECALL THAT STATEMENT?

18   A. YES.

19   Q. WOULD YOU IDENTIFY WHO THAT PERSON IS?

20   A. THAT WOULD HAVE BEEN MR. FRANCOIS BUDOIS.  DO YOU WANT ME

21   TO SPELL THAT FOR YOU?

22   Q. NO.  WE WILL GET IT FOR THE COURT REPORTER IN A MINUTE,

23   AND I MAY MISPRONOUNCE THAT TERRIBLY AS THE DAY GOES BY.  IS

24   MR. BUDOIS EMPLOYED BY J. WALTER COMPANY, LIMITED?

25           MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  I

1    UNDERSTAND THAT THERE IS A NEED TO ADDRESS SOME DISCOVERY

2    MATERIALS, PERHAPS IN ORDER TO ELICIT QUESTIONS THAT ARE

3    RELATED TO THE MERITS, BUT THESE QUESTIONS DO SEEM TO GO

4    MORE TO ISSUES OF WILLFULNESS AND OTHER ISSUES THAT MAY BE

5    RESERVED FOR LATER IN THE CASE, AND WE WOULD LIKE TO STICK

6    TO THE ISSUES AT HAND.  SO WE OBJECT TO THESE AS NOT

7    RELEVANT.

8              THE COURT:  WHAT IS THE RELEVANCE OF IT?

9              MR. CAPP:  YOUR HONOR, THERE IS -- HERE IS WHAT IS

10   GOING ON IN THIS CASE.  THE CASE HAS BEEN BIFURCATED, BUT

11   EVERY SINGLE ASPECT OF MISCONDUCT HAS NOT BEEN POSTPONED

12   UNTIL THE DAMAGES PHASE.  LITIGATION MISCONDUCT TAKEN

13   FRIVOLOUS POSITIONS, WHICH WE HAVE ALREADY FOUND UNDER RULE

14   11 FOR THE INEQUITABLE CONDUCT PART OF THE CASE, HAS BEEN

15   GOING ON THROUGHOUT THIS LITIGATION AND IT IS ADDRESSABLE AT

16   THE CONCLUSION OF THIS TRIAL UNDER SECTION 285 OF THE PATENT

17   CODE.  SO WILLFULNESS MAY BE POSTPONED, BUT OTHER ASPECTS OF

18   EGREGIOUS CONDUCT --

19             THE COURT:  WE WILL ADDRESS THOSE ASPECTS AT A

20   SEPARATE HEARING PURSUANT TO RULE 11, IF THAT BECOMES

21   NECESSARY.  WE DON'T NEED TO ADDRESS THOSE DURING THE TRIAL

22   FOR THE COURT TO MAKE THE FINDINGS AND CONCLUSIONS THAT IT

23   NEEDS TO REACH.

24             MR. CAPP:  ALL RIGHT.  THANK YOU, YOUR HONOR.  I

25   WILL TRY TO PARE BACK MY EXAMINATION ACCORDINGLY.  I THINK I

1    UNDERSTAND THE COURT'S ADMONITION HERE.

2    BY MR. CAPP:

3    Q. MR. VANDEMEULEBROOCKE, WOULD YOU PLEASE TURN TO

4    PLAINTIFF'S EXHIBIT 134?  FOR THE RECORD, THIS IS ALSO IN

5    THE FILE OF RECORD AT DOCKET ENTRY 191, DATED SEPTEMBER 2 OF

6    2007.  MR. VANDEMEULEBROOCKE, ARE YOU FAMILIAR WITH

7    DEFENDANT'S RESPONSE TO PLAINTIFF'S SECOND AMENDED

8    INFRINGEMENT CONTENTIONS?

9    A. I HAVE SEEN THAT.  YES.

10   Q. DID YOU PARTICIPATE IN THE PREPARATION OF PLAINTIFF'S

11   EXHIBIT 134?

12   A. NO.

13   Q. DID YOU REVIEW AND APPROVE PLAINTIFF'S EXHIBIT 134 BEFORE

14   IT WAS FILED WITH THE COURT?

15   A. WHEN WAS IT FILED?

16   Q. YOU CAN TELL THERE IS A HEADER AT THE TOP OF THE PAGE,

17   THERE IS A BANNER THAT SAYS "FILED 07-02-2007."  DO YOU SEE

18   THAT?

19   A. UH-HUH (AFFIRMATIVE).

20   Q. DID YOU REVIEW AND APPROVE THESE BEFORE THEY WERE

21   SUBMITTED TO THE COURT?

22   A. I DON'T THINK SO, SIR.

23   Q. TO YOUR KNOWLEDGE, DID ANYONE UNDER YOUR SUPERVISION THAT

24   IS DIRECTLY RELATED TO THE BIO-CIRCLE PRODUCT LINE, DID THEY

25   REVIEW AND APPROVE THIS BEFORE IT WAS SUBMITTED TO THE

1    COURT?

2    A. NO.

3    Q. WOULD YOU PLEASE TURN TO PAGE 23, PLEASE?

4    A. YES.

5    I WANT TO DIRECT YOUR ATTENTION TO THE LEFT-HAND COLUMN.

6    FIRST OF ALL, LET'S WALK AROUND A FEW THINGS SO THAT

7    EVERYONE IS ON THE SAME PAGE.  DO YOU SEE THIS PAGE IS

8    REFERRING TO THE PARTS WASHER BR 200, WHICH IS THE SAME

9    PARTS WASHER THAT WE WERE REFERRING TO IN THE EARLIER

10   INFRINGEMENT CONTENTIONS?

11   A. YES.

12   Q. NOW, I WANT YOU TO NOTICE THAT WE ARE DEALING WITH CLAIM

13   1 OF THE 110 PATENT, WHICH IS THE SAME CLAIM THAT WE WERE

14   DEALING WITH IN THE EARLIER INFRINGEMENT CONTENTIONS.  AND

15   NOW LET'S GO DOWN AND LOOK AT THE POSITION ON FLOW PATH.  DO

16   YOU SEE THAT FOR THE LIMITATION A FLOW PATH DEFINED BETWEEN

17   THE BASIN AND THE TANK THROUGH WHICH THE FLUID FLOWS FROM

18   THE BASIN BACK TO THE TANK THAT THE DEFENDANTS, AS OF JULY

19   2, 2007, HAVE DENIED THAT THAT LIMITATION IS MET BY THE BR

20   200?

21   A. UH-HUH (AFFIRMATIVE).  I SEE IT.

22   Q. WHAT WAS THE CONSTRUCTION OR YOUR INTERPRETATION OF THE

23   TERM FLOW PATH THAT THE DEFENDANTS HAD IN MIND WHEN THEY

24   MADE THIS DENIAL IN THEIR INFRINGEMENT CONTENTIONS?

25            MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  THIS AGAIN

1    SOUNDS LIKE IT IS DIRECTED TO THE BASIS FOR WHY THIS

2    DOCUMENT TAKES THE POSITION THAT IT TOOK IN JULY OF 2007.  I

3    BELIEVE THAT THE ISSUE BEFORE THE COURT IS THE ISSUES OF

4    INFRINGEMENT AND VALIDITY OF PATENTS AT ISSUE, SO I OBJECT

5    TO THIS AS IRRELEVANT.

6             MR. CAPP:  YOUR HONOR, I AM --

7             THE COURT:  I AM GOING TO OVERRULE THE OBJECTION.

8    ASK THE QUESTION.

9    BY MR. CAPP:

10   Q. MR. VANDEMEULEBROOCKE, WHAT CONSTRUCTION OF FLOW PATH DID

11   THE DEFENDANTS HAVE IN MIND WHEN THEY MADE THIS DENIAL IN

12   THEIR INFRINGEMENT CONTENTIONS?

13   A. TO ANSWER YOUR QUESTION, SIR, I WOULD HAVE TO KNOW HOW

14   THEY UNDERSTOOD "FLOW PATH."  IT'S MY INTERPRETATION OF A

15   FLOW PATH MIGHT BE DIFFERENT FROM WHAT THEY SAY, I DON'T

16   KNOW WHAT THEY WERE THINKING AT THAT TIME.  SORRY.  I REALLY

17   WANT TO HELP YOU, BUT FLOW PATH --

18   Q. I AM SORRY, I DIDN'T MEAN TO INTERRUPT YOU.  LET'S GET

19   RIGHT TO THE HEART OF THE MATTER.  IS YOUR UNDERSTANDING OF

20   THE MEANING OF THE TERM "FLOW PATH" AS IT IS USED IN

21   CHEMFREE'S CLAIMS DIFFERENT FROM THE MEANING THAT THE JUDGE

22   PUT ON IT IN HIS MARKMAN ORDER IN 2007?

23   A. MY INTERPRETATION -- DO YOU WANT MY INTERPRETATION OF A

24   FLOW PATH?

25   Q. YES, I DO.

1   A. YES, I CAN GIVE YOU.  I TOLD YOU BEFORE, THESE ARE BIG

2   AQUARIUMS OR THE SINK IS LIKE YOUR SINK AT HOME.  THERE IS A

3   DRAIN FOR WHICH THE LIQUID GOES OUT OF THE SINK, BASICALLY.

4   THERE IS A WAY OUT.  BECAUSE THEY WOULD FILL IT AND CREATE A

5   MESS.  SO YOU NEED A DRAIN.  AND THIS TO ME, THIS IS A

6   DRAIN.

7   Q. WOULD YOU AGREE WITH ME THEN THAT THE DEFENDANTS SHOULD

8   AMEND THEIR INFRINGEMENT CONTENTIONS TO ACKNOWLEDGE THAT THE

9   FLOW PATH LIMITATION IS MET FOR EACH ONE OF THOSE FOUR

10  ACCUSED PARTS WASHERS; THAT INDEED, ALL FOUR OF THEM DO, IN

11  FACT, HAVE A FLOW PATH DEFINED BETWEEN THE BASIN AND THE

12  TANK THROUGH WHICH THE FLUID FLOWS FROM THE BASIN BACK TO

13  THE TANK IN ACCORDANCE WITH HOW THE JUDGE HAS CONSTRUED THAT

14  TERM?

15  A. I DON'T KNOW HOW THE JUDGE HAS RULED ON THIS.  I CAN ONLY

16  TELL YOU THAT THERE IS A DRAIN ON EACH OF THESE MACHINES.

17  Q. LET'S GO BACK TO THE JUDGE'S CLAIM CONSTRUCTION ORDER,

18  DOCKET 212.  IT SHOULD BE ONE OR TWO EXHIBITS BACK, BUT WE

19  WILL SHOW IT UP HERE ON THE SCREEN.  PAGE 50.  CAN YOU SEE

20  THAT UP ON THE SCREEN, MR. VANDEMEULEBROOCKE?

21  A. YES.

22  Q. IF YOU USE THE COURT'S CLAIM CONSTRUCTION THAT IS SHOWN

23  IN THE MARKMAN ORDER AND YOU APPLY THAT, IS IT NOT, IN FACT,

24  TRUE THAT ALL FOUR OF THE ACCUSED PARTS WASHERS HAVE A FLOW

25  PATH DEFINED BETWEEN THE BASIN AND THE TANK THROUGH WHICH

1   THE FLUID FLOWS FROM THE BASIN BACK TO THE TANK?

2   A. EACH ONE OF THEM HAS A FLOW PATH, THE DRAIN.  YES.

3   Q. I AM GOING TO PLAY A VIDEO NOW WHICH HAS BEEN DOWNLOADED

4   FROM THE BIO-CIRCLE WEBSITE, IT IS FOR IDENTIFICATION,

5   PLAINTIFF'S EXHIBIT 86.  I WOULD LIKE TO WATCH THAT VIDEO

6   NOW AND THEN I WILL HAVE A FEW QUESTIONS FOR YOU ABOUT IT.

7              THE COURT:  ANY OBJECTION TO 86, MR. SCHAETZEL?

8              MR. SCHAETZEL:  NO, YOUR HONOR, PRESUMING THAT IT

9   IS THE VIDEO THAT I THINK IT IS.

10             THE COURT:  OKAY.

11                  (VIDEO IS PLAYED.)

12  BY MR. CAPP:

13  Q. BEFORE I ASK YOU SOME QUESTIONS ABOUT THE VIDEO, I WILL

14  REPLAY A SHORT SEGMENT TOWARD THE FRONT.  I WOULD LIKE YOU

15  TO TURN THE PLAINTIFF'S EXHIBIT 126, PLEASE, AND IT SHOULD

16  BE MAYBE THREE MORE EXHIBITS BACK IN YOUR NOTEBOOK.

17  A. 126?

18  Q. 126.  ALL RIGHT.  DO YOU RECOGNIZE THIS AS THE VERSION OF

19  DEFENDANT'S PRODUCT CATALOG THAT WAS PRODUCED BY THE

20  DEFENDANTS PRIOR TO YOUR DEPOSITION IN 2007; CORRECT?

21  A. THIS IS THE U.S. CATALOG.  YES.  CHEMICAL CATALOG.

22  Q. BUT MORE IMPORTANTLY THAN THAT, THIS WAS A VERSION OF THE

23  CATALOG, THIS WAS THE ONLY VERSION OF THE CATALOG THAT J.

24  WALTER PRODUCED TO THE PLAINTIFF PRIOR TO YOUR DEPOSITION IN

25  2007; CORRECT?

1    A. THAT IS THE ONE I HAVE SEEN.  YES.

2    Q. WOULD YOU TURN TO PAGE 9, PLEASE?

3    A. OKAY.

4    Q. DO YOU SEE OVER ON THE LEFT-HAND SIDE ABOUT HALFWAY DOWN

5    THE PAGE, THERE IS A DEPICTION WHICH HAS THIS CAPTION, AND I

6    QUOTE, "TWO-PART FILTER.  TWO-PART FILTER SYSTEM WHICH

7    SEPARATES FINE AND COURSE WASTE PARTICLES."  DO YOU SEE

8    THAT?

9    A. YES.

10   Q. DO YOU AGREE WITH THAT STATEMENT IN THE PRODUCT CATALOG?

11   A. THAT THIS IS A TWO-PART FILTER?

12   Q. AND THAT IT SEPARATES FINE AND COURSE WASTE PARTICLES?

13   A. YES.

14   Q. AND DOES IT SEPARATE FINE AND COURSE WASTE PARTICLES FROM

15   THE FLOW OF CLEANING FLUID AS IT FLOWS FROM THE BASIN INTO

16   THE TANK?

17   A. IT WILL TRAP COURSE PARTICLES AND NOT THE VERY FINE ONES,

18   BUT IT WILL TRAP COURSE PARTICLES, YES.

19   Q. WOULD YOU GO NOW TO PLAINTIFF'S EXHIBIT 112.  SORRY, YOUR

20   HONOR.  AT THIS TIME, MR. VANDEMEULEBROOCKE, DO YOU AGREE

21   THAT PLAINTIFF'S EXHIBIT 126 IS A TRUE AND ACCURATE COPY OF

22   WALTER'S U.S. PRODUCT CATALOG?

23   A. YES.

24            MR. CAPP:  WE TENDER INTO EVIDENCE.

25            MR. SCHAETZEL:  NO OBJECTION, YOUR HONOR.

1              THE COURT:  ADMITTED.

2              THE WITNESS:  YOU WANT ME TO GO WHERE?  SORRY.

3    BY MR. CAPP:

4    Q. ACTUALLY, GO TO PLAINTIFF'S EXHIBIT 192, PLEASE.

5    A. 190?

6    Q. 192.  IT SHOULD BE THE NEXT ONE AFTER THE PRODUCT

7    CATALOG.

8    A. I AM THERE.

9    Q. DO YOU RECOGNIZE THIS AS A TWO-PAGE BROCHURE THAT AT ONE

10   TIME OR ANOTHER WAS PUBLISHED BY J. WALTER COMPANY, LIMITED

11   OR J. WALTER, INC. SOMETIME AFTER INTRODUCTION OF THE BR

12   200?

13   A. YES.

14   Q. AND IS IT A TRUE AND ACCURATE COPY OF THAT PRODUCT

15   BROCHURE?

16   A. SEEMS LIKE IT.  YES.

17   Q. ON THE FIRST PAGE, I WOULD LIKE AGAIN TO ZOOM IN ON THE

18   LEFT-HAND -- I'M SORRY, THE SECOND PAGE, LEFT-HAND SIDE.  DO

19   YOU SEE AGAIN THE SAME GRAPHIC AND ACCOMPANYING TEXT ABOUT

20   THE TWO-PART FILTER SYSTEM WHICH SEPARATES FINE AND COURSE

21   WASTE PARTICLES?

22   A. YES.

23   Q. SO THIS WAS A STATEMENT THAT BIO-CIRCLE MADE TO THE

24   PUBLIC ON MORE THAN ONE OCCASION WHILE THE BR 200 WAS ON THE

25   MARKET; CORRECT?

1   A. YES.

2   Q. I WANT TO GO BACK TO PLAINTIFF'S EXHIBIT 086, AND THIS

3   TIME WE WILL DO A VIDEO CLIP FROM 0 TO 22 SECONDS.

4                         (VIDEO IS PLAYED.)

5   BY MR. CAPP:

6   Q. WERE YOU ABLE TO OBSERVE FROM THE VIDEO, THAT FLUID

7   APPEARS TO BE DRAINING FROM THE BASIN?

8   A. YES.  SURE.

9   Q. AFTER THE FLUID GOES DOWN THE DRAIN, DOES IT TEND TO GO

10  THROUGH THE DEVICE REFERRED TO IN YOUR PRODUCT LITERATURE AS

11  THE TWO-PART FILTER SYSTEM?

12  A. YES.

13  Q. DO YOU DISPUTE THAT THE PLASTIC FILTER ON THE BR 200 IS

14  POROUS?

15  A. IT'S A MESH OF SOME SORT.  WHAT I DEFINE BY "POROUS," IT

16  IS MORE LIKE A NONWOVEN TISSUE OR SOMETHING.  MY PERSONAL

17  OPINION.  WHEN YOU ASK ME WHAT IS POROUS, I THINK OF A

18  POROUS MATERIAL.  THIS HAS HOLES IN IT AND IT'S MADE OF

19  PLASTIC.  SO....

20  Q. AND THE HOLES THAT ARE IN IT ARE DESIGNED TO ALLOW THE

21  FLUID TO FLOW THROUGH THE HOLES; RIGHT?

22  A. YES.

23  Q. AND THE HOLES ARE INTENTIONALLY MADE SMALL ENOUGH SO THAT

24  SEDIMENT AND PARTICULATE MATTER DON'T GO THROUGH THE HOLES;

25  CORRECT?

1    A. YES.  I'M SORRY.  YES.

2    Q. LET'S GO BACK AND PLAY PLAINTIFF'S EXHIBIT 86, AND THIS

3    TIME, JUST CLIP IT FROM 6 TO 13 SECONDS AND PLAY IT TWICE.

4                        (VIDEO IS PLAYED.)

5    BY MR. CAPP:

6    Q. THAT THING THAT THE NARRATOR REFERS TO IN THE VIDEO AS A

7    TWO-STAGE FILTER, WHAT DO YOU CALL IT?

8    A. IT WAS A COFFEE-LIKE FILTER AT THE BOTTOM, AND A GRATED

9    PART ON TOP, A STRAINER-TYPE.

10   Q. THE WHITE PLASTIC PART WITH THE TINY HOLES IN IT, DO YOU

11   REFER TO THAT AS A FILTER?

12   A. YES.

13   Q. IN ACCORDANCE WITH THE NORMAL, ORDINARY MEANING OF THE

14   TERM "FILTER" AS YOU UNDERSTAND IT, WHEN YOU LOOK AT THAT

15   WHITE PLASTIC THING, YOU CALL IT A FILTER; RIGHT?

16   A. IT CATCHES PARTICLES.  SO IT FILTERS.

17   Q. LET'S GO TO PLAINTIFF'S EXHIBIT 148 NOW.  SOMETIME IN

18   2005 THERE WAS SOME CONCERN THAT THE TWO-PART FILTER WAS

19   ALLOWING TOO MUCH EVAPORATION TO ESCAPE OUT OF THE DRAIN

20   HOLE; CORRECT?

21   A. YES.

22   Q. AND SO YOU HAD YOUR -- THE PERSON UNDER YOUR SUPERVISION,

23   PASCAL LAVALLEE, DO A STUDY TO SEE WHETHER OR NOT YOU COULD

24   REDUCE THE AMOUNT OF EVAPORATION IF YOU MODIFIED THE BR 200

25   WITH A THREE-PART FILTER SYSTEM THAT HAD BEEN USED

```
1    PREVIOUSLY IN THE BR 100; CORRECT?
2    A. YEAH, WE DIDN'T WANT TO RETURN TO A THREE-PART FILTER.
3    WE WANTED TO ADD THE SPONGE TO PREVENT EVAPORATION.  AT THIS
4    STAGE, WE WANTED TO GO BACK TO WHAT WE WERE GETTING FROM
5    CHEMFREE IN THE BEGINNING, AND WE THOUGHT THAT THE STRAINER
6    AND THE MESH BASKET WAS ENOUGH TO TRAP PARTICLES AND THAT WE
7    WOULD ALSO ADD THE SPONGE, THERE'S THREE COMPONENTS, YES,
8    BUT THE SPONGE WOULD SERVE MORE TO PREVENT EVAPORATION.
9    Q. NOW, I'VE BEEN ON THE WITNESS STAND BEFORE AND I
10   UNDERSTAND A LITTLE BIT ABOUT THE PRESSURE THAT YOU ARE
11   UNDER.  YOU USED THE WORD "CHEMFREE" IN YOUR ANSWER, AND I
12   DON'T THINK YOU MEANT TO SAY THAT YOU GOT THE THREE-PART
13   FILTER FROM CHEMFREE.
14   A. OH NO.  I AM VERY SORRY.
15   Q. GO AHEAD AND CORRECT YOUR ANSWER.
16   A. GRAY MILLS.  THANK YOU VERY MUCH.
17            MR. CAPP:  YOUR HONOR, MAY I APPROACH THE WITNESS?
18            THE COURT:  YES.
19   BY MR. CAPP:
20   Q. MR. VANDEMEULEBROOCKE, LET ME HAND YOU WHAT IS MARKED AS
21   PLAINTIFF'S EXHIBIT 368.  YOUR HONOR, MAY I TAKE IT OUT OF
22   THE PLASTIC BAG?  MR. VANDEMEULEBROOCKE, WOULD YOU TAKE A
23   LOOK AT THAT AND CONFIRM THAT THAT IS AN EXAMPLE OF THE
24   THREE-PART FILTER SYSTEM THAT WAS USED IN THE BR 100 THAT --
25   A. TO MY --
```

1    Q. LET ME FINISH MY QUESTION.

2    A. I'M SORRY.

3    Q. THAT IS A TRUE AND CORRECT EXAMPLE OF THE THREE-PART

4    FILTER SYSTEM THAT GRAY MILLS MAKES FOR BIO-CIRCLE?

5    A. I WAS UNDER THE IMPRESSION, SIR, THAT THE SPONGE WAS

6    THICKER AT THAT TIME.  BUT THAT MIGHT BE ONLY AN IMPRESSION.

7    BUT I AM PRETTY SURE THE SPONGE WAS THICKER AT THAT TIME.

8    BUT THE THREE PARTS ARE THERE.

9    Q. AND WHAT IS TAKING PLACE IN PLAINTIFF'S EXHIBIT 148 IS

10   YOU ARE CONSIDERING REPLACING THE EXISTING TWO-PART FILTER

11   SYSTEM FROM THE BR 200 WITH THE THREE-PART FILTER SYSTEM

12   THAT WAS FROM THE BR 100; CORRECT?

13   A. I REMEMBER VERY, VERY WELL WHAT WE DID THEN, SIR.  AND AT

14   THAT TIME OUR BIG CONCERN WAS NOT FILTERING OF THE LIQUID.

15   IN THE CHEMFREE MACHINE THEY HAVE A BIG MAT, AND THE LIQUID

16   HAS TO GO THROUGH IT, AND ALSO SERVES AS AN EVAPORATION

17   BARRIER.  WE DON'T HAVE THAT.  OUR BIG -- FOR US, THE LIQUID

18   WAS IMPORTANT.  WE DON'T -- IN THE BEGINNING, I HAVE

19   REFERRED TO THESE MACHINES AS BIG AQUARIUMS, AND FRANKLY,

20   THIS IS WHAT THEY ARE.  WE CONSTRUCT MACHINES TO MAKE OUR

21   LIQUID WHAT IT IS, WORK AS IT DOES, AND CLEAN WELL AND FOR

22   THE MICROBES TO SURVIVE LONG, LONG TIME.  AND AT THAT TIME,

23   WE KNEW VERY WELL THAT COFFEE FILTER, IF I MAY CALL IT THIS

24   WAY, WAS GOOD ENOUGH, IT DIDN'T -- NOT ALL OF THE LIQUID

25   WOULD GO THROUGH IT BECAUSE IT'S NOT SO TIGHT.  IN THE

1    CHEMFREE MACHINE, THERE IS NO WAY OUT.  IT GOES THERE,

2    BECAUSE THE MAT, YOU SAW IT YESTERDAY, IS LARGE.  THE COFFEE

3    FILTER, WHEN -- IT IS USED TO HANG UNDER, NOT EVERYTHING

4    GOES THROUGH, SO SOME GO ON THE SIDE.  AND NEITHER THIS IS

5    FOOLPROOF, BY THE WAY, BECAUSE IT GOES UNDER, IT'S NOT

6    TIGHT.  IT'S NOT WELDED TO THE PLASTIC.  OUR CONCERN AT THAT

7    TIME WAS NOT TRAPPING THE PARTICLES, OUR CONCERN WAS TO

8    REDUCE EVAPORATION.  WITH THE COFFEE FILTER, WE HEAT, THE BR

9    200, THE LIQUID USED TO BE HEATED TO 37 DEGREES C.  WE

10   INJECT AIR, WITH THE BUBBLER, WHICH CHEMFREE DOESN'T DO.  SO

11   WE INJECT AIR WITH A BUBBLER.  THIS AIR IS HEATED, HAS TO

12   COME OUT.  AND WHEN YOU HAVE A BIG HOLE IN THE MIDDLE LIKE

13   THIS, THAT'S A VERY, VERY GOOD CHIMNEY FOR EVAPORATION.

14   SIMPLE AS THAT.  SO WE WANTED -- WE COULD NOT USE THIS

15   SPONGE IN THE COFFEE FILTER, IT DIDN'T FIT.  SO WE SAID

16   LET'S GO BACK TO THIS SYSTEM, AND ADD THE SPONGE.  WE COULD

17   HAVE CHOSEN, IF WE WOULD HAVE REPLACED ONLY THE COFFEE

18   FILTER AND THE STRAINER, TO REPLACE THE COFFEE FILTER BY

19   THIS.  BUT WE SAID NO, WE HAVE A BIG PROBLEM WITH

20   EVAPORATION, WE HAVE CUSTOMERS COMPLAINING THAT THEY WERE

21   USING TOO MUCH LIQUID, AND WE SAID LET'S ADD THE SPONGE IN

22   IT TO PREVENT EVAPORATION.

23   Q. AND NOW, ON THE LABELING, WHEN YOU SAID THAT SPONGE, WHAT

24   IS THE LABEL REFER TO IT AS?

25   A. I DON'T KNOW, SIR.

1          MR. CAPP:  YOUR HONOR, MAY I APPROACH THE WITNESS

2     AND HAND HIM WHAT IS MARKED FOR IDENTIFICATION AS

3     PLAINTIFF'S EXHIBIT 367?

4          THE COURT:  YES.

5          MR. CAPP:  CAN I TAKE OUT IT OUT OF THE PLASTIC

6     BAG?

7          THE COURT:  YES.

8     BY MR. CAPP:

9     Q. MR. VANDEMEULEBROOCKE, DO YOU RECOGNIZE EXHIBIT 367 AS A

10    PRODUCT WHICH IS SOLD BY THE J. WALTER COMPANY, LIMITED AND

11    J. WALTER, INC.?

12    A. YES.

13    Q. DO YOU RECOGNIZE IT AS, STILL IN THE PACKAGE, AN EXAMPLE

14    OF THE FOAM SPONGE, WHICH IS ONE OF THE COMPONENTS OF

15    EXHIBIT 368 THAT I HAVE HANDED YOU?

16    A. THIS ONE YOU MEAN?

17    Q. YES.

18    A. NO.  BECAUSE YOU SEE, THAT IS WHAT I MEANT, THIS ONE IS

19    THICKER.  THIS ONE USED TO BE OFFERED WITH THE BR 100.  AND

20    WHEN WE DID THIS ONE, WE DIDN'T NEED SUCH A THICK SPONGE.

21    SO WE HAVE CHANGED TO THIS ONE.

22    Q. WOULD YOU READ TO THE COURT WHAT IS ON THE LABEL OF

23    PLAINTIFF'S EXHIBIT 368?  SORRY.  367.

24    A. FOAM SPONGE FILTER.  I AM NOT DISPUTING THAT AT ALL.

25    VERY HONEST.  YOU ASKED ME.  SORRY.  CAN I TALK?

1  Q. CERTAINLY.  THERE IS A QUESTION PENDING.  GO AHEAD AND

2  COMPLETE YOUR ANSWER.

3  A. YOU HAVE ASKED ME IF THIS IS BASICALLY UNDERSTOOD, ARE

4  THESE THE SAME OR ARE THESE PART OF -- WE NEVER SOLD THIS

5  ONE TO FIT, AFTER THIS E-MAIL, TO FIT INTO THIS ONE.  THAT

6  WAS SOLD -- IT WAS -- IT SAYS A FILTER ON IT BUT WITH THE BR

7  100.

8  Q. WHICHEVER SIZE AND SHAPE OF THE SPONGE IS USED, YOU WOULD

9  AGREE WITH ME THAT IT DOES A BETTER JOB THAN THE COFFEE

10  FILTER OF INHIBITING EVAPORATION OUT OF THE TANK; CORRECT?

11  A. YES.

12  Q. DOES IT ALSO FUNCTION TO STRAIN PARTICULATE MATTER FROM A

13  STREAM OF FLUID WHICH IS PASSING THROUGH IT DOWN TO THE TANK

14  FROM THE BASIN?

15  A. IT CATCHES SOME.

16  Q. WOULD YOU TURN TO THE NEXT EXHIBIT WHICH IS MARKED AS

17  DOCKET 255?  AND IF YOU WOULD, IF YOU CAN FLIP TOWARD THE

18  BACK, YOU WILL SEE THAT THE DOCUMENT PAGE NUMBERS, THE

19  HEADER IN THE MIDDLE CHANGES FROM DOCKET 255 TO DOCKET

20  255-3.

21  A. I DON'T SEE THAT.  I AM SORRY.

22        MR. CAPP:  YOUR HONOR, MAY I APPROACH THE WITNESS?

23        THE COURT:  YES.

24        THE WITNESS:  IT'S JUST THAT IT'S DIFFICULT TO SEE

25  HERE.  SORRY.

1  BY MR. CAPP:

2  Q. FOR EVERYONE'S REFERENCE, CAN WE TURN TO DOCKET 255-3,

3  PAGE 27 OF 73 IN THE UPPER RIGHT HAND CORNER?

4  MR. VANDEMEULEBROOCKE, THIS IS AN INTERROGATORY RESPONSE

5  WHICH THE DEFENDANTS FILED WITH THE COURT IN RESPONSE TO A

6  MOTION TO COMPEL DISCOVERY, SO IT WAS A FILE OF THE RECORD

7  AT DOCKET 255.  I WANT TO READ INTO THE RECORD DEFENDANT'S

8  RESPONSE WITH RESPECT TO THE CLAIM LIMITATION, CLAIM 8,

9  WHICH READS, AND I QUOTE, "THE SYSTEM OF CLAIM 5 IN SAID

10  PARTS WASHER FURTHER INCLUDING A FILTER INTERPOSED WITHIN

11  SAID FLOW PATH."  AND WALTER'S RESPONSE WAS, AND I QUOTE,

12  "WALTER PARTS WASHERS DO NOT LITERALLY INFRINGE THIS

13  LIMITATION BECAUSE THEY DO NOT INCLUDE A POROUS MATERIAL

14  THROUGH WHICH THE CLEANING FLUID IS PASSED IN ORDER TO TRAP

15  PARTICULATE MATTER WHILE ALLOWING THE CLEANING FLUID,

16  HYDROCARBONS AND MICROORGANISMS TO PASS THROUGH THE BR 100,

17  BR 150, BR 200, AND IO 200, INCLUDING A STAINLESS STEEL

18  GRATING, A METAL RECEPTACLE OR BASKET AND A SPONGE.

19      "THE SPONGE IS A DENSE MATERIAL THAT FUNCTIONS AS AN

20  EVAPORATION BARRIER AND DOES NOT FILTER BECAUSE THE FLUID

21  LEAKS TO THE SIDES DURING OPERATION.  THE IO 200 ONLY USES A

22  METAL RECEPTACLE.  THE METAL RECEPTACLE AND THE STEEL

23  GRATING, BEING MADE OF METAL, DO NOT INCLUDE," QUOTE,"'A

24  POROUS MATERIAL,'" CLOSED QUOTE.  "AS SUCH, THE WALTER PARTS

25  WASHERS DO NOT LITERALLY INFRINGE THIS LIMITATION.  THE

1    WALTER PARTS WASHERS ALSO DO NOT INFRINGE THIS LIMITATION
2    UNDER THE DOCTRINE OF EQUIVALENCE.  TO FIND INFRINGEMENT
3    UNDER THE DOCTRINE OF EQUIVALENCE, THE DIFFERENCES BETWEEN
4    THE  ACCUSED DEVICE AND THE CLAIMED INVENTION MUST BE
5    INSUBSTANTIAL.  THE FILTER CLAIMED IS A POROUS MATERIAL THAT
6    FILTERS THE FLUID FLOWING THROUGH IT WHILE ADDING
7    MICROORGANISMS TO THE FLUID.  SEE THE 835 PATENT, COLUMN 5,
8    58 THROUGH 63.  IN ORDER TO PERFORM THIS FUNCTION, THE
9    FILTER IS DISPOSED ON A SUPPORT GRID PLACED IN THE FLOW
10   PATH.  835 PATENT, COLUMN 3, LINES 65 AND 67, COLUMN 4,
11   LINES 1 TO 3.  THE RESULTS -- THIS RESULTS IN THE CLEANING
12   FLUID FLOWING THROUGH THE DRAIN TO FLOW THROUGH THE POROUS
13   MATERIAL AND GRID, THEREBY BEING FILTERED AND SUPPLEMENTED
14   WITH ADDITIONAL MICROORGANISMS PRIOR TO FLOWING INTO THE
15   TANK.  ENDS AT COLUMN 6, LINES 60 TO 66.  THE ACCUSED DEVICE
16   IS MORE THAN INSUBSTANTIALLY DIFFERENT BECAUSE IT PERFORMS A
17   SUBSTANTIALLY DIFFERENT FUNCTION IN A SUBSTANTIALLY
18   DIFFERENT WAY, TO ACHIEVE A SUBSTANTIALLY DIFFERENT RESULT.
19   SPECIFICALLY, NONE OF THE STAINLESS STEEL GRATING, SPONGE,
20   OR RECEPTACLE INCLUDE MICROORGANISMS INTO THE FLUID.
21   ADDITIONALLY, NONE OF THE STEEL GRATING, SPONGE OR
22   RECEPTACLE PROVIDE A POROUS MATERIAL THROUGH WHICH THE
23   CLEANING FLUID FLOWS.  THE STAINLESS STEEL GRATING AND THE
24   METAL RECEPTACLE ARE METALLIC, AND THUS, DO NOT PROVIDE A
25   POROUS MATERIAL.  IN FACT, THE STAINLESS STEEL GRATING KEEPS

1   PARTS FROM FALLING INTO THE DRAIN.  THE DENSE SPONGE IS TO

2   PROVIDE A VAPOR BARRIER.  THE SPONGE DOES NOT FILTER BECAUSE

3   THE FLUID LEAKS TO THE SIDES DURING OPERATION.  THE FUNCTION

4   OF RECEPTACLE OR BASKET IS TO HOLD THE SPONGE AND TO COLLECT

5   DEBRIS THAT SHOULD NOT PASS THROUGH.  THIS RESULTS IN AN

6   EFFECTIVE VAPOR BARRIER THAT PREVENTS PARTS AND DEBRIS FROM

7   FALLING THROUGH.  THIS IS MORE THAN INSUBSTANTIALLY

8   DIFFERENT BECAUSE IT DOES NOT PROVIDE THE FILTRATION

9   PROVIDED BY THE POROUS MATERIAL TO THE CLEANING FLUID PRIOR

10  TO ENTERING THE TANK.  THEREFORE, THE PARTS WASHERS ALSO DO

11  NOT INFRINGE THIS LIMITATION UNDER THE DOCTRINE OF

12  EQUIVALENCE." CLOSED QUOTE.  DID I READ THAT INTO THE

13  RECORD CORRECTLY, SIR?

14  A. YES.

15  Q. WHO AT THE COMPANY IS RESPONSIBLE FOR THE CONTENT OF THAT

16  INTERROGATORY RESPONSE?

17  A. I REMEMBER THAT I TOOK PART IN THIS ONE.  SO I HAD -- I

18  AM NOT SURE.  I NEED TO KNOW THE DATE.  I DISCUSSED THAT AT

19  ONE POINT WITH OUR LAWYERS.  BUT AS I SAID, I GOT INVOLVED

20  IN '06, AND MOSTLY '07.  SO THIS WAS AFTER THE FACT, YES, I

21  HAVE DISCUSSED THAT PRIOR TO MY VISIT TO WASHINGTON.  YES.

22  Q. ALL RIGHT.  DO YOU RECALL THAT YOUR DEPOSITION WAS IN

23  JULY OF 2007?

24  A. YES.

25  Q. OKAY.  DO YOU SEE AT THE TOP THAT THIS PAPER WAS PREPARED

1    AND FILED WITH THE COURT ON SEPTEMBER 17TH OF 2007?

2    A. I SEE IT NOW.  YES.

3    Q. SO THAT WOULD HAVE BEEN TWO MONTHS AFTER YOUR DEPOSITION?

4    A. YES.

5    Q. DOES THAT REFRESH YOUR RECOLLECTION THAT, IN FACT, YOU

6    DID NOT PARTICIPATE IN THE PREPARATION OF THIS INTERROGATORY

7    RESPONSE, AND IN FACT, YOU DIDN'T EVEN SEE IT BEFORE IT WAS

8    SUBMITTED TO THIS COURT?

9    A. I DID NOT -- AS I SAID, I DISCUSSED WITH THE LAWYERS,

10   THEY ASKED ME MY OPINION, THINGS LIKE THAT.  BUT I DID NOT

11   WRITE THAT.  NO.

12   Q. DO YOU AGREE WITH THE CONTENT THAT IS EXPRESSED IN THAT

13   INTERROGATORY RESPONSE?

14   A. YES.

15   Q. LET'S START WITH THE FIRST SENTENCE WHERE IT READS, "THEY

16   DO NOT INCLUDE A POROUS MATERIAL THROUGH WHICH THE CLEANING

17   FLUID IS PASSED IN ORDER TO TRAP PARTICULATE MATTER WHILE

18   ALLOWING CLEANING FLUID HYDROCARBONS AND MICROORGANISMS TO

19   PASS THROUGH."  SO YOU AGREE WITH THE POSITIONS STATED IN

20   THAT INTERROGATORY RESPONSE; CORRECT?

21   A. YES.

22   Q. LET'S TALK ABOUT THE THREE-PART FILTER SYSTEM ON THE BR

23   100, 200 AND THE IO 400.  COULD YOU AVAIL YOURSELF AGAIN OF

24   THE PHYSICAL EXHIBITS 367 AND 368 IN FRONT OF YOU?

25   A. OKAY.

1    Q. NOW, I WOULD LIKE TO DIRECT YOUR ATTENTION TO PLAINTIFF'S

2    EXHIBIT 103.  DO YOU RECOGNIZE THIS AS A PRODUCT DATA SHEET

3    OR FLYER PUBLISHED BY J. WALTER COMPANY, LIMITED AND/OR J.

4    WALTER, INC.?

5    A. YES.

6    Q. ZOOM IN ON THE UPPER LEFT-HAND CORNER, PLEASE.  DO YOU

7    SEE THE TEXT UNDERNEATH THE GRAPHIC THAT HAS BEEN ZOOMED IN

8    ON THE SCREEN, MR. VANDEMEULEBROOCKE?

9    A. YES.

10   Q. WOULD YOU READ THAT INTO THE RECORD, PLEASE?

11   A. "FILTER SYSTEM COMES IN THREE PIECES THAT SEPARATES FINER

12   AND COURSER WASTE PARTICLES.  THE FIRST STAINLESS STEEL

13   GRATING CATCHES COURSE PIECES, I.E., IRON FRAGMENTS, THE

14   SECOND PIECE IS A DENSE SPONGE THAT CATCHES THE SMALLEST

15   PARTICLES, 90 MICRONS, AND THIS SPONGE IS PLACED INSIDE A

16   GRATED RECEPTACLE THAT ALSO SEPARATES THE WASTE SPECS FROM

17   THE CLEANING SOLUTION."

18   Q. DO YOU RECOGNIZE PLAINTIFF'S EXHIBIT 103 AS A TRUE AND

19   ACCURATE COPY OF THE ORIGINAL, MR. VANDEMEULEBROOCKE?

20   A. DO YOU MEAN THIS ONE?

21   Q. YES.  NO.  PLAINTIFF'S EXHIBIT 103, THE DOCUMENT THAT IS

22   UP ON THE SCREEN.

23   A. OH, SORRY.  IF I RECOGNIZE IT AS AN ORIGINAL DOCUMENT?

24   Q. IS IT AN ACCURATE REPRODUCTION OF THE ORIGINAL?

25   A. THAT WAS PRODUCED BEFORE MY TIME.  SO I WASN'T THERE.

```
 1    WHAT I SEE THERE MAKES SENSE TO WHAT I HAVE SEEN AFTER.  BUT
 2    I DID NOT PRODUCE THIS ONE.
 3              MR. CAPP:  I TENDER INTO EVIDENCE.
 4              MR. SCHAETZEL:  NO OBJECTION, YOUR HONOR.
 5              THE COURT:  ADMITTED.
 6    BY MR. CAPP:
 7    Q. MR. VANDEMEULEBROOCKE, TO YOUR KNOWLEDGE, IS THE
 8    INFORMATION ON THIS DOCUMENT ABOUT THE SPONGE CATCHING
 9    PARTICULATE MATTER DOWN TO 90 MICRONS, IS THAT ACCURATE?
10    A. YOU SEE, SIR, THAT WAS PRODUCED BEFORE MY TIME.  I WOULD
11    NOT HAVE WROTE IT THIS WAY.  I'VE BEEN 21 YEARS IN THIS
12    BUSINESS AND I KNOW A LITTLE BIT ABOUT FILTERS AND WHAT THEY
13    DO.  IF I WANT TO CATCH PARTICLES AND REALLY CATCH
14    PARTICLES, THAT MEANS TO PREVENT PARTICLES TO ENTER THE
15    TANK, AND DROP INTO THE FLUID, I WOULD NOT HAVE DESIGNED
16    THIS.  THE CHEMFREE FILTER DOES THE JOB.  THIS IS TOO LOOSE
17    INSIDE.  FIRST OF ALL, THE CUSTOMERS REMOVE IT SOMETIMES.
18    IT'S TOO LOOSE INSIDE.  THE CUSTOMERS WILL CLEAN IT, THEY
19    WILL PUT IT BACK THIS WAY INSTEAD OF PUTTING IT BACK FLAT.
20    IT'S NOT -- I KNOW IT'S WRITTEN THIS WAY.  I WOULD NOT HAVE
21    WRITTEN IT THIS WAY.
22    Q. SO ONE OF YOUR CONCERNS ABOUT THAT SYSTEM IS IT DOESN'T
23    WORK PERFECTLY.  IS THAT WHAT I UNDERSTAND YOUR TESTIMONY
24    CORRECTLY?
25    A. IT DOESN'T FILTER TOTALLY, I DON'T CALL IT A FILTER
```

1    BECAUSE IT IS NOT PRECISE ENOUGH.

2    Q. SO IT DOESN'T MEET YOUR DEFINITION OF A FILTER BECAUSE IT

3    DOESN'T CAPTURE WHAT, ALL PARTICULATE MATTER?  IT LETS SOME

4    PARTICULATE MATTER, IT DOESN'T END, RUN AROUND THAT DROPS

5    INTO THE TANK?  IS THAT YOUR CONCERN?

6    A. YOU ARE REFERRING TO THE SPONGE?

7    Q. I AM REFERRING TO THE ENTIRE SYSTEM THAT YOU REFER TO IN

8    YOUR PRODUCT LITERATURE AS THE THREE-PART FILTER SYSTEM.

9    A. THAT SOMEBODY, NOT ME, SOMEBODY REFERRED TO THE

10   THREE-PARTS FILTER SYSTEM?  AND THAT'S MARKETING STUFF.  I

11   AM NOT IN MARKETING.  WHAT I AM TELLING YOU, SIR, IS THAT IF

12   I WANT TO CONSTRUCT A FILTER THAT CATCHES MOST OF THE

13   PARTICLES, AND IS VERY EFFECTIVE, THE CHEMFREE FILTER DOES

14   THE JOB.  THIS, JUST THE WAY THIS -- LET'S SAY THIS IS THE

15   BOTTOM OF THE SINK, OKAY, THIS DROPS THIS WAY.  HOLES LIKE

16   THIS.  IT'S NOT TIGHT.  A LOT OF -- NOT A LOT, BUT LIQUID

17   WILL GO THROUGH THE SIDE OF IT AND SO ON AND SO ON.  THIS

18   DROPS LIKE THIS, THERE IS A BIG SPACE HERE.  SO IT'S NOT

19   VERY EFFECTIVE, TO BE HONEST WITH YOU.  AND IF I HAVE TO

20   CONSTRUCT SOMETHING TO BE EFFECTIVE, I WILL MAKE THIS SPONGE

21   HERE, FIRST OF ALL, VERY TIGHT, I WILL NOT USE A LOOSE

22   MATERIAL LIKE THIS.  AND I WILL NOT ALLOW THE CUSTOMERS TO

23   REMOVE IT BECAUSE ONCE THEY REMOVE IT, THERE IS NOTHING.

24   AND THAT'S MY EXPLANATION TO YOU.

25   Q. WHEN THE DEVICES REFERRED TO AS THE THREE-PART FILTER

1    SYSTEM IS INSTALLED ON THE BR 100 OR THE IO 400 OR THE BR

2    200, AND THE SYSTEM IS IN OPERATION, DOES SOME FLUID PASS

3    THROUGH THE SPONGE AND THROUGH THE WIRE MESH BASKET THAT

4    HOLDS THE SPONGE?

5    A. IF THESE -- IF THESE PIECES ARE IN PLACE, YES.  SOME WILL

6    DO.

7    Q. AND AS THE FLUID PASSES THROUGH THE SPONGE AND THE WIRE

8    MESH SCREEN BASKET, IS PARTICULATE MATTER TRAPPED IN EITHER

9    THE SPONGE OR THE WIRE MESH BASKET OR BOTH?

10   A. SOME IN BOTH.

11   Q. LET'S TURN TO PLAINTIFF'S EXHIBIT 139.

12   MR. VANDEMEULEBROOCKE, DO YOU RECOGNIZE PLAINTIFF'S EXHIBIT

13   139 AS A COPY OF THE DEFENDANT'S OWNER'S MANUEL, OPERATOR'S

14   MANUEL FOR THE BR 100 PARTS WASHERS?

15   A. YES.

16   Q. AND DOES IT APPEAR TO BE A TRUE AND ACCURATE COPY OF THE

17   OWNER'S MANUAL?

18   A. YES.

19        MR. CAPP:  I TENDER INTO EVIDENCE.

20        THE COURT:  ANY OBJECTION?

21        MR. SCHAETZEL:  NO OBJECTION, YOUR HONOR.

22        THE COURT:  ADMITTED.

23   BY MR. CAPP:

24   Q. WOULD YOU TURN TO THE PAGE THAT IS PAGINATED AT THE

25   BOTTOM OF THE PAGE AS PAGE 3 OF THE ENGLISH LANGUAGE PAGES?

1    A. OKAY.

2    Q. DO YOU SEE THAT THE ANNOTATED ITEM "J" IN THE GRAPHIC ON

3    PAGE 3 IS REFERRED TO AS THE THREE-PART FILTER?

4    A. YES.

5    Q. AND THE THREE-PART FILTER IS DIVIDED INTO THREE

6    COMPONENTS, WHICH AT THE TIME YOU CALLED A STAINLESS STEEL

7    GRATING, A FOAM SPONGE FILTER, AND A GRATED RECEPTACLE;

8    CORRECT?

9    A. YES.

10   Q. AND IS IT YOUR TESTIMONY THAT THIS THREE-PART FILTER

11   DEVICE SHOULD NOT BE CONSIDERED A FILTER AS THE TERM

12   "FILTER" IS USED IN CHEMFREE'S PATENT CLAIMS?

13           MR. SCHAETZEL:  OBJECTION AS TO CALLING FOR A

14   LEGAL CONCLUSION, YOUR HONOR.

15           THE COURT:  WELL,  I AM GOING TO OVERRULE THE

16   OBJECTION.  YOU MAY TESTIFY FROM YOUR KNOWLEDGE OF PARTS

17   WASHERS, FILTERS, ET CETERA, IN YOUR EXPERIENCE AS TO

18   WHETHER THAT SHOULD OR NOT BE -- SHOULD NOT BE CALLED A

19   FILTER.

20   A. SORRY, THE QUESTION WAS?  IS THIS A FILTER OR WHAT WAS

21   YOUR QUESTION?

22   Q. LET'S GO BACK.  YOU ARE THE HEAD OF R AND D FOR THE

23   BIO-CIRCLE PRODUCT LINE OF J. WALTER COMPANY, LIMITED;

24   CORRECT?

25   A. YES.

```
 1    Q. AND YOU HAVE PREVIOUSLY TESTIFIED THAT YOU HAVE

 2    SUFFICIENT EXPERTISE TO READ AND UNDERSTAND WHAT IS

 3    DISCLOSED AND CLAIMED IN THE CHEMFREE'S PATENTS; CORRECT?

 4    A. YES.

 5    Q. AND YOU, IN FACT, HAVE READ THE CLAIMS OF CHEMFREE'S

 6    PATENTS; CORRECT?

 7    A. YES.

 8    Q. AND IN FACT, YOU READ THE TEACHING DISCLOSURE IN

 9    CHEMFREE'S PATENTS; CORRECT?

10    A. YES.

11    Q. AND YOU KNOW FROM YOUR OWN PERSONAL EXPERIENCE, BECAUSE

12    J. WALTER HAS BOUGHT A CHEMFREE SMART WASHER THAT YOU HAVE,

13    IN FACT, INSPECTED THAT MACHINE, HAVE YOU NOT?

14    A. I DID.

15    Q. AND WHEN YOU WERE TESTIFYING EARLIER TODAY, ABOUT THE

16    CHEMFREE SMART WASHER MACHINE AND HOW IT WAS DIFFERENT FROM

17    YOUR MACHINE, YOU WERE TESTIFYING FROM YOUR OWN PERSONAL

18    EXPERIENCE AND OBSERVATIONS; CORRECT?

19    A. YES.

20    Q. SO AT THIS POINT IN TIME, I WANT TO ASK YOU, IS THE

21    THREE-PART FILTER SYSTEM THAT IS REFERRED TO AS ANNOTATED

22    FEATURE "J" IN THE OWNER'S MANUAL FOR THE BR 100, IS THAT A

23    FILTER IN ACCORDANCE WITH THE UNDERSTANDING THE FILTER AS

24    THE JUDGE HAS CONSTRUED THAT TERM IN THIS CASE?

25              MR. SCHAETZEL:  SAME OBJECTION, YOUR HONOR.
```

1           THE COURT:  OVERRULED.

2           THE WITNESS:  YOU ARE REFERRING TO THE POROUS

3    MATERIAL PHRASE OR --

4    Q. LET'S GO BACK TO -- IF YOU CAN SPLIT SCREEN THIS, IT

5    WOULD BE GREAT.  DOCKET 212, PAGE 50.  NOW, DO YOU SEE ON

6    PAGE 50 ABOUT THREE ROWS DOWN WHERE IT SAYS "FILTER AND

7    POROUS MEDIUM"?  THE JUDGE'S CONSTRUCTION OF THAT TERM IS,

8    AND I QUOTE, "A POROUS MATERIAL THROUGH WHICH THE CLEANING

9    FLUID IS PASSED IN ORDER TO TRAP PARTICULATE MATTER WHILE

10   ALLOWING CLEANING FLUID, HYDROCARBONS, AND MICROORGANISMS TO

11   PASS THROUGH."  DO YOU SEE THAT?

12   A. YES.

13   Q. DO YOU RECALL DURING THE EARLIER STAGE OF THIS CASE WHEN

14   WE WERE ARGUING OVER THE CORRECT MEANING OF THE TERMS,

15   WHETHER IT WAS THE PLAINTIFF OR THE DEFENDANT THAT WAS

16   ARGUING FOR A BROAD CONSTRUCTION OF THE TERM "FILTER"?

17   A. I DON'T RECALL THE DIFFERENT MEETINGS OR ARGUMENTS.  NO.

18   I READ THIS, AND THAT'S WHAT I RECALL.

19   Q. JUST TRYING TO GET SOME CONTEXT HERE BECAUSE WE HAVE AN

20   ALL-DAY HEARING HERE, IN FRONT OF THIS JUDGE, OVER THE

21   MEANING OF THAT TERM, AND DO YOU NOT RECALL THAT IT WAS THE

22   PLAINTIFF ARGUING FOR A BROAD DEFINITION OF THE TERM AND IT

23   WAS YOUR SIDE OF THE CASE THAT WAS ARGUING FOR A NARROW

24   INTERPRETATION OF THAT TERM?

25   A. SIR, I WAS NOT HERE AT THAT TIME.  I WAS NOT IN THIS

1    COURTROOM.  I DON'T RECALL WHO WAS ASKING FOR WHAT.  THAT IS

2    WHAT I AM SAYING.  WHAT I AM SAYING IS, I READ THE CLAIMS, I

3    READ WHAT JUDGE WROTE, AND SO ON AND SO ON.  THIS I READ.  I

4    DON'T -- BUT WHAT I AM TELLING YOU, I DON'T RECALL WHO WAS

5    ASKING FOR WHAT.

6             THE COURT:  THE RECORD WILL SHOW THAT, MR. CAPP.

7    ASK YOUR QUESTION OF THE WITNESS, IF YOU STILL WISH TO ASK

8    THE QUESTION.

9    BY MR. CAPP:

10   Q. MR. VANDEMEULEBROOCKE, LOOKING AT THE COURT'S DEFINITION

11   OF FILTER --

12   A. YES.

13   Q. -- IS IT YOUR TESTIMONY THAT THAT DEFINITION DOES OR DOES

14   NOT READ ON THE THREE-PART FILTER, WHICH IS ANNOTATED

15   FEATURE "J" IN THE OWNER'S MANUAL OF THE BR 100?

16   A. HONESTLY SIR, IT SAYS A POROUS MATERIAL THROUGH WHICH THE

17   CLEANING FLUID, THAT MEANS THE CLEANING FLUID AS A WHOLE, IS

18   PASSED IN ORDER TO TRAP PARTICLE MATTER WHILE ALLOWING THE

19   CLEANING FLUID, HYDROCARBONS AND SO ON AND SO ON.  THIS DOES

20   NOT THAT, BECAUSE IT'S NOT THE CLEANING -- WHEN I READ THE

21   CLEANING FLUID, THE FLUID, YOU HAVE, AS IN THE CHEMFREE

22   MACHINE, YOU HAVE -- THE LIQUID HAS NO CHOICE.  BOOM, IT

23   GOES RIGHT IN THERE.  HERE -- IS IT 20 PERCENT OF THE LIQUID

24   THAT GOES FROM THE -- INTO THE TANK FROM THE BASIN INTO THE

25   TANK, I CANNOT SAY THAT THIS DOES EXACTLY THIS AS I

1    UNDERSTAND THIS.  I'M SORRY.

2    Q. ALL RIGHT.  MAYBE IT WOULD HELP IF WE PLAY A VIDEO.

3    LET'S TEE-UP PLAINTIFF'S EXHIBIT 89, PLEASE.  PLAY THE

4    ENTIRE VIDEO.

5                      (VIDEO IS PLAYED.)

6             THE COURT:  ASK YOUR QUESTION, THEN LET'S MOVE ON.

7    BY MR. CAPP:

8    Q. IN ORDER FOR MY QUESTION TO BE VERY DIRECT, I WOULD LIKE

9    TO REPLAY 17 SECONDS OF THAT, A 17-SECOND CLIP AND THEN ASK

10   MY QUESTION.  MAY I DO THAT, YOUR HONOR?

11            THE COURT:  WHAT DOES IT SHOW THAT THIS ONE

12   DOESN'T?

13            MR. CAPP:  IT FOCUSES IN ON THE SPONGE FILTER AND

14   THE HANDS PICKING DEBRIS OUT OF THE SPONGE FILTER.

15   BY MR. CAPP:

16   Q. DO YOU REMEMBER THAT SCENE FROM THE VIDEO,

17   MR. VANDEMEULEBROOCKE?

18   A. YES.

19   Q. AFTER REVIEWING THE VIDEO, DO YOU STILL AGREE WITH THE

20   STATEMENT THAT THE SPONGE DOES NOT FILTER THE FLUID?

21   A. THE SPONGE AND THIS THREE-PARTS PIECE DOES NOT FILTER ALL

22   THE LIQUID, DOES NOT.  THE REASON -- I AM VERY HONEST HERE.

23   I HAVE SEEN TOO MANY -- THOSE MACHINES ON THE MARKET HAVE

24   SLUDGE IN THE BOTTOM OF THE TANK.  THE SLUDGE WOULD NOT BE

25   THERE IF I WOULD TRAP -- ON THESE MACHINES, IF THIS WOULD

1   HAVE TRAPPED ALL THE PARTICLES, WE WOULD NOT HAVE A PROBLEM

2   OF SLUDGE ON THE BOTTOM OF THE TANK.

3               (BREAK FROM 12:00 UNTIL 1:15 P.M.)

4          THE COURT:  ALL RIGHT, MR. CAPP.  YOU MAY PROCEED.

5          MR. CAPP:  THANK YOU, YOUR HONOR, AND I WILL TRY

6   TO SPEED THIS ALONG.  I WORKED VERY HARD AT IT OVER LUNCH TO

7   PARE THIS BACK.

8          THE COURT:  THANKS.

9   BY MR. CAPP:

10  Q. MR. VANDEMEULEBROOCKE, WOULD YOU TURN NOW TO PLAINTIFF'S

11  EXHIBIT 226?  IT SHOULD BE LESS THAN HALFWAY DOWN THROUGH

12  YOUR BINDER.

13  A. 226 YOU SAID?

14  Q. 226.

15  A. OKAY.

16  Q. DO YOU RECOGNIZE THAT AS WHAT IS ON THE SCREEN?

17  A. YES.

18  Q. DO YOU RECOGNIZE THIS AS A PRINTOUT FROM THE BIO-CIRCLE

19  WEBSITE WHICH HAS BEEN PUBLISHED ON THE BIO-CIRCLE WEBSITE

20  DURING THE COURSE OF THIS LITIGATION?

21  A. YES.

22          MR. CAPP:  YOUR HONOR, I TENDER IT INTO EVIDENCE

23  AT THIS TIME.

24          THE COURT:  ANY OBJECTION?

25          MR. SCHAETZEL:  NO, SIR.  NO OBJECTION.

```
 1              THE COURT:  ADMITTED.
 2   BY MR. CAPP:
 3   Q. WILL YOU NOW TURN TO PLAINTIFF'S EXHIBIT 371.  I
 4   APOLOGIZE, YOUR HONOR.  HAVE YOU FOUND EXHIBIT 371?
 5   A. YES.
 6   Q. DO YOU RECOGNIZE THIS PATENT AS UNITED STATES PATENT --
 7   UNITED STATES PATENT 7303908 TO OVERLAND?
 8   A. YES.
 9   Q. AND WHO CURRENTLY OWNS THIS PATENT?
10   A. WALTER SURFACE TECHNOLOGIES.  OR MORE, IT WOULD BE WHAT
11   WE COULD CALL A SWITZERLAND COMPANY THAT IS OWNED BY THE J.
12   WALTER INTERNATIONAL GROUP.
13   Q. DOES THAT COMPANY AFFORD RIGHTS TO THE PATENT TECHNOLOGY
14   IN THE 908 PATENT TO J. WALTER COMPANY, LIMITED AND J.
15   WALTER, INC.?
16   A. THIS COMPANY, THIS PATENT IS NOW OWNED OR IS OWNED BY
17   THIS COMPANY, SURFACE TECHNOLOGY IPGA IN SWITZERLAND, WHICH
18   IS A COMPANY THAT IS OWNED BY THE WALTER GROUP.
19   Q. THE POINT IS, THAT COMPANY GIVES J. WALTER COMPANY,
20   LIMITED AND J. WALTER, INC. PERMISSION TO PRINT PATENT
21   NOTICES ON THE BIO-CIRCLE, IO 400 AND IO 200; CORRECT?
22   A. YES, SIR.
23   Q. AND THE INVENTOR ON THE EXHIBIT 371, THE 908 PATENT,
24   THAT'S THE BERT OVERLAND GUY WHO IS PICTURED ON PLAINTIFF'S
25   EXHIBIT 226; CORRECT?
```

1  A. YES.

2  Q. MR. VANDEMEULEBROOCKE, IS THERE A FILTER ANYWHERE ON THE

3  IO 200 THAT FILTERS PARTICLES DOWN TO TEN MICRONS OR LESS?

4  A. NO.  I'M SORRY, SIR, THERE IS A STRAINER AND A LIKE

5  SOMETHING SIMILAR -- MAY I?  SOMETHING SIMILAR TO THIS

6  BASKET.

7  Q. FOR THE RECORD, I AM HANDING MR. VANDEMEULEBROOCKE A

8  PIECE TAKEN FROM THE DRAIN HOLE, THE IO 200.  IS THAT THE

9  DRAIN DEVICE THAT YOU WERE REFERRING TO?

10  A. YES.  THANK YOU.

11  Q. DOES THAT DEVICE FILTER DOWN TO TEN MICRONS?

12  A. I WOULD NOT KNOW THAT, SIR.  I DON'T KNOW.

13  Q. YOU DON'T KNOW ONE WAY OR THE OTHER?

14  A. I DON'T KNOW IF IT'S TEN OR 12.  I KNOW IT FILTERS.  I

15  KNOW THAT IT CAPTURES PARTICLES, BUT TO WHICH, YOU KNOW,

16  SIZE I DON'T KNOW.  I'M SORRY.

17  Q. WOULD YOU TURN NOW, SIR, TO PLAINTIFF'S EXHIBIT 172?  AND

18  I THINK YOU'LL BE HAPPY TO KNOW WE ARE GETTING TOWARD THE

19  BACK OF THE BOOK.

20  A. OKAY.

21  Q. DO YOU RECOGNIZE THIS DOCUMENT AS AN INTERNAL PRODUCT OF

22  J. WALTER COMPANY, LIMITED?

23  A. YES.

24  Q. AND DO YOU SEE AFTER WE GET PAST PAGE 1, IF WE SKIM

25  THROUGH PAGES 2, 3, 4 AND 5, THERE ARE SIDE-BY-SIDE

1   PHOTOGRAPHIC COMPARISONS BETWEEN J. WALTER'S PRODUCT AND

2   CHEMFREE'S PRODUCT?

3   A. YES.

4   Q. DOES THIS DOCUMENT APPEAR TO BE A TRUE AND ACCURATE

5   REPRODUCTION OF THE ORIGINAL THAT WAS PREPARED BY THE

6   DEFENDANTS?

7   A. YES.

8           MR. CAPP:  TENDER INTO EVIDENCE.

9           MR. SCHAETZEL:  NO OBJECTION.

10          THE COURT:  ADMITTED.

11  BY MR. CAPP:

12  Q. DO YOU RECALL WHEN THIS DOCUMENT WAS PREPARED, SIR?  OR

13  DO YOU KNOW WHEN IT WAS PREPARED?

14  A. I RECALL THAT IT WAS PREPARED PROBABLY IN PROBABLY '04,

15  MAYBE '05.

16  Q. AT THE TIME THAT THIS WAS PREPARED, DID THE DEFENDANTS

17  HAVE A CHEMFREE PARTS WASHER IN THEIR POSSESSION?

18  A. WE BOUGHT ONE.  YES.  WITH GREAT DIFFICULTY, I MUST SAY,

19  BUT WE BOUGHT ONE, YES.

20  Q. IN OTHER WORDS, THE CHEMFREE PARTS WASHER THAT IS

21  DEPICTED IN THE PHOTOGRAPH OF THIS EXHIBIT, THAT PARTS

22  WASHER HAD BEEN PURCHASED, WAS IN THE POSSESSION OF J.

23  WALTER COMPANY AT THE TIME; CORRECT?

24  A. YES.

25  Q. CAN YOU TELL THE COURT WHETHER THESE PHOTOGRAPHS WERE

1   TAKEN BEFORE OR AFTER THIS LAWSUIT BEGAN IN DECEMBER OF

2   2004?

3   A. FRANKLY, I DON'T KNOW.

4   Q. WOULD YOU TURN NOW TO PLAINTIFF'S EXHIBIT 173.  DO YOU

5   RECOGNIZE THIS DOCUMENT AS SOMETHING THAT WAS PREPARED BY AN

6   EMPLOYEE OF THE DEFENDANTS?

7   A. YES.

8   Q. AND DOES IT APPEAR TO BE A TRUE AND ACCURATE REPRODUCTION

9   OF THE ORIGINAL?

10  A. YES.

11          MR. CAPP:  TENDER INTO EVIDENCE, YOUR HONOR.

12          MR. SCHAETZEL:  NO OBJECTION.

13          THE COURT:  ADMITTED.

14  BY MR. CAPP:

15  Q. MR. VANDEMEULEBROOCKE, DO YOU KNOW WHEN THIS PARTICULAR

16  DOCUMENT WAS PREPARED?

17  A. THIS DOCUMENT FOLLOWED THE PREVIOUS DOCUMENT WE HAVE

18  LOOKED AT.

19  Q. LET ME ASK THE QUESTION THIS WAY.  WHEN DID DEFENDANTS

20  FIRST PURCHASE THE CHEMFREE PARTS WASHER THAT IS DEPICTED IN

21  THE PHOTOGRAPHS OF PLAINTIFF'S EXHIBIT 173?

22  A. I DON'T KNOW EXACTLY WHEN, SIR.  MAY I ADD SOMETHING?

23  Q. YES.

24  A. THANK YOU.  THIS WAS DONE, THE FIRST DOCUMENT, AND THE

25  PREVIOUS ONE WAS DONE AS A REQUEST -- FOLLOWING A REQUEST

1   FROM THE PRESIDENT OF WALTER CANADA, THAT AT THAT TIME THERE

2   WAS ONE CONTRACT TO BE AWARDED, AND CHEMFREE, THE COMPANY,

3   WAS THERE AND WE WERE THERE, AND HE WANTED TO KNOW MORE FOR

4   HIS SALES GROUP, A COMPARISON BETWEEN THE TWO MACHINES AS TO

5   TRAIN, THEY SAY IT WAS A TRAINING DOCUMENT.  THIS IS WHY WE

6   WENT FROM THE FIRST DOCUMENT TO LIKE MORE AND MORE

7   POWERPOINT DOCUMENT, THIS EXHIBIT NOW, BECAUSE THIS WAS USED

8   BY WALTER CANADA AS A TRAINING DOCUMENT FOR THE SALES FORCE,

9   CANADIAN SALES FORCE.

10  Q. WELL, IF YOU DON'T KNOW THE EXACT DATE WHEN IT WAS

11  PURCHASED, DO YOU KNOW WHETHER THE COMPANY STILL HAS THE

12  INVOICE FROM THE PURCHASE?

13  A. ACTUALLY, SIR, I KIND OF KNEW YOU WOULD ASK THIS

14  QUESTION, AND I HAVE LOOKED FOR THE INVOICE BEFORE TO COME

15  HERE, AND WE MIGHT HAVE EXCHANGED PRODUCTS FOR THIS --

16  AGAINST THIS MACHINE, YOU KNOW, WE BOUGHT IT FROM ONE OF OUR

17  CUSTOMERS, SO MAYBE WE GAVE HIM A CREDIT OR SOMETHING.  I

18  COULD NOT FIND THE INVOICE.  THIS IS WHY I DON'T KNOW THE

19  EXACT DATE, I'M SORRY.

20  Q. DO YOU KNOW WHETHER OR NOT THE COMPANY HAS ANY DOCUMENT

21  ANYWHERE, ANY PLACE THAT WOULD ESTABLISH WHEN WALTER TOOK

22  THIS MACHINE INTO ITS POSSESSION?

23  A. I WOULD HAVE FOUND IT.  I DIDN'T FIND IT.  SO NO.

24  Q. ALL RIGHT.  YOUR HONOR, THE NEXT DOCUMENT THAT I AM GOING

25  TO PUT UP HAS BEEN DESIGNATED AS HIGHLY CONFIDENTIAL BY THE

1  DEFENDANTS.  I HAVE TURNED OFF MY SCREEN HERE.  I AM GOING

2  TO BLOCK THE SCREEN HERE, BUT IT WILL BE AVAILABLE TO YOU

3  AND TO THE WITNESS.  AND AT THIS TIME,

4  MR. VANDEMEULEBROOCKE, WOULD YOU TURN TO PLAINTIFF'S EXHIBIT

5  127?

6  A. OKAY.

7  Q. WITHOUT DISCLOSING ANYTHING ABOUT THE CONTENTS OF THE

8  DOCUMENT, WOULD YOU SIMPLY IDENTIFY FOR THE COURT WHAT THE

9  CONTENTS ARE IN TERMS OF A GENERAL CATEGORY?  WHAT IS THE

10  DESCRIPTION OF THE EXHIBIT?

11  A. THE BIO-CIRCLE CONCENTRATE IS 9.96.

12  Q. I AM NOT ASKING YOU FOR THAT DETAIL AT THIS POINT.  WILL

13  YOU TELL, GENERALLY DESCRIBE FOR THE COURT, WHAT THIS

14  EXHIBIT IS?

15  A. I'M SORRY.  I MISUNDERSTOOD YOU.  THIS IS THE RECIPE --

16  THAT WAS A RECIPE AT THAT TIME FOR THE BIO-CIRCLE L.

17  Q. AND IS IT A TRUE AND ACCURATE REPRODUCTION OF THE

18  ORIGINAL?

19  A. THAT WAS -- YES.  YES.

20  Q. AND AT ONE TIME OR ANOTHER, THIS WAS THE FORMULA FOR

21  BIO-CIRCLE L FLUID THAT WAS SOLD ON PARTS WASHERS THAT WERE

22  IN THE UNITED STATES; CORRECT?

23  A. YES.

24       MR. SCHAETZEL:  SORRY, I APOLOGIZE.  I MIGHT HAVE

25  HAD AN OBJECTION WITH THE LAST QUESTION.  WITH THE BOOK

1    FALLING, I COULDN'T HEAR THE QUESTION WHEN IT CAME OUT.

2            MR. CAPP:  I WILL RE-ASK IT.

3            MR. SCHAETZEL:  THANK YOU.

4    BY MR. CAPP:

5    Q. CAN YOU TELL FROM LOOKING AT THE DOCUMENT WHETHER THIS

6    WOULD HAVE BEEN THE FORMULA OF BIO-CIRCLE L WOULD HAVE BEEN

7    SOLD INTO THE UNITED STATES AT ANY POINT IN TIME?  EVER?

8    A. YES.

9            MR. CAPP:  TENDER INTO EVIDENCE.

10           MR. SCHAETZEL:  NO OBJECTION, YOUR HONOR.

11           THE COURT:  ADMITTED.

12   BY MR. CAPP:

13   Q. THE NEXT ONE, WOULD YOU TURN THE PLAINTIFF'S EXHIBIT 128

14   AND AGAIN, YOUR HONOR, WE WILL KEEP THIS NOT UP ON THE BIG

15   SCREEN YET.  WOULD YOU TELL THE JUDGE WHAT PLAINTIFF'S

16   EXHIBIT 128 IS?

17   A. THIS IS THE FORMULA FOR AN IMPROVED LIQUID BIO-CIRCLE L.

18   Q. AND HAS BIO-CIRCLE L FLUID, IN ACCORDANCE WITH

19   PLAINTIFF'S EXHIBIT 128, BEEN SOLD INTO THE UNITED STATES?

20   A. YES.

21   Q. AS BETWEEN PLAINTIFF'S EXHIBITS 127 AND 128, WOULD THAT

22   ENCOMPASS ALL OF THE BIO-CIRCLE FLUID THAT HAS EVER BEEN

23   SOLD IN THE UNITED STATES?

24   A. YES.

25   Q. WOULD YOU TELL THE COURT WHAT THE TYPICAL SURFACTANT TO

 1   WATER CONCENTRATION LEVEL IS ON BIO-CIRCLE L THAT IS USED IN

 2   YOUR PARTS WASHING MACHINES?

 3   A. I JUST WANT TO EXPLAIN THAT WE BUY -- CB CHEMIE IN

 4   GERMANY IS IN CHARGE OF PRODUCING WHAT WE CALL THEIR

 5   CONCENTRATE.  WE BUY THIS FROM THEM.  THE SURFACTANTS ARE

 6   PART OF THIS.  SO WE DON'T -- AND WE DON'T KNOW WHAT IS IN

 7   IT.  THIS IS HOW WE KEEP THIS SECRET TO THEM.  SO I WILL

 8   JUST -- I ASSUME -- I KNOW THE PERCENTAGE OF SURFACTANTS IN

 9   THAT MIX, THIS I KNOW.  I BELIEVE IT IS BETWEEN FIVE TO TEN

10   PERCENT.  SOMETHING LIKE THIS.  I DON'T KNOW THE EXACT

11   PERCENTAGE.  I'M SORRY.

12   Q. DID I GET THAT ONE INTO EVIDENCE?  IF SO, I AM READY TO

13   MOVE ON.

14           MR. SCHAETZEL:  WHICH ONE INTO EVIDENCE?

15           MR. CAPP:  I WOULD LIKE TO VERIFY THAT 127 AND 128

16   HAVE BOTH BEEN TENDERED AND ADMITTED.

17           THE CLERK:  128 HASN'T BEEN TENDERED.

18           MR. CAPP:  TENDER 128.

19           MR. SCHAETZEL:  NO OBJECTION.

20           THE COURT:  IT'S ADMITTED.

21   BY MR. CAPP:

22   Q. THIS IS -- I AM GOING TO PULL SOMETHING UP ON THE SCREEN

23   WHICH IS NOT IN YOUR BOOK.  THIS IS SOMETHING THAT HAS JUST

24   COME UP RECENTLY, BUT I WILL ASK THE AV GUY TO PULL UP

25   DOCKET 568, PAGE 108, WHICH IS FROM THE DEFENDANT'S RESPONSE

1   TO PLAINTIFF'S FINDINGS AND CONCLUSIONS.  BLOW UP 232,

2   PLEASE.  I HEARD THIS FROM COUNSEL, I WANT TO VERIFY THROUGH

3   A WITNESS, THAT THIS STATEMENT IS SOMETHING THE COMPANY IS

4   GOING TO STAND BEHIND.  AFTER IT SAYS "RESPONSE," IT SAYS,

5   "WALTER DOES NOT DISPUTE THAT THE ACTIVE CLEANING AGENT IN

6   THE BIO-CIRCLE L CLEANING FLUID IS A SURFACTANT AND THAT AS

7   CURRENTLY CONSTRUED, THE CLEANING FLUID IS SURFACTANT

8   BASED," CLOSED QUOTE.  WOULD YOU AFFIRM THAT THAT IS

9   CURRENTLY THE DEFENDANT'S POSITION IN THIS LITIGATION?

10  A. YES.

11  Q. LET ME KEEP GOING.  AND I QUOTE, "WALTER RESPECTFULLY

12  MAINTAINS ITS ARGUMENT THAT SURFACTANT BASED SHOULD PROPERLY

13  BE CONSTRUED AS HAVING AN 80 PERCENT SURFACTANT TO WATER

14  RATIO RATHER THAN SIMPLY HAVING A SURFACTANT IN THE SOLUTION

15  FOR PURPOSES OF APPEAL," CLOSED QUOTE.  DO YOU SEE THAT?

16  A. YES.

17  Q. IS THAT YOUR OPINION, THAT THE TERM "SURFACTANT BASED"

18  SHOULD BE CONSTRUED AS 80 PERCENT SURFACTANT?

19  A. SIR, IN THE MARKET RIGHT NOW, THERE IS -- WE HAVE A WATER

20  BASED PRODUCT OR AN AQUEOUS PRODUCT.  THIS IS HOW CHEMICAL

21  PRODUCT, IT IS CLEANER, WATER BASED CLEANER.  WE NEVER CALL

22  IT A SURFACTANT BASED CLEANER.  NOT THAT I KNOW OF, ANYHOW.

23  AND IN THE MARKET, OUR CUSTOMERS DON'T SAY OH, IS IT

24  SURFACTANT BASED?  IS IT A SOLVENT BASED OR A WATER BASED

25  CLEANER?  AND WITH THE CONCENTRATION WE HAVE, WE VIEW IT AS

1   A WATER BASED PRODUCT, BUT WE UNDERSTAND THERE ARE

2   SURFACTANTS IN IT.

3   Q. BUT AS FAR AS YOU KNOW, YOU ARE NOT AWARE OF ANY J.

4   WALTER COMPANY, LIMITED OR J. WALTER, INC. PRODUCT

5   LITERATURE THAT REFERS TO BIO-CIRCLE L AS SURFACTANT BASED.

6   IS THAT YOUR TESTIMONY?

7   A. NO.  I MIGHT HAVE -- I AM NOT SURE.  I MIGHT HAVE SEEN

8   ONE ONLY ONE DOCUMENT, MAYBE IN WASHINGTON, YOU SHOWED ME

9   SOMETHING THAT -- LIKE A MARKETING DOCUMENT OR SOMETHING

10  WHERE SOMEBODY USED THIS TERM.  BUT THIS IS NOT SOMETHING

11  THAT IN MY GROUP WE USE AS A TERM.  WE SAY WATER BASED.

12  Q. LET'S TURN NOW TO PLAINTIFF'S EXHIBIT 149.  NOW, YOU

13  WOULD AGREE, WE HAVE FOUR PARTS WASHERS LINED UP AGAINST THE

14  WALL; RIGHT?

15  A. YES.

16  Q. AND OUT OF THOSE FOUR, THE BIO-CIRCLE 100 AND THE

17  BIO-CIRCLE 200 AND THE BIO-CIRCLE IO 400 ALL HAVE A LEVEL

18  CONTROL SYSTEM, WHICH INCLUDES A MAGNET, A MAGNETIZED

19  DOUGHNUT THAT SLIDES UP AND DOWN ON A SHAFT, AND THEN WHEN

20  THAT MAGNET DROPS DOWN OR MAKES CONTACT, IT SHUTS THE HEATER

21  OFF; CORRECT?

22  A. YES.

23  Q. AND THEN YOU WENT TO A NEW SYSTEM WHEN YOU INTRODUCED THE

24  IO 200; CORRECT?

25  A. YES.

1    Q. AND THAT IS WHAT I WANT TO TALK TO YOU ABOUT NOW.  SO

2    PLAINTIFF'S EXHIBIT 149 IS THE IO 200 TROUBLE SHOOTING

3    GUIDE; CORRECT?

4    A. YES.

5    Q. AND YOU ARE FAMILIAR WITH THIS DOCUMENT; CORRECT?

6    A. YES.

7    Q. AND THIS IS A TRUE AND ACCURATE REPRODUCTION OF THE

8    ORIGINAL, IS IT NOT?

9    A. I THINK SO.  YES.

10   Q. AT THE BOTTOM OF PAGE 1 IT DISCUSSES THE PRESSURE SWITCH.

11   DO YOU SEE THAT?

12   A. YES.

13   Q. IT SAYS, "IT CUTS POWER TO THE HEATER AND THE HEATER PUMP

14   WHEN THE PRESSURE DROPS BELOW A SET PRESSURE LEVEL.

15   EXAMPLE, PUMP INTAKE BLOCK OR NOT ENOUGH LIQUID INSIDE

16   UNIT," CLOSED QUOTE.  DO YOU SEE THAT?

17   A. YES.

18   Q. NOW, LET ME GO -- OH, DID I TENDER 149 INTO EVIDENCE YET?

19        MR. CAPP:  I TENDER IT AT THIS TIME.

20        MR. SCHAETZEL:  NO OBJECTION.

21        THE COURT:  ADMITTED.

22   BY MR. CAPP:

23   Q. NOW, WOULD YOU TURN NOW TO PLAINTIFF'S EXHIBIT 117?  DO

24   YOU RECOGNIZE THIS AS A DIAGRAM OF THE HEATER UNIT ON THE IO

25   200?

1    A. YES.

2    Q. NOW, IF I WAS TO HAND YOU A LASER POINTER, WOULD YOU BE

3    ABLE TO IDENTIFY FOR THE COURT WHERE THE PRESSURE SWITCH IS

4    LOCATED ON PLAINTIFF'S EXHIBIT 117?

5    A. PROBABLY COULD.  YES.

6    Q. DO YOU NEED A MINUTE?  ANNOTATED FEATURE 13 ON THE TABLE,

7    IT SAYS "PRESSURE SWITCH" NEXT TO IT.  HIGHLIGHT THAT.  ZOOM

8    IN ON THAT.  AND THEN WOULD YOU NOW GO TO THE SECOND PAGE OF

9    117 AND SEE IF YOU CAN GIVE MR. VANDEMEULEBROOCKE SOME HELP

10   HERE.  THE SECOND PAGE?  MR. VANDEMEULEBROOCKE, LET ME

11   DIRECT YOUR ATTENTION.  CAN YOU FOLLOW MY LASER POINTER

12   HERE?  DO YOU SEE AN ITEMIZED FEATURE THAT IS ANNOTATED AS

13   NO. 13?

14   A. YES.  THAT IS IT.

15   Q. THAT IS THE PRESSURE SWITCH?

16   A. YES.  THAT IS IT.

17   Q. AND THE ACTUAL PRESSURE SWITCH ITSELF IS ON THE INSIDE OF

18   THE HEATER CANISTER; CORRECT?

19   A. YES.

20   Q. WILL YOU EXPLAIN TO THE COURT HOW IT OPERATES.

21   A. WE BUY THESE HEATERS FROM A COMPANY IN CHICAGO CALLED

22   TRUE HEAT, AND THIS COMPANY SPECIALIZE IN HEATERS FOR HOT

23   TUBS.  IN THE HOT TUB, OBVIOUSLY, IF YOU HAVE NO LIQUID,

24   THERE IS NO PRESSURE, SO THE PRESSURE SWITCH WILL CUT THE

25   POWER TO THE HEATER, ALL WITHOUT OPEN THE POWER TO THE

1    HEATER.  SO THAT IS AN OFF-THE-SHELF PRODUCT THAT WE USE.

2    AND FOR US, IT'S USED -- IT WILL CUT THE POWER TO THE HEATER

3    OR IT WON'T TURN ON THE HEATER, IT WILL PREVENT THE HEATER

4    TO BE TURNED ON IF -- FOR A MULTIPLE OF REASONS.  IF THERE

5    IS NOT ENOUGH LIQUID IN THE BASE, OBVIOUSLY.  IF IN THE

6    LINE, FILTER LINE, SOMETHING CLOGS THE LINE, IT WILL DO THE

7    SAME THING, OR IF THERE IS NOT ENOUGH PRESSURE FOR WHATEVER

8    REASON.  I WILL GIVE YOU AN EXAMPLE.  WHEN WE FIRST STARTED

9    WITH THIS, OUR LINE DIDN'T HAVE ENOUGH -- IT WAS TOO -- HOW

10   COULD I SAY, TOO LARGE.  IT DID NOT CREATE ENOUGH PRESSURE

11   IN THE LINE, SO CERTAIN HEATERS WOULD NOT WORK, AND

12   CUSTOMERS WOULD COMPLAIN THAT THERE IS NO HEAT TO THEIR

13   SYSTEM.  AND WE REALIZED THAT WE HAD TO CREATE MORE PRESSURE

14   IN THE LINE.  SO THAT MEANS THAT THE BASE COULD HAVE BEEN --

15   WAS FULL OF LIQUID, THERE WAS NOTHING TO CLOG THE LINE.

16   THERE WAS ONLY NOT ENOUGH PRESSURE IN THE LINE.  SO THIS

17   HEATER, THIS PRESSURE SWITCH, WILL AS SOON AS IT WILL DETECT

18   THERE IS NOT ENOUGH PRESSURE, WILL OPEN, BASICALLY.

19   Q. NOW, LET'S TAKE A SITUATION WHERE EVERYTHING IS OPERATING

20   NORMALLY, THERE IS NO MAINTENANCE PROBLEMS, EVERYTHING WITH

21   THE CUSTOMER IS HAPPY AND FINE AND THEY ARE WASHING PARTS,

22   IT IS ALL FILLED UP WITH FLUID, THE INTAKE IS NOT BLOCKED,

23   IT IS PLUGGED INTO THE WALL, THERE IS NO ELECTRICAL

24   PROBLEMS, IT IS FUNCTIONING NORMALLY.  IN THAT SITUATION,

25   THERE IS A DEDICATED PUMP IN THE TANK THAT DELIVERS WATER OR

1  CLEANING FLUID UNDER PRESSURE TO THE HEATER CANISTER, AND

2  THERE IS ENOUGH PRESSURE BUILT-UP IN THE HEATER CANISTER TO

3  DEPRESS THE PRESSURE SWITCH, WHICH THEN ALLOWS THE HEATER TO

4  TURN ON; CORRECT?

5  A. YES.

6  Q. AND THEN IF WE ALLOW EVAPORATION TO OCCUR, THE FLUID

7  LEVEL IN THE TANK WILL GRADUALLY DROP; CORRECT?

8  A. YES.

9  Q. AND IF NOTHING ELSE HAPPENS OTHER THAN WE ALLOW THE

10  EVAPORATION PROCESS TO PROCEED, AT SOME POINT THE LEVEL OF

11  THE FLUID IN THE TANK WILL DROP BELOW THE INTAKE LEVEL OF

12  THAT PUMP, WON'T IT?

13  A. THE FIRST THING THAT WILL HAPPEN IS THE FLOW SWITCH WILL

14  CUT THE POWER TO THE CLEANING PUMPS.  THAT MEANS A CUSTOMER

15  WON'T BE ABLE TO CLEAN PARTS.  THERE WON'T BE LIQUID COMING

16  OUT OF THE FAUCET.

17  Q. I UNDERSTAND THAT, SIR, BUT THERE ARE TWO PUMPS.  I AM

18  TALKING ABOUT PUMPS THAT DELIVERS THE FLUID TO THE HEATER,

19  NOT THE PUMP THAT DELIVERS THE FLUID TO THE FAUCET IN THE

20  SINK.

21  A. OKAY.

22  Q. IF THE FLUID DROPS TO THE LEVEL OF THE INTAKE OF THE PUMP

23  THAT SUPPLIES THE HEATER, AT THAT POINT IN TIME, THAT PUMP

24  IS INGESTING AIR INSTEAD OF CLEANING FLUID; CORRECT?

25  A. YES.

1   Q. AND AT THAT POINT IN TIME, THROUGH THE LINE UP INTO THE

2   HEATER, THAT WILL GENERATE A DECREASE IN PRESSURE, WHICH

3   WILL ALLOW THAT PRESSURE SWITCH TO POP OUT AND SEND A

4   SHUT-OFF SIGNAL TO THE HEATER; CORRECT?

5   A. YES.

6   Q. AND THAT IS THE PRIMARY REASON FOR THE PRESSURE SWITCH IN

7   THERE, ISN'T IT?

8   A. THE PRIMARY REASON IS, AS I SAID, WE ARE BUYING THE

9   HEATERS IN THIS WAY, MADE LIKE THAT.  IT WAS TOO EXPENSIVE

10  TO CHANGE THE DESIGN BECAUSE WE WANTED TO HAVE ONLY FOR --

11  WE WANTED SOMETHING MORE -- ANOTHER TYPE OF FLOW SWITCH.  WE

12  TOOK THIS ONE, BECAUSE IT WAS TOO EXPENSIVE, WE TOOK THIS

13  ONE AND IT WORKS IN THE SAME WAY IF THERE IS NOT ENOUGH

14  PRESSURE IN THE LINE, IT WILL CUT THE POWER TO THE HEATER.

15  Q. LET ME TRY AND ASK THE QUESTION THIS WAY.  THE

16  THREE-PARTS WASHER TO THE LEFT HAVE THAT MAGNET DOUGHNUT

17  THAT DROPS DOWN AND ENCLOSES THE CIRCUIT TO SHUT OFF THE

18  HEATER; CORRECT?  THE BR 100, THE BR 200, THE IO 400;

19  CORRECT?

20  A. YES.

21  Q. AND THE REASON WHY YOU DO THAT IS YOU DON'T WANT THE

22  FLUID TO GET SO LOW THAT YOU'LL HAVE A RUNAWAY HEATER

23  CONDITION AND THE SYSTEM WILL MELT; ISN'T THAT TRUE?

24  A. THAT IS ONE OF THE TWO REASONS.  THE OTHER REASON IS WE

25  DON'T WANT CUSTOMERS, WHEN IT GETS TOO -- BEFORE THE LIQUID

1   GETS SO LOW THAT THE UNIT WOULD MELT, THE CUSTOMERS WILL

2   START CLEANING THEIR PARTS WITH AN OILY LIQUID BECAUSE WHEN

3   IT GETS SO LOW, THE LIQUID IS REALLY, REALLY OILY.  SO WE

4   DON'T -- WE DON'T WANT THE CUSTOMERS TO USE -- THEY WON'T BE

5   HAPPY, SO WE DON'T WANT THE CUSTOMERS TO USE THEIR UNIT WHEN

6   THE LIQUID IS SO LOW.  THAT IS THE REASON NUMBER ONE.  THE

7   REASON NUMBER TWO IS THE SAFETY REASON, OBVIOUSLY, THE

8   LIQUID IS TOO LOW, THERE IS A RISK OF FIRE.  AND WE NEED THE

9   POWER TO BE CUT TO THE HEATER AS WELL, TO THE COIL HEATER IN

10  THESE MACHINES.

11  Q. SO YOU HAVE A LEVEL CONTROL SYSTEM IN THE FORM OF THE

12  MAGNET DOUGHNUT THAT SLIDES UP AND DOWN, AND ONE OF THE

13  FUNCTIONS THAT IT PROVIDES, IT'S A SAFETY DEVICE TO PROTECT

14  THE RUNAWAY HEATER CONDITION THAT WOULD CAUSE A FIRE;

15  CORRECT?

16  A. IT WILL CUT THE POWER TO THE HEATER.  YES.

17  Q. AND THE PRESSURE SWITCH IN THE HEATER CANISTER IN THE IO

18  200 ALSO SERVES THAT FUNCTION, DOES IT NOT?  IT'S THERE SO

19  THAT WHEN A LOW PRESSURE CONDITION IS DETECTED, IT WILL

20  ASSOCIATE THAT WITH A LOW FLUID LEVEL CONDITION AND TURN THE

21  HEATER OFF; CORRECT?

22  A. NOT NECESSARILY.  THAT WILL BE A LOW -- IF THIS SWITCH,

23  THIS PRESSURE SWITCH, WILL BE TRIGGERED IF THE PRESSURE IS

24  LOW IN THE LINE.  ONE OF THE CAUSE COULD BE THAT THE LIQUID

25  IS VERY LOW, IT COULD BE CLOGGED, IT COULD BE ANY OF THE

1    REASON, BUT ONE OF THE REASON IS THAT, BUT NOT ONLY THIS

2    REASON.

3    Q. WOULDN'T YOU AGREE WITH ME THAT THE PRIMARY REASON IT'S

4    SET UP THE WAY THAT IT IS, IF YOU HAVE A LOW LEVEL CONDITION

5    IN THE TANK, THAT PRESSURE SWITCH IS A SAFETY MEASURE TO

6    KEEP THE MACHINE FROM CATCHING FIRE?

7    A. IT'S A SAFETY MEASURE.  YES.

8    Q. THAT IS THE NUMBER ONE, PRIMARY REASON WHY THAT DEVICE IS

9    IN THE IO 200, ISN'T IT?

10   A. IT'S ONE OF THE MAIN REASONS.  YES.

11   Q. THE GUY THAT IS PICTURED IN PLAINTIFF'S EXHIBIT 226, AND

12   I'VE GOT HIM ON THE FOAM CORE BOARD RIGHT THERE, BERT

13   OVERLAND, WHEN DID THAT RELATIONSHIP BETWEEN J. WALTER,

14   LIMITED AND BERT OVERLAND BEGIN?

15   A. IN '05, I BELIEVE.  '04 OR'05.  '05.

16   Q. SO IT DIDN'T BEGIN UNTIL AFTER THE BR 100 WAS LAUNCHED;

17   RIGHT?

18   A. SORRY?

19   Q. YOUR RELATIONSHIP WITH BERT OVERLAND DID NOT BEGIN UNTIL

20   THE BR 100 WAS ALREADY LAUNCHED AND DISCONTINUED IN THE

21   UNITED STATES; CORRECT?

22   A. IT WAS AFTER THAT.  YES.

23   Q. AND IT WAS -- THE RELATIONSHIP WITH OVERLAND DIDN'T BEGIN

24   UNTIL AFTER THE BR 200 WAS ALREADY FULLY DEVELOPED, LAUNCHED

25   AND ON SALE IN THE UNITED STATES; CORRECT?

1    A. YES.

2    Q. WOULD YOU TURN TO PLAINTIFF'S EXHIBIT 370 PLEASE?

3    MR. VANDEMEULEBROOCKE, YOU RECOGNIZE THIS AS A COPY OF THE

4    UNITED STATES PATENT 6057147, TO BERT OVERLAND?

5    A. YES.

6    Q. WHO CURRENTLY OWNS THIS PATENT?

7    A. SURFACE TECHNOLOGY IPAG IN SWITZERLAND.

8    Q. WHO IS THE POINT MAN FOR THE J. WALTER SIDE OF THE

9    TRANSACTION IN DEALING WITH MR. OVERLAND TO ACQUIRE THE

10   RIGHTS OF THIS PATENT?

11   A. THAT WAS MR. FRANCOIS BUDOIS.

12   Q. AND TO YOUR KNOWLEDGE, THAT OCCURRED IN LATE 2005;

13   CORRECT?

14   A. NO, I DIDN'T SAY THAT.  I SAID SOMEWHERE IN '04 OR '05,

15   TO BE MORE PRECISE IT IS VERY DIFFICULT FOR ME.  I BELIEVE

16   THERE WAS -- I KNOW IT WAS A WINTER DAY.  VERY COLD.  THIS I

17   REMEMBER.  AND IT WAS EITHER LATE IN'04 OR BEGINNING OF'05.

18   Q. YOU HAVE A LOT OF THOSE DAYS IN CANADA, DON'T YOU?

19   A. WE HAVE OUR SHARE.  YES.

20   Q. THE IO 400 THAT IS SITTING OVER HERE ON THE FLOOR, WHICH

21   IS MARKED AS JOINT EXHIBIT 33, HAS A PLACARD ON IT

22   INDICATING A PATENT MARKING FOR THE 147 PATENT; CORRECT?

23   A. I BELIEVE SO.  YES.

24   Q. AND THE IO 200, WHICH IS ON THE FLOOR HERE, MARKED AS

25   JOINT EXHIBIT 34, HAS A PLACARD ON IT WITH A PATENT MARKING

1    FOR THE 147 PATENT; CORRECT?

2    A. YES.

3             MR. CAPP:  YOUR HONOR, THAT COMPLETES MY

4    EXAMINATION.  I WILL TENDER THE WITNESS.

5             THE COURT:  ALL RIGHT.

6             MR. SCHAETZEL:  YOUR HONOR, WHILE WE ARE GETTING

7    SET UP, IF I MIGHT, A QUESTION OF PROCEDURE.  WE HAVE HEARD

8    THE COURT INDICATE THAT IN PLAINTIFF'S CASE IN CHIEF THAT

9    SOMETIMES IT CAN BE CONFUSING.  I DON'T RECALL THE EXACT

10   WORDS YOU USED, YOUR HONOR, TO HAVE A WITNESS, YOU KNOW, BE

11   TENDERED FOR BOTH PARTIES FOR BOTH SIDES AT THE SAME TIME.

12            THE COURT:  TO HAVE THE DEFENDANT PRESENT ITS

13   DEFENSE THROUGH THE CROSS-EXAMINATION OF A WITNESS CALLED BY

14   THE PLAINTIFF.

15            MR. SCHAETZEL:  YES.  AND WE APPRECIATE THE CHANCE

16   TO ALLOW MR. HOUGHTON TO FINISH HIS EXAMINATION.

17   MR. VANDEMEULEBROOCKE IS IN A DIFFERENT POSITION.  HE WILL

18   BE HERE AS THE COMPANY REPRESENTATIVE FOR THE WEEK.  SO WITH

19   THE COURT'S PERMISSION, WE WILL SIMPLY CROSS IN RESPONSE TO

20   WHAT HAS BEEN DONE ALREADY AND THEN CALL HIM BACK LATER IN

21   THE WEEK, IF THAT IS APPROPRIATE.

22            THE COURT:  I THINK THAT WILL BE FINE, UNLESS

23   MR. CAPP HAS SOME --

24            MR. CAPP:  I HAVE NO OBJECTION TO PROCEEDING IN

25   THAT MANNER.

1          MR. SCHAETZEL:  IT MIGHT HELP US.

2          THE COURT:  GOOD.

3                    CROSS-EXAMINATION

4     BY MR. SCHAETZEL:

5     Q. MR. VANDEMEULEBROOCKE, I HAVE A FEW QUESTIONS FOR YOU

6     THIS AFTERNOON.

7     A. FINE.

8     Q. YOU WERE ASKED SEVERAL QUESTIONS ABOUT THE GRAY MILLS

9     COMPANY AND THE GRAY MILLS MACHINE.  DID WALTER COPY THE BR

10    100 FROM GRAY MILLS?

11    A. NO.

12    Q. WHAT ARE SOME OF THE DIFFERENCES BETWEEN THE BR 100 AND

13    THE GRAY MILLS UNIT, THAT YOU KNOW OF?

14    A. WHAT I KNOW, AS I SAID, I WAS NOT WITH WALTER THEN, WHAT

15    I KNOW IS THE MAIN DIFFERENCES WOULD BE THERE IS AN AIR PUMP

16    ON THE BR 100, THERE IS NO LID, THERE IS THIS STEEL PLATING

17    IN THE BACK TO HOLD THE FAUCET AND THE BRUSH.  THE --

18    COMPARED TO THE GRAY MILLS MACHINE, THE GRAY MILL MACHINES,

19    EVERYTHING, THE HEATER, EVERYTHING, ALL OF THESE COMPONENTS

20    WERE ATTACHED TO THE BOTTOM OF THE SINK.  IN THE BR 100, ALL

21    OF THESE ARE ATTACHED TO A REMOVABLE CONTROL UNIT THAT CAN

22    BE REMOVED FROM THE MACHINE.  THE MEASUREMENT IN FRONT FOR

23    THE NUMBER OF GALLONS INSIDE ARE DIFFERENT.  I AM TRYING TO

24    THINK.  THE WHOLE SYSTEM IS ATTACHED DIFFERENTLY.  YES.

25    Q. BY WAY OF REFRESHING YOUR RECOLLECTION, HOW ARE MICROBES

1    PUT INTO THE BR 100 UNIT?  HOW WERE -- SORRY.

2    A. WE USE THE SAME BIO-CIRCLE L. WHERE THE MICROBES ARE

3    ALREADY IN THE SOLUTION SO THERE IS NO FILTER MAT ON THIS

4    MACHINE.

5    Q. HOW LONG DOES THE PUMP IN THE BIO-CIRCLE 100, THE BR 100,

6    HOW LONG DOES IT RUN?

7    A. 24-7.

8    Q. AND BETWEEN THE BR 200, AND THE IO 400 -- PLEASE, GO

9    AHEAD.

10   A. I'M SORRY, SIR.  I GOT CONFUSED FOR A MINUTE, SO MANY OF

11   THESE MACHINES.  I WAS REFERRING MORE TO THE 150 WHEN I

12   SPOKE.  I WILL START AGAIN WITH THE 100.

13   Q. THAT IS OKAY.

14   A. IF I MAY.

15   Q. PLEASE.

16   A. THERE IS NO FILTER MAT.  THE PUMP, THE LIQUID PUMP RUNS

17   ALWAYS.  AND THERE IS NO AIR PUMP.  THIS IS A DIFFERENCE.

18   THERE IS NO AIR PUMP.  THERE IS A BYPASS, SORT OF WHEN THE

19   CUSTOMER IS NOT USING THE MACHINE TO CLEAN PARTS, SO WHEN

20   THERE IS NO LIQUID GOING EITHER TO THE BRUSH OR THE FAUCET,

21   THERE IS A BYPASS, AND THE LIQUID IS SENT TO A TUBE THAT

22   GOES ACROSS THE BASIN AND WITH HOLES IN IT, AND THE LIQUID

23   FALLS BACK INTO THE TUB, INTO THE SOLUTION, CREATING --

24   BRINGING OXYGEN TO THE MIX.

25   Q. SO THOSE WOULD BE DIFFERENCES BETWEEN THE GRAY MILLS UNIT

1   AND THE BR 100; CORRECT?

2   A. PLUS, AS I SAID, ALL OF THE ELECTRICAL COMPONENTS WERE

3   INTO A REMOVABLE CONTROL UNIT, PLUG INTO A BOX ON THE SIDE,

4   THAT WOULD HANG ON THE SIDE OF THE MACHINE.

5   Q. AND THE FILTER MAT, WAS THERE A FILTER MAT IN THE BR 100?

6   A. NO.

7   Q. LOOKING AT THE BR 200 AND THE IO 400, ARE THERE ANY

8   DIFFERENCES BETWEEN THOSE TWO MACHINES?

9   A. THE IO 400 -- ON THE BR 200, ALL OF THE COMPONENTS ARE

10  CONNECTED TO A PCB, THAT IS BEHIND THE TOUCH PAD IN FRONT OF

11  THE MACHINE, AS YOU CAN SEE THERE.  OKAY.

12  Q. BY PCB, YOU ARE REFERRING TO THE CONTROL BOARD?

13  A. YES, THE CONTROL BOARD, AND EVERYTHING IS CONNECTED TO

14  THE CONTROL BOARD, WHICH IS BEHIND THIS TOUCH PAD THAT YOU

15  SEE IN THE BLACK CASING ON THE BR 200.  AND THAT WAS NOT SO

16  GOOD BECAUSE THERE IS A LOT OF LIQUID AROUND THAT.

17  CUSTOMERS ARE WASHING PARTS AND THE LIQUID WILL FALL ONTO

18  THE CONTROL BOARD AND SO ON AND SO ON.  AND SO THAT WAS A

19  PROBLEM.  THE SECOND PROBLEM IS WHEN THE CUSTOMERS WOULD

20  HAVE -- WHEN A MACHINE WOULD FAIL, THERE WAS NO WAY FOR THE

21  CUSTOMER TO REMOVE ANYTHING.  THEY WOULD HAVE TO SHIP THIS

22  BIG MACHINE ACROSS THE COUNTRY FROM VANCOUVER TO MONTREAL OR

23  L. A. TO HARTFORD.  VERY EXPENSIVE TO US.  SO WHAT WE DID,

24  WE -- THE MAIN DIFFERENCE BETWEEN THE TWO MACHINES ARE THAT

25  WE TOOK ALL OF THIS PCB AND EVERYTHING, AND WE PUT

1   EVERYTHING INTO A BOX, A METAL BOX THAT HANGS ON THE SIDE OF

2   THE IO 400.  VERY SIMILAR TO WHAT WE DID IN THE BR 100,

3   ACTUALLY.  OKAY.  SO WHEN A MACHINE WOULD FAIL, THE CUSTOMER

4   WOULD JUST REMOVE THIS UNIT, PUT IT IN A BOX AND SHIP IT TO

5   US AND INSTEAD OF SHIPPING THE WHOLE MACHINE WITH THE LIQUID

6   IN IT.

7   Q. OKAY.  ON THE SIDE OF THE IO 400, WHAT IS THIS HERE?

8   A. IT IS A FILTER.

9   Q. IS THERE A FILTER LIKE THAT ON THE SIDE OF THE IO --

10  SORRY, THE BR 200?

11  A. NO.

12  Q. SO WOULD THAT BE ANOTHER DIFFERENCE?

13  A. YES.

14  Q. WHY IS THERE A FILTER OR CARTRIDGE FILTER ON THE SIDE OF

15  THE IO 400?

16  A. IT WAS AN OPTION ON THE BR 200.  IT BECAME STANDARD ON

17  THE IO 400.  BECAUSE WE WANTED TO, AS WE DON'T CAPTURE ALL

18  OF THE PARTICLES THAT FALL INTO THE -- WITH THIS -- WITH

19  THAT, I MEAN, THAT FALL INTO THE TUB, WE WANTED FOR THE

20  CUSTOMERS TO USE A LIQUID AS CLEAN AS POSSIBLE.  SO WE ARE

21  TRYING, WE ARE ATTEMPTING TO TRAP THE PARTICLES IN

22  SUSPENSION BEFORE THEY GET TO THE FAUCET OF THIS.

23  Q. IS THERE A CARTRIDGE FILTER ON THE IO 200?

24  A. YES.

25  Q. YOU WERE ASKED SOME QUESTIONS ABOUT THE IO 200 PRESSURE

1    SWITCH.  DO YOU RECALL THAT?

2    A. YES.

3    Q. IF FLUID IN THE IO 200 BEGINS TO DROP, PLEASE DESCRIBE

4    WHAT HAPPENS, WHETHER IT'S A RESULT OF EVAPORATION OR

5    DRAG-OUT OR ANYTHING ELSE.  WHAT HAPPENS?

6    A. THE FIRST THING THAT HAPPENS IS WE HAVE A FLOAT SWITCH AS

7    WELL.  IT FLOATS, REALLY FLOATS, ON TOP OF THE LIQUID.  AND

8    AS THE LIQUID GOES LOW, THIS FLOW SWITCH WILL FOLLOW, AND AT

9    ONE POINT, AT A CERTAIN ANGLE, THERE IS A STEEL WALL IN THE

10   FLOW SWITCH THAT WILL ROLL DOWN AND CUT THE POWER TO THE

11   LIQUID PUMP.

12   Q. TO THE LIQUID PUMP?

13   A. TO THE LIQUID PUMP.  THE FIRST THING WE WANT TO AVOID IS

14   FOR THE CUSTOMERS TO CLEAN THEIR PARTS WITH A GNARLY LIQUID.

15   SO THE FIRST THING, BEFORE IT GETS TOO LOW AND THERE IS A

16   PROBLEM WITH A FIRE OR ANYTHING LIKE THAT, WE WANT TO MAKE

17   SURE -- THIS IS A SIGNAL ON THE IO 200, BECAUSE THERE IS

18   NOTHING TO TELL THE CUSTOMER THAT THE LIQUID IS LOW.  THERE

19   IS NO -- THERE IS NOT A -- LIKE ON THE BR 200, THERE IS A

20   LIGHT THAT WILL COME ON AND SAY -- YOU WILL TURN IT ON AND

21   IT WILL SAY THAT THE LIQUID IS LOW, PLEASE ADD LIQUID.  ON

22   THE IO 200, THERE IS NO LIGHT LIKE THIS.  SO THE ONLY WAY WE

23   HAVE TO TELL THE CUSTOMER, MR. CUSTOMER, YOU FORGOT TO ADD

24   LIQUID IN THE MACHINE.  BECAUSE OF EVAPORATION OR DRAG-OUT

25   OR WHATEVER, THE LIQUID IS LOW, IS WHEN IT'S TRYING TO PUSH

1   THE MUSHROOM SWITCH.  HE WANTS TO CLEAN A PART AND THERE IS

2   NO LIQUID COMING OUT BECAUSE THE FLOAT SWITCH HAS CUT THE

3   POWER TO THE LIQUID PUMP BECAUSE THE LIQUID IS TOO LOW.

4           THE COURT:  EXCUSE ME.  LET ME ASK YOU THIS:  WHEN

5   YOU SAY THERE IS AN OILY LIQUID, IS THAT HYDROCARBONS THAT

6   HAVE COME FROM PARTS THAT WENT THROUGH THE DRAIN?

7           THE WITNESS:  YES.

8           THE COURT:  ALL RIGHT.  DO THEY -- IS THE REASON

9   THAT THE MACHINE PUMPS IT UP WHEN IT'S LOW, IS THAT BECAUSE

10  THE INTAKE FOR THE PUMP IS LOW IN THE TANK OR IS THAT

11  BECAUSE THE OILY LIQUID IS AT THE TOP OF THE TANK BUT AS IT

12  GETS LOW, IT COMES DOWN TO THE INTAKE?  DO YOU UNDERSTAND

13  WHAT I AM ASKING?

14          THE WITNESS:  YES, SIR.  THE PUMPS HANG IN THE IO

15  200 ABOUT -- THERE IS ABOUT 40 LITERS LEFT AT THAT POINT.

16  OKAY.  SO IF THEY WERE IN THE BOTTOM, THAT WOULD BE TOO

17  DANGEROUS FOR THE PUMP.  SO THEY HANG ABOUT 60 PERCENT OF

18  THE BASE.  AND AT THAT TIME THE LIQUID OVER ALL, THERE IS

19  OIL ON TOP FOR SURE, YOU ARE RIGHT.  BUT THE LIQUID IS VERY

20  DIRTY AS WELL BECAUSE THERE IS NOT ENOUGH MICROBES LEFT TO

21  REALLY BIOREMEDIATE THE LIQUID SO WELL.  SO THE WHOLE THING

22  IS OILY, VERY OILY.  BUT THERE IS MORE ON TOP, CLOSE TO

23  WHERE THE PUMPS ARE LOCATED.

24          THE COURT:  OKAY.  THANK YOU.  EXCUSE ME.

25  MR. SCHAETZEL, GO AHEAD.

1            MR. SCHAETZEL:  MR. VANDEMEULEBROOCKE.  IF I CAN

2  ASK THE WITNESS TO COME AND REMOVE THIS.

3            THE COURT:  YOU MAY STEP DOWN.

4              (WITNESS COMPLIES WITH REQUEST).

5  BY MR. SCHAETZEL:

6  Q. I'M GOING TO ASK YOU TO SHOW THE JUDGE WHAT YOU JUST WERE

7  REFERRING TO.  I'LL BE GLAD TO HOLD THIS FOR YOU.

8  A. THIS FLOW SWITCH, THERE IS LIQUID IN THE TUB.  THE FLOW

9  SWITCH GOES FLOATS LIKE THIS.  IT GOES DOWN WITH THE LIQUID

10  AND YOU WILL HEAR AT ONE POINT, THERE IS A STEEL BALL, THE

11  BALL IS CLOSED LIKE THIS, THAT MEANS THERE IS A CONTACT, IT

12  GOES LIKE THIS, THERE IS NO CONTACT.  IT CUTS THE POWER TO

13  THE LIQUID PUMP.

14  Q. AND APPROXIMATELY HOW FAR IS THAT LIQUID PUMP FROM THE

15  BOTTOM OF THE TANK?  IF YOU COULD JUST --

16  A. IT HANGS ABOUT IN THE TANK ABOUT HERE.  I DON'T KNOW IF

17  YOU CAN SEE.

18  Q. AND WHERE IS THE BOTTOM OF THE TANK, IF YOU CAN PUT TWO

19  HANDS --

20  A. RIGHT ABOUT HERE ON THE SIDE.

21            THE COURT:  THANK YOU.

22            MR. SCHAETZEL:  YOUR HONOR, SUBJECT TO CALLING

23  THIS WITNESS AGAIN, WE HAVE NO FURTHER QUESTIONS AT THIS

24  TIME.

25            THE COURT:  MR. CAPP, DO YOU HAVE ANY FURTHER

1    QUESTIONS?

2              MR. CAPP:  I CERTAINLY DO.

3                   REDIRECT EXAMINATION

4    BY MR. CAPP:

5    Q. WHEN YOU WERE DEMONSTRATING THE DISC-SHAPED FLOAT SWITCH

6    FOR THE JUDGE A MINUTE AGO, LET'S TALK ABOUT WHAT HAPPENS

7    THERE.  IF THAT STEEL BALL ROTATES, IT TURNS OFF ONE OF THE

8    TWO PUMPS; RIGHT?  AND THAT'S THE ONE THAT BRINGS THE FLUID

9    UP TO THE FAUCET SO YOU CAN NO LONGER CLEAN; CORRECT?

10   A. YES.

11   Q. BUT IF SOMETHING HAPPENS WHERE MAYBE THE FLUID IS GETTING

12   CLOSE TO THAT LEVEL ON FRIDAY AFTERNOON, AND THEY ARE ALL

13   DONE WASHING PARTS, AND THEN YOUR CUSTOMER DECIDES TO GO

14   FISHING FOR TWO WEEKS AND COME BACK, THE OTHER PUMP WILL

15   STILL COME ON AND PUMP INTO THE HEATER, WON'T IT?  UNLESS

16   YOU SHUT POWER TO THE UNIT OFF; CORRECT?

17   A. YES.

18   Q. SO THE EVAPORATION PROCESS WILL CONTINUE, DESPITE THE

19   FACT THAT YOUR FIRST FLOAT SWITCH WITH THE STEEL BALL HAS

20   TURNED OFF ONE OF THE TWO PUMPS; CORRECT?

21   A. YES.

22   Q. AND THE FLUID, IF LEFT LONG ENOUGH, IT WILL COOL, THEN

23   THE TEMPERATURE GAUGE WILL TELL THE HEATER TO TURN ON, WHICH

24   WILL TELL THE PUMP TO SEND THE PUMP TO THE HEATER, AND THAT

25   PROCESS WILL CONTINUALLY CYCLE, AND THE FLUID WILL

1    CONTINUALLY DROP AND DROP AND DROP AFTER THE FIRST FLOAT

2    SWITCH IS TURNED OFF THE FIRST PUMP; RIGHT?

3    A. YES.

4    Q. AND BECAUSE OF THAT, YOU PUT A PRESSURE SWITCH IN THE

5    HEATER CANISTER SO THAT THAT WOULD POP OUT AND TURN OFF

6    POWER TO THE HEATER SO THAT THE THING WOULDN'T CATCH FIRE

7    WHILE THAT GUY IS ON A FISHING TRIP FOR TWO WEEKS; CORRECT?

8    A. IT WILL -- YES, IT WILL PROTECT ALSO THE MACHINE.  YES.

9    Q. NOW --

10   A. IF I MAY, THOUGH, YOU SAY WE PUT -- WE PUT A PRESSURE

11   SWITCH THERE.  WE -- IT WAS ALREADY THERE.  WE JUST BUYING

12   IT THIS WAY.  WE DID NOT DESIGN IT FOR THIS.  THANK YOU.

13   Q. MR. VANDEMEULEBROOCKE, WERE YOU UNDER THE IMPRESSION THAT

14   THIS UPSTREAM FILTER CANISTER DEVICE WAS NOVEL TO J.

15   WALTER'S DEVELOPMENT OF THE BR 200 -- SORRY, IO 400 AND THE

16   IO 200?

17   A. WAS NOVEL, MEANING --

18   Q. DID YOU CONSIDER THIS TO BE SOME SORT OF TECHNOLOGICAL

19   BREAKTHROUGH DEVELOPMENT BY J. WALTER COMPANY, LIMITED?

20   A. NO.

21   Q. OKAY.  DO YOU NOT UNDERSTAND THAT THERE WAS A DEVICE LIKE

22   THAT ON THE BIO 436 THAT GRAY MILLS SOLD TO J. WALTER

23   COMPANY, LIMITED IN THE MID 1999?

24   A. I DON'T KNOW ABOUT THAT.  I DON'T KNOW -- I HAVE NEVER

25   SEEN THIS MACHINE, SO I DON'T KNOW IF THERE WAS ONE OR NOT.

1   SORRY.

2   Q. WILL YOU PULL UP PLAINTIFF'S EXHIBIT 320, PLEASE?  START

3   SCROLLING THROUGH SLOWLY, PAGE BY PAGE, AND I WILL TELL YOU

4   WHEN TO STOP.  MR. VANDEMEULEBROOCKE, YOU HAVE NEVER SEEN

5   ONE OF THOSE MACHINES BEFORE YOU CAME IN HERE TODAY?

6   A. NO.

7   Q. YOU NEVER SEEN A PICTURE OF ONE; RIGHT?

8   A. OF THIS ONE?  NEVER.  NO.

9   Q. SO YOU CAN'T EVEN TESTIFY WHETHER OR NOT THAT THE BIO

10  436, AS DEPICTED IN THAT PHOTOGRAPH, WAS OR WAS NOT THE BIO

11  436 THAT WAS ON THE INVOICE BETWEEN GRAY MILLS AND J. WALTER

12  IN MID 1999; CORRECT?

13  A. NO.

14  Q. NOW, THERE HAS BEEN TESTIMONY IN THIS CASE ABOUT THE FACT

15  THAT YOU PUT MICROBES DIRECTLY IN THE FLUID INSTEAD OF

16  INTRODUCING THEM THROUGH A FILTER.  DO YOU RECALL THAT?

17  A. YES.

18  Q. CAN WE GO TO -- OH, DO YOU CONSIDER THAT TO BE A

19  TECHNOLOGICAL BREAKTHROUGH OF J. WALTER COMPANY, LIMITED?

20  A. ABSOLUTELY.  YES.

21  Q. YOU DO?

22  A. OF THE CB CHEMIE.

23  Q. THE CONCEPT OF PUTTING MICROORGANISMS IN THE FILTER --

24  A. NO.  NOT IN THE FILTER.

25  Q. YOU CONSIDERED THAT TO BE A TECHNOLOGICAL BREAKTHROUGH OF

1   CB CHEMIE?

2   A. NO.  YOU SAID IN THE FILTER.  I DID NOT SAY THE FILTER.

3   Q. DO YOU CONSIDER THE FACT THAT YOUR BIO-CIRCLE L CLEANING

4   FLUID IS PACKAGED AND SHIPPED WITH THE MICROBES IN THE FLUID

5   CONTAINER TO BE A TECHNOLOGICAL BREAKTHROUGH OF J. WALTER

6   COMPANY, LIMITED AND CB CHEMIE?

7   A. YES.

8   Q. YOU WERE THE POINT MAN FOR BUYING THE OVERLAND 147

9   PATENT, WERE YOU NOT?

10  A. NO.

11          MR. SCHAETZEL:  OBJECTION.

12  BY MR. CAPP:

13  Q. YOU WERE NOT?

14  A. NO.

15  Q. DID YOU HAVE DIRECT COMMUNICATION WITH MR. OVERLAND?

16  A. FOR BUYING THIS PATENT?

17  Q. YES.

18  A. NO.

19  Q. HAVE YOU EVER READ IT?

20  A. YES.

21  Q. WOULD YOU PLEASE, PLAINTIFF'S EXHIBIT 370, PLEASE.  WOULD

22  YOU SCROLL TO COLUMN 5, PLEASE, GARY.  THE LAST FULL

23  PARAGRAPH.  WOULD YOU BLOW THAT UP.  I NEED YOU TO DO TWO

24  BECAUSE I NEED YOU TO GET THE TOP OF COLUMN 6 DOWN TO LINE

25  9.  SORRY, LINE 15 ON THE RIGHT-HAND SIDE.  CAN WE JUST READ

1   THIS INTO THE RECORD, AND I QUOTE, STARTING AT LINE 57,

2   QUOTE, "THE MICROBIAL CLEANING SOLUTION USED IN THE PRESENT

3   INVENTION IS A PRODUCT OF NATURE'S WAY, INC., SOLD UNDER THE

4   TRADEMARK PC AND PROTECTED UNDER THE UNITED STATES PATENT

5   NO. 5561059 TO KAISER, ET AL., QUOTE, SUBSTRATE

6   BIOAVAILABILITY ENHANCED CHEMICAL MIXTURE FOR USE IN

7   BIOREMEDIATION, CLOSED QUOTE.  THE NATURE'S WAY PC CLEANING

8   SOLUTION CONTAINS THE FOLLOWING NATURAL, HYDROCARBON

9   DEGRADING AEROBIC MICROORGANISMS:  ACROMOBACTER,

10  ACINETOBACTER, ALCALIGENES, ARTHROBACTER, BACILLUS,

11  NOCARDIA, FLAVOBACTERIUM AND PSEUDOMONAS, SPP.  THE PCC

12  PARTS AQUEOUS CLEANING SOLUTION IS AN INNOVATIVE,

13  COST-EFFECTIVE SOLUTION THAT HAD BEEN UNDER DEVELOPMENT AND

14  EXTENSIVE FIELD TESTING UNDER INDUSTRIAL STANDARDS FOR

15  SEVERAL YEARS.  THE SOLUTION DOES NOT CONTAIN ANY HARMFUL

16  INGREDIENTS AND IS USER FRIENDLY TO HUMANS AND THE

17  ENVIRONMENT.  THE NATURALLY OCCURRING MICROBES COMPRISED IN

18  THE SOLUTION FEED ON HYDROCARBONS, TRANSFORMING OIL AND

19  GREASE TO HARMLESS CARBON DIOXIDE AND WATER.  THE MICROBES

20  ARE NOT GENETICALLY DEVELOPED BUT GATHER FROM OIL SPILLS

21  THAT WERE BEING CLEANED BY A NATURAL PROCESS.  THE AEROBIC

22  MICROBES OF PC THRIVE ON HYDROCARBONS.  IF THEIR FOOD SOURCE

23  OR OXYGEN SUPPLY IS DEPLETED, THEY WILL DIE AND BECOME PART

24  OF THE BIOMASS.  THE PC CLEANING SOLUTION BIOREMEDIATES OIL,

25  GREASE VARNISHED PARTS AND OTHER PETROLEUM PRODUCTS WITH

1    EASE, PETROLEUM BASED SOLVENT PROCESSES ARE HARSH TO BOTH

2    WORKERS AND THE ENVIRONMENT," CLOSED QUOTE.  DID YOU SEE

3    THAT?

4    A. YES.

5    Q. NOW, WERE YOU AWARE OF THAT DISCLOSURE IN THE OVERLAND

6    147 PATENT AT THE TIME THAT IT WAS ACQUIRED BY J. WALTER

7    AFFILIATE IN ABOUT 2004, 2005?

8    A. YES.

9    Q. ALL RIGHT.  DO YOU UNDERSTAND THAT THE MR. KAISER THAT

10   WAS MENTIONED ON COLUMN 5 AS BEING THE PATENT HOLDER FOR

11   NATURE'S WAY PC FLUID IS THE SAME PERSON AS CONRAD KAISER

12   WHO APPEARS ON YOUR PROMOTIONAL LITERATURE AT PLAINTIFF'S

13   EXHIBIT 226?  DID YOU KNOW THAT?

14   A. YES.

15   Q. OKAY.  TAKING ALL OF THAT INTO ACCOUNT, FIRST OF ALL,

16   WOULD YOU GO BACK TO THE BEGINNING OF PLAINTIFF'S EXHIBIT

17   370?  THE FIRST PAGE.  WOULD YOU HIGHLIGHT THE -- FROM THE

18   TOP DOWN TO WHERE IT SAYS "FILE," ABOUT TWO INCHES DOWN.

19   RIGHT THERE.  DIRECT YOUR ATTENTION TO THE BOTTOM LEFT-HAND

20   CORNER OF THAT ZOOMED PORTION.  DO YOU SEE THAT THE PATENT

21   APPLICATION FOR OVERLAND'S FILE IN THE UNITED STATES PATENT

22   OFFICE WAS JANUARY 21, 1997?

23   A. UH-HUH (AFFIRMATIVE).

24   Q. WAS THAT BEFORE OR AFTER J. WALTER COMPANY, LIMITED AND

25   CB CHEMIE DEVELOPED BIO-CIRCLE L CLEANING FLUID?

1    A. I WOULDN'T KNOW THAT.  AS I SAID IN THE BEGINNING, WHEN

2    YOU START ASKING QUESTIONS TODAY, I WAS NOT THERE, THEN I

3    DON'T KNOW EXACTLY WHEN ALL OF THIS STARTED BETWEEN P.R.

4    SOMERS AND ULRICH BERENS, AND I DON'T KNOW EXACTLY WHEN CB

5    CHEMIE STARTED TO WORK ON BIO-CIRCLE L.  I DON'T KNOW.

6            MR. CAPP:  NO FURTHER QUESTIONS.  THANK YOU.

7            THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP

8    DOWN.  WHO IS YOUR NEXT WITNESS, MR. CAPP?

9            MR. CAPP:  MR. MARKS.  I WOULD LIKE TO CALL

10   MR. FRANK MARKS TO THE STAND, YOUR HONOR.

11           THE COURT:  ALL RIGHT.

12                    FRANCIS MARKS

13                 PLAINTIFF'S WITNESS

14                        SWORN

15                  DIRECT EXAMINATION

16   BY MR. CAPP:

17   A. MY NAME IS FRANCIS MARKS.  M-A-R-K-S.

18   Q. WHERE DO YOU LIVE?

19   A. I LIVE IN SANDY SPRINGS.

20   Q. WILL YOU SUMMARIZE THE EXTENT OF YOUR POST HIGH SCHOOL

21   EDUCATION?

22   A. I HAVE A DEGREE IN ECONOMICS FROM THE SCHOOL AT THE

23   UNIVERSITY OF PENNSYLVANIA.

24   Q. DO YOU HOLD AN EDUCATIONAL DEGREE OR SCIENTIFIC OR

25   ENGINEERING DISCIPLINE?

1  A. ONLY IF YOU CONSIDER ECONOMICS TO BE A DISMAL SCIENCE.

2  Q. MY DEGREE IS IN PSYCHOLOGY, SO I LABOR UNDER THE SAME.

3  BY WHOM ARE YOU PRESENTLY EMPLOYED?

4  A. INTELLIGENCE SYSTEMS CORPORATION.

5  Q. WHAT POSITIONS DO YOU HOLD?

6  A. VICE-PRESIDENT OF INTELLIGENT SYSTEMS AND PRESIDENT OF

7  CHEMFREE CORPORATION.

8  Q. WHERE IS CHEMFREE CORPORATION LOCATED?

9  A. OUR OFFICES ARE IN NORCROSS, GEORGIA.

10  Q. WHAT PRODUCT LINES IS THE COMPANY INVOLVED IN?

11  A. PARTS WASHERS.

12  Q. MORE SPECIFICALLY, ANY PARTICULAR KIND OF PARTS WASHERS?

13  A. YES.  BIOREMEDIATING PARTS WASHERS.

14  Q. I WANT THIS TO BE CLEAR FOR THE COURT.  DOES CHEMFREE

15  MANUFACTURE AND SELL ANY PRODUCTS OTHER THAN BIOREMEDIATION

16  PARTS WASHERS?

17  A. WE SELL THE PHYSICAL PARTS WASHER, THE FLUID AND THE

18  FILTERS.

19  Q. AND APPROXIMATELY WHAT ARE CHEMFREE CORPORATION'S ANNUAL

20  SALES IN DOLLARS TERMS?

21  A. LAST YEAR THERE WERE ABOUT 13 MILLION.

22  Q. AND APPROXIMATELY HOW MANY PARTS WASHER MACHINE UNITS

23  SOLD?

24  A. IN THE LAST TWO YEARS, ABOUT 18,000.

25  Q. WOULD YOU TELL THE COURT WHAT GEOGRAPHIC MARKETS YOU ARE

1    IN?

2    A. WE ARE IN INTERNATIONAL COMPANY, DOING BUSINESS IN NORTH

3    AMERICAN, SOUTH AMERICA, THE EUROPEAN UNION AND THE PACIFIC

4    RIM COUNTRIES.

5    Q. DESCRIBE SOME OF THE DISTRIBUTION CHANNELS THAT YOU USE.

6    A. WE USE RESELLERS, OTHERWISE CALLED DISTRIBUTORS.  WE DO

7    HAVE SOME DIRECT CUSTOMERS THAT WE PROVIDE PRODUCT TO.  AND

8    WE ALSO HAVE SOME LEASE CUSTOMERS THAT WE DEAL WITH ON A

9    DIRECT BASIS AND THEN WE PRIVATE LABEL THE PRODUCT.

10   Q. WHAT DO YOU CONSIDER TO BE YOUR PRIMARY COMPETITION IN

11   TERMS OF TRYING TO SELL YOUR PARTS WASHER PRODUCTS IN THE

12   UNITED STATES?

13   A. SOLVENT PARTS WASHERS.

14   Q. HOW MANY COMPETITORS DO YOU HAVE IN THE UNITED STATES

15   THAT SELL SINK ON A DRUM PARTS WASHERS THAT ADVERTISE A

16   BIOREMEDIATION CAPABILITY?

17   A. PROBABLY EIGHT OR NINE POSSIBLY.

18   Q. HOW MANY OF THOSE HAVE PERMISSION TO EITHER CO-ASSIGNMENT

19   OR LICENSE TO PRACTICE CHEMFREE'S PATENTS?

20   A. ONE.

21   Q. AND WHO IS THAT?

22   A. THE INCORPORATION BY THE NAME OF ZYMO INTERNATIONAL.

23   Q. AND DID THAT CO-ASSIGNMENT RESULT OUT OF LITIGATION THAT

24   WAS SETTLED IN 1996?

25   A. YES, IT DID.

1  Q. AND WAS THAT TIED TO THE DEPARTURE OF MR. MCCLUER FROM

2  CHEMFREE IN LATE 1994?

3  A. YES.

4  Q. OF THE COMPETITORS THAT YOU HAVE FOR SINK ON A DRUM

5  BIOREMEDIATION PARTS WASHERS, WHICH ONE APPEARS TO HAVE THE

6  GREATEST MARKET PRESENCE IN TERMS OF SALES?

7  A. BIO-CIRCLE.

8  Q. OF THE COMPETITORS FOR SINK ON A DRUM BIOREMEDIATION

9  PARTS WASHERS, WHICH ONE APPEARS TO HAVE THE GREATER MARKET

10  PRESENCE IN TERMS OF ADVERTISING AND MARKETING?

11  A. BIO-CIRCLE.

12  Q. DO YOU RECALL MR. HOUGHTON'S TESTIMONY YESTERDAY THAT HE

13  WAS NOT AWARE OF ANY INSTANCES WHERE CHEMFREE HAS SUPPLANTED

14  AN EXISTING CUSTOMER RELATIONSHIP WITH BIO-CIRCLE?

15  A. YES.

16  Q. CAN YOU GIVE THE COURT A RECENT, REAL LIFE EXAMPLE ON

17  THAT PARTICULAR POINT?

18  A. THERE IS A MILITARY BASE IN SOUTH CAROLINA THAT EARLY ON

19  ACQUIRED A LARGE NUMBER OF BIO-CIRCLE MACHINES PRIMARILY FOR

20  WEAPONS CLEANING.  THEY ARE REPLACING THOSE BIO-CIRCLE

21  MACHINES WITH CHEMFREE PRODUCT FOR USE IN THE SAME

22  APPLICATION.

23  Q. LET'S GIVE THE JUDGE SOME DETAILS HERE.  WHAT IS THE NAME

24  OF THE ARMY BASE?

25  A. FORT JACKSON.

1    Q. HOW LONG HAVE YOU BEEN EMPLOYED BY EITHER INTELLIGENCE

2    SYSTEMS OR CHEMFREE CORPORATION?

3    A. SINCE 1982.

4    Q. DESCRIBE THE VARIOUS POSITIONS THAT YOU HELD OVER THE

5    YEARS.

6    A. OVER THE YEARS, WITH INTELLIGENCE SYSTEMS, I'VE BEEN

7    VICE-PRESIDENT OF CORPORATE DEVELOPMENT, AND AT VARIOUS

8    TIMES, PRESIDENT OF CHEMFREE CORPORATION.  AN ORGANIZATION

9    KNOWN AS DOCTORS ASSOCIATES, AND INTELLIGENT ENCLOSURES

10   CORPORATION, AND CHEMFREE CORPORATION.

11   Q. MR. MARKS, I AM GOING TO ASK YOU TO SLIDE A LITTLE CLOSER

12   TO THE MICROPHONE, IF YOU DON'T MIND.  IT MAY BE MY HEARING.

13   A. NO.

14   Q. BUT THAT WILL HELP.  THE LIST OF COMPANIES THAT YOU GAVE,

15   WHAT PRODUCT LINES WERE THOSE COMPANIES INVOLVED IN?

16   A. QUADRO INCORPORATION, PRIMARILY AT THAT TIME, WAS IN THE

17   BUSINESS OF PERSONAL COMPUTER ENHANCEMENT PRODUCTS.  DOCTORS

18   ASSOCIATES IS A LOCUM TENENS ORGANIZATION.  INTELLIGENT

19   ENCLOSURES PRODUCED MANY ENVIRONMENTS, MANY CLEAN ROOMS FOR

20   THE SEMICONDUCTOR INDUSTRY, AND CHEMFREE CORPORATION

21   PRODUCES BIOREMEDIATING PARTS WASHERS.

22   Q. PRIOR TO 1993, DID YOU HAVE ANY PERSONAL EXPERIENCE IN

23   THE PARTS WASHING INDUSTRY?

24   A. NO.

25   Q. DO YOU RECALL MONITORING THE PROGRESS OF MR. MCCLUER AND

1    MR. MCNALLY AS THEY TRIED TO DEVELOP AN ENVIRONMENTALLY

2    FRIENDLY PARTS WASHER IN 1993 AND 1994?

3    A. YES.

4    Q. DID YOU CONTRIBUTE ANY SUGGESTIONS TO IMPROVE THEIR

5    DESIGN OF THE PARTS WASHER?

6    A. MUCH OF THE WORK THAT WAS DONE DURING THAT TIME WAS

7    COLLABERATIVE AND I DID OFFER A NUMBER OF SUGGESTIONS, A

8    NUMBER OF QUESTIONS.

9    Q. CAN YOU GIVE WHAT YOU CONSIDER TO BE MOST SIGNIFICANT

10   SUGGESTION OR IDEA?

11   A. THE MOST SIGNIFICANT ONE WAS SOLVING THE PROBLEM OF HOW

12   TO USE A FLAT FILTER EFFECTIVELY IN A BIOREMEDIATING PARTS

13   WASHER.  AND TO SOLVE THAT PROBLEM, I DEVELOPED THE DESIGN

14   OF A MULTITIERED SINK.

15   Q. I WANT YOU TO STOP NOW AND PICTURE A SNAPSHOT POINT IN

16   TIME AT THE END OF MARCH OF 1994.  I WANT YOU TO DESCRIBE

17   THE FEATURES THAT WERE PRESENT ON BETA TEST UNITS THAT

18   CHEMFREE HAD IN THE FIELD AS OF MARCH -- END OF MARCH OF

19   1994.

20   A. IT WOULD HAVE BEEN A MACHINE WITH A SINK, A TANK, IT

21   WOULD HAVE CONTAINED A FILTER.  IT WOULD HAVE HAD A HEATER,

22   IT WOULD HAVE HAD A MECHANISM FOR CONTROLLING THE HEATER, A

23   THERMOSTAT THAT WOULD SENSE THE TEMPERATURE OF THE FLUID AND

24   TO TURN THE -- CONTROL THE ELECTRONICS OR SENSE THE

25   ELECTRONICS TO TURN OFF THE HEATER UNDER CERTAIN

1   CIRCUMSTANCES.  WOULD HAVE HAD A PUMP, WOULD HAVE HAD A

2   FLOAT SWITCH TO TELL THE LEVEL OF THE FLUID, AND WOULD HAVE

3   HAD BIOREMEDIATION CAPABILITY THROUGH MICROBES.

4   Q. THE MARCH -- THE END OF MARCH OF 1994, HOW WERE THE

5   MICROBES DELIVERED TO THE -- I CAN'T SALVAGE THAT QUESTION.

6   I HAVE TO START OVER.  WOULD YOU DESCRIBE THE PARTICULAR

7   CLEANING FLUID THAT WAS BEING USED IN THE MID OR TOWARD THE

8   END OF MARCH OF 1994 IN YOUR BETA TESTING UNIT?

9   A. IN FACT, I BELIEVE WE WERE USING EXPERIMENTAL CLEANING

10  FLUID THAT WE HAD ACQUIRED FROM A COMPANY BY THE NAME OF

11  INTRATECH AND IT HAD MICROBES IN THE FLUID.

12  Q. DID CHEMFREE GET INVOLVED IN LITIGATION WITH MR. MCCLUER

13  SOMETIME AFTER THE CHEMFREE SMART WASHER WAS COMMERCIALIZED?

14  A. YES.

15  Q. WHAT WAS THE NATURE OF THAT DISPUTE?

16  A. AFTER THE PRODUCT HAD BEEN INTRODUCED INTO THE MARKET,

17  MR. MCCLUER LEFT HIS CONSULTING ASSIGNMENT WITH CHEMFREE AND

18  FORMED A NEW COMPANY, WITH NEW PEOPLE, ASSOCIATES OF HIS,

19  AND INTRODUCED INTO THE MARKET A KNOCKOFF OF THE CHEMFREE

20  SMART WASHER.

21  Q. DID MCCLUER'S NEW COMPANY GET INVOLVED IN THAT

22  LITIGATION?

23  A. YES, THEY DID.

24  Q. WHAT WAS THE RESOLUTION OF THAT LITIGATION, AS OF

25  CHEMFREE AND MCCLUER'S NEW COMPANY?

1   A. IN 1996 WE REACHED A SETTLEMENT AGREEMENT UNDER WHICH THE

2   PATENT APPLICATIONS OR THE PATENTS THAT WERE BEING PURSUED

3   BY CHEMFREE AND THE PATENT APPLICATIONS BEING PURSUED BY THE

4   COMPANY, WHICH WAS KNOWN AS ABS AT THAT TIME, WERE

5   CO-ASSIGNED.

6   Q. DID THE RESOLUTION WITH ABS ZYMO INVOLVE A PROCESS FOR

7   DETERMINING WHO SHOULD BE NAMED AS INVENTORS ON CHEMFREE'S

8   PATENT APPLICATIONS?

9   A. YES, IT DID.

10  Q. WOULD YOU DESCRIBE THAT PROCESS?

11  A. WELL, IT WAS A GREAT CONCERN BECAUSE WE HAD DIFFERENT

12  INVENTORS NAMED ON THE PATENTS IN EACH OF THE TWO FAMILIES,

13  ALTHOUGH THEY ALL DERIVE FROM A SINGLE PARENT APPLICATION.

14  WE WANTED TO BE ABSOLUTELY SURE THAT THE INVENTORSHIP WAS

15  CORRECT, SO THAT THERE WOULD NEVER BE A CHALLENGE TO

16  INVENTORSHIP TO INVALIDATE THE PATENTS AT ANY TIME IN THE

17  FUTURE.  SO IN RESOLUTION, THERE WAS AN AGREEMENT SPELLED

18  OUT IN THE SETTLEMENT AGREEMENT THAT WE WOULD HIRE AN

19  INDEPENDENT, EXPERIENCED PATENT ATTORNEY, WHO WOULD THEN

20  EXAMINE THE RECORD AND ISSUE A PROPOSAL OR RECOMMENDATIONS

21  OF HIS FINDINGS AS TO WHO SHOULD BE DECLARED THE INVENTORS

22  ON EACH OF THE SEVERAL PATENT APPLICATIONS.

23  Q. DO YOU REMEMBER THE NAME OF THAT JOINTLY HIRED PATENT

24  ATTORNEY?

25  A. YES, HIS NAME IS DAL SHEFTE.

1    Q. AND DO YOU RECALL WHERE HE WAS LOCATED?

2    A. IN NORTH CAROLINA, I BELIEVE.

3    Q. AND DO YOU RECALL THE PROCESS BY WHICH HE WAS SELECTED?

4    A. HE WAS CHOSEN BY THE PATENT ATTORNEY FOR ABS AND THE

5    PATENT ATTORNEY FOR CHEMFREE.  TOGETHER THEY CHOSE HIM.

6    Q. APPROXIMATELY HOW MUCH MONEY DID CHEMFREE EXTEND BETWEEN

7    THE MONEY IT PAID TO MR. SHEFTE AND THEN THE MONEY IT PAID

8    TO ITS OWN PATENT ATTORNEY TO MONITOR MR. SHEFTE THROUGH

9    THAT PROCESS?

10   A. CLOSE TO $50,000.

11   Q. WHY WAS -- WAS THAT A LOT OF MONEY TO CHEMFREE IN 1996?

12   A. IT WAS A GREAT DEAL OF MONEY.  IT IS EVEN TODAY.

13   Q. LET'S PUT IT INTO PERSPECTIVE.  IN 1996, WHAT WAS YOUR

14   SALES REVENUE, PROFIT PICTURE, LOOKING?

15   A. IN 1996, I CAN'T BE PRECISE ON THE SALES REVENUE NUMBER,

16   BUT IT WAS THE LOW MILLIONS.  AND WE WERE PROBABLY NOT

17   PROFITABLE THAT YEAR.

18   Q. WHY WERE YOU UNWILLING TO UNDERTAKE SUCH AN EXPENSE TO

19   HIRE A PATENT ATTORNEY?

20   A. BECAUSE WE WANTED TO BE ABSOLUTELY SURE THAT THE

21   INVENTORSHIP SHOWN ON THE PATENTS WAS CORRECT SO THAT WE

22   COULD AVOID ANY CHALLENGE TO THAT INVENTORSHIP ANYTIME IN

23   THE FUTURE.

24         MR. CAPP:  THAT COMPLETES MY EXAMINATION.  I WILL

25   TENDER THE WITNESS.

```
1           THE COURT:  ALL RIGHT.  MR. HARBIN, LET'S TAKE OUR
2    AFTERNOON RECESS AND YOU CAN GET ORGANIZED.  WE WILL RESUME
3    AGAIN AT 2:55.
4               (BREAK FROM 2:35 UNTIL 2:55 P.M.)
5           THE COURT: ALL RIGHT, MR. HARBIN.
6           MR. HARBIN:   THANK YOU, YOUR HONOR.  YOUR HONOR,
7    MR. MARKS IS THE CORPORATE REPRESENTATIVE OF CHEMFREE.  I
8    CAN EITHER JUST DO A CROSS WHICH WOULD BE FAIRLY SHORT, AND
9    WE ARE GOING TO CALL HIM ON CROSS IN OUR CASE, BUT IT WOULD
10   BE VERY QUICKLY AFTER DR. DURKEE TESTIFIES, OR I CAN JUST DO
11   THE WHOLE THING NOW.
12          THE COURT:  MR. CAPP?
13          MR. CAPP:  WHATEVER PLEASES THE COURT.  I THINK --
14          THE COURT:  WELL, I WILL LEAVE THAT UP TO YOU
15   THEN, MR. HARBIN, WHICHEVER YOU THINK WOULD MAKE A BETTER
16   PRESENTATION, YOU CAN PROCEED THAT WAY, UNLESS MR. CAPP HAS
17   AN OBJECTION.
18          MR. HARBIN:   OKAY.  I GUESS THEN I WILL PROCEED
19   JUST WITH THE WHOLE OUR WHOLE CROSS-EXAMINATION.  I WILL TRY
20   TO GIVE YOU THE AFTERNOON OFF, MR. MARKS.
21                     CROSS-EXAMINATION
22   BY MR. HARBIN:
23   Q. YOU TESTIFIED ABOUT THE SALES OF THE COMPANY, AND I THINK
24   DID YOU SAY THAT 1800 UNITS SOLD IN THE LAST TWO YEARS?
25   A. 18,000.
```

1    Q. IS THAT WORLDWIDE?

2    A. YES.

3              THE COURT:  WAS THAT LAST YEAR OR THE LAST TWO

4    YEARS?

5              THE WITNESS:  NO.  THE LAST TWO YEARS, '07 AND

6    '08.

7    BY MR. HARBIN:

8    Q. AND SO YOU STARTED FIRST COMMERCIAL SALES IN

9    APPROXIMATELY LATE 1994?

10   A. CORRECT.

11   Q. SO THAT STARTED ABOUT 13 YEARS AFTER THE COMPANY STARTED

12   TRYING TO SELL THE SMART WASHERS?

13   A. CLOSER TO 15, I WOULD SAY.

14   Q. YOUR MATH IS BETTER THAN MINE.  IN THE FIRST SEVERAL

15   YEARS OF CHEMFREE'S ATTEMPT, THE SALES WERE VERY MEDIOCRE;

16   CORRECT?

17   A. WELL, THEY BUILT UP OVER TIME.  STARTED SLOWLY AND BUILT

18   UP OVER TIME.

19   Q. WELL, IN THE YEAR 2000, FOR EXAMPLE, IT WAS YOUR ESTIMATE

20   THAT THE MARKET WOULD GROW IN THE FUTURE, BUT AT THAT TIME

21   IT WAS GOING TO GROW VERY LITTLE; IS THAT CORRECT?

22   A. IN THE YEAR 2000 ITSELF?

23   Q. YES.

24   A. I MEAN, RELATIVE TO 1999 OR JUST IN GENERAL?  I AM NOT

25   CLEAR ON YOUR QUESTION.

1  Q. IF I CAN HAND YOU YOUR DEPOSITION -- LET ME REPHRASE THE

2  QUESTION, BECAUSE I JUMPED TO 2002.  BUT IN THE YEAR 2000,

3  WAS IT WAS CORRECT, YOU WERE HAVING A HARD YEAR SELLING THE

4  SMART WASHER?

5  A. IT HASN'T BEEN EASY ANY OF THE YEARS.  IT IS VERY

6  INNOVATIVE TECHNOLOGY, AND IT REQUIRES A GREAT DEAL OF

7  EDUCATION OF THE MARKETPLACE FOR THE SALES TO CONTINUE TO

8  INCREASE.

9  Q. AND YOUR ESTIMATE, IN THE YEAR OF 2000, WAS THAT IN THE

10  U.S. MAYBE A FEW THOUSAND PARTS WASHERS COULD BE SOLD,

11  BIOREMEDIATING PARTS WASHERS IN THE U.S.; CORRECT?

12  A. IN THE YEAR?

13  Q. YES.

14  A. PROBABLY CORRECT.  YES.

15  Q. AND YOU ATTRIBUTE THAT IN 2000, THE FACT THAT SOLVENT

16  BASED CLEANING, SIX YEARS AFTER YOU CAME IN WITH THE

17  BIOREMEDIATING, YOUR BIOREMEDIATING PARTS WASHER, IS STILL

18  MORE ACCEPTED?

19  A. CORRECT.

20  Q. AND THERE WAS STILL MORE CONVINCING TO DO TO CONVINCE END

21  USERS THAT THE BIOREMEDIATING PARTS WASHERS CLEAN AS WELL AS

22  SOLVENT WASHERS; CORRECT?

23  A. THAT IS CORRECT.

24  Q. I BELIEVE YOU ESTIMATED THAT WORLDWIDE THAT YEAR, THE

25  SALES WERE NO MORE THAN 2,000 OR 2500 UNITS; CORRECT?

1  A. I DON'T RECALL EXPRESSLY, BUT THAT SOUNDS PRETTY

2  REASONABLE.

3  Q. AND IN 1996, THE SALES WERE LESS THAN THAT?

4  A. I AM SURE THEY WERE.  AND ONE OF THE REASONS, ONE OF THE

5  THINGS YOU WERE LOOKING FOR WERE IMPROVED SALES IN '96 AND

6  THROUGH 2000, BUT SOME MORE GOVERNMENTAL REGULATION,

7  ENVIRONMENTAL REGULATION?

8  A. THAT IS VERY HELPFUL IN THIS MARKETPLACE.

9  Q. THAT WAS SOMETHING THAT HAD BEEN ANTICIPATED WHEN YOU

10  CAME OUT WITH THE PRODUCT, BUT IT HADN'T HAPPENED AS SOON AS

11  YOU HOPED?

12  A. YES.  THAT IS REASONABLE.

13  Q. THANK YOU, SIR.  AND YOU ARE STILL WAITING FOR THE

14  ENVIRONMENTAL REGULATION TO INCREASE TO DRIVE FURTHER SALES

15  OF PARTS WASHERS TO BIOREMEDIATING PARTS WASHERS?

16  A. GOVERNMENTAL REGULATION IS CERTAINLY ONE OF THE TRIGGERS

17  THAT WILL CAUSE PROSPECTS TO CONSIDER MORE ENVIRONMENTALLY

18  FRIENDLY SOLUTIONS.  AND THERE HAS BEEN CONSIDERABLE CHANGE

19  OVER THE YEARS IN JUST WHAT HAS HAPPENED FROM GOVERNMENT

20  REGULATION.

21  Q. NOW, YOU MENTIONED YOUR LAST TWO YEARS SALES, YOU HAD A

22  TREMENDOUS INCREASE IN SALES YOUR LAST YEAR, 2007 TO 2008;

23  CORRECT?

24  A. CORRECT.

25  Q. YOU HAD A TREMENDOUS INCREASE IN SALES FROM THE YEAR 2006

1    TO 2007?

2    A. THAT IS CORRECT.  AND I CAN CERTAINLY BREAK THEM DOWN

3    INTO THE INDIVIDUAL YEARS, IF YOU WANT TO KNOW THOSE

4    NUMBERS.

5    Q. SORRY?

6    A. I CAN BREAKT IT DOWN BETWEEN THE TWO YEARS, IT IS 18,000

7    ROUGHLY FOR THE TWO YEARS, IT WAS CLOSE TO 10,000 OR SO IN

8    '07, AND ABOUT 8,000 ALMOST 8,000 IN '08.

9    Q. AND BEFORE, THE INCREASE FROM 2006 TO 2007 WAS ABOUT 74

10   PERCENT?

11   A. 2007 WAS A VERY VERY SUCCESSFUL YEAR FOR US.

12   Q. DOES THAT SOUND APPROXIMATELY CORRECT?

13   A. YES.  I BELIEVE IT WOULD BE CLOSE TO THAT.

14   Q. AND THAT JUMP, FROM 2006 TO 2007 WAS ATTRIBUTABLE

15   PRIMARILY TO ONE CUSTOMER THAT YOU STARTED IN BUSINESS WITH?

16   A. YES.

17   Q. AND IS THAT CUSTOMER CINTAS?

18   A. YES, IT IS.

19   Q. AND HOW WOULD YOU CHARACTERIZE YOUR CURRENT RELATIONSHIP

20   WITH CINTAS AS FAR AS -- ARE THERE ISSUES, CONCERNS, ABOUT

21   LOSING SALES?  IS IT VERY POSITIVE?  HOW WOULD YOU

22   CHARACTERIZE IT?

23   A. WE ARE VERY IMPRESSED WITH THE RELATIONSHIP, CHEMFREE.

24   AND MY UNDERSTANDING, FROM THE CONTACTS THAT I HAVE, CINTAS

25   AND OTHERS REPORTING TO ME, THEY ARE DELIGHTED WITH THE

1    PRESENT SITUATION.

2    Q. SO THERE IS NO PROBLEMS AT ALL WITH CINTAS CURRENTLY?

3    A. PROBLEMS?

4    Q. IN YOUR RELATIONSHIP WITH CINTAS?

5    A. NO.  NOT IN THE RELATIONSHIP.

6             MR. CAPP: YOUR HONOR, I DO HAVE AN OBJECTION, IF

7    IT PLEASE THE COURT.  A SHORT SIDE BAR I THINK WOULD BE VERY

8    HELPFUL RIGHT NOW.

9             THE COURT:  ALL RIGHT.

10             (SIDE BAR CONFERENCE AS FOLLOWS:)

11             MR. CAPP: YOUR HONOR, EARLY IN THE CASE, IN

12   INTERROGATORY RESPONSES, WE DID ASSERT COMMERCIAL SUCCESS AS

13   A SECONDARY CONSIDERATION OF NON-OBVIOUSNESS.  FURTHER ALONG

14   IN THE CASE WE HAD DECIDED NOT TO PURSUE THAT AT TRIAL,

15   SO -- AND I TOLD THE OTHER SIDE, SO I DON'T UNDERSTAND WHY

16   WE ARE CONTINUING DOWN THIS ROAD, IF THERE IS AN OPEN

17   QUESTION ABOUT THAT, I PREFER THAT MR. HARBIN PICK THIS BACK

18   UP TOMORROW.  IN THE MEAN TIME, I WILL GET YOU A BENCH BRIEF

19   TO SHOW THAT PROVING THE ABSENCE OF COMMERCIAL SUCCESS IS A

20   MERE NEUTRAL FACTOR, AND IT'S NOT SOMETHING THAT WEIGHS IN

21   HIS FAVOR ON HIS OBVIOUSNESS DEFENSE, IN WHICH CASE WE ARE

22   WASTING YOUR TIME.  SO --

23             MR. HARBIN:  YOUR HONOR, I THOUGHT THE OBJECTION

24   WAS GOING TO BE ABOUT CINTAS, BUT I AM DONE WITH IT.  I ONLY

25   HAVE TWO MORE QUESTIONS ABOUT THE -- THEY RAISED THIS ISSUE

1   ABOUT SALES, AND BECAUSE THERE HAD BEEN TESTIMONY ABOUT THE

2   LEVEL PRIOR, AND THEY RAISE CURRENT, AND I THOUGHT IT RAISED

3   AN IMPLICATION THAT I WAS ENTITLED TO GO INTO.  I ONLY HAVE

4   TWO MORE QUESTIONS ON IT AND I AM DONE.

5          MR. CAPP:  MY UNDERSTANDING OF THE LAW IS

6   DIFFERENT.  BUT AS I SAID YESTERDAY, THAT IT'S ALL OF THE

7   SECONDARY CONSIDERATION.

8          THE COURT:  I WILL ALLOW THE TWO MORE QUESTIONS,

9   IN THE INTEREST OF TIME.  AND AT SOME POINT, IF YOU WANT TO

10  SUBMIT -- I AM SURE YOU WILL BRIEF THE QUESTION OF

11  OBVIOUSESNESS, AND YOU CAN ADDRESS THAT AT THE TIME.

12          (END OF SIDE BAR CONFERENCE.)

13  BY MR. HARBIN:

14  Q. YOU SAID THAT THE 2007 SALES WERE GREATER THAN 2008.

15  CORRECT?

16  A. CORRECT.

17  Q. AND YOU EXPECT 2009 SALES TO BE A LITTLE LESS THAN 2008?

18  A. OUR GOAL IS TO MAKE THEM EQUAL THIS YEAR WHAT WE DID LAST

19  YEAR.  BUT IT'S HARD WORK.

20  Q. BUT YOUR EXPECTATION IS SOMETHING ELSE?

21  A. WE HAVE A PLAN THAT WE BELIEVE THAT WILL CAUSE IT TO BE

22  ABOUT EQUAL THIS YEAR.

23  Q. NOW, IN REGARD TO THE -- I COULD NOT UNDERSTAND YOU, I

24  APOLOGIZE.  WHEN YOU MENTIONED A SPECIFIC INSTANCE OF

25  COMPETITION BETWEEN WALTER AND CHEMFREE, WAS THAT IN SOUTH

1    CAROLINA?

2    A. YES.

3    Q. AND YOU ARE SAYING THAT CHEMFREE TOOK THAT BUSINESS FROM

4    WALTER OR VICE VERSA?

5    A. MY UNDERSTANDING, THE SITUATION IS THAT WALTER SOLD A

6    LARGE NUMBER OF PARTS WASHERS TO THE MILITARY BASE FORT

7    JACKSON.  THEY ARE USED PRIMARILY FOR WEAPONS CLEANING.  OUR

8    DISTRIBUTOR IN THAT AREA HAS BEEN REPLACING THOSE MACHINES,

9    THOSE BIO-CIRCLE MACHINES, WITH CHEMFREE PRODUCT.

10   Q. ALL RIGHT.  WELL, CONGRATULATIONS.

11   A. THANK YOU.

12   Q. I TAKE IT YOU DON'T KNOW OF ANY INSTANCE OF WALTER TAKING

13   A SALE FROM CHEMFREE?

14   A. I AM SURE THERE HAVE BEEN SOME.

15   Q. BUT YOU DON'T KNOW OF ANY?

16   A. I DON'T KNOW THAT.

17   Q. NOW, I DON'T WANT TO GET A LOT INTO THE ISSUES, THE LEGAL

18   DISPUTES BETWEEN CHEMFREE AND MR. MCCLUER.  I WOULD LIKE TO

19   JUST ASK A FEW QUESTIONS TO FOLLOW UP ON YOUR COMMENTS, SIR.

20       IF I MAY APPROACH.  WE REFER FROM TIME TO TIME TO

21   DOCUMENTS ABOUT THE DEVELOPMENT OF YOUR SMART WASHER

22   PRODUCT.  WE WILL GET INTO THE DETAILS IN A LITTLE BIT MORE

23   OF THE CHRONOLOGY, BUT MR. MCCLUER CAME TO INTELLIGENT

24   SYSTEMS TO WORK ON THIS PARTS WASHING PROJECT, AND Y'ALL GOT

25   STARTED IN ABOUT AUGUST, AS FAR AS HIM ACTUALLY DOING SOME

1    WORK IN AUGUST OF 1993?

2    A. YES.

3    Q. AND AGAIN, WE WILL GET UP TO THAT IN A MINUTE, BUT HE

4    CAME ALONG WITH MR. MCNALLY AND MR. CALTO WORKING AS

5    CONSULTANTS?

6    A. CALTO WAS NOT A CONSULTANT IN AUGUST, BUT SOMETIME NOT

7    TOO LONG AFTER THAT.

8    Q. AND WE ARE NOT SAYING THERE WAS A PROMISE OF EMPLOYMENT

9    OR A CONTRACT, BUT THERE WERE DISCUSSIONS WITH BOTH

10   MR. MCNALLY AND MR. MCCLUER ABOUT IF THIS PROJECT WORKED

11   OUT, THEM BECOMING EMPLOYED WITH CHEMFREE FULL TIME;

12   CORRECT?

13   A. THAT IS CORRECT.  IF THEY COULD ACHIEVE THEIR BUSINESS,

14   AND IT WAS A COMMERCIAL SUCCESS, THE LIKELIHOOD IS THAT THEY

15   WOULD BECOME EMPLOYEES.

16   Q. AND THAT THEY MAY GET SOME EQUITY IN THE COMPANY;

17   CORRECT?

18   A. CORRECT.

19   Q. OR IN INTELLIGENT SYSTEMS.

20   A. WELL, INTELLIGENT SYSTEMS WOULD HAVE BEEN THE ONLY EQUITY

21   REALLY WORTH ANYTHING, BECAUSE IT WAS PUBLICLY TRADED.

22   Q. IS IT CORRECT, I WILL GET US SOME DOCUMENTS IN A MINUTE,

23   IS IT CORRECT THAT MR. MCCLUER PREVIOUSLY HAD A COMPANY

24   CALLED CHEMFREE TECHNOLOGIES?

25   A. THAT IS WHAT I UNDERSTAND.

1    Q. AND THAT WAS THE PART OF INTELLIGENCE SYSTEMS?

2    A. YES.

3    Q. Y'ALL JUST TOOK THAT NAME AFTER THEY STARTED CONSULTING?

4    A. WE CHECKED OUT THE AVAILABILITY OF THE NAME AFTER IT HAD

5    BEEN SUGGESTED BY MCCLUER AND MCNALLY, AND FOUND THAT THAT

6    WAS FREE FOR OUR INCORPORATION, AND WE USED IT.

7    Q. AND ONE OF THE POSITIONS, YOUR UNDERSTANDING THIS IS A

8    BUSINESS MR. MCCLUER HAD HAD SOME FOR TIME?

9    A. CHEMFREE TECHNOLOGIES?  NO.  BECAUSE HE REPRESENTED

10   HIMSELF AS BEING FROM SUMMA ENVIRONOMICS, I BELIEVE, WHEN HE

11   ANNOUNCED IT, WHEN THEY CAME TO PRESENT THEIR BUSINESS PLAN

12   TO ME.

13   Q. HAVE YOU EVER EXPLORED THE RELATIONSHIP BETWEEN HIS

14   ORIGINAL CHEMFREE AND SUMMA?

15   A. NO.

16   Q. THE CORPORATION RELATIONSHIP?

17   A. NO.

18   Q. DO YOU UNDERSTAND WHAT MR. MCNALLY'S ROLE WAS WITH

19   MR. MCCLUER WHEN THEY HAD BEEN WORKING TOGETHER BEFORE THEY

20   JOINED YOUR COMPANY?

21   A. MY UNDERSTANDING IS THAT THEY WERE ALL PART OF THE SAME

22   ORGANIZATION THAT MCNALLY, BECAUSE OF HIS BACKGROUND, WAS

23   TAKING A LEAD ON TRYING TO FIND FUNDING FOR THE DEVELOPMENT

24   OF THEIR PRODUCT IDEAS.

25   Q. MR. MCNALLY HAS SEVERAL YEARS, TO YOUR UNDERSTANDING,

1   SEVERAL YEARS OF EXPERIENCE IN FINANCIAL SERVICES?

2   A. HE HAD BEEN INVOLVED WITH BANKING FOR A NUMBER OF YEARS.

3   YES.

4   Q. NOW, IF YOU LOOK AT, I THINK IT IS THE FIRST NOTEBOOK I

5   HANDED YOU, EXCUSE ME, I GUESS IT IS THE SECOND, DEFENDANT'S

6   EXHIBIT 274.

7   A. 274?  IS THAT IN THIS DEVELOPMENT NOTEBOOK?

8   Q. IT SHOULD BE THE SECOND NOTEBOOK.

9   A. YES.  YES.

10  Q. SORRY, I APOLOGIZE.  246.  DO YOU RECOGNIZE EXHIBIT 246,

11  DEFENDANT'S EXHIBIT 246 AS AN EMPLOYEE CONFIDENTIAL

12  AGREEMENT THAT MR. MCCLUER SIGNED ON OR ABOUT DECEMBER 2,

13  1993 AT CHEMFREE?

14  A. YES.

15         MR. HARBIN:  YOUR HONOR, WE WOULD OFFER

16  DEFENDANT'S EXHIBIT 246 INTO EVIDENCE.

17         MR. SCHAETZEL:  NO OBJECTION.

18         THE COURT:  IT'S ADMITTED.

19         MR. CAPP: NO OBJECTION.

20         THE COURT:  IT'S ADMITTED.

21  BY MR. HARBIN:

22  Q. AND THIS IS THE ONLY WRITTEN CONTACT THAT MR. MCCLUER HAD

23  WITH CHEMFREE OR INTELLIGENT SYSTEMS; CORRECT?

24  A. CORRECT.

25  Q. NOW, YOU SAID DISPUTES AROSE AFTER THE PRODUCT WAS

1    COMMERCIALIZED?

2    A. NO.  NO.  I DON'T KNOW THAT YOU WOULD CALL THEM DISPUTES

3    EXACTLY.  BUT THERE WERE CERTAINLY DIFFERENCES OF OPINION ON

4    THE SITUATION IN THE LATE SUMMER, EARLY FALL OF 1994.

5    Q. NOW, AND YOU ALLUDED THAT THEY HAD THE OPPORTUNITY TO

6    EMPLOY THAT THEIR BUSINESS PLAN WAS SUCCESSFUL HELD TRUE?

7    A. NO.

8    Q. THAT DID NOT COME TRUE?

9    A. IT DID NOT COME CLOSE.

10   Q. AND IT IS IN FACT THAT YOU DID NOT OFFER MR. MCCLUER A

11   JOB?

12   A. NO, IT WAS NOT.  BUT THEY DID NOT ACHIEVE THE DEVELOPMENT

13   PORTION OF THE PLAN, AND THE INTRODUCTION OF THE PRODUCT WAS

14   MUCH LATER THAN ORIGINALLY ANTICIPATED.

15   Q. IF I UNDERSTAND YOUR TESTIMONY, AND LET ME JUST ASK, WAS

16   THERE ONE FACTOR IN YOUR DECISION NOT TO OFFER MR. MCCLUER

17   FULL TIME EMPLOYMENT WAS HIS AGE?

18   A. NO, ABSOLUTELY NOT.  WE DID NOT EMPLOY HIM FULL TIME

19   EMPLOYMENT BECAUSE WE HAD CONCERN ABOUT HIS INTEGRITY.

20   Q. YOU REMEMBER A CONCERN THAT EMPLOYEES AT INTELLIGENCE

21   SYSTEMS GENERALLY RETIRED AT AGE 60?

22   A. NO, WE DO NOT HAVE A RETIREMENT AGE, OR I WOULD HAVE BEEN

23   LONG GONE.

24   Q. LET ME HAND YOU YOUR 1996 DEPOSITION.

25   A. '96?  OKAY.

1   Q. AND ASK YOU TO TURN TO PAGE 204.  YOU WERE ASKED AT THE

2   TOP, THE FIRST LINE, "DID MR. MCCLUER'S AGE EVER HAVE

3   ANYTHING TO DO WITH THE FACT THAT HE WAS NOT OFFERED A

4   FULL-TIME EMPLOYMENT POSITION?"  AND YOU ANSWERED THEN IN

5   1996, "IT WAS AN ITEM THAT OCCURRED TO ME THAT I HAD SOME

6   CONCERNS ABOUT, BECAUSE WE HAVE OVER THE YEARS EMPLOYEES

7   HAVE RETIRED FROM INTELLIGENT SYSTEMS AS THEY REACHED THEIR

8   MID 60'S, AND MR. MCCLUER WAS OLDER THAN THAT AT THAT TIME."

9   AND YOU DID SAY THE PRINCIPLE REASON WAS PERFORMANCE.  BUT

10  THAT WAS A FACTOR IN YOUR DECISION; CORRECT?

11          MR. CAPP: YOUR HONOR, COULD WE READ IN THE ENTIRE

12  ANSWER RATHER THAN JUST PART OF IT?

13  BY MR. HARBIN:

14  Q. I PUT THE PRINCIPLE REASONS -- IS THAT THE DECISION THAT

15  LED TO OFFERING MR. MCCLUER A CONSULTING POSITION, HAD TO DO

16  WITH PERFORMANCE?  HIS AGE WAS A FACTOR, WASN'T IT?

17  A. NO, AS I SAID, IT WAS NOT FACTOR.  IT WAS BECAUSE OF OUR

18  CONCERN ABOUT HIS INTEGRITY.  I WAS OVER THE AGE OF 60 AND

19  IN MY MID 60'S AT THAT TIME AS WELL, SO -- AND I WASN'T

20  ABOUT TO RETIRE.

21  Q. WELL, YOU DON'T GET TO ASK THAT QUESTION.  ALL RIGHT,

22  SIR.  WHEN YOU MET MR. MCNALLY AND MR. MCCLUER, THAT WAS THE

23  FIRST TIME YOU HAD CONSIDERED ENTERING THE PARTS WASHING

24  BUSINESS; CORRECT?

25  A. THAT IS CORRECT.  YOU WERE TOLD THEY HAD DONE SOME WORK

1    ON ENVIRONMENTALLY FRIENDLY PARTS WASHERS; CORRECT?

2    A. YES.

3    Q. YOU UNDERSTOOD MR. MCCLUER HAD ALREADY ACQUIRED AN

4    AQUEOUS PARTS WASHER FROM A SUPPLIER IN I BELIEVE MINNESOTA;

5    IS THAT RIGHT?

6    A. SOMETIME LATER, I HAD LEARNED THAT, NOT AT THE EARLY

7    MEETINGS, HOWEVER.

8    Q. AND DID YOU COME TO LEARN THAT MULTIPLE COMPANIES AT THE

9    TIME MR. MCNALLY AND MR. MCCLUER STARTED TALKING TO YOU WERE

10   MAKING AQUEOUS PARTS WASHERS AT THAT TIME?

11   A. THERE WERE AQUEOUS PARTS WASHERS ON THE MARKET AT THAT

12   TIME.

13   Q. YOUR UNDERSTANDING WAS THAT THE PARTS WASHER THAT

14   MR. MCCLUER HAD BUILT OR ACQUIRED -- LET ME TAKE A STEP

15   BACK.  DID YOU HAVE AN UNDERSTANDING WHETHER HE HAD DONE

16   ONE, OR WHETHER HE ACQUIRED ONE, OR ACQUIRED ONE AND

17   MODIFIED IT?

18   A. I NEVER DID SEE THE DEVICE.  NEVER EVEN REALLY SAW A

19   PHOTOGRAPH OF IT.  BUT IT WAS MY UNDERSTANDING THAT HE HAD

20   ACQUIRED A PARTS WASHER, A METAL PARTS WASHER THAT COULD BE

21   USED FOR SOLVENT CLEANING, AND HAD MODIFIED IT, OR AT LEAST

22   HAD PLANS TO MODIFY IT.

23   Q. IT WAS MY UNDERSTANDING YOU DID SEE BOTH PHOTOGRAPHS AND

24   A DRAWING OF THE PARTS WASHERS; CORRECT?

25   A. I DO REMEMBER A DRAWING.  I DON'T RECALL THE PHOTOGRAPH.

1    Q. IF YOU COULD LOOK, SIR, AT PAGE 31 OF YOUR DEPOSITION IN

2    1996, BEGINNING AT LINE 10.

3    A. YES.

4    Q. YOU WERE ASKED, "DID YOU RECEIVE ANY DOCUMENTATION FROM

5    THEM REGARDING THAT PARTS WASHER?"  "ANSWER:  I DID RECEIVE

6    FROM THEM, AS I RECALL, A DRAWING AND A FEW 3 X 5

7    PHOTOGRAPHS OF THE UNIT THAT HAD ACTUALLY BEEN BUILT."  DOES

8    THAT REFRESH YOUR RECOLLECTION ABOUT THE PHOTOGRAPHS?

9    A. APPARENTLY THAT IS WHAT I SAID AT THAT TIME.

10   Q. NOW, YOU UNDERSTOOD THIS WAS A -- THAT THE PARTS WASHER

11   THAT MR. MCCLUER HAD ALREADY ACQUIRED OR DEVELOPED AT THE

12   TIME HE STARTED TALKING TO YOU HAD A SINK AND A TANK;

13   CORRECT?

14   A. A SINK AND A TANK.  YES.

15   Q. AND IT HAD A PUMP?

16   A. I PRESUME SO.  YES.

17   Q. AND IT HAD FILTER BOX; CORRECT?

18   A. THE DRAWING I SAW HAD A REFERENCE TO A FILTER BOX.

19   Q. CAN YOU LOOK IN YOUR NOTEBOOK, SIR, AT DEFENDANT'S

20   EXHIBIT -- IT WILL BE IN THE FIRST NOTEBOOK, DEFENDANT'S

21   EXHIBIT 96.  DO YOU RECALL IF THAT WAS THE DRAWING THAT YOU

22   SAW WHEN YOU MET EARLY ON WITH MR. MCCLUER AND MR. MCNALLY?

23   A. I THINK IT IS.  YES.

24          MR. HARBIN:  YOUR HONOR, WE WOULD OFFER

25   DEFENDANT'S EXHIBIT 96 INTO EVIDENCE.

1              MR. CAPP: NO OBJECTION.

2              THE COURT:  ADMITTED.

3    BY MR. HARBIN:

4    Q. IS IT CORRECT, SIR, THAT IN THE FIRST PARTS WASHER DESIGN

5    THEY PRESENTED TO YOU, THIS IS OBVIOUSLY BEFORE YOU ALL

6    ACTUALLY STARTED WORKING TOGETHER, YOU WERE JUST TALKING

7    ABOUT IT; CORRECT?

8    A. I DON'T RECALL EXACTLY WHEN I SAW THIS.  COULD WELL HAVE

9    BEEN AT THAT TIME.

10   Q. BUT YOU KNEW IT REFLECTED WORK THAT THEY HAD ALREADY DONE

11   BEFORE THEY STARTED?

12   A. I KNEW THIS WAS AN IDEA THAT THEY HAD.  I REALLY DON'T

13   KNOW FOR SURE WHETHER THEY HAD ACTUALLY A MACHINE THAT HAD

14   BEEN MODIFIED IN THIS FASHION.

15   Q. OKAY.  AND THEY WERE ALREADY TALKING ABOUT, AS THIS

16   SHOWS, A FILTER TRAY; CORRECT?  TO GO UNDER THE SINK?

17   A. CORRECT?  TO GO UNDER THE SINK?

18   Q. YES, SIR.

19   A. YES, SIR, IT WOULD GO UNDER THE SINK SOMEWHERE, YES.

20   Q. AND THEY WERE ALREADY CONTEMPLATING A FLAT FILTER;

21   CORRECT?

22   A. IN THIS DRAWING THERE APPEARS THERE IS A FLAT FILTER.

23   YES.

24   Q. AND IF YOU CAN LOOK IN THE FIRST NOTEBOOK, SIR, AT

25   DEFENDANT'S EXHIBIT THE 134 -- BEFORE WE GET TO THAT, IF

1    YOU -- THAT'S ALL RIGHT.  IF YOU COULD LOOK AT DEFENDANT'S

2    EXHIBIT 134.

3    A. YES.

4    Q. IS THIS A LETTER THAT YOU RECEIVED FROM MR. MCNALLY ON OR

5    ABOUT MAY 27 OF 1993?

6    A. IT SEEMS TO BE.  YES.

7    Q. AND IF YOU BLOW UP THE SECOND PARAGRAPH?

8    A. THE SECOND.  YES.

9    Q. THEY TOLD YOU THAT THEY ALREADY DISCUSSED THE

10   ENVIRONMENTALLY FRIENDLY SYSTEM OF SAFETY KLEEN; CORRECT?

11   A. MAY I READ THIS?

12   Q. YES, SIR.

13   A. THIS IS A VERY POOR COPY.  WHERE AM I TO BE READING, "WE

14   SHOWED HIM THE PARTS WASHER AND HE IMMEDIATELY WANTED TO BUY

15   ONE"?

16   Q. MAYBE YOU SHOULD LOOK AT THE SCREEN.

17   A. OH.  THANK YOU.  (PAUSE).  YES, I SEE THAT.

18   Q. AND IF YOU LOOK AT THE THIRD PARAGRAPH, IS IT TRUE THEY

19   TOLD YOU THAT THEY HAD ALREADY PRESENTED THEIR EXISTING

20   PARTS WASHER CONCEPT TO CHRYSLER CORPORATION?

21   A. IT SAYS IN THIS LETTER THAT THEY DID, YES.

22   Q. YOUR HONOR, WE OFFER DEFENDANT'S EXHIBIT 134 INTO

23   EVIDENCE.

24           THE COURT: ANY OBJECTION, MR. CAPP?

25           MR. CAPP: IT'S IRRELEVANT, YOUR HONOR.  THERE IS

1    NO CONNECTION BETWEEN THE PARTS WASHER THAT IS BEING

2    DESCRIBED OR CONTEMPLATED IN THAT LETTER, AND THERE IS NO

3    CONNECTION BETWEEN THAT AND THE PATENT INVENTION.  I QUITE

4    FRANKLY CAN'T SEE HOW THE COURT COULD POSSIBLY CARE ABOUT

5    SOME OTHER TYPE OF PARTS WASHER THAT WAS BEING WORKED ON

6    YEARS BEFORE THEY GOT TO CHEMFREE.  SO I THINK THERE IS A

7    VERY SERIOUS OBJECTION ON RELEVANCY GROUNDS.

8             THE COURT:  WELL, I WILL ADMIT THE DOCUMENT AND

9    GIVE IT THE WEIGHT ON THE ISSUES THAT IT IS RELEVANT TO, IF

10   ANY.

11            MR. HARBIN:   THANK YOU, YOUR HONOR.

12   BY MR. HARBIN:

13   Q. AND IF YOU CAN LOOK, SIR, AT DEFENDANT'S EXHIBIT 136.

14   A. YES.

15   Q. I TELL YOU WHAT, BEFORE WE GET TO THAT, LET'S LOOK AT

16   DEFENDANT'S EXHIBIT 135.  DO YOU RECALL IF YOU WERE GIVEN,

17   BEFORE THEY ACTUALLY START WORKING AS CONSULTANTS WITH

18   INTELLIGENCE SYSTEMS -- WOULD IT BE ALL RIGHT, SIR, IF I

19   REFER TO INTELLIGENCE SEASONS, IF I CALL IT ISC?

20   A. THAT WILL BE FINE.

21   Q. DO YOU RECALL IF YOU WERE GIVEN THIS DOCUMENT OR VERSION

22   OF IT BEFORE MR. MCNALLY AND MR. MCCLUER STARTED WORKING

23   WITH ISC?  AND I KNOW THERE ARE THEY WORKED AS BOARD

24   CONSULTANTS, BUT I AM --

25   A. THIS CAME TO ME IN CONJUNCTION WITH THEIR BUSINESS PLAN.

1    Q. AND IF YOU CAN BLOW UP THE FIRST PARAGRAPH.  IS IT TRUE

2    THEY TOLD YOU IN EARLY DISCUSSIONS THEY HAD ALREADY DONE

3    DESIGN WORK ON THE FILTER AND HAD RELATIONSHIPS -- WELL,

4    FIRST OF, DID THEY TELL YOU?

5    A. WELL, IF INDEED I SAW IT, THAT'S WHAT THIS LETTER SAYS,

6    IN THIS REPORT.

7    Q. DO YOU RECALL IF THEY TOLD YOU THAT?

8    A. THAT THEY HAD BEEN WORKING ON A DESIGN, PROPRIETARY

9    DESIGN?  YES.

10   Q. FOR FILTERS.  AND THEY HAD RELATIONSHIPS WITH MULTIPLE

11   FILTER MANUFACTURERS?

12   A. MOST LIKELY.

13   Q. ALL RIGHT.  IF YOU CAN LOOK, SIR, AT DEFENDANT'S EXHIBIT

14   136.  AND IS THIS A LETTER THAT YOU RECEIVED FROM

15   MR. MCNALLY ON OR ABOUT JUNE OF 1993?

16   A. IT APPEARS TO BE.

17   Q. AND IS IT CORRECT THAT THEY HAD ALREADY COME UP WITH A

18   SMART WASHER NAME BEFORE THEY STARTED CONSULTING WITH ISC?

19   A. YES.

20   Q. YOU'VE ADOPTED A NAME THAT YOU ADOPTED FOR ALL OF YOUR

21   PARTS WASHERS; CORRECT?

22   A. CORRECT.

23   Q. NOW, IS IT CORRECT THAT YOU THEN AGREED TO HELP FUND A

24   MARKETING STUDY?

25   A. YES.

1  Q. AND IF YOU CAN SHOW, MR. MORELAND, EXHIBIT 144.  AS PART

2  OF THE MARKETING STUDY, IT'S NOT REALLY LEGIBLE, BUT IT IS A

3  MARKETING GROUP THAT DID IT.

4  A. WORKSHOP I THINK IS THE NAME.

5  Q. IS ONE OF THE THINGS THEY DID, THEY DID INTERVIEWS WITH

6  POTENTIAL CUSTOMERS?

7  A. YES.

8  Q. AND YOU RECOGNIZE DEFENDANT'S EXHIBIT 144 AS WHAT THEY

9  PRODUCED ABOUT THE RESULT OF THEIR INTERVIEWS?

10  A. THIS APPEARS TO BE THE REPORT.  YES.

11  Q. AND IF YOU LOOK AT PAGE, THE PAGE BATES STAMPED I THINK

12  IT'S THE THIRD PAGE, BATES STAMPED 06195.

13  A. OKAY.

14  Q. IS IT CORRECT THAT YOU, LEARNED SIR -- AND THIS WAS GIVEN

15  TO YOU IN APPROXIMATELY JULY OF 1993?

16  A. YES.

17  Q. IS IT CORRECT YOU LEARNED, SIR, THAT THE PARTS WASHING

18  USER MARKET, THEY WANTED A CONVENIENT PARTS WASHER?

19  CORRECT?

20  A. THEY WANTED A CONVENIENT --

21  Q. RIGHT.  ONE OF THE THINGS THAT WAS IMPORTANT WAS

22  CONVENIENCE, IT SHOULD BE EASY TO USE.  DO YOU SEE THAT?

23  A. YES.

24  Q. AND YOU WERE TOLD BEFORE YOU UNDERTOOK YOUR PARTS WASHER

25  VENTURE THAT CUSTOMERS WANTED TO KNOW ABOUT THE CHEMICALS

1    USED WERE, WOULD IT HURT THEIR SKIN?  DO YOU SEE THAT?

2    A. YES.

3    Q. ANOTHER TERM FOR THAT IS HOW CAUSTIC IT IS; CORRECT?

4    A. YES.

5    Q. AND SO YOU UNDERSTOOD BEFORE YOU STARTED THE VENTURE THAT

6    CUSTOMERS WERE INTERESTED IN NONCAUSTIC PARTS WASHERS?

7    A. YES.  AS IT SAYS, THEY WANTED NONTOXIC, NONFLAMMABLE,

8    NONCAUSTIC, NONHAZARDOUS, AND THEY WANTED EVERYTHING GOOD

9    THAT COULD POSSIBLY BE FOUND IN A PARTS WASHING FLUID.

10   Q. IF YOU CAN LOOK AT TWO PAGES LATER 06197.  IS IT CORRECT

11   SIR -- SORRY, IT IS PAGE 06196.  IS IT CORRECT YOU WERE TOLD

12   THAT THE CUSTOMERS ARE INTERESTED IN ORGANIC PARTS WASHERS

13   AND THIS WOULD BE PART OF WHAT?

14   A. THEY DID NOT WANT HAZARDOUS WASTE.  THAT IS ONE OF THE

15   GREAT PROBLEMS WITH USING MINERAL SPIRITS, SOLVENTS IS THE

16   HAZARDOUS WASTE AND THE CONTROLLED MANNER IN WHICH IT HAS TO

17   BE DISPOSED OF.

18   Q. AND THE CUSTOMERS WERE INTERESTED IN A FILTERING

19   SOLUTION.  DID IT HAVE A FILTER SYSTEM?

20   A. YES.

21   Q. AND IF YOU YOU CAN LOOK, SIR, AND WE OFFER DEFENDANT'S

22   EXHIBIT 144.

23           MR. CAPP: NO OBJECTION.

24           THE COURT: IT'S ADMITTED.

25   BY MR. HARBIN:

1   Q. IF YOU CAN LOOK AT DEFENDANT'S EXHIBIT 148.

2            MR. HARBIN:  YOUR HONOR, I THOUGHT I DID, BUT DID

3   I OFFER EXHIBITS 135 AND 136 INTO EVIDENCE?  HE HAS ALREADY

4   TESTIFIED ABOUT THAT.

5            THE CLERK:  NO, SIR, YOU DID NOT.

6            MR. HARBIN:   WE DON'T NEED 135, BUT I WOULD OFFER

7   136, THE JUNE 9, 1993 LETTER.

8            MR. CAPP: NO OBJECTION ON THAT ONE, YOUR HONOR.

9            THE COURT:  IT'S ADMITTED.

10  BY MR. HARBIN:

11  Q. AND IF YOU COULD LOOK, SIR, AT DEFENDANT'S EXHIBIT 148.

12  A. YES.

13  Q. IS THIS A LETTER YOU ARE SEEING FROM MR. MCNALLY IN LATE

14  JULY OF 1993 CONTAINING THEIR THE MARKETING GROUP'S

15  PROJECTIONS ABOUT THE FINANCIAL OPPORTUNITY IN THE PARTS

16  WASHING MARKET?

17  A. YES.

18  Q. AND IF YOU LOOK AT THE PAGE, PL-7, THAT TOP HALF.  THE

19  MARKETING STUDY REPORTED TO YOU, THERE WERE WAS A POTENTIAL

20  JUST IN THE U.S. IMMEDIATELY OF MORE THAN $129 MILLION IN

21  SALES; CORRECT?

22  A. CORRECT.

23  Q. AND LONG TERM MORE THAN $360 IN SALES.

24  A. CORRECT.

25  Q. OBVIOUSLY THOSE HAVE NOT BEEN ACHIEVED; CORRECT?

1    A. CORRECT.  YES.

2    Q. AND THAT IS PART OF THE BUSINESS PLAN THAT YOU SAID THEY

3    DID NOT MEET?

4    A. NO, THIS IS WAS NOT THEIR BUSINESS PLAN.  THEY DID NOT

5    COMMIT TO THESE NUMBERS.  THIS IS MARKETING GURUS WHO THINK

6    THE WORLD IS THEIR OYSTER.

7           MR. HARBIN:  AND YOUR HONOR, WE OFFER DEFENDANT'S

8    EXHIBIT 148 INTO EVIDENCE.

9           MR. CAPP: IT'S IRRELEVANT, YOUR HONOR.

10          THE COURT:  THE SAME RULING.

11   BY MR. HARBIN:

12   Q. NOW, ONCE THEY JOINED CHEMFREE, WE WILL GET INTO THE

13   DETAILS, BUT MR. MCCLUER AND MR. MCNALLY'S INVOLVEMENT ON

14   THIS PROJECT OF DEVELOPING COMMERCIAL PARTS WASHERS FOR

15   CHEMFREE WAS MORE INTENSE IN EUROPE; CORRECT?

16   A. MORE WHAT?

17   Q. THEIR EFFORT WAS MORE INTENSE.  THEY WERE THERE DAY TO

18   DAY WORKING ON THE DEVELOP DEVELOPMENT?

19   A. CORRECT.

20   Q. YOUR INVOLVEMENT, YOU WERE NOT AT THAT TIME PRESIDENT,

21   BUT YOU WERE A SENIOR EXECUTIVE; CORRECT?  WHEN THEY

22   STARTED?

23   A. WELL, I WAS THE VICE-PRESIDENT OF INTELLIGENCE SYSTEMS AS

24   I AM TODAY.

25   Q. AND YOU HAD OCCASIONAL INTERACTION WITH THEM?

1   A. YES.  I MET WITH THEM BECAUSE THEY WERE IN THE SAME

2   PHYSICAL FACILITY EVERY SO OFTEN.  AND THEN WE HAD SOMEWHAT

3   FORMAL REPORTING WHERE EVERY COUPLE OF WEEKS THEY WOULD

4   BRIEF ME ON WHAT THEY HAD ACCOMPLISHED, AND TURNED IN TIME

5   SHEETS THAT RECORDED THE ACCOMPLISHMENTS OF THE LAST TWO

6   WEEKS.

7   Q. AND IF YOU COULD PUT UP DEFENDANT'S EXHIBIT 159.  IF YOU

8   COULD LOOK AT THAT, SIR, IN THE FIRST NOTEBOOK.

9   A. UH-HUH (AFFIRMATIVE).  MR. MCCLUER.

10  Q. MR. MCCLUER WOULD PERIODICALLY SUBMIT, ROUGHLY EVERY TWO

11  OR THREE WEEKS, A SUMMARY OF THE CONSULTING WORK HE HAS DONE

12  ON THE PROJECT, AND REQUEST PAYMENT; CORRECT?

13  A. YES.

14  Q. AND THAT WOULD GO DIRECTLY TO YOU OR THROUGH MR. MCNALLY

15  TO YOU?

16  A. THAT IS CORRECT.  SOMETIMES THEY SUBMITTED JOINT REPORTS,

17  SOMETIMES ONE WOULD WRITE IT UP, SOMETIMES THE OTHER WOULD.

18  Q. AND THAT IS YOUR INITIALS AT THE TOP RIGHT-HAND CORNER OF

19  THIS FIRST PAGE, FOR EXAMPLE.  DO YOU SEE THAT?

20  A. YES.

21  Q. AND YOU ARE APPROVING?

22  A. I AM APPROVING PAYMENT TO MCCLUER OF $2727.

23          MR. HARBIN:  WE WOULD OFFER DEFENDANT'S EXHIBIT 2

24  INTO EVIDENCE.

25          MR. CAPP: NO OBJECTION.

1          THE COURT:  ADMITTED.

2     BY MR. HARBIN:

3     Q. AND YOU DON'T RECALL MR. MCCLUER EVER OVERSTATING THE

4     WORK THAT HE HAD DONE IN THE SUMMARIES HE SUBMITTED, DO YOU?

5     A. I DO REMEMBER THERE WAS SOME CONFUSION ON A COUPLE OF

6     OCCASIONS ABOUT THE NUMBER OF HOURS THAT HE WORKED AND THAT

7     HE WAS BILLING FOR.  THEY WERE PAID BASICALLY BY THE HOUR,

8     SO IF THEY TOOK A WEEK OFF THEY DIDN'T GET PAID.

9     Q. BUT AS FAR AS DESCRIPTIONS OF HIS WORK, YOU DON'T RECALL

10    THEM EVER OVERSTATING THE WORK THAT THEY DID?

11    A. IN THE GENERAL REPORTING OF WHAT WAS ACCOMPLISHED?  NO, I

12    DON'T.

13    Q. OKAY, SIR.  NOW, I WANT TO TALK, SIR, ABOUT SPECIFIC

14    ASPECTS OF THE DEVELOPMENT THAT WE'VE BEEN DISCUSSING, AND

15    WE WILL START WITH YOUR SINK CONCEPTION, THE CONCEPTION

16    CONCERNING THE SINK, WHICH I UNDERSTAND YOU TO SAY, ON YOUR

17    DIRECT, WAS YOUR PRINCIPAL CONTRIBUTION, MOST SIGNIFICANT.

18    A. THAT IS CORRECT.

19    Q. YOU DID NOT DESIGN THE WHOLE SINK, DID YOU, SIR?

20    A. YES, I DID.  I AM NOT SURE I UNDERSTAND WHAT "THE WHOLE

21    SINK" MEANS, BUT IF YOU ARE TALKING ABOUT THE SHAPE OF THE

22    SINK, UNDERNEATH THE APPARENT TOP, THAT WAS MY DESIGN.

23    Q. ISN'T IT TRUE, SIR, THAT WHAT YOUR CONTRIBUTION WAS, WAS

24    TO OFFER A CONCEPT FOR A PORTION OF THE SINK DESIGN?

25    A. I THINK I JUST ANSWERED THAT QUESTION.

1    Q. SORRY?

2    A. NO, I BELIEVE THE SHAPE OF THE SINK THAT YOU CANNOT SEE,

3    AS YOU LOOK AT THE PARTS WASHER, WHICH SOLVED THE PROBLEM OF

4    HOW TO PROPERLY POSITION THE FLAT FILTER, WAS MY DESIGN.

5    Q. LET ME ASK YOU TO REFER, SIR, TO A PAGE OF THE 1996

6    DEPOSITION, PAGE 75 AND 76.  STARTING AT LINE 24, PAGE 75

7    AND GOING THROUGH LINE 7 OF PAGE 76.  YOU WERE ASKED

8    SPECIFICALLY, "WHO SPECIFICALLY AT CHEMFREE DESIGNED THE

9    SINK?"  AND YOUR ANSWER WAS THEN, "A PORTION OF THE SINK I

10   OFFERED THE ORIGINAL CONCEPT OF THE DESIGN THAT WAS THEN PUT

11   INTO A DRAWN FORM."  DO YOU SEE THAT?

12   A. YES.

13   Q. WAS THAT STATEMENT TRUE, YOUR CONTRIBUTION WAS A PORTION

14   OF THE SINK?

15   A. I DREW THE ORIGINAL DESIGN OF THE SINK ON A WHITEBOARD AT

16   CHEMFREE LOCATION, AND THEN IT WAS PUT INTO A, I CALL IT A

17   CAD DRAWING, ALTHOUGH I THINK IT WAS DONE MANUALLY THAN

18   THROUGH A COMPUTER, WHICH WAS THEN SENT OFF TO THE VENDOR,

19   SCIENTIFIC PLASTICS, TO SEE IF THEY COULD PRODUCE IT.

20   Q. ISN'T IT TRUE, SIR, THAT YOUR CONTRIBUTION WAS AN

21   INTEGRATED SINK THAT WOULD HAVE OFF-SETS IN IT THAT WOULD

22   ALLOW THE RACK AND THE FILTER?

23   A. CORRECT.

24   Q. YOU CAME UP WITH LEDGES, A MOLDED FORM, THAT WAS YOUR

25   CONTRIBUTION, THE LEDGES?

1   A. THE DESIGN OF THE SINK WHICH INCORPORATED THE

2   MULTI-TIERED FORM TO HOLD THE LEDGES.  YES.

3   Q. WELL, IS YOUR TESTIMONY NOW THAT YOU DID NOT JUST

4   CONCEIVE A PORTION OF THE SINK, OR THE WHOLE SINK?

5   A. WHAT IS THE WHOLE SINK?  ARE YOU TALKING ABOUT THE VERY

6   TOP PART AND THE BACK SPLASH OF THE SINK?  IF THAT IS PART

7   OF IT, NO, I DIDN'T DO THE BACK SPLASH AND I DIDN'T DO THIS

8   THING THAT IS REFERRED TO AS THE LELAND BAR, WHICH IS THE

9   TOWEL RACK ON THE SIDE.  BUT IF YOU TAKE THAT SINK OUT AND

10  YOU LOOK AT IT FROM THE BOTTOM, THAT IS THE DESIGN THAT I

11  PRODUCED, YES.

12  Q. AND IN THAT REGARD, YOU CONSIDER THIS SINK ON THE TOP

13  HERE TO BE A TECHNOLOGICAL BREAKTHROUGH OR INNOVATION?

14  A. APPARENTLY THE PATENT OFFICE ISSUED ME A PATENT IN MY

15  NAME FOR THAT DESIGN.

16  Q. SIR, MAYBE MY QUESTION WAS -- I DIDN'T ASK YOU TO OPINE

17  ABOUT WHAT THE PATENT OFFICE THOUGHT.  MY QUESTION IS, DO

18  YOU CONSIDER THE ACTUAL SINK PORTION --

19  A. NOT THE TOP.

20  Q. -- TO BE A TECHNOLOGICAL INNOVATION?

21  A. THE DESIGN SOLVED A PROBLEM THAT WAS INTERFERING WITH THE

22  DEVELOPMENT OF THE PRODUCT WHICH WAS HOW TO PROPERLY

23  POSITION THE FLAT FILTER.

24  Q. SIR, WITH DUE RESPECT, IF I TIE MY SHOE, I AM SOLVING A

25  PROBLEM.  MY QUESTION IS, DO YOU CONSIDER THE SINK TO BE A

1    TECHNOLOGICAL INNOVATION?

2    A. YES.

3    Q. CAN YOU LOOK, SIR, IN THE NOTEBOOK AT DEFENDANT'S EXHIBIT

4    208, THE SECOND PAGE?  SO DOES THIS DRAWING, SIR, DEPICT

5    WHAT YOU ARE SAYING IS YOUR INVENTION, THE DIMENSIONS OF THE

6    SINK WITH THE TWO LEDGES, ONE TO HOLD THE FILTER AND ONE TO

7    HOLD THE FALSE BOTTOM?

8    A. WHICH NUMBER ARE WE LOOKING AT?

9    Q. SORRY, SIR.  IT IS DEFENDANT'S EXHIBIT 208.

10   A. YES.

11           MR. HARBIN:  YOUR HONOR, WE WOULD OFFER

12   DEFENDANT'S EXHIBIT 208 INTO EVIDENCE.

13           MR. CAPP: CAN I JUST SEE THE ENTIRE EXHIBIT REAL

14   QUICK?  IS IT A SINGLE PAGE?

15           THE COURT:  ARE YOU OFFERING ALL FOUR PAGES?

16           MR. HARBIN:  WE WILL EVENTUALLY.  I WOULD BE

17   SURPRISED IF THERE IS AN OBJECTION.  WE CAN JUST DO THIS AS

18   ONE PAGE, IF CHEMFREE PREFERS.

19           MR. CAPP: YOUR HONOR, I DON'T HAVE A FULL

20   FOUNDATION FOR WHAT IT'S BEING OFFERED FOR AT THIS TIME.  IS

21   THIS BEING OFFERED AS A DRAWING THAT JIM MCCLUER DREW?

22           THE COURT:  LAY SOME FOUNDATION

23           MR. CAPP: I WOULD WANT MORE FOUNDATION --

24           THE COURT:  IT WOULD STILL BE ADMISSIBLE IF THE

25   WITNESS TESTIFIES THAT THAT IS AN ACCURATE DRAWING OF HIS

1    PORTION OF THE INVENTION, BUT --

2             MR. HARBIN:   WE CAN -- INITIALLY NOW -- I BELIEVE

3    HE HAS GIVEN TESTIMONY -- WE WILL JUST INITIALLY JUST OFFER

4    THAT PAGE, AND --

5             THE COURT:  ALL RIGHT.

6             MR. CAPP: YOUR HONOR, IT CAN COME IN WITHOUT

7    OBJECTION.

8             THE COURT:  ALL RIGHT.

9    BY MR. HARBIN:

10   Q. NOW, IS IT CORRECT THAT MR. MCCLUER AND MR. MCNALLY DID

11   THE IMPLEMENTATION OF YOUR CONCEPT OF THE SINK SHAPE?

12   A. YES.

13   Q. ISN'T IT TRUE, SIR, THAT YOU TESTIFIED AGAIN ABOUT -- YOU

14   TESTIFIED ABOUT MR. SHEFFIE'S REPORT THAT CHEMFREE AND ZYMO

15   REQUESTED?

16   A. CORRECT.

17   Q. ISN'T IT TRUE THAT MR. SHEFFIE, IN HIS REPORT, OPINED

18   THAT THE ORIGINAL APPLICATIONS IN THE CLAIMS, IN THE

19   ORIGINAL APPLICATIONS CONCERNING THE SINK WITH THE FALSE

20   BOTTOM, THAT MR. MCCLUER WAS THE SOLE INVENTOR?

21   A. NO.

22   Q. IT IS NOT TRUE?

23   A. NOT TRUE.

24   Q. HAVE YOU READ THE REPORT, SIR?

25   A. I HAVE READ THE FINAL REPORT.

1    Q. AND WHEN DID YOU READ IT?

2    A. SOMETIME WITHIN THE LAST COUPLE OF YEARS.

3    Q. UNTIL A COUPLE OF YEARS AGO, YOU HAD NOT READ IT, HAD

4    YOU?

5    A. I HAD NOT.

6    Q. LET ME REFER YOU, SIR, AND ASK YOU TO LOOK -- LET ME HAND

7    YOU, IF I COULD, DEFENDANT'S EXHIBIT -- LET ME HAND YOU

8    DEFENDANT'S EXHIBIT 845.  HAVE YOU SEEN THAT REPORT, SIR?

9    A. I DON'T KNOW IF THIS IS THE ONE THAT I ACTUALLY SAW.

10   THIS IS THE FIRST OR THE SECOND REPORT?

11   Q. LET ME HAND YOU DEFENDANT'S EXHIBIT 846.

12   A. I HAVE ONLY SEEN ONE OF THEM.  OKAY, YES.

13   Q. YOU SAY YOU SAW THE SECOND ONE?

14   A. I BELIEVE THIS IS THE ONE THAT I HAVE SEEN, THE SECOND

15   ONE.  I DON'T RECALL.

16   Q. THAT IS DEFENDANT'S EXHIBIT 846.  WHAT IS THE DATE ON

17   THAT?

18   A. JUNE 16TH, 1997.  THAT IS 845.

19   Q. THAT ONE IS THE FIRST ONE?

20   A. NO.  THE OTHER ONE IS MAY 15TH.  EXCUSE ME, CORRECT.  I

21   THOUGHT THAT WAS '96.  MAY 15TH, 1998 IS THE SECOND ONE.

22   846; RIGHT?

23   Q. THAT IS THE ONE THAT YOU BELIEVE YOU HAVE SEEN?

24   A. I THINK SO.  YES.  YES.

25   Q. BUT YOU WERE SENT, IF YOU LOOK, SIR, AT DEFENDANT'S

1    EXHIBIT 741 -- DO I HAVE THAT?

2    Q. IT SHOULD BE IN THE BACK OF THE SECOND NOTEBOOK.

3    A. WHAT IS THE NUMBER AGAIN?

4    Q. 741.

5    A. I CAN READ IT HERE.

6    Q. THIS IS A LETTER THAT YOUR COMPANY'S PATENT ATTORNEY,

7    CHEMFREE'S PATENT ATTORNEY, MR. ISAF, SENT TO YOU ON JULY

8    16TH OF 1997?

9    A. THAT IS WHAT IT IS REFERRING TO, YES.

10   Q. BUT YOU HAVEN'T SEEN IT?

11   A. I DON'T HAVE ANY RECOLLECTION OF SEEING THAT BEFORE

12   UNTIL, LIKE I SAID, A COUPLE OF YEARS AGO.

13   Q. DO YOU HAVE ANY KNOWLEDGE OF WHAT CAUSED MR. SHEFFIE TO

14   CHANGE HIS OPINION BETWEEN THE TWO OPINIONS?

15   A. I KNOW WHAT I'VE BEEN TOLD.

16   Q. BUT YOU DIDN'T TALK TO MR. SHEFFIE?

17   A. I DID NOT.

18   Q. NOW, LET'S TALK ABOUT MR. STRANGE'S WORK ON ATTACHING THE

19   MICROBES TO THE FILTER.  NOW, I KNOW YOU HEARD MR. STRANGE'S

20   TESTIMONY, YOU WERE HERE IN THE COURT.

21   A. YES, I WAS HERE.

22   Q. BUT YOUR UNDERSTANDING AT THE TIME, YOU COULD POUR

23   MICROBES IN, THERE WERE MANY WAYS TO APPLY THE MICROBES TO

24   THE PARTS WASHER?

25   A. CORRECT.

1   Q. AND IN FACT, YOUR OPINION OR YOUR RECOLLECTION IS THAT

2   ASKING THE USER TO DUMP IN THE MICROBES, CHARGING THE UNIT

3   WITH FLUID -- LET ME TAKE A STEP BACK.  CHARGING THE UNIT

4   WITH FLUID IS WHAT IS REFERRED TO, IF THE FLUID FROM

5   EVAPORATION OR OTHERWISE, WHEN THAT HAPPENS, THE FLUID GOES

6   DOWN, AND YOU REPLENISH IT, THAT IS REFERRED TO AS CHARGING

7   IT; CORRECT?  AND IS IT TRUE THAT YOUR CONCLUSION WAS THAT

8   ASKING THE END USER TO DUMP IN MICROBES WHEN CHARGING THE

9   UNIT WITH FLUID WAS AN EFFECTIVE TECHNIQUE?

10  A. EXCUSE ME?  DO YOU MIND REPEATING THAT?

11  Q. ISN'T IT TRUE THAT BACK WHEN YOU WERE DEVELOPING THE

12  CHEMFREE PARTS WASHER, THAT YOU DETERMINED THAT ASKING THE

13  USER OR HAVING THE USER DUMP IN THE MICROBES WHEN CHARGING

14  THE UNIT WITH FLUID WAS AN EFFECTIVE TECHNIQUE FOR ADDING

15  MICROBES?

16  A. YES.

17  Q. BUT YOU ALL CONCLUDE IT WAS NOT VIABLE FROM A MARKETING

18  VIEWPOINT?

19  A. THAT CONCLUSION WAS REACHED.  YES.

20  Q. AND ANOTHER REASON TO CONCEAL THE BUGS WAS THAT YOU WERE

21  HOPING TO BE CREATIVE IN THE PACKAGING TO DETER KNOCK-OFFS?

22  A. NO, IT WAS MORE OF THE MAGIC OF BIOREMEDIATION WOULD NOT

23  BE QUITE AS OBVIOUS TO THE USER.  THE RESULTS WOULD BE, BUT

24  NOT THE TECHNIQUE.

25  Q. BECAUSE ONCE THE USER COULD SEE THAT IT'S JUST BUGS ON A

1    MAT WITH FLUID THROWING FLOWING THROUGH IT?

2    A. WE THOUGHT, FROM THE MARKETING POINT OF VIEW, IT WOULD BE

3    BETTER BUGS -- IT WOULD BE MORE ADVANTAGEOUS IF THE BUGS

4    WERE PROVIDED IN AN UNOBVIOUS MANNER.

5    Q. AND IF YOU LOOK AT PAGE 84 OF YOUR 1996 DEPOSITION.  AND

6    WE CAN REVIEW THE WHOLE ANSWER IF YOU WANT.  BUT MY QUESTION

7    IS, LINES 5 TO 7, IF WE WERE NOT AT LEAST CREATIVE IN THE

8    PACKAGING, THAT WE WOULD HAVE TOO MANY KNOCK-OFFS.  DO YOU

9    SEE THAT?

10   A. YES.

11   Q. SO THAT WAS ALSO A FACTOR?

12   A. THAT WAS A FACTOR.  YES.

13   Q. AND IT IS TRUE THAT IN YOUR SYSTEM, BUGS DO HAVE TO BE --

14   THE BUGS, THE FILTER WITH THE BUGS, THE MAT, HAS TO BE

15   PERIODICALLY REPLACED?

16   A. MEANING THE MAT SHOULD BE PERIODICALLY REPLACED TO REMOVE

17   THE PARTICULATE.  IT ALSO ENHANCES THE COLONY OF THE

18   MICROBES.

19   Q. AND IN FACT, IF YOU DON'T REPLACE THE OZZY MAT, YOU CALL

20   IT, THE MAT WITH THE MICROBES EVERY 30 DAYS OR SO, THEIR

21   PERFORMANCE WILL BE DEGRADED; CORRECT?

22   A. IF YOU DO NOT REPLACE THE FILTER, NOR DO YOU ADD FLUID

23   OVER TIME AND YOU DON'T FEED THEM, YES, THE PERFORMANCE WILL

24   DEGRADE.  BUT OVER AN EXTENDED PERIOD OF TIME, MICROBES ARE

25   VERY HEARTY.  AND BESIDES, THERE ARE MICROBES IN THE FLUID.

1    Q. LET ME ASK YOU, SIR -- I AM GOING TO HAND YOU EXHIBITS

2    589, 591, 592, AND 593.  AND IF YOU COULD PUT UP,

3    MR. MORELAND, EXHIBIT 589.  DO YOU RECOGNIZE THIS AS

4    INSTRUCTIONS AS GIVEN TO YOUR USER BY THE COMPANY?

5    A. YES.

6    Q. AND YOU TELL THEM THE FAILURE TO CHANGE THE OZZY MAT

7    MONTHLY WILL REDUCE THE EFFICIENCY, HEALTH, AND

8    BIOREMEDIATION CAPABILITIES OF THE MICROBES; IS THAT

9    CORRECT?

10   A. YES.

11   Q. IS THAT CORRECT?

12   A. YES, IT IS.

13          MR. CAPP:  I OBJECT TO THIS, YOUR HONOR.  WE ARE

14   NOT LITIGATING AGAINST THE COMMERCIAL PRODUCT, WE ARE

15   LITIGATING THE PATENTS, THE PATENT DISCLOSURE, AND THE

16   PATENT CLAIMS.

17          THE COURT:  WHAT IS THE RELEVANCE OF THAT?

18          MR. HARBIN:   YOUR HONOR, IT'S RELEVANT TO A

19   COUPLE OF DIFFERENT ISSUES.

20          THE COURT:  RELEVANCE IS YOUR OBJECTION, ISN'T IT

21   MR. CAPP?

22          MR. CAPP: YES.  AND IT'S VERY IMPORTANT BECAUSE

23   THE PATENTEES GET A PATENT AND SOMETIMES, AND SOMETIMES NOT,

24   THEY HAVE A PRODUCT.  I WANT TO MAKE SURE THIS LITIGATION IS

25   ABOUT READING OUR CLAIMS ON THEIR PRODUCT AND NOT A

1   COMPARISON OF THEIR PRODUCT TO OUR PRODUCT.  I AM CONCERNED

2   THIS IS A LITTLE BIT OF A MISDIRECTION BY THE DEFENDANTS

3   HERE.

4           MR. HARBIN:  YOUR HONOR, HE RAISED TWO ISSUES,

5   AND AGAIN, I HAVE A THICK SKIN, I WILL TRY TO KEEP MY THICK

6   SKIN.  BUT AGAIN, YOUR HONOR, THIS IS RELEVANT TO TWO

7   ISSUES.  THE MAIN ONE I THINK IS THE ISSUE OF COPYING OR NOT

8   COPYING, WHICH RELATES -- CAN RELATE THAT THE PATENTS MORE

9   COMMONLY RELATES TO COMMERCIAL EMBODIMENT.  AND WE HEARD

10  EXTENSIVE ARGUMENT FROM CHEMFREE AND QUESTIONING OF THE

11  WITNESSES ABOUT WHETHER WALTER COPIED THEIR COMMERCIAL

12  EMBODIMENT.  NOT SIMPLY THE CLAIMS, NOT PUTTING THE CLAIMS

13  ON THE BOARD, BUT DID YOU, YOU KNOW, YOU HEARD THE CLAIM, WE

14  DON'T THINK IS RECORDED BY THE EVIDENCE, BUT YOU GOT A

15  CHEMFREE MACHINE THROUGH GREY MILLS AND COPIED THAT MACHINE.

16  AND THIS IS DIRECTLY RESPONSIVE TO THAT, AND IT ALSO DEALS

17  WITH THE ISSUE OF OBVIOUSNESS.

18          MR. CAPP: YOUR HONOR, CHEMFREE HAS A LOT OF

19  PATENTS AND A LOT OF CLAIMS.  WE HAVE CHOSEN NOT TO ASSERT

20  CLAIMS AGAINST THE DEFENDANTS THAT HAVE LIMITATIONS DIRECTED

21  TO MICROBES ATTACHED TO THE FILTER.  WE ARE ASSERTING OTHER

22  CLAIMS, THOSE ARE THE CLAIMS THAT ARE IN ISSUE, AND IF THERE

23  IS ANY COPYING DONE, IT WAS COPYING DONE TO THE SUBJECT

24  MATTER OF THOSE CLAIMS THAT WERE WE ARE ASSERTING THIS WHOLE

25  LINE OF QUESTIONING IS IRRELEVANT.

1          THE COURT:  ALL RIGHT.  WELL, I AM GOING TO ADMIT

2     THE DOCUMENT, AND I DON'T SEE VERY MUCH RELEVANCE TO THIS

3     RIGHT NOW, MR. HARBIN, BUT I TRUST THAT YOU WILL ATTEMPT TO

4     POINT OUT SOME LATER IN YOUR BRIEFING.

5          MR. HARBIN:  I WILL TRY TO CONVINCE YOU, YOUR

6     HONOR.

7          THE COURT:  MIGHT CHANGE MY MIND OR EDUCATE ME?

8          MR. HARBIN:  IN LIGHT OF THAT, WE WOULD ALSO

9     OFFER, FOR RELATED REASONS, I CAN GO INTO DETAILS, BUT YOUR

10    HONOR'S HONEST COMMENT, WE WOULD OFFERED EXHIBITS 592, WHICH

11    IS THE ISSUE OF FREQUENTLY ASKED QUESTIONS, AND EXHIBIT 593,

12    WHICH IS THE OZZY USER MATS FOR THE SMART WASHER.

13         THE COURT:  THE SAME RULING, MR. CAPP.  I WILL

14    ADMIT IT OVER OBJECTION, AND GIVE IT THE WEIGHT TO ANY ISSUE

15    THAT I FIND IT RELATES TO.  I UNDERSTAND YOUR POSITION WITH

16    REGARD TO ITS RELEVANCE.

17         MR. CAPP: THANK YOU, YOUR HONOR.

18    BY MR. HARBIN:

19    Q. AND LET ME ASK YOU TO LOOK, SIR, AT EXHIBIT 594.

20    A. YES.

21    Q. NOW, THIS IS ABOUT A PRODUCT CALLED OZZY BOOSTER.  CAN

22    YOU TELL ME WHAT THE PURPOSE OF THIS PRODUCT IS, TELL ME

23    FIRST WHAT THE PURPOSE OF THE PRODUCT IS.

24    A. THE PURPOSE IS TO PROVIDE A CONCENTRATED AMOUNT OF

25    MICROBES FOR INTRODUCTION INTO THE SYSTEM.

1  Q. NOW, WHY DO YOU NEED THAT?

2  A. IF A SYSTEM HAS NOT BEEN PROPERLY MAINTAINED, HAS BEEN

3  LEFT DORMANT OVER AN EXTENDED PERIOD OF TIME, OR HAS A HEAVY

4  BUILD-UP OF OIL AND GREASE BECAUSE IT HAS BEEN USED AS A

5  DUMP RATHER THAN AS A PARTS CLEANER, SOMETIMES IT IS

6  NECESSARY TO BOOST THE CAPABILITY OF THE MICROBES FOR

7  BIOREMEDIATION.

8  Q. AND WE WOULD OFFER THAT FOR THE SAME REASONS, YOUR HONOR,

9  EXHIBIT 594.

10          MR. CAPP: SAME OBJECTION, YOUR HONOR.

11          THE COURT:  ALL RIGHT.  OBJECTION IS NOTED.

12  BY MR. HARBIN:

13  Q. NOW, BY THE WAY, YOU ALL DID NOT CONSIDER RELEVANT AN

14  OXYGEN PUMP, DID YOU?

15  A. NO, WE DID NOT.

16  Q. I WANT TO TALK TO YOU SPECIFICALLY THE NEXT SPECIFIC

17  FEATURE IS THE MICROBES AND THE CLEANING FLUIDS, FIRST

18  STARTING WITH THE MICROBES.  IF I UNDERSTAND, YOU WERE NOT

19  INVOLVED, YOURSELF, IN FORMULATING A MICRON SOLUTION?

20  A. CORRECT.

21  Q. THAT WAS DONE BY MR. MCNALLY AND MR. MCCLUER?

22  A. THEY RESEARCHED THE AVAILABILITY OF MICROBES FOR USE IN

23  THE MACHINE.  YES.

24  Q. THAT MEANS THEY CONTACTED SUPPLIERS?

25  A. YES.

1    Q. IT WAS MR. MCCLUER'S RESPONSIBILITY FOR CONTACTING THE

2    MICRON SUPPLIERS; CORRECT?

3    A. I DON'T RECALL WHO DID IT.  I THINK THEY PROBABLY SHARED

4    THE RESPONSIBILITY.  MCCLUER MAY HAVE DONE MOST OF THE

5    CONTACTING, I JUST DON'T KNOW.

6    Q. IF YOU CAN LOOK, SIR, AT PAGE 63 OF YOUR DEPOSITION OF

7    1996, STARTING AT PAGE 62 LINE 24, GOING TO 63 LINE 7.  YOU

8    WERE ASKED WHO DECIDED ON THE SUPPLIERS OF MICROORGANISMS

9    DURING THE DEVELOPMENT PERIOD, AND YOUR ANSWER WAS, "BACK IN

10   1996 MR. MCCLUER WAS IN CHARGE OF CONTACTING VARIOUS

11   SUPPLIERS OF MICROORGANISMS."

12   A. I SAID HE WAS PRIMARILY CHARGED WITH SEEKING OUT THE

13   SUPPLIERS.  YES.  THAT DOES NOT MEAN THAT MCCLUER DID IT

14   ALL.  PRIMARILY.

15   Q. NOW, IS IT YOUR RECOLLECTION THAT THE FIRST CONVERSATION

16   YOU HAD WITH ANYONE, THE FIRST CONVERSATION YOU ARE AWARE

17   OF, ABOUT USING MICROBES, AND YOU ARE OKAY IF I SAY MICROBES

18   INSTEAD OF BUGS?

19   A. NO PROBLEM.

20   Q. ARE YOU AWARE THAT THE EARLIER CONVERSATION THAT YOU ARE

21   AWARE OF ABOUT USING THE MICROBES IN THE PARTS WASHING

22   SOLUTION WITH THE FLUID WAS IN LATE 1993?

23   A. LATE 1993, PERHAPS IN VERY VERY EARLY 1994.

24   Q. FOR EXAMPLE, I WILL ASK YOU SOME SPECIFICS.  DO YOU

25   RECALL A DINNER SPECIFICALLY IN DECEMBER OF 1994?

1  A. I THINK IT WAS IN DECEMBER.  IT COULD HAVE BEEN JANUARY

2  1ST OR 2ND, BUT IT WAS AT THE YEAR'S TURN.

3  Q. BUT MR. MCNALLY AND MR. MCCLUER HAD DONE WORK BEFORE THAT

4  WITH A PILLOW FILTER THAT HAD MICROBES OR BUGS; CORRECT?

5  A. THE PILLOW FILTER INHERENTLY, BECAUSE OF THE MATERIALS

6  THAT THE PILLOW FILTER WAS MADE OF, HAD INHERENT MICROBES IN

7  THEM, AND THERE WERE NO MICROBES ADDED.  IT WAS NOT ADDED,

8  IT WAS NOT -- THEY WERE THERE JUST BECAUSE OF THE NATURE OF

9  THE FILLER THAT WAS IN THE PILLOW.

10  Q. WELL, I WANT TO REMEMBER THAT.  LET ME GET BACK TO THAT.

11  BECAUSE OF THE NATURE OF THE FILLER?

12  A. YES.  IT WAS, AT LEAST AT ONE POINT, IT WAS A REPROCESSED

13  PAPER, USED NEWSPAPER MATERIAL.

14  Q. AND YOU KNEW OF THAT WORK, YOUR KNOWLEDGE, TO YOUR

15  KNOWLEDGE, THAT WORK WAS DONE AT LEAST FROM OCTOBER TO

16  NOVEMBER OF 1993; CORRECT?

17  A. CORRECT.

18  Q. MR. MCCLUER SHOWED YOU A PILLOW THAT HE HAD GOTTEN;

19  CORRECT?

20  A. YES.

21  Q. PILLOW MATERIAL?

22  A. YES.

23  Q. AND THEY GOT THAT FROM A COMPANY CALLED ENRETECH?

24  A. I THINK THEY MAY HAVE HAD PILLOWS FOR MORE THAN ONE OR

25  THE INGREDIENTS OF THE PILLOWS, INTERNAL INGREDIENTS, FROM

1   MORE THAN ONE.  BUT YES, I BELIEVE THEY MAY HAVE GOTTEN

2   SOMETHING FROM ENRETECH, I AM NOT SURE WHO SUPPLIED THE

3   PILLOW MATERIAL.

4   Q. IF YOU COULD LOOK, SIR, YOU HAVE YOUR 2000 DEPOSITION?

5   A. IF YOU GAVE IT TO ME.

6   Q. IF YOU COULD LOOK, SIR, AT PAGE 37 OF THAT DEPOSITION,

7   LINES 9 TO 18.  AND YOU WERE ASKED, SIR, BACK IN THE 2000,

8   AT LINE 9, "DO YOU KNOW HOW THAT CAME ABOUT?  WERE YOU

9   INVOLVED IN THE PILLOW RESEARCH?"  "ANSWER:  MR. MCNALLY AND

10  MR. MCCLUER SHOWED ME WHAT THEY HAD BEEN DOING, AND

11  DEMONSTRATED THE PILLOW WHICH THEY HAD RECEIVED FROM AN

12  OUTFIT BY THE NAME OF ENRETECH."  DOES THAT REFRESH YOUR

13  RECOLLECTION?

14  A. IF THAT IS WHAT IT SAYS, I AM SURE THAT'S CORRECT.

15  Q. AND ENRETECH MATERIAL, THAT YOU TRIED TO MAKE WHAT YOU

16  CALL A PILLOW OUT OF.

17        MR. CAPP: CAN WE HAVE THE ENTIRE ANSWER READ INTO

18  THE RECORD, NOT JUST PART OF IT?

19        THE COURT:  GIVE ME THE LINES YOU WANT OR GIVE

20  MR. HARBIN THE LINES YOU WANT.

21        MR. HARBIN:   I WILL READ THE REST OF IT.

22        MR. CAPP: LINES 15 THROUGH 18, PLEASE.

23        MR. HARBIN:  ENRETECH IS A MANUFACTURER OF

24  ABSORBENT MATERIALS, AND THEY MANUFACTURED THESE PADS FOR

25  WIPING UP OIL SPILLS.  AND A VARIATION OF THAT, I BELIEVE,

1    IS WHAT WAS IN THE PILLOW."  DO YOU SEE THAT?  DO YOU SEE

2    THAT SIR?

3    A. YES.

4    Q. DO YOU STILL BELIEVE THAT IS A TRUE STATEMENT?

5    A. YES.

6    Q. AND IS IT TRUE THIS NEXT QUESTION, MR. RICHARD BLACKMORE

7    AT THE TIME WAS THE HEAD OF THE COMPANY?

8    A. CORRECT.

9    Q. AND YOU MET MR. BLACKMORE, YOU DIDN'T KNOW HIM BEFORE

10   THIS WORK STARTED; CORRECT?

11   A. I DID NOT.

12   Q. BUT YOU MET HIM IN THE SUMMER OF 1993; CORRECT?  PROBABLY

13   AUGUST?

14   A. MOST LIKELY.  YES.

15   Q. WHEN HE VISITED IN ATLANTA?

16   A. YES.

17   Q. YOU WERE INTRODUCED TO HIM BY MR. MCCLUER AND

18   MR. MCNALLY; CORRECT?

19   A. YES.  THAT WOULD HAVE BEEN THE CASE.

20   Q. AND YOU DON'T KNOW WHICH ONE OF THEM KNEW HIM EARLIER, DO

21   YOU?

22   A. NO.

23   Q. YOU JUST SAID HELLO TO HIM, HE WAS WORKING WITH THEM;

24   CORRECT?

25   A. CORRECT.

1  Q. HE WAS THERE IN YOUR OFFICE WORKING WITH THEM, AND YOU

2  CAME TO LEARN MORE ABOUT ENRETECH LATER; CORRECT?

3  A. YES, I DID.

4  Q. YOU HAD DINNER WITH MR. BLACKMORE IN DECEMBER OF 1993;

5  CORRECT?

6  A. YES.

7  Q. AND AT THAT DINNER, MR. BLACKMORE TOLD YOU HIS COMPANY

8  HAD ALREADY INCORPORATED BUGS INTO FLUID FOR BIOREMEDIATION,

9  DIDN'T HE?

10  A. THAT'S CORRECT.  THAT THEY HAD PRODUCED SOME EXPERIMENTAL

11  FLUID THAT CONTAINED WHAT HE DESCRIBED AS A MATRIX

12  CONSISTING OF THE MICROBES.

13  Q. AND IF YOU CAN LOOK, SIR, AT PLAINTIFF'S EXHIBIT 528, IT

14  IS THE -- IT IS AT THE BEGINNING OF THE FIRST JOINT

15  NOTEBOOK, BECAUSE WE PUT THE PLAINTIFF'S EXHIBITS FIRST.

16  A. OKAY.  I HAVE IT.

17  Q. THIS IS A DESCRIPTION OF ENRETECH COMPANY; CORRECT?

18  A. I GUESS SO.  I DON'T REMEMBER EVER HAVING SEEN THIS

19  BEFORE, BUT IT SEEMS TO BE A DESCRIPTION OF THEIR COMPANY

20  AND THEIR PRODUCTS.

21  Q. WELL, ISN'T IT TRUE THAT ENRETECH IS A COMPANY THAT

22  SPECIALIZED IN BIOREMEDIATION HYDROCARBON ABSORBING

23  PRODUCTS?

24  A. THAT IS WHAT THEY SAY.  YES.

25  Q. ISN'T IT TRUE THAT EVERY PRODUCT THEY SOLD AT THE TIME,

1  ALL ENRETECH PRODUCTS --

2          THE COURT:  LAY SOME FOUNDATION FOR THE WITNESS'S

3  KNOWLEDGE IN THAT REGARD, MR. HARBIN.  YOU HAVE ALREADY

4  OFFERED THE DEPOSITION TESTIMONY ON WHAT ENRETECH DOES.

5          MR. HARBIN:  TO GET BACK TO THE QUESTION OF WHY

6  THEY ARE USING IT, BUT I THINK THE FOUNDATION WOULD BE HIS

7  DISCUSSIONS DIRECTLY WITH MR. BLACKMORE AND OTHERS ABOUT

8  THEM.  HE HAD DINNER WITH THEM IN DECEMBER.

9          THE COURT:  I DON'T THINK HAVING DINNER WITH HIM

10  IS ENOUGH TO ADMIT AN EXHIBIT THAT WASN'T GENERATED AT

11  DINNER ABOUT WHAT THE COMPANY DOES.

12  BY MR. HARBIN:

13  Q. WELL, FORGET ABOUT THE EXHIBIT.  ISN'T IT YOUR

14  UNDERSTANDING THAT THEY OFFERED MULTIPLE PRODUCTS FOR

15  BIOREMEDIATION, ABSORBING HYDROCARBONS AND BIOREMEDIATION?

16  A. I DID NOT KNOW VERY MUCH ABOUT ENRETECH.

17  Q. DID YOU COME TO LEARN IT?

18  A. IS THAT ALL OF THEIR PRODUCTS WERE OF THIS NATURE?  NO, I

19  NEVER KNEW THAT.  THEY PROVIDED PRODUCTS THAT WERE USED IN

20  THE EXPERIMENTS BY MCCLUER AND MCNALLY.

21  Q. YOU DID LEARN THAT HYDROCARBON ABSORPTION AND

22  BIOREMEDIATION WAS AN ESSENTIAL PART OF THEIR BUSINESS,

23  DIDN'T YOU?

24  A. I DON'T RECALL THAT.  NO.

25  Q. A MAJOR PART OF THEIR BUSINESS?

1   A. IT WAS CERTAINLY PART OF THEIR BUSINESS.  I DON'T KNOW

2   WHAT THEIR BUSINESS WAS OR IS.

3   Q. WELL, GOING BACK TO THE STAGES THAT THE PILLOWS THAT

4   MR. MCCLUER AND MR. MCNALLY HAD BEEN EXPERIMENTING WITH THAT

5   CONTAINED MICROBES, YOU SAID IT IS BECAUSE OF THE NATURE OF

6   THE FILLER.

7   A. YES.

8   Q. THE FILLER IS THE HYDROCARBON ABSORBING MATERIAL THAT

9   THEY GOT FROM ENRETECH; CORRECT?

10  A. I THINK THEY MAY HAVE GOTTEN IT FROM OTHER SOURCES AS

11  WELL.  BUT I AM SURE THEY DID GET SOME FROM ENRETECH, YES.

12  Q. SIR, AGAIN, WE CAN GO BACK TO YOUR DEPOSITION WHERE YOU

13  SAID IN 2006 THAT IT WAS ENRETECH?

14  A. I AGREE IT SAYS THAT, BUT IT ALSO DOESN'T SAY THAT THEY

15  GOT IT ANYWHERE ELSE.  I DON'T KNOW.  I DIDN'T DO THOSE

16  EXPERIMENTS MYSELF.

17  Q. AND ENRETECH PROVIDE IT WITH MICROBES IN IT; CORRECT?

18  THE MATERIAL INHERENTLY HAS MICROBES IN IT.

19  A. THEY DIDN'T ADD MICROBES TO IT, AS FAR AS I AM AWARE.

20  Q. IT IS A MATERIAL HE OFFERED FOR BIOREMEDIATION AND

21  HYDROCARBON ABSORPTION?

22  A. THE PURPOSE OF IT WAS TO ABSORB THE OIL WITHIN THE FLUID

23  TO EXTEND THE LIFE OF THE FLUID.  AND YES, IT HAD MICROBES

24  IN THE MATERIAL, AND THEREFORE IT PROBABLY BIOREMEDIATED, OR

25  AT LEAST REMEDIATED SOME OF THE OIL THAT WAS ABSORBED INTO

1   IT.

2   Q. SIR, ISN'T IT TRUE THAT ENRETECH PROVIDED AND OFFERED THE

3   MATERIAL THAT ABSORBED THE OIL IS ALSO OFFERING

4   BIOREMEDIATING?

5   A. I REALLY DON'T KNOW THAT.

6   Q. YOU DON'T KNOW THAT?

7   A. NO, I DON'T.  THEY MAY WELL HAVE.  I DON'T KNOW.

8           MR. HARBIN:  I DON'T HAVE MUCH, IF ANYMORE, YOUR

9   HONOR.  LET ME SEE.  I WILL TRY TO GET DONE BY 4:30.

10          THE COURT:  ALL RIGHT.

11  BY MR. HARBIN:

12  Q. I WANT TO TURN, SIR, TO THE FLUID ASPECT OF THE EQUATION.

13  IS IT TRUE, SIR, THAT ENRETECH, FOR A TIME -- AFTER THIS

14  PILLOW INVESTIGATION WAS DONE, ENRETECH PROVIDED A SOLUTION

15  WITH MICROBES IN IT?

16  A. THEY INITIALLY PROVIDED SOLUTION WITHOUT MICROBES.  THEY

17  MADE US AWARE OF THEIR EXPERIMENTAL SOLUTION AT THIS DINNER

18  THAT WE'VE TALKED ABOUT THAT THEY HAD A FLUID THAT DID HAVE

19  MICROBES IN IT, AND WE BOUGHT THAT FROM THEM.

20  Q. OKAY.  AND YOU DID NOT DESIGN THAT FLUID, THAT WAS A

21  FLUID THAT ENRETECH DESIGNED?

22  A. THAT IS CORRECT.

23  Q. CHEMFREE DIDN'T KNOW WHAT WAS IN THAT FLUID AS FAR AS THE

24  CHEMICAL DETAILS?

25  A. I DON'T BELIEVE WE DID.

1  Q. AND YOU DIDN'T HAVE THE DETAILS OF WHAT MICROBES WERE IN

2  THEM?

3  A. BLACKMORE MAY WELL HAVE TOLD US WHAT WAS IN IT, BUT HE

4  DIDN'T TELL ME.

5  Q. AND YOU CONCLUDED, DIDN'T YOU, SIR, THAT THE ENRETECH

6  SOLUTION WITH THE CLEANING FLUID AND THE MICROBES TOGETHER

7  SUCCESSFULLY PERFORMED?

8  A. IT INITIALLY PERFORMED SUCCESSFULLY.  OVER TIME IT WAS

9  MUCH LESS CONSISTENT AND RELIABLE.

10  Q. DID YOU HAVE AN ISSUE THAT -- YOU CONSIDERED ENRETECH FOR

11  A SUPPLIER; CORRECT?

12  A. YES.

13  Q. DID YOU HAVE AN ISSUE WHERE ENRETECH DECIDED TO GET

14  INVOLVED WITH ANOTHER COMPANY IN CHICAGO, THAT WAS A

15  BUSINESS ISSUE WITH THEM?

16  A. NOT THAT I AM AWARE OF.

17  Q. LET ME ASK YOU TO LOOK IN YOUR BOOK AT PLAINTIFF'S

18  EXHIBIT 527, SIR.

19  A. YES.

20  Q. THIS IS A STATUS REPORT THAT I AM NOT GOING TO ASK YOU TO

21  IDENTIFY.  GO TO THE FIRST PAGE FOR NOW.  MR. MORELAND, GO

22  TO THE FIRST PAGE, THE COVER PAGE.  THIS IS A STATUS REPORT

23  THAT WAS PERIODICALLY SUBMITTED ABOUT THE PARTS WASHER

24  DEVELOPMENT?

25  A. I BELIEVE SO.  YES.

1    Q. AND WHO PREPARED THESE GENERALLY?  DO YOU KNOW?

2    A. IT WOULD HAVE BEEN MCNALLY OR MCCLUER OR BOTH WORKING

3    TOGETHER.

4    Q. AND THEY WOULD HAVE BEEN DISTRIBUTED TO YOU, AMONG

5    OTHERS?

6    A. PRIMARILY TO ME AND SOMETIMES I WOULD DISTRIBUTE THEM TO

7    OTHERS.

8    Q. IT SAYS AGENDA FEBRUARY 16, 1994.  DOES THAT MEAN THERE

9    WAS A MEETING ON FEBRUARY 16TH?

10   A. IT WOULD APPEAR SO.

11   Q. AND YOU RECALL GETTING THIS PARTICULAR MEMO?

12   A. NO, I DON'T.

13   Q. BUT YOU DON'T DISPUTE IT IS ONE OF THE STATUS REPORTS

14   THAT WAS DONE, DO YOU, SIR?

15   A. YES.  INDEED.

16   Q. YOU ARE IN AGREEMENT IT IS ONE OF THE STATUS REPORTS?  MY

17   QUESTION IS, YOU ARE NOT DISPUTING THIS WAS A CHEMFREE

18   INTERNAL STATUS REPORT?

19   A. NO.  YES, IT AM NOT DISPUTING THIS IS AN INTERNAL REPORT.

20   YES.

21   Q. IF YOU LOOK AT PAGE BATES STAMPED CHEMFREE 152.  BLOW UP

22   THE SECOND PARAGRAPH ABOUT THE CLEANING FLUID.  YOU HAD

23   EVALUATED, A PRIOR FLUID, PRODEX?

24   A. YES.

25   Q. AND THE CONCLUSION REPORTED TO YOU IN FEBRUARY OF 1996

1    WAS THAT THE ENRETECH GREEN SOLUTION -- THAT, BY THE WAY, IS

2    REFERRING TO THE CLEANING SOLUTION ENRETECH PROVIDED WITH

3    THE BUGS IN IT.

4    A. YES.

5              MR. CAPP:  YOU SAID 1996.

6              MR. HARBIN:  EXCUSE ME.  1994.

7    BY MR. HARBIN:

8    Q. THE CONCLUSION OF THE REPORT WAS THE ENRETECH GREEN

9    SOLUTION IS HIGHLY EFFECTIVE AND REMEDIATES HYDROCARBONS,

10   THAT IS THE FLUID OF CHOICE?

11   A. CORRECT.

12   Q. AND IN FACT, IF YOU LOOK AT THE LAST PAGE, SECTION 6, AND

13   BLOW UP SECTION C.  THE PLAN THAT WAS REPORTED TO YOU WAS A

14   THAT ENRETECH WOULD PURSUE PATENTS ON THE FLUID AND THE

15   FILTERS; CORRECT?

16   A. YES.  THAT IS WHAT THIS SAYS.

17   Q. AND THAT CHEMFREE WOULD PURSUE DESIGN AND FUNCTIONAL

18   PATENTS ON THE MACHINE; CORRECT?

19   A. YES.

20   Q. BECAUSE YOUR UNDERSTANDING WAS ENRETECH HAD CREATED A

21   FUNCTIONING FLUID THAT CONTAINED SURFACTANTS AND MICROBES;

22   CORRECT?

23   A. IT DID.  YES.  IT DID IN OUR TESTING.

24   Q. SORRY?

25   A. IT DID PERFORM SO IN OUR TESTING.

1    Q. NOW, YOU THEN WENT WITH A DIFFERENT SUPPLIER, YOU DIDN'T

2    USE ENRETECH AFTER SOME POINT, YOU USED A COMBINATION OF

3    FLUID PROVIDED BY WARREN CHEMICAL CALLED SEAWASH 7?

4    A. YES.

5    Q. AND COMBINED WITH MICROBES PROVIDED BY LRC, LOUISIANA

6    REMEDIATION COMPANY?

7    A. YES.

8    Q. AND THESE WERE COMPANIES THAT HAD BEEN -- FIRST OFF,

9    WARREN CHEMICAL HAD BEEN PROVIDING CLEANING FLUID PRIOR TO

10   THEIR DEALINGS WITH CHEMFREE; CORRECT?

11   A. YES, THAT WAS THEIR BUSINESS, I BELIEVE.

12   Q. IN FACT, AND THAT IS THE SOLUTION YOU WERE USING UP TO

13   THE TIME THE PATENT APPLICATION WAS APPLIED FOR IN SEPTEMBER

14   OF 1994.  CORRECT?

15   A. YES.  THAT COMBINATION WAS DETERMINED TO BE THE MOST

16   VIABLE.

17   Q. AND JUST SO THE RECORD IS CLEAR, BECAUSE MY QUESTION IS

18   BAD, THE COMBINATION MOST VIABLE THAT CHEMFREE USED IN ITS

19   PRODUCT UNTIL THE TIME THAT THE PATENT APPLICATION WAS FILED

20   IN SEPTEMBER OF 1994 WAS THE SEAWASH 7 CLEANING FLUID FROM

21   WARREN CHEMICAL AND THE MICROBES FROM LOUISIANA REMEDIATION?

22   A. RIGHT.  AND WE USED THAT FOR QUITE SOME TIME.

23   Q. AFTER THIS?

24   A. AFTER THAT.  YES.

25   Q. SOMETIME BEGINNING IN 1995 YOU STARTED DEVELOPING YOUR

1    OWN SOLUTION; CORRECT?

2    A. WE DID.

3    Q. NOW, LET ME ASK YOU TO LOOK AT PLAINTIFF'S EXHIBIT 45.

4    DID YOU HAVE ANY DEALINGS WITH SEAWASH WHEN YOU WERE TALKING

5    TO THEM ABOUT PROVIDING FLUID?

6    A. I MET CHARLIE WARREN SOMEWHERE ALONG THE WAY.

7    Q. HAVE YOU EVER SEEN THIS DOCUMENT?

8    A. I DON'T RECALL THIS SPECIFIC DOCUMENT, NO.

9    Q. AND IS IT CORRECT THAT YOU DID NOT KNOW WHAT THE CHEMICAL

10   FORMULATION OF THE SEAWASH 7 WAS, DID YOU, SIR?

11   A. THAT IS CORRECT.

12   Q. IN FACT, WARREN CHEMICAL, THE PROVIDER OF SEAWASH 7, TOLD

13   YOU THEY CONSIDERED THEIR CHEMICAL FORMULATION TO BE

14   PROPRIETARY AND THEY WOULD NOT DISCLOSE IT TO CHEMFREE PRIOR

15   TO FILING A PATENT; IS THAT CORRECT?

16   A. THAT IS CORRECT.

17   Q. AND THEY DID NOT DISCLOSE IT TO CHEMFREE PRIOR TO FILING

18   THE THEIR PATENT?

19   A. I DON'T THINK THEY EVER DISCLOSED IT TO US.

20   Q. AND LOUISIANA REMEDIATION, THE MAKER OF THE MICROBES USED

21   LRC-1, CONSIDERED ITS PARTICULAR COMBINATION OF MICROBES AND

22   SUPPORTING NUTRIENTS TO BE PROPRIETARY; CORRECT?

23   A. I BELIEVE SO.

24   Q. AND THEY WOULD NOT -- LRC WOULD NOT DISCLOSE ITS FORMULA

25   OF MICROBES AND SUPPORTING NUTRIENTS TO CHEMFREE PRIOR TO

1    THE TIME THE PATENT APPLICATION WAS FILED, WOULD THEY?

2    A. THE ACTUALLY FORMULA AND COMBINATION, NO.  I AM SURE THEY

3    DID PUBLISH TYPES OF MICROBES THAT WERE PRESENT, BUT NOT IN

4    WHAT QUANTITIES.  BECAUSE IT WAS A MULTITUDE OF MICROBES.

5    Q. LET ME READ YOU -- YOU RECALL AN AFFIDAVIT THAT YOU

6    FILED, YOU SIGNED AND EXECUTED THAT WAS FILED IN COMBINATION

7    WITH CHEMFREE'S MOTION FOR SUMMARY JUDGMENT, SIR?

8    A. YES.

9    Q. LET ME READ YOU PARAGRAPH 13 OF YOUR SWORN AFFIDAVIT,

10   DECLARATION.  "IN 1994 LOUISIANA REMEDIATION COMPANY, MAKERS

11   OF LRC-1, CONSIDERED ITS PARTICULAR COMBINATION OF STRAINS

12   OF MICROBES AND SUPPORTING NUTRIENTS TO BE PROPRIETARY AND

13   WOULD NOT DISCLOSE IT TO CHEMFREE PRIOR TO FILING THE PATENT

14   APPLICATION."

15   A. I BELIEVE THAT IS WHAT I JUST SAID, OR WAS ATTEMPTING TO

16   SAY.  THEY TOLD US WHAT STRAINS, BUT NOT HOW THEY WERE

17   COMBINED.

18   Q. OKAY.  AND THE COMBINATION OF FLUID AND MICROBES

19   IDENTIFIED IN THE PATENT IS THE COMBINATION OF LRC AND

20   SEAWASH 7; CORRECT?

21   A. CORRECT.

22   Q. AND OTHER THAN THE ENRETECH COMBINATION OF FLUID AND

23   MICROBES, WHICH YOU DETERMINED AFTER INITIALLY THINKING IT

24   WORKED, YOU DETERMINED IT WAS INCONSISTENT.  THIS IS THE

25   ONLY COMBINATION THAT YOU DETERMINED YOU WERE COMFORTABLE

1    SELLING COMMERCIALLY AT THE TIME THE PATENT APPLICATION WAS

2    FILED; CORRECT?

3    A. CORRECT.

4    Q. AND WHAT YOU DID WAS, YOU GOT A FLUID THAT THE CONTENTS

5    OF WHICH YOU DIDN'T KNOW, AND A MICROBE FORMULA, AND MICROBE

6    COMPOSITION FROM LRC, AND YOU SENT THE COMBINATION TO A

7    TESTING LAB; CORRECT?

8    A. WE SENT IT TO TESTING LABS AND USED IT IN THE BETA TEST

9    MACHINES ALSO.

10   Q. AND THE TESTING LAB REPORTED TO YOU, BASED ON THEIR

11   TESTING CRITERIA, HOW EFFICIENT IT WAS AS A CLEANING

12   SOLUTION?

13   A. CORRECT.

14          MR. HARBIN:  THAT IS ALL I HAVE, YOUR HONOR.

15          THE COURT:  ALL RIGHT.  MR. CAPP, DO YOU HAVE ANY

16   FURTHER QUESTIONS?

17          MR. CAPP: IT CAN WAIT, YOUR HONOR.

18          THE COURT:  OKAY.  ALL RIGHT.  THANK YOU,

19   MR. MARKS.  THIS WOULD BE A GOOD TIME THEN TO RECESS FOR THE

20   DAY.  WHAT DO YOU HAVE FOR US TOMORROW, MR. CAPP?

21          MR. CAPP: YOUR HONOR, WE ONLY HAVE ONE LIVE

22   WITNESS LEFT TO CALL, AND THAT IS TOM MCNALLY, WHO IS THE

23   THIRD CO-INVENTOR THAT IS STILL EMPLOYED BY THE COMPANY.

24          AT THAT TIME I'VE GOT THREE DEPOSITIONS TO TENDER

25   OF OUT-OF-STATE WITNESSES, AND THEN THE EXPERT REPORTS OF

1   OUR EXPERT.  AND MY STAFF HAS BROUGHT TO MY ATTENTION THERE

2   WERE SOME EXHIBITS THAT I INTRODUCED DURING

3   MR. VANDEMEULEBROOCKE'S WHICH I NEGLECTED TO GET ADMITTED.

4   I ASK THE COURT TO INDULGE ME ON TRYING TO REMEDY THAT

5   BEFORE I REST MY CASE IN CHIEF.

6        THE COURT:  SURE.  AND IF YOU WILL DISCUSS THAT

7   WITH MR. HARBIN, IF HE HAS NO OBJECTION, WE WILL SIMPLY

8   ADMIT THEM, AND THEN YOU CAN REFER TO THEM IN SUBSEQUENT

9   FILINGS AND ANY FURTHER ARGUMENT.

10        WELL, I THINK YOUR IDEA FOR ME TO TAKE SOME TIME

11   TO QUICKLY REVIEW THE EXPERT DECLARATION AND PERHAPS THE

12   DEPOSITION IS A GOOD IDEA.  HOW MUCH TIME TO YOU THINK YOUR

13   LIVE TESTIMONY IS GOING TO TAKE?

14        MR. CAPP: I WOULD EXPECT THE DIRECT EXAMINATION TO

15   BE LESS THAN AN HOUR, POSSIBLY LESS THAN 30 TO 45 MINUTES.

16   I DON'T KNOW HOW LONG THEY WILL GO ON CROSS.

17        THE COURT: OKAY.  MR. SCHAETZEL, ARE YOU GOING TO

18   BE READY TO START TOMORROW AFTERNOON WITH YOUR EVIDENCE?

19        MR. SCHAETZEL:  WE CAN BE, YOUR HONOR.  WE HAD

20   AGREED, PURSUANT TO THE ORDER THAT YOUR HONOR ENTERED, THAT

21   DR. DURKEE WOULD BE ON THE STAND ON WEDNESDAY, AND SO THAT

22   IS WHAT WE HAD PLANNED FOR WEDNESDAY.

23        THE COURT:  ISN'T THAT TOMORROW?

24        MR. SCHAETZEL:  YES, SIR.  WE ARE READY FOR

25   DR. DURKEE TOMORROW, IF THAT IS YOUR QUESTION.  BUT I AM NOT

1    SURE WHERE YOU ARE GOING WHEN YOU SAY YOU WANT SOME TIME TO

2    READ --

3         THE COURT:  WELL, IF MR. CAPP IS CORRECT, AND

4    THERE IS REMAINING -- HIS PRESENTATION IS GOING TO TAKE AN

5    HOUR, I WAS THINKING I MIGHT TAKE THE REST OF THE MORNING TO

6    REVIEW THE OTHER EVIDENCE HE IS OFFERING BE ON THE PAPERS,

7    NOT LIVE, AND THEN BE READY TO START WITH YOUR WITNESS

8    TOMORROW AFTERNOON.  NOW, TELL ME WHAT THE SCHEDULING

9    PROBLEM IS WITH HIM.

10        MR. SCHAETZEL:  WITH DR. DURKEE?

11        MR. CAPP: THERE IS NO PROBLEM, YOUR HONOR.  HE

12   TOLD ME HE WANTS TO CALL DURKEE AS HIS FIRST WITNESS.  I

13   SAID I WILL MAKE SURE MR. DURKEE IS HERE AS SOON AS I REST,

14   AND AS SOON AS THE COURT INDICATES THAT YOU --

15        THE COURT:  OKAY.  WELL, THE ONLY REASON I ASKED

16   IS, IF HE HAD SOME PRIOR ENGAGEMENT THAT HE HAD TO BE AT ON

17   THURSDAY, I COULD START EARLIER WITH HIS TESTIMONY.  BUT IF

18   THERE IS NO INCONVENIENCE WITH HIM TO START EARLY TOMORROW

19   AFTERNOON, THAT SEEMS TO BE THE PROPER TIME.  NOW, IS THERE

20   ANY PROBLEM WITH THAT?

21        MR. CAPP: NO, YOUR HONOR.  HE IS IN A HOTEL ACROSS

22   THE STREET FROM BOTH OF OUR OFFICES, AND HE'S AT OUR

23   BASICALLY BECK AND CALL FOR AS SOON AS THE PARTIES ARE

24   READY, WE WILL GET HIM DOWN HERE AND GET HIM ON THE WITNESS

25   STAND.

1          THE COURT:  HOW LONG DO YOU THINK YOUR PORTION OF

2     THE CASE WILL TAKE, MR. SCHAETZEL?

3          MR. SCHAETZEL:  SORRY, YOUR HONOR?

4          THE COURT:  HOW LONG DO YOU THINK YOUR PORTION,

5     THE DEFENDANT'S PORTION, OF THE CASE WILL TAKE?

6          MR. SCHAETZEL:  WE STILL THINK TWO TO TWO AND A

7     HALF DAYS YOUR HONOR.

8          THE COURT:  SO THAT WOULD GET US THROUGH FRIDAY

9     PERHAPS.  AND THAT PUTS THE BALL BACK IN YOUR COURT,

10    MR. CAPP.  HOW LONG DO YOU THINK YOU MIGHT NEED FOR REBUTTAL

11    EVIDENCE?

12         MR. CAPP: WHEN HE RESTS, I AM GOING TO MAKE A RULE

13    52 C MOTION TO GET RID OF THE OBVIOUSNESS DEFENSE AND THE

14    INVENTORSHIP DEFENSE.  IF I PREVAIL ON THAT, THERE WON'T BE

15    IN ANY REBUTTAL CASE AT ALL.  IF THE INVENTORSHIP CASE GOES

16    OUT, WHICH WE BELIEVE IT SHOULD, MY REBUTTAL ON SECONDARY

17    CONSIDERATIONS OF NON-OBVIOUSNESS WOULD BE AN HOUR OR TWO

18    HOURS, I WOULD THINK.  BUT IF BOTH OBVIOUSNESS AND

19    INVENTORSHIP COME IN, I PURPOSELY HAVE NOT PUT ON THE LITANY

20    OF, YOU KNOW, THAT WHOLE JAMES MCCLUER SOAP OPERA FROM 1995

21    TO 2004, AND I'VE BEEN HOPING FOR YEARS TO AVOID THAT.  BUT

22    IT DOES TAKE TIME FOR ALL THREE OF THESE GENTLEMEN TO TELL

23    THEIR FULL STORY.

24         MR. HARBIN:  IF I CAN ADDRESS THAT.  THERE IS A

25    LOT OF OBVIOUS ANIMOSITY BETWEEN THOSE TWO PARTIES, AND I

1    DON'T -- I HAVEN'T SAT DOWN AND INTERVIEWED MR. MCCLUER, I

2    AM NOT GOING TO. I DON'T PLAN TO GO INTO A LITANY OF

3    HISTORY LIKE I TRIED TO AVOID FROM 1995 TO 2004. OUR ISSUE

4    IS PRE-1993 TILL BASICALLY THE TIME HE LEFT CHEMFREE. THIS

5    OTHER STUFF TO ME IS INTERESTING HISTORY, BUT NOTHING TO DO

6    WITH THIS CASE, SO I AM NOT GOING INTO ALL OF THAT. WHAT

7    DETAIL, I WANT TO BE SURE BECAUSE I MAY HAVE MISSED WHAT WE

8    SAID. WE HAVE MR. MCNALLY FIRST TOMORROW; RIGHT? MY

9    CROSS-EXAMINATION, I WILL TRY TO CAP, I TOOK AN HOUR AND A

10   HALF OR SO WITH MR. MARKS, WOULD BE THE SAME. I WILL TRY TO

11   BE A LITTLE LESS. I WANT TO BE SURE THAT WE ARE NOT -- HOW

12   LONG ARE YOU GOING TO BE ON DIRECT?

13          MR. CAPP: I AM SAYING LESS THAN THAN AN HOUR OR A

14   HALF AN HOUR. BUT IF YOU ARE TALKING HALF AN HOUR AND A

15   HALF, WE MIGHT BE UP NEXT TO LUNCH TIME BY THE TIME LIVE THE

16   TESTIMONY IS OVER. OF COURSE A LOT OF THIS IS REALLY HIS

17   CASE, WHICH HE IS JUST DOING.

18          MR. HARBIN: I CAN WAIT ON THAT. IT IS JUST

19   MR. MCNALLY'S CONVENIENCE. I CAN WAIT TO DO ANYTHING BUT

20   CROSS OF THE DIRECT, I CAN WAIT ON ALL OF IT UNTIL OUR CASE.

21          THE COURT: THAT MIGHT BE A BETTER IDEA, AND THEN

22   PRESENT ANYTHING FURTHER YOU NEED TO SUPPORT YOUR CASE IN

23   YOUR PORTION OF THE CASE. BUT I WOULD LIKE TO FINISH

24   FRIDAY, IF WE COULD. SO GIVE SOME THOUGHT TO THE REMAINDER

25   OF DEFENDANT'S CASE, AND WE MAY GO A LITTLE LATE TOMORROW

1    AND THURSDAY IF WE NEED TO GET THROUGH THAT.

2            MR. SCHAETZEL:  YOUR HONOR, ONE FURTHER SCHEDULING

3    ITEM.  WE DO HAVE MR. SCHUDEL WHO WILL NEED TO FLY OUT.  HE

4    LIVES IN SWITZERLAND.  SO THAT IS MY ONLY -- HE NEEDS TO FLY

5    OUT THURSDAY AFTERNOON.  I BELIEVE HIS PLANE IS AROUND 4:00.

6    I NEED TO DOUBLE-CHECK AND FIND OUT FROM HIM.  BUT IF THERE

7    IS NO OBJECTION, I DON'T HAVE ANY -- WE HAD THOUGHT WE WOULD

8    GET DR. DURKEE DONE ON WEDNESDAY, AND I TOLD MR. SCHUDEL

9    THURSDAY.  BUT IF IT'S APPROPRIATE WITH DR. DURKEE, IF THERE

10   IS SOME CHANCE TO ACCOMMODATE MR. SCHUDEL, I WOULD

11   APPRECIATE THAT.  WE HAD TRIED TO DO THAT IN THE SCHEDULE

12   ALREADY.  BUT IT IS VERY EXPENSIVE TO REDO A PLANE FLIGHT TO

13   SWITZERLAND.

14           THE COURT: YOU MEAN LIKE BREAK DR. DURKEE'S FOR

15   MR. SCHUDEL?

16           MR. SCHAETZEL:  IF NEED BE, WE WOULD ASK THAT

17   CONSIDERATION.

18           THE COURT:  I HAVE NO PROBLEM WITH THAT.  BUT I

19   WOULD HAVE TO HEAR --

20           MR. CAPP: SOUNDS LIKE WE SHOULD DO DR. SCHUDEL

21   FIRST.  THIS IS THE FIRST I HEARD THEY WERE GOING TO FLY

22   SOMEBODY ACROSS THE ATLANTIC.  THAT IS WHY I PLANNED ON

23   PUTTING SCHUDEL UP BY A DEPOSITION.  THIS COMES AS A

24   SURPRISE.  BUT LET'S PUT SCHUDEL UP FIRST, AND THEN GO TO

25   DR. DURKEE.  THAT SHOULDN'T INCONVENIENCE ANYBODY.

```
1            MR. SCHAETZEL:  THAT IS FINE.  WE CAN PUT
2      MR. SCHUDEL UP TOMORROW AFTERNOON, YOUR HONOR.
3            THE COURT:  AND MR. DURKEE WILL BE AVAILABLE WHEN
4      YOU GET TO HIM, ACCORDING TO MR. CAPP.
5            THE COURT:  GOOD.  I DON'T KNOW IF WE MADE ANY
6      PROGRESS WITH THAT DISCUSSION OR NOT.  AND WE WILL GO A
7      LITTLE LATE IF WE NEED TO.
8                  (HEARING ADJOURNS AT 4:37 P.M.)
9                          * * * * *
10                  REPORTER'S CERTIFICATION
11
12        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
13     FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.
14
15                          _____
16                          LORI
                            OFFICIAL COURT REPORTER
                            UNITED STATES DISTRICT COURT
17                          NORTHERN DISTRICT OF GEORGIA
18
19                          DATE:  AUGUST 10, 2009
20
21
22
23
24
25
```