1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION

3

CHEMFREE CORPORATION,          )
4                              )
                 PLAINTIFF,    )
5                              )         CIVIL ACTION
          VS.                  )         FILE NO. 1:04-CV-3711-JTC
6                              )
                               )         ATLANTA, GA
7    J. WALTER INC.; J. WALTER )         JULY 15, 2009
     COMPANY, LTD.,            )
8                              )
                 DEFENDANT.    )
9    _____)

10

11                     VOLUME 3

12              PAGES 352 THROUGH 551

13        TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
            BEFORE THE HONORABLE JACK T. CAMP
14             UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16       FOR THE PLAINTIFF:        WILLIAM ARTHUR CAPP
                                   LUKE ANDERSON
17                                 KLAUS MELARTI
                                   ATTORNEYS AT LAW
18
         FOR THE DEFENDANTS:       STEVE SCHAETZEL
19                                 JOHN HARBIN
                                   DAVID MORELAND
20                                 ANTHONY ASKEW
                                   ATTORNEYS AT LAW
21

22   LORI BURGESS, OFFICIAL COURT REPORTER
     (404) 215-1528
23

24   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED BY CAT.
25

## INDEX OF EXAMINATIONS

WITNESS NAME                                                    PAGE
THOMAS MCNALLY
    DIRECT BY MR. MELARTI      ............................................. 354
    CROSS BY MR. HARBIN        ............................................. 384
    REDIRECT BY MR. MELARTI    ............................................. 457
WARNER SCHUDLE
    DIRECT BY MR. SCHAETZEL    ............................................. 465
    CROSS BY MR ANDERSON       ............................................. 489
    REDIRECT BY MR. SCHAETZEL  ............................................. 499
JOHN BEST DURKEE
    DIRECT BY MR. SCHAETZEL    ............................................. 501

1          THE COURT:  ALL RIGHT.  WHERE ARE WE, MR.

2     ANDERSON?

3          MR. ANDERSON:  THE PLAINTIFF IS READY TO CALL OUR

4     NEXT WITNESS, MR. TOM MCNALLY.  BEFORE WE ASK MR. MCNALLY TO

5     COME TO THE STAND, I WOULD SIMPLY LIKE TO DRAW THE COURT'S

6     ATTENTION TO A BENCH BRIEF THAT PLAINTIFFS FILED THIS

7     MORNING, DOCKET NO. 590.  IT RELATES TO THE RELEVANCY

8     OBJECTION THAT YOUR HONOR HEARD YESTERDAY ABOUT COMMERCIAL

9     SUCCESS EVIDENCE AND THE LACK OF COMMERCIAL SUCCESS AS IT

10    RELATES TO WHAT THE DEFENDANTS ARE SEEKING TO PUT EVIDENCE

11    IN ON.  IF YOUR HONOR WOULD LIKE, I DO HAVE A COPY FOR THE

12    COURT.  I KNOW THAT IT IS ALSO ON ECF.

13         THE COURT:  YEAH.  LET ME HAVE A COPY IF YOU HAVE

14    AN EXTRA ONE.

15         MR. ANDERSON:  I DO, YOUR HONOR, AND WE HAVE ALSO

16    PROVIDED A COPY TO DEFENDANT'S COUNSEL AS WELL.  MAY I

17    APPROACH, SIR?

18         THE COURT:  YES.  ALL RIGHT.  CALL YOUR WITNESS,

19    MR. ANDERSON.

20         MR. ANDERSON:  YES, SIR.  MR. TOM MCNALLY.

21

22                    THOMAS MCNALLY

23                  PLAINTIFF'S WITNESS

24                       SWORN

25                  DIRECT EXAMINATION

1   BY MR. MELARTI:

2   A. THOMAS WILLIAM MCNALLY.  M-C-N-A-L-L-Y.

3   Q. GOOD MORNING, MR. MCNALLY.

4   A. GOOD MORNING.

5   Q. WHERE DO YOU LIVE?

6   A. IN NORCROSS, GEORGIA.

7   Q. AND ARE YOU CURRENTLY EMPLOYED?

8   A. YES, I AM.

9   Q. WHERE ARE YOU EMPLOYED?

10  A. AT CHEMFREE CORPORATION.

11  Q. AND WHAT IS YOUR CURRENT POSITION?

12  A. I AM A VICE-PRESIDENT, GENERAL MANAGER AND DIRECTOR OF

13  CHEMFREE CORPORATION.

14  Q. OKAY.  ARE YOU A CO-INVENTOR ON THE PATENTS IN SUIT IN

15  THIS MATTER?

16  A. YES, I AM.

17  Q. AND WHAT DO YOU CONSIDER TO BE YOUR CONTRIBUTIONS TO THE

18  PATENTS IN SUIT?

19  A. I CONSIDER MY CONTRIBUTIONS TO BE THE LEVEL SENSOR

20  WORKING IN CONCERT WITH A THERMOSTAT, THE HEATER, AND THE

21  ADDITION OF MICROBES TO A FLOWING STREAM OF FLUID.

22  Q. WHEN DID YOU START WORKING WITH CHEMFREE?

23  A. IN 1993.

24  Q. AND FROM THE TIME THAT YOU STARTED WORKING WITH CHEMFREE,

25  WERE YOU INVOLVED IN THE CONSTRUCTION OF PROTOTYPES?

1    A. YES, I WAS.

2    Q. AND WERE YOU ALSO INVOLVED IN THE PLACEMENT OF PROTOTYPES

3    IN THE FIELD?

4    A. YES, I WAS.

5    Q. AS OF THE END OF MARCH OF 1994, COULD YOU DESCRIBE THE

6    FEATURES THAT WERE INCORPORATED INTO CHEMFREE'S PROTOTYPES?

7    BY THE END OF MARCH OF 1994, WE HAD THE TIERED BASIN, WE HAD

8    THE FILTER RESTING ON A LAYER OF THE TIERED BASIN, WE HAD

9    THE LEVEL SENSOR SWITCH, WE HAD HEAT, WE HAD THE THERMOSTAT

10   AND WE HAD MICROBES FLOWING IN THE FLUID.

11   Q. NOW, AT SOME POINT DID CHEMFREE BEGIN TO MANUFACTURE THE

12   PARTS WASHER IN QUANTITY?

13   A. YES, WE DID.

14   Q. WHEN WAS THAT?

15   A. IN APPROXIMATELY SEPTEMBER OF 1994 WE PLACED OUR FIRST

16   ORDER FOR 100 PIECES FROM A MOLDER AND BUILT THE MACHINES

17   OUT FROM THERE.

18   Q. AND DID YOU ADOPT A NAME FOR THIS?

19   A. WE ADOPTED THE NAME SMART WASHER.

20   Q. AND HAVE YOU OBTAINED TRADEMARK PROTECTION FOR THAT?

21   A. YES, WE HAVE.

22   Q. NOW, AFTER THE PATENT APPLICATION WAS FILED, WOULD YOU

23   PLEASE DESCRIBE SOME OF THE EFFORTS THAT YOU WENT THROUGH IN

24   ORDER TO DEVELOP DISTRIBUTION CHANNELS FOR THE PARTS WASHER.

25   A. WE EXAMINED THE PARTS WASHER MARKET AND DETERMINED THAT

1    THERE WERE SEVERAL CHANNELS THROUGH THE AUTOMOTIVE INDUSTRY,

2    THROUGH INDUSTRIAL CHANNELS AND THROUGH THE U.S. GOVERNMENT,

3    SO WE BEGAN SEARCHING FOR DISTRIBUTION.

4    Q. AND DID YOU FORM A RELATIONSHIP WITH A COMPANY CALLED

5    GRAY MILLS?

6    A. YES, WE DID.

7    Q. IF YOU WOULD PLEASE DESCRIBE THE BUSINESS OF GRAY MILLS.

8    A. GRAY MILLS IS A MANUFACTURER, DISTRIBUTOR, MARKETER OF

9    INDUSTRIAL PUMPS AND PARTS WASHERS.

10   Q. AND HOW DID IT COME ABOUT THAT YOU PURSUED A RELATIONSHIP

11   WITH GRAY MILLS?

12   A. WE IDENTIFIED GRAY MILLS AS A COMPANY THAT HAD

13   DISTRIBUTION IN THE PARTS WASHER MARKET THAT WE WERE

14   INTERESTED IN, SO WE CONTACTED THEM.

15   Q. AND WHEN DID THE RELATIONSHIP WITH GRAY MILLS BEGIN?

16   A. WE BEGAN TALKING TO THEM IN LATE 1996, EARLY 1997.

17   SOMEWHERE IN THAT TIME FRAME.

18   Q. AND HOW LONG DID IT LAST?

19   A. THE RELATIONSHIP ENDED IN 1999.

20   Q. IF YOU WOULD DESCRIBE TO THE COURT THE TYPES OF BUSINESS

21   TRANSACTIONS THAT YOU DID WITH GRAY MILLS.

22   A. WE -- INITIALLY WE SOLD THEM PARTS CLEANERS, FILTERS AND

23   FLUIDS, EVENTUALLY WE ENTERED INTO A PRIVATE LABEL

24   RELATIONSHIP WITH GRAY MILLS.

25   Q. MR. MCNALLY, IN FRONT OF YOU ARE EXHIBITS IN A BINDER.

1    AND IF YOU WOULD, TURN TO PLAINTIFF'S EXHIBIT 313.

2    A. OKAY.

3    Q. DO YOU RECOGNIZE THIS DOCUMENT?

4    A. YES, I DO.

5    Q. AND IF YOU WOULD, PLEASE DESCRIBE WHAT IT IS.

6    A. IT IS A PHOTOGRAPH OF A MACHINE CALLED A BIOMATIC BIO

7    777.

8    Q. DO YOU SEE THERE ARE MULTIPLE PAGES IN THIS DOCUMENT?

9    A. YES.

10   Q. IF YOU WOULD, CAN YOU GO THROUGH EACH OF THE PAGES?

11   A. THE FIRST, PAGE 1 OF 13, IS A PICTURE FROM THE FRONT OF A

12   GRAY MILLS BIOMATIC BIO 177.  THE SECOND PAGE OF 13,

13   WARNINGS AND CAUTIONS, THAT IT'S A SIGN THAT IS ATTACHED TO

14   THE MACHINE.  THE NEXT PAGE SHOWS THE TOP OF THE MACHINE

15   LOOKING DOWN, IT SHOWS THE SPIGOTS THAT LEAD TO THE BRUSH,

16   IT SHOWS THE SINK, IT SHOWS THE FALSE BOTTOM.  THE BOTTOM OF

17   THIS SHEET ON PAGE 3, A PICTURE OF THE MSDS, THE MATERIAL

18   SAFETY DATA SHEET THAT WAS INCORPORATED INTO EVERY FILTER

19   THAT WE SHIPPED TO GRAY MILLS.  THE NEXT PICTURE IS A

20   PICTURE OF THE TIERED BASIN OF THE SINK.  ITEM 4 IS THE

21   TIER.  ITEM 5, I THINK, IS MEANT TO DEPICT THE STAINLESS

22   STEEL, WHAT WE CALL FILTER SUPPORT GRID.  ITEM 6 IS THE

23   DRAIN HOLE.  THAT'S -- THE NEXT PICTURE IS A PICTURE OF WHAT

24   WE CALL THE FILTER SUPPORT GRID.  THE NEXT PICTURE IS ONE

25   LOOKING DOWN INTO THE MACHINE THAT SHOWS -- WELL, ITEM 8 IS

1   THE PUMP, ITEM 7 IS THE HEATER.  THE NEXT, PAGE 7, SHOWS A

2   COUPLE OF PICTURES OF THE PUMP.  THE NEXT PICTURE SHOWS THE

3   BOTTOM OF -- THE INTERIOR BOTTOM OF THE 777.  ITEM 12 IS THE

4   LEVEL SENSOR SWITCH.  ITEM 9 IS THE LEG OF THE HEATER.

5   ITEMS 10 AND 11 ARE THERMOSTATS.  THE NEXT PAGE, ITEM 13

6   FOCUSES ON THE LEVEL SENSOR SWITCH AND THE THERMOSTATS AT

7   THE BOTTOM.  ITEM 14 IS THE BOTTOM OF THE TIERED SINK AND

8   THAT IS THE DRAIN HOLE.  ITEM 15 IS THE DRAIN HOLE.  PAGE 11

9   IS THE SERIAL NUMBER LABEL SHOWING THAT IT WAS MANUFACTURED

10  IN MARCH OF 1998.  THAT IS A SERIAL NUMBER LABEL ATTACHED BY

11  CHEMFREE CORPORATION.  ITEM NUMBER -- EXCUSE ME, PAGE 12, IS

12  THE SIDE OF THE MACHINE SHOWING THE CONTROL BOX IN THE UPPER

13  RIGHT-HAND CORNER AND THE BRUSH STILL IN ITS PLASTIC BAG,

14  AND THAT IS A FRONT VIEW OF THE SAME.

15  Q. NOW, DO YOU RECOGNIZE EACH AND EVERY OF THESE PHOTOGRAPHS

16  IN PLAINTIFF'S EXHIBIT 313?

17  A. YES, I DO.

18  Q. AND DO YOU RECOGNIZE THEM TO BE TRUE AND ACCURATE

19  DESCRIPTIONS OF ASPECTS OF THE BIO 777 MACHINE THAT CHEMFREE

20  MANUFACTURED?

21  A. YES, THEY DO.

22          MR. MELARTI:  TENDER THE EXHIBIT INTO EVIDENCE,

23  YOUR HONOR.

24          THE COURT:  ANY OBJECTION?

25          MR. HARBIN:  NO, YOUR HONOR.

1          THE COURT:  ADMITTED.

2    BY MR. MELARTI:

3    Q. MR. MCNALLY, IF YOU WOULD TURN NEXT TO WHAT HAS BEEN

4    MARKED AS PLAINTIFF'S EXHIBIT 311.

5    A. YES.

6    Q. OKAY.  DO YOU RECOGNIZE WHAT IS SHOWN IN THIS DOCUMENT?

7    A. THIS IS THE LABEL THAT CHEMFREE CORPORATION PRINTED FOR

8    THE BIO FL 777, WHICH IS THE NAME GIVEN BY GRAY MILLS FOR

9    THE FILTER USED IN OUR DEVICE.  AND IT WAS IN EVERY PACKAGE

10   OF FILTER, EACH INDIVIDUAL -- EVERY INDIVIDUAL FILTER THAT

11   WE SHIPPED TO GRAY MILLS.

12   Q. DO YOU SEE THE SECOND PAGE OF THIS DOCUMENT?

13   A. YES.

14   Q. IF YOU WOULD PLEASE DESCRIBE THAT.

15   A. THIS IS THE MATERIAL SAFETY DATA SHEET.  WHEN YOU SHIP A

16   PRODUCT SUCH AS A BIOFILTER, OSHA REQUIRES YOU TO HAVE SOME

17   SORT OF INFORMATION ABOUT THE SAFETY OF THAT DEVICE.

18   Q. AND DO YOU RECOGNIZE THESE IMAGES TO BE TRUE AND ACCURATE

19   REPRODUCTIONS OF THE LABELS THAT WERE MADE AT THE TIME?

20   A. YES.  THEY ARE TRUE AND ACCURATE IMAGES.

21          MR. MELARTI:  OFFER IT INTO EVIDENCE.

22          MR. HARBIN:  NO OBJECTION, JUDGE.

23          THE COURT:  ADMITTED.

24   BY MR. MELARTI:

25   Q. NOW, WHY WAS THIS CALLED A BIOFILTER, THE FILTER YOU

1   TALKED ABOUT?

2   A. IT WAS CALLED A BIOFILTER BECAUSE IT WAS A FILTER

3   MANUFACTURED BY CHEMFREE CORPORATION AND IT CONTAINED

4   FREEZE -- DRIED MICROBES.  IT WAS PART OF GRAY MILLS'S

5   PRIVATE LABEL OPERATION.

6   Q. AND HOW DID YOU DELIVER THOSE FILTERS TO GRAY MILLS?

7   A. THOSE FILTERS WERE INDIVIDUALLY WRAPPED, INDIVIDUALLY

8   LABELED, INCLUDED IN MSDS IN PLASTIC BAGS AND THEN SHIPPED

9   IN GROUPS OF 12, I THINK IT WAS, TO GRAY MILLS.

10  Q. IF YOU WOULD, ON THE FIRST PAGE OF PLAINTIFF'S EXHIBIT

11  311, THERE IS A REFERENCE RIGHT UNDER THE BIOFILTER TITLE

12  TO, QUOTE, "USING CHEMFREE PATENT BIOREMEDIATION

13  TECHNOLOGY."  DO YOU SEE THAT, SIR?

14  A. YES, I DO.

15  Q. DO YOU HAVE -- OVER WHAT TIME PERIOD WAS THAT PRINTED ON

16  LABELS THAT WERE INCLUDED IN THE BIOFILTERS THAT WERE SOLD

17  TO GRAY MILLS?

18  A. EACH AND EVERY PIECE OF EQUIPMENT CONSUMABLE AND

19  CONSUMABLE THAT WE SHIPPED TO GRAY MILLS HAD THAT LEGEND ON

20  IT.  IT WAS A REQUIREMENT OF OUR AGREEMENT.

21  Q. AND THERE IS A MENTION AT THE BOTTOM OF THE FIRST PAGE OF

22  PLAINTIFF'S EXHIBIT 311 TO BIOTENE FLUID?

23  A. I SEE THAT.

24  Q. WHAT IS BIOTENE FLUID?

25  A. BIOTENE WAS THE NAME THAT GRAY MILLS GAVE TO OUR SW1

1  PRODUCT, WHICH WAS, ESSENTIALLY, SEAWASH 7.

2  Q. AND WHERE WAS THAT PACKAGED AND LABEL?

3  A. THAT WAS PACKAGED AND LABELED IN OUR FACTORY IN NORCROSS,

4  GEORGIA.

5  Q. DID IT ALSO CONTAIN SIMILAR MENTIONS TO CHEMFREE PATENTED

6  BIOREMEDIATION TECHNOLOGY?

7  A. YES, IT DID.  AS I PREVIOUSLY TESTIFIED, THAT WAS A

8  REQUIREMENT OF ALL OF THE PRODUCTS THAT WE SHIPPED TO GRAY

9  MILLS.

10  Q. AND OVER WHAT TIME PERIOD WAS THAT PRINTED ON LABELS THAT

11  WERE INCLUDED ON BIOTENE FLUID?

12  A. FROM APPROXIMATELY 1997 UNTIL THE RELATIONSHIP ENDED IN

13  LATE 1999.

14  Q. OKAY.  SO MR. MCNALLY, IF YOU WOULD, TURN NEXT TO

15  PLAINTIFF'S EXHIBIT 309.  DO YOU RECOGNIZE THIS DOCUMENT?

16  A. YES, I DO.

17  Q. AND WHAT DO YOU RECOGNIZE THE DOCUMENT TO BE?

18  A. THIS IS A GRAY MILLS MARKETING PIECE FOR THE BIOMATIC

19  BIO 777 HEATED BIOREMEDIATING PARTS CLEANER, WHICH WAS THE

20  PRIVATE LABEL NAME FOR THE CHEMFREE SMART WASHER.

21          MR. MELARTI:  ENTER INTO EVIDENCE.

22          THE COURT:  ANY OBJECTION?

23          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

24          THE COURT:  ADMITTED.

25  BY MR. MELARTI:

1  Q. DID YOU HAVE AN UNDERSTANDING WITH GRAY MILLS REGARDING

2  THE CONTENT OF PRINTED MARKETING MATERIALS FOR PRODUCTS THAT

3  WERE PRIVATE LABELED, MANUFACTURED BY CHEMFREE?

4  A. YES.  PART OF OUR AGREEMENT WAS THAT THEY WERE NOT TO

5  PUBLISH ANYTHING UNTIL IT HAD BEEN REVIEWED BY CHEMFREE

6  CORPORATION.

7  Q. IF YOU WOULD, TURN NEXT TO PLAINTIFF'S EXHIBIT 310.

8  A. YES.

9  Q. DO YOU RECOGNIZE THIS DOCUMENT?

10 A. YES.  THIS IS A FAX FROM GRAY MILLS CORPORATION TO

11 MYSELF.

12 Q. AND DO YOU RECOGNIZE THE SUBSTANCE OF THE FAX?

13 A. YES.  GRAY MILLS HAD AN INDIVIDUAL BY THE NAME OF PEG

14 ESPOSITO, WHO DID THEIR MARKETING WRITE-UPS.  THAT WAS THE

15 COVER LETTER FOR A PROOF OF THE PREVIOUS DOCUMENT THAT PEG

16 ESPOSITO SENT TO ME TO APPROVE.

17 Q. AND DO YOU RECOGNIZE THIS TO BE A TRUE AND ACCURATE COPY

18 OF THAT FAX?

19 A. YES, IT IS.

20         MR. MELARTI:  ENTER INTO EVIDENCE.

21         MR. HARBIN:  NO OBJECTION, YOUR HONOR.

22         THE COURT:  ADMITTED.

23 BY MR. MELARTI:

24 Q. SO DID GRAY MILLS TYPICALLY SEND PROOFS TO CHEMFREE FOR

25 REVIEW AND TO APPROVE THE RESPECTIVE PRIVATE LABEL PRODUCTS?

1   A. YES, THEY DID.

2   Q. AND DID CHEMFREE EVER APPROVE PROOFS THAT DID NOT CONTAIN

3   A PATENT PENDING NOTICE?

4   A. WE DID NOT APPROVE PROOFS THAT DID NOT CONTAIN THE PATENT

5   PENDING NOTICE.

6   Q. NOW, BESIDE THE BIO 777 WITH THE ACCOMPANYING BIOFILTER

7   AND BIOTENE FLUID, DID CHEMFREE EVER SELL ANY OTHER PRODUCTS

8   TO GRAY MILLS?

9   A. I AM SORRY, WILL YOU REPEAT THE QUESTION?

10  Q. BESIDES THE 777 FILTERS AND FLUID, DID CHEMFREE SELL ANY

11  OTHER PRODUCTS TO GRAY MILLS?

12  A. NO.  WE DID NOT.

13  Q. MR. MCNALLY, IF YOU WOULD TURN TO PLAINTIFF'S EXHIBIT

14  137.

15  A. YES.

16  Q. CAN YOU PLEASE DESCRIBE THIS DOCUMENT?

17  A. THIS IS A GRAY MILLS MARKETING PIECE FOR A DEVICE CALLED

18  A GRAY MILLS BIOMATIC.

19  Q. AND ARE YOU FAMILIAR WITH THIS PRODUCT?

20  A. YES, I AM VERY FAMILIAR WITH THIS PRODUCT.

21  Q. AND HAVE YOU SEEN THIS DOCUMENT BEFORE?

22  A. YES, I HAVE.

23  Q. AND DOES THIS APPEAR TO BE A TRUE AND ACCURATE COPY OF

24  THE MARKETING PIECE YOU HAVE SEEN?

25  A. YES, IT DOES APPEAR TO BE A TRUE AN ACCURATE COPY.

1               MR. MELARTI:  TENDER INTO EVIDENCE, YOUR HONOR.

2               THE COURT:  MR. HARBIN, ANY OBJECTION?

3               MR. HARBIN:  NO, YOUR HONOR.

4               THE COURT:  ADMITTED.

5     BY MR. MELARTI:

6     Q. HOW IS IT THAT YOU ARE FAMILIAR WITH THIS PRODUCT?

7     A. WE HELPED GRAY MILLS MAKE IT.

8     Q. NOW, DID GRAY MILLS ALREADY HAVE THE BIO 436 MODEL ON THE

9     MARKET WHEN CHEMFREE BEGAN THIS RELATIONSHIP WITH GRAY

10    MILLS?

11    A. THEY DID NOT.  GRAY MILLS HAD A MACHINE CALLED A DH 436

12    THAT WAS DESIGNED FOR USE WITH SOLVENTS.

13    Q. IF YOU WOULD, TURN TO THE SECOND PAGE OF PLAINTIFF'S

14    EXHIBIT 137.

15    A. YES.

16    Q. DO YOU SEE A REFERENCE TO BIOTENE FLUID AND A REFERENCE

17    TO FILTERS?

18    A. YES, I DO.

19    Q. DID CHEMFREE PRIVATE LABEL THE BIOFILTER AND THE BIOTENE

20    FLUID FOR GRAY MILLS THAT ARE SHOWN ON THIS PAGE?

21    A. YES, WE DID.

22    Q. YOU MENTIONED A MOMENT AGO THE DH 436 PRODUCTS?

23    A. YES.

24    Q. OKAY.  COULD YOU PLEASE DESCRIBE YOUR EXPERIENCE WITH

25    THAT PARTICULAR PRODUCT?

1   A. THE DH 436 WAS A PRODUCT MANUFACTURED BY GRAY MILLS

2   CORPORATION, HAD A DISTINCTIVE SHAPE THAT IN THE INDUSTRY WE

3   CALL THE ELEPHANT FOOT.  BUT THE DH 436 ORIGINALLY HAD A

4   PUMP AND THAT WAS ABOUT -- AND SPIGOTS, BUT THAT WAS ABOUT

5   IT.  IT WAS DESIGNED FOR USE WITH SOLVENTS.

6   Q. WOULD IT HAVE WORKED WITH CHEMFREE'S BIOTIN FLUID?

7   A. IT WOULD NOT HAVE.

8   Q. WHAT FEATURES WERE MISSING?

9   A. WE WORKED -- THE FEATURES THAT WERE MISSING WERE HEATER,

10  LEVEL SENSOR SWITCH, AND THE FLUID.

11  Q. AND WAS CHEMFREE ABLE TO HELP GRAY MILLS REMEDY THESE?

12  A. YES, WE WERE.

13  Q. WERE YOU INVOLVED IN THAT WORK?

14  A. I WAS DIRECTLY INVOLVED IN ADVISING GRAY MILLS ABOUT THE

15  SELECTION OF HEATERS, THE SELECTION OF MISCELLANEOUS LEVEL

16  SENSING DEVICES, THERMOSTATS, SO ON AND SO FORTH, AND OF

17  COURSE WE PROVIDED THE FLUID TO THEM.  AND THE FILTERS.

18  Q. SO WOULD YOU SAY THAT YOU ARE INTIMATELY FAMILIAR WITH

19  THE GRAY MILLS PRODUCT?

20  A. YES, I AM INTIMATELY FAMILIAR WITH THE GRAY MILLS

21  PRODUCT.

22  Q. IF YOU WOULD, SIR, TURN TO PAGE 320, WHICH IS AT THE BACK

23  OF YOUR BINDER.  AND IF YOU WOULD TAKE A MOMENT AND GO

24  THROUGH THOSE AND SEE IF YOU RECOGNIZE THEM.

25  A. I DO RECOGNIZE THESE IMAGES.

1    Q. AND WHAT DO YOU RECOGNIZE THE IMAGES TO SHOW?

2    A. THE IMAGES SHOW A GRAY MILLS BIOMATIC MACHINE, WHICH THEY

3    CAME TO CALL THE BIO 436, WHICH INCORPORATES THE

4    IMPROVEMENTS THAT WE HELPED THEM MAKE.

5    Q. AND DO THESE PHOTOGRAPHS FAIRLY AND ACCURATELY REFLECT

6    THE FEATURES OF THE BIO 436 MODEL?

7    A. YES, THEY DO.

8         MR. MELARTI:  TENDER INTO EVIDENCE, YOUR HONOR.

9         MR. HARBIN:   NO OBJECTION, YOUR HONOR.

10        THE COURT:  ADMITTED.

11   BY MR. MELARTI:

12   Q. VERY QUICKLY, MR. MCNALLY, IF YOU WOULD, WOULD YOU PLEASE

13   GO THROUGH THIS EXHIBIT AND IDENTIFY WHAT IS SHOWN IN THE

14   IMAGES?

15   A. THE FIRST IMAGES, THE FULL FRONTAL VIEW, IF YOU WILL, OF

16   THE GRAY MILLS BIOMATIC.  THE NEXT IMAGE SHOWS ON THE TOP

17   THE INSTRUCTIONS THAT WERE ON THE INSIDE OF THE LID OF THE

18   BIOFILTER 436.  SIMILARLY, THE YELLOW LABEL IS WARNINGS

19   ASSOCIATED WITH THAT.  THE NEXT PICTURE SHOWS GRAY MILLS

20   BIOMATIC WITH THE TOP DOWN.  THE NEXT TWO ARE, I SUPPOSE,

21   PURPORTED TO SHOW, DO SHOW, THE CONTROL BOX THAT IS SLUNG

22   DOWN TO THE RIGHT OF THE GRAY MILLS BIOMATIC.  THE NEXT

23   PICTURE SHOWS THE CANISTER FILTER THAT WAS ADDED TO THE BACK

24   OF THE BIO 436, AND THE CONTROL UNIT TO THE LEFT, ITEM NO.

25   2.  THE NEXT PHOTOGRAPH IS A CLOSER VIEW OF BOTH OF THOSE

1    ITEMS, THE CONTROL BOX AND THE CANISTER FILTER.  THE NEXT

2    PICTURE SHOWS THE MECHANICAL BRUSH, THE INSIDE OF THE SINK,

3    AND THE DRAIN, ITEM NO. 3.  ITEM NO. 7 IS THE COURSE FILTER

4    THAT FITS OVER THE TOP OF THE INSERT FILTER, WHICH IS IN THE

5    DRAIN HOLE AND ITEM NO. 6.  ITEM NO. 8 IS WHAT WE CALL THE

6    INSERT FILTER.  ITEM NO. 9 IS THE SPONGE FILTER.  ITEM NO.

7    10 SHOWS -- EXCUSE ME, ITEM NO. 11 IS THE INSERT FILTER

8    REMOVED FROM THE SINK.  ITEM NO. 10 IS THE DRAIN HOLE.  ITEM

9    NO. 12 IS THE SAME DRAIN HOLE.  ITEM NO. 13 IS AN IMAGE OF

10   THE SPONGE FILTER.  ITEM NO. 14 IS THE INSERT FILTER THAT

11   FITS IN THE DRAIN.  THE NEXT TWO PICTURES SHOW THE

12   ATTACHMENT OF THE LEVEL SENSOR SWITCH, THE HEATER, THE

13   THERMISTORS, THE PUMP AND THE OUTWARD FLOW UPWARD FROM THE

14   PUMP.  ITEM NO. 15 IS THE LEVEL SENSOR SWITCH.  ITEM NO. 16

15   IS THE HEATER COIL.  ITEM NO. 17 IS THE PUMP.  AND THEN

16   THERE ARE TWO VIEWS OF THE PUMP RIGHT UNDERNEATH THAT.  THE

17   NEXT TWO PICTURES ARE VIRTUALLY IDENTICAL, SHOWING THE LEVEL

18   SENSOR SWITCH, THE HEATER.  THE BOTTOM PICTURE HERE MORE

19   CLEARLY SHOWS THE THERMOSTAT ATTACHED TO THE DOWNWARD LEG OF

20   THE HEATER COIL.  THE NEXT TWO PICTURES, THE TOP ONE IS

21   PRETTY MUCH THE SAME AS THE ONE BEFORE THAT.  THE BOTTOM ONE

22   SHOWS THE LEVEL SENSOR SWITCH, ITEM 18, AND ITEM 19 SHOWS

23   THE THERMOSTAT ATTACHED TO THE DOWNWARD LEG OF THE HEATER

24   COIL.  THAT'S IT.

25   Q. NOW, IN CONNECTION WITH YOUR WORK ON MODIFYING THE DH 436

1    GRAY MILLS PRODUCT AND CREATING THE BIO 436 MODEL, DID YOU

2    COME TO OBSERVE THE OPERATION OF THE PARTS WASHER?

3    A. YES, I DID.

4    Q. IF YOU WOULD, CAN YOU BRIEFLY DESCRIBE THE FLOW OF

5    CLEANING FLUID THROUGH THE BIO 436 MODEL?

6    A. THE CLEANING FLUID IS HEATED IN THE BOTTOM OF THE TANK

7    WHEN ONE TURNS THE PUMP ON.  THE FLUID FLOWS UP OUT OF THE

8    PUMP, INTO THE DISTRIBUTION POINT AT THE HEAD OF THE BACK OF

9    THE SINK.  IT THEN IS DISTRIBUTED THROUGH EITHER A SPIGOT OR

10    A BRUSH OR BOTH.  IT WASHES OVER THE PART TO BE CLEANED, SO

11    TO SPEAK.  THE CONTAMINANTS ARE WASHED OFF THE PART AND THEN

12    THEY ARE CONTAINED WITH THE FLUID AND THEY GO DOWN THROUGH

13    THE MISCELLANEOUS FILTERS BACK INTO THE HOLDING TANK.

14    EXCUSE ME, I LEFT OUT ON THE UPWARD LINK ON THE PUMP, THE

15    FLUID ACTUALLY FLOWS THROUGH THE CANISTER FILTER INTO THE

16    BACK OF THE DISTRIBUTION POINT.

17    Q. AND DID YOU MAKE ANY OBSERVATIONS REGARDING ANY

18    PARTICULATES THAT MAY HAVE BEEN INTRODUCED INTO THE CLEANING

19    FLUID?

20    A. THE PARTICULATES WERE GENERALLY TRAPPED IN THE

21    MISCELLANEOUS FILTERS.

22    Q. NOW, THERE HAS BEEN TESTIMONY IN THIS CASE CONCERNING THE

23    USE OF AN UPSTREAM CANISTER FILTER THAT WOULD HAVE BEEN

24    MOUNTED TO THE SIDE OF THE PARTS WASHER.

25    A. YES, SIR.

1    Q. LET'S TURN TO EXHIBIT 137.  IF YOU WILL LOOK TO THE

2    SECOND PAGE OF THIS EXHIBIT.  IF YOU LOOK TO THE MIDDLE OF

3    THE PAGE.  WHAT IS THAT IN THE MIDDLE OF THE PAGE?

4    A. THAT IS THE CANISTER THAT HOLDS THE CANISTER FILTER.  THE

5    FILTER ITSELF IS THE ROUND OBJECT IN THE BOTTOM LEFT-HAND

6    CORNER.

7    Q. OKAY.  DO YOU KNOW IF THE BIO 436 MODEL OF LATE 1990'S

8    WOULD HAVE HAD A CANISTER MOUNTED AS AN UPSTREAM FILTER?

9    A. THE BIO 436 DID HAVE A CANISTER MOUNTED FILTER.

10   Q. AND WHO MANUFACTURED THE FILTER ELEMENTS THAT WERE

11   INSERTED?

12   A. THE CORE ELEMENT WAS AVAILABLE COMMERCIALLY BUT THEN

13   CHEMFREE ADDED A WRAP OF POLYESTER THAT INCLUDED

14   FREEZE-DRIED MICROBES.

15   Q. MR. MCNALLY, NEXT LET'S TURN TO PLAINTIFF'S EXHIBIT 541.

16   IF YOU WOULD IDENTIFY THE DOCUMENT.

17   A. THIS IS AN INVOICE DATED 10-25-1999 FROM CHEMFREE

18   CORPORATION BILLING GRAY MILLS CORPORATION FOR SHIPMENTS OF

19   PRODUCT TO GRAY MILLS.

20   Q. DO YOU RECOGNIZE THIS TO BE A TRUE AND ACCURATE COPY OF

21   THAT INVOICE?

22   A. THIS IS A TRUE AND ACCURATE COPY OF THAT INVOICE.

23             MR. MELARTI:  ENTER INTO EVIDENCE.

24             MR. HARBIN:  NO OBJECTION, YOUR HONOR.

25             THE COURT:  ADMITTED.

1    BY MR. MELARTI:

2    Q. AND THE NEXT, IF YOU WOULD, MR. MCNALLY, TURN TO

3    PLAINTIFF'S EXHIBIT 544 AND IF YOU WOULD SIMILARLY, PLEASE,

4    IDENTIFY THE DOCUMENTS.

5    A. THIS IS AN INVOICE DATED JUNE 30TH OF 1999 FOR A SHIPMENT

6    OF BIOTENE PRODUCT TO GRAY MILLS CORPORATION FROM CHEMFREE

7    CORPORATION.

8    Q. AND DO YOU RECOGNIZE THIS TO BE A TRUE AND ACCURATE COPY

9    OF THAT INVOICE?

10   A. IT IS A TRUE AND ACCURATE COPY OF THAT INVOICE.

11            MR. MELARTI:  MAY I TENDER THIS INTO EVIDENCE?

12            MR. HARBIN:  NO OBJECTION.

13            THE COURT:  ADMITTED.

14   BY MR. MELARTI:

15   Q. MR. MCNALLY, DOES THIS REPRESENT -- THE SHIPMENT

16   REPRESENTED IN PLAINTIFF'S EXHIBIT 544, DOES THIS REPRESENT

17   THE LAST SHIPMENT OF BIOTENE TO GRAY MILLS?

18   A. I BELIEVE IT DOES SHOW THE LAST SHIPMENT OF BIOTENE FLUID

19   TO GRAY MILLS CORPORATION.

20   Q. AND DID THE PRODUCT THAT WAS USED TO FILL THIS PARTICULAR

21   ORDER CONTAIN CHEMFREE PATENT PENDING MARKINGS?

22   A. IT DID CONTAIN CHEMFREE PATENT PENDING MARKINGS.

23   Q. OKAY.  ARE YOU FAMILIAR WITH THE J. WALTER COMPANY?

24   A. I AM FAMILIAR WITH THE J. WALTER COMPANY.

25   Q. AND WHAT IS THE J. WALTER COMPANY?

1  A. J. WALTER CORPORATION IS A COMPANY HEADQUARTERED IN

2  CANADA THAT SPECIALIZES IN CHEMICALS AND ABRASIVES AND PARTS

3  WASHERS.

4  Q. WHEN DID YOU FIRST COME INTO CONTACT WITH J. WALTER?

5  A. I FIRST CAME INTO CONTACT WITH J. WALTER IN APPROXIMATELY

6  2001.

7  Q. AND HOW DID YOU COME ABOUT TO COME IN CONTACT WITH J.

8  WALTER?

9  A. CHEMFREE CORPORATION, IN SEARCHING OUT METHODS OF

10  DISTRIBUTION, BECAME INTERESTED IN THE CANADIAN MARKET, AND

11  WE HIRED A CONSULTANT BY THE NAME OF RON BELAIRE, AND RON

12  BELAIRE SUGGESTED THAT WALTER CORPORATION HAD MANY ENTREES

13  INTO THE INDUSTRIAL WORLD AND THEY MIGHT BE AN APPROPRIATE

14  DISTRIBUTOR FOR CHEMFREE PRODUCTS.

15  Q. AND DID ANYTHING COME OUT OF MR. BELAIRE'S SUGGESTION?

16  A. YES.  MR. BELAIRE WAS ABLE TO ARRANGE A MEETING WITH

17  OFFICERS OF J. WALTER CORPORATION IN THEIR LOCATION IN

18  MONTREAL, CANADA.

19  Q. DID YOU END UP MEETING WITH ANYONE AT J. WALTER?

20  A. YES, I MET WITH A GENTLEMAN BY THE NAME OF VERNON

21  SCHUDEL.

22  Q. AND WHEN WAS THIS?

23  A. THE MEETING WAS EARLY JUNE OF 2001.

24  Q. AND WHAT WAS THE PURPOSE OF THAT MEETING?

25  A. THE PURPOSE OF THE MEETING WAS TO INTRODUCE THE

1  TECHNOLOGY TO WALTER, TO IDENTIFY THE OPPORTUNITIES THAT WE

2  FELT WERE PRESENT FOR BIOREMEDIATION PARTS WASHER, AND TO

3  ENTERTAIN THE IDEA OF WALTER BECOMING A DISTRIBUTOR OF

4  CHEMFREE PRODUCTS.

5  Q. AND DID YOUR BUSINESS RELATIONSHIP ALSO APPEAR TO BE OF

6  INTEREST TO MR. SCHUDEL?

7  A. YES.  MR. SCHUDEL APPEARED TO BE VERY INTERESTED IN WHAT

8  WE WERE TALKING ABOUT, HE ASKED A LOT OF QUESTIONS ABOUT THE

9  TECHNOLOGY, ABOUT THE PRODUCTS THAT WE WERE SELLING AND SO

10  ON.

11  Q. NOW, AT THAT MEETING DID YOU INFORM MR. SCHUDEL ABOUT THE

12  CHEMFREE'S PATENT?

13  A. YES, WE DID.  WE MENTIONED TO MR. SCHUDEL THAT WE HAD

14  PATENTS EITHER ISSUED OR PENDING IN THE UNITED STATES,

15  CANADA.  WE WERE PURSUING A PCT PATENT IN EUROPE.  WE ALSO

16  HAD PATENTS IN CHINA -- EXCUSE ME, THAT HADN'T BEEN FILED

17  YET.  AND IN LATIN AMERICA.

18  Q. IF YOU WOULD, MR. MCNALLY, NEXT TURN TO PLAINTIFF'S

19  EXHIBIT 140, WHICH BEGINS AT THE BACK OF YOUR BINDER.

20  A. YES.  I SEE THAT.

21  Q. DO YOU RECOGNIZE THIS DOCUMENT?

22  A. YES.  THIS IS A LETTER THAT I SENT ON THE 18TH OF JUNE OF

23  2001 TO MR. WARNER SCHUDEL, SENIOR VICE-PRESIDENT OF J.

24  WALTER CORPORATION.

25  Q. DO YOU RECOGNIZE THIS TO BE A TRUE AND ACCURATE COPY OF

1   THIS LETTER?

2   A. THIS IS A TRUE AN ACCURATE COPY OF THAT LETTER.

3           MR. MELARTI:  TENDER INTO EVIDENCE.

4           MR. HARBIN:  WE OBJECT, YOUR HONOR.  WE BELIEVE IT

5   IS IRRELEVANT.

6           THE COURT:  ALL RIGHT.  OBJECTION IS NOTED BUT

7   IT'S ADMITTED.

8   BY MR. MELARTI:

9   Q. WHAT WAS THE PURPOSE OF THIS LETTER?

10  A. THE PURPOSE OF THIS LETTER WAS TO FOLLOW-UP WITH

11  MR. SCHUDEL.  AS I SAID, HE WAS EVIDENTLY -- EXCUSE ME, HE

12  APPEARED TO BE INTERESTED IN THE PRODUCT THAT WE WERE

13  TALKING ABOUT, BUT J. WALTER EXPRESSED SOME RESERVATIONS

14  ABOUT SELLING A PRODUCT THAT DIDN'T HAVE THEIR NAME ON IT.

15  SO YOU WILL NOTICE IN THE LETTER I MENTIONED THE POSSIBILITY

16  OF PRIVATE LABELING.

17  Q. DID YOU HAVE ANY FURTHER CONTACT WITH MR. SCHUDEL?

18  A. MR. SCHUDEL DID NOT DIRECTLY RESPOND TO THIS LETTER, SO I

19  CALLED HIM TO FOLLOW-UP.

20  Q. AND DID CHEMFREE AND WALTER END UP IN ANY SORT OF

21  BUSINESS RELATIONSHIP?

22  A. WE DID NOT ESTABLISH A RELATIONSHIP WITH WALTER.

23  MR. SCHUDEL TOLD ME THAT --

24          MR. HARBIN:   OBJECTION, YOUR HONOR.  I OBJECT.

25  THIS IS IRRELEVANT.

1           THE COURT:  ALL RIGHT.  THAT IS NOTED BUT

2    OVERRULED.

3           THE WITNESS:  MR. SCHUDEL INFORMED ME THAT THE J.

4    WALTER CORPORATION HAD NO INTEREST, WHATSOEVER, IN

5    BIOREMEDIATION -- BIOREMEDIATION PARTS WASHERS.  SORRY.

6    BY MR. MELARTI:

7    Q. MR. MCNALLY, IF YOU WOULD TURN NEXT TO PLAINTIFF'S

8    EXHIBIT 101, WHICH WOULD BE IN THE MIDDLE OF YOUR BINDER.

9    A. YES.  I SEE THAT.

10   Q. DO YOU RECOGNIZE THIS DOCUMENT?

11   A. THIS DOCUMENT IS A COPY OF A WALTER COMMUNITY NEWS

12   LETTER.  THAT IS WHAT I WAS LOOKING FOR.

13   Q. NOW, DO YOU RECOGNIZE WHAT IS SHOWN IN THE MIDDLE OF THE

14   PAGE A GREEN DEVICE?

15   A. YES, I DO.

16   Q. AND WHAT DO YOU RECOGNIZE IT TO BE?

17   A. IT LOOKS LIKE A GRAY MILLS 436 IN THE COLOR GREEN.

18   Q. NOW, AT THE TIME THAT YOU MET WITH MR. SCHUDEL IN CANADA,

19   WERE YOU AWARE THAT WALTER WAS ALREADY SELLING THE GRAY

20   MILLS 436 MACHINES IN EUROPE?

21   A. I WAS NOT.

22   Q. MR. MCNALLY, NEXT TURN TO PLAINTIFF'S EXHIBIT 307.  YOU

23   RECOGNIZE THIS DOCUMENT?

24   A. I RECOGNIZE THIS.

25   Q. AND WHAT DO YOU RECOGNIZE IT TO BE?

1    A. THIS IS A LETTER FROM FRANK MARKS, WHO IS THE PRESIDENT

2    OF CHEMFREE CORPORATION, DATED DECEMBER 4TH OF THE YEAR 2000

3    TO JERRY SHIELDS, WHO IS THE PRESIDENT AND THE PRINCIPAL

4    OWNER OF GRAY MILLS CORPORATION.

5    Q. DO YOU RECOGNIZE THIS TO BE A TRUE AND ACCURATE COPY OF

6    THAT LETTER?

7    A. THIS IS A TRUE AND ACCURATE COPY OF THAT LETTER.

8              MR. MELARTI:  TENDER IT INTO EVIDENCE.

9              MR. HARBIN:  NO OBJECTION, YOUR HONOR.

10             THE COURT:  ADMITTED.

11   BY MR. MELARTI:

12   Q. WHAT WAS THE SUBSTANCE OF THIS LETTER?

13   A. THIS LETTER WAS TO LET MR. SHIELDS KNOW THAT CHEMFREE

14   CORPORATION HELD PATENTS ON THE BIOREMEDIATING PARTS WASHER,

15   AND THAT CHEMFREE HAD NOT GRANTED LICENSES TO GRAY MILLS OR

16   TO OTHER THIRD PARTIES THROUGH GRAY MILLS FOR USING THAT

17   TECHNOLOGY.

18   Q. AND DID CHEMFREE GIVE GRAY MILLS PERMISSION TO CONTINUE

19   THE MANUFACTURE OF THEIR BIO 436 PRODUCT AFTER CHEMFREE'S

20   PATENTS ISSUED IN 2000?

21   A. WE DID NOT.

22   Q. IF YOU WOULD, MR. MCNALLY, NEXT TURN TO PAGE 1 EXHIBIT

23   183 AND LOOK AT IT AND IDENTIFY IT FOR THE RECORD.

24   A. I RECOGNIZE THIS AS PHOTOGRAPHS OF THE BR 100.

25   Q. OKAY.  AND AFTER LOOKING THROUGH THESE IMAGES, DO YOU

1  RECOGNIZE THEM TO BE TRUE AND ACCURATE COPIES OF DEPICTIONS

2  OF THE VARIOUS COMPONENTS OF THE BR 100?

3  A. THEY ARE TRUE AND ACCURATE IMAGES OF THE BR 200.

4          MR. MELARTI:  TENDER INTO EVIDENCE, YOUR HONOR.

5          THE COURT:  ANY OBJECTION?

6          MR. HARBIN:  I BELIEVE, YOUR HONOR, THIS IS A BR

7  100.

8          THE WITNESS:  I MEANT BR 100.

9          MR. HARBIN:  NO OBJECTION THEN.

10          THE COURT:  IT'S ADMITTED.

11  MR. MELARTI:

12  Q. MR. MCNALLY, WAS CHEMFREE AWARE THAT PRODUCT SUCH AS THE

13  ONE SHOWN IN EXHIBIT 183 WERE BEING MADE, USED ANYWHERE OR

14  SOLD IN THE UNITED STATES AT ANY TIME BEFORE CHEMFREE FILED

15  THIS LITIGATION IN 2004?

16  A. WE BECAME AWARE THAT THEY WERE SELLING THESE WHEN WALTER

17  CONTACTED CHEMFREE IN 2004.

18  Q. DID GRAY MILLS EVER APPROACH CHEMFREE ABOUT A LICENSE TO

19  TAKE THE BIO 436 WASHER -- EXCUSE ME, LET ME START OVER.

20  DID GRAY MILLS EVER APPROACH CHEMFREE ABOUT A LICENSE TO

21  MAKE THEIR BIO 436 PARTS WASHER FOR RESALE BY THE DEFENDANTS

22  IN THIS CASE?

23  A. THEY DID NOT.

24  Q. AND HAS EITHER OF THE DEFENDANTS IN THIS CASE EVER

25  APPROACHED CHEMFREE ABOUT A LICENSE TO IMPORT OR SELL THIS

1    PARTS WASHER IN THE UNITED STATES?

2    A. THEY HAVE NOT.

3    Q. WHEN DID YOU FIRST BECOME AWARE THAT WALTER WAS IMPORTING

4    BIOREMEDIATING PARTS WASHERS IN THE UNITED STATES?

5    A. IN 2004, J. WALTER CORPORATION CONTACTED THE SENIOR

6    FINANCIAL OFFICER OF INTELLIGENCE SYSTEMS CORPORATION, WHICH

7    IS THE OWNER OF CHEMFREE CORPORATION, TO INQUIRE ABOUT THE

8    POSSIBILITY OF AN ACQUISITION OR SOME SORT OF BUSINESS

9    RELATIONSHIP.  IT WAS AT THAT TIME THAT WE FOUND OUT THAT

10   THEY WERE SELLING AND MARKETING BIOREMEDIATING PARTS WASHERS

11   IN THE UNITED STATES.

12   Q. ARE YOU FAMILIAR WITH WALTER'S BR 100 PARTS WASHER?

13   A. I AM FAMILIAR WITH BR -- WITH WALTERS BR 100.

14   Q. AND IF YOU WOULD, IS THAT THE MACHINE THAT YOU RECOGNIZE

15   ALL THE WAY TO THE LEFT HERE ALONG THE WALL, WHAT HAS BEEN

16   ENTERED AS JOINT EXHIBIT 31?

17   A. THAT APPEARS TO BE A BR 100.

18   Q. HAVE YOU INSPECTED THE BR 100?

19   A. I HAVE INSPECTED THE BR 100.

20   Q. DO YOU RECALL THE FEATURES OF THE BR 100?

21   A. I DO RECALL THE FEATURES OF THE BR 100.

22   Q. AND DID YOU OBSERVE ANY DIFFERENCES BETWEEN THE BR 100

23   AND THE BIO 436 WITH RESPECT TO THE CLAIMS AT ISSUE IN THIS

24   LITIGATION?

25   A. THERE APPEAR TO BE NO DIFFERENCES WITH RESPECT TO THE

```
 1  CLAIMS --
 2              MR. HARBIN:  OBJECTION, YOUR HONOR.  COMPOUND
 3  GIVEN THE NUMBER OF CLAIMS.
 4              THE COURT:  WHAT WAS THAT AGAIN, MR. HARBIN?
 5              MR. HARBIN:   IT IS COMPOUND GIVEN THE LARGE
 6  NUMBER OF CLAIMS AND ELEMENTS.
 7              THE COURT:  RESTATE YOUR QUESTION, PLEASE,
 8  MR. MELARTI.
 9  BY MR. MELARTI:
10  Q. LET'S DO IT THIS WAY INSTEAD.  LET ME ASK YOU THIS:
11  MR. MCNALLY, IF YOU WOULD, COULD YOU VERY BRIEFLY DESCRIBE
12  THE FEATURES OF THE BR 100?
13  A. I CAN DESCRIBE THE FEATURES OF THE BR 100.  IT HAS A
14  SINK, A DRAIN IN THE SINK WITH A FILTER IN THAT DRAIN, A
15  THREE LAYER -- THREE-PART FILTER THAT FITS INTO THE DRAIN
16  HOLE IN THAT SINK.  IT HAS A DRAIN THAT DRAINS INTO THE
17  BASIN IN THE BOTTOM.  THE BASIN IN THE BOTTOM CONTAINS A
18  LEVEL SENSOR SWITCH, A THERMOSTAT, A HEATER COIL, A PUMP AND
19  A METHOD FOR THE PUMP TO PUMP UP INTO THE SPIGOTS IN THE
20  BACK OF THE BR 100.  AND THOSE ARE THE FEATURES OF THE
21  PRODUCT.
22  Q. NOW, ARE YOU FAMILIAR WITH WALTER'S BR 200 AND THE IO 200
23  MODELS?
24  A. I AM FAMILIAR WITH THE BR 200 AND THE IO 200.  WE
25  PURCHASED MODELS.  IN FACT, THOSE MODELS RIGHT THERE CAME
```

1   FROM OUR FACTORY.  WE PURCHASED THE 200 IN 2004 -- THE BR

2   200 IN 2004 AND THE IO 200 IN 2007.

3   Q. JUST FOR SAKE OF CLARITY, YOU POINTED TO TWO DEVICES UP

4   AGAINST THE BACK WALL HERE.  YOU WERE POINTING TO THE SECOND

5   MACHINE FROM THE LEFT AS THE BR 200?

6   A. IF WE START FROM THE LEFT, THE ONE ON THE EXTREME LEFT,

7   FROM OUR PERSPECTIVE, IS THE BR 100.  THE ONE TO THE RIGHT

8   OF IT THAT IS RATHER SQUARE AND LARGE, THAT IS THE BR 200.

9   AND THE NEXT MACHINE OVER, I BELIEVE, IS THE IO 200.

10  BECAUSE OF THE ANGLE I CAN'T BE 100 PERCENT SURE.

11  Q. IS IT POSSIBLE THE LAST MACHINE --

12  A. IT IS POSSIBLE THAT THE LAST MACHINE IS THE 200.

13  Q. OKAY.  NOW, YOU MENTIONED THAT YOU DID TESTING ON THESE

14  MACHINES?

15  A. WE TESTED THE BR 200 AND THE IO 200 IN OUR LABORATORIES

16  IN NORCROSS.

17  Q. PLEASE DESCRIBE WHAT YOU DID TO TEST THEM.

18  A. WE FOLLOWED THE DIRECTIONS IN THE MANUALS.  WE FILLED THE

19  MACHINES WITH THE BIO-CIRCLE FLUID.  WE ALLOWED, IN THOSE

20  CASES, THE MACHINES TO HEAT UP TO OPERATING TEMPERATURE.  WE

21  THEN OBTAINED DIRTY PARTS FROM A JUNK YARD, AND WE CLEANED

22  THE -- FOLLOWING THE DIRECTIONS IN THE MANUAL, WE CLEANED

23  THE DIRTY PARTS.

24          MR. HARBIN:  SORRY TO INTERRUPT, MR. MCNALLY.  I

25  OBJECT TO THIS TESTIMONY BECAUSE I DON'T BELIEVE IT HAS EVER

1    BEEN DISCLOSED THAT THIS IS A BASIS, TESTING BY CHEMFREE IS

2    A BASIS FOR CLAIMING INFRINGEMENT.  I THINK THIS IS THE

3    FIRST WE HAVE EVER HEARD OF THIS AND I OBJECT TO HIS

4    TESTIMONY.

5              THE COURT:  MR. MELARTI?

6              MR. MELARTI:  YOUR HONOR, I THINK THE WITNESS IS

7    MERELY IDENTIFYING THE PARTICULAR FEATURES OF THE BR 200 AND

8    IO 200 THAT HE OBSERVED IN INVESTIGATING THE PRODUCT.  WE

9    ARE NOT USING MR. MCNALLY TO ESTABLISH INFRINGEMENT OF ANY

10   CLAIMS IN SUIT.

11             MR. HARBIN:  IF I MAY RESPOND, YOUR HONOR.  HE HAS

12   ALREADY TESTIFIED ABOUT IDENTIFYING THE FEATURES.  AND NOW

13   HE IS EXPLICITLY TESTIFYING ABOUT TESTING OF THE MACHINE.

14   IT'S GOT TO BE AN OPERATION.  THAT IS DIFFERENT THAN JUST

15   IDENTIFYING FEATURES AND I DON'T BELIEVE IT HAS EVER BEEN

16   DISCLOSED AND WE OBJECT.

17             THE COURT:  WELL, I AM GOING TO OVERRULE THE

18   OBJECTION.  YOU MAY ASK YOUR QUESTION.  I GUESS YOU MAY

19   CONTINUE TO ANSWER, MR. MCNALLY.

20             THE WITNESS:  I WOULD REPHRASE THAT AND SAY

21   INSTEAD OF TESTING, WE OPERATED THE MACHINE IN ACCORDANCE

22   WITH THE DIRECTIONS IN THE OPERATING MANUAL.  WE WANTED TO

23   SEE IF THE MACHINE WOULD PERFORM THE FUNCTIONS THAT THE

24   OPERATING MANUAL TOLD AN ORDINARY OPERATOR THAT THEY WOULD

25   PERFORM.  SO WE FOLLOWED THE DIRECTIONS IN THE OPERATING

1  MANUALS IN BOTH MACHINES.  WE ALLOWED THE FLUID TO HEAT UP

2  TO OPERATING TEMPERATURE.  WE THEN TURNED THE PUMPS ON.  WE

3  RAN THE FLUID AS INDICATED IN THE OPERATING MANUAL OVER THE

4  OBJECT TO BE CLEANED, AND OBSERVED THAT IN NORMAL OPERATION

5  OF THE MACHINE, THE FLUID WOULD, IN SOME CASES MORE

6  EFFICIENTLY THAN OTHERS, WASH CONTAMINANT OFF THE PARTS TO

7  BE CLEANED, WHICH IS THE PURPOSE OF THE PARTS WASHER, AND

8  THE CONTAMINANT WOULD THEN BE GATHERED IN THE FILTERS IN

9  BOTH OF THE MACHINES.

10  BY MR. MELARTI:

11  Q. WHAT TYPE OF FILTER WAS IN THE BR 200 MODEL THAT YOU

12  OBTAINED?

13  A. THE ORIGINAL FILTER WAS SOMETHING WE NICKNAMED THE COFFEE

14  FILTER BECAUSE IT LOOKED VERY MUCH LIKE THE FILTER IN A

15  MR. COFFEE MACHINE THAT YOU CAN GET AT ANY WAL-MART.

16  Q. AND DO YOU KNOW IF THERE HAVE BEEN ANY OTHER TYPES OF

17  FILTERS IN THE BR 200 MODEL?

18  A. WHEN THE -- WHEN WE TRIED TO RE-ORDER THE COFFEE FILTER

19  BECAUSE WE WANTED TO SIMPLY CONTINUE TO OPERATE THE BR 200,

20  THE 200 AS IT WAS ORIGINALLY DELIVERED TO US, WE DISCOVERED

21  THAT IN THE WALTER CATALOG, THE COFFEE FILTER WAS NO LONGER

22  AVAILABLE, BUT THE THREE-PART FILTER, THE DRAIN INSERT, THE

23  SPONGE AND THE GROSS FILTER OVER THE TOP, THEY WERE

24  AVAILABLE FOR FIT INTO THE BR 200.

25  Q. LET'S TURN TO THE IO 200.  IN OPERATING THE IO 200, DID

1  YOU MAKE ANY OBSERVATIONS ABOUT LOW LEVEL, LOW FLUID LEVEL

2  CONDITIONS?

3  A. WE DID.  WE -- IN ORDER TO TEST THE MACHINE --

4      MR. HARBIN:  JUST FOR THE RECORD, YOUR HONOR, I

5  HAVE TO, AGAIN, MAINTAIN MY OBJECTIONS TO THIS NEW EVIDENCE

6  BEING FIRST DISCLOSED AT TRIAL.

7      THE COURT:  ALL RIGHT.  OVERRULED.

8      THE WITNESS:  IN THE ORDINARY COURSE OF OPERATION

9  OF THE MACHINE, A PARTICULAR PLASTIC MACHINE THAT HAS A

10  HEATER COIL IN IT, WE ARE NOT IN OUR FACTORY 24 HOURS A DAY.

11  WE WERE CONCERNED IF WE LEFT IT ON AND OPERATING, ACCORDING

12  TO THE OPERATING MANUAL, THAT THERE WAS A POSSIBILITY THAT

13  IF THE FLUID GOT TOO LOW, THE HEATER COIL WOULD CAUSE THE

14  MACHINE TO CATCH FIRE.  SO WE OPERATED THE MACHINE UNTIL THE

15  FLUID WAS EXTREMELY LOW, AND THEN WE DISCOVERED THAT THERE

16  IS A LOW-LEVEL SENSOR WHICH WILL TURN OFF THE HEATER UNIT

17  WHEN THE FLUID IS TOO LOW.

18  Q. DID YOU STUDY THE SCREENS THAT GO INTO THE BOTTOM OF THE

19  IO 200 MODEL?

20  A. COULD YOU REPEAT THE QUESTION?

21  Q. ARE THERE ANY SCREENS AT THE BOTTOM OF THE SINK OF THE IO

22  200 MODEL?

23  A. YES.  THERE ARE SCREENS AT THE BOTTOM OF THE SINK IN THE

24  IO 200 MODEL.

25  Q. DID YOU MAKE ANY OBSERVATIONS CONCERNING THE APERTURE

1   SIZE OF THE HOLES IN THE SCREEN?

2   A. WE DID.  THE APERTURE SIZE ARE BETWEEN 400 AND 500

3   MICRONS.

4   Q. AND HOW YOU KNOW THAT?

5   A. WE OBSERVED SAMPLES PROVIDED BY FILTER COMPANIES AND THEN

6   COMPARED THE APERTURE SIZE.

7             MR. ANDERSON:  I HAVE NOTHING FURTHER FOR THIS

8   WITNESS.  I TENDER THE WITNESS.

9             THE COURT:  ALL RIGHT.  MR. HARBIN, YOU MAY

10  CROSS-EXAMINE.

11            MR. HARBIN:  ALL RIGHT, YOUR HONOR.  THANK YOU.

12                     CROSS-EXAMINATION

13  BY MR. HARBIN:

14  Q. GOOD MORNING, MR. MCNALLY.

15  A. GOOD MORNING.

16  Q. MY NAME IS JOHN HARBIN.  I AM REPRESENTING WALTER

17  COMPANIES, AND I AM GOING TO ASK YOU SOME QUESTIONS.

18            MR. HARBIN:  AND YOUR HONOR, AGAIN, I CAN JUST DO

19  THE CROSS OR GO AHEAD AND DO OUR CROSS FOR OUR CASE,

20  WHATEVER YOU WOULD PREFER.

21            MR. ANDERSON:  I THINK WE HAVE TAKEN THE SCOPE

22  ISSUE VERY LIBERALLY SO FAR, YOUR HONOR.  I AM VERY HAPPY

23  FOR MR. MCNALLY TO GO AHEAD AND PROCEED AND DEAL WITH ALL OF

24  THE ISSUES THAT MR. HARBIN MIGHT HAVE.

25            THE COURT:  ALL RIGHT, MR. HARBIN.

1    BY MR. HARBIN:

2    Q. MR. MCNALLY, FIRST ABOUT THE OPERATION OF CERTAIN

3    MACHINES OF WALTER THAT YOU JUST TESTIFIED ABOUT.  WHEN DID

4    YOU DO THAT OPERATION?

5    A. AS I MENTIONED IN MY TESTIMONY, WE PURCHASED THE BR 200

6    IN 2004, WE PURCHASED THE IO 200 IN 2007.

7    Q. WHEN DID YOU DO THE TESTING?

8    A. BETWEEN 2004 AND TODAY AND BETWEEN 2007 AND TODAY.

9    Q. ARE THERE ANY WRITTEN RECORDS OF THAT TESTING?

10   A. NOT TO THE BEST OF MY KNOWLEDGE.

11   Q. THERE IS NO NOTES?

12   A. THERE MAY BE SOME NOTES IN THE ORDINARY COURSE OF

13   BUSINESS.

14   Q. DO YOU KNOW IF THERE ARE NOTES?

15   A. AS I SAID PREVIOUSLY, I DON'T RECALL ANY.

16   Q. DID YOU GIVE ANYONE REPORTS OF YOUR TESTING BEFORE

17   TESTIFYING ABOUT IT TODAY?

18   A. EXCUSE ME?  ASK THE QUESTION AGAIN?

19   Q. DID YOU GIVE ANYONE REPORTS ABOUT YOUR TESTING BEFORE YOU

20   ARE TESTIFYING ABOUT IT TODAY?

21   A. WE DID TALK ABOUT IT.

22   Q. TO WHOM DID YOU TALK ABOUT IT?

23   A. I SPOKE ABOUT IT TO MY COLLEAGUES AT CHEMFREE CORPORATION

24   AND TO OUR ATTORNEYS.

25   Q. I WANT TO ASK YOU ABOUT THE JUNE 2001 MEETING WITH

1    WALTER.

2    A. YES, SIR.

3    Q. PUT UP PLAINTIFF'S EXHIBIT 140.  IS IT TRUE THAT YOU DID

4    NOT REALLY DO ANY RESEARCH ON WALTER BEFORE THIS MEETING?

5    A. THAT IS NOT CORRECT.

6    Q. YOU DID NOT EVEN LOOK TO SEE IF THEY HAD A WEBSITE AT THE

7    TIME, DID YOU, SIR?

8    A. I DON'T THINK I SAID THAT.  I BELIEVE I LOOKED THEM UP ON

9    THE WEB, AND THAT IS HOW I FOUND OUT THAT THEY WERE A

10   COMPANY THAT SPECIALIZED IN CHEMICALS AND ABRASIVES.

11   Q. LET ME HAND YOU, SIR, A COPY OF YOUR DEPOSITION FROM

12   2007.

13   A. THANK YOU.

14   Q. AND ASK YOU TO LOOK AT THE BEGINNING OF PAGE 256 LINE 24

15   OF YOUR DEPOSITION.  YOU WERE ASKED, "BEFORE YOU WENT TO THE

16   MEETING, DID YOU DO ANY INVESTIGATION ABOUT WHO J. WALTER

17   WAS?"  LOOK AT PAGE 257.  YOU ANSWERED:  "AN ABRASIVE

18   COMPANY, BUT MR. BELAIRE SUGGESTED THEY DID HAVE PARTS

19   CLEANERS OF SOME KIND."

20   A. THAT IS CORRECT.

21   Q. NOW, I WILL COME BACK TO THAT.  YOU WERE ASKED AT LINE 8,

22   "DID YOU LOOK TO SEE IF THEY HAD A WEBSITE?"  "ANSWER:  I

23   DID NOT AT THAT TIME.  I DON'T REMEMBER IF I DID."

24   A. AND THAT IS IDENTICAL TO THE TESTIMONY THAT I JUST GAVE.

25   I DON'T REMEMBER THAT I DID.

1    Q. I THOUGHT YOU SAID YOU DID, SIR.  I AM SORRY IF I

2    MISUNDERSTOOD.  YOU WERE ASKED, "DID YOU KNOW THEY WERE IN

3    THE PARTS WASHING BUSINESS AT THAT POINT?"  YOU ANSWERED,

4    "TO THE EXTENT THAT MR. BELAIRE TOLD ME THEY WERE, YES."  SO

5    YOU DID KNOW WALTER WAS IN THE PARTS WASHER BUSINESS, DIDN'T

6    YOU?

7    A. MR. BELAIRE MENTIONED THAT THEY MIGHT BE IN THE PARTS

8    WASHER BUSINESS.  THAT IS CORRECT.

9    Q. AND IF YOU LOOK, SIR, BACK AT PLAINTIFF'S EXHIBIT 140,

10   AND IF YOU CAN BLOW UP THE FOURTH PARAGRAPH.

11   A. YES, SIR.

12   Q. WHAT WAS DISCUSSED AT THE MEETING WAS A POSSIBILITY OF

13   WALTER DISTRIBUTING OR BEING A PRIVATE LABEL COMPANY FOR

14   CHEMFREE IN CANADA; CORRECT?

15   A. ACTUALLY IF YOU READ THE SENTENCE IT SAYS, OUR PRODUCTS

16   DISTRIBUTION IN CANADA AND CERTAIN COUNTRIES IN EUROPE.

17   Q. CANADA AND CERTAIN COUNTRIES IN EUROPE.  THANK YOU.  AND

18   BY THE WAY, YOU WERE LOOKING AT THE TIME, YOU WERE TALKING

19   TO OTHER COMPANIES FOR RESPECTIVE PRIVATE LABEL FOR EITHER

20   DISTRIBUTORS OR PRIVATE LABEL SELLERS OF CHEMFREE MACHINES;

21   CORRECT?

22   A. PARTICULARLY IN EUROPE.  YES.

23   Q. DIDN'T YOU ALSO AROUND THAT TIME MEET WITH A DIVISION OF

24   NAPA, WINS MAQ?

25   A. WINS IS NOT A DIVISION OF NAPA.

1   Q. SORRY.  YOU MET WITH A DIVISION OF NAPA; CORRECT?

2   A. WE HAVE BUSINESS WITH NAPA.

3   Q. UAP?

4   A. UAP IN CANADA IS A DIVISION OF NAPA NOW.

5   Q. SO YOU WERE ALSO LOOKING AT CANADA AT THE TIME, AND

6   OTHERS TO POTENTIALLY BE PRIVATE LABELS IN CANADA?

7   A. NAPA DOES NOT PRIVATE LABEL.  THEY SELL UNDER OUR LABEL.

8   UAP SELLS UNDER OUR LABEL.

9   Q. AND MEQ?  DOES THAT RING A BELL?

10  A. THERE IS A DISTRIBUTOR IN WINNEPEG WITH INITIALS SIMILAR

11  TO THAT, BUT THEY ALSO SELL OUR LABELED MACHINES.

12  Q. AND IS IT YOUR TESTIMONY THAT -- YOU HAD NOT PREPARED ANY

13  MEMO ABOUT YOUR CONFERENCE CALL OR YOUR CALL WITH

14  MR. SCHUDEL OF WALTER FOLLOWING THIS JUNE OF 2001 LETTER,

15  HAVE YOU?

16  A. I DID NOT WRITE A MEMO TO THAT EFFECT.

17  Q. MR. SCHUDEL'S RESPONSE TO YOU THAT MR. WALTER IS NOT

18  INTERESTED IN DOING BUSINESS WITH CHEMFREE DIDN'T CHANGE

19  ANYTHING YOU WERE DOING, DID IT?

20  A. WELL, IT CHANGED OUR PURSUIT OF WALTER AS A DISTRIBUTION

21  PARTNER.

22  Q. OTHER THAN --

23  A. OTHER THAN THAT, IT DID NOT.

24  Q. AND SO YOU DON'T HAVE NOTES OR MEMO ABOUT THE MEETING;

25  CORRECT?  YOU DON'T HAVE ANY NOTES ABOUT THE MEETING?

1  A. I HAVE THAT LETTER THAT I SENT.

2  Q. SORRY, YOU DON'T HAVE NOTES ABOUT THE TELEPHONE CALL WITH

3  MR. SCHUDEL THAT FOLLOWED THAT LETTER?

4  A. I DO NOT HAVE NOTES TO THAT EFFECT.

5  Q. ISN'T IT TRUE THAT WHAT MR. SCHUDEL JUST TOLD YOU IS THEY

6  WERE NOT INTERESTED IN PURSUING DISCUSSIONS ANY FURTHER, OR

7  WORDS TO THAT EFFECT?

8  A. NO.  I REMEMBER DISTINCTLY MR. SCHUDEL SAID J. WALTER

9  CORPORATION HAS NO INTEREST IN BIOREMEDIATION PARTS WASHERS,

10  AND HE USED THE WORD COMPLICATED.  IT IS WAY TOO

11  COMPLICATED.

12  Q. NOW, LET'S TURN TO THE DEVELOPMENT, SIR, OF THE CHEMFREE

13  PARTS WASHER.  AND YOU BEGAN YOUR EMPLOYMENT -- YOU STARTED

14  WITH CHEMFREE AS A CONSULTANT; CORRECT?

15  A. YES, SIR, I DID.

16  Q. AND YOU BEGAN EMPLOYMENT AS A FULL TIME EMPLOYEE IN JUNE

17  OF 1994; CORRECT?

18  A. I BELIEVE THAT IS CORRECT.

19  Q. AND YOU CAME OVER TO CONSULT WITH CHEMFREE ALONG WITH

20  MR. MCCLUER?

21  A. YES, I DID.

22  Q. AND CHEMFREE REPRESENTATIVES, MR. MARKS, FOR EXAMPLE,

23  DISCUSSED WITH YOU THE POTENTIAL OF WORKING FULL TIME AT

24  CHEMFREE IF THIS OPPORTUNITY WERE SUCCESSFUL?

25  A. MR. MARKS IS AN EMPLOYEE OF INTELLIGENT SYSTEMS

1    CORPORATION.  INTELLIGENT SYSTEMS CORPORATION DISCUSSED WITH
2    US THE POSSIBILITY OF BECOMING EMPLOYEES AT SOME TIME IN THE
3    FUTURE.
4    Q. IF THIS, YOU KNOW, IF THIS PROJECT WEREN'T SUCCESSFUL?
5    A. THAT IS CORRECT.
6    Q. THAT IS THE DEVELOPMENT OF A PARTS WASHER?
7    A. THAT IS CORRECT.
8    Q. AND YOU BOTH HAD SIMILAR EXPECTATIONS WHEN YOU CAME, YOU
9    AND MR. MCCLUER, WHEN YOU CAME TO CHEMFREE, DIDN'T YOU?
10   A. I CAN'T SPEAK TO WHAT MR. MCCLUER'S EXPECTATIONS WERE.
11   Q. BUT SHORTLY AFTER THE TIME YOU WERE GIVEN A POSITION IN
12   ABOUT SEPTEMBER OF 1994, SHORTLY BEFORE THE PATENT WAS
13   APPLIED FOR, THERE WAS A FALLING OUT BETWEEN MCCLUER AND
14   CHEMFREE; CORRECT?
15   A. MR. MCCLUER DIDN'T SHOW UP FOR WORK ONE DAY.
16   Q. SO THERE WAS A DISAGREEMENT ABOUT WHAT HIS EMPLOYMENT OR
17   CONSULTING ARRANGEMENT WAS; CORRECT?
18   A. AS I SAID, MR. MCCLUER DIDN'T SHOW UP FOR WORK ONE DAY.
19   MOST OF HIS DISCUSSIONS WERE WITH INTELLIGENCE SYSTEMS.
20   Q. SIR, IF YOU DON'T KNOW THE ANSWER, JUST PLEASE TELL ME
21   YOU DON'T KNOW THE ANSWER.  MY QUESTION IS, WASN'T THAT
22   BECAUSE THERE WAS A DISPUTE BETWEEN MR. MCCLUER AND CHEMFREE
23   OR INTELLIGENCE SYSTEMS ABOUT HIS ONGOING EMPLOYMENT
24   RELATIONSHIP, WHETHER HE WAS GOING TO CONTINUE AS A
25   CONSULTANT, WHETHER HE WAS GOING TO BE AN EMPLOYEE?

1  A. I THOUGHT I ANSWERED THE QUESTION BY SAYING MR. MCCLUER

2  DIDN'T SHOW UP FOR WORK ONE DAY, AND WE DISCOVERED LATER

3  THAT HE HAD SOME SORT OF DISAGREEMENT.

4  Q. YOU DISCOVERED THAT?

5  A. EXCUSE ME?

6  Q. YOU DISCOVERED THAT?

7  A. YES.  INTELLIGENCE SYSTEMS TOLD ME WHAT MR. MCCLUER HAD

8  SAID.

9  Q. NOW, PRIOR TO JOINING INTELLIGENT SYSTEMS, YOU WERE

10  WORKING WITH MR. MCCLUER AND A COMPANY CALLED CHEMFREE

11  TECHNOLOGIES AND A RELATED COMPANY CALLED SUMMA

12  TECHNOLOGIES?

13  A. THAT IS NOT CORRECT.

14  Q. LET'S TAKE IT FIRST, DIDN'T YOU WORK AT TIMES WITH

15  MR. MCCLUER AT A COMPANY CALLED CHEMFREE TECHNOLOGIES?

16  A. IN THE SUMMER OF 1993, I BRIEFLY WAS NAMED AN OFFICER OF

17  CHEMFREE TECHNOLOGIES IN ORDER TO WRITE A LETTER TO THE

18  SHAREHOLDERS SAYING THAT CHEMFREE TECHNOLOGIES HAD NO

19  REVENUE FOR TWO YEARS, AND THE SHAREHOLDERS HAD THEREFORE

20  USED THIS LETTER THAT I WROTE TO WRITE OFF THEIR INVESTMENTS

21  IN CHEMFREE TECHNOLOGIES.  THAT IS THE ONLY TIME THAT I WAS

22  CONSIDERED THAT I WAS AN EMPLOYEE OF CHEMFREE TECHNOLOGIES.

23  Q. I APOLOGIZE IF MY QUESTION WAS NOT CLEAR.  BUT BY THE

24  WAY, THAT LETTER DIDN'T GO OUT UNTIL 1994, IS THAT RIGHT?

25  A. NO.  1993.

```
1   Q. I DIDN'T ASK IF YOU WERE SIMPLY AN EMPLOYEE.  YOU WORKED

2   WITH MR. MCCLUER AND HIS COMPANY AT CHEMFREE TECHNOLOGIES;

3   CORRECT?  AS A CONSULTANT?

4   A. MR. MCCLUER'S COMPANY CHEMFREE TECHNOLOGIES WAS SEEKING

5   FUNDING.  I HAD MY OWN COMPANY CALLED JKK CONSULTING, AND I

6   WAS CONSULTING WITH MR. MCCLUER TO TRY TO OBTAIN FUNDING FOR

7   HIM, EXCUSE ME, FOR CHEMFREE TECHNOLOGIES.

8   Q. ISN'T IT TRUE, SIR, THAT YOU WORKED AS A CONSULTANT, AND

9   I AM NOT SAYING NECESSARILY FULL TIME.  IN FACT, FULL OR

10  PART-TIME, WE WILL GET TO HOW MUCH, YOU WORKED WITH CHEMFREE

11  TECHNOLOGIES, MR. MCCLUER'S EARLIER COMPANY, ON AND OFF FOR

12  SOME PERIOD OF TIME, SEVERAL MONTHS, AS A CONSULTANT?

13  A. THAT IS CORRECT.

14  Q. OKAY.  AND IN FACT, SIR, IF YOU CAN LOOK AT -- LET ME

15  HAND YOU, SIR, TWO NOTEBOOKS, ONE AND TWO.  IF YOU COULD PUT

16  UP, MR. MORELAND, DEFENDANT'S EXHIBIT 136 -- SORRY, PUT UP

17  FIRST EXHIBIT 34.  THIS IS A LETTER YOU WROTE MR. MARKS AT

18  INTELLIGENT SYSTEMS ON BEHALF -- IN MAY OF 1993, CORRECT?

19  WHEN YOU HAD EARLY DISCUSSIONS, WHEN YOU WERE STARTING

20  DISCUSSIONS WITH INTELLIGENCE SYSTEMS ABOUT POSSIBLY DOING

21  SOME BUSINESS TOGETHER ABOUT DIFFERENT CONCEPTS?

22  A. THAT IS CORRECT.

23  Q. AND YOU WRITE THIS ON BEHALF OF CHEMFREE TECHNOLOGIES.

24  RIGHT?

25  A. I WAS WRITING THIS ON BEHALF OF JKK CONSULTANT, MYSELF AS
```

1    A CONSULTANT.

2    Q. IF YOU LOOK AT THE SECOND PARAGRAPH, SIR, THE THIRD

3    PARAGRAPH, SORRY, YOU TALKED ABOUT HARVEY, THAT IS HARVEY

4    ROUTENBURGER; CORRECT?

5    A. THAT IS CORRECT.

6    Q. IT IT TALKS ABOUT HIM PRESENTING OUR, QUOTE, PARTS WASHER

7    CONCEPT?

8    A. THAT IS CORRECT.

9    Q. IS IT YOUR TESTIMONY THAT WAS YOUR CONSULTING COMPANY'S

10   PARTS WASHER CONCEPT, OR IS THAT CHEMFREE'S TECHNOLOGIES?  .

11   A. IT IS A PLURAL WORD, "OUR." CHEMFREE TECHNOLOGIES AND JKK

12   CONSULTING.

13   Q. SO YOU WERE WRITING ON BEHALF OF YOUR CONSULTING COMPANY

14   AND CHEMFREE TECHNOLOGIES?

15   A. THAT IS CORRECT.

16   Q. IF YOU WILL LOOK SIR AT PLAINTIFF'S EXHIBIT 136.

17   A. YES, SIR.

18   Q. THIS IS A LETTER YOU WROTE TO MR. MARKS IN JUNE 9, 1993?

19   A. THAT IS CORRECT.

20   Q. ON BEHALF OF -- ON THE LETTERHEAD OF CHEMFREE

21   TECHNOLOGIES; IS THAT CORRECT?

22   A. THAT IS CORRECT.

23   Q. NOW, AND BEFORE YOU DID CONSULTING WITH MR. MCCLUER,

24   MAYBE DURING -- BUT I THINK BEFORE YOU -- YOU HAD ABOUT AN

25   18 YEAR CAREER IN THE BANKING INDUSTRY?

1    A. IF YOU INCLUDE THE FORMAL CORPORATE FINANCIAL ACTIVITY,

2    AND THEN YEARS AS A CONSULTANT IN THE FINANCIAL SERVICES

3    INDUSTRY, THAT WOULD BE ABOUT 18 YEARS.  YES.

4    Q. I BELIEVE, AS YOU ALREADY TESTIFIED ABOUT, YOUR FOCUS

5    WHEN YOU JOINED, WHEN YOU STARTED CONSULTING WITH

6    MR. MCCLUER'S COMPANY, CHEMFREE TECHNOLOGIES, WAS PRIMARILY

7    ABOUT FUNDING, RAISING MONEY?

8    A. AT THE BEGINNING OF THE RELATIONSHIP, THAT IS EXACTLY

9    WHAT WAS GOING ON.  WE WERE LOOKING FOR FUNDING.

10   Q. ALL RIGHT.  I THOUGHT THAT IS HOW YOU CHARACTERIZED IT IN

11   YOUR TESTIMONY EARLIER.  DID YOU DO OTHER CONSULTING FOR

12   MR. MCCLUER'S CHEMFREE TECHNOLOGIES?

13   A. VERY EARLY IN THE RELATIONSHIP I BECAME FASCINATED WITH

14   THE PARTS WASHER, AND BEGAN TO TALK ABOUT THE FUNCTIONALITY

15   OF THE PARTS WASHER WITH MR. MCCLUER AND MR. CALTO.

16   Q. BY THE WAY, WHEN YOU STARTED CONSULTING WITH

17   MR. MCCLUER'S COMPANY, IT WAS ALREADY AN EXISTING COMPANY.

18   HE ALREADY HAD -- THE COMPANY WAS ALREADY OPERATING?

19   A. CHEMFREE TECHNOLOGIES WAS A COMPANY UNDER THE LAWS OF THE

20   STATE OF GEORGIA.

21   Q. AND MR. MCCLUER WAS WORKING ON, AMONG OTHER THINGS, A

22   COOLING TOWER TECHNOLOGY?

23   A. THAT IS CORRECT.

24   Q. AND HE, IN THAT REGARD, HE WAS WORKING ON FILTRATION

25   SYSTEMS FOR --

1    A. ACTUALLY THAT ANSWER IS A LITTLE MISLEADING WHEN YOU SAY

2    MR. MCCLUER WAS WORKING ON COOLING TOWER TECHNOLOGY.

3    MR. MCCLUER WAS MARKETING A DEVICE PURCHASED FROM A SWISS

4    COMPANY THAT WAS REPUTED TO REMOVE SCALE FROM THE INSIDE OF

5    WATER SYSTEMS AND COOLING TOWERS.

6    Q. AND IS IT TRUE THAT PRIOR TO YOUR WORK WITH CHEMFREE

7    TECHNOLOGIES, YOU HAD NO PRIOR EXPERIENCE WITH PARTS WASHER,

8    THE PARTS WASHER INDUSTRY; CORRECT?

9    A. THAT IS CORRECT.

10   Q. NOW, ISN'T IT TRUE, IF YOU CAN PUT UP DEFENDANT'S EXHIBIT

11   99, ISN'T IT TRUE THAT YOU AND MR. MCCLUER WERE LOOKING AT

12   PARTS WASHERS AS EARLY AS OF JANUARY OF 1993?

13   A. THAT IS CORRECT.

14   Q. AND IF YOU CAN PUT UP DEFENDANT'S EXHIBIT 90.  IS IT TRUE

15   THAT MR. MCCLUER, CHEMFREE TECHNOLOGIES, PURCHASED A PARTS

16   WASHER FROM FOUNTAIN INDUSTRIES?

17   A. SUMMA TECHNOLOGIES.

18   Q. SUMMA TECHNOLOGY.

19   A. SUMMA TECHNOLOGY.  SORRY.  THAT IS CORRECT.

20   Q. AND MR. MCCLUER WORKED FOR SUMMA TECHNOLOGY, AND YOU WERE

21   CONSULTING OR WORKING WITH SUMMA TECHNOLOGIES ALSO?

22   A. JUST TO BE SURE EVERYTHING IS STRAIGHT.  SUMMA

23   TECHNOLOGIES INVESTED IN A COMPANY CALLED SUMMA

24   ENVIRONMENTAL.  MR. MCCLUER WAS AN EMPLOYEE OF SUMMA

25   ENVIRONMENTAL.  SUMMA ENVIRONMENTAL WAS FUNDED BY SUMMA

1  TECHNOLOGIES.  SUMMA TECHNOLOGIES BOUGHT THE PARTS WASHER

2  FOR SUMMA ENVIRONMENTAL TO WORK WITH.

3  Q. SO YOU AND MR. MCCLUER WORKED WITH THIS PARTS WASHER.

4  FIRST OF ALL, IT WAS ACQUIRED IN 1992; CORRECT?

5  A. THAT IS CORRECT.

6        MR. HARBIN:  WE OFFER DEFENDANT'S EXHIBIT 90 INTO

7  EVIDENCE.

8        MR. MELARTI:   NO OBJECTION.

9        THE COURT:  ADMITTED.

10 BY MR. HARBIN:

11 Q. IF YOU CAN PUT UP DEFENDANT'S EXHIBIT 81.  DO YOU

12 RECOGNIZE THIS MATERIAL SAFETY DATA SHEET, SIR, AS A MSDS

13 FOR A CLEANING COMPOUND?

14 A. I NEED TO READ FURTHER DOWN.  I CAN TELL YOU SODIUM

15 METACILICATE, BUT THERE IS NO INDICATION THAT -- I HAVE TO

16 ASSUME THAT IT IS A CLEANING FLUID.

17 Q. DO YOU SEE THE CLAM CLEANING COMPOUND?

18 A. THERE WE GO.  THANK YOU.  THE CLAM CLEANING COMPOUND.

19 YES.

20 Q. AND DO YOU RECOGNIZE THIS AS A SURFACTANT?

21 A. NO, SIR.  I DON'T.  I AM NOT AN EXPERT.

22 Q. YOU DON'T KNOW ONE WAY OR THE OTHER?

23 A. NO, SIR.

24 Q. NOW, IS IT TRUE THAT YOU AND MR. MCCLUER GOT THE IDEA OF

25 ENVIRONMENTALLY FRIENDLY PARTS WASHERS FROM HARVEY

1    RUTTENBERG?

2    A. HARVEY RUTTENBERG HAD WORKED IN THE PARTS INDUSTRY FOR A

3    NUMBER OF YEARS --

4    Q. IF YOU CAN ANSWER MY QUESTION.  IS IT TRUE THAT YOU AND

5    MR. MCCLUER GOT THE IDEA OF LOOKING AT AN ENVIRONMENTALLY

6    FRIENDLY PARTS WASHER FROM MR. RUTTENBERG?

7    A. I WAS TRYING TO ANSWER THE QUESTION.

8    Q. IS THAT TRUE, YES OR NO.?

9    A. SAY THAT AGAIN?

10   Q. IS THAT TRUE, YES OR NO?

11   A. COULD YOU REPEAT THE QUESTION?

12   Q. DID THE IDEA TO INVESTIGATE AN ENVIRONMENTALLY FRIENDLY

13   PARTS WASHER COME FROM MR. RUTTENBERG?

14   A. HARVEY RUTTENBERG MENTIONED THE DESIRABILITY OF A

15   ENVIRONMENTALLY FRIENDLY PARTS WASHER.

16   Q. IS THAT YES?

17   A. YES.

18   Q. AND MR. RUTTENBERG TOLD YOU IT WAS A HUGE MARKET -- BY

19   THE WAY, THIS WAS IN 1992?

20   A. WE FIRST -- I CANNOT ANSWER THAT SPECIFICALLY.

21   Q. THAT IS WHY YOU BOUGHT THE PARTS WASHER, ISN'T IT?  TO

22   START LOOKING AT IT?

23   A. I CAN'T ANSWER THAT EITHER.

24   Q. BUT THE DISCUSSION WITH MR. RUTTENBERG, THAT WAS BEFORE

25   YOU JOINED INTELLIGENCE SYSTEMS AS A CONSULTANT; CORRECT?

1    A. THAT IS CORRECT.

2    Q. AND MR. RUTTENBERG TOLD YOU THAT THERE WAS A HUGE

3    POTENTIAL MARKET; CORRECT?

4    A. CORRECT.

5    Q. BECAUSE AMONG OTHER THINGS, HEALTH ISSUES WERE BECOMING

6    AN INCREASING CONCERN AS OF 1992?

7    A. I CAN'T RECALL A SPECIFIC COMMENT ABOUT HEALTH IN 1992.

8    Q. IF YOU CAN LOOK AT PAGE -- EXCUSE ME -- LET ME HAND YOU,

9    SIR, YOUR 2000 DEPOSITION, TAKEN FEBRUARY 15TH OF 2000.  AND

10   IF YOU CAN LOOK, SIR, AT PAGE 33 OF YOUR DEPOSITION.

11   A. YES, SIR.

12   Q. YOU ARE TALKING ABOUT YOUR CONVERSATION WITH

13   MR. RUTTENBERG.  THE QUESTION IS ASKED AT LINE 10, "THAT

14   CONVERSATION WITH RUTTENBERG DID YOU ASK HIM WHAT'S THE

15   BENEFIT OF THIS?  DID YOU GO INTO ANY KIND OF DETAIL?"

16   "ANSWER:  MR. RUTTENBERG SUGGESTED THERE WAS A HUGE MARKET

17   FOR SOMETHING LIKE AN ENVIRONMENTALLY FRIENDLY PARTS

18   WASHER."  "QUESTION:  WHY?"  DO YOU RECALL THAT?

19   A. YES, I DO.

20   Q. "QUESTION:  WHY?"  "ANSWER:  BECAUSE OF HIS KNOWLEDGE OF

21   THE PARTS WASHER MARKET."  "QUESTION:  DID HE TELL YOU WHY

22   THERE WAS A HUGE MARKET?  I MEAN WHAT ABOUT IT IS

23   ENVIRONMENTALLY SAFE?"  "ANSWER:  BECAUSE MINERAL SPIRITS

24   ARE DANGEROUS, AND IN 1992 SOME OF THE HEALTH AND SAFETY

25   ISSUES THAT HERETOFOR THAT HAD NOT BEEN HIGHLIGHTED WERE

1    COMING TO THE FORE."  DO YOU SEE THAT TESTIMONY?

2    A. YES, I DO.

3    Q. IS THAT TRUE TESTIMONY YOU GAVE?

4    A. THAT WAS TRUE TESTIMONY THEN, AND IT IS NOW.

5    Q. AND YOU WERE ASKED THE QUESTION:  "THE HEALTH AND SAFETY

6    ISSUES BEING HEALTH AND SAFETY ISSUES DUE TO EXPOSURE TO

7    SOLVENTS?"  "ANSWER:  THAT IS CORRECT.  AND IN ADDITION,

8    SOME OF IT IS FLAMMABLE AND SOME OF IT FULL OF WHAT IS

9    CALLED VOC'S, VOLATILE ORGANIC CHEMICALS WHICH IMPACT THE

10   OZONE."  IS THAT CORRECT?

11   A. THAT IS CORRECT.

12   Q. IS IT TRUE INCREASED STATE AND FEDERAL REGULATION

13   REGARDING HAZARDOUS CHEMICALS AND SOLVENTS WAS A FACTOR IN

14   MR. RUTTENBERG'S OPINION THAT THERE WAS A HUGE POTENTIAL

15   MARKET FOR PARTS WASHERS?

16   A. YES.

17   Q. IS IT TRUE ALSO, SIR, THAT THE EXXON VALDEZ SITUATION

18   INCREASED INTEREST.  BIOREMEDIATION BECAME POPULAR AFTER THE

19   EXXON VALDEZ?

20   A. I CAN'T SAY WITH CONFIDENCE THAT THAT IS A TRUE

21   STATEMENT.

22   Q. IF YOU CAN LOOK, SIR, AT PAGE 67 OF YOUR 2007 DEPOSITION.

23   A. 2007?

24   Q. YES, SIR.

25   A. 66 DID YOU SAY?

1    Q. PAGE 67, SIR.  I'M SORRY.  LINES 15 TO THE END.

2    A. YES, SIR.

3    Q. AND YOU WERE ASKED, "DO YOU EVER RECALL HAVING A

4    CONVERSATION WITH MR. MCCLUER ABOUT BIOREMEDIATION?"  AND I

5    AM PARAPHRASING.  "I AM REFERRING TO THE TIME AT THE

6    BEGINNING OF THE CONSULTING ARRANGEMENT WITH INTELLIGENT

7    SYSTEMS."  AND YOU ANSWERED, "THE SUBJECT OF BIOREMEDIATION,

8    WHICH IS SIMPLY THE REMEDIATION, THE REDUCTION OF HAZARDOUS

9    CHEMICALS BECAME VERY GENERALLY POPULAR ABOUT THE TIME OF

10   THE EXXON VALDEZ."

11   A. THAT IS -- THE CONCLUDING STATEMENT IN THAT LINE IS, AND

12   I CAN'T PLACE THAT IN THE TIME SPECTRUM, AND THAT IS EXACTLY

13   WHAT I WAS TESTIFYING TO.  I JUST DON'T REMEMBER WHAT TIME

14   WE ARE TALKING ABOUT.

15   Q. AND IF YOU CAN LOOK, SIR, AT DEFENDANT'S EXHIBIT 116 IN

16   YOUR FIRST NOTEBOOK.  HAVE YOU SEEN THIS LETTER BEFORE, SIR?

17   A. I CAN'T RECALL IF I HAVE EVER SEEN THIS LETTER BEFORE.

18   Q. WOULD YOU RECALL -- LOOK AT THE BOTTOM PARAGRAPH.  DO YOU

19   RECALL WHETHER IN MARCH OF 1993 YOU WERE WORKING WITH LARGE

20   AUTOMOTIVE AFTERMARKET CHAINS TO DEVELOP A PARTS WASHER?

21   A. SORRY, WHERE DO YOU SEE THAT?

22            MR. HARBIN:  I WILL WITHDRAW IT, YOUR HONOR.

23   BY MR. HARBIN:

24   Q. CAN YOU LOOK AT DEFENDANT'S EXHIBIT 127, SIR, IN YOUR

25   NOTEBOOK.  DO YOU RECALL THIS INFORMATION THAT MR. MCCLUER

1   SENT TO MR. MARKS IN MAY OF 1993, EARLY IN YOUR DISCUSSIONS,

2   ABOUT POSSIBLY JOINING UP WITH INTELLIGENCE SYSTEMS?

3   A. THAT IS CORRECT.

4   Q. AND IT IS A LIST OF REFERENCE INFORMATION, CONTACTS.

5   A. THAT IS CORRECT.

6   Q. AND IF YOU LOOK AT THE LAST PAGE, THE LAST PARAGRAPHS, 5

7   AND 6.

8   A. I SEE THAT.

9   Q. YOU WERE WORKING WITH FALCON INDUSTRIES ABOUT AN

10  ENVIRONMENTALLY FRIENDLY RECYCLING PARTS WASHER; CORRECT?

11  A. CORRECT.

12  Q. IS THAT WHERE YOU INSTALLED THE UNIT THAT HAD BEEN

13  ACQUIRED FROM FOUNTAIN INDUSTRIES?

14  A. THAT IS CORRECT.

15  Q. AND YOU HAD -- I WILL COME BACK TO IT.  AND IS IT TRUE

16  THAT HARVEY RUTTENBERG, I AM NOT SAYING HE WAS EMPLOYED, BUT

17  HE WAS ASSISTING YOU ALL IN YOUR EFFORTS IN 1993 BEFORE YOU

18  JOINED INTELLIGENCE SYSTEMS; CORRECT?

19  A. I WOULDN'T USE THE WORD "ASSISTING."  "ASSISTING" IMPLIES

20  THAT YOU ARE HELPING IN SOME WAY.  MR. RUTTENBERG TENDED TO

21  OFFER OPINIONS ABOUT LOTS OF THINGS.

22  Q. IN AN EFFORT TO HELP; CORRECT?

23  A. YES.

24          MR. HARBIN:  YOUR HONOR, CAN I TAKE A FEW MINUTES?

25  TAKE OUR MORNING BREAK?

1          THE COURT:  THIS WILL BE A GOOD GOOD TIME TO TAKE

2     OUR MORNING BREAK.  WE WILL RESUME AT TEN MINUTES AFTER

3     11:00.

4               (BREAK FROM 10:56 UNTIL 11:15 A.M.)

5          THE COURT: ALL RIGHT, MR. HARBIN.

6          MR. HARBIN:  THANK YOU, YOUR HONOR.

7     BY MR. HARBIN:

8     Q. MR. MCNALLY, MR. RUTTENBERG, HE BECAME -- HE HAD A

9     BUSINESS WITH CHEMFREE ON THE MARKETING OR SELLING PARTS

10    WASHERS?

11    A. HE WAS A MANUFACTURER REPRESENTATIVE FOR CHEMFREE

12    CORPORATION.

13    Q. DOES THAT MEAN HE WAS SELLING PARTS WASHERS?

14    A. HE REPRESENTED OUR PRODUCT TO DIFFERENT COMPANIES.  HE

15    DID NOT DIRECTLY SELL PARTS WASHERS.  MANUFACTURERS REPS

16    DON'T DO THAT.

17    Q. NOW, IS IT TRUE, SIR, THAT -- I WANT TO ASK YOU SOME

18    QUESTIONS ABOUT THE PROTOTYPE THAT WAS DEVELOPED.  IS IT

19    TRUE THAT YOU ALL, MR. MCCLUER, CHEMFREE, CHEMFREE

20    TECHNOLOGIES, SUMMA, WHATEVER THE LEGAL ENTITY WAS DEVELOPED

21    BEFORE YOU STARTED CONSULTING WITH INTELLIGENTS, LET'S TALK

22    ABOUT THAT.  THAT PARTS WASHER WAS AN ENVIRONMENTALLY SAFE

23    PARTS WASHER; CORRECT?  THAT WAS THE CONCEPT?

24    A. I CAN'T TESTIFY THAT IT WAS ENVIRONMENTALLY FRIENDLY.

25    Q. THAT WAS THE CONCEPT, WASN'T IT, SIR, TO DEVELOP BEFORE

1    YOU JOINED INTELLIGENTS TO DEVELOP AN ENVIRONMENTALLY

2    FRIENDLY PARTS WASHER?

3    A. THE GOAL WAS TO DEVELOP AN ENVIRONMENTALLY FRIENDLY PARTS

4    WASHER.

5    Q. AND IN FACT, THAT IS THE TYPE OF PARTS WASHER IT WAS IN

6    TERMS OF ITS STRICTURE; IS THAT CORRECT?

7    A. THAT'S NOT CORRECT.

8    Q. SIR, CAN YOU LOOK AT PAGE 13 OF YOUR DEPOSITION OF 1996?

9    A. 1996?

10   Q. YES, SIR.

11          THE COURT: IS THIS TO REFRESH HIS RECOLLECTION OR

12   TO IMPEACH HIS ANSWER TO THAT?

13          MR. HARBIN:  IMPEACHMENT, IF IT DOESN'T REFRESH

14   HIM.  IF IT DOES REFRESH HIM, I AM SATISFIED WITH THAT, YOUR

15   HONOR.

16          THE WITNESS:  I DON'T HAVE A COPY OF MY 1996

17   DEPOSITION.

18          MR. HARBIN:  I THOUGHT YOU HAD IT.  I'M SORRY.

19   THERE YOU GO, SIR.

20          THE COURT:  WHAT PAGE AND LINE?

21          MR. HARBIN:  PAGE 13, YOUR HONOR.

22   BY MR. HARBIN:

23   Q. PAGE 13 OF YOUR DEPOSITION AT LINE 7, EXCUSE ME, LINE 9.

24   YOU WERE ASKED, "WHAT TYPES OF PARTS WASHERS WAS THIS IN

25   TERMS OF ITS STRICTURE?"  AND YOU ANSWERED, "IT IS AN

1   ENVIRONMENTALLY SAFE PARTS WASHER."  IS THAT WHAT YOU

2   STATED?

3   A. THAT WAS THE STATEMENT I MADE IN 1996.

4   Q. SIR, WAS THAT A TRUE STATEMENT THAT YOU MADE UNDER OATH

5   IN 1996, LESS THAN TWO YEARS AFTER THIS PATENT WAS APPROVED?

6   A. IF YOUR ANSWER IS DIFFERENT NOW, EXPLAIN WHY.

7   A. IT WAS AN ENVIRONMENTALLY SAFE PARTS WASHER.  THAT WAS

8   WHAT I SAID.

9   Q. AND IT WAS ENVIRONMENTALLY SAFE BECAUSE YOU USED SUPER

10  FILTRATION; IS THAT CORRECT?

11  A. THAT IS CORRECT.

12  Q. AND YOU AGREE, SIR, THAT AS CHEMFREE TOLD THE PATENT

13  OFFICE IN ITS FIRST APPLICATION, THAT PARTS WASHERS FIT WITH

14  FILTERS WERE WELL KNOWN IN THE INDUSTRY AS OF THE TIME OF

15  THE APPLICATION; CORRECT?  LOOK HERE, SIR, WHERE THE -- YOU

16  DON'T KNOW ONE WAY OR THE OTHER?

17  A. OKAY.  THE FINAL PARAGRAPH SAYS THAT FILTERS ARE OFTEN

18  INCORPORATED INTO PARTS WASHERS.  THAT'S CORRECT.

19  Q. AND YOU UNDERSTOOD THAT THE PARTS WASHERS AT THE TIME, AT

20  THE TIME YOU JOINED INTELLIGENTS, THERE WERE ALREADY PARTS

21  WASHERS WITH A BASIN ON TOP OF A TANK; CORRECT?

22  A. THAT IS A STANDARD -- YES, SIR.

23  Q. AND THAT USED A PUMP TO PUMP THE FLUID FROM THE TANK INTO

24  THE BASIN?

25  A. YES, SIR.

1    Q. AND A DRAIN?

2    A. YES, SIR.

3    Q. AND THE FILTERS WERE SOMETIMES, PRIOR TO THE TIME YOU

4    STARTED WITH INTELLIGENTS, DEVELOPED INTO THE FLOW PATH;

5    CORRECT?

6    A. THERE WERE SOMETIMES FILTERS INCORPORATED INTO THE FLOW

7    PATH.

8    Q. IN FACT, THAT IS VERY COMMON, IF YOU ARE GOING TO FILTER

9    FLUID, TO PUT THE FILTER IN THE FLOW PATH OF THE FLUID SO

10   MOST OF THE FLUID IS FILTERED, NUMBER ONE; CORRECT?  AT

11   LEAST?

12   A. YOU WOULD -- IF THE PURPOSE -- YES.

13   Q. AND SO THE FLUID CAN BE PUSHED THROUGH OR PULLED THROUGH

14   THE FILTER?

15   A. YES.

16   Q. AND THE PARTS WASHER YOU ALL OBTAINED FROM FOUNTAIN

17   INDUSTRIES WAS -- YOU ALL MODIFIED IT AS TO WHERE THE FILTER

18   WENT; CORRECT?

19   A. WE ADDED A FILTER.  THAT'S CORRECT.

20   Q. YOU ADDED A FILTER DRAWER THAT INCORPORATED A FLAT

21   FILTER; CORRECT?

22   A. THAT IS CORRECT.

23   Q. AND IT IS CORRECT THAT YOU DON'T RECALL WHO DID THAT, BUT

24   MR. MCCLUER MAY HAVE DONE THAT MODIFICATION?

25   A. THAT IS CORRECT THAT I DON'T RECALL.

1   Q. AND WHEN YOU STARTED WORKING ON THIS PARTS WASHER PROJECT

2   YOU DIDN'T KNOW WHAT YOUR SURFACTANTS WERE, YOU HAD NO PRIOR

3   EXPERIENCE WITH THEM; CORRECT?

4   A. I DID NOT KNOW WHAT SURFACTANTS WERE.

5   Q. AND IN FACT, SIR, TO YOUR KNOWLEDGE AND EXPERIENCE, ISN'T

6   IT TRUE THAT THE PHYSICAL DEVICE, I WANT TO TALK ABOUT

7   BIOREMEDIATING PARTS WASHERS IN GENERAL.  BUT FROM YOUR

8   EXPERIENCE IN WORKING WITH THEM FOR THE LAST SEVERAL YEARS,

9   ISN'T IT TRUE THAT THE PHYSICAL DEVICE, THE PARTS WASHER, IS

10  IRRELEVANT TO THE MICROBIAL ACTION IN THE MACHINE?

11  A. I CAN'T ANSWER THAT WITH CONFIDENCE.  I AM NOT AN EXPERT.

12  Q. CAN YOU LOOK AT YOUR DEPOSITION, 1996, SIR, AT PAGE 187?

13  A. PAGE 187?

14  Q. YES, SIR.  YOU WERE ASKED AT LINE 3, "DO YOU RECALL WHEN

15  THE FIRST PROTOTYPE BIOREMEDIATING PARTS WASHER WENT OUT OF

16  THE DOORS AT CHEMFREE?"  YOUR ANSWER WAS, "THE PHYSICAL

17  DEVICE, THE PARTS WASHER, IS IRRELEVANT TO THE MICROBIAL

18  ACTION IN THE MACHINE.  BY THAT I MEAN THE GARBAGE CAN

19  DEVICE THAT WE FIRST BUILT WAS TURNED INTO A MICROBIAL --

20  EXCUSE ME, BIOREMEDIATING PARTS WASHER BY THE ADDITION

21  INITIALLY OF FLUID THAT HAD MICROBES IN IT."  WAS THAT A

22  TRUE STATEMENT, SIR?

23  A. THAT WAS THE OPINION THAT I EXPRESSED AT THE TIME.

24  Q. IN FACT, IN YOUR OPINION, A PARTS WASHER IS A SQUARE BOX

25  WITH A COVER TO IT, THERE IS NOT MUCH TO IT.

1    A. A PARTS WASHER IS A SQUARE BOX THAT CLEANS PARTS.  IT

2    DOESN'T HAVE TO BE SQUARE.

3    Q. WELL, IN YOUR OPINION, THERE IS NOT MUCH TO PARTS WASHERS

4    IN TERMS OF TECHNOLOGY; CORRECT?

5    A. IN A CONVENTIONAL PARTS WASHER, THERE IS NOT MUCH TO THE

6    TECHNOLOGY.

7    Q. NOW, IF YOU CAN PULL UP DEFENDANT'S EXHIBIT 137.  IF YOU

8    CAN LOOK AT THAT, SIR, IN THE FIRST BOOK.  IS IT CORRECT,

9    SIR, THAT YOU AND MR. MCCLUER, WE CAN TAKE IT STEP BY STEP

10   AND TRY TO SHORT CUT.  ENGAGE LOCKWOOD GREEN TO DO SOME

11   DESIGN WORK CONCERNING THE PARTS WASHER IN JUNE OF 1993?

12   A. THAT IS CORRECT.

13   Q. AND THIS IS A MEMO ABOUT THAT WORK?

14   A. THAT IS CORRECT.

15   Q. AND IF YOU CAN LOOK AT EXHIBIT 154 IN YOUR BOOK.  IS THAT

16   THE PRELIMINARY CONCEPT THAT LOCKWOOD GREEN PROVIDED IN MID

17   AUGUST I SEE A DATE OF AUGUST 18TH OF 1993.  IN RESPONSE TO

18   YOUR ASKING HIM TO DO THAT WORK?

19   A. YES, IT IS.

20   Q. AND IF YOU LOOK AT BATES NUMBER CHEM 12, IT' MCCLUER

21   7929.

22   A. YES, I SEE THAT.

23   Q. THIS IS ONE OF THE DRAWINGS THEY PROVIDED IN THAT

24   DOCUMENT; CORRECT?

25   A. THAT IS ONE OF THE DRAWINGS.

1    Q. AND IT INCLUDED OBVIOUSLY A SINK AND A DRAIN; CORRECT?

2    A. THERE IS A BASIN AND A DRAIN.

3    Q. AND IT HAS A FILTER RACK BELOW THAT, ABOUT TWO-THIRDS OF

4    THE WAY DOWN; CORRECT?

5    A. YES.  IT HAS A RACK TO HOLD FILTERS.

6    Q. AND INCLUDES A SUBMERSIBLE PUMP IN THE LOWER LEFT-HAND

7    CORNER?

8    A. YES, IT HAS A PUMP IN IT.

9    Q. AND THIS WAS CONTEMPLATING, AGAIN, FLAT FILTERS?

10   A. YES, IT WAS.

11   Q. YOUR HONOR, WE WOULD OFFER DEFENDANT'S EXHIBIT 154 INTO

12   EVIDENCE.

13           MR. MELARTI:  NO OBJECTION.

14           THE COURT:  ADMITTED.

15   BY MR. HARBIN:

16   Q. I WANT TO TALK ABOUT THE DEVELOPMENT AFTER YOU JOINED

17   CHEMFREE THAT WERE -- YOU AND MR. MCCLUER STARTED AT

18   CHEMFREE JUST -- IT IS ALREADY IN EVIDENCE, BUT THE FIRST

19   WEEK OF AUGUST?

20   A. AUGUST 7TH OF 1993.

21   Q. AND AS FAR AS YOUR ROLE, IS IT CORRECT YOU DID THE

22   MANAGEMENT, AND MR. MCCLUER DID THE ENGINEERING; IS THAT

23   RIGHT?

24   A. THAT IS NOT CORRECT.

25   Q. YOU CAN LOOK, SIR, AT PAGE 79 OF YOUR DEPOSITION OF 1996.

1    A. 1996?  YES, SIR.

2    Q. THE PAGE NUMBER WAS WHAT?  SORRY, PAGE 79.  AND IF YOU GO

3    BACK TO PAGE 78 AT LINE 24, AND I NEED TO BE MORE SPECIFIC.

4    IS IT TRUE, SIR, THAT IN THE PERIOD FROM JANUARY OF '94 TO

5    JUNE OF '94, YOUR RESPECTIVE ROLES WERE THAT YOU WERE DOING

6    THE MANAGING AND MR. MCCLUER WAS DOING THE ENGINEERING?

7    A. MR. MCCLUER AND MYSELF WERE WORKING ON THE TECHNICAL

8    DEVELOPMENT OF THE PARTS WASHER.

9    Q. IF YOU CAN LOOK, SIR, YOU WERE ASKED A QUESTION, LINE 24,

10   "AFTER DECEMBER OF '93, LET'S SAY THE PERIOD JANUARY OF '94

11   TO JUNE OF '94, WHO WAS WORKING ON THE TECHNICAL DEVELOPMENT

12   OF THE PARTS WASHER?"  "ANSWER:  MR. MCCLUER AND MYSELF."

13   THEN YOU WERE ASKED ON LINE THREE, "WHAT SPECIFICALLY WERE

14   YOU DOING DURING THAT TIME PERIOD AS OPPOSED TO WHAT

15   MR. MCCLUER MIGHT HAVE BEEN DOING?  HOW DID YOU DIVIDE THE

16   LABOR?"  "ANSWER:  IN ADDITION TO MANAGE THE CORPORATION,

17   MR. MCCLUER WAS PRINCIPALLY INVOLVED IN ENGINEERING

18   ACTIVITIES."  "QUESTION:  SO YOU WERE DOING THE MANAGING AND

19   HE WAS DOING THE ENGINEERING?"  "ANSWER:  RIGHT."  IS THAT A

20   TRUE STATEMENT?

21   A. THAT IS A TRUE STATEMENT.

22   Q. I WANT TO ASK ABOUT SOME SPECIFIC CONTRIBUTIONS.  BY THE

23   WAY, REGARDING MR. MCCLUER'S CONTRIBUTION, YOU DID AGREE HE

24   IS ONE OF THE INVENTORS; CORRECT?

25   A. MR. MCCLUER IS ONE OF THE CO-INVENTORS.  THAT'S CORRECT.

1    Q. AND YOU DO AGREE MR. MCCLUER CAME UP WITH SOME SPECIFIC

2    IDEAS, CONCESSIONS, HIMSELF BUT YOU JUST CAN'T REMEMBER WHAT

3    ANY OF THEM ARE; IS THAT CORRECT?

4    A. THAT IS NOT CORRECT.

5    Q. LET ME ASK YOU TO LOOK AT PAGE 98 OF YOUR 2007

6    DEPOSITION, SIR.  IF YOU LOOK AT PAGE 98 AT LINES 4 THROUGH

7    7, YOU WERE ASKED, "SO AGAIN, IN YOUR OPINION, THERE WERE

8    ASPECTS OF THE DESIGN THAT MR. MCCLUER CAME UP WITH HIMSELF,

9    YOU JUST DON'T REMEMBER WHAT THEY ARE?"  "ANSWER:  THAT'S

10   CORRECT."  IS THAT TRUE?

11   A. TAKING INTO CONTEXT OF THE WHOLE STREAM OF QUESTIONS,

12   THAT'S CORRECT.

13   Q. NOW, LET'S TALK ABOUT MR. STRANGE'S CONTRIBUTION ABOUT

14   THE FILTER.  MR. STRANGE'S CONTRIBUTION IS COMING UP WITH A

15   WAY TO HIDE THE BUGS AND THE MICROBES AND MAINTAIN SOME

16   MYSTERY IN THAT REGARD; CORRECT?

17   A. THAT IS CORRECT.

18   Q. THAT CAME UP IN A MARKETING MEETING IN TALKING ABOUT

19   RETURNING MYSTERY TO THE DEVICE; CORRECT?

20   A. THAT IS CORRECT.

21   Q. THE ORIGINAL THOUGHT WAS THAT THE MICROBES WOULD NOT BE

22   VISIBLE TO THE USER, BUT THAT ENDED UP NOT TO BE THE CASE;

23   IS THAT CORRECT?

24   A. THE MICROBES ARE STILL NOT VISIBLE TO THE USER.

25   Q. CAN'T YOU SEE A DARK PLACE SOMETIMES ON THE MAT?

1   A. A DARK SPOT IS WHEAT BRAN.  YOU CAN'T SEE A MICROBE.

2   Q. THEY ARE MICROSCOPIC; CORRECT?

3   A. CORRECT.

4   Q. BUT THEY ARE IN THE WHEAT?

5   A. THEY ARE ATTACHED TO THE WHEAT.  IT DOESN'T NECESSARILY

6   HAVE TO BE WHEAT.

7   Q. IS IT TRUE THAT MR. STRANGE DID NOT SUGGEST GLUING THE

8   BUGS TO THE FILTER?

9   A. HE DID SAY ATTACHING RATHER THAN GLUING.

10  Q. NOW, I WANT TO TALK ABOUT YOUR CONTRIBUTION.  ISN'T IT

11  TRUE, SIR, THAT YOUR CONTRIBUTION WAS TO CONTRIBUTE TO THE

12  DISCUSSION ABOUT THE DEVICE, AND YOU CAN'T BE MORE SPECIFIC

13  ABOUT WHAT YOUR INVENTIVE CONTRIBUTION WAS?

14  A. THAT IS NOT CORRECT.

15  Q. LOOK, SIR, AGAIN IN YOUR 1996 DEPOSITION, PAGE 107 AND

16  108.  FIRST AT PAGE 107, THE TOP RIGHT HAND PAGE.  AT LINE

17  14 YOU WERE ASKED, "ARE THERE ANY PARTS YOU FEEL YOU HAVE AN

18  INVENTIVE CONCEPT TO OR HAD THE IDEA OF?"

19  A. DID WE SWITCH BACK TO --

20  Q. 1996.

21  A. OKAY.  I AM THERE.  WHAT WAS THE QUESTION?

22  Q. YOU WERE ASKED, "ARE THERE -- AS FAR AS YOU HAVE GONE,

23  ARE THERE ANY PARTS THAT YOU FEEL YOU HAVE AN INVENTIVE

24  CONCEPT TO OR HAD THE IDEA?"  "ANSWER:  CONTRIBUTED ON OR AN

25  INVENTIVE CONCEPT TO?"  "QUESTION:  WAS IT YOUR IDEA TO DO

1    ANY PARTS THAT WE'VE TALKED ABOUT SO FAR?"  "ANSWER:  I

2    PREFER THE CONTRIBUTED ON AN INVENTIVE CONCEPT OR DESIGN."

3    "QUESTION:  ARE YOU SAYING THAT'S WHAT YOU DID?"  "ANSWER:

4    I SAID I CONTRIBUTED TO THE DISCUSSION THAT WE HAVE ALREADY

5    TALKED ABOUT, I.E., PRODUCT REVIEW.  AND WHAT I SAID BEFORE,

6    NO SINGLE PERSON SAID SUDDENLY SAID THIS IS THE WAY WE ARE

7    GOING TO BUILT IT AND THAT IS MY IDEA."

8         AND IF YOU LOOK DOWN AT THE BOTTOM OF PAGE 108, YOU

9    WERE ASKED, AT LINES 20 TO 25, "COULD YOU BE MORE SPECIFIC

10   IN WHAT YOU ACTUALLY SUGGESTED IT FOUND ITS WAY INTO, AT

11   LEAST AS FAR AS WE'VE GONE, ONE OF THESE COMPONENTS OF THE

12   MACHINE?"  "ANSWER:  I CANNOT BE MORE SPECIFIC."

13   A. AND IN 1996, I COULD NOT BE MORE SPECIFIC.

14   Q. THANK YOU.  LET'S TALK ABOUT THE HEATER.  I THINK YOU

15   TESTIFIED TODAY THAT YOU CLAIM INVENTION OF THE HEATER.

16   A. YES.

17   Q. YOU ARE NOT CLAIMING THAT -- WELL, LET ME JUST ASK YOU,

18   SIR.  ISN'T IT TRUE IN FACT THAT INTERNALLY MR. CALTO IS THE

19   ONE WHO HAD THE IDEA FOR A HEATER?

20   A. MR. CALTO SUGGESTED THE ATTACHMENT OF A BELT HEATER TO

21   THE OUTSIDE OF THE PARTS WASHER.

22   Q. IF YOU CAN LOOK AT PAGE 118, SIR, OF YOUR 1996

23   DEPOSITION, LINES 2 THROUGH 9.  YOU SEE YOU ARE ASKED, "SO

24   YOUR TESTIMONY IS THAT THE HEATER IS PRIMARILY TO KEEP THE

25   USER COMFORTABLE WITH THE FLUID?"  "ANSWER:  NO, WHAT I

1   TESTIFIED WAS THAT THE ORIGINAL IDEA OF HEATING THE FLUID

2   CAME AS A RESULT OF COMFORT CONSIDERATIONS AND CLEANING

3   ABILITY CONSIDERATIONS."  IS THAT TRUE, SIR, YOU ALREADY

4   THOUGHT OF HEATING THE FLUID BEFORE YOU EVEN GOT TO THE

5   TOPIC OF THE MICROBES; CORRECT?

6   A. THAT IS CORRECT.

7   Q. YOU WERE ASKED, "DO YOU REMEMBER WHOSE IDEA THAT WAS?"

8   "ANSWER:  I BELIEVE IT WAS TOM CALTO'S."

9   A. AND I BELIEVE THAT IS WHAT I JUST SAID.  EXCUSE ME, I

10  APOLOGIZE, THAT IS WHAT I JUST TESTIFIED TO.

11  Q. I MISUNDERSTOOD YOUR TESTIMONY THEN, SIR.  CORRECT?  AND

12  ISN'T IT YOUR CUSTOMERS ALSO THAT SUGGESTED USING A HEATER?

13  A. NO, SIR.  THAT'S NOT CORRECT.

14  Q. DIDN'T MILLIKEN ACTUALLY SUGGEST YOU USE A HEATER?

15  A. MILLIKEN SAID THE FLUID WAS VERY COLD AND UNCOMFORTABLE.

16  Q. LOOK AT EXHIBIT 159 IN YOUR BOOK.

17  A. YES, SIR.

18  Q. DO YOU RECOGNIZE THESE AS A COMPILATION OF FROM REPORTS

19  FROM MR. MCCLUER THAT HE SUBMITTED PERIODICALLY TO GET PAID,

20  AND YOU APPROVED SOME OF THEM?

21  A. YES, I RECOGNIZE THESE.

22  Q. AND IF YOU LOOK AT THE PAGE, BATES STAMP CHEM147, THAT'S

23  A REPORT FROM MR. MCCLUER, NOVEMBER 24, '93 ABOUT THE UNIT

24  INSTALLED AT MILLIKEN, AND THAT WAS INSTALLED SORT OF A

25  PROTOTYPE, A BETA UNIT AT MILLIKEN?

1  A. YES, SIR.  I SEE THAT.

2  Q. DO YOU SEE IT THEY TALKED ABOUT THAT THEY OBSERVED IT

3  BEING COLD AND SUGGESTED A HEATER BE USED TO HEAT THE

4  CLEANING FLUID?

5  A. RIGHT.  IT WAS SUGGESTED THAT A HEATER BE USED TO HEAT

6  THE CLEANING FLUID.

7  Q. AND NOW, BY THE WAY, MR. CALTO WAS SOMEBODY YOU AND

8  MR. MCCLUER KNEW BEFORE YOU STARTED WITH ISC; CORRECT?

9  A. THAT IS CORRECT.

10  Q. AND HE HELPED OUT FOR A TIME WITH ISC CONSULTING AS A

11  CONSULTANT?

12  A. THAT IS CORRECT.

13  Q. AND HE PARTICIPATED IN SOME OF THE MEETINGS, CORRECT?

14  ABOUT THE DEVELOPMENT OF THE PARTS WASHER?

15  A. YES, HE DID.

16  Q. AND HE CAME UP WITH THE IDEA?

17  A. HE SUGGESTED THE BELT HEATER.

18  Q. AGAIN, HE CAME UP WITH THE IDEA OF THE HEATER GENERALLY,

19  DIDN'T HE, AS YOU SAID, IN 1996?

20  A. WELL SIR, THERE ARE HEATERS AND THERE ARE HEATERS.

21  Q. WELL, WHAT YOU DID -- YOU DON'T BELIEVE MR. CALTO MADE AN

22  INVENTIVE CONTRIBUTION OF THE PARTS WASHER AT CHEMFREE, DID

23  YOU?

24  A. I DON'T BELIEVE I SAID THAT.

25  Q. WOULD YOU BELIEVE HE DID MAKE AN INVENTIVE CONTRIBUTION?

1  A. I DON'T THINK I SAID THAT EITHER.

2  Q. LOOK, SIR, AT YOUR 2000 DEPOSITION AT PAGE 120, FEBRUARY

3  OF 2000.

4  A. YES, SIR.  WHAT PAGE?

5  Q. PAGE 120, SIR.

6  A. YES, SIR.

7         MR. MELARTI:  YOUR HONOR, I AM GOING TO OBJECT AS

8  TO THE RELEVANCY TO THIS LINE OF QUESTIONING.  NOWHERE IN

9  THE VALIDITY CONTENTIONS HAVE DEFENDANTS MADE ANY

10  ALLEGATIONS AS TO WHETHER OR NOT MR. CALTO SHOULD BE AN

11  INVENTOR.  THE ONLY ALLEGATIONS HAVE BEEN DIRECTED TO

12  MR. MCCLUER AND MR. MCCLUER'S INVENTORSHIP IN THIS CASE.

13         MR. HARBIN:  BRIEFLY, JUDGE, MAY I ADDRESS THAT?

14         THE COURT:  YES.

15         MR. HARBIN:  WE ARE NOT CLAIMING THAT AS A

16  GROUNDS, BUT WE DO THINK IT IS RELEVANT FOR EVALUATING THE

17  CLAIMS BY MR. MCNALLY AND MR. MARKS AND MR. STRANGE FOR

18  HAVING MADE INVENTIVE CONTRIBUTIONS FROM WHAT THEY

19  SUGGESTED.

20         THE COURT:  I AM GOING TO OVERRULE THE OBJECTION,

21  BUT I AM ASK YOU TO MOVE ALONG, MR. HARBIN, IF YOU COULD

22  PLEASE.  WE ARE SPENDING I THINK MORE TIME ON THIS THAN IT

23  DESERVES.

24         MR. HARBIN:  I WILL WITHDRAW THAT QUESTION, YOUR

25  HONOR, AND MOVE ON.

1  BY MR. HARBIN:

2  Q. ISN'T IT TRUE YOU DIDN'T DESIGN A HEATER YOURSELF, SIR?

3  A. THAT IS CORRECT.

4  Q. WHAT YOU DID, YOU GAVE A LIST OF HEATING SUPPLIERS TO

5  MR. MCCLUER TO GO FIND HEATING SUPPLIERS; CORRECT?

6  A. THAT IS CORRECT.

7  Q. AND A HEATING COMPANY DESIGNED A HEATER FOR YOU, MAYBE

8  MULTIPLE HEATERS?

9  A. WE CONTACTED SEVERAL HEATING COMPANIES -- EXCUSE ME,

10  COMPANIES THAT MANUFACTURE HEATERS, AND ASKED FOR THEM TO

11  SUGGEST DESIGN.  YES, WE DID.

12  Q. AND YOU EVENTUALLY ADOPTED ONE OF THE SUGGESTED DESIGNS?

13  A. WE EVENTUALLY ADOPTED ONE THAT WAS SUGGESTED.  THAT IS

14  CORRECT.

15  Q. NOW, LET'S TURN TO THE ISSUE OF THE BIOREMEDIATION PART

16  OF IT, THE USE OF THE MICROBES.  AND THE FIRST ONE I WANT TO

17  ASK YOU ABOUT, YOUR FIRST KNOWLEDGE OF THAT, YOU HAVE MET,

18  SIR, AN INDIVIDUAL RICHARD BLACKMORE?

19  A. I DID MEET AN INDIVIDUAL, RICHARD BLACKMORE.

20  Q. LET ME BRIEFLY GO BACK TO ONE OTHER, YOUR OTHER ITEM THAT

21  YOU SAID YOU INVENTED, THE LEVEL SENSOR?

22  A. CORRECT.

23  Q. JUST VERY BRIEFLY.  YOU DID NOT DESIGN A LEVEL SENSOR,

24  DID YOU, SIR?

25  A. NO, SIR, I DID NOT.

1  Q. YOUR IDEA WAS THAT THERE SHOULD BE A LEVEL SENSOR

2  COMBINED WITH A HEAT SENSOR, AND YOU LOCATED ONE FROM AN

3  EXISTING SUPPLIER; CORRECT?

4  A. I CAN'T RECALL THE EXACT SEQUENCE OF EVENTS.

5  Q. WELL, WHETHER THAT IS THE EXACT SEQUENCE, THAT IS WHAT

6  HAPPENED.  YOU HAD A DISCUSSION WITH MR. MCCLUER AND

7  MR. MCCLUER WONDERED IF THERE WAS A LEVEL SENSOR COMBINED

8  WITH A HEAT SENSOR, AND I THINK YOU SAID THERE IS, AND YOU

9  FOUND A SUPPLIER FOR THEM; CORRECT?

10  A. MR. MCCLUER DENIED THAT SUCH A PRODUCT EXISTED.

11  Q. THANK YOU, SIR.  AND IN FACT, IF YOU LOOK AT DEFENDANT'S

12  EXHIBIT 159, AGAIN, MR. MCCLUER'S REPORTS, AT PAGE CHEMFREE

13  157.  LOOK AT THE BOTTOM OF A FEW LINES OF THE SECOND

14  PARAGRAPH.  YOU ALL LOCATED AN INEXPENSIVE FLUID LEVEL

15  SENSOR IN FEBRUARY OF 1994; CORRECT?

16  A. WE HAVE LOCATED AN INEXPENSIVE FLUID LEVEL SENSOR.  THAT

17  IS CORRECT.  THAT IS WHAT IT SAYS.

18  Q. NOW, LET'S TALK ABOUT THE MICROBES AND THE USE OF THE

19  MICROBES IN A PARTS WASHER.  YOU ARE FAMILIAR WITH -- AT

20  LEAST WERE FAMILIAR WITH A MAN NAMED RICHARD BLACKMORE?

21  A. I AM FAMILIAR WITH THE NAME RICHARD BLACKMORE.

22  Q. AND HE HAS A COMPANY CALLED ENTRETECH?  WELL, HE OWNED

23  IT, HE WAS A PRINCIPAL?

24  A. HE WAS A PRINCIPAL OF A COMPANY THAT HAS BEEN CALLED

25  ENVIRONMENTA BIOREMEDIATION TECHNOLOGY, ENTRETECH.

1    Q. WOULD YOU BE COMFORTABLE IF I CALL IT ENTRETECH?

2    A. YES, SIR.

3    Q. AND YOU MET MR. BLACKMORE IN JULY OF 1993; CORRECT?  AT A

4    MEETING?

5    A. I DON'T RECALL EXACTLY WHEN I MET RICHARD BLACKMORE.

6    Q. CAN I ASK YOU TO LOOK AT YOUR 2007 DEPOSITION, SIR?  PAGE

7    189?  AND YOU DON'T NEED TO BLOW THIS UP.  YOU WERE ASKED ON

8    LINE 22, "UNDER WHAT CIRCUMSTANCES?"  "ANSWER:  I MET

9    MR. BLACKMORE ON SEVERAL OCCASIONS.  NOT ONLY IN A MEETING

10   AT VISTA, BUT ALSO WE INVITED MR. BLACKMORE TO OUR FACILITY

11   AT CHEMFREE."  "QUESTION:  WHO IS WE?"  THIS IS THE TOP OF

12   PAGE 190.  "MR. MCCLUER, MYSELF, MR. CALTO AND MR. MARKS."

13   "QUESTION:  DO YOU KNOW WHETHER HE IN FACT VISITED THAT

14   OFFICE IN JULY OF 1993, WHETHER HE VISITED BUSINESS OFFICES

15   IN JULY OF 1993?"  AND YOU SAID, "YES, HE DID, BECAUSE I

16   WENT TO THAT SAME MEETING."  IS THAT YOUR TESTIMONY?

17   A. YES.  THANK YOU FOR REFRESHING MY MEMORY.

18   Q. AND ISN'T IT TRUE IN THAT MEETING -- FIRST OF ALL, WHO IS

19   MR. BENNER, JUST BRIEFLY?

20   A. FRED BENNER WAS A FORMER EMPLOYEE OF SUMMA TECHNOLOGIES

21   WHO HAD BEEN LET GO WHEN SUMMA ABANDONED SUMMA ENVIRONOMICS,

22   OUR COMPANY, IN APRIL OF 1993.  AND HE WENT TO WORK FOR A

23   COMPANY CALLED VISTA.  WE KNEW HIM FROM THE SUMMA TECHNOLOGY

24   DAYS.

25   Q. IS IT TRUE THAT AT THAT MEETING IN JULY OF 1993

1    MR. BLACKMORE SHOWED MR. BENNER A SUBSTANCE THAT ABSORBED

2    OIL AND ALSO CONTAINED A BIOLOGICAL REMEDIATING COMPONENT?

3    A. RICHARD BLACKMORE SHOWED US AN ABSORBENT MATERIAL THAT

4    WAS PURPORTEDLY TO CONTAIN MICROBES.

5    Q. AND THAT WAS MATERIAL OF ENTRETECH?

6    A. IT WAS ENTRETECH MATERIAL.  CORRECT.

7    Q. AND IT WAS USED, FOR EXAMPLE, TO THROW AROUND GAS

8    STATIONS AND ABSORB GASOLINE AND OIL?

9    A. THAT IS ONE USE OF THEM AS WELL.  ABSORBENT.

10   Q. AND THAT IS ABSORBENT MATERIAL THAT YOU AND MR. MCCLUER

11   LOOKED INTO INCORPORATING INTO A FILTER AT YOUR WORK AT

12   INTELLIGENT SYSTEMS EARLY ON?

13   A. THAT IS CORRECT.

14   Q. AND MR. MCCLUER DESCRIBED THE MICROBES TO YOU AS ACTING

15   ON THE OIL AND ACTING ON HYDROCARBONS; CORRECT?

16   A. SORRY, WILL YOU REPEAT?

17   Q. MR. BLACKMORE, IN YOUR DISCUSSIONS WITH HIM, DESCRIBED

18   THE MICROBES AS ACTING ON THE HYDROCARBONS, BIOREMEDIATING?

19   A. MR. BLACKMORE SAID THEY WERE MICROBES THAT WERE

20   ABSORBENT.

21   Q. AND DESCRIBED IT THEM AS ACTING ON THE HYDROCARBONS;

22   CORRECT?

23   A. I DON'T RECALL THAT SPECIFICALLY, BUT IF I SAID THAT,

24   THEN PERHAPS IT'S TRUE.  I DON'T RECALL.

25   Q. LET ME ASK YOU TO LOOK AT PLAINTIFF'S EXHIBIT 528.  DO

1    YOU RECALL RECEIVING INFORMATION FROM ENTRETECH ABOUT THEIR

2    PRODUCTS?

3    A. I DO RECALL RECEIVING MARKETING INFORMATION FROM

4    ENTRETECH.

5    Q. AND IS THIS THE INFORMATION YOU RECEIVED?

6    A. THIS IS A PAGE FROM SOME OF THE MARKETING MATERIAL THAT

7    WE RECEIVED FROM ENTRETECH.

8    Q. IF YOU LOOK AT IN THE HARD COPY, AT PLAINTIFF'S EXHIBIT

9    528, IT IS ACTUALLY MULTIPLE PAGES.  THE BEGINNING OF THE

10   FIRST BOOK, WE STARTED WITH THE PLAINTIFF'S EXHIBIT.

11   A. OKAY.  YES, SIR.

12   Q. AND YOU RECEIVED THESE DOCUMENTS FROM MR. BLACKMORE?

13   A. THOSE APPEAR TO BE DOCUMENTS THAT WE RECEIVED FROM

14   ENTRETECH CORPORATION.

15   Q. AND IF YOU LOOK AT THE THIRD PARAGRAPH, MR. BLACKMORE'S

16   COMPANY PRESCRIBED ALL OF THE ENTRETECH PRODUCTS AS BEING

17   EFFECTIVE IN REDUCING IMMEDIATE THREATS, ET CETERA, WHILE

18   PROVIDING LONG-TERM SOLUTIONS TO ENVIRONMENTAL CONCERNS

19   THROUGH BIOREMEDIATION; CORRECT?

20   A. THEY DO SAY THAT THEY PROVIDE LONG-TERM SOLUTIONS TO

21   ENVIRONMENTAL CONCERNS THROUGH BIOREMEDIATION.

22           MR. HARBIN:  YOUR HONOR, WE WOULD OFFER

23   PLAINTIFF'S EXHIBIT 528 INTO EVIDENCE.

24           THE COURT:  MR. ANDERSON?

25           MR. MELARTI:  OBJECTION.  THERE IS NO FOUNDATION

1   FOR THIS DOCUMENT.  IT IS HEARSAY.

2          MR. HARBIN:  HE JUST TESTIFIED THAT HE RECEIVED IT

3   FROM MR. BLACKMORE OF ENTRETECH.

4          THE COURT:  WELL, THAT MAY SOLVE THE

5   AUTHENTICATION PROBLEM.  WHAT ABOUT THE HEARSAY OBJECTION?

6          MR. HARBIN:  WELL, I THINK THE HEARSAY OBJECTION

7   IS RESOLVED EASILY, YOUR HONOR, BECAUSE IN PART ONE OF THE

8   QUESTIONS HERE IS THE INVENTIVENESS OF COMING UP WITH THE

9   IDEA OF ADDING MICROBES TO SOLUTION, AND THAT'S WHAT THIS

10  WHOLE DISCUSSION WITH MR. BLACKMORE RELATES IN PART TO, AND

11  IT INCLUDES WHAT THEY TOLD THEM THE EXISTING PRODUCTS WOULD

12  DO.

13         THE COURT:  ANY FURTHER, MR. ANDERSON?

14         MR. MELARTI:  THAT MAY WELL BE, BUT MR. MCNALLY

15  CANNOT VOUCH FOR THE ACCURACY OF ANY OF THIS.

16         THE COURT:  WELL, IT WOULD STILL BE RELEVANT FOR

17  THE REASON I THINK MR. HARBIN OFFERED IT FOR, SO THE

18  OBJECTION IS OVERRULED.

19         MR. MELARTI:  THANK YOU.

20  BY MR. HARBIN:

21  Q. AND YOU AND MR. MCCLUER DID WORK EARLY IN 1993 AT ISC,

22  DID WORK ON PUTTING HIS ABSORBENT MATERIAL INTO MAKING THAT

23  INTO THE FILTER?

24  A. WE DID.

25  Q. AND YOUR UNDERSTANDING IS THAT THE MATERIAL HAD MICROBES

1    IN IT?

2    A. AS I EARLIER TESTIFIED.  MR. BLACKMORE SAID IT DID.

3    Q. AND THEN WHEN WE GET TO THE DETAILS, MR. BLACKMORE HAS

4    COME FROM ENTRETECH TO PROVIDE AND DID PROVIDE CHEMFREE WITH

5    CLEANING SOLUTION THAT HAD MICROBES IN IT; CORRECT?

6    A. STARTING IN 1994.

7    Q. AND BY THE WAY, SIR, I ASKED YOU ABOUT -- I WON'T GO

8    THROUGH ALL OF THEM.  I ASKED YOU ABOUT MR. MCCLUER'S

9    REPORTS.  LET ME ASK YOU TO LOOK AT DEFENDANT'S EXHIBIT 156.

10   YOU ALSO SUBMITTED PERIODIC CONSULTING REPORTS TO, WHEN YOU

11   WERE -- BEFORE YOU BECAME EMPLOYED, AT LEAST IN JUNE OF

12   1994, TO CHEMFREE FOR CONSULTING PAYMENT; CORRECT?

13   A. I DID SUBMIT INVOICES FOR SOME CONSULTING TO INTELLIGENT

14   SYSTEMS.

15   Q.  AND YOU SUMMARIZED THE WORK THAT YOU HAD DONE?

16   A. WE DID SUMMARIZE.

17   Q. AND YOU INTENDED THESE SUMMARIES TO BE ACCURATE?

18   A. THEY WERE VERY SHORT AND GENERALLY CORRECT.  BUT WE

19   DIDN'T SPEND A LOT OF TIME MAKING SURE THAT EVERYTHING WE

20   DID WAS CONTAINED IN THESE.

21             MR. HARBIN:  WE OFFER 156 INTO EVIDENCE.

22             MR. MELARTI:  NO OBJECTION.

23             THE COURT:  ADMITTED.

24             MR. HARBIN:  I WOULD PROPOSE AT THE SAME TIME I

25   WILL GIVE YOU ALL A LIST AND CHEMFREE'S COUNSEL A LIST WE

1    PROPOSED THAT WE JUST OFFER ALL OF HIS INDIVIDUAL REPORTS

2    WITHOUT HAVING THEM AUTHENTICATED, AND IF THEY HAVE AN

3    OBJECTION, JUST --

4                THE COURT: OKAY.

5    BY MR. HARBIN:

6    Q. NOW, SIR, DID I UNDERSTAND YOU TO SAY THAT YOU INVENTED

7    THE COMBINATION OF THE MICROBES IN THE FLUID?

8    A. I BELIEVE WHAT I SAID WAS I CONTRIBUTED TO THAT.  I MAY

9    HAVE SAID "INVENTED."

10   Q. IT IS TRUE THAT YOU DID NOT INVENT CLEANING FLUID;

11   CORRECT?

12   A. I DID NOT INVENT CLEANING FLUID.  THAT IS CORRECT.

13   Q. YOU DID NOT INVENT ANY MICROBES OR MICRON COMPOSITION?

14   A. I DID NOT INVENT MICROBES.  I DID DISCUSS THE COMPOSITION

15   OF THE MICROBES THAT WERE INCLUDED IN THE FLUID.

16   Q. IS WHAT YOU ARE SAYING THAT YOU ARE CLAIMING THAT, WHEN

17   YOU HEARD THERE WERE DIFFICULTIES WITH THE ABSORBENCE AND IN

18   THE PILLOW QUILTING, THAT THE PILLOW FILTERS, WITH THE

19   ENTRETECH MATERIAL; CORRECT?

20   A. YES.

21   Q. YOU SAID THAT IS FINE, SOMEBODY MAKES MICROBES AND SEE IF

22   WE CAN SEPARATE THEM AND PUT THEM IN THE FLUID?

23   A. I CAN'T SAY "YES" OR "NO" TO THAT.

24   Q. MORE FUNDAMENTALLY, SIR, ISN'T IT TRUE THAT ONE OF

25   MR. BLACKMORE'S EMPLOYEES, CHEMIST TED RICHARDSON, SUGGESTED

1    PUTTING THE BUGS IN THE CLEANING SOAP, IN THE FLUID?

2    A. ENTRETECH DID NOT HAVE AN TECHNICIAN NAMED RICHARDSON.

3    Q. WHOSE CHEMIST IS TED RICHARDSON?

4    A. I HAVE NEVER HEARD OF TED RICHARDSON.

5    Q. IF YOU WILL LOOK, SIR, AT YOUR 2002 DEPOSITION, PAGE 85

6    AND 6?  LET ME TRY TO SHORT CUT THIS.

7    A. HIS NAME IS DICKERSON.

8    Q. ISN'T IT -- IS IT TRUE -- ISN'T IT TRUE THAT

9    MR. DICKERSON, IN A MEETING YOU ALL HAD WITH HIM AND

10   MR. BLACKMORE, SUGGESTED COMBINING THE BUGS WITH CLEANING

11   FLUID?

12   A. MR. DICKERSON SUGGESTED THAT MIGHT BE A POSSIBILITY.

13   Q. HE ACTUALLY SUGGESTED SOME COMBINATIONS THAT HE THOUGHT

14   WOULD WORK; CORRECT?

15   A. I AM NOT SURE THAT WE EVER ACTUALLY SPOKE DIRECTLY TO TED

16   DICKERSON.  RICHARD BLACKMORE OFFERED US A SOAP THAT WAS

17   PURPORTED TO HAVE MICROBES IN IT.

18   Q. WHETHER IT CAME FROM MR. BLACKMORE OR MR. DICKERSON, IT

19   WAS MR. DICKERSON THAT CAME UP WITH THE IDEA OF PUTTING THE

20   BUGS IN THE FLUID?

21   A. I CAN'T TESTIFY TO THAT EITHER.

22   Q. NOW, IN REGARD TO THE FLUID, YOU USED FOR A TIME THE

23   ENTRETECH SOLUTION THAT WE BRIEFLY MENTIONED THEIR SOAP, IS

24   IT CALLED PANDA SOAP?

25   A. THE ENTRETECH SOAP IS CALLED PANDA SOAP.

1  Q. AND THERE ARE MICROBES?

2  A. NOT ALL OF THE PANDA SOAP HAD MICROBES IN IT.

3  Q. I KNOW, BUT FOR BIOREMEDIATING PARTS WASHERS, YOU FOR A

4  TIME OBTAINED A COMBINATION OF CLEANING SOLUTION THAT HAD

5  THE CLEANING FLUID AND THE BUGS IN IT FROM ENTRETECH?

6  A. IN 1994 ENTRETECH PROVIDED US WITH A FLUID THAT THEY SAID

7  HAD MICROBES IN IT.

8  Q. AND YOU DID NOT ASSIST IN DEVELOPING THAT FLUID OR THE

9  MICROBES, THAT WAS ENTRETECH'S JOB, WASN'T IT?

10  A. ENTRETECH PROVIDED A FLUID THAT WAS PURPORTED TO HAVE

11  MICROBES IN IT.

12  Q. SIR, YOUR HONOR, I WOULD ASK THAT THE WITNESS BE DIRECTED

13  TO ANSWER THE QUESTION.  THE QUESTION WAS, DID YOU ASSIST IN

14  THE DEVELOPMENT OF THE SOLUTION THAT ENTRETECH PROVIDED YOU

15  WITH CLEANING FLUIDS AND BUGS BOTH IN A SOLUTION?

16  A. I DID NOT ASSIST IN THE FORMULATION OF THE SOAP THAT WAS

17  PURPORTED TO HAVE MICROBES IN IT.

18  Q. AND IF YOU COULD LOOK, SIR, AT PLAINTIFF'S EXHIBIT 527.

19          THE COURT: WHEN YOU SAY THE SOAP, MR. MCNALLY, ARE

20  YOU REFERRING TO THE SOLUTION?  THEY ARE ONE IN THE SAME

21  THING?

22          THE WITNESS:  YES.

23          THE COURT:  OKAY.

24  BY MR. HARBIN:

25  Q. DO YOU RECOGNIZE THIS AS -- I AM TALKING ABOUT -- THAT IS

1    JUST THE FIRST PAGE, A REPORT THAT WAS DONE INTERNALLY AT

2    CHEMFREE IN FEBRUARY OF 1994 ABOUT THE DEVELOPMENT OF THE

3    PARTS WASHER?

4    A. THIS APPEARED TO BE A STATUS REPORT DATED FEBRUARY 16TH

5    OF 1994.

6    Q. AND IF YOU LOOK AT PARAGRAPH 2, DID YOU PREPARE THIS

7    REPORT, SIR, BY THE WAY?

8    A. I PARTICIPATED IN PREPARING THIS REPORT.

9    Q. WERE YOU THE ONE THAT APPROVED IT GOING TO MR. MARKS?

10   A. THROUGH ALL OF THIS PROCESS, ONE OF MR. MCCLUER'S HOBBIES

11   WAS MS DOS.  SO IN THE PREPARATION OF MOST OF THE DOCUMENTS

12   THAT WE WILL SEE, MR. MCCLUER WAS THE ONE THAT LIKED TO PLAY

13   WITH WORD PROCESSING.  SO MOST OF MY NOTES ARE ON YELLOW

14   SHEETS OF PAPER, AND MR. MCCLUER WOULD REDUCE THEM TO

15   DOCUMENTS.

16   Q. AND IF YOU LOOK ON PAGE CHEM152.  IT WAS YOUR

17   RECOMMENDATION TO CHEMFREE, IN MID FEBRUARY THAT THE

18   ENTRETECH SOLUTION WAS HIGHLY EFFECTIVE, THAT WAS YOUR

19   OPINION AT THE TIME?

20   A. IT WAS THE OPINION OF THE JOINT AUTHORS OF THIS DOCUMENT.

21   YES.

22   Q. DID YOU HAVE AN OPINION ONE WAY OR THE OTHER?

23   A. I WAS ONE OF THE JOINT AUTHORS, SO YES.

24   Q. THAT IT WAS REMEDIATING THE HYDROCARBONS?

25   A. YES.

1    Q. AND THAT IT WAS THE FLUID OF CHOICE?

2    A. THAT IS CORRECT.

3    Q. AND IF YOU LOOK AT THE LAST PAGE, 4-C, IT WAS YOUR

4    RECOMMENDATION THAT THE COMPANY PURSUE DESIGN AND FUNCTIONAL

5    PATENTS ON THE MACHINE, AND ENTRETECH WAS GOING TO PURSUE

6    PATENTS ON THE FLUIDS AND THE FILTERS, CORRECT?  AT THAT

7    TIME?

8    A. THAT'S WHAT THE REPORT SAYS.  YES.

9    Q. NOW YOU HAD SOME ISSUES WITH THE ENTRETECH WITH

10   REPEATABILITY OR RELIABILITY WITH IT WORKING.  YOU GOT SOME

11   GOOD TEST RESULTS BACK FIRST, CORRECT?

12   A. WE HAD GOOD TEST RESULTS ON ST. PATRICK'S DAY IN 1994,

13   MARCH 17TH, BUT THE FLUID WAS COMPLETELY UNRELIABLE.

14   Q. YOU ALSO HAD AN ISSUE COME UP IN THE SPRING OF 1994 AT

15   ENTRETECH ABOUT, NOT A TECHNICAL ISSUE, BUT A CORPORATE AND

16   BUSINESS RELATIONSHIP ISSUE INVOLVING A COMPANY FROM

17   CHICAGO?

18   A. I DON'T RECALL ANY OF THAT.

19   Q. LET ME ASK YOU TO LOOK, SIR, THAT EXHIBIT, DEFENDANT'S

20   EXHIBIT 365, IS THAT ANOTHER ONE OF YOUR PERIODIC REPORTS

21   FROM APRIL?

22   A. I HAVEN'T FOUND IT YET.  365?

23   Q. YES, SIR.

24   A. MY EXHIBITS SEEM TO SKIP FROM 363 TO 367.

25   Q. I WILL GIVE YOU A COPY HERE, SIR.

1    A. THANK YOU.

2    Q. IS THAT A REPORT OF APRIL 1, 1994?

3    A. THIS IS A DOCUMENT DATED APRIL 1, 1994.

4    Q. IT WAS ONE OF YOUR REPORTS FOR COMPENSATION; CORRECT?

5    A. THAT IS CORRECT.

6    Q. AND WAS ONE OF THE ISSUES, WAS THERE AN ISSUE WITH

7    ENTRETECH, YOU REFER TO CORPORATE INTRANSIGENTS.  DO YOU

8    KNOW WHAT THAT REFERS TO?

9    A. YES, SIR.  I SEE THAT PHRASE.

10   Q. THERE WAS AN ISSUE WHERE YOU SAID THEY HAD AN EXCLUSIVE

11   COMPANY IN CHICAGO, AND THEY INVOLVED THE COMPANY IN

12   CHICAGO?

13   A. I DON'T RECALL THE DETAILS, UNLESS YOU ARE REFERRING TO

14   INFRINGEMENT ON THE PART OF THE SUPPLIER.  THE SUPPLIER WAS

15   ENTRETECH.

16   Q. BY THE WAY, SIR, REGARDING THE LEVEL SWITCH, THE LEVEL

17   SWITCH IN MAKING THAT COMBINED WITH THE HEATER ELEMENT IN

18   YOUR PARTS WASHER?

19   A. WHAT ABOUT IT?

20   Q. WHAT IS THE PURPOSE OF THAT, OF INCORPORATING THAT INTO

21   THE PARTS WASHER?

22   A. TO ENSURE THAT THE HEATER OPERATES WHEN THERE IS FLUID

23   ENOUGH -- THE LEVEL SENSOR WILL DISABLE THE HEATER IF THE

24   FLUID IS TOO LOW.

25   Q. WHAT IS THE REASON FOR INCORPORATING THAT CAPABILITY INTO

1   THE PARTS WASHER?

2   A. GENERALLY BECAUSE YOU DON'T WANT THE HEATER RUNNING IN A

3   PLASTIC DEVICE IF THERE IS NO FLUID PRESENT.

4   Q. IT IS A SAFETY ISSUE, IN PART?

5   A. IN PART, IT IS A SAFETY ISSUE.  THAT IS CORRECT.

6   Q. NOW, YOU WENT TO ANOTHER SUPPLIER OF FLUID; CORRECT?

7   FROM ENTRETECH?

8   A. WELL SIR, I AM NOT SURE HOW TO ANSWER THAT BECAUSE --

9   Q. IT IS A HORRIBLE QUESTION.

10  A. WE INVESTIGATED A DOZEN FLUID SUPPLIERS.  AND THE FLUID

11  IS SOLUTION, SOAP, CLEANING FLUID.

12  Q. YOU ENDED UP WITH, UP UNTIL THE TIME THE PATENT

13  APPLICATION, THE FIRST PATENT APPLICATION WAS FILED IN

14  SEPTEMBER OF 1994, WITH THE COMBINATION OF SEAWASH 7;

15  CORRECT?

16  A. THAT IS CORRECT.

17  Q. FOR WARREN CHEMICAL?

18  A. YES.

19  Q. AND LRC, MICROBES FROM LOUISIANA REMEDIATION CORPORATION.

20  A. LRC-1 FROM LOUISIANA REMEDIATION CORPORATION.

21  Q. AND BY THE WAY, IN THIS DEVELOPMENT PROCESS, FROM THE

22  TIME YOU STARTED IN AUGUST OF 1993 UNTIL THE PATENT

23  APPLICATION WAS FILED IN 1994, CAN YOU APPROXIMATE WHAT WAS

24  THE HIGHEST NUMBER OF EMPLOYEES THAT CHEMFREE HAD?

25  A. ONE.

1  Q. WHO WAS THAT?  YOU?

2  A. ME.

3  Q. AND CAN YOU TELL THE COURT --

4  A. SORRY, SIR.  THE TIME PERIOD AGAIN?

5  Q. FROM THE TIME YOU STARTED, I KNOW YOU WEREN'T AN EMPLOYEE

6  THE WHOLE TIME.  FROM THE TIME YOU STARTED IN AUGUST OF '93

7  AS CONSULTANT UNTIL THE PATENT WAS APPLIED FOR IN SEPTEMBER

8  30TH OF 1994.

9  A. THERE MAY HAVE BEEN SOME ADMINISTRATIVE HELP, BUT I DON'T

10  RECALL.  WE GENERALLY USED THE ISC FACILITIES, SO I WAS THE

11  ONLY EMPLOYEE.

12  Q. AND CAN YOU IDENTIFY EVERYBODY, I KNOW YOU CALLED

13  SUPPLIERS FOR PARTS, ET CETERA.  BUT EVERYBODY WITHIN

14  CHEMFREE THAT WORKED ON THE DEVELOPMENT OF THE PARTS WASHER,

15  CAN YOU IDENTIFY THOSE PEOPLE?  AND THE SHORT CUT, THERE IS

16  YOU, YOU HAVE TESTIFIED MR. MARKS, THERE IS MR. STRANGE.

17  A. I TESTIFIED THAT WE USED ALL OF THE FACILITIES AT

18  INTELLIGENT SYSTEMS.  THAT MEANS THAT WE HAD ACCESS TO ALL

19  OF THE COMPANY'S TECHNICIANS AND ENGINEERS AND SO ON AND SO

20  FORTH.  SO IN THOSE REPORTS THAT WE'VE BEEN THROUGH BEFORE,

21  WE MENTIONED PEOPLE LIKE ROB GENCO, FRANK DAVIS, THOSE ARE

22  THE ONLY TWO NAMES THAT COME TO MIND, THAT WERE NOT

23  EMPLOYEES OF CHEMFREE.

24  Q. THOSE COME TO MIND, YOURSELF, MR. MCNALLY, MR. MARKS,

25  MR. STRANGE, AND MR. MCCLUER?

1   A. AND MR. CALTO WAS THERE FOR A PERIOD.

2   Q. YOU DON'T KNOW WHO FIRST MADE CONTACT WITH LRC; CORRECT?

3   A. THAT WAS ME.

4   Q. LET ME ASK YOU TO LOOK AT YOUR 2000 DEPOSITION, PAGE 105.

5   YOU WERE ASKED, "HOW DID YOU GET IN TOUCH WITH LOUISIANA

6   REMEDIATION?"  "ANSWER:  I DON'T REMEMBER."  "QUESTION:  DID

7   YOU CONTACT THEM INITIALLY?"  "ANSWER:  I AM NOT SURE WHO

8   MADE THE INITIAL CONTACT WITH LRC."  IS THAT TRUE?

9   A. THAT WAS WHAT I SAID IN THE YEAR 2000.  I HAVE HAD A LOT

10   OF TIME TO THINK ABOUT IT SINCE THEN.

11   Q. SO YOUR MEMORY NOW IS BETTER?

12   A. THAT IS CORRECT.

13   Q. BUT YOU ALL DID NOT, AGAIN, ASSIST IN THE DEVELOPMENT OF

14   LRC'S MICROBES, THEY IN FACT KEPT THE COMPOSITION OF

15   MICROBES PROPRIETARY, WOULDN'T DISCLOSE THE SPECIFIC

16   COMPOSITIONS TO YOU; CORRECT?

17   A. THEY WOULD NOT DISCLOSE THEM SPECIFICALLY.

18   Q. AND THE SEAWASH COMBINATION, THE SEAWASH FLUID, THAT WAS

19   SUPPLIED BY WARREN CHEMICAL, AND WARREN CHEMICAL WOULD NOT

20   PROVIDE TO YOU THE CHEMICAL FORMULA OF THEIR FLUID; CORRECT?

21   A. WARREN CHEMICAL CONSIDERED THE COMPOSITION OF THEIR FLUID

22   TO BE A TRADE SECRET.

23   Q. AND IN THAT REGARD, YOU RECALL FILING A DECLARATION IN

24   SUPPORT OF CHEMFREE'S MOTION FOR SUMMARY JUDGMENT IN THIS

25   CASE?

1  A. I DO RECALL.

2  Q. OR SIGNING ONE?

3  A. I RECALL SIGNING ONE.

4  Q. AND I JUST WANT TO CLARIFY THE RECORD, I AM NOT CASTING

5  ASPERSIONS, BUT PARAGRAPH 14 OF YOUR AFFIDAVIT SAYS AT THE

6  TIME THAT WE FILED THE PATENT APPLICATION WE DID KNOW THAT

7  THE -- WE DID KNOW THE CHEMICAL FORMULA OF SEAWASH AND

8  WARREN CHEMICAL AT THAT TIME WAS WILLING TO DISCLOSE THE

9  FORMULA TO US.  THAT IS A TYPO.  YOU LEFT OUT THE "NOT"?

10  A. THAT IS CORRECT.

11  Q. NOW, IF YOU CAN LOOK, SIR, AT DEFENDANT'S EXHIBIT 278.

12  DO YOU RECOGNIZE THAT AS INFORMATION THAT LRC PROVIDED YOU

13  IN APRIL OF 1994 ABOUT THEIR PRODUCT?

14  A. I RECOGNIZE IT AS A MARKETING PIECE FROM LOUISIANA

15  REMEDIATION COMPANY.

16  Q. AND YOU CAME -- IN FACT, FOR QUITE SOME TIME YOU

17  INCORPORATED THEIR PRODUCT IN YOUR PARTS WASHERS, CORRECT?

18  A. WE DID USE LOUISIANA REMEDIATION PRODUCTS IN OUR FILTERS.

19  Q. OKAY.  FLIP TO THE NEXT PAGE.  THE DOCUMENT PROVIDES, THE

20  HISTORY OF BIOREMEDIATION, AND THERE ARE COMPANIES INVOLVED

21  IN IT; CORRECT?

22  A. AS I SAID, THIS IS A MARKETING PIECE, SO --

23  Q. DID YOU FIND IN YOUR DEALINGS WITH THEM ANY OF THE

24  INFORMATION TO BE INCORRECT THAT YOU'VE BEEN PROVIDED?

25  A. I NEVER TESTED THE HISTORY OF BIOREMEDIATION.

1    Q. DID YOU FIND ANY INFORMATION ABOUT THE COMPANY'S

2    OFFERINGS TO BE INCORRECT?  THE COMPANY'S PRODUCTS?

3    A. I DID NOT.

4            MR. HARBIN:  WE WOULD OFFER THIS EXHIBIT, YOUR

5    HONOR, INTO EVIDENCE.

6            MR. MELARTI:  SAME OBJECTION AS BEFORE.  TO THE

7    EXTENT THAT THIS DOCUMENT IS USED TO ESTABLISH THAT LRC

8    PROVIDED PRODUCTS, THAT IS FINE.  BUT MR. MCNALLY CANNOT

9    VOUCH AS TO THE CONTENT OF THIS DOCUMENT.  AND, FOR EXAMPLE,

10   THE HISTORY OF BIOREMEDIATION.  SO AGAIN, ON THE GROUND OF

11   HEARSAY, DON'T KNOW WHERE MR. HARBIN IS GOING, BUT I WOULD

12   LIKE TO KNOW THE --

13           THE COURT:  MR. HARBIN, THE RELEVANCE?

14           MR. HARBIN:  WE BELIEVE IT IS RELEVANT, YOUR

15   HONOR, WHAT WE STATED EARLIER ABOUT THE OTHER DOCUMENT.

16           THE COURT:  AND WHAT WERE THOSE?

17           MR. HARBIN:  SORRY, YOUR HONOR?

18           THE COURT:  WHAT WERE THOSE?

19           MR. HARBIN:  I THINK IT IS RELEVANT BOTH TO THE

20   STATE OF MIND OF THE INVENTORS DOING WHAT THEY DO, THAT WHAT

21   THEY ARE RELYING ON FROM THE SUPPLIERS PRIMARILY.  AND, YOU

22   KNOW, WHETHER OR NOT ALL DETAIL IS TRUE, I THINK IT DOES

23   SHOW THE STATE OF THE ART GENERALLY AT THE TIME THE

24   COMPANIES ARE OUT THERE PROVIDING THIS INFORMATION.

25           THE COURT:  OBJECTION IS OVERRULED.

1    MR. HARBIN:

2    Q. AND LET ME ASK YOU TO LOOK, SIR, AT PLAINTIFF'S EXHIBIT

3    45.

4    A. 145?

5    Q. NO. 45.  PLAINTIFF'S EXHIBIT 45, WHICH I THINK IS THE

6    FIRST EXHIBIT IN THE FIRST BOOK.

7    A. I DON'T SEEM TO HAVE PLAINTIFF'S EXHIBIT 45.

8    Q. I CAN HAND YOU A COPY, SIR.  IS THIS INFORMATION THAT WAS

9    PROVIDED TO YOU BY SEAWASH WHEN YOU WERE WORKING WITH

10   SEAWASH?

11   A. THIS APPEARS TO BE A LABEL FROM A BOTTLE OF SEAWASH 7.

12   Q. IS THIS A LABEL THAT THEY PREPARED?

13   A. SORRY, I SAID THIS APPEARS TO BE A COPY OF A LABEL FROM

14   SEAWASH 7.

15   Q. DO YOU KNOW IF IT IS A LABEL THAT THEY PREPARED?  "THEY"

16   MEANING WARREN CHEMICAL CORPORATION?

17   A. YES.  I BELIEVE THIS IS A LABEL PREPARED BY WARREN

18   CHEMICAL CORPORATION.

19   Q. IN REGARD TO THEIR FLUID IN GENERAL, I WANT TO ASK YOU

20   JUST A MINUTE ABOUT YOUR TESTIMONY ABOUT THE GRAY MILLS

21   MACHINE AND FLUID.  YOU TESTIFIED THAT THE BIOTENE FLUID

22   WOULD NOT WORK IN THE GRAY MILLS DH 437; IS THAT CORRECT?

23   A. BEFORE IT WAS MODIFIED.

24   Q. IS IT YOUR TESTIMONY THAT YOU CANNOT USE AN AQUEOUS FLUID

25   IN A SOLVENT PARTS WASHER?

1  A. THAT IS NOT CORRECT.  THAT IS NOT MY TESTIMONY.

2  Q. YOU CAN?

3  A. YES, YOU CAN.

4  Q. AND YOU CAN USE AN AQUEOUS FLUID THAT IS NOT

5  BIOREMEDIATING IN THE CHEMFREE PARTS WASHER?

6  A. YOU CAN USE AN AQUEOUS FLUID THAT IS NOT BIOREMEDIATING

7  IN OUR PARTS WASHER.

8  Q. IN FACT, SOME OF YOUR CUSTOMERS DO THAT?

9  A. I DON'T HAVE KNOWLEDGE OF THAT.

10 Q. BUT YOU HAVE INDIRECT KNOWLEDGE.  YOU HAVE HEARD OF THAT?

11 A. HAVE I HEARD THAT?

12 Q. YES.

13 A. I MAY HAVE HEARD THAT.

14 Q. BECAUSE, I MEAN, YOU ALL INSTRUCT THE END USERS TO USE

15 YOUR FLUID AND YOUR MATS; CORRECT?

16 A. WHAT WAS THE FIRST PART OF THE QUESTION?

17 Q. CHEMFREE INSTRUCTS ITS CUSTOMERS TO USE YOUR FLUID AND

18 YOUR MATS?

19 A. THAT IS CORRECT.

20 Q. BUT YOU ARE AWARE NOT ALL CUSTOMERS FOLLOW THAT?

21 A. SOME MIGHT USE AN AQUEOUS PARTS WASHER?

22 A. I THINK I JUST TESTIFIED THAT I DON'T HAVE ANY DIRECT

23 KNOWLEDGE OF THAT.

24 Q. BUT AGAIN, YOU HAVE INDIRECT KNOWLEDGE?

25 A. I SAID, I MAY HAVE HEARD THAT.  THAT IS CORRECT.

1    Q. AND YOU TESTIFIED THAT YOUR LAST SHIPMENT TO GRAY MILLS

2    WAS IN JUNE/AUGUST OF 1999, AND THOSE PRODUCTS INCLUDED

3    PATENT MARKINGS; IS THAT RIGHT?

4    A. YES.  THEY DID.

5    Q. ISN'T IT TRUE THAT NO PATENT HAD ISSUED RELEVANT TO THE

6    PARTS WASHER IN JUNE/AUGUST OF 1999?

7    A. WE HAVE TALKED ABOUT THE OVER-ZEALOUSNESS OF OUR

8    MARKETING DEPARTMENT.  YES, WE HAVE.

9    Q. SO YOU ACTUALLY HAD LABELS THAT SAID SUBJECT TO PATENT,

10   BUT THEY WEREN'T PATENTED?

11   A. IT SHOULD HAVE SAID "PATENT PENDING."

12   Q. YOU WERE ASKED -- LOOK AGAIN AT PLAINTIFF'S EXHIBIT 101.

13   YOU TESTIFIED ABOUT ON DIRECT.  DO YOU KNOW IF THIS UNIT

14   THAT IS SHOWN IS A GRAY MILLS UNIT, 436 UNIT?

15   A. I THINK WHAT I TESTIFIED WAS THAT IT LOOKS VERY MUCH LIKE

16   A GRAY MILLS UNIT BUT IN GREEN.

17   Q. BUT YOU DON'T KNOW IF IT'S ONE, DO YOU?

18   A. NO, I CAN'T IDENTIFY FROM THE PICTURE THAT THIS IS

19   ACTUALLY MANUFACTURED BY GRAY MILLS.

20   Q. NOW, LET'S GO BACK TO THE TOPIC OF THE SOLUTION, THE

21   COMBINATION OF THE MICROBES.  AND I WILL FINISH UP BY 12:30,

22   YOUR HONOR, I BELIEVE.  LET ME ASK YOU, SIR, TO LOOK AT

23   DEFENDANT'S EXHIBIT 430.  THIS IS ONE OF YOUR REPORTS, JUNE

24   10, 1994.

25   A. YES, IT IS.

1  Q. AND IF YOU LOOK AT THE LAST TWO LINES, YOU REFER TO

2  ACCEPTING DELIVERY OF SW-1 PARK FLUID, THAT IS A SEAWASH

3  FLUID; CORRECT?

4  A. YES.  WE CLEVERLY CALL IT SW INSTEAD OF SEAWASH.

5  Q. IS THAT THE FIRST DELIVERY OF THE SEAWASH FLUID TO YOU?

6  A. I CAN'T TESTIFY TO THAT.  I BELIEVE WE WOULD HAVE TESTED

7  IT BEFORE WE ORDERED IT.

8  Q. LET ME ASK YOU, SIR, TO LOOK AT DEFENDANT'S EXHIBIT 370.

9  A. YES, SIR.

10  Q. IS THIS A MEMO FROM YOU TO MR. MCCLUER AND TOM CALTO IN

11  APRIL OF '94 ASKING QUESTIONS ABOUT THE FLUID THAT YOU WERE

12  LOOKING AT AT THE TIME?

13  A. IT DOES APPEAR TO BE A MEMO FROM ME TO JIM AND TOM, JIM

14  MCCLUER AND TOM CALTO.

15            MR. HARBIN:  YOUR HONOR, WE OFFER THIS MEMO INTO

16  EVIDENCE, DEFENDANT'S EXHIBIT 370.

17            THE COURT:  MR. MELARTI?

18            MR. MELARTI:  NO OBJECTION.

19            THE COURT:  ADMITTED.

20  BY MR. HARBIN:

21  Q. LET ME ASK YOU, SIR, TO LOOK AT EXHIBIT 465, DEFENDANT'S

22  EXHIBIT 465.

23  A. YES, SIR.

24  Q. IS THIS A MEMO THAT YOU WROTE TO -- IS THIS A MEMO OR

25  LETTER YOU WROTE TO AL MCPHERSON AT LOUISIANA REMEDIATION

1    SUPPLIER ON JULY 29 OF 1994?

2    A. THIS IS A LETTER I WROTE TO MR. MCPHERSON, A COPY OF A

3    LETTER THAT I WROTE TO MR. MCPHERSON IN 1994.

4    Q. ALL RIGHT.  AND YOU WERE ASKING QUESTIONS ABOUT THEIR

5    BACTERIA, AND THE INTERACTION FIRST WITH, YOU KNOW, WHAT

6    THEY WILL BE TRYING TO CLEAN.  COMPOUNDS -- LET ME REPHRASE

7    THAT QUESTION.

8         ONE OF THE QUESTIONS YOU ARE ASKING LRC IN LATE JULY OF

9    1994 WAS WHETHER THE CLEANING SOLUTION WOULD NEGATIVELY

10   IMPACT THE BACTERIA; CORRECT?

11   A. THAT IS NOT CORRECT.

12   Q. YOU ARE ASKING THEM ABOUT A PH NEUTRAL ENVIRONMENT AND

13   CERTAIN COMPOUNDS, WHETHER THEY WILL DEGRADE OR NEGATIVELY

14   AFFECT THE MICROBES?

15   A. YOU ARE TALKING ABOUT THE CONTAMINANTS INTRODUCED TO THE

16   THE PH NEUTRAL ASPECTS OF THE CLEANER.

17             MR. HARBIN:  WE OFFER 465 INTO EVIDENCE.

18             MR. MELARTI:  NO OBJECTION.

19             THE COURT:  ADMITTED.

20             MR. HARBIN:  LOOK AT EXHIBIT 481, SIR.

21   BY MR. HARBIN:

22   Q. THIS IS A MEMO THAT -- LET ME ASK YOU FIRST, HAVE YOU

23   SEEN THIS MEMO?

24   A. I HAVE NEVER SEEN THIS BEFORE.

25   Q. IS IT TRUE THAT CHEMFREE'S PATENT ATTORNEYS WERE AS LATE,

1    LATE END OF AUGUST OF 1994, COMMUNICATING WITH LRC ABOUT

2    TECHNICAL INFORMATION?

3    A. I CAN'T TESTIFY TO THAT.

4    Q. YOUR HONOR, I DON'T REMEMBER IF THERE IS AN OBJECTION.

5    WE WOULD OFFER THIS INTO EVIDENCE, EXHIBIT 481.

6              THE COURT:  MR. ANDERSON?

7              MR. MELARTI:  I DON'T BELIEVE A FOUNDATION HAS

8    BEEN LAID AT THIS POINT.

9              THE COURT:  IT HASN'T, BUT DO YOU OBJECT TO IT?

10             MR. MELARTI:  UNFORTUNATELY, YOUR HONOR, THE

11   PRETRIAL OBJECTION DOESN'T ACTUALLY MATCH OUR ENTRY ON THE

12   LIST, DOES NOT MATCH THIS DOCUMENT.  SO AT THIS POINT I

13   CANNOT TELL WHETHER OR NOT WE, IN PRETRIAL PROCEEDINGS,

14   OBJECTED TO THIS DOCUMENT.

15             THE COURT:  ALL RIGHT.  WELL, I AM GOING TO

16   CONDITIONALLY ADMIT IT.  IF YOU HAVE SOME REASON THAT IT'S

17   NOT AUTHENTIC OR THAT IT SHOULD NOT BE ADMITTED, I WILL TAKE

18   A LOOK AT IT WHEN YOU HAVE A CHANCE TO DETERMINE THAT.

19   BY MR. HARBIN:

20   Q. IS IT TRUE, MR. MCNALLY, THAT IN YOUR UNDERSTANDING, THE

21   TESTING DID NOT INDICATE THE FLUID AND MICROBES MIX WAS

22   STABLE UNTIL SEPTEMBER OF 1994?

23   A. I AM NOT SURE I UNDERSTAND.  WHAT IS THE QUESTION?

24   Q. IS IT TRUE THAT THE TESTING THAT CHEMFREE DID, OR ITS

25   CONSULTANTS DID -- YOU OFTEN SENT THE SOLUTIONS OUT TO LABS

1  TO BE TESTED?

2  A. WE DID.

3  Q. IS IT TRUE THAT YOUR TESTING DID NOT INDICATE THAT THE

4  FLUID MICRON MIX WAS STABLE UNTIL SEPTEMBER OF 1994?

5  A. I CAN'T TESTIFY TO THAT AS TO THE DATES.

6  Q. WAS IT TRUE THAT IT WOULD BE A LITTLE MORE ACCURATE THAT

7  THE TESTING THAT DEMONSTRATED THE COMBINATION OF FLUID AND

8  MICROBES WAS STABLE WASN'T COMPLETED UNTIL SEPTEMBER OF

9  1994?

10  A. I BELIEVE THERE WAS A MEMO DATED MARCH 17TH OF 1994 IN

11  WHICH WE FIRST REPORTED SUCCESS AFTER REMEDIATING

12  HYDROCARBONS USING MICROBES AND FLUID.

13  Q. WELL, THAT MEMO, SIR, WAS ABOUT THE ENTRETECH SOLUTION OF

14  THEIR MICROBES AND THEIR FLUIDS; CORRECT?

15  A. THAT IS CORRECT, WHICH WAS MICROBES IN FLUID

16  BIOREMEDIATING IN A PARTS WASHER.

17  Q. IF I UNDERSTAND YOUR TESTIMONY, YOU SUBSEQUENTLY

18  DETERMINED THAT WAS NOT A RELIABLE SOLUTION.  THAT IT WAS

19  SOMETIMES EFFECTIVE, THERE WASN'T MICROBES IN THE SOLUTION

20  THAT ENTRETECH DELIVERED; CORRECT?

21  A. WE DID DETERMINE THAT WE HAD TO FIND A BETTER WAY TO DO

22  IT.

23  Q. WELL, DID YOU DETERMINE THAT SOMETIMES THERE WERE NO

24  MICROBES IN THE SOLUTION?

25  A. WE DID DETERMINE THAT SOMETIMES THERE WERE NOT MICROBES

1  IN THE SOLUTION.

2  Q. AND IF I CAN REFER YOU, SIR, TO YOUR 2007 DEPOSITION,

3  PAGE 177 LINES 10 THROUGH 13.  YOUR TESTIMONY WAS, "THE

4  TESTING THAT DEMONSTRATED THAT EVERYTHING WAS STABLE REALLY

5  WASN'T COMPLETE UNTIL SEPTEMBER OF 1994."  DO YOU SEE THAT?

6  A. I DO SEE THAT.

7  Q. WAS THAT A TRUE STATEMENT?

8  A. THAT IS A TRUE STATEMENT.

9  Q. OKAY.  AND LET ME ASK YOU -- I WILL WITHDRAW, THAT YOUR

10  HONOR.  LET ME YOU ASK THIS, SIR, IF YOU CAN LOOK AT EXHIBIT

11  499.

12  A. YES.

13  Q. THIS IS A LETTER YOU SENT TO MR. WITHERSPOON, A PATENT

14  AGENT WITH MR. ISAF?

15  A. IT DOES APPEAR TO BE A COPY OF THE LETTER THAT I SENT TO

16  LOU ISAF.

17  Q. NOW, THIS LISTS MARKS, MCCLUER, MCNALLY, AND STRANGE AS

18  INVENTORS; CORRECT?

19  A. IT LISTS MARKS, MCCLUER, MCNALLY, AND STRANGE AS

20  INVENTORS.

21  Q. THIS IS THE FIRST TIME THIS LIST OF INVENTORS HAVE BEEN

22  PROVIDED TO YOUR PATENT COUNSEL BEFORE?

23  A. I CAN'T TESTIFY TO THAT.

24  Q. ISN'T IT TRUE, IF YOU LOOK AT DEFENDANT'S EXHIBIT 479,

25  THAT AS OF THE END OF AUGUST OF 1994, THE CORRESPONDENCE

1    BETWEEN MR. ISAF'S OFFICE AND CHEMFREE WAS, FIRST OFF, WAS

2    SHOWING MR. MCCLUER AS THE INVENTOR, THE SOLE INVENTOR?

3    A. THIS IS A LETTER FROM LOUIS ISAF'S OFFICE BY JIM

4    WITHERSPOON & ASSOCIATES.  MR. MCCLUER, WHO WAS PART OF A

5    TEAM AT CHEMFREE CORPORATION.

6    Q. THAT IS NOT WHAT I ASKED YOU.

7    A. WHAT WAS THE QUESTION?

8    Q. THIS DOCUMENT IDENTIFIED MR. MCCLUER AS THE SOLE

9    INVENTOR?

10    A. IN THIS DOCUMENT, MR. MCCLUER IS THE ONLY ONE LISTED AS

11    THE INVENTOR.

12          MR. HARBIN:  WE OFFER 479 AND 499 INTO EVIDENCE.

13          MR. MELARTI:  NO OBJECTION.

14          THE COURT:  ADMITTED.

15    BY MR. HARBIN:

16    Q. I BELIEVE YOU TESTIFIED IN SEPTEMBER OF 1994 WAS THE TIME

17    THAT MR. MCCLUER, AT THE TIME, STOPPED COMING TO WORK AT

18    CHEMFREE?

19    A. ONCE AGAIN, I CAN'T BE SPECIFIC AS OF THE DATES, BUT IT

20    WAS IN THE TIME FRAME OF SEPTEMBER OF 1994, LABOR DAY.

21    Q. LET ME BRIEFLY RECAP ON THIS ALLEGED INVENTION.  YOU AND

22    MR. MCCLUER HAD NOT HAD ANY EXPERIENCE IN THE PARTS WASHING

23    INDUSTRY BEFORE YOU STARTED -- BEFORE YOU GOT YOUR PARTS

24    WASHER IN LATE 1992?

25    A. THAT IS CORRECT.

443

1   Q. YOU ARE NOT A BIOLOGIST OR CHEMIST, ARE YOU, SIR?

2   A. I AM NOT.

3   Q. NEITHER IS MR. MCCLUER?

4   A. THAT IS CORRECT.

5   Q. NOW, IN REGARD TO THE -- AFTER THE TESTING OF THE FLUID,

6   YOU END UP WITH SEAWASH 7 AND RLC, BUT YOU DIDN'T KNOW THE

7   SPECIFIC COMPOSITIONS OF IT.  YOU TESTIFIED YOU TESTED OTHER

8   MATERIALS; CORRECT?

9   A. WE DID TEST -- WELL, ACTUALLY, THERE WAS A STATEMENT IN

10  THE FIRST PART OF THAT -- EXCUSE ME -- THERE WAS A PHRASE IN

11  THE FIRST PART OF THE STATEMENT LEADING UP TO THE QUESTION

12  THAT WAS NOT CORRECT.

13  Q. WELL, LET ME JUST REPHRASE IT.  I AM SORRY.  IN THE

14  SPRING, THE SUMMER OF 1994, YOU ALL EVALUATED OR LOOKED AT

15  DIFFERENT POTENTIAL FLUIDS, CORRECT?

16  A. WE DID.

17  Q. YOU LOOKED AT DIFFERENT POTENTIAL MICROBES?

18  A. WE DID.

19  Q. WHAT YOU DID WAS, YOU USED A SOURCE FOR COMMERCIAL

20  SUPPLIERS, AND YOU FOUND COMMERCIALLY AVAILABLE FLUID

21  SUPPLIERS; CORRECT?

22  A. WE DID FIND COMMERCIALLY AVAILABLE FLUIDS.

23  Q. AND YOU FOUND COMMERCIALLY AVAILABLE MICROBES?

24  A. WE DID FIND VENDORS THAT SUPPLIED COMMERCIALLY AVAILABLE

25  MICROBES.

1  Q. AND YOU MADE NO EFFORT TO ISOLATE THESE SPECIFIC

2  MICROORGANISMS THAT WERE INVOLVED?

3  A. THAT IS NOT CORRECT.

4  Q. WAS IT TRUE YOU HAD A SUCCESSFUL BIOREMEDIATING PARTS

5  WASHER BEFORE YOU KNEW OR UNDERSTOOD THE CLASSIFICATION OF

6  THE PARTICULAR MICROORGANISMS THAT WERE USED?

7  A. THAT IS CORRECT.

8  Q. YOU SIMPLY, AGAIN, LOOKED AT THE THOMAS REGISTRY AND

9  OTHER PUBLICLY AVAILABLE SOURCES?

10  A. WE WENT TO THE THOMAS REGISTER TO FIND APPROPRIATE

11  VENDORS OF MISCELLANEOUS PARTS.  THERE WAS NO INTERNET THEN.

12  Q. IS IT YOUR TESTIMONY THAT YOU TRIED AT LEAST A DOZEN

13  COMBINATIONS?

14  A. I MAY HAVE SAID A DOZEN.  THAT IS A FIGURE OF SPEECH.

15  THERE WERE MORE THAN ONE, AND LESS THAN 12.  THERE WAS MORE

16  THAN ONE AND LESS THAN 12.

17  Q. AND YOU FOUND THAT ALL BUT TWO OR THREE OF THEM WORKED TO

18  SOME DEGREE?

19  A. AGAIN, I CAN'T TESTIFY TO WHETHER THERE WAS TWO OR THREE

20  OR FOUR OR FIVE OR SIX OR SEVEN.  BUT COMMERCIALLY AVAILABLE

21  SUPPLIERS OF OIL DISPERSANTS AND DEGREASERS, AND WE HAD

22  SEVERAL THAT WORKED.

23  Q. AND IN REGARD, WHAT YOU -- YOU DIDN'T MODIFY ANY OF THESE

24  SOLUTIONS YOURSELF, YOU TESTED WHETHER THEY CLEANED OR NOT?

25  A. IN THE BEGINNING, THAT IS CORRECT.  WE DID NOT DO ANY

1  MODIFICATIONS TO THE FLUIDS.

2  Q. AND YOU DIDN'T MODIFY THE SEAWASH FLUID, DID YOU?

3  SEAWASH 7, THAT YOU ENDED UP USING UP UNTIL THE TIME THE

4  PATENT WAS APPLIED FOR?

5  A. SEAWASH 7 WAS MANUFACTURED BY A CHEMICAL COMPANY CALLED

6  WARREN CHEMICAL CORPORATION.  CHARLIE WARREN, WHO WE CAME TO

7  KNOW WELL, WAS THE SOLE PROPRIETOR OF THAT COMPANY.  WE

8  WORKED WITH CHARLIE ON SEVERAL DIFFERENT FORMULATIONS

9  INCLUDED WITHIN THE SEAWASH 7.

10  Q. ISN'T IT TRUE, SIR, THAT SEAWASH 7 WAS NOT CUSTOMIZED FOR

11  YOU, THAT IT WAS SIMPLY A COMMERCIAL BRAND THAT WAS THEN

12  AVAILABLE FROM ORDINARY COMMERCIAL SOURCES?

13  A. SEAWASH 7 WAS AVAILABLE FROM ORDINARY COMMERCIAL SOURCES.

14  Q. AND LRC-1 WAS A COMMERCIAL BRAND THAT WAS AVAILABLE

15  FROM ORDINARY COMMECIAL SOURCES?

16  A. LRC-1 WAS A TYPE OF -- YES.

17  Q. IN YOUR DEVELOPMENT YOU CONCLUDED THAT THE AMOUNT OF

18  EXPERIMENTATION NECESSARY FOR YOU ALL TO COMBINE A CLEANING

19  FLUID THAT YOU DIDN'T KNOW THE SPECIFIC COMPOSITION OF, AND

20  MICROBES THAT YOU DIDN'T KNOW THE SPECIFIC COMBINATION OF,

21  TO COME UP WITH A WORKING BIOREMEDIATING PARTS WASHER

22  SOLUTION WAS NOT DIFFICULT NOR EXPENSIVE; IS THAT CORRECT?

23  A. YOU USED THE WORD "SPECIFIC" IN BOTH DESCRIBING SEAWASH

24  7, A SPECIFIC CHEMICAL FORMULATION THAT WE DIDN'T KNOW THE

25  SPECIFICS.  YOU USED THE WORD "SPECIFIC" WITH LRC-1.  IT WAS

1   NOT CORRECT THAT -- IT IS CORRECT THAT WE DIDN'T KNOW THE

2   SPECIFICS.  WE KNEW, HOWEVER, THE GENERAL TYPE OF CLEANERS

3   AND OIL DISPERSANTS THAT WERE USED IN SEAWASH 7, AND WE KNEW

4   THE GENUS AND SPECIES OF MICROBES THAT WERE USED IN LRC-1.

5   Q. SEAWASH -- YOU COULD TELL ANYBODY THAT INFORMATION ABOUT

6   THE FLUID, THAT IS GENERALLY AVAILABLE INFORMATION.

7   A. THAT IS NOT CORRECT.  IF YOU READ AN MSDS FROM SEAWASH 7

8   FROM THOSE DAYS, IT DOES NOT DISCLOSE THE GENERAL TYPES OF

9   CHEMICALS THAT ARE USED IN THAT FLUID.

10  Q. BUT SEAWASH PROVIDES MORE DISCLOSURE OF INFORMATION THAN

11  JUST THAT MSDS?

12  A. UNDER CERTAIN CONDITIONS OF CONFIDENTIALITY, YES, THEY

13  WILL.  WELL, EXCUSE ME, THEY WOULD HAVE.  MR. WARREN IS

14  DEAD.

15  Q. AND THIS IS TRUE, ACTUALLY IN GENERAL, YOUR TESTIMONY OF

16  ALL OF THE DIFFERENT COMBINATIONS YOU TRIED, THE AMOUNT OF

17  EXPERIMENTATION NECESSARY TO DETERMINE THE OPERABILITY OF

18  THE COMBINATION OF CLEANING FLUID AND MICROBES WAS NEITHER

19  DIFFICULT NOR EXPENSIVE?  ISN'T THAT YOUR TESTIMONY?

20  A. I DON'T THINK I HAVE EVER TESTIFIED TO THAT.

21  Q. LET ME ASK YOU, SIR, LET ME HAND YOU A COPY OF YOUR

22  AFFIDAVIT FILED THAT YOU EXECUTED IN SUPPORT OF CHEMFREE'S

23  MOTION FOR SUMMARY JUDGMENT, AND ASK YOU TO READ THE

24  PARAGRAPH, THE FIRST SENTENCE OF THE PARAGRAPH 23.

25  A. "THE AMOUNT OF EXPERIMENTATION NECESSARY TO DETERMINE THE

1  OPERABILITY OF A COMBINATION OF CLEANING FLUID AND MICROBES

2  IS NEITHER DIFFICULT NOR EXTENSIVE." YES.  THAT IS CORRECT.

3  I APOLOGIZE IF I MISCONSTRUED THE QUESTION.

4  Q. SO ONCE CHEMFREE HAD THE IDEA OR THE CONCEPT, WHOEVER

5  FIRST SUGGESTED IT -- BY THE WAY, SIR, LET ME ASK YOU TO

6  LOOK BACK AT PLAINTIFF'S EXHIBIT 45.  THE LABEL SAYS,

7  SEAWASH IS WATER BASED, BIODEGRADABLE, NONFLAMMABLE,

8  PHOSPHATE FREE, AND NON-TOXIC.  DO YOU SEE THAT?

9  A. I SEE THAT.

10  Q. YOU WERE AWARE AT THE TIME THAT YOU STARTED DEALING WITH

11  SEAWASH THEY OFFERED OTHER FLUIDS THAT WERE NONFLAMMABLE,

12  OTHER CLEANING FLUIDS?

13  A. SEAWASH 7 IS SPECIFIC.

14  Q. ARE YOU AWARE THAT THEY OFFERED OTHER NONFLAMMABLE

15  CLEANING FLUIDS?

16  A. WARREN CHEMICAL CORPORATION HAD A WHOLE LINE.  I CAN'T

17  TESTIFY THAT ANY OF THEM WERE NONFLAMMABLE.

18  Q. ISN'T IT TRUE THAT THE CONCERN ABOUT FLAMMABLE GENERALLY

19  DEALS WITH THE SOLVENT, THAT IS AN ISSUE ARISING FROM THE

20  USE OF SOLVENT CLEANERS?

21  A. WELL, SIR, I AM NOT AN EXPERT, BUT THERE IS POSSIBILITY

22  FOR WATER BASED SOLVENTS TO BE FLAMMABLE.

23  Q. BUT STILL SOLVENT CLEANERS.

24  A. EXCUSE ME?

25  Q. SOLVENT CLEANERS?

1    A. FOR AQUEOUS CLEANERS TO BE FLAMMABLE.  IT IS ENTIRELY

2    POSSIBLE.

3    Q. BUT THE GENERAL CONCERN, WHEN PEOPLE TALK ABOUT

4    FLAMMABLE, IS CONCERNING SOLVENT BASED CLEANERS; CORRECT?

5    A. I DON'T KNOW HOW I CAN DEFINE GENERAL CONCERN.

6    Q. SO ISN'T IT TRUE, SIR, THAT WARREN CHEMICAL PUBLICIZED TO

7    THE WORLD THEY HAD NONFLAMMABLE CLEANERS?

8    A. I CAN'T TESTIFY IF THEY PUBLICIZED THAT TO THE WORLD.

9    Q. DID THEY PUBLICIZE TO THEIR CONSUMERS AND PROSPECTS THAT

10   THEY HAD NON-TOXIC CLEANERS?

11   A. I CAN'T EVEN TESTIFY THAT THEY MARKETED TO ANYBODY.

12   Q. IS IT TRUE, SIR, THAT ONCE YOU AT CHEMFREE HAD THE

13   CONCEPT OF HAVING PUT THE SURFACTANT CLEANING FLUID WITH

14   MICROBES INTO THE PARTS WASHER, AND HAVING A BIOREMEDIATING

15   PARTS WASHER, THAT YOU WERE ABLE TO ACCOMPLISH THAT WITHOUT

16   DIFFICULT OR EXPENSIVE TESTING?

17   A. ONCE WE COULD IDENTIFY THE CONCEPT AND ONCE WE HAD PROOF

18   OF THE CONCEPT ON MARCH 17 OF 1994, WE THEN SET OUT TO MAKE

19   SURE THAT IT WORKED IN ALL CASES.

20   Q. WELL THE PROOF OF THE CONCEPT IN MARCH OF 1994 ALSO DID

21   NOT INVOLVE EXTENSIVE, IN YOUR WORDS, NEITHER THE PROOF OF

22   THE CONCEPT WITH THE ENTRETECH FLUID DID NOT PROVIDE INVOLVE

23   NEITHER DIFFICULT OR EXTENSIVE TESTING, DID IT?

24   A. NO, IT DID NOT.

25   Q. OKAY.  SO GO BACK TO MY QUESTION.  ONCE YOU CAME UP WITH

1  THE CONCEPT OF HAVING A PARTS WASHER USING SURFACTANT FLUID

2  CONTAINING MICROBES TO WASH PARTS, YOU WERE ABLE TO DEVELOP

3  THAT WITHOUT EITHER DIFFICULT OR EXTENSIVE TESTING?

4  A. THE DIFFICULTY FOR ME IS THE WORD "SURFACTANT CLEANER."

5  IT'S A SURFACTANT BASED CLEANER, BUT IT IS NOT A SURFACTANT

6  CLEANER.  AND I APOLOGIZE, BUT --

7  Q. SURFACTANT JUST MEANS BASICALLY SOAP, DOESN'T IT, SIR,

8  DETERGENT?

9  A. NOT AT ALL, SIR.  A SURFACTANT IS A SURFACE ACTIVE AGENT.

10  IT IS AN INGREDIENT IN THE OLD DISPERSANT NONTOXIC CLEANER

11  THAT WE DEVELOPED.

12  Q. ISN'T THAT HOW SOAP OPERATES, IS SURFACE ACTIVATION?

13  A. YES, SIR, IT IS.

14  Q. SO SURFACTANT IS A FANCY WORD FOR SOAP, ISN'T IT?

15  A. IT CAN BE CONSTRUED TO BE ANOTHER FANCY WORD OR TANICIDE

16  OR SURFACTANT.

17  Q. LET ME GO BACK TO MY QUESTION.

18  A. I DON'T REMEMBER YOUR QUESTION.

19  Q. I WILL --

20           THE COURT: THIS IS YOUR LAST QUESTION, I HOPE,

21  MR. HARBIN.

22           MR. HARBIN:  SECOND TO LAST, YOUR HONOR.

23           THE COURT: BETTER HURRY THEN, IF YOU WANT TO GET

24  IN TWO.

25  BY MR. HARBIN:

1  Q. ISN'T IT TRUE THAT ONCE YOU CAME UP WITH THE CONCEPT OF

2  HAVING A PARTS WASHER WITH A DETERGENT --

3  A. YES.

4  Q. -- AND UTILIZING MICROBES IN THE SOLUTION TO

5  BIOREMEDIATE, THAT YOU WERE ABLE TO COME UP WITH AN

6  OPERATING PARTS WASHER WITHOUT EITHER DIFFICULT OR EXTENSIVE

7  TESTING?

8  A. WE WERE ABLE TO PERFECT THE CONCEPT.  THAT'S CORRECT.

9  Q. AND ISN'T IT TRUE, SIR, IF I CAN HAND YOU, SIR, A COPY OF

10 JTX, JOINT EXHIBIT 27.  AND IF YOU CAN BLOW UP THE FIRST TOP

11 OF THE PAGE AND THE BOTTOM PARAGRAPH.  HAVE YOU SEEN THIS

12 DOCUMENT BEFORE SIR?

13 A. THIS APPEARS --

14 Q. ON HAKANSSAN-2?

15 A. THIS APPEARS TO BE A DOCUMENT THAT WE ALL AGREED CAN BE

16 CALLED HAKANSSAN-2.

17 Q. ISN'T IT TRUE, SIR, THAT THE CONCEPT OF HAVING A PARTS

18 WASHER FOR CLEANING METAL AND OTHER OBJECTS USING A WASHING

19 LIQUID CONTAINING A DETERGENT AND MICROORGANISMS FOR

20 REDUCING THE CONTAMINANTS WAS DISCLOSED IN OCTOBER OF 1992,

21 BASICALLY ALMOST TEN MONTHS BEFORE YOU STARTED WORKING FOR

22 ISC?

23 A. THIS DOES NOT DISCLOSE THE NONFLAMMABLE NON-TOXIC OIL

24 DISPERSANT AND DEGREASER.  IT DOESN'T MENTION ANYTHING ABOUT

25 FLAMMABLE.  IT DOEN'T MENTION ANYTHING ABOUT TOXICITY.  SO

1   IT DOES NOT DISCLOSE THAT.  AND IN ADDITION, I AM NOT AN

2   EXPERT.

3   Q. WELL YOU JUST OFFERED TESTIMONY --

4   A. IT WAS MY HUMBLE OPINION AS THE PRACTITIONER OF PARTS

5   WASHING.

6   Q. AND LET ME GO BACK TO MY QUESTION.

7   A. YES, SIR.

8   Q. MY QUESTION WAS, FOLLOWING ON THE PRIOR QUESTION, WAS

9   SPECIFICALLY THIS:  I WASN'T ASKING ABOUT DETAILS OF

10  FLAMMABLE, ET CETERA.  I WAS ASKING, ISN'T IT TRUE THAT THE

11  CONCEPT OF A PARTS WASHER CONTAINING A FLUID THAT HAS A

12  DETERGENT AND MICROORGANISMS FOR BIOREMEDIATION WAS

13  DISCLOSED IN OCTOBER OF 1992?

14  A. I CAN TESTIFY BY READING --

15  Q. SIR, CAN YOU ANSWER THE QUESTION?

16  A. I AM TRYING TO ANSWER THE QUESTION.  I CAN TESTIFY THAT

17  THE HAKANSSAN-2 ECT PATENT, I THINK IT WAS ISSUED, DOES SAY

18  THAT IT RELATES TO A DEVICE FOR CLEANING OBJECTS PREFERABLY

19  OF METAL FOR THE REMOVAL OF CONTAMINANTS SUCH AS OIL,

20  GREASE, AND SOLID PARTICLES AND LIKELY USING A WASHING

21  LIQUID CONTAINING AN ACTIVE DETERGENT AND MICROORGANISMS.

22  Q. AND YOU WOULD AGREE THIS IS A MUCH MORE DETAILED

23  DISCLOSURE THAT YOU OBTAINED IN YOUR INITIAL DISCUSSIONS

24  WITH MR. BLACKMORE IN JULY OF 1993, WOULDN'T YOU?

25  A. NO, I WILL NOT AGREE TO THAT.

1              MR. HARBIN:  CAN I JUST HAVE -- I ONLY HAVE A FEW

2    MORE TO FOLLOW UP ON HIS EARLIER TESTIMONY ABOUT WHAT IT

3    DOES AND DOESN'T HAVE.  I WOULD LIKE TO BRIEFLY ASK --

4              THE COURT: WE WILL TAKE OUR LUNCH RECESS THEN.  WE

5    WILL RESUME AT 2:00.  MR. MCNALLY, IF YOU'LL BE BACK ON THE

6    STAND AT THAT TIME.

7                   (BREAK FROM 12:54 UNTIL 2:00 P.M.)

8              THE COURT: ALL RIGHT, MR. HARBIN.  LET'S WRAP IT

9    UP.

10             MR. HARBIN:  YES, YOUR HONOR.  ABOUT FIVE

11   MINUTES, IF THAT IS OKAY.  I APPRECIATE THE COURT'S

12   PATIENCE.

13   BY MR. HARBIN:

14   Q. SO IT IS CLEAR, LET ME CLARIFY A COUPLE OF THINGS.

15   NUMBER ONE, YOU ARE NOT SAYING, SIR, ARE YOU, THAT THERE

16   IS -- YOU ARE AWARE WEAK OF AN AQUEOUS BASED CLEANING

17   SOLUTION USING A SURFACTANT, NOT A SOLVENT, THAT IS

18   FLAMMABLE, ARE YOU?

19   A. AN AQUEOUS BASE FLUID WITH 20 PERCENT ISOPROPYL ALCOHOL

20   WILL CATCH FIRE.

21   Q. IS THAT A SURFACTANT BASED AQUEOUS SOLUTION?

22   A. YOU COULD HAVE A SURFACTANT IN THAT.  IT DOESN'T RULE IT

23   OUT.

24   Q. GENERALLY, UNLESS YOU HAD ALCOHOL, SURFACTANT BASED

25   CLEANERS WITH WATER ARE NOT FLAMMABLE?

1    A. I AM NOT A CHEMIST, I CAN'T ANSWER THAT QUESTION.

2    Q. DID YOU SAY BIOTENE IS WHAT YOU PROVIDED TO CHEMFREE --

3    THE BIOTENE FLUID IS WHAT YOU PROVIDED TO GRAY MILLS?

4    A. THAT IS CORRECT.

5    Q. AND THAT WAS SIMPLY THE FLUID OBTAINED, THE SEAWASH FLUID

6    OBTAINED FROM WARREN CHEMICAL; RIGHT?

7    A. THERE WAS BIOTENE AND SUPER BIOTENE, BOTH OF WHICH WERE

8    PROVIDED TO GRAY MILLS.  THEY WERE TWO DIFFERENT FORMULAS.

9    THE ORIGINAL SW1, WHICH WAS -- THIS WAS PURCHASED FROM

10   WARREN CHEMICAL CORPORATION, WAS THE ORIGINAL FORMULA

11   BIOTENE.

12   Q. AND THAT DID NOT HAVE MICROBES IN IT, DID IT?

13   A. IT DID NOT.

14   Q. THE OTHER ONE DIDN'T EITHER, DID IT?

15   A. SUPER BIOTENE DID NOT EITHER.

16   Q. GOING BACK, IF YOU CAN, TO JOINT EXHIBIT 27.  THIS IS

17   THE -- WHEN WE TALK ABOUT THE HAKANSSAN-2 REFERENCE, I JUST

18   WANT TO RESPOND BRIEFLY TO YOUR COMMENTS THAT YOU THOUGHT --

19   I BELIEVE YOU SAID YOU WERE NOT AN EXPERT, BUT YOU THOUGHT

20   THIS DID NOT INDICATE NONTOXIC, NONCAUSTIC, ET CETERA, I

21   JUST WANT TO ASK YOU ABOUT A COUPLE OF THOSE.  WITH REGARD

22   TO CAUSTIC, IF YOU LOOK AT PAGE J5011, THE MIDDLE PARAGRAPH.

23   THIS PROVIDES -- DOES CALL FOR CONTROLLING THE PH VALUE AND

24   FOR CONTROLLING THE TEMPERATURE, IS THIS CORRECT?  THIS

25   DISCLOSURE IN HAKANSSAN-2?

1    A. I DON'T KNOW LEGALLY WHAT THE WORD "DISCLOSED" MEANS OR

2    ANYTHING LIKE THAT.  I KNOW THAT THIS IS A DESCRIPTION OF

3    THE INVENTION, AND IT SUGGESTS THAT IF YOU CONTROL THE PH

4    YOU MAY BE ABLE TO USE A BIOLOGICAL FLUID.

5    Q. IS IT YOUR UNDERSTANDING, I KNOW YOU ARE NOT AN EXPERT,

6    BUT EXTREME PH VARIATIONS COULD BE HARMFUL TO SOME MICROBES?

7    A. AGAIN, AS A LAYPERSON, I UNDERSTAND THAT IF THE PH IS

8    HIGHER OR LOWER, IT COULD BE HARMFUL TO SOME MICROBES.

9    Q. WHAT WAS THE PURPOSE OF MAKING YOUR SMART WASHER

10   NONCAUSTIC?

11   A. NOT CAUSTIC?

12   Q. RIGHT.

13   A. THERE ARE A VARIETY OF REASONS, AND ONE OF WHICH WAS THE

14   LIFE OF THE MICROBES.

15   Q. ONE WAS THE COMFORT OF THE USER NOT HAVING TO PUT THEIR

16   HANDS IN CAUSTIC FLUID; CORRECT?

17   A. ONE OF THE REASONS WAS INDEED, IF YOU PUT YOUR HANDS IN

18   CAUSTIC FLUID, IT WILL BURN YOU.

19   Q. AND YOU DIDN'T WANT TO HARM THEIR HANDS?

20   A. WE HAD NO DESIRE TO HARM OUR USERS HANDS.

21   Q. AND THAT WAS A REQUEST THAT YOU MADE, THAT WAS MADE BY

22   PROSPECTS BACK WHEN YOU DID THE MARKETING SURVEY BACK IN

23   JULY OF 1993, WASN'T IT?

24   A. I CAN'T TESTIFY TO THAT.

25   Q. OKAY.  BUT ONE PURPOSE IS, YOU JUST SAID, WAS NOT TO HARM

1    THE MICROBES; CORRECT?  TO MAKE A GOOD ENVIRONMENT FOR THE

2    MICROBES?

3    A. THAT IS CORRECT.

4    Q. AND YOU UNDERSTAND THIS SYSTEM IS -- THIS HAKANSSAN-1

5    REFERENCE, IS ABOUT HAVING AN OPERABLE SYSTEM USING

6    MICROBES; CORRECT?

7    A. THIS IS HAKANSSAN-2.

8    Q. HAKANSSAN-2.  EXCUSE ME.

9    A. WHAT WAS THE QUESTION?

10   Q. YOU UNDERSTAND THIS HAKANSSAN-2 REFERENCE IS ABOUT HAVING

11   AN OPERABLE SYSTEM THAT INCLUDES MICROORGANISMS?

12   A. IT IS A CABINET WASHER THAT HAS MICROORGANISMS.

13   Q. AND IN THAT REGARD, IN REGARD TO THE ELEMENT OF

14   NONTOXICITY, WHAT DOES IT MEAN TO BE NONTOXIC IN TERMS OF A

15   PARTS WASHER TO YOU?

16   A. TOXICITY IS DEFINED BY THE EPA.

17   Q. DOES IT MEAN NOT TO HARM OR KILL THE MICROBES?

18   A. IT MEANS NOT TO HARM OR KILL FLORA OR FAUNA.

19   Q. SO IN THIS CASE, THAT IS THE MICROBES?

20   A. IN THIS CASE, IT COULD BE THE MICROBES.

21   Q. AND IF YOU LOOK AT THE PAGE ON THE TOP OF PAGE J506, THE

22   TOP PARAGRAPH.  IT SAYS, THE BIOLOGICAL WASHING METHOD

23   OPERATING A COMPLETELY CLOSED SYSTEM AND DOES NOT PRODUCE

24   ANY TOXIC SUBSTANCES AND THUS ARE PREFERRED.  DOESN'T THAT

25   INDICATE TO YOU THAT THIS IS A NONTOXIC SYSTEM?

1   A. WHAT THEY ARE TALKING ABOUT THERE IS THE BIOLOGICAL

2   METHODS DON'T PRODUCE TOXIC SUBSTANCES, ONLY THE BY-PRODUCTS

3   OF BIOLOGICAL ACTIVITY CAN BE ACIDS THAT ARE TOXIC.

4   Q. WELL, IN FACT, IT ACTUALLY TALKS ABOUT THAT, DOESN'T IT,

5   IF YOU LOOK AT PAGE 5010, THE MIDDLE PARAGRAPH.  HAKANSSAN-2

6   PROVIDES -- IN ADDITION, HAKASSAN HAS A HEATER, DOESN'T IT,

7   TO KEEP IT TO OPTIMUM TEMPERATURE, THE SOLUTION?  THAT IS

8   WHAT IT SAYS RIGHT THERE.

9   A. I DON'T RECALL.  AS I SAID, I AM NOT AN EXPERT.

10  Q. YOU SEE THE REFERENCE.  YOU SEE THE REFERENCE TO HAVING

11  OPTIMUM TEMPERATURE RIGHT THERE, DON'T YOU, SIR?

12  A. YES.

13  Q. IT FURTHER SAYS THE CONTAMINANTS COMING FROM THE OBJECTS

14  IN THE WASHING CHAMBER, AS WELL AS DEAD MICROORGANISMS, MUST

15  BE ABLE TO BE SEPARATED FROM THE WASHING LIQUID AS THEY

16  WOULD OTHERWISE BE ACCUMULATED TO TOXIC CONCENTRATIONS

17  MAKING BIOLOGIC LIFE IN THE WASHING LIQUID IMPOSSIBLE.  DO

18  YOU SEE THAT, SIR?

19  A. I SEE THAT.

20  Q. ISN'T THAT TELLING YOU, YOU ARE NOT AN EXPERT, BUT ISN'T

21  THIS TELLING YOU IT IS SUPPOSED TO BE NONTOXIC SO THE

22  BIOLOGICAL LIFE COULD SURVIVE?

23  A. MY READING OF THAT IS THAT YOU HAVE TO CONTROL THE

24  ENVIRONMENT SO THAT IT DOES NOT BECOME TOXIC.  IF THAT, BY

25  INFERENCE, MEANS THAT IT IS NOT TOXIC TO BEGIN WITH, I AM

1    NOT QUALIFIED TO SAY THAT.

2    Q. SO YOU DON'T KNOW ONE WAY OR THE OTHER?

3    A. I DON'T KNOW ONE WAY OR THE OTHER.  NO, SIR.

4    Q. AND IF YOU LOOK ON PAGE 5011, THE MIDDLE PARAGRAPH.  IT

5    TALKS ABOUT NEUTRITIVE ADDITIVES AND OTHER THINGS BEING

6    SUPPLIED IN THE WASHING LIQUID, AND SUMMA MATS AND, QUOTE,

7    ACTIVE FERMENTATION CAN BE BASED THEREON.  DO YOU SEE THAT?

8    A. YES, I SEE THAT.

9    Q. YOU KNOW WHAT ACTIVE FERMENTATION MEANS IN TERMS OF

10   WHETHER THE MICROBES ARE THRIVING, GROWING, OR DYING?

11   A. I DON'T KNOW.

12   Q. AND IT'S TRUE, ISN'T IT SIR, THAT THIS OCTOBER 1992

13   DISCLOSURE ALSO DISCLOSES A LEVEL SENSOR IN A PARTS WASHER?

14   A. YOU CAN LOOK, FOR EXAMPLE, AT PAGE -- THE BOTTOM

15   PARAGRAPH AT PAGE 5010.  YOU SEE IT DESCRIBES A LEVEL

16   SENSOR, IN FACT, A HEATER WITH A THERMOSTAT AND LEVEL

17   SENSORS ARE ALL COUPLED TO A CONTROL SYSTEM.  DO YOU SEE

18   THAT?

19   A. THAT IS ALL PART OF THE LIQUID CONTAINER.  THAT IS

20   CORRECT.

21              MR. HARBIN:  THAT IS ALL I HAVE, YOUR HONOR.

22   THANK YOU.

23              THE COURT: MR. ANDERSON?

24                      REDIRECT EXAMINATION

25   BY MR. MELARTI:

```
1   Q. MR. MCNALLY, IF YOU WILL LOOK TO PLAINTIFF'S EXHIBIT 101.

2   A. YES, SIR.

3   Q. I THINK YOU TESTIFIED THAT YOU COULDN'T BE -- COULDN'T

4   SAY WITH CERTAINTY WHETHER OR NOT GRAY MILLS HAD

5   MANUFACTURED A GREEN DEVICE DEPICTED ON PLAINTIFF'S EXHIBIT

6   101; IS THAT CORRECT?

7   A. I CANNOT TESTIFY WITH CERTAINTY THAT THEY HAVE

8   MANUFACTURED IT.

9   Q. CAN YOU EXPLAIN TO THE COURT WHY IT IS THAT YOU ASSUMED

10  THIS WAS THE GRAY MILLS 436 MODEL?

11  A. THE ELEPHANT-FOOT SHAPE IS DISTINCTIVE IN THE INDUSTRY TO

12  GRAY MILLS.  GRAY MILLS IS WELL-KNOWN IN THE INDUSTRY FOR

13  HAVING THE ELEPHANT-FOOT SHAPE.  IT IS VERY MUCH LIKE A

14  COCA-COLA BOTTLE.  YOU DON'T HAVE TO SEE THE COCA-COLA IN IT

15  TO RECOGNIZE THAT IT'S COCA-COLA.

16           MR. MELARTI:  THANK YOU.  THAT'S ALL.

17           THE COURT:  THANK YOU, MR. MCNALLY, YOU MAY STEP

18  DOWN.  MR. ANDERSON, WHAT'S NEXT?

19           MR. ANDERSON:  YOUR HONOR, AS PART OF THE

20  PLAINTIFF'S CASE IN CHIEF, WE ARE PREPARED TO TENDER TO THE

21  COURT A SERIES OF DEPOSITIONS.  WE ARE ALSO PREPARED TO

22  TENDER TO THE COURT THE EXPERT REPORTS OF DR. JOHN DURKEE.

23  THE COURT WAS PRESENTED WITH AND ADOPTED AN ORDER INDICATING

24  THAT HIS DIRECT EXAMINATION AS PART OF THE PLAINTIFF'S CASE

25  IN CHIEF WOULD BE PERMITTED TO COME IN THROUGH HIS REPORTS,
```

1    AND THEN HE WOULD BE SUBJECT TO CROSS-EXAMINATION.

2    SPECIFICALLY THE DEPOSITIONS THAT WE WOULD LIKE TO PUT INTO

3    THE RECORD AT THIS POINT ARE MR. BERT OVERLAND, MR. WARNER

4    SCHUDLE, MR. PASCAL LAVALLEE, MR. GARY SHIELDS AND DR. JOHN

5    DURKEE.  WE HAVE COPIES READY.  I KNOW THAT FROM PREVIOUS

6    CONVERSATIONS, I BELIEVE MR. SCHAETZEL WOULD LIKE TO ADDRESS

7    THE COURT REGARDING OUR TENDER OF THESE DEPOSITIONS BEFORE

8    THEY ARE ACTUALLY HANDED UP, YOUR HONOR.

9              THE COURT:  ALL RIGHT.

10             MR. SCHAETZEL:  YOUR HONOR, TWO THINGS:  FIRST --

11             ARE YOU GOING TO SUBMIT DR. DURKEE'S DEPOSITION?

12             MR. ANDERSON:  WE ARE INTENDING TO SUBMIT HIS

13   EXPERT REPORTS, YES.

14             MR. SCHAETZEL:  WHEN YOU SAID DR. DURKEE, I WANTED

15   TO BE SURE I WAS CLEAR ON THAT.

16             YOUR HONOR, THE ONLY OBJECTION THAT WE HAVE IS TO

17   THE DEPOSITION TRANSCRIPT OF WARNER SCHUDLE.  MR. SCHUDLE

18   WILL TESTIFY LIVE AND, IN FACT, HE IS THE NEXT WITNESS.  THE

19   CONVERSATION THAT MR. ANDERSON AND I HAD, AND MR. CAPP TO

20   SOME PART, HAS TO DO WITH THEIR DESIRE TO BE ABLE TO BOTH

21   CROSS-EXAMINE AND SUBMIT HIS DEPOSITION TRANSCRIPT AND THAT

22   IS OUR OBJECTION.  WE FEEL LIKE THAT IS TWO BITES OUT OF THE

23   APPLE.  MR. SCHUDLE WAS ON OUR MAY-CALL LIST.  HE IS HERE

24   AND PREPARED TO TESTIFY.  AND FOR THAT REASON, WE OBJECT TO

25   THAT TRANSCRIPT COMING IN.  IF THERE IS A SPECIFIC PORTION

1    THAT FOR SOME REASON, YOU KNOW, THEY SAY PURSUANT TO SOME

2    OTHER RULE OF EVIDENCE THAT IT SHOULD COME IN, THAT WOULD BE

3    A DIFFERENT MATTER.  WE ARE FINE TO TAKE THAT UP, SEPARATE

4    AND APART FROM THIS EXCHANGE, BUT IN TERMS OF IT COMING IN

5    WHOLESALE, WE DO HAVE AN OBJECTION.

6         THE COURT:  THAT IS A GENERAL RULE, MR. ANDERSON.

7    AND LET ME APOLOGIZE TO MR. MELARTI.  I'VE BEEN CALLING YOU

8    MR. ANDERSON.  YOU ARE MUCH BETTER LOOKING.  SO I HAVEN'T

9    BEEN PAYING ENOUGH ATTENTION.

10        MR. ANDERSON:  YES, SIR, AND I DO ACKNOWLEDGE THAT

11   IS THE GENERAL RULE.  I DO THINK THERE IS A COUPLE OF POINTS

12   I WOULD LIKE TO MAKE, YOUR HONOR.  FIRST, THIS STILL REMAINS

13   THE PLAINTIFF'S CASE IN CHIEF.  WE HAVE WORKED CONSISTENTLY

14   AND WELL WITH OPPOSING COUNSEL TO TRY AND DETERMINE WHAT

15   WITNESSES ARE GOING TO BE CALLED AND WHEN.  THERE IS NO

16   DOUBT THAT MR. WARNER SCHUDLE IS ON THE POSSIBLE MAY-CALL

17   LIST.  IF I COULD HAVE THE ITEM UP ON THE SCREEN.  WE HAD

18   MADE A SPECIFIC OVERTURE TO WALTER'S COUNSEL TO TRY TO

19   DETERMINE WHO THEY WERE PLANNING TO BRING FROM OUT OF STATE.

20   MR. WARNER SCHUDLE RESIDES IN SWITZERLAND, HE IS BEYOND

21   SUBPOENA POWER HERE AND FOR THAT REASON, WHEN WE HAD THE

22   EXCHANGE WHERE ON JULY 10TH --

23        THE COURT:  OKAY.  WELL, LET ME ASK YOU THIS:  IS

24   HE HERE RIGHT NOW, READY TO TESTIFY?  CAN THE PLAINTIFFS

25   CALL HIM?

1              MR. SCHAETZEL:  YES, SIR.  HE IS IN THE OTHER

2   ROOM.

3              THE COURT:  WHAT ABOUT THAT?

4              MR. ANDERSON:  IN TERMS OF JUST MOVING THINGS

5   ALONG IN PLAINTIFF'S CASE IN CHIEF, WE WOULD MUCH PREFER TO

6   SIMPLY HAVE HIS DEPOSITION SUBMITTED AND FROM THAT, IF THERE

7   IS A NEED FOR ANY CROSS, I WOULD EXPECT IT TO BE A VERY

8   LIMITED CROSS-EXAMINATION.  THE DEPOSITION ITSELF IS 80

9   PAGES.  WE HAVE DESIGNATED PORTIONS.  IT IS RELATIVELY

10  SHORT, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  I WILL ALLOW THE

12  DEPOSITION, BUT I THINK THAT THE WITNESS'S TESTIMONY LIVE

13  IS, OF COURSE, MAKES THE PRIMARY RECORD OF WHAT THE WITNESS

14  TESTIFIES TO.  THE OTHER COMES IN PERHAPS FOR IMPEACHMENT.

15  BUT I WILL ALLOW YOU TO SUBMIT IT AND THEN AFTER

16  CROSS-EXAMINATION, YOU CAN REFER TO PORTIONS OF IT THAT YOU

17  THOUGHT SHOULD HAVE COME IN OR SHOULD BE CONSIDERED BY THE

18  COURT.  I THINK THAT -- MR. SCHAETZEL, I THINK THAT IS FAIR

19  IN THAT IN PREPARING AND HIS BEING BEYOND THE SUBPOENA POWER

20  OF THE COURT, IT WAS REASONABLE FOR PLAINTIFF TO THINK THAT

21  THEY COULD SUBMIT, AS PART OF THEIR CASE, PORTIONS OF HIS

22  DEPOSITION, ESPECIALLY SINCE HE'S, I ASSUME, A FRIENDLY

23  WITNESS FOR THE DEFENDANT.  OKAY.  LET'S GET WHAT WE NEED

24  SUBMITTED, SUBMITTED.

25             MR. ANDERSON:  THIS IS DR. DURKEE'S MATERIALS.

```
 1            THE COURT:  ARE THERE EXTRA COPIES BECAUSE I AM
 2   GOING TO TAKE THE TIME TO LOOK AT SOME OF THIS.
 3            MR. ANDERSON:  LET ME CLARIFY HOW MANY YOU HAVE
 4   THERE, SIR.  I BELIEVE YOU MAY HAVE TWO COPIES THERE IN
 5   TERMS OF WHAT I HAVE HANDED UP ALREADY.  IF YOU WOULD LIKE
 6   ADDITIONAL COPIES --
 7            THE COURT:  WELL, I DO HAVE A SUMMER INTERN THAT
 8   IS LEARNING A LOT, I THINK, FROM THIS.
 9            MR. ANDERSON:  WE'LL BE HAPPY TO DO THAT AND IN
10   LIGHT OF THE VOLUME, I THINK WE COULD ALSO OFFER THOSE IN
11   ELECTRONIC FORMAT THAT WOULD BE SEARCHABLE PDF VERSIONS, IF
12   THE COURT -- IF THAT IS HELPFUL TO YOUR HONOR.
13            THE COURT:  I THINK THAT WOULD BE VERY HELPFUL.
14            MR. ANDERSON:  I CAN HAVE THOSE MATERIALS
15   TOMORROW, SIR.
16            THE COURT:  OKAY.  WITH THAT, DOES THE PLAINTIFF
17   REST?
18            MR. ANDERSON:  WE HAVE -- WE HAVE DEPOSITIONS AS
19   WELL TO HAND UP.  THOSE ARE THE EXPERT REPORTS.
20            THE COURT:  NOW, ARE PARTS OF THE DEPOSITIONS
21   MARKED AS TO BE CONSIDERED BY THE COURT OR THE ENTIRE
22   DEPOSITION?
23            MR. CAPP:  YOUR HONOR, CAN I ADDRESS THAT?
24            THE COURT:  YEAH.  GO AHEAD.
25            MR. CAPP:  THE DEPOSITIONS HAVE BEEN DESIGNATED IN
```

1    ACCORDANCE WITH YOUR INSTRUCTIONS.  THE PLAINTIFFS'S

2    PORTIONS HAVE BEEN HIGHLIGHTED IN YELLOW.  THE DEFENDANTS'S

3    PORTIONS HAVE BEEN HIGHLIGHTED --

4            THE COURT:  THAT WAS MY QUESTION.

5            MR. CAPP:  -- IN BLUE.  SO THAT HAS BEEN DONE THAT

6    WAY.  AS FAR AS WHETHER WE ARE READY TO REST OR NOT, WHAT I

7    WAS HOPING TO CONVINCE THE COURT, WAS AT THE TIME WE FINISH

8    OUR LIVE TESTIMONY, THAT WE WOULD HAVE A SHORT TIME FOR THE

9    COURT TO RETIRE TO CHAMBERS TO READ, AND DURING THAT

10   INTERIM, I WANTED TO DO SOME QUALITY CONTROL TO MAKE SURE I

11   HAD ALL OF MY EXHIBITS IN TO SEE IF THERE MIGHT BE SOME

12   EXHIBITS IN THE DEPOSITIONS THAT OBJECTIONS WERE SUSTAINED

13   TO, SO THAT AT THAT POINT, I KNEW WHERE I WAS ON MY EXHIBIT

14   TENDER AND HAVE THAT --

15           THE COURT:  THAT WILL BE FINE.  YOU AND

16   MR. SCHAETZEL GET TOGETHER AND SEE IF YOU CAN RESOLVE ANY

17   DIFFERENCES, BUT MAKE SURE THAT YOUR RECORD IS COMPLETE AND

18   ALL OF YOUR DEPOSITIONS HAVE BEEN OFFERED.  IF WE NEED TO

19   DISCUSS ANY, WE WILL DO THAT WHEN I COME BACK ON THE BENCH,

20   AND I WILL TAKE -- I CAN BARELY SCRATCH THE SURFACE IF I

21   TOOK THE NEXT COUPLE OF DAYS OF THAT, BUT I THINK I WILL --

22   IT'S AFTER 2:00 NOW.  I THINK WE WILL TRY TO RESUME, SAY, AT

23   3:30 AND THAT WILL GIVE ME A CHANCE TO AT LEAST SCAN A GOOD

24   BIT OF THE MATERIAL AND I THINK THAT WILL MAKE THE

25   CROSS-EXAMINATION, I HOPE, MORE UNDERSTANDABLE, AND SO WE

1    WILL TRY TO DO THAT.  IS THERE ANYTHING ELSE WE NEED TO TAKE

2    UP BEFORE WE RECESS?

3            MR. CAPP:  YOUR HONOR, I WAS WILLING TO OFFER FOR

4    THEM TO CALL MR. SCHUDLE LIVE OUT OF ORDER BECAUSE

5    MR. SCHUDLE HAS SOME TRAVEL --

6            THE COURT:  THAT IS RIGHT.  WE TALKED ABOUT THAT

7    YESTERDAY.  Y'ALL REMIND ME OF THINGS LIKE THAT.  WHAT ABOUT

8    THAT?

9            MR. SCHAETZEL:  THAT IS FINE.  MR. SCHUDLE IS HERE

10   AND THAT IS WHAT WE ARE PREPARED TO DO.

11           THE COURT:  AND YOU HAVE NO OBJECTION TO MR. CAPP

12   WAITING TO REST UNTIL HE HAS A CHANCE TO REVIEW THE

13   DEPOSITION?

14           MR. SCHAETZEL:  NO.  THAT'S FINE.

15           MR. ANDERSON:  YOUR HONOR, WE COULD HAVE THE

16   ABILITY OF SUBMITTING THESE ELECTRONICALLY AS WELL IF YOU

17   WOULD LIKE SEARCHABLE COPIES OF THE DEPOSITION TRANSCRIPTS.

18           THE COURT:  I PROBABLY WOULD.  LET'S TAKE A LOOK

19   AT THEM.

20           MR. ANDERSEN:  IN THE MEANTIME, WE WILL PROVIDE

21   THE EXPERT REPORTS AS WE INDICATED.

22           THE COURT:  YES.  I WOULD LIKE TO SEE THAT.  WHAT

23   TIME DID YOU SAY YOUR WITNESS NEEDS TO LEAVE TO CATCH A

24   PLANE?

25           MR. SCHAETZEL:  THE PLANE IS AT 4 O'CLOCK

1   TOMORROW, YOUR HONOR.  SO WE ARE FINE TODAY.

2          THE COURT:  I FORGOT WHETHER IT WAS YESTERDAY.  I

3   MEAN, TOMORROW OR, I GUESS, YESTERDAY, TOO, BUT TOMORROW OR

4   TODAY.

5          MR. SCHAETZEL:  ON BEHALF OF THE DEFENDANTS, YOUR

6   HONOR, WE CALL WARNER SCHUDLE.

7          THE COURT:  ALIVE AND IN PERSON.

8          MR. SCHAETZEL:  YES, SIR.

9

10                 WARNER SCHUDLE

11               DEFENDANT'S WITNESS

12                     SWORN

13               DIRECT EXAMINATION

14  BY MR. SCHAETZEL:

15  A. WARNER SCHUDLE, S-C-H-U-D-E-L.

16  Q. GOOD AFTERNOON, MR. SCHUDLE.

17  A. GOOD AFTERNOON.

18  Q. MR. SCHUDLE, WHEN DID YOU START WORKING AT WALTER?

19  A. I STARTED IN DECEMBER OF 1968.

20  Q. AND HOW WAS IT THAT YOU CAME TO BE EMPLOYED AT WALTER?

21  A. I WAS A NEW ARRIVAL IN CANADA AS AN IMMIGRANT FROM

22  SWITZERLAND.  AND WAS MY SECOND EMPLOYMENT.  I FOUND AN

23  EMPLOYER WHO WAS STILL DOING SOMETHING SIMILAR AS I HAVE

24  BEEN DOING IN SWITZERLAND BEFORE.

25  Q. AND WHAT HAD YOU BEEN DOING IN SWITZERLAND BEFORE?

1    A. I WAS IN A COMMERCIAL COMPANY THAT WAS SELLING SIMILAR

2    PRODUCTS WITH SIMILAR MANUFACTURERS IN SWITZERLAND.  AND

3    FOUND SO SOME OF THE SAME CONTACTS AGAIN WITH MY NEW

4    EMPLOYER.

5    Q. AND WHAT DID YOU START DOING FOR WALTER WHEN YOU FIRST

6    CAME IN 1968?

7    A. WALTER WAS A VERY SMALL COMPANY IN THOSE DAYS.  I STILL

8    REMEMBER THE FIRST YEAR WE MADE 1 MILLION DOLLARS IN SALES.

9    I STARTED AS A COMMERCIAL ASSISTANT TO FIRST THE PEOPLE THAT

10   DID SOURCING AND ADVERTISING.

11   Q. AND YOU NO LONGER WORK FOR WALTER; IS THAT CORRECT?

12   A. I DO NO LONGER WORK FOR WALTER, CANADA.  YES.  THAT IS

13   RIGHT.

14   Q. AND YOU HAVE LEFT MONTREAL; IS THAT CORRECT?

15   A. I AM NOW LIVING IN SWITZERLAND.

16            THE COURT:  MR. SCHUDLE, WHEN YOU SAY YOU NO

17   LONGER WORK FOR WALTER, CANADA, IS THERE A RELATED

18   CORPORATION THAT YOU WORK FOR PRESENTLY?

19   A. I TOOK SEMIRETIREMENT IN JANUARY OF 2003.  I MOVED TO

20   SWITZERLAND, BACK TO MY HOME COUNTRY, AND I STILL WORK TWO

21   DAYS A WEEK RUNNING A LOGISTICS AND R AND D FACILITY IN

22   SWITZERLAND.

23            THE COURT:  BUT IT HAS NO RELATION WITH ANY OF THE

24   PARTIES TO THIS CASE?  OR DOES IT?

25            THE WITNESS:  NO, IT DOESN'T.

1           THE COURT:  ALL RIGHT.  THANK YOU.

2           MR. SCHAETZEL:  I WOULD LIKE TO HAND UP, YOUR

3  HONOR, THE WITNESS BOOK FOR THIS WITNESS.  TO HELP US MOVE

4  THINGS ALONG.

5           THE COURT:  THANK YOU.

6  BY MR. SCHAETZEL:

7  Q. WHEN YOU LEFT WALTER IN MONTREAL IN THE 2002 TIME FRAME,

8  WHAT WAS YOUR JOB AT THAT TIME?

9  A. I WAS VICE-PRESIDENT PRODUCT DEVELOPMENT, RESEARCH AND

10  PRODUCT DEVELOPMENT.

11  Q. AND WHEN YOU LEFT, WHO TOOK THE POSITION THAT YOU

12  VACATED?

13  A. I HANDED OVER THE REINS TO CLAUDE VANDEMEULEBROOCKE, WHO

14  TOOK OVER MY JOB.

15  Q. WHAT IS THE BUSINESS OF WALTER WHEN YOU WERE IN CANADA,

16  WHAT WAS THE BUSINESS THAT YOU DID FOR WALTER?

17  A. BUSINESS OF THE COMPANY?

18  Q. YES.

19  A. WE WERE MAINLY MARKETING AND SELLING HIGH PERFORMANCE

20  ABRASIVES AND CHEMICALS FOR THE METAL WORKING INDUSTRY.

21  Q. WHO WERE SOME OF THE CUSTOMERS THAT YOU WOULD SERVE?

22  A. WE HAVE VERY WIDE RANGE OF CUSTOMERS.  OUR CUSTOMERS ARE

23  THE END USERS EVEN THOUGH WE SELL EXCLUSIVELY THROUGH

24  DISTRIBUTION.  BUT THE CUSTOMERS WOULD BE LARGE CORPORATIONS

25  AS WELL, LIKE LOMBARDI, LIKE ALCAN, LIKE GE, LIKE GENERAL

1    MOTORS.  JUST A VERY LARGE NUMBER.

2    Q. THE PRODUCTS THAT WALTER SOLD WHILE YOU WERE THERE, WERE

3    ANY OF THOSE PRODUCTS DEVELOPED BY WALTER?

4    A. YES, MOST OF THEM.  THE PRODUCTS THAT HAVE -- MAYBE I

5    SHOULD GO BACK A BIT IN HISTORY.  WHEN I STARTED WITH

6    WALTER, WE WERE MOSTLY REPRESENTING EUROPEAN MANUFACTURERS

7    ON AN EXCLUSIVITY AGREEMENT FOR FIRST, CANADA, AND ALSO FOR

8    THE UNITED STATES.  BUT AS TIME WENT ON, TALKING FROM 1968,

9    THIS IS ONE OF MY MAIN CONTRIBUTIONS WAS THAT WE BROUGHT

10   IDEAS TO OUR MANUFACTURING PARTNERS TO MAKE PRODUCTS

11   ESPECIALLY FOR US WITH OUR NAME ON IT BECAUSE IN THE

12   BEGINNING, THIS WAS NOT WITH OUR NAME ON IT.  SO LAST 30

13   YEARS, WE'VE BEEN SELLING EXCLUSIVELY UNDER OUR NAME, ALL

14   EXCLUSIVE PRODUCTS THAT ARE TO BE CONSIDERED OUR OWN

15   PRODUCTS.

16   Q. IN DEVELOPING THOSE PRODUCTS, WOULD WALTER PAY ATTENTION

17   TO PATENT MATTERS?

18   A. YES.  THIS WAS DEFINITELY A VERY IMPORTANT THING TO LOOK

19   AFTER TO MAKE SURE THAT WE DIDN'T INFRINGE.  WE WERE ALSO

20   ALWAYS INTERESTED TO SEE IF WE COULD GET PATENT PROTECTION

21   FOR OUR INNOVATIONS AS WELL.  SO THIS WAS AN IMPORTANT

22   THING.  WE ALSO HAD TO HAVE OUR OWN MINI TRADEMARKS, OUR OWN

23   TRADEMARKS THAT IF THE SAME THING WITH INTELLECTUAL

24   PROPERTY, WE HAD TO MAKE SURE THAT WE USE TRADEMARKS, GOT

25   REGISTRATION OF TRADEMARKS AND DID NOT INFRINGE ON EXISTING

1  ONES.

2  Q. WHAT WAS YOUR ROLE IN TERMS OF THE PATENT PART OF THINGS

3  THAT WALTER WOULD PAY ATTENTION TO?

4  A. I WOULD BE THE PRIMARY RESPONSIBLE PERSON FOR THIS TO

5  MAKE SURE THAT WE STAYED CLEAR, THAT WE WOULD NOT INFRINGE

6  ON EXISTING PATENTS.  AND ALSO TO POSSIBLY REGISTER PATENTS

7  SO FAR ON OUR OWN INNOVATIONS.

8  Q. DO YOU HAVE ANY PERSONAL EXPERIENCE WITH PATENTS?

9  A. YES.  I ACTUALLY OWNED -- REGISTERED MY OWN PATENT IN

10  1984.  I WAS ALSO PART OF REGISTERING MANY PATENTS WITH OUR

11  MANUFACTURING PARTNERS IN THEIR NAME TO HELP THEM GET

12  REGISTRATION.

13  Q. IN THE TIME THAT YOU WERE WITH WALTER, DO YOU HAVE ANY

14  IDEA HOW MANY PATENTS YOU WOULD HAVE LOOKED AT FOR THIS

15  PURPOSE?

16  A. YEAH.  IT'S MANY, MANY, I WOULD SAY.  OVER 100.  MAYBE 2,

17  300.

18  Q. AND IN THE TIME THAT YOU WERE AT WALTER, WAS THE COMPANY

19  EVER SUED FOR PATENT INFRINGEMENT?

20  A. NO.  THERE HAVE NEVER BEEN ANY INFRINGEMENTS BEING -- NO

21  SUING.  NO.  IN ALL OF THE 40 YEARS THAT I WAS WITH THE

22  COMPANY.

23  Q. THE SUBJECT MATTER OF THIS LAWSUIT HAS TO DEAL WITH THE

24  BIOREMEDIATION PARTS WASHERS.  WHAT WAS WALTER'S FIRST

25  BIOREMEDIATING PARTS WASHER?

1  A. THE FIRST ONE WE LAUNCHED, WE SOLD, WAS THE BR 100 MODEL.

2  Q. AND HOW WAS IT THAT WALTER CAME TO DECIDE TO GET INTO THE

3  BUSINESS OF SELLING THE BR 100 MODEL?

4  A. THIS GOES BACK TO SOME COOPERATION BETWEEN THE OWNER OF

5  WALTER, MR. SOMERS, AND OUR CHEMICAL PARTNER IN GERMANY BY

6  THE NAME OF CB CHEMIE.  THEY TOGETHER CAME UP WITH THE IDEA

7  OF MAKING A BIOREMEDIATING PARTS WASHER WITH A SPECIALLY

8  MADE LIQUID FOR IT.  THE WHOLE THING STARTED OUT WITH WORK

9  BEING DONE ON A VERY SPECIAL LIQUID THAT CONTAINED MICROBES

10  ALREADY READY TO GO, TO HAVE A READY TO USE LIQUID.

11  Q. AND WHO WAS IT THAT DID THE WORK ON THE LIQUID AT CB

12  CHEMIE?

13  A. THAT WAS PRIMARILY THE OWNER, MR. BERENS.  THERE IS ALSO

14  THE LAB PERSON THAT IS IN CHARGE OF THE LAB THERE WAS VERY

15  INVOLVED.  I DO KNOW THAT THERE WAS A COOPERATION WITH THE

16  UNIVERSITY OF BIELEFELD, THE BIOCHEMISTRY DEPARTMENT THERE,

17  TO COME UP WITH A WORKABLE SOLUTION ON THAT IDEA.

18  Q. YOU SAID TO COME UP WITH WHAT?

19  A. A WORKABLE PRODUCT ON THIS IDEA OF INCORPORATING THE

20  MICROBES IN THE LIQUID.

21  Q. SO DID CB CHEMIE MAKE A WORKABLE SOLUTION WITH

22  MICROORGANISMS IN IT?

23  A. YES.  THAT IS WHEN I STARTED TO BECOME ACTIVE IN THIS

24  PROJECT, ONCE THERE WERE INDICATIONS THAT THIS GOING TO

25  WORK.  THIS DIDN'T WORK PERFECTLY RIGHT AWAY BUT THERE WERE

1    INDICATIONS THAT YES, WE NEED A MACHINE TO WORK WITH THIS

2    NEW LIQUID.

3    Q. AND WOULD YOU RECEIVE REPORTS FROM CB CHEMIE ON HOW

4    THINGS WERE PROGRESSING WITH THE LIQUID?

5    A. YES.  I WOULD HAVE HEARD THAT YES, IT'S WORKING, THERE

6    WERE TESTS BEING MADE.  YES.

7    Q. DID YOU RECEIVE ORAL REPORTS OR WRITTEN REPORTS OR BOTH?

8    A. THIS WAS ALL ORAL.  YES.

9    Q. DID WALTER SEND ANY CLEANING FLUID OF ANY TYPE TO CB

10   CHEMIE FOR THEM TO LOOK AT WHILE CB CHEMIE WAS DEVELOPING

11   THE FLUID?

12   A. NO.  THERE WAS NO SUCH -- THERE WAS NOTHING AVAILABLE

13   LIKE THAT.

14   Q. YOU INDICATED THEN THAT YOU BEGAN TO GET INVOLVED AT SOME

15   POINT IN TIME.  WHAT DID YOU DO?

16   A. WE WERE DEFINING THEN WHAT THIS MACHINE HAD TO DO TO MAKE

17   THIS LIQUID WORK PROPERLY.  AND WE WERE STARTING TO LOOK

18   AROUND, WHO MAKES PARTS WASHERS THAT COULD BE SUITABLE SO IT

19   COULD BE MADE SUITABLE FOR THIS SYSTEM.

20   Q. AND DID THERE COME A TIME THAT YOU PURCHASED A PARTS

21   WASHER?

22   A. I KNOW WE GOT THE SAMPLE FROM GRAY MILLS AT ONE POINT.

23   YES.

24   Q. IF YOU COULD, I WOULD LIKE TO ASK YOU TO TAKE A LOOK

25   AT -- I GUESS WE WILL USE THE PLAINTIFF'S EXHIBIT.  IF YOU

1    WOULD LOOK IN YOUR NOTEBOOK, SIR, AND FIND PLAINTIFF'S

2    EXHIBIT -- WELL, IT'S NOT THERE.  LET'S USE DEFENDANT'S FOR

3    THAT MATTER.  THE SECOND HALF, THE VERY END, DTX 990, IT

4    CORRESPONDS WITH PLAINTIFF'S EXHIBIT 317.  MR. SCHUDLE, YOU

5    RECOGNIZE THIS AS AN INVOICE FROM GRAY MILLS FOR A BIO 436 A

6    PARTS WASHER?

7    A. YES, I DO.

8    Q. AND WHAT IS THE DATE OF THIS INVOICE?

9    A. IT'S 16TH OF JUNE, 1999.

10   Q. AND WOULD THIS BE THE MACHINE FROM GRAY MILLS TO WHICH

11   YOU REFERRED?

12   A. YES, THAT WOULD BE THE ONE.  YEAH.

13   Q. ON THE SECOND LINE, IT INDICATES THAT YOU PURCHASED SUPER

14   BIOTENE.  WHAT DO YOU UNDERSTAND SUPER BIOTENE TO BE?

15   A. THIS IS A LIQUID THAT IS A CLEANING LIQUID WITHOUT

16   MICROBES.  THIS WAS JUST CAME WITH THIS MACHINE.  IT WAS OF

17   NO INTEREST TO US.

18   Q. WHEN YOU PURCHASED THIS MACHINE IN 1999, DID YOU HAVE ANY

19   IDEA THAT A COMPANY NAMED CHEMFREE HAD BEEN INVOLVED WITH

20   GRAY MILLS?

21   A. NO.

22   Q. DID YOU HAVE ANY IDEA THAT CHEMFREE HAD ANY SORT OF

23   INVOLVEMENT OR INPUT INTO THE BIO 436 UNIT?

24   A. NO.

25   Q. WHAT HAPPENED TO THE BIO 436 UNIT THAT YOU PURCHASED?

1 A. WE STUDIED IT AND WE STARTED MAKING OUR OWN MODEL BASED

2 ON WHAT WE LEARNED FROM, NOT JUST FROM THIS MACHINE.

3 Q. DO YOU KNOW IF YOU STILL -- DO YOU KNOW IF WALTER STILL

4 HAS THE MACHINE?

5 A. I DON'T KNOW.  I DON'T THINK SO.  IT'S LONG TIME.

6 Q. WHAT HAPPENED TO THE SUPER BIOTENE FLUID THAT YOU BOUGHT?

7 A. NOTHING.

8 Q. DO YOU KNOW IF WALTER STILL HAS THE SUPER BIOTENE FLUID?

9 A. I WOULDN'T THINK SO.

10 Q. DO YOU KNOW IF THAT SUPER BIOTENE FLUID WAS SENT TO CB

11 CHEMIE?

12 A. I AM SURE WE DIDN'T SEND THAT.  NO.

13 Q. THE BIOMATIC -- SORRY, THE BIO 436 A UNIT, DID YOU

14 UNDERSTAND THAT IT WAS AT LEAST CAPABLE OF BEING A

15 BIOREMEDIATING PARTS WASHER WHEN YOU BOUGHT IT?

16 A. THERE WAS NO LIQUID THAT WOULD WORK IN THIS.  WHAT WE GOT

17 HERE WAS A MACHINE WITH A CLEANING AGENT THAT WOULD NOT BE

18 SELF-REMEDIATING.  IT IS JUST THE CLEANER.  IT IS A HEATED,

19 WATER-BASED CLEANER.

20 Q. WHEN YOU PURCHASED THE UNIT, DO YOU RECALL IF YOU

21 PURCHASED ANY FILTERS WITH THE UNIT?

22 A. YES, I RECALL WE DIDN'T ORDER ANY FILTERS WITH THAT.

23 Q. WHY DID YOU NOT ORDER ANY FILTERS?

24 A. BECAUSE THE SYSTEM OF DELIVERING MICROBES WITH A FILTER

25 WAS NOT CONSIDERED BY OURSELVES.  WE HAD A BETTER IDEA.  WE

1   WANTED TO MAKE SOMETHING THAT WORKED BETTER WITH ACTUAL

2   USERS THAT DIDN'T HAVE TO MAINTAIN THEIR MICROBES ON A

3   CONTINUOUS BASIS.

4   Q. YOU MENTIONED THAT YOU STUDIED THE BIO 436 UNIT.  IN

5   DEVELOPING YOUR MODEL, DID YOU COPY THE BIO 436 UNIT?

6   A. NO.  NO.  THE FUNCTIONS THAT WE INCORPORATED IN OUR

7   MACHINE WAS QUITE DIFFERENT THAN WHAT THIS MACHINE WAS.

8   Q. WHAT DID YOU DO TO DEVELOP THE WALTER BR 100 UNIT?

9   A. WE DID SOME CHANGES TO IT THAT RELATED DIRECTLY TO MAKE

10  IT WORK WITH OUR LIQUID, WHICH WAS TO MAKE SURE THAT THE

11  LIQUID GOT STIRRED ALL THE TIME AND AERATED.  SO WE CHANGED

12  THE -- WE MADE THE PUMP RUN CONTINUOUSLY AND PUT A BYPASS

13  INTO THE CIRCULATION THAT SPLASHED BACK ONTO THE LIQUID WHEN

14  THE TOP OF THE BRUSH OR THE NOZZLE ON TOP OF THE SHUT OFF

15  SO THAT IT KEPT GOING AROUND AND SPLASHING AND MIXING UP THE

16  LIQUID TO PUT OXYGEN INTO THE LIQUID.

17  Q. AND WAS THAT THE PURPOSE FOR THE BYPASS?

18  A. THAT WAS THE PURPOSE FOR THE BYPASS.  YES.

19  Q. AND WHAT BENEFIT DID SPLASHING FLUID INTO THE LIQUID

20  PROVIDE?

21  A. IT MIXES UP THE OIL THAT ACCUMULATE AFTER CLEANING THE

22  PARTS, SOILED PARTS, AND BRINGS OXYGEN INTO THE LIQUID SO

23  THAT THE MICROBES WOULD WORK AT MAXIMUM CAPACITY.

24  Q. DO YOU RECALL IF THERE WERE ANY OTHER DIFFERENCES BETWEEN

25  THE WALTER UNIT AND THE GRAY MILLS BIO 436?

1   A. YES.  THERE WERE SOME OTHER CHANGES.  THE FIXED -- THE

2   TEMPERATURE SETTING, IT WAS AN ADJUSTABLE TEMPERATURE

3   SETTING ON THERE.

4   Q. SORRY, WITH THE LANGUAGE, YOU SAID YOU FIXED IT.  DO YOU

5   MEAN YOU FIXED THE BIO 436, OR SOMETHING ELSE?

6   A. NO.  WE ACTUALLY -- WHAT HAPPENED, WE MADE SOME OTHER

7   THINGS THAT WERE PERFECTLY NEW.  WE MADE THE -- AS FAR AS I

8   RECALL, THIS SAMPLE MACHINE HAD A HEATER AND PUMP THAT WAS

9   ATTACHED TO THE UPPER SINK.  SO FOR SERVICING THIS -- THE

10  LIQUID, YOU HAD TO REMOVE THE COVER AND TURN IT UPSIDE-DOWN

11  TO BE ABLE TO HAVE ACCESS TO THE LIQUID, WHICH WAS A VERY

12  CUMBERSOME THING.  SO WE MADE THEM DEVELOP A SEPARATE UNIT

13  THAT HAS THE HEATER AND THE PUMP ALL ATTACHED THAT HOOKS

14  ONTO THE SIDE OF THE LOWER COMPARTMENT, THE LOWER TANK.

15  Q. AND SO TO BACK UP FOR JUST A SECOND, WHEN YOU SAY WE

16  FIXED THE TEMPERATURE, YOU MEAN THAT YOU SET THE TEMPERATURE

17  AT A CERTAIN POINT SO THAT IT COULD NOT BE ADJUSTED?

18  A. THE WAY THIS WAS MADE INSIDE THE BOX, THE CONTROL BOX,

19  THE ELECTRICAL BOX, THAT IT WAS AN ADJUSTABLE THERMOSTAT

20  THAT COULD BE SET BY OPENING THE BOX TO THE TEMPERATURE YOU

21  WOULD LIKE.  AND WE MADE SURE THAT THIS WAS FIXED SO THAT

22  THIS WAS DONE WITH A VERY SIMPLE MEANS.  IT WAS GLUED IN

23  PLACE WITH SOME LACQUER SO THAT THE TEMPERATURE COULD NOT BE

24  CHANGED AND THE MICROBES WOULD NOT WORK PROPERLY ANYMORE.

25  Q. AND AFTER YOU DETERMINED WHAT YOU WANTED IN YOUR MACHINE,

1    WHO DID YOU WORK WITH TO BUILD YOUR PROTOTYPE, YOUR

2    MANUFACTURING PARTNER?

3    A. WE WORKED WITH GRAY MILLS TO MAKE THIS SPECIAL MODEL FOR

4    US.

5    Q. AND DID GRAY MILLS SAY ANYTHING TO YOU LIKE OH NO, WE

6    CAN'T DO THIS BECAUSE WE ARE WORKING WITH CHEMFREE?

7    A. NO.  NO.

8    Q. DID GRAY MILLS SAY ANYTHING TO YOU AT ALL ABOUT CHEMFREE

9    AT THAT POINT?

10   A. NOTHING AT ALL.  CHEMFREE.  GRAY MILLS, YOU SAID.

11   Q. SORRY?

12   A. YOU SAID CHEMFREE?

13   Q. NO.  SORRY.  DID GRAY MILLS SAY ANYTHING TO YOU ABOUT

14   CHEMFREE?

15   A. OKAY.  THERE WAS NO CONTACT WITH CHEMFREE.

16   Q. BEFORE YOU LAUNCHED THIS PRODUCT, WERE YOU CONCERNED

17   ABOUT PATENTS?

18   A. YES.  WE DO THIS AS A MATTER OF RULE, EVERY TIME WE

19   LAUNCH SOMETHING, WE MAKE SEARCHES.  WE WERE LAUNCHING THIS

20   PRODUCT FIRST IN EUROPE, SO OUR PARTNER IN EUROPE WAS

21   RESPONSIBLE FOR MAKING SURE THAT IT WAS CLEAR ON THE

22   EUROPEAN MARKET.

23   Q. WAS THAT PARTNER CB CHEMIE?

24   A. THAT WAS CB CHEMIE, YES.

25   Q. AND WHAT DID CB CHEMIE TELL YOU ABOUT PATENTS?

1    A. THEY SAID THAT THEY CHECKED AND THAT THIS PRODUCT WOULD

2    NOT INFRINGE ON ANY PATENT.

3    Q. AND DID YOU CHECK FOR ANY PATENTS?

4    A. WE WERE GETTING READY IN -- THIS LAUNCHING IN EUROPE TOOK

5    PLACE IN THE FALL OF 2000.  AND WE WERE GETTING READY TO

6    LAUNCH EARLY 2001 IN CANADA.  AND AT THAT TIME I DID A

7    SEARCH.

8    Q. PLEASE PULL UP PLAINTIFF'S EXHIBIT 101.  I WOULD LIKE TO

9    ASK YOU, MR. SCHUDLE, TO TAKE A LOOK AT WHAT IS ON YOUR

10   SCREEN.  YOU SAID YOU LAUNCHED IN EUROPE IN THE FALL OF

11   2000.  WHAT IS THIS DOCUMENT?

12   A. THAT IS AN INTERNAL -- IS THAT INTERNAL?  THAT WAS A

13   NEWSPAPER FOR NEW THINGS THAT WE ARE DOING INTERNATIONALLY.

14   Q. AND IT'S A NEWSPAPER THAT WALTER PUBLISHES?

15   A. YES.

16   Q. AND IN THIS NEWSPAPER IT SAYS, "IN OCTOBER OF THIS YEAR,

17   WE OFFICIALLY LAUNCHED THE LATEST WALTER SOLUTION

18   BIO-CIRCLE."  DO YOU SEE THAT?

19   A. YES.

20   Q. SO DOES THAT INDICATE THAT YOU LAUNCHED IN EUROPE IN

21   OCTOBER OF 2000?

22   A. YES.

23   Q. FURTHER, IN THAT FIRST PARAGRAPH IT SAYS, "WE ARE NOW

24   READY TO SEIZE MARKET OPPORTUNITIES SUCH AS SWITZERLAND

25   WHERE NEW LAWS AND REGULATIONS THAT WILL TAKE EFFECT NEXT

1    YEAR WILL CHARGE SPECIAL FEES TO COMPANIES THAT USE

2    SOLVENTS.  WE ALREADY HAVE TWO SWISS COMPANIES INTERESTED IN

3    SELLING BIO-CIRCLE IN THEIR COUNTRY."  ARE YOU FAMILIAR WITH

4    WHAT THE NEW MARKET OPPORTUNITIES WERE SUCH AS IN

5    SWITZERLAND?

6    A. YES, I AM.

7    Q. WHAT WERE THEY?

8    A. THERE WAS, IN THOSE DAYS, THERE WAS NEW THAT THERE WAS A

9    VOC TAX ADDED TO ANYTHING THAT CONTAINED VOC'S USED IN

10   INDUSTRY.  QUITE A HEFTY TAX.  IN THOSE DAYS WAS ABOUT ONE

11   DOLLAR PER KILO OF VOC'S CONTAINED IN SUCH PRODUCTS, SO THIS

12   FAVORED THE REPLACEMENT OF VOC AS USED IN CLEANERS BY

13   WATER-BASED SYSTEMS.  AND THAT WAS A REAL INCENTIVE FOR THE

14   INDUSTRY TO GO TO THESE NEW SYSTEMS.  AND STILL TODAY.  THEY

15   TRIPLED THE FEE IN THE MEANTIME AND IT IS A VERY STRONG PUSH

16   IN THIS DIRECTION.

17   Q. AND WHEN YOU USE THE DESIGNATION "VOC," DOES THAT REFER

18   TO A VOLATILE ORGANIC COMPOUND?

19   A. YES, IT DOES.

20   Q. AND YOU RECOGNIZE MINERAL SPIRITS AS A VOLATILE ORGANIC

21   COMPOUND?

22   A. YES.

23   Q. AND IN THE SECOND PARAGRAPH ON THIS EXHIBIT IT READS,

24   "BIO-CIRCLE IS A NEW, DISRUPTIVE TECHNOLOGY THAT WILL CHANGE

25   THE WAY PEOPLE THINK ABOUT CLEANING.  WITH THE GROWING

1   GLOBAL AWARENESS FOR ENVIRONMENTAL PROTECTION AND INCREASING

2   SENSITIVITY TO WORKER SAFETY ISSUES, BIO-CIRCLE IS A

3   PERFECTLY ADAPTED SOLUTION FOR THESE CONCERNS."  WHAT WAS

4   THE GROWING GLOBAL AWARENESS AND THE INCREASE IN SENSITIVITY

5   REFERENCE THERE?

6   A. THE VOC'S ARE BLAMED FOR OUR GLOBAL WARMING EFFECTS THAT

7   WE ARE GETTING.  SO THIS IS DEFINITELY ONE OF THE REASONS.

8   AS IT RELATES TO PEOPLE WORKING WITH MINERAL SPIRITS IN

9   CLEANING, WHERE THERE IS CONTACTS BY THE WORKER'S HANDS AND

10  OTHER BODY PARTS, THERE IS A VERY BIG RISK OF -- THAT THESE

11  THINGS ARE CANCER-CAUSING AGENTS.  AND SO THIS NEW SYSTEM

12  USING WATER-BASED CLEANERS IS MUCH SAFER FOR THE WORKER.

13  Q. WHAT WAS PUT IN THE DRAIN OF THE BR 100?

14  A. WHEN YOU REFER TO "DRAIN," YOU WOULD MEAN THE DRAIN OF

15  THE SINK?

16  Q. THE DRAIN OF THE SINK.

17  A. NOT THE DRAIN TO EMPTY THE LOWER TANK?

18  Q. NO.  THE DRAIN IN THE SINK.  THANK YOU.

19  A. THERE WAS A CONTRAPTION IN THERE THAT THE LIQUID FLOWS

20  THROUGH AND PREVENTS PARTS FROM FALLING IN, AND ALSO THERE

21  IS A FOAM SPONGE IN THERE -- YOU ARE NOW SHOWING IT TO ME,

22  SO IT IS MUCH EASIER -- THAT PREVENTS EVAPORATION OF THE

23  LIQUID.  THIS IS A VERY IMPORTANT THING ESPECIALLY WITH OUR

24  AERATION IN THE LOWER TANK OF IT, CREATING A LOT OF HOT AIR

25  AND STEAM, AND IT IS VERY IMPORTANT TO PREVENT THIS CHIMNEY

1   EFFECT THROUGH THAT HOLE TO CONDENSE THE STEAM BACK INTO THE

2   LOWER TANK.

3   Q. WHICH PART, WHEN YOU REFER TO THE FOAM SPONGE, WHICH

4   PART?

5   A. THAT WOULD BE THIS THING.

6   Q. VERY GOOD.  WILL THAT PART CATCH PARTICULATE MATTER OR

7   ANY OF THOSE THREE PARTS CATCH PARTICULATE MATTER IF THEY'RE

8   WASHED OFF?

9   A. YEAH.  THE LIQUID THAT GOES THROUGH THERE ON THE WAY DOWN

10  WOULD PARTIALLY GO THROUGH THIS, AND IT GETS DIRTY AFTER

11  AWHILE.  YES.

12  Q. AND THE COMPANY REFERRED TO THAT SOMETIMES AS A

13  THREE-PART FILTER, DID IT NOT?

14  A. I THINK THAT WAS USED IN SOME ADVERTISING LIKE THAT.

15  YEAH.

16  Q. THE COMPANY DID EVENTUALLY LAUNCH THIS PRODUCT IN THE

17  UNITED STATES FOR A TIME, DID IT NOT?

18  A. YES.

19  Q. AND DO YOU HAVE ANY IDEA OF APPROXIMATELY HOW MANY UNITS

20  WERE BROUGHT OR SOLD INTO THE UNITED STATES?

21  A. THE LAUNCH IN THE UNITED STATES WAS AFTER THE CANADIAN

22  LAUNCH.  I DON'T KNOW EXACTLY WHEN.  THEY WERE VERY SLOW IN

23  ADAPTING THIS AND THERE WERE VERY FEW UNITS SOLD.

24  Q. YOU THINK THERE HAVE BEEN FEWER THAN 50 SETS?

25  A. AROUND THAT.  YEAH.

1    Q. DO YOU KNOW?

2    A. I DON'T KNOW.  I SHOULDN'T SPECULATE.

3    Q. YOU MENTIONED YOU DID A SEARCH FOR PATENTS.

4    A. YES.

5    Q. DO YOU RECALL IF YOU FOUND ANY CHEMFREE PATENTS IN YOUR

6    SEARCH?

7    A. YES, I DO.

8    Q. YOU HAPPEN TO RECALL THE PATENT NUMBER OF THE CHEMFREE

9    PATENT?

10   A. NO.

11   Q. IF YOU WOULD, PLEASE, SIR, TURN IN YOUR NOTEBOOK THERE TO

12   JOINT APPENDIX 21.

13   A. OKAY.

14   Q. MR. SCHUDLE, WHAT IS THIS DOCUMENT?

15   A. IT'S PATENT NO. 5,961,733, ISSUED ON OCTOBER 5, 1999.

16   Q. HAVE YOU SEEN THIS PATENT BEFORE?

17   A. THAT MUST BE THE ONE I SAW AT THAT TIME, JUDGING BY THE

18   DATE.  YES.  I HAVE TO READ WHAT THE CLAIMS ARE HERE.

19   Q. ONCE YOU FOUND THIS PATENT WHAT DID YOU DO WITH IT?

20   A. I READ IT.

21   Q. AND DID YOU COME TO A DETERMINATION AS TO WHETHER OR NOT

22   YOU THOUGHT THE BR 100 UNIT WOULD INFRINGE THIS PATENT?

23   A. I CAME TO THE DEFINITE CONCLUSION THAT WE DID NOT

24   INFRINGE WITH OUR BR 100.

25   Q. OKAY.  AND WHAT LED YOU TO THAT CONCLUSION?

1    A. IN THE CLAIMS IT SAYS SOMEWHERES, I DON'T FIND THEM RIGHT

2    NOW, BUT THIS REFERS TO A PARTS CLEANER THAT HAS A FILTER

3    MAT THAT BRINGS THE MICROORGANISMS INTO THE LIQUID.

4    Q. LOOKS LIKE MY COPY DOESN'T HAVE THAT IN IT, TOO.  CAN YOU

5    SEE CLAIM 1 EITHER ON THE SCREEN OR --

6    A. YES, I CAN.  YEAH.  OKAY.  "THE METHOD OF CLEANING

7    HYDROCARBONS FROM AN OBJECT, THE METHOD COMPRISING THE STEPS

8    OF INTRODUCING HYDROCARBON, BIODEGRADING MICROORGANISMS INTO

9    THE CLEANING FLUID THAT IS NONTOXIC TO THE MICROORGANISMS

10   WHEREIN THE CLEANING FLUID IS WITHIN A WASHING APPARATUS

11   INCLUDING A TANK FOR CONTAINING THE FLUID AND A BASIN FOR

12   RECEIVING THE PART, A PUMP, A CONDUIT ASSEMBLY FOR PUMPING

13   THE FLUID FROM THE TANK INTO CONTACT WITH THE PART WITHIN

14   THE BASIN AND THE FLOW PATH DEFINED BETWEEN THE BASIN AND

15   THE TANK THROUGH WHICH THE FLUID FLOWS AND BRINGING THE PART

16   INTO CONTACT WITH THE FLUID WITHIN THE BASIN.  AN

17   IMPROVEMENT CHARACTERIZED BY" -- AND THERE WE HAVE THE

18   INTRODUCTION -- "CHARACTERIZED BY THE INTRODUCING STEP

19   INCLUDES THE STEP OF INITIALLY POSITIONING A FILTER INTO THE

20   FLOW PATH OF SAID CLEANING FLUID, CONSISTING OF A

21   BIODEGRADABLE, NONTOXIC, NONCAUSTIC, NONFLAMMABLE, OIL

22   DISPERSANT CLEANER AND DEGREASER, SAID FILTER HAVING THE

23   MICROORGANISMS ATTACHED THERETO.  SO THAT IS, RELEASING THE

24   MICROORGANISMS FROM SAID FILTER INTO THE FLUID FLOW AS THE

25   FLUID PASSES THROUGH THE FILTER SUCH AS THAT THE

1  MICROORGANISMS ARE DELIVERED INTO AND SUSTAINED WITHIN THE

2  FLUID."

3  Q. IS THAT LAST PARAGRAPH THE ONE THAT YOU JUST READ,

4  "RELEASING THE MICROORGANISMS FROM SAID FILTER," IS THAT

5  WHAT PERSUADED YOU THAT THE BR 100 WOULD NOT INFRINGE THAT

6  PATENT?

7  A. DEFINITELY.  YES.

8  Q. ONCE YOU CAME TO THAT DETERMINATION, WHAT DID YOU DO?

9  A. WE MOVED ON WITH OUR PROJECT.

10  Q. AND AS A RESULT, THE BR 100 WAS SUBSEQUENTLY LAUNCHED IN

11  THE UNITED STATES FOR AWHILE; CORRECT?

12  A. YES.  THAT IS CORRECT.

13  Q. NOW, YOU HAVE MET MR. MCNALLY FROM CHEMFREE, HAVE YOU

14  NOT?

15  A. YES, I HAVE.

16  Q. WHAT WERE THE CIRCUMSTANCES OF YOUR MEETING MR. MCNALLY?

17  A. DURING THE SPRING OF 2001, I WAS IN MY OFFICE IN POINT

18  CLAIRE AND I HAD A COLD CALLING, MR. MCNALLY DOWNSTAIRS

19  WANTING TO SEE ME.

20  Q. WHERE IS POINT CLAIRE?

21  A. THAT IS THE HEAD OFFICE OF WALTER IN CANADA.

22  Q. POINT CLAIRE IS A SUBURB?

23  A. IT IS A SUBURB OF MONTREAL.

24  Q. AND DID YOU SEE MR. MCNALLLY THAT DAY?

25  A. YES.  I ASKED HIM TO COME UPSTAIRS INTO OUR MEETING ROOM

1    AND WE HAD A MEETING.

2    Q. AND WHAT DID MR. MCNALLY -- FIRST OF ALL, WAS HE ALONE?

3    A. NO.  HE WAS WITH A PERSON THAT I KNOW THE NAME FROM THE

4    LETTER, BUT I DIDN'T KNOW HIM.

5    Q. AND THAT WOULD BE MR. BELAIRE?

6    A. THAT WOULD BE MR. RON BELAIRE.  YEAH.

7    Q. AND THEN JUST SINCE YOU MENTIONED THE LETTER, LET'S GO

8    AHEAD AND PUT IT ON.  LOOK AT EXHIBIT 746 IN YOUR BOOK,

9    PLEASE, SIR.  YOU MENTIONED A LETTER.  IS THIS THE LETTER TO

10   WHICH YOU REFERRED?

11   A. YES.  THAT IS CORRECT.

12   Q. AND IS THIS A LETTER THAT YOU RECEIVED FROM MR. MCNALLY?

13   A. YES, I DID.

14   Q. AND IT WAS SUBSEQUENT TO YOUR MEETING WITH HIM IN POINT

15   CLAIRE, WAS IT NOT?

16   A. THAT WAS A FOLLOW-UP LATER ON IN THE VISIT.  YES.

17   Q. SO WHEN YOU MET WITH HIM IN POINT CLAIRE IN 2000, WHAT

18   WAS DISCUSSED?

19   A. HE MADE POWERPOINT PRESENTATION ON HIS COMPANY, AND HE

20   WAS PITCHING TO WORK TOGETHER WITH US ON SELLING HIS

21   PRODUCT.

22   Q. HOW LONG DID THE MEETING LAST?

23   A. I WOULD GUESS ABOUT AN HOUR.  IT WAS IN THE MORNING.

24   YEAH.

25   Q. AND AT THE CONCLUSION OF THE MEETING, WAS THERE ANYTHING

1    FOR YOU TO DO?

2    A. NO.  THERE WAS NOTHING FOR ME TO DO.

3    Q. WHEN MR. MCNALLY LEFT, WHAT -- WAS IT YOUR SENSE THAT YOU

4    NEEDED TO, YOU KNOW, CHECK INTO SOMETHING WITH HIM AGAIN OR

5    DO ANYTHING MORE WITH HIM OR DID YOU THINK ANYTHING AT ALL

6    WOULD HAPPEN AFTER THAT?

7    A. NO, I DIDN'T HAVE ANY REASON TO DO ANY FOLLOW-UP AT THIS

8    POINT.

9    Q. DID YOU INDICATE TO MR. MCNALLY THAT WALTER WAS

10   INTERESTED IN ENTERING INTO A BUSINESS RELATIONSHIP WITH

11   CHEMFREE?

12   A. NO, I DID NOT.  HE KNEW THAT WE WERE SELLING WATER-BASED

13   CLEANERS AND HE THOUGHT THIS WAS A GOOD IDEA FOR US TO ADD

14   THIS PRODUCT TO OUR LINE.

15   Q. AND DID HE SPEAK WITH YOU ABOUT THIS POSSIBILITY OF

16   CHEMFREE PRIVATE LABELING A PARTS WASHER FOR WALTER?

17   A. IT IS AN IDEA THAT HE ADVANCED TO -- THAT THIS COULD BE

18   POSSIBLE AND -- YEAH.

19   Q. WAS THAT AN IDEA THAT WALTER WAS INTERESTED IN?

20   A. I DID NOT INDICATE THAT TO HIM.

21   Q. WAS THE COMPANY, IN FACT, INTERESTED IN ENTERING INTO A

22   BUSINESS RELATIONSHIP WITH CHEMFREE AT THAT POINT IN TIME?

23   A. NO.  WE WERE ALREADY SELLING SOME PRODUCT LIKE THIS,

24   WHICH I DON'T KNOW IF MR. MCNALLY KNEW THIS AT THAT TIME OR

25   NOT.  I WOULD ASSUME THAT HE PROBABLY DID.  WE HAD A BETTER

```
1    IDEA.  WE HAD THE BETTER WORKING SYSTEM AND WE WERE

2    CONVINCED THAT THIS WAS NOT A GOOD PRODUCT FOR US TO SELL.

3    Q. DID YOU HAVE ANY SUBSEQUENT CONTACT WITH MR. MCNALLY?

4    A. AFTER I GOT THIS LETTER AND THEN HE MADE A FOLLOW-UP

5    PHONE CALL, A QUICK FOLLOW-UP PHONE CALL TO SAY -- TO

6    BASICALLY SEE IF THERE IS ANYTHING NEW.

7    Q. AND WHAT DID YOU TELL MR. MCNALLY IN THAT PHONE CALL?

8    A. I TOLD HIM THAT WE WERE NOT INTERESTED TO PURSUE THIS

9    FURTHER.

10   Q. IF YOU WILL LOOK AT THE LETTER THAT IS DEFENDANT'S

11   EXHIBIT 746, IN THE FOURTH PARAGRAPH ON THE FIRST PAGE,

12   MR. MCNALLY STATES IN THE FIRST SENTENCE, "YOU MENTIONED

13   SOME INTEREST IN OUR PRODUCTS FOR DISTRIBUTION IN CANADA AND

14   CERTAIN COUNTRIES IN EUROPE BUT ALSO EXPRESSED SOME

15   RESERVATIONS ABOUT BRINGING OUR PRODUCTS INTO YOUR LINE

16   WITHOUT EXCLUSIVITY."  DID WALTER DESIRE EXCLUSIVITY FOR ITS

17   PRODUCTS IN EUROPE AND CANADA?

18   A. WE -- THIS IS ONE OF OUR KEYS, THAT WHEN WE SELL

19   SOMETHING, THAT WE HAVE A CLEAN MARKETPLACE THAT WE CAN

20   FULLY PUT OUR SALES FORCE BEHIND IT.  YES.  BUT THIS IS A

21   BIT PUTTING WORDS IN MY MOUTH HERE.  I NEVER INDICATED AN

22   INTEREST.  HE ADVANCED THE POSSIBILITY OF SELLING, IN THIS

23   LETTER, BUT I NEVER -- WE WERE NOT INTERESTED.

24   Q. NOW, AT SOME POINT IN TIME, THE COMPANY BEGAN WORK ON THE

25   NEXT GENERATION, THE BR 200.
```

1    A. YES.

2    Q. WHAT PROMPTED THE COMPANY TO GET INVOLVED WITH THE BR

3    200, TO DEVELOP IT?

4    A. WE HAD STARTED, AS I SAID BEFORE, TO SELL SUBSTANTIAL --

5    OR A FAIR NUMBER OF MACHINES IN EUROPE.  WE HAD SOME

6    TECHNICAL PROBLEMS WITH THE MACHINE.  AND THE GERMAN CB

7    CHEMIE WANTED A DIFFERENT-LOOKING MACHINE THAT WAS BETTER

8    SUITED FOR SELLING IN THE GERMAN MARKET.

9    Q. AND WHO TOOK THE LEAD BETWEEN WALTER AND CB CHEMIE ON

10   DEVELOPING THE BR 200?

11   A. THIS WAS DEFINITELY A PROJECT HANDLED BY CB CHEMIE.  THEY

12   WERE STARTING ON IT AND WE ONLY LATER STARTED ALSO WORKING

13   WITH THEM ON THIS NEW PROJECT.

14   Q. WERE YOU INTERESTED IN THE BR 200 AND THE -- IN IMPROVING

15   THE FLUID IN ANY WAY IN THE BR 200?

16   A. THE FLUID WAS AN ONGOING PROJECT OF IMPROVING IT.  THE

17   FLUID WORKED BETTER IN EUROPE BECAUSE THE CLEANING WAS MORE

18   OIL BASED THERE, SO WE NEEDED -- NORTH AMERICA, IT HAS TO BE

19   ABLE TO BIOREMEDIATE GREASE, AS WELL, TO A LARGER EXTENT.

20   SO THERE WAS A CONTINUOUS IMPROVEMENT ON THE LIQUID OVER THE

21   YEARS, ACTUALLY.

22   Q. WHAT DIFFERENCES DO YOU RECALL BEING MADE BETWEEN THE BR

23   100 AND THE BR 200?

24   A. THERE WERE MANY DIFFERENCES.  THE OBVIOUS ONE IS THE

25   SHAPE OF IT.  IT IS DONE IN A DIFFERENT MOLDING PROCESS.  WE

1   HAVE OUR DOUBLE-WALLED CONSTRUCTION FOR INSULATING THE LOWER

2   PART AS WELL SO TO HAVE LESS HEAT LOSS, TO BE MORE ENERGY

3   EFFICIENT.  WE CHANGED THE WAY THE AERATE, THE LIQUID, BY

4   ADDING AN AIR PUMP THAT BUBBLES INTO THE LIQUID.  THIS ALSO

5   MADE IT POSSIBLE TO LET THE CIRCULATION PUMP RUN

6   INTERMITTENTLY ONLY WHEN THE THING IS BEING USED.  WE ADDED

7   AN ELECTRONIC CONTROLS UP FRONT.  I THINK THAT'S ABOUT IT.

8   Q. WHO BUILT THE BR 200?

9   A. THIS WAS CONTRACTED OUT TO A COMPANY BY THE NAME OF

10  DANIOS IN GERMANY.

11  Q. AND WHO WOULD HAVE GIVEN DESIGN SPECIFICATIONS TO DANIOS

12  ON HOW TO BUILD THE BR 200?

13  A. THIS WAS A DIRECT REPORT BETWEEN CB CHEMIE AND DANIOS.

14  Q. DID -- WAS WALTER CONCERNED ABOUT ANYTHING IN TERMS OF

15  THE DESIGN OF THE BR 200, THE SECOND GENERATION MACHINE?

16  A. YES.  THEY SHOWED US ONCE THEY HAD SOME DESIGNS MADE,

17  SOME SKETCHES MADE, THAT THEY WERE WORKING ON THIS AND WE

18  SAID YES, WE WOULD LIKE TO PARTICIPATE WITH OUR INPUT IN

19  THIS DESIGN SO IT COULD ALSO BE SOLD IN NORTH AMERICA.

20  Q. WERE THERE ANY DIFFERENCES BETWEEN WHAT YOU NEEDED IN

21  NORTH AMERICA AS OPPOSED TO EUROPE?

22  A. DEFINITELY THE VOLTAGE.  THE APPROVALS THAT ARE

23  ELECTRICAL APPROVALS REQUIRED SOME OF THE COMPONENTS HAVE TO

24  BE DONE DIFFERENTLY.  YES.

25  Q. WAS THE BR 200 PROJECT FINISHED WHEN YOU TOOK

1   SEMIRETIREMENT IN 2002?

2   A. NO, THIS WAS NOT FINISHED.  THIS WAS IN PROGRESS.

3   Q. ARE YOU AWARE THAT THE BR 200 UNIT WAS EVENTUALLY BROUGHT

4   TO THE MARKET?

5   A. YES, I AM.

6   Q. AND WHEN WALTER'S END USERS WOULD USE EITHER THE BR 100

7   OR THE BR 200, DID WALTER INTEND  FOR ITS CUSTOMERS TO

8   INFRINGE ANY PATENTS WHATSOEVER?

9   A. NO.

10  Q. DID WALTER HAVE ANY KNOWLEDGE THAT ANY OF ITS CUSTOMERS

11  WERE INFRINGING ANY PATENTS?

12  A. NO, WE DIDN'T.

13          MR. SCHAETZEL:  NO FURTHER QUESTIONS FOR THIS

14  WITNESS, YOUR HONOR.

15          THE COURT:  MR. ANDERSON, CROSS-EXAMINATION?

16          MR. ANDERSON:   THANK YOU, YOUR HONOR.  YOUR

17  HONOR, I NEED TO COLLECT SOME EXHIBITS FOR THIS WITNESS AND

18  PUT THEM IN A BINDER.  MAY I APPROACH THE WITNESS?

19          THE COURT:  YES.  PLEASE.

20                  CROSS-EXAMINATION

21  BY MR. ANDERSON:

22  Q. GOOD AFTERNOON, MR. SCHUDLE.  MY NAME IS LUKE ANDERSON.

23  I REPRESENT CHEMFREE IN THIS ACTION.  AND I BELIEVE TODAY IS

24  THE FIRST TIME THAT WE HAVE HAD THE OPPORTUNITY TO MEET,

25  SIR.  I HAVE SOME QUESTIONS THAT I WOULD LIKE TO ASK YOU AND

1   GO THROUGH.  WALTER HAS AN I.P. POLICY?  IS THAT YOUR

2   TESTIMONY, SIR?

3   A. AN I.P. POLICY NOT TO INFRINGE ON EXISTING PATENTS.  YES.

4   Q. AS IT RELATED TO THE PARTS WASHERS, IT WAS YOUR

5   RESPONSIBILITY TO FOLLOW THE I.P. POLICY?

6   A. YES.

7   Q. AND YOU WERE THE ONE THAT WAS RESPONSIBLE TO MAKE SURE

8   THAT POLICY WAS FOLLOWED AS IT RELATED TO THE PARTS WASHERS?

9   A. THAT IS CORRECT.

10  Q. AS OF JUNE 2001, WALTER HAD PLANS TO SELL THE BIO-CIRCLE

11  PARTS WASHER IN THE UNITED STATES?

12  A. YES, WE DID.

13  Q. IN JUNE OF 2001, YOU WERE AWARE THAT CHEMFREE HAD A

14  PATENT IN CANADA?

15  A. IN CANADA AND IN THE UNITED STATES.

16  Q. SO YOU WERE AWARE THAT CHEMFREE HAD PATENTS IN BOTH

17  CANADA AND THE UNITED STATES, SIR?

18  A. YES.  THAT IS CORRECT.

19  Q. I BELIEVE THAT YOU HAD TESTIFIED THAT YOU HAD RUN A

20  SEARCH AND LOCATED ONE OF CHEMFREE'S PATENTS; IS THAT

21  CORRECT, SIR?

22  A. THAT IS CORRECT.

23  Q. HOW DID YOU CONDUCT THAT SEARCH?

24  A. ON THE INTERNET.

25  Q. AND WHEN DID YOU CONDUCT THAT SEARCH?

1    A. I CAN'T PUT AN EXACT DATE ON IT.  I ESTIMATE EARLY 2001.

2    Q. IT WOULD HAVE BEEN DONE IN CONNECTION WITH PLANS TO TAKE

3    THE PRODUCT TO MARKET IN ROUGHLY JUNE OF 2001?

4    A. THAT IS CORRECT.

5    Q. PUT UP JOINT EXHIBIT NO. 1, PLEASE.  MR. SCHUDLE, I WOULD

6    LIKE -- GO TO THE NEXT PAGE, PLEASE.  I APOLOGIZE,

7    MR. SCHUDLE.  I DON'T HAVE A PAPER COPY OF THIS ONE

8    AVAILABLE FOR YOU.  IT IS PLAINTIFF'S JOINT EXHIBIT NO. 1.

9    YOU CAN BLOW UP THE TOP SECTION UP HERE, PLEASE.

10          MR. ANDERSON:  YOUR HONOR, WE HAVE LOCATED A PAPER

11   COPY OF JOINT EXHIBIT NO. 1.  MAY I APPROACH TO GIVE THAT TO

12   THE WITNESS TO MAKE IT A LITTLE EASIER FOR HIM TO FOLLOW

13   ALONG, SIR?

14          THE COURT:  YES.

15   BY MR. ANDERSON:

16   Q. MR. SCHUDLE, YOU WILL SEE IN THE TOP RIGHT-HAND CORNER

17   THAT THIS PATENT IS DATED FEBRUARY 1ST OF 2000.  DO YOU SEE

18   THAT, SIR?

19   A. CORRECT.  YES.

20   Q. YOU ALSO SEE IN THE LEFT-HAND COLUMN ABOUT THREE LINES

21   DOWN THAT THIS WAS ALSO ISSUED TO CHEMFREE CORPORATION.

22   A. YES.

23   Q. DID YOUR SEARCH IN 2001 REVEAL THIS PARTICULAR PATENT AS

24   WELL?

25   A. I CAN'T SAY FOR SURE, BUT I SEE WHERE YOU ARE GOING WITH

1   THIS.  IF I FOUND THE ONE PATENT, I WOULD HAVE FOUND THIS

2   ONE AS WELL.  SO -- BUT I DON'T REMEMBER.

3   Q. YOU DON'T HAVE ANY RECOLLECTION OF SEEING JOINT EXHIBIT

4   NO. 1?

5   A. TO HAVE SEEN MORE THAN ONE PATENT?  NO.

6   Q. WHEN YOU FOUND THE PATENT THAT YOU TESTIFIED TO A FEW

7   MOMENTS AGO, THE JOINT EXHIBIT NO. 21, THE PATENT ENDING IN

8   733, DID THAT CAUSE YOU TO DO ANY ADDITIONAL SEARCHING TO

9   SEE IF THERE WERE ADDITIONAL PATENTS THAT WERE OUT THERE?

10  A. I KNOW I SEARCHED AS MUCH AS I COULD, AND WHATEVER I

11  FOUND GAVE ME THE CONCLUSION THAT WE WERE SAFE WITH OUR --

12  Q. IT WAS YOUR INTENT TO DO A FULL, DILIGENT SEARCH --

13  A. THAT IS FOR SURE, YES.

14  Q. -- TO LOCATE ALL RELEVANT PATENTS THAT YOU COULD FIND?

15  A. YES.

16  Q. AND YOUR TESTIMONY IS THAT YOU DON'T RECALL SEEING THE

17  PATENT THAT WE ARE LOOKING AT, JOINT EXHIBIT NO. 1, THE

18  PATENT ENDING IN 110?

19  A. I DON'T RECALL.  I DIDN'T RECALL THE OTHER ONE EITHER.  I

20  JUST KNOW WHAT THE CONCLUSION.

21  Q. BUT IT IS POSSIBLE YOU SAW THIS ONE AS WELL?

22  A. IT IS POSSIBLE.  YES.

23  Q. I WOULD LIKE US TO TAKE A LOOK AT PLAINTIFF'S EXHIBIT NO.

24  180.  MR. SCHUDLE, IT IS AT EXHIBIT F IN THE BINDER THAT I

25  PROVIDED TO YOU.  DO YOU KNOW CATRIN SHURER AT CB CHEMIE?

1    A. SORRY?

2    Q. DO YOU KNOW CATRIN SHURER?

3    A. SHURER?  YES, I KNOW HER.  YES.

4    Q. THE NEXT PERSON FROM DANIOS, JOACHIM FISCHER?

5    A. YES, I DO.

6    Q. AND YOU KNOW CLAUDE VANDEMEULEBROOCKE?

7    A. YES, I DO.

8    Q. HE TOOK OVER THE RESPONSIBILITIES FOR PRODUCT DEVELOPMENT

9    WHEN YOU ENTERED SEMI-RETIREMENT?

10   A. THAT IS CORRECT.

11   Q. THE SUBJECT OF THE E-MAIL IS, "STARTING THE PRESSURE

12   BIO-CIRCLE PROJECT."  YOU ARE FAMILIAR WITH THE PRESSURE

13   BIO-CIRCLE PROJECT?

14   A. VAGUELY.  YES.

15   Q. AND AS PART OF THAT, YOU BOUGHT THE GRAY MILLS TEMPEST

16   20?

17          MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  THERE HAS

18   BEEN NO FOUNDATION.  THE E-MAIL, BY ITS DATE, IS NOVEMBER 4,

19   2004, WHICH WOULD HAVE BEEN ALMOST THREE YEARS AFTER THIS

20   WITNESS HAD LEFT HIS CURRENT POSITION, NOR IS HE LISTED ON

21   THE DOCUMENT.

22          MR. ANDERSON:  YOUR HONOR, I BELIEVE THE CURRENT

23   QUESTION THAT WAS PENDING WAS WHETHER HE WAS FAMILIAR WITH

24   THE PRESSURE BIO-CIRCLE PROJECT.  AND I BELIEVE THAT IS --

25   HIS KNOWLEDGE OF THAT IS SEPARATE AND DISTINCT FROM THE

1    DOCUMENT ITSELF.

2             MR. SCHAETZEL:  AND THAT QUESTION, YOUR HONOR, IF

3    I MAY, IS BEYOND THE SCOPE OF THE DIRECT.  SO I AM NOT SURE

4    WHERE WE ARE GOING HERE, BUT WE DO OBJECT TO THIS LINE OF

5    QUESTIONING AS BEING BEYOND THE SCOPE AND IRRELEVANT.

6             MR. ANDERSON:   WHERE WE ARE GOING HERE, YOUR

7    HONOR, IS THERE WAS TESTIMONY IN THE DIRECT EXAMINATION

8    ABOUT HOW PRODUCTS WERE PURCHASED FROM GRAY MILLS AND THE

9    WORK THAT WAS DONE WITH THEM.  WHAT WE ARE LEADING UP TO IS

10   THE ISSUE OF --

11            THE COURT:  ALL RIGHT.  OVERRULED.

12   BY MR. ANDERSON:

13   Q. AND MR. SCHUDLE YOU ARE FAMILIAR WITH A PRESSURE

14   BIO-CIRCLE PROJECT?

15   A. YES, I HAVE SEEN THIS.  YEAH.

16   Q. AND AS PART OF THAT, THE GRAY MILLS TEMPEST 20 WAS

17   PURCHASED?

18   A. THAT IS WHAT IT LOOKS LIKE.  YEAH.

19   Q. AND IF WE TAKE A LOOK AT THE THIRD PARAGRAPH HERE, "OUR

20   CHALLENGE WILL BE TO BACKWARD ENGINEER THIS PRODUCT TO ADAPT

21   IT TO THE BIO-CIRCLE BASE WHILE MAKING SURE THE MACHINE

22   REMAINS SIMPLE, EASY TO USE, MAINTENANCE FRIENDLY, AND ABOVE

23   ALL, COST-EFFECTIVE."  DO YOU SEE WHERE I AM REFERRING TO,

24   SIR?

25   A. YES, I DO.

1    Q. WALTER, FROM TIME TO TIME, STUDIES COMPETITORS PRODUCTS

2    AS PART OF ITS PRODUCT DEVELOPMENT PROGRAM, DOESN'T IT?

3    A. YES, WE DO.

4    Q. AND SOMETIMES YOU EVEN GO SO FAR AS TRYING TO REVERSE

5    ENGINEER THOSE PRODUCTS AS PART OF YOUR STUDIES, DON'T YOU,

6    SIR?

7    A. NO, WE DON'T.  I REALLY -- THIS IS NOT OUR COMPANY

8    CULTURE.  WE ALWAYS DEVELOP SOMETHING BETTER.  THAT IS THE

9    ONLY WAY WE CAN SURVIVE IN THIS HIGH MARGIN BUSINESS WE ARE

10   IN.  WE HAVE TO HAVE A BETTER PRODUCT.  SO THIS IS A VERY

11   TERRIBLE WORDING IN THAT.  THAT'S ALL.  THIS IS -- YOU KNOW,

12   I AM JUST LOOKING AT THIS, WHAT I KNOW ABOUT THIS GRAY MILLS

13   TEMPEST 20 MACHINE.  I NEVER SEEN IT BUT I KNOW IT IS A

14   NONBIOREMEDIATING MACHINE.  IT IS -- IT HAS NOTHING TO DO --

15   THE ONLY THING THAT IS IN THERE IS IT HAS A HIGH PRESSURE

16   PUMP AND A COUPLE OF GLOVES SO THAT WE CAN WORK WITH PART.

17   THERE IS NO SIMILARITY ON WHAT WE, IN THE END, DEVELOPED AS

18   A PRODUCT.

19           MR. CAPP:  THIS WAS EARLY ON IN WALTER'S VENTURE

20   INTO STARTING TO DEVELOP AND SELL BIOREMEDIATING PARTS

21   WASHERS, WAS IT NOT?

22   A. THAT WAS 2004.  THAT IS NOT THAT LONG AGO.

23   Q. BUT IT WAS RELATIVELY EARLY IN THE PRODUCT DEVELOPED FOR

24   WALTER INTO BIOREMEDIATING PARTS WASHERS?

25   A. YEAH.  YEAH.

1  Q. BEFORE THAT, WALTER HAD A LONG HISTORY OF DEVELOPING

2  OTHER TYPES OF PRODUCTS.

3  A. YES.

4  Q. ABRASIVES?

5  A. YES.

6  Q. PRODUCTS RELATED TO METAL FINISHING?

7  A. CORRECT.

8  Q. AND SO AS PART OF THE EARLY VENTURE INTO DEVELOPING A

9  PARTS WASHER, YOUR TESTIMONY IS THAT WALTER DID NOT ATTEMPT

10  TO REVERSE ENGINEER COMPETITORS'S PRODUCTS?

11  A. THAT IS CORRECT.

12  Q. DEFENDANT'S EXHIBIT 990.  MR. SCHUDLE, DO YOU RECALL

13  TESTIFYING DURING YOUR DIRECT ABOUT THE SUPER BIOTENE FLUID?

14  A. YES, I DO.

15  Q. WHY WERE YOU INTERESTED IN BUYING THE SUPER BIOTENE FLUID

16  TO BEGIN WITH?

17  A. I DON'T KNOW IF WE WERE INTERESTED.  IT JUST CAME WITH

18  THE MACHINE.

19  Q. IT APPEARS TO ME, SIR, THAT YOU PAID AN ADDITIONAL $450

20  FOR THE SUPER BIOTENE FLUID.  DO YOU SEE THAT, SIR?

21  A. AS FAR AS I REMEMBER, WE DIDN'T PAY FOR THIS SAMPLE.

22  Q. WELL, YOU DON'T HAVE ANY REASON TO QUESTION THE ACCURACY

23  OF WHAT WAS IN THE DOCUMENTS, DO YOU, SIR?

24  A. I DON'T KNOW.  THERE IS NO -- SOMETHING IS WHITED OUT AT

25  THE END THERE.

1    Q. THIS IS A GRAY MILLS DOCUMENT THAT WAS SENT TO WALTER?

2    DO YOU SEE WHERE I AM REFERRING TO, SIR?

3    A. YES.

4    Q. AND IT RELATES TO AN ORDER THAT WALTER PLACED TO GRAY

5    MILLS?

6    A. YES.

7    Q. AND THAT ORDER RELATES TO A MACHINE, A PARTS WASHER?

8    A. UH-HUH (AFFIRMATIVE).

9    Q. AND IT RELATES TO THE SUPER BIOTENE FLUID; IS THAT

10   CORRECT?

11   A. THAT IS CORRECT.

12   Q. AND ACCORDING TO THE INVOICE HERE, WALTER PAID $450 FOR

13   THE SUPER BIOTENE FLUID.  RIGHT HERE, UNDER THE UNIT PRICE.

14   A. I DON'T KNOW IF WE PAID FOR IT OR NOT.  IT WAS PART OF

15   THE SHIPMENT.  YES.  IF WE WERE INVOICED WE PAID FOR IT.

16   YES.

17   Q. WALTER WAS INTERESTED IN THE SUPER BIOTENE FLUID ENOUGH

18   TO PAY $450 FOR IT?

19   A. I GUESS SO.

20   Q. WHAT DID YOU DO WITH THAT SUPER BIOTENE FLUID WHEN IT

21   ARRIVED?

22   A. WE PUT IT ASIDE AND PUT OUR LIQUID IN THE MACHINE.

23   Q. IT IS YOUR TESTIMONY THAT YOU PAID $450 FOR THE SUPER

24   BIOTENE FLUID AND YOU SIMPLY SAT IT ASIDE AND DIDN'T DO

25   ANYTHING WITH IT; IS THAT CORRECT, SIR?

1   A. YES.  I TESTIFIED TO THAT.  YES.

2           MR. ANDERSON:  YOUR HONOR, MAY I HAVE ONE MINUTE

3   BEFORE WE CONCLUDE?

4           THE COURT:  YES.

5   BY MR. ANDERSON:

6   Q. MR. SCHUDLE, AFTER PAYING $450 FOR THE BIOTENE FLUID, DID

7   YOU AT LEAST READ THE LABEL ON IT WHEN IT ARRIVED?

8   A. YOU ARE MAKING ME SAY THAT WE PAID FOR THIS.  I DOUBT

9   THAT WE PAID FOR IT.

10  Q. OKAY.  WELL, LET'S JUST ADDRESS IT THIS WAY.  WHEN THE

11  BIOTENE FLUID ARRIVED, DID YOU READ THE LABEL?

12  A. NO.

13  Q. ARE YOU AWARE OF ANYONE ELSE HAVING READ THE LABEL?

14  A. I AM NOT AWARE.  NO.

15  Q. SORRY?

16  A. I AM NOT AWARE OF ANYBODY READING A LABEL.

17  Q. THANK YOU, SIR.

18          MR. ANDERSON:  YOUR HONOR, I TENDER THE WITNESS.

19          THE COURT:  MR. SCHAETZEL, DO YOU HAVE ANY FURTHER

20  QUESTIONS?

21          MR. SCHAETZEL:  VERY SHORT.  YES, YOUR HONOR.

22          THE COURT:  ALL RIGHT.  I THINK I AM GOING TO ASK

23  YOU TO RESERVE THEM UNTIL AFTER THE BREAK.  WE WILL TAKE OUR

24  AFTERNOON RECESS.  WE WILL RESUME AT 3:40.

25          (BREAK FROM 3:24 P.M. UNTIL 3:40 P.M.)

1              MR. ANDERSON:  YOUR HONOR, IF I MIGHT SIMPLY

2     INQUIRE AS TO THE COURT'S PREFERENCE FOR THE SCHEDULE FOR

3     THE REST OF THE DAY.  THE NEXT WITNESS IS GOING TO BE

4     PLAINTIFF'S EXPERT, DR. JOHN DURKEE.  DR. DURKEE IS IN A

5     WHEELCHAIR AND WILL NEED SOME ADDITIONAL LEAD TIME FOR

6     TAKING THE STAND, AND IF YOU ARE INTERESTED IN CONTINUING TO

7     TAKE TESTIMONY FOLLOWING MR. SCHUDLE TESTIMONY, I NEED TO

8     GET DR. DURKEE MOVING TO GET HERE.  HE IS HERE, HE IS ON THE

9     FLOOR, AND IT'S NOT A PROBLEM, I JUST DIDN'T KNOW IF YOU

10    WERE INTERESTED IN TAKING TIME TO READ DR. DURKEE'S EXPERT

11    REPORT, AND SIMPLY NEED SOME GUIDANCE, YOUR HONOR.

12             THE COURT:  WELL, WE ARE RUNNING A GOOD BIT

13    BEHIND.  I THINK WE WILL FORGE ON TODAY WITH DR. DURKEE AND

14    GO TILL ABOUT 5:30.

15             MR. ANDERSON:  YES, SIR, I WILL GET HIM MOVING.

16             THE COURT:  ALL RIGHT.

17                     REDIRECT EXAMINATION

18    BY MR. SCHAETZEL:

19    Q. WHEN DID YOU TAKE SEMI RETIREMENT AGAIN, SIR?

20    A. JANUARY 1ST OF 2003.

21    Q. THE E-MAIL THAT YOU WERE SHOWN, PLAINTIFF'S EXHIBIT 180,

22    WAS DATED NOVEMBER 4, 2004.  DID YOU HAVE ANYTHING TO DO

23    WITH THE PURCHASE OF A GRAY MILLS TEMPEST 20 MACHINE IN

24    NOVEMBER OF 2004?

25    A. NO, I DIDN'T.

1  Q. DID YOU HAVE ANYTHING TO DO WITH THIS PROJECT THAT WAS

2  READ OUT AS THE STARTING PRESSURE BIOCIRCLE PRODUCT?

3  A. NO, I DIDN'T.

4          MR. SCHAETZEL:  NO FURTHER QUESTIONS, YOUR HONOR.

5          MR. ANDERSON:  NOTHING FURTHER FROM THE PLAINTIFF,

6  YOUR HONOR.

7          THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP

8  DOWN.  ALL RIGHT, SO WE ARE TO YOUR EXPERT?

9          MR. ANDERSON:  WE ARE, YOUR HONOR.  AND HE IS ON

10  HIS WAY TO THE COURTROOM.  WHILE HE IS ON HIS WAY, MAY I

11  CLEAR THE MATERIALS FROM THE PREVIOUS WITNESS?

12          THE COURT:  YES.  PLEASE.

13          MR. HARBIN:  IS MR. SCHUDLE RELEASED FROM HIS

14  SUBPOENA?  CAN HE STAY IN COURT?

15          THE COURT:  ANY OBJECTION TO MR. SCHUDLE BEING

16  EXCUSED?

17          MR. ANDERSON:  NO OBJECTION, YOUR HONOR.

18          THE COURT:  OKAY.

19          MR. SCHAETZEL:  IF I MIGHT, YOUR HONOR.  WE

20  APPRECIATE VERY MUCH THE CHANCE TO TAKE PEOPLE OUT OF ORDER

21  AND ACCOMMODATE SCHEDULES.  WE DO BELIEVE THAT WE WILL WANT,

22  AT THE OFFICIAL CLOSE OF THE PLAINTIFF'S CASE, TO MAKE A

23  MOTION, AND I WOULD JUST LIKE TO BE CERTAIN THAT I AM NOT

24  DOING ANYTHING TO WAIVE THAT RIGHT INADVERTENTLY.  I PRESUME

25  THAT YOU HAD NO OBJECTION IF THEY ARE GOING TO, I PRESUME,

1    MAKE A MOTION AT THE END OF OUR CASE.

2          MR. ANDERSON:  I DON'T, YOUR HONOR.  I THINK, YOU

3    KNOW, YOU HEARD FROM MR. CAPP EARLIER TODAY, AND HE WANTED

4    AN OPPORTUNITY JUST TO DO SOME EXHIBIT CHECKING,

5    HOUSEKEEPING.  AND THE PLAINTIFFS, I WOULD ANTICIPATE, WOULD

6    BE IN A POSITION TO REST FIRST THING TOMORROW MORNING.  AND

7    IF THERE ARE MOTIONS TO BE HEARD AT THAT POINT, THAT WOULD

8    BE OUR VIEW OF WHEN IT WOULD BE APPROPRIATE.

9          THE COURT:  ALL RIGHT.

10          MR. SCHAETZEL:  VERY WELL.  THANK YOU.

11                    JOHN BEST DURKEE

12                        SWORN

13                   DIRECT EXAMINATION

14    BY MR. SCHAETZEL:

15    A. JOHN BEST DURKEE, D-U-R-K-E-E.  I LIVE IN HUNT, TEXAS.

16    Q. HELLO, DR. DURKEE.  STEVE SCHAETZEL.  IT IS GOOD TO SEE

17    YOU AGAIN, SIR.

18    A. GOOD AFTERNOON.

19    Q. WHAT YOU HAVE BESIDE YOU IS THE REPORTS, AND AT LEAST IF

20    THERE WERE A TABLE, IT WOULD BE HELPFUL TO LOOK AT THEM.

21    CAN WE SET SOME BOXES UP FOR A TABLE?  WILL THAT HOLD IT?

22    VERY GOOD.  DR. DURKEE, YOU'VE OPINED IN THIS CASE THAT IN

23    YOUR OPINION, THE ART THAT IS AT ISSUE HERE IS THE ART OF

24    PARTS WASHING, IS IT NOT?

25    A. I HAVE.

1    Q. AND WHEN YOU SPEAK OF A PERSON OF ORDINARY SKILL IN THE

2    ART IN YOUR REPORTS, OR IN THIS CASE, IS THAT A PERSON OF

3    ORDINARY SKILL IN THE PARTS WASHING ART?

4    A. IN CLEANING AND PARTS WASHING.  YES, SIR.

5    Q. CLEANING AND PARTS WASHING ART?

6    A. YES, SIR.

7    Q. IN YOUR OPINION, THAT ART DOES NOT INCLUDE THE ABILITY TO

8    WORK WITH MICROORGANISMS, DOES IT?

9    A. IT DOES NOT.

10   Q. ON WHAT DO YOU BASE YOUR OPINION THAT THE ART IS JUST

11   PARTS WASHING AND DOES NOT INCLUDE MICROORGANISMS?

12   A. IS THERE A TIME PERIOD THAT IS IMPORTANT IN ANSWERING

13   THIS QUESTION?  TO YOU?  IS THERE A PLACE THAT IS IMPORTANT?

14   Q. THERE CERTAINLY WOULD BE A TIME PERIOD.  WHY DON'T WE

15   START WITH AROUND THE TIME THAT THIS PATENT APPLICATION WAS

16   FILED IN 1993, 1994 TIME FRAME.

17   A. OKAY.  AT THAT TIME THERE WERE -- THERE WAS NO

18   BIOREMEDIATION ART ASSOCIATED WITH PARTS WASHERS.

19   Q. AT WHAT POINT IN TIME DO YOU BELIEVE THAT THERE BECAME AN

20   ART THAT INCLUDED BIOREMEDIATION PARTS WASHERS, IF AT ALL?

21   A. WELL, YOU ARE DEFINING ART AS THE PRACTICE OF SOME

22   TECHNOLOGY BY ARTISANS.  IS THAT WHAT YOU MEAN?

23   Q. I AM TRYING TO USE THE TERM "ART" IN THE SAME WAY THAT

24   YOU USED IT IN YOUR EXPERT REPORTS.  LET ME GIVE YOU AN

25   EXAMPLE AND PERHAPS THAT WILL HELP.

503

1   A. PLEASE.

2   Q. IF YOU COULD TURN IN YOUR REBUTTAL REPORT, WHICH IS

3   DEFENDANT'S EXHIBIT 1137.  SO IF YOU COULD FIND IT -- I CAN

4   HOLD THAT FOR YOU, SIR.

5   A. I HAVE 1137 NOW.

6   Q. IF YOU WOULD SIR, PLEASE TURN TO PAGE 88.  IN THE MIDDLE

7   OF THE PAGE, AFTER QUOTING FROM COLUMN 1 OF THE 110 PATENT,

8   YOUR TESTIMONY READS, "IT IS MY OPINION THAT THE PERTINENT

9   ART OR FIELD OF ENDEAVOR FOR THE CHEMFREE PATENT IS THE ART

10  OF MAKING PARTS WASHERS THAT REMOVE HYDROCARBON CONTAMINANTS

11  FROM PARTS."  DO YOU SEE THAT LANGUAGE?

12  A. I DO.

13  Q. THAT'S A CORRECT STATEMENT OF YOUR OPINION, IS IT NOT?

14  A. IT IS.

15  Q. WHAT I WANT TO KNOW IS, IN YOUR MIND, AT SOME POINT IN

16  TIME, DID THAT ART, AS YOU USE THE TERM THERE, DID THAT ART

17  INCLUDE MICROORGANISMS, OR BIOREMEDIATED PARTS WASHERS?

18  A. PLEASE HELP ME TO UNDERSTAND YOUR QUESTION.  I AM NOT

19  SURE WHAT YOU MEAN BY "TIME."  THE ART OF CHEMFREE'S PATENTS

20  SPEAK TO BIOREMEDIATION PARTS WASHERS, BUT THAT'S NOT ART AS

21  PRACTICED AS ARTISANS BECAUSE IT HADN'T YET BEEN DEVELOPED,

22  DEVELOPED BY AND USED BY OTHERS.  PLEASE HELP ME TO

23  UNDERSTAND YOUR QUESTION.

24  Q. I WILL CERTAINLY TRY.  WHEN YOU USE THE WORD "ART" HERE,

25  HOW ARE YOU USING IT?

1    A. I AM USING IT AS A PRACTICE TECHNOLOGY.

2    Q. AS PRACTICE TECHNOLOGY?  OKAY.  DOES THE ART OF PARTS

3    WASHING AS A PRACTICE TECHNOLOGY TODAY INCLUDE

4    BIOREMEDIATION PARTS WASHERS?

5    A. IT DOES.

6    Q. SORRY?

7    A. IT DOES.

8    Q. IT DOES?  OKAY.  AT THE TIME PERIOD OF 1993 OR 1994, WHEN

9    CHEMFREE FILED ITS PATENT APPLICATION, DID THE ART OF

10   PRACTICE TECHNOLOGY INCLUDE BIOREMEDIATING PARTS WASHERS?

11   A. IT DID NOT.

12   Q. IT DID NOT?  AT WHAT POINT IN TIME DID THAT CHANGE?

13   A. CAN YOU GIVE ME SOME PARAMETERS, PLEASE, ON YOUR

14   DEFINITION OF CHANGE?  DO YOU MEAN MARKET SIZE, NUMBER OF

15   MACHINES, ACCEPTANCE BY CUSTOMERS?  CAN YOU HELP ME, PLEASE.

16   WHAT DOES THE WORD "CHANGE" MEAN IN THE CONTEXT OF YOUR

17   QUESTION?

18   Q. I SIMPLY WANT TO KNOW IF WE HAVE -- IN 1993, 1994, THE

19   ART AS IT IS DEFINED IN YOUR REPORT, DOES NOT INCLUDE

20   BIOREMEDIATED PARTS WASHERS, AND TODAY, WE DO HAVE THE ART

21   AS INCLUDING BIOREMEDIATED PARTS WASHERS, I WANT TO KNOW

22   WHEN WE BRIDGED THAT GAP.  AND IT DOESN'T HAVE TO BE A

23   PARTICULAR DAY, IF THERE IS AN EVENT THAT YOU SAY OCCURRED

24   THAT CAUSES -- I AM LOOKING FOR THAT CHANGE.

25   A. I THINK I NEED TO KNOW THE UNITS OF THAT CHANGE TO GIVE

1    YOU A GOOD RESPONSE.

2    Q. SORRY?

3    A. I'M SORRY.  I THINK I NEED TO KNOW THE UNITS OF THAT

4    CHANGE AS THEY ARE IMPORTANT TO YOU TO GIVE YOU A FAIR

5    RESPONSE.  WHAT DO YOU CONSIDER TO BE CHANGE, NUMBERS OF

6    UNITS SOLD, ACCEPTANCE BY CUSTOMERS, SCIENTIFIC PAPERS

7    PUBLISHED OR DO YOU HAVE A METRIC ON CHANGE?

8    Q. IT WOULD BE ANY AND ALL OF THE ABOVE BECAUSE, SIR, I AM

9    TRYING TO UNDERSTAND YOUR OPINION ON WHAT CONSTITUTES THE

10   ART, AND IN YOUR OPINION, IN 1993, THERE WAS NOT A

11   BIOREMEDIATION PART OF THAT ART AND NOW THERE IS.  AND SO

12   WHATEVER UNITS THAT YOU USE ARE FINE WITH ME, I WOULD JUST

13   LIKE TO KNOW WHAT AND WHEN IT CHANGED.

14   A. I AM SORRY BUT I DON'T KNOW HOW TO ANSWER THAT QUESTION

15   WITHOUT SOME MORE SPECIFICITY, PLEASE.  WHAT I TESTIFIED TO

16   HERE AND JUST NOW IS THAT THERE WERE NOT -- THERE WAS NOT --

17   I DON'T THINK THIS WILL DO US ANY GOOD, OR I DON'T KNOW HOW

18   TO USE IT.

19            THE COURT:  PUT THE MICROPHONE DIRECTLY IN FRONT

20   OF YOUR MOUTH, DOCTOR, FOR IT TO WORK PROPERLY.

21            THE WITNESS:  OKAY.  IS THAT BETTER?

22            MR. SCHAETZEL:  IT'S SOME BETTER.  BUT PLEASE GO

23   AHEAD.

24            THE WITNESS:  OKAY.  I TESTIFIED IN MY REPORT, AND

25   TODAY, THAT THERE WERE NOT -- THERE WAS NOT AN ART OF

1    BIOREMEDIATING PARTS WASHERS AT THE TIME OF THE CHEMFREE

2    INVENTIONS.  AND I JUST TESTIFIED THAT THERE IS SO NOW.  IF

3    YOU WANT ME TO TESTIFY AS TO THE TRANSITION BETWEEN THOSE

4    TWO POINTS, I NEED TO KNOW WHAT UNITS YOU CONSIDER FOR THAT

5    TRANSITION.  I DIDN'T TESTIFY THAT THERE WAS A TRANSITION, I

6    TESTIFIED THAT THERE WAS A STARTING POINT AND THERE WAS AN

7    ENDING POINT.  PLEASE HELP ME TO UNDERSTAND YOUR METRICS.

8    BY MR. SCHAETZEL:

9    Q. OKAY.  DO YOU BELIEVE, SIR, THERE WAS A TRANSITION?

10   A. YES.

11   Q. OKAY.  PLEASE DESCRIBE THAT TRANSITION.

12   A. INCREASED FREQUENCY OF USE, INCREASED NUMBER OF

13   SUPPLIERS.

14   Q. WHEN YOU SAY "INCREASED NUMBER OF SUPPLIERS," THAT'S AN

15   INCREASED NUMBER OF SUPPLIERS OF WHAT?

16   A. BIOREMEDIATION PARTS WASHERS.

17   Q. OKAY.  IF YOU WOULD, SIR, I DON'T KNOW, CAN YOU SEE IT ON

18   THE LARGE SCREEN?  IS THAT COMFORTABLE FOR YOU?

19   A. SHOCKINGLY, I CAN.  YES.

20   Q. IF WE COULD GO TO JTX-1, COLUMN 4, WHICH IS THE 110

21   PATENT, COLUMN 4.

22   A. CAN YOU PLEASE GIVE ME A HINT OF WHERE THAT IS IN THIS

23   COMPENDIUM.

24   Q. IT IS NOT IN THAT HANDBOOK, THAT IS WHY I WAS DIRECTING

25   YOU TO THE SCREEN, SIR.  AND IN PARTICULAR --

1    A. AND THIS IS THE 110 PATENT.  THANK YOU.

2    Q. THIS IS THE 110 PATENT.  AND STARTING AT LINE 49 TO THE

3    END OF THE PARAGRAPH.  BLOW THAT UP.  OKAY.  IF YOU WOULD

4    PLEASE, SIR, START READING WITH ME AT APPROXIMATELY LINE 56.

5    THIS IS IN THE 110 PATENT.  "THE MICROORGANISMS EMPLOYED

6    PREFERABLY NOT ONLY HAVE THE CAPABILITY FOR BIODEGRADE

7    ORGANIC WASTE BUT FURTHER ARE RESISTANTS TO ENVIRONMENTAL

8    SHOCK AND HAVE METABOLIC VERSATILITY.  ADDITIONALLY, THE

9    MICROORGANISMS ARE PREFERABLY NONPATHOGENIC.  ACCEPTABLE

10   MICROORGANISMS, FOR EXAMPLE, NOT LIMITATIONS, ARE THOSE FROM

11   THE GENERA BACILLUS, PSEUDOMONUS AND FLAVOBACTERIUM.

12   SUITABLE SPECIES ARE WELL KNOWN AND REPORTED IN THE ART."

13   HOW DO YOU INTERPRET THE TERMS "THE ART" THERE AS IT

14   PERTAINS TO THE PARTS WASHING FIELD AT THE TIME THIS

15   APPLICATION WAS FILED IN 1993 AND 1994?

16   A. IF I UNDERSTAND YOUR QUESTION, IT IS ABOUT THE BIOLOGICAL

17   CONTENT OF THE CHEMFREE PARTS WASHER PER THE 110 PATENT.  I

18   AM NOT SURE THAT IS AN AREA WHERE I HAVE THE CREDIBILITY TO

19   COMMENT ON.  MY EXPERTISE IS IN PARTS WASHING.

20   Q. OKAY.  DO YOU RECOGNIZE THAT WHEN IT SAYS "SUITABLE

21   SPECIES ARE WELL KNOWN AND REPORTED IN THE ART," THAT ART

22   DOES NOT INCLUDE PARTS WASHING, DOES IT?  BECAUSE IN 1993

23   AND 1994, THERE WAS NO MICROORGANISM COMPONENT OF THE PARTS

24   WASHING ART.  ISN'T THAT CORRECT?

25   A. THAT IS CORRECT.

1    Q. SO DO YOU HAVE AN OPINION, SIR, AS TO WHAT THE ART IS

2    THAT IS BEING REFERRED TO IN THE CHEMFREE PATENT AT THIS

3    POINT, OR BY YOUR PREVIOUS ANSWER, ARE YOU SAYING THAT IS

4    SOMETHING YOU DON'T FEEL COMPETENT TO ADDRESS?

5    A. I CERTAINLY DON'T FEEL COMPETENT TO SPEAK ABOUT SPECIFIC

6    GENERA OF MICROORGANISMS.  BUT THERE IS IN A SENSE A

7    DISCONTINUITY IN THIS PATENT BECAUSE IT SPEAKS TO BOTH OF

8    THE TEXTURES, IF YOU WILL, OF THE INVENTION, OR MAYBE I

9    SHOULD SAY, ALL THREE.  BUT THERE IS -- THERE IS A TEXTURE

10   ASSOCIATED WITH THE PARTS WASHING ART, PARTS CLEANING ART,

11   AND THAT'S ASSOCIATED WITH THE CLEANING FLUID IN THE

12   APPARATUS.  AND HERE WE HAVE SPECIFICITY ABOUT THE ART OF

13   BIOREMEDIATION UPON WHICH I CAN'T COMMENT.  BUT I HAVE

14   NOTICED IN READING THIS PATENT THAT THERE IS A BIT OF A

15   DISCONTINUITY THERE.

16   Q. YOU MENTIONED THE ART OF BIOREMEDIATION.  WOULD YOU

17   BELIEVE THAT TO BE THE ART THAT IS REFLECTED IN THIS

18   SENTENCE, "SUITABLE SPECIES ARE WELL KNOWN AND RECORDED IN

19   THE ART"?

20   A. I HAVE NO IDEA.

21          IF WE LOOK BACK UP IN THE FIRST LINE OF THIS

22   PARAGRAPH, STARTING AT LINE 49, "THE BIOLOGICAL COMPONENT IS

23   PREFERABLY IN THE FORM OF MICROORGANISMS THAT BIODEGRADE

24   ORGANIC COMPOUNDS SUCH AS, FOR EXAMPLE, NOT LIMITATION,

25   HYDROCARBONS, OILS, GREASES, PETROLEUM BY-PRODUCTS,

1    CRENELATES, POLYCHLORINATED BIPHENYLS AND OTHER CARBON BASED

2    COMPOSITIONS."  WOULD A PERSON OF ORDINARY SKILL IN THE

3    PARTS WASHING ART HAVE FAMILIARITY WITH MICROORGANISMS THAT

4    BIODEGRADE ORGANIC COMPOUNDS SUCH AS THOSE ORGANIC COMPOUNDS

5    LISTED IN THAT SENTENCE?

6    A. THEY WOULD NOT.

7    Q. IF WE COULD, LET'S TAKE A LOOK AT CLAIM 1 OF THIS PATENT.

8    IF YOU LOOK IN THE FIRST PARAGRAPH OF THIS CLAIM, "A SYSTEM

9    FOR CLEANING HYDROCARBONS FROM A PART COMPRISING A

10   BIODEGRADABLE, NONTOXIC, NONCAUSTIC, NONFLAMMABLE OIL

11   DISPERSANT CLEANER AND DEGREASER FLUID, A PARTS WASHERS

12   INCLUDING A TANK FOR CONTAINING THE FLUID AND A BASIN FOR

13   RECEIVING THE PART, A PUMP AND CONDUIT ASSEMBLY FOR PUMPING

14   THE FLUID FROM THE TANK INTO CONTACT WITH THE PART WITHIN

15   THE BASIN, THE FLOW PATH DEFINED BETWEEN THE BASIN AND THE

16   TANK THROUGH WHICH THE FLUID FLOWS FROM THE BASIN BACK TO

17   THE TANK, AND MICROORGANISMS WITHIN THE PARTS WASHER FOR

18   BIODEGRADING THE HYDROCARBONS."  I AM INTERESTED IN THAT

19   LAST PHRASE, SIR:  "MICROORGANISMS WITHIN THE PARTS WASHER

20   FOR BIODEGRADING THE HYDROCARBONS."  THAT PART OF THE CLAIM

21   IS OUTSIDE THE SCOPE OF THE PERSON OF ORDINARY SKILL IN THE

22   PARTS WASHER ART IN 1993 AND 1994, IS IT NOT?

23   A. IT IS, SIR.

24   Q. IN YOUR SAME REBUTTAL REPORT THAT YOU HAVE IN FRONT OF

25   YOU, SIR, IF WE CAN TURN TO PAGE 241.

1    A. YES.

2    Q. IF YOU COULD FIND ITEM NO. 3, IT SAYS, "GRAHAM FACTOR NO.

3    2, LEVEL OF ORDINARY SKILL IN THE ART."  DO YOU SEE THAT

4    PARAGRAPH?

5    A. I DO.

6    Q. IT READS, "PERTINENT FIELD OF ENDEAVOR, IS PARTS WASHING.

7    THE ORDINARY PRACTITIONER IN THIS INDUSTRY HAS NO MORE THAN

8    A BACHELOR'S DEGREE IN A TECHNICAL FIELD WITH NO MORE THAN

9    ABOUT ONE YEAR OF CHEMISTRY AND/OR BIOLOGY COLLEGE LEVEL

10   CLASS WORK AND FROM ONE-HALF TO THREE YEARS PRACTICAL

11   EXPERIENCE IN THE PARTS WASHING INDUSTRY.  THE PERSON OF

12   ORDINARY SKILL DOES NOT HAVE SPECIALIZED TRAINING IN

13   ENVIRONMENTAL SCIENCES, WASTE WATER TREATMENT OR

14   BIOREMEDIATION TECHNOLOGY."  DO YOU SEE THAT LANGUAGE?  THAT

15   IS A CORRECT STATEMENT OF YOUR OPINION, IS IT NOT?

16   A. IT IS.

17   Q. IN THIS ONE-HALF TO THREE YEARS OF PRACTICAL EXPERIENCE

18   IN THE PARTS WASHER INDUSTRY, LOOKING AT THE 1993, 1994 TIME

19   FRAME, WOULD THE PERSON OF ORDINARY SKILL IN THAT TIME FRAME

20   HAVE WORKED WITH A BIOREMEDIATION PART WASHER?

21   A. THEY WOULD NOT.

22   Q. AND IN TERMS OF THE EDUCATIONAL BACKGROUND OF THE PERSON

23   OF ORDINARY SKILL IN THE ART, YOU HAVE INDICATED THAT THE

24   PERSON WOULD HAVE NO MORE THAN A BACHELOR'S DEGREE IN A

25   TECHNICAL FIELD.  DOES THE TECHNICAL FIELD MATTER TO YOU?

1    FOR EXAMPLE -- PEOPLE I WORK WITH WILL SMILE, PERHAPS, AT

2    THIS -- I AM AN INDUSTRIAL ENGINEER, WHICH THEY BELIEVE IS

3    NO ENGINEER AT ALL AS OPPOSED TO THE CHEMICAL ENGINEERS AND

4    SO ON AND SO FORTH.  THERE WOULD BE THOSE IN MY FIRM WHO

5    WOULD SAY THAT INDUSTRIAL ENGINEER IS NOT A TECHNICAL FIELD.

6    I AM INTERESTED ON WHETHER OR NOT YOU THINK, FOR EXAMPLE,

7    DOES IT MATTER IF MY TECHNICAL DEGREE MIGHT BE IN

8    ENGINEERING OR SOME OTHER SCIENCE OR, YOU KNOW, SOME FIELD?

9    DOES THAT MATTER?

10   A. I DON'T THINK THAT IT DOES.  THERE IS ENOUGH VARIETY --

11   THIS WAS ENOUGH VARIETY IN THE INDUSTRY AT THAT TIME.  I

12   MEAN, I SAY THE PERSON WHO I CONSIDER TO BE THE MOST

13   SUCCESSFUL IN DEVELOPING COMMERCIALIZING PARTS CLEANING

14   TECHNOLOGY IN THAT TIME PERIOD WAS A LAWYER.

15   Q. I THINK THERE IS A LESSON THERE FOR ALL OF US.  IF WE CAN

16   THEN, DR. DURKEE, IS IT FAIR TO SAY THAT THE PERSON OF

17   ORDINARY SKILL, IN YOUR OPINION, IS A PERSON THAT HAS, IN

18   THE 1993, 1994 TIME FRAME, HAS LITTLE TO NO EXPERIENCE OR

19   TECHNICAL TRAINING WITH THE USE OF MICROORGANISMS?

20   A. WILL YOU REPEAT YOUR QUESTION, PLEASE?

21   Q. SURE.  IT'S TRUE, IS IT NOT, THAT IN YOUR OPINION THE

22   PERSON OF ORDINARY SKILL IN THE ART IN THE 1993 TO 1994 TIME

23   FRAME HAS LITTLE TO NO TECHNICAL EDUCATION OR EXPERIENCE

24   WITH MICROORGANISMS IN THE PARTS WASHING FIELD?

25   A. YES, SIR.

1    Q. AND IT'S TRUE, IS IT NOT, THAT YOU CAME TO THAT OPINION

2    BASED ON, IN PART, YOUR REVIEW OF, FOR EXAMPLE, THE 110

3    PATENT THAT WE HAD ON THE SCREEN BEFORE?

4    A. WOULD YOU PLEASE REPEAT THAT QUESTION?  IT IS TRUE --

5    Q. IT IS TRUE THAT YOU CAME TO THAT OPINION ON THE LEVEL FOR

6    THE PERSON OF ORDINARY SKILL IN THE ART BASED IN PART ON

7    REGAINING THE 110 PATENT, THE CHEMFREE 110 PATENT THAT WE

8    LOOKED AT A FEW MINUTES AGO?

9    A. THE WAY I DETERMINE THE LEVEL ORDINARY OF SKILL WAS TO

10   START WITH THE 110 PATENT, IF YOU LIKE, BUT TO START WITH

11   ANY OF THE CHEMFREE PATENTS THAT SPEAK TO THE ART OF THEIR

12   CLAIMS BEING CLEANING AND PARTS WASHING.  AND THEN I

13   SEARCHED FOR PEOPLE WHOM I KNEW AT THAT TIME, AND WHAT THEIR

14   BACKGROUNDS WERE.  AND BASICALLY MADE A DATABASE, MADE SOME

15   DECISIONS ABOUT THEIR LEVELS OF SKILL, AND KNOWING THEIR

16   PROFESSIONAL HISTORY, PRODUCED THE OPINION THAT YOU SEE NOW.

17   Q. VERY WELL.  THANK YOU.  IF YOU COULD, SIR, PLEASE TURN TO

18   PAGE 93 IN THIS SAME REBUTTAL REPORT, PAGE 93.  DO YOU SEE

19   THE HEADING, "LEVEL OF ORDINARY SKILL IN THE ART"?

20   A. YES, SIR.

21   Q. OKAY.  I AM FOCUSED ON THIS PART OF YOUR REPORT.  IT IS

22   SOMEWHAT LENGTHY.  IT RUNS ON FOR, I DON'T KNOW, MAYBE 15

23   PAGES OR SO.  BUT IN THESE PAGES, YOU LIST CERTAIN FACTORS

24   THAT YOU CONSIDERED IN COMING TO YOUR OPINION ON THE LEVEL

25   OF ORDINARY SKILL IN THE ART.  DO YOU RECALL THAT FROM

1    SEEING THESE PAGES?

2    A. I AM FAMILIAR WITH MY REPORT.  IS THERE ONE PARTICULAR OR

3    MORE THAT YOU WANT TO CALL ATTENTION TO?

4    Q. YES, SIR.  THERE ARE SEVERAL THINGS.

5    A. PLEASE.

6    Q. IF WE START ON THIS PAGE, 93.  UNDER "LEGAL STANDARD

7    APPLIED" -- GET A LITTLE BIT FURTHER, DAVID, DOWN THAT PAGE.

8    THANK YOU.  "IN THE FOLLOWING ANALYSIS, I HAVE BEEN GUIDED

9    BY THE FOLLOWING LEGAL STANDARDS PROVIDED TO ME BY COUNSEL

10   FOR CHEMFREE.  THE ISSUE OF OBVIOUSNESS IS DETERMINED WITH

11   REFERENCE TO A HYPOTHETICAL PERSON HAVING ONLY ORDINARY

12   SKILL IN THE ART."  DO YOU SEE THAT MUCH, SIR?

13   A. I DO.

14   Q. OKAY.  THEN THERE IS A FOOTNOTE TO AN ITEM 17:  "SEE

15   ASSUMPTIONS SECTION ABOVE, STANDARD OIL COMPANY V. AMERICAN

16   CYANAMID COMPANY," WITH A CITE.  DID YOU PROVIDE THAT CITE

17   IN THIS REPORT?

18   A. I DID NOT.

19   Q. HOW DID THAT CITE GET INTO YOUR REPORT?

20   A. I AM A COMPUTER PERSON.  I TAKE IT THAT YOU MEAN "CITE"

21   IS A CITATION?

22   Q. YES.  A CITATION.  YES, SIR.

23   A. THAT WAS PROVIDED TO ME BY COUNSEL.

24   Q. THAT PART OF YOUR REPORT, YOU ARE NOT REPRESENTING TO THE

25   COURT THAT YOU HAVE KNOWLEDGE, FOR EXAMPLE, OF THAT LEGAL

1   STANDARD THAT IS IN THE STANDARD OIL CASE; IS THAT CORRECT?

2   A. I DON'T HAVE KNOWLEDGE OF THE SPECIFIC CASE.  I AM

3   FAMILIAR WITH THE LEGAL STANDARD THAT I USE.

4   Q. HOW DID YOU BECOME FAMILIAR WITH THAT LEGAL STANDARD,

5   SIR?

6   A. COUNSEL.

7   Q. AND WHEN IT REFERS TO "ASSUMPTIONS SECTION ABOVE," THAT

8   IS A REFERENCE TO AN EARLIER PART OF THE REPORT, IS IT NOT,

9   WHERE THERE ARE A SERIES OF PARAGRAPHS THAT SET FORTH THE

10  ASSUMPTIONS?

11  A. CAN YOU PLEASE SHOW ME THE WORD "ASSUMPTION"?  I DON'T

12  SEE IT.

13  Q. IT IS IN THE FOOTNOTE.

14  A. OH.

15  Q. DOWN HERE.

16  A. OKAY.

17  Q. YOU DO HAVE AN EARLIER SECTION OF THE RECORD ENTITLED

18  "ASSUMPTIONS."  DO YOU RECALL?

19  A. YES.

20  Q. HOW DID THE ASSUMPTIONS GET INTO YOUR REPORT?

21  A. THE ORIGINAL DRAFT OF THAT REPORT OF THAT SECTION OF MY

22  REPORT WAS PROVIDED TO ME BOTH IN WORDS AND ADVICE BY

23  COUNSEL.  BUT I PARTICIPATED IN THE PREPARATION OF THE WHOLE

24  REPORT, AND I CONSIDER IT TO BE ALL MY OWN.  UNDERSTANDING

25  THAT MY SPECIALTY IS PARTS WASHING.

1  Q. THANK YOU.  WHAT I AM INTERESTED IN IS HOW WAS IT DECIDED

2  TO REFERENCE THIS PARTICULAR ASSUMPTION AT FOOTNOTE 17 AT

3  THIS PARTICULAR PART OF THE REPORT?

4  A. COUNSEL, THIS IS A THICK BOOK.  I DON'T REMEMBER.

5  Q. OKAY.

6  A. I DON'T REMEMBER THAT PARTICULAR FOOTNOTE.

7  Q. IF YOU LOOK TO THE NEXT PAGE, SIR, THERE ARE SEVERAL

8  FOOTNOTES AGAIN, 18 THROUGH 22, AT THIS TIME.  WHAT I WOULD

9  LIKE TO KNOW IS, WHAT WAS DONE WHEN YOU TRIED TO -- OR WHAT

10  WAS DONE TO DECIDE THAT AT EACH PLACE IN THE REPORT, THAT

11  THAT WOULD BE A GOOD PLACE TO CITE TO A LEGAL STANDARD?

12            MR. CAPP:  CAN I REQUEST A SHORT SIDE BAR ON THIS?

13            THE COURT:  ALL RIGHT.

14            (SIDE BAR CONFERENCE AS FOLLOWS:)

15            MR. CAPP:  YOUR HONOR, WE HAVE ALREADY HAD A

16  MOTION IN LIMINE ON THIS.  AND YOU HAVE ALREADY RULED ON

17  THIS.  IT'S NO SECRET THAT PREPARING EXPERT REPORTS ON

18  OBVIOUSNESS IS A MIXED QUESTION OF LAW AND FACT AND SO THAT

19  ATTORNEYS PROVIDE LAW TO THE EXPERT WITNESSES.

20  MR. SCHAETZEL DID IT FOR DR. ADRIENS.

21            THE COURT:  I UNDERSTAND.

22            MR. CAPP:  I DON'T SEE, CONSIDERING THE MOTION IN

23  LIMINE AND THE RULING THAT WE ALREADY HAVE ABOUT NOT GETTING

24  INTO REPORT DRAFTING, IT SEEMS TO ME WE ARE EITHER ON THE

25  VERGE OR WE HAVE CROSSED THE LINE ON YOUR HONOR'S RULING ON

1  THIS MATTER.

2          THE COURT:  MR. SCHAETZEL?

3          MR. SCHAETZEL:  IT'S CERTAINLY MY INTENT TO STAY

4  WITHIN THE FOUR CORNERS OF YOUR RULING, AND MY UNDERSTANDING

5  OF THE RULING IS THAT ON HIS FINAL REPORT WE CAN ASK

6  QUESTIONS AS TO HOW IT WAS PREPARED.  I AM DIRECTLY

7  INTERESTED IN WHETHER OR NOT THE CITATION THERE, WHICH

8  REFERS TO A GIVEN ASSUMPTION, IS THE OPINION OF THIS WITNESS

9  OR WAS IT PROVIDED BY COUNSEL.  I THINK THE COURT HAS A

10  RIGHT TO KNOW IF THAT PART OF THIS REPORT IS BEING PROVIDED

11  BY THIS WITNESS OR IF IT'S, IN EFFECT, LEGAL COUNSEL THAT

12  HAVE PROVIDED IT.

13          THE COURT:  I THINK THAT IS RIGHT.  YOU MAY ASK

14  THE QUESTION.

15                  (END OF SIDE BAR CONFERENCE.)

16  BY MR. SCHAETZEL:

17  Q. DR. DURKEE, LET ME SEE IF I CAN ASK ANOTHER QUESTION TO

18  GET US TO AN END POINT OF THIS PART.  WHEN EITHER I OR THE

19  COURT SEES A REFERENCE TO -- LET'S TAKE, FOR EXAMPLE, IF YOU

20  COULD, THE TOP OF THIS PAGE, THE FIRST FULL SENTENCE, ALONG

21  WITH THE FOOTNOTES, THE LAST SENTENCE OF THAT FIRST

22  PARAGRAPH READS, "COURTS HAVE NEVER JUDGED PATENTABILITY BY

23  WHAT THE REAL INVENTOR SLASH APPLICANT SLASH PATENTEE COULD

24  OR WOULD DO."  AND THEN THERE IS A CITATION DOWN TO NO. 19,

25  "SEE ASSUMPTIONS ABOVE.  KIMBERLY CLARK CORP. V. JOHNSON &

1   JOHNSON," WITH A CASE CITATION.  WHAT I WOULD LIKE TO KNOW,

2   SIR, IS IT YOUR OPINION THAT THAT IS A CORRECT STATEMENT OF

3   WHAT IS SAID IN THAT CASE?  OR IS THAT SOMETHING THAT WAS

4   SUPPLIED TO YOU BY COUNSEL?

5   A. I DON'T REMEMBER THE SPECIFIC HISTORY OF THAT FOOTNOTE,

6   AND I AM SURE THE SPECIFIC FOOTNOTE WAS PROVIDED TO ME BY

7   COUNSEL.

8   Q. WOULD YOUR TESTIMONY AS TO THE MANY OTHER -- YOU KNOW,

9   LIKE FOR EXAMPLE, IF WE TURN OVER TO THE NEXT PAGE, PAGE 95,

10  THERE ARE ANOTHER THREE FOOTNOTES.  RATHER THAN ASKING YOU

11  ABOUT EACH AND EVERY FOOTNOTE, BECAUSE THERE ARE MANY OF

12  THEM, WOULD THAT TESTIMONY BE GENERALLY TRUE FOR OTHER

13  FOOTNOTES, SIR, THAT WHERE A REFERENCE IS MADE THAT

14  TYPICALLY YOU WOULD NOT REMEMBER THE DETAILS OF IT BUT YOU

15  WOULD THINK THAT THE FOOTNOTE WAS PROVIDED TO YOU BY

16  COUNSEL?

17  A. IN GENERAL.  YES, SIR.

18  Q. NOW, IN THIS SECTION OF THE REPORT, YOU SET OUT THE SIX

19  FACTORS THAT WERE CONSIDERED IN COMING TO YOUR CONCLUSION ON

20  WHAT CONSTITUTES THE PERSON OF ORDINARY SKILL IN THE ART.

21  AND THOSE SIX FACTORS ARE CONSISTENT WITH WHAT I THINK OF AS

22  THE ENVIRONMENTAL DESIGN FACTORS.  IF YOU LOOK OVER AT THE

23  FIRST FACTOR, IT'S "EDUCATIONAL LEVEL OF THE INVENTOR,"

24  WHICH IS ON PAGE 96.  SO THERE IS ONE FACTOR.  SO YOU

25  CONSIDER THE EDUCATIONAL LEVEL OF THE INVENTORS IN COMING TO

1   YOUR CONCLUSION, DID YOU NOT?

2   A. YES, SIR.

3   Q. AND THE NEXT FACTOR OVER ON PAGE 98 IS THE TYPE OF

4   PROBLEMS ENCOUNTERED IN THE ART.  AND YOU CONSIDERED THAT,

5   DID YOU NOT?

6   A. I DID.

7   Q. AND WE COULD SAY THE SAME THING FOR THE REMAINING

8   FACTORS.  YOU CONSIDERED PRIOR ART SOLUTIONS TO THOSE

9   PROBLEMS, WHICH BEGINS ON PAGE 101, DID YOU NOT?  I'M SORRY,

10  DID I MISSPEAK, DR. DURKEE?

11  A. YOUR QUESTION WAS, DID I CONSIDER THAT FACTOR, AND THE

12  ANSWER IS YES.

13  Q. AND THE LAST TWO FACTORS YOU CONSIDERED WERE RAPIDITY

14  WITH WHICH INVENTIONS ARE MADE AND THE SOPHISTICATION OF THE

15  TECHNOLOGY.  ISN'T THAT CORRECT?  AND FOR YOUR REFERENCE,

16  THOSE CAN BE FOUND ON PAGES 105 AND 107.

17  A. YES, SIR.

18  Q. AND AFTER CONSIDERATION OF THOSE FACTORS, YOU CAME TO THE

19  OPINION, AS WE'VE SAID BEFORE, THAT, I BELIEVE IT WAS -- YOU

20  DON'T NEED TO TURN TO IT, BUT JUST TO REFRESH YOUR

21  RECOLLECTION, ON PAGE 241, THAT "THE ORDINARY PRACTITIONER

22  IN THIS INDUSTRY HAS NO MORE THAN A BACHELOR'S DEGREE IN A

23  TECHNICAL FIELD WITH NO MORE THAN ABOUT ONE YEAR OF

24  CHEMISTRY AND/OR BIOLOGY, COLLEGE LEVEL WORK, FROM ONE-HALF

25  TO THREE YEARS PRACTICAL EXPERIENCE IN THE PARTS WASHING

1    INDUSTRY."  I WOULD FIRST LIKE TO TALK ABOUT THE LAST FACTOR

2    SIR, THE SOPHISTICATION OF THE TECHNOLOGY.  THAT BEGINS ON

3    PAGE 108 -- 107.  IF YOU WOULD, SIR, PLEASE LOOK AT PAGE

4    108, AND AT THE BOTTOM OF THAT PAGE THERE IS A PARAGRAPH

5    THAT BEGINS, "SOLVENT CLEANING TECHNOLOGY AS IT WAS NORMALLY

6    USED TO PROVIDE A POWERFUL SUITE OF TECHNOLOGIES," AND IT

7    CARRIES ON.  WHEN YOU REFER TO "SOLVENT CLEANING TECHNOLOGY"

8    THERE, WHAT ARE YOU REFERRING TO?

9    A. COLD CLEANING MOST OF THE TIME, VAPOR DEGREASING SOME OF

10   THE TIME.

11   Q. ARE YOU INCLUDING SINK ON A DRUM, SMALL UNITS, SUCH AS

12   ARE AT ISSUE IN THIS CASE?

13   A. YES, SIR.

14   Q. YOU THEN CARRY ON TO THE NEXT PARAGRAPH AND MENTION

15   CONVENTIONAL, AQUEOUS CLEANING TECHNOLOGY.  WHAT ARE YOU

16   REFERRING TO THERE?

17   A. IS THERE A PLACE OR A TIME PERIOD ASSOCIATED WITH YOUR

18   QUESTION?

19   Q. YES.  THE 1993-1994 TIME FRAME.  WHEN WE TALK ABOUT

20   PERSON OF ORDINARY SKILL IN THE ART, THAT IS THE TIME FRAME

21   THAT I AM INTERESTED IN.  WHAT WAS THE CONVENTIONAL AQUEOUS

22   CLEANING TECHNOLOGY THAT YOU ARE REFERENCING THERE, IN YOUR

23   OPINION?

24   A. HOT CORROSIVE FLUIDS.  N-A-O-H, LYE, WHICH IS THE K-O-H,

25   PERHAPS SODIUM METASULPHATE.  THE MECHANISM OF CLEANING WAS

1    NOT ONE THAT, FORTUNATELY, WE WOULD RECOGNIZE NOW.  THE

2    MECHANISM FOR CLEANING WAS SURFACE REMOVAL, NOT SOIL

3    REMOVAL.  WE REMOVED AT THAT TIME, BECAUSE WE DIDN'T HAVE

4    ANY OTHER TECHNOLOGY, THE SURFACE UNDERLYING THE SOIL SO

5    THAT THE SOIL WOULD BE LIFTED AS WELL.  THIS WAS CORROSIVE

6    CLEANING.

7    Q. SO THE SOLVENT TECHNOLOGY WAS COLD; CORRECT?

8    A. SOLVENT CLEANING TECHNOLOGY WOULD INCLUDE THE SINK ON A

9    DRUM PARTS WASHERS, IT WOULD INCLUDE COLD CLEANING WITH 111

10   TRICHLOROETHANE APPLIED WITH A PAINT BRUSH AND A COFFEE CAN,

11   IT WOULD INCLUDE VAPOR DEGREASING.

12   Q. AND THEN YOU HAVE ANOTHER PARAGRAPH ON PAGE 109 THAT

13   TALKS ABOUT "MANY INDUSTRIAL APPLICATIONS SUCH AS THOSE

14   WITHIN THE INDUSTRY SEGMENT WHERE CHEMFREE AND WALTER

15   PROVIDE GOODS DO NOT REQUIRE COMPLETION OF THE RINSING AND

16   DRYING STEPS."  ARE WE STILL TALKING ABOUT CONVENTIONAL

17   AQUEOUS CLEANING WHEN YOU START TALKING ABOUT THOSE

18   INDUSTRIAL APPLICATIONS?

19   A. MAY I ASK YOU TO REWORD THAT QUESTION, PLEASE?

20   Q. SURE.  I WILL MAKE IT HOPEFULLY MORE CLEAR.  WHAT ARE YOU

21   REFERRING TO BY "THE MANY INDUSTRIAL APPLICATIONS?"

22   APPLICATIONS OF WHICH FORM OF CLEANING?  OR IS IT ANOTHER

23   CLEANING?

24   A. IT WOULD NOT BE ANOTHER METHOD OF CLEANING, IT WOULD BE A

25   USE OF A CLEANING PART.  IN THE CASE WHERE ONE IS DOING

1  APPLICATION OF COATINGS, PAINTS, PERHAPS SURFACE INSPECTION,

2  ONE DOES NEED TO RINSE AND PROBABLY DRY SURFACES.  IF ONE IS

3  DOING CLEANING OF PARTS THAT WILL BE PERHAPS EXPERIENCING

4  FURTHER PRODUCTION, FURTHER PROCESSING, IF YOU LIKE, PARTS

5  THAT ARE BEING REPAIRED AND NEED TO BE INSPECTED, PARTS

6  WHERE THE SURFACE DOES NOT NEED TO BE -- DOES NOT NEED TO BE

7  FULLY CLEAN OF CLEANING FLUID AND THE SOIL CONTAINED WITHIN,

8  AND DOES NOT NEED TO BE DRIED.  THAT'S THE DISTINCTION I WAS

9  TRYING TO MAKE THERE.  THE RINSING AND THE DRYING STEPS ARE

10  VERY EXPENSIVE THAT YOU HAVE TO CLEAN.

11  Q. IF YOU WOULD, SIR, PLEASE LOOK AT THIS ITEM 6, WHICH RUNS

12  FROM PAGE 107 TO 110.  MY QUESTION HERE IS, IN ANY PART OF

13  THIS SECTION, DID YOU ADDRESS THE SOPHISTICATION OF THE

14  TECHNOLOGY AS INCLUDING ANY BIOREMEDIATION TECHNOLOGY?

15  A. AT THE TIME OF THESE INVENTIONS, WHICH I BELIEVE IS THE

16  STIPULATION OF YOUR QUESTION?

17  Q. YES.  STILL THE '93, '94.

18  A. AT THAT TIME THERE WAS NO BIOREMEDIATION TECHNOLOGY

19  ASSOCIATED WITH PARTS CLEANING.

20  Q. DR. DURKEE, I WOULD LIKE TO HAND YOU WHAT HAS BEEN MARKED

21  BY THE PARTIES AS JOINT TRIAL EXHIBIT 27, WHICH I THINK YOU

22  WILL RECOGNIZE AS A COPY OF WHAT WE REFERRED TO AS THE

23  HAKANSSAN-2 PATENT, OR THE HAKANSSAN-2 REFERENCE, NOT

24  PATENT.

25  A. YES, SIR.

1   Q. YOU HAVE SEEN THIS BEFORE?

2   A. I HAVE.

3   Q. AND YOU HAD SEEN THIS WHEN YOU PREPARED THIS REBUTTAL

4   REPORT BACK IN, I GUESS, MARCH OF LAST YEAR, HAD YOU NOT?

5   A. I BELIEVE SO.

6   Q. OKAY.  HAKANSSAN-2 DISCLOSES A BIOREMEDIATING PARTS

7   WASHER, DOES IT NOT?

8   A. IT DOES.

9   Q. WHY IS, GIVEN THAT IT WAS AVAILABLE IN 1992 AND THE TIME

10  FRAME IS 1993 AND 1994, THERE IS NO MENTION OF HAKANSSAN-2

11  OR BIOREMEDIATION TECHNOLOGY IN YOUR SOPHISTICATION OF THE

12  TECHNOLOGY CONSIDERATION?  WHY NOT?

13  A. BECAUSE IT HADN'T BECOME PRACTICED ART.

14  Q. SO IN OTHER WORDS, TO YOUR KNOWLEDGE, THERE WAS NO ACTUAL

15  EQUIPMENT IN THE FIELD, SO YOU DIDN'T CONSIDER THE

16  BIOREMEDIATION PARTS WASHER THAT IS DESCRIBED IN HAKANSSAN-2

17  REFERENCE IN DOING THIS PART OF THE REPORT; IS THAT CORRECT?

18  A. CORRECT.

19  Q. IF YOU LOOK AT "PRIOR ART SOLUTIONS TO THE PROBLEMS,"

20  BEGINNING OVER ON PAGE 101.

21  A. MAY I ADD TO MY ANSWER ON THAT, PLEASE?

22  Q. YES.

23  A. I DID NOT BECAUSE THE HAKANSSAN-2 REFERENCE, WITH WHICH I

24  WAS FAMILIAR, DID NOT SPEAK TO THE U.S. INDUSTRIAL PARTS

25  WASHING INDUSTRY AS IT EXISTED IN THAT TIME.

1   Q. IN TERMS OF ITEM 4, IN THE ENVIRONMENTAL PATENT IN YOUR

2   REPORT SIR, ON PAGE 101.  THE HEADING, ON PAGE 101, AND THE

3   CONSIDERATION WAS "PRIOR ART SOLUTIONS TO THOSE PROBLEMS."

4   DO YOU SEE THAT?

5   A. YES, SIR.

6   Q. THERE IS NO MENTION IN THE "PRIOR ART SOLUTIONS" SECTION

7   OF THE HAKANSSAN-2 REFERENCE OR OF BIOREMEDIATION PARTS

8   WASHER TECHNOLOGY.  AND YOU DIDN'T MENTION HAKANSSAN-2 AS A

9   PRIOR ART SOLUTION FOR THE SAME REASONS THAT YOU DIDN'T

10  MENTION IT IN THE SOPHISTICATION OF THE TECHNOLOGY; CORRECT?

11  A. CORRECT.

12  Q. AND IN THE SECTION PRECEDING THAT, NO. 3, "THE TYPE OF

13  PROBLEMS ENCOUNTERED IN THE ART,"  THERE IS, AGAIN, NO

14  MENTION OF BIOREMEDIATION TECHNOLOGY OR THE HAKANSSAN-2

15  REFERENCE.  DID YOU ALSO NOT MENTION HAKANSSAN-2 OR

16  BIOREMEDIATION IN THIS SECTION OF YOUR REPORT FOR THE SAME

17  REASONS?

18  A. THAT IS CORRECT.

19  Q. IN THE SECTION -- IN COMING TO YOUR OPINION ON THE PERSON

20  OF ORDINARY SKILL IN THE ART, DID YOU CONSIDER ANY OTHER

21  FACTORS, OTHER THAN THOSE THAT ARE LISTED HERE IN YOUR

22  REPORT?

23  A. YES.

24  Q. WHAT OTHER FACTORS DID YOU CONSIDER?

25  A. BASICALLY, THE TECHNOLOGICAL ENVIRONMENT AT THE TIME.

1    Q. PLEASE DESCRIBE THE TECHNOLOGICAL ENVIRONMENT AT THE

2    TIME, AND JUST FOR MY QUESTION, WE ARE STILL IN THE '93-'94

3    TIME FRAME.

4    A. WE ARE.  AT THAT TIME, THE PREDOMINANT METHOD OF CLEANING

5    WAS, IF YOU WILL, THE PRODUCT WAS THE PROCESS.  AND IF I MAY

6    DESCRIBE THAT TO THIS COURT, I HAVE SEEN MANY EXAMPLES IN

7    PERSON AND TRAINED PEOPLE TO DO THIS, TO TAKE A COFFEE CAN

8    FULL OF 111 TRICHLOROETHANE AND A PAINT BRUSH.  I SPENT A

9    COLD JANUARY IN 1991, MILWAUKEE, AT BRIGGS AND STRATTON

10   LAWNMOWER ENGINE PLANT, AND THERE WERE A CONSIDERABLE NUMBER

11   OF PEOPLE LEARNING TO USE AND USING TRICHLOROETHANE IN A

12   COFFEE CAN AND A PAINT BRUSH APPLIED TO AN OIL DRAIN PLUG ON

13   A LAWNMOWER.  AND THEY WOULD DAB ON ONE WASH, IF YOU LIKE,

14   OF CLEANING FLUID, 111 TRICHLOROETHANE, IT WOULD LIBERATE

15   THE SOIL, DRAIN OFF THE BOTTOM OF THE LAWNMOWER ENGINE.

16   THEY WOULD APPLY ANOTHER COATING OF 111 TRICHLOROETHANE.  A

17   PROFESSIONAL CLEANING CONSULTANT WOULD CALL THAT THE RINSE

18   STEP.  AND THEN BECAUSE THE 111 TRICHLOROETHANE EVAPORATES

19   SO FAST, THE SURFACE WOULD BE DRY.  AND THE USER WOULD HAVE

20   CLEAN PARTS, DRY PARTS WITH ESSENTIALLY NO PROCESS.  WE CALL

21   THAT THE PRODUCT IS THE PROCESS.  AND THAT SPEAKS TO IN

22   TERMS OF THE DEFINITION OF ORDINARY SKILL.  THE LEVEL OF

23   TECHNICAL EXPERIENCE, TECHNICAL CAPABILITY NECESSARY TO

24   DESIGN, TRAIN, BUILD AND MANAGE THAT SORT OF ENTERPRISE, IT

25   WOULD BE AS LOW AS YOU COULD IMAGINE.  THAT'S ONE OF MY

1   REASONS WHY I BELIEVE THE ESTIMATE THAT I MADE AND TESTIFY

2   TO HERE TODAY IS THE RIGHT ESTIMATE OR AN OVERESTIMATE.

3              MR. CAPP:  YOUR HONOR, CAN I HAND SOME COUGH DROPS

4   UP TO THE WITNESS?

5              THE COURT:  SURE.

6              THE WITNESS:  MAY I GIVE YOU ANOTHER REASON?

7              MR. SCHAETZEL:  OF COURSE.

8              THE WITNESS:  I SPOKE ABOUT THE PRODUCT BEING THE

9   PROCESS AS BEING A DEFINITION OF A LOW LEVEL OF ORDINARY

10  SKILL.  ANOTHER AREA, AND ANOTHER AREA THAT I MENTIONED, IT

11  WAS IMPORTANT TO ME IN MAKING MY DEFINITION OF THE LEVEL OF

12  ORDINARY SKILL, WAS, AND I WILL USE THIS PHRASE, NOBODY

13  CARES.  AND BY THAT I MEAN, CLEANING WASN'T HIGHLY VALUED IN

14  THAT TIME FOR AT LEAST THE GOOD REASON THAT IT WAS SO EASY

15  TO DO THAT NO ONE CONSIDERED IT TO BE A TASK OF ANY

16  SUBSTANCE.  CLEANING WAS NOT VALUED.  AND THAT LED TO

17  ASSIGNMENT OF THE LOWEST SKILLED PEOPLE IN AN ENTERPRISE TO

18  THE CLEANING LINE.  AND IF THE COURT HAS THE TIME, I WOULD

19  LIKE TO OFFER A PERSONAL EXPERIENCE ABOUT THAT SITUATION.

20             THE COURT:  ALL RIGHT.

21             THE WITNESS:  RECENTLY, I VISITED AN ARMY BLACK

22  HAWK HELICOPTER MAINTENANCE BASE.  THESE PEOPLE HAD THE

23  RESPONSIBILITY OF RESTORING ARMY HELICOPTERS THAT CAME BACK

24  FROM IRAQ TO WORKABLE CONDITION IN THE FIELD AGAIN.  THAT

25  REQUIRED A GREAT DEAL OF CLEANING WORK.  THEY HAD A FACILITY

1    WHOSE SIZE WAS AT LEAST 10,000 SQUARE FEET.  THEY HAD

2    INVESTED MULTIPLE MILLIONS OF DOLLARS IN FACILITIES.  THEY

3    HAD STAFF DOING CLEANING WORK FOR THE ENTIRE ENTERPRISE,

4    NUMBERING, I THINK, 65 OR 70 PEOPLE.  AND EVERY ONE OF THOSE

5    PEOPLE WAS HIRED IN OFF THE STREET.  THEY HAD THE LEAST

6    AMOUNT OF TRAINING OF ANY PERSON IN THAT ENTERPRISE.  WHEN

7    SOMEONE WAS NEEDED OUTSIDE THAT ENTERPRISE, THEY WOULD

8    EITHER SELECT FROM THE CLEANING LINE THE PERSON THAT THEY

9    WANTED, OR SOMEONE WOULD BID OUT AND THEN THEY WOULD HIRE

10   ANOTHER PERSON OFF THE STREET AND GIVE THEM A MINIMAL LEVEL

11   OF TRAINING.

12           THEY ASKED ME, AT THE END OF MY FOUR-DAY VISIT TO

13   THAT MILITARY BASE, TO GIVE THEM A SET OF RECOMMENDATIONS,

14   AND PROBABLY THE MOST IMPORTANT RECOMMENDATION I GAVE THEM

15   WAS TO CONSIDER A CORE COMPETENCY LADDER FOR CLEANING.  I

16   SUGGESTED THAT THEY VALUE CLEAN.  I SUGGESTED THAT THEY

17   TRAIN PEOPLE TO HIGHER LEVELS THAN THEY HAD AS A WAY TO

18   PREVENT PROBLEMS, AND AS IS UNFORTUNATELY CUSTOMARY IN MY

19   INDUSTRY, THAT RECOMMENDATION FELL ON STONE AND NOT FALLOW

20   GROUND.  PEOPLE WHO WORK IN MY INDUSTRY, THEY ARE NOT THE

21   HIGHEST VALUED PEOPLE, RATHER THEY ARE THE LOWEST VALUED

22   PEOPLE.  A FRIEND OF MINE SAYS THAT THE CLEANING MACHINE IS

23   THE MACHINE CLOSEST TO THE BACK DOOR OF THE PLANT, OPERATED

24   BY THE PERSON WITH THE LEAST LEVEL OF SKILL.  THE POINT I AM

25   TRYING TO MAKE IN TERMS OF DEFINITION OF A LEVEL OF ORDINARY

1    SKILL IS THAT I CONSIDERED THAT CLEANING WORK WAS NOT HIGHLY

2    VALUED IN THAT TIME FRAME.

3    BY MR. SCHAETZEL:

4    Q. AND THE LEVEL THAT YOU JUST DESCRIBED, IN TERMS OF GIVING

5    OPINIONS ON, FOR EXAMPLE, OBVIOUSNESS IN A CASE, THAT IS THE

6    LEVEL THAT YOU APPLIED, IS IT NOT?  THAT IS THE LEVEL OF

7    ORDINARY SKILL IN THE ART THAT YOU'VE APPLIED?

8    A. MY OPINION ON THAT HAS NOT CHANGED.

9    Q. SO THE RECORD IS CLEAR, THAT'S THE LEVEL OF ORDINARY

10   SKILL IN THE ART THAT YOU USED TO COME TO THE CONCLUSION,

11   FOR EXAMPLE, THAT THE CHEMFREE PATENT, A CLAIM OF A CHEMFREE

12   PATENT WAS NOT OBVIOUS?

13          MR. CAPP:  EXCUSE ME, YOUR HONOR.  OBJECTION.  I

14   THINK IN THE CONTEXT OF THE CONVERSATION RIGHT NOW, THAT

15   QUESTION IS VAGUE AND AMBIGUOUS.

16          MR. SCHAETZEL:  I'LL BE GLAD TO REPHRASE.

17          THE COURT:  OKAY.

18   BY MR. SCHAETZEL:

19   Q. YOU JUST DESCRIBED A LEVEL OF ORDINARY SKILL IN THE ART

20   AND FACTORS THAT YOU USED TO COME TO THAT OPINION, DID YOU

21   NOT?

22   A. I DID.

23   Q. AND THAT OPINION -- SORRY, THAT LEVEL OF ORDINARY SKILL

24   IN THE ART THAT YOU JUST DESCRIBED, THAT'S THE LEVEL OF

25   ORDINARY SKILL THAT YOU USED TO FORM YOUR OPINIONS ABOUT

1    OBVIOUSNESS IN THIS CASE, IS IT NOT?

2    A. THAT IS THE ONLY LEVEL OF ORDINARY SKILL THAT I USED.

3    Q. NOW -- AND YOU ARE WELCOME TO TURN TO THIS BUT YOU DON'T

4    NEED TO FOR TIME PURPOSES, I CAN JUST TELL YOU IN YOUR

5    SUPPLEMENTAL REPORT OF JANUARY 7TH OF THIS YEAR, YOU'VE

6    INDICATED THAT YOU READ THE EXPERT REPORT OF JAMES

7    BRICKLE -- IT'S THE EXPERT REPORT OF JAMES L. BRICKLE IN

8    RESPONSE TO THE INITIAL EXPERT REPORT OF PETER ADRIENS DATED

9    ON OR ABOUT SEPTEMBER 11, 2008.  DO YOU RECALL READING AN

10   EXPERT REPORT BY DR. BRICKLE?

11   A. I DO.

12   Q. AND DO YOU RECALL THAT DR. BRICKLE LOOKED AT THE SAME

13   CHEMFREE PATENTS AND APPLIED THE SAME SIX FACTORS FOR

14   ORDINARY SKILL IN THE ART AND HE CAME TO A DIFFERENT

15   CONCLUSION ABOUT THAT LEVEL OF ORDINARY SKILL, DIDN'T HE?

16           MR. CAPP:  OBJECTION.  THAT QUESTION

17   MISCHARACTERIZES DR. BRICKLE'S REPORT.

18           THE COURT:  WHAT ABOUT THAT?

19           MR. SCHAETZEL:  I DON'T THINK IT MISCHARACTERIZES

20   IT AT ALL BUT I'LL BE GLAD TO GET DR. BRICKLE'S REPORT IN

21   FRONT OF THE WITNESS AND ADDRESS IT.  IF I TOOK TOO BIG OF A

22   JUMP, I --

23           THE COURT:  ALL RIGHT.

24                        (PAUSE.)

25   BY MR. SCHAETZEL:

1    Q. DR. DURKEE, I WOULD LIKE TO ASK YOU, PLEASE, TO -- I HAVE

2    HANDED YOU WHAT IS DEFENDANT'S EXHIBIT TRIAL EXHIBIT 1146,

3    WHICH IS THE EXPERT REPORT OF JAMES L. BRICKLE, PH.D. IN

4    RESPONSE TO INITIAL EXPERT REPORT OF PETER ADRIENS, AND IN

5    PARTICULAR, I HAVE OPENED JUST TO THE TABLE OF CONTENTS.

6    AND IF YOU WOULD, SIR, PLEASE LOOK UNDER THE TABLE OF

7    CONTENTS WITH ME AT ROMAN NUMERAL 6, AND I JUST WANT TO

8    REVIEW THE FACTORS.  IN YOUR REPORT, YOU LOOKED AT THE LEGAL

9    STANDARD APPLIED, DID YOU NOT?

10   A. I DID.

11   Q. AND THEN YOU LOOKED AT THE EDUCATIONAL LEVEL OF THE

12   INVENTOR?

13   A. I DID.

14   Q. AND THEN YOU LOOKED AT THE TYPE OF PROBLEMS ENCOUNTERED

15   IN THE ART; CORRECT?

16   A. I DID.

17   Q. AND YOU LOOKED AT THE PRIOR ART SOLUTIONS TO THOSE

18   PROBLEMS AND THE RAPIDITY WITH WHICH INNOVATIONS ARE MADE?

19   A. I DID.

20   Q. AND THE EDUCATIONAL LEVEL OF WORKERS ACTIVE IN THE FIELD;

21   CORRECT?

22   A. I DID.

23   Q. SO THOSE ARE THE SAME FACTORS THAT DR. BRICKLE LOOKED AT?

24   A. YES, SIR.

25   Q. IF YOU WOULD, SIR, PLEASE TURN TO PAGE 42 OF

1    DR. BRICKLE'S REPORT, WHICH IS DEFENDANT'S EXHIBIT TRIAL

2    EXHIBIT 1146.  AND IF WE LOOK AT THE FIRST FULL PARAGRAPH OF

3    THAT SECTION, DR. BRICKLE STATES, "IN MY EXPERIENCE WITH

4    EDUCATING, HIRING, TRAINING AND WORKING WITH PEOPLE WHO ARE

5    PRACTICING THE ART OF ENVIRONMENTAL ENGINEERING AND SCIENCE,

6    I HAVE FOUND THAT THOSE ENTERING THE WORK FORCE AFTER AN

7    UNDERGRADUATE PROGRAM HAVE THE FUNDAMENTAL KNOWLEDGE

8    REQUIRED TO PRACTICE THE ART.  I HAVE ALSO FOUND THAT IT MAY

9    TAKE FROM 6 MONTHS TO TWO YEARS FOR THESE PEOPLE TO ORIENT

10   TO THE BUSINESS PRACTICES OF CONSULTING, PROJECT MANAGEMENT,

11   AND CLIENT MANAGEMENT.  THUS, IN TAKING THIS FACTOR INTO

12   ACCOUNT, IN MY OPINION, THE EDUCATION LEVEL OF THOSE OF

13   ORDINARY SKILL PROVIDING ENVIRONMENTAL ENGINEERING AND

14   SCIENCE SERVICES IN 1994 WAS NO MORE THAN A BACHELOR'S

15   DEGREE WITH APPROXIMATELY TWO TO THREE YEARS OF PRACTICAL

16   EXPERIENCE WORKING IN THEIR FIELD."  DR. BRICKLE CAME TO THE

17   POSITION, DID HE NOT, THAT THE APPROPRIATE ART AND LEVEL OF

18   SKILL WAS BASED ON THE ENVIRONMENTAL ENGINEERING AND SCIENCE

19   SERVICES ART?

20          MR. CAPP:  OBJECTION.  THAT QUESTION

21   MISCHARACTERIZES DR. BRICKLE'S REPORT.

22          MR. SCHAETZEL:  I AM NOT SURE HOW, YOUR HONOR.  I

23   QUOTED FROM -- I HAVE QUOTED FROM THE REPORT, AND, YOUR

24   HONOR, I AM IN THE SECTION WHERE DR. BRICKLE STATES HIS

25   OPINION AND CONCLUSION ON THE LEVEL OF ORDINARY SKILL IN THE

1    ART.

2              MR. CAPP:  I AM HAPPY TO EXPLAIN IT MORE IN THE

3    SIDE BAR.  I DON'T WANT TO GO INTO TOO MUCH DETAIL SO THAT I

4    WOULD BE ACCUSED OF COACHING THE WITNESS.

5              THE COURT:  ALL RIGHT.

6              (SIDE BAR CONFERENCE AS FOLLOWS:)

7              MR. CAPP:  YOUR HONOR, WE HAVE AN UNUSUAL PATENT

8    HERE.  THIS IS THE FIRST ONE LIKE THIS I HAVE EVER DEALT

9    WITH.  WE HAVE A PATENT, FOR THE FIRST TIME, TWO DISPARATE

10   FIELDS OF TECHNOLOGY.  AND FOR THAT REASON, WE HAD TO COME

11   BACK TO YOUR HONOR BECAUSE WE HAD ONLY DONE AN EXPERT REPORT

12   FROM SOMEONE THAT'S SKILLED IN THE ART IN PARTS WASHING, AND

13   ONCE THEY BROUGHT IN THEIR ENVIRONMENTAL OR THEIR ENABLEMENT

14   DEFENSE, WE HAD TO GO AND GET A SECOND EXPERT, WHICH YOU

15   ALLOWED, SO WE BROUGHT IN DR. BRICKLE.  AND DR. BRICKLE WAS

16   SPECIFICALLY BROUGHT IN TO DO A REPORT RELATIVE TO THE

17   CAPABILITIES OF SOMEONE OF ORDINARY SKILL IN THE

18   ENVIRONMENTAL SCIENCES ART, WHEREAS DR. DURKEE WAS TO DO ONE

19   OF ORDINARY SKILL IN THE ART OF PARTS WASHING.  AND THE

20   ISSUE THEN WAS FOR THE ENABLEMENT DEFENSE, BECAUSE THERE WAS

21   THIS MARRIAGE OF TWO TECHNOLOGIES UNDER -- LIKE IN THE KING

22   CASE AND SOME OF THOSE, ONCE THAT WAS ADDRESSED ON SUMMARY

23   JUDGEMENT THAT YOU CAN HAVE THE TEAM APPROACH AND HAVE TWO

24   PRACTITIONERS FROM TWO DIFFERENT FIELDS TO ENABLE AN

25   INVENTION.

1            AND WHAT MR. SCHAETZEL IS TRYING TO DO NOW IS

2    SHOEHORN THAT STANDARD BACK INTO THE OBVIOUSNESS INQUIRY.  I

3    WISH I COULD BE MORE HELP TO YOUR HONOR IN THIS, BUT I HAVE

4    RESEARCHED THIS AS FAR AS I CAN, AND I CAN FIND NO SUPPORT

5    FOR THE PROPOSITION THAT THE TEAM APPROACH TO ORDINARY SKILL

6    THAT IS APPLICABLE IN AN ENABLEMENT ANALYSIS IN A NEW PATENT

7    THAT BRINGS TOGETHER TWO DISPARATE FIELD OF TECHNOLOGY IS

8    ALSO APPLICABLE TO ORDINARY SKILL IN THE ART FOR OBVIOUSNESS

9    PURPOSES.

10           THE COURT:  WHAT IS THE OBJECTION TO

11   MR. SCHAETZEL'S QUESTION?

12           MR. CAPP:  MR. SCHAETZEL'S QUESTIONS ARE TRYING TO

13   CHARACTERIZE DR. BRICKLE'S REPORT AS BEING THE LEVEL OF

14   ORDINARY SKILL IN THE ART TO PRACTICE CHEMFREE'S INVENTION,

15   AND THAT IS NOT RIGHT.  DR. BRICKLE WAS BROUGHT IN TO POINT

16   OUT WHAT THE PERSON OF ORDINARY SKILL IN THE ART IN

17   ENVIRONMENTAL SCIENCES WOULD CONTRIBUTE TO A TEAM OF

18   PRACTITIONERS THAT WOULD ENABLE THE TWO DISPARATE FIELDS IN

19   THE CHEMFREE PATENT.

20           THE COURT:  OKAY.  MR. SCHAETZEL?

21           MR. SCHAETZEL:  I BELIEVE, YOUR HONOR, THE

22   OBJECTION WAS THAT I HAD MISCHARACTERIZED DR. BRICKLE'S

23   REPORT.  I DON'T BELIEVE THAT I HAVE.  WHAT I THINK I

24   UNDERSTOOD MR. CAPP TO ARGUE IS THAT FROM THE BEGINNING, THE

25   TWO EXPERTS WERE HIRED FOR DIFFERENT PURPOSES, ONE FOR PARTS

```
1    WASHING AND ONE FOR ENVIRONMENTAL SCIENCES.  OUR POSITION IS
2    THAT WE HAVE TWO EDUCATED GENTLEMEN WHO WENT THROUGH THE
3    SAME SIX FACTORS LOOKING AT THE SAME PATENT AND THE SAME
4    LANGUAGE AND CAME TO DIFFERENT CONCLUSIONS.  NOW, IF THE
5    ANSWER TO THAT IS THEY CAME TO DIFFERENT CONCLUSIONS BECAUSE
6    THEY WERE ASKED TO COME TO DIFFERENT CONCLUSIONS, I WOULD
7    LIKE TO GET THAT BEFORE THE COURT.  IF THEY CAME TO
8    DIFFERENT CONCLUSIONS BECAUSE THEY READ IT DIFFERENTLY OR
9    THEY HAD A DISPARATE VIEW OF THINGS, I WOULD LIKE TO GET
10   THAT BEFORE THE COURT.  EITHER WAY, I DON'T THINK I
11   MISCHARACTERIZED WHAT DR. BRICKLE SAID.
12             MR. CAPP:  I DISAGREE.  IF YOU WILL HEAR ME OUT.
13             THE COURT:  I WILL ASK YOU TO DO ONE THING.  THE
14   WITNESS HAS READ DR. BRICKLE'S REPORT.  LET'S HEAR WHAT HE
15   HAS TO SAY.  BUT PREFACE YOUR QUESTION WITH DR. BRICKLE'S
16   FIELD OF EXPERTISE.
17             MR. SCHAETZEL:  OKAY.
18                 (END OF SIDE BAR CONFERENCE).
19   BY MR. SCHAETZEL:
20   Q. DR. ADRIENS, IN READING DR. BRICKLE'S EXPERT REPORT, DID
21   YOU BECOME AWARE THAT HIS AREA OF EXPERTISE IS THAT OF
22   ENVIRONMENTAL SCIENCES?
23   A. ACTUALLY, I AM JOHN DURKEE.
24   Q. I AM SORRY.  DR. DURKEE.  I APOLOGIZE.  DR. DURKEE, IN
25   READING DR. BRICKLE'S REPORT, DID YOU LEARN THAT
```

1   DR. BRICKLE'S AREA OF EXPERTISE IS ENVIRONMENTAL SCIENCES?

2   A. I DID.

3   Q. AND IN REVIEWING DR. BRICKLE'S REPORT, DID YOU COME TO AN

4   OPINION THAT THE LEVEL OF ORDINARY SKILL IN THE ART, GIVEN

5   YOUR TWO DIFFERENT BACKGROUNDS, SOMEHOW ALSO DIFFERED?

6   A. I AGREE THAT THEY DO.

7   Q. HOW IS IT THAT YOU THINK THEY DIFFER?

8   A. BECAUSE THEY COVER DIFFERENT LEVELS OF EDUCATION AND

9   DIFFERENT AMOUNTS OF PROFESSIONAL EXPERIENCE.

10  Q. AND WHEN YOU APPROACHED THE ISSUE OF THE LEVEL OF

11  ORDINARY SKILL IN THE ART, IN MAKING YOUR -- COMING TO YOUR

12  OPINIONS ON THAT ISSUE, WHAT CONSIDERATION, IF ANY, DID YOU

13  GIVE TO THE LEVEL OF ORDINARY SKILL IN THE ART THAT

14  DR. BRICKLE OPINED ON RELATED TO ENVIRONMENTAL SERVICES?

15          MR. CAPP:  OBJECTION, YOUR HONOR.  WE KEEP TRYING

16  TO BE VAGUE AND AMBIGUOUS HERE ABOUT SAYING "ORDINARY SKILL

17  IN THE ART" WITHOUT SPECIFYING WHICH ART WE ARE TALKING

18  ABOUT.

19          MR. SCHAETZEL:  YOUR HONOR, I DON'T BELIEVE THE

20  QUESTION IS VAGUE AND AMBIGUOUS.  IN FACT, I BELIEVE THE

21  QUESTION COMES DIRECTLY FROM THE LANGUAGE OF SECTION 103.

22  BUT I THINK I CAN REPHRASE THE QUESTION.

23          THE COURT:  ALL RIGHT.  DO.

24  BY MR. SCHAETZEL:

25  Q. DR. DURKEE, WHAT CONSIDERATION, IF ANY, DID YOU GIVE TO

1  THE POINTS MADE IN DR. BRICKLE'S EXPERT REPORT REGARDING THE

2  LEVEL OF ORDINARY SKILL IN THE ART?

3  A. I DON'T THINK I COULD HAVE GIVEN ANY AS I THINK IN TIME.

4  HIS WAS DONE AFTER MINE.

5  Q. I THINK, SIR, YOUR LAST REPORT, YOUR JANUARY 2009 REPORT

6  WAS DONE AFTER HIS REPORT, BECAUSE THAT IS HOW YOU GOT THE

7  CHANCE TO READ IT BEFORE YOU DID THAT REPORT, SIR.

8  A. MY DEFINITION, BASED ON THE FACTORS AND WHAT WE HAVE

9  TALKED ABOUT, WAS DONE IN THE SPRING OF 2008.  SO IT WAS

10  DONE PRIOR TO THE WORK DONE BY PROFESSOR BRICKLE.  SO THERE

11  COULD HAVE BEEN NO INTERACTION.

12  Q. ALL RIGHT.  I UNDERSTAND, SIR, THAT THERE WAS NO

13  INTERACTION.  IF I MAY TRY AND REFRESH YOUR RECOLLECTION,

14  DR. BRICKLE DID THIS REPORT AT DEFENDANT'S EXHIBIT 1146 IN

15  SEPTEMBER OF 2008.

16  A. UH-HUH (AFFIRMATIVE).

17  Q. AND THEN YOU DID YOUR MOST RECENT REPORT IN JANUARY OF

18  2009.

19  A. THAT IS CORRECT.

20  Q. AND IN DOING THE JANUARY OF 2009 REPORT, YOU REFERENCED

21  THAT YOU HAD REVIEWED DR. BRICKLE'S SEPTEMBER REPORT?

22  A. I DID.

23  Q. OKAY.  WHAT I WOULD LIKE TO KNOW, SIR, IS, IN FORMULATING

24  YOUR OPINIONS ON THE LEVEL OF ORDINARY SKILL IN THE ART IN

25  YOUR REPORT, WHAT CONSIDERATION OR WEIGHT DID YOU GIVE TO

1    DR. BRICKLE'S REPORT AND HIS OPINIONS?

2    A. PERHAPS I DON'T UNDERSTAND THE THRUST OF THE QUESTIONS.

3    BUT MY OPINION ABOUT ORDINARY SKILL WAS FORMED IN THE SPRING

4    OF 2008.  DR. BRICKLE'S REPORT WAS RECEIVED LATER.  AND I

5    THINK YOU ASKED ME EARLIER IF MY OPINION ON ORDINARY SKILL

6    HAD CHANGED, AND I SAID THAT IT HAD NOT EXCEPT THAT IT MIGHT

7    BE AN OVERESTIMATE.

8    Q. I UNDERSTAND YOUR POINT.  THANK YOU.  IN DOING YOUR 2009

9    REPORT, YOU OPINED ON OBVIOUSNESS AS IT PERTAINED TO CERTAIN

10   REFERENCES.  FOR EXAMPLE, HAKANSSAN-2 AND OTHERS; CORRECT?

11   A. YES, SIR.

12   Q. IN PREPARING THAT REPORT ON OBVIOUSNESS, IN JANUARY OF

13   2009, WHAT WEIGHT OR CONSIDERATION DID YOU GIVE TO

14   DR. BRICKLE'S EXPERT REPORT FROM SEPTEMBER OF 2008, IF ANY?

15   A. MY REPORT ABOUT OBVIOUSNESS WAS IN THE AREAS WHERE I HAVE

16   CREDIBILITY.  AND THAT WAS CLEANING AND WASHING OF PARTS.

17   AND THAT'S WHAT MY REPORT IS ABOUT.  I WAS PLEASED TO READ

18   OF HIS OPINION ABOUT PERSONS NOT PARTICIPATING IN THE

19   INDUSTRIAL PARTS WASHING COMMUNITY IN THE EARLY 90'S.

20   Q. IF WE COULD, LET'S TAKE A LOOK AT THE 110 PATENT, JTX-1.

21   AND IN PARTICULAR, THE FIRST COLUMN, THE SUMMARY OF THE

22   INVENTION, FIRST PARAGRAPH.

23   A. EXCUSE ME, MR. SCHAETZEL, DID I LOSE MY BOOK THAT HAD IT

24   IN IT?

25   Q. NO, YOU DID NOT.  THIS IS YOUR BOOK.  THAT IS YOUR

1  REBUTTAL REPORT, SIR.  BUT MY QUESTION IS NOT ON THAT PAGE

2  THAT YOU ARE LOOKING AT, SIR.

3  A. I THINK I FIGURED THAT OUT.

4  Q. OKAY.  "SUMMARY OF THE INVENTION."  IF YOU COULD READ

5  WITH ME.

6  A. THIS IS THE 110 PATENT?

7  Q. YES, SIR.  110 PATENT.  THIS IS THE 110 PATENT, COLUMN 1,

8  WE ARE AT THE "SUMMARY OF THE INVENTION."  "BRIEFLY DESCRIBE

9  THE PRESENT INVENTION COMPRISES A PARTS WASHING SYSTEM

10  CHARACTERIZED BY A COOPERATIVE INTERACTION AMONG AN INTEGRAL

11  COMPONENT, A FLUID COMPONENT, AND A BIOLOGICAL COMPONENT."

12  IN YOUR OPINION, WHAT IS THE BIOLOGICAL COMPONENT OF THIS

13  INVENTION?

14  A. I THINK THE CLAIMS STATE THAT THE BIOLOGICAL COMPONENT IS

15  THE MICROORGANISMS.

16  Q. AND WHAT DO THOSE MICROORGANISMS DO?

17  A. THE SPECIFICATION, AND MAYBE THE CLAIMS, I DON'T RECALL,

18  AND I DON'T HAVE A COPY OF THE WHOLE PATENT, BUT THE

19  MICROORGANISMS BIOREMEDIATE HYDROCARBONS INTO CO2 AND WATER.

20  Q. AT WHAT POINT IN THE PROCESS, I AM NOT WORRIED ABOUT THE

21  CLAIMS, BUT AT WHAT POINT IN THE PROCESS DO THE

22  MICROORGANISMS BIOREMEDIATE THE HYDROCARBONS?

23  A. CAN YOU HELP ME TO UNDERSTAND WHAT A PROCESS IS?  I KNOW

24  WHAT THE SYSTEM IS.

25  Q. WELL, LET'S LOOK AT IT FROM IN TERMS OF THE SYSTEM.  IF I

1    AM WORKING AS THE PARTS WASHER, I WASH THE PART, THE FLUID

2    FLOWS DOWN INTO THE TANK, AND AT THAT POINT IN TIME, AT

3    LEAST IN THE TANK, BIOREMEDIATION OCCURS.  ISN'T THAT

4    CORRECT?

5    A. IT'S MY UNDERSTANDING THAT BIOREMEDIATION OCCURS

6    EVERYWHERE AND AT ALL TIMES.

7    Q. DOES BIOREMEDIATION THEN OCCUR IN THE TANK?

8    A. IT DOES.  MAY I AUGMENT THAT?

9    Q. OF COURSE.

10   A. WHEN I SAID "EVERYWHERE," I MEANT EVERYWHERE IN THE

11   FLUID.  I DIDN'T MEAN ALL SPACE AND TIME.

12   Q. UNDERSTOOD.  WHEN THE BIOLOGICAL COMPONENT OR THE

13   MICROORGANISMS ARE AT WORK DEGRADING HYDROCARBON, THAT CAN

14   OCCUR AFTER THE PART HAS BEEN CLEANED, CAN'T IT?

15   A. I THINK MY TESTIMONY WAS THAT IN THE CLEANING FLUID,

16   BIOREMEDIATION OCCURS EVERYWHERE AND AT ALL TIMES.

17   Q. SO IT COULD OCCUR AFTER THE WASHING PART WAS COMPLETE;

18   CORRECT?

19   A. IT COULD OCCUR AT ANY STAGE.  IT COULD OCCUR AT ALL

20   TIMES.

21   Q. IF YOU WOULD, SIR, IN THE REPORT THAT YOU HAVE IN FRONT

22   OF YOU, PLEASE TURN TO PAGE 88, AGAIN.  THIS IS YOUR

23   REBUTTAL REPORT.

24   A. THAT IS EXHIBIT 1137?

25   Q. THAT IS A VERY GOOD QUESTION.

1    A. I WILL GO TO 88 AND SEE WHAT IS THERE.

2    Q. YES.  1137.  THE SAME LANGUAGE THAT WE LOOKED AT BEFORE.

3    "IT IS MY OPINION" -- "IT IS MY OPINION THAT THE PERTINENT

4    ART OR FIELD OF ENDEAVOR FOR THE CHEMFREE PATENT IS THE ART

5    OF MAKING PARTS WASHERS THAT REMOVE HYDROCARBON CONTAMINANTS

6    FROM PARTS."  ISN'T IT TRUE, DR. DURKEE --

7    A. EXCUSE ME.  NO, I DO NOT SEE WHERE WE ARE AT.  PLEASE.

8    Q. DO YOU SEE THAT LANGUAGE NOW, SIR?  "IT IS MY OPINION

9    THAT THE PERTINENT ART OF OR FIELD OF ENDEAVOR FOR THE

10   CHEMFREE PATENT IS THE ART OF MAKING PARTS WASHER THAT

11   REMOVE HYDROCARBON CONTAMINANTS FROM PARTS."  DO YOU SEE

12   THAT?

13   A. I BELIEVE THAT TO BE A CORRECT STATEMENT.  THAT IS MY

14   OPINION.

15   Q. SIR, DOESN'T THAT OPINION IGNORE THE BIOLOGICAL COMPONENT

16   PART BECAUSE THE INVENTION IS NOT ONLY REMOVING THE

17   HYDROCARBON CONTAMINANT FROM THE PART, AS YOU SAY IN THIS

18   SENTENCE, ISN'T IT ALSO REMEDIATING THE HYDROCARBON?

19   A. THE ART DESCRIBED IN THE PATENT SPECIFICATION IS CLEANING

20   OF PARTS, WASHING OF PARTS.  I HAVE TESTIFIED THAT THE ART

21   CLAIMED BY CHEMFREE HAS THREE COMPONENTS, AND THEY ARE

22   BIOLOGICAL, APPARATUS AND CLEANING FLUID.  AND THAT ART IS

23   WHAT I MEANT WHEN I WROTE THAT STATEMENT.  I MEANT THE

24   ENTIRE, TO USE THE WORD YOU USED A MOMENT AGO, PROCESS.

25   SYSTEM.

1   Q. SO EVEN THOUGH IT DOESN'T SAY IT HERE, IF I UNDERSTAND

2   YOUR TESTIMONY, YOU ARE SAYING THAT YOU CONSIDERED THE

3   REMEDIATION OF HYDROCARBON PART OF THE INVENTION; IS THAT

4   CORRECT?

5   A. THAT IS PART OF THE INVENTION.

6   Q. OKAY.  THAT IS PART OF THE INVENTION.  IN COMING TO YOUR

7   CONCLUSION ON THE LEVEL OF ORDINARY SKILL IN THE ART,

8   HOWEVER, IF YOU DON'T CONSIDER ANY OF THE BIOREMEDIATION

9   ART, DON'T YOU OMIT THE BIOLOGICAL COMPONENT OF THE ART IN

10  COMING TO THE LEVEL OF ORDINARY SKILL THAT YOU ARE GOING TO

11  APPLY?

12  A. CAN YOU TAKE THAT QUESTION IN STEPS, PLEASE?

13  Q. SURE.  I UNDERSTAND YOU TO SAY THAT BY THIS SENTENCE, YOU

14  MEANT TO INCLUDE -- OR IT INHERENTLY STATES, IF YOU WILL,

15  THAT YOU ARE CONSIDERING THE BIOLOGICAL COMPONENT OF THE

16  INVENTION.  BUT -- IS THAT CORRECT, SIR?

17  A. IT IS.

18  Q. OKAY.  BUT WHEN WE GO TO THE NEXT PAGES, AND WE LOOK AT

19  THE SIX FACTORS THAT YOU CONSIDERED, THERE IS NO MENTION OF

20  BIOREMEDIATION TECHNOLOGY, AND THERE IS NO MENTION OF

21  HAKANSSAN-2.  AND MY QUESTION IS, IN THE APPLICATION OF

22  THOSE FACTORS, IT'S TRUE, IS IT NOT, THAT YOU DID NOT

23  CONSIDER THE BIOLOGICAL COMPONENT IN ARRIVING AT YOUR

24  ULTIMATE OPINION ON WHAT CONSTITUTES THE PROPER SKILL IN THE

25  ART FOR YOUR EXPERT REPORT?

1    A. IS YOUR QUESTION RELATING TO A CONCLUSION ABOUT

2    OBVIOUSNESS?  IS IT A QUESTION RELATED TO THE LEVEL OF

3    ORDINARY SKILL IN THE PARTS WASHING ART?

4    Q. IT IS RELATED TO THE LEVEL OF ORDINARY SKILL IN THE PARTS

5    WASHING ART, AND MY QUESTION IS, IS IT TRUE THAT IN COMING

6    TO YOUR OPINION ON THE LEVEL OF ORDINARY SKILL IN THE PARTS

7    WASHING ART, YOU DID NOT CONSIDER THE BIOLOGICAL COMPONENT

8    OF THE INVENTION BECAUSE THERE IS NO MENTION OF HAKANSSAN-2,

9    FOR EXAMPLE, OR ANY BIOREMEDIATION CLEANING TECHNOLOGY OR

10   ANY OF THAT BIOREMEDIATING ART-TYPE STUFF IN THOSE SIX

11   FACTORS?

12   A. AND I AM ASSUMING WE ARE TALKING THE TIME PERIOD OF THESE

13   PATENTS, EARLY 90'S?

14   Q. YES, SIR.  STILL '93-'94.

15   A. THE PERSON OF ORDINARY SKILL IN PARTS WASHING WOULD HAVE

16   HAD NO EXPERIENCE IN BIOREMEDIATING PARTS WASHER BECAUSE

17   THEY HADN'T BEEN INVENTED.  SO MY OPINION ABOUT THE LEVEL OF

18   SKILL FOUNDED BY THAT PERSON COULD NOT HAVE INCLUDED

19   BIOREMEDIATION.  IT WASN'T A TOPIC FOR EXERCISE WITHIN PARTS

20   WASHERS AT THAT TIME.

21   Q. LET ME HAND YOU A CLEAN COPY, JUST FOR EASE OF WORKING

22   WITH THIS.  DR. DURKEE, FOR EASE OF USE, I AM HANDING YOU A

23   COPY OF YOUR SUPPLEMENTAL EXPERT REPORT THAT WAS DONE IN

24   JANUARY OF THIS YEAR.  FOR THE RECORD, I HAVE HANDED THE

25   WITNESS A DUPLICATE COPY FOR EASE OF USE OF WHAT IS MARKED

1  AS DEFENDANT'S EXHIBIT TRIAL EXHIBIT 1149.  PLEASE TURN TO

2  THE -- I GUESS, FROM PAGES 3 UNTIL 15 OF THIS REPORT,

3  "ASSUMPTIONS AS TO LEGAL STANDARDS."  IT IS CORRECT, IS IT

4  NOT, THAT THESE WERE PROVIDED TO YOU BY COUNSEL?

5  A. THAT IS CORRECT.

6  Q. IN LOOKING AT THIS REPORT, IF YOU COULD, PLEASE, TURN TO

7  PAGE 20 OF THE REPORT, "DIFFERENCES BETWEEN THE PRIOR ART

8  AND THE CLAIMED INVENTION."

9  A. MAY I AUGMENT MY LAST ANSWER, SIR?

10  Q. OF COURSE.

11  A. THE ASSUMPTIONS AS TO LEGAL STANDARDS WERE CERTAINLY

12  PROVIDED TO ME BY COUNSEL.  BUT HAVING WRITTEN THE REPORT

13  AND STANDING BY BEHIND ALL OF IT, I HAVE EDITED THEM

14  SLIGHTLY AND HAVE SOME CONTRIBUTION OR LACK OF IT TO THEIR

15  ORDER.

16  Q. OKAY.  IN THIS SECTION, "DIFFERENCES BETWEEN THE PRIOR

17  ART AND THE CLAIMED INVENTION," DID YOU PROVIDE THESE

18  OPINIONS USING THE LEVEL OF ORDINARY SKILL IN THE ART FOR

19  PARTS WASHING THAT YOU'VE DEFINED IN YOUR REPORT AND

20  EXPLAINED TODAY?

21  A. I DID.

22  Q. AND THAT MEANS, DOES IT NOT, THAT YOU DID NOT CONSIDER

23  THAT PERSON OF ORDINARY SKILL IN THE ART TO HAVE THE

24  KNOWLEDGE THAT WOULD COME, FOR EXAMPLE, FROM THE HAKANSSAN-2

25  REFERENCE BECAUSE THAT WAS A BIOREMEDIATING PARTS WASHER?

1    A. MAY I ASK YOU TO RESTATE THAT, I AM CONFUSED, PLEASE.

2    Q. SURE.  THE PERSON OF ORDINARY SKILL IN THE ART, IN YOUR

3    OPINION, IS A PERSON IN THE PARTS WASHING INDUSTRY; CORRECT?

4    A. YES, SIR.

5    Q. AND THAT PERSON HAS, IF YOU WILL, NO OR LITTLE

6    FAMILIARITY WITH MICROORGANISMS AND BIOREMEDIATION.  ISN'T

7    THAT CORRECT?

8    A. YES, SIR.

9    Q. SO THE HAKANSSAN-2 REFERENCE THAT WE LOOKED AT A MINUTE

10   AGO -- DO YOU RECALL, DO YOU HAVE A COPY OF THAT PATENT,

11   SIR?  THAT IS A BIOREMEDIATING PARTS WASHER; CORRECT?

12   A. YES.  IT IS.

13   Q. AND SO THE PERSON OF ORDINARY SKILL IN THE ART, AS YOU

14   DEFINED IT, WOULD NOT BE ABLE TO KNOW -- WOULD NOT KNOW AND,

15   IF YOU WILL, WORK WITH THE HAKANSSAN-2 TEACHING.  ISN'T THAT

16   CORRECT?

17   A. NO, I DON'T BELIEVE THAT.  I BELIEVE THE PERSON OF

18   ORDINARY SKILL IN PARTS WASHING ART COULD EVALUATE THAT

19   MACHINE AS IF IT WAS A PARTS WASHER.

20   Q. AND HOW WOULD THEY EVALUATE THAT MACHINE?

21   A. BY USING THE CAPABILITIES THAT THEY HAD AS ONE OF

22   ORDINARY SKILL.  IT IS, AFTER ALL, A PARTS WASHER.

23   Q. SO IN OTHER WORDS, THE PERSON OF ORDINARY SKILL IN THE

24   PARTS WASHING ART WOULD LOOK AT THAT MACHINE AND BE ABLE TO

25   DETERMINE HOW WELL IT CLEANED PARTS; CORRECT?

1  A. YES.

2  Q. A PERSON OF ORDINARY SKILL IN THE PARTS WASHING ART,

3  HOWEVER, WOULD NOT BE ABLE TO LOOK AT THE HAKANSSAN-2

4  REFERENCE AND DETERMINE IF IT WAS BIOREMEDIATING

5  HYDROCARBONS.  ISN'T THAT CORRECT?

6  A. PLEASE GIVE ME SOME BACKGROUND ON THAT, PLEASE.  HELP ME

7  THROUGH THAT WITH A STEP.

8  Q. I WILL TRY.  HAKANSSAN-2 IS A BIOREMEDIATING PARTS

9  WASHER, ARE WE -- CORRECT?

10  A. YES.

11  Q. THE PERSON OF ORDINARY SKILL IN THE PARTS WASHING ART,

12  IF -- A HYPOTHETICAL, MAYBE, WILL GET US THERE, DR. DURKEE.

13  PRESUME WITH ME THAT WE CAN GO NEXT DOOR AND A HAKANSSAN-2

14  MACHINE HAS BEEN SET UP AND IS CLEANING PARTS.  OKAY?

15  A. YES, SIR.

16  Q. ALL RIGHT.  THE PERSON OF ORDINARY SKILL IN THE ART -- IN

17  THE PARTS WASHING ART COULD GO NEXT DOOR AND SEE HOW WELL

18  THE HAKANSSAN-2 PARTS WASHING UNIT WAS CLEANING PARTS,

19  REMOVING THE HYDROCARBONS FROM THE PARTS.

20  A. THAT PERSON, THE PERSON OF ORDINARY SKILL IN THE PARTS

21  WASHING WOULD UNDERSTAND THAT.  THEY WOULD RECOGNIZE THE

22  COMPONENTS, THE ENGINEERING COMPONENTS, THE PARTS, AND SOME

23  OF THE DESIGN OF THAT PARTS WASHER, AND CERTAINLY THEY WOULD

24  RECOGNIZE THE SURFACE FINISH.

25  Q. WOULD THE PERSON OF ORDINARY SKILL IN THE ART -- IN THE

1   PARTS WASHING ART HAVE AN UNDERSTANDING OF THE

2   BIOREMEDIATION PROCESS TAKING PLACE IN THE HAKANSSAN-2

3   SYSTEM THAT IS NEXT DOOR RUNNING?

4           MR. CAPP:  YOUR HONOR, OBJECTION; LACK OF

5   FOUNDATION.  THERE HAS BEEN NO EVIDENCE THAT THERE EVER WAS

6   SUCH A THING AS A HAKANSSAN-2 PARTS WASHER IN THE UNITED

7   STATES PRIOR TO THE DATE OF INVENTION.

8           MR. SCHAETZEL:  YOUR HONOR, IT'S A HYPOTHETICAL

9   QUESTION TO AN EXPERT WITNESS.

10          THE COURT:  OVERRULED.  ASK THE QUESTION.

11          MR. SCHAETZEL:  THANK YOU.

12  BY MR. SCHAETZEL:

13  Q. WOULD THE PERSON OF ORDINARY SKILL IN THE PARTS WASHER

14  ART BE ABLE TO GO TO THIS HAKANSSAN-2 UNIT THAT IS SET UP,

15  RUNNING NEXT DOOR, AND UNDERSTAND HOW THE BIOREMEDIATION

16  PROCESS IS OCCURRING?

17  A. IN THE TIME FRAME --

18  Q. YES, SIR, 1993, 1994.

19  A. -- OF THESE INVENTIONS, THAT PERSON WOULD NOT RECOGNIZE

20  BIOREMEDIATION, A BIOREMEDIATING PARTS WASHER BECAUSE ONE

21  HADN'T BEEN INVENTED YET IN TERMS OF THE PATENTS OF

22  CHEMFREE.

23          OKAY.  LET'S GO BACK TO THE 110 PATENT.  IN

24  PARTICULAR, CLAIM 1.  BLOW UP JUST THE FIRST PARAGRAPH.

25  DR. DURKEE, THE PATENT CALLS FOR "A SYSTEM FOR CLEANING

1    HYDROCARBONS FROM A PART COMPRISING A BIODEGRADABLE,

2    NONTOXIC, NONCAUSTIC, NONFLAMMABLE OIL DISPERSANT CLEANER

3    AND DEGREASER FLUID."  WHAT EXPERIENCE OR ABILITY WOULD THE

4    PERSON IN THE PARTS WASHING ART HAVE TO BE ABLE TO DETERMINE

5    THAT THE FLUID IN A BIOREMEDIATING PARTS WASHER IN THE

6    '93-'94 TIME FRAME WAS NONTOXIC TO THE MICROORGANISMS?

7    A. I DON'T BELIEVE THERE WAS SUCH A PART WASHER AT THAT

8    TIME.

9    Q. IF YOU WOULD THEN, SIR, HYPOTHETICAL, ENGAGE A

10   HYPOTHETICAL FOR ME.  IF YOU WILL GO BACK AND BUILD THE

11   HAKANSSAN-2 PARTS WASHING MACHINE NEXT DOOR.  DOES THE

12   HYPOTHETICAL PERSON IN THE ORDINARY SKILL IN THE ART OF A

13   PARTS WASHING MACHINE HAVE THE ABILITY TO LOOK AT THAT

14   MACHINE AND SEE IF IT IS CLEANING PARTS?

15   A. IF THEY WOULD RECEIVE THE PARTS AFTER PROCESSING, THEY

16   CERTAINLY DO.

17   Q. BUT THAT PERSON WOULD NOT HAVE THE NECESSARY SKILL SET TO

18   DETERMINE THAT THE CLEANING FLUID WAS NONTOXIC TO THE

19   MICROORGANISMS, WOULD THEY?

20   A. A PERSON OF ORDINARY SKILL IN THE PARTS WASHING INDUSTRY

21   WOULD BE ABLE TO READ THE PATENT.  THE PATENT SPEAKS FAIRLY

22   CLEARLY THAT MICROORGANISMS ARE KILLED, THEY DIE, AND THEY

23   CONTAMINATE PARTS OF THE MACHINERY OF HAKANSSAN AND THEY

24   HAVE TO BE REMOVED.  I AM THINKING THAT MY PERSON OF

25   ORDINARY SKILL IN PARTS WASHING CAN READ THE HAKANSSAN

1  PATENT.  THAT IS WHAT IT SAYS.

2  Q. BUT CAN THEY, IN THE CONTEXT OF THIS CLAIM NOW, THE

3  CHEMFREE PATENT CLAIM, CAN THE PERSON OF ORDINARY SKILL IN

4  THE ART, IN THE PARTS WASHING ART -- LET ME ASK YOU THIS.

5  HOW WOULD THE PERSON OF ORDINARY SKILL IN THE PARTS WASHING

6  ART DETERMINE THAT THE FLUID WAS NONTOXIC TO THE

7  MICROORGANISMS?

8  A. BY READING THE PATENT.

9  Q. OKAY.  I AM SORRY.  THANK YOU.  WHAT IN THE PATENT WOULD

10  THEY READ, IN THE CHEMFREE PATENT WOULD THEY READ, WHAT ARE

11  YOU REFERRING TO?

12  A. I WAS -- I THOUGHT YOU WERE REFERRING TO HAKANSSAN-2.

13  Q. HAKANSSAN-2 IS SIMPLY THE EXAMPLE OF THE MACHINE THAT IS

14  NEXT DOOR.

15  A. THEN I WAS CONFUSED BY THE PREAMBLE TO YOU QUESTION.

16  START AT A PLACE WHERE WE BOTH UNDERSTAND.

17  Q. I'LL BE GLAD TO DO IT.  THE HAKANSSAN-2 PARTS WASHER IS

18  NEXT DOOR.  THE PERSON OF ORDINARY SKILL IN THE PARTS WASHER

19  CAN GO OVER THERE AND LOOK AT THE PARTS AND TELL IF THEY ARE

20  CLEAN.  ISN'T THAT CORRECT?

21  A. THIS IS THE HAKANSSAN MACHINE ACROSS THE HALL HERE?

22  Q. YES.  THE HYPOTHETICAL.

23  A. NOT THE MACHINE OF THE 110 PATENT.

24  Q. CORRECT.

25  A. IF I UNDERSTAND YOUR QUESTION, YES, THEY CAN ASSESS THE

1    QUALITY OF THE PARTS THAT THEY WERE DELIVERED TO.

2    Q. THEY CAN TELL THAT THE HYDROCARBONS HAD BEEN REMOVED?

3    A. FROM PARTS PROVIDED FOR CLEANING TO THE HAKANSSAN MACHINE

4    IN THE TIME FRAME OF '93.

5    Q. OKAY.  BUT THAT PERSON OF ORDINARY SKILL IN THE ART CAN

6    NOT TELL WHETHER OR NOT THE CLEANING FLUID IS TOXIC TO THE

7    MICROORGANISMS, CAN IT?

8    A. CAN YOU HELP ME TO UNDERSTAND WHICH CLEANING FLUID YOU

9    MEAN?  YOU MEAN THE ONE ON THAT PAGE OR DO YOU MEAN THE ONE

10   IN HAKANSSAN?

11   Q. THE ONE IN HAKANSSAN.

12   A. WELL, THE PATENT LANGUAGE IN HAKANSSAN IS FAIRLY

13   SPECIFIC.  I THINK IT IS ON PAGE 8 OR AROUND LINE 20 WHERE

14   IT SPEAKS TO THE EXISTENCE WITH CONTAMINANTS OF DECEASED

15   MICROORGANISMS.

16   Q. SO THE PERSON OF ORDINARY SKILL IN THE ART CAN READ THE

17   PATENT AND SEE THAT MICROORGANISMS DIE IN THE HAKANSSAN-2

18   PROCESS; CORRECT?

19   A. CORRECT.

20   Q. ALL RIGHT.  DOES THE PERSON OF ORDINARY SKILL IN THE

21   PARTS WASHING ART KNOW THAT THOSE MICROORGANISMS HAVE DIED

22   BECAUSE THE FLUID IS NONTOXIC TO THE MICROORGANISMS?

23   SORRY, THE FLUID IS TOXIC TO THE MICROORGANISMS?

24   A. I DON'T THINK HE CARES.  SHOULD WE LOOK AT THE CLAIM

25   CONSTRUCTION LANGUAGE FOR THE PHRASE "NONTOXIC"?

1    Q. BE HAPPY TO.  IF YOU LOOK IN -- LET ME HAND YOU -- THIS

2    IS THE EXHIBITS TO YOUR -- IF YOU GO TO EXHIBIT B.  I WAS

3    LOOKING FOR, SIR, IF THE PARTIES HAD AGREED -- DO YOU

4    RECALL, SIR, IF THE PARTIES HAD AGREED OR IF THE COURT

5    FOUND, THE DEFINITION?  IF YOU WOULD LOOK AT PAGE 3, SIR, OF

6    EXHIBIT B TO YOUR REBUTTAL REPORT.

7    A. PAGE 3 OF THE BOOK THAT I HAVE, I BELIEVE, IS NOT MY

8    REBUTTAL REPORT.

9    Q. IT IS THE EXHIBIT TO YOUR REBUTTAL REPORT BUT YOU HAD THE

10   RIGHT PAGE.  THIS IS ITEM G HERE.  THIS IS AN EXHIBIT TO

11   YOUR REBUTTAL REPORT.

12   A. OKAY.

13   Q. DO YOU SEE THE DEFINITION THAT WAS AGREED TO BY THE

14   PARTIES?

15   A. I DO.

16   Q. IT SAYS, "SAID FLUID IS NONTOXIC TO SAID MICROORGANISMS

17   MEANS THAT THE FLUID IS COMPATIBLE WITH THE MICROORGANISMS

18   SUCH THAT THE MICROORGANISMS ARE CAPABLE OF LIVING WITHIN

19   THE CLEANING FLUID."

20   A. WELL, ABOVE THAT IT SAYS, "NONTOXIC MEANS NOT POISONOUS,

21   NOT CAPABLE OF CAUSING INJURY OR DEATH BY CHEMICAL MEANS."

22   IS THAT STILL -- THAT'S A PART OF THIS TEXT?

23   Q. YES, SIR.  YOU ARE WELCOME TO USE -- I THOUGHT THE OTHER

24   EXPLANATION WAS EASIER, BUT YOU ARE WELCOME TO USE IT ALL.

25   IT IS TRUE, IS IT NOT, THAT A PERSON OF ORDINARY SKILL IN

1  THE PARTS WASHING ART LACKS THE NECESSARY SKILL SET, AS

2  YOU'VE DEFINED THAT PERSON, TO DETERMINE IF THE -- USING THE

3  SECOND PART OF THE DEFINITION -- THE FLUID, CLEANING FLUID

4  IS NONTOXIC TO THE MICROORGANISMS?

5  A. I CANNOT AGREE.

6  Q. WHY NOT?

7  A. BECAUSE MY PERSON OF ORDINARY SKILL COULD READ AND WOULD

8  READ THAT THE PROCESS OF HAKANSSAN-2 SPEAKS CLEARLY ABOUT

9  ORGANISMS DYING.  AND THE COURT'S CLAIM CONSTRUCTION SPEAKS

10  OF "NOT CAPABLE OF CAUSING INJURY OR DEATH BY CHEMICAL

11  MEANS."

12  Q. BUT --

13  A. SO FINDING -- FINDING OR READING OF DEAD ORGANISMS IN THE

14  HAKANSSAN APPARATUS, IT SEEMS TO ME, IS CONSISTENT WITH THE

15  PHRASE "NONTOXIC" NOT BEING OPERATIVE FOR THAT FLUID.

16  Q. DR. DURKEE, DO YOU HAVE AN UNDERSTANDING OF WHAT CAUSES

17  MICROORGANISMS TO DIE IN THE FLUID?

18  A. NO, SIR.  THAT IS NOT MY FIELD.

19  Q. DO YOU HAVE AN UNDERSTANDING OF WHAT CAUSES THE

20  MICROORGANISMS TO DIE IN THE HAKANSSAN-2 PATENT?

21  A. I DO NOT.

22  Q. ISN'T IT POSSIBLE, FOR EXAMPLE, THAT THE MICROORGANISMS

23  COULD DIE BY NATURAL CAUSE?

24  A. I HAVE NO INFORMATION ON THAT.

25  Q. OKAY.  HOW CAN THE PERSON OF ORDINARY SKILL IN THE PARTS

1   WASHER ART, EVEN IF THEY ARE ABLE TO SEE DEAD MICROORGANISMS

2   IN THE HAKANSSAN-2 APPARATUS HYPOTHETICALLY SET UP ACROSS

3   THE HALL, KNOW IF THEY'VE BEEN KILLED BY CHEMICAL MEANS OR

4   THAT THEY HAVE DIED A NATURAL DEATH?

5   A. CAN WE GET THE HAKANSSAN PATENT AND SEE WHAT THAT SAYS

6   TOGETHER, PLEASE?

7   Q. YES, SIR.

8         THE COURT:  WELL, WE WILL GET IT OUT BUT WE WILL

9   GET IT OUT IN THE MORNING, I THINK.  IT IS 5:30 AND TIME TO

10  RECESS FOR THE DAY.  WE WILL START IN THE MORNING AT 9:30.

11        MR. SCHAETZEL:  YES, SIR.

12            (ADJOURNS AT 5:30 P.M.)

13                  * * * * *

14            REPORTER'S CERTIFICATION

15

16     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

17  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18

19                  _____

                    LORI
20                  OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
21                  NORTHERN DISTRICT OF GEORGIA

22                  DATE: AUGUST 12, 2009

23

24

25