1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

CHEMFREE CORPORATION,          )
4                              )
               PLAINTIFF,      )
5                              )        CIVIL ACTION
          VS.                  )        FILE NO. 1:04-CV-3711-JTC
6                              )
                               )        ATLANTA, GA
7   J. WALTER INC.; J. WALTER  )        JULY 17, 2009
    COMPANY, LTD.,             )
8                              )
               DEFENDANT.      )
9   _____)

10

11                    VOLUME 5

12              PAGES 744 THROUGH 937

13            TRANSCRIPT OF BENCH TRIAL
          BEFORE THE HONORABLE JACK T. CAMP
14            UNITED STATES DISTRICT JUDGE

15

    APPEARANCES:
16      FOR THE PLAINTIFF:          WILLIAM ARTHUR CAPP
                                    STEPHEN LUKE ANDERSON
17                                  KLAUS MELARTI
                                    ATTORNEYS AT LAW
18
        FOR THE DEFENDANTS:         STEVE SCHAETZEL
19                                  JOHN HARBIN
                                    DAVID SCOTT MORELAND
20                                  ATTORNEY AT LAW

21

22  LORI BURGESS, OFFICIAL COURT REPORTER
    (404) 215-1528
23

24  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED BY CAT.
25

## INDEX OF EXAMINATIONS

WITNESS NAME                                                              PAGE
DR. PETER ADRIAENS
    DIRECT BY MR. HARBIN      ...............................................746
    VOIR DIRE BY MR. CAPP     ...............................................752
    CROSS BY MR. CAPP         ...............................................779
FRANCIS MARKS
    DIRECT BY MR. ANDERSON    ...............................................916
    CROSS BY MR. HARBIN       ...............................................925
    REDIRECT BY MR. ANDERSON  ...............................................928
TOM MCNALLY
    DIRECT BY MR. MELARTI     ...............................................929
    CROSS BY MR. HARBIN       ...............................................933

```
 1              THE COURT: GOOD MORNING, EVERYONE.  WHERE WERE WE
 2   YESTERDAY?  MR. HARBIN?
 3              MR. HARBIN:   WE ARE READY TO CALL DR. PETER
 4   ADRIAENS TO THE STAND.
 5                        PETER ADRIAENS
 6                           SWORN
 7                      DIRECT EXAMINATION
 8   BY MR. HARBIN:
 9   A. PETER ADRIAENS.  AND THE LAST NAME IS SPELLED,
10   A-D-R-I-A-E-N-S.
11   Q. DR. ADRIAENS, WILL YOU BRIEFLY DESCRIBE FOR THE COURT
12   YOUR EDUCATIONAL HISTORY SINCE HIGH SCHOOL?
13   A. AFTER HIGH SCHOOL I GOT AN UNDERGRADUATE BACHELORS DEGREE
14   IN AGRICULTURAL ENGINEERING, WHICH IS NOW CALLED
15   ENVIRONMENTAL ENGINEERING, A MASTER'S DEGREE IN
16   BIO-ENGINEERING THAT WAS AT THE UNIVERSITY OF GENT IN
17   BELGIUM.  I CAME TO THE UNITED STATES IN 1985 AND RECEIVED
18   MY PH.D. IN 1989 IN ENVIRONMENTAL SCIENCE, AND THEN MOVED ON
19   TO STANFORD UNIVERSITY TO DO THREE YEARS OF POST DOCTORAL
20   WORK ON BIOREMEDIATION.
21   Q. WHEN DID YOU RECEIVE YOUR PH.D.?  DID YOU SAY IN 1990?
22   A. 1989.  YES, SIR.
23   Q. WHAT WAS THE SUBJECT OF YOUR DISSERTATION?
24   A. THE SUBJECT WAS BIOREMEDIATION OF POLYCHLORINATED
25   BIPHENYLS.
```

1  Q. WHEN YOU WERE AT STANFORD, WHAT WAS THE FOCUS OF YOUR

2  WORK?

3  A. THE WORK THERE WAS BIOREMEDIATION OF POLY CHLORINATED

4  DIOXINES AND BENZOFURANS, ANOTHER FORM OF ORGANIC COMPOUNDS.

5  Q. CAN YOU BRIEFLY DESCRIBE YOUR WORK HISTORY FOLLOWING THE

6  POST DOCTORAL WORK?

7  A. IN 1992 I STARTED AT THE UNIVERSITY OF MICHIGAN AS AN

8  ASSISTANT PROFESSOR IN THE DEPARTMENT OF CIVIL AND

9  ENVIRONMENTAL ENGINEERING.  I AM STILL THERE, A FULL

10  PROFESSOR IN THAT DEPARTMENT.  AND IN 2005 I STARTED WITH

11  ZELL AND LURIE INSTITUTE FOR ENTREPRENEURIAL STUDIES

12  BUSINESS SCHOOL, AND AM CURRENTLY PART-TIME THERE, AND HAVE

13  MY OWN COMPANY, ENVIRONMENTAL CONSULTING COMPANY, CALLED

14  CLEAN-TECH.

15  Q. WHAT ARE YOUR RESPONSIBILITIES AS A PROFESSOR IN THE

16  DEPARTMENT OF CIVIL AND ENVIRONMENTAL ENGINEERING?

17  A. AS A PROFESSOR, I DIRECT A RESEARCH GROUP OF STUDENTS,

18  POST DOCTORAL FELLOWS, AND VISITORS TO DO RESEARCH IN THE

19  AREA OF REMEDIATION, ENVIRONMENTAL SCIENCES, AND A NUMBER OF

20  OTHER AREAS.

21  Q. HAVE YOU DONE SOME WORK THAT IS OF SOME PARTICULAR

22  RELEVANCE TO THIS CASE?

23  A. THERE ARE TWO ASPECTS THAT I WOULD CONSIDER TO BE

24  RELEVANT TO THIS CASE.  ONE IS THAT A LOT OF THE RESEARCH IS

25  FOCUSED IN TRANSLATING TECHNOLOGY FROM THE LABORATORY INTO

1    THE FIELD, SUCH AS PETITIONERS'S APPLICATIONS THAT OBTAINS

2    TO BIOREMEDIATION.  THE OTHER COMPONENT DEALS WITH MY WORK

3    WITH THE AUTOMOTIVE INDUSTRY WHERE WE WORKED WITH METAL

4    WORKING FLUIDS.  THESE ARE MINERAL OILS THAT ARE USED IN

5    MANUFACTURING PROCESSES, AND THAT EXPOSED ME TO WASHING

6    PROCESSES OF PARTS THAT WERE MANUFACTURED BY SUPPLIERS AND

7    SUBCONTRACTORS TOO, GENERAL MOTORS AND FORD.

8    Q. AND WHAT ARE YOUR GENERAL RESPONSIBILITIES AS PROFESSOR

9    AT THE ZELL LURIE INSTITUTE FOR ENVIRONMENTAL STUDIES?

10   A. IT IS FOR ENTREPRENEURIAL STUDIES.

11   I TEACH COURSES ON BUSINESS ENTREPRENEURSHIP FOR ENGINEERS,

12   AND ON CLEAN TECH ENTREPRENEURSHIP, AND I AM A CONSULTANT TO

13   -- AN ADVISOR TO TWO INVESTMENT FUNDS THAT INVEST AT THE

14   SCHOOL IN NEW AND EMERGING TECHNOLOGIES.

15   Q. AND IS YOUR WORK, WHEN YOU ARE DONE WITH THAT, IN THAT

16   TEACHING POSITION THAT YOU THINK IS RELEVANT IN THIS CASE?

17   A. YES.  AS PART OF THE -- I GUESS BEFORE WE DECIDE ON

18   MAKING INVESTMENTS IN COMPANIES, WE DO A DUE DILIGENCE

19   ANALYSIS ON THE INTELLECTUAL PROPERTY THAT THE INVENTORS

20   HAVE, PROTOTYPES THAT THEY MIGHT HAVE, SO WE DO PRODUCT

21   ANALYSIS, SOME IP ANALYSIS, AND MARKET ANALYSIS.

22   Q. IN REGARD TO YOUR POSITION WITH IS IT WITH GLOBAL TECH,

23   INC., WHAT ARE YOUR GENERAL DUTIES THERE?

24   A. GLOBAL CLEAN TECH IS AN EXECUTIVE CONSULTING COMPANY, AND

25   I WORK -- THE GLOBAL PART COMES FROM THE WORK THAT I DO IN

1    CHINA WITH TECHNOLOGY PARTS WHERE I WORK WITH START-UPS THAT

2    ARE FUNDED PRIVATELY OR BY THE CHINESE GOVERNMENT AND ARE

3    LOOKING INTO COMMERCIALIZATION OF THE PRODUCTS.  A LOT OF

4    TECHNOLOGIES DEAL WITH REMEDIATION, WATER TREATMENT, AND THE

5    LIKE.

6    Q. WHAT DO YOU CONSIDER TO BE YOUR PRIMARY AREAS OF

7    EXPERTISE?

8    A. MY MAIN AREAS OF EXPERTISE, PRETTY MUCH SINCE I STARTED

9    IN MY RESEARCH, HAVE BEEN BIOREMEDIATION OF ORGANIC

10   COMPOUNDS.  THIS CAPTURES ANYTHING FROM OIL HYDROCARBONS TO

11   VOC'S, VOLATILE ORGANIC COMPOUNDS, TO THE MORE RECALCITRANT

12   COMPOUNDS LIKE THE PCB'S, BOTH IN THE LABORATORY AND

13   DEMONSTRATIONS OUT IN THE FIELD.  I ALSO DO ANALYSIS,

14   ENVIRONMENTAL SENSING, OR ENVIRONMENTAL ANALYSIS OF THE

15   EFFICACY OF SUCH PROCESSES.

16   Q. LET ME HAND YOU WHAT HAS BEEN MARKED AS DEFENDANT'S

17   EXHIBIT 895-A.

18            MR. HARBIN:  AND YOUR HONOR WE WILL PUT A STAMP ON

19   THIS.

20   BY MR. HARBIN:

21   Q. DO YOU RECOGNIZE THIS AS A COPY OF YOUR CURRENT

22   CURRICULUM VITAE?

23   A. YES, IT IS.

24            MR. HARBIN:  YOUR HONOR, WE WOULD OFFER THAT INTO

25   EVIDENCE.

1              THE COURT: ANY OBJECTION?

2              MR. CAPP: HOW DO WE DO THIS, YOUR HONOR?  IT IS

3    ATTACHED TO HIS EXPERT REPORT.  SO ARE ALL OF THE EXPERT

4    REPORTS COMING INTO EVIDENCE OR --

5              MR. HARBIN:   I HAVEN'T OFFERED THE EXPERT

6    REPORTS.  I ONLY OFFERED THE CV.

7              MR. CAPP: NO OBJECTION.

8              THE COURT:  IT'S ADMITTED.

9    BY MR. HARBIN:

10   Q. AS PART OF YOUR WORK IN THIS THIS CASE, HAVE YOU HAD AN

11   OPPORTUNITY TO REVIEW AND STUDY PUBLICATIONS IN AREA PARTS

12   WASHERS?

13   A. YES, I HAVE.

14   Q. CAN YOU BRIEFLY SUMMARIZE WHAT YOU HAVE STUDIED?

15   A. I HAVE LOOKED AT THE PATENT, I HAVE READ THE PATENTS IN

16   SUIT.  I HAVE READ PRIOR ART.  I HAVE LOOKED AT PROSECUTION

17   HISTORIES OF THE PATENTS IN SUIT.  I HAVE CONSULTED OR

18   LOOKED AT A NUMBER OF PUBLICATIONS IN THE AREA OF

19   BIOREMEDIATION, AS WELL AS TEXTBOOKS THAT WERE GENERALLY

20   AVAILABLE TO THE PUBLIC.  I THINK THAT PRETTY MUCH CAPTURES

21   IT.

22   Q. AND HAVE YOU DONE WORK YOURSELF REGARDING PARTS WASHERS,

23   OR PARTS WASHER TECHNOLOGY?

24   A. I HAVE BEEN EXPOSED TO PARTS WASHING TECHNOLOGY.

25   Q. HOW WAS THAT?

1    A. IN CONJUNCTION WITH MY WORK FOR FORD AND GENERAL MOTORS

2    THAT DEALT WITH THE PARTS THAT WERE MANUFACTURED THERE USING

3    METAL WORKING FLUIDS.  METAL WORKING FLUIDS ARE MINERAL

4    OILS, A COMBINATION OF MINERAL OILS, TOLL (PHONETIC) OILS,

5    AND OTHER TYPES OF HYDROCARBONS.  THESE PARTS, FOLLOWING

6    MANUFACTURING, HAVE TO BE CLEANED IN A PARTS WASHER.  SO I

7    HAVE VISITED AND DISCUSSED WITH A NUMBER OF OFFICIALS AT

8    MIDBROOK COMPANY, WHICH IS IN JACKSON, MICHIGAN.  THEY DO

9    PARTS WASHING FOR THE AUTOMOTIVE INDUSTRY.  SO THAT WAS ONE

10   REAL EXPERIENCE.  THE OTHER EXPERIENCE IS IN MY OWN RESEARCH

11   AND DEVELOPMENT AT THE UNIVERSITY OF MICHIGAN THAT DEAL WITH

12   BIOREACTORS WHICH HAVE METAL PARTS, GLASS PARTS, OTHER TYPES

13   OF PARTS, AND ESSENTIALLY NEED TO BE WASHED AND OFTEN

14   DEGREASED IN SINKS.  AND WHAT ENDS UP HAPPENING, BECAUSE OF

15   OSHA REGULATIONS, AT THE UNIVERSITY OF MICHIGAN, IS THAT A

16   LOT OF THE WASTE THAT IS PRODUCED HAS TO BE CONTAINED IN A

17   RECEPTACLE AND IS THEN INVENTORIED.  THAT WAS MY PARTS

18   WASHING EXPERIENCE IN MY RESEARCH.

19   Q. HAVE YOU REVIEWED THE CHEMFREE PATENTS THAT ARE AT ISSUE

20   IN THIS CASE?

21   A. YES, I HAVE.

22   Q. GENERALLY SPEAKING, WHAT IS THE SUBJECT MATTER THAT IS

23   CLAIMED IN THE PATENTS AS YOU UNDERSTAND THEM?

24   A. AS I UNDERSTAND IT, THE SUBJECT MATTER IS A

25   BIOREMEDIATING PARTS WASHER WHICH ESSENTIALLY HAS THREE

1    COMPONENTS, TWO OR THREE, DEPENDING ON HOW YOU CATEGORIZE

2    IT.  THERE IS THE APPARATUS ON THE ONE HAND, AND THEN THERE

3    IS THE FLUID AND THE MICROORGANISMS ON THE OTHER HAND.

4              MR. CAPP: EXCUSE ME, YOUR HONOR.  WE ARE

5    TRANSITIONING FROM QUALIFICATIONS TO THE SUBSTANCE OF HIS

6    TESTIMONY.  MAY I HAVE TWO QUESTIONS ON VOIR DIRE?

7              THE COURT:  WITH REGARD TO HIS EXPERTISE?

8              MR. CAPP: WITH REGARD TO HIS QUALIFICATIONS.

9              THE COURT:  I THOUGHT WE WERE PROBABLY BEYOND THAT

10   BACK IN THE PRE-TRIAL STAGE.

11             MR. CAPP: I DON'T REMEMBER BRINGING IT UP IN

12   PRETRIAL.  I KNOW THEY HAD SOME OBJECTIONS TO DURKEE DURING

13   PRETRIAL.

14             THE COURT:  OKAY.  YEAH.  ALL RIGHT.  BUT LET ME

15   ASK YOU THIS FIRST, MR. HARBIN.  WHAT IS THE AREA OF

16   EXPERTISE IN WHICH HE WILL OFFER AN OPINION?

17             MR. HARBIN:  DEALING WITH BIOREMEDIATING PARTS

18   WASHERS WITH HIS -- AND IF PEOPLE ARE CONCERNED, WE CAN HAVE

19   HIM STEP OUT OR SOMETHING.  HIS BELIEF WE THINK IS

20   CONSISTENT WITH THE CLAIMS, IS THE BIOREMEDIATION PART OF IT

21   IS THE KEY PART, AND HE HAS WORKED EXTENSIVELY WITH THAT.

22   HE WILL REFER TO IT AS BIO-REACTORS.

23             THE COURT:  I THINK THAT'S FINE.  GO AHEAD,

24   MR. CAPP.

25                        VOIR DIRE

1   BY MR. CAPP:

2   Q. GOOD MORNING, DR. ADRIAENS.  DO YOU CONSIDER YOURSELF TO

3   BE AN EXPERT IN THE FIELD OF PARTS WASHING?

4   A. IT DEPENDS HOW YOU DEFINE THAT.

5   Q. LET'S TAKE THE BIOREMEDIATION COMPONENT OUT.  PRIOR TO

6   1994, YOU UNDERSTAND THAT THERE WERE NO BIOREMEDIATION PARTS

7   WASHERS SOLD IN THE UNITED STATES; CORRECT?

8   A. YES.

9   Q. SO THE TECHNOLOGY THAT EXISTSD UP UNTIL THE TIME THAT

10  CHEMFREE DID ITS INVENTION BEFORE BIOREMEDIATION WAS ADDED

11  TO PARTS WASHERS, DO YOU CONSIDER YOURSELF TO BE AN EXPERT

12  IN THAT TECHNOLOGY?

13              MR. HARBIN:  OBJECTION TO THE QUESTION.  LACKS

14  FOUNDATION.

15              THE COURT:  OVERRULED.  GO AHEAD.

16              THE WITNESS:  SIR, IF YOU ARE REFERRING TO THE

17  SOLVENT PARTS WASHERS, I HAVE NOT WORKED WITH SOLVENT PARTS

18  WASHERS.

19  BY MR. CAPP:

20  Q. I DIDN'T MEAN TO LIMIT IT TO SOLVENT PARTS WASHERS, I

21  MEANT TO LIMIT IT TO AQUEOUS BIOREMEDIATION PARTS WASHERS.

22  DO YOU CONSIDER YOURSELF TO BE AN EXPERT IN THAT FIELD?

23  A. I HAVE READ THE BACKGROUND IN THIS AREA, YES.

24  Q. AT THE TIME THAT YOU UNDERTOOK YOUR ENGAGEMENT IN THIS

25  CASE, HAD YOU EVER SEEN AN AQUEOUS PARTS WASHER?  HAVE YOU

1    SEEN ONE, USED ONE, OR DESIGNED ONE?

2    A. NO.  I DESIGN BIO-REACTORS THAT RECIRCULATE FLUID AND

3    MICROORGANISMS.

4    Q. DO YOU CONSIDER YOURSELF TO HAVE AN INFORMED OPINION AS

5    TO THE CAPABILITIES OF THE PERSON OF ORDINARY SKILL IN THE

6    PARTS WASHING INDUSTRY OR AS IT EXISTED AROUND 1994?

7    A. NONE BIOREMEDIATING PARTS WASHERS.

8    Q. WERE THERE ANY BIOREMEDIATING PARTS WASHERS IN THE UNITED

9    STATES PRIOR TO 1994?

10           MR. HARBIN:  OBJECTION TO FORM OF THE QUESTION.

11   LACKS FOUNDATION, YOUR HONOR.

12           THE WITNESS:  THERE WERE NOT.

13           THE COURT:  OKAY.  IT IS ANSWERED AND THE

14   OBJECTION IS OVERRULED.

15   BY MR. CAPP:

16   Q.  SO WITH THAT QUALIFICATION, DO YOU CONSIDER YOURSELF TO

17   HAVE AN INFORMED OPINION AS TO THE CAPABILITIES OF A PERSON

18   OF ORDINARY SKILL IN THE ART IN THE PARTS WASHING INDUSTRY

19   AROUND 1994?

20   A. I UNDERSTAND THAT THAT SKILL, THAT SKILL AT THAT TIME,

21   BEFORE BIOREMEDIATING PARTS WASHERS WERE INVENTED, WAS LOW.

22           MR. CAPP: YOUR HONOR, I AM GOING TO IMPEACH ON

23   THAT STATEMENT, BUT I WILL WAIT AND DO THAT ON CROSS.  AT

24   THIS TIME WE WILL AGREE THAT DR. ADRIAENS IS AN EXPERT IN

25   THE FIELD OF ENVIRONMENTAL SCIENCES, BUT OTHER THAN THAT, WE

1    WOULD RENEW OUR OBJECTION AS TO HIS QUALIFICATIONS TO GIVE

2    EXPERT TESTIMONY IN THE FIELD OF PARTS WASHING UNDER THE

3    FLEXRES CASE THAT WAS BRIEFED IN OUR MOTION IN LIMINE NUMBER

4    ONE, AND THAT HIS TESTIMONY SHOULD BE LIMITED TO THE SCOPE

5    OF HIS EXPERTISE, WHICH IS NOT PARTS WASHING TECHNOLOGY.

6              MR. HARBIN:  MAY I RESPOND, YOUR HONOR?

7              THE COURT:  YES.

8              MR. HARBIN:  I CAN HAVE HIM ADDRESS WHY HE

9    BELIEVES THE LEVEL OF ART THAT HE IS PROPOSING IS THE

10   ACCURATE ART.  I ALSO WILL POINT OUT, I DIDN'T TAKE THE

11   TIME, BUT AS YOUR HONOR NOTED, THIS WAS ADDRESSED BEFORE.

12   THEY DID FILE A MOTION IN LIMINE ON IT AND IT WAS RESOLVED,

13   AND WE THINK THE OBJECTION SHOULD BE OVERRULED.

14             THE COURT:  I WILL ALLOW HIM TO GIVE HIS OPINION.

15   I THINK YOUR ARGUMENT GOES MUCH MORE TO THE WEIGHT TO BE

16   ALLOWED HIS OPINION THAN TO WHETHER HE CAN EXPRESS AN

17   OPINION.  GO AHEAD, MR. HARBIN.

18   BY MR. HARBIN:

19   Q. I THINK YOU WERE IN THE PROCESS OF ANSWERING THE SUBJECT

20   MATTER OF THE CLAIMS, WHAT YOU UNDERSTAND THE SUBJECT MATTER

21   OF THE PATENTS TO BE?

22   A. THE SUBJECT MATTER OF THE PATENT IS A BIOREMEDIATING

23   PARTS WASHER.  SO A KEY FEATURE OF THIS PARTS WASHER IS THE

24   COMPONENT THAT DEGRADES THE OILS THAT ARE REMOVED FROM THE

25   PARTS.

1  Q. AS PART OF YOUR WORK IN THIS CASE, DID YOU FORM AN

2  OPINION AS TO THE APPROPRIATE LEVELS OF ORDINARY SKILL, THE

3  ART TO WHICH THE CLAIM SUBJECT MATTER PERTAINS AT THE TIME

4  OF THE ALLEGED INVENTION?

5  A. YES, I DID.

6  Q. AND WHAT IS YOUR OPINION?

7  A. IT IS MY OPINION, UPON READING THE PATENTS, THAT THE

8  PERSON OF ORDINARY SKILL IS ONE WITH AN UNDERGRADUATE DEGREE

9  IN ENVIRONMENTAL ENGINEERING, AND THREE YEARS OF WORKING

10  EXPERIENCE IN AUTOMOTIVE OR RELATED MANUFACTURING

11  INDUSTRIES.

12  Q. CAN YOU GIVE AN EXAMPLE OF WHAT YOU ARE TALKING ABOUT

13  WITH THAT LEVEL OF SKILL AND EXPERIENCE?

14  A. YES.  ESSENTIALLY UPON READING THE PATENTS, WHAT IS

15  CLAIMED IS A BIO-REACTOR, THE VESSEL USES MICROORGANISMS IN

16  A FLUID TO DEGRADE AN ORGANIC.  ENVIRONMENTAL ENGINEERS ARE

17  TAUGHT TO, AND HAVE BEEN EXPOSED TO, VARIOUS DIFFERENT

18  BIO-REACTOR DESIGNS IN WHICH MICROORGANISMS SUSTAINED IN

19  FLUIDS ARE USED TO DEGRADE ORGANIC WASTE.  BIOLOGICAL WASTE

20  WATER TREATMENTS SYSTEMS THAT RECIRCULATE FLUIDS, THAT

21  RECIRCULATE MICROORGANISMS, HAVE BEEN IN VOGUE FOR ALMOST 40

22  YEARS.

23          SECOND, ENVIRONMENTAL ENGINEERS ARE EXPOSED TO --

24  KNOW ABOUT MICROBIAL LIFE CYCLES, THEY KNOW HOW

25  MICROORGANISMS WORK, HOW THEY GROW, HOW THEY FUNCTION.

1    ENVIRONMENTAL ENGINEERS KNOW ABOUT FLUIDS AND FLUID

2    MECHANICS AND FLUID STABILITY AS PART OF THEIR TRAINING.

3    AND THE RELATED EXPERIENCE IN AUTOMOTIVE OR MANUFACTURING

4    INDUSTRIES WOULD HAVE EXPOSED THEM TO PARTS WASHERS OR WASTE

5    TREATMENT DERIVED FROM THAT.

6              THE COURT:  LET ME ASK A QUESTION.  THAT SOUNDS

7    MORE LIKE WHAT WE, IN THE LAW, CALL AN ASPIRATIONAL STANDARD

8    RATHER THAN AN ACTUAL STANDARD OF PEOPLE ENGAGED IN THE

9    TRADE.  DO YOU HAVE ANY COMMENT ON THAT?  DID YOU KNOW

10   PEOPLE ENGAGED IN THE TRADE, AND WERE THEY AS QUALIFIED AS

11   YOU DESCRIBED THEM?

12             THE WITNESS:  YOUR HONOR, IF YOU REFER TO THE

13   TRADE AS BEING USERS OF PARTS WASHERS -- SORRY.  AS A

14   CLARIFICATION TO YOUR QUESTION, YOUR HONOR, IS THAT THE

15   USERS OF PARTS WASHERS?

16             THE COURT:  WELL, I THINK A BETTER WORD WOULD BE,

17   AND THE APPROPRIATE WORD WOULD BE, THE ART.  I AM REFERRING

18   TO PEOPLE THAT WERE WORKING IN THE ART OF PARTS WASHERS

19   WHICH HAD A BIOREMEDIATION ASPECT TO THEM.

20             THE WITNESS:  YES.

21             THE COURT:  AND THE REASON I ASK, IF THERE WAS NO

22   PARTS WASHER WITH A BIOREMEDIATION FUNCTION TO IT BEFORE

23   1994, IT'S HARD FOR ME TO GRASP THE NATURE OF YOUR OPINION

24   WITH REGARD TO WHO WAS ORDINARILY SKILLED IN THAT ART.

25             THE WITNESS:  I WOULD LIKE TO ANSWER THAT, YOUR

1    HONOR, BY READING THE PATENTS IN SUIT, THAT THERE ARE

2    NUMEROUS REFERENCES TO THE FACT THAT, FOR EXAMPLE,

3    MICROORGANISMS ARE WELL-KNOWN IN THE ART, AND THAT

4    ALTERNATIVE EMBODIMENTS OR ALTERNATIVE METHODS ARE

5    WELL-KNOWN IN THE ART.  THOSE THAT WERE AT THAT TIME

6    OPERATING PARTS WASHERS COULD NOT POSSIBLY HAVE KNOWN ABOUT

7    THE BIOREMEDIATION COMPONENT THAT IS CLAIMED IN THE PATENTS

8    IN SUIT, AND THAT --

9         THE COURT:  THAT IS WHAT MADE IT AN INVENTION,

10   WASN'T IT?  I MEAN, IF THEY HAD KNOWN ABOUT THAT, AND THEY

11   HAD BEEN KNOWN BEFORE, IT WOULD NOT HAVE BEEN AN ADVANCE IN

12   THE TECHNOLOGY.

13        THE WITNESS:  THERE WAS PRIOR ART, COMBINED PRIOR

14   ART, SOME WHICH I CAN TESTIFY TO.  BUT IF ONE READS THE

15   PATENT, AND I AM ASKED AS A TECHNICAL EXPERT WHO DO YOU

16   THINK IS THE PERSON OF ORDINARY SKILL, THEN I HAVE TO REFER

17   TO WHAT IS MENTIONED IN THE PATENT IN TERMS OF WHAT THAT

18   PERSON OF ORDINARY SKILL HAS TO UNDERSTAND.

19        THE COURT:  OKAY.  I SEE.  ALL RIGHT.  GO AHEAD,

20   MR. HARBIN.

21        MR. HARBIN:  I CAN ASK SOME QUESTIONS I THINK THAT

22   WILL HELP WITH THAT IN THAT REGARD, YOUR HONOR.

23   BY MR. HARBIN:

24   Q. DR. ADRIAENS, YOU REFER -- YOU TESTIFIED, WHEN THE JUDGE

25   WAS QUESTIONING YOU ABOUT THE BIO-REACTOR BEING A -- DEFINE

1    GENERALLY, DESCRIBE GENERALLY WHAT YOU MEAN BY BIO-REACTOR.

2    A. A BIO-REACTOR IS ESSENTIALLY A CONTAINED VESSEL, AND IT

3    CAN HAVE A NUMBER OF DIFFERENT CONFIGURATIONS, THAT CONTAINS

4    THE FLUID, THAT CONTAINS MICROORGANISMS, AND IT IS USED FOR

5    VARIOUS DIFFERENT REASONS, AMONG OTHERS TO DEGRADE ORGANIC

6    COMPOUNDS.  A BIO-REACTOR IS USUALLY A MIXING FUNCTION.

7    BIO-REACTOR MAY OR MAY NOT HAVE A NUMBER OF DIFFERENT

8    CONTROL FUNCTIONS, BUT IT IS ESSENTIALLY A VESSEL IN WHICH

9    MICROORGANISMS ARE SUSTAINED TO PERFORM A CERTAIN FUNCTION.

10   Q. AND WITH THAT DEFINITION, TELL THE COURT WHETHER OR NOT

11   YOU CONSIDER THE BIOREMEDIATED PARTS WASHERS DESCRIBE IN THE

12   PATENT AS A BIO-REACTOR?

13   A. YES.  AND ONE OF MY EXPERT REPORTS, I STATED THAT

14   ESSENTIALLY THE BIOREMEDIATING PARTS WASHER IS A FED BATCH

15   BIO-REACTOR WHERE BASICALLY YOUR MICROORGANISMS ARE IN A

16   VESSEL, AND ARE BEING RECYCLED AS A NEW ORGANIC LOAD, I.E.,

17   GREASE OR OIL IS INTRODUCED IN THE VESSEL.  IT MIXES, OR

18   MICROORGANISMS MAY OR MAY NOT BE MIXED AS RECIRCULATING

19   SYSTEM.  THERE IS NUTRIENTS ADDED TO SUSTAIN MICROORGANISMS,

20   SO FROM THAT PERSPECTIVE IT IS A BIO-REACTOR SYSTEM.

21   Q. AND IF YOU DEFINE THE INDUSTRY AS PERSONS DESIGNING

22   MACHINES, INCLUDING PARTS WASHERS, TO BE BIO-REACTORS, WHO

23   DO YOU THINK WOULD BE THE APPROPRIATE LEVEL OF SKILL FOR

24   PEOPLE DESIGNING SUCH MACHINES?

25   A. ENVIRONMENTAL ENGINEERS HAVE DESIGNED BIO-REACTORS SINCE

1    THE LATE 60'S, EARLY 70'S TO DEAL WITH WATER AND WASTE WATER

2    TREATMENT.

3    Q. AND CAN YOU DESCRIBE WHAT YOU MEANT IN REGARD TO THE WORK

4    YOU'VE DONE WITH AUTOMOTIVE COMPANIES IN A LITTLE MORE

5    DETAIL?

6    A. YES.  THE WORK WITH THE AUTOMOTIVE COMPANIES.

7    Q. AND WHEN I SAY YOU, I MEAN THE GROUP THAT YOU RUN.

8    A. MY RESEARCH GROUP TOGETHER WITH COLLABORATORS IN OTHER

9    DEPARTMENTS WAS FUNDED BY A CONSORTIUM OF AUTOMOTIVE

10   INDUSTRIES TO FIGURE OUT HOW TO HELP THEM DEAL WITH THEIR

11   METAL WORKING FLUIDS, THE MINERAL OILS IN THE METAL WORKING

12   FLUIDS.

13            THE COURT: WHEN YOU REFER TO THAT, PLEASE FOCUS US

14   ON THE TIME PERIOD IN WHICH YOU DID IT TOO.  IN OTHER WORDS,

15   THE CHRONOLOGICAL HISTORY OF YOUR WORK IN THE INDUSTRY.

16            THE WITNESS:  OKAY.  THE WORK THAT I DID WITH FORD

17   AND GENERAL MOTORS WAS IN 1999-2000 TIME FRAME, AND IT WENT

18   THROUGH TO PROBABLY 2004-2005.  SINCE THEN I HAVE INTERACTED

19   WITH MIDBROOK, THE COMPANY THAT DOES THE PARTS WASHING FOR

20   GM, TO HELP THEM GET INTO OTHER PARTS CLEANING MARKETS.  GM

21   IS -- MIDBROOK IS A SUBCONTRACTOR.  THEY GET THEIR PALLETS

22   OF PARTS EVERY MORNING, THEY WASH THEM DURING THE DAY.  AT

23   THE END OF THE DAY THEY SEND THEM BACK TO THE AUTOMOTIVE

24   COMPANIES.  SO IT IS MORE OF AN INDUSTRIAL-SIZED PARTS

25   WASHER IN THAT CASE.  I DON'T KNOW IF THAT WAS SUFFICIENT.

1    BY MR. HARBIN:

2    Q. WHAT DO YOU UNDERSTAND TO BE THE EDUCATIONAL LEVELS OF

3    JUST GENERALLY OF THE NAMED INVENTORS OF THE CHEMFREE

4    PATENTS?

5    A. WHAT I UNDERSTAND, THE INVENTORS OF THE CHEMFREE PATENTS

6    HAVE UNDERGRADUATE DEGREES IN A RANGE OF DIFFERENT SCIENCES

7    OR SUBJECTS FROM BUSINESS ADMINISTRATION TO INDUSTRIAL

8    ENGINEERING AND THE LIKE WITH VERY LIMITED BACKGROUND OR

9    KNOWLEDGE OF CHEMISTRY, BIOLOGY, AND THE LIKE.

10   Q. DID YOU GIVE YOUR UNDERSTANDING OF THEIR EDUCATION ANY

11   SIGNIFICANT WEIGHT IN YOUR OPINION?

12   A. NO, I DIDN'T.

13   Q. AND WHY IS THAT?

14   A. THE LAW DOESN'T REQUIRE ME TO TAKE THAT, GIVE THAT A LOT

15   OF WEIGHT.

16   Q. AND DID YOU -- LET ME ASK YOU TO LOOK AT THE 110 PATENT.

17   COLUMN 4, LINES 50 TO 55 -- SORRY -- 55 TO 63.  YOU TALKED

18   ABOUT ONE OF THE FACTORS IN YOUR OPINION ABOUT THE

19   APPROPRIATE LEVEL WAS WHAT THE PATENT DESCRIBES AS THE

20   TECHNOLOGY?

21   A. YES.  WHAT WAS THE QUESTION?

22   Q. THE CHEMFREE PATENTS IS ONE OF THE THINGS YOU CONSIDERED

23   IN DETERMINING THE APPROPRIATE LEVEL OF THE ART?

24   A. YES, IT WAS.

25   Q. IS THIS ONE OF THE SECTIONS YOU CONSIDERED HERE WHERE THE

1  CHEMFREE PATENT TALKS ABOUT WHAT MICROORGANISMS ARE

2  ACCEPTABLE AND, QUOTE, SUITABLE SPECIES ARE WELL-KNOWN AND

3  RECORDED IN THE ART, CLOSED QUOTE?

4  A. YES.

5  Q. NOW, DID YOU HEAR DR. DURKEE'S TESTIMONY THAT PERSONS OF

6  ORDINARY SKILL IN THE ART, AS HE UNDERSTANDS THE APPROPRIATE

7  LEVEL TO BE, WOULD NOT UNDERSTAND AND HAVE KNOWLEDGE ABOUT

8  WHAT, FOR EXAMPLE, SPECIFIC MICROORGANISMS ARE APPROPRIATE?

9  A. YES.

10  Q. DID YOU UNDERSTAND DR. DURKEE TO ACTUALLY TESTIFY THAT

11  THIS LEVEL OF ORDINARY SKILL IN THE ART WAS LOWER THAN HE

12  HAD OPINED IN HIS INITIAL REPORT?

13  A. I DID HEAR THAT.

14  Q. WAS IT YOUR UNDERSTANDING THAT HE WAS TALKING ABOUT

15  PEOPLE WHO USED PARTS MACHINES -- FIRST LET ME ASK THAT

16  QUESTION -- AS OPPOSED TO DESIGN MACHINES?

17  A. YES.

18  Q. DID YOU GET ANY FEELING ABOUT WHAT WHETHER HE WAS TALKING

19  ABOUT USERS OF INDUSTRIAL MACHINES, OR LIKE AUTO REPAIR SHOP

20  MACHINES, ONE WAY OR THE OTHER?  DID YOU GET ANY

21  UNDERSTANDING ABOUT THAT?

22  A. BASED ON WHAT I HEARD FROM HIS TESTIMONY, HE WAS TALKING

23  ABOUT SIMPLE MACHINES, INCLUDING THE COFFEE CAN AND THE

24  PAINT BRUSH.

25  Q. AND WHY IS IT THAT YOU BELIEVE THAT ENVIRONMENTAL

1  EDUCATION WOULD BE THE APPROPRIATE EDUCATION LEVEL FOR THOSE

2  OF SKILL IN THE ART AS DEFINED IN THE PATENT?

3  A. BECAUSE THAT IS -- THE ENVIRONMENTAL ENGINEERING ART IS

4  THE ART THAT GIVES YOU THE SKILL LEVEL TO BE ABLE TO

5  IDENTIFY POTENTIAL SUITABLE MICROORGANISMS.  IT TEACHES YOU

6  ABOUT LIFE CYCLES OF MICROORGANISMS, IT TEACHES YOU ABOUT

7  GROWTH, AND ACTIVITY, AND BIODEGRADATION, AND BIOREMEDIATION

8  OF ORGANIC COMPOUNDS.

9  Q. WHAT DO YOU MEAN BY THE LIFE CYCLE OF THE MICROBES?

10  A. MICROORGANISMS ESSENTIALLY GO THROUGH FOUR STAGES IN

11  THEIR LIFE CYCLE.  IT STARTS WITH AN INITIAL LAG PHASE WHICH

12  IS A PHASE THAT THEY ADAPT TO THE SUBSTRATE THAT THEY ARE

13  RECEIVING.  THERE IS NOT MUCH GROWTH GOING ON THERE.  THERE

14  IS NO REPLICATION OF THE CELLS.  THE SECOND PHASE IS THE

15  EXPONENTIAL PHASE WHERE THE CELLS START MULTIPLYING AND

16  START GENERATING BIO MASS, A LOT MORE BIO MASS.  ULTIMATELY

17  THE MICROORGANISMS WILL BE IN EQUILIBRIUM WITH THE SOLUTION,

18  AND THAT WILL BE THE STATIONARY PHASE AND ULTIMATELY GO

19  THROUGH THE DEATH PHASE.  SO THAT WOULD BE THE FOUR PHASES

20  OF A MICROBIAL LIFE CYCLE.

21  Q. ALL RIGHT.  AND BRIEFLY CAN YOU DESCRIBE WHAT YOU MEAN BY

22  BIO MASS THAT THE MICROBES GENERATE?

23  A. YES.  THE BIO MASS IS WHAT ENVIRONMENTAL ENGINEERS AND

24  WHAT WE IN THE ART REFER TO AS THE SLUDGE.  BASICALLY A

25  MICROORGANISM THAT DEGRADES AN ORGANIC COMPOUND WILL

1  GENERATE CO2, CARBON DIOXIDE, ON THE ONE HAND, AND WILL

2  GENERATE WASTE AND BIO MASS AND INCORPORATE THE ORGANICS

3  INTO ITS CELL MASS ON THE OTHER HAND.  MUCH THE SAME WAY AS

4  WHAT HAPPENS WHEN WE EAT, SOME OF WHAT WE EAT GETS

5  INCORPORATED IN OUR BODY MASS, AND SOME OF IT IS WASTED AS

6  GAS.  THE CELLS DO THE SAME THING.  SO BIO MASS IS

7  ESSENTIALLY SLUDGE, INCREASE IN NUMBERS OF ORGANISMS AND

8  POTENTIAL SIZE OF ORGANISMS.

9           MR. HARBIN:  YOUR HONOR, THERE ARE TWO QUESTIONS

10  I WOULD LIKE TO ASK THE WITNESS THAT I THINK DEAL WITH THE

11  UNDERSTANDING OF THE LEVEL IN THE ART AS HE HAS DEFINED IT,

12  ALSO ADDRESSED DR. DURKEE'S TESTIMONY.  I CAN GO INTO DETAIL

13  IF YOU WOULD LIKE, BUT ALSO IMPLICATES ISSUES RELATING TO

14  PRIOR ART IN THIS CASE.  BUT, YOU KNOW, ALSO DEAL WITH THE

15  LEVEL OF ORDINARY SKILL AS WE DEFINE WHAT THE KNOWLEDGE IS.

16  AND IN FACT, HE HAS OPINED IN HIS REPORTS ABOUT SOME OF WHAT

17  I AM GOING TO ASK.

18           THE COURT:  GO AHEAD.  I AM SURE IF MR. CAPP HAS

19  AN OBJECTION, HE'LL STATE IT.

20  BY MR. HARBIN:

21  Q. DID YOU HEAR DR. DURKEE OPINE THAT IF THERE IS SLUDGE IN

22  A PARTS WASHER OR OTHER MACHINE DOING BIOREMEDIATION, THAT

23  INDICATES THAT THE MICROBES ARE DYING OR DEAD, ALL OF THEM?

24  A. I DID HEAR THAT.

25  Q. THAT THE FLUID OR SOMETHING ELSE IS TOXIC TO THE

1    MICROBES?

2    A. YES, THAT IS WHAT IS INFERRED.

3    Q. BY HIS TESTIMONY?

4    A. YES.

5    Q. DO YOU AGREE WITH DR. DURKEE'S OPINIONS IN THAT REGARD?

6    A. NO, I DO NOT.

7    Q. CAN YOU EXPLAIN TO THE COURT WHY?

8    A. NO.  BECAUSE, AGAIN, PART OF THE NATURAL LIFE CYCLE OF

9    ANY MICROORGANISM THAT IS BIODEGRADING ORGANIC COMPOUNDS,

10   SLUDGE IS BEING PRODUCED, SO SLUDGE IS A POSITIVE INDICATOR

11   THAT BIOREMEDIATION IS OCCURRING AND THAT THE MICROORGANISMS

12   ARE ACTIVE.

13   Q. AND IF I CAN ASK YOU TO LOOK AT DTX 4144.  YOU CAN JUST

14   PULL -- LET ME JUST ASK YOU, IS THAT ONE OF THE EXPERT

15   REPORTS YOU HAVE GIVEN IN THIS CASE?

16   A. YES, IT IS.

17            MR. CAPP: EXCUSE ME, YOUR HONOR, I HAVE AN

18   OBJECTION.  THIS IS IMPROPER REBUTTAL REPORT MATERIAL.  THIS

19   ISN'T COVERED IN HIS INITIAL EXPERT REPORT.

20            THE COURT: I COULDN'T UNDERSTAND YOU.  SORRY,

21   MR. CAPP?

22            MR. CAPP: YOUR HONOR, DR. ADRIAENS EXCEEDED THE

23   PROPER SCOPE OF REPORTS.  HE WASN'T REBUTTING DR. DURKEE

24   BECAUSE DR. DURKEE WASN'T RESPONDING TO HIM.  THIS MATERIAL

25   IS NOT COVERED IN HIS INITIAL EXPERT REPORT.

```
 1              THE COURT:  SO?  I AM TRYING TO UNDERSTAND THE
 2    OBJECTION.
 3              MR. CAPP: THE NORTHERN DISTRICT OF GEORGIA HAS A
 4    POLICY, AND I AM FRANKLY IN AGREEMENT THAT WE HAVE INITIAL
 5    REPORTS AND THEN RESPONSES AND THEN REBUTTALS.  THAT IS NOT
 6    THE CASE IN EVERY JURISDICTION.  WHEN I AM IN THE ONES THAT
 7    JUST HAVE TWO, I TRY AND GET A CONSENT ORDER TO GET THAT
 8    THIRD REBUTTAL REPORT IN, BECAUSE I DO THINK IT IS
 9    IMPORTANT.  BUT, IT NEEDS TO BE LIMITED TO THE FACT THAT YOU
10    DEFINE THE SCOPE OF YOUR OPINION IN YOUR INITIAL REPORT, THE
11    OTHER EXPERT HAS AN OPPORTUNITY TO RESPOND TO IT, AND THEN
12    YOU ARE ALLOWED TO REBUT ONLY WITH RESPECT TO THE SCOPE THAT
13    YOU PRESENTED IN YOUR INITIAL REPORT.  AND THE PROBLEM WE'VE
14    HAD THROUGHOUT THIS CASE IS WE HAD A VERY SCANTY BARE BONES
15    SKELETAL INITIAL REPORT, AND ATTEMPT AFTER ATTEMPT TO EXPAND
16    UPON IT, AND THIS IS ONE OF THOSE EFFORTS.
17              THE COURT:  I UNDERSTAND THAT.  MR. HARBIN, WHAT
18    IS YOUR RESPONSE?
19              MR. HARBIN:  YOUR HONOR, I DIDN'T UNDERSTAND
20    THIS -- THERE IS THE BACKGROUND REPORT, THE NEXT SECTION
21    SAYS THE BACKGROUND, PRACTICAL EXPERIENCE IN BIOREMEDIATION
22    DEALING WITH WHAT PEOPLE IN THE FIELD; THE BACKGROUND FOR
23    THE NEXT SECTION, ORDINARY SKILL IN THE ART, WHICH IS THE
24    DISPUTE BETWEEN THE PARTIES AS TO THE LEVEL OF SKILL IN THE
25    ART.  I AM NOT GOING TO GET INTO ANY OF THE ENABLEMENT
```

1    ISSUES OR ANY ISSUES THAT HAVE BEEN EXCLUDED.

2              THE COURT:  ALL RIGHT.

3    BY MR. HARBIN:

4    Q. YOU TALK ABOUT THE EXPONENTIAL PHASE IN YOUR TESTIMONY,

5    AND THIS SAYS THE EXPONENTIAL PHASE IS THE OPTIMUM GROWTH

6    STAGE FOR CELLS; CORRECT?

7    A. THAT IS CORRECT.

8    Q. AND THAT IS WHERE THE MAXIMUM DEGRADATION RATE OF

9    HYDROCARBONS WOULD OCCUR?

10   A. THAT IS CORRECT.

11   Q. AND YOU STATE THAT IF OPTIMUM CONDITIONS ARE NOT

12   MAINTAINED, ITS DUE TO EXHAUSTION OF NUTRIENTS OR

13   ACCUMULATION OF WASTE PRODUCTS.  DO YOU SEE THAT PHRASE?

14   A. I SEE THAT.

15   Q. SO IS THAT INDICATING THAT WASTE PRODUCTS DO ACCUMULATE

16   IN THE OPTIMUM PHASE OF MICROBIAL GROWTH?

17   A. THEY DO.

18   Q. SIMILAR TO HUMAN BEINGS?

19   A. SIMILAR TO HUMAN BEINGS.

20   Q. AND IF, YOU KNOW, IF THEY ARE NOT HANDLED OR REDUCED,

21   THEN THE SITUATION COULD BECOME TOXIC; CORRECT?

22   A. THAT IS CORRECT.

23   Q. BUT THE FACT THERE ARE WASTE PRODUCTS, SLUDGE, DOES NOT

24   INDICATE THAT THE ENVIRONMENT IS TOXIC TO THE MICROBES?

25   A. NO.  AS I SAID BEFORE, IT IS AN INDICATION OF ACTIVE

1    HEALTHY GROWTH OF THE ORGANISMS.

2    Q. OF ACTIVE HEALTHY GROWTH?

3    A. ACTIVE AND HEALTHY GROWTH OF THE MICROORGANISMS.  IF I

4    MAY ELABORATE ON THAT.

5    Q. SURE.

6    A. WHEN I TESTIFIED EARLIER ABOUT THE FOUR DIFFERENT PHASES,

7    WHAT HAPPENS IN THESE REACTORS, NOT EVERY MICROORGANISM IS

8    AT THE SAME PHASE IN ITS LIFE CYCLE.  SO WHAT YOU ARE GOING

9    TO FIND IS THAT, ON AVERAGE, IN ANY KIND OF BIOREMEDIATION

10   SYSTEM, YOU ARE GOING TO HAVE UP TO 50 PERCENT OF THE

11   MICROORGANISMS THAT ARE ACTUALLY DEAD.  THERE IS A WHOLE

12   BUNCH OF THEM THAT ARE ACTIVELY GROWING, BUT THERE IS ALSO A

13   WHOLE BUNCH OF THEM THAT ARE IN THE DEATH PHASE.  SO YOU

14   HAVE AN AVERAGE OF THESE FOUR PHASES FOR ALL OF THESE

15   MICROORGANISMS THAT EXIST IN A REACTOR.

16   Q. AND DID YOU UNDERSTAND DR. DURKEE TO TESTIFY THAT HE WAS

17   UNCERTAIN IF THE MICROBES INGESTION OF SURFACTANTS

18   CONSTITUTES BIODEGRADATION?

19   A. YES.

20   Q. AND DO YOU HAVE AN OPINION ABOUT THAT?

21   A. YES, I DO.

22   Q. WHAT IS YOUR OPINION?

23   A. INGESTION OF ORGANIC COMPOUNDS OR THE SURFACTANTS, A LOT

24   OF WHICH ARE LINEAR MOLECULES, CONSTITUTES BIOREMEDIATION.

25   Q. AND DOES IT CONSTITUTE BIODEGRADATION?

1   A. BIODEGRADATION.

2   Q. HOW DO YOU DEFINE BIODEGRADATION?

3   A. BIODEGRADATION IS A BIOLOGICAL OR MICROBIAL METHOD BY

4   WHICH ORGANIC COMPOUNDS ARE BEING BROKEN DOWN INTO SMALLER

5   COMPOUNDS.

6   Q. AND IS THIS THE SAME QUESTION IF THE MICROBES INGEST THE

7   NUTRIENTS, WHICH IS WHEN NUTRIENTS ARE PUT IN WITH THE

8   MICROBES, WHAT ARE THEY THERE FOR, GENERALLY?

9   A. WHAT ARE THEY THERE FOR?

10  Q. WHAT ARE THEY PUT IN THE ENVIRONMENT FOR?

11  A. MICROORGANISMS, AGAIN, JUST LIKE HUMANS, NEED A BALANCE

12  OF WHAT THEY TAKE IN.  SO IF YOU GIVE MICROORGANISMS A LOT

13  OF CARBON, WHICH IS THE HYDROCARBONS, YOU ARE ALSO GOING TO

14  HAVE TO GIVE THEM A LOT OF OTHER COMPONENTS LIKE NITROGEN

15  AND PHOSPHOROUS, WHICH ARE THE NUTRIENTS, SO THEY CAN GROW

16  AND GET INTO THE EXPONENTIAL PHASE.  SO THE NUTRIENTS ARE

17  THERE TO MAINTAIN AND SUSTAIN THE MICROORGANISMS IN THE

18  REACTOR.

19  Q. AND SO WHEN THE MICROBES INGEST NUTRIENTS, ARE THEY

20  BIODEGRADING THE NUTRIENTS?

21  A. NO.  SINCE THESE NUTRIENTS ARE INORGANIC COMPOUNDS, THAT

22  IS NOT A BIODEGRADATION PROCESS.  IT IS SOMETHING WE CALL AN

23  ASSIMILATION PROCESS, BUT IT IS NOT BIODEGRADATION.

24  Q. ASSIMILATING THE CELLS?

25  A. ASSIMILATING TO CELLS.  YES.

```
1    Q. AND YOU MAY HAVE ADDRESSED THIS A LITTLE BIT ALREADY, BUT
2    IF -- WHAT DOE THE WORD "TOXIC" MEAN TO YOU AS AN
3    ENVIRONMENTAL ENGINEER AS IT RELATES TO MICROBES?
4    A. TOXIC CAN EITHER MEAN, AS I PUT IN MY EXPERT REPORT HERE,
5    A SLOW-DOWN OF METABOLISM, OR ALL TOGETHER A DEATH, I MEAN,
6    A STOPPAGE OF METABOLISM BY THE CELLS, THE CELLS NO LONGER
7    ACTIVE.
8    Q. AND NOT TO STATE THE OBVIOUS, BUT USING THE LATTER
9    DEFINITION OF DEATH OF THE MICROBES, IF THE MICROBES ARE
10   ACTIVE IN A SOLUTION, DOES THAT INDICATE TO YOU WHETHER THE
11   SOLUTION OR ENVIRONMENT IS TOXIC TO THEM?
12   A. EXCUSE ME, CAN YOU RESTATE THAT QUESTION?
13   Q. IN THE MICROBES ARE ACTIVE IN AN ENVIRONMENT, IN A
14   SOLUTION, DOES THAT INDICATE TO YOU WHETHER OR NOT THE
15   SOLUTION IS TOXIC TO THE MICROBES IN THE SENSE OF THE LATTER
16   DEFINITION OF KILLING THEM?
17   A. NO.
18   Q. IT INDICATES THAT THE SOLUTION IS NOT TOXIC?
19   A. IT'S NOT TOXIC.
20   Q. AND DO YOU HAVE AN UNDERSTANDING OF WHAT CAUSTIC MEANS IN
21   THE SENSE OF IN REGARD TO MICROBES?
22   A. YES.
23   Q. AND WHAT EFFECT WILL A CAUSTIC SITUATION HAVE ON MICROBES
24   GENERALLY?
25   A. CAUSTIC SOLUTIONS WOULD KILL MICROORGANISMS JUST IN THE
```

1    SAME WAY AS IT IS ABRASIVE TO HUMAN CELLS, DERMAL CELLS.

2    ESSENTIALLY THE MAKEUP OF THE MICROBIAL CELL WALL IS THE

3    SAME, VERY SIMILAR TO THE MAKEUP OF THE HUMAN CELLS.  IT IS

4    ESSENTIALLY THESE CELLS WILL DISSOLVE, WILL DEGRADE, WILL

5    DIE IN THE PRESENCE OF A CAUSTIC SOLUTION.

6    Q. AND DID YOU INDICATE THAT SURFACTANTS ARE ORGANIC

7    MATERIAL?

8    A. YES, THEY ARE.

9    Q. SO SURFACTANTS GENERALLY ARE BIODEGRADABLE?

10   A. THEY ARE.

11   Q. IN YOUR EXPERIENCE, ARE SURFACTANTS GENERALLY FLAMMABLE

12   OR NONFLAMMABLE?

13   A. THEY ARE NOT FLAMMABLE.  I HAVE NOT FOUND ANY EVIDENCE

14   THAT THEY ARE FLAMMABLE.

15   Q. DID YOU DO SOME INVESTIGATION -- DID YOU HEAR DR. DURKEE

16   TALK ABOUT THE POSSIBILITY OF SOME FLAMMABLE SURFACTANT THAT

17   MAY CONTAIN -- BECAUSE IT CONTAINS SOME ALCOHOL COMPOUND OR

18   SOMETHING?  DID YOU HEAR TESTIMONY TO THAT EFFECT?

19   A. I HEARD THAT.  YES.

20   Q. DID YOU DO AN INVESTIGATION, INTERNET RESEARCH, TO TRY TO

21   FIND AN EXAMPLE OF THAT?

22   A. YES, I DID.

23   Q. AND WERE YOU ABLE TO?

24   A. I WAS NOT ABLE TO.

25   Q. DR. ADRIAENS, WERE YOU ASKED TO EVALUATE CERTAIN SPECIFIC

1    CLAIMS OF THE CHEMFREE PATENTS CONCERNING THE QUESTION OF

2    ININFRINGEMENT OR NONINFRINGEMENT?

3    A. YES, I WAS.

4    Q. SPECIFICALLY WERE YOU ASKED TO LOOK AT CLAIM 5 OF THE 110

5    PATENT, AND CLAIMS 4 AND 16 OF THE 125 PATENT, AND APPLY IT

6    TO THE WALTER MODEL IO 200?

7    A. YES.  THESE ARE THE CLAIMS PERTAINING TO THE HEATER.

8    Q. PULL UP CLAIM 5 OF THE 110 PATENT.  YOU SEE WHERE IT

9    SAYS, THE COMBINATION OF CLAIM 1 WHEREIN THE HEATER IS

10   CONSTRUCTED AND ARRANGED TO ADD HEAT TO THE FLUID WHILE THE

11   FLUID IS DISPOSED WITHIN THE TANK?

12   A. I SEE THAT.

13   Q. NOW, HAVE YOU LOOKED TO THE COURT'S CONSTRUCTION OF THAT?

14   A. I DID LOOK AT THE COURT'S CONSTRUCTION.  YES.

15   Q. BASED ON THAT, DO YOU HAVE AN OPINION AS TO WHETHER OR

16   NOT THE IO 200 INFRINGES CLAIM 5 OF THE 110 PATENT?

17   A. IN MY ANALYSIS, IT DID NOT.

18   Q. WHY NOT?

19   A. THE HEATER IN THE IO 200 IS POSITIONED OUTSIDE OF THE

20   TANK, WHEREAS THE COURT'S CONSTRUCTION OF THE CLAIM STATED

21   THAT THE HEATING HAD TO OCCUR INSIDE THE TANK, OR THE TANK

22   THAT HOLDS THE FLUID.  BUT WHAT THE IO 200 DOES, IT PUMPS

23   THE FLUID OUT OF THE TANK AND HEATS IT IN THE HEATER OUTSIDE

24   OF THE TANK, AND THEN BRINGS THE HEATED FLUID BACK INTO THE

25   TANK.

```
 1              THE COURT:  DR. ADRIAENS, IT DOESN'T MAKE ANY
 2   DIFFERENCE FROM WHERE THE HEATER IS, AS LONG AS THE HEATING
 3   OCCURS IN THE TANK UNDER THAT CONSTRUCTION, DOES IT?
 4              THE WITNESS:  THAT IS NOT THE WAY I UNDERSTOOD THE
 5   CLAIM CONSTRUCTION TO READ.
 6              THE COURT:  OKAY.  GO AHEAD, MR. HARBIN.
 7              MR. HARBIN:  WE WILL GET TO A MINUTE, YOUR HONOR,
 8   TO THE ISSUE OF DOCTRINE OF EQUIVALENCE, WHICH I THINK YOUR
 9   HONOR IS ADDRESSING.
10   BY MR. HARBIN:
11   Q. I WOULD ASK YOU TO COME DOWN, LIKE MR. VANDEMEULEBROOCKE
12   DID, AND JUST POINT OUT WHERE YOU UNDERSTAND THE HEATER IS
13   ON THE IO 200.
14   A. YES.
15   Q. THE SORT OF RECTANGULAR BOX, YOU SEE IT HAS A RED SWITCH
16   ON THE TOP OF A SMALL YELLOW SQUARE AT THE BOTTOM?
17   A. YES.  THE BOX THAT ALSO HAS THE CONTROL CIRCUIT.  YES.
18   Q. AND IS YOUR BASIS FOR -- JUST TO EXPEDITE MATTERS, IS
19   YOUR BASIS -- WELL, YOU LOOKED AT CLAIM 16 OF THE 125
20   PATENT; IS THAT RIGHT?  EXCUSE ME, FIRST CLAIM 4 OF THE 125
21   PATENT?
22   A. I LOOKED AT ALL OF THE CLAIMS.  BUT IF YOU COULD PULL IT
23   UP, PLEASE.
24   Q. PULL UP CLAIM 4 OF THE 125.  WHERE YOU SEE THE LANGUAGE
25   THAT STATES, METHOD OF CLAIM 1 FURTHER COMPRISING THE STEP
```

1    OF MAINTAINING THE FLUID AT A DESIRED TEMPERATURE WHEREIN A

2    HEATER HEATS THE RESERVOIR?

3    A. I SEE THAT.

4    Q. AND DID YOU REACH AN OPINION AS TO INFRINGEMENT OF THAT

5    CLAIM?

6    A. I DID.  THERE WAS NO -- THE COURT DID NOT HAVE A SEPARATE

7    CLAIM CONSTRUCTION ON THIS LANGUAGE HERE, SO I ASSUMED IT TO

8    MEAN THE SAME AS THE CLAIM CONSTRUCTION PERTAINING TO THE

9    FACT THAT THE FLUID HAD TO BE HEATED INSIDE THE TANK.

10   Q. AND IF YOU CAN LOOK AT CLAIM 16 OF THE 125 PATENT?

11   A. I DID.

12   Q. AND THAT CLAIM, THE DEFENDANT CLAIM SAYS, SPECIFICALLY

13   THE METHOD OF CLAIM 13 WHEREIN THE HEATING STEP INCLUDES A

14   STEP OF HEATING THE FLUID WITHIN THE TANK?

15   A. YES.

16   Q. DID YOU REACH AN OPINION AS TO THE QUESTION OF WHETHER

17   THE IO 200 INFRINGES THAT CLAIM?

18   A. I DID.

19   Q. AND WHAT IS YOUR --

20   A. THAT IT DOES NOT INFRINGE.

21   Q. FOR THE SAME REASONS?

22   A. FOR THE SAME REASONS I JUST STATED.

23   Q. ARE YOU FAMILIAR WITH, GENERALLY FAMILIAR, WITH THE

24   DOCTRINE OF INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENCE?

25   A. I BECAME FAMILIAR WITH THAT.  YES.

1    Q. WHAT IS YOUR GENERAL UNDERSTANDING OF THAT DOCTRINE?

2    A. THE WAY I UNDERSTAND THE DOCTRINE IS THAT IT'S

3    ESSENTIALLY A THREE-PART TEST THAT IS APPLIED TO ASSESS

4    INFRINGEMENT, ONE WHERE THE METHOD OR THE APPARATUS HAS THE

5    SAME FUNCTION, DOES IT THE SAME WAY, AND ACHIEVES THE SAME

6    RESULT.  SO EACH OF THESE TESTS HAVE TO BE EVALUATED

7    SEPARATELY.

8    Q. AND WHAT IS YOUR OPINION AS TO WHETHER -- DO YOU HAVE AN

9    OPINION AS TO WHETHER THE IO 200 INFRINGES ANY OF THESE

10   CLAIMS UNDER THE DOCTRINE OF EQUIVALENCE?

11            MR. CAPP: OBJECTION, YOUR HONOR.  I AM LOOKING AT

12   DR. ADRIAENS'S REPORT.  IT'S DOCKET 338, FILED MARCH 31,

13   2008, WHICH IS HIS RESPONSE TO DR. DURKEE'S REPORT.  AND HIS

14   ENTIRE TREATMENT OF THIS SUBJECT IS HALF A PAGE ON PAGE 27,

15   AND HALF A PAGE ON PAGE 28, AND IT LOOKS TO ME LIKE IT JUST

16   ADDRESSES DIRECT INFRINGEMENT.  THERE IS NO FUNCTION WAY

17   ANALYSIS UNDER DOCTRINE OF EQUIVALENCE ANALYSIS AT ALL.  HE

18   IS WAY OUTSIDE THE SCOPE OF HIS REPORT NOW.

19            MR. HARBIN:  MAY I HAVE A MOMENT YOUR HONOR?

20   (PAUSE).

21   BY MR. HARBIN:

22   Q. YOUR HONOR, IT WOULD TAKE ME -- MY UNDERSTANDING IS IT

23   WAS AN ASSESSMENT REPORT ADDRESSING THEIR RESPONSES, BUT I

24   CAN VERIFY, IF YOUR HONOR WISHES, AND THAT IS MY LAST TOPIC

25   FOR THIS WITNESS.

1          THE COURT:  I AM GOING TO ALLOW THE TESTIMONY, AND

2    I'LL BE MORE FAMILIAR, AS MR. CAPP IS, WITH THE VARIOUS

3    REPORTS WHEN I RULE ON THAT.  AND IF IT IS OUTSIDE THE SCOPE

4    OF WHAT THE WITNESS SHOULD TESTIFY TO, I WON'T CONSIDER IT,

5    BUT I WILL ALLOW YOU TO ENTER IT INTO THE RECORD.

6          MR. HARBIN:  ALL RIGHT.

7    BY MR. HARBIN:

8    Q. DO YOU HAVE AN OPINION, SIR?

9    A. DO I HAVE --

10   Q. AN OPINION AS TO WHETHER THE IO 200 INFRINGES THESE

11   CLAIMS THAT YOU DESCRIBED UNDER THE DOCTRIN OF EQUIVALENCE?

12   A. THE WAY I UNDERSTAND, NO, IT DOES NOT INFRINGE THE

13   CLAIMS.

14   Q. WHAT IS THE BASIS OF THAT OPINION?

15   A. THE BASIS IS THAT, EVEN THOUGH THE HEATER HAS THE SAME

16   FUNCTION, IT IS ACCOMPLISHING THE SAME END GOAL, HEATING THE

17   FLUID, IT DOES IT FUNDAMENTALLY IN A DIFFERENT WAY.

18          MR. HARBIN:  YOUR HONOR, WHAT WE PROPOSE TO DO IS,

19   GIVEN THE PORTIONS OF HIS REPORTS THAT HAVE BEEN EXCLUDED,

20   THAT WE WILL REDACT THEM AND SUBMIT THE ONES JUST ON THE ART

21   AND THE BACKGROUND, AND THEN THE SKILL IN THE ART, AND THEN

22   INFRINGEMENT.

23          THE COURT:  ALL RIGHT.

24          MR. HARBIN:  EXCLUDE THE OTHER PORTIONS.

25          MR. CAPP: IS HE TENDERING THE REPORTS INTO

1  EVIDENCE TO SUPPLEMENT HIS TESTIMONY FROM THE WITNESS STAND?

2  IS THAT WHAT I HEAR?

3           THE COURT:  IS THAT WHAT HE HEARS, MR. HARBIN?

4           MR. HARBIN:  I DON'T THINK THEY SUPPLEMENT IT, BUT

5  I THINK THE KEY PART YOU JUST SAW.  BUT THERE IS ADDITIONAL

6  VERBIAGE.  BUT I GUESS THAT IS AN OBJECTION.

7           MR. CAPP:  WE WENT THROUGH AN ELABORATE PROCEEDING

8  OVER THE LAST MONTH ABOUT WHETHER DR. DURKEE WAS GOING TO

9  COME, WHETHER WE SHOULD PRODUCE HIM LIVE, WHETHER THEY WERE

10  GOING TO TRY TO SUBPOENA HIM TO GET HIS DEPOSITION TAKEN IN

11  SAN ANTONIO A COUPLE OF DAYS BEFORE TRIAL, AND WE NEGOTIATED

12  AND WE WORKED OUT A DEAL, AND WE BROUGHT DURKEE HERE AT OUR

13  EXPENSE, WE LET THEM EXAMINE HIM IN THEIR CASE IN CHIEF, AND

14  THE QUID PRO QUO FOR THAT WAS WE WERE ALLOWED TO PUT

15  DR. DURKEE'S REPORTS IN AS SWORN DECLARATIONS IN ORDER TO

16  SPEED UP THE TRIAL.  SO THERE WAS NEGOTIATION AND THERE WAS

17  AN AGREEMENT.  NOW, THEY ARE DOING AN ADDENDUM ON THAT THAT

18  WE NEVER DISCUSSED OR AGREED TO.

19           MR. HARBIN:  I GUESS THAT IS AN OBJECTION, YOUR

20  HONOR.  I THINK DR. DURKEE, THAT WE DID WORK OUT AN

21  ARRANGEMENT, BECAUSE THEY OBJECTED TO US DEPOSING HIM, AND

22  THAT'S WHEN WE AGREED TO NOT TAKE THE DEPOSITION, BUT TO

23  QUESTION HIM AT TRIAL, AND NOT HAVE TO GO DEPOSE HIM.  THAT

24  WAS THEIR CONDITIONS FOR AGREEING.  THAT IS FINE WITH US.  I

25  DON'T THINK IT HAS ANYTHING TO DO WITH THIS ISSUE.

 1          THE COURT:  TELL ME WHAT YOU ARE WANTING TO DO,

 2   AND THEN --

 3          MR. HARBIN:  I THOUGHT YOUR HONOR WOULD WANT TO

 4   SEE THEM.  I DON'T HAVE AN OBJECTION.  BUT I THOUGHT YOUR

 5   HONOR WOULD WANT TO SEE THE RELEVANT PORTIONS OF THEM, BUT I

 6   AM FINE NOT OFFERING THEM.  THAT IS FINE.

 7          THE COURT:  ALL RIGHT.  FINE.  THANKS.  YOU MAY

 8   CROSS-EXAMINE.

 9          MR. CAPP: THANK YOU, YOUR HONOR.  I JUST NEED A

10   MINUTE TO PASS UP SOME DEPOSITIONS AN COPIES OF REPORTS.

11          THE COURT:  WHILE YOU ARE DOING THAT, MR. HARBIN,

12   HOW MANY FURTHER WITNESSES DO YOU HAVE TODAY IN YOUR CASE?

13          MR. HARBIN:  YOUR HONOR, WE NEED TO DEAL WITH SOME

14   EXHIBITS AND DEPOSITIONS, BUT WE ARE DONE WITH LIVE

15   WITNESSES.  WE HAVE DECIDED NOT TO CALL MR. MCCLUER.

16          THE COURT:  THAT IS A DISAPPOINTMENT.

17          MR. HARBIN:  IT WAS A DISAPPOINTMENT FOR ME TOO,

18   BUT I AM TRYING TO MAKE MR. CAPP HAPPY.  THAT IS MY MAIN

19   GOAL.

20          THE COURT:  HE HAS BEEN MENTIONED AT LENGTH IN THE

21   PROCEEDINGS.  OKAY, GOOD.  WHAT DO WE HAVE HERE, MR. CAPP?

22   TWO DEPOSITIONS?

23          MR. CAPP: TWO DEPOSITIONS, BECAUSE WE HAVE THE

24   EXTRA ROUND OF INITIAL REPORTS.  SO HIS FIRST DEPOSITION

25   VOLUME 1 WAS TAKEN MAY OF 2008, AND THEN THE SECOND

1    DEPOSITION WAS TAKEN ON JANUARY 28TH.  AND FOR EASE OF

2    REFERENCE, WE HAVE VOLUME 1 AND VOLUME 2, AND THEY ARE

3    PAGINATED ALL THE WAY THROUGH.

4              THE COURT: AND YOU SIMPLY HAVE THESE FOR THE

5    PURPOSES OF IMPEACHMENT?

6              MR. CAPP: YES, YOUR HONOR.

7                      CROSS-EXAMINATION

8    BY MR. CAPP:

9    Q. GOOD MORNING, DR. ADRIAENS.

10   A. GOOD MORNING, SIR.

11   Q. I WOULD LIKE TO PICK UP WHERE WE LEFT OFF ON MY VOIR DIRE

12   WHERE YOU SAID YOU SEEMED TO HAVE AN OPINION AS TO WHAT THE

13   CAPABILITY OF PERSONS OF ORDINARY SKILL IN THE PARTS WASHING

14   INDUSTRY WOULD HAVE BEEN AROUND 1994.  DO YOU RECALL THAT

15   TESTIMONY DURING YOUR VOIR DIRE?

16   A. I DO.

17   Q. WOULD YOU TURN TO PAGE 339, LINE 14, WHICH WOULD BE IN

18   VOLUME 2 OF YOUR REPORT?  ALL RIGHT.  GARY, WILL YOU

19   HIGHLIGHT THE QUESTION AND ANSWER AT LINE 14 THROUGH 16?

20   DR. ADRIAENS, DO YOU RECALL AT YOUR DEPOSITION, I ASKED YOU

21   THIS QUESTION, YOU GAVE THE FOLLOWING ANSWER?  QUESTION:

22   "DO YOU ALSO CONSIDER YOURSELF TO BE AN EXPERT IN THE FIELD

23   OF PARTS WASHING?"  AND YOUR ANSWER WAS:  "I DO NOT."  DO

24   YOU RECALL THAT?

25   A. I RECALL THAT.

1   Q. OKAY.  HAS YOUR EXPERTISE IN THAT FIELD CHANGED

2   DRAMATICALLY SINCE JANUARY OF THIS YEAR?

3   A. SINCE JANUARY OF THIS YEAR?

4   Q. DIDN'T YOU GIVE THAT TESTIMONY IN JANUARY OF 2009?

5   A. IS THIS THE JANUARY ONE?  THIS IS THE MAY.  OH, OKAY.

6   THIS IS JANUARY.  SORRY, I AM -- WHAT PAGE WAS IT AGAIN?

7   OKAY.

8   Q. THIS WOULD BE VOLUME 2, YOUR JANUARY 28TH OF 2009

9   DEPOSITION.

10  A. UH-HUH (AFFIRMATIVE).

11  Q. PAGE 339.

12  A. UH-HUH (AFFIRMATIVE).

13  Q. DO YOU RECALL GIVING THAT QUESTION AND ANSWER?

14  A. I DO IF IT'S THERE.  YEAH.

15  Q. I MEAN, HAS YOUR LEVEL OF EXPERTISE IN THE FIELD OF PARTS

16  WASHING INCREASED DRAMATICALLY SINCE JANUARY OF 2009?

17  A. NO, IT HASN'T.  BUT I THINK IT'S IMPORTANT TO LOOK AT

18  LINE 20.  IT'S NOT A SCIENTIFIC ENDEAVOR, THE FIELD OF PARTS

19  WASHING.

20  Q. WELL, LET'S GO AHEAD AND READ THAT QUESTION AND ANSWER

21  AND GET IT IN CONTEXT.  WOULD YOU SCROLL UP A LITTLE BIT?

22  LET'S GO THROUGH THE WHOLE THING NOW THAT YOU BROUGHT THAT

23  UP.  WOULD YOU GO TO 338, LINE 23?

24  A. YES.

25  Q. I AM GOING TO READ THIS INTO THE RECORD DOWN THROUGH AND

```
1    INCLUDING 340, LINE 16.  DO YOU RECALL THIS CONVERSATION

2    BETWEEN THE TWO OF US?

3         (THE COURT REPORTER READ THE RECORD AS REQUESTED.)

4    "QUESTION:  I TAKE IT BY NOW YOU'RE AWARE THE PLAINTIFF HAS

5    TWO EXPERTS, DR. DURKEE AND DR. BRICKLE?"

6    "ANSWER:  THAT IS CORRECT."

7    "QUESTION:  AND DO YOU UNDERSTAND THAT DR. DURKEE IS BEING

8    OFFERED TO THE COURT AS AN EXPERT IN THE FIELD OF PARTS

9    WASHING?"

10   "ANSWER:  THAT'S WHAT I UNDERSTAND."

11   "QUESTION:  AND YOU UNDERSTAND THAT DR. BRICKLE IS BEING

12   OFFERED TO THE COURT AS AN EXPERT IN THE FIELD OF

13   ENVIRONMENTAL SCIENCE AND ENGINEERING?"

14   "ANSWER:  THAT IS WHAT I UNDERSTAND."

15   "QUESTION:  DO YOU CONSIDER YOURSELF TO BE AN EXPERT IN THE

16   FIELD OF ENVIRONMENTAL SCIENCE?"

17   "ANSWER:  I DO."

18   "QUESTION:  DO YOU ALSO CONSIDER YOURSELF TO BE AN EXPERT IN

19   THE FIELD OF PARTS WASHING?"

20   "ANSWER:  I DO NOT."

21   "QUESTION:  DO YOU RECOGNIZE THE FIELD OF PARTS WASHING AND

22   THE FIELD OF ENVIRONMENTAL SCIENCES AS TWO SEPARATE FIELDS

23   OF SCIENTIFIC ENDEAVOR?"

24   "ANSWER:  SCIENTIFIC ENDEAVOR?  THE TWO ARE SEPARATE.  YES,

25   THEY ARE TWO SEPARATE FIELDS."
```

1    "QUESTION:  TO THE EXTENT YOU KNOW, WHO WOULD YOU CONSIDER

2    TO BE THE DOMINANT PLAYERS IN THE PARTS WASHING INDUSTRY IN

3    1994?"

4    "ANSWER:  THE DOMINANT PLAYERS?"

5    "QUESTION:  YES.  IN THE MARKETPLACE.  MANUFACTURERS,

6    DISTRIBUTORS."

7    "ANSWER:  I DON'T KNOW."

8    "QUESTION:  HAVE YOU EVER MET ANYONE THAT WORKED IN A

9    SCIENTIFIC OR ENGINEERING CAPACITY IN THE PARTS WASHING

10   INDUSTRY AROUND 1995?"

11   "ANSWER:  I DON'T KNOW."

12   "QUESTION:  DO YOU CONSIDER YOURSELF --"

13        MR. HARBIN:  YOUR HONOR, I OBJECT.  THIS HAS GONE

14   BEYOND IMPEACHMENT ON CROSS-EXAMINATION.  HE HASN'T ASKED

15   HIM THESE QUESTIONS HERE.

16        MR. CAPP:  YOUR HONOR, I HAVE LIKE FOUR LINES TO

17   GO.

18        THE COURT:  LET ME THINK ABOUT WHAT HE SAID FOR A

19   MOMENT, MR. CAPP, AND I WILL CALL ON YOU IF I NEED A

20   RESPONSE.  I DISAGREE, MR. HARBIN.  I THINK IT RELATES TO,

21   AT LEAST WHAT I HAVE HEARD SO FAR, RELATES TO DR. ADRIAENS'S

22   TESTIMONY.  YOU MAY PROCEED.

23        MR. CAPP:  GARY, LET'S PICK UP AT 340, LINE 4 AND

24   I WILL JUST READ DOWN TO LINE 16.

25        (THE COURT REPORTER READ THE RECORD AS REQUESTED.)

1   "QUESTION:  HAVE YOU EVER MET ANYONE THAT WORKED IN THE

2   SCIENTIFIC ENGINEERING CAPACITY WITHIN THE PARTS WASHING

3   INDUSTRY AROUND 1994?"

4   "ANSWER:  NOT AROUND 1994."

5   "QUESTION:  DO YOU CONSIDER YOURSELF TO BE KNOWLEDGEABLE

6   ABOUT THE CAPABILITIES OF A PERSON OF ORDINARY SKILL WITHIN

7   THE ART OF PARTS WASHING?"

8            MR. CAPP:  AND THERE IS AN OBJECTION INTERPOSED

9   WHICH -- MR. SCHAETZEL, DO YOU WANT TO REPEAT THAT

10  OBJECTION?

11           MR. SCHAETZEL:  YOU ARE WELCOME TO READ IT.

12           MR. CAPP:  DO YOU CARE TO ARGUE THAT OBJECTION

13  NOW?

14           MR. HARBIN:  I AM OBJECTING, MR. CAPP.

15           THE COURT:  MR. CAPP, IF HE HAS AN OBJECTION, HE

16  WILL STAND UP.  YOU DON'T HAVE TO INVITE HIM TO ARGUE.  IF

17  HE DOESN'T STAND UP AND RAISE AN OBJECTION, SKIP IT.

18           MR. CAPP:  THANK YOU, YOUR HONOR.

19  BY MR. CAPP:

20  "ANSWER:  I DIDN'T DEFINE A PERSON OF ORDINARY SKILL IN

21  PARTS WASHING IN 1994."

22  Q. IS THAT YOUR TESTIMONY IN JANUARY OF THIS YEAR,

23  DR. ADRIAENS?

24  A. THAT IS CORRECT.  IT'S ON PAPER.  HOWEVER, CAN I

25  ELABORATE MY ANSWER?

```
1    Q. YES.
2    A. OKAY.  GOOD.  BECAUSE WHAT WE ARE TALKING ABOUT IS, I DID
3    NOT DEFINE A PERSON OF ORDINARY SKILL IN PARTS WASHING IN
4    1994 BECAUSE THAT IS NOT WHAT THE SCOPE OF THE INVENTION IS.
5    THE SCOPE -- I WAS RETAINED TO OFFER AN OPINION ON THE
6    SCOPE, ON THE PERSON OF ORDINARY SKILL IN THE ART, ON THE
7    INVENTION, WHICH IS A BIOREMEDIATING PARTS WASHER WHEREBY
8    THE BIOREMEDIATION COMPONENT IS THE CRITICAL COMPONENT.  THE
9    PARTS WASHER COMPONENT HAD BEEN -- THERE WAS A LOT OF PRIOR
10   ART IN THE PARTS WASHER COMPONENT SO I DID NOT DEFINE A
11   PERSON OF ORDINARY SKILL IN PARTS WASHER.
12   Q. YOU UNDERSTAND I AM NOT ASKING WHAT YOU DID, I AM ASKING
13   ABOUT YOUR QUALIFICATIONS.  DO YOU UNDERSTAND THAT?
14   A. I DON'T SEE THAT AS THE QUESTION.
15           THE COURT:  WHEN THERE IS AN OBJECTION, GIVE ME AN
16   OPPORTUNITY TO RULE ON IT.
17           MR. HARBIN:  I OBJECT TO THE CHARACTERIZATION OF
18   ALL OF THESE QUESTIONS BECAUSE I THINK THEY ASK A LOT ABOUT
19   WHAT HE DID, BUT REGARDLESS....
20           THE COURT:  THAT SORT OF LOST ME, TOO.  ASK
21   ANOTHER QUESTION SO WE WILL ALL BE ON THE SAME PAGE.
22           MR. CAPP:  ABSOLUTELY.
23   BY MR. CAPP:
24   Q. DR. ADRIAENS, DO YOU CONSIDER YOURSELF TO HAVE AN
25   INFORMED OPINION AS TO THE CAPABILITIES OF SOMEONE OF
```

1    ORDINARY SKILL IN THE ART OF PARTS WASHING IN 1994?

2    A. IS THE ART OF PARTS WASHER THE USER OR THE MANUFACTURER?

3    IN THE DEPOSITION YOU REFER -- I AM JUST TRYING TO GET A

4    CLARIFICATION ON YOUR QUESTION.  IN THE LINE OF QUESTIONING

5    IN THE DEPOSITION, YOU WERE REFERRING TO MANUFACTURING OF

6    PARTS WASHERS AND I DO NOT HAVE AN OPINION ON WHO WAS

7    MANUFACTURING PARTS WASHERS.

8    Q. LET'S SEE IF WE CAN GET AN UNDERSTANDING HERE.  WHAT IS

9    YOUR UNDERSTANDING WHEN I USE THE TERM "THE ART," "AN ART"?

10          MR. HARBIN:  OBJECT TO THE FORM OF THE QUESTION,

11   YOUR HONOR.  AMBIGUOUS.

12          THE COURT:  I THINK I WILL SUSTAIN THAT, MR. CAPP.

13   I THINK THE WITNESS IS ENTITLED TO -- IF YOU ARE ASKING HIM

14   ABOUT ART AS IT APPLIES SO MUCH IN CONSTRUING PATENTS AND

15   THE OTHER FACTORS THAT WOULD MAKE PATENTS INVALID, THEN I

16   THINK YOU NEED TO GIVE HIM A DEFINITION OF ART.

17          MR. CAPP:  I WILL TRY, YOUR HONOR.

18          THE COURT:  AND THEN LET HIM ANSWER THAT.

19          MR. CAPP:  I AM TRYING TO BE DIRECT, YOUR HONOR.

20   I WILL GET THERE.

21          THE COURT:  SURE.

22   BY MR. CAPP:

23   Q. DO YOU UNDERSTAND THAT BACK IN THE OLD DAYS PEOPLE THAT

24   MADE BARRELS THAT WERE CALLED COOPERS AND PEOPLE THAT MADE

25   HORSESHOES WERE CALLED BLACKSMITHS, AND THERE WERE DIFFERENT

1  AREAS OF TECHNOLOGY THAT WERE CONSIDERED TO BE ARTS, AND

2  THAT PEOPLE THAT PRACTICED THOSE ARTS WERE CONSIDERED TO BE

3  ARTISANS.  ARE YOU FAMILIAR WITH THAT CONCEPT?

4  A. I AM.

5  Q. AND THE ART THAT YOU PRACTICE IN IS THE ART OF

6  ENVIRONMENTAL SCIENCES; CORRECT?

7  A. ENVIRONMENTAL ENGINEERING.  YES.

8  Q. AND THE ART THAT DR. DURKEE PRACTICES IN IS THE ART OF

9  PARTS WASHING.  DO YOU UNDERSTAND THAT?

10  A. I UNDERSTAND THAT.

11  Q. AND I AM AT LEAST TRYING TO PRACTICE IN THE ART OF LEGAL

12  SERVICES.  DO YOU UNDERSTAND THAT?

13  A. YES.

14  Q. SO IN THAT VEIN, DO YOU CONSIDER YOURSELF TO HAVE AN

15  INFORMED OPINION AS TO THE CAPABILITIES OF SOMEONE OF

16  ORDINARY SKILL IN THE ART OF PARTS WASHING IN 1994?

17  A. AND AGAIN, I AM GOING TO HAVE TO FOLLOW-UP A QUESTION:

18  IS THE ART THE USER, USE OF A PARTS WASHER, OR THE

19  MANUFACTURING OF A PARTS WASHER?

20  Q. I DON'T KNOW THAT I CAN ANSWER THAT QUESTION.  I DON'T

21  KNOW -- I WOULD RATHER ASK THE QUESTIONS HERE.  I HAVE

22  DEFINED THE ART.  THE ART IS PARTS WASHING; RIGHT?  AND

23  WITHIN AN ART, YOU UNDERSTAND THAT THERE ARE VARIOUS SKILL

24  LEVELS; RIGHT?

25  A. YES.

1          THE COURT:  OKAY.  LET'S DO THIS, DOCTOR.  GIVE US

2   YOUR OPINION, BOTH WITH REGARD -- OR YOUR ANSWER, EXCUSE ME,

3   BOTH WITH REGARD TO THE USER AND TO THE MANUFACTURER, IF

4   THEY DIFFER.

5          THE WITNESS:  THANK YOU, YOUR HONOR.  THE WAY I

6   UNDERSTAND IT IS THAT A PERSON OF ORDINARY SKILL IN THE ART

7   OF PARTS WASHING, I GUESS, WHO WOULD BE A USER OF -- AND WE

8   ARE TALKING ABOUT A NONBIOREMEDIATING PARTS WASHER; CORRECT?

9          MR. CAPP:  ACTUALLY, NO.  I AM NOT TALKING

10  ABOUT --

11         THE COURT:  WE ARE TALKING ABOUT PARTS WASHERS IN

12  THE CASE.

13         MR. CAPP:  A PARTS WASHER AT THE TIME OF THE

14  INVENTION, WHICH IS 1994.

15         THE WITNESS:  THE USER WOULD HAVE A LOW LEVEL OF

16  SKILL, THE USER OF A PARTS WASHER, BECAUSE ALL THE USER HAS

17  TO EVALUATE IS WHETHER THE PART IS CLEAN.

18         THE COURT:  LOW LEVEL OF SKILL IN WHAT AREA?

19         THE WITNESS:  THE USER IS YOUR SHOP GUY.  I DON'T

20  KNOW THAT THERE IS ANY PARTICULAR SKILL SET REQUIRED.

21  BY MR. CAPP:

22  Q. MAYBE WE ARE HAVING A MISCOMMUNICATION HERE BECAUSE YOU

23  ARE ACTUALLY GIVING ME WHAT YOUR OPINION IS, AND THE

24  QUESTION I POSED TO YOU WAS, DID YOU CONSIDER YOURSELF TO

25  HAVE AN INFORMED OPINION AS TO THE CAPABILITIES OF SOMEONE

```
1    OF ORDINARY SKILL IN THE ART OF PARTS WASHING IN 1994?
2    A. I DID NOT PROVIDE AN OPINION ON THAT.
3    Q. I UNDERSTAND THAT YOU DIDN'T PROVIDE ONE.  I AM ASKING,
4    DO YOU CONSIDER YOURSELF TO HAVE AN INFORMED OPINION ON THAT
5    SUBJECT?
6    A. MY OPINION IS THAT THE SKILL LEVEL WOULD BE LOWER THAN
7    THE SKILL LEVEL THAT I DEFINED.  AND THAT'S ABOUT AS FAR AS
8    I CAN GO WITH THAT.
9    Q. WOULD YOU TURN TO PAGE 340 IN YOUR JANUARY DEPOSITION?  I
10   WOULD LIKE TO USE THIS FOR PURPOSES OF IMPEACHMENT, YOUR
11   HONOR.  LET'S GO TO PAGE 340.  I WANT TO READ FROM LINES 19
12   TO LINES 25 WHERE I ASKED YOU THIS QUESTION AND YOU GAVE THE
13   FOLLOWING ANSWER, AND I QUOTE, "QUESTION.  DO YOU CONSIDER
14   YOURSELF TO HAVE AN INFORMED OPINION AS TO THE CAPABILITIES
15   OF SOMEONE OF ORDINARY SKILL IN THE ART IN THE PARTS WASHING
16   IN 1994," AND YOUR ANSWER WAS, "I WILL BASE THAT ON
17   DR. DURKEE'S REPORT AND HOW HE DEFINED IT."  THE FOLLOWING
18   QUESTION:  "SO IN OTHER WORDS, YOU ARE NOT IN A POSITION TO
19   CHALLENGE DR. DURKEE'S OPINION REGARDING THE CAPABILITIES OF
20   SOMEONE OF ORDINARY SKILL IN THE ART OF PARTS WASHING; IS
21   THAT CORRECT?"  "WITNESS:  OF PARTS WASHING.  NO."  DO YOU
22   RECALL THAT WAS YOUR TESTIMONY IN JANUARY OF THIS YEAR?
23   A. YES.  AND THAT IS WHAT I JUST SAID.
24   Q. DR. ADRIAENS, IN YOUR OPINION WAS THE IDEA TO COMBINE
25   PARTS WASHING AND BIOREMEDIATION A NOVEL IDEA IN THE 1993 TO
```

1    1994 TIME FRAME?

2              MR. HARBIN:  YOUR HONOR, I OBJECT TO THE QUESTION.

3    MAY I EXPRESS IT?

4              THE COURT:  YES.

5              MR. HARBIN:  IT IS OUTSIDE THE SCOPE OF HIS

6    DIRECT.  HIS DIRECT WAS VERY LIMITED TO DEFINITION OF LEVEL

7    OF SKILL IN THE ART, AN INFRINGEMENT.  AND PART OF THAT WAS

8    BECAUSE OF RULINGS THE COURT HAD ISSUED AT THE REQUEST OF

9    THE PLAINTIFF, WHICH WE HAVE ACCEPTED FOR THIS TRIAL,

10   LIMITING HIM FROM TESTIFYING AS TO CERTAIN AREAS.  AND WE

11   DID NOT OFFER HIM ON THOSE AREAS.  IN FACT, HE HAS BEEN

12   EXCLUDED FROM TESTIFYING.  I DIDN'T GO INTO DIRECT ON THAT.

13   I THINK IT IS UNFAIR FOR THE PLAINTIFF TO COME IN AND START

14   CROSS-EXAMINING HIM ON THESE AREAS WHEN HE HAS BEEN LIMITED

15   AND HE WASN'T OFFERED.

16             THE COURT:  I THINK HE IS WITHIN THE AREA YOU

17   DESCRIBED, AND I AM GOING TO ALLOW THE QUESTION.  GO AHEAD.

18   OR THE QUESTION IS WITHIN THE AREA THAT YOU DESCRIBED.

19   EXCUSE ME.

20   BY MR. CAPP:

21   Q. DR. ADRIAENS, IN YOUR OPINION WAS THE IDEA TO COMBINE

22   PARTS WASHING AND BIOREMEDIATION A NOVEL IDEA IN 1993 TO

23   1994?

24             MR. HARBIN:  JUST FOR THE RECORD, I ALSO OBJECT TO

25   THE EXTENT THAT IT CALLS FOR A LEGAL CONCLUSION INVOKING

1   PATENT TERMS.

2           THE COURT:  OVERRULED.

3           THE WITNESS:  CAN YOU RESTATE THE QUESTION,

4   PLEASE?

5   BY MR. CAPP:

6   Q. I WILL REPEAT IT VERBATIM THE BEST I CAN.  DR. ADRIAENS,

7   IN YOUR OPINION, WAS THE IDEA TO COMBINE PARTS WASHING AND

8   BIOREMEDIATION A NOVEL IDEA IN 1993 TO 1994?

9   A. I GUESS IT DEPENDS ON HOW DO YOU DEFINE A NOVEL IDEA.

10  Q. WELL, YOU GAVE AN OBVIOUSNESS OPINION IN THE CASE, DID

11  YOU NOT?

12  A. I DID.

13  Q. AND YOU CAME TO THE CONCLUSION THAT IT WAS OBVIOUS.  DO

14  YOU REMEMBER THAT?

15  A. I DID.

16  Q. AND NOW I AM SIMPLY COMING BACK AND ASKING YOU, QUOTE,

17  "IN YOUR OPINION, WAS THE IDEA TO COMBINE BIOREMEDIATION AND

18  PARTS WASHING A NOVEL IDEA IN THE 1993 TO 1994 TIME FRAME?"

19  A. WELL, THERE WAS PRIOR ART.

20          MR. HARBIN:  SAME OBJECTIONS, YOUR HONOR.

21          THE COURT:  YOUR OBJECTION IS NOTED.  YOU DON'T

22  HAVE TO MAKE IT AGAIN.

23          THE WITNESS:  I WANT TO UNDERSTAND WHETHER A NOVEL

24  IS INTENDED AS A TECHNICAL TERM OR AS A LEGAL TERM.  AND

25  BECAUSE THAT WILL -- MY ANSWER WILL DEPEND ON THAT.

1          THE COURT:  WELL, I WILL DEFINE THAT FOR YOU,

2    DOCTOR.  YOU ARE NOT A LAWYER SO YOU ARE NOT EXPECTED TO

3    ANSWER A LEGAL TERM UNLESS SPECIFICALLY ASKED WITHIN THE

4    AREA OF YOUR EXPERTISE.  SO NOVEL MEANS THE ORDINARY MEANING

5    OF NOVEL.

6          THE WITNESS:  THANK YOU, YOUR HONOR.  AT THAT

7    TIME, THERE WAS ALREADY PRIOR ART.  SO THE OVERALL IDEA WAS

8    NOVEL, BUT THERE WAS PRIOR ART IN THAT AREA.

9    BY MR. CAPP:

10   Q. WOULD YOU TURN TO PAGE 148 OF YOUR DEPOSITION, AND THIS

11   WILL BE THE MAY 19 VOLUME.  WE WILL PICK UP ON LINE 23, AND

12   WE WILL READ DOWN TO 149 LINE 7.  DR. ADRIAENS, YOU REMEMBER

13   THAT I ASKED YOU THESE QUESTIONS AND YOU GAVE ME THESE

14   ANSWERS?

15   "QUESTION:  IN YOUR OPINION, WAS THE IDEA TO COMBINE

16   BIOREMEDIATION AND PARTS CLEANING A NOVEL IDEA IN THE 1993

17   TO 1994 TIME FRAME?"

18   "ANSWER:  DID I THINK IT WAS A NOVEL IDEA?"

19   "QUESTION:  YES."

20   "ANSWER:  I WOULD HAVE TO SAY YES TO THAT."

21   Q. IS THAT YOUR TESTIMONY IN MAY OF 2008?

22   A. IF IT'S THERE, YES.  IT WAS.

23   Q. AND NOW, YOU WERE NOT ENGAGED IN THIS MATTER UNTIL

24   JANUARY OF 2008; CORRECT?

25   A. YES.

1   Q. AND YOU SUBMITTED YOUR FIRST REPORT BY THE END OF

2   FEBRUARY, DIDN'T YOU?

3   A. YES.

4   Q. SO THE ENTIRE TIME THAT YOU DEVOTED TO THAT MATTER, WHICH

5   I TAKE IT WAS NOT FULL TIME, WAS YOU ISSUED YOUR INITIAL

6   REPORT WITHIN SIX WEEKS AFTER YOU WERE ENGAGED; CORRECT?

7   A. YES.  PER COURT'S INSTRUCTIONS.

8   Q. AND PRIOR TO THAT TIME, YOU NEVER HAD REALLY STUDIED A

9   PARTS WASHER PATENT, HAD YOU?

10  A. WHICH PARTS WASHER PATENT?

11  Q. PRIOR TO THE TIME THAT YOU WERE ENGAGED TO GIVE OPINION

12  TESTIMONY IN THIS CASE, YOU HAD NEVER REALLY SAT DOWN AND

13  STUDIED A PARTS WASHER PATENT, HAD YOU?

14  A. I HAD NOT.

15  Q. THE PRIOR ART REFERENCES THAT YOU RELIED ON IN YOUR

16  INITIAL REPORT WERE ALL PROVIDED TO YOU BY COUNSEL, WEREN'T

17  THEY?

18  A. YES, THEY WERE.

19  Q. NOW, LET'S GO TO PAGE 9 OF YOUR INITIAL REPORT.  DO YOU

20  HAVE THAT WITH YOU?

21  A. INITIAL REPORT?

22  Q. FOR THE RECORD, IT'S OF RECORD AT DOCKET 313, FILED

23  FEBRUARY 29, 2008, AND IT HAS OTHERWISE BEEN MARKED FOR

24  IDENTIFICATION BY THE DEFENDANTS AS DEFENDANT'S EXHIBIT

25  1131.  WOULD YOU TURN TO PAGE 9, PLEASE?  WHAT WE SEE ON

1  PAGE 9, WHICH BY MY COUNT IS TEN LINES OF TEXT, THAT IS YOUR

2  ENTIRE TREATMENT OF DISCUSSION OF FIELD OF THE INVENTION AND

3  LEVEL OF ORDINARY SKILL IN THE ART, ISN'T IT?

4  A. THAT'S CORRECT.

5  Q. NOWHERE IN YOUR REPORT DO YOU PERFORM AN ANALYSIS AND

6  GIVE AN OPINION AND CONCLUSION AS TO THE APPLICABLE FIELD OF

7  THE INVENTION, DO YOU?

8  A. IT'S SELF-EXPLANATORY.  NO.

9  Q. STARTING FROM WHERE IT SAYS "BASED ON MY EDUCATION AND

10  EXPERIENCE" AND DOWN TO WHERE IT SAYS "PATENTS IN DISPUTE,"

11  IS THERE ANY LANGUAGE THAT YOU WOULD LIKE TO POINT TO IN

12  THAT PARAGRAPH THAT YOU BELIEVE CONSTITUTES AN ANALYSIS AND

13  OPINION CONCLUSION AS TO WHAT THE CORRECT FIELD OF THE

14  INVENTION IS FOR THE PATENTS IN SUIT?

15  A. THE -- WHAT I HAVE IS BASICALLY WHAT IT SAYS, BACHELOR'S

16  DEGREE IN ENVIRONMENTAL ENGINEERING.  BECAUSE I SAW THE

17  INVENTION AS BEING A BIO-REACTOR, AS I ELABORATED MORE ON

18  OTHER PAGES THAT I ALSO CAN TESTIFY TO.

19  Q. SECOND LINE ALL THE WAY ON THE RIGHT, HIGHLIGHT, WHERE IT

20  SAYS, AND I QUOTE, "I HAVE REVIEWED THE PATENTS IN SUIT AND

21  I UNDERSTAND THAT THE COURT HAS NOT DEFINED THE LEVEL OF

22  ORDINARY SKILL IN THE ART."  DO YOU SEE THAT?

23  A. YES.

24  Q. WHEN YOU USE THE TERM "THE ART," WHAT ART ARE YOU

25  REFERRING TO?

1    A. THE ART -- IN THIS CASE, IT IS VERY GENERAL.  SKILL IN

2    THE ART.  IT'S NOT REFERRED TO THE --

3    Q. BASKET WEAVING, BARREL MAKING, BLACKSMITH?  WHAT ART ARE

4    YOU REFERRING TO?

5    A. IT IS THE ART OF BIOREMEDIATING PARTS WASHERS.

6    Q. BUT YOU DON'T EXPRESS THAT IN YOUR REPORT, DO YOU?

7    A. IT IS NOT A LEGAL REPORT.  IT IS A TECHNICAL REPORT.  AND

8    THAT'S THE LEVEL OF ANALYSIS THAT I TYPICALLY DO.

9    Q. AND THEN AS FAR AS DETERMINING THE LEVEL OF ORDINARY

10   SKILL IN THAT ART, THERE IS NO ANALYSIS THAT DISCUSSES THE

11   SIX FACTORS FROM THE ENVIRONMENTAL DESIGN CASE, IS THERE?

12   A. NO, THERE IS NOT.

13   Q. YOU DON'T EVEN LIST THE SIX ENVIRONMENTAL DESIGN FACTORS

14   IN YOUR REPORT, DO YOU?

15   A. I ELABORATED ON THEM IN LATER REPORTS.

16   Q. RIGHT.  BUT AT THE TIME YOU WROTE THAT REPORT, YOU

17   WEREN'T EVEN AWARE OF THEIR EXISTENCE; CORRECT?

18   A. I DO NOT RECALL.

19   Q. I TAKE IT THAT YOU DISAGREE WITH DR. DURKEE'S OPINION

20   THAT THE FIELD OF THE INVENTION IS PARTS WASHING.

21   A. YES, I DO.

22   Q. SO YOU BELIEVE, I TAKE IT, THAT THE FIELD OF THE

23   INVENTION IS THE ART OF MAKING BIOREMEDIATION PARTS WASHERS;

24   IS THAT CORRECT?

25   A. IS THIS A QUESTION ON ENABLEMENT?

1  Q. NO.  I THINK WE HAVE PRETTY MUCH TAKEN CARE OF ENABLEMENT

2  IN THIS CASE.

3  A. YOU SAID "MAKING," SO I JUST WANT TO MAKE SURE THAT I

4  UNDERSTAND THE SCOPE OF YOUR QUESTION.

5  Q. THIS HAS TO DO WITH YOUR OPINION AS TO THE LEVEL OF

6  ORDINARY SKILL IN THE ART THAT YOU USED WHEN YOU DID YOUR

7  OBVIOUSNESS OPINION BACK IN EARLY 2008.  IS IT YOUR OPINION

8  THAT THE PERSON OF ORDINARY SKILL IN THE ART SHOULD BE A

9  PERSON OF ORDINARY SKILL IN THE ART IN THE FIELD OF MAKING

10 BIOREMEDIATION PARTS WASHERS?

11 A. IT'S A PERSON OF ORDINARY SKILL IN THE ART, THE WAY I

12 CONSIDERED IT -- AND ALSO HAVE A DISCUSSION WITH COUNSEL --

13 IS A HYPOTHETICAL PERSON THAT HAS SKILLS IMPUTED ON THEM TO

14 BE ABLE TO MAKE AND USE THE INVENTION.

15 Q. WELL, I UNDERSTAND THAT THE PERSON IS HYPOTHETICAL.  ARE

16 YOU ALSO TELLING ME IT IS OKAY FOR THE ART TO BE

17 HYPOTHETICAL?

18 A. THE ART OF BIOREMEDIATING PARTS WASHERS AND BIO-REACTORS.

19 YES.  I DIDN'T SPECIFICALLY DEFINE THAT.

20 Q. BUT HERE IS THE QUESTION:  IN 1994, IN THE UNITED STATES,

21 WAS THERE AN INDUSTRY THAT MADE BIOREMEDIATION PARTS

22 WASHERS?

23 A. THERE WAS NOT.

24 Q. IN ORDER TO HAVE AN ART, YOU NEED ARTISANS; RIGHT?

25 A. THAT IS CORRECT.

1   Q. AND THOSE WOULD BE ARTISANS OF VARIOUS SKILL LEVELS FROM

2   NOVICES TO APPRENTICES TO PEOPLE OF ORDINARY SKILL ALL THE

3   WAY UP TO EXPERTS; RIGHT?

4   A. RIGHT.

5   Q. AND APART FROM THE POSSIBILITY THAT THERE WAS A SWEDISH

6   GUY BY THE NAME OF HAKANSSAN, WHO DRAFTED A COUPLE OF PAPER

7   PATENTS THAT GOT PUBLISHED IN EUROPE, THERE WERE NO ARTISANS

8   IN THE ART OF MAKING BIOREMEDIATION PARTS WASHERS IN THE

9   1993-94 TIME FRAME IN THE UNITED STATES, WERE THERE?

10          MR. HARBIN:  OBJECTION, YOUR HONOR.  MISSTATES THE

11  EVIDENCE, LACKS FOUNDATION.  REQUIRES GETTING INTO OTHER

12  EVIDENCE THAT THEY HAVE EXCLUDED.

13          THE COURT:  WHAT SORT OF FOUNDATION DO WE NEED

14  HERE?

15          MR. HARBIN:  SORRY?

16          THE COURT:  WHAT IS YOUR OBJECTION WITH REGARD TO

17  FOUNDATION?

18          MR. HARBIN:  TO ESTABLISH THAT HE LOOKED FOR ART

19  ALL OVER THE WORLD, WHICH, I THINK, WAS BASICALLY THE

20  QUESTION.  BUT WE HAVE REFERENCES IN THE CASE THAT HAVE BEEN

21  EXCLUDED AND THAT QUESTION PRESUMES DON'T EXIST, AND I

22  UNDERSTAND WE ARE NOT SUPPOSED TO GO INTO THEM BUT IT IS AN

23  UNFAIR QUESTION.

24          THE COURT:  MR. CAPP?

25          MR. CAPP:  I AM NOT TRYING TO GET INTO PRIOR ART.

1    I AM SIMPLY TRYING TO GET TO THE FACT THAT IN THE UNITED

2    STATES AT THE TIME OF THE INVENTION, WERE THERE ARTISANS OF

3    VARIOUS SKILL LEVELS OR NOT.

4              MR. HARBIN:  YOUR HONOR, I THINK HE HAS ASKED HIM

5    TWO OR THREE TIMES, DOES HE KNOW, TO HIS KNOWLEDGE, WAS

6    THERE AN INDUSTRY OF PARTS WASHERS BIOREMEDIATING IN 1994,

7    AND HE SAID NO, TWO OR THREE TIMES.  I THINK THAT HAS BEEN

8    ESTABLISHED.

9              MR. CAPP:  IF THERE IS AGREEMENT --

10             THE COURT:  I WILL ALLOW THE QUESTION ONCE MORE.

11   ASK IT AND THEN LET'S MOVE ON.

12             MR. CAPP:  I AM PREPARED TO MOVE ON WITH THAT

13   STATEMENT BY MR. HARBIN THAT IT HAS BEEN ESTABLISHED.  I AM

14   PREPARED TO MOVE ON.

15             THE COURT:  OKAY.

16             MR. HARBIN:  THE WITNESS'S TESTIMONY HAS BEEN

17   ESTABLISHED, YOUR HONOR, IS WHAT I WAS REFERRING TO.

18             MR. CAPP:  WELL, IF MR. HARBIN IS NOT AGREEING

19   THAT THE FACT HAS BEEN ESTABLISHED --

20             THE COURT:  I DON'T CARE WHAT HE IS AGREEING TO OR

21   NOT.  IF YOU WANT TO PRESENT SOME EVIDENCE, PRESENT IT.  IN

22   THAT REGARD.

23             THE WITNESS:  CAN I ELABORATE ON MY ANSWER BEFORE?

24             MR. CAPP:  I DON'T BELIEVE THERE IS A QUESTION

25   PENDING, SIR.

```
1              THE COURT:  LET HIM STATE HIS QUESTION AGAIN SO WE
2  WILL ALL KNOW WHAT HE IS ASKING.
3  BY MR. CAPP:
4  Q. DR. ADRIAENS, PRIOR TO 1994, DID YOU HAVE AN OPPORTUNITY
5  TO OBSERVE THE DAY-TO-DAY ACTIVITIES OF ANYONE THAT WORKED
6  IN THE SCIENTIFIC OR ENGINEERING CAPACITY IN THE PARTS
7  WASHING INDUSTRY?
8  A. I AM SORRY, THAT WASN'T THE QUESTION I WANTED TO
9  ELABORATE ON.  IS THAT A NEW QUESTION?
10             THE COURT:  LOOK, DON'T WORRY ABOUT WHETHER IT IS
11 AN OLD QUESTION OR A NEW QUESTION.  HE IS ASKING A QUESTION.
12 IF YOU CAN ANSWER IT, HE IS ENTITLED TO AN ANSWER.  IF YOU
13 CAN'T, TELL US WHY.
14             THE WITNESS:  THANK YOU, YOUR HONOR.
15             MR. CAPP:  LET ME RE-ASK THE QUESTION, SIR.
16             THE WITNESS:  THANK YOU.
17 BY MR. CAPP:
18 Q. PRIOR TO 1994, DID YOU HAVE AN OPPORTUNITY TO OBSERVE THE
19 DAY-TO-DAY ACTIVITIES OF ANYONE THAT WORKED IN THE
20 SCIENTIFIC OR ENGINEERING CAPACITY IN THE PARTS WASHING
21 INDUSTRY?
22 A. NO.
23 Q. CAN YOU NAME ME ONE COMPANY THAT WAS MANUFACTURING AND
24 SELLING BIOREMEDIATION PARTS WASHERS IN THE UNITED STATES IN
25 1994?
```

1    A. NO.

2    Q. CAN YOU NAME ME ONE PERSON OF ANY SKILL LEVEL THAT WAS

3    INVOLVED IN THE MANUFACTURE OR SALE OF BIOREMEDIATION PARTS

4    WASHERS IN THE UNITED STATES IN 1994?

5    A. NO.

6    Q. AS FAR AS YOU KNOW, TO THE BEST OF YOUR KNOWLEDGE,

7    CHEMFREE IS THE FIRST COMPANY THAT HAS COMMERCIALIZED

8    BIOREMEDIATION PARTS WASHER; CORRECT?

9    A. I AM NOT SURE.

10   Q. ARE YOU IN POSSESSION OF ANY PERSONAL KNOWLEDGE BY WHICH

11   YOU COULD REFUTE THE PROPOSITION THAT CHEMFREE CLAIMS TO BE

12   THE FIRST COMPANY THAT HAS COMMERCIALIZED A BIOREMEDIATION

13   PARTS WASHER?

14   A. I HAVE NO KNOWLEDGE.

15   Q. NOW, IN DETERMINING THE LEVEL OF ORDINARY SKILL FOR THE

16   PURPOSES OF YOUR ENABLEMENT ANALYSIS LAST JANUARY, YOU

17   REJECTED THE NOTION THAT THE PERSON OF ORDINARY SKILL COULD

18   ACTUALLY BE A TEAM OF PRACTITIONERS FROM TWO DIFFERENT

19   DISCIPLINES, DIDN'T YOU?

20            MR. HARBIN:  YOUR HONOR, I WOULD OBJECT.  THIS IS

21   GETTING INTO LEGAL ESOTERIC OF PATENT LAW AND HE HAS OPINED

22   AND BEEN CROSS-EXAMINED BY --

23            THE COURT:  OKAY.  MR. CAPP, WHAT WE WANT TO KNOW

24   IS WHAT THE WITNESS KNOWS TODAY.  NOW, WHAT HE MAY HAVE

25   TESTIFIED TO IN THE PAST MAY BE RELEVANT TO IMPEACH HIM, AND

1    IF YOU HAVE IT IN THE DEPOSITION UNDER OATH AND HE SAYS HE

2    DIDN'T SAY IT, THEN YOU CAN OFFER THAT AS EVIDENCE THAT HE

3    DID SAY IT.  OTHERWISE, IT IS JUST IMPEACHMENT.  SO WRITE

4    YOUR QUESTION DOWN, WE ARE GOING TO TAKE A 15-MINUTE RECESS.

5    YOU CAN ASK IT WHEN WE START AGAIN IN 15 MINUTES.

6              (BREAK FROM 11:27 A.M. UNTIL 11:40 A.M.)

7    BY MR. CAPP:

8    Q. DR. ADRIAENS, ISN'T IT TRUE THAT AT THE TIME OF THE

9    INVENTION, SOMEONE OF ORDINARY SKILL WOULD HAVE REQUIRED AN

10   UNDUE AMOUNT OF EXPERIMENTATION IN ORDER TO DEVELOP

11   CHEMFREE'S PATENTED INVENTION?

12             MR. HARBIN:  OBJECTION, YOUR HONOR.  OUTSIDE OF

13   THE SCOPE AND GETS INTO AREAS THAT ARE NOT AT ISSUE.

14             THE COURT:  OVERRULED.  YOU MAY ANSWER THE

15   QUESTION.

16             THE WITNESS:  CAN YOU RESTATE THE QUESTION,

17   PLEASE?

18   MR. CAPP:

19   Q. ACTUALLY, I CAN'T.  I AM GOING TO ASK THE COURT REPORTER

20   TO REPEAT IT.

21             (THE COURT REPORTER READ THE RECORD AS REQUESTED.)

22             THE WITNESS:  TO DEVELOP IT TO THE FULL SCOPE OF

23   THE CLAIMS, YES.

24   BY MR. CAPP:

25   Q. I AM NOT SURE I UNDERSTAND THE EXTENT OF YOUR

1    QUALIFICATION.  SO LET ME RE-ASK THE QUESTION IN THE SENSE

2    OF SOMEONE DEVELOPING THE CHEMFREE INVENTION AT THE TIME OF

3    THE INVENTION TO DEVELOP IT TO THE POINT WHERE IT WAS READY

4    TO BE PATENTED.  WOULD THAT NOT HAVE REQUIRED AN UNDUE

5    AMOUNT OF EXPERIMENTATION?

6            MR. HARBIN:  JUST FOR THE RECORD, IF I COULD HAVE

7    AN INSTRUCTION BECAUSE THIS IS THE ENABLEMENT ISSUE, IF YOUR

8    HONOR WANTS TO ALLOW IT, IF I COULD HAVE A STANDING

9    OBJECTION.

10           THE COURT:  WELL, LET ME ASK YOU, MR. CAPP, WHAT

11   IS THE PURPOSE OF THE QUESTION IN VIEW OF THE FACT THAT

12   ENABLEMENT IS OFF THE TABLE?

13           MR. CAPP:  THIS IS NOT AN ENABLEMENT QUESTION.

14   THIS IS AN OBVIOUSNESS QUESTION.  IF IT WOULD HAVE TAKEN --

15           THE COURT:  ALL RIGHT.  ALL RIGHT.  ASK YOUR

16   QUESTION.

17           MR. CAPP:  CAN I HAVE IT READ BACK, PLEASE.

18        (THE COURT REPORTER READ THE RECORD AS REQUESTED.)

19           MR. HARBIN:  OBJECT, YOUR HONOR, TO THE EXTENT IT

20   IS A LEGAL CONCLUSION AND TO THE EXTENT IT INVOKES --

21           THE COURT:  TELL ME AGAIN.

22           MR. HARBIN:  TO THE EXTENT IT'S A LEGAL CONCLUSION

23   IN TERM OF ART, PATENT LAW AND INVOKES EVIDENCE AND ISSUES

24   THAT WE'VE BEEN PRECLUDED FROM GOING INTO.

25           THE COURT:  OVERRULED.  DR. ADRIAENS, DO YOU

1   REMEMBER THE QUESTION NOW?  IT'S BEEN ASKED TWO OR THREE

2   TIMES.

3           THE WITNESS:  YES, BUT UNFORTUNATELY I STILL DO

4   NOT UNDERSTAND IT, WHETHER MR. CAPP IS ASKING ME -- SORRY,

5   YOUR HONOR.  WHETHER MR. CAPP IS ASKING ME WHETHER A PERSON

6   OF ORDINARY SKILL CAN MAKE THE INVENTION OR WHETHER THE

7   INVENTORS AT THAT TIME, AS THEY WERE DEVELOPING IT, WERE

8   PATENTING IT.  THERE WAS A QUALIFICATION IN YOUR QUESTION

9   THAT I DO NOT UNDERSTAND, OR I AM NOT SURE WHERE YOU ARE

10  DIRECTING THAT.

11  BY MR. CAPP:

12  Q. YOU WERE ENGAGED TO GIVE AND DEVELOP OPINION TESTIMONY IN

13  JANUARY OF 2008, WERE YOU NOT?

14  A. I WAS.

15  Q. AND IN CONNECTION WITH THAT ENGAGEMENT, YOU SAT DOWN WITH

16  COUNSEL AND ACQUIRED KNOWLEDGE ABOUT THE LEGAL STANDARDS TO

17  BE APPLIED TO AN OBVIOUSNESS DETERMINATION, DID YOU NOT?

18  A. I DID.

19  Q. AND IN CONNECTION WITH THAT, YOU RECEIVED SOME

20  INSTRUCTION AND TRAINING ON WHAT THE LEVEL OF ORDINARY SKILL

21  IN THE ART MEANT; CORRECT?

22  A. I DID.

23  Q. AND YOU RECEIVED SOME TRAINING ON WHAT IT MEANT FOR AN

24  INVENTION TO BE OBVIOUS.  DO YOU REMEMBER?

25  A. I DO.

```
 1    Q. AND YOU ALSO RECEIVED SOME TRAINING ON WHAT THE AMOUNT OF
 2    EXPERIMENTATION THAT WOULD BE CONSIDERED, UNDUE
 3    EXPERIMENTATION TO PRACTICE THE INVENTION FOR ENABLEMENT
 4    PURPOSES EVEN AFTER THIS PERSON OF ORDINARY SKILL IN THE ART
 5    WAS GIVEN A COPY OF THE PATENT SPECIFICATION TO READ.  DO
 6    YOU REMEMBER THAT?
 7    A. YES.
 8    Q. SO NOW WE ARE TALKING ABOUT A PERSON OF ORDINARY SKILL IN
 9    THE ART.  ARE YOU WITH ME SO FAR?
10    A. I AM.
11    Q. THIS PERSON OF ORDINARY SKILL IN THE ART DOES NOT HAVE
12    THE CHEMFREE PATENT DISCLOSURE YET.
13    A. OKAY.
14    Q. AND THE QUESTION IS, WOULDN'T IT HAVE TAKEN A
15    CONSIDERABLE AMOUNT OF EXPERIMENTATION FOR THAT PERSON OF
16    ORDINARY SKILL IN THE ART AT THE TIME OF THE INVENTION TO
17    DEVELOP A BIOREMEDIATION PARTS WASHER AS DISCLOSED AND
18    CLAIMED IN CHEMFREE'S PATENT?
19    A. THE PERSON OF ORDINARY SKILL IN THE ART, AS I HAVE
20    DEFINED IT, WHICH IS THE ENVIRONMENTAL ENGINEER WHO
21    UNDERSTANDS WATER TREATMENT -- YOU SAID AT THE TIME OF THE
22    INVENTION.  OKAY.  WOULD IT HAVE TAKEN UNDUE
23    EXPERIMENTATION --
24    Q. ACTUALLY, JUST TO BE CLEAR --
25              THE COURT:  LET THE WITNESS FINISH.  HE IS IN THE
```

1    PROCESS OF TRYING TO ANSWER.

2           THE WITNESS:  I AM TRYING TO ANSWER YOUR QUESTION.

3    SO WOULD IT HAVE TAKEN UNDUE EXPERIMENTATION TO DEVELOP A

4    PARTS WASHER, A BIOREMEDIATING PARTS WASHER BASED ON THE

5    SPECIFICATIONS AS DISCLOSED IN THE PATENT?  THAT'S HOW I

6    UNDERSTAND YOUR QUESTION.

7           MR. CAPP:  ACTUALLY, JUDGE, IT WOULD BE HELPFUL IF

8    I COULD JUST HAVE THE COURT REPORTER READ BACK THE ACTUAL

9    QUESTION THAT I ASKED BECAUSE I BELIEVE I WORDED IT WITH THE

10   WORDS "CONSIDERABLE EXPERIMENTATION" AS OPPOSED TO "UNDUE."

11          THE COURT:  NO.  WE ARE GOING TO MOVE ON IN JUST A

12   MINUTE.  IF YOU CAN ANSWER DR. ADRIAENS'S QUESTION, FINE,

13   AND HE WILL DO THE BEST HE CAN TO ANSWER IT.  IF HE CAN'T,

14   LET'S JUST GO ON AND ASK YOUR NEXT QUESTION.

15   BY MR. CAPP:

16   Q. DR. ADRIAENS, IN YOUR OPINION, COULD SOMEONE OF ORDINARY

17   SKILL IN THE ART DEVELOP WHAT IS DISCLOSED AND CLAIMED IN

18   CHEMFREE'S PATENTS WITHOUT ENGAGING IN CONSIDERABLE

19   EXPERIMENTATION?

20   A. HOW DO YOU DEFINE "CONSIDERABLE"?

21   Q. SLIGHTLY LESS THAN THE AMOUNT THAT YOU CONSIDERED UNDUE

22   IN YOUR ENABLEMENT OPINION.

23   A. I CAN'T ANSWER THAT QUESTION.  BECAUSE I AM NOT SURE WHAT

24   THAT MEANS.

25          THE COURT:  OKAY.  THAT'S GOOD.  ASK YOUR NEXT

```
 1    QUESTION.  ALL RIGHT MOVE ON TO ANOTHER QUESTION.
 2              MR. CAPP:  YES, YOUR HONOR.
 3    BY MR. CAPP:
 4    Q. DR. ADRIAENS, YOU WERE ENGAGED TO FORMULATE AN OPINION AS
 5    TO WHETHER CHEMFREE'S PATENTS ARE INVALID OVER THE PRIOR
 6    ART; CORRECT?
 7    A. CORRECT.
 8    Q. AND YOU WERE ALSO ENGAGED TO FORMULATE AN OPINION AS TO
 9    WHETHER CHEMFREE'S -- SOME OF CHEMFREE'S PATENT CLAIMS WERE
10    INFRINGED BY THE DEFENDANT'S BIO-CIRCLE PARTS WASHERS;
11    CORRECT?
12    A. YES.
13    Q. AND IN CONNECTION WITH THOSE DUAL ASSIGNMENTS, YOU
14    STUDIED THE PRIOR ART; CORRECT?
15    A. I DID.
16    Q. AND IN CONNECTION WITH THOSE DUAL ASSIGNMENTS, YOU ALSO
17    OPERATED ONE OR MORE OF THE DEFENDANT'S PARTS WASHERS,
18    DIDN'T YOU?
19    A. I DID.
20    Q. AND IN CONNECTION WITH THOSE DUAL ASSIGNMENTS, YOU ALSO
21    STUDIED THE COURT'S MARKMAN CLAIM CONSTRUCTION ORDER, DIDN'T
22    YOU?
23    A. I DID READ THAT, YES.
24    Q. AND IN CONNECTION WITH THOSE DUAL ASSIGNMENTS, YOU ALSO
25    UNDERSTOOD THAT THE TERMS OF CHEMFREE'S PATENTS AS CONSTRUED
```

1   BY THE COURT'S CLAIM CONSTRUCTION ORDER SHOULD BE APPLIED IN

2   A CONSISTENT MANNER TO THE PRIOR ART FOR PURPOSES OF

3   INVALIDITY AND TO THE ACCUSED DEVICES FOR PURPOSES OF

4   INFRINGEMENT, DIDN'T YOU?

5   A. CAN YOU RESTATE THAT QUESTION, PLEASE?

6   Q. YES.  IN CONNECTION WITH YOUR ASSIGNMENT, YOU GOT THE

7   COURT'S MARKMAN ORDER; RIGHT?

8   A. I DID.

9   Q. AND YOU UNDERSTOOD THAT YOU WERE TO TAKE THAT MARKMAN

10  ORDER AND YOU WERE TO APPLY THE COURT'S CLAIM CONSTRUCTION

11  IN A CONSISTENT MANNER, WHETHER YOU WERE READING IT ON THE

12  PRIOR ART FOR PURPOSES OF YOUR INVALIDITY ANALYSIS, AND

13  YOU'RE READING IT ON THE ACCUSED DEVICES FOR PURPOSES OF

14  YOUR INFRINGEMENT ANALYSIS; CORRECT?

15  A. THAT IS WHAT I UNDERSTAND.

16  Q. OKAY.  IF YOU TAKE THE TERM "FLOW PATH" AND APPLY IT AS

17  YOU HAVE DONE OVER THE PRIOR ART FOR PURPOSES OF YOUR

18  INVALIDITY ANALYSIS, AND THEN ATTEMPT TO APPLY THE SAME TERM

19  IN A CONSISTENT MANNER OVER THE ACCUSED WALTER PARTS

20  WASHERS, WOULD YOU AGREE THAT THE BR 100 HAS A FLOW PATH?

21  A. I DID NOT DO -- SO YOU'RE TALKING ABOUT INFRINGEMENT.  I

22  DID NOT DO AN INFRINGEMENT ANALYSIS ON ALL OF THE WALTER

23  PARTS WASHERS.

24  Q. DID YOU READ THE COURT'S CLAIM CONSTRUCTION ORDER ON WHAT

25  THE DEFINITION OF FLOW PATH WAS?

1   A. YES, I DID.

2   Q. AND DID YOU STUDY PRIOR ART IN AN ATTEMPT TO READ THE

3   COURT'S INSTRUCTION FAITHFULLY AND CORRECTLY AND DILIGENTLY

4   ON THE PRIOR ART?

5   A. AS FAR AS I COULD INTERPRET IT, YES.

6   Q. YOU WEREN'T TRYING TO BE INTENTIONALLY BIASED WHEN YOU

7   DID YOUR INVALIDITY REPORT, WERE YOU?

8   A. NO.

9   Q. SO -- AND YOU'VE ALSO SEEN AND ACTUALLY OPERATED THE

10  DEFENDANT'S PARTS WASHERS, HAVEN'T YOU?

11  A. I DID NOT OPERATE THE PARTS WASHER UNTIL MARCH OF 2008.

12  Q. SO THAT IS GREAT.  SO THAT MEANS THAT YOUR KNOWLEDGE IS

13  EVEN MORE RECENT THAN WHEN YOU WROTE YOUR REPORT, ISN'T IT?

14          MR. HARBIN:  OBJECT TO THE FORM OF THE QUESTION,

15  YOUR HONOR.  AMBIGUOUS.

16          THE COURT:  WHAT WAS THE OBJECTION?

17          MR. HARBIN:  OBJECT TO THE FORM OF THE QUESTION.

18  AMBIGUOUS.  I CAN EXPLAIN WHY IF YOU WANT ME.

19          THE COURT:  EXPLAIN WHY.

20          MR. HARBIN:  WE'RE LEADING UP TO AN ISSUE OF, I

21  BELIEVE, ASKING ABOUT INFRINGEMENT TESTIMONY WHEN HE HAS

22  EVALUATED -- HE HAS DONE A VERY LIMITED INFRINGEMENT

23  ANALYSIS, WHICH DOESN'T JUST ENTAIL LOOKING AT THE CLAIMS OR

24  THE CONSTRUCTION OR THE MACHINES, BUT THE FILE WRAPPERS, AND

25  IT'S AN ANALYSIS THAT HASN'T BEEN A FOUNDATION OF THAT HE

1    HAD DONE THAT FOR PURPOSES OF INFRINGEMENT.

2             MR. CAPP:  I AM SORRY, YOUR HONOR.  I WON'T

3    RESPOND UNTIL YOU ASK ME TO.  SORRY.

4             THE COURT:  ALL RIGHT.  WHAT DO YOU SAY, MR. CAPP?

5             MR. CAPP:  YOUR HONOR, DR. ADRIAENS ISSUED AN

6    EXPERT REPORT, IT IS DOCKET 338, MARCH 31, 2008, AND IT IS

7    ABOUT 50 OR 60 PAGES LONG.  LET ME SEE IF I CAN FIND THE

8    SIGNATURE BLOCK.

9             THE COURT:  TELL ME WHAT YOU ARE GETTING AT.

10            MR. CAPP:  HE CONSTRUES AND APPLIES TERMS AGAINST

11   CLAIMS OF THE 491 PATENT, THE 110 PATENT, THE 125 PATENT.

12   HE HAS APPLIED THE SAME TERMS AGAINST ALL OF THE CLAIM

13   TERMS, AGAINST MULTIPLE PRIOR ART REFERENCES, AND HE HAS

14   HANDS-ON FAMILIARITY WITH THE DEFENDANT'S PARTS WASHERS.

15            THE COURT:  ASK YOUR QUESTION.

16   BY MR. CAPP:

17   Q. DR. ADRIAENS, IF YOU TAKE THE TERM "FLOW PATH" AND APPLY

18   IT AS YOU HAVE DONE OVER THE PRIOR ART, AND THEN ATTEMPT TO

19   APPLY THE SAME TERM IN A CONSISTENT MANNER OVER THE ACCUSED

20   WALTER PARTS WASHERS, WOULD YOU AGREE THAT THE BR 100 HAS A

21   FLOW PATH?

22   A. I DID NOT STUDY THE BR 100, AS I JUST INDICATED.

23   Q. ALL RIGHT.  DID YOU STUDY THE BR 200?

24   A. I WORKED WITH THE -- OR MY LAB WORKED WITH THE BR 200.

25   Q. DID YOU -- HOW CLOSE TO THE MACHINE DID YOU GET?

1    A. I SAW THE MACHINE.

2    Q. DID YOU GET CLOSE ENOUGH TO LOOK OVER THE EDGE OF THE

3    BASIN AND APPEAR DOWN INTO THE BASIN?

4    A. I DID.

5    Q. DID YOU SEE THAT THERE WAS A ROUND CIRCULAR HOLE IN THE

6    MIDDLE OF THE BASIN?

7    A. EVERY BASIN DOES HAVE THAT.  YES.

8    Q. AND DID THAT STRIKE YOU AS BEING SIMILAR TO THE THINGS

9    THAT YOU OPINED WERE FLOW PATHS IN THE PRIOR ART WHEN YOU

10   DID YOUR INVALIDITY ANALYSIS?

11          MR. HARBIN:  OBJECT, YOUR HONOR.  IF I MAY HAVE A

12   STANDING OBJECTION.  ALSO, I WOULD ASK IF HE IS GOING TO BE

13   ASKED ABOUT OPINIONS, HE NEEDS TO BE PROVIDED THOSE

14   OPINIONS.

15          THE COURT:  YOU MAY HAVE A STANDING OBJECTION.  GO

16   AHEAD.

17          THE WITNESS:  SORRY, WHERE WERE WE ON THE

18   QUESTION?

19   BY MR. CAPP:

20   Q. ALL RIGHT.  LET'S GO BACK TO WHEN YOU WERE GIVEN THIS

21   TASK WHERE THESE ATTORNEYS OVER HERE GAVE YOU PIECES OF

22   PRIOR ART IN JANUARY AND FEBRUARY OF 2008.  DO YOU REMEMBER

23   THAT?

24   A. YES.

25   Q. AND YOU STUDIED THOSE; RIGHT?

1  A. I READ ALL OF THOSE.

2  Q. SO YOU READ THE TEXT AND YOU ALSO LOOKED AT THE DRAWINGS;

3  RIGHT?

4  A. I DID.

5  Q. AND WHEN YOU SAW SOMETHING IN THE DRAWING THAT LOOKED

6  LIKE A CIRCULAR HOLE IN THE MIDDLE OF A SINK OR A BASIN, DID

7  YOU CONSIDER THAT TO BE A FLOW PATH AS YOU RECALL FROM YOUR

8  INVALIDITY ANALYSIS?

9  A. I SUPPOSE.  I AM GOING TO HAVE TO SEE THE CLAIM

10  CONSTRUCTION BY THE COURT AGAIN.

11  Q. DOCKET 212, PAGE 50.  NOW, DR. ADRIAENS, DO YOU RECALL

12  THAT WHEN YOU STUDIED THE PRIOR ART BACK IN JANUARY AND

13  FEBRUARY OF 2008, YOU FOUND MULTIPLE PRIOR ART REFERENCES

14  THAT IN YOUR OPINION HAD FLOW PATHS.  DO YOU REMEMBER THAT?

15  A. I DO.

16  Q. AND WHEN YOU MADE THAT FINDING AND REACHED THAT OPINION

17  AND CONCLUSION, WHAT IS SHOWN UP ON THE SCREEN RIGHT NOW

18  FROM THE COURT'S CLAIM CONSTRUCTION ORDER IS THE

19  CONSTRUCTION THAT YOU USED; RIGHT?

20  A. YES.

21  Q. SO IF YOU TAKE THAT CONSTRUCTION, AND YOU TRY FAITHFULLY

22  TO APPLY IT CONSISTENTLY AS YOU DID THE PRIOR ART OVER TO

23  THE BR 100, WOULD YOU AGREE THAT -- SORRY.  THE BR 200.

24  DOES THE BR 200 HAVE A FLOW PATH?

25  A. TECHNICALLY, I WOULD AGREE WITH THAT.  YES.

1  Q. NOW, YOU ALSO FOUND IN YOUR INITIAL EXPERT REPORT THAT

2  THERE WERE NUMEROUS PRIOR ART REFERENCES THAT HAD A FILTER.

3  DO YOU REMEMBER THAT?

4  A. YES.

5  Q. OKAY.  AND DO YOU SEE THAT THE COURT HAS CONSTRUED THE

6  TERM "FILTER"?

7  A. YES.

8  Q. AND WHEN YOU DID YOUR INVALIDITY REPORT, YOU TRIED TO

9  FAITHFULLY APPLY THE COURT'S CLAIM CONSTRUCTION RULING WHEN

10  YOU LOOKED AT THE PRIOR ART TO DETERMINE WHETHER THE PRIOR

11  ART HAD FILTERS IN THEM OR NOT, DIDN'T YOU?

12  A. I DID.

13  Q. SO NOW YOU TAKE THAT TERM AND TRY AND APPLY IT

14  CONSISTENTLY OVER TO THE BR 200.  DOES THE BR 200 HAVE A

15  FILTER INTERPOSED IN THE FLOW PATH?

16  A. IT DOES.  EVERY SINK DOES.

17  Q. AND HOW ABOUT THE IO 400 SITTING NEXT TO IT, DOES IT ALSO

18  HAVE A FILTER INTERPOSED IN THE FLOW PATH?

19  A. I HAVEN'T LOOKED AT THE IO 400 RECENTLY.

20       MR. CAPP:  YOUR HONOR, CAN THE WITNESS HOP DOWN

21  AND TAKE A PEEK INTO THE SINK OF THE IO 400 VERY QUICKLY?

22       THE COURT:  YOU MAY, IF THAT WOULD HELP, DOCTOR.

23       THE WITNESS:  YES, IT DOES.

24  BY MR. CAPP:

25  Q. WOULD YOU ALSO TAKE A LOOK AND SEE WHETHER, IN YOUR

1   OPINION, THE IO 200 HAS A FILTER INTERPOSED IN THE FLOW PATH
2   BETWEEN THE BASIN AND THE TANK?
3   A. IT DOES.
4            MR. CAPP:  YOUR HONOR, I HAVE TWO OR THREE MORE
5   QUESTIONS, THEN WE CAN BREAK FOR LUNCH UNLESS THERE IS
6   REDIRECT.
7   BY MR. CAPP:
8   Q. DR. ADRIAENS, DO YOU RECALL -- GARY, WOULD YOU PULL UP
9   THE 125 PATENT, CLAIM 6.  DR. ADRIAENS, I DIRECT YOUR
10  ATTENTION TO THE THIRD LINE FROM THE BOTTOM, STARTING OVER
11  TOWARD THE RIGHT WHERE IT SAYS, AND I QUOTE, "RETAINING THE
12  HYDROCARBONS WITHIN THE FLUID IN THE TANK WHILE THE
13  MICROORGANISMS BIODEGRADE THE HYDROCARBONS."  DO YOU SEE
14  THAT?
15  A. YES.
16  Q. OKAY.  DO YOU RECALL THAT YOU READ THAT CLAIM LIMITATION
17  ON SEVERAL ITEMS OF PRIOR ART WHEN YOU DID YOUR INVALIDITY
18  ANALYSIS?
19  A. YES.
20  Q. AND YOU ARE FAMILIAR WITH THE OPERATION.  YOU HAVE
21  ACTUALLY OPERATED THE DEFENDANT'S ACCUSED INFRINGING PARTS
22  WASHERS; RIGHT?
23  A. YES.
24  Q. SO IF THE PRIOR ART REFERENCES THAT YOU SAW POSSESS THE
25  LIMITATION OF RETAINING THE HYDROCARBONS WITHIN THE FLUID

1    AND THE TANK WHILE THE MICROORGANISMS BIODEGRADE THE

2    HYDROCARBONS AND YOU APPLY THE COURT'S CONSTRUCTION OF THOSE

3    TERMS CONSISTENTLY OVER TO THE DEFENDANT'S ACCUSED PARTS

4    WASHERS, DO THE DEFENDANT'S ACCUSED PARTS WASHERS MEET THAT

5    LIMITATION, IN YOUR OPINION?

6    A. THIS IS A VERY COMMON FEATURE IN ALL OIL BIOREMEDIATING

7    BIO-REACTORS.

8    Q. SO IS YOUR ANSWER YES?

9    A. YES.  BUT IT'S NOT UNIQUE.

10            MR. CAPP:  NO FURTHER QUESTIONS, YOUR HONOR.

11            THE COURT:  ANY REDIRECT?

12            MR. CAPP:  I AM SORRY, YOUR HONOR, CAN I ASK TWO

13   MORE QUESTIONS?

14            THE COURT:  SURE.

15            MR. HARBIN:  NO OBJECTION.

16                  CROSS-EXAMINATION (RESUMED)

17   BY MR. CAPP:

18   Q. PULL UP THE 110 PATENT, CLAIM 5.  NOW, DR. ADRIAENS, DO

19   YOU REMEMBER WHEN YOU WERE ON DIRECT EXAMINATION, IT WAS

20   YOUR OPINION THAT THE IO 200 DID NOT MEET THE LIMITATION OF

21   THE HEATER AS CONSTRUCTED AND ARRANGED TO ADD HEAT TO THE

22   FLUID WHILE THE FLUID IS DISPOSED IN THE TANK.  DO YOU

23   RECALL THAT?

24   A. THAT IS RIGHT.

25   Q. IS THERE A DEVICE ON THE IO 200 THAT SENSES THE

1  TEMPERATURE OF THE FLUID?

2  A. THERE IS A THERMOSTAT WHERE YOU CAN SET THE TEMPERATURE.

3  Q. I UNDERSTAND WHAT A THERMOSTAT IS BUT DOESN'T THE

4  THERMOSTAT NEED A THERMISTOR THAT IS A TEMPERATURE SENSOR TO

5  TELL WHAT THE TEMPERATURE IS?

6  A. THE IO 200, I WILL HAVE TO TAKE A LOOK AT IT.

7  Q. SIR, YOU DO NOT RECALL -- IS IT THAT YOU DON'T REMEMBER

8  OR THAT YOU NEVER ACTUALLY LOOKED AT THE UNIT WHEN YOU

9  REACHED YOUR OPINION THAT THAT LIMITATION WAS NOT INFRINGED?

10  A. I LOOKED AT IT FROM THE PERSPECTIVE OF ADDING HEAT TO THE

11  FLUID.  I DIDN'T LOOK AT A THERMISTOR.

12  Q. WHEN YOU DID YOUR ANALYSIS AND YOU REACHED YOUR OPINION

13  AND CONCLUSION, DID YOU HAPPEN TO ASCERTAIN WHERE THE IO 200

14  MEASURES THE TEMPERATURE OF THE FLUID IN ORDER TO SEND A

15  SIGNAL TO THE THERMOSTAT TO ACTIVATE THE HEATER TO TURN IT

16  ON IF THE FLUID IS TOO COLD OR TO TURN IT OFF WHEN IT GETS

17  HOT ENOUGH?

18  A. I DON'T RECALL.

19  Q. LET ME MAKE -- I AM NOT SURE I UNDERSTAND.  ARE YOU

20  SAYING YOU DON'T RECALL WHETHER YOU DID THE ANALYSIS OR NOT,

21  OR YOU RECALL DOING THE ANALYSIS BUT YOU JUST DON'T REMEMBER

22  WHERE THE THERMISTOR IS?

23  A. I LOOKED AT THE FUNCTION, I LOOKED AT HOW THE WATER IS

24  HEATED IN THE SYSTEM.  I DID NOT LOOK AT WHETHER THERE IS A

25  THERMISTOR OR WHERE YOU CAN REGULATE THE TEMPERATURE OR

1   ANYTHING LIKE THAT.

2   Q. LET ME ASK YOU THIS:  IF YOU HAD DONE A LITTLE BIT MORE

3   OF AN ANALYSIS AND STUDIED AND YOU WOULD HAVE FOUND OUT THAT

4   THE PLACE WHERE THE THERMISTOR IS LOCATED TO SENSE THE

5   TEMPERATURE IS IN THE TANK, AND THAT IS WHERE IT MEASURES

6   THE TEMPERATURE TO TURN THE HEATER ON, AND THEN ONCE WARM

7   WATER FROM THE HEATER COMES OUT AND GOES BACK INTO THE TANK,

8   A THERMISTOR SENSES THAT AND SENDS ANOTHER SIGNAL BACK TO

9   THE THERMOSTAT TO TURN THE HEATER OFF, WOULD THAT HAVE

10  CHANGED YOUR OPINION AS TO WHETHER OR NOT THAT CLAIM

11  LIMITATION WAS MET?

12  A. NO.

13  Q. COME UP TO THE 125 PATENT, CLAIM 4.  DR. ADRIAENS, I

14  BASICALLY HAVE THE SAME QUESTION AS THIS ONE.  IF YOU HAD

15  DONE A FURTHER INVESTIGATION AND DETERMINED THAT THE PLACE

16  WHERE THE IO 200 MEASURES THE TEMPERATURE IN ORDER TO SEND A

17  SIGNAL TO TURN THE HEATER ON OR OFF, AND YOU WOULD HAVE

18  FOUND OUT THAT THE PLACE THAT MEASUREMENT TAKES PLACE IS IN

19  THE BODY OF THE FLUID DOWN IN THE TANK, WOULD THAT HAVE

20  CHANGED YOUR OPINION AS TO WHETHER OR NOT CLAIM 4 OF THE 125

21  PATENT IS INFRINGED?

22  A. IT WOULDN'T HAVE.

23  Q. IT WOULD NOT, IS THAT YOUR TESTIMONY?  IT WOULD NOT?

24  A. IF THE SENSOR IN THE TANK --

25  Q. SIR, I DIDN'T MEAN TO QUESTION, I JUST DIDN'T HEAR THE

1  ANSWER.  THAT WAS THE ONLY REASON I FOLLOWED UP.

2  A. I WOULD LIKE YOU TO RESTATE YOUR QUESTION.

3  Q. THE IO 200 HAS A HEATER; RIGHT?

4  A. YES.

5  Q. AND THERE IS SOMETHING CALLED A THERMOSTAT THAT TELLS THE

6  HEATER TO TURN ON AND TO TURN OFF; RIGHT?

7  A. UH-HUH (AFFIRMATIVE).

8  Q. AND THEN THERE IS A TEMPERATURE SENSING DEVICE CALLED THE

9  THERMISTOR THAT IS LOCATED SOMEWHERE THAT MEASURES THE

10  TEMPERATURE OF THE FLUID IN ORDER FOR THE THERMOSTAT TO KNOW

11  IF IT IS HOT OR COLD SO IT CAN SEND THE RIGHT SIGNAL TO THE

12  HEATER TO TURN ON OR OFF.  ARE YOU WITH ME SO FAR?

13  A. YES.

14  Q. IF YOU HAD DONE A FURTHER INVESTIGATION AND ASCERTAINED

15  THAT THE THERMISTOR WAS LOCATED DOWN IN THE BODY OF THE

16  FLUID IN THE TANK, WOULD THAT HAVE CHANGED YOUR OPINION AS

17  TO WHETHER OR NOT CLAIM 4, THAT LIMITATION IN CLAIM 4, IS

18  MET?

19  A. I DID NOT READ THAT IN THIS CLAIM.  SO, NO.  IT WOULDN'T

20  HAVE CHANGED MY OPINION.

21  Q. CLAIM 16.  IS IT YOUR UNDERSTANDING THAT IN ORDER FOR

22  CLAIM 16 TO BE INFRINGED, THE HEATER HAS TO BE PHYSICALLY

23  IMMERSED IN THE BODY OF FLUID IN THE TANK?

24  A. THAT WAS MY UNDERSTANDING.

25  Q. IF I HAD A TANK THAT WAS A METAL TANK, LIKE MY HOT WATER

1   HEATER AT HOME -- ARE YOU WITH ME?  AND THE WAY THAT WATER

2   IS HEATED IS THERE IS A FLAME THAT IS OUTSIDE OF THE TANK

3   AND UNDERNEATH IT, WOULDN'T THAT BE A HEATING STEP THAT

4   INCLUDES A STEP OF HEATING THE FLUID WITHIN THE TANK?

5   A. YES.  BUT IT WOULD GENERATE -- YES.

6            MR. CAPP:  NO FURTHER QUESTIONS, YOUR HONOR.

7            THE COURT:  REDIRECT?

8            THE WITNESS:  CAN I ELABORATE MY ANSWER TO HIS

9   LAST QUESTION, OR ARE WE BEYOND THAT?

10            THE COURT:  GO AHEAD, IF YOU WANT THE ELABORATE

11   IT.

12            THE WITNESS:  OKAY.  IT IS A MEANS BECAUSE THAT

13   HEATER UNDERNEATH THAT METAL TANK WOULD GENERATE CONVECTION

14   CURRENTS THAT WOULD HEAT THE WATER, WHICH IS THE SAME WAY AS

15   THE COIL INSIDE THE TANK.  THANK YOU, YOUR HONOR.

16            MR. HARBIN:  FIRST OFF, YOUR HONOR, I WOULD JUST

17   LIKE TO -- I WAS GOING TO QUESTION THE WITNESS, BUT I WOULD

18   JUST LIKE TO STATE FOR THE RECORD, WITH REGARD TO THE

19   QUESTIONING OF DR. ADRIAENS ABOUT OBVIOUSNESS OR SKILL IN

20   THE ART IN HIS FIRST REPORT, I WOULD -- IT IS MY

21   UNDERSTANDING THAT I'VE GOT THE INITIAL REPORT OF JOHN

22   DURKEE DONE THE SAME DAY OR THE DAY AFTER, FEBRUARY OF 2008.

23   THERE IS NOT ANY REFERENCE TO SKILL IN THE ART, WHAT THE ART

24   IS, TRYING TO DEFINE THE SKILL IN THE ART, AND WE HAVEN'T

25   OBJECTED TO HIM TESTIFYING ABOUT IT.  BUT I JUST WANTED TO

1  POINT THAT OUT TO THE COURT, BECAUSE DR. ADRIAENS WAS

2  CROSS-EXAMINED VIGOROUSLY ABOUT THE ABSENCE OF DETAIL IN HIS

3  REPORT THAT DID ADDRESS SKILL IN THE ART.

4  MR. CAPP: YOUR HONOR, MAY I HAVE A SHORT RESPONSE

5  TO THAT?

6  THE COURT:  ALL RIGHT.

7  MR. CAPP: LEVEL OF ORDINARY SKILL IN THE ART

8  APPLIES TO AN OBVIOUSNESS ANALYSIS, BECAUSE IT IS ONE OF THE

9  FOUR GRAND FACTORS.  DR. ADRIAENS'S REPORT ON OBVIOUSNESS

10  WAS DUE ON FEBRUARY 29.  DR. DURKEE'S REPORT, IN RESPONSE TO

11  THAT, WAS DUE ON MARCH 31, 2008.  AND DR. DURKEE'S ANALYSIS

12  OF LEVEL OF ORDINARY SKILL IN THE ART COVERS FROM PAGE 93 TO

13  PAGE 112 OF HIS REPORT.  SO HE DID A ROUGHLY 19 -- I GUESS

14  17-PAGE ANALYSIS, COMPARED TO DR. ADRIAENS'S TEN LINES OF

15  TEXT ON A SINGLE PAGE.

16  THE COURT:  OKAY.

17  MR. HARBIN:   THE OTHER THING, IF YOU COULD -- I

18  WILL WITHDRAW THAT, YOUR HONOR.  YOUR HONOR, I AM A LITTLE

19  CONCERNED.  WHAT I PROPOSE, THIS IS OUR LAST WITNESS, TO

20  CONFER OVER LUNCH.  I DON'T THINK I AM GOING TO ASK ANY

21  FURTHER QUESTIONS OF THIS WITNESS.  I MAY ASK THAT, AFTER I

22  CONFER WITH MY COLLEAGUES, I MAY ASK THAT WE -- WE MAY ASK

23  YOUR HONOR TO INTRODUCE SOME OF HIS REPORTS, BECAUSE I AM

24  CONCERNED ABOUT, GIVEN THE SCOPE OF THE RESTRICTIONS IN THE

25  CASE, AND THEN THE PLAINTIFF'S CROSS-EXAMINATION, THAT WE'VE

1    BEEN PUT IN AN UNTENABLE POSITION.  BUT IF I COULD, AND IF I

2    COULD CONFER ABOUT THAT OVER LUNCH.

3            THE COURT:  OKAY.

4            MR. HARBIN:   OR MAYBE YOUR HONOR IS NOT GOING TO

5    RECONSIDER ITS RULINGS, BUT IT IS A CONCERN I HAVE, JUST

6    THAT THERE WERE ISSUES OF RESTRICTION ON OBVIOUSNESS.

7    ENABLEMENT WAS OUT OF THE CASE, BUT THE BIGGER ISSUES FOR US

8    WITH OBVIOUSNESS AND PRIOR ART THAT WE THINK COULD BE

9    ADDRESSED THAT WERE IMPLICATED BY A LOT OF THE QUESTIONS.

10   WE HAVE MADE AN OFFER OF PROOF, AND THAT MAY ADDRESS OUR

11   CONCERNS.  WE FILED A COPY, AND WE HAVE A COURTESY COPY FOR

12   THE COURT, BUT I WOULD LIKE TO CONFER WITH MY COLLEAGUES

13   BRIEFLY IF I COULD OVER LUNCH.

14           THE COURT:  SO YOU WOULD LIKE TO TAKE OUR LUNCH

15   RECESS NOW, AND YOU HAVE NO FURTHER QUESTIONS?

16           MR. HARBIN:  OTHER THAN --

17           THE COURT:  OTHER THAN WHAT YOU MAY DECIDE OVER

18   LUNCH?

19           MR. HARBIN:  YES, SIR.

20           THE COURT:  I THINK THAT IS FINE, AND I THINK THAT

21   WILL PROBABLY MAKE THINGS MOVE ALONG A LITTLE MORE QUICKLY.

22   LET'S TAKE A LUNCH RECESS UNTIL 1:30, AND WE WILL START

23   AGAIN AT THAT TIME.

24               (BREAK FROM 12:21 TILL 1:30.)

25           THE COURT: ALL RIGHT.  WHERE ARE WE WITH OUR

1    FURTHER EXAMINATION?

2             MR. HARBIN:   WE ARE NOT GOING TO ASK ANY FURTHER

3    QUESTIONS, YOUR HONOR.  WE WOULD LIKE TO MAKE AN OFFER OF

4    PROOF BRIEFLY, AND SATISFY ANY EXISTING --

5             THE COURT:  DO YOU HAVE ANY FURTHER EVIDENCE?

6             MR. HARBIN:  NO LIVE WITNESSES.  WE WOULD LIKE TO

7    TENDER SOME DEPOSITIONS AND SOME EXHIBITS WHICH PLAINTIFF'S

8    COUNSEL IS REVIEWING.  I THINK THEY ARE PRIMARILY THE

9    INDIVIDUAL MCNALLY REPORTS THAT I MENTIONED.

10            THE COURT:  HOW YOU WANT TO TENDER THE

11   DEPOSITIONS?  DO YOU WANT TO STATE THOSE NOW?

12            MR. SCHAETZEL:  THAT WILL BE FINE, YOUR HONOR, IF

13   YOU WANT TO DO THAT.

14            THE COURT:  OKAY.

15            MR. SCHAETZEL:  WE WOULD LIKE TO TENDER THE

16   DEPOSITIONS OF MR. SHEFFIE, MR. OVERLAND, MS. MARTIN, THEN

17   DR. BRICKLE, MR. WHITEMAN, AND THEN WE WOULD LIKE TO ALSO

18   TENDER SOME INCONSISTENT STATEMENTS FROM DEPOSITIONS THAT

19   WERE PLAYED BY MR. STRANGE, MCNALLY, AND MARKS.

20            BRIEFLY, YOUR HONOR, MR. SHEFFIE IS THE LAWYER UP

21   IN CAROLINA THAT TOOK A LOOK AT THE INVENTORSHIP ISSUE, AND

22   I WOULD LIKE THE COURT TO SEE THE TWO OPINIONS THAT HE GAVE

23   IN TERMS OF INVENTORSHIP.  AND MR. OVERLAND --

24            THE COURT: I THINK I HAD MR. SHEFFIE TESTIFY LIVE

25   A FEW YEARS AGO.  HE IS A VERY IMPRESSIVE WITNESS.

1              MR. HARBIN:  I AM DISAPPOINTED YOU FEEL THAT WAY,

2      BECAUSE I CROSS-EXAMINED HIM.  I DON'T KNOW IF YOU REMEMBER

3      THAT.  IT WAS MY FIRST TIME.

4              THE COURT:  HE WAS HARD TO CROSS-EXAMINE, WASN'T

5      HE?

6              MR. SCHAETZEL:  MS. MARTIN IS THE PATENT ATTORNEY

7      THAT WROTE THE 226 APPLICATION.  DR. BRICKLE, BECAUSE

8      DR. DURKEE RELIED ON PARTS OF DR. BRICKLE'S REPORTS.  MR.

9      WHITEMAN, WHO IS WITH ZYMO, WAS DEPOSED IN THE CASE.  AND

10     THEN OF COURSE YOU KNOW ABOUT MR. STRANGE AND MR. MCNALLY

11     AND MR. MARKS.

12             THE COURT:  ANY OBJECTION TO THOSE BEING MADE A

13     PART OF THE RECORD?

14             MR. ANDERSON:  MAY I APPROACH?

15             THE COURT:  YES.

16             MR. ANDERSON:  THANK YOU, YOUR HONOR.  THERE IS

17     NO OBJECTION TO THE SHEFFIE, OVERLAND, MARTIN, DR. BRICKLE,

18     OR WHITEMAN DEPOSITIONS COMING IN, YOUR HONOR.  WE DO HAVE

19     CONCERN ABOUT THE STRANGE, MCNALLY, AND MARKS DEPOSITIONS;

20     MERELY YOUR HONOR'S HAD AN OPPORTUNITY TO HEAR THEM LIVE.

21     MY UNDERSTANDING FROM THE PROFFER IS THAT THE STATEMENTS

22     THAT ARE BEING OFFERED ARE SUPPOSEDLY INCONSISTENT

23     STATEMENTS.  THERE WAS AN OPPORTUNITY TO IMPEACH THE

24     WITNESSES WHILE THEY WERE HERE ON THE STAND.  SINCE I DON'T

25     KNOW THE FULL EXTENT OF THE PROFFER THAT IS BEING MADE, I

1    WOULD ALSO SIMPLY MENTION TO THE COURT THAT WE HAD RAISED

2    OBJECTIONS AND A MOTION TO STRIKE THE DESIGNATIONS OF THE

3    STRANGE, MCNALLY, AND MARKS DEPOSITIONS AS WELL AS SIMPLY

4    BEING CUMULATIVE.

5            I BELIEVE YOUR HONOR'S AWARE THAT THERE HAS BEEN

6    OVER A DECADE OF LITIGATION INVOLVING CHEMFREE, MCCLUER, AND

7    OTHERS.  THESE GENTLEMEN HAVE BEEN DEPOSED ON AVERAGE NO

8    LESS THAN FOUR TIMES, AND SO THE DEPOSITIONS ARE NOT ONLY

9    VOLUMINOUS, THEY ARE LARGELY REPETITIVE OF THE SAME ISSUES

10   IN EACH LITIGATION THAT THE GENTLEMEN WERE ASKED TO GIVE

11   TESTIMONY ON.  SO IF WE ARE BEING ASKED AT THIS POINT TO PUT

12   IN THE FULL SERIES OF FOUR DEPOSITIONS FROM EACH WITNESS, I

13   WOULD ALSO SIMPLY OBJECT TO IT AS BEING CUMULATIVE EVIDENCE

14   AS WELL.

15           THE COURT:  ALL RIGHT.  WHAT ABOUT THAT?  YOU ARE

16   OFFERING, NOT JUST INCONSISTENT STATEMENTS, BUT THE ENTIRE

17   DEPOSITIONS AS AN INCONSISTENT STATEMENT?

18           MR. SCHAETZEL:  NO, SIR, I WAS NOT CLEAR.  WHEN I

19   SAY PRIOR INCONSISTENT STATEMENTS, WE WOULD MEAN SELECTED

20   PORTIONS MUCH LESS THAN WHAT WE DESIGNATED ORIGINALLY FOR

21   THOSE WITNESSES WHEN WE DID NOT KNOW THAT THEY WOULD APPEAR

22   LIVE.  AND THEY WOULD BE IN THE NATURE OF PRIOR INCONSISTENT

23   STATEMENTS AND ADMISSIONS AGAINST INTEREST.

24           THE COURT:  ALL RIGHT.  YOU CAN SUBMIT THOSE.  MR.

25   ANDERSON?

1          MR. ANDERSON:  YOUR HONOR, I STILL HAVE A PROBLEM

2     WITH THAT POSITION.  NAMELY, IF THEY ARE GOING TO BE

3     OFFERING THE DEPOSITIONS FOR THE PURPOSES OF PRIOR

4     INCONSISTENT STATEMENTS, WE ARE HERE TO TAKE LIVE EVIDENCE.

5     IF THERE ARE ISSUES WE WOULD MUCH PREFER TO HAVE THEM HERE

6     AIRED OUT IN COURT.  IF I NEED AN OPPORTUNITY TO REDIRECT MY

7     WITNESS FOLLOWING THEIR ALLEGED IMPEACHMENT, I WOULD PREFER

8     TO HAVE THAT OPPORTUNITY, YOUR HONOR, OR TO GIVE THE WITNESS

9     AN OPPORTUNITY TO EXPLAIN WHAT THIS ALLEGED INCONSISTENCY IS

10    THAT THEY ARE BEING POINTED TO.

11         THE COURT:  WELL, THEY CAN'T TESTIFY HERE TO A

12    PRIOR INCONSISTENT STATEMENT, OR IT WOULDN'T BE A PRIOR

13    INCONSISTENT STATEMENT, WOULD IT?  SO I THINK I AM GOING TO

14    ALLOW IT.  I WILL GIVE YOU THE OPPORTUNITY TO REVIEW IT.

15    YOU HAVEN'T EVEN SEEN WHAT THEY ARE SUBMITTING, HAVE YOU?

16         MR. ANDERSON:  I HAVE NOT.

17         THE COURT:  AND IF YOU THINK ANY OF THEM ARE

18    INAPPROPRIATE, I AM ASSUMING MANY OF THEM WERE THINGS THEY

19    WERE CROSS-EXAMINED ON WHEN THEY TESTIFIED, BUT IF YOU THINK

20    THEY ARE INAPPROPRIATE OR THAT UNDER THE RULE OF

21    COMPLETENESS ANOTHER PORTION OF THE DEPOSITION NEEDS TO BE

22    ADDED, YOU'LL HAVE THE OPPORTUNITY TO DO THAT.  A SHORT

23    OPPORTUNITY, BUT THE OPPORTUNITY TO DO THAT.

24         MR. ANDERSON:  THANK YOU, YOUR HONOR.

25         THE COURT:  IS THAT IT?

1          MR. SCHAETZEL:  WE DO HAVE AN OFFER OF PROOF, YOUR

2     HONOR.  MR. ASKEW WILL SPEAK TO THAT.

3          THE COURT:  OKAY.

4          MR. ASKEW: YOUR HONOR, TONY ASKEW, ONE OF THE

5     LAWYERS FOR THE WALTER COMPANY.  I APPEAR AT THIS TIME TO

6     MAKE AN OFFER OF PROOF WITH RESPECT TO THOSE ITEMS THAT HAVE

7     BEEN STRUCK OR PRECLUDED FROM EVIDENCE IN THIS CASE.  I HAVE

8     MADE THAT IN A WRITTEN FORM, AND I WANTED TO TAKE JUST A

9     SECOND TO JUST BRIEFLY REVIEW IT, BUT I HAVE SUBMITTED IT IN

10    WRITING AND I HAVE AN ADDITIONAL COPY HERE THAT I CAN TENDER

11    IF YOU WOULD LIKE.

12         WE ARE GOING TO BE OFFERING THE SEVEN REFERENCED

13    PATENTS THAT HAVE BEEN STRICKEN, THE HAKANSSAN-1 PATENT, THE

14    OLSON PATENT, THE GWEN PATENT, THE LASHNETT PATENT, THE

15    KISER PATENT, THE MOLTON PATENT, AND THEN THE MINKIN-1

16    PATENT.  MINKIN-2 IS IN EVIDENCE.  WE ARE ALSO GOING TO BE

17    OFFERING THE TESTIMONY OF THE FOUR WITNESSES THAT PERFORM

18    THE PRIOR PUBLIC USE OF A BIOREMEDIATING PARTS WASHER IN A

19    TRADE SHOW WELL BEFORE THE DATE OF INVENTION OF THE ALLEGED

20    INVENTORS IN THIS CASE, THAT IS THE GLEN KNOLTON, WILLIAM

21    LASHMETT, BRENT LASHMETT, AND THEN ROBERT BUCKLAND TESTIMONY

22    THAT WAS OFFERED IN THE FORM OF AFFIDAVITS.

23         AND THEN FINALLY WE WANT TO OFFER FOR PROOF THE

24    TESTIMONY BY DEPOSITION OF THOMAS CALTO AND FREDERICK

25    BENNER, THOSE ARE TWO WITNESSES THAT WE BELIEVE WOULD

1   CORROBORATE THE PRIOR INVENTORSHIP TESTIMONY OF MR. MCCLUER.

2   SO I MAKE THAT OFFER.  I MADE THAT TENDER, AND I HAVE AN

3   ADDITIONAL COPY HERE THAT I CAN TENDER TO THE COURT.  WE

4   HAVE DONE IT ELECTRONICALLY YESTERDAY.

5              THE COURT:  ALL RIGHT.

6              THE COURT:  ANY OBJECTION TO THAT, MR. CAPP?

7              MR. CAPP: I DON'T HAVE A PROBLEM WITH MAKING A

8   PROFFER AS LONG AS IT DOESN'T COME IN AS EVIDENCE, YOUR

9   HONOR.

10             THE COURT:  RIGHT.  OKAY.  THANK YOU.

11             ALL RIGHT, MR. SCHAETZEL, WHAT IS NEXT?

12             MR. SCHAETZEL:  YOUR HONOR, AS WE STATED EARLIER,

13  WE PROVIDED A SMALL NOTEBOOK TO THE OTHER SIDE TO REVIEW AND

14  WE BELIEVE MR. ANDERSON HAS TAKEN A LOOK AT THEM AND WE ARE

15  IN AGREEMENT WITH ALL OF THE EXHIBITS SAVE TWO,  AND WE WILL

16  ADDRESS THAT NOW

17             YOUR HONOR, THE DEFENDANT WOULD OFFER PLAINTIFF'S

18  EXHIBIT 45.

19             MR. ANDERSON:   NO OBJECTION, YOUR HONOR.

20             THE COURT:  ADMITTED.

21             MR. SCHAETZEL:  PLAINTIFF'S EXHIBIT 527.

22             MR. ANDERSON:   NO OBJECTION.

23             THE COURT:  ADMITTED.

24             MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 99.

25             MR. ANDERSON:   NO OBJECTION.

1            THE COURT:  ALL RIGHT.

2            MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 127

3            MR. ANDERSON:   NO OBJECTION.

4            THE COURT:  ALL RIGHT.

5            MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 137.

6            MR. ANDERSON:   NO OBJECTION.

7            MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 169.

8            MR. ANDERSON:  NO OBJECTION.

9            MR. SCHAETZEL:  174.

10           MR. ANDERSON:  NO OBJECTION.

11           MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 185.

12           MR. ANDERSON:   NO OBJECTION.

13           MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 196.

14           MR. ANDERSON:  NO OBJECTION.

15           MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 241.

16           MR. ANDERSON:  NO OBJECTION.

17           MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 250.

18           MR. ANDERSON:  NO OBJECTION.

19           MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 271.

20           MR. ANDERSON:  NO OBJECTION.

21           MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 284.

22           MR. ANDERSON:  NO OBJECTION.

23           MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 301.

24           MR. ANDERSON:  NO OBJECTION.

25           MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 315.

1          MR. ANDERSON:   NO OBJECTION.

2          MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 325.

3          MR. ANDERSON:   NO OBJECTION.

4          MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 329.

5          MR. ANDERSON:   NO OBJECTION.

6          MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 338.

7          MR. ANDERSON:   NO OBJECTION.

8          MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 352.

9          MR. ANDERSON:   NO OBJECTION.

10         MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 364.

11         MR. ANDERSON:   WE OBJECT TO EXHIBIT 364, YOUR

12   HONOR.

13         THE COURT: ALL RIGHT.  WHAT IS THE OBJECTION?

14         MR. ANDERSON:   YOUR HONOR, IS IT POSSIBLE THAT WE

15   CAN GET THIS UP ON THE SCREEN SO WE CAN LOOK AT IT?

16   DEFENDANT'S EXHIBIT 364.  YOUR HONOR, DEFENDANT'S EXHIBIT

17   364 IS AN OVERVIEW OF THE LRC TECHNOLOGY THAT COMES FROM

18   LOUISIANA REMEDIATION COMPANY.  AND IF WE LOOK AT PAGE 1,

19   WHICH IS ACTUALLY THE NEXT PAGE, THIS IS THE PAGE THAT

20   MR. MCNALLY WAS QUESTIONED ABOUT DURING HIS EXAMINATION, AND

21   AT THE TIME WE OBJECTED ON THE GROUNDS THAT THERE WAS NO

22   FOUNDATION AND THAT IT WAS HEARSAY.  WE MAINTAINED THAT

23   THERE WAS INADEQUATE FOUNDATION FOR THIS, AND WE MAINTAIN

24   OUR HEARSAY OBJECTION BECAUSE OUR BELIEF IS THAT THE

25   TESTIMONY WAS ASKING MR. MCNALLY TO VOUCH FOR THE

1    TRUTHFULNESS OF THE HISTORY OF BIOREMEDIATION THAT APPEARS

2    IN THIS DOCUMENT.  AND FOR THAT REASON, WE BELIEVE THAT IT'S

3    HEARSAY, YOUR HONOR.

4           THE COURT:  WELL, MR. MCNALLY COULDN'T DO THAT,

5    AND IT WAS NOT OFFERED -- I MEAN, IT WAS NOT ACCEPTED AS AN

6    EXHIBIT AT THE TIME; RIGHT?

7           MR. ANDERSON:  IT WAS NOT, AND IT IS STILL BEING

8    OFFERED NOW, YOUR HONOR.

9           THE COURT:  ALL RIGHT.  MR. SCHAETZEL?

10          MR. SCHAETZEL:  YOUR HONOR, WE ARE WILLING TO

11   STRIKE THE PORTION ON THE HISTORY OF BIOREMEDIATION IF THAT

12   IS WHAT IS CAUSING THE PROBLEM HERE.  WE ARE NOT ASSERTING

13   THIS FOR THE TRUTH OF THE MATTER ASSERTED.  IN OTHER WORDS,

14   WE ARE NOT STATING THAT THIS PROVIDES A COMPLETE TRUE AND

15   ACCURATE HISTORY OF BIOREMEDIATION; HOWEVER, IT DOES REFLECT

16   THE SALES MATERIAL THAT WAS PROVIDED BY LOUISIANA

17   REMEDIATION, LRC, AT THE TIME, AS ACCORDING TO THE STAMP

18   FROM THE FAX MACHINE OF 6-27-1994.  SO THEREFORE, WE WOULD

19   SUBMIT THOSE AND THE REASONS ARGUED PREVIOUSLY AS THE COURT

20   HAS ALREADY MENTIONED THAT IT SHOULD BE ADMITTED.

21          THE COURT: WELL, LET'S ASSUME THAT IT IS

22   AUTHENTICATED AND, TWO, THAT IT IS THE SALES MATERIAL

23   OFFERED BY LRC AT THE TIME THEY WERE SEEKING A PORTION OF

24   THE INVENTION.  WHAT DOES THAT -- WHAT ISSUE DOES THAT

25   RELATE TO IN THE LITIGATION?

1          MR. SCHAETZEL:  I BELIEVE IT IS ULTIMATELY GOING

2     TO RELATE TO CONCEPTION AND REDUCTION TO PRACTICE STATES,

3     YOUR HONOR, AS FIRST OF ALL, THIS WOULD BE EVIDENCE OF THE

4     EXCHANGE BETWEEN MR. MCNALLY AND -- WELL, MAYBE JUST

5     CHEMFREE AND LRC, MAYBE NOT NECESSARILY MR. MCNALLY.  SO IT

6     WOULD GO IN PART, I THINK MOSTLY TO THE INVENTORSHIP ISSUE.

7          THE COURT:  OKAY.  MR. ANDERSON?  FIRST OF ALL,

8     WAS THIS AUTHENTICATE, OR WAS THE AUTHENTICATION AGREED TO

9     OR NOT OBJECTED TO IN THE PRETRIAL ORDER?

10          MR. ANDERSON:   YOUR HONOR, I DON'T BELIEVE THAT

11    THERE WAS ANY PRETRIAL OBJECTION THAT WAS RAISED TO THIS

12    EXHIBIT BY CHEMFREE.  ONE OF THE THINGS THAT STRUCK ME ABOUT

13    MR. SCHAETZEL'S COMMENTS IS THE ONLY PORTION OF THIS

14    DOCUMENT THAT WAS PUT TO MR. MCNALLY WAS THE HISTORY OF

15    BIOREMEDIATION, I BELIEVE.  AND NOW WE ARE TALKING ABOUT A

16    PROFFER OF STRIPPING THAT OUT AND SEEING IF THAT CURES THE

17    PROBLEM.  IT DOESN'T CURE THE PROBLEM, YOUR HONOR.  THIS IS

18    SALES AND MARKETING MATERIAL.  THERE IS NOTHING THAT IS MORE

19    UNRELIABLE THAN THE BOASTFUL COMMENTS OF SOMEONE TRYING TO

20    MAKE A SALE.  SO WE STILL ARE CONCERNED ABOUT THE HEARSAY

21    FACTOR OF DEFENDANT'S EXHIBIT 364.

22          THE COURT:  WELL, IF IT'S NOT OFFERED FOR THE

23    TRUTH OF WHAT IS STATED, IT'S OFFERED FOR WHAT THE PLAINTIFF

24    KNEW AT THE TIME THAT IT WAS RECEIVED WITH REGARD TO THE

25    PRODUCT OF THIS LRC COMPANY.  THAT TAKES OUT OR AWAY THE

1    HEARSAY OBJECTION, DOES IT NOT?

2            MR. ANDERSON:   I DON'T BELIEVE THAT THE TESTIMONY

3    HAS ESTABLISHED THAT, THOUGH, YOUR HONOR.

4            THE COURT:  ESTABLISHED WHAT?

5            MR. ANDERSON:   THAT THIS WAS -- THAT THIS

6    MATERIAL WAS KNOWN TO CHEMFREE AT THE TIME.

7            THE COURT:  ALL RIGHT.  I WILL SUSTAIN THE

8    OBJECTION.  YOU MAY MAKE IT PART OF THE RECORD,

9    MR. SCHAETZEL, FOR THE PURPOSES OF APPEAL, THAT IT WAS

10   OFFERED, BUT IT WILL NOT BE CONSIDERED.

11           MR. SCHAETZEL: VERY WELL, YOUR HONOR.  I BELIEVE

12   THE NEXT EXHIBIT IS 365.

13           MR. ANDERSON:   NO OBJECTION, YOUR HONOR.

14           MR. SCHAETZEL: AND DEFENDANT'S EXHIBIT 376.

15           MR. ANDERSON:   NO OBJECTION.

16           MR. SCHAETZEL: DEFENDANT'S EXHIBIT 397.

17           MR. ANDERSON:   NO OBJECTION.

18           MR. SCHAETZEL: DEFENDANT'S EXHIBIT 401.

19           MR. ANDERSON:   NO OBJECTION.

20           MR. SCHAETZEL: DEFENDANT'S EXHIBIT 413.

21           MR. ANDERSON:   NO OBJECTION.

22           MR. SCHAETZEL: DEFENDANT'S EXHIBIT 414.

23           MR. ANDERSON:   NO OBJECTION.

24           MR. SCHAETZEL: DEFENDANT'S EXHIBIT 430.

25           MR. ANDERSON:   NO OBJECTION.

```
 1              MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 435.

 2              MR. ANDERSON:   NO OBJECTION.

 3              MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 591.

 4              MR. ANDERSON:   NO OBJECTION.

 5              MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 741.

 6              MR. ANDERSON:   NO OBJECTION.

 7              MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 746.

 8              MR. ANDERSON:   NO OBJECTION.

 9              MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 845.

10              MR. ANDERSON:  NO OBJECTION.

11              MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 846.

12              MR. ANDERSON:   NO OBJECTION.

13              MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 990.

14              MR. ANDERSON:   NO OBJECTION.

15              MR. SCHAETZEL:  DEFENDANT'S EXHIBIT 846.

16              MR. ANDERSON:  NO OBJECTION.

17         I GUESS I DO HAVE A PROBLEM IF YOU ARE AT THE END

18    OF THE LIST.  I HAVE AN OBJECTION TO EXHIBIT 96.  I THOUGHT

19    I HEARD YOU CALL OUT EXHIBIT 196.

20              MR. SCHAETZEL:  I DID CALL OUT 196.

21              MR. ANDERSON:   I HAVE AN OBJECTION TO 96, WHICH

22    IS IN YOUR BINDER.

23              MR. SCHAETZEL:  EXHIBIT 96.

24              MR. ANDERSON:   CAN WE HAVE DEFENDANT'S EXHIBIT 96

25    UP ON THE SCREEN?  YOUR HONOR, THE PLAINTIFFS OBJECT TO THE
```

1    INTRODUCTION OF DEFENDANT'S EXHIBIT 96, WHICH IS A TECHNICAL

2    DRAWING OF SUMMA ELECTRONICS.  WE OBJECT ON THE GROUNDS THAT

3    THERE IS NO FOUNDATION FOR THIS PARTICULAR EXHIBIT, THERE

4    HAS BEEN NO SPONSORING WITNESS, AND THIS EXHIBIT CONTAINS

5    HEARSAY.

6             THE COURT:  WHAT IS THE EXHIBIT NUMBER?

7             MR. ANDERSON:   DEFENDANT'S EXHIBIT 96, YOUR

8    HONOR.

9             THE COURT:  IT WAS NOT OBJECTED TO IN ACCORDANCE

10   WITH THE PRETRIAL PROCEDURES, THEREFORE IT IS ADMITTED.

11            MR. ANDERSON:  THANK YOU, YOUR HONOR.

12            THE COURT: IS THAT IT?

13            MR. SCHAETZEL:  THOSE ARE ALL OF THE DOCUMENTS,

14   YOUR HONOR.  YES.

15            THE COURT:  DOES THE DEFENDANT REST ITS

16   PRESENTATION?

17            MR. SCHAETZEL:  YES, YOUR HONOR.

18            THE COURT:  MR. CAPP, WHAT FURTHER DO YOU HAVE?

19            MR. CAPP: I WOULD LIKE TO BRING A MOTION AT THIS

20   TIME, YOUR HONOR.  THE PLAINTIFF BRINGS A MOTION PURSUANT TO

21   RULE 52 C OF THE FEDERAL CIVIL PROCEDURE FOR JUDGMENT ON

22   PARTIAL FINDINGS.  WE WOULD MOVE FOR PARTIAL JUDGMENT ON THE

23   INFRINGEMENT CASE.  AND SPECIFICALLY IT WILL BE THE CLAIMS

24   THAT I COVERED DURING MY OPENING STATEMENT, AND I WILL RUN

25   THROUGH THOSE IN A MINUTE.  WE WILL MOVE ON THE INVENTORSHIP

1   DEFENSE AS I'VE BEEN PROMISING THROUGHOUT THE WEEK, AND THEN

2   WE WILL MOVE ON THE 35 USC 102 ANTICIPATION DEFENSE.  AND

3   THEN FINALLY THE 35 USC 103 OBVIOUSNESS DEFENSE.  I WOULD

4   LIKE TO START BY PULLING UP SLIDE NO. 47, YOUR HONOR.

5           THE COURT:  IS THIS ON INVENTORSHIP?

6           MR. CAPP: WE ARE GOING TO START WITH INFRINGEMENT.

7   REMEMBER DURING MY OPENING STATEMENT I SAID THERE WERE

8   BASICALLY FOUR CLAIM LIMITATIONS AT ISSUE THAT WE THOUGHT WE

9   COULD PROVE PRETTY MUCH SLAM DUNK, AND THEN ONCE WE DID

10  THAT, THERE WOULD BE A DOMINO RIPPLE EFFECT THAT WOULD COVER

11  ALMOST THE ENTIRE BREADTH OF ALL 21 CLAIMS AND ALL FOUR

12  ACCUSED PARTS WASHERS.  THIS IS THE 110 PATENT CLAIM 1

13  AGAINST THE FIRST OF THEIR PARTS WASHERS, WHICH IS THE BR

14  100.  THE ONLY ELEMENT THEY PUT IN ISSUE WAS THE FLOW PATH

15  TERM.  AND I BELIEVE IT'S BEEN ESTABLISHED BEYOND ANY NEED

16  TO GO FURTHER IN THIS CASE THAT THE FLOW PATH TERM HAS BEEN

17  MET.

18          GO TO SLIDE 55.  THIS IS THE SAME CLAIM LIMITATION

19  OF THE BR 200 AND THE IO 400 AND AGAIN, THAT IS THE ONLY

20  CLAIM LIMITATION WHICH HAS BEEN PUT IN PLAY, AND I THINK

21  BETWEEN THE ADMISSIONS OF MR. VANDEMEULEBROOCKE AND THEN THE

22  EXPERT WITNESS THIS MORNING, DR. ADRIAENS, THERE IS NO

23  LONGER SUFFICIENT DISPUTE THAT THAT CLAIM LIMITATION IS MET

24  TO ALLOW THIS CASE TO PROCEED ANY FURTHER, AND WITHOUT

25  PULLING UP ANOTHER SLIDE, I -- NO.  LET ME GO ON TO THE NEXT

1   ELEMENT.  SO THAT IS ON FLOW PATH.  AND IF YOU GO TO SLIDE

2   88, PLEASE.

3           THE COURT:  WHAT WAS THE PREVIOUS CLAIM?

4           MR. CAPP: YOUR HONOR, I DIDN'T HEAR YOUR QUESTION.

5   I AM SORRY.

6           THE COURT:  THE PREVIOUS CLAIM OUT OF I THINK THE

7   110 PATENT THAT HAD FLOW PATH IN IT THAT YOU WERE MOVING FOR

8   JUDGMENT AS A MATTER OF LAW ON.

9           MR. CAPP: THIS IS GOING TO COVER ALL OF THE

10  ASSERTED CLAIMS OF THE 110 PATENT AGAINST THE FOLLOWING

11  THREE ACCUSED MACHINES, THE BR 100, THE BR 200, AND IO 400.

12  AND YOUR HONOR, YOU SEE THE FLOW PATH WAS THE ONLY CLAIM

13  LIMITATION PUT IN ISSUE ON ALL OF THOSE CLAIMS FOR THOSE

14  THREE DEVICES AND WE BELIEVE THAT THE FLOW PATH LIMITATION

15  HAS BEEN MET, AND SO THAT INFRINGEMENT HAS BEEN PROVED AS TO

16  THOSE CLAIMS.

17          NOW, IF WE GO ON TO THE FILTER LIMITATION, PULL UP

18  SLIDE 48, PLEASE.  YOUR HONOR, THIS IS CLAIM 5 OF THE 835

19  PATENT, AND YOU CAN SEE THERE ARE TWO LIMITATIONS WHICH HAVE

20  NOT BEEN ACKNOWLEDGED HERE.  THE FIRST IS THE FLOW PATH

21  LIMITATION WHICH I ALREADY ASSERTED HAS BEEN MET, AND THAT

22  IS IN THE MIDDLE OF THE NONASSERTED INDEPENDENT CLAIM.  AND

23  THEN THERE IS ONE ADDITIONAL LIMITATION FOR THE ASSERTED

24  DEPENDENT CLAIM WHICH IS THE FILTER LIMITATION THAT WE'VE

25  BEEN DISPUTING.

1             AND I SUBMIT TO YOUR HONOR, BETWEEN THE EVIDENCE

2    OF DR. DURKEE'S EXPERT REPORT, THE INCREDIBLE DISCREDITED

3    TESTIMONY OF MR. VANDEMEULEBROOCKE ON THE ISSUE, COUPLED

4    WITH THE ADMISSIONS OF DR. ADRIAENS THIS MORNING, THAT THERE

5    IS NO LONGER ANY SERIOUS ISSUE THAT THE BR 100 ACTUALLY THAT

6    ANY OF THE FOUR OF THEM HAVE A FILTER.  AND JUST TO WALK YOU

7    THROUGH TO SHOW YOU, THOSE ARE THE ONLY TWO LIMITATIONS IN

8    PLAY FOR THE 835 PATENT.  AT LEAST CLAIM 8.

9             LET'S PULL UP SLIDE 56 VERY QUICKLY.  SO THESE ARE

10   THE NEXT TWO MIDDLE.  THE BR 200 AND IO 400.  THE NEXT TWO

11   CLAIM LIMITATIONS.  AND NOW SLIDE 62, AND NOW IF YOU GO TO

12   SLIDE 89.  YOUR HONOR, IN THE INTEREST OF TIME, I WON'T PULL

13   UP INDIVIDUAL SLIDES FOR THE VERY MINOR ADDITIONAL DEPENDENT

14   CLAIM LIMITATIONS IN 10, 11, AND 12.  IF THEY WANT TO ARGUE

15   THAT, FINE.  BUT I SUBMIT, ONCE WE GET FILTER AND FLOW PATH

16   IN, THOSE MINOR DEPENDENT CLAIM LIMITATIONS ARE FAIRLY

17   INCONSEQUENTIAL IN 11 AND 12.  ONCE WE GET THE FILTER

18   ESTABLISHED, THAT PICKS UP THE 226 PATENT CLAIM 1 -- NOT YET

19   ON THAT, LET'S GO BACK.  ALL I WANT RIGHT NOW IS FLOW PATH

20   AND FILTER.  THE ONLY CLAIM LIMITATION THEY PUT IN PLAY ON

21   THE 226 PATENT CLAIM 1, THE INDEPENDENT CLAIM, WAS POROUS

22   MEDIUM, WHICH THE COURT HAS DEFINED AS ESSENTIALLY THE

23   IDENTICAL CONSTRUCTION OF FILTER.  SO YOU KNOW, BASICALLY

24   ONCE WE GET FLOW PATH AND FILTER, WHICH I SUBMIT WE HAVE,

25   THAT PRETTY MUCH KNOCKS OUT EVERYTHING FOR THE BR 100, 200,

1    AND 400 DOWN THROUGH THE INDEPENDENT CLAIM OF 226, AND IT

2    CAPTURES THE IO 200 FOR THE 835 AND THE INDEPENDENT CLAIM OF

3    THE 226.

4              NOW, IF WE GO TO SLIDE 49.  YOUR HONOR, THIS PICKS

5    UP THIS SURFACTANT BASED LIMITATION, WHICH IS CLAIME 3 AT

6    THE BOTTOM OF THIS SLIDE.  IF YOU LOOK FIRST AT THE

7    INDEPENDENT CLAIM, THE ONLY THING THAT THEY PUT IN PLAY

8    THERE WAS THE POROUS MEDIUM LIMITATION, WHICH I SUBMIT IS

9    MET.  ONCE YOU SAY THAT THERE IS A FILTER, SO NOW YOU DROP

10   DOWN TO CLAIM 3, WHICH IS THE DEPENDENT LIMITATION.  THE

11   ONLY THING THEY PUT IN PLAY THERE WAS SURFACTANT BASED, AND

12   I BELIEVE THAT THEY ADMITTED IN THEIR OPENING STATEMENT THAT

13   THEY WERE NO LONGER CHALLENGING SURFACTANT BASED FOR ANY OF

14   THE ACCUSED WASHERS.

15             GO TO SLIDE 90, PLEASE.

16             THE COURT:  IS THAT RIGHT, MR. SCHAETZEL, THERE IS

17   NO LONGER ANY DISPUTE WITH REGARD TO SURFACTANT?

18             MR. SCHAETZEL:  THAT IS CORRECT, AS SET FORTH IN

19   OUR PROPOSED FINDINGS OF FACT, YOUR HONOR.

20             MR. CAPP:  SO WE SHOULD PICK UP CLAIMS 3 AND 4.

21   THE REASON WHY I HAVE CHECK MARKS ON 4 THERE, YOUR HONOR, IS

22   THE ONLY LIMITATION IN 4 ADDITIONAL WAS WATER BASED.  AND

23   THEY ACKNOWLEDGED THAT THE FLUID WAS WATER BASED.  THEY HAD

24   ONLY CHALLENGED THAT IT WAS SURFACTANT BASED.  SO AT THIS

25   POINT, WE WOULD HAVE INFRINGEMENT ACROSS THE BOARD ON ALL

1    FOUR MACHINES FOR BOTH THE 835, AND THE 226, AND THEN FOR

2    THREE OF THE MACHINES ON ALL OF THE CLAIMS OF THE 110.

3              SO NOW GARY GO TO SLIDE 50.  THIS IS THE BR 100,

4    YOUR HONOR.  IF YOU LOOK AT -- THESE ARE ASSERTED CLAIMS 4

5    AND 5, BUT THEY DEPEND FROM NONASSERTED CLAIM 1.  THE ONLY

6    CLAIM LIMITATION THAT THEY PUT IN PLAY ON THAT ONE WAS

7    ALLOWING THE MICROORGANISMS WITHIN THE FLUID TO BIODEGRADE

8    THE HYDROCARBONS, AND I SUBMIT BETWEEN THE TESTIMONY WE

9    HEARD FROM DR. ADRIAENS, THEIR EXPERT THIS MORNING, AND WHAT

10   THEIR PRESIDENT OF THE COMPANY TIM HOUGHTON SAID WHEN HE WAS

11   HAVING HIS 15 MINUTES OF FAME WITH JAY LENO ON THE VIDEO,

12   THAT THAT LIMITATION IS MET TO THE POINT WHERE IT'S

13   IRREFUTABLE, PAST THE SUMMARY JUDGMENT STANDARD, AND IS

14   READY TO HAVE JUDGMENT ENTERED ON THAT.

15             AND I WILL REPRESENT TO THE COURT, THAT THAT WAS

16   THE ONLY LIMITATION THAT WAS PUT IN PLAY FOR THE OTHER THREE

17   MACHINES TOO.  AND THAT THE EVIDENCE AS TO THE BR 100 WOULD

18   APPLY ALSO TO THE 200, THE 400, AND THE IO 200.  LET'S WALK

19   THROUGH IT REAL QUICK.  GO TO SLIDE 51.  SO NOW WE ARE

20   MOVING ON TO THE 125 PATENT CLAIMS 6 AND 7.  CLAIM 6 IS

21   NONASSERTED.  THAT IS THE INDEPENDENT CLAIM.  AND THEN THERE

22   IS AN ASSERTED CLAIM 7.  LET ME START FROM THE BOTTOM AND

23   WORK UP, YOUR HONOR.  AT THE BOTTOM, THE LIMITATION THAT IS

24   PUT IN PLAY IS THE FILTER AND I SUBMIT THAT THAT LIMITATION

25   HAS ALREADY BEEN MET FROM OUR DISCUSSION OF THE 835 PATENT.

1    SO ONCE THAT IS MET, THEN YOU GO UP AND YOU LOOK AT THE I

2    GUESS YOU GO TO THE MIDDLE NEXT, WHICH THERE IS A FLOW PATH

3    LIMITATION IN CLAIM 6 BUT I SUBMIT THAT HAS ALREADY BEEN MET

4    BECAUSE WE HAVE COVERED THAT WHEN WE TALKED ABOUT THE 110

5    PATENT.  SO YOU'VE GOT FLOW PATH AND FILTER ALREADY TAKEN

6    CARE OF.

7            THE ONLY ONE LEFT THAT IS NEW IS RETAINING THE

8    HYDROCARBONS WITHIN THE FLUID AND THE TANK WHILE

9    MICROORGANISMS BIODEGRADE THE HYDROCARBONS.  AND I SUBMIT

10   THAT AS BETWEEN DR. DURKEE'S EXPERT REPORT, THAT FINDS THAT

11   THIS IS MET.  MR. HAUGHTON'S STATEMENTS ON THE JAY LENO

12   VIDEO, AND THEN DR. ADRIAENS'S TESTIMONY THIS MORNING, THAT

13   THAT LIMITATION IS MET PAST THE POINT OF IT'S READY FOR

14   JUDGMENT.  AND I WILL REPRESENT TO THE COURT THAT THOSE SAME

15   LIMITATIONS APPLY TOO, AND I COULD SHOW YOU SIMILAR SLIDES

16   FOR THE BR 200, IO 400, AND THE BR 200.  I WILL SAY THAT IS

17   THE CASE JUST TO SPEED UP THE MOTION HERE.

18           GO TO SLIDE 91.  GO AHEAD.  ONCE YOU ADD ON THOSE

19   LIMITATIONS, WE BASICALLY SUBMIT THIS CASE IS READY FOR

20   JUDGMENT -- A FINDING OF INFRINGEMENT ON ALL CLAIMS THAT THE

21   BR 100, ALL CLAIMS ASSERTED AGAINST THE BR 200, ALL CLAIMS

22   ASSERTED AGAINST THE IO 400, AND THEN WHEN WE GET OVER TO

23   THE IO 200, ALL ASSERTED CLAIMS, THE 835, AND THE 226, AND

24   THEN CLAIMS 5, 7, 18, AND 21 OF THE IO 200.  AND THEN WE ARE

25   PREPARED TO GO TO CLOSING ARGUMENT ON THE OTHER CLAIM

1    LIMITATIONS ON THE IO 200.

2             IF IT PLEASES THE COURT, I CAN GO THROUGH THE

3    ENTIRE MOTION OR I CAN --

4             THE COURT:  NO, I WOULD LIKE TO HEAR THE RESPONSE

5    TO THAT PORTION OF THE MOTION.

6             MR. SCHAETZEL:  YOUR HONOR, THERE ARE CERTAIN

7    TERMS THAT IN LIEU OF WHAT HAS HAPPENED OVER THE LAST FEW

8    DAYS THAT WE AGREE TO BASED ON THE COURT'S RULING DURING THE

9    WEEK.  FOR EXAMPLE, IN OUR RESPONSE TO THEIR PROPOSED

10   FINDINGS OF FACT AND CONCLUSIONS OF LAW, THE ARGUMENT ON THE

11   LOCATION OF THE FLOW PATH WE DID NOT RAISE.  THAT CAME IN IN

12   THE FORM OF AN OFFER SO THAT WAS OUR POSITION ON FLOW PATH

13   COMING INTO THE TRIAL BY THE COURT'S RULING AT TRIAL, THAT

14   DID NOT GO FORWARD, SO WE ARE IN AGREEMENT WITH THE

15   STATEMENTS MADE ABOUT FLOW PATH.

16            AS TO THE PRESENCE OF A FILTER, THERE ARE CERTAIN

17   THINGS, YOUR HONOR, ABOUT THE FILTER SITUATION THAT ARE

18   UNIQUE, AND IT COMES BACK TO I GUESS YOU THINK OF IT AS AN

19   INTERPRETATION OF THE COURT'S INTERPRETATION OF THE WORD

20   FILTER AND POROUS MEDIUM.  WE DO NOT DENY AND WHAT WE HAVE

21   TRIED TO SAY THROUGHOUT THIS TRIAL IS, WE DO NOT DENY THAT

22   THERE IS THE MATERIAL AT THE DRAIN COVER, WHATEVER ONE WANTS

23   TO CALL IT, THE SPONGE FILTER WITH THE BASKET THAT HOLDS IT

24   AND THE LITTLE SEALING FILTER TO IT, IF WE ARE GOING TO CALL

25   IT A FILTER, THE POINT THAT WE WOULD MAKE TO THE COURT IS

1    THIS.

2         WE BELIEVE THAT THERE IS A DIFFERENCE BETWEEN A

3    STRAINER AND A FILTER.  AND QUITE FRANKLY, THE PLAINTIFF

4    ALSO BELIEVES THERE IS A DIFFERENCE BETWEEN A STRAINER AND A

5    FILTER.  LOOKING, FOR EXAMPLE, YOUR HONOR, AT THE 835

6    PATENT, COLUMN FOUR, AT APPROXIMATELY LINE 8.  STARTING TO

7    THE FAR RIGHT-HAND COLUMN, THE FAR RIGHT-HAND SIDE OF THE

8    COLUMN.

9         THE WITNESS:  THE COURT:  OKAY.

10        MR. SCHAETZEL:  THE PATENT READS, BEGINNING AT

11   LINE 7, THE VERY END, THEN CONTINUING ON TO LINE 8.  A

12   STRAINER NOT SHOWN IS DEFINED WITHIN THE DRAIN HOLE 64.  A

13   STRAINER NOT SHOWN IS DEFINED WITHIN THE DRAIN HOLE 64.  GO

14   TO THE PRIMARY FIGURE OF THIS PATENT, HOLE 64 IS RIGHT HERE

15   AT THE BASIN, THE BASE OF THE SINK.  RIGHT HERE, YOUR HONOR.

16   THAT IS WHERE THEY HAVE THE STRAINER LOCATED.  THERE HAS

17   BEEN NO CLAIM, AND THERE IS NO CLAIM IN ANY OF THESE

18   PATENTS, TO A STRAINER IN THE DRAIN.  BUT WHAT HAS HAPPENED

19   IS THAT THE COURT'S INTERPRETATION OF POROUS MEDIUM AND

20   FILTER HAS BEEN TAKEN BY I THINK MOST CONCERNED TO BE SO

21   BROAD THAT IT WOULD IN EFFECT READ ON OR COVER A STRAINER.

22   WE DON'T THINK THAT IS WHAT WAS MEANT BY THE PATENT DRAFTER,

23   AND IT'S NOT WHAT IS SHOWN IN THEIR OWN DRAWINGS, AND IT'S

24   NOT WHAT IS SHOWN IN THE PATENT DOCUMENT ITSELF.  WE WOULD

25   SAY THIS IN RESPONSE TO THE INFRINGEMENT ALLEGATION.  THE

1    POSITION IS THAT THE COURT'S INTERPRETATION OF THE WORD

2    STRAIN -- THE WORD FILTER AND POROUS MEDIUM IS TO BE READ SO

3    BROADLY AS TO INCLUDE A STRAINER THEN, YES, WE HAVE

4    STRAINERS OR FILTERS IN THE HOLE, THERE IS NO QUESTION OF

5    THAT.  HOWEVER, IF A DISTINCTION IS TO BE MADE BETWEEN

6    STRAINER AND A FILTER, THEN THERE IS A DIFFERENCE.  AND IT'S

7    MOST PROMINENT IN THE IO 200.

8            IN THE IO 200, THERE IS A BASKET, NO SPONGE, AND

9    THIS GRATE THAT GOES ACROSS THE TOP.  THIS IS A MESH, THIS

10   IS THE GRATE.  IT ACTS NO DIFFERENT THAN THE DRAIN IN ANY

11   OTHER SINK THAT MIGHT CATCH VEGETABLES AS YOU ARE WORKING ON

12   AT HOME.  IT IS THE SAME THING.  WE WOULD SUBMIT THAT THE

13   PATENT ACCOMMODATES AND PROVIDES FOR ONE TO BE ABLE TO PUT A

14   STRAINER IN THE HOLE OF THE SINK WITHOUT CONSTITUTING AN

15   INFRINGEMENT OF THE FILTER LIMITATION.  SO THAT WOULD BE THE

16   DEFENDANT'S POINT IN REFERENCE TO THAT ITEM, YOUR HONOR, AND

17   I BELIEVE THAT THE TESTIMONY HAS BEEN, WITHOUT EQUIVOCATION,

18   YES, WE HAVE, IF YOU WILL, STRAINERS IN EACH OF THESE

19   DEVICES.

20           THE QUESTION IS WHETHER OR NOT THE TERM FILTER AS

21   INTERPRETED BY THE COURT OR THE TERM POROUS MEDIUM AS

22   INTERPRETED BY THE COURT WILL BE READ SO BROADLY AS TO

23   INCLUDE THOSE DEVICES.  BUT WE DO NOT DISPUTE, AND WHAT WE

24   TRY TO DO IN OUR RESPONSES TO THE FINDINGS OF FACT AND

25   CONCLUSIONS OF LAW PROPOSED BY PLAINTIFF, WE DO NOT DISPUTE

1    THAT WE CALLED IT A FILTER IN THE ADVERTISING MATERIAL, THAT

2    WE HAVE THESE ELEMENTS IN THE DRAIN.  THE QUESTION IS

3    WHETHER OR NOT, HAVING SEEN THE DEVICES AND HAVING SEEN HOW

4    THEY FUNCTION IN CONJUNCTION WITH THIS LANGUAGE, THAT PART

5    OF THE COURT'S DETERMINATION OR THE COURT'S DEFINITION,

6    SORRY, SHOULD BE READ ON TO THE STRAINER AS WE WOULD CALL

7    IT.

8              THE COURT:  WHY WOULD A POROUS MEDIUM NOT INCLUDE

9    A STRAINER?  WHAT WOULD BE THE DISTINCTION THERE?

10             MR. SCHAETZEL:  YOUR HONOR, I BELIEVE THE

11   DISTINCTION THAT A POROUS MEDIUM WOULD BE MORE LIKE A

12   THREE-DIMENTIONAL INTERCONNECTED GROUP OF OPENINGS.  A

13   POROUS MEDIUM IS LIKE, FOR EXAMPLE IN THE SIMS PATENT, YOU

14   KNOW, AS DR. DURKEE REFERRED TO IT, THE PAPER TOWEL FILTER

15   OR A WOVEN MATERIAL THAT WOULD -- THAT WOULD CERTAINLY BE A

16   POROUS MEDIUM.  IT WOULD HAVE THAT THREE-DIMENSIONAL

17   OPENING, IF YOU WILL, SO THAT THE FLUID COULD WORK THROUGH

18   IT ALMOST BY A CAPILLARY ACTION OR SOMETHING LIKE THAT.

19   THAT WOULD BE THE DISTINCTION TO ME OF A POROUS MEDIUM AND A

20   FILTER.

21             THE COURT:  I WAS ASKING THE DIFFERENCE BETWEEN A

22   POROUS MEDIUM AND A STRAINER.

23             MR. SCHAETZEL:  OH, I'M SORRY.  A POROUS MEDIUM

24   AND A STRAINER.  I MEANT TO SAY STRAINER.

25             THE COURT:  WELL, WHAT WOULD THE -- OH, IN THE OLD

1    DAYS WHEN PEOPLE MADE ICED TEA, THEY USED A LARGE, I FORGET

2    THE TECHNICAL NAME OF IT, TO POUR THE TEA THROUGH TO MAKE

3    SURE THERE WERE NO SMALL LEAVES AND ALL LEFT IN THE TEA.

4    WOULD THAT HAVE BEEN A POROUS MEDIUM?

5            MR. SCHAETZEL:  I WOULD HAVE CALLED IT A STRAINER,

6    YOUR HONOR.  BECAUSE IF I AM THINKING OF THE RIGHT IMPLEMENT

7    THAT YOU STRAIN --

8            THE COURT: YEAH, IT WAS ROUND AND PUT IT ACROSS

9    THE TEAC PITCHER, AND THE TEA THAT YOU MADE, IT CAUGHT THE

10   LITTLE TEA LEAVES.

11           MR. SCHAETZEL:  TO BE FRANK, YOUR HONOR --

12           THE COURT: IT WAS CALLED A STRAINER.

13           MR. SCHAETZEL:  WOULD I HAVE SAID I AM FILTERING

14   THE TEA.  I MIGHT WELL HAVE --

15           THE COURT:  NO.  BUT WOULD YOU HAVE CHARACTERIZED

16   IT AS A POROUS MEDIUM?

17           MR. SCHAETZEL:  NO, SIR, I WOULD NOT V. I THINK OF

18   A POROUS MEET MEDIUM AS MORE OF A MATERIAL LIKE ITEM.  BUT

19   THAT IS JUST ME.

20           THE COURT:  OKAY.

21           MR. SCHAETZEL:  AS TO BE CLEAR FOR THE RECORD,

22   YOUR HONOR, YES, WE, IN OUR RESPONSES TO THE PROPOSED

23   FINDINGS OF FACT AND CONCLUSIONS OF LAW, CONCEDED THE

24   SURFACTANT ELEMENT.

25           AS TO THE 125 PATENT, TO TRY AND CAPTURE AS MUCH

1    IN A COUPLE OF COMMENTS AS I CAN, THE ELEMENT I THINK THAT

2    MR. CAPP FOCUSED ON WAS THE IDEA OF RETAINING -- LET ME BE

3    CERTAIN I STATE THE LANGUAGE CORRECTLY.  FOR EXAMPLE, IN

4    CLAIM 1, OF THE 125 PATENT, AND I MAY BE LOOKING AT A

5    DIFFERENT CLAIM THAN WHAT MR. CAPP PUT IN HIS, BUT IF YOU

6    COULD GO DOWN ONE MORE.  THE CONTESTED ITEM WAS THE ONE THAT

7    IS HERE, "ALLOWING THE MICROORGANISMS WITHIN THE FLUID TO

8    BIODEGRADE THE HYDROCARBONS."  I KNOW IN SOME OTHER CLAIM

9    LANGUAGE, I BELIEVE THE WORD RETAINING THE MICROORGANISMS --

10            THE COURT:  LET ME INTERRUPT YOU HERE BECAUSE WE

11   ARE CHANGING GEARS WITH THIS.  LET ME LOOK BACK A LITTLE BIT

12   AT FILTER STRAINER POROUS MEDIUM.  IT WON'T TAKE BUT A

13   SECOND.

14            MR. SCHAETZEL:  YES, SIR.

15                    (PAUSE).

16            THE COURT: WELL, I NOTE THAT AT THE MARKMAN

17   HEARING IT WAS AGREED THAT FILTER AND POROUS MEDIUM WERE

18   EQUIVALENT TERMS.  THEREFORE IF THE DEVICE IS EITHER A

19   FILTER OR A POROUS MEDIUM, IT WOULD COME WITHIN THE

20   DEFINITION OF FILTER IN THE PATENT.  I CONSTRUED FILTER TO

21   MEAN A POROUS MATERIAL THROUGH WHICH THE CLEANING FLUID IS

22   PASSED IN ORDER TO TRAP PARTICULATE MATTER WHILE ALLOWING

23   THE CLEANING FLUID HYDROCARBONS AND MICROORGANISMS TO PASS

24   THROUGH.  I AM AFRAID I CAN'T SEE A DISTINCTION THERE

25   MR. SCHAETZEL.

1          MR. SCHAETZEL:  IN REFERENCE TO THE 125 PATENT,

2    WHICH IS THAT WOULD BE THE LAST PATENT TO ADDRESS YOUR

3    HONOR.  WE WOULD HAVE TWO PRINCIPLE POINTS.  FIRST OF ALL,

4    AS STATED IN OUR OPENING, THIS IS THE PATENT LIKE THE 226,

5    THAT IS A METHOD PATENT, HAS METHOD STEPS, AND IT'S OUR

6    LEGAL POSITION THAT THE LAW REQUIRES AN INFRINGER TO

7    PRACTICE EACH AND EVERY STEP OF A METHOD PATENT IN ORDER TO

8    FIND DIRECT INFRINGEMENT.  FOR EXAMPLE, IN THE 125 PATENT,

9    AS MR. CAPP NOTED, THERE WAS A STEP THAT WAS, AS HE PUT IT,

10   PUT IN PLAY, AND THAT PUT IN PLAY STEP IS THE LAST ONE THAT

11   IS HIGHLIGHTED ON THE PAGE, ALLOWING THE MICROORGANISMS

12   WITHIN THE FLUID TO BIODEGRADE THE HYDROCARBONS.

13          NOW, THAT STEP WAS DENIED.  THAT STEP WOULD NOT BE

14   PRACTICED BY WALTER IN OUR VIEW.  THAT STEP OF ALLOWING THE

15   MICROORGANISMS WITHIN THE FLUID TO BIODEGRADE THE

16   HYDROCARBONS WOULD BE PRACTICED BY THE CUSTOMER.  THE

17   CUSTOMER WOULD WASH THE PART, ALLOW THE HYDROCARBONS TO FALL

18   DOWN INTO THE TANK AND IN THE TANK THE MICROORGANISMS WOULD

19   BIODEGRADE THE HYDROCARBONS.  SO THE FIRST POINT IS DIRECTLY

20   TO THE FACT THAT WE THINK THERE DOES HAVE TO BE A DIRECT

21   INFRINGEMENT PROVEN BEFORE WE MOVE ON TO ANYTHING ELSE, AND

22   TO THE ELEMENT, IF YOU WILL, THAT WAS PUT IN PLAY, ALLOWING

23   THE MICROORGANISMS WITHIN THE FLUID TO BIODEGRADE THE

24   HYDROCARBONS.  THAT IS THE ELEMENT ON WHICH WE RELY.  WE

25   WOULD SAY THAT ELEMENT IS NOT PERFORMED BY WALTER.

1          THE QUESTION THAT CAME UP I BELIEVE IN A HEARING,
2     AND ALSO IN OPENING, YOUR HONOR, WAS THE FACT THAT CERTAIN
3     OTHER PARTS OF THE CLAIM WERE ACKNOWLEDGED.  AND THAT IS
4     TRUE.  FOR EXAMPLE, THE SUSPENDED IN A BIODEGRADEABLE
5     NONCAUSTIC SOLUTION WAS THE FIRST ELEMENT ACKNOWLEDGED, AS
6     WAS THE BRINGING THE PART INTO CONTACT WITH THE FLUID
7     CONTAINING THE MICROORGANISMS.  IT WOULD BE VERY TRUE THAT
8     WALTER WOULD ALSO NOT BE A PARTY THAT WOULD BRING INTO
9     CONTACT, WITH THE FLUID, THE PART, THAT WOULD ALSO BE THE
10    CUSTOMER.  IT WAS ACKNOWLEDGED.
11         TWO POINTS ON THAT, YOUR HONOR.  YOU ASKED ME ONE
12    TIME WHAT DOES ACKNOWLEDGE MEAN IN THIS CONTEXT.  I THINK
13    THAT WHEN ONE ACKNOWLEDGES, UNDER THE LOCAL RULES PROVISION,
14    THAT A CERTAIN STEP IS SATISFIED BY AN ACCUSED
15    INSTRUMENTALITY, I THINK WHAT WALTER WAS TRYING TO ADMIT
16    HERE IS THAT, YES, THE CUSTOMER DOES, YOU KNOW, BRING THE
17    PART INTO CONTACT, AND SO THAT WAS NOT GOING TO BE A
18    DISPUTED ELEMENT THAT THE CUSTOMER DID THAT.  I DON'T KNOW
19    THAT WALTER EVER INTENDED TO SOMEHOW ADMIT OR ACKNOWLEDGE
20    THAT WALTER BROUGHT THE PART INTO CONTACT BECAUSE THAT'S NOT
21    WHAT WALTER DOES.  WALTER MAKES THE MACHINE AND THEN SELLS
22    IT HERE IN THE STATES.  SO THERE IS A QUESTION, WITHOUT -- I
23    WOULD LIKE TO MAKE THE COURT AWARE OF THAT.  THERE IS A
24    QUESTION THAT ARISES WHEN A PARTY ACKNOWLEDGES A STEP AND
25    THEN, YOU KNOW, DOESN'T ACKNOWLEDGE ANOTHER STEP.  OUR

1   POSITION HERE IS THAT, AS TO THE STEP THAT WAS NOT

2   ACKNOWLEDGED, ALLOWING THE MICROORGANISMS WITHIN THE FLUID

3   TO BIODEGRADE THE HYDROCARBONS, THAT THAT STEP IS THE

4   CUSTOMER STEP AND WALTER DOES NOT PERFORM THAT STEP.  AND

5   SINCE IT WOULD TAKE TWO PARTIES TO INFRINGE ALL OF THE

6   METHOD CLAIMS OF THE 125 PATENT, THERE IS NO DIRECT

7   INFRINGEMENT OF THAT, BECAUSE THE LAW SAYS IF THE TWO

8   PARTIES, AND THEY ARE NOT SOMEHOW RELATED IN THAT ONE PARTY

9   CAN CONTROL THE ACTIVITIES OF THE OTHER, THEN THERE IS NO

10  DIRECT INFRINGEMENT.

11          THE COURT:  GIVE ME AN EXAMPLE OF THAT, THAT

12  EITHER THE FEDERAL CIRCUIT OR THE SUPREME COURT HAS FOUND IN

13  AN ANALOGOUS SITUATION TO THIS WHERE THERE IS NO DIRECT FROM

14  TIME TO TIME?

15          MR. SCHAETZEL:  I CAN CITE YOU TO CASES, YOUR

16  HONOR, AND I DO NOT RECALL THE FACTS OF THOSE CASES OFF THE

17  TOP OF MY HEAD.  THE FIRST ONE IS THE BMC RESOURCES CASE,

18  AND THE SECOND ONE IS THE MINI AUCTION CASE.  BOTH OF THEM

19  ARE CITED IN OUR MATERIALS, BUT TO GIVE YOU THE FACTUAL

20  EXAMPLE OF THOSE, I AM AFRAID I CANNOT DO THAT OFF THE TOP

21  OF MY HEAD.

22          PERHAPS -- DOES ANYONE KNOW THE FACTS OF THIS?

23  WHEN IN DOUBT, ASK A YOUNGER LAWYER.  YOUR HONOR, WE THINK

24  THAT WE HAVE SOME IDEA OF THE CASE, BUT BEFORE WE SPOKE TO

25  IT, I WOULD APPRECIATE THE CHANCE TO BE CERTAIN OF THAT.  I

1   THINK, FOR EXAMPLE, THE MINI AUCTION CASE WAS AN ONLINE

2   AUCTION WHERE YOU HAD THE PERSON ON THE INTERNET AT THE ONE

3   END DOING CERTAIN STEPS, IT IS SOME SORT OF A SOFTWARE

4   PATENT, I BELIEVE.  I AM NOT CERTAIN OF THAT, BUT SOFTWARE

5   AT ONE END BEING PERFORMED, AND THEN THE PERSON AT THE OTHER

6   END ACTUALLY BUYING THE ITEM OR PARTICIPATING IN THE ACTION,

7   AND YOU HAD THE DISTINCTION BETWEEN THE ONE END OF THE

8   INTERNET, THE PERSON RUNNING THE SITE I PRESUME, AND THE

9   PERSON AT THE OTHER END ACTUALLY PARTICIPATING IN THE

10  ACTION.  THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT FOUND

11  THAT THAT DID NOT MEET THE REQUIREMENT OF HAVING A SINGLE

12  ENTITY PERFORM ALL STEPS OF THE METHOD CLAIM.

13          THE COURT:  WELL, I THINK I HAVE HAD THAT CASE

14  CITED IN A SOFTWARE CASE FOR MEDICAL OFFICES AWHILE BACK.

15  BUT IT SEEMED TO ME THAT THERE IS A DISTINCTION THERE WHEN

16  YOU HAVE ANOTHER PARTY THAT HAS TO MAKE A DECISION TO

17  PARTICIPATE OR TO BUY IN ORDER TO COMPLETE THE ELEMENTS OF

18  THE CLAIM; WHEREAS HERE, EVEN IF IT IS DONE BY THE CUSTOMER,

19  THE CUSTOMER BOUGHT IT TO DO THAT.  AND SOMEHOW THAT DOESN'T

20  SEEM TO FIT THAT EXAMPLE.  OKAY.  WHAT ELSE, MR. SCHAETZEL?

21          MR. SCHAETZEL:  ON THE INFRINGEMENT ISSUES, THAT

22  WOULD BE ALL, YOUR HONOR.

23          THE COURT:  ALL RIGHT.

24          MR. SCHAETZEL:  I BELIEVE WE ADDRESSED ALL FOUR

25  PATENTS.

```
1            THE COURT:  WHAT ABOUT THE NO DIRECT INFRINGEMENT,

2    MR. CAPP?

3            MR. CAPP: WELL, THAT IS MET AND IT'S MET TWICE.

4    LET'S GO THROUGH WHAT THE EVIDENCE WAS.  WALTER ITSELF IS A

5    DIRECT INFRINGER, OR AT LEAST THE J. WALTER, INC. AMERICAN

6    ENTITY IS A DIRECT INFRINGER, BECAUSE THE TESTIMONY IS VERY

7    CLEAR, THEY TAKE THEIR MACHINES, THEY PUT THEM IN A TRAILER,

8    THEY DRIVE OUT, THEY FILL THEM WITH FLUID, THEY PLUG THEM IN

9    AND OPERATE THEM, THEY WASH PARTS, THEY DEMONSTRATE THEM.

10   THE OIL GETS BIOREMEDIATED.  THEY PERFORM EVERY SINGLE STEP.

11   WHEN THEY GO TO A TRADE SHOW, THEY OPERATE THEM, THEY CLEAN

12   PARTS.

13           THE COURT:  I HEARD THAT TESTIMONY.  ARE YOU

14   TELLING ME IF THEY JUST SOLD IT, SAY WITH WRITTEN

15   INSTRUCTIONS ON IT, AND THE PURCHASER THEN HAD TO, WHEN HE

16   PUT THEIR FLUID THROUGH IT AND PROPERLY OPERATED IT IN

17   ACCORDANCE WITH INSTRUCTIONS, AND LEFT THE FLUID IN THERE TO

18   BIOREMEDIATE IN THE TANK, THE HYDROCARBONS, AND THEY HADN'T

19   GONE OUT AND ACTUALLY HANDS-ON DONE IT THEMSELVES TO SHOW

20   IT, THAT THAT WOULDN'T BE DIRECT INFRINGEMENT?

21           MR. CAPP: I AM SAYING THERE ARE TWO DIRECT

22   INFRINGERS.  THERE IS ONE THAT THE DEFENDANT DOES HANDS-ON

23   ITSELF IN THE UNITED STATES, AND THEN THERE IS THE PROSPECT

24   THAT THEY CONTRIBUTORILY INFRINGE OR INDUCE TO INFRINGE BY

25   SELLING AND ADVERTISING.
```

1          AND MR. SCHAETZEL'S ARGUMENT IS THAT THEY ARE NOT

2    A CONTRIBUTORY INFRINGER BECAUSE THE CUSTOMER DOESN'T

3    PROVIDE -- DOESN'T MEET EVERY STEP.  MR. SCHAETZEL'S

4    ARGUMENT IS THAT, SURE, THE CUSTOMER, YOU KNOW, DOES THE

5    METHOD WHERE THE FLUID IS IN THERE, AND BRINGS THE PART INTO

6    CONTEXT, ALLOW THE FLUID TO REMOVE THE OIL AND ALLOWS THE

7    MICROORGANISMS WITHIN THE FLUID TO BIODEGRADE THE

8    HYDROCARBONS, BUT THEY DON'T PROVIDE A PARTS WASHER FOR, FOR

9    RECEIVING THE PART.  SO HE SAYS WE ARE WALTER, WE SELL IT TO

10   THEM, SO THAT IS THE PROVIDER STEP, SO THAT IS WHY THEY

11   DON'T CONTRIBUTORILY INFRINGE.  AND MY RESPONSE TO THAT

12   IS --

13          THE COURT:  I AM NOT TALKING ABOUT CONTRIBUTORY

14   INFRINGEMENT.  I AM TALKING ABOUT DIRECT INFRINGEMENT.  AND

15   YOU GAVE ME FACTS IN THIS CASE WHICH YOU THINK AMOUNT TO

16   DIRECT INFRINGEMENT, AND MAYBE THEY DO.  WHAT I AM ASKING

17   IS, IF THE FACTS DIDN'T SHOW THAT A REPRESENTATIVE OF J.

18   WALTER WENT WITH THE MACHINE THEY HAD JUST SOLD AND RAN

19   CLEANING FLUID THROUGH IT, JUST FURNISHED INFORMATION, THAT

20   THERE WOULD BE NO DIRECT INFRINGEMENT?

21          MR. CAPP: I AM WITH YOU NOW.  I JUST DIDN'T

22   UNDERSTAND YOUR QUESTION BEFORE.  SEPARATE AND APART FROM

23   THE DIRECT INFRINGEMENT THAT THE DEFENDANT DOES, THE

24   CUSTOMER DIRECTLY INFRINGES.  THE ONLY DISPUTE BETWEEN THE

25   PARTIES IS WHO DOES THE PROVIDING STEP.  AND OUR POSITION IS

1  THAT THE CUSTOMER DOES THE PROVIDING STEP.  THE CUSTOMER HAS

2  THE CHOICE, THEY'VE GOT A DIRTY PART, THEY CAN SIT DOWN ON

3  THE GARAGE FLOOR WITH A PAINT CAN FULL OF KEROSENE AND A

4  PAINT BRUSH AND WASH THEIR PART THAT WAY, OR THEY CAN LOOK

5  OVER IN THE CORNER AND SEE THAT BIO-CIRCLE MACHINE AND THEY

6  CAN GET UP AND CARRY THE PART OVER AND TURN IT ON, AND THAT

7  ACT WOULD BE PROVIDING THE PARTS WASHER SO THEY COULD

8  PERFORM THAT METHOD.

9          SO ONCE YOU GET OVER THE HURDLE OF THE CUSTOMER

10 HIMSELF DOING THE PROVIDING STEP, THEN THE CUSTOMER IS

11 PERFORMING EVERY SINGLE STEP IN THE METHOD CLAIM.  AND WHAT

12 WE REALLY HAVE HERE IS A HAIL MARY PASS AT THE FOURTH

13 QUARTER ON A VERY TWISTD DEFINITION OF THIS WORD PROVIDING

14 WHEN IT WAS NEVER TEED UP FOR YOUR HONOR AT THE MARKMAN

15 HEARING.  IF THERE WAS AN ARGUMENT ABOUT WHAT IT WAS TO

16 PROVIDE A PARTS WASHER.  THAT SHOULD HAVE BEEN TEED UP TWO

17 YEARS AGO, AND THEY SHOULD HAVE DISPUTED THAT THAT

18 LIMITATION WAS MET, AND THEY SHOULD HAVE GIVEN ME AN

19 INTERROGATORY RESPONSE GIVING ME AN UNDERLYING FACTUAL BASIS

20 FOR WHY THEY DIDN'T ACKNOWLEDGE THIS STEP.

21          THE COURT:  WHAT KIND OF INFRINGEMENT IS THAT?

22 ASSUMING I AGREE WITH YOU THAT THE CUSTOMER DOES ALL OF THE

23 PARTS, MEETS ALL OF THE REQUIREMENTS WITH J. WALTER'S

24 MACHINE, YOU ARE SUING J. WALTER.  IS THAT DIRECT

25 INFRINGEMENT BY J. WALTER?

1          MR. CAPP:  ONLY WHEN THEY PROVIDE ALL OF THE STEPS

2     AT TRADE SHOWS AND DEMOS.  WHEN THE CUSTOMER DOES IT, THEN

3     J. WALTER IS LIABLE OF CONTRIBUTORY INFRINGEMENT AND

4     INDUCEMENT TO INFRINGEMENT BECAUSE --

5          THE COURT:  BUT NOT OF COURSE DIRECT INFRINGEMENT?

6          MR. CAPP: THE CUSTOMER IS THE DIRECT INFRINGER AT

7     THAT POINT.  AND J. WALTER IS LIABLE FOR INFRINGEMENT UNDER

8     35 USC 271 BECAUSE THEY ARE CONTRIBUTING, THEY ARE

9     CONTRIBUTORY TO THAT DIRECT INFRINGEMENT BY THE CUSTOMER.

10    THAT IS CLASSIC CONTRIBUTORY INFRINGEMENT.

11         THE COURT:  WHAT IS YOUR NEXT ARGUMENT?

12         MR. CAPP: I NEED TO COME BACK ON FILTER FOR A

13    MINUTE, YOUR HONOR, IN CASE THAT IS NOT A SLAM DUNK ALREADY.

14    WHEN WE DID THE MARKMAN HEARING, THE DEFINITION THAT WE

15    PROPOSED WAS BASICALLY A PLAIN AND ORDINARY MEANING, WHICH I

16    TOOK VERY MUCH VERBATIM OUT OF THE AMERICAN HERITAGE

17    DICTIONARY SEEKING A BROAD CONSTRUCTION.  I WANT TO SHOW YOU

18    THAT METAL SCREEN FILTERS ARE UNDERSTOOD IN THE PLAIN AND

19    ORDINARY MEANING OF THE TERM IN THIS INDUSTRY THAT METAL

20    SCREEN MESH FILTERS ARE CONSIDERED FILTERS.  SO IF YOU WOULD

21    PULL THIS UP, I AM GOING TO SHOW YOU IN THREE PLACES, YOUR

22    HONOR.

23         THE COURT:  THEY DON'T HAVE TO BE A FILTER, THEY

24    CAN BE A POROUS MEDIUM, WHICH I HAVE ALREADY HELD IS THE

25    SAME AS A FILTER.  DO YOU SEE ANY PROBLEM WITH THAT?

1            MR. CAPP:  NO.  IF YOU ARE ALREADY THERE, I

2    MEAN --

3            THE COURT:  I DON'T WANT YOU TO PUT ANYTHING UP.

4    I THINK THEY AMOUNT TO CERTAINLY A POROUS MEDIUM.  YOU CAN

5    ARGUE ALL DAY ABOUT WHETHER THEY ARE A FILTER, BUT THEY

6    AMOUNT TO A POROUS MEDIUM THAT PERFORMS THE SAME FUNCTION,

7    AND IT'S BEEN STIPULATED OR AGREED BY THE PARTIES THAT A

8    FILTER AND A POROUS MEDIUM ARE IDENTICAL.

9            MR. CAPP: I'VE BEEN TAUGHT WHEN I STRIKE OIL TO

10   QUIT DRILLING, SO IF I AM ALREADY THERE --

11           THE COURT:  OR HAVE THE SAME MEANING.  NOT

12   IDENTICAL, BUT HAVE THE SAME MEANING.  THEY COULD BE

13   IDENTICAL.

14           MR. CAPP: I DID WANT TO SHOW YOUR HONOR THAT METAL

15   MESH SCREENS ARE UNDERSTOOD IN THIS INDUSTRY AS BEING

16   FILTERS, AND I HAVE THREE SOURCES FOR YOU.

17           THE COURT:  YOU MAY SHOW ME SOMETHING THAT CHANGES

18   MY MIND ABOUT THAT, MR. CAPP.  SO I WOULD SUGGEST YOU GO ON

19   TO YOUR NEXT ARGUMENT.

20           MR. CAPP: THANK YOU, YOUR HONOR.  I JUST GOT

21   CONFUSED WHERE WE WERE THERE FOR A MINUTE.  THE MOTION WE

22   WOULD LIKE THE JUDGE TO GRANT JUDGMENT ON PARTIAL FINDINGS

23   ON THE INVENTORSHIP DEFENSE.  THAT IS THE 102 F AND 102 G.

24   YOUR HONOR, THIS IS -- WHEN IT IS BROUGHT BY A THIRD PARTY,

25   THIS IS A DISFAVORED DEFENSE IN THE LAW.  IT IS CONSIDERED A

1    HYPERTECHNICAL DEFENSE, AND COURTS GENERALLY DON'T LIKE IT.

2    FOR THAT REASON --

3              THE COURT: I DON'T LIKE IT.

4              MR. CAPP: -- PATENTS ARE EMBUED -- WHEN THEY COME

5    OUT OF THE PATENT OFFICE, PATENTS ARE IMBUED WITH A

6    PRESUMPTION THAT THE INVENTORSHIP IS CORRECT.  SO THAT

7    PRESUMPTION MUST BE OVERCOME BY CLEAR AND CONVINCING

8    EVIDENCE.

9              NOW, THE DEFENDANT'S STAR WITNESS ON THIS ISSUE

10   WAS GOING TO BE JAMES MCCLUER.  JAMES MCCLUER WAS GOING TO

11   BE THEIR ONLY WITNESS, WHICH MEANT HIS TESTIMONY WAS GOING

12   TO BE ESSENTIALLY UNCORROBORATED ANYWAY, AND HE'S ALREADY

13   CONSENTED TO JUDGMENT IN JUDGE FORRESTER'S COURT

14   ACKNOWLEDGING IN THE FINDINGS OF FACT AND CONCLUSIONS OF LAW

15   THAT THE OTHER THREE CO-INVENTORS INDEED WERE CO-INVENTORS.

16             THE COURT: IS THAT IN THE RECORD IN THIS CASE?

17             MR. CAPP: YOUR HONOR, WE WERE PLANNING ON ASKING

18   THE COURT TO TAKE JUDICIAL NOTICE OF THAT DURING THE

19   REBUTTAL PORTION OF OUR CASE.  I CAN CERTAINLY ASK THE COURT

20   TO TAKE JUDICIAL NOTICE OF IT AT THIS TIME, IF THE COURT IS

21   SO INCLINED.  BUT IT IS TEED UP AS --

22             THE COURT:  OKAY.  MR. SCHAETZEL, I BELIEVE THAT

23   IS AN APPROPRIATE SUBJECT FOR JUDICIAL NOTICE.  DO YOU

24   DISAGREE?

25             MR. SCHAETZEL:  MR. HARBIN WILL ARGUE THIS ISSUE.

1          THE COURT:  MR. HARBIN?

2          MR. HARBIN:   YOUR HONOR, IF YOU ARE GOING TO TAKE

3     JUDICIAL NOTICE, WE WOULD ASK THAT YOU TAKE JUDICIAL NOTICE

4     OF THE ENTIRE PROCEEDINGS AND THE HEARING THAT RESULTED IN

5     THAT.  WE CAN PROVIDE THE TRANSCRIPT.

6          MR. CAPP: NO OBJECTIONS TO THE TRANSCRIPT COMING

7     IN.

8          MR. HARBIN:   I BELIEVE IT IS ALREADY ATTACHED TO

9     OUR MOTIONS.

10          MR. CAPP: NO OBJECTION TO THE TRANSCRIPT COMING

11     IN.

12          SO, ESPECIALLY NOW WITH THE TRANSCRIPT IN, WHERE

13     MR. MCCLUER HIMSELF STOOD UP IN OPEN COURT AND LOOKED JUDGE

14     FORRESTER IN THE EYE AND AFFIRMED THAT MR. STRANGE WAS A

15     CO-INVENTOR, AND THAT MR. MCNALLY WAS A CO-INVENTOR, AND

16     THAT MR. MARKS WAS A CO-INVENTOR, AND LOOKED THE JUDGE IN

17     THE EYE AND SAID WHAT HE WAS DOING WAS UNDER OF HIS OWN FREE

18     WILL AND NOT UNDER DURESS, I THINK IT THAT UNDERSCORED THAT

19     THE DEFENDANTS CAN'T MEET THEIR BURDEN OF PROOF.  I DON'T

20     THINK THEY COULD HAVE MET THEIR BURDEN OF PROOF EVEN IF THEY

21     HAD CALLED MCCLUER, AND THEY ELECTED NOT TO CALL HIM TODAY

22     DESPITE AN ENORMOUS INVESTMENT OF EXPENSE ON OUR PART

23     GETTING READY FOR THIS PART OF THE CASE.  SO IF THERE WAS

24     EVER A TIME FOR A RULE 52 C GRANT, IT WOULD BE IN THIS CASE

25     ON THE INVENTORSHIP DEFENSE.

```
1              THE COURT:  OKAY.  ALL RIGHT, MR. SCHAETZEL.  WHAT
2    ABOUT THE INVENTORSHIP DEFENSE?
3              MR. SCHAETZEL:  MR. HARBIN WILL ADDRESS THAT.
4              THE COURT:  MR. HARBIN, WHAT ARE YOU LOOKING FOR
5    THERE?  AND I HAVE YOUR BENCH BRIEF BEFORE ME.  BUT I QUITE
6    FRANKLY I HAVE NOT HAD THE OPPORTUNITY TO READ IT.
7              MR. HARBIN:   WELL, YOUR HONOR, YOU CAN TAKE IT
8    OFF YOUR LIST.  WE NOTIFIED CHEMFREE LAST NIGHT, WE SAID WE
9    ARE NOT GOING TO CALL MR. MCCLUER.  WE ALSO WITHDRAWING THE
10   102 G DEFENSE, BUT WE ARE PURSUING 102 F.  AND WE WOULD ASK
11   THE COURT TO DECLARE THAT THERE HAS BEEN A MISJOINDER IN
12   THIS SITUATION.
13             THE COURT:  WHAT WOULD THE MISJOINDER BE?
14             MR. HARBIN:   YOUR HONOR, THE MISJOINDER WOULD BE
15   A FEW THINGS.  NUMBER ONE, OVER ALL, WE DO THINK THE
16   CASE MEETS THE EVIDENCE THAT MR. MCCLUER WAS IN FACT THE
17   SOLE INVENTOR.  THIS WAS A FAIRLY UNUSUAL SITUATION.  IT
18   DOES COME UP OCCASIONALLY, BUT IT IS NOT A CASE WHERE THERE
19   IS AN INVENDOR A, AND AN INVENTOR B TOTALLY INDEPENDENT OF
20   INVENTOR A, AND INVENTOR B COMES ALONG AND SAYS THIS IS A
21   CASE WHERE INVENTOR A, WHERE MR. MCCLUER, UNDENIABLY STARTED
22   THIS WORK BEFORE JOINING ISC, JOINED ISC AS A CONSULTANT,
23   WAS CORRESPONDING WITH THE PATENT ATTORNEY AS THE INVENTOR.
24   THEN THE OTHER THREE, MR. MCNALLY, MR. MCCLUER, AND
25   MR. STRANGE CAME NAMED AS CO-INVENTORS IN SOME -- IN
```

1    DIFFERING LEVELS ON THE PATENTS.

2         YOUR HONOR, THE PRINCIPLE WE ARE RELYING ON --

3    FIRST OFF, AS A RESULT, THERE IS NO DISPUTE BY ANYBODY THAT

4    MR. MCCLUER WAS THE AN INVENTOR.  ALL OF THE DEFENDANTS, ALL

5    OF CHEMFREE'S PRINCIPLES ACKNOWLEDGE THAT.  CHEMFREE

6    ACKNOWLEDGES THAT.  SO IT IS THAT UNIQUE CASE.  THE QUESTION

7    IS TO WHAT EXTENT ARE ANY OF THE OTHERS PROPERLY NAMED AS

8    INVENTORS.  WE WERE PURSUING A 102 G CASE, YOUR HONOR,

9    BECAUSE OF THE PRIOR RULING, BECAUSE OF THE EXTRAORDINARY

10   EFFORTS BY CHEMFREE TO KEEP THIS ELDERLY MAN FROM

11   TESTIFYING, THREATENING HIM WITH JAIL AND FINANCIAL

12   SANCTIONS, AND CONSIDERING HOW -- CONSIDERING THE REST OF

13   THE CASE, WE DID DECIDE NOT TO CALL HIM.  BUT WE STILL THINK

14   THAT THE EVIDENCE WARRANTS THE FINDING.  AND THAT IS, UNDER

15   THIS PRINCIPLE, YOUR HONOR, THAT TO BE AN INVENTOR YOU HAVE

16   TO PERFORM AN INVENTIVE ACT.  THAT AN INDIVIDUAL MUST MAKE A

17   CONTRIBUTION TO THE CONCEPTION OF THE CLAIMED INVENTION IS

18   NOT INSIGNIFICANT IN QUALITY, AND THAT CONTRIBUTION IS

19   MEASURED AGAINST THE DIMENSION OF THE FULL INVENTION.  AND

20   HERE, FOR EXAMPLE, IS THE FINA OIL CASE, 123 F 3D 1466; AND

21   THEN IN THE NARTON CORPORATION CASE, THE COURT DEALT WITH A

22   SITUATION OF AN EXTENDER, AND SAID THERE IS NOT AND COULD

23   NOT BE ANY CLAIM THAT THE ADDITION OF THE EXTENDER HERE WAS

24   ANYTHING BUT OBVIOUS, THEREFORE ONE INVENTOR'S CONTRIBUTION

25   DOESN'T MAKE HIM A CO-INVENTOR.  THE SUBJECT MATTER OF CLAIM

1    11, 558 F 3D 1352 AND 1358.

2           MR. MARKS CLAIMED INITIALLY TO INVENT THE SINK,

3    BUT AS WE WENT BACK OVER ALL OF THE EARLIER DEPOSITIONS,

4    THOSE PARTICULARLY TAKEN IN 1996, JUST A YEAR AND A HALF

5    AGO, A YEAR AND A HALF OR SO AFTER THE FILE DATE OF THE

6    APPLICATIONS, MR. MARKS, MR. MARKS TESTIFIED HE INVENTED

7    JUST THE LEDGE BETWEEN THESE SINKS.  CAN YOU SHOW

8    DEFENDANT'S EXHIBIT 208 PAGE 2.  MR. MARKS READILY ADMITTED

9    THAT WHAT HE INVENTED WAS THE INDENTATION IN THE SINK.  EVEN

10   BEFORE KSR, YOUR HONOR, WHICH WE WILL GET INTO MORE ON

11   OBVIOUSNESS, WE WOULD SUBMIT THAT IS NOT AN INVENTIVE

12   CONTRIBUTION, THAT IS ORDINARY ASSISTANCE UNDER THE CASE

13   LAW, THEREFORE, HE IS NOT PROPERLY AN INVENTOR.  AND AS TO

14   MR. MARKS, HE IS IDENTIFIED ON THE 226 PATENT I BELIEVE AS A

15   CO-INVENTOR WHEN THERE IS NOT THIS LIMITATION OR THE FALSE

16   SINK -- A FALSE -- THE FALSE BOTTOM OF THE SINK WITH THE

17   FILTER UNDERNEATH THAT HE CLAIMS TO NOW HAVING INVENTED, BUT

18   I THINK HE ADMITTED ON THE STAND THS IS REALLY WHAT IT WAS,

19   NOT THE WHOLE SINK, IT WAS THIS INDENTATION.

20          MR. STRANGE SEEMS TO HAVE COME UP WITH THE IDEA OF

21   GLUING THE BUGS TO THE FILTER.  THAT WAS CLEARLY, ALL

22   WITNESSES ADMITTED, YOUR HONOR, THAT WAS A MARKETING

23   PURPOSE.  MR. STRANGE TRIED TO CLAIM A FUNCTIONAL PURPOSE,

24   THAT POURING THE MICROBES INTO THE FLUID WOULD NOT WORK.

25   MR. MARKS, HOWEVER, TESTIFIED THAT THE FLUID WAS EFFICIENT

1    AND WORKED FINE.  THIS WAS A MARKETING DECISION TO HIDE,

2    CONCEAL THE BUGS FROM THE CUSTOMERS TO GIVE IT SOME MYSTERY,

3    AS WELL AS MR. MCNALLY, THAT THIS CAME OUT OF A MARKETING

4    MEANS.  SO AGAIN, THIS IS NOT A INVENTIVE CONTRIBUTION, BUT

5    THE MARKETING STEP, NOT DRIVEN BY THE FUNCTION OF THE

6    DEVICE.  AND BY THE WAY, ONE DETAIL, MR. STRANGE SAID HE

7    CAME UP WITH THE IDEA OF GLUING IT.  MR. MCNALLY TESTIFIED

8    HE DID NOT, HE JUST SAID LET'S JUST ATTACH THE BUGS TO THE

9    FILTER.

10         THEN YOU GET TO MR. MCNALLY, YOUR HONOR, WHO

11   RELUCTANTLY TESTIFIED AGAIN OR ADMITTED WHEN HE CONFIRMED

12   WITH HIS EARLIER TESTIMONY THAT HE WAS THE MANAGER AND

13   MR. MCCLUER WAS THE ENGINEER.  CLAIMED INITIALLY TO HAVE

14   INVENTED THE HEATER, AND THEN WHEN CONFRONTED WITH HIS PRIOR

15   TESTIMONY IN 1996 THAT MR. CALTO THOUGHT OF THE HEATER, AND

16   I THINK THE EVIDENCE SHOWS, DR. DURKEE ADMITTED, NOW THAT

17   THE HEATER IN -- A PARTS WASHER HEATER IN AN AQUEOUS PARTS

18   WASHER EXISTED BEFORE IN THE PRIOR ART, AND WHAT THESE

19   INDIVIDUALS DID IS, MR. MCNALLY ADMITTED ON THE STAND HE GOT

20   SOMEONE TO DESIGN ONE FOR THEM, SO THERE WAS NO INVENTION

21   THERE.

22         THE SAME WITH THE LEVEL SENSOR, YOUR HONOR.  IN

23   1996 HE TESTIFIED THAT -- WELL, MAYBE NOT 1996, BUT WE

24   CONFRONTED HIM WITH HIS SWORN TESTIMONY THAT HE CALLED

25   SOMEONE, HE ADMITTED THAT HE SIMPLY CALLED SOMEONE AND SAID

1    I CAN BUY THIS OFF THE SHELF, THE COMBINATION OF A LEVEL

2    SENSOR WITH A THERMOSTAT AND HEATER.  HE FOUND ONE.  THAT IS

3    NOT AN INVENTIVE STEP.

4         AGAIN, YOUR HONOR, AS THE EVIDENCE SHOWS,

5    HAKANSSAN-2 SHOWS, NOT ONLY A LEVEL SENSOR BUT A CONTROL

6    CONNECTED TO THE HEATER AND THE CONTROL BOX.  I THINK THAT'S

7    GENERALLY THE LANGUAGE USED WHICH, AGAIN, WE WILL TALK ABOUT

8    MORE ON OBVIOUSNESS.

9         THE COURT:  LET ME ASK YOU THIS:  WHAT IS THE --

10   ASSUME YOU ARE CORRECT, AND THERE IS MISJOINDER AND MARKS,

11   MCNALLY, AND STRANGE ARE REMOVED AS CO-PATENTEES, WHAT IS

12   THE EFFECT OF THAT?  I MEAN, THEY OWN THE PATENT.  CHEMFREE

13   OWNS THE PATENT IN ANY EVENT.

14        MR. HARBIN:  THERE IS ONLY -- THE ONLY EFFECT AS

15   TO US, FRANKLY, YOUR HONOR, IS PRESERVING OUR ISSUE ON

16   APPEAL UNDER THE FEDERAL CIRCUIT CASE THAT WE CITED EARLIER

17   THAT, WITH EITHER INEQUITABLE CONDUCT OR CONDUCT EQUIVALENT

18   TO THAT, THERE IS SOME DISAGREEMENT IN THE CASE LAW, BUT

19   THAT THE PATENT CAN BE VOIDED, RULED UNENFORCIBLE.  SO IT

20   WOULD BE TO PRESERVE THAT ISSUE.  OTHERWISE, MY

21   UNDERSTANDING OF THE LAW IS, YOUR HONOR WOULD JUST DECLARE

22   THERE IS A MISJOINDER, AND AGAIN WE THINK THAT THERE REAL

23   CLEARLY IS, ON THE 226, WITHOUT GET INTO ANY OF THIS

24   EVIDENCE, EVEN ACCEPTING ALL OF CHEMFREE'S CLAIMS ABOUT WHAT

25   MR. MARKS INVENTED, THAT YOU DECLARE A MISJOINDER, AND IT'S

1    UP TO THEM TO INVOLVE MR. MCCLUER AND DECIDE ARE THEY GOING

2    TO REQUEST A CORRECTION OR NOT.

3              THE COURT:  IT WOULDN'T GIVE, FOR EXAMPLE,

4    MR. MCCLUER ANY ADDITIONAL RIGHTS THAT HE DOESN'T PRESENTLY

5    HAVE SINCE HE SOLD THE PATENT, EVEN IF HE WERE THE SOLE

6    INVENTOR?

7              MR. HARBIN:   THAT'S CORRECT.

8              THE COURT:  OKAY.

9              MR. HARBIN:  THE FINAL ISSUES CONCERN COMBINING

10   THE FLUID WITH MICROBES WHICH NOW MR. MCCLUER -- EXCUSE

11   ME -- MR. MCNALLY MADE SOME CLAIM TO, BUT THEN ADMITTED IN A

12   VARIETY OF PRIOR DEPOSITIONS HE DID NOT, OR THE EVIDENCE

13   CLEARLY SHOWED HE DID NOT.  AND BEGINNING WITH -- PULL UP

14   THE 1996 DEPOSITION PAGES 107 AND 108 WHERE HE WAS ASKED

15   ABOUT DURING THE OPERATING PHASE -- YOU HEARD THE TESTIMONY,

16   YOUR HONOR, IT WILL BE IN THE RECORD -- (UNITELLIGIBLE) --

17   BUT ASKED WHAT, AFTER SEEING THERE WAS NO DISCUSSION, SHE

18   SAID I CAN'T BE MORE SPECIFIC IN CONTRIBUTING TO THE

19   DISCUSSION.  AND EVEN IN THE NOT THAT IS NOT AN INVENTIVE

20   CONTRIBUTION, AND THERE IS OTHER TESTIMONY WHICH I WON'T GO

21   THROUGH WHERE HE SAID WELL IT WAS A GROUP DECISION, WHERE

22   THE GROUP WAS ME AND MR. MCCLUER, THERE WAS CLEAR INFERENCE

23   THAT WAS MR. MCCLUER'S AND ENGINEERS'S CONCEPT THE ONE WHO

24   IS DEALING WITH THE SUPPLIERS.

25              I JUST WANT A FINAL NOTE ON INVENTORSHIP, YOUR

1    HONOR, THAT THERE IS A CLAIM ON OBVIOUSNESS AS TO THE

2    INVENTION DATE, IF CHEMFREE DOES CLAIM A DATE AS THEY HAVE

3    CONTENDED OF MARCH OR APRIL OF 1994, I WOULD SUBMIT THERE IS

4    A NONJOINDER ISSUE AS, YOUR HONOR, I WON'T PULL IT UP UNLESS

5    YOUR HONOR WISHES, YOU SAW IT A FEW TIMES, IS THEY

6    INTERNALLY RECOMMENDED THAT ENTRETECH APPLY FOR PATENTS IN

7    MID FEBRUARY OF 1994 ON THE FILTER AND THE FLUID, AND THAT

8    THEY APPLIED FOR THE MACHINE, AND THEY DIDN'T HAVE THE OTHER

9    SOLUTION OF SEAWASH AND THE LRC UNTIL WELL INTO THE SUMMER.

10   IF YOU REMEMBER THE EXHIBIT SHOWING THE SHIPMENT I THINK IN

11   EARLY JUNE, WHICH WAS THE FIRST DOCUMENT THAT THEY SHIPPED.

12           THE FINAL PIECE OF EVIDENCE, YOUR HONOR, I WOULD

13   POINT OUT IS THE ATTORNEY SHEFFIE'S CONCLUSIONS THAT

14   CHEMFREE SAID THEY PAID, AND THEY SHOWED MR. MCCLUER AS THE

15   SOLE INVENTOR ON SOME OF THE CLAIMS.  WE HAVE PUT THAT IN

16   THE RECORD.  IT WAS AMENDED, BUT STILL SHOWED MR. MCCLUER

17   THE SOLE INVENTOR ON SOME OF THOSE.  THANK YOU.

18           MR. CAPP: MAY I BE PERMITTED TO RESPOND?

19           THE COURT:  YEAH, BUT I THINK WE WILL TAKE A

20   LITTLE BREAK FIRST.  LET'S RECESS UNTIL 3:15 OR, MORE

21   ACCURATELY, 15 MINUTES.  BECAUSE THAT CLOCK DOESN'T MATCH

22   ANY OTHER CLOCKS THAT I SEEM TO HAVE, INCLUDING MY WATCH.

23   AND WE WILL GET STARTED AGAIN IN 15 MINUTES.

24           (BREAK FROM 3:01 UNTIL 3:16)

25           THE COURT:  ALL RIGHT, MR. CAPP.

1         MR. CAPP: THANK YOU, YOUR HONOR.  FOR THE RECORD,

2    THE THREE EXHIBITS WHICH THE COURT'S INCLINED TO TAKE

3    JUDICIAL NOTICE OF ARE PLAINTIFF'S EXHIBIT 582, WHICH IS THE

4    CONSENT ORDER AND JUDGMENT FROM THE CHEMFREE VERSUS MCCLUER

5    ACTION; PLAINTIFF'S EXHIBIT 583, WHICH IS THE PERMANENT

6    INJUNCTION FROM THAT SAME ACTION; AND WHAT IS OF RECORD IN

7    THIS CASE AT DOCKET 543 PAGES 88 TO 179, WHICH IS THE

8    TRANSCRIPT OF THE NOVEMBER 1, 2008 HEARING OVER IN JUDGE

9    FORRESTER'S COURT.  IT WAS FILED AS AN EXHIBIT TO, I

10   BELIEVE, THE MOTION IN LIMINE PROCEEDINGS THAT WE HAD FOR

11   THE PRETRIAL CONFERENCE.

12        THE COURT:  OKAY.

13        MR. CAPP: YOUR HONOR, THE FIRST THING WE NEED TO

14   CLEAR UP IS WHAT IS THE STANDARD FOR INVENTIVE CONTRIBUTION.

15   MR. HARBIN ARGUED THAT EACH CO-INVENTOR NEEDS TO INVENT

16   SOMETHING THAT WOULD PASS THE OBVIOUSNESS STANDARD UNDER THE

17   KSR RULING, AND THAT IS DEAD WRONG ON THE LAW.  HERE IS THE

18   CORRECT STATEMENT OF THE LAW, AND THIS COMES FROM JUDGE

19   FORRESTER'S RULING, THAT CONSENT JUDGMENT THAT WE JUST PUT

20   IN, AND I AM QUITE SURE THAT THIS IS THE CORRECT STATEMENT

21   OF THE LAW BECAUSE THIS WAS PREPARED AND PRESENTED BY ORDER,

22   WHICH I DRAFTED FOR JUDGE FORRESTER'S SIGNATURE, IN WHICH HE

23   SIGNED UNMODIFIED.

24        IF YOU GO DOWN ABOUT FIVE LINES, HIGHLIGHT WHERE

25   IT STARTS SECTION 116.  AND YOUR HONOR, THIS IS REFERRING TO

1   35 USC SECTION 116 WHICH IS THE JOINT INVENTORSHIP OR

2   CO-INVENTORSHIP STATUTE.  SECTION 116 SETS NO EXPLICIT LOWER

3   LIMIT ON THE QUANTUM OR QUALITY OF INVENTIVE CONTRIBUTION

4   REQUIRED FOR A PERSON TO QUALIFY AS JOINT INVENTOR, AND THAT

5   COMES FROM THE FINA OIL & CHEMICAL CASE, 123 F 3D 1466,

6   WHICH IS VERY IRONIC BECAUSE MR. HARBIN, WHEN HE WAS UP

7   HERE, HAD ANOTHER QUOTE FROM THE FINA OIL CASE THAT HE WAS

8   POINTING OUT TO THE COURT, THEN HE NEGLECTED TO POINT OUT

9   THAT THAT COMES FROM THE FINA OIL CASE, AND HE ARGUED

10  SOMETHING DIRECTLY CONTRARY TO THAT.

11          THE NEXT STATEMENT FROM THE ELI LILY CASE IS EVEN

12  MORE SIGNIFICANT, YOUR HONOR.  AND I WILL JUST READ IT.

13  "FURTHERMORE, COURTS RECOGNIZE THAT THE LINE BETWEEN TRUE

14  CONTRIBUTION TO INVENTORSHIP AND THE REMAINING OR MORE

15  PROSAIC CONTRIBUTIONS TO THE INVENTIVE PROCESS THAT DO NOT

16  RENDER THE CONTRIBUTOR A CO-INVENTOR IS SOMETIMES A

17  DIFFICULT ONE TO DRAW."  AND IF ANYTHING, IT IS REAL

18  DIFFICULT IN THIS CASE TO GET TO THE LEVEL OF CLEAR AND

19  CONVINCING EVIDENCE WHEN YOU'VE GOT ALL OF THESE PERSONAL

20  PROBLEMS WITH MCCLUER WITH HIS UNCORROBORATED ORAL

21  TESTIMONY.

22          NOW, WITH RESPECT TO MR. HARBIN'S CRITICISM OF THE

23  INVENTIVE CONTRIBUTION OF MR. STRANGE AND MR. MARKS, I WOULD

24  LIKE TO PULL UP VERY QUICKLY JTX-21.  THIS IS A JOINT

25  EXHIBIT WHICH THE PARTIES HAVE STIPULATED TO, AND THIS IS

1    U.S. PATENT 5,961,733.  BLOW UP THE TOP THERE.  THIS IS THE

2    PATENT THAT NAMES LELAND STRANGE AS THE SOLE INVENTOR, YOUR

3    HONOR.  THIS IS THE PATENT THAT GOES TO, WHICH IS DIRECTED

4    TO, THE GLUING ON OF THE MICROBES TO THE FILTER.  SO THE

5    PATENT OFFICE THOUGHT ENOUGH OF THAT IDEA THAT THEY GAVE

6    MR. STRANGE HIS OWN PATENT ON IT.  SO THAT IS PRETTY GOOD

7    INVENTIVE CONTRIBUTION.  NOW LET'S GO TO JTX-26.

8            THE COURT:  DID HE TELL THEM THAT HE'D FIGURED IT

9    OUT FROM K-MART OF WHEREVER IT WAS?

10           MR. CAPP:  MY ANSWER TO THAT, YOUR HONOR, SECTION

11   103 OF THE OBVIOUS CODE SAYS INVENTION SHALL NOT BE

12   NEGATIVED BY THE MANNER WHICH IT IS INVENTED.  AND THIS IS

13   MR. MARK'S PATENT THAT HE HAS THE SOLE INVENTORSHIP ON, AND

14   THIS IS U.S. PATENT 6,044,854 NAMES HIM AS THE SOLE

15   INVENTOR, AND THAT IS DIRECTED TO THAT MULTI-TIERED SINK.

16   SO THE PATENT OFFICE THOUGHT ENOUGH ABOUT THAT TO GIVE HIM

17   HIS OWN PATENT ON IT AS THE SOLE INVENTOR.  AND, YOU KNOW,

18   MR. SHEFFIE, WHO I THINK EVERYONE IN THIS ROOM RESPECTS, DID

19   THE INVESTIGATION, AND HE AGREED THAT THAT IS MR. MARKS'S.

20           AS FAR AS MR. MCNALLY, HE PROBABLY DID MORE -- HE

21   DOESN'T HAVE A PATENT WHERE HE IS THE SOLE INVENTOR, BUT HE

22   PROBABLY MADE MORE JOINT CONTRIBUTIONS THAN ANYONE.  SO I AM

23   GOING TO RESPOND TO WHAT HE HAD TO SAY ABOUT THE LRC-1

24   MICROBES AND HOW THAT FITS THE DATE OF INVENTION, BUT THAT

25   MAKES MORE SENSE WHEN I GET TO OBVIOUSNESS IN A MINUTE.  SO

1    THAT CONCLUDES WHAT I HAVE TO SAY ABOUT THE INVENTORSHIP

2    DEFENSE, OTHER THAN TO BE VERY VERY CLEAR THAT, ALTHOUGH THE

3    DEFENDANTS HAVE WITHDRAWN THE 102 G DEFENSE, WE WOULD STILL

4    LIKE THE COURT TO ENTER JUDGMENT ON THAT DEFENSE, RATHER

5    THAN JUST TO ACKNOWLEDGE THAT IT HAS JUST BEEN WITHDRAWN.

6    SO WE ARE ASKING FOR RULE 10 ON BOTH THE 102 F AND THE 102 G

7    DEFENSE.

8            AND WITH THAT I AM READY TO MOVE TO THE THIRD

9    POINT.

10            THE COURT: ALL RIGHT.

11            MR. CAPP: WE ASK THE COURT TO ENTER JUDGMENT

12   AGAINST THE INVALIDITY OVER THE THE PRIOR ART DEFENSE, WHICH

13   IS THE ANTICIPATION DEFENSE UNDER 35 USC 102, AND THEN LATER

14   THE OBVIOUSNESS DEFENSE UNDER 35 USC 103.  PULL UP SLIDE 4,

15   PLEASE.  THIS IS THE STANDARD FOR WHAT IS REQUIRED TO PROVE

16   ANTICIPATION, YOUR HONOR.  AND AGAIN, THIS IS SOMETHING

17   WHERE A PATENT COMES OUT OF THE PATENT OFFICE IMBUED WITH

18   THE PRESUMPTION OF VALIDITY, AND THE PRESUMPTION MUST BE

19   OVERCOME BY CLEAR AND CONVINCING EVIDENCE.  THIS IS WHAT WE

20   COMMONLY REFER TO AS THE ALL LIMITATIONS RULE.  TO

21   ANTICIPATE UNDER 5 USC SECTION 102 B A SINGLE PRIOR ART

22   REFERENCE MUST EXPRESSLY OR INHERENTLY DISCLOSE EACH CLAIM

23   LIMITATION.  SO THEY CAME IN HERE WITH THE BURDEN OF PROOF

24   OF CLEAR AND CONVINCING EVIDENCE TO TAKE ALL OF OUR CLAIMS

25   AND READ THEM ALL ON HAKANSSAN-2 IN A WAY THAT EVERY SINGLE

1    CLAIM LIMITATION IS FOUND IN HAKANSSAN-2.  AND THERE IS

2    JUST -- THEY HAVEN'T MET THEIR BURDEN OF PROOF ON THAT.

3    PULL UP SLIDE FIVE.

4              THE COURT: WHEN THE COURT SAYS "INHERENTLY

5    DISCLOSE," IT MEANS -- WHAT DOES IT MEAN, ENCLOSE WITHIN THE

6    TERMS AND MEANS OF THAT PARTICULAR PATENT?

7              MR. CAPP: I HAVE A SLIGHT WITH THIS STATEMENT OF

8    LAW ON THAT.  YOUR HONOR, WHILE I AM FLIPPING THROUGH HERE,

9    HERE WE GO, SLIDE 9.  THE TWO STANDARDS THE COURT NEEDS TO

10   APPLY ARE THE ONES DOWN AT THE BOTTOM OF THE SLIDE.

11   INHERENCY MAY NOT BE ESTABLISHED BY MERE POSSIBILITIES THAT

12   SOMETHING MAY RESULT FROM CIRCUMSTANCES IS INSUFFICIENT.  SO

13   THE IDEA THAT, WELL, MAYBE IT IS THERE OR MAYBE IT'S NOT.

14   THAT DOESN'T GET IT.  THE TEST IS THAT THE FINAL STATEMENT,

15   AND THAT COMES FROM THE DAYCO PRODUCTS CASE, AND I QUOTE,

16   INHERENCY MAY BE ESTABLISHED THROUGH EXTRINSIC EVIDENCE,

17   HOWEVER, THE EVIDENCE MUST ESTABLISH THAT THE MISSING MATTER

18   IS NECESSARILY PRESENT IN THE REFERENCE, CLOSED QUOTE.  SO

19   IT'S NOT JUST THAT IT MAY BE THERE, IT HAS TO BE THERE.

20   IT'S THE SORT OF THING WHERE PRACTITIONERS MAY NOT HAVE

21   MENTIONED IT BECAUSE IT IS JUST UNDERSTOOD THAT IT'S

22   NECESSARILY THERE.  YOU KNOW, MAYBE A LAWYER NEEDS SOMEONE

23   TO EXPLAIN IT TO THEM, OR A JUDGE NEEDS TO.  BUT THE

24   PRACTITIONERS SEE IT AND THEY KNOW IT'S THERE, SO MUCH SO

25   THAT IT DOESN'T NEED TO BE SAID.  AND THE EVIDENCE DOESN'T

1    SHOW THAT IN THIS CASE.

2             HAKANSSAN-2 -- LET'S GO TO SLIDE FIVE.  THE FIRST

3    THING IS, FOR THE LOU ISAF PROSECUTED CASE, THE 110, THE

4    835, AND THE 125 ALL START WITH A CLAIM LIMITATION DIRECTED

5    TO A BASIN WHICH WE'VE CONSTRUED FOR PURPOSES OF THE JOINT

6    CLAIM CONSTRUCTIONS, EVERYONE AGREED TO IT, THAT A BASIN WAS

7    AN OPEN VESSEL.  THIS IS A CLOSED CHAMBER PARTS WASHING

8    SYSTEM, VERY DIFFERENT FROM OPEN BASIN, PARTICULARLY IF YOU

9    LOOK TO THE CENTER OF THE DIAGRAM.  AND RIGHT HERE, THAT'S

10   AN INDICATION OF WHAT THEY CALL A PERFORATED PIPELINE THAT

11   ROTATED IN THERE, AND THAT IS A HIGH PRESSURE SPRAY DEVICE.

12   AS DR. DURKEE EXPLAINED, INSTEAD OF HAVING SOMEONE STANDING

13   WITH A BRUSH USING MECHANICAL FORCE TO REMOVE, TO ASSIST IN

14   THE REMOVAL OF THE ADHERED CONTAMINANT FROM THE PART, THIS

15   USED SPRAY IMPACT.  SO IT'S VERY SIGNIFICANT THE DIFFERENCE

16   BETWEEN AN OPEN BASIN WASHER AND A HIGH PRESSURE WASHER.

17   AND THE SIGNIFICANCE THAT WILL COME IN IN OBVIOUSNESS IN A

18   MINUTE WHEN WE START TALKING ABOUT MOTIVATIONS TO MODIFY THE

19   REFERENCE, BUT THERE IS NO OPEN BASIN, SO HAKANSSAN-2 CAN'T

20   ANTICIPATE ANY OF THE LOU ISAF'S THE 110, THE 835, JUST ON

21   OPEN BASIN ALONE.

22             WE HAVE CLAIMS DIRECTED TO A FILTER, HAKANSSAN-2

23   DOES NOT HAVE A FILTER.  DURKEE HAS GONE AND EXPLAINED THAT

24   IN CONSIDERABLE DETAIL IN HIS REPORT.  THERE WAS TESTIMONY,

25   WHEN HE WAS ON THE STAND YESTERDAY, IT MIGHT BE DESIRABLE,

1    IT MIGHT BE A GOOD IDEA, IT MIGHT BE WONDERFUL TO PROTECT

2    THE PUMP, BUT IT DOESN'T HAVE TO BE.  IT DOESN'T HAVE TO BE

3    THERE.  AND I WILL JUST ILLUSTRATE, YOUR HONOR.  THIS IS THE

4    IO 200 HERE, AND IT HAS THE FILTER RIGHT HERE.  I CAN SIT

5    THERE AND PICK THAT UP, WALK AWAY, LET SOMEONE ELSE WALK

6    OVER, TURN THAT THING ON AND WASH A PART, I CAN BE SITTING

7    THERE.  IT HAS NO FILTER EXPRESSLY OR --

8         THE COURT:  WAIT.  ISN'T THAT THE POROUS MATERIAL

9    YOU'VE GOT THERE?

10        MR. CAPP:  THAT IS THE WAY I LOOK AT IT, YOUR

11   HONOR.  SO YOU COULD OPERATE THE IO 200 WITH OR WITHOUT THE

12   FILTER, AND IF YOU TAKE THE FILTER OUT AND IT STILL WORKS,

13   THEN IT'S PRETTY CLEAR THAT NOT ALL PARTS WASHERS HAVE TO

14   HAVE A FILTER.  GOOD IDEA, DESIRABLE, YOU KNOW, GREAT.  BUT

15   DOES IT NECESSARILY HAVE TO BE THERE.  THE ANSWER IS NO, THE

16   LOU ISAF PATENTS, THE 110, THE 835, AND THE 125 ALL HAVE A

17   LIMITATION, A REASONABLY NARROW LIMITATION DIRECTED TO THE

18   CLEANING FLUID.  IT HAS TO BE BIODEGRADEABLE, NONCAUSTIC

19   NONTOXIC, NONFLAMMABLE.  THERE IS NO EXPRESS DISCLOSURE IN

20   HAKANSSAN-2 THAT THE FLUID IS NONCAUSTIC.  AND I SUBMIT THAT

21   -- I MEAN, THE CLOSEST THEY ARE GOING TO GET IS TRY TO ARGUE

22   THAT THEY GOT SOMETHING OUT OF DURKEE ON THAT YESTERDAY.

23   AND I SUBMIT TO YOU THAT WHATEVER IT IS THAT THEY THINK THEY

24   GOT IS SO AMBIGUOUS AND SO EQUIVOCAL THAT IT DOESN'T SATISFY

25   DURKEE ESTABLISHING THAT NONCAUSTIC IS NECESSARILY PRESENT

1    BY CLEAR AND CONVINCING EVIDENCE.  IT'S A TORTURED ARGUMENT

2    THAT THEY CAME OUT OF USING THAT ONE SENTENCE THAT HAD

3    ALKALINE, ACIDIC, AND BIOLOGICAL.  THEY GOT SOME TESTIMONY

4    FROM DURKEE, BUT IT DIDN'T RISE TO THE LEVEL OF A CLEAR AND

5    UNEQUIVOCAL STATEMENT THAT THAT NECESSARILY MEANT THAT THE

6    FLUID HAD TO BE NONCAUSTIC.

7            FINALLY, WE HAVE SOME CLAIM LIMITATIONS, NOT ALL,

8    THAT HAVE LIMITATIONS DIRECTED TO A LEVEL CONTROL SYSTEM.

9    NOW, HAKANSSAN-2 DOES HAVE A LEVEL CONTROL SYSTEM, BUT THE

10   WAY THIS THING WORKS, THIS IS A VERY BIG COMPLEX DESIGN,

11   YOUR HONOR.  AND YOU SEE OVER HERE IN THE UPPER LEFT-HAND

12   CORNER, THAT IS A FEED LINE FROM A WATER SYSTEM.  SO THIS

13   THING IS DESIGNED TO BE HOOKED RIGHT IN TO THE WATER SYSTEM

14   OF THE PLANT, AND THE LEVEL CONTROL SYSTEM DETECTS THE WATER

15   FLOW, SURE, THEN IT DOES AN ACTION.  BUT THE ACTION IS NOT

16   TO TURN THE HEATER OFF, THE ACTION IS TO FILL UP THE WATER.

17   AND SO THE LIMITATION THAT IS DIRECTED TO THE LEVEL CONTROL

18   BEING INTEGRATED WITH THE THERMOSTAT AND THE HEATER IS NOT

19   INHERENTLY -- OR IT'S NOT EXPRESSLY MET, AND THEN WE HAD 15

20   TO 30 MINUTES OF BACK AND FORTH WITH MR. SCHAETZEL AND

21   MR. DURKEE ABOUT WHETHER THAT IS INHERENTLY MET OR NOT, AND

22   IS IT DESIRABLE.  IT MAY BE DESIRABLE.  CAN IT BE DONE?

23   YEAH, IT COULD BE DONE IF YOU ASK SOMEBODY TO DO IT, BUT IS

24   IT NECESSARILY PRESENT?  NO.  SO THERE ARE AT LEAST FOUR

25   LIMITATIONS THERE WHICH THEY CANNOT GET TO THE ALL

1    LIMITATIONS STANDARD ON, SO WE SHOULD BE ENTITLED TO

2    JUDGMENT ON THE 102 DEFENSE, AND I WILL SURRENDER THE PODIUM

3    FOR COUNTERPOINT ON THAT.

4         MR. SCHAETZEL:  FIRST OF ALL, YOUR HONOR, THE

5    ANTICIPATION DEFENSE HAS ALWAYS AND ONLY GONE TO THE 226

6    PATENT.  SO TO THE LINE THAT THE OTHER THREE THAT ARE

7    IDENTIFIED AS THE MR. ISAF PATENTS, THAT IS NOT AT ISSUE.

8    WHAT WE ARE TALKING ABOUT IS THE 226 PATENT, AND QUITE

9    FRANKLY, YOUR HONOR, THE 226 PATENT IS A MONOPOLY ON THE

10   BIOREMEDIATION PROCESS.  IT'S THE BROADEST CLAIM, IT HAS

11   NOTHING TO DO WITH BIODEGRADEABLE NONCAUSTIC, ALL OF THAT IS

12   OUT.  SO IF I CAN, I WOULD FIRST LIKE TO TAKE A LOOK AT

13   CLAIM 1 OF THE 226 PATENT.  THERE ARE RELATIVELY FEW

14   ELEMENTS, ONLY SIX.  OF THOSE SIX, THREE ARE NOT AT ISSUE,

15   THAT THEY ARE ALREADY PRESENT IN THE HAKANSSAN REFERENCE.

16        THE FIRST ONE, PLACING AT LEAST ONE PART IN A

17   FIRST CHAMBER.  VERY IMPORTANT TWO POINTS ON THIS, YOUR

18   HONOR.  CHEMFREE HAS IDENTIFIED THEIR OPEN BASIN AS A

19   CHAMBER.  CHAMBERS TEND TO BE CLOSED.  THE DISTINCTION BEING

20   DRAWN BETWEEN AN OPEN BASIN AND A CHAMBER IS NOT MUCH OF A

21   DISTINCTION WHEN YOUR PATENT CLAIM SAYS A FIRST CHAMBER AND

22   THAT CHAMBER IS AN OPEN VESSEL.  BUT PUT THAT ASIDE, PERHAPS

23   THAT IS ONE OF THE REASONS THERE IS NO ARGUMENT THAT

24   HAKANSSAN-2 DOES IN FACT REQUIRE PLACING AT LEAST ONE PART

25   IN A FIRST CHAMBER, THE WASHING TANK.

1          YOU THEN COME DOWN TO ELEMENT E, REMOVING ORGANIC

2     MATTER.  REMOVING ORGANIC MATTER IN THE CLEANING FLUID IN

3     THE SECOND CHAMBER WHEREIN THE STEP OF REMOVING THE ORGANIC

4     MATTER FROM THE FLUID COMPRISES BIOLOGICALLY DEGRADING THE

5     ORGANIC MATTER.  THAT IS REMARKABLY BROAD, YOUR HONOR.  IT

6     DOESN'T SAY HOW THE ORGANIC MATTER IS REMOVED, IT DOESN'T

7     MATTER IF IT'S UNDER HIGH PRESSURE OR LOW PRESSURE, IT

8     DOESN'T MATTER WHAT THE FLUID IS.  THE FLUID COULD BE

9     CAUSTIC, IT COULD BE NONCAUSTIC, IT COULD KILL THE

10    MICROORGANISMS, IT COULD NOT KILL THE MICROORGANISMS.  IT IS

11    A REMARKABLY BROAD ELEMENT.  AND IT'S ADMITTED THAT THAT

12    ELEMENT READS ON WHAT HAPPENS IN THE WASHING CHAMBER OF THE

13    HAKANSSAN-2 REFERENCE.

14         SO REMOVING ORGANIC MATTER IS EXACTLY WHAT HAPPENS

15    IN THE WASHING CHAMBER HERE.  SO WE KNOW THAT THAT ORGANIC

16    MATTER IS GOING TO BE PRESENT AT THE END OF THE WASHING

17    CYCLE SOMEWHERE AT THE BOTTOM OF THE WASHING TANK.  THE LAST

18    ITEM, RECIRCULATING THE CLEANING LIQUID FROM THE SECOND

19    CHAMBER TO THE FIRST CHAMBER TO BE AVAILABLE FOR WASHING

20    PARTS.  SO WE ARE RECIRCULATING THE CLEANING LIQUID FROM THE

21    SECOND CHAMBER, WHICH IS THE STORAGE TANK OF HAKANSSAN, TO

22    THE FIRST CHAMBER, THE WASHING TANK, FOR THE PURPOSE OF

23    WASHING PARTS.  THOSE THREE ELEMENTS ARE MET LITERALLY.  NO

24    ISSUE ABOUT THEM.  TWO MORE ELEMENTS ARE EFFECTIVELY MET.

25         WE NEXT GO TO ELEMENT B, CIRCULATING A CLEANING

1    FLUID FROM A SECOND CHAMBER TO THE FIRST CHAMBER TO WASH THE

2    SURFACES OF THE PART IN CONTACT WITH THE FLUID, SAID

3    CLEANING FLUID REMOVING ORGANIC MATTER.  SO WE ARE NOW

4    TAKING CLEANING FLUID FROM THE SECOND CHAMBER OR THE HOLDING

5    TANK TO THE FIRST CHAMBER TO WASH THE SURFACES OF THE PART

6    IN CONTACT WITH THE FLUID.  THERE IS NO ISSUE THAT THE FLUID

7    ACTUALLY REMOVES ORGANIC MATTER.  DR. DURKEE AGREED TO THAT.

8    THE ONLY ISSUE HERE IS WHAT WE DID WITH DR. DURKEE IN TERMS

9    OF HOW IT HAPPENS.  AND IN DR. DURKEE'S REPORT, IS HIS

10   ARGUMENT FOR THIS ONE IS THAT HAKANSSAN-2 DOES NOT CIRCULATE

11   THE CHEAPING FLUID BETWEEN TWO CHAMBERS, RATHER HAKANSSAN-2

12   PERFORMS A BULK TRANSFER OF FLUID TO THE WASHING CHAMBER,

13   THEN CIRCULATES WITHIN THE WASHING CHAMBER, AND THEN

14   COMPLETE OF THE WASHING CYCLE THE FLUID IS RETURNED TO THE

15   WASHING LIQUID TANK BY PUMP.

16            SO IN OTHER WORDS, HE SAYS IT DOESN'T CIRCULATE A

17   CLEANING FLUID FROM THE SECOND CHAMBER, THE HOLDING TANK TO

18   THE FIRST CHAMBER HERE, BECAUSE WHAT HAPPENS IS IN BETWEEN

19   THE PROCESS OF BRINGING THE FLUID BACK, YOU ACTUALLY

20   CIRCULATE THE FLUID AROUND THE PART.  TWO POINTS TO BE MADE

21   THERE, YOUR HONOR.  REGARDLESS OF THAT INTERMEDIATE STEP

22   THAT HE DESCRIBES, THE INTERMEDIATE STEP BEING THAT YOU WASH

23   THE FLUID HERE AND THE FLUID WILL CIRCULATE WITHIN THE

24   WASHING TANK, YOU ARE STILL CIRCULATING FLUID FROM THE

25   STORAGE TANK TO THE WASHING TANK, AND THEN BACK OVER TO THE

1    STORAGE TANK.  THAT CIRCULATION PROCESS WILL HAPPEN

2    CONTINUOUSLY IN THIS.  AND FOR THAT REASON, FOR EXAMPLE,

3    DR. DURKEE ADMITED -- DR. DURKEE ADMITTED, YOU KNOW, WE

4    DON'T ADD ANY FLUID TO THIS.  IT IS NOT LIKE WE GO OUT AND

5    GET NEW FLUID.  IT IS RECIRCULATED.  IT IS GOING FROM ONE

6    TANK TO THE WASHING CHAMBER AND BACK.

7            A SECOND POINT ON THIS, YOUR HONOR, STEP B, IS

8    CIRCULATED, IT WAS CONTESTED BY DR. DURKEE.  STEP F,

9    RECIRCULATED WAS NOT CONTESTED BY DR. DURKEE.  THOSE TWO

10   POSITIONS ARE INCONSISTENT.  IF YOU ARE RECIRCULATING IN

11   STEP F, YOU ARE ALSO CIRCULATING IN STEP B.  SO THE QUESTION

12   IS, IS CIRCULATING A CLEANING FLUID, DOES THAT ELEMENT READ

13   ON HAKANSSAN-2.  AND IT DOES.  BECAUSE THE TEST IS, DOES THE

14   CLAIM AT ISSUE READ ON THE PRIOR ART EITHER DIRECTLY OR

15   UNDER THE PRINCIPLES OF INHERENCY.  DOES THIS CLAIM READ ON

16   THIS DEVICE.  THAT MEANS DOES ELEMENT B READ ON THIS DEVICE.

17   SURE IT DOES.  YOU CIRCULATE THE CLEANING FLUID FROM THE

18   SECOND CHAMBER, THE CLEANING FLUID FROM THE SECOND CHAMBER

19   TO THE WASHING TANK TO WASH THE SURFACES OF THE PART, THE

20   CLEANING FLUID REMOVES ORGANIC MATTER HERE, AND IT WILL

21   CIRCLE BACK.  IT WILL RECYCLE LATER BACK TO HERE.

22           ELEMENT D, DRAINING THE CLEANING LIQUID FROM THE

23   FIRST CHAMBER INTO THE SECOND CHAMBER.  DR. DURKEE'S POINT

24   HERE IS THAT HAKANSSAN-2 DOES NOT DRAIN FROM THE WASHING

25   CHAMBER TO THE TANK, RATHER THE FLUID IS PUMPED AGAINST THE

1    FORCE OF GRAVITY.  THIS IS A DISTINCTION WITHOUT A
2    DIFFERENCE, YOUR HONOR.  THERE IS NOT -- THAT SAYS THE WORD
3    "DRAINING" HAS TO BE UNDER POWER OR NOT UNDER POWER.  THAT
4    IS ONE OF THE PROBLEMS WITH THIS CLAIM.  IT IS SO BROAD.
5    YOU CAN DRAIN IT BUT PUMPING IT OUT, YOU CAN DRAIN IT BY
6    OPENING A VALVE, YOU CAN DRAIN IT ANY WAY YOU WANT, YOU JUST
7    HAVE TO DRAIN IT.  AND WHAT HAPPENS HERE IS, YOU DRAIN THE
8    CLEANING LIQUID FROM THE FIRST CHAMBER INTO THE SECOND
9    CHAMBER.  YES, IT GETS PUMPED THERE, NO QUESTION ABOUT IT,
10   BUT IT IS STILL A DRAINING PROCESS.  SO ELEMENT D IS
11   LITERALLY MET.
12        WHICH BRINGS US TO THE ONLY ELEMENT OF THIS CLAIM
13   ABOUT WHICH THERE IS REALLY ANY DISPUTE, I SUBMIT, AND THAT
14   COMES BACK TO THE TERM "POROUS MEDIUM."  THE QUESTION IS,
15   CAN YOU READ THE POROUS MEDIUM, ELEMENT C, ONTO THIS CLAIM
16   USING MR. CAPP'S LANGUAGE.  IS A PUMP NECESSARILY -- IS A
17   FILTER NECESSARILY PRESENT HERE.  WE SUBMIT THAT IT IS.  THE
18   FIRST PIECE OF EVIDENCE THAT WOULD SHOW THAT IT IS NOT THIS
19   REFERENCE, OR THE HAKANSSAN REFERENCE, OR THE PATENTS, BUT
20   THE SIMS REFERENCE.  SIMS SHOWS AN EXAMPLE IN THE 1994 TIME
21   FRAME, WHERE --
22        THE COURT: WELL, IF YOU SAY SIMS SHOWS AN EXAMPLE
23   THAT WAS LATER USED IN THE CHEMFREE OR MCCLUER PATENT, DOES
24   THAT CHANGE THE STANDARD THAT MR. CAPP REFERRED TO WHERE YOU
25   ONLY HAD ONE PRIOR ART REFERENCE?

1            MR. SCHAETZEL:  NO, SIR, I FULLY AGREE THAT IS THE

2    CORRECT STANDARD, AND I AM NOT TRYING TO REFER TO SIMS AS --

3            THE COURT:  PRIOR ART?

4            MR. SCHAETZEL:Y I THINK IT IS PRIOR ART, BUT I AM

5    NOT TRYING TO COMBINE SIMS WITH HAKANSSAN.  THE POINT THAT I

6    WOULD MAKE WITH SIMS IS THAT IT'S KNOWN IN THIS TECHNOLOGY,

7    IT IS KNOWN IN THIS ART, HOWEVER WE END UP FINDING THAT, AT

8    THE END OF THE DAY, SIMS WILL BE INCLUDED IN THAT ART, AND

9    THAT ART UNDERSTANDS THAT THERE ARE SIGNIFICANT PARTS OF

10   THESE MACHINES THAT YOU DO NOT NEED TO SHOW IN ORDER TO

11   COMMUNICATE WITH THAT PERSON OF ORDINARY SKILL OF THE ART.

12   THAT IS THE ONLY REASON FOR WHICH I REFERRED TO THE SIMS

13   REFERENCE.

14            AND WHAT SIMS TALKS ABOUT IS NOT SHOWN IN THE

15   OUTLINE, BUT KNOWN BY ALL THOSE IN THE ART TO EXIST IN THE

16   BOX IS AN INTERNAL EXPLOSION-PROOF RECIRCULATED PUMP.  THE

17   SIMS PARTS WASHER IS ABOUT TWO PUMPS, ONE THAT PUMPS

18   BASICALLY THE FLUID THROUGH THE FILTERS, AND THE OTHER PUMP

19   THAT WORKS IN CONJUNCTION WITH THE HEATER, AND SO ON AND SO

20   FORTH.  IN SIMS, THEY SAY EVERYBODY KNOWS THERE IS A PUMP

21   THERE.  WE ALL KNOW THAT THERE IS A PUMP.  THAT IS THE LEVEL

22   OF SKILL THAT WE ARE WORKING AT.  PEOPLE UNDERSTAND THAT IN

23   THE MECHANICS YOU DON'T HAVE TO SHOW EACH AND EVERY ITEM

24   THERE, WHICH BRINGS ME TO THE REFERENCE ON WHICH WE RELY,

25   HAKANSSAN-2.

1          DOES THAT PERSON OF ORDINARY SKILL IN THE ART HAVE

2    TO SEE SOME SORT OF INDICIA IN THIS DRAWING TO SAY, OH,

3    THERE IS A FILTER THERE, OR WOULD THEY NECESSARILY

4    UNDERSTAND THAT THERE IS FILTER THERE?  WE'VE PROVEN THAT

5    THEY WOULD NECESSARILY UNDERSTAND IT FOR TWO REASONS.

6          I DISAGREE WITH MR. CAPP'S RECOLLECTION OF

7    DR. DURKEE'S TESTIMONY, AND I'VE BEEN -- IT'S BEEN -- A COPY

8    OF IT HAS BEEN PROVIDED, BUT I HAVEN'T HAD A CHANCE TO READ

9    ALL OF DR. DURKEE'S TESTIMONY YET.  BUT MY RECOLLECTION OF

10   DR. DURKEE'S TESTIMONY IS THAT HE SAID THAT THIS PERSON OF

11   ORDINARY SKILL IN THE ART, AS HE DEFINED IT, WOULD WANT TO

12   PROTECT THE PUMP.  THAT THAT PERSON WOULD KNOW YOU HAD TO

13   PROTECT THE PUMP.  AND HE IDENTIFIED HAKANSSAN-2 AS AN

14   EXPENSIVE PIECE OF EQUIPMENT THAT WOULD HAVE A VERY

15   EXPENSIVE PUMP THAT YOU WOULD WANT TO PROTECT.

16          THE SECOND THING THAT IS IMPORTANT IS, IN THE

17   HAKANSSAN-2 REFERENCE, IN THE ABSTRACT, YOUR HONOR, ON THE

18   FIRST PAGE, THE FIRST SENTENCE, THE INVENTION RELATES TO A

19   DEVICE FOR CLEANING OBJECTS, PREFERABLY OF METAL, FOR

20   REMOVAL OF CONTAMINANTS SUCH AS OIL, GREASE, SOLID

21   PARTICLES.  IN OTHER WORDS, WHAT WE ARE CLEANING IN THIS

22   WASHING CHAMBER, WE ARE NOT JUST GETTING GREASE, WE ARE NOT

23   JUST GETTING HYDROCARBONS, WE ARE GETTING SOLID PARTICLES.

24   THE QUESTION THEN IS, OKAY, THE PERSON IN ORDINARY -- THE

25   PERSON OF ORDINARY SKILL, HOWEVER THAT GETS DEFINED FOR

1    PURPOSES OF THIS, WE SUBMIT, IT DOESN'T MATTER.  IT COULD BE

2    THE LOW LEVEL OR THE HIGH LEVEL.  ALTHOUGH WE OBVIOUSLY

3    ADVOCATE THE HIGHER LEVEL, BUT ALL OF THOSE PEOPLE WOULD

4    LOOK AT THIS AND SAY, IF I AM WASHING AND GETTING SOLID

5    PARTS IN THIS TANK, AND THEY ARE FALLING DOWN HERE, AND I

6    HAVE A VERY EXPENSIVE PUMP, THAT PERSON IS GOING TO SAY I AM

7    PUTTING A FILTER RIGHT THERE.  I KNOW THAT THERE IS A FILTER

8    RIGHT THERE, AND IT IS NECESSARY.  WHY IS IT NECESSARY?

9    BECAUSE I AM WASHING THINGS IN THIS WASHING TANK THAT WILL

10   REQUIRE THAT I HAVE A FILTER TO PROTECT THAT PUMP.  THAT WAS

11   THE TESTIMONY OF DR. DURKEE.

12        SO WE RESPECTFULLY DISAGREE WITH MR. CAPP ON THE

13   226 PATENT.  THAT IS THE ONLY PATENT THAT WE HAVE CITED AS

14   BEING ANTICIPATED BY THE HAKANSSAN-2 REFERENCE, AND WE

15   BELIEVE THAT HAKANSSAN-2 DOES IN FACT ANTICIPATE THIS

16   REFERENCE.

17        MR. CAPP: YOUR HONOR, I HAVE JUST BEEN BARELY I

18   THINK PLEASANTLY SURPRISED BECAUSE YOUR HONOR HAS ON SEVERAL

19   OCCASIONS, AFTER THE CLOSE OF DISCOVERY, ALLOWED THEM TO

20   FILE AMENDED AND THEN FURTHER AMENDED AND THEN FURTHER AND

21   FURTHER AND FURTHER AMEND INVALIDITY CONTENTIONS.  AND TODAY

22   IS THE FIRST TIME I HEARD THAT THE ONLY CLAIM THAT THEY WERE

23   ARGUING HAKANSSAN ANTICIPATES IS THE 226.  I MEAN, IF THAT

24   IS TAKEN AS AN ADMISSION THAT THEY ARE -- THEY ARE NOT EVEN

25   CLAIMING ANTICIPATION OF THE 110, THE 825, AND 125, I THINK

1    THAT IS GREAT AND I THINK I AM ENTITLED TO JUDGMENT BASED ON

2    THAT, BASED ON MY READING OF THE INVALIDITY CONTENTIONS.  SO

3    THAT REALLY JUST LEAVES US DOWN TO ONE ELEMENT OF ONE CLAIM.

4            CAN I HAVE THE SLIDE, SLIDE 9 UP, PLEASE?  THIS IS

5    DR. DURKEE'S TESTIMONY IN THE YELLOW.  YOU KNOW, WE HAVE

6    SUBMITTED HIS TESTIMONY IN THE FORM OF A DECLARATION, AND HE

7    STATES, QUOTE, "THERE IS NO EXPRESS DISCLOSURE IN

8    HAKANSSAN-2 ABOUT USE WITH A FILTER.  IN ADDITION, IT IS

9    POSSIBLE FOR THE APPARATUS OF HAKANSSAN-2 TO BE USED WITHOUT

10   A FILTER, THUS A FILTER IS NOT EXPRESSLY OR INHERENTLY

11   PRESENT IN HAKANSSAN-2," CLOSED QUOTE.  AND IF YOUR HONOR

12   REMEMBERS, OR HAS HAD AN OPPORTUNITY TO READ HIS REPORT,

13   DR. DURKEE RELIED IN PART, NOT ONLY ON HIS OWN ANALYSIS, BUT

14   ALSO THE ANALYSIS OF THE PATENT EXAMINER WHO HAS BEEN

15   REVIEWING THE CONTINUATION APPLICATIONS WHERE WE'VE BEEN

16   PROSECUTING SIMILAR CLAIMS TO THE ONES THAT AREN'T IN SUIT,

17   WITH FILTER LIMITATIONS.  AND THE EXAMINER SAYS THERE IS NO

18   FILTER IN HAKANSSAN-2 EXPRESSLY OR INHERENTLY.

19           SO I UNDERSTAND THAT THE MOTION IN LIMINE THEY

20   HAVE SAID IS THAT, HEY, THAT WAS A CONTINUATION, BUT WE

21   CLAIMED A FILTER AND THE PATENTS ENSUED, THEN WE CLAIMED A

22   FILTER IN THE CONTINUATION APPLICATION.  ACTUALLY THERE WERE

23   THREE CONTINUATION APPLICATIONS IN FRONT OF EXAMINER

24   STINSON.  AND HE LOOKED AT THAT FILTER LIMITATION, HE LOOKED

25   AT THE PRIOR ART WHICH INCLUDED HAKANSSAN-2, AND HE GAVE AN

1    INTERVIEW SUMMARY SAYING, HEY, THERE IS NO ONE THERE

2    EXPRESSLY OR INHERENTLY, SO THE VERY EXPERIENCED EXAMINER

3    WHO HAS BEEN THERE FOR 20 YEARS, AND 15 DEAL WITH CHEMFREE

4    PATENT APPLICATIONS, AND THE ONLY EXPERT IN THE CASE THAT

5    HAS WEIGHED IN ON HAKANSSAN-2, YOU KNOW, AGREED WITH THE

6    EXAMINER, HEY, IT IS NOT THERE.  IT MAY BE A GOOD IDEA, IT

7    MAY BE A GREAT IDEA, IT MAY BE DESIRABLE, BUT IT'S NOT

8    NECESSARILY PRESENT.

9         MR. SCHAETZEL:  I NEED TO MAKE ONE COMMENT FOR THE

10   RECORD, IF I MIGHT.

11        THE COURT:  ALL RIGHT.

12        MR. SCHAETZEL:  THANK YOU, YOUR HONOR.  WITH

13   REFERENCES TO EXAMINER STINSON'S REPORT, I DON'T BELIEVE

14   THAT THERE WAS ANY SHOWING IN DR. DURKEE'S TESTIMONY THAT

15   THAT WOULD BE THE TYPE OF INFORMATION UPON WHICH AN EXPERT

16   IN HIS POSITION WOULD RELY.  AND I DO NOT RECALL THAT FOR --

17   YOU KNOW, IN ANY OF HIS -- IN ANY OF THE REDIRECT THAT WAS

18   DONE OF HIM.  AND I CERTAINLY DON'T RECALL IT IN THE WRITTEN

19   TESTIMONY THAT WAS PROVIDED.

20        AND JUST IN CONCLUSION, YOUR HONOR, I THINK, YOU

21   KNOW, IF I TOOK THE OIL FILTER OUT OF MY CAR, YEAH, IT WOULD

22   RUN FOR AWHILE, BUT I THINK IT IS NECESSARILY THERE.  SO

23   THAT ARGUMENT IS NOT CONSISTENT WITH WHAT THE PERSON OF

24   ORDINARY SKILL IN THE ART WOULD SEE IN THE HAKANSSAN

25   REFERENCE IN OUR VIEW.

```
1              THE COURT: ALL RIGHT.
2              MR. CAPP: YOUR HONOR, THE FINAL RULE 52 C MOTION
3    IS OVER THE DEFENDANT'S 35 USC 103 OBVIOUSNESS DEFENSE.  AND
4    AGAIN, THIS IS SOMETHING THAT THEY HAVE THE BURDEN OF PROOF
5    BY CLEAR AND CONVINCING EVIDENCE, BECAUSE THE PATENT IS
6    PRESUMED TO BE VALID.  SO WHAT EVIDENCE DID THEY PUT ON TO
7    MEET THAT BURDEN?  FIRST OF ALL, YOU HAVE TO GO THROUGH A
8    GRAND FACTOR ANALYSIS AND ESTABLISH THE LEVEL OF ORDINARY
9    SKILL IN THE ART.
10             YOU HEARD DR. ADRIAENS'S TESTIMONY TODAY, OR AT
11   LEAST AFTER HE WAS IMPEACHED WITH HIS DEPOSITION TESTIMONY.
12   HE IS NOT -- HE DOES NOT HAVE AN INFORMED OPINION OF THE
13   CAPABILITY OF SOMEONE OF ORDINARY SKILL IN THE ART BECAUSE
14   HE READILY ADMITS HE IS NOT AN EXPERT IN THE AREA OF PARTS
15   WASHING.  DR. DURKEE IS.
16             NOW, DETERMINING THE LEVEL OF ORDINARY SKILL IN
17   THE ART IS A QUESTION OF LAW FOR THE COURTS, NOT A MATTER OF
18   EVIDENCE, AND I REGRET THAT THE COURT WAS PUT THROUGH THE
19   LENGTHY EXAMINATION OF DR. DURKEE YESTERDAY TRYING TO
20   EMBARRASS AND HUMILIATE HIM ON WHAT REALLY IS AN ISSUE OF
21   LAW, AND A VERY COMPLEX ISSUE OF LAW, ONE THAT I AM STILL
22   STRUGGLING WITH.  I REGRET, AND I ALMOST WANT TO APOLOGIZE
23   TO THE COURT, THAT THIS CASE HAS GONE ON FOR AN EXTRA YEAR
24   BECAUSE, WHEN WE WENT THROUGH DR. DURKEE'S INITIAL EXPERT
25   REPORT ON INVALIDITY AND WE GOT HIT WITH THAT ENABLEMENT
```

1   DEFENSE AT THE VERY VERY LAST MINUTE, AND WE WERE SCRAMBLING

2   WITH ALL OF THE NEW REFERENCES THAT THEY PUT IN, THAT IN MY

3   ATTEMPT TO EDUCATE DR. DURKEE ON THE LAW, I WAS NOT ABLE TO

4   GET HIM THE APPROPRIATE LEGAL STANDARD FOR LEVEL OF ORDINARY

5   SKILL FOR ENABLEMENT WHEN YOU HAVE A MULTI-DISCIPLINARIAN

6   INVENTION.

7          WE HAD AN ISSUE WITH HIS DEPOSITION THAT OPENED

8   PANDORA'S POX, DRUG THE CASE ON FOR AN EXTRA YEAR.  I

9   FINALLY GOT THE CORRECT STANDARD TO HIM.  YOU GRACIOUSLY

10  ALLOWED ME TO GET DR. BRICKLE IN SO THAT I HAD BOTH

11  DISCIPLINES COVERED, BOTH PARTS WASHING AND ENVIRONMENT

12  SCIENCES, AND WE EVENTUALLY PREVAILED ON THE ENABLEMENT

13  DEFENSE.

14         AND THE COURT FOUND CORRECTLY THAT YOU CAN USE A

15  TEAM APPROACH FOR THE LEVEL OF ORDINARY SKILL IN THE ART FOR

16  ENABLEMENT, AND THAT COMES OUT OF A COUPLE OF VERY OLD

17  ARCANE CASES FROM THE 1960'S BY THE CCPA.  I WAS ABLE TO

18  FIND ONE FEDERAL CIRCUIT ERA DECISION THAT ACKNOWLEDGED THAT

19  INDICTA.  AND ONCE I FOUND IT, I BROUGHT IT TO THE COURT'S

20  ATTENTION, AND YOU FOUND CORRECTLY THAT WE WERE RIGHT, THAT

21  IF YOU BRING TOGETHER FOR THE FIRST TIME TWO DISCIPLINES,

22  THEN FOR ENABLEMENT PURPOSES, FOR READING THE SPECIFICATION

23  AND THEN DTHAT PRACTICING IT, YOU CAN BRING IN A TEAM EACH

24  TO DO, YOU KNOW, THE PART THAT IS APPLICABLE TO THEM.

25         THE PROBLEM THAT I HAVE STRUGGLED WITH THROUGHOUT

1    THE ENTIRE CASE IS, DOES THAT APPLY TO THE OBVIOUSNESS

2    STANDARD OR NOT.  AND I HAVE TRIED AND TRIED AND TRIED TO

3    FIND A CASE OR A TREATISE OR SOMETHING THAT SAYS YES, THE

4    TEAM APPROACH ALSO APPLIES TO OBVIOUSNESS.  AND WE WENT TO

5    THE SUMMARY JUDGMENT BRIEFING, AND I WAS GETTING ROUNDLY

6    CRITICIZE BY THE DEFENSE FOR TAKING DIFFERENT POSITIONS, BUT

7    IT WAS A SINGLE APPROACH TO OBVIOUSNESS, AND A TEAM APPROACH

8    THE ENABLEMENT.  AND I WROTE BACK AND I SAID THAT IS GREAT

9    IF YOU THINK THAT, GIVE ME A CASE AND, IF YOU ARE RIGHT, I

10   WILL RECONSIDER MY POSITION.  AND HERE WE ARE A YEAR LATER,

11   AND I AM YET TO HEAR THAT CASE.  SO I CAN ONLY STAND HERE

12   BEFORE YOUR HONOR AND SAY, AS NEAR AS I AM ABLE TO HELP YOU,

13   WHICH IS PART OF MY JOB, TO DO THIS RIGHT, IT IS A SINGLE

14   PERSON OF ORDINARY SKILL IN THE MOST PERTINENT ART AT THE

15   TIME, AND THE MOST PERTINENT ART AT THE TIME IS PARTS

16   WASHING, AND THE PARTS WASHING PRACTITIONER AT THAT TIME

17   DIDN'T HAVE EXPERTISE IN BIOREMEDIATION.  AND SO EVERYTHING

18   FLOWS FROM THAT.

19          THAT PERSON WOULD NOT BE ABLE TO TAKE THE FOUR

20   REFERENCES THAT THEY HAVE, ALONE OR ANY OF THE POSSIBILITY

21   COMBINATIONS, AND MODIFY THEM TO GET TO THIS INVENTION

22   WITHOUT ENGAGING IN EXTENSIVE DEVELOPMENT AND

23   EXPERIMENTATION.

24          WE HAVE ALREADY GONE THROUGH THE ANTICIPATION

25   ANALYSIS ON HAKANSSAN.  WE HAVE SEEN HOW COMPLICATED IT IS,

1   WE HAVE SEEN IT IS MISSING SEVERAL ELEMENTS.  SO NOW FOR

2   OBVIOUSNESS, THE PERSON OF ORDINARY SKILL IN THE ART WOULD

3   HAVE TO ANALYZE ALL OF THE DIFFERENCES, BOTH CLAIMED AND

4   UNCLAIMED, AND THEN ON THEIR OWN, WITHOUT PROMPTING, OR

5   ENCOURAGEMENT, OR INSTRUCTION, INTUITIVELY SEE THAT IT'S

6   OBVIOUS TO GET TO OUR INVENTION, EITHER JUST BY LOOKING AT

7   HAKANSSAN OR BY LOOKING AT HAKANSSAN IN COMBINATION, I

8   SUBMIT, FOR THE SAME REASON THE ANTICIPATION IS NOT A VIABLE

9   DEFENSE.

10          ALL OF THOSE DIFFERENCES BETWEEN HAKANSSAN-2 AND

11  THE CLAIMS FOR ANTICIPATION PROVIDES A GAP THAT IS TOO BROAD

12  FOR THE PERSON OF ORDINARY SKILL IN THE ART TO LEAVE, TO

13  MAKE THE MODIFICATION, GET TO THE CLAIMED INVENTION.  THEY

14  HAVE THE BURDEN OF PROOF.  WHAT IS THEIR EVIDENCE?  THEIR

15  EVIDENCE IS, THEIR OWN EXPERT COULDN'T GET THEM THERE.  THEY

16  TRIED TO CROSS-EXAMINE -- THEY MADE A DEAL, THEY WERE SO

17  DESPERATE FOR EVIDENCE, THEY MANEUVERED A SITUATION TO TRY

18  AND GET MY EXPERT HERE TO SO THEY COULD USE --

19          MR. HARBIN:  YOUR HONOR, I DON'T USUALLY DO THIS,

20  BUT I OBJECT -- AND I APOLOGIZE, I DON'T USUALLY DO THIS

21  VERY RARELY.  BUT I DO OBJECT TO COUNSEL'S CHARACTERIZATIONS

22  OF WALTER'S COUNSEL REPEATEDLY, AS OPPOSED TO THE LEGAL

23  ISSUES TO BE ADDRESSED.

24          THE COURT:  ALL RIGHT.  LET'S KEEP IT TO THE FACTS

25  AND THE LAW, MR. CAPP.

1            MR. CAPP: THANK YOU, YOUR HONOR.  YOU HAVE SEEN ME

2    HERE MANY TIMES BEFORE, AND I DO GET A LITTLE PASSIONATE

3    SOMETIMES, AND I APOLOGIZE IF I HAVE STEPPED OVER BOUNDS.

4            ORDINARILY IN A PATENT CASE YOU WOULD NEVER SEE

5    THE DEFENDANT CALL THE PLAINTIFF'S EXPERT AND TRY TO TURN

6    HIM INTO THEIR OWN EXPERT IN ORDER TO TRY AND MEET A BURDEN

7    OF PROOF OF CLEAR AND CONVINCING EVIDENCE.  THIS IS THE

8    FIRST TIME I HAVE SEEN IT IN MY CAREER.  I WOULD BE SHOCKED

9    IF I EVER SEE IT AGAIN.  BUT DR. DURKEE'S TESTIMONY IS NOT

10   ENOUGH TO GET THEM OVER THIS HURDLE OF CLEAR AND CONVINCING

11   EVIDENCE FOR OBVIOUSNESS.

12           THE OTHER THREE REFERENCES, SIMS, ATHEY, AND

13   MINKIN ARE NOT COMBINABLE.  EACH IN THEIR OWN WAY TEACHES A

14   WAY FROM THE INVENTION.  AND I'LL BE VERY BRIEF HERE, IF I

15   HAVE TO GO TO CLOSING ARGUMENT IN A COUPLE OF HOURS AND GO

16   THROUGH THIS AGAIN.  BUT IF THE REFERENCE TEACHES A WAY, IT

17   CAN'T BE COMBINABLE.  THAT IS THE LAW.  IF A REFERENCE

18   TEACHES A WAY, IT IS NOT COMBINABLE.

19           ATHEY TEACHES A WAY BECAUSE IT IS A HIGH

20   TEMPERATURE DISH WASHER IN THE CLOSED CABINET.  THE LAST

21   THING YOU ARE GOING TO WANT TO DO IN A RESTAURANT IN A DISH

22   WASHER IS CULTIVATE MICROBES IN THERE.  SIMS IS A MINERAL

23   SPIRITS PARTS WASHER, AND IT HAS A SUB-MICRON FILTER WHICH

24   WILL NOT ALLOW MICROORGANISMS TO PASS THROUGH IT BECAUSE THE

25   MICROORGANISMS ARE THREE TO FIVE MICRONS IN DIAMETER, THE

```
 1    SUB-MICRON FILTER IN SIMS SCREENS DOWN TO A HALF A MICRON,
 2    SO YOU CAPTURE AND COLLECT ALL OF THE MICROBES AND COAGULATE
 3    THE FILTER WITH THEM.  SO SIMS TEACHES A WAY.  SIMS USES
 4    MINERAL SPIRITS.  IF YOU PUT MICROORGANISMS WITH MINERAL
 5    SPIRITS, THEY ARE GOING TO DIE.  SO IN ORDER TO BRING SIMS
 6    INTO PLAY, YOU WOULD HAVE TO DRAIN ALL OF THE FLUID OUT,
 7    DRAIN -- TAKE THE FILTERS OUT, WHICH IS THE PATENTABILITY OF
 8    IT ANYWAY.  TAKE IT FROM A SINGLE CHAMBER TO TWO CHAMBERS,
 9    MOVE THE FILTER FROM LAYING ON THE BOTTOM OF THE BASIN TO
10    SOMEWHERE BETWEEN THE TWO BASINS, THE BASIN AND THE TANK,
11    AFTER YOU ADD THE OTHER CHAMBER.  IT TEACHES A WAY, AND THAT
12    WON'T GET YOU THERE.
13             THE THIRD ONE IS MINKIN.  MINKIN IS KIND OF A
14    WEIRD ANIMAL.  DR. DURKEE KNOWS MR. MINKIN PERSONALLY.  THAT
15    WAS A CLOSED CHAMBER WASHER FOR VERY HIGH PRESSURE AND VERY
16    HIGH TEMPERATURE CLEANING.  AND THOSE INVENTIONS, OR THOSE
17    TYPES OF PARTS WASHERS, HAD BEEN KNOWN.  IF YOU READ MINKIN,
18    THE PROBLEM THAT IT WAS TRYING TO ADDRESS WAS SOMETHING THEY
19    CALLED A WATER HAMMER EFFECT.  SO THE HEAD HAD A COUPLE OF
20    LITTLE APPARATUSES IN THERE SO THAT AS THE TEMPERATURE
21    CHANGED RAPIDLY, BECAUSE TEMPERATURE MAKES AIR EXPAND, HE
22    HAD A LITTLE DEVICE IN THERE TO EASE THAT PRESSURE
23    DIFFERENTIAL SO THAT YOU WOULDN'T HAVE THE WATER HAMMER
24    EFFECT BETWEEN THE TWO CHAMBERS.  BUT MINKIN TEACHES A WAY,
25    AND BECAUSE IT OPERATES AT SUCH A HIGH TEMPERATURE THAT IT
```

1    WOULD KILL THE MICROBES, IT TEACHES A WAY BECAUSE IT

2    OPERATES AT SUCH A HIGH PRESSURE YOU WOULDN'T BE INCLINED TO

3    CONVERT IT FROM A CLOSED CHAMBER TO AN OPEN BASIN PARTS

4    WASHER, BECAUSE, THE REASON WHY IT IS CLOSED CHAMBER HIGH

5    PRESSURE, THAT IS HOW YOU ARE TRYING TO CLEAN.  SO SOMEONE

6    OF ORDINARY SKILL IN THE ART GOES, IF THAT IS HOW I AM

7    TRYING TO CLEAN, IF I OPEN IT UP AND TAKE THE PRESSURE AWAY,

8    NOW I AM SHOTTING AT LOW PRESSURE, I AM NOT GOING TO GET MY

9    CLEANING EFFECT.  SO YOU'VE GOT THREE SECONDARY REFERENCES,

10   ALL OF WHICH TEACH A WAY, SO THEY ARE NOT COMBINABLE.

11          NOW YOU ARE LOOKING AT HAKANSSAN-2 AS A STAND

12   ALONE REFERENCE, AND IT'S SIMPLY TOO BIG A GAP TO BRIDGE TO

13   MAKE ALL OF THE MODIFICATIONS THAT YOU NEED TO GET TO THE

14   CLAIMED INVENTION.

15          MR. HARBIN:  YOUR HONOR, IF I MAY PROCEED.

16          THE COURT:  PLEASE.

17          MR. HARBIN:  YOUR HONOR, WE SUBMIT THAT WHILE I

18   GO THROUGH MANY OF THESE CLAIMS THEY ARE NOT ONLY OBVIOUS,

19   THEY ARE PAINFULLY OBVIOUS.  I SUBMIT THE PLAINTIFF'S

20   ARGUMENTS AND MANY OF THEIR LEGAL CITATIONS AND PROPOSED

21   INCLUSIONS IGNORE THE SEMINAL CHANGE IN OBVIOUSNESS LAW IN

22   THE KSR DECISION BY THE SUPREME COURT IN 2007.

23          AND I WOULD SUBMIT THAT MANY OF THESE CLAIMS WOULD

24   BE OBVIOUS UNDER THE TRADITIONAL PRIOR MORE STRICT STANDARD,

25   BUT PLAINLY ARE OBVIOUS NOW.  AND BEFORE I GET TO THAT, LET

1    ME REVIEW WHAT I THINK, IN SUMMARY, THE EVIDENCE SHOWS.  AND

2    IN SUMMARY THE EVIDENCE SHOWS THAT PARTS WASHERS WERE WELL

3    KNOWN IN THE INDUSTRY.  CHEMFREE ADMITTED THAT TO THE PATENT

4    OFFICE.  PARTS WASHERS WITH FILTERS ARE WELL KNOWN.

5             ONE OF THE INTERESTING THINGS ABOUT THIS CASE IS,

6    AND WE HEARD ABOUT ANTICIPATION, DOES HAKANSSAN-2 HAVE A

7    FILTER IN IT.  WELL, AS CHEMFREE'S COUNSEL ACKNOWLEDGED, WE

8    WILL GET INTO MORE DETAIL LATER, DR. DURKEE CLEARLY SAID A

9    FILTER WOULD BE A GOOD IDEA IN HAKANSSAN-2.  IT IS AN

10   EXPENSIVE MACHINE WITH AN EXPENSIVE PUMP.  THERE IS A CLEAR

11   MOTIVATION TO COMBINE, FILTERS ARE WELL KNOWN, FILTERS IN

12   THE FLOW PATH ARE WELL KNOWN.

13            IN GENERAL, DR. DURKEE ADMITTED, AS I THINK ALL OF

14   THE EVIDENCE SHOWED, PARTS WASHERS ARE WELL KNOWN, AND

15   DR. DURKEE ADMITTED THAT HAKANSSAN-2, WHICH WAS PRESUMED AND

16   DISCLOSES A BIOREMEDIATING PARTS WASHER.

17            SO WHAT YOU GET TO IN THIS CASE, AS FAR AS

18   OBVIOUSNESS GOES, IS SOME INCREDIBLY PICKY ARGUMENTS ABOUT

19   MECHANICAL DETAILS.  AND THEN YOU HAVE THE ISSUE OF THE

20   BIOLOGICAL BIOREMEDIATION COMPONENT, WHICH CHEMFREE TOLD THE

21   PATENT OFFICE TO GET THIS PATENT, IS THE INVENTIVE ASPECT OF

22   IT.  TO GET INTO THAT, YOUR HONOR, I WANT TO REVIEW BRIEFLY

23   WHAT KSR AND THE IMPACT OF KSR.  AND I DO THINK THIS IS A

24   PARADIGM OF THE KIND OF CASE THAT LED THE SUPREME COURT TO

25   ISSUE THE KSR DECISIONS.  AS I MENTIONED, YOUR HONOR, THE

1    SUPREME COURT SPECIFICALLY REJECTED THE TEACHING SUGGESTION

2    MOTIVATION WHICH SAID, NUMBER ONE, THERE HAD TO BE AN

3    EXPLICIT TEACHING OR SUGGESTION OR MOTIVATION TO LEAD AN

4    EXAMINER TO COMBINE REFERENCES.

5            THE COURT WENT BEYOND THAT, HOWEVER, AND HELD THAT

6    THERE IS -- THE OBVIOUSNESS STATUTE REQUIRES AN EXPANSIVE

7    AND FLEXIBLE APPROACH, THAT IF YOU COMBINE FAMILIAR ELEMENTS

8    ACCORDING TO NO METHODS, AND YOU GET NOTHING MORE THAN

9    PREDICTABLE RESULTS, IT IS LIKELY OBVIOUS.  THAT YOU LOOK,

10   NOT ONLY TO EXPLICIT PRIOR ART REFERENCE, BUT TO THE

11   INTERRELATED TEACHINGS OF MULTIPLE PATENTS, THE EFFECTS OF

12   DEMANDS KNOWN IN THE DESIGN COMMUNITY, WHICH IS AN ISSUE

13   HERE OR PRESENT IN THE MARKETPLACE, THE EVIDENCE CLEARLY

14   SHOWED WHAT LED TO THIS WAS AN INCREASE, EVERYBODY ADMITTED,

15   DR. DURKEE ADMITTED IT CLEARLY, HE GAVE EXTENSIVE TESTIMONY

16   ABOUT THE EFFECT OF THE MONTREAL PROTOCOL, THE INCREASED

17   ENVIRONMENTAL REGULATIONS, THE INCREASED INTEREST IN HEALTH

18   AND SAFETY, AND THE BACKGROUND KNOWLEDGE POSSESSED BY A

19   PERSON HAVING SKILL IN THE ART, ALL IN ORDER TO DETERMINE

20   WHETHER THERE WAS AN APPARENT REASON TO COMBINE.  NOT

21   NECESSARILY AN EXPLICIT REASON, BUT AN APPARENT REASON.

22           IF YOU WILL LOOK AT THE SECOND PAGE.  IF IT'S A

23   PREDICTABLE VARIATION, IT IS -- GENERALLY THAT IS AN

24   INDICATION OF OBVIOUSNESS, IT IS NOT ABSOLUTE.  IF A

25   TECHNIQUE HAS BEEN USED TO IMPROVE ONE DEVICE, AND A PERSON

1    OF ORDINARY SKILL WOULD RECOGNIZE IT AND IMPROVED SIMILAR

2    DEVICES IN THE SAME WAY, USING THE TECHNIQUE IS OBVIOUS

3    UNLESS IT IS -- AN ACTUAL APPLICATION IS BEYOND HIS OR HER

4    SKILL.

5            IN THIS REGARD, YOUR HONOR, ONE THING WE DID NOT

6    PUT UP HERE, BUT ONE OF THE HOLDINGS OF THE FEDERAL CIRCUIT

7    THAT WAS SPECIFICALLY AND EXPRESSLY REJECTED IN KSR IS THAT

8    A PIECE OF PRIOR ART HAD TO BE DEALING WITH THE SAME PROBLEM

9    AS THE PROBLEM ADDRESSED IN THE PATENT TO BE CONSIDERED AS

10   RELEVANT PRIOR ART.  NOW, IN REGARD TO CHEMFREE'S COUNSEL'S

11   ARTICLE ARGUMENTS THAT ATHEY, SIMS, AND MINKIN TEACH A WAY,

12   I SUBMIT THAT IS AN ERRONEOUS CONSTRUCTION, YOUR HONOR, OF

13   WHAT TEACHING A WAY MEANS.  TEACHING A WAY MEANS THAT IN THE

14   PRIOR ART REFERENCE, YOU ARE TEACHING THE PEOPLE IN THE ART

15   THAT SOMETHING LIKE THE INVENTION WILL NOT WORK.  IT DOESN'T

16   MEAN THAT BECAUSE THE DEVICE IS DIFFERENT, BECAUSE IT IS A

17   HIGH PRESSURE SYSTEM OR A CLOSED TANK INSTEAD OF A LOW

18   PRESSURE SYSTEM, THAT SOMEONE SKILLED IN THE ART CANNOT LOOK

19   AT IT.  BACK IN THAT POSITION, THAT IS -- THAT ARGUMENT WAS

20   REALLY AN ATTEMPT TO ARGUE THE PRE-KSR LAW THAT THESE ARE

21   DIFFERENT MACHINES AND, BY THE WAY, HAKANSSAN-2, ALTHOUGH IT

22   IS MORE TECHNICAL, IS DEALING WITH THE SAME GENERAL ART, AND

23   CLEARLY EVEN UNDER PRE-KSR LAW WOULD BE SOMETHING TO LOOK

24   AT.

25            BUT TO SAY FOR A PARTS WASHER TO GET A HEATER YOU

1    CAN'T LOOK AT A DISHWASHER WHICH HAD BEEN HEATED ALONG WITH

2    PARTS WASHERS FOR DECADES, IT IS PRECISELY, YOUR HONOR, WHAT

3    KSR IS DESIGNED TO ELIMINATE, THAT KIND OF ARGUMENT.

4              NOW, SO WHAT YOU END UP WITH, YOUR HONOR, AND I

5    WOULD GO INTO MORE DETAIL, BUT DR. DURKEE ADMITTED THAT

6    HAKANSSAN-2 DISCLOSES A BIOREMEDIATING PARTS WASHER.  HE

7    ARGUED ABOUT -- HIS SOLE ARGUMENT AS FAR AS OBVIOUSNESS FOR

8    THE INDICATION OF BIOREMEDIATION COMPONENTS, I SHOULD SAY,

9    ON TOXICITY, ET CETERA, WAS THAT SLUDGE INDICATED TO HIM,

10   EVEN THOUGH THE PATENT CLEARLY TALKS ABOUT, NOT ONLY LIVING

11   MICROORGANISMS, BUT OPTIMIZING THE ENVIRONMENT WITH

12   TEMPERATURE, THE PH, YOU KNOW, CONTROLLING THAT FOR THE

13   OPTIMUM ENVIRONMENT, THAT BECAUSE THERE WAS INDICATION OF

14   SLUDGE, HE INTERPRETED THAT TO MEAN IT WAS TOXIC TO THE

15   MICROBES.

16             YOU HEARD DR. ADRIAENS, YOUR HONOR, TESTIFY, TO

17   SOMEONE THAT WHO IS FAMILIAR WITH BIOREMEDIATION, SLUDGE IS

18   PRESENT IN ANY ACTIVE SYSTEM.  AND IN FACT, IS AN INDICATION

19   OF HEALTHY MICROBES.  AND GENERALLY, YOUR HONOR, DR. DURKEE

20   BEGGED OFF THE BIOREMEDIATION, BECAUSE HE SAID THAT IS NOT

21   HIS AREA OF EXPERTISE.  AND THAT, YOUR HONOR, LEADS TO THE

22   QUESTION OF A LEVEL OF SKILL IN THE ART, WHICH IS SOMETHING

23   YOUR HONOR HAS DETERMINED.  AND IN REGARD TO THE

24   ANTICIPATION, YOUR HONOR, FIND IT AS A HIGH LEVEL WE THINK

25   APPROPRIATELY, AND WE THINK AS WE GET INTO IN A MINUTE, THE

1    PATENT DEMANDS IT.  NOW CHEMFREE'S COUNSEL HAS ARGUED THAT

2    THEY ARE ENTITLED TO A TEAM APPROACH, TO COMBINE A PARTS

3    WASHING EXPERT WITH A BIOREMEDIATION EXPERT.  WELL, I SUBMIT

4    THERE IS AN OPEN QUESTION ABOUT THE LAW, AS CHEMFREE'S

5    COUNSEL ACKNOWLEDGED.  IT IS SOME OLD AND SOMEWHAT OBTUSE

6    STATEMENTS.  BUT ACCEPTING THAT FOR THE MOMENT, YOUR HONOR,

7    THERE IS NO BASIS FOR SPLITTING THE TEAM UP.  THE TEAM'S

8    KNOWLEDGE IS THE TEAM'S KNOWLEDGE.  TO SAY WE ARE USING THE

9    TEAM KNOWLEDGE FOR ENABLEMENT, AND SPLITTING THE TEAM UP FOR

10   OBVIOUSNESS DOES NOT APPLY TO THE TEAM.  AND MOREOVER, FIRST

11   OFF, YOUR HONOR, IT IS CONTRARY TO THE LAW.

12          NOW, THERE IS NOT A LOT OF CASES ON IT, BUT THERE

13   IS CLEARLY NO CASE TO HOLD TO ALLOW AN APPLICATION OF A

14   LOWER STANDARD FOR OBVIOUSNESS THAN ENABLEMENT.  CHISHOLM

15   SAYS, AND I CAN FIND THE CITE IF YOUR HONOR WISHES, THAT IT

16   WOULD SEEM TO BE THE SAME LEVEL OF ART, LEVEL OF SKILL IN

17   THE ART, FOR SECTION 112 AND SECTION 113.  NOTED THERE ARE A

18   FEW CASES.  AGAIN, NOT TO MAKE A PUN, YOUR HONOR, I THINK

19   THAT IS BECAUSE THIS IS PAINFULLY OBVIOUS, IT IS LIKE HAVING

20   TO HAVE THE SAME STANDARD FOR INFRINGEMENT AND VALIDITY.

21          CHISHOLM DOES SAY IN SECTION 7.03 (B)(2)(II) THAT

22   THERE IS SOME AFFORDED THE KNOWLEDGE IMPORTED TO THE PERSON

23   OF SKILL IN THE ART MAY BE LESS FOR ENABLEMENT THAN FOR

24   OBVIOUSNESS.  NOW, NUMBER ONE, THAT IS NOT SUPPORTING TWO

25   DIFFERENT PERSONS OF THE ART.  STILL SAYING THERE IS ONE

1    PERSON IN THE ART.  IF YOU ACCEPT THE TEAM, THE ONLY LOGICAL

2    PERMISSIBLE CONCEPT UNDER ANY CONSTRUCTION OF PERSONS

3    SKILLED IN THE ART IS IT IS ONE TEAM.  THERE IS SOME

4    AUTHORITY FOR HAVING A LOWER STANDARD FOR ENABLEMENT THAN

5    FOR OBVIOUSNESS.  THERE IS NO AUTHORITY FOR HAVING A LOWER

6    STANDARD FOR OBVIOUSNESS.  AND MUCH LESS IN THIS CASE,

7    CHEMFREE PROPOSES A GROSSLY LOWER STANDARD FOR OBVIOUSNESS

8    USING A FUNDAMENTALLY DIFFERENT DEFINITION AND LEVEL OF THE

9    ART.

10           YOU KNOW, LEAVING ASIDE, YOU KNOW, THERE IS

11   OBVIOUS REASONS WHY CHEMFREE WOULD WANT TO DO THAT IN AN

12   OBVIOUSNESS CASE, YOUR HONOR, IT IS NOT SUPPORTED IN GENERAL

13   THE CASE LAW, AND IT IS NOT SUPPORTED UNDER THIS PATENT.  IF

14   YOU CAN PULL UP THE 110 PATENT, COLUMN 4, LINES 50 TO 62.

15   CONTAINED IN THIS PATENT, YOUR HONOR, AND OBTAINING A

16   PATENT, TAKING WHAT WAS WELL KNOWN IN THE ART AS FAR AS

17   PARTS WASHERS AND OBTAINING A PATENT ON BIOREMEDIATING PARTS

18   WASHERS, CHEMFREE PROVIDED VERY LITTLE DISCLOSURE ABOUT

19   EITHER THE FLOW FLUID OR THE MICROBES, BUT TOLD A

20   REPRESENTATIVE OF THE PATENT OFFICE THAT THE SUITABLE

21   SPECIES ARE WELL KNOWN AND REPORTED IN THE ART.  IN OTHER

22   WORDS, YOUR HONOR, CHEMFREE'S PROPOSING THAT FOR

23   OBVIOUSNESS, NOT ONLY THAT YOU ADOPTED A DIFFERENT STANDARD

24   THAN THE COURT DID FOR ENABLEMENT, BUT A DIFFERENT STANDARD

25   THAN CHEMFREE PRESENTED TO THE PATENT OFFICE TO GET THIS

1    PATENT.  AND IT WAS CLEARLY UNDERSCORED BY DR. DURKEE'S

2    TESTIMONY, WHEN HE REPEATEDLY ADMITTED HE CANNOT ADDRESS --

3    HIS ART DOES NOT KNOW THE SUITABLE SPECIES, CANNOT ADDRESS

4    THE MICROBES.

5         YOUR HONOR, IN EXCHANGE FOR THE EXCLUSIVE PATENT

6    RIGHTS THE PATENTEE GETS, THE PATENTEE IS TO TEACH THE

7    PUBLIC.  BUT MORE IMPORTANTLY, TEACH THE ART.  THAT IS WHY

8    WE TALK ABOUT THE TEACHINGS OF THE PATENT.  CHEMFREE

9    PROPOSES, YOUR HONOR, THAT THIS PROVIDES NO TEACHING BECAUSE

10   THE ART CANNOT UNDERSTAND IT.  AND YOUR HONOR, ASIDE, EVEN

11   DR. DURKEE, WITH THE SIGNIFICANT LOWER STANDARD THAN WE

12   THINK IS APPROPRIATE, ADMITTED MANY OBVIOUS ELEMENTS OF

13   THESE PATENTS.

14        NOW, WE HAVE A GENERALLY -- HE HAD ADMITTED

15   HAKANSSAN-2 IS A BIOREMEDIATING PARTS WASHER.  LET'S TALK

16   ABOUT THE FIRST SECTION -- PATENT 226.  THIS IS, AS MY

17   CO-COUNSEL SAID, THE BROADEST CLAIM.  AND MANY OF THESE

18   CLAIMS, INCLUDING THE ONLY ONE THAT REPRESENTS WHAT CHEMFREE

19   REPRESENTED TO THE PATENT OFFICE IS THE NOVEL PART OF IT,

20   THE FLUID COMPRISING BIOLOGICALLY -- THE FLUID BIOLOGICALLY

21   DEGRADING ORGANIC MATTER.  SOME GENERAL REFERENCE TO

22   BIOREMEDIATION.  THEY ADMITTED THAT CLAIM WAS PRESENT IN

23   HAKANSSAN.

24        IN REGARD TO THE ANTICIPATION ARGUMENT, WE HEARD

25   THAT IT IS -- HAKANSSAN-2 IS A CLOSED BASIN RATHER THAN AN

1    OPEN BASIN, AS IF THAT IS AN INVENTIVE DIFFERENCE.  YOU

2    COULDN'T TAKE A MUCH MORE COMPLEX MACHINE, YOUR HONOR, AND

3    TURN IT INTO A SIMPLE OPEN SINK, A SINK LIKE A DISHWASHER,

4    WHICH AGAIN HAS BEEN IN THE MARKET FOR YEARS, EVERYONE

5    ADMITS, DR. DURKEE ADMITS, BEFORE THIS PATENT.  MR. MCCLUER

6    AND PERHAPS MR. MCNALLY DREW ONE FOR CHEMFREE BEFORE THEY

7    ARRIVED.

8            AND THEN WE HEARD ABOUT THE FILTER, A LOT ABOUT

9    THE FILTER IN THIS CASE.  AGAIN YOUR HONOR, THEY ADMITTED,

10   THE PATENT OFFICE, THAT FILTERS ARE OBVIOUS.  DR. DURKEE

11   ADMITTED THEY ARE OBVIOUS, AND HE ADMITTED CLEAR THE

12   MOTIVATION, WHETHER OR NOT IT IS NECESSARILY PRESENT IN

13   HAKANSSAN, AS CHEMFREE'S COUNSEL ADMITTED, IT IS A GOOD IDEA

14   TO PUT IT IN.  DR. DURKEE ADMITTED THAT.  THERE IS THE

15   MOTIVATION.

16           YOUR HONOR, WE HAVE THE -- SO, REGARDING THE 226

17   CLAIM, IT IS NOT ANTICIPATED, YOUR HONOR, AS WE BELIEVE IT

18   IS IT IS PLAINLY OBVIOUS.  IF YOU COULD TURN TO THE 110

19   CLAIM.  THE 110 CLAIM, YOUR HONOR, ADDS THE LANGUAGE IN THE

20   TOP OF CLAIM 1, BIODEGRADE NONTOXIC, NONCAUSTIC,

21   NONFLAMMABLE WHICH I BELIEVE IS PRESENT IN ALL THE REST OF

22   THE CLAIMS.  IT'S NOT IN THE 226 CLAIM.  A LOT WAS MADE

23   ABOUT THIS, YOUR HONOR.  BUT EVEN -- WELL, THE EVIDENCE IS,

24   FOR ONE IN THE ART, WHICH IS DR. ADRIAENS, YOUR HONOR, IS

25   UNDISPUTED, AND THIS IS BASIC ENVIRONMENTAL SCIENCE.  BUT IF

1    YOU HAVE A WORKING BIOREMEDIATING PARTS WASHER SO THE

2    MICROBES ARE SURVIVING, AS IS IN HAKANSSAN-2, THE ENABLED

3    PRIOR ART REFERENCE, IT IS BY DEFINITION NONTOXIC.  THE

4    COURT'S CONSTRUCTION OF, IF YOU PULL UP THAT CONSTRUCTION,

5    NONTOXIC TO MICROORGANISMS.  SAID FLUID IS NONTOXIC TO SAID

6    MICROORGANISMS.  MEANS THAT THE FLUID IS COMPATIBLE WITH THE

7    MICROORGANISMS SUCH THAT THE BUGS AGAIN ARE CAPABLE OF

8    LIVING WITHIN THE CLEANING FLUID.  CLEARLY, YOUR HONOR, IN

9    HAKANSSAN-2, THEY ARE LIVING.  SO THEY ARE OBVIOUSLY -- IT

10   IS OBVIOUSLY NONTOXIC.

11            AND IF YOU RECALL AGAIN, YOUR HONOR, DR. DURKEE'S

12   ONLY ATTEMPT TO QUIBBLE WITH THAT OR DISPUTE THAT WAS I SEE

13   SLUDGE IN THE HAKANSSAN-2, THEREFORE, IT MUST BE KILLING THE

14   MICROBES.  WELL, YOUR HONOR, YOU HEARD DR. ADRIAENS'S

15   TESTIMONY, UNDISPUTED, THAT SLUDGE IS A HEALTHY SIGN.  YOU

16   HEARD THE TESTIMONY OF PERSONNEL FROM CHEMFREE THAT THEY ARE

17   OPERATING PARTS WASHERS, YOU HAVE TO CLEAN THE FILTER

18   BECAUSE SLUDGE BUILDS UP.  THAT DOESN'T MEAN YOU ARE KILLING

19   ALL OF THE MICROBES.  IT JUST LIKE LIVING ORGANISMS, THEY

20   CREATE BY-PRODUCTS, THEY CREATE SLUDGE.  THAT IS NOT AT ALL

21   A SIGN OF A TOXIC ENVIRONMENT.

22            CAUSTIC, YOUR HONOR, THE TESTIMONY WAS ALSO

23   UNDISPUTED THERE THAT CAUSTIC TO MICROBES WOULD KILL THEM IN

24   HAKANSSAN-2, UNDISPUTED BY SOMEONE SKILLED IN THE ART, YOUR

25   HONOR, DR. ADRIAENS, THAT CAUSE CAUSTIC WOULD BE KILLING THE

1    MICROBES AND THEY ARE NOT KILLING THE MICROBES.  BUT THERE

2    IS ANOTHER REASON, YOUR HONOR, WHY THAT IS OBVIOUS.  EVEN IF

3    THEY WERE NOT CLEARLY, IF NOT INHERENTLY, NOT EXPRESSLY

4    PRESENT IN HAKANSSAN-2, AND THAT IS THAT CAUSTIC OR HAVING A

5    NONCAUSTIC IS A DESIRABLE CUSTOMER PREFERENCE.

6              IF YOU COULD PULL UP -- WAS IT DEFENDANT'S EXHIBIT

7    144?  AND LOOK AT THE LIST, YOUR HONOR.  REMEMBER, THIS IS

8    THE INFORMATION THAT CHEMFREE OBTAINED FROM THEIR

9    CUSTOMERS'S PROSPECTS BEFORE THEY EVEN STARTED.  IN FACT,

10   THIS IS REALLY WHAT MR. MCNALLY AND MR. MCCLUER DID TO

11   BEFORE THEY JOINED CHEMFREE.  THE CUSTOMERS WANTED TO KNOW

12   HOW TOXIC IT IS, HOW, IF IT GOT IN THEIR EYES OR ON THEIR

13   SKIN HOW IT WOULD BOTHER THEM, ALSO HOW FLAMMABLE IT IS,

14   WHICH MR. MCNALLY AND I THINK ALSO MR. MARKS ADMITTED WAS

15   THE CUSTOMER SAYING THEY WANTED IT NON CAUSTIC AND THEY

16   WANTED IT NONFLAMMABLE.  OBVIOUSLY IF YOU ARE GOING TO HAVE

17   AN OPEN BASE WASHER YOU WANT IT NONFLAMMABLE.

18             UNDER KSR, YOUR HONOR, TAKING AN OBVIOUS STEP TO

19   ANSWER MARKET DESIRES IS NOT AN INVENTIVE STEP.  IF YOU CAN

20   LOOK AT THE THIRD SLIDE ON THE KSR.  SUBSEQUENT -- ACTUALLY

21   SOME, SUBSEQUENT TO KSR, YOUR HONOR, FEDERAL CIRCUIT CASES

22   HELD THAT IMPLICIT MOTIVATION TO COMBINE EXISTS, NOT ONLY

23   WHEN, YOU KNOW, AGAIN, TO PARAPHRASE, PRIOR ART AS A WHOLE

24   TO MAKE IT EXPLICIT, BUT WHEN THE IMPROVEMENT IN TECHNOLOGY

25   IS DEPENDENT WITH THE COMBINATION OF REFERENCES WHICH

1    RESULTS IN A PRODUCT OF PROCESS THAT IS MORE DESIRABLE.  IN

2    ROTHMAN V. TARGET CORP., THE NEXT ONE, THE FEDERAL CIRCUIT

3    THIS YEAR HELD THAT MARKET TRENDS CAN ESTABLISH OBVIOUSNESS

4    THAT THE MARKET DEMAND FOR NURSING MOTHERS FOR CLOTHING IN

5    WHICH THEY COULD EXERCISE DROVE A CHANGE THAT WAS NOT AN

6    INVENTIVE CHANGE.  IN THIS CASE, YOUR HONOR, REALIZING THAT

7    THE CUSTOMERS NEEDS, NOT ONLY SAFE FOR CUSTOMER USE, BUT

8    SAFE FOR MICROBES, AND NONCAUSTIC, NONFLAMMABLE, ET CETERA.

9           IN REGARD TO FLAMMABLE YOUR HONOR, THE EVIDENCE

10   ALSO SHOWED, YOU HEARD THE TESTIMONY THAT FROM DR. ADRIAENS,

11   THAT SURFACTANTS GENERALLY ARE NONFLAMMABLE, CHEMFREE'S

12   EMPLOYEES ADMITTED THAT.  DR. DURKEE ADMITTED THAT

13   GENERALLY, AND STRAINED TO COME UP WITH ONE SURFACTANT HE

14   HAD DEALT WITH OR HEARD ABOUT THAT, NOT BECAUSE THE

15   SURFACTANT WAS FLAMMABLE, BUT BECAUSE IT HAD SOME ALCOHOL

16   COMPOSITION IN IT.  THAT DOES NOT CHANGE THE FACT, YOUR

17   HONOR, THAT SURFACTANTS ARE GENERALLY NONFLAMMABLE, AND

18   SOMEONE READING HAKANSSAN-2 WOULD SEE IT AS NONFLAMMABLE.

19          BUT AGAIN, A DESIRE OF WANTING TO MEET CUSTOMER

20   DESIRES FOR AN OPEN WATER-BASED PARTS WASHER WOULD NOT WANT

21   IT TO BE FLAMMABLE, AND IT WAS AN EASY STEP.  IF YOU CAN

22   LOOK AT PLAINTIFF'S EXHIBIT 45, THE SEAWASH 7 CLEANING FLUID

23   THAT CHEMFREE OBTAINED, AND THIS IS WHAT THEY WERE USING AT

24   THE TIME OF THE PATENT APPLICATION, AND THEY ADMITTED THEY

25   DID NOT KNOW THE COMPOSITION, BUT IT WAS -- COMMERCIALLY IT

1    WAS STANDARD COMMERCIALLY AVAILABLE PRODUCT, SEAWASH FROM

2    WARREN CHEMICAL, ADVERTISED BIODEGRADABLE, NONFLAMMABLE,

3    NONTOXIC.

4         AND WITH REGARD TO BIODEGRADEABLE, YOUR HONOR, THE

5    EVIDENCE IS UNDISPUTED FROM DR. ADRIAENS ALSO -- BY THE WAY,

6    ON THE RIGHT SIDE IT SAYS NEUTRAL PH.  THIS IS OBVIOUS

7    ASPECTS OF A PRODUCT COMMERCIALLY AVAILABLE AT THE TIME OF

8    THE INVENTION.

9         REGARDING THE BIODEGRADEABLE ELEMENT, YOUR HONOR,

10   IT APPEARS IN SEVERAL PATENTS, PART OF THIS LITANY OF

11   BIODEGRADEABLE, NONTOXIC, NONFLAMMABLE.  THE EVIDENCE IS

12   UNDISPUTED THAT THE MICROBES IN HAKANSSAN-2 ARE INGESTING

13   THE SURFACTANTS AND, THEREFORE, THEY ARE BIODEGRADEABLE.

14   BUT AGAIN, YOUR HONOR, THIS IS AN OBVIOUS STEP TO SOMEONE OF

15   SKILL IN THE ART.

16        IF YOU CAN LOOK BACK TO THE 110 PATENT, THE CLAIM

17   WITH THE LEVEL SENSOR.  FIRST, YOUR HONOR, LET ME JUST TALK

18   ABOUT THE HEATER, WHICH IS IN THE EARLIER CLAIM 4, IT

19   APPEARS, A HEATER OR HEATING THE FLUID APPEARS IN OTHER

20   CLAIMS.  YOUR HONOR, A FEW POINTS THAT, NUMBER ONE, WE HAVE

21   THE ATHEY REFERENCE ABOUT A HEATER, THE CRITIQUE THAT IT IS

22   IN A DISH WASHER IS NOT TEACHING A WAY, IT IS A MACHINE FOR

23   WASHING OBJECTS, LIKE A PARTS WASHER, THROUGH CIRCULATED

24   FLUID, IT IS OBVIOUSLY SOMEONE OF SKILL WOULD LOOK AT,

25   SOMEONE SKILLED IN THE ART.  EVEN DR. DURKEE ADMITTED HE

1    WOULD LOOK FOR HEATERS, I BELIEVE HE SAID THEY EXISTED HERE.

2    BUT TO ARGUE, EVEN IF IT DID NOT EXIST IN THE PRIOR ART EVEN

3    IF WE DID NOT HAVE AN ADMISSION BY DR. DURKEE THAT ADDING A

4    HEATER TO A PARTS WASHER MAKES IT INVENTIVE IN THE YEAR 1994

5    IS CONTRARY TO LAW, LEAVING ASIDE, AGAIN, YOUR HONOR,

6    HAKANSSAN-2 TALKS ABOUT CONTROLLING THE TEMPERATURE TO

7    OPTIMIZE THE SITUATION IN THE BIOREACTOR -- THE

8    BIOREMEDIATING PARTS WASHERS.  IN REGARD TO -- AND I DON'T

9    WANT THAT BELABOR THIS, YOUR HONOR, BUT THE MARKET SURVEY

10   SHOWS THAT IT WAS ALSO NOT ONLY GOOD FOR THE MICROBES, BUT

11   CUSTOMERS USING THE OPEN WASH BASIN, CUSTOMERS WANTING TO

12   WASH THEIR HANDS, IT IS COMFORTABLE FOR THEM.  IT IS AN

13   OBVIOUS STEP.

14           THE RELATED CLAIM THAT APPEARS IN THIS PATENT AND

15   SOME OTHER PATENTS IS THE LEVEL SENSOR.  WELL AGAIN, YOUR

16   HONOR, PULL UP WHERE HAKANSSAN-2 TALKS ABOUT THE LEVEL

17   SENSOR --

18           THE COURT: IF I MAY, MR. HARBIN, I AM GOING TO

19   INTERRUPT YOU, AND WE ARE GOING TO TAKE ABOUT A TEN-MINUTE

20   RECESS AND GET STARTED AGAIN IN TEN MINUTES.

21               (BREAK FROM 4:33 TO 4:43 P.M.)

22           THE COURT:  ALL RIGHT, MR. HARBIN.

23           MR. HARBIN:   JUST A FEW MORE MINUTES AND I'LL BE

24   DONE.  GOING BACK TO HAKANSSAN-2, YOUR HONOR.  PROVIDES THE

25   WASHING LIQUID SHOULD BE KEPT AT A PREDETERMINED PH,

1    CONTROLLED PH.  CONTROL THE TEMPERATURE FOR OPTIMUM

2    CONDITIONS, AND OBVIOUSLY THE OPTIMUM CONDITIONS FOR THE

3    MICROBES.  SO IT CLEARLY HAS A HEATER IN IT.

4         MY UNDERSTANDING IS, DR. DURKEE ADMITTED THAT.  WE

5    LOOK AT THIS, THIS WASHING LIQUID CONTAINER HAS A HEATER, HE

6    HAD SOME CONCERN ABOUT I CAN'T TELL THE DIMENSIONS OR

7    SOMETHING OF THE DRAWING, BUT ADMITTED IT HAS A HEATER.  I

8    THINK -- I BELIEVE HE ADMITTED THAT HEATERS WERE PRESENT IN

9    AQUEOUS PARTS WASHERS BEFORE THE INVENTION.

10        AND IF YOU LOOK AT THE JTX-28 -- WE WILL COME BACK

11   TO HAKANSSAN-2.  THE ATHEY PATENT YOUR HONOR, IS ON A LIQUID

12   TEMPERATURE CONTROL AND LOW LIQUID LEVEL DETECTOR AND TALKS

13   ABOUT THE TEMPERATURE SENSOR WORKING WITH CONTROLLING THE

14   HEATER 20 YEARS BEFORE THE INVENTION.  SO AGAIN, EVEN UNDER

15   PRE-KSR LAW, YOUR HONOR, THERE WERE CLEARLY PRIOR ART

16   REFERENCES AVAILABLE ON HEATERS.

17        THEN THE NEXT ELEMENT, YOUR HONOR, IS THE LEVEL

18   SENSOR ITSELF, ATHEY 20 YEARS AGO.  HAKANSSAN-2 DISCUSSES A

19   LEVEL SENSOR, AND WHETHER AS A RESULT OF ATHEY, 20 YEARS

20   AGO, OR OTHER MANUFACTURERS.  MR. MCNALLY TESTIFIED HE FOUND

21   A COMMERCIALLY AVAILABLE LEVEL SENSOR COMBINED WITH THE

22   HEATER, AS AGAIN I COULD PULL UP THE SPECIFIC LANGUAGE IN

23   HAKANSSAN-2, BUT IT'S BEEN COVERED.  IT'S NOT JUST A LEVEL

24   SENSOR, BUT A COMBINATION OF THE LEVEL SENSOR AND THE HEATER

25   COMBINED WITH A CONTROL BOX.

1          THERE ARE OTHER RELATED ELEMENTS, YOUR HONOR.  I

2   WON'T GO CLAIM BY CLAIM, BUT THEY ARE -- BASICALLY THOSE

3   COVER I BELIEVE THE SPECIFIC ELEMENTS THAT WERE DISPUTED.  I

4   THINK AT ONE POINT THERE WAS A DISPUTE BY DR. DURKEE, EVEN

5   WHEN HE WAS TRYING TO DISPUTE A DRAIN, BUT OBVIOUSLY DRAINS

6   WERE IN THE PRIOR ART.  SO YOUR HONOR, THIS IS AGAIN, IN

7   CLOSING THE EXACT SITUATION THAT KSR INTENDS AND DOES

8   ADDRESS.

9          THE COURT:  THANK YOU, MR. HARBIN.

10         MR. CAPP: MAY I RESPOND, YOUR HONOR?

11         THE COURT:  YES.  PLEASE DO.

12         MR. CAPP: YOUR HONOR, THIS PAGE HERE IS FROM

13  DR. DURKEE'S REPORT, AND I WANT TO SHOW YOU THE CITATION IN

14  THE MIDDLE, BUT I ALSO WANT TO ALERT YOU AND YOUR CLERK,

15  THAT WHAT I TRIED TO DO WITH DURKEE AND IN ALL OF HIS EXPERT

16  REPORTS IS PUT A FAIRLY LENGTHY SECTION IN THERE THAT HAD

17  CASE ABSTRACTS ON ALL OF THE MAJOR POINTS OF LAW, AND THAT

18  WAS MY WAY OF TEACHING HIM THE LAW SO HE COULD ADDRESS MIXED

19  QUESTIONS OF LAW AND FACT.  BUT I THINK YOU OR YOUR CLERK

20  WILL BOTH FIND IT VERY CONVENIENT TO HAVE A NICE LITTLE

21  COMPENDIUM OF ALL OF THE LITTLE SOUND BYTES OF CASE

22  ABSTRACTS FOR EVERYTHING IN THE CASE.

23         BUT THE MIDDLE QUOTE HERE IS FROM THE KSR

24  STANDARD, AND THIS IS FUNDAMENTALLY WHAT IS WRONG WITH

25  MR. HARBIN'S ARGUMENT.  AND THIS IS FROM THE KSR CASE.  THE

1    SUPREME COURT STILL RECOGNIZES THAT A PATENT COMPOSED OF

2    SEVERAL ELEMENTS IS NOT PROOF OBVIOUS MERELY BY

3    DEMONSTRATING THAT EACH OF ITS ELEMENTS WAS INDEPENDENTLY

4    KNOWN FROM THE PRIOR ART.  NOW, THEY HAD THE BURDEN OF PROOF

5    ON HERE, AND THEY SHOULD HAVE COME IN HERE PREPARED TO PUT

6    ON A CLASSIC FOUR-FACTOR GRAHAM FACTORS ANALYSIS.  IN OTHER

7    WORDS, THE LEVEL OF ORDINARY SKILL IN THE ART, AND GET IT

8    RIGHT, AND THEN COME IN WITH PROOF OF WHAT THE SCOPE AND

9    CONTENT OF THE PRIOR ART WAS, INCLUDING THESE ARE OUR FOUR

10   REFERENCES, AND THESE ARE WHY THEY ARE PRIOR ART.  WE

11   HAVEN'T HEARD ANYTHING ABOUT THAT.  THE EVIDENCE THAT HAS

12   COME IN FROM MR. MARKS AND MR. MCNALLY SUPPORTED BY

13   CORROBORATED DOCUMENTATION IS THAT BY MARCH OF 1994 THEY

14   HAD, IN THE FIELD, OPERATIONAL PARTS WASHERS WITH A BASIN

15   AND A TANK, A PUMP, THE LEVEL CONTROL SYSTEM, HEATER, AND A

16   FLUID THAT HAD MICROORGANISMS THAT WAS EFFECTIVE AT

17   BIOREMEDIATING OIL AND GREASE.  NOW, THAT IS THE INVENTION.

18          YOU HAVE CONCEPTION, IT IS CORROBORATED, I HEARD

19   SOMETHING ABOUT THE LRC-1 MICROBES.  THAT'S FURTHER

20   REDUCTION TO PRACTICE, AND COMMECIALIZATION.  CONCEPTION,

21   CONCEPTION, THE DATE OF INVENTION, THAT'S NO LATER THAN THE

22   END OF MARCH.  THAT PREDATES MINKIN, AND IT PREDATES SIMS.

23          AND YOU HAVE HEARD NO EVIDENCE -- AS A MATTER OF

24   FACT, THEY CAME IN HERE FOR FOUR AND A HALF DAYS OF THE CASE

25   AND SAID WE HAVE A 102 G DEFENSE, WE HAVE A 102 G DEFENSE,

1   MEANING MCCLUER COMPLETELY INVENTED THE THING EVEN A YEAR

2   BEFORE THAT WHICH PREDATED SIMS AND MINKIN.  SO JUST ON

3   SCOPE AND CONTENT OF THE PRIOR ART ALONE, THEY LOSE TWO OUT

4   OF THEIR FOUR PRIOR ART REFERENCES BECAUSE THEY CAN'T

5   ESTABLISH THEIR BURDEN OF PROOF ON DATE OF INVENTION.

6           ONCE YOU GET PAST THE SCOPE AND CONTENT, THE THIRD

7   GRAHAM FACTOR, AND THIS MAY BE THE MOST SIGNIFICANT ONE,

8   YOUR HONOR, THE THIRD GRAHAM FACTOR IS THE DIFFERENCES

9   BETWEEN THE PRIOR ART AND THE CLAIMED INVENTION.  WHAT WE

10  HAVE HEARD AD NAUSEAM IS, WELL, THIS REFERENCE SAYS THIS,

11  AND THIS REFERENCE SAYS THAT, AND THIS REFERENCE SAYS THAT,

12  POINTING TO SIMILARITIES BETWEEN THE PRIOR ART AND THE

13  CLAIMED INVENTION.

14          THE SIGNIFICANT THING FOR AN OBVIOUSNESS DEFENSE,

15  WHAT ARE THE DIFFERENCES BETWEEN THE PRIOR ART AND THE

16  CLAIMED INVENTION?  BECAUSE, YOU KNOW, EVIL KNEIVEL CAN GET

17  ON HIS MOTORCYCLE AND JUMP OVER 15 CARS PRETTY GOOD, BUT

18  WHEN HE TRIED TO JUMP OVER A CANYON HE HAD SOME PROBLEMS.

19  SO THE DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIMED

20  INVENTION SET THE GAP THAT HAS TO BE BRIDGED BY THIS PERSON

21  OF ORDINARY SKILL IN THE ART TO GET TO THE CLAIMED

22  INVENTION.

23          IF THE DIFFERENCES ARE SMALL, AND UNDER THE KSR

24  STANDARD, WHICH IS NOW THE PERSON OF ORDINARY SKILL IN THE

25  ART, IS A PERSON OF ORDINARY CREATIVITY, IF THAT DIFFERENCE

1    IS SO SMALL THAT IT FALLS WITHIN THE AMBIT OF ORDINARY

2    CREATIVITY, YOU KNOW, THEN YOU'VE GOT AN ARGUMENT FOR

3    OBVIOUSNESS UNDER KSR.  BUT IF THE DIFFERENCES BETWEEN THE

4    PRIOR ART AND THE CLAIM INVENTION ARE SUBSTANTIAL, NOW IT

5    TAKES MORE THAN MERE ORDINARY CREATIVITY TO BRIDGE THAT GAP.

6           NOW, WE DID NOT, AS THE PLAINTIFF, WE DID NOT

7    UNDERTAKE THE BURDEN OF PROOF TO COME IN HERE AND ESTABLISH

8    WHAT THOSE DIFFERENCES WERE.  THAT WAS THEIR JOB.  AND THEY

9    DIDN'T GET THE JOB DONE.

10          NOW, DR. ADRIAENS GAVE HIS INITIAL REPORT WHICH

11   CAME OUT AT THE END OF FEBRUARY, A LOT OF IT WAS STRICKEN

12   BECAUSE IT DIDN'T MEET THE MINIMUM REQUIREMENTS FOR AN

13   EXPERT REPORT UNDER RULE 26 A(2)(B).  HE WAS VERY CONCLUSORY

14   AND HE WAS PROBLEMATIC IN TWO MAJOR AREAS ON THE

15   OBVIOUSNESS.

16          FIRST OF ALL, HE DID NOT EFFECTIVELY GIVE REASONS

17   AND MOTIVATIONS TO COMBINE.  AND YOUR HONOR PROPERLY STRUCK

18   THAT PART OF HIS REPORT, BECAUSE IT DIDN'T MEET THE MINIMUM

19   REQUIREMENTS OF RULE 26 A(2)(B).  THE OTHER SERIOUS

20   DEFICIENCY IN HIS REPORT IS ALL HE DID WAS SAY, OKAY, HERE

21   IS MY OBVIOUSNESS ANALYSIS, HERE IS MY CLAIM CHART.  IT IS

22   SIMILAR HERE, IT IS SIMILAR HERE.  THERE IS NO ANALYSIS, NO

23   DISCUSSION OF THE DIFFERENCES BETWEEN THE PRIOR ART AND THE

24   CLAIMED INVENTION, SO THE COURT CAN THEN SEE HOW BROAD IS

25   THIS GAP THAT THE PERSON OF ORDINARY SKILL HAS TO LEAP TO

1   GET FROM THE STATE OF THE ART TO THE IMPROVEMENT THAT THEY

2   ARE MAKING IN IN THE ART WITH AN INVENTION.

3            SO THEY HAD THE BURDEN OF PROOF ON THE GRAHAM

4   FACTORS, AND THEY DIDN'T MEET IT, AND IT WASN'T DR. DURKEE'S

5   JOB TO DO THEIR JOB FOR THEM.  HIS JOB WAS TO COME IN HERE

6   AND RESPOND TO THE FACT, HE WAS POINTING OUT THAT

7   DR. ADRIAENS HADN'T DONE HIS JOB, AND HE WAS VERY EFFECTIVE

8   AT THAT.  BUT DR. DURKEE NEVER ASSUMED THE BURDEN OF PROVING

9   THAT THE PATENTS WERE VALID.  HIS JOB WAS TO COME IN AND

10  SHOW THAT THE DEFENDANTS HAVE NOT EFFECTIVELY PROVED THAT

11  THEY ARE INVALID.

12           YOUR HONOR, WHAT THE DEFENDANTS HAVE DONE IN THIS

13  CASE IS THE CLASSIC HINDSIGHT ANALYSIS, AND HERE IS HOW YOU

14  DO A HINDSIGHT ANALYSIS.  YOU GET YOUR PRIOR ART REFERENCES,

15  AND YOU TREAT THEM, EACH ONE, LIKE IT IS A SPARE PARTS BIN,

16  AND PUT ALL OF THE PARTS IN THERE.  AND THEN YOU TAKE THE

17  PATENT AND YOU USE THAT AS A BLUEPRINT OR A SHOPPING LIST

18  AND YOU GO THROUGH, OH, I NEED ONE OF THESE, SO I WILL TAKE

19  THIS OUT OF THE HAKANSSAN-2 BIN.  OH, WELL, GOODNESS, I NEED

20  A FILTER, SIMS HAS A FILTER, I WILL PULL THE FILTER OUT OF

21  SIMS.  I NEED A LEVEL CONTROL SYSTEM.  OH, ATHEY HAS ONE,

22  LET ME PULL ONE OUT OF THAT BIN, AND THEN I WILL GO OVER AND

23  I WILL USE THE PATENT AND I WILL PUT ONE TOGETHER.  THAT IS

24  YOUR CLASSIC HINDSIGHT CASE, AND THAT IS WHAT YOU JUST

25  HEARD.

1          LET'S GO TO SLIDE 12, PLEASE.  HERE IS THE LAW ON

2    THAT.  THIS CAME OUT LAST YEAR.  THIS IS THE ABBOTT

3    LABATORIES CASE.  ONE MAY NOT RELY ON HINDSIGHT TO PICK AND

4    CHOOSE ISOLATED ELEMENTS FROM THE PRIOR ART AND COMBINE THEM

5    SO AS TO YIELD THE INVENTION IN QUESTION IF SUCH A

6    COMBINATION WOULD NOT HAVE BEEN OBVIOUS AT THE TIME OF THE

7    INVENTION.  THE OBVIOUSNESS INQUIRY MUST GUARD AGAINST

8    SLIPPING INTO THE USE OF HINDSIGHT AND RESIST THE TEMPTATION

9    TO READ INTO THE PRIOR ART THE TEACHINGS OF THE INVENTION IN

10   ISSUE.  AND THAT IS WHAT THEY HAVE DONE IN THIS CASE.  THEY

11   HAVE TAKEN CHEMFREE'S PATENT AND LOOKED AT IT AND SAID,

12   LET'S TREAT THIS AS A SHOPPING LIST AND LET'S GO SHOPPING.

13   OH, HERE, I NEED ONE OF THOSE.  OH, PULL THAT OUT THAT

14   REFERENCE, LET'S GO PULL THAT ONE FROM THAT REFERENCE, AND

15   VOILA, HERE THEY ARE.  THAT IS NOT WHAT IT TAKES TO MEET

16   THEIR BURDEN OF PROOF.

17          NEXT SLIDE.  THIS IS THE SENSONICS CASE.  A PATENT

18   CANNOT BE USED AS A BLUEPRINT TO PIECE TOGETHER ELEMENTS IN

19   THE PRIOR ART.  THE IDENTIFICATION OF EACH CLAIMED ELEMENT

20   IN THE PRIOR ART WORK SUFFICIENT TO NEGATE PATENTABILITY IF

21   IDENTIFICATION OF EACH CLAIMED ELEMENT IN THE PRIOR ART WERE

22   SUFFICIENT TO NEGATE PATENTABILITY, VERY FEW PATENTS WOULD

23   EVER ISSUE.  REJECTING THE PATENT SOLEY BY FINDING PRIOR ART

24   COROLLARIES FOR THE CLAIMED ELEMENTS WOULD PERMIT USE OF THE

25   INVENTION ITSELF AS A BLUEPRINT FOR PIECING TOGETHER

1    ELEMENTS IN THE PRIOR ART.  THAT IS WHAT THEY HAVE DONE

2    HERE.

3          NEXT SLIDE PLEASE.  WHEN YOU TRY TO MAKE A

4    COMBINATION UNDER SECTION 103, THE BURDEN OF PROOF IS ON THE

5    DEFENDANT TO PROVE THE COMBINABILITY OF MULTIPLE REFERENCES.

6    IN ORDER TO ESTABLISH A PRIMA FACIE CASE OF OBVIOUSNESS, ONE

7    MUST SHOW SOME OBJECTIVE TEACHING IN THE PRIOR ART OR THAT

8    KNOWLEDGE GENERALLY AVAILABLE TO ONE OF ORDINARY SKILL IN

9    THE ART WOULD LEAD THAT INDIVIDUAL TO COMBINE THE RELEVANT

10   TEACHINGS OF THE REFERENCES.  THEY HAVEN'T MET THAT BURDEN

11   HERE.

12         NEXT SLIDE.  AND YOUR HONOR, THIS GOES TO THE

13   ARGUMENT THAT WAS MADE ABOUT, OH, THE MONTREAL PROTOCOL

14   PROVIDED THE MOTIVATION TO COME UP WITH AN ENVIRONMENTAL

15   PARTS WASHER.  THIS WAS ADDRESSED LAST YEAR IN THE INOGETICS

16   VERSUS ABBOTT LABATORIES CASE WHERE THE FEDERAL CIRCUIT

17   STATED THAT THE KNOWLEDGE OF A PROBLEM AND THE MOTIVATION TO

18   SOLVE IT ARE ENTIRELY DIFFERENT FROM A MOTIVATION TO COMBINE

19   PARTICULAR REFERENCES TO REACH THE PARTICULAR CLAIMED

20   METHOD.  IF KNOWLEDGE OF A PROBLEM AND THE MOTIVATION TO

21   SOLVE IT WERE ALL IT WAS, THEN IN WORLD WAR II THE UNITED

22   STATES WAS VERY MOTIVATED TO END THE WAR SOONER.  SO DOES

23   THAT MAKE INVENTION OF THE ATOMIC BOMB AND THE MANHATTAN

24   PROJECT OBVIOUS?  I DON'T THINK SO.  I THINK IT TOOK

25   OPPENHEIMER AND FEW OTHERS GUYS BEYOND ORDINARY SKILL IN THE

1    ART TO DO THAT.

2            SO I AM NOT GOING TO BELABOR THE POINT FURTHER,

3    YOUR HONOR.  I DON'T HAVE THE BURDEN OF PROOF.  I HAVE JUST

4    COME UP HERE AS THE PATENTEE PLAINTIFF TO POINT OUT TO YOU

5    THAT THEY HAVEN'T MET THEIR BURDEN OF PROOF, AND I SUBMIT

6    THEY SIMPLY HAVEN'T.

7            THE COURT:  OKAY.

8            MR. HARBIN:   YOUR HONOR, MAY I RESPOND TO A

9    COUPLE OF POINTS?  I'LL BE BRIEF.

10           THE COURT:  I WILL ASK YOU TO BE BRIEF,

11   MR. HARBIN.

12           MR. HARBIN:   THAT IS THE PATENTEE'S ARGUMENT,

13   ALWAYS THE DEFENDANT IS USING HINDSIGHT AND PICKING AND

14   CHOOSING AMONG THE REFERENCES.  AGAIN, YOUR HONOR, WE CAN

15   GET LOST IN THE FOREST IN THIS CASE WITH ALL OF THESE

16   REFERENCES AND EVERYTHING, BUT THE BACKGROUND IS, NOT ONLY

17   THE PATENT ITSELF, WHICH DISCLOSES EVERYTHING EXCEPT HEATER

18   LEVEL SENSOR AND THE BIOREMEDIATING COMPONENTS, THOSE ARE

19   ALL IN HAKANSSAN-2.  HAKANSSAN-2 HAS THE BIOREMEDIATION

20   COMPONENTS, THE LEVEL SENSOR, THE HEATER, THE PH CONTROL, IT

21   IS CLEARLY NONTOXIC, THE ATTEMPT TO DISTINGUISH IT BY

22   CHEMFREE FAILED.  THIS IS NOT A CASE OF COMBINING --

23   SOMETIMES YOU GET CASES WHERE PEOPLE COMBINE THE FIVE, TEN,

24   OR MORE REFERENCES.

25           SECOND, YOUR HONOR, IN KSR, AGAIN, YOU DON'T EVEN

1    NEED A REFERENCE, IF IT IS AN OBVIOUS STEP, A NONINVENTIVE

2    STEP.  AGAIN, ADDING A LEVEL SENSOR, WHICH DR. DURKEE

3    ADMITTED IS A SAFETY ISSUE.  TAKING AN OBVIOUS STEP FOR A

4    SAFETY REASON IS NOT A PATENTABLE INVENTION.  AND SOME OF

5    THE CASE LAW OF CHEMFREE CITED IN THE BRIEF AND AGAIN RELIED

6    ON, ONE OF THE CASES IN 1999, WHICH CITED EXPRESSED TEACHING

7    LAW WHICH WAS SQUARELY OVERRULED BY KSR.  THANK YOU.

8           THE COURT:  ALL RIGHT, MR. CAPP.  WHERE ARE YOU

9    WITH YOUR PRESENTATION?

10           MR. CAPP: WELL, I AM SITTING HERE HOPING I AM

11   GOING TO GET A FAVORABLE RULING ON MY 5 C MOTION.  BUT

12   BEYOND THAT, WE ARE READY TO PUT ON A REBUTTAL CASE IF

13   NEEDED.  THE TWO PLACES, DEPENDING ON THE COURT'S RULING, IF

14   YOU DENY THE MOTION ALL THE WAY ACROSS THE BOARD, SO THAT

15   THE INVENTORSHIP CASE IS LIVE, WE HAVE THREE WITNESSES TO

16   PUT UP THAT WILL ALL BE QUITE SHORT.  THEY WILL BE

17   MR. LELAND STRANGE, THEN TOM MCNALLY, AND FRANK MARKS.  AND

18   MR. STRANGE AND MCNALLY FOR SURE WILL PUT SOME ADDITIONAL

19   EVIDENCE IN TO ESTABLISH THE TIME-LINE OF THE INVENTION TO

20   CONVINCE YOUR HONOR THAT IT WAS INVENTED AT CHEMFREE, THAT

21   THEY MADE CONTRIBUTIONS, AND TO FIRMLY ESTABLISH THAT DATE

22   OF INVENTION BY THE END OF MARCH.

23           THE OTHER PART OF OUR CASE WILL BE THE PART THAT

24   REBUTS THEIR PRIMA FACIE OBVIOUSNESS CASE, WHICH IS WHAT WE

25   CALL SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS, AND WE WILL

1    PRESENT EVIDENCE ON FOUR POINTS.  LET ME SEE IF I CAN DO

2    THIS FROM MEMORY.  THREE OF THEM ARE GOING TO COME FROM THE

3    OVERLANDS SITUATION, TRYING TO PATENT THE SAME THING.

4    ADVERTISING BY THE ACCUSED INFRINGER THAT ARE LAUDITORY

5    TOWARD THE BENEFITS OF THE CLAIMED INVENTION.  THE THIRD ONE

6    IS COPYING.  AND THE FORTH ONE ESCAPES MY NOTICE, BUT --

7    OH -- AND MR. MCNALLY WILL GIVE SOME TESTIMONY ABOUT HONORS

8    AND AWARDS GIVEN TO THE CHEMFREE SMART WASHER INDICATING

9    THAT THE INVENTION HAS RECEIVED HONOR AND ACCEPTANCE IN THE

10   FAVORABLE RESPONSE IN THE MARKETPLACE, AND I WOULD EXPECT

11   THE DIRECT TESTIMONY ON ALL OF THAT TO BE 45 MINUTES.  I

12   CAN'T SPEAK FOR CROSS.  I MEAN, CUMULATIVE, ALL THREE

13   WITNESSES, WE REALLY TRY TO BEAR THEM DOWN TO JUST A FEW

14   BULLET POINTS.

15          THE COURT:  ALL RIGHT.  WELL, I AM GOING TO GRANT

16   YOUR MOTION WITH REGARD TO INFRINGEMENT.  AND I THINK WITH

17   REGARD TO INVENTORSHIP, GIVEN THE BALANCE, GIVEN THE

18   EVIDENCE THAT IS BEFORE THE COURT, AND THE HIGH BURDEN ON

19   THE DEFENDANT THERE, I AM GOING TO GRANT YOUR MOTION WITH

20   REGARD TO INVENTORSHIP.  I AM NOT WITH REGARD TO

21   ANTICIPATION OBVIOUSNESS.  IF YOU HAVE SOME MORE EVIDENCE ON

22   THAT, I WOULD LIKE THE HEAR IT.

23          SO THE QUESTION IS, WHEN WILL WE RECONVENE FOR

24   FURTHER TESTIMONY?  ANY SUGGESTIONS?

25          MR. CAPP: MY THREE WITNESSES ARE COMPANY

1    REPRESENTATIVES, AND THEY ARE ALL LOCAL.  I AM UNDER THE

2    PILE ON ANOTHER CASE NEXT WEEK.  IF THE COURT WANTS TO DO IT

3    ON MONDAY, I WILL TRY MY BEST TO HANDLE BOTH MATTERS, BUT IF

4    THE COURT NEEDS A HIATUS, IT WOULD BE GREAT THING FOR ME IF

5    WE COULD HAVE A WEEK RECESS IN THERE AND THEN RECONVENE THE

6    FOLLOWING MONDAY.  AND IN PART, BECAUSE THIS IS A CASE THAT

7    MR. ANDERSON AND I ARE FIRST AND SECOND CHAIR ON, SO WE

8    CAN'T JUST SHIFT WORK LOADS AROUND ON US.

9         THE COURT:  OKAY.  WHAT ABOUT YOU, MR. SCHAETZEL?

10   WHAT IS YOUR SCHEDULE LIKE?

11        MR. SCHAETZEL:  LOOKS LIKE FOR US, YOUR HONOR,

12   THAT THE NEXT TWO WEEKS ARE VERY DIFFICULT.  AFTER THAT WE

13   CAN ACCOMMODATE THE COURT'S SCHEDULE AS NEED BE.

14        THE COURT: WELL, I HATE TO LET THIS SIT FOR TWO

15   WEEKS.  I WILL HAVE FORGOTTEN MOST OF WHAT YOU TOLD ME THIS

16   WEEK BY THEN.

17        MR. SCHAETZEL:  IF WE CAN DO IT MONDAY THEN THAT

18   WOULD PROBABLY BE THE BEST.  BUT I WANTED TO BE CONSIDERATE

19   OF MR. -- MR. HARBIN WILL BE OUT OF TOWN, THEN I AM OUT OF

20   TOWN.  BUT WE CAN TRY TO MOVE SOME THINGS AROUND.

21        THE COURT:  ALL RIGHT.  I THINK I CAN DO IT

22   MONDAY, BUT THERE ARE TWO QUALIFICATIONS ON THAT.  ONE, I'VE

23   GOT A BROKEN TOOTH THAT I'VE PUT OFF MY DENTAL APPOINTMENT

24   TWICE NOW BECAUSE OF LITIGATION.  I THINK I'VE GOT TO BE IN

25   MONDAY MORNING AT 9 O'CLOCK, AND I THINK I AM GOING TO GO

1    THIS TIME.  AND TWO, THAT WOULD MEAN THAT I'LL BE IN NEWNAN,

2    AND IT WOULD BE MUCH BETTER, IN MY OPINION, TO PROCEED IN

3    NEWNAN.  IT WOULD SAVE THE EXTRA HOUR GETTING STARTED THAT

4    IT TAKES ME TO DRIVE TO ATLANTA.  COULD YOU ALL BE PRESENT

5    AT THE NEWNAN COURTHOUSE SAY AT 11 O'CLOCK MONDAY MORNING?

6            MR. CAPP:  YOUR HONOR, MR. MARKS HAS A FLIGHT OUT

7    OF THE COUNTRY AT THAT TIME.  I WOULD STILL HAVE MR. STRANGE

8    AND MR. MCNALLY AVAILABLE.  BUT THIS IS A MATTER OF SOME

9    IMPORTANCE.  I THINK I AM JUST GOING TO HAVE TO LOSE HIM AS

10   A WITNESS, IF THAT IS THE CASE, BUT WE WILL DO WHATEVER YOUR

11   HONOR SAYS.  I AM QUITE SURE I HAVE THE OTHER TWO GENTLEMEN

12   HERE TO FINISH UP THE TESTIMONY.

13           THE COURT: OKAY.  WHAT ABOUT YOU, MR. SCHAETZEL?

14           MR. SCHAETZEL:  WE CAN BE THERE.

15           THE COURT:  NOW, HOW LONG DO YOU THINK YOU'LL BE?

16           MR. CAPP: I SERIOUSLY, WHEN I SAID 45 MINUTES, I

17   MEANT IT, FOR FINISHING UP THOSE THREE WITNESSES.  I HAVE

18   THEM DOWN TO JUST "BING, BING, BING," BULLET POINTS.

19           THE COURT: I HATE -- I WOULD HATE TO PUT THAT OFF

20   FOR TWO WEEKS THEN.  SO IF THAT IS NOT A TERRIBLE

21   INCONVENIENCE, YOU HAVE TO DRIVE A LITTLE FURTHER TO GET TO

22   NEWNAN, BUT THERE IS PLENTY OF PARKING, NO TROUBLE TO GET IN

23   THE COURTHOUSE, AND OTHERWISE IT'S A MORE CONVENIENT PLACE

24   TO PRESENT A CASE.

25           MR. CAPP: YOUR HONOR, CAN I ASK THE COURT FOR AN

```
 1    INDULGENCE ON ONE MATTER?  WOULD IT BE POSSIBLE TO PRESERVE
 2    MR. MARKS'S TESTIMONY BY DEPOSITION?  IT WILL BE VERY SHORT.
 3    WE WILL HAVE THE TRANSCRIPT TYPED RIGHT UP, AND I DON'T WANT
 4    TO SAY PERFUNCTORY --
 5              THE COURT: WHEN WOULD YOU TAKE THE DEPOSITION?
 6              MR. CAPP: WELL, IF LORI DIDN'T MIND STICKING
 7    AROUND, WE COULD DO IT RIGHT NOW AT THE CLOSE OF THE DAY.
 8    BUT OTHERWISE WE CAN SEE IF WE CAN GET A COURT REPORTER FOR
 9    TOMORROW, OR -- WHEN WILL YOU BE BACK?
10              MR. MARKS:  AUGUST 2ND
11              MR. CAPP: I GUESS WE HAVE TO DO IT TONIGHT OR OVER
12    THE WEEKEND.
13              THE COURT: WHEN DOES MR. MARKS'S PLANE LEAVE?
14              MR. CAPP:  9:45 MONDAY MORNING.
15              THE COURT:  SO MONDAY IS OUT.  WHAT ABOUT THAT,
16    MR. SCHAETZEL?  YOU DIDN'T HAVE ANYTHING PLANNED FOR THE
17    WEEKEND, DID YOU?
18              MR. SCHAETZEL:  WE'LL BE HAPPY TO ACCOMMODATE
19    MR. MARKS, YOUR HONOR.
20              THE COURT: I APPRECIATE THAT.  I THINK THAT IS
21    CONSIDERATE.  IF YOU ALL CAN WORK THAT OUT, I'LL BE GLAD TO
22    TAKE A LOOK AT IT BY DEPOSITION, AND THEN WE WILL HEAR THE
23    REST OF THE CASE MONDAY MORNING STARTING AT 11:00.
24              MR. CAPP: I AM THINKING WE USUALLY GO TILL 5:30.
25    IT IS ONLY 5 AFTER 5:00.  WE CAN PROBABLY HAVE MR. MARKS UP
```

```
1    AND DOWN AND PROBABLY BE DONE WITH HIM BY 5:30, IF YOUR

2    HONOR DIDN'T MIND, YOU KNOW, WORKING THE NORMAL FULL DAY

3    TODAY.

4              THE COURT:  WELL, SINCE IT WILL DEPRIVE YOU ALL OF

5    THE WEEKEND OTHERWISE, GO AHEAD.

6              MR. CAPP: THANK YOU.  AND ON BEHALF OF BOTH

7    COUNSEL AND MY CLIENT, THANK YOU.

8              THE COURT: MR. MARKS, YOU REMAIN UNDER OATH FROM

9    HAVING PREVIOUSLY TESTIFIED IN THE CASE.

10             MR. CAPP: I MISSPOKE ABOUT ONE THING.  WE ONLY

11   HAVE TWO WITNESSES LEFT, BECAUSE YOU HAVE GRANTED THE 52 C

12   MOTION ON INVENTORSHIP.  I DON'T NEED TO CALL MR. STRANGE

13   ANY LONGER.  CAN HE BE EXCUSED, SO HE WILL NOT BE

14   SEQUESTERED AND HANGING AROUND THE COURTHOUSE ANYMORE?

15             THE COURT:  ALL RIGHT.

16             MR. CAPP: THANK YOU.

17             MR. ANDERSON:  YOUR HONOR, MAY I OFFER THE COURT

18   JUST A VERY BRIEF COMMENT AS TO THE DIRECTION WE ARE HEADING

19   WITH THIS TESTIMONY SO THAT WE MAY GO AHEAD AND PUT IT IN

20   CONTEXT?

21             THE COURT:  ALL RIGHT.

22             MR. ANDERSON:  YOUR HONOR, MR. MARKS'S TESTIMONY

23   IS GOING SPECIFICALLY TO THE ISSUE OF SECONDARY FACTORS OF

24   NONOBVIOUSNESS, SPECIFICALLY THE IDEA OF THE COPYING OF

25   CHEMFREE'S INVENTION IN THE MARKETPLACE.  THIS ISSUE IS
```

1    ADDRESSED IN DR. DURKEE'S REBUTTAL REPORT, WHICH IS DOCKET

2    NO. 337, AT SECTION 5 D 6.  5 D 6, PAGE 182.

3            THE COURT:  GIVE ME THAT AGAIN?

4            MR. ANDERSON:   DOCKET NO. 337, SECTION OF HIS

5    REPORT AT SECTION 5 D 6, IT OCCURS AT PAGE 182 OF HIS

6    REPORT, AND IT'S THE SECTION DEALING WITH COPYING BY OTHERS.

7            THE COURT:  ALL RIGHT.

8                        FRANCIS MARKS

9                     PREVIOUSLY SWORN

10                    DIRECT EXAMINATION

11   BY MR. ANDERSON:

12   Q. MR. MARKS, PLEASE REMIND US OF WHAT YOUR POSITION IS WITH

13   CHEMFREE.

14   A. I AM THE PRESIDENT OF CHEMFREE.

15   Q. AND HOW LONG HAVE YOU BEEN INVOLVED WITH CHEMFREE, SIR?

16   A. SINCE 1993.

17   Q. WHAT TYPE OF ADVERTISING HAS CHEMFREE DONE WITH ITS

18   BIOREMEDIATING PARTS WASHER?

19   A. IN 1995, AFTER WE HAD ACHIEVED COMMERCIALIZATION OF THE

20   PRODUCT, WE ADVERTISED IN TRADE PRESS, CLEAN TECH MAGAZINES,

21   WE ATTENDED TRADE SHOWS.

22   Q. CAN YOU ESTIMATE FOR ME HOW FREQUENTLY OR HOW MANY TRADE

23   SHOWS CHEMFREE DISPLAYED AT IN THE SAY 1994 THROUGH 2000

24   TIME FRAME?

25   A. MAJOR TRADE SHOWS, PROBABLY THREE TO FOUR A YEAR.  AND

1  THEN OF REGIONAL OR RESELLERS SPONSORED SHOWS, DISTRIBUTOR

2  SHOWS, A FEW MORE, PERHAPS 10 TO 12.

3  Q. WHAT TYPE OF PUBLICATION IS THE CLEAN TECH MAGAZINES THAT

4  YOU WERE REFERRING TO?

5  A. CLEAN TECH MAGAZINE WAS THE PREMIER MAGAZINE FOR THE

6  TRADE, FOR THE PARTS WASHING TRADE.

7  Q. WHEN WAS THE FIRST COMMERCIAL SALE OF CHEMFREE'S

8  BIOREMEDIATING PARTS WASHER MADE?

9  A. OCTOBER OF 1994.

10  Q. HAS CHEMFREE CONTINUOUSLY BEEN PRESENT IN THE

11  BIOREMEDIATING PARTS WASHER SINCE IT MADE THAT FIRST SALE

12  INTO THE MARKETPLACE?

13  A. YES, WE HAVE.

14  Q. ARE YOU FAMILIAR WITH A PRODUCT KNOWN AS ATEC CLEAN PRO

15  WASHER?

16  A. I AM.

17  Q. AND HOW IS IT THAT YOU ARE FAMILIAR WITH THE ATEC CLEAN

18  PRO WASHER?

19  A. CHEMFREE OBTAINED ONE OF THOSE WASHERS SEVERAL YEARS AGO.

20  Q. I WOULD LIKE YOU TO TAKE A LOOK IN THE BINDER IN FRONT OF

21  YOU AT THE TAB MARKED EXHIBITS B, C, AND E.  MR. MARKS, ARE

22  YOU FAMILIAR WITH EXHIBIT B THAT IS IN FRONT OF YOU BEING

23  DISPLAYED UP HERE?

24  A. YES.

25  Q. WHAT IS THIS DOCUMENT?

1   A. THIS IS A SALES PIECE PRODUCED BY ATEC TRANS TOOL, WHICH

2   WAS A DISTRIBUTOR OF THIS PARTICULAR PRODUCT.

3   Q. AND WHAT TYPE OF FEATURES ARE BEING PROMOTED IN THIS

4   ADVERTISEMENT?

5   A. THEY ARE PROMOTING PARTS CLEANING, FILTRATION, AND

6   BIOREMEDIATION.

7   Q. DO YOU SEE ANY PATENT MARKING NOTICES IN THIS DIAGRAM

8   SIR?

9   A. YES, THERE ARE PATENT MARKINGS.

10  Q. WHAT IS THE PATENT NUMBER?

11  A. IT IS THE 147 PATENT THAT IS REFERRED TO IN THE OVERLAND

12  SHEET HERE.

13  Q. YOU'VE HAD AN OPPORTUNITY TO OBSERVE THE ATEC CLEAN PRO

14  BIOREMEDIATING PARTS WASHER BEFORE?

15  A. YES, I HAVE.

16  Q. OKAY.  CAN WE GO TO THE NEXT PAGE OF THIS EXHIBIT,

17  PLEASE?  IF WE CAN GO FULL STREAM ON THIS.  MR. MARKS, DO

18  YOU RECOGNIZE THIS PRODUCT HERE?

19  A. YES.

20  Q. WHAT IS IT?

21  A. THIS IS THE CLEAN PRO MACHINE SOLD BY ATEC.

22  Q. CAN WE GO TO THE NEXT PHOTO, PLEASE?  CAN YOU DESCRIBE

23  FOR US, PLEASE, WHAT YOU SEE IN THE TOP PHOTO?

24  A. THE TOP PHOTO IS LOOKING INTO THE SINK, THE BRUSH, THE

25  DEVICE THEY USED WHICH IS THE SAME AS A FAUCET IS SHOWN,

1  POWER CORD OVER TO THE RIGHT, AND THEN THE BASKET, DRAIN,

2  THE BASKET OR THE PARTICULATE FILTER THAT FITS INTO THE

3  OPENING.

4  Q. WHAT IS THIS ITEM RIGHT HERE, SIR?

5  A. THAT IS THE OPENING THAT ALLOWS THE FLUID TO DRAIN FROM

6  THE SINK INTO THE BASE.

7  Q. IF WE CAN TAKE A LOOK AT THE PICTURE ON THE BOTTOM HALF

8  OF THAT PAGE, PLEASE.

9  A. YES.

10  Q. CAN YOU DESCRIBE FOR US WHAT YOU SEE THERE?

11  A. THAT IS THE GRID THAT THEY USED TO HOLD THE FLAT FILTER.

12  THAT IS THE THINGS THAT LOOK LIKE THEY ARE ABOUT ONE INCH

13  SQUARE PERHAPS, METAL.  THE TOP PART IS THE SINK ITSELF

14  MOVED OPEN AND MOVED BACK.

15  Q. IF WE COULD LOOK AT THE NEXT PHOTO, PLEASE.  COULD YOU

16  DESCRIBE FOR US, SIR, WHAT THIS IS?

17  A. THIS IS THE SO CALLED INLINE HEATER.  THE FLUID FLOWS

18  THROUGH THIS UNIT WHEN IT IS ACTIVATED AND IS HEATED BEFORE

19  IT IS PUMPED BACK INTO THE TANK.

20  Q. DO YOU KNOW WHEN ATEC CLEAN PRO BIOREMEDIATING PARTS

21  WASHER ENTERED THE MARKETPLACE?

22  A. THIS ONE THAT IS BEING ILLUSTRATED WAS SOMETIME AFTER

23  2000.  I THINK THEY WERE IN THE MARKETPLACE PROBABLY IN

24  ABOUT 2001, 2002.

25  Q. DO YOU SEE ONE OF THE ATEC CLEAN PRO PARTS WASHERS HERE

1   IN THE COURTROOM, SIR?

2   A. YES, IT IS HERE IN THE COURTROOM.

3   Q. CAN YOU IDENTIFY IT FOR THE COURT, SIR?

4   A. DR. OVERLAND OR MR. OVERLAND IS IN THE WAY HERE, BUT IT

5   IS WAY IN THE BACK.  IT'S THE ONE CLOSEST TO THE WALL.

6   Q. THE ONE IN THE FAR BACK THERE?

7   A. YES.  THE ONE CLOSEST TO THE WALL.

8           MR. ANDERSON:  YOUR HONOR, I WOULD LIKE TO MOVE

9   INTO EVIDENCE EXHIBIT B THAT THE WITNESS HAS BEEN LOOKING

10  AT.

11          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

12          THE COURT:  ADMITTED.

13  BY MR. ANDERSON:

14  Q. MR. MARKS, ARE YOU FAMILIAR WITH A COMPANY CALLED FOR

15  BEST?

16  A. YES, I AM.

17  Q. WHO IS FOR BEST?

18  A. THAT IS A COMPANY THAT WAS ORIGINALLY FORMED BY CHARLIE

19  WARREN OF WARREN CHEMICAL, AND MANUFACTURES A BIOREMEDIATING

20  PARTS WASHER.

21  Q. WHAT IS CHEMFREE'S CONNECTION WITH WARREN CHEMICAL?

22  A. WARREN CHEMICAL WAS THE SUPPLIER OF THE SEAWASH 7 PRODUCT

23  DISCLOSED IN THE PATENTS THAT WAS USED BY CHEMFREE IN THE

24  FIRST COUPLE OF YEARS OR SO OF PROVIDING CLEANING FLUIDS.

25  Q. WHAT INFORMATION DID CHEMFREE PROVIDE WARREN CHEMICAL

1    ABOUT ITS SMART WASHER BIOREMEDIATING PARTS WASHER?

2    A. MR. WARREN IS A KEY SUPPLIER TO CHEMFREE, VISITED WITH US

3    SEVERAL TIMES A YEAR, AND HAD ACCESS THROUGHOUT THE CHEMFREE

4    FACILITY TO OUR MANUFACTURING AND OTHER PROCESSES.

5    Q. DOES FOR BEST OFFER A BIOREMEDIATING PARTS WASHER FOR

6    SALE?

7    A. YES, THEY DO.

8    Q. ARE YOU FAMILIAR WITH FOR BEST'S BIOREMEDIATING PARTS

9    WASHER?

10    A. I AM.

11    Q. HOW IS IT THAT YOU ARE FAMILIAR WITH FOR BEST'S

12    BIOREMEDIATING PARTS WASHER?

13    A. I HAVE SEEN ADVERTISEMENTS REGARDING IT, AND THEN ALSO

14    CHEMFREE ACQUIRED A COPY OF ONE OF THE FOR BEST PARTS

15    WASHERS.

16    Q. HAVE YOU HAD AN OPPORTUNITY TO INSPECT THE FOR BEST

17    PRODUCT THAT CHEMFREE PURCHASED?

18    A. YES, I HAVE.

19    Q. I WOULD LIKE US TO LOOK AT WHAT IS EXHIBIT C TO

20    DR. DURKEE'S REPORT.  MR. MARKS, DO YOU RECOGNIZE THIS

21    MATERIAL, SIR?

22    A. YES, I DO.

23    Q. WHAT IS THIS?

24    A. THIS IS A SCREEN PRITN FROM THEIR FOR BEST WEBSITE.

25    Q. CAN YOU COMMENT REGARDING THE FEATURES THAT ARE BEING

1    PROMOTED FOR FOR BEST'S BIOREMEDIATING PARTS WASHER?

2    A. PRIMARILY, AS WITH THE OTHER ATEC MACHINE, PARTS

3    CLEANING, INTERNAL FILTRATION, AND IN-SYSTEM BIOREMEDIATION.

4    Q. LET'S TAKE A LOOK AT THE PICTURES THAT BEGIN ON PAGE 4 OF

5    THIS EXHIBIT.  MR. MARKS IF YOU COULD DESCRIBE FOR ME WHAT

6    WE SEE HERE ON PAGE 4.

7    A. THIS IS A FRONTAL SHOT OF THE MACHINE.  I BELIEVE THE

8    PAIL CONTAINS THE CLEANING FLUID THAT IS USED, AND THERE ARE

9    TWO SMALL PHOTOS OF THE DECAL ON EACH SIDE OF THE BACK

10   SPLASH OF THE SINK.

11   Q. DO YOU RECOGNIZE PAGE 4 OF EXHIBIT C AS BEING A FOR BEST

12   PARTS WASHER?

13   A. YES, IT IS A TYPICAL SINK ON A DRUM.

14   Q. IF WE COULD LOOK AT THE NEXT PAGE.  MR. MARKS, CAN YOU

15   DESCRIBE FOR ME WHAT YOU SEE HERE?

16   A. OH, THIS IS A SHOT OF THE SINK ITSELF, SHOWING THE

17   NOZZLE, A RATHER STRANGE THING RUNNING FROM LEFT TO RIGHT

18   THROUGH THE LITTLE SILVER HOLE IS A LEVEL SENSOR, AND THE

19   HOSE WOULD EXTEND TO A BRUSH.  YOU CAN SEE THE HOLE IN THE

20   SINK THAT ALLOWS THE FLUID TO FLOW THROUGH TO THE BASE, AND

21   THEN THEY HAVE A MESH TYPE OF PLASTIC MESH-TYPE DEVICE THAT

22   FITS INTO THE BOTTOM OF THE SINK.

23   Q. TAKE A LOOK AT THE NEXT PICTURE, PLEASE.  MR. MARKS, CAN

24   YOU PLEASE DESCRIBE FOR US WHAT YOU SEE HERE IN THIS

25   PICTURE, PAGE OF EXHIBIT C?

1    A. THIS IS THE INTERIOR OF THE TANK AND YOU CAN SEE CLEARLY

2    THE PUMP WHICH IS CONNECTED TO THE WHITE THING AT THE TOP.

3    THAT IS THE PUMP AT THE VERY BOTTOM OF IT.  THE HEATER, THE

4    RODS LEADING DOWN, AND THE ELEMENT ITSELF, AND THIS OTHER

5    THING I BELIEVE IS EITHER A HOSE THAT IS JUST THERE, THAT IT

6    SERVES NO PARTICULAR PURPOSE, OR IT IS THE EXTENSION OF THE

7    LEVEL SENSOR.

8    Q. DO YOU SEE ONE OF FOR BEST'S BIOREMEDIATING PARTS WASHERS

9    HERE IN THE COURTROOM TODAY, SIR?

10   A. I DO YES, I DO.

11   Q. CAN YOU PLEASE IDENTIFY IT FOR THE COURT?

12   A. IT IS THE BLACK AND GRAY MACHINE WITH THE BLUE NOZZLE

13   THAT IS SECOND FROM THE WALL IN THE BACK OF THE COURTROOM.

14          MR. ANDERSON:  YOUR HONOR, AT THIS TIME, I WOULD

15   LIKE TO MOVE EXHIBIT C TO DURKEE'S REPORT INTO EVIDENCE.

16          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

17          THE COURT:  ADMITTED.

18   BY MR. ANDERSON:

19   Q. MR. MARKS, ARE YOU FAMILIAR WITH A COMPANY CALLED CLEAN

20   TECH?

21   A. YES, I AM.

22   Q. WHO IS CLEAN TECH?

23   A. CLEAN TECH IS A MANUFACTURER OF PARTS WASHERS.

24   Q. ARE YOU FAMILIAR WITH CLEAN TECH'S BIOREMEDIATING PARTS

25   WASHER?

1    A. YES, I AM.

2    Q. WHEN DID CLEAN TECH START OFFERING ITS BIOREMEDIATING

3    PARTS WASHER FOR SALE?

4    A. IT SEEMS TO ME I RECALL SEEING IT AT TRADE SHOWS IN THE

5    VERY LATE '90'S.

6    Q. HAVE YOU HAD AN OPPORTUNITY TO OBSERVE THEIR PARTS

7    WASHER, SIR?

8    A. YES.

9    Q. HOW IS IT THAT YOU'VE HAD AN OPPORTUNITY TO OBSERVE CLEAN

10   TECH'S BIOREMEDIATING PARTS WASHER?

11   A. WELL, I DID SEE IT AT TRADE SHOWS MORE THAN ONCE.  AND

12   ALSO CHEMFREE HAS A SAMPLE OF THIS UNIT IN ITS WAREHOUSE.

13   Q. WHEN YOU SAY THIS UNIT, CAN YOU IDENTIFY THAT IN EXHIBIT

14   E TO DR. DURKEE'S REPORT?

15   A. YES.

16   Q. KEEP ON GOING.  GO TO PAGE 3.

17   A. THERE IT IS.  THE ONE WE HAVE IS KNOWN AS THE KT 4000

18   BIO, WHICH IS THE UNIT ON THE LOWER LEFT CORNER.  THAT'S IT.

19   Q. DO YOU -- WHAT IS EXHIBIT E TO DR. DURKEE'S REPORT THAT

20   YOU ARE LOOKING AT IN FRONT OF YOU?

21   A. WHAT IS IT?  OH, IT'S -- THESE ARE PRINTS FROM THEIR

22   CLEAN TECH WEBSITE.

23          MR. ANDERSON:  YOUR HONOR, AT THIS POINT I MOVE

24   EXHIBIT E TO DR. DURKEE'S REPORT INTO EVIDENCE.

25          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

1          THE COURT:  ADMITTED.

2          MR. ANDERSON:  YOUR HONOR, I HAVE NO FURTHER

3   QUESTIONS FOR THIS WITNESS AT THIS POINT.  THANK YOU.  THANK

4   YOU FOR THE COURT'S INDULGENCE.

5          THE COURT:  MR. HARBIN, ANY CROSS-EXAMINATION?

6          MR. HARBIN:  YES, YOUR HONOR.  VERY BRIEFLY.

7                    CROSS-EXAMINATION

8   BY MR. HARBIN:

9   Q. GOOD AFTERNOON, MR. MARKS.

10  A. GOOD AFTERNOON.

11  Q. I BELIEVE YOU SAID THAT THE FIRST COMPANY IS ATEC CLEAN

12  PRO?

13  A. YES.

14  Q. YOU SAW THAT ON THE MARKET IN 2001 OR 2002?

15  A. YES.

16  Q. OKAY.

17  A. THEY STARTED -- BEEN ON THE MARKET FOR QUITE SOME TIME,

18  AND CLEAN TECH IS STILL IN THE BUSINESS.

19  Q. YOU DON'T HAVE ANY INFORMATION ABOUT HOW MANY THEY HAVE

20  SOLD, DO YOU?

21  A. NO, I DON'T.

22  Q. AND WHAT ABOUT FOR BEST?  DO YOU KNOW WHEN THEY HAVE BEEN

23  ON THE MARKET?

24  A. YES.

25  Q. THE BIOREMEDIATING PARTS WASHER?

1    A. THEY FIRST APPEARED IN I WOULD SAY PROBABLY '96, AND THEY

2    ARE ON THE MARKET STILL TODAY.

3    Q. YOU DO NOT KNOW HOW MANY THEY HAVE SOLD, DO YOU?

4    A. NO, IT IS A PRIVATE COMPANY.  THEY DON'T PUBLISH THAT

5    INFORMATION.

6    Q. AND WHAT ABOUT CLEAN TECH, HOW LONG HAVE THEY BEEN ON THE

7    MARKET?

8    A. CLEAN TECH HAS BEEN AROUND FOR QUITE AWHILE, AND IT IS A

9    FAIRLY LARGE ORGANIZATION.  IT SELLS A GREAT MANY

10   SOLVENT-TYPE WASHERS TO REGIONAL OIL COMPANIES AND SUPPLIERS

11   OF SOLVENT WASHERS.  THEY BROUGHT OUT THEIR BIOREMEDIATING

12   WASHER, AS FAR AS I RECALL, IT WOULD HAVE BEEN ABOUT 1999 OR

13   2000.

14   Q. YOU DON'T BELIEVE THEY SOLD MANY BIOREMEDIATING PARTS

15   WASHERS, DO YOU, SIR?

16   A. AGAIN, THEY DON'T PUBLISH THAT INFORMATION, BUT WE RUN

17   INTO THEM OCCASIONALLY IN THE FIELD.  WE DON'T KNOW THE

18   NUMBERS.

19   Q. OCCASIONALLY?

20   A. OCCASIONALLY.

21   Q. DO YOU RECALL ESTIMATING IN 2002 THAT YOU HAD 78 PERCENT

22   OF THE MARKET IN THE BIOREMEDIATING PARTS WASHING MARKET?

23   A. THAT SOUNDS REASONABLE.

24   Q. AND YOU BELIEVE THAT IS NOW HIGHER OR LOWER?

25   A. TALKING ABOUT THE U.S. NOW?

1   Q. YES, SIR.

2   A. I WOULD SAY IN THE U.S. WE ARE AT LEAST AT THAT LEVEL,

3   AND PERHAPS SLIGHTLY ABOVE.

4   Q. AND YOU HAVEN'T -- YOU HAVE NOT TAKEN -- IN FACT, IN 2002

5   YOU DID NOT CONSIDER ANY OF THESE COMPANY TO BE SIGNIFICANT

6   COMPETITORS, ATEC, FOR BEST, AND CLEAN TECH?

7   A. THE MOST SIGNIFICANT COMPETITOR REMAINS THE SOLVENT TYPE

8   WASHERS, PRIMARILY FROM SAFETY CLEAN.  IN THE BIOREMEDIATING

9   AREA, THESE WERE THREE OF THE PRINCIPLE PLAYERS.

10  Q. DO YOU RECALL WHEN YOU WERE ASKED ABOUT BIOREMEDIATING --

11  ABOUT COMPETITORS IN 2002 IN THE BIOREMEDIATING PARTS

12  WASHER, COMPETITORS MENTIONED, GRAY MILLS, ABS AND ZYMO?

13  A. YES.

14  Q. AND YOU HAVE NOT TAKEN LEGAL ACTION AGAINST ANY OF THESE

15  COMPANIES, HAVE YOU, SIR?

16  A. WELL, OF COURSE WE WERE INVOLVED WITH ZYMO FOR AWHILE, AS

17  YOU KNOW.

18  Q. I APOLOGIZE.  NOT THOSE COMPANIES I JUST NAMED.  THE ONES

19  THAT YOU ARE SAYING ARE COPIERS THAT YOU'VE IDENTIFIED.

20  ATEC, FOR BEST, AND CLEAN TECH, YOU HAVE NOT TAKEN LEGAL

21  ACTION AGAINST ANY OF THOSE, HAVE YOU, SIR?

22  A. WE HAVE NOT.

23  Q. AND DO YOU RECALL WHEN THE FIRST PATENT OF THE CHEMFREE

24  FAMILY PATENTS ISSUED?

25  A. I BELIEVE IT WAS IN 1999.

1   Q. IF YOU CAN PULL UP THE DTX-1097.  HIGHLIGHT THAT FIRST

2   PORTION.  ARE YOU AWARE THAT THE FIRST OVERLAND PATENT WAS

3   FILED IN 1997?

4   A. YES.

5   Q. SO OBVIOUSLY, HE COULD HAVE NOT BEEN COPYING THE CHEMFREE

6   PATENT WHEN HE APPLIED FOR HIS PATENT; RIGHT?

7   A. EXCEPT FOR THE FACT THAT OUR EQUIPMENT WAS ON THE MARKET,

8   BUT HE WOULD NOT HAVE HAD THE PATENT DOCUMENT IN FRONT OF

9   HIM.

10          MR. HARBIN:  THAT IS ALL I HAVE, YOUR HONOR.

11          MR. ANDERSON:  YOUR HONOR, I HAVE ONE REQUEST FOR

12   ONE FOLLOW-UP QUESTION.

13          THE COURT:  OKAY.

14                  REDIRECT EXAMINATION

15   BY MR. ANDERSON:

16   Q. DOES CHEMFREE HAVE THE FINANCIAL RESOURCES TO ENGAGE IN

17   MULTIPLE PATENT SUITS SIMULTANEOUSLY, SIR?

18   A. NO, WE DO NOT.

19          THE COURT:  THANK YOU, MR. MARKS.  YOU MAY STEP

20   DOWN.  HOW MANY MORE WITNESSES DID YOU SAY YOU HAD?

21          MR. CAPP: YOUR HONOR, WE HAVE ONE MORE.  AND MY

22   UNDERSTANDING IS, HE WILL BE CONSIDERABLY SHORTER THAN

23   MR. MARKS.

24          THE COURT:  WE ARE ON A ROLL.  LET'S CALL YOUR

25   LAST WITNESS THEN.

1              MR. CAPP: OUR NEXT WITNESS WILL BE MR. TOM

2     MCNALLY.  AND MR. MELARTI WILL BE HANDLING THAT EXAMINATION

3     FOR US.

4              THE COURT:  ALL RIGHT.

5                         TOM MCNALLY

6                       PREVIOUSLY SWORN

7                      DIRECT EXAMINATION

8     BY MR. MELARTI:

9     Q. MR. MCNALLY, WILL YOU PLEASE REMIND US WHAT YOUR CURRENT

10    POSITION IS?

11    A. I AM THE VICE-PRESIDENT AND GENERAL MANAGER OF CHEMFREE

12    CORPORATION, AND DIRECTOR OF THE FIRM AS WELL.

13    Q. AND HOW LONG HAVE YOU BEEN ASSOCIATED WITH CHEMFREE?

14    A. I CO-FOUNDED THE COMPANY 16 YEARS AGO.

15    Q. WHEN DID CHEMFREE LAUNCH ITS SMART WASHER?

16    A. WE LAUNCHED THE SMART WASHER COMMERCIALLY IN 1994.

17    Q. AND SINCE THAT TIME, HAS CHEMFREE RECEIVED RECOGNITION IN

18    THE INDUSTRY FOR ITS SMART WASHER PRODUCT?

19    A. WE HAVE RECEIVED A LOT OF RECOGNITION IN THE INDUSTRY.

20    Q. AND WHAT KIND OF RECOGNITION HAS CHEMFREE RECEIVED?

21    A. THERE HAVE BEEN ARTICLES ABOUT IT AND MISCELLANEOUS

22    AWARDS, ARTICLES IN INDUSTRY PUBLICATIONS, IN NEWSLETTERS,

23    AND ALSO IN THE U.S. MILITARY PUBLICATIONS.

24              MR. MELARTI:  IF I MAY APPROACH, YOUR HONOR?

25              THE COURT:  YES.

1    BY MR. MELARTI:

2    Q. IF YOU WOULD, MR. MCNALLY, TURN TO THE DOCUMENT IN FRONT

3    OF YOU THAT HAS BEEN MARKED AS PLAINTIFF'S EXHIBITS 598.

4    A. I HAVE IT.

5    Q. DO YOU RECOGNIZE THIS DOCUMENT?

6    A. YES, I DO.

7    Q. AND WHAT DO YOU RECOGNIZE THIS TO BE?

8    A. THIS IS AN IMAGE SHOWING AN AWARD THAT WAS PRESENTED TO

9    CHEMFREE CORPORATION AND THE SMART WASHER BY THE AUSTRALIAN

10   AUTOMOTIVE AFTERMARKET ASSOCIATION IN 1996.  MATTSON

11   AUTOMOTIVE INDUSTRIES IS A DISTRIBUTOR OF OURS, AND THEY GOT

12   THE NAME WRONG, THEY CALLED IT SMART CLEAN.  IT WAS SMART

13   WASHER.

14            MR. MELARTI:  AT THIS TIME, WE TENDER THE EXHIBIT

15   INTO EVIDENCE, YOUR HONOR.

16            MR. HARBIN:  NO OBJECTION, YOUR HONOR.

17            THE COURT:  ADMITTED.

18   BY MR. MELARTI:

19   Q. LET'S NEXT TURN TO WHAT HAS BEEN MARKED AS PLAINTIFF'S

20   EXHIBIT 601.  DO YOU SEE THAT?

21   A. YES.  I DO.

22   Q. DESCRIBE THIS DOCUMENT.

23   A. THIS DOCUMENT IS AN IMAGE OF AN AWARD THAT WE WERE

24   PRESENTED BY PLANT ENGINEERING AS PRODUCT OF THE YEAR IN

25   1998.  PLANT ENGINEERING IS A PUBLICATION THAT SPONSORED

1  TRADE SHOWS AND SO ON AND SO FORTH.  THIS IS NOT ONE OF

2  THOSE AWARDS THAT ONE WINS FOR ADVERTISING.

3          MR. MELARTI:  AT THIS TIME, I TENDER EXHIBIT 601

4  INTO EVIDENCE, YOUR HONOR.

5          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

6          THE COURT:  ADMITTED.

7  BY MR. MELARTI:

8  Q. NEXT, MR. MCNALLY, TURN TO WHAT HAS BEEN MARKED AS

9  EXHIBIT 602.  DO YOU SEE THAT?

10  A. YES, I DO.

11  Q. YOU PLEASE DESCRIBE WHAT IS SHOWN IN THIS EXHIBIT?

12  A. THIS IS AN IMAGE OF AN AWARD THAT WE RECEIVED AS PRODUCT

13  OF THE YEAR PRESENTED TO THE CHEMFREE SMART WASHER BY PLANT

14  SERVICES IN MAINTENANCE REPAIR AND OPERATIONS.  IT IS THE

15  MRO SOLUTION AWARD.  WE ARE PARTICULARLY PROUD OF THIS ONE,

16  BECAUSE IT WAS FROM THE INDUSTRY THAT USES THE PRODUCT

17  ACROSS THE BOARD, IT WASN'T NECESSARILY FROM A SPECIFIC

18  PARTS CLEANING PERSPECTIVE.  IT WAS CITED AS A PRODUCT THAT

19  ASSISTED IN MAINTENANCE, REPAIR, AND OPERATIONS ACROSS THE

20  BOARD.

21          MR. MELARTI:  AT THIS THIS TIME, I WOULD MOVE

22  EXHIBIT 602 INTO EVIDENCE, YOUR HONOR.

23          MR. HARBIN:  NO OBJECTION, YOUR HONOR.

24          THE COURT:  ADMITTED.

25  BY MR. MELARTI:

1   Q. MR. MCNALLY, ARE YOU FAMILIAR WITH AN ENTITY CALLED CLEAN

2   TECH MAGAZINE?

3   A. YES, I AM.

4   Q. WHAT IS CLEAN TECH MAGAZINE?

5   A. CLEAN TECH MAGAZINE WAS THE HOUSE -- TRADE PUBLICATION,

6   IF YOU WILL, FOR THE PARTS CLEANER INDUSTRY.  CLEAN TECH

7   MAGAZINE ALSO SPONSORED TRADE SHOWS.  ORIGINALLY THEY HAD

8   THEIR OWN SHOW, NOW IT IS PART OF A LARGER MECHANICAL

9   ENGINEERING SHOW AND PLASTIC SHOW, AND SO ON, AND USUALLY

10  HELD IN CHICAGO.

11  Q. AND HAS CLEAN TECH AWARDED RECOGNITION FOR INNOVATION IN

12  THE CLEANING INDUSTRY?

13  A. YES.  IN THE YEAR 2000 THE CHEMFREE SMART WASHER AND

14  CHEMFREE OZZY JUICE, WHICH IS OUR FLUID, WON THE MOST

15  OUTSTANDING PRODUCT OF 2000 AWARD.

16  Q. AND IS THE CLEAN TECH AWARD A PRESTIGIOUS AWARD?

17  A. IT IS.  AS I SAID, IT IS THE AWARD FROM FOLKS IN OUR

18  INDUSTRY.

19  Q. IF YOU WOULD, MR. MCNALLY, TURN TO WHAT HAS BEEN MARKED

20  AS EXHIBIT 600.

21  A. YES.  I SEE THAT.

22  Q. WHAT DO YOU RECOGNIZE THIS TO BE?

23  A. THIS IS A DEPICTION OF THAT AWARD THAT WE WERE JUST

24  TALKING ABOUT, THE OUTSTANDING PRODUCT OF 2000 FROM CLEAN

25  TECH.

```
1    Q. AND ARE YOU AWARE OF ANY OTHER ENTITIES HAVING RECEIVED
2    THIS CLEAN TECH AWARD?
3    A. YES, I AM.
4    Q. AND ARE YOU FAMILIAR WITH ANY OF THOSE?
5    A. YES.  IRONICALLY THE WALTER MACHINE WON THE CLEAN TECH
6    AWARD FOR THE OUTSTANDING INNOVATIVE PRODUCT IN 2005.
7    Q. IF YOU WOULD, MR. MCNALLY, TURN TO WHAT HAS BEEN MARKED
8    AS PLAINTIFF'S EXHIBIT 090?
9    A. I HAVE THAT IN FRONT OF ME.
10   Q. IF YOU LOOK IN THE TOP RIGHT CORNER OF THIS DOCUMENT, YOU
11   SEE THE IMAGE THAT IS DEPICTED THERE?
12   A. YES.  THAT IS THE CLEAN TECH AWARD FOR 2005.
13   Q. AND THAT IS THE ONE THAT WAS AWARDED TO THE WALTER PARTS
14   CLEANER?
15   A. YES.
16           MR. MELARTI:  APOLOGIES, YOUR HONOR.  AT THIS TIME
17   I TENDER INTO EVIDENCE EXHIBIT 600.
18           MR. HARBIN:  NO OBJECTION.
19           THE COURT:  ADMITTED.
20           MR. MELARTI:  NOTHING FURTHER, YOUR HONOR.
21           THE COURT:  MR. HARBIN, YOU MAY CROSS-EXAMINE.
22                      CROSS-EXAMINATION
23   BY MR. HARBIN:
24   Q. MR. MCNALLY, WAS THE CLEAN TECH AWARD THAT YOU WON FOR
25   THE FLUID, OR THE MACHINE?
```

1   A. IT WAS OZZY JUICE FLUID THAT WON THE AWARD.

2           MR. HARBIN:  THAT IS ALL I HAVE, YOUR HONOR.

3   THANK YOU.

4           THE COURT:  ALL RIGHT.  THANK YOU, MR. MCNALLY.

5   YOU MAY STEP DOWN.  ALL RIGHT.  WHAT ELSE DO YOU HAVE?  ARE

6   YOU READY TO REST?

7           MR. CAPP: THE PLAINTIFF IS PREPARED TO REST THE

8   REBUTTAL PORTION OF ITS CASE, YOUR HONOR.

9           THE COURT:  OKAY.  MR. HARBIN, WHAT ABOUT YOUR

10  SIDE?

11          MR. HARBIN:  NOTHING, YOUR HONOR.

12          THE COURT:  ALL RIGHT.  WHAT ABOUT A SCHEDULE TO

13  RESUBMIT YOUR PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF

14  LAW BASED ON THE TRANSCRIPT REFERENCES TO THE EVIDENCE THAT

15  YOU ARE RELYING ON, PARTICULARLY FOR THE FINDINGS OF FACT?

16          MR. CAPP: THE PLAINTIFFS ARE PREPARED TO DO

17  WHATEVER THE COURT BELIEVES IS REASONABLE.  IF YOU SET A

18  DATE, WE WILL MAKE SURE WE MEET IT, YOUR HONOR.  I KIND OF

19  AM THINKING MAYBE TWO WEEKS OUT.

20          THE COURT:  OKAY.  I ASSUME YOU WILL NEED THE

21  TRANSCRIPT TO DO THAT.  WHAT ABOUT THAT?

22          MR. CAPP: MY MEMORY IS GOOD, BUT IT IS NOT THAT

23  GOOD, YOUR HONOR.

24          THE COURT:  A LOT OF THE REFERENCES WILL BE TO

25  EXHIBITS RATHER THAN TO LIVE TESTIMONY.

1           MR. CAPP: I COULD DO IT WITHOUT THE TRANSCRIPT, I

2    JUST -- I WANT TO SATISFY WHAT THE COURT EXPECTS FROM ME.

3    IF YOU WANT THE SPECIFICITY OF PAGE AND LINE NUMBERS OF

4    TESTIMONIAL REFERENCES, THEN THE ONLY WAY I CAN DO THAT IS

5    IF I HAVE THE TRANSCRIPT.

6           THE COURT: WELL, THAT MAKES IT A LOT EASIER ON US.

7    WHAT ABOUT SIMULTANEOUSLY SUBMITTING ON AUGUST 7TH AMENDED

8    PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, ASSUMING

9    YOU GET THE TRANSCRIPT IN TWO WEEKS, GIVES YOU A WEEK, I

10   THINK.

11          MR. SCHAETZEL:  THAT IS QUICK, BUT WE WILL GET IT

12   DONE.  YES, SIR.

13          THE COURT:  AND THEN LET'S SAY THE FOLLOWING

14   FRIDAY, ANY OBJECTIONS THAT YOU WISH TO REGISTER TO OPPOSING

15   COUNSEL'S PROPOSED FINDINGS AND CONCLUSIONS.  NOW, WITH

16   REGARD TO CLOSING ARGUMENT, YOU ALL ARGUED THE CASE PRETTY

17   WELL ON MR. CAPP'S MOTION, AND I DON'T KNOW THAT ANY

18   FURTHER, PARTICULARLY IN VIEW OF YOUR SCHEDULES FOR NEXT

19   WEEK, THAT ANY FURTHER ORAL ARGUMENT WOULD BE NECESSARY,

20   UNLESS I SET ONE LATER, SAY IN AUGUST WHEN WE ARE DOWN TO A

21   FEW ISSUES THAT I WOULD LIKE YOU TO COMMENT ON.

22          MR. CAPP, WHAT IS YOUR PREFERENCE WITH REGARD TO

23   SUBMITTING A WRITTEN FINAL ARGUMENT, OR WILL YOU BE ABLE TO

24   COVER ALL OF THAT IN YOUR PROPOSED FINDINGS OF FACT?

25          MR. CAPP: I HAVE A HARD TIME DIFFERENTIATING

1    BETWEEN A BRIEF AND PROPOSED FINDINGS OF FACT.  I THINK WHAT

2    I HAVE TO SAY CAN BE IN THE PROPOSED FINDINGS OF FACT.

3         THE COURT:  IT SEEMS TO ME, PARTICULARLY SINCE YOU

4    WILL HAVE THE OPPORTUNITY TO OBJECT TO OPPOSING COUNSEL'S.

5    MR. SCHAETZEL, WHAT ABOUT YOU?

6         MR. SCHAETZEL:  WE WOULD PREFER TO DO A BRIEF OR

7    ORAL ARGUMENT, YOUR HONOR.  IT IS DIFFICULT TO DO IT IN

8    FINDINGS OF FACT AND CONCLUSIONS OF LAW.  FOR EXAMPLE, WHEN

9    WE DID FINDINGS OF FACT AND CONCLUSIONS OF LAW, THE

10   PLAINTIFF'S RESPONSE TO OURS WAS BRIEF, WHEREAS WE WENT

11   THROUGH AND DID EACH RESPONSE TO EACH ONE.  AND IT'S VERY

12   DIFFICULT TO DO IT.  IT IS MUCH -- THERE IS A CONTINUITY TO

13   A BRIEF THAT IT IS VERY HARD TO PULL TOGETHER IN FINDINGS OF

14   FACT.

15        THE COURT:  WELL, THERE IS NOT A DAY NEXT WEEK

16   THAT WOULD BE CONVENIENT FOR BOTH OF YOU, OR IS THERE, WITH

17   YOUR SCHEDULE?

18        MR. SCHAETZEL:  I WILL DO IT WHENEVER.  HE IS THE

19   ONE THAT --

20        MR. CAPP: WHAT I AM THINKING, YOUR HONOR, IS AFTER

21   YOU'VE SEEN THE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF

22   LAW AND OBJECTIONS AND HAD AN OPPORTUNITY TO DIGEST THOSE,

23   IF YOU HAD ANY FURTHER QUESTIONS YOU WANTED TO HEAR ORAL

24   ARGUMENT ON, I SAY COME DOWN IN THE NEXT DAY OR TWO OR THREE

25   AND JUST ADDRESS THESE PARTICULAR POINTS, I THINK THAT WOULD

1    BE MORE EFFICIENT.

2              THE COURT:  ALL RIGHT.  MR. SCHAETZEL, THAT SHOULD

3    GIVE YOU THE OPPORTUNITY TO ARGUE.  I WON'T LIMIT YOU TO

4    THINGS THAT I SPECIFICALLY WANT TO HEAR FROM YOU ON.  THERE

5    MAY BE OTHER THINGS YOU WANT TO ADDRESS.  AND WE WILL HAVE

6    AN ORAL ARGUMENT THEN AFTER I REVIEW THE PROPOSED FINDINGS

7    AND CONCLUSIONS OF LAW, BARRING IT LOOKING SO CLEAR THAT I

8    FEEL I DON'T NEED ANY FURTHER EDUCATION ON IT, BUT WE WILL

9    TRY TO DO THAT, AND THAT WOULD BE IN AUGUST.

10             MR. SCHAETZEL:  THAT WOULD BE FINE, YOUR HONOR,

11   AND WE'LL BE HAPPY TO DO IT IN NEWNAN.  THE LOCATION IS --

12             THE COURT:  I THINK I'VE GOT A NUMBER OF CASES TO

13   TRY IN ATLANTA DURING AUGUST.  IF I HAVE A DAY IN NEWNAN

14   THAT IS FREE, THAT MIGHT BE MORE CONVENIENT.  AND MR. MARTIN

15   WILL GET BACK TO YOU IN REGARD TO THAT.  THANK YOU, COUNSEL.

16   I THINK THE CASE HAS BEEN VERY WELL-PRESENTED, AND I

17   APPRECIATE THAT.

18                 (END OF BENCH TRIAL AT 5:48 P.M.)

19                    REPORTER'S CERTIFICATION

20        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

21   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22                              _____

23                              LORI BURGESS
                                OFFICIAL COURT REPORTER
                                UNITED STATES DISTRICT COURT
24                              NORTHERN DISTRICT OF GEORGIA

25                                 DATE:  AUGUST 18, 2009

U.S. DISTRICT COURT
LORI BURGESS, RMR