```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION


3


4    CHEMFREE CORPORATION       )
                                )    CIVIL ACTION
5            VS.                )    FILE NO. 1:04-CV-03711-JTC
                                )
6                               )    ATLANTA, GA
     J. WALTER, INC.,           )    MAY 5, 2010
7    _____)    2:00 P.M.

8

9

10                   TRANSCRIPT OF MOTIONS HEARING
                  BEFORE THE HONORABLE JACK T. CAMP
11                   UNITED STATES DISTRICT JUDGE

12

13

14

15   APPEARANCES:
          FOR THE PLAINTIFF:          WILLIAM ARTHUR CAPP
16                                    WOODY JAMESON
                                      ATTORNEYS AT LAW
17
          FOR THE DEFENDANT:          STEPHEN SCHAETZEL
18                                    JOHN HARBIN
                                      RICHARD RICHARDS
19                                    ATTORNEYS AT LAW

20

21

22

     LORI BURGESS, OFFICIAL COURT REPORTER
23
     (404) 215-1528
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
25   PRODUCED BY CAT.
```

1              THE CLERK:  YOUR HONOR, THIS IS THE TIME SET FOR

2     THE STATUS CONFERENCE IN THE CHEMFREE CORPORATION VERSUS J.

3     WALTER, INC.  CIVIL ACTION NO. 1:04-CV-3711.  WILL COUNSEL

4     PLEASE STAND AND IDENTIFY YOURSELVES AND YOUR CLIENTS FOR

5     THE RECORD?

6              MR. CAPP:  GOOD AFTERNOON, YOUR HONOR.  BILL CAPP

7     WITH DUANE MORRIS FOR THE PLAINTIFF CHEMFREE.  MY LEGAL

8     ASSISTANT AQUANIS JOSHUA IS WITH ME HERE AT COUNSEL TABLE.

9     THE PRESIDENT OF THE COMPANY IS FRANK MORRIS, WHO IS SEATED

10    BEHIND ME, AND OUR OFFICE MANAGER PARTNER FOR DUANE MORRIS,

11    WOODY JAMESON, IS IN THE GALLERY.  AND HE WROTE A LETTER TO

12    YOU TODAY, AND I DON'T KNOW IF YOU HAD TIME TO TAKE A LOOK

13    AT THAT.

14             THE COURT:  I HAVE TAKEN TIME TO LOOK AT IT, AND I

15    HOPE WE'LL HAVE TIME AT THE END OF THE ARGUMENT TO ADDRESS

16    THAT.  IF NOT, WE CAN DO IT BY TELEPHONE AND MAYBE TOMORROW.

17             MR. SCHAETZEL:  FOR THE WALTER COMPANY DEFENDANTS,

18    I AM STEVE SCHAETZEL FROM KING AND SPALDING.  WITH ME AT THE

19    TABLE IS JOHN HARBIN.  MR. HARBIN WILL ALSO BE PARTICIPATING

20    IN THE ARGUMENT TODAY.  AND TO MR. HARBIN'S LEFT IS MR. BOB

21    RICHARDS.

22             MR. RICHARDS:  GOOD AFTERNOON, YOUR HONOR.

23             THE COURT:  ALL RIGHT.  FIRST OF ALL, I AM SORRY,

24    IT'S BEEN SO LONG SINCE THE TRIAL IN THIS.  I DON'T REMEMBER

25    A SITUATION WHERE I HAVE DELAYED SO LONG TO ENTER AN ORDER.

1    IT IS EASIER IF YOU DO IT RIGHT AFTER THE TRIAL, BUT I HAVE

2    HAD A NUMBER OF THINGS COME UP, AND ONCE I GOT AWAY FROM IT,

3    IT WAS HARD TO PICK IT UP AGAIN.  BUT I DO HOPE TO ENTER --

4    I HAVE GONE BACK OVER IT, LOOKED AT MOST OF THE MATERIAL,

5    AND I HOPE TO ENTER AN ORDER BY EARLY NEXT WEEK ON ALL OF

6    THE ISSUES THAT ARE REMAINING.

7              SO THAT WE'LL BE IN AGREEMENT ON THAT, MR. CAPP,

8    WHY DON'T YOU TELL ME WHAT ISSUES YOU SEE AS REMAINING.

9              MR. CAPP:  THANK YOU, YOUR HONOR.  THIS IS WHAT WE

10   DISPOSED OF AT THE END OF THE TRIAL ON FRIDAY AFTERNOON.  WE

11   TOOK CARE OF THE INVENTORSHIP, INFRINGEMENT OF THE THREE OF

12   THE FOUR PARTS WASHERS ON ALL OF THE CLAIMS OF ALL FOUR

13   PATENTS.  THERE WAS A FOURTH MACHINE CALLED THE IO 200, AND

14   THERE WERE SOME CLAIMS IN TWO OF THE PATENTS THAT SURVIVED,

15   BUT ALL OF THE CLAIMS THAT WERE ASSERTED IN THE 835 PATENT

16   AND THE 226 PATENT WERE RESOLVED ON RULE 52, AND THEN OF THE

17   125 PATENT, CLAIMS 5, 7, 18, AND 21 WERE DISPOSED OF.

18             AND THEN ON THE ANTICIPATION DEFENSE, THAT WAS

19   RESOLVED AT THAT TIME BY AN ANNOUNCEMENT BY THE DEFENDANT

20   THAT THEY WERE WITHDRAWING OR NOT ASSERTING THEIR 102

21   ANTICIPATION DEFENSE OVER THREE OF THE PATENTS, THE 110, THE

22   835, AND THE 125 PATENT.

23             THE COURT:  LEAVING THE 226 PATENT?

24             MR. CAPP:  CORRECT, YOUR HONOR.  SO WHAT WE HAVE

25   LEFT TODAY IS INFRINGEMENT ON THE IO 200.  YOU HAVE THE 110

1   PATENT BECAUSE THERE IS A DISPUTED CLAIM LIMITATION IN CLAIM

2   1, WHICH IS THE INDEPENDENT CLAIM, WHICH WILL THEN FLOW

3   THROUGH THE REST OF THE CLAIMS.  AND THEN ON THE 125 PATENT

4   IT IS CLAIMS 4, 16, 17, AND 19, BUT IT IS REALLY JUST TWO

5   CLAIM LIMITATIONS THAT APPLY IN THOSE FOUR.  WHAT WE HAVEN'T

6   DONE ON INVALIDITY IS 102 ANTICIPATION OVER ONE REFERENCE,

7   THE HAKANSSON-2 REFERENCE OVER THE 226 PATENT, AND THAT

8   REALLY IS JUST CLAIM 1 BECAUSE THE PLAINTIFF ACKNOWLEDGE

9   THAT THE DEPENDENT CLAIM LIMITATIONS AT ISSUE ARE IN

10  HAKANSSON-1, SO IT IS JUST THE INDEPENDENT CLAIM THAT IS AT

11  PLAY THERE.

12          AND THEN FOR THEIR 103 OBVIOUSNESS DEFENSE, THEIR

13  PRIMARY REFERENCE IS HAKANSSON-2.  IT IS ASSERTED AGAINST

14  ALL CLAIMS, AND IT'S ASSERTED IN SEVERAL DIFFERENT WAYS.  IT

15  IS ASSERTED AS A STAND ALONE REFERENCE, AND THEN IT IS

16  ASSERTED IN VARIOUS COMBINATIONS WITH THE THREE OTHER

17  REFERENCES.

18          DO YOU WANT ME TO KEEP GOING?  THAT IS THE

19  OVERVIEW.

20          THE COURT:  TELL ME AT THIS TIME WHAT THE BURDEN

21  IS ON EACH OF THOSE ISSUES THAT REMAIN.

22          MR. CAPP:  SURE.  PLAINTIFF HAS THE BURDEN OF

23  PROOF ON INFRINGEMENT WHICH WE ARE PREPARED TO MEET.  OH,

24  AND THAT BURDEN IS PREPONDERANCE OF THE EVIDENCE.  ON THE

25  OTHER SIDE OF THE AISLE THE DEFENDANT HAS THE BURDEN OF

1    PROOF ON INVALIDITY, AND THAT IS A CLEAR AND CONVINCING

2    EVIDENCE STANDARD.

3             THE COURT:  BOTH ANTICIPATION AND OBVIOUSNESS?

4             MR. CAPP:  THAT IS CORRECT, YOUR HONOR.  AND

5    OBVIOUSNESS.

6             THE COURT:  AND THAT IS CLEAR AND CONVINCING?

7             MR. CAPP:  YES.  FOR ANY INVALIDITY DEFENSE, THAT

8    IS CLEAR AND CONVINCING EVIDENCE.

9             THE COURT:  ALL RIGHT.  LET'S TAKE UP -- I AM MORE

10   INTERESTED IN THE INVALIDITY DEFENSES OF ANTICIPATION AND

11   OBVIOUSNESS.  SO MR. HARBIN, ARE YOU GOING TO ADDRESS THOSE?

12            MR. HARBIN:  MR. SCHAETZEL IS GOING TO AN ADDRESS

13   THE ANTICIPATION, YOUR HONOR.  I AM GOING TO ADDRESS

14   OBVIOUSNESS.

15            THE COURT:  THAT IS FINE.  LET'S HEAR FROM THOSE,

16   AND THEN I WILL HEAR FROM MR. CAPP, AND THEN I WILL ALLOW A

17   BRIEF REPLY.  AND THEN IN THE TIME WE HAVE LEFT, MR. CAPP, I

18   WOULD LIKE TO HEAR FROM YOU ON THE INFRINGEMENT ISSUES.

19            MR. CAPP:  VERY GOOD, YOUR HONOR.

20            MR. SCHAETZEL:  BEFORE I START, AS TO THE

21   INFRINGEMENT, THERE IS ONE QUESTION THAT WOULD HELP US, I

22   THINK, AS WE WENT FORWARD TO ARGUE THAT.  AND THAT IS

23   WHETHER OR NOT IN RULING AT THE CLOSE OF THE EVIDENCE LAST

24   TIME, THE COURT ADDRESSED THE ISSUES OF CONTRIBUTORY

25   NEGLIGENCE, INFRINGEMENT, AND INFRINGEMENT BY INDUCEMENT.

```
1    IN THE CHART THAT YOU'VE BEEN SHOWN, WE USE THE WORD
2    "INFRINGEMENT," AND THAT IS THE WORD THAT WAS ALSO USED LAST
3    TIME.  IT IS OUR POSITION THAT CONTRIBUTORY INFRINGEMENT AND
4    INDUCEMENT OF INFRINGEMENT ARE STILL OPEN ISSUES AS TO ALL
5    OF THE PATENTS.  IF THIS WERE IN REFERENCE TO JUST DIRECT
6    INFRINGEMENT, I THINK WE ARE IN AGREEMENT.  BUT THAT IS ON
7    THE INFRINGEMENT ISSUE, ONE THING THAT WE WOULD LIKE TO GET
8    UNDERSTOOD AND CLARIFIED AT THIS TIME, SO THAT -- WE ARE
9    PREPARED TO ARGUE AS THE COURT WOULD LIKE, BUT WHEN WE GET
10   TO INFRINGEMENT, THAT WILL BE AN ISSUE.
11           THE COURT:  OKAY.  I WILL TRY TO REMEMBER IN THE
12   MEAN TIME.
13           MR. SCHAETZEL:  OKAY.
14           THE COURT:  IF I MAY THEN, YOUR HONOR, IF I COULD
15   GET THIS ON TO THE --
16           MR. SCHAETZEL:  THE FIRST ISSUE THAT WE WOULD LIKE
17   TO ADDRESS IN TERMS OF INVALIDITY, YOUR HONOR, IS THE LEVEL
18   OF ORDINARY SKILL IN THE ART AND SOME HISTORY AS TO HOW WE
19   GET THERE OR HOW WE'VE GOTTEN THERE IS IMPORTANT.  WHEN THIS
20   CASE STARTED, AND WHEN OUR FIRM FIRST GOT INVOLVED, THERE
21   WAS ONLY ONE LEVEL OF ORDINARY SKILL IN THE ART, THERE WAS
22   ALSO NO ENABLEMENT ISSUE.  THERE WAS ONLY THE RAISED ISSUES
23   OF OBVIOUSNESS.  AND THE LEVEL OF ORDINARY SKILL IN THE ART
24   THAT WAS PROMULGATED AT THAT TIME THAT WAS FIRST OFFERED BY
25   DR. DURKEE WAS A RELATIVELY LOW STANDARD OF ORDINARY SKILL
```

1    IN THE ART.  IT WAS STANDARDS OF ORDINARY SKILL THAT DID NOT

2    INCLUDE BIOREMEDIATION, OR THAT DID NOT INCLUDE

3    ENVIRONMENTAL SCIENCES.  IT ONLY LOOKED AT PARTS WASHING.

4    THE COURT ALLOWED US TO RAISE THE ISSUE OF ENABLEMENT.

5            WE RAISED THE ISSUE OF ENABLEMENT AFTER TAKING

6    DR. DURKEE'S DEPOSITION.  AT THAT DEPOSITION, WHEN TALKING

7    TO DR. DURKEE ABOUT HOW WOULD A PERSON OF THE LOWER SKILL,

8    HOW WOULD A PERSON THAT DOES NOT KNOW BIOLOGY, OR ANY

9    ENVIRONMENTAL SCIENCE, HOW WOULD THAT PERSON BE ABLE TO

10   CONDUCT THE EXPERIMENTS NECESSARY TO DETERMINE WHAT THE

11   RIGHT MICROORGANISM IS WITH THE RIGHT SURFACTANTS.

12   DR. DURKEE TESTIFIED THAT THAT PERSON OF ORDINARY SKILL IN

13   THE ART WOULD NOT.  THAT PERSON COULD NOT.  SO THE PLAINTIFF

14   THEN SAID, WELL, I WANT TO GO OUT AND GET AN EXPERT IN THE

15   ENVIRONMENTAL SCIENCES ART.  THE COURT PERMITTED THAT, AND

16   THAT WAS DR. BRICKEL.  DR. BRICKEL TESTIFIED THAT FOR

17   PURPOSES OF ENABLEMENT THERE IS A HIGHER LEVEL OF SKILL.

18   THAT HIGHER LEVEL OF SKILL IS ONE THAT INCLUDES

19   ENVIRONMENTAL SCIENCES, AND THAT LEVEL OF ORDINARY SKILL IS

20   ESSENTIALLY THE SAME AS THE LEVEL OF ORDINARY SKILL THAT

21   WALTER, THE DEFENDANTS IN THIS CASE, HAVE ARGUED FOR SINCE

22   THE BEGINNING.

23            FOR PURPOSES OF ENABLEMENT, THE PARTIES ARE IN

24   AGREEMENT, THAT IS A HIGHER LEVEL OF ORDINARY SKILL.

25   HOWEVER, NOW THAT THE ENABLEMENT ISSUE HAS BEEN RESOLVED BY

1    SUMMARY JUDGMENT, AT THIS STATE OF THE PROCEEDING THE

2    PLAINTIFF REVERTS BACK TO THE LOWER LEVEL FOR PURPOSES OF

3    OBVIOUSNESS.  WE ARGUE THAT THAT IS NOT RIGHT.  WE ARGUE

4    THAT THAT IS A WRONG STANDARD FOR THE COURT TO APPLY, FOR

5    SEVERAL REASONS.

6             FIRST, WE CAN LOOK AT THE PATENTS THEMSELVES.

7    THIS IS A COPY OF THE 110 PATENT AND, IN PARTICULAR, WE

8    WOULD ASK THE COURT TO LOOK AT COLUMN 1, LINE 37, SUMMARY OF

9    THE INVENTION.  BRIEFLY DESCRIBE THE PRESENT INVENTION

10   COMPRISES A PARTS WASHING SYSTEM CHARACTERIZED BY

11   COOPERATIVE INTERACTION AMONG A MECHANICAL COMPONENT, FLUID

12   COMPONENT --

13            THE COURT:  LET ME ASK YOU THIS.  THIS STUCK IN

14   THE BACK OF MY MIND.  I AM SORRY, I DON'T MEAN TO INTERRUPT

15   YOUR PRESENTATION.  WHAT WAS THE DATE FOR THE LEVEL OF

16   ORDINARY SKILL IN THE ART FOR THE ENABLEMENT?

17            MR. SCHAETZEL:  SORRY, WHAT WAS THE DATE?

18            THE COURT:  WHAT WAS THE DATE THAT ORDINARY SKILL

19   IN THE ART WOULD HAVE BEEN DETERMINED WITH REGARD TO THE

20   ENABLEMENT DEFENSE?

21            MR. SCHAETZEL:  UNDER SECTION BOTH 103 AND 112, I

22   BELIEVE IT WOULD BE AT THE TIME OF THE INVENTION.

23            THE COURT:  SO THERE IS NO DIFFERENCE IN THE DATE

24   OF THE ORDINARY SKILL IN THE ART WITH REGARD TO EITHER

25   ENABLEMENT OR INFRINGEMENT?

1        MR. SCHAETZEL:  I WOULD LIKE THE CHANCE TO DOUBLE
2   CHECK, BUT I THINK THAT IS CORRECT.
3        MR. CAPP:  THE PLAINTIFF DOES NOT AGREE WITH THAT,
4   YOUR HONOR.
5        THE COURT:  I WILL HEAR FROM YOU ON THAT IN JUST A
6   MINUTE THEN, OR WHEN WE GET TO THE -- LET'S RESERVE THAT TO
7   THE INFRINGEMENT ARGUMENT, AND THEN WE WILL GET TO THAT.  I
8   HAVE ENOUGH TO KEEP STRAIGHT IN MY MIND HERE.
9        MR. SCHAETZEL:  I KNOW OFFER THE TOP OF MY HEAD,
10  THAT SECTION 103 OBVIOUSNESS WOULD BE AT THE TIME OF THE
11  INVENTION.  SO THAT IS THE ONE UNDER SECTION 103 THAT I AM
12  CONTEMPLATING.
13        THE COURT:  RIGHT.  BUT I WOULD ASSUME THIS IS AN
14  AREA IN WHICH THE LEVEL OF ORDINARY SKILL IN THE ART MAY BE
15  CHANGING BECAUSE OF THE USE OF MICROORGANISMS.  BUT LET'S
16  DEAL WITH THE ANTICIPATION AND OBVIOUSNESS RIGHT NOW, AND WE
17  WILL GET TO THAT IN A MINUTE.
18        MR. SCHAETZEL:  OKAY.  THE LEVEL OF ORDINARY SKILL
19  IN THE ART AS IT PERTAINS TO THE PATENT INVENTION MUST
20  INCLUDE THE BIOLOGICAL COMPONENT.  THE PATENT ITSELF
21  REQUIRES IT.  THAT IS WHAT IS SHOWN IN COLUMN 1 AT LINE 59.
22  YOU HAVE A MECHANICAL COMPONENT, A FLUID COMPONENT, AND A
23  BIOLOGICAL COMPONENT.  AND THE SPECIFICATION PROVIDES THAT
24  THESE ARE INTERACTIVE -- A COOPERATIVE INTERACTION AMONG
25  THOSE THREE.  THE LEVEL OF ORDINARY SKILL IN THE ART THAT IS

1   BEING PROMULGATED BY THE DEFENDANTS IN THIS CASE IGNORES

2   THAT BIOLOGICAL COMPONENT.  IT SAYS THAT A PERSON OF

3   ORDINARY SKILL IN THE ART WOULD BE A PARTS WASHER WHO

4   DOESN'T KNOW ANYTHING ABOUT THE BIOLOGICAL COMPONENT.

5   THAT'S NOT CONSISTENT WITH WHAT IS IN THE CLAIM LANGUAGE OF

6   THE PATENT.

7           AT COLUMN 4, LINE 49, AND AGAIN WE ARE REFERRING

8   TO THE 110 PATENT, THE SPECS BEING ESSENTIALLY THE SAME FOR

9   THREE OF THE FOUR PATENTS, AND PRETTY MUCH FOR THE 226 AS

10  WELL.  AT LINE 49 OF COLUMN 4, THE BIOLOGICAL COMPONENT IS

11  DEFINED, ITS PREFERABLY IN THE FORM OF MICROORGANISMS THAT

12  BIODEGRADE ORGANIC COMPOUNDS SUCH AS, FOR EXAMPLE, AND NOT

13  LIMITATION, AND IT LISTS THE COMPOUNDS THAT THE

14  MICROORGANISMS CAN BIODEGRADE.  WHEN WE GET DOWN TO LINE 60,

15  ACCEPTABLE MICROORGANISMS, FOR EXAMPLE, ARE THOSE FROM THE

16  GENERA BACILLUS, PSEUDOMONUS, AND FLAVUM BACTERIA.  SUITABLE

17  SPECIES ARE WELL KNOWN AND REPORTED IN THE ART.  THE ART

18  THAT IS BEING REFERRED TO THERE NECESSARILY INCLUDES

19  BIOLOGY.  BECAUSE THE PERSON OF ORDINARY SKILL IS GOING TO

20  GO BACK UP INTO WHAT IS EARLIER IN THE PARAGRAPH, AND WE ARE

21  GOING TO ATTRIBUTE TO THAT PERSON KNOWLEDGE OF HOW TO GO

22  ABOUT DETERMINING APPROPRIATE MICROORGANISMS TO ADDRESS THE

23  GREASES AND SO ON AND SO FORTH, THE ORGANICS THAT ARE LISTED

24  THERE.  SO THE PATENT ITSELF REQUIRES THAT THE BIOLOGICAL

25  COMPONENT BE A PART OR ONE OF THE SKILL SETS THAT THE PERSON

1    OF ORDINARY SKILL IN THE ART HAS.

2           THE STATUTE REQUIRES, SECTION 103 A OF THE PATENT

3    STATUTE, A PATENT MAY NOT BE OBTAINED THOUGH THE INVENTION

4    IS NOT IDENTICALLY DISCLOSED OR DESCRIBED AS SET FORTH IN

5    SECTION 102.  THE DIFFERENCE BETWEEN THE SUBJECT MATTER

6    SOUGHT TO BE PATENTED, THE PARAGRAPH IDENTIFIES THE SUBJECT

7    MATTER AT ISSUE AS THE SUBJECT MATTER SOUGHT TO BE PATENTED.

8    THAT IS IMPORTANT BECAUSE WHEN WE CARRY ON TO THE SENTENCE

9    IT DEFINES THE LEVEL OF ORDINARY SKILL.  THE DIFFERENCES

10   BETWEEN THE SUBJECT MATTER SOUGHT TO BE PATENTED AND THE

11   PRIOR ART ARE SUCH THAT THE SUBJECT MATTER AS A WHOLE WOULD

12   HAVE BEEN OBVIOUS AT THE TIME THE INVENTION WAS MADE TO A

13   PERSON HAVING ORDINARY SKILL IN THE ART, TO WHICH SAID

14   SUBJECT MATTER PERTAINS.

15           AGAIN, THE USE OF THE WORD "SUBJECT MATTER" THERE

16   RELATES BACK TO THE SUBJECT MATTER SOUGHT TO BE PATENTED.

17   WHEN WE LOOK AT THE CLAIMS OF THE 110 PATENT OR ANY OF THE

18   OTHER PATENTS, IN EACH CASE THE SUBJECT MATTER SOUGHT TO BE

19   PATENTED INCLUDES A BIOLOGICAL COMPONENT.  IT INCLUDES

20   MICROORGANISMS, IT INCLUDES MICROORGANISMS THAT CAN SURVIVE

21   AND THRIVE IN SURFACTANT AND, AS A RESULT, THE PATENT AND

22   THE STATUTE BOTH REQUIRE A HIGHER LEVEL OF ORDINARY SKILL IN

23   THE ART WHERE THE PERSON KNOWS SOMETHING OR HAS THE

24   BIOLOGICAL ENVIRONMENTAL SCIENCE AND SKILL SET.

25           THE PLAINTIFF HAS FOUND NO LAW THAT SUPPORTS THE

1    BIFURCATED HIGH LEVEL FOR ENABLEMENT, LOW LEVEL FOR

2    OBVIOUSNESS SYSTEM OR APPROACH.  THE CASE LAW THAT HAS BEEN

3    CITED TO THE COURT ARE CASES THAT RELATE TO ENABLEMENT.

4    THEY ARE NOT CASES THAT IN ONE CASE OR, YOU KNOW, A COURT

5    LOOKED AT BOTH ISSUES AND IN ONE INSTANCE APPLIED A HIGHER

6    LEVEL OF SKILL IN THE ART, THEN A LOWER LEVEL OF SKILL IN

7    THE ART FOR OBVIOUSNESS.  THE NAQUIN CASE, THE ENZO BIOCHEM

8    CASE ARE CASES THAT RELATE DIRECTLY TO ENABLEMENT.

9    NEVERTHELESS, CHEMFREE, AS IT ARGUED FOR ENABLEMENT, SAID I

10   CAN HAVE A TEAM, AND THAT IS PART OF WHAT THE COURT FOUND ON

11   SUMMARY JUDGMENT, THAT THE PERSON OF ORDINARY SKILL IN THE

12   ART COULD GO OUT TO TALK TO SOMEONE WHO HAD THE REQUISITE

13   SKILL THAT WOULD BE NEEDED IN THE ENVIRONMENTAL SCIENCES

14   PART.  SO THAT PERSON WAS PART OF A TEAM THAT WOULD COMPRISE

15   LEVEL OF ORDINARY SKILL IN THE ART.  THERE IS NOTHING IN THE

16   CASES THAT HAVE BEEN CITED TO THE COURT THAT SAY, WELL, IF

17   YOU BUILD A TEAM FOR ENABLEMENT, WHEN YOU GET TO THE

18   OBVIOUSNESS INQUIRY YOU GET TO DROP ONE OF THE PEOPLE OFF

19   THE TEAM, YOU GET TO FORGET THAT, YOU GET TO TAKE THAT

20   PERSON AWAY.

21          IN TERMS OF OUR HIGHER LEVEL OF ORDINARY SKILL IN

22   THE ART, ONE THAT INCLUDES ENVIRONMENTAL SCIENCE, THE

23   PLAINTIFF ARGUES THAT WE ARE LOOKING FOR SOME SORT OF AN

24   ESTABLISHED ART, AND THAT THERE WAS NO ESTABLISHED ART, THAT

25   THIS WAS A COMBINATION OF TWO DISPARATE TECHNOLOGIES, WHO

1   TOOK CHEMISTRY OR BIOCHEMISTRY AND PUT IT TOGETHER WITH

2   PARTS WASHING, AND THAT THERE WAS NO ESTABLISHED ART.  THAT

3   IS NOT REALLY OUR ARGUMENT.  OUR ARGUMENT IS THAT UNDER

4   SECTION 103 OF THE PATENT STATUTE, WHAT MATTERS IS THE

5   SUBJECT MATTER SOUGHT TO BE PATENTED AND THE SUBJECT MATTER

6   HERE SOUGHT TO BE PATENTED INCLUDES THE BIOLOGICAL

7   COMPONENT, AND THEREFORE THE HIGHER LEVEL OF ORDINARY SKILL

8   IN THE ART APPLIES.

9            BUT THERE IS ONE LAST REASON WHY WE WOULD URGE THE

10  COURT TO ADOPTED THE HIGHER LEVEL OF ORDINARY SKILL.  AND

11  IT'S, IF YOU WILL, THE EQUITY OF THE SITUATION IN TERMS OF

12  THE PATENT BARGAIN THAT IS STRUCK WITH THE PATENT OFFICE.

13           I GO BACK TO COLUMN FOUR.  AND IN PARTICULAR LINE

14  63.  "SUITABLE SPECIES ARE WELL KNOWN AND REPORTED IN THE

15  ART."  BY MAKING THAT STATEMENT, IN TERMS OF OBTAINING THEIR

16  PATENT, THE INVENTORS WENT TO THE PATENT OFFICE AND SAID, WE

17  DON'T NEED TO TELL YOU ANY MORE ABOUT THAT, BECAUSE THAT IS

18  WITHIN THE SKILL SET OF THE PERSON OF ORDINARY SKILL IN THE

19  ART.  WE DON'T NEED TO LIST OUT ALL OF THE THINGS THAT YOU

20  WOULD NEED TO DO TO DETERMINE WHAT IS AN ACCEPTABLE SPECIES

21  OR WHAT IS AN ACCEPTABLE MICROORGANISM.  THAT IS PART OF THE

22  DEAL THAT THEY CUT, THAT THEY DIDN'T HAVE TO DO ANY MORE.

23           NOW, IN THE OBVIOUSNESS INQUIRY, THEY ARE TRYING

24  TO WITHDRAW FROM THAT.  IN EFFECT, THEY ARE TRYING TO SAY WE

25  DIDN'T HAVE TO TELL YOU ABOUT IT TO GET THE PATENT, BUT WE

1    SHOULD STILL GET THE BENEFIT OF A LOWER LEVEL OF ORDINARY

2    SKILL IN THE ART, A PERSON WHO WOULDN'T UNDERSTAND A

3    SUITABLE SPECIES OR WOULDN'T KNOW WHAT IS REPORTED IN THE

4    ART, WE SHOULD GET THE BENEFIT OF THAT LOWER STANDARD.  THAT

5    IS CONTRARY TO THE BARGAIN THAT WAS STRUCK WITH THE PATENT

6    OFFICE IN TERMS OF OBTAINING PATENTS IN THIS CASE.

7            AS A RESULT, WE BELIEVE THAT THE HIGHER LEVEL OF

8    SKILL IS THE MORE APPROPRIATE LEVEL AND THAT IS THE ONE THAT

9    SHOULD BE APPLIED, AND THAT IS IMPORTANT BECAUSE, AS THE

10   COURT LOOKS AT THE OBVIOUSNESS ISSUE, AS THE COURT LOOKS AT

11   HAKANSSON-2, THE PERSON OF ORDINARY SKILL IN THE ART WILL

12   READ, THAT HAS THE HIGHER LEVEL OF SKILL, WILL READ MORE

13   INSIGHTFULLY, IF YOU WILL, INTO HAKANSSON-2, WILL SEE ALL OF

14   WHAT IS THERE; WHEREAS THE PERSON OF ORDINARY SKILL IN THE

15   ART THAT DOESN'T HAVE THAT BACKGROUND, AS ADVOCATED BY THE

16   PLAINTIFF, ARGUABLY MAY MISS SOMETHING.  THERE ARE CERTAIN

17   THINGS THAT WE THINK BOTH PERSONS, REGARDLESS OF THEIR

18   LEVEL, WOULD GET.  BUT ESPECIALLY AS TO BIOLOGICAL

19   COMPONENT, WE THINK THE APPROPRIATE STANDARD IS THE HIGHER

20   LEVEL OF ORDINARY SKILL.  WHICH BRINGS US TO THE FIRST

21   INVALIDITY ARGUMENT, WHICH IS ANTICIPATION OF THE 226

22   REFERENCE.

23            THE COURT:  YOU ARE ARGUING FROM COLUMN 4, LINE 63

24   OF --

25            MR. SCHAETZEL:  THE 110 PATENT, YOUR HONOR.  AS

1    MR. CAPP INDICATED, THERE ARE THREE CLAIMS THAT ARE AT ISSUE

2    HERE, 1, 3, AND 4.  CLAIMS 3 AND 4 ARE REALLY NOT A

3    CONSIDERATION BECAUSE THE PARTIES ARE IN AGREEMENT THAT

4    HAKANSSON TEACHES WHAT IS IN 3 AND 4, SO WE REALLY NEED TO

5    FOCUS ONLY ON CLAIM 1.  WHAT WE HAVE TRIED TO SET UP, YOUR

6    HONOR, IS THE DIAGRAM THAT WE WORKED WITH IN THE COURTROOM

7    AT TRIAL.  TO YOUR LEFT, WHICH REPRESENTS THE HAKANSSON-2

8    REFERENCE, AND THE CLAIM, CLAIM 1, THAT IS ON THE SCREEN.

9            CLAIM 1 HAS SIX STEPS.  NOW, IN TERMS OF THE

10    ANTICIPATION ANALYSIS, IT CAN BE CONSIDERED THE FLIP SIDE OF

11    INFRINGEMENT.  THERE IS A MAXIM THAT I AM SURE I WILL

12    MISSTATE, BUT THE IDEA IS IF YOU CAN FIND IT IN THE PRIOR

13    ART THE CLAIM READS ON IT, THEN THAT WILL INVALIDATE THE

14    CLAIM AS AN ANTICIPATION, MUCH AS YOU WOULD TRY TO READ THE

15    CLAIM ON INFRINGEMENT AS THE PLAINTIFF DOES OUR PROCESS.  SO

16    IT IS HELPFUL TO TRY AND READ CLAIM 1 ONTO THE HAKANSSON-2

17    REFERENCE BECAUSE THAT WILL SHOW US THAT HAKANSSON-2 IN FACT

18    DOES ANTICIPATE EACH ELEMENT OF THESE CLAIMS, OR OF THIS

19    CLAIM.  AND IN FACT, THERE IS ONLY ONE ELEMENT THAT IS

20    REALLY IN DISPUTE.

21            FIRST OF ALL, IN HIS CHARTS, DR. DURKEE CONCEDED

22    THAT ELEMENTS A, E, AND F, THE FIRST AND THE LAST TWO, ARE

23    FOUND IN HAKANSSON.  THOSE THREE ARE NOT IN DISPUTE.  SO WE

24    CAN FOCUS ON B, C, AND D.  HERE IS HOW IT WOULD WORK.  A,

25    PLACE AT LEAST ONE PART IN A FIRST CHAMBER.  THIS ONE IS NOT

1    IN DISPUTE.  YOU WOULD PLACE A PART INTO THE WASHING TANK OF

2    HAKANSSON-2, CIRCULATE A CLEANING FLUID FROM THE SECOND

3    CHAMBER TO THE FIRST CHAMBER TO WASH THE SURFACES OF THE

4    PART IN CONTACT WITH THE SAID CLEANING FLUID REMOVING

5    ORGANIC MATTER.  DR. DURKEE HAD SOME TROUBLE WITH THIS ONE.

6              FIRST OF ALL, WE HAVE A SECOND CHAMBER.  THAT IS

7    WHERE THE FLUID IS RETAINED.  THAT IS THE SUPPLY, IF YOU

8    WILL, OF THE CLEANING FLUID, AND THAT IS CIRCULATED INTO THE

9    WASHING TANK WHERE IT IS SPRAYED AGAINST THE PART THAT IS

10   THERE TO CLEAN THE PART.  THE PROBLEM THAT DR. DURKEE HAD

11   WAS HE SAID, WELL, WAIT A MINUTE, IT'S A TWO-LEVEL

12   CIRCULATION.  NOT ONLY DOES IT GET CIRCULATED TO THE WASHING

13   TANK AND THEN EVENTUALLY BACK INTO ITS STORAGE FACILITY OR

14   STORAGE TANK, IT ALSO CIRCULATES WITHIN THIS TANK.  THAT IS

15   TRUE.  IT DOESN'T CHANGE THE FACT THAT YOU STILL CIRCULATE

16   THE CLEANING FLUID FROM A SECOND CHAMBER, THE STORAGE

17   CHAMBER, TO A FIRST CHAMBER, AND THEN BACK TO THE STORAGE

18   CHAMBER.

19             IN OTHER WORDS, THE FACT THAT THERE IS ANOTHER

20   CIRCULATION IN THERE DOESN'T CHANGE THE FACT THAT YOU HAVE

21   THE PRIMARY CIRCULATION FROM ONE TANK TO THE NEXT.  SO

22   HAKANSSAN-2 DOES IN FACT SHOW THAT.  AND WE CONTEND THAT

23   DR. DURKEE ADMITTED THAT ON EXAMINATION, PRINCIPALLY AT PAGE

24   476 LINES 4 THROUGH THE END OF THE PAGE.

25             THERE IS ANOTHER LIMITED -- LET'S SKIP C TO COME

1    BACK TO IT, AND GO TO D, BECAUSE THAT ONE -- THERE IS SOME

2    DISCUSSION ABOUT THAT ONE AS WELL WITH DR. DURKEE.  D,

3    DRAINING THE CLEANING LIQUID FROM THE FIRST CHAMBER INTO THE

4    SECOND CHAMBER.  NOW, IN THE PATENT, THE WAY THAT HAPPENS,

5    IS YOU ARE WASHING THE PART UP IN THE SINK AND THE FLUID

6    DRAINS DOWN INTO THE TANK BELOW.  THAT IS DRAINING.

7         DR. DURKEE'S POINT IS, WELL, HERE YOU HAVE A PUMP

8    IN THE MIDDLE.  YOU HAVE A PUMP THAT IS A PART OF THE

9    PROCESS.  DR. DURKEE CONCEDED THAT WHAT WOULD HAPPEN IS YOU

10   WOULD DRAIN, ONCE THE FLUID WAS THROUGH WORKING ON THE PART,

11   YOU WOULD DRAIN TO THE PUMP AND THEN THE PUMP WOULD DIRECT

12   THE FLUID BACK UP INTO THE STORAGE TANK.  THERE IS NOTHING

13   IN THE PATENT AND THERE IS NOTHING IN THIS LANGUAGE THAT

14   SAYS DRAIN HAS TO BE DONE BY GRAVITY.  THAT WAS DR. DURKEE'S

15   ASSUMPTION.  HE JUST LOOKED AT WHAT HAPPENS IN THE CHEMFREE

16   DEVICE WHERE IT JUST FALLS FROM THE SINK INTO THE TANK BELOW

17   AND APPLIED THAT.  BUT WHEN YOU LOOK AT THE LANGUAGE AND THE

18   LANGUAGE IN THE SPECIFICATION, THERE IS NOTHING THAT SAYS

19   THE DRAIN, AS IT WOULD BE IN A SWIMMING POOL, WHEN YOU PUMP

20   OR YOU DRAIN A SWIMMING POOL OF WATER, NOTHING THAT SAYS YOU

21   COULDN'T USE "DRAIN" IN THAT CONTEXT.  THAT'S WHY WE CONTEND

22   THAT DRAINING THE CLEANING LIQUID FROM THE FIRST CHAMBER

23   WHERE THE PART IS TO THE SECOND CHAMBER WHICH THE STORAGE

24   TANK IS MET BY THIS ELEMENT.

25         WE BELIEVE THAT DR. DURKEE ESSENTIALLY AGREED WITH

1    THAT.  HE CERTAINLY AGREED THAT YOU DRAIN FROM THE WASHING

2    TANK TO THE PUMP, BUT THEN AS HE POINTED OUT IN HIS

3    POSITION, HE PUMPED IT OR HAKANSSAN-2 PUMPS IT BACK INTO THE

4    STORAGE TANK, AND THAT IS A DISTINCTION WITHOUT A

5    DIFFERENCE.  THE DRAINING CAN INCLUDE THAT PUMP.

6            WHICH TAKES US TO THE POINT WHICH IS THE GREATEST

7    CONTENTION I THINK BETWEEN THE PARTIES, THAT IS ELEMENT C,

8    "PASSING THE CLEANING FLUID THAT HAD CONTACTED THE PART

9    THROUGH A POROUS MEDIUM."  STATED ANOTHER WAY, DOES

10   HAKANSSON-2 DISCLOSE A FILTER?  IS THAT SHOWN IN

11   HAKANSSON-2?  IT IS ADMITTED BY THE DEFENDANTS THAT THERE IS

12   NO, IF YOU WILL, IN THE DRAWING, YOU CAN'T GO TO A DRAWING

13   IN HAKANSSON-2 AND SAY ITEM "X" IS THE FILTER.  IT IS NOT

14   SHOWN IN THAT WAY.  WITHOUT QUESTION, IT'S NOT SHOWN.

15   HOWEVER, HAKANSSON-2 DOES HAVE LANGUAGE THAT SAYS A PERSON

16   OF ORDINARY SKILL IN THE ART, REGARDLESS OF WHETHER IT IS

17   HIGH OR LOW, WOULD UNDERSTAND THAT A FILTER IS USED.  THIS

18   IS THE ABSTRACT TO HAKANSSON-2, THE FIRST PAGE OF THE

19   HAKANSSON-2 REFERENCE.

20           THE INVENTION RELATES TO A DEVICE FOR CLEANING

21   OBJECTS, PREFERABLY OF METAL, SO WE ARE TALKING ABOUT METAL

22   ITEMS, FOR REMOVAL OF CONTAMINANTS SUCH AS OIL, GREASE,

23   SOLID PARTICLES AND THE LIKE BY USING A WASHING LIQUID

24   CONTAINING, AND IT GOES ON TO TALK ABOUT A BIOREMEDIATING

25   WASH AND SO ON AND SO FORTH.  AND THE KEY LANGUAGE THERE AND

1    THE REFERENCE, A PERSON OF ORDINARY SKILL IN THE ART WOULD

2    REALIZE THERE IS A FILTER INHERENTLY USED AND DISCLOSED IN

3    THIS REFERENCE HAKANSSON-2 IS BECAUSE OF THE LANGUAGE "SOLID

4    PARTICLES."

5         THE ABSTRACT ISN'T THE ONLY PLACE THAT MENTIONED

6    SOLID ARTICLES.  CLAIM 1 OF THIS PUBLICATION, AS IT WAS

7    FILED, REFERENCES THIS SAME LANGUAGE AS TO SOLID PARTICLES.

8    THE PERSON OF ORDINARY SKILL IN THE ART, AND PERHAPS EVEN

9    MORE SO THE PERSON OF LOWER SKILL IN THE ART, WHO WAS MORE

10   FOCUSED ON THE MACHINERY OR THE MECHANICS OF IT, WOULD

11   RECOGNIZE, AS DR. DURKEE DID, THAT YOU WOULD WANT TO PROTECT

12   THAT PUMP.  YOU HAVE SOLID PARTICLES IN THIS WASHING TANK

13   THAT ARE BEING TAKEN AWAY, AND YOU DON'T WANT TO HAVE TO

14   REPLACE THE PUMP, YOU DON'T WANT TO CAUSE DAMAGE TO THE

15   PUMP, SO WHAT WILL YOU DO?  YOU WILL FILTER OUT THE SOLID

16   PARTICLES.

17        HAKANSSON-2 INHERENTLY DISCLOSES ELEMENT C OF THE

18   REFERENCE CLAIM, PASSING THE CLEANING FLUID THAT HAD

19   CONTACTED THE PART THROUGH A POROUS MEDIUM.  POROUS MEDIUM

20   IS THERE IN THE CHEMFREE REFERENCE IN ORDER TO CATCH

21   PARTICLES AND KEEP IT OUT OF THE TANK BELOW.  A POROUS

22   MEDIUM, A FILTER, WOULD BE USED IN THE SAME WAY IN

23   HAKANSSON-2 TO PROTECT THAT PUMP.  IT COULD BE PUT IN ANY

24   ONE OF A NUMBER OF PLACES, AND THE CLAIM DOESN'T SPECIFY

25   WHERE IT HAS TO BE.  IT SIMPLY CALLS FOR THE STEP OF PASSING

1     THE CLEANING FLUID THAT HAD CONTACT WITH THE PART THROUGH A

2     POROUS MEDIUM.

3           WE REFERENCED IN OUR PAPERS, YOUR HONOR, WHERE

4     DR. DURKEE WAS THE ONE WHO SAID THAT A PERSON OF ORDINARY

5     SKILL IN THE ART, AS HE DEFINED, LOWER LEVEL OF ORDINARY

6     SKILL IN THE ART, WOULD WANT TO PROTECT THAT PUMP.  THAT

7     DESIRE, COUPLED WITH THAT KNOWLEDGE OF MECHANICS, SAYS THERE

8     IS A FILTER INHERENTLY DISCLOSED IN IT.  THE REASON THAT

9     THAT IS IMPORTANT FOR BOTH ANTICIPATION AND OBVIOUSNESS, AS

10     MR. HARBIN ADDRESSES IT, IS THAT WHAT HAS HAPPENED IN THIS

11     SITUATION IS THAT THE HAKANSSON-2 REFERENCE IS MORE

12     SOPHISTICATED, IF YOU WILL, IT IS MORE COMPLEX, IT HAS MORE

13     BELLS AND WHISTLES THAN WHAT IS BEFORE THE COURT IN TERMS OF

14     THE CHEMFREE PATENTS.  THE HAKANSSON REFERENCE IS, IF YOU

15     WILL, A STEP AHEAD.  THE ART HAS ALREADY ADVANCED BEYOND

16     WHAT IS IN THE CHEMFREE PATENTS BECAUSE HAKANSSON-2

17     DISCLOSES BIOREMEDIATION, HAS MICROORGANISMS, HAS A

18     SURFACTANT, HAS A CLEANING FLUID, HAS A MECHANICAL

19     COMPONENT.

20          A MECHANICAL COMPONENT THAT IS FAR MORE COMPLEX,

21     FAR MORE SOPHISTICATED THAN THAT PRESENTLY BEFORE THE COURT

22     IN THE CHEMFREE PATENTS, AND IT HAS A FLUID COMPONENT.

23     HAKANSSAN-2 INCLUDES ALL THREE.  AND OUR POSITION IS THAT

24     HAKANSSAN-2 INHERENTLY DISCLOSES EACH OF THESE ELEMENTS, BUT

25     IN PARTICULAR ELEMENT C, WHICH IS THE POROUS MEDIUM.

1          THAT'S ALL WE HAVE AT THIS STAGE.  THANK YOU FOR
2     YOUR PATIENCE.
3          THE COURT:  OKAY.
4          MR. CAPP:  IF IT PLEASES THE COURT, I WOULD LIKE
5     TO START WITH DIRECTING THE COURT'S ATTENTION TO
6     MR. SCHAETZEL'S COMMENTS AND ORDINARY SKILL IN THE ART.
7     NOW, ORDINARY SKILL IN THE ART IS ONE OF THE FOUR GRAHAM
8     FACTORS THAT APPLIES TO THE OBVIOUSNESS ANALYSIS.  AND AS
9     MR. SCHAETZEL -- MR. HARBIN WILL ARGUE OBVIOUSNESS, BUT THEN
10    HE STARTS HIS ANTICIPATION PRESENTATION WITH ONE OF THE
11    GRAHAM FACTORS FOR THE OBVIOUSNESS ANALYSIS, WHICH IS THE
12    ORDINARY LEVEL OF SKILL IN THE ART.  THE PROBLEM THAT WE
13    HAVE HERE, AND MR. SCHAETZEL'S APPROACH, AND WE'VE BEEN
14    DOING A LITTLE DELICATE DANCE ON THIS FOR ABOUT TWO YEARS
15    NOW, WHAT THE DEFENDANT WANTS TO DO IS CHANGE THE SHAPE OF
16    THE PLAYING FIELD AND THEN PLAY THE GAME ON A PLAYING FIELD
17    THAT DOESN'T REALLY EXIST, IT DOESN'T REFLECT REALITY.
18          SO WHAT WE NEED TO DO IS START WITH THE STATUTE,
19    WHICH IS 35 USC 103.  PULL UP SLIDE 27.  THE MOST IMPORTANT
20    PART OF THIS STATUTE FOR US IS, LET ME JUST READ THE WHOLE
21    FIRST SENTENCE, AND I'LL LEAVE OFF THE SECOND SENTENCE.
22    "THE PATENT MAY NOT BE OBTAINED THROUGH THE INVENTION IS NOT
23    DISCLOSED OR DESCRIBED AS SET FORTH IN SECTION 102 OF THIS
24    TITLE, IF THE DIFFERENCES BETWEEN THE SUBJECT MATTER SOUGHT
25    TO BE PATENTED AND THE PRIOR ART ARE SUCH THAT THE SUBJECT

1    MATTER AS A WHOLE WOULD HAVE BEEN OBVIOUS AT THE TIME THE

2    INVENTION WAS MADE TO A PERSON OF ORDINARY SKILL IN THE ART

3    TO WHICH SAID SUBJECT MATTER PERTAINS."  PATENTABILITY SHALL

4    NOT BE NEGATIVED BY THE MANNER IN WHICH THE INVENTION WAS

5    MADE.

6              AND THE GAMING THAT HAS BEEN GOING ON IN THIS CASE

7    HAS BEEN GOING ON FOR TWO YEARS NOW HAS BEEN OVER WHAT IT

8    MEANS TO HAVE ART TO WHICH SAID SUBJECTED MATTER PERTAINS.

9    THE DEFENDANT KEEPS WANTING TO SAY ORDINARY SKILL IN THE

10   ART, ORDINARY SKILL IN THE ART.  AND THEY NEVER REALLY TRY

11   TO DEFINE WHAT THAT ART WAS.  NOW, YES, WHEN YOUR HONOR

12   DECIDED ENABLEMENT, AND I BELIEVE DECIDED IT CORRECTLY, YOU

13   APPLIED THE PREVAILING LAW WHICH INCLUDED THE NAQUIN CASE,

14   THE ENZO BIOCHEM CASE, AND DETERMINED THAT TO PRACTICE THE

15   INVENTION, PEOPLE OF ORDINARY SKILL IN THE ART, READING THE

16   SPECIFICATION, WOULD THEN GO OUT AND GATHER THE

17   PRACTITIONERS WHO CAN THEN APPLY THE TEACHINGS, AND IF THAT

18   REQUIRES A TEAM, YOU CAN ASSEMBLE A TEAM.  THAT'S THE LAW.

19             WHAT MR. SCHAETZEL IS ASKING THE COURT TO DO IS TO

20   SAY, SINCE YOU CAN DO THAT FOR ENABLEMENT, THEREFORE YOU

21   ALSO HAVE TO TAKE THAT APPROACH FOR OBVIOUSNESS.  AND HE

22   TOOK ME TO TASK FOR NOT CITING TO YOU LEGAL AUTHORITY THAT

23   SUPPORTED MY POSITION.  AND IF YOU REMEMBER MY CLOSING

24   ARGUMENT FROM THE RULE 52 C MOTION, I TOLD YOU CANDIDLY THAT

25   I HAD RESEARCHED, AND I HAD RESEARCHED, AND I HAD RESEARCHED

1   AND HAD BEEN UNABLE TO FIND ANY CASE ANYWHERE THAT SAID YOU

2   COULD ASSEMBLE A TEAM OF PRACTITIONERS FOR PURPOSES OF A 35

3   USC SECTION 103 OBVIOUSNESS CASE.

4          AND I HAD CHALLENGED THE DEFENDANT, ONCE AGAIN, IF

5   THERE WAS SUCH AUTHORITY, PLEASE BRING IT TO EVERYONE'S

6   ATTENTION.  I POINTED THAT OUT IN 2008, I POINTED IT OUT IN

7   2009, AND NOW WE ARE IN THE MIDDLE OF 2010.  THEY HAVE HAD

8   TEN MONTHS SINCE THE TRIAL ENDED TO GO OUT AND RESEARCH TO

9   FIND ONE CASE, ONE LAW REVIEW ARTICLE, ONE TREATISE, ONE

10  ANYTHING THAT SUGGESTED THAT THE PERSON OF ORDINARY SKILL IN

11  THE ART FOR 103 CAN BE PERSONS, IN THE PLURAL.

12         NOW, IF YOU REMEMBER WHEN I HAD DR. ADRIAENS ON

13  THE STAND ON CROSS-EXAMINATION, ADRIAENS WAS THE DEFENDANT'S

14  EXPERT WITNESS.  I ASKED HIM, POINT BLANK, ARE YOU AWARE OF

15  ANY COMPANY THAT WAS MAKING BIOREMEDIATION PARTS WASHERS IN

16  1994, AND HIS ANSWER WAS NO.  AS FAR AS WE KNOW, AS FAR AS

17  ANYONE HAS BEEN ABLE TO DETERMINE, THE FIRST BIOREMEDIATION

18  PARTS WASHER THAT WAS SUCCESSFULLY COMMERCIALIZED WAS THAT

19  OF THE INVENTOR, CHEMFREE.  WHAT WE SEE IN HAKANSSON IS ONE

20  OF TWO PAPER PATENTS BY SOMEBODY IN SWEDEN BY THE NAME OF

21  HAKANSSON, AND NOW THE ARGUMENT BEING RAISED BY THE

22  DEFENDANTS IS THIS:  BECAUSE MR. HAKANSSON SAT DOWN AND

23  WROTE A PAPER PATENT IN 1988, THEREFORE IN 1994 THERE MUST

24  HAVE BEEN PRACTITIONERS OF ORDINARY SKILL IN WHATEVER ART IS

25  DESCRIBED IN MR. HAKANSSON'S 1988 PAPER PATENT.  I CAN'T GET

1    THERE FROM HERE, AND I HAVE NO AUTHORITY TO SUPPORT THAT

2    PROPOSITION.  I CAN'T GET THERE.

3            SO WHAT WE HAVE IS, WHEN WE GET TO THE LEVEL,

4    LEVEL OF ORDINARY SKILL IN THE ART, WE HAVE BASICALLY TWO

5    CHOICES HERE.  WE CAN GO WITH A PARTS WASHING PRACTITIONER

6    AND THOSE PEOPLE, ORDINARY PRACTITIONERS AT THE TIME OF THE

7    INVENTION IN THE PARTS WASHING ART HAD LITTLE OR NO

8    BIOREMEDIATION EXPERTISE.  THAT IS JUST A FACT.  THE ONLY

9    WITNESS THAT HAS TESTIFIED WHO WAS KNOWLEDGEABLE ABOUT THAT

10   INDUSTRY WAS DR. DURKEE, AND HE WAS VERY CLEAR THAT THE

11   ORDINARY PRACTITIONER DIDN'T HAVE THAT EXPERTISE AT THE

12   TIME.  THIS IS A SMALL INDUSTRY, SMALL PLAYERS, MOM AND POP,

13   THEY DON'T HAVE A LOT OF R & D, THE TECHNOLOGY WAS FAIRLY

14   UNSOPHISTICATED.  SO THAT IS OPTION NUMBER ONE.

15           AND THEN YOU GO TO OPTION NUMBER TWO, WHICH WOULD

16   BE A BACHELORS DEGREE ENGINEER IN ENVIRONMENTAL SCIENCES.

17   THE PROBLEM WITH THAT IS, NO ONE IN ENVIRONMENTAL SCIENCES

18   IS DOING, YOU KNOW, TOXIC SPILL CLEAN-UP OR CREATING

19   BIOREACTORS HAS ANY PARTS WASHING EXPERTISE.  SO THEY DON'T

20   KNOW HOW TO MAKE THINGS CLEAN.  THEY DON'T UNDERSTAND THE

21   CHEMISTRY OF CLEANING AND WHAT GOES INTO THAT.  SO THEN YOU

22   GO TO OPTION NUMBER THREE, WHICH IS SOME COMBINATION OF THE

23   TWO.

24           AND YES, THERE IS LAW THAT YOU CAN HAVE THE

25   COMBINATION FOR PURPOSES OF ENABLEMENT.  IF THERE WAS

1    AUTHORITY THAT YOU COULD HAVE HAD A COMBINATION FOR

2    OBVIOUSNESS, I WOULD HAVE BROUGHT IT TO YOUR HONOR'S

3    ATTENTION AND I WOULD HAVE TRIED THE CASE THAT WAY.  I TRIED

4    THE CASE BASED ON THE LAW OF THE WAY IT APPEARS TO ME, AND

5    THAT IS THE PREDOMINANT FIELD OF THIS INVENTION IS THE FIELD

6    OF PARTS WASHING.

7            AND THE PRACTITIONERS IN THE FIELD OF PARTS

8    WASHING, WHICH IS THE SUBJECT MATTER TO WHICH THE INVENTION

9    PERTAINS, THOSE PRACTITIONERS DIDN'T HAVE EXPERTISE IN

10   MICROBIOLOGY.  I WILL ANSWER THE COURT'S QUESTION TO

11   MR. SCHAETZEL, THE ENABLEMENT GOES BY THE FILING DATE.  SO

12   MR. MARKS AND THE OTHER INVESTORS FILED ON SEPTEMBER 30,

13   1994.  THAT IS THE FILING DATE WHICH IS THE DATE FOR

14   ENABLEMENT.

15           THE POSITION THAT WE TOOK AT TRIAL, AND I BELIEVE

16   WE PROVED WITH OVERWHELMING EVIDENCE, IS THAT THE DATE OF

17   INVENTION WAS SOMETIME NO LATER THAN MARCH TO APRIL OF 1994.

18   AND WHAT WE HAVE THERE IS THE TESTIMONY FROM MR. MCNALLY AND

19   MR. MARKS THAT THEY HAD OPERATIONAL PROTOTYPES IN THE FIELD

20   UNDER SECRECY AGREEMENTS AT MULTIPLE LOCATIONS THAT HAD THE

21   MICROORGANISMS THAT HAD THE FILTER AND THE HEATER AND ALL OF

22   THE COMPONENTS THAT WE ARE CLAIMING, SO THAT WE NOT ONLY HAD

23   CONCEPTION FOR SURE, BUT WE HAD AN ACTUAL REDUCTION TO

24   PRACTICE NO LATER THAN THE MARCH/APRIL TIME FRAME, 1994.

25   AND OBVIOUSNESS IS DETERMINED BY THE DATE OF INVENTION,

1    WHICH CAN BE, YOU KNOW, BEFORE THE FILING DATE.

2            AND THAT IS VERY SIGNIFICANT IN THIS CASE, BECAUSE

3    OUR DATE OF INVENTION RENDERS TWO OF THEIR FOUR OBVIOUSNESS

4    PRIOR ART REFERENCES NOT PRIOR ART, BECAUSE THEY POST DATE

5    OUR DATE OF INVENTION, EVEN THOUGH THEY PREDATE OUR FILING

6    DATE.

7            SO SORRY I WAS SO LONG-WINDED.  THAT IS SUCH AN

8    IMPORTANT POINT, AND I JUST FEEL LIKE THE DEFENDANT HAS

9    TRIED TO BE SO MISLEADING AND CONFUSING THE COURT, I JUST

10   FELT I NEEDED TO TAKE SOME TIME ON THAT TODAY.

11           LET'S GO TO SLIDE 16.  I AM GOING TO DO A

12   TWO-MINUTE COMMERCIAL HERE, YOUR HONOR.  MY CLIENT'S PRODUCT

13   IS THE FIRST OF ITS KIND.  AT THE TIME OF THE INVENTION IN

14   EARLY TO MID 1994, THE AQUEOUS PARTS CLEANING IN AN OPEN

15   BASIN ENVIRONMENT WITH IN ITS INFANCY.  AT THE TIME OF THE

16   INVENTION, IN ORDER TO GET ACCEPTABLE CLEANING PERFORMANCE

17   IN AN OPEN BASIN ENVIRONMENT WHERE YOU CAN'T USE HIGH

18   TEMPERATURES, YOU CAN'T USE HIGH PRESSURE, AND YOU CAN'T USE

19   HARSH CHEMICALS, THAT WAS -- YOU COULDN'T DO THAT PRIOR TO

20   THIS INVENTION.

21           DR. DURKEE'S TESTIMONY ESTABLISHED THAT THE EARLY

22   AQUEOUS CLEANING FLUIDS BASICALLY OPERATED BY CHEMICALLY

23   ERODING THE SURFACE OF THE PART.  IN OTHER WORDS, YOU GOT

24   THE CONTAMINANT OFF THE PART BECAUSE THE CHEMICALS WERE SO

25   STRONG THEY WOULD ACTUALLY TAKE A LITTLE BIT OF THE SURFACE

1    OF THE PART OFF WITH THE CONTAMINANT, AND THAT IS HOW YOU

2    GOT IT CLEAN.  ONE OF THE THINGS THAT -- IF YOU LOOK AT ALL

3    OF THE PRIOR ART REFERENCES OF THE DEFENDANT, ONE OF THE

4    THINGS THAT IS MISSING FROM ALL OF THEIR REFERENCES IS AN

5    OPEN BASIN AQUEOUS PARTS WASHER THAT USES MODERN SURFACTANT

6    CHEMISTRY WHERE YOU CAN BASICALLY GET THE CONTAMINANT TO

7    SLIDE OFF OF THE PART.  YOU MAKE IT SLIPPERY AND SLIDE OFF

8    IN A PH NEUTRAL CHEMICAL ENVIRONMENT.  THAT'S MISSING FROM

9    ALL OF THE PRIOR ART REFERENCES, NOT JUST HAKANSSON-2, BUT

10   ALL OF THEM.

11          WHAT YOU SEE IN THE PRIOR ART CITED BY THE

12   DEFENDANT ARE CLOSED CABINET WASHERS THAT USE EITHER HIGH

13   PRESSURE, HIGH TEMPERATURE, OR CAUSTIC CHEMICALS, OR SOME

14   COMBINATION OF THOSE THREE IN ORDER TO GET THE CONTAMINANT

15   OFF THE PART.

16          YOUR HONOR, WHAT YOU SEE WHEN CHEMFREE COMES ON

17   THE SCENE IS A NEW AND INNOVATIVE WAY OF CLEANING PARTS THAT

18   BALANCES THREE ASPECTS OF CLEANING THAT AREN'T NECESSARILY

19   INHERENTLY COMPATIBLE WITH EACH OTHER, AND I HAVE

20   ILLUSTRATED THAT UP HERE.  BASICALLY THEY HAVE CLEANING,

21   GOOD CLEANING PERFORMANCE, THEY HAVE OPERATOR COMFORT AND

22   SAFETY BOTH IN TERMS OF TEMPERATURE AND THE PH. NEUTRALITY

23   OF THE CHEMICALS, AND THEN THIRDLY WHAT THEY HAVE IS A

24   BENEFICIAL HOST ENVIRONMENT FOR THE MICROBES AND THEY HAVE

25   ALL THREE OF THOSE WORKING TOGETHER.  AND WHAT THAT MEANS

```
 1    IS, IF YOU HAVE SOMEONE WORKING AT YOUR FARM AND YOU WANT TO

 2    HAVE, YOU KNOW, CLEAN A TRACTOR PART, YOU CAN GIVE THAT PART

 3    TO SOMEBODY AND THEY CAN GO OVER AND THEY CAN CLEAN IT,

 4    COMPARABLY, IN BARE HANDS, AND GET IT CLEAN, AND YOU DON'T

 5    HAVE TO WORRY ABOUT CHEMICAL BURNS, OR HIGH TEMPERATURE

 6    SCALDING, OR ANYTHING LIKE THAT.  THAT WASN'T AVAILABLE

 7    UNTIL CHEMFREE CAME ON THE SCENE.

 8            AND THEN ON TOP OF THAT, ONCE THE CONTAMINANTS GOT

 9    DOWN IN THE TANK, THE MICROORGANISMS WOULD BIOREMEDIATE SO

10    THE FLUID COULD REFRESH ITSELF OVER TIME.

11            NOW, THE DEFENDANT WANTS TO DISMISS THIS BALANCING

12    OF THESE THREE ASPECTS OF THE CLEANING AS MERE -- AS OBVIOUS

13    DESIGN CHOICES.  ATTORNEYS CAN STAND AT THE PODIUM AND SAY

14    ANYTHING.  I MEAN, THAT IS MERE ATTORNEY, THERE IS NO

15    EVIDENCE TO SUPPORT THAT THOUGHT.  WHAT WE HAVE HERE, AND

16    THE ONLY EVIDENCE IS THAT THIS WAS REALLY INNOVATIVE, THIS

17    IS VERY IMPORTANT, BECAUSE CHEMFREE, YOUR HONOR, HAS I

18    BELIEVE, AT LAST COUNT, 11 ISSUED UNITED STATES PATENTS

19    STEMMING FROM THE SAME SPECIFICATION.  WE HAVE ASSERTED

20    FIVE, BUT WE NARROWED IT DOWN TO FOUR.  BUT ALL OF THOSE

21    CLAIMS AND ALL OF THOSE PATENTS HAVE BEEN ALLOWED OVER THE

22    BEST PRIOR ART.

23            EARLY ON IN THE PROSECUTION OF THE EARLIEST

24    PATENTS AT ISSUE, THE 110 AND THE 491, CHEMFREE OVERCAME

25    REFERENCES THAT HAD BIOREMEDIATION CAPABILITY.  THAT WAS THE
```

1    LASHMETT REFERENCE AND THE HAKANSSON-1 REFERENCE WHICH EVEN

2    DEFENDANTS' EXPERT AT DEPOSITION CONCEDED WAS SUPERIOR TO

3    HAKANSSON 2.

4              NOW, ONE OF THE WAYS THAT CHEMFREE DISTINGUISHED

5    OVER THE PRIOR ART AND GOT THEIR CLAIMS ALLOWED WAS EXAMINER

6    STINSON, WHO IS A VERY EXPERIENCED EXAMINER, IF YOU GO TO

7    THE PTO WEBSITE, YOU DO A SEARCH ON FRANKIE STINSON AS THE

8    EXAMINER, YOU WILL GET THOUSANDS OF HITS COVERING A PERIOD

9    OF PROBABLY CLOSE TO 30 YEARS NOW, AND NEAR 20 AT THE TIME

10   THESE PATENTS ISSUED.  MR. STINSON IMPOSED AN EXAMINER'S

11   AMENDMENT ON THE CLAIMS THAT ISSUED FROM CHEMFREE'S

12   PROSECUTION, NOT THE ONES OR ZYMO.

13             REMEMBER, THERE ARE THE TWO CO-OWNERS, BUT ON THE

14   ONES THAT WERE WORE PROSECUTE BY CHEMFREE'S PATENT ATTORNEY

15   LOU ISSAF, MR. STINSON IMPOSED AN EXAMINER'S AMENDMENT IN

16   ORDER TO GRANT AN ALLOWANCE AND MADE THEM CHANGE THE

17   CLEANING FLUID TO SAY THAT IT WAS A "BIODEGRADABLE,

18   NONTOXIC, NONCAUSTIC, NONFLAMMABLE OIL DISPERSANT AND

19   DEGREASING FLUID."  AND THAT WAS DEEMED BY THE PTO TO

20   DISTINGUISH OVER THE OTHER BIOREMEDIATION ART THAT WAS

21   BEFORE THE EXAMINER INCLUDING THE HAKANSSON REFERENCE.

22             ALL RIGHT, SLIDE 19, PLEASE.  AS MR. SCHAETZEL

23   CONCEDED, THERE WAS NO EXPRESS DISCLOSURE OF A POROUS MEDIUM

24   IN HAKANSSON.  IT HAS A DIFFERENT FLUID CIRCULATION PATH

25   THAN THE PATENT.  HERE IS THE 226 PATENT, CLAIM 1.  THERE IS

1    THREE ELEMENTS THAT ARE NOT MET, B, C, AND D, AND LET'S GO

2    AHEAD AND TAKE THOSE.  I'VE GOT ANOTHER COMMENT BEFORE I GET

3    INTO THE MEAT OF THIS, YOUR HONOR.

4         WHEN WE START TALKING ABOUT INHERENT ANTICIPATION,

5    THERE IS A LOT OF TALK ABOUT INHERENT ANTICIPATION BECAUSE

6    MR. SCHAETZEL CONCEDED THAT THERE WAS NO FILTER THAT WAS

7    EXPRESSLY DISCLOSED.  THEY CAN'T FIND IT IN THE TEXT

8    EXPRESSLY, YOU CAN'T FIND IT IN THE FIGURE.  HE CONCEDED

9    THAT.  SO IN ORDER TO ESTABLISH THAT IT IS NECESSARILY

10   PRESENT, ORDINARILY HE WOULD BE ENTITLED TO PRESENT

11   EXTRINSIC EVIDENCE SUCH AS AN EXPERT OPINION OR SOMETHING

12   LIKE THAT, BUT THERE ARE TWO EXCLUSION ORDERS IN THIS CASE

13   BECAUSE OF SOME DEFAULTS OF THE DEFENDANTS IN COMPLYING WITH

14   DISCOVERY.

15        THE FIRST EXCLUSION IS, YOUR HONOR ORDERED THAT

16   DR. ADRIAENS COULD NOT TESTIFY ABOUT THE HAKANSSON-2

17   REFERENCE BECAUSE HE DIDN'T INCLUDE IT IN HIS EXPERT

18   REPORTED, SO THERE WAS NO EVIDENCE FROM THE DEFENDANT'S OWN

19   EXPERT AT TRIAL THAT CAME IN ON HAKANSSON-2.  NONE.  BECAUSE

20   IT WAS EXCLUDED BECAUSE HE FORGOT AND NEGLECTED OVERSIGHT,

21   DIDN'T INCLUDE IT IN HIS EXPERT REPORT.

22        THERE IS ALSO ANOTHER EVIDENCE EXCLUSION ORDER

23   THAT YOUR HONOR ENTERED, AND THAT IS WE ASKED IN

24   INTERROGATORY NUMBER FIVE, WE ASKED THE DEFENDANT TO

25   DISCLOSE WHAT EXTRINSIC EVIDENCE DO YOU HAVE THAT INHERENT

1    FEATURES ARE NECESSARILY PRESENT IN HAKANSSON-2?  THEY

2    DIDN'T ANSWER THAT.  WE MOVED TO COMPEL.  THEY SAID THEY PUT

3    IT IN THEIR EXPERT REPORT.  THEY DIDN'T.  SO YOUR HONOR

4    GRANTED A MOTION IN LIMINE THAT THEY COULD NOT PUT ON

5    EXTRINSIC EVIDENCE THAT ANY FEATURES WERE PRESENT IN

6    HAKANSSON-2 INHERENTLY.  SO THEY DIDN'T BECAUSE THEY

7    COULDN'T.  SO THIS ENTIRE INHERENT ARGUMENT IS NOTHING MORE

8    THAN AN ATTORNEY SAYING HERE IS THE REFERENCE, YOUR HONOR,

9    AND I AM AN ATTORNEY AND I AM REAL SMART AND I AM TELLING

10   YOU, A PERSON OF ORDINARY SKILL IN THE ART, EVEN THOUGH NO

11   WITNESSES TESTIFIED ABOUT THIS, COULD FIND IT THERE.  AND I

12   SUBMIT TO YOU THAT AN ATTORNEY SAYING SOMETHING ABOUT WHAT A

13   PERSON OF ORDINARY SKILL IN THE ART WITH NO SUPPORTING

14   EVIDENCE IS JUST MERE ARGUMENT, IT IS NOT EVIDENCE.

15          THE COURT:  I RECALL DR. DURKEE REFERRING TO IT ON

16   CROSS OR SOMETHING THAT IT WAS COMMON KNOWLEDGE AND THAT HE

17   WOULD HAVE WANTED TO PROTECT THE PUMP IN HIS PARTS WASHER.

18          MR. CAPP:  THERE WAS SOME BACK AND FORTH ABOUT

19   WHAT FILTERS DO AND THE BENEFITS OF USING A FILTER.  THERE

20   WAS NEVER A POINT WHERE HE WAS PUSHED TO THE POINT, AND EVEN

21   ASKED THE QUESTION, IS A FILTER NECESSARILY PRESENT IN THE

22   REFERENCE.  NOW, HE COVERED THAT IN HIS EXPERT REPORTS WHICH

23   WERE SUBMITTED AS DECLARATIONS, SO WE DIDN'T HAVE TO DO

24   DIRECT EXAMINATION, AND HE WAS UNEQUIVOCAL IN THERE IS THAT

25   IT'S NOT NECESSARILY PRESENT.  WHETHER IT'S ADVISABLE OR NOT

```
 1    DOESN'T MATTER, IT IS NOT NECESSARILY PRESENT.  AND BECAUSE
 2    IT'S NOT NECESSARILY PRESENT IT DOESN'T MEET THE LEGAL
 3    STANDARDS FOR INHERENCY, CASE CLOSED.
 4              THE COURT:  WELL, I THOUGHT WHAT HE SAID ON CROSS
 5    WAS FAIRLY PERSUASIVE, BUT THAT WOULD BE SUBJECT TO THE
 6    CLEAR AND CONVINCING EVIDENCE BURDEN ON THE DEFENDANT;
 7    RIGHT?
 8              MR. CAPP:  THE DEFENDANT HAS THE BURDEN OF PROOF
 9    BY CLEAR AND CONVINCING EVIDENCE.  THE FACT THAT HE MIGHT
10    HAVE CONCEDED THAT IN SOME CIRCUMSTANCES IT WAS ADVISABLE,
11    IT WAS BENEFICIAL, DOESN'T GET YOU TO THE POINT WHERE IT'S
12    THERE, EVEN THOUGH YOU CAN'T SEE IT, BECAUSE IT NECESSARILY
13    HAS TO BE THERE.  HIS TESTIMONY NEVER GOT TO THAT POINT.
14    AND THAT IS THE STANDARD THAT HAD TO BE MET, THE MINIMUM
15    STANDARD, AND THEY NEVER GOT THERE.
16              THE COURT:  WHAT ABOUT THE B AND D?  IT SEEMS TO
17    ME THAT, WHETHER DIRECTLY OR INHERENTLY, THAT THEY ARE IN
18    THE HAKANSSON-2?
19              MR. CAPP:  WOULD YOU PERMIT ME TO SHOW YOU WHY --
20              THE COURT:  I WOULD LIKE YOU TO.  THAT IS WHAT WE
21    ARE HERE FOR.
22              MR. CAPP:  GOOD.  FIRST OF ALL, ONE THING THAT
23    MR. SCHAETZEL DID NOT DO DURING HIS PRESENTATION IS DIRECT
24    YOU, YOUR HONOR, TO THE MARKMAN CONSTRUCTION, WHICH THE
25    DEFENDANT STIPULATED TO ON THE CONSTRUCTION OF THESE TERMS.
```

1    THIS APPEARS IN JOINT CLAIM CONSTRUCTION DOCKET 114 AT PAGE

2    6.   THE PARTIES AGREED TO IT.   WITH RESPECT TO THE LONGER

3    PHRASE, "CIRCULATING A CLEANING FLUID FROM A SECOND CHAMBER

4    TO THE FIRST CHAMBER TO WASH THE SURFACES OF THE PART IN

5    CONTACT WITH THE FLUID," THE PARTIES STIPULATED TO THE

6    FOLLOWING:   THAT IT MEANS THAT "CIRCULATING A CLEANING FLUID

7    FROM A SECOND CHAMBER TO THE FIRST CHAMBER TO WASH THE

8    SURFACES OF THE PART IN CONTACT WITH THE FLUID REFERENCE TO

9    THE CLEANING FLUID FLOWING THROUGH A CIRCUIT OR SYSTEM AND

10   INTO CONTACT WITH THE SURFACE OF A PART SO AS TO WASH THE

11   PART."   THAT'S THE IMPORTANT PART.

12           THIS IS A SINGLE STEP, YOUR HONOR.   HAKANSSON, IN

13   ORDER TO GET THE FLUID FROM ONE CHAMBER TO ANOTHER, DOES A

14   BULK TRANSFER.   AND IT'S JUST MOVING FLUID FROM THE BOTTOM

15   OF ONE TANK TO THE BOTTOM OF ANOTHER, THEN YOU CLOSE SOME

16   VALVES, THEN YOU TURN THE PUMP BACK ON, AND THEN YOU START

17   AN INTERNAL LOOP.   ACTUALLY I HAVE A VIDEO OF IT THAT

18   ILLUSTRATES THIS.   WHY DON'T I GO AHEAD AND PLAY IT.   HERE

19   YOU PUT THE PART IN, TURN A VALVE, DO YOUR BULK TRANSFER.

20   NOW YOU TURN THE PUMP ON WHERE YOU ARE DRAWING FROM THE

21   BOTTOM OF THE TANK.   NOW YOU DRAIN IT WHERE YOU DO ANOTHER

22   VALVE, AND NOW YOU REPEAT THE CYCLE FROM THE RINSING TANK.

23   SO THE ARGUMENT HERE IS THAT HAKANSSON SATISFIES A SINGLE

24   CLAIM LIMITATION OF THE METHOD CLAIM, WHICH IS PUT IN THERE

25   AS A SINGLE STEP, THEY DO TWO STEPS TO GET IT DONE, AND HE

1    IS ARGUING THAT THOSE TWO STEPS SATISFY WHAT IS IN THE

2    PATENT AS A SINGLE STEP.

3         NOW, WE HAD A VERY SIMILAR CLAIM THAT WAS UP IN

4    FRONT OF EXAMINER STINSON BACK IN 2005, IT WASN'T IDENTICAL

5    BUT IT WAS SIMILAR, AND STINSON SAID THAT WE WERE

6    DISTINGUISHABLE FROM HAKANSSON-2 BECAUSE THE CIRCULATION

7    PATH THAT WE DESCRIBED IN OUR CLAIM WAS DIFFERENT FROM THE

8    CIRCULATION PATH DESCRIBED IN HAKANSSON-2 SO IT DOES MAKE A

9    DIFFERENCE.  AND IN THIS CASE HAKANSSON-2 TEACHES A

10   DIFFERENT FLUID CIRCULATION PATH THAN WHAT IN FACT IS

11   CLAIMED IN THE PATENT.

12        THE COURT:  NOW, TELL ME AGAIN WHAT THE DIFFERENCE

13   IS IN THE TWO CIRCULATION PATHS.

14        MR. CAPP:  THE 226 PATENT CLAIM ONE HAS A STEP,

15   AND THAT STEP IS FLUID CIRCULATES FROM ONE CHAMBER TO THE

16   SECOND CHAMBER, AND WHILE IT IS DOING THAT COMES INTO

17   CONTACT WITH THE PART, WHICH IS WHAT YOU HAVE SEEN FROM HOW

18   THESE THINGS HAPPEN.  WE'VE GOT THE TANK, YOU TURN THE PUMP

19   ON, AND THE WAY THAT THE WATER GETS IN THROUGH THE FLUID

20   GETS INTO THAT SECOND CHAMBER IS, IT EXITS THE FAUCET WHICH

21   YOU SPRAY ON TO THE PARTS.  SO IT IS SPILLING ON TO THE PART

22   AS IT IS COMING INTO THE OTHER CHAMBER, WHICH IS DIFFERENT

23   FROM HAKANSSON, WHICH IS A BULK TRANSFER FROM ONE TANK TO

24   THE OTHER.  THEN YOU SHUT THE PUMP DOWN, THEN YOU TURN SOME

25   VALVES, TURN SOME MORE VALVES, AND THEN YOU TURN THE PUMP

1    BACK ON, AND NOW YOU DO A CONTINUOUS LOOP THROUGH THE

2    WASHING CHAMBER.  AND THEN WHEN YOU ARE DONE WITH THAT, YOU

3    PUMP IT BACK.  SO IT'S DIFFERENT, IT'S DIFFERENT ENOUGH, I

4    SUBMIT, THAT THERE IS NO ANTICIPATION.

5              THE COURT:  OKAY.

6              MR. CAPP:  THE FINAL ONE IS DRAINING, AND HERE IS

7    THE PROBLEM I HAVE WITH THE DEFENDANT'S POSITION ON

8    DRAINING, IS DRAINING IS ONE OF THOSE WORDS, IF YOU LOOK IT

9    UP IN THE DICTIONARY, HAS A LOT OF DIFFERENT DEFINITIONS,

10   AND IT CAN REFER TO A GRAVITY DRAIN, OR IT COULD REFER TO

11   SOMETHING THAT IS MORE SOPHISTICATED WHERE YOU CAN SIPHON

12   SOMETHING OUT FROM THE TOP OR PUMP IT OUT.  SO WHAT WE HAVE

13   HERE IS, IN SPITE OF THE 300 PAGES OF MARKMAN BRIEFING THAT

14   WE DID, AND I THINK A 70-PAGE ORDER AND ALMOST 100 TERMS

15   THAT WE WERE INITIALLY ASKED TO CONSTRUE SOMEHOW OR ANOTHER,

16   AND I GUESS I HAVE TO TAKE A LITTLE BIT OF FAULT FOR THIS

17   TOO, NEITHER ONE OF US THOUGHT TO BRING TO THE COURT'S

18   ATTENTION TO CONSTRUE "DRAIN THE CLEANING FLUID FROM THE

19   FIRST CHAMBER INTO THE SECOND CHAMBER."  SO REALLY WHAT IS

20   HAPPENING HERE IS MR. SCHAETZEL, AFTER THE CLOSE OF THE

21   EVIDENCE, COMING TO YOUR HONOR AND SAYING WE NEED SOME MORE

22   MARKMAN CONSTRUCTION HERE BECAUSE THIS -- I SAY THIS TERM

23   MEANS THIS, CAPP SAYS THIS TERM MEANS SOMETHING ELSE.

24   THAT'S NOT A FACT ISSUE, THAT IS A MARKMAN ISSUE, WHICH IS A

25   QUESTION OF LAW.

1            I MEAN, VERY QUICKLY, IF YOU LOOK AT THE CLAIM AS

2    A WHOLE, AND READING THE SPECIFICATION IN CONTEXT, LOOK AT

3    ELEMENT B.  YOU TALK ABOUT CIRCULATING A CLEANING FLUID,

4    LOOK AT ELEMENT F.  YOU ARE TALKING ABOUT RECIRCULATING THE

5    CLEANING FLUID, AND SANDWICHED IN BETWEEN YOU HAVE THIS

6    OTHER THING CALLED DRAINING.  IF "DRAINING" WAS A TERM THAT

7    WAS MEANT IN A VERY BROAD CONTEXT TO INCLUDE PUMPING UPHILL

8    AGAINST GRAVITY, YOU WOULDN'T NEED TO USE THE TERM

9    "CIRCULATING" IN B. OR "RECIRCULATING" IN F.  IF YOU LOOK AT

10   THE CONTEXT AS A WHOLE AND SPECIFICATION AS A WHOLE, I

11   SUBMIT THE MORE REASONABLE CONSTRUCTION IS THAT DRAINING IS

12   A, YOU KNOW, GRAVITY DRAIN FROM ONE TO THE OTHER.  AND IF

13   THAT IS RIGHT, IT IS A QUESTION OF LAW FOR YOU TO DETERMINE,

14   IF THAT IS RIGHT, THEN THAT IS ANOTHER ELEMENT THAT IS NOT

15   MET IN HAKANSSON-2.

16           IN CASE IT IS ANY HELP TO YOUR LAW CLERK, YOUR

17   HONOR, THE PERTINENT LAW ON INHERENCY THAT REQUIRES THAT THE

18   ELEMENT NECESSARILY IS PRESENT, NOT JUST MERE POSSIBILITY OR

19   PROBABILITY OR LIKELY, IT NECESSARILY HAS TO BE THERE.

20   THOSE CITATIONS ARE IN RE:  ULRICH, 666 F 2D 578 AT PAGE

21   581.  AND THAT IS A CCPA CASE OF 1981.  AND THEN MORE

22   RECENTLY THERE IS DAYCO PRODUCTS, INC. VERSUS TOTAL

23   CONTAINMENT, INC. WHICH IS AT 329 F 3D 1358, 1369.  THAT IS

24   A FEDERAL CIRCUIT CASE 2003.  IF I MAY, I HAVE A COUPLE OF

25   THINGS I WANT TO POINT OUT ABOUT THE FILTER BEFORE I GET OFF

1    OF THAT SUBJECT.  HERE IS WHY A FILTER ISN'T NECESSARILY

2    PRESENT, AND PROBABLY ISN'T PRESENT, IN ALL LIKELIHOOD, TO A

3    NEAR CERTAINTY ISN'T PRESENT IN HAKANSSON, YOUR HONOR.  YOU

4    LOOK AT THE BOTTOM OF THE WASHING LIQUID TANK HERE, IN THE

5    PATENT IT IS EXPLAINED AND DESCRIBED AS BEING CONICAL IN

6    SHAPE.  AND THE CONICAL SHAPE OF THAT WAS IN ORDER TO MAKE

7    THE BOTTOM OF THAT TANK A SETTLING CHAMBER FOR

8    SEDIMENTATION.

9            AND THEN BENEATH THAT IS DISCLOSED A PURGE VALVE,

10   WHICH IS SAID TO EITHER BE USED VERY OFTEN OR CONTINUOUSLY

11   TO REMOVE SEDIMENT.  AND IF YOU SIT DOWN AND READ HAKANSSON

12   ALL THE WAY THROUGH FROM COVER TO COVER, I WENT THROUGH THAT

13   PAINFUL PROCESS YESTERDAY MORNING, WHAT YOU SEE IS LANGUAGE

14   THAT THE CONTAMINANTS LEAVE THE WASHING TANK THROUGH THE

15   PUMP, GET PUMPED BACK TO THE WASHING LIQUID TANK, AND THEN

16   IT TALKS ABOUT IT SEDIMENTING DOWN THROUGH THAT CONE SHAPED

17   BOTTOM, WHICH ACTS AS -- AND THEN IT ACTS AS A PURGE VALVE.

18   SO IF ANYTHING, SOMEONE OF ORDINARY SKILL IN THE ART READING

19   THAT SAYS, OH, THIS GUY KNOWS HOW HE WANTS TO HANDLE

20   SEDIMENT THAT IS WASHED FROM THE PARTS.  HE PUSHED THEM INTO

21   THE WASHING LIQUID CONTAINER, HE SET THEM OUT AND EXITS THEM

22   THROUGH A PURGE VALVE.

23           NOW, WHAT YOU DON'T WANT TO DO IN SOMETHING LIKE

24   HAKANSSON, AND DR. DURKEE TALKS ABOUT THIS IN HIS REPORT, IS

25   IF YOU LOOK HERE AT THE BOTTOM OF THE WASHING TANK, THAT IS

1   THE COMMON CONDUIT RIGHT THERE.  WASHING FLUID GOES THROUGH

2   THERE.  WHEN YOU ARE DRAINING AND GOING BACK TO THE WASHING

3   TANK IT DRAINS THERE WHEN YOU ARE CIRCULATING AND DOING YOUR

4   WASHING CYCLE, AND IT IS ALSO COMMON WHEN THE RINSE TANK IS

5   RINSING AND GOING BACK TO THE RINSE.  SO TO ACCEPT

6   MR. SCHAETZEL'S ARGUMENT THAT, GEE, THIS IS A GREAT PLACE TO

7   PUT A FILTER, WHAT YOU ARE SAYING IS ALL OF THE FILTH THAT

8   YOU ARE ACCUMULATING IN YOUR FILTER THERE TO RUN YOUR NICE

9   CLEAN RINSE FLUID THROUGH.  AND DR. DURKEE TALKS ABOUT WHY

10  THAT ISN'T SUCH A GOOD PLACE TO PUT A FILTER IN HIS REPORT.

11          SO BOTTOM LINE IS, HAKANSSON DOES NOT ANTICIPATE

12  ANY OF THE CLAIMS IN THE 226.  IT DOESN'T ANTICIPATE

13  INDEPENDENT CLAIM 1.

14          THE COURT:  MR. CAPP, WHAT ABOUT OBVIOUSNESS?

15          MR. CAPP:  I THOUGHT I WAS GOING TO COUNTER PUNCH

16  ON THAT AFTER MR. HARBIN'S BEST SHOT.

17          THE COURT:  ALL RIGHT.  THAT WILL BE FINE.

18          MR. SCHAETZEL:  MAY WE RESPOND BRIEFLY, YOUR

19  HONOR, TO A COUPLE OF LAST POINTS ON ANTICIPATION?

20          THE COURT:  YEAH, I THINK THAT WOULD BE A GOOD

21  IDEA WHILE THIS IS ON THE TABLE.

22          MR. SCHAETZEL:  THANK YOU, YOUR HONOR.

23          THE COURT:  THEN I WILL HEAR WHAT MR. HARBIN HAS

24  TO SAY ABOUT OBVIOUSNESS.

25          MR. SCHAETZEL:  YOUR HONOR, FIRST OF ALL, I WOULD

1   LIKE TO SAY THAT THE PARTIES ARE IN AGREEMENT, AND I

2   APPRECIATE MR. CAPP REMINDING ME OF MY HORN BOOK LAW FOR

3   LEVEL OF ORDINARY SKILL IN THE ART.  WE ARE IN AGREEMENT

4   THAT, FOR PURPOSES OF ENABLEMENT, THAT IS AS OF THE FILING

5   DATE.  THE PARTIES DO NOT AGREE THAT THEY PROVED THAT THEY

6   HAD AN EARLIER INVENTION DATE, AND I GOT CONFUSED.  AND THAT

7   WOULD BE ADDRESSED IN TERMS OF WHETHER OR NOT A COUPLE OF

8   REFERENCES APPLY.  BUT OUR RELIANCE, AND WE CITE THIS IN OUR

9   PAPERWORK, IS I BELIEVE MR. CAPP SAID IN THE SPRING OR SO OF

10  1994 --

11          MR. CAPP:  MARCH/APRIL OF 1994.

12          MR. SCHAETZEL:  THERE IS A LETTER FROM MR. MCNALLY

13  TO HIS CHEMIST IN JULY OF 1994 WHERE HE IS ASKING, WELL, IF

14  YOU PUT LRC-1 AND THIS SURFACTANT TOGETHER, IS THAT GOING TO

15  BE A GOOD COMBINATION.  WILL IT WORK.  SO OUR ARGUMENT IS,

16  IF IN JULY OF 1994 YOU ARE STILL ASKING THAT QUESTION, YOU

17  HAVEN'T GOTTEN TO THE EUREKA MOMENT, YOU WILL.  YOU ARE NOT

18  TO INVENTION YET.  BUT AS TO THE STANDARD, I WOULD LIKE --

19  MR. CAPP IS ABSOLUTELY RIGHT, AND I APPRECIATE THAT NEEDS TO

20  BE ON THE TABLE.

21          THE COURT:  I UNDERSTAND.

22          MR. SCHAETZEL:  SECONDLY, IN TERMS OF THE

23  DEFINITION OF CIRCULATION.  I WOULD LIKE TO POINT OUT, THIS

24  IS A COPY OF DR. DURKEE'S WORK THAT HE SUBMITTED, AND IF YOU

25  LOOK AT ITEM F, THE LAST ONE, RECIRCULATING -- AND AGAIN,

1  THIS IS THE FIRST CLAIM OF THE 226 PATENT.  SO WE ARE

2  LOOKING AT THOSE SIX ITEMS.  ITEM F, RECIRCULATING THE

3  CLEANING FLUID FROM THE SECOND CHAMBER, WHICH IS THE STORAGE

4  TANK, TO THE FIRST CHAMBER, WHICH IS WHERE THE WASHING

5  OCCURS, TO BE AVAILABLE FOR WASHING PARTS.

6      OKAY, SO IN OTHER WORDS, MOVING THE FLUID FROM THE

7  STORAGE TANK TO HERE, HE SAYS THAT HAKANSSON-2 TEACHES THAT

8  RECIRCULATION.  THAT'S WHAT THIS X IS HERE.  IN HIS CHART,

9  WHEN THERE IS AN X, HE SAYS, I AGREE THAT IS FOUND WITHIN

10  HAKANSSON-2.  WHEN IT IS A ZERO OR AN O, HE SAYS, NO, THAT

11  IS A POINT OF DISPUTE.  SO WHEN IT COMES TO CIRCULATION, YOU

12  KNOW, YOU DON'T GET THAT ONE BOTH WAYS, I DON'T THINK.

13      RECIRCULATION, MOVING IT FROM THERE TO THERE, HE

14  SAYS IT IS THERE, BUT WHEN WE GET BACK UP TO RECIRCULATING

15  IN B, YOU KNOW, HE INITIALLY TOOK THE POINT THAT THERE

16  WASN'T CIRCULATION.  AGAIN, IN ITEM B, WE BELIEVE THAT THERE

17  IS, AND WE BELIEVE THAT HE TESTIFIED ACCORDINGLY.

18      AS TO THE QUESTION ABOUT WHETHER OR NOT ONE OF

19  ORDINARY SKILL IN THE ART WOULD USE A FILTER, I COULD RUN MY

20  CAR WITHOUT AN OIL FILTER FOR SOME PERIOD OF TIME, BUT IT

21  WOULD QUIT WORKING.  IT WOULD STOP.  IT WOULD TURN TO

22  SLUDGE.  THE PERSON OF ORDINARY SKILL IN THE ART, REGARDLESS

23  OF THE LEVEL, WE SUBMIT, WOULD BRING THAT SAME LEVEL OF

24  KNOWLEDGE TO THIS SITUATION.  IN THE HAKANSSON-2 REFERENCE,

25  MR. HAKANNSON DOESN'T WANT HIS MACHINE TO STOP FUNCTIONING

1    UNDER ITS OWN WEIGHT.  HE PROVIDES FOR ADDING NUTRIENTS TO

2    THE SYSTEM TO KEEP IT GOING.

3         HE PROVIDES -- YOU KNOW, HE IS LOOKING AT IT AND

4    SAYING, I WANT TO KEEP THIS RUNNING, SO HOW DO I DO THAT?  I

5    AM GOING TO NECESSARILY NEED TO FILTER OUT THE SOLID

6    PARTICLES, AND WE DID RAISE THAT WITH DR. DURKEE, AND WE

7    WOULD DIRECT THE COURT TO PAGE 49 OF THE TRANSCRIPT.  I

8    ASKED DR. DURKEE, THIS IS A QUOTE, STARTING AT LINE 17:  "MY

9    QUESTION IS THIS, DR. DURKEE.  IF I KNOW THAT I AM REMOVING

10   SOLID PARTICLES, REFERRING TO HAKANSSON-2 NOW, I KNOW THAT I

11   AM REVIEWING SOLID PARTICLES, IS IT YOUR TESTIMONY THAT I

12   DON'T WANT TO TRY AND PRECLUDE THOSE SOLID PARTICLES FROM

13   GETTING INTO MY PUMP AND RUINING IT?"  AND HE ANSWERED, "I

14   CERTAINLY WANT TO PROTECT MY PUMP.  I DON'T WANT IT TO BE

15   RUINED.  AND I AM AWARE, AS ONE OF ORDINARY SKILL, THERE ARE

16   PARTICLES IN THE WASTE FROM THE CLEANING OPERATION."  HE IS

17   REFERRING TO HAKANSSON.  HE GOES ON TO SAY, "I DON'T SPEAK

18   IN THIS TEXT, REFERRING TO HAKANSSON, AS TO HOW I AM GOING

19   TO DO THAT."  THEN I RAISE THE QUESTION, "BUT WE KNOW EVEN

20   FROM THE SOLVENT WASHERS, WHICH ARE THE PRIOR ART WASHERS

21   THAT WOULD HAVE HAD FILTERS, THAT WE LOOKED AT BACK IN

22   ANOTHER PART OF HIS ARE REPORT, PAGE 39, THAT THE PERSON OF

23   ORDINARY SKILL IN THE ART IN 1993-1994 HAS, AS YOU DEFINE

24   IT, WOULD KNOW TO PUT A FILTER IN A FLOW PATH IN ORDER TO

25   PROTECT THE PUMP, DON'T WE?"  AND HE SAID, "FILTERS ARE

1   ABSOLUTELY COMMON, AND I BELIEVE ONE OF ORDINARY SKILL

2   WOULD, A, KNOW ENOUGH TO PUT ONE IN, BUT WOULD KNOW WHAT THE

3   WEAKNESS OF DOING THAT MIGHT BE."  AND THE PERSON -- AND I

4   ASKED THE QUESTION, "AND THE PERSON WOULD ALSO KNOW THE

5   IMPORTANCE OF PROTECTING THE PUMP?"  "YES, SIR.  THAT IS AN

6   EXPENSIVE PUMP."

7           WE SUBMIT THAT, IN ORDER TO KEEP THE SYSTEM

8   RUNNING, A PERSON OF ORDINARY SKILL IN THE ART WOULD

9   RECOGNIZE THAT A FILTER IS NECESSARY IN ORDER TO KEEP THAT

10  SYSTEM RUNNING.  SO WHILE THE PARTIES MAY DIFFER AS TO WHAT

11  IS THE IMPORTANCE OF WHAT DR. DURKEE'S TESTIMONY IS THERE,

12  HE CLEARLY IS WORRIED ABOUT THE PUMP, AND HE WANTS TO KEEP

13  THE SYSTEM RUNNING, AND HE WOULD HAVE TO PROTECT THE PUMP TO

14  DO THAT.

15          THE COURT:  I THINK I WOULD HAVE AGREED WITH THAT

16  WHEN I FIRST READ WHAT DR. DURKEE SAID ABOUT THAT, BUT THERE

17  IS SOME VALIDITY TO WHAT MR. CAPP SAID IN THAT THAT DOES

18  APPEAR TO BE THE LOCATION THAT THE PARTICLES ARE DRAINED

19  OUT, THE DRAIN AT THE BOTTOM OF THE TANK TO THE LEFT THERE

20  WHERE THE CLEANING FLUID IS.  AND THE WAY THAT IS SET UP, I

21  DON'T SEE ANY WAY YOU COULD PUT A FILTER IN THERE AND THEN

22  REMOVE THE FILTER WITH THE PARTS IN IT, THE FLAG, OR

23  WHATEVER IT IS THAT YOU CLEAN OFF.

24          MR. SCHAETZEL:  IN WHERE?

25          THE COURT:  I DON'T SEE ANYWHERE YOU CAN PUT A

1    FILTER REASONABLY IN THAT MACHINE TO PROTECT THE PUMP FROM

2    GETTING THE PARTICLES, AND THEN REMOVE THE FILTER WITH THE

3    PARTS IN IT, WHICH OF COURSE YOU WOULD HAVE TO DO.  I MEAN,

4    IT JUST DOESN'T MAKE SENSE THE WAY THAT IS SHAPED.

5            MR. SCHAETZEL:  I THINK, YOUR HONOR, YOU WOULD PUT

6    THE -- YOU COULD, FOR EXAMPLE, PUT IT UPSTREAM OF THE PUMP

7    BETWEEN THE TANK AND THERE, AND THEN WHEN YOU -- AFTER YOU

8    HAVE PUMPED THE FLUID OUT, WHEN YOU ARE NOT RUNNING IT, AND

9    THEN YOU CAN REMOVE THE FILTER AND INSERT IT BACK IN.  AM I

10   MISUNDERSTANDING THE COURT'S QUESTION?

11           THE COURT:  NO, YOU ARE UNDERSTANDING IT.  IT

12   JUST -- THAT LOOKS LIKE A PIPE AND NOT A REMOVABLE FILTER

13   BETWEEN THE PUMP AND THE TANK, AND THE TANK SEEMS TO BE A

14   SOLID DEVICE WHERE IT SAYS WASHING TANK THERE.  AND IF YOU

15   ARE GOING TO FILTER IT OUT, WHAT DO YOU NEED A DRAIN FOR IT?

16   I MEAN, ALL OF THAT MAKES ME WONDER IF THAT IS NECESSARY BY

17   CLEAR AND CONVINCING EVIDENCE, BUT I AM NOT SURE HOW MUCH OF

18   THE DIAGRAM TO APPLY TO THE CLAIMS.

19           MR. SCHAETZEL:  THAT IS A VERY GOOD POINT, YOUR

20   HONOR.  AND IN THAT PATENT, DIAGRAMS ARE NOT INTENDED TO BE

21   DETAILED SPECIFICATIONS.

22           THE COURT:  I UNDERSTAND.

23           MR. SCHAETZEL:  BUT IN TERMS OF THIS EXIT, I THINK

24   I WANT TO BE VERY CAREFUL OF WHAT THE PURPOSE OF THAT IS

25   FOR.  MR. CAPP WENT OVER THAT EXIT.  THE MICROORGANISMS ARE

1    GOING TO BE ACTIVE AND FERMENTING IN THE, AS IT IS SAID IN

2    THE HAKANSSON REFERENCE IN THIS CASE, TANK.  AND ONE OF THE

3    THINGS THAT, AT LEAST I HAVE LEARNED IN THIS, IS THAT DEAD

4    MICROORGANISMS IN A SYSTEM LIKE THIS ARE SOMETHING TO BE

5    EXPECTED, THAT THAT IS GOING TO HAPPEN.

6            AND FOR EXAMPLE, USING THIS ONE, THE HEATING

7    ELEMENTS ARE UP NEAR THE TOP OF THE TANK, AND WE WERE TRYING

8    TO FIGURE OUT WHY THAT WAS AT TRIAL.  AND I BELIEVE

9    DR. DURKEE AGREED WITH ME THAT I WOULD HAVE TO DOUBLE-CHECK.

10   BUT MY ARGUMENT IS, AT LEAST THEY ARE AT THE TOP, BECAUSE

11   DOWN HERE AT THE BOTTOM YOU ARE GOING TO HAVE A LOT OF DEAD

12   MICROORGANISMS, AND WHAT YOU ARE USING THIS FOR IS NOT TO

13   CLEAN OUT SOLID PARTICLES THAT ARE GOING TO GET TRANSPORTED

14   BACK INTO THE TANK, YOU ARE GOING TO GET OUT THE SLUDGE, IF

15   YOU WILL, OF DEAD MICROORGANISMS.  I THINK THAT IS THE

16   PURPOSE FOR THIS VENT, IF YOU WILL.  IT'S NOT INTENDED TO

17   RUN SOLID PARTICLES AND GREASE AND SO ON AND SO FORTH.

18           THE COURT:  THAT MAKES SENSE.  I UNDERSTAND YOUR

19   POSITION IN THAT REGARD.  IT'S JUST THAT THE DIAGRAM DOES

20   NOT FIT WITH THE EXPLANATION, BUT I DON'T SUPPOSE A DIAGRAM

21   HAS TO, IF THE LANGUAGE OF THE CLAIM DOES.  ALL RIGHT, GO ON

22   TO YOUR NEXT POINT.

23           MR. SCHAETZEL:  ONE LAST -- TWO LAST POINTS, YOUR

24   HONOR.  FIRST OF ALL, THE HAKANSSON-2 REFERENCE, I JUST WANT

25   THE COURT TO BE CERTAIN THAT I AM CLEAR WITH THE COURT.  THE

1     HAKANSSON-2 REFERENCE WAS NOT CONSIDERED IN THE PROSECUTION

2     OF THIS APPLICATION BY THE PATENT OFFICE.  SO ALTHOUGH I

3     BELIEVE THE COURT HAD EXCLUDED -- AND I AM HAPPY FOR THAT TO

4     BE TAKEN CARE OF AT ANOTHER TIME -- THE CONVERSATION OF WHAT

5     MR. STINSON THE EXAMINER HAD SAID IN FUTURE APPLICATIONS.

6            THE COURT:  I BELIEVE THAT IS MY RECOLLECTION,

7     TOO.

8            MR. SCHAETZEL:  BUT WHEREVER, THE POINT IS THAT IN

9     THIS APPLICATION, IN ADDRESSING THIS CLAIM, HAKANSSON-2 WAS

10     NOT CONSIDERED BY ANYONE AT THE PATENT OFFICE.

11            THE COURT:  I UNDERSTAND THAT, BUT THAT DOESN'T

12     MEAN THAT IT IS NOT CONSIDERED FOR THE PURPOSE OF WHETHER

13     THE CLAIM WAS ANTICIPATED, DOES IT?

14            MR. SCHAETZEL:  NO, SIR, IT DOES NOT.  IT IS

15     AVAILABLE AS A REFERENCE FOR ANTICIPATION.

16            THE OTHER POINT THAT I MAKE IS, YOU WERE SHOWN

17     SOME INFORMATION REGARDING ATTRIBUTES OF THE FLUID,

18     NONCAUSTIC, NONFLAMMABLE, SO ON AND SO FORTH.  THAT IS NOT A

19     PART OF THIS PATENT.  THAT IS WHAT MAKES THIS PATENT SO

20     BROAD, IN OUR VIEW, ANTICIPATED BY HAKANSSON.  EVEN THOUGH

21     HAKANSSON, IN OUR VIEW, DOES SHOW THOSE THINGS, THERE IS

22     NOTHING IN CLAIM 1 THAT SAYS THE CLEANING FLUID HAS TO BE

23     NONFLAMMABLE OR THAT THE CLEANING FLUID HAS TO BE

24     NONCAUSTIC.  IT IS ANY CLEANING FLUID FOR ANY -- YOU KNOW,

25     ALL WE ARE TALKING ABOUT HERE IS THE METHOD OF WASHING

1    PARTS, PLACING ONE PART IN THE CHAMBER AND CIRCULATING A

2    CLEANING FLUID.  NOW, ONE COULD ARGUE THAT THAT CLEANING

3    FLUID HAS GOT TO BE INTERPRETED SOMEWHERE WITHIN THE

4    CONFINES OF THE SPECIFICATION, AND THE SPECIFICATION

5    DESCRIBES IT, BUT THERE IS NOTHING IN THE CLAIM THAT

6    REFERENCES THAT.  SO THAT IS NOT A WAY TO DISTINGUISH OVER

7    HAKANSSON-2 IN REFERENCE TO THIS PATENT.  THAT IS LANGUAGE

8    THAT IS IN OTHER PATENTS, FOR EXAMPLE, THE 110 PATENT, NOT

9    THE 226.

10          AND FINALLY, AS THE COURT HAS ALREADY NOTED, AND

11   WE WOULD LIKE TO REINFORCE, ON THE EFFECT, IF YOU WILL, OF

12   HAKANSSON-2.  PART OF WHAT THE COURT WAS SHOWN, AND IT WAS

13   DESCRIBED AS HOW THIS WAS THE FIRST COMMERCIAL, I FORGET

14   EXACTLY THE WORDS THAT WERE USED, BUT THE FIRST COMMERCIAL

15   EMBODIMENT WHERE WE HAD, YOU KNOW, BIOREMEDIATING FLUID AND

16   PARTS WASHING -- WELL, SECTION 103 IS BROADER THAN JUST THAT

17   INITIAL COMMERCIALIZATION OF IT.  AND IT'S NOT NEW BECAUSE

18   IT IS DESCRIBED IN HAKANSSON.  HAKANSSON-2 DOES PROVIDE FOR

19   A BIOLOGICAL COMPONENT, HAKANSSON-2 DOES SHOW A MECHANICAL

20   COMPONENT, AND HAKANSSON-2 DOES SHOW THE FLUID COMPONENT.

21   ALL THREE OF THOSE ARE PRESENT.  SO WITH THAT, YOUR HONOR,

22   THAT CONCLUDES OUR PRESENTATION ON ANTICIPATION.

23          THE COURT:  OKAY.

24          MR. CAPP:  YOUR HONOR, CAN I MAKE ONE BRIEF POINT?

25          THE COURT:  MAKE IT QUICK, PLEASE.

1          MR. CAPP:  THERE IS, ON PAGE 9 OF THE HAKANSSON

2    REFERENCE, AND THIS IS WHAT I WAS ALLUDING TO, BUT I FOUND

3    THE ACTUAL PORTION.  IT SAYS, AND I WILL START AT LINE 23.

4    "DURING FERMENTING A SMALL AMOUNT OF CARBONIC ACID ARE

5    FORMED WHICH ARE EVACUATED INTO AN EXIT DUCT, 9.  A SLURRY

6    OF DEAD BACTERIA AND CONTAMINANTS IS ALSO FORMED

7    ACCOMPANYING THE WASHING LIQUID FROM THE OBJECTS IN THE

8    WASHING CHAMBER, 1.  THIS SLURRY IS ALLOWED TO SETTLE IN THE

9    LOWER PORTION OF THE WASHING LIQUID CONTAINER, WHICH IS

10   CONICAL, AND IS LOCATED BELOW THE DUCT."  SO THE INVENTOR

11   HERE CLEARLY IS CONTEMPLATING THAT CONTAMINANTS WASH FROM

12   THE PART ARE COMING BACK TO THE WASHING CHAMBER, AND THEN

13   THEY ARE SETTLING OUT IN THE WASHING CHAMBER.  AND THAT IS

14   VERY SUGGESTIVE THAT THERE WAS NO FILTER INTENDED.

15          THE COURT:  MR. SCHAETZEL, IF THERE IS NO FILTER,

16   YOU LOSE ON ANTICIPATION, IS THAT RIGHT?

17          MR. SCHAETZEL:  YES, SIR.

18          THE COURT:  OKAY.

19          MR. SCHAETZEL:  AND IN RESPONSE TO THAT, YOUR

20   HONOR, I DO BELIEVE THERE IS A DIFFERENCE BETWEEN THE

21   CONTAMINANTS AND THE SOLID PARTS.  THE CONTAMINANTS, GREASE

22   AND OIL, THE BUGS GET INVOLVED IN THAT, THEY ARE GOING TO

23   HAVE THAT ON THEM, THAT IS GOING TO TRAP, NO QUESTION.  YOU

24   CAN'T STOP ALL OF THAT.  YOU CAN'T STOP ALL OF THAT IN THE

25   FILTER IN THESE UNITS.  FOR EXAMPLE, THEY REPLACE A FILTER

1  ONCE A MONTH IN THE COMMERCIAL ENVIRONMENT.  THE GREASE AND

2  OIL IS GOING TO BE DIFFERENT FROM THE SOLID PARTICLES.  YOU

3  HAVE TO GET THOSE OUT TO PROTECT YOUR PUMP.

4          THE COURT:  ALL RIGHT.  MR. HARBIN?

5          MR. HARBIN:  MAY IT PLEASE THE COURT.  I AM GOING

6  TO ADDRESS THE OBVIOUSNESS DEFENSE AND WHY WE BELIEVE THE

7  PATENT CLAIMS AT ISSUE IN THE 110 PATENT, AND 125 PATENT,

8  THE 226 PATENT, AND THE 835 PATENT ARE PLAINLY OBVIOUS.  AS

9  WE HAD BRIEFED, YOUR HONOR, EXTENSIVELY IN THE EVIDENCE AT

10  TRIAL, WE BELIEVE THE EVIDENCE SHOWS THEY ARE OBVIOUS IN

11  LIGHT OF HAKANSSON-2 ALONE.  HAKANSSON-2 IN COMBINATION WITH

12  ATHEY AND ALSO HAKANSSON-2 IN COMBINATION WITH MINKIN AND

13  SIMS, OR A COMBINATION OF BOTH.

14          I AM GOING TO FOCUS YOUR HONOR -- WELL, THE

15  PLAINTIFF ADMITS THESE ARE RELEVANT PRIOR ART REFERENCES

16  SUBJECT TO THEIR ARGUMENT ABOUT TEACHING A WAY, WHICH I WILL

17  DEAL WITH.  THEY CONTEST MINKIN AND SIMS AS BEING TRUE PRIOR

18  ART BASED ON A TEMPORAL ISSUE THAT THEY CLAIM THAT THE

19  ACTUAL DATE OF CONCEPTION IN REDUCTION TO PRACTICE PRECEDES

20  THAT.  I AM GOING TO FOCUS YOUR HONOR ON -- YOU KNOW, WE

21  DISAGREE WITH THAT, AS WE BRIEFED.  I AM GOING TO FOCUS ON

22  HAKANSSON-2 ALONE, AND IN COMBINATION WITH ATHEY, BECAUSE I

23  BELIEVE THAT WITH THE PRIOR ART AS ADMITTED BOTH BY THE

24  PATENT ITSELF OF CHEMFREE AND DR. DURKEE, THE EXPERT, AND

25  JUST THE COMBINATION OF HAKANSSON-2 OR HAKANSSON AND ATHEY

1    THAT THE CLAIMS OF EACH PATENT ARE PAINFULLY OBVIOUS, AND

2    THAT GETTING INTO SIMS AND MINKIN IS GETTING -- IS DELVING

3    INTO MECHANICAL DETAILS THAT, I SUBMIT, THE CURRENT LAW, KSR

4    AND ITS PROGENY, ARE DESIGNED TO BACK AWAY FROM AND SAY YOU

5    ARE NOT REQUIRED TO LOOK AT EVERY LITTLE MECHANICAL DETAIL

6    AND SAY CAN YOU EXPRESSLY FIND THAT IN THE PRIOR ART.

7             IN THAT REGARD, YOUR HONOR, I AM GOING TO FOCUS ON

8    HAKANSSON ALONE, AND HAKANSSON AND ATHEY WITH THE PRIOR ART

9    AS ADMITTED BY DR. DURKEE IN THE PATENTS THEMSELVES.  WE

10   AGREE, YOUR HONOR, WITH THE CURRENT LAW, THE BURDEN ON

11   OBVIOUSNESS IS ON THE DEFENDANTS UNDER CLEAR AND CONVINCING

12   EVIDENCE.

13            ON APPEAL WE MAY RAISE THE ISSUE OF WHETHER THAT

14   IS THE REMAINING STILL AN APPROPRIATE BURDEN.  IN PART, IN

15   LARGE PART, BECAUSE OF THE FUNDAMENTAL CHANGE IN THE SCOPE

16   AND APPLICATION OF THE OBVIOUSNESS DEFENSE FOLLOWING THE KSR

17   DECISION, YOUR HONOR.  I THINK PATENTS GRANTED AND

18   EXAMINATIONS GRANTED UNDER PRIOR LAW, AS IN THIS CASE, ARE

19   NOT ENTITLED TO THE DEFERENCE THEY WOULD HAVE BEEN BEFORE.

20   I THINK CHEMFREE'S COUNSEL ALLUDED TO EXAMINER STINSON

21   ISSUING HUNDRED OF THOUSANDS OF PATENTS.  I THINK THAT IS

22   PRECISELY ONE OF THE ISSUES THAT THE SUPREME COURT WAS

23   RESPONDING TO IN KRS IN SAYING THIS HAS GONE TOO FAR.

24            PATENTEES ARE COMING IN SAYING, WELL, THIS

25   PARTICULAR WORD, THIS PARTICULAR ITEM IS NOT EXPRESSLY FOUND

1    IN THE PRIOR ART, THEREFORE, MR. AND MS. EXAMINER, WE ARE

2    ENTITLED TO A PATENT.  AND THAT IS EXACTLY WHAT KSR IN PART

3    WAS RESPONDING TO.

4           SO YOUR HONOR, KSR REINFORCED THE ELEMENTS OF

5    OBVIOUSNESS ANALYSIS UNDER SECTION 103.  GOING BACK TO THE

6    GRAHAM DECISION BY THE SUPREME COURT, THAT IS THE LEVEL OF

7    ORDINARY SKILL IN THE ART, WHAT IS THAT LEVEL.  THE SCOPE

8    AND CONTENT OF THE PRIOR ART.  THE DIFFERENCES BETWEEN THE

9    PRIOR ART AND THE CLAIMS AT ISSUE, AND SECONDARY

10   CONSIDERATIONS.  WE WILL TOUCH ON EACH OF THOSE, YOUR HONOR.

11          FIRST I WANT TO TALK ABOUT THE LEVEL OF SKILL IN

12   THE ART, AGAIN, AS IT DOES APPLY TO THE SECTION 103 AND THE

13   IMPACT OF KSR.  YOUR HONOR, AS MR. SCHAETZEL, MY CO-COUNSEL,

14   HAS ALREADY ADDRESSED, WE BELIEVE THERE IS NO SUPPORT TO THE

15   PLAINTIFF'S PROPOSITION THAT THE COURT SHOULD ADOPT A LOWER

16   DEFINITION OF WHAT IS THE ORDINARY SKILL IN THE ART, IN

17   FACT, ORDERS OF MAGNITUDE LESS THAN WAS OTHERWISE APPLIED IN

18   THE CASE SPECIFICALLY IN THE ENABLEMENT FINDING.  WE THINK

19   THAT IS CONTRARY TO THE LAW GENERALLY, AND WE BELIEVE IT'S

20   PARTICULARLY CONTRARY TO WHAT IS LEGAL AND APPROPRIATE,

21   GIVEN THIS PATENT.  WE ALSO HAVE NOT FOUND A CASE SQUARELY

22   ON POINT, YOUR HONOR.  IT IS ONE OF THESE PRINCIPLES THAT WE

23   THINK IS SO OBVIOUS, NOT TO MAKE A PUN, BUT IT IS SIMILAR TO

24   THE PRINCIPLE THAT THE SCOPE OF THE CLAIMS ARE THE SAME FOR

25   INFRINGEMENT AND VALIDITY, LOOKING AT THE PRIOR ART, THE

1    KNOWLEDGE OF ONE OF THE ART IS THE SAME.

2           AS WE POINTED OUT BEFORE, YOUR HONOR, THERE IS A

3    REFERENCE IN CHISHOLM IN SECTION 7.03 SUB PART 2 B SMALL

4    CASE I, WHERE CHISHOLM INDICATES THERE IS SOME AUTHORITY FOR

5    THE PROPOSITION THAT THE KNOWLEDGE OF ONE OF ORDINARY SKILL

6    MAY BE LESS FOR ENABLEMENT THAN FOR OBVIOUSNESS.

7           BUT NUMBER ONE, HE IS TALKING ABOUT THE LEVEL OF

8    KNOWLEDGE, NOT THE FUNDAMENTAL LEVEL OF SKILL.  AND THERE IS

9    NO SUPPORT FOR SAYING THAT THE LEVEL OF SKILL SHOULD BE LESS

10   FOR OBVIOUSNESS THAN FOR ENABLEMENT.  I BELIEVE I HAVE NOT

11   RUN THIS TO THE GROUND, YOUR HONOR.

12          WE DO BELIEVE MR. CAPP IS CORRECT THAT THE TIMING

13   FOR, IN SECTION 102 AND 103, IS THE DATE OF THE INVENTION,

14   AND UNDER ENABLEMENT IT IS THE FILING DATE OF THE

15   APPLICATIONS.  WE SUBMITTED THIS CASE BOTH BECAUSE OF THE

16   PATENT AND BECAUSE OF THE EVIDENCE THAT IS A DISTINCTION

17   WITHOUT A DIFFERENCE.  THE PRIOR ART OF THE PATENT

18   CONVENTIONAL PARTS WASHERS GOES BACK YEARS.  THE HAKANSSON-2

19   PATENT IS DATED TWO YEARS PRIOR TO THE APPLICATION AT ISSUE.

20          THE ATHEY PATENT, YOUR HONOR, IS ADOPTING SOME OF

21   THE TECHNOLOGY THAT ARE IN THE CLAIMS, BUT WE SUBMIT THEY

22   ARE ALSO IN HAKANSSON.  BUT ATHEY GOES BACK 20 YEARS.  AND

23   BY THEIR OWN ARGUMENT AND EVIDENCE, YOUR HONOR, THEY WERE

24   THE FIRST IN THE FIELD TO HAVE A COMMERCIALLY SOLD PATENT

25   WASHER, BIOREMEDIATING PATENT PARTS WASHER, IN THE U.S.  I

1    DON'T THINK THAT IS REALLY RELEVANT, AS I GET TO IT IN A

2    MINUTE, BUT AS FAR AS THE DIFFERENCE IN TIMING, IT IS

3    IMMATERIAL IN THIS CASE, WE SUBMIT.

4            AND YOUR HONOR, AGAIN, THE PLAINTIFF ACCUSED THE

5    DEFENSE OF WANTING TO CHANGE THE SHAPE OF THE PLAYING FIELD.

6    I SUBMIT IT IS THE PLAINTIFF WHO WANTS TO CHANGE THE RULES

7    OF THE GAME BETWEEN ENABLEMENT AND OBVIOUSNESS.  BECAUSE I

8    SUBMIT IT IS AN ADMISSION YOUR HONOR THAT THE PLAINTIFF

9    REALIZES THAT IF THE COURT APPLIES THE SAME DEFINITION OF

10   SKILL IN THE ART THAT THE COURT APPLIED IN THE ENABLEMENT

11   DECISION ON THE PATENT WITH VERY SPARSE DISCLOSURES ABOUT

12   THE BIOREMEDIATING ASPECT OF THE CLAIMS, WHICH WHEN YOU LOOK

13   AT WHAT THE PATENTS AGAIN ADMIT WAS PRESENT IN THE PRIOR

14   ART, IS THE ONLY NEW ELEMENT OVER CONVENTIONAL PARTS

15   WASHERS, THAT THE PLAINTIFFS WOULD LOSE ON THE OBVIOUSNESS

16   CONSIDERATION.

17           YOUR HONOR, BOTH PARTIES I BELIEVE HAVE CITED THE

18   ENVIRONMENTAL DESIGNS LIMITED CASE 713 F 2D 693.  AS LAYING

19   OUT THE SIX FACTORS DETERMINING WHAT IS A LEVEL OF SKILL IN

20   THE ART, TWO OF THOSE, YOUR HONOR, ARE THE SOPHISTICATION OF

21   THE TECHNOLOGY, AND THE TECHNOLOGY AT ISSUE HERE IS CLEARLY

22   BIOREMEDIATING PARTS WASHERS.  THAT IS WHAT THE PATENT SAYS,

23   THAT IS WHAT DR. DURKEE AGREED.  AND THE TYPES OF PROBLEMS

24   ENCOUNTERED IN THE ART, AND THAT IS CLEARLY AGAIN, YOUR

25   HONOR, THE ART OF BIOREMEDIATING PARTS WASHERS.  IN THEIR

1     PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND I

2     THINK THEY ALREADY ALLUDED TO THIS SOMEWHAT, YOUR HONOR, THE

3     PLAINTIFF WANTS THE COURT TO ADOPT ANOTHER FACTOR WHICH IS,

4     THERE HAS TO BE AN EXISTING INDUSTRY WITH COMMERCIALLY

5     AVAILABLE PRODUCTS AND EMBODYING THE CLAIMS OF THE PATENT.

6     THAT IS NO SOMEWHERE IN THE SIX FACTORS, AND IT'S NOT

7     APPROPRIATE.

8             YOUR HONOR, THERE IS ONE FACTOR THAT DEALS WITH

9     THE EDUCATION LEVEL OF THOSE IN THE FIELD, BUT THAT IS

10    SYNONYMOUS WITH THE ART.  AND AS YOUR HONOR IS AWARE,

11    PATENTS COME OUT OF UNIVERSITIES, THEY COME OUT OF RESEARCH

12    CENTERS, THEY COME OUT OF INDIVIDUAL INVENTORS WHO PULL

13    IDEAS FROM ELSEWHERE.  THAT HAS HAPPENED IN THIS CASE.  THE

14    QUESTION IS NOT LIMITED TO WHAT ARE COMMERCIAL ENTITIES

15    MANUFACTURING FOR COMMERCIAL SALE IN THIS COUNTRY OR

16    ANYWHERE ELSE.

17            AND AGAIN, YOUR HONOR, IF YOU LOOK AT THE EVIDENCE

18    IN THIS CASE, THE EVIDENCE IS, WHEN THIS GENERAL CONCEPT

19    BETWEEN MR. MCCLUER AND MR. MCNALLY CAME UP, THEY CALLED

20    PEOPLE WHO HAD AVAILABLE MICROBES, USED INITIALLY IN

21    BIOREMEDIATION, NOT IN PARTS WASHING.  THEY ENDED UP TALKING

22    TO WARREN CHEMICAL, WHICH HAD COMMERCIALLY AVAILABLE PRODUCT

23    AVAILABLE WHICH, AS AN ASIDE, WAS NONTOXIC, NONCAUSTIC,

24    NONFLAMMABLE.  I WILL TALK ABOUT THAT LATER.  BUT THEY WENT

25    OUTSIDE THE PARTS WASHING FIELD, YOUR HONOR.  AND AGAIN, THE

1    PATENT DOES, TO EXPAND ON WHAT, BRIEFLY, ON WHAT

2    MR. SCHAETZEL SAID, COLUMN FOUR REFERS TO WHAT IS WELL-KNOWN

3    AND REPORTED IN THE ART, YOUR HONOR, CONCERNING THE MICROBES

4    AND THE APPROPRIATE SPECIES.

5         WHEN YOU LOOK AT THE PUBLICATIONS ON PAGE 2 THAT

6    CHEMFREE CITED TO THE PATENT OFFICE IN OBTAINING THIS

7    PATENT, IT IS CLEARLY -- THEY ARE CLEARLY NOT LIMITED TO

8    PARTS WASHING ARTICLES ABOUT CONVENTIONAL PARTS WASHERS.  IN

9    FACT, THESE DIDN'T COME INTO EVIDENCE, BUT MY PREDICTION IS

10   YOU WILL FIND NONE OF THESE COME FROM THE CONVENTIONAL PARTS

11   WASHING FIELD.  AGAIN, LOUISIANA REMEDIATION, THOSE WERE

12   INITIALLY ENVIRONMENTAL REMEDIATION SYSTEMS.

13        AND IF I UNDERSTAND CHEMFREE'S CONTENTION, AT

14   LEAST THEIR EXPERT'S CONTENTION, THEY ARE NOT EVEN TALKING

15   ABOUT THE LEVEL OF SKILL OF MANUFACTURERS, THEY ARE TALKING

16   ABOUT USERS, AND DR. DURKEE TESTIFIED THE PERSON THAT USES

17   THE WASHER, THEY PUT THAT PERSON IN CHARGE OF CLEANING, IT

18   IS SIMPLE.  HE WAS ASKED ONE QUESTION ABOUT AN ASPECT OF THE

19   BIOREMEDIATION TECHNOLOGY.  AND OBVIOUSLY, AS YOUR HONOR

20   RECALLS, HE SAID MANY TIMES, I AM NOT QUALIFIED TO ANSWER

21   THAT, AND A PERSON OF SKILL IN THE ART WOULDN'T BE

22   QUALIFIED.  HE ALSO SAID AT ONE POINT, A PERSON OF SKILL IN

23   THE ART, AS HE DEFINES IT, WOULDN'T EVEN CARE.  SO THAT IS

24   CLEARLY NOT THE APPROPRIATE LEVEL OF SKILL IN THE ART.

25        THE COURT:  I AM NOT SURE I AGREE -- MR. HARBIN, I

1    AND NOT SURE I AGREE WITH YOU THAT THE AVAILABILITY OF NO

2    OTHER BIOREMEDIATING PARTS WASHERS WOULD NOT BE A RELEVANT

3    FACTOR TO DETERMINING WHAT THE PRIOR ART IS.  I MEAN,

4    SOMEBODY WOULD HAVE HAD TO HAVE THOUGHT OF IT AND BUILT ONE

5    FOR IT TO BE GENERALLY INCLUDED IN THE PRIOR ART OF ANY SORT

6    OF PARTS WASHERS, WOULDN'T THEY?  WHAT ARE THOSE SIX FACTORS

7    AGAIN?

8              MR. HARBIN:  YOUR HONOR, THE SIX FACTORS ARE -- IT

9    MAY TAKE ME A MINUTE.  I CITED THE THREE I THINK THAT ARE

10   THE MOST RELEVANT, BUT IF YOU WILL GIVE ME A MINUTE, I WILL

11   SEE IF I CAN FIND THEM.

12             THIS IS ON PAGE 82, YOUR HONOR, OF OUR PROPOSED

13   CONCLUSIONS OF LAW.  EDUCATIONAL LEVEL OF THE INVENTOR, THE

14   TYPES OF PROBLEMS ENCOUNTERED IN THE ART, PRIOR ART SOLUTION

15   TO THOSE PROBLEMS, RAPIDITY TO WHICH INVENTIONS ARE MADE,

16   SOPHISTICATION OF THE TECHNOLOGY, AND EDUCATIONAL LEVEL OF

17   ACTIVE WORKERS IN THE FIELD.  AND WHAT I WAS ALLUDING TO,

18   YOUR HONOR, IS THE TYPES OF PROBLEMS ENCOUNTERED IN THE ART

19   -- WELL, IT COMES UP IN SEVERAL OF THEM, THE DEFINITION OF

20   THE ART.

21             I THINK AGAIN, CHEMFREE HAS DEFINED IT AS

22   BIOREMEDIATION IN THEIR OWN TO THE PATENT OFFICE, AND I

23   THINK THEY ARE BOUND BY THAT.  AND I DO THINK, YOUR HONOR,

24   EVEN IF THE COURT CONSIDERS THAT AS A FACTOR, NUMBER ONE,

25   THERE CLEARLY HAD BEEN A PRIOR BIOREMEDIATING PARTS WASHER

1    CONCEIVED, AND THAT IS THE HAKANSSON-2 REFERENCE ITSELF,

2    WHICH IS MORE COMPLEX, AND WE THINK, WE SUBMIT, YOUR HONOR,

3    THE IMPACT OF THAT IS, AS MR. SCHAETZEL SAID, THE STATE OF

4    THE ART HAD MOVED BEYOND THESE CLAIMS, IN FACT, TO COME UP

5    WITH A MORE SIMPLE VERSION IS NOT A PATENTABILITY INVENTION.

6            AND THAT LEADS ME TO THE NEXT TOPIC I JUST WANT TO

7    REVIEW, YOUR HONOR, AND THAT IS THE IMPACT OF THE KSR CASE

8    IN GENERAL, YOUR HONOR.  THE SUPREME COURT HELD, FOR THE

9    TRADITIONAL TEACHING SUGGESTION AND MOTIVATION TEST IS A

10   HELPFUL INSIGHT, THE OBVIOUSNESS INQUIRY IS EXPANSIVE AND

11   FLEXIBLE.  WHEN YOU COMBINE KNOWN ELEMENTS ACCORDING TO

12   KNOWN METHODS AND YOU YIELD PREDICTABLE RESULTS, THAT IS

13   LIKELY NOT OBVIOUS.  THE THIRD CITATION DOWN HERE, YOUR

14   HONOR, IS PARTICULARLY RELEVANT.  THE EFFECTS OF DEMANDS

15   KNOWN TO THE DESIGN COMMUNITY OR PRESENT IN THE MARKETPLACE

16   AND THE BACKGROUND KNOWLEDGE POSSESSED BY A PERSON HAVING

17   ORDINARY SKILL IN THE ART MAY LEAD THE AN APPARENT REASON TO

18   COMBINE KNOWN ELEMENTS.

19           AND THESE HOLDINGS YOUR HONOR, THE COURT HELD

20   TWO -- MADE TWO ADDITIONAL HOLDINGS WHICH ARE RELEVANT TO

21   THIS CASE.  NUMBER ONE, THE COURT THOUGHT THAT THE TEACHING,

22   SUGGESTION, MOTIVATION DOES NOT HAVE TO BE EXPLICIT, THE

23   COURT HELD THAT A PRIOR ART REFERENCE DOES NOT HAVE TO

24   ADDRESS THE SAME PROBLEM THAT THE PATENT IS ADDRESSING TO BE

25   RELEVANT, TO BE LOOKED AT BY SOMEONE IN THE ART, AND THAT

1    APPLIES, FOR EXAMPLE TO ATHEY, WHICH I WILL TALK ABOUT

2    LATER.  THE COURT HELD THAT, "IF A TECHNIQUE HAS BEEN USED

3    TO IMPROVE ONE DEVICE, A PERSON OF ORDINARY SKILL IN THE ART

4    WOULD RECOGNIZE THAT IT WOULD IMPROVE SIMILAR DEVICES IN THE

5    SAME WAY, USING THE TECHNIQUES IS OBVIOUS UNLESS ITS ACTUAL

6    APPLICATION IS BEYOND HIS OR HER SKILL."

7            THE COURT HELD, YOUR HONOR, AN IMPLICIT MOTIVATION

8    TO COMBINE EXISTS NOT ONLY WHEN A SUGGESTION MAY BE GLEANED

9    FROM THE PRIOR ART AS A WHOLE, BUT WHEN THE IMPROVEMENT IS

10   TECHNOLOGY INDEPENDENT, AND THE COMBINATION OF REFERENCES

11   RESULTS IN A PRODUCT OR PROCESS THAT IS MORE DESIRABLE, FOR

12   EXAMPLE, IT IS STRONGER, CHEAPER, CLEANER, FASTER, ET

13   CETERA."  AND THAT IS THE DYSTAR CASE.  MARKET TRENDS, YOUR

14   HONOR, CAN ESTABLISH OBVIOUSNESS.

15           I WOULD LIKE TO CITE JUST TWO MORE THINGS FROM THE

16   CASE, YOUR HONOR.  THIS IS NOT AN OFFICIAL COPY, BUT

17   CONSISTENT WITH THESE HOLDINGS, THE COURT HELD, IF A

18   PERSON -- THIS IS WHERE I UNDERLINED "PREDICTABLE

19   VARIATION."  "IF A PERSON OF ORDINARY SKILL IN THE ART CAN

20   IMPLEMENT A PREDICTABLE VARIATION, AND WOULD SEE THE BENEFIT

21   OF DOING SO, THE ALLEGED INVENTION IS LIKELY NOT

22   PATENTABLE."

23           AND FINALLY, YOUR HONOR, THE COURT HELD THAT, "THE

24   FEDERAL CIRCUIT ERRED IN CONCLUDING THAT A PATENT CLAIM MAY

25   NOT BE PROVED OBVIOUS MERELY BY SHOWING THAT THE COMBINATION

1      OF ELEMENTS WAS OBVIOUS TO TRY."  IN OTHER WORDS, YOUR

2      HONOR, HERE IT DOES NOT HAVE TO BE A PRIOR ART REFERENCE

3      THAT THE DEFENDANT CAN POINT TO ABOUT THE IMPROVEMENT.  IF

4      IT IS AN OBVIOUS STEP TO TAKE, IF THAT IS ESTABLISHED, THEN

5      IT IS LIKELY NOT PATENTABLE.  "WHEN THERE IS A DESIGN NEED

6      OR MARKET PRESSURE TO SOLVE A PROBLEM AND THERE ARE FINITE

7      NUMBER OF IDENTIFIED PREDICTABLE SOLUTIONS, A PERSON OF

8      ORDINARY SKILL IN THE ART HAS GOOD REASON TO PURSUE THE

9      KNOWN OPTIONS WITHIN HIS OR HER TECHNICAL GRASP.  IF THAT

10     LEADS TO THE ANTICIPATED SUCCESS, IT IS LIKELY A PRODUCT,

11     NOT OF AN INNOVATION, BUT OF ORDINARY SKILL AND COMMON

12     SENSE."

13              AND THAT, YOUR HONOR, IS WHAT HAPPENED HERE, WE

14     SUBMIT.  THESE WERE OBVIOUS STEPS, PREDICTABLE VARIATIONS TO

15     THE EXTENT THEY WERE NOT CLEARLY ALREADY IN THE PRIOR ART.

16     SO LET ME TURN TO THAT, YOUR HONOR.

17              BY THE WAY YOUR HONOR, THERE IS A FOOTNOTE 3 IN

18     THE MINI AUCTION CASE GOING BACK TO THIS ISSUE OF THE LEVEL

19     OF SKILL IN THE ART AND WHETHER IT IS THE SAME OR DIFFERENT

20     FROM ENABLEMENT.  IT IS FOOTNOTE 3, YOU HAVE TO READ THERE A

21     LITTLE BIT INTO IT, BUT I DO THINK IT IS THE APPROPRIATE

22     READING, BECAUSE BASICALLY WHAT THE COURT IS SAYING IS,

23     WELL, THERE WAS AN ARGUMENT THAT THE PATENT DID NOT HAVE

24     MUCH IN THE WAY OF AN ENABLING DISCLOSURE AND ENABLEMENT WAS

25     A DEFENSE.  AND THE COURT, IN FOOTNOTE 3, I THINK, SAID THAT

1    ENABLEMENT AND OBVIOUSNESS ARE FLIP SIDES OF THE SAME COIN,

2    AS YOUR HONOR HAS ALLUDED TO IN THIS CASE, INDICATING TO ME

3    THAT YOU DO USE THE SAME DEFINITIONS OF SKILL IN THE ART.

4             NOW, IN REGARD TO WHAT WAS IN THE PRIOR ART, YOUR

5    HONOR, IF YOU LOOK AT THE 110 PATENT, COLUMN 1.  A BASIN ON

6    TOP OF A TANK, YOUR HONOR, WAS -- IN FACT, IT WAS ADMITTED

7    IN THE PRIOR ART OF CONVENTIONAL PARTS WASHERS.  HAVING THE

8    SPIRITS DRAIN FROM THE BASIN BACK FROM INTO THE TANK WAS IN

9    THE PRIOR ART.  HE GOES ON TO SAY, AT THE BOTTOM, TWO

10   PARAGRAPHS DOWN, "FILTERS ARE OFTEN INCORPORATED INTO

11   CONVENTIONAL PARTS WASHERS."

12            AND YOUR HONOR, WE CAN GET INTO DETAIL IF YOU

13   WOULD LIKE, I BELIEVE I CAN, BUT YOU WILL RECALL DR. DURKEE

14   DID TESTIFY, AS YOUR HONOR I THINK WAS ALLUDING TO, THAT

15   FILTERS ARE WELL-KNOWN TO THOSE IN THE ART.  WHETHER OR NOT

16   IT WOULD HAVE BEEN -- WHETHER OR NOT IT IS INHERENT IN

17   HAKANSSON-2, WE BELIEVE IT IS, IT CLEARLY WAS PREFERABLE, AS

18   I BELIEVE MR. SCHAETZEL ALREADY QUOTED DR. DURKEE.  SOMEBODY

19   WITH SKILL WOULD PUT A FILTER IF THERE TO PROTECT AN

20   EXPENSIVE PUMP.  BUT IT WAS ALSO COMMON, HE ADMITTED, IN

21   CONVENTIONAL SIMILAR PARTS WASHERS.  AND I THINK THIS IS

22   VERY NOTABLE, YOUR HONOR, WE WILL TALK ABOUT SOME OF THE

23   OTHER ELEMENTS, BUT REGARDING THE 226 PATENT, CHEMFREE'S

24   COUNSEL ADMITTED THAT THE ONLY ITEMS THAT ARE NOT INHERENT

25   IN HAKANSSON-2 ARE "B", "C" AND "D."  IN OTHER WORDS,

1    CHEMFREE ADMITTED THAT ELEMENT "E" IN CLAIM 1 OF THE 226

2    PATENT, "REMOVING ORGANIC MATTER IN THE CLEANING FLUID, ET

3    CETERA, WHEREIN THE STEP OF REMOVING THE ORGANIC MATTER FROM

4    THE FLUID COMPRISES BIOLOGICALLY DEGRADING THE ORGANIC

5    MATTER," CHEMFREE ADMITS, YOUR HONOR, THAT IS IN THE

6    HAKANSSON REFERENCE, AND THAT IS IN THE PRIOR ART, IT IS

7    PRESUMED TO BE ENABLED.  BUT IT IS ADMITTED BY CHEMFREE.

8            ON SECTION 102, ANTICIPATION, YOUR HONOR, CHEMFREE

9    IS ARGUING HAGGLING ABOUT CIRCULATING, WHETHER HAKANSSON-2

10   CIRCULATES IN THE SAME DIRECTION FROM THE SECOND CHAMBER TO

11   THE FIRST CHAMBER TO WASH THE SURFACES OF THE PART.  NOW

12   YOUR HONOR, WE SUBMIT IT IS.  BUT WHETHER IT IS OR ISN'T,

13   ALL IT DOES, UNDER CHEMFREE'S ARGUMENT, IS REVERSE THE FLOW.

14   AS I ALLUDED TO, THE PATENT ADMITS THAT THE CIRCULATION, AS

15   CLAIMED IN THIS CLAIM, IS IN THE PRIOR ART, DR. DURKEE

16   ADMITTED IT.  THE NEXT ONE ITEM THEY CONTEST IS "C," PASSING

17   THE CLEANING FLUID THAT HAD CONTACTED THE PART THROUGH A

18   POROUS MEDIUM.  AND AGAIN, WE ALLUDED TO THIS, YOUR HONOR.

19   WE SUBMIT THAT IS IN HAKANSSON, BUT CLEARLY IT IS IN THE

20   PRIOR ART, AND BOTH ADMITTED IN THE PATENT SPECIFICATION,

21   AND AS DR. DURKEE READILY TESTIFIED TO.  AND THE FOURTH ONE

22   IS DRAINING THE FLUID, THE LIQUID, FROM THE FIRST CHAMBER

23   INTO THE SECOND CHAMBER AS MR. CAPP, YOU JUST HEARD MR. CAPP

24   SAY HIS QUIBBLING WITH HAKANSSON-2 IS THAT IT USES A MORE

25   COMPLEX SYSTEM OF PUMP.  AGAIN, THE DEVICE AT ISSUE IS A

1    PUMP, BUT THEY DO IT I THINK IN REVERSE, BUT THAT THIS CLAIM

2    IS FOR GRAVITY FLOW.  WHILE I SUBMIT, I PRESUME MR. CAPP

3    WILL ADMIT THAT GRAVITY FLOW THROUGH A DRAIN WAS NOT AN

4    INVENTIVE ELEMENT IN 1994.

5            NOW, YOUR HONOR, DR. DURKEE ADMITTED, YOUR HONOR,

6    THAT HAKANSSON-2 DISCLOSES THE BIOREMEDIATING PARTS WASHER

7    FOR CLEANING HYDROCARBONS FROM A PART THAT INCLUDES, AMONG

8    OTHER THINGS, A TANK, A BASIN, A PUMP, AN ASSEMBLY, A FLOW

9    PATH -- A FLOAT DEVICE PATH, AND MICROBES, AND A

10   THERMOSTATICALLY CONTROLLED HEATER FOR HEATING THE FLUID.

11           AND AGAIN, ATHEY, YOUR HONOR, I CAN PUT IT UP IF

12   YOUR HONOR WISHES, BUT YOUR HONOR WILL RECALL, I BELIEVE

13   AGAIN IT DATES BACK 20 YEARS, IS A PATENT ON A COMMERCIAL

14   DISHWASHER THAT INCLUDES A TEMPERATURE CONTROL DEVICE IN THE

15   DISHWASHER, TIED TO THE LIQUID LEVEL DETECTOR SO IT CONTROLS

16   IT AT THE OPTIMUM TEMPERATURE.  AGAIN, WE BELIEVE THAT'S --

17   IF YOU LOOK AT THE PLAINTIFF'S PROPOSED FINDINGS OF FACT AND

18   CONCLUSIONS, I THINK THEY REALLY ADMIT THAT IS IN

19   HAKANSSON-2, THEY JUST SAY IT IS DONE DIFFERENTLY.  BUT

20   HAKANSSON-2 IS GUARDING AGAINST THE FLUID GETTING TOO HIGH

21   AND ATHEY THE FLUID GETTING TOO LOW.  BUT ATHEY CLEARLY HAS

22   A LEVEL DETECTOR TO GUARD AGAINST THE FLUID BEING TOO LOW,

23   AND DR. DURKEE AGAIN ADMITTED THIS IS WELL-KNOWN IN THE ART.

24           THE COURT:  NOW WHAT DID HE ADMIT WAS WELL-KNOWN

25   IN THE ART?

1          MR. HARBIN:  I CAN PULL YOUR HONOR SPECIFIC

2     EXAMPLES AND QUOTES, BUT THAT THE LEVEL SENSOR AND THE

3     HEATER, I BELIEVE HE SAID THE COMBINATION.

4          THE COURT:  THE THING THAT HAS BOTHERED ME A

5     LITTLE ABOUT THAT IS THE FACT THAT IT IS A COMMERCIAL

6     DISHWASHER, AND WE ARE TALKING ABOUT THE ART OF PARTS

7     WASHERS, AND I DON'T KNOW THAT ONE THAT KNOWS PARTS WASHERS

8     WOULD NECESSARILY BE FAMILIAR WITH HOW A COMMERCIAL

9     DISHWASHER WORKED.  FOR EXAMPLE, IN KSR, IF I REMEMBER

10    RIGHT, ALL OF THE PATENTS THAT THEY LOOKED AT TO SEE THAT IT

11    WAS THE SUBJECT PATENT WAS OBVIOUS ALL HAD TO DO WITH THE

12    PEDAL FOR CONTROLLING THE THROTTLE OF AN ENGINE, GAS ENGINE.

13    AND IT SEEMS TO ME TO BE A MUCH BIGGER STEP THERE TO JUMP

14    FROM PARTS WASHERS TO DISHWASHERS.

15         MR. HARBIN:  YOUR HONOR, TWO ANSWERS.  NUMBER ONE,

16    I DON'T THINK IT IS A BIG STEP.  I THINK THAT SOMEBODY IN

17    THE FIELD -- AND I THINK -- I WILL FIND THE CITE IN A

18    MINUTE, YOUR HONOR.  ACTUALLY I HAVE THE CITES FROM THE

19    TEMPORARY AND I WILL HAVE TO FOLLOW UP WITH THE DAILY

20    TRANSCRIPT CITES, I APOLOGIZE.  BUT DR. DURKEE DID TESTIFY

21    THAT ABOUT PARTS WASHERS AND THE DISHWASHER.

22         THE COURT:  SO HE DREW IT INTO THE AMBIT OF WHAT

23    ONE THAT KNEW ABOUT PARTS WASHERS SHOULD KNOW ABOUT?

24         MR. HARBIN:  YES, YOUR HONOR.  AND I BELIEVE, AND

25    I WILL FIND YOU --

1              MR. CAPP:  THAT IS NOT NECESSARY.  WE HAVE

2    CONCEDED THAT POINT.

3              THE COURT:  OKAY.  THANKS.

4              MR. HARBIN:  ALL RIGHT.  AND SINCE WE ARE TALKING

5    ABOUT ATHEY, YOUR HONOR, LET ME GO AHEAD AND ADDRESS ONE

6    ISSUE THAT MAY BE, NOW THAT THEY HAVE CONCEDED IT, IS NOT --

7    MAYBE THEY ARE CONCEDING THIS AS WELL.  BUT THEY HAVE

8    ARGUED, YOUR HONOR, THAT ATHEY SHOULD NOT -- THAT ELEMENT OF

9    ATHEY SHOULD NOT BE CONSIDERED BECAUSE IT TEACHES A WAY.  I

10   SUBMIT, YOUR HONOR, THAT IS MISCONSTRUCTION OF WHAT THE

11   TEACHING-A-WAY DOCTRINE MEANS.  THE TEACHING-A-WAY DOCTRINE

12   MEANS YOU CITED SOME CASES IN OUR MATERIALS MEANS THAT IT'S

13   IN REFERENCE THAT TEACHES THAT THE CLAIMED INVENTION WOULD

14   NOT WORK OR TEND TO DISCOURAGE YOU FROM USING THE CLAIMED

15   INVENTION.  IF YOU ARE LOOKING -- ON THE OTHER HAND IF YOU

16   ARE BUILDING A PARTS WASHER AND YOU ARE LOOKING FOR

17   TEMPERATURE CONTROL TIED TO A LEVEL CONTROL, AND AGAIN THAT

18   WAS IN HAKANSSON-2.  YOU COULD LOOK AT A DISHWASHER, THE

19   FACT THAT IT SETS THE DISHWASHER TO A HIGH TEMPERATURE

20   BECAUSE IT IS TRYING TO SANITIZE DOESN'T CHANGE THE FACT

21   THAT IT'S CONTROLLING THE TEMPERATURE TO A CERTAIN LEVEL AND

22   TYING IT TO THE LEVEL OF THE FLUID.  THAT IS ALL YOU ARE

23   LOOKING FOR.

24              AND AGAIN, KSR SPECIFICALLY HELD THAT YOU DON'T

25   HAVE TO LIMIT YOUR SEARCH TO REFERENCES THAT ARE IN THE

1    PRIOR ART, AND HE HAS CONCEDED THE BASIC POINT NOW.  BUT I

2    SUBMIT ALSO THIS IS -- IT IS WELL-WITHIN MECHANICAL ARTS,

3    AND THAT IS ONE OF THE THINGS I THINK THIS IS AN AREA WHERE,

4    IN 1994, WE WOULD NOT HAVE TO FIND THE SPECIFIC REFERENCE TO

5    SHOW THAT USING A TEMPERATURE CONTROL, THERMOMETER, LEVEL

6    FLUID CONTROL, OR TYING THE TWO TOGETHER IS FOUND IN A

7    SPECIFIC REFERENCE FOR FINDING THIS IS OBVIOUS.  BUT I THINK

8    I SHOULD BE QUIET, BECAUSE I BELIEVE HE HAS CONCEDED.

9          YOUR HONOR, I THINK -- I WENT THROUGH THE 226

10   PATENT, AND THAT DID NOT HAVE, YOUR HONOR -- WE REVIEWED THE

11   ONLY ELEMENTS THEY ARE CONTESTING EVEN AS ANTICIPATION, I

12   THINK IT WAS MATTER OF LAW THAT IS CLEARLY OBVIOUS.  IT DID

13   NOT HAVE THE ELEMENTS THAT THEY ARE DISPUTING ON SOME OF THE

14   OTHER CLAIMS ABOUT NONFLAMMABLE, NONCAUSTIC.  WE TALKED

15   ABOUT THE FILTER.  IF YOU LOOK AT PAGES 65 TO 69, YOUR

16   HONOR, THE PLAINTIFF'S PROPOSED FINDINGS, THESE ARE THE

17   BASES ON WHICH THEY DISTINGUISH HAKANSSON FROM THESE OTHER

18   PATENTS, PATENT CLAIMS.  NO EXPRESS DISCLOSURE ABOUT

19   NONFLAMMABILITY OF A CLEANING FLUID, NO EXPRESS DISCLOSURE

20   ABOUT BEING NONCAUSTIC, NO INHERENT FILTER.  WE HAVE TALKED

21   ABOUT THE FILTER, AND I THINK FULLY COVERED THAT POINT.

22         HAKANSSON DESCRIBES A MORE COMPLICATED FLOW PATH.

23   AGAIN, I THINK THE FACT THAT IT IS MORE COMPLICATED ONLY

24   MEANS IT IS ADVANCED BEYOND.  BUT ALSO, AS WE HAVE SEEN,

25   CHEMFREE ADMITS THE FLOW PATH IS IN THE PRIOR ART OF THE

1    PATENT SPECIFICATION ITSELF.  THE CHEMFREE IS AN OPEN BASIN,

2    BUT AGAIN, OPEN BASINS ARE ADMITTED TO BE IN THE PRIOR ART

3    IN THE SPECIFICATION.  ONE OF THE THINGS THAT IS NOTABLE,

4    YOUR HONOR, IS THE PLAINTIFFS STRONGLY LITIGATED FOR A TIME

5    THAT HAKANSSON-2 DID NOT TEACH THAT THE FLUID SHOULD BE

6    NONTOXIC, NOR THAT IT HAD THE LEVEL CONTROLS AND THE HEATER.

7    THEY SEEM TO HAVE CONCEDED THAT, EVEN AS IN HAKANSSON-2,

8    THEY DON'T -- THEY DON'T CONTEND IN THEIR PROPOSED FINDINGS

9    OF FACT AND CONCLUSIONS OF LAW THAT HAKANSSON-2 DOES NOT

10   TEACH, THEY HAVE A NONTOXIC FLUID, AND I THINK THE EVIDENCE

11   WAS OVERWHELMING, IT IS DISCLOSING AND TEACHING TO HAVE

12   THRIVING MICROBES IN AN ENVIRONMENT CONTROLLED SO THAT THE

13   MICROORGANISMS CAN LIVE, OBVIOUSLY IT IS NONTOXIC.

14        LET ME ADDRESS, YOUR HONOR, THE ISSUE OF

15   NONCAUSTIC, WHICH IS ONE THEY HIT I THINK THE HARDEST.  WE

16   BELIEVE, YOUR HONOR, THAT THE EVIDENCE DOES SHOW THAT IT IS

17   PRESENT IN HAKANSSON-2 BECAUSE OF THE TESTIMONY WE HAVE

18   CITED BY DR. ADRIAENS THAT CAUSTIC DAMAGING A MICROBE WOULD

19   BE SIMILAR TO DAMAGING TISSUE IN YOUR SKIN, AND IF IT'S

20   ALLOWING THE MICROBES TO THRIVE, IT WOULDN'T BE CAUSTIC TO

21   THE HUMAN SKIN.

22        BUT THERE IS ANOTHER REASON, YOUR HONOR, SQUARELY

23   WITHIN KSR, AND THAT IS THIS:  IF YOU LOOK AT PAGES 8 AND 9

24   OF THE HAKANSSON-2 PATENT, IT PLAINLY DISCLOSES, AGAIN,

25   DEVELOPING THE OPTIMUM PERFORMANCE PARAMETERS.  IT SAYS IN

```
1    LINES 15 TO 17, "INCLUDING MAINTAINING THE WASHING LIQUID AT
2    A PREDETERMINED PH VALUE AND OPTIMUM TEMPERATURE."  AND NOW
3    REMEMBER, YOUR HONOR -- AND THAT APPEARS AGAIN ON PAGE 7.  I
4    THINK IT IS BASICALLY SIMILAR.  BUT REMEMBER UNDER KSR, YOUR
5    HONOR, UNDER SUBSTANTIVE CASES, I CAN CITE -- I DON'T HAVE
6    THE REFERENCE WITH ME -- HAKANSSON-2 PLAINLY TEACHES
7    CONTROLLING THE PH LEVEL IN AN OPTIMUM RANGE, OBVIOUSLY NOT
8    TOO ACIDIC, NOT TO ALKALINE.
9         I THINK MR. CAPP HAS ALREADY ALLUDED TO THE
10   REFERENCE IN HAKANSSON ABOUT MAINTAINING CARBOLIC ACID
11   BUILD-UP AND DEALING WITH THAT.  SO IF A PRIOR ART REFERENCE
12   TEACHES MAINTAINING AN OPTIMUM LEVEL OF PH VALUE, IT IS A
13   PREDICTABLE VARIATION UNDER KSR, YOUR HONOR, TO SAY I AM
14   GOING TO SET IT MORE FINELY WITHIN THAT PREDICTABLE LEVEL.
15   AND OBVIOUSLY, YOUR HONOR, THERE IS NO ARGUMENT THAT THAT
16   WAS BEYOND THE LEVEL OF SKILL TO DO THAT.
17        THE SECOND ASPECT, YOUR HONOR, AND WE ALSO THINK
18   UNDER THE COMMON DEFINITION, AS WE BRIEFED IT, IS
19   NONFLAMMABLE, BUT AGAIN THAT IS A PREDICTABLE VARIATION.
20   THE RELATED POINT ABOUT KSR I WOULD LIKE TO DRAW YOUR
21   HONOR'S ATTENTION TO IS THAT RESPONDING TO MARKET DESIRES IS
22   NOT NECESSARILY, UNDER KSR, AN INVENTIVE STEP.  AND IF YOU
23   RECALL, YOUR HONOR, THE EXHIBIT THAT WAS THE -- I THINK THIS
24   IS DEFENDANT'S EXHIBIT 144.  IT'S THE INTERVIEWS THAT
25   MR. MCCLUER AND MR. MCNALLY HAD DONE BEFORE THEY JOINED
```

1    CHEMFREE.  AND IF YOU LOOK ON THE PAGE BATES STAMPED 6195,

2    THEY TALKED ABOUT A LOT OF THINGS, INCLUDING THEY WANT TO

3    KNOW WOULD IT HURT HUMANS IF IT GOT IN THEIR EYES, HOW

4    FLAMMABLE IT IS, HOW TOXIC, ET CETERA.  SO CLEARLY THERE WAS

5    A CUSTOMER DESIRE FOR NONCAUSTIC, NONIRRITATING TO THE SKIN,

6    NOT FLAMMABLE.  IT IS COMMON SENSE, IF YOU ARE GOING TO HAVE

7    AN OPEN PARTS WASHER, YOUR HONOR, YOU DON'T WANT IT TO BE

8    FLAMMABLE.  AND AGAIN, KSR SAYS YOU CAN'T IGNORE THE COMMON

9    SENSE OF THOSE IN THE FIELD.  THEY ARE NOT AUTOMATONS, AND

10   THERE IS NO LONGER A SITUATION WHERE YOU GET TO POINT TO A

11   DISCRETE WORD AND SAY, AH, NONFLAMMABILITY DOESN'T APPEAR

12   EXPRESSLY IN THE PRIOR ART AND THEREFORE IT IS NOT OBVIOUS.

13   THAT IS NOT THE CASE ANYMORE.

14        MOREOVER, YOUR HONOR, THEY FOUND A COMMERCIALLY

15   AVAILABLE SOURCE FROM SEAWASH, WHICH THEY ENDED UP USING,

16   WHICH WAS MARKETED BY WARREN CHEMICAL AS BIODEGRADABLE,

17   NONFLAMMABLE, NONTOXIC.  SO IT WAS READILY ON THE MARKET,

18   AND IT WAS A SIMPLE DESIGN CHOICE TO MEET THE MARKET NEEDS.

19        WHICH LEADS ME, YOUR HONOR, TO THE FINAL POINT

20   ABOUT THE ELEMENTS, AND THAT IS TAKING CONVENTIONAL PARTS

21   WASHERS TO BIOREMEDIATING.  AND THE EVIDENCE WE THINK IS

22   OVERWHELMING, THERE WAS MARKET DEMAND.  TRUTHFULLY I THINK

23   IT IS ACCURATE TO SAY THERE WAS PERCEIVED MARKET DEMAND MORE

24   THAN ACTUAL MARKET DEMAND.  IF YOU RECALL THE CHEMFREE

25   EXECUTIVES TESTIFYING, THIS PRODUCT HAS NOT BEEN AS

1    SUCCESSFUL AS THEY WOULD LIKE.  THAT THE MAIN COMPETITION IS

2    STILL SOLVENT-BASED WASHERS.  BUT THERE WAS A PERCEIVED

3    MARKET DEMAND, THERE WAS THE MONTREAL PROTOCOL, INCREASED

4    ENVIRONMENTAL REGULATION.  IT WAS AN OBVIOUS STEP TO SAY WE

5    ARE GOING TO TAKE IT, WE ARE GOING TO DEVELOP A

6    BIOREMEDIATING PARTS WASHER.  AND AGAIN, THEY DID NOT INVENT

7    THE GENERAL CONCEPT OF BIOREMEDIATING PARTS WASHERS.  THAT

8    WAS, AMONG OTHER POTENTIAL PLACES, IT WAS IN HAKANSSON-2

9    YEARS BEFORE THE APPLICATION.

10          SO RESPONDING TO THAT DEMAND AND PUTTING THOSE TWO

11   TOGETHER, THERE WAS A CLEAR MOTIVATION, DR. DURKEE TESTIFIED

12   EXTENSIVELY ABOUT IT, AND THAT IS NOT -- THAT DOES NOT

13   CREATE AN INVENTIVE REPETITIVE STEP.

14          IN THAT REGARD, YOUR HONOR, AT LEAST IN THEIR

15   PROPOSED FINDINGS AND CONCLUSIONS OF LAW, CHEMFREE REALLY

16   ADOPTS WHAT I THINK IS A RED HERRING.  THEY KEEP TALKING

17   ABOUT WHAT WOULD BE THE MOTIVATION FOR A USER OR DEVELOPER

18   OF HAKANSSON-2, A MORE COMPLEX PARTS WASHER TO GO BACKWARDS

19   TO GO TO A MORE SIMPLE PARTS WASHER.  THAT IS NOT REALLY THE

20   TEST.  THE TEST, YOUR HONOR, IS WHAT WAS THE MOTIVATION FOR

21   SOMEBODY USING A SIMPLE PARTS WASHER TO ADOPT THE

22   BIOREMEDIATION STEP, AND WAS THERE A SOURCE OUT THERE THAT

23   HAD A PRIOR ART SOURCE.  AND IT CLEARLY WAS.

24          LIKE IN KSR, WHAT WAS THE MOTIVATION TO GO TO AN

25   ELECTRONIC SENSOR ON THE PEDAL INSTEAD OF A MECHANICAL

1   DEVICE?  IN MUNIAUCTION WHAT WAS THE MOTIVATION TO GO TO

2   INTERNET-BASED METHOD INSTEAD OF JUST THE PRIOR ELECTRONIC

3   METHOD.  THERE ARE MANY EXAMPLES OF THAT, YOUR HONOR, I CAN

4   GIVE WHERE THE COURT HAS BASICALLY SAID TAKING IT TO THE

5   NEXT STEP TECHNOLOGICALLY IS NOT NECESSARILY AN INVENTIVE

6   STEP.

7         NOW, BRIEFLY YOUR HONOR, I WOULD LIKE TO ADDRESS

8   THE ISSUE OF SECONDARY CONSIDERATIONS.  THE PLAINTIFF I

9   THINK RELIES HEAVILY ON SECONDARY CONSIDERATIONS.  THE FIRST

10  POINT I WOULD MAKE, YOUR HONOR, IS AS WE POINTED OUT IN OUR

11  BRIEFING, THE SECONDARY CONSIDERATIONS CANNOT OVERCOME A

12  STRONG CASE, PRIMA FASCIE CASE OF OBVIOUSNESS.  AND I WILL

13  CITE, AMONG OTHER CASES, THE MUNIAUCTION CASE, 532 F 3D,

14  1318, PINPOINT CITE IS 1328.  BUT MOREOVER, YOUR HONOR, THEY

15  RELY ON MARKETING PRIMARILY, THEY RELY ON AWARDS, MARKETING,

16  TOUTING THE BENEFITS, ALLEGED COPYING, AND ALLEGED

17  UNEXPECTED RESULTS.  AND THEN THEY CITE CHEMFREE'S ADOPTION

18  OF THE OVERLAND PATENT, THE ACQUISITION OF IT.

19        I WOULD LIKE TO ADDRESS THOSE BRIEFLY.  YOU KNOW

20  MARKETING, YOUR HONOR, NEEDS TO BE RECOGNIZED FOR WHAT IT

21  IS.  IT CAN BE CONSIDERED, BUT GENERALLY IN THE CASES, YOUR

22  HONOR, MARKETING, ADVERTISING, AND AWARDS ARE CITED, BUT

23  THEY ARE CITED WHEN THERE IS EVIDENCE ALSO OF SIGNIFICANT

24  COMMERCIAL SUCCESS, WHICH THE PLAINTIFF IS NOT CLAIMING

25  HERE, AND I THINK THE EVIDENCE SHOWED TO THE CONTRARY.  NOW,

1    FEDERAL CIRCUIT CASE LAW DOES SHOW THAT THAT IS, AS FAR AS

2    THE LACK OF COMMERCIAL SUCCESS, IT IS A NEUTRAL FACTOR.  BUT

3    AGAIN, I DO THINK, AS WE PUT IN OUR PROPOSED FINDINGS -- OUR

4    RESPONSE TO THEIR PROPOSED FINDINGS, YOU CAN READ, I THINK,

5    GRAHAM.  IT IS A BRIEF DISCUSSION IN GRAHAM OF THESE

6    FACTORS, BUT IT SAYS, THEY MAY BE CONSIDERED FOR OBVIOUSNESS

7    OR NONOBVIOUSNESS.  I DON'T THINK UNDER GRAHAM THEY ARE

8    NECESSARILY LIMITED TO NONOBVIOUSNESS.  BUT AT A MINIMUM,

9    YOUR HONOR, THE CASES THAT TALK ABOUT ADVERTISING ARE

10   GENERALLY CASES WHERE THERE IS ALSO SIGNIFICANT COMMERCIAL

11   SUCCESS.

12       YOUR HONOR HEARD THE EVIDENCE OF COPYING.  WE HAVE

13   ADDRESSED THAT.  BUT AMONG OTHER THINGS, THE EVIDENCE WAS

14   UNDISPUTED THAT WE TRIED TO DEVELOP AN APPROVED DEVICE WITH

15   IMPROVED FLUID.  THEIR EMBODIMENT, AS YOU RECALL, HAD THIS

16   MAT, THE BUGS IN THE MAT, AND WALTER SPECIFICALLY DID NOT

17   WANT TO DO THAT AND DID NOT DO THAT.

18       AND REGARDING THE OVERLAND PATENT, YOUR HONOR, AS

19   CHEMFREE ADMITS, THE CASE LAW THEY CITE GENERALLY DEALS WITH

20   WHEN THE COMPETITORS ITSELF ATTEMPTS TO APPLIES FOR A PATENT

21   ON THE INVENTION.  AND IN THIS CASE, THERE WERE SOME

22   DIFFERENCES, BUT MORE TO THE POINT, MR. OVERLAND DID THAT ON

23   HIS OWN, YOUR HONOR.  WALTER ACQUIRED THAT PATENT

24   SUBSEQUENTLY AS PART OF A BROADER RELATIONSHIP, AND THERE IS

25   ALL SORTS OF REASONS FOR DOING THAT.  I DON'T THINK YOU CAN

1    ATTRIBUTE ANYTHING SIGNIFICANT TO THAT.  IN GOING BACK TO

2    THE INITIAL POINT, I DON'T THINK IT OVERCOMES THE

3    OVERWHELMING CASE THAT THESE CLAIMS ARE OBVIOUS.  THANK YOU.

4         THE COURT:  LET ME ASK YOU THIS, MR. HARBIN.  THIS

5    IS SOMETHING THAT HAS OCCURRED TO ME RECENTLY.  IF

6    BIOREMEDIATION WAS AN OBVIOUS SOLUTION TO A PROBLEM IN 1994,

7    AND LARGELY IT HAD BEEN LEARNED FROM MEDIA REPORTS OF THE

8    EXXON VALDEZ OIL SPILL, I FIND IT IRONIC OR SOME QUESTION IN

9    MY MIND AS TO WHY THEY HAVE NOT BEEN ABLE TO USE ANY

10   BIOREMEDIATION WITH REGARD TO THE PRESENT OIL SPILL AND THE

11   RIG OFF THE LOUISIANA COAST.

12        MR. HARBIN:  THAT EXCEEDS MY KNOWLEDGE, YOUR

13   HONOR.  BUT I WOULD SAY THIS:  AND IT --

14        THE COURT:  AND IT'S BEYOND, YOU KNOW, IT IS

15   BEYOND THE PARAMETERS OF THE CASE TOO.  BUT THAT HAS BEEN A

16   QUESTION IN MY MIND, WHEN THEY TALKED ABOUT THEM, BUT THEY

17   HAVE NOT USED THEM AT ALL THAT I HAVE SEEN.

18        MR. HARBIN:  MY UNDERSTANDING IS, THEY ARE USING

19   IT, BUT I DO THINK THAT THE EVIDENCE AT TRIAL SHOWS THAT

20   USING BIOREMEDIATING MICROBES IN MORE DISCRETE SETTINGS,

21   SOMEWHAT CLOSER TO A PARTS WASHER, LIKE A SMALLER SPILL OR A

22   SPECIFIC LAND SITE.  ONE OF THE ISSUES I KNOW OVERALL IN

23   THIS WHOLE SITUATION IN THE GULF IS THE WIND AND THE WATER

24   AND JUST THE VOLUME OF IT, HOW DO YOU -- I AM SURE ONE ISSUE

25   IS HOW DO YOU APPLY THE MICROBES AND ARE THEY GOING TO STAY

1    WHERE THEY ARE, VERSUS GETTING WASHED AWAY OR WHATEVER.  AND

2    YOU HAVE TO -- YOU KNOW, THEY HAVE TO HAVE TIME TO DIGEST

3    THE ORGANIC COMPOUNDS, ET CETERA.

4         I DO THINK IT IS IMPORTANT TO KEEP IN MIND, YOUR

5    HONOR, THAT GIVEN THAT ISSUE THAT THE PLAINTIFFS DID NOT --

6    THEY DON'T CLAIM TO HAVE INVENTED A MICROBE FOR

7    BIOREMEDIATION OF ANY KIND, INCLUDING IN PARTS WASHERS.

8    THEY OBTAINED COMMERCIALLY AVAILABLE MICROBES.

9         THE COURT:  RIGHT.  THANK YOU.  THANK YOU,

10   MR. HARBIN.  MR. CAPP?

11        MR. CAPP:  I DON'T HARDLY KNOW WHERE TO BEGIN,

12   THAT PRESENTATION WAS SO DISJUNCTIVE.  I REALLY THINK I NEED

13   TO COME BACK TO THIS IDEA OF ORDINARY SKILL IN THE ART

14   FIRST.  THIS DEFENDANT CAN'T MEET ITS BURDEN OF PROOF

15   REGARDLESS OF WHAT THE LEVEL OF ORDINARY SKILL IN THE ART

16   IS.  I MEAN, WHETHER IT IS HIGH, WHETHER IT'S LOW.  I MEAN,

17   LET'S TAKE A LOOK AT WHAT EVIDENCE WAS PRESENTED AT TRIAL.

18   THE PLAINTIFF AGREED AND STIPULATED INTO EVIDENCE FOUR

19   REFERENCES.  SO THOSE CAME IN.  AND THEN WE'VE GOT THE ISSUE

20   OF WHETHER TWO OF THEM ARE ACTUALLY PRIOR ART OR NOT.

21   BEYOND THAT, THEIR PRIMARY REFERENCE, HAKANSSON-2, WAS NOT

22   TESTIFIED ABOUT AT ALL BY THEIR EXPERT.

23        THEIR EXPERT THOUGHT THAT THE LEVEL OF ORDINARY

24   SKILL IN THE ART WAS AT THE LEVEL OF AN ENVIRONMENTAL

25   SCIENTIST.  BUT HE NEVER TOOK THE OPPORTUNITY, NOR COULD HE,

1    BECAUSE OF HOW THE CASE PROGRESSED, INTO GIVING TESTIMONY AS

2    TO WHAT THAT PERSON COULD OR COULD NOT DO IN TERMS OF THEIR

3    CAPABILITY TO MODIFY THE PRIOR ART IN ORDER TO GET TO THE

4    PATENT INVENTION, BECAUSE HE FAILED TO ADEQUATELY ADDRESS

5    THAT IN HIS EXPERT REPORT.  SO THERE HAS BEEN NO EVIDENCE OF

6    THAT.  SO YOU'VE GOT THE REFERENCES, YOU HAVE NO COMPETENT

7    TESTIMONY BY A WITNESS THAT WAS PROFFERED BY THE DEFENDANT,

8    SO THEN YOU HAVE THE DEFENDANT CALLING THE PLAINTIFF'S

9    EXPERT AS ITS PRIMARY WITNESS IN SUPPORT OF ITS CASE IN

10    CHIEF ON AN ISSUE THAT IT HAS THE BURDEN OF PROOF BY CLEAR

11    AND CONVINCING EVIDENCE, HOPING THEY CAN BUILD THEIR ENTIRE

12    CASE OUT OF CROSS-EXAMINING SOMEONE WHO HAS DONE A WRITTEN

13    REPORT SAYING THAT THE PATENTS ARE NONOBVIOUS.  THAT IS WHAT

14    THIS CASE IS.  THAT IS ALL THE EVIDENCE THAT THERE HAS BEEN.

15         SO WHETHER OR NOT DR. DURKEE IS CORRECT THAT THE

16    FIELD OF THE INVENTION FOR OBVIOUSNESS IS PARTS WASHING,

17    THAT THE LEVEL OF ORDINARY SKILL IN THE ART IS, AS

18    DR. DURKEE SAID, THERE HAS BEEN NO TESTIMONY AT ALL FROM ANY

19    WITNESS AS TO WHAT YOU CAN DO WITH THESE PRIOR ART

20    REFERENCES AND MODIFY THEM IN ACCORDANCE WITH SOME OTHER

21    LEVEL OF SKILL IN THE ART.  THERE HAS BEEN NO TESTIMONY.

22    LOTS OF ARGUMENT, BUT NO TESTIMONY.

23         NOW, I DO NEED TO TAKE MR. HARBIN TO TASK FOR NOT

24    HAVING COMMANDED HIS FACTS WHEN HE CAME TO THE PODIUM TODAY,

25    BECAUSE THE LEVEL OF ORDINARY SKILL IN THE ART IN

1    DR. DURKEE'S REPORT IS NOT A PARTS WASHING OPERATOR.  YOU

2    KNOW, SOMEBODY WHO STANDS OVER THE SINK AND WASHES THE

3    PARTS.  IT IS CLEAR, IF YOU READ HIS REPORT, THE PERSON HAS

4    A COLLEGE DEGREE, THE PERSON HAS AT LEAST ONE YEAR OF

5    CHEMISTRY OR ONE YEAR OF BIOLOGY.  THAT'S NOT THE KIND OF

6    PERSON THAT SITS IN AN INDUSTRIAL PLANT AND WASHES PARTS OR

7    SITS IN A GARAGE, MECHANICS GARAGE, AND WASHES PARTS THAT

8    YOU TAKE OFF OF A CAR FOR REPAIR.

9         IT WAS CLEAR, IF YOU READ HIS ENTIRE REPORT IN

10   CONTEXT, HE IS DESCRIBING THE INDUSTRY.  HE IS DESCRIBING

11   WHO THE PLAYERS ARE IN THE INDUSTRY AND THE AMOUNT OF

12   RESEARCH, AND DON'T THEY GO BY HOW BIG THE COMPANIES ARE.

13   AND HE ACTUALLY NAMED PEOPLE THAT HE KNEW FROM PERSONAL

14   EXPERIENCE WHO ARE OUT THERE MAKING THESE KINDS OF MACHINES,

15   AND HE PUT ALL OF THAT TOGETHER TO SAY THAT THE PERSON OF

16   ORDINARY SKILL IN THE ART THAT WOULD BE DESIGNING ONE OF

17   THESE THINGS WOULD HAVE A BACHELORS DEGREE.

18        I WILL GO BACK TO THE THREE ALTERNATIVES THAT WE

19   HAD ON ORDINARY SKILL.  THERE IS THE PLAINTIFF'S OBVIOUSNESS

20   ONE FROM DURKEE, WHICH IS THE PARTS WASHING GUY WITH THE

21   BACHELORS DEGREE AND TWO TO THREE YEARS OF EXPERIENCE IN

22   PARTS WASHING BUT VERY LITTLE MICROBIOLOGY EXPERTISE.  AND

23   THEN YOU'VE GOT THE ENVIRONMENTAL SCIENTIST WHO KNOWS SOME

24   MICROBIOLOGY AND MAYBE EVEN THE MECHANICS OF BIO-REACTORS,

25   BUT DOESN'T HAVE A LOT OF EXPERTISE IN CLEANING CHEMISTRY

1    AND CLEANING TECHNOLOGY.  THE SCIENCE OF REMOVING A STUCK-ON
2    CONTAMINANT FROM A PART.
3              AND THEN YOU HAVE THE TEAM APPROACH.  WELL, THERE
4    HAS BEEN NO EVIDENCE FROM EITHER SIDE AS TO WHAT THE TEAM
5    APPROACH COULD OR COULDN'T DO WITH THESE REFERENCES.
6    NEITHER PARTY EVEN TRIED TO PUT THAT ON.
7              SO WHICHEVER WAY YOUR HONOR COMES DOWN ON THAT,
8    THE ONLY WITNESS THAT SAT THERE AND GAVE AN OPINION
9    TESTIMONY IS DR. DURKEE, AND HIS LEVEL OF ORDINARY SKILL IN
10   THE ART IS WHAT IT IS.  BUT THERE HAS BEEN NO EVIDENCE AT
11   THE OTHER TWO LEVELS.  IT JUST WASN'T ADDRESSED.  AND
12   THEY'VE GOT THE BURDEN OF PROOF.
13             I NEED TO BRING THIS UP, YOU KNOW, A LITTLE BIT
14   TONGUE-IN-CHEEK, BUT IT REALLY DOES FALL HERE.  BECAUSE,
15   YOUR HONOR, JUST A YEAR AGO WHAT THEY WERE ADVOCATING IN ALL
16   OF THEIR PAPERS AND THEIR SUMMARY JUDGMENT WAS, THIS
17   TECHNOLOGY IS SO COMPLICATED THAT EVEN IF YOU HAND THE
18   SPECIFICATION TO A PERSON OF HIGH SKILL IN THE ART, LIKE
19   DR. ADRIAENS SAID, YOU STILL CAN'T PRACTICE, IT IS NOT
20   ENABLED.  IT'S NOT ENABLED.
21             AND IF YOU LOOK AT DR. ADRIAENS REPORTS, AND I
22   THINK I QUOTED COPIOUSLY FROM THAT IN MY FINDINGS OF FACT
23   AND CONCLUSIONS OF LAW OVER AND OVER AND OVER AGAIN, HE
24   SAID, "MY PERSON OF ORDINARY SKILL JUST COULDN'T DO THIS."
25   "MY PERSON OF ORDINARY SKILL JUST COULDN'T DO THIS."  "MY

1    PERSON OF ORDINARY SKILL JUST COULDN'T DO THIS," EVEN WITH

2    THE SPECIFICATION, NEVER MIND JUST THE PRIOR ART REFERENCES.

3            SO BASICALLY WHAT YOU HAVE IS A DEFENDANT WHO PUT

4    ON NO AFFIRMATIVE CASE AT ALL BECAUSE THEY MESSED UP ON

5    THEIR EXPERT REPORT, IT WAS STRICKEN, THEY WERE FORBIDDEN BY

6    AN EXCLUSIONARY ORDER TO PUT ON AFFIRMATIVE EVIDENCE OF

7    MODIFYING THE ART, MOTIVATIONS, AND WHAT IT WOULD TAKE TO

8    MODIFY THE PRIOR ART.  SO ESSENTIALLY THEIR CASE WAS THIS:

9    WELL, THE PLAINTIFF DIDN'T COME INTO COURT AND THEY DIDN'T

10   PROVE THAT THE PATENTS ARE NOT OBVIOUS, SO THEY MUST BE

11   OBVIOUS.

12           WELL, THAT IS NOT HOW YOU DO THINGS.  THEY ARE THE

13   DEFENDANT, THEY'VE GOT THE BURDEN OF PROOF.  THEY DIDN'T PUT

14   ON AFFIRMATIVE EVIDENCE TO PROVE THEIR CASE.

15           THE OTHER THING, AND THIS IS VERY CHARACTERISTIC

16   OF MR. HARBIN'S PRESENTATION THAT HE JUST FINISHED, IS

17   REMEMBER UNDER THE STATUTE THE OBVIOUSNESS STANDARD IS YOU

18   LOOK AT THE INVENTION AS A WHOLE, WHETHER THE INVENTION AS A

19   WHOLE WOULD HAVE BEEN OBVIOUS TO SOMEONE IN ORDINARY SKILL

20   IN THE ART.  WHAT YOU HEARD WAS, WELL, IT'S OBVIOUS TO ADD

21   THIS ELEMENT, IT IS OBVIOUS TO ADD THAT ELEMENT, IT IS

22   OBVIOUS TO ADD THAT ELEMENT.  AND THEY GAVE THE CLASSIC

23   HINDSIGHT ANALYSIS, WHICH IS HAND SOMEONE A PATENT AND THEY

24   TAKE THAT AS A SHOPPING LIST, AND NOW YOU GIVE THAT TO YOUR

25   PRIOR ART SEARCHER, AND THE PRIOR ART SEARCHER SAYS, I NEED

1    TO GO FIND PRIOR ART THAT HAS THIS, THIS, AND THIS ON MY

2    SHOPPING LIST.  AND YOU GO, COME BACK, AND OKAY, THIS

3    REFERENCE HAS THIS ELEMENT, THIS REFERENCE HAS THIS ELEMENT

4    OVER HERE, THIS REFERENCE HAS THIS ELEMENT OVER HERE.

5              AND THEN YOU COME IN FRONT OF THE COURT AND SAY,

6    SEE, GOT MY SHOPPING LIST DONE.  HERE IS ALL OF THE ELEMENTS

7    AND THEY ARE ALL IN PRIOR ART AND SO OF COURSE IT'S OBVIOUS.

8              IF YOU HAVEN'T SEEN THE MOVIE YET, I HIGHLY

9    RECOMMEND IT, I HAVE THE DVD, I JUST HAPPENED TO SEE IT OVER

10   THE WEEKEND BEFORE YOU SENT YOUR NOTICE OUT.  IT IS CALLED

11   FLASH OF GENIUS, AND IT IS THE MOVIE THAT GOES THROUGH THE

12   LITIGATION HISTORY OF THE VARIABLE SPEED WINDSHIELD WIPER

13   PATENTS.

14             THE COURT:  I HAVE HEARD THAT IS A GOOD MOVIE.  I

15   HAVE NOT SEEN IT.

16             MR. CAPP:  I CAN'T REMEMBER THE INVENTOR'S NAME.

17   HE REPRESENTED HIMSELF PRO SE AT THE TRIAL, AND FORD'S

18   ENGINEER GOT ON THE WITNESS STAND AND HE DID EXACTLY WHAT

19   MR. HARBIN JUST ARGUED TO YOU.  HE SAYS, THERE IS THE

20   SCHEMATIC, SEE?  THE CAPACITOR.  OH, THAT WAS IN THE PRIOR

21   ART.  YOU SEE THAT VARIABLE RESISTER, THAT WAS IN THE PRIOR

22   ART.  SEE THAT MECHANICAL DO-HICKEY THAT WAS IN THE PRIOR

23   ART.  ALL THIS GUY OVER HERE DID WAS ARRANGE THEM IN SOME

24   SORT OF NEW WAY.  AND THE INVENTOR HAD HIS KID RUN OUT TO

25   BARNES & NOBLE BOOKSTORE AND COME RUNNING BACK IN WITH A

1    TALE OF TWO CITIES, AND HE PULLED IT OUT AND HE ASKED

2    PERMISSION TO CROSS-EXAMINE OFF OF THE BOOK AND ASKED THE

3    FORD ENGINEER, AND READ THE FIRST SENTENCE, IT WAS THE BEST

4    OF TIMES, IT WAS THE WORST OF TIMES, AND WENT THROUGH EACH

5    WORD.  OH, THAT WAS KNOWN BEFORE DICKENS WROTE THIS.  YEAH.

6    YEAH.  SO ALL DICKENS DID WAS TAKE THOSE KNOWN WORDS AND

7    ARRANGE THEM IN A NEW WAY; RIGHT?

8              AND THAT'S THE POINT.  ALL OF THESE OBVIOUSNESS

9    QUESTIONS IS, YES, INVENTORS CREATE BY TAKING THE THINGS

10   THAT ARE KNOWN, THE BUILDING BLOCKS, IF YOU WILL.  AND WHY

11   THE UNITED STATES PATENT OFFICE GIVES THEM A PATENT IS

12   BECAUSE THEY USE SOME INNOVATION, THEY ARRANGE THEM IN A NEW

13   WAYS TO CREATE SOMETHING THAT IS NEW AND USEFUL OF A

14   SUFFICIENT INCREMENT THAT IT GETS PAST THE OBVIOUSNESS.

15             THE COURT:  THAT'S OKAY UNDER KSR.  YOU CAN DO

16   THAT.  SO WHY SHOULD -- WHAT IS THE DIFFERENCE HERE WHY THAT

17   WASN'T OBVIOUS TO REARRANGE THESE DIFFERENT FEATURES INTO A

18   BIOREMEDIATING PARTS WASHER?

19             MR. CAPP:  WELL, WE NEED TO TAKE IT BY THE

20   NUMBERS.  LET'S START WITH HAKANSSON.  LET'S REMEMBER WHAT

21   IS MISSING FROM HAKANSSON.  HAKANSSON IS A CLOSED CABINET

22   SYSTEM, WHICH MEANS THEY COULD USE HIGH PRESSURE SPRAY IN

23   ORDER TO GET THE CLEANING EFFICIENCY THAT THEY NEED.  YOU

24   CLOP THE TOP OFF OF THAT SO THAT IT IS AN OPEN BASIN, YOU

25   CAN'T USE THAT HIGH PRESSURE ANYMORE.  SO YOU ARE GOING TO

1    SACRIFICE CLEANING EFFICIENCY TO GO TO A LOW PRESSURE SPRAY

2    TO ACCOMMODATE THE FACT THAT YOU ARE IN AN OPEN BASIN

3    ENVIRONMENT.

4         THE COURT:  WELL, LET ME ASK YOU THIS:  DO YOU SEE

5    MANY HAKANSSON PARTS WASHERS AROUND?

6         MR. CAPP:  THE EXTENT OF MY INVESTIGATION IN THE

7    CASE, AND BEING THE ATTORNEY FOR, YOU KNOW, THE INDUSTRY

8    LEADER IN THIS, THERE IS NO KNOWN HAKANSSON MACHINE ANYWHERE

9    IN THE PLANET EARTH.

10        THE COURT:  DO YOU SEE MANY CHEMFREE PARTS WASHERS

11   AROUND?  WHAT HAS BEEN THE COMMERCIAL SUCCESS OF CHEMFREE IN

12   MAKING AND SELLING THESE PARTS WASHERS OR LICENSING SOMEONE

13   ELSE TO SELL THEM?

14        MR. CAPP:  I CAN GENERALIZE THAT.  THE BEST PERSON

15   TO ANSWER THAT IS SITTING BACK IN THE COURTROOM.  RIGHT NOW

16   MY UNDERSTANDING IS THAT YOU BASICALLY HAVE THREE MARKET

17   SEGMENTS FOR THE SMALL SINK ON A DRUM STYLE PARTS WASHERS.

18   THE BIG INDUSTRY THINKS THAT YOU HAVE A FACTORY WHERE THEY

19   WHEEL THEM IN ON A CONVEYOR BELT IS A DIFFERENT MARKET.  BUT

20   FOR THE SMALL SINK ON A DRUM, THE LARGEST MARKET SEGMENT IS

21   STILL RETAINED BY THE MINERAL SPIRIT TYPE SOLVENT PARTS

22   WASHERS, AND THAT IS THE MARKET THAT MR. MARKS IS TRYING TO

23   PENETRATE, AND THAT BIO CIRCLE IS TRYING TO PENETRATE IN

24   ORDER TO BUILD UP THEIR MARKET SHARE.

25        THEN YOU HAVE THE NON- BIOREMEDIATION AQUEOUS

1    UNITS WHERE YOU HAVE TO REPLACE THE FLUID PERIODICALLY

2    BECAUSE THEY BECOME SATURATED WITH CONTAMINANTS, AND THEN

3    YOU HAVE THE BIOREMEDIATION.  I DON'T FEEL COMFORTABLE

4    TELLING YOU WHETHER MR. MARKS' MARKET SEGMENT HAS SURPASSED

5    AQUEOUS OR NOT.  I AM AWARE THAT SOLVENT IS STILL THE

6    BIGGEST, AQUEOUS AND BIOREMEDIATION TOGETHER WOULD BE

7    SMALLER THAN THAT.  BUT WHETHER BIOREMEDIATION HAS PASSED

8    THE --

9            THE COURT:  DO YOU KNOW WHAT THE GROSS REVENUE A

10   YEAR HAS BEEN IN THE LAST FEW YEARS?

11           MR. MARKS;  YES, I DO.

12           THE COURT:  WHAT IS IT?

13           MR. MARKS:  THE GROSS REVENUE IS ABOUT $15

14   MILLION.

15           THE COURT:  AND THAT IS ALL PARTS WASHERS?

16           MR. MARKS:  THE PARTS WASHERS, THE FLUID AND THE

17   MATS.  WE SELL THE MATS.

18           THE COURT:  OKAY.  WHAT DOES THAT TELL YOU,

19   MR. CAPP?  AND OF COURSE THE HAKANSSON-2 IS NOT EVEN

20   SUPPOSED TO BE ON THE TABLE, I SUPPOSE, BUT THAT THERE ARE

21   NONE OF THEM, AND THAT THERE ARE PERHAPS $15 MILLION OF THE

22   BIOREMEDIATING PARTS WASHERS OR FLUIDS SOLD A YEAR.

23           MR. CAPP:  WELL, WHAT IT TELLS ME IS THAT GASOLINE

24   AND KEROSENE AND MINERAL SPIRITS ARE STILL VERY VERY GOOD AT

25   REMOVING HYDROCARBON CONTAMINANTS FROM METAL PARTS, AND

1    THERE IS A BIG SEGMENT OF THE POPULATION THAT WILL SACRIFICE

2    THE ENVIRONMENT FOR CLEANING EFFICIENCY AND COST RIGHT NOW.

3         THE COURT:  MAYBE I THINK ON SMALLER LEVELS, BUT

4    IT TELLS ME THAT IF THERE ARE NO HAKANSSON-2'S OUT THERE,

5    AND IT WAS SUPPOSEDLY INVENTED SIX YEARS BEFORE THE CHEMFREE

6    VERSION OF A BIODEGRADABLE PARTS WASHER, AND THEY ARE ABLE

7    TO SELL $15 MILLION WORTH A YEAR, THAT SOMETHING ABOUT THE

8    HAKANSSON-2 DIDN'T WORK AND WASN'T ALL THAT OBVIOUS AS FAR

9    AS TAKING OVER THE MARKET.  IN OTHER WORDS, IF THEY HAD

10   EXACTLY COPIED THE HAKANSSON-2, THEY MIGHT BE SELLING NO

11   PARTS WASHERS A YEAR NOW TOO.  YOU DON'T SEE ANYTHING IN

12   THAT THAT IS RELEVANT TO DISCUSSION?

13        MR. CAPP:  WELL, HERE IS WHAT I DO SEE.  IF YOU

14   READ HAKANSSON AND LOOK AT THE PRODUCT APPLICATION THAT IT

15   WAS GEARED FOR, AND THEN YOU LOOK AT THE PRODUCT APPLICATION

16   THAT MR. MARKS'S INVENTION IS GEARED FOR, THEY ARE REALLY

17   NOT THE SAME PRODUCT APPLICATION.  IF YOU READ HAKANSSON,

18   WHAT YOU WILL SEE IS THEY HAVE RINSING IN THERE, THEY HAVE

19   DRYING IN THERE --

20        THE COURT:  I AM GIVING THEM THAT IT IS EXACTLY

21   THE SAME THING, I AM GIVING THEM THAT IT IS THE SAME

22   APPLICATION, AND I AM COMPARING THE TWO.  AND THAT SEEMS TO

23   SAY TO ME THAT HAKANSSON WOULDN'T MAKE THIS MACHINE OBVIOUS

24   IF YOU CAN SELL THESE AND YOU CAN'T SELL IT.  NOW, I AM SURE

25   THERE ARE OTHER FACTORS INVOLVED LIKE MAYBE, AS YOU SAY, THE

1    APPLICATION OF IT.  WHAT IS SUPPOSEDLY THE APPLICATION OF

2    THE HAKANSSON MACHINE?

3            MR. CAPP:  HAKANSSON IS HUGE.  IT IS SOMETHING YOU

4    WOULD SEE IN A FACTORY.  IT IS FIXED, IT IS HUGE, YOU

5    CONVEYOR PARTS IN A BIN, THAT IS WHY YOU SPRAY WASH THEM.

6    IT IS VERY MUCH A BULK PROCESS.  THAT IS WHY THE WASHING

7    FLUID TANK HERE IS FIXED TO A SUPPLY LINE TO THE PLUMBING IN

8    THE BUILDING AS OPPOSED TO BEING A SIT-OVER-IN-THE-CORNER

9    SELF-CONTAINED UNIT.  IT IS CLEAR FROM READING IT, THAT IT

10   IS IN THE MIDDLE OF A MANUFACTURING FACILITY.  AND I AM VERY

11   FAMILIAR WITH THAT, BECAUSE I USED TO WORK FOR TEXAS

12   INSTRUMENTS IN HOUSTON, AND THE JOB I HAD HAD ME DOWN IN THE

13   MACHINE SHOP ALL THE TIME, SO I COULD SEE THEM CUTTING THE

14   PARTS ON THE LATHE OR THE DRILL PRESS, AND THEY USED CUTTING

15   OIL IN ORDER TO KEEP THE MACHINES COOL, THEY WERE CONSTANTLY

16   BEING SPRAYED WITH CUTTING OIL DURING THE CUTTING PROCESS.

17   SO WHAT YOU HAD WHEN YOU WERE DONE AT THE END OF THE DAY WAS

18   CUTTING OIL THAT HAD ALL OF THESE, YOU KNOW, TINY METAL

19   FINES ON THEM, SORT OF LIKE SAWDUST, SO THEY WOULD HAVE TO

20   TAKE THOSE PARTS AND CLEAN THEM SOMEWHERE BEFORE YOU SEND

21   THEM DOWN TO THE NEXT MANUFACTURING OPERATION, WHICH COULD

22   BE PLATING OR COATING OR, YOU KNOW, JUST ASSEMBLY.

23           MR. MARKS'S PRODUCT APPLICATION IS MORE GEARED FOR

24   A BICYCLE SHOP OR A CAR REPAIR SHOP WHERE YOU DON'T NEED THE

25   SAME DEGREE OF CLEANING FOR THE NEXT THING YOU ARE GOING TO

1  DO.  THE MECHANIC DOESN'T HAVE TO GET IT PERFECTLY CLEAN TO

2  REBUILD IT AND PUT IT BACK ON THE CAR, WHEREAS THE

3  MANUFACTURER, YOU KNOW, NEEDS TO GET IT VERY VERY CLEAR,

4  CLEAN, AND THEN RINSE IT, AND THEN DRY IT BEFORE THEY TAKE

5  IT DOWN TO THE PAINT SHOP.

6        SO YOU'VE GOT THE SIZE OF THE OPERATION GOING ON,

7  AND THE DEGREE OF CLEANNESS GOING ON, AND DR. DURKEE DID A

8  VERY GOOD JOB OF EXPLAINING THE DIFFERENT TYPES OF, YOU

9  KNOW, PARTS WASHING IN HIS EXPERT REPORT.  SO THERE ARE

10  THOSE DIFFERENCES THERE.

11        I WOULD SAY HAKANSSON WOULDN'T SELL IN THIS MARKET

12  BECAUSE IT IS SO COMPLEX WITH THOSE MONITORING AND METERING

13  DEVICES, IT OPERATES AS A HIGH PH, WHEREAS CHEMFREE HAS

14  FIGURED OUT, WITH MODERN SURFACTANT TECHNOLOGY, TO OPERATE

15  DOWN AT A MORE PH NEUTRAL THING.

16        THE COURT:  WELL, ALL THAT SAYS TO ME, THAT IT

17  DIDN'T MAKE -- AND I WILL HAVE TO LOOK AT THE OTHER TWO, BUT

18  THAT IT DIDN'T MAKE THIS OBVIOUS, I GUESS IS THE POINT I AM

19  TRYING TO MAKE.  IF THERE IS NO MARKET FOR IT, FOR WHATEVER

20  REASON, AND THERE IS A MARKET FOR THIS ONE, EVEN THOUGH IT'S

21  NOT A GREAT MARKET.

22        MR. CAPP:  EXAMINER STINSON CAME TO THAT

23  CONCLUSION AND GAVE US PATENT CLAIMS THAT DISTINGUISHED OVER

24  HAKANSSON.

25        THE COURT:  OKAY.  ANYTHING ELSE YOU WANTED TO SAY

1    ON OBVIOUSNESS?

2              MR. MARKS:  THE $15 MILLION WAS THE CHEMFREE

3    SALES.  THE ACTUAL RETAIL SALES TO USERS WOULD HAVE BEEN AT

4    LEAST TWICE THAT, BECAUSE OF THE DISTRIBUTION CHANNELS TO

5    END USERS.

6              THE COURT:  OKAY.  I AM JUST -- I DON'T THINK WE

7    HAVE GIVEN -- IF THAT IS A RELEVANT FACTOR, AND I AM NOT

8    SURE IT IS, I DON'T THINK THE DEFENDANTS HAVE HAD AN

9    OPPORTUNITY TO TEST THAT, ALTHOUGH I AM SURE THEY HAVE SEEN

10   FINANCIAL STATEMENTS.  SO I AM ONLY GOING TO ACCEPT THAT TO

11   THE POINT THAT OR CONSIDER IT TO THE POINT THAT MR. CAPP

12   POINTED OUT, THAT THERE IS SOME SIGNIFICANT SALES A YEAR,

13   ALTHOUGH NOT TO THE EXTENT THAT THE COMPANY WOULD LIKE ON

14   EITHER SIDE.  ALL RIGHT, ANYTHING ELSE YOU WOULD LIKE TO

15   TELL ME ABOUT OBVIOUSNESS?

16             MR. CAPP:  I NEED TO REBUT SOMETHING MR. HARBIN

17   SAID ABOUT PH.  HE POINTED OUT ON HAKANSSON-2 THAT THERE

18   WERE MECHANISMS TO MONITOR AND METER PH.  WHAT HE DIDN'T

19   SAY, BECAUSE HE COULDN'T SAY, IS WHAT THAT PH RANGE WAS,

20   BECAUSE THERE IS NO TEACHING IN HAKANSSON-2 ABOUT WHAT THE

21   ACTUAL PH IS.  HAKANSSON-2 POST-DATES HAKANSSON-1, AND IF

22   YOU READ IT, IT IS PURELY AN APPARATUS PATENT.  HAKANSSON-1,

23   WHICH PREDATES IT, IS A FULL BIOREMEDIATION SYSTEM WHICH HAS

24   DISCLOSURES ABOUT FLUID AND HAS DISCLOSURES ABOUT SPECIFIC

25   SPECIES OF MICROORGANISMS AND HAS ANALOGOUS IF NOT IDENTICAL

1   MONITORING AND METERING FEATURES IN THERE TO MAINTAIN THE

2   PH.

3            THE COURT:  MAYBE THERE IS SOMETHING I AM

4   OVERLOOKING.  I THOUGHT THE PURPOSE OF MONITORING THE PH WAS

5   TO KEEP IT FROM BEING CAUSTIC TO EITHER PEOPLE OR THE

6   MICROORGANISMS.

7            MR. CAPP:  I AM SO GLAD YOU SAID THAT BECAUSE THAT

8   IS THE MISLEADING IMPRESSION THAT THEY WANTED TO MAKE.  WHAT

9   IT REALLY IS, IF YOU LOOK AT IT, AND YOU SEE IT IN

10  HAKANSSON-1, IT SAYS THAT THOSE MONITORING AND METERING

11  THINGS ARE IN THERE TO MAINTAIN THE PH ABOVE 9.2, THAT WHEN

12  THE PH DROPS FROM ABOVE 9.2 TO 9.2, THEN IT METERS IN

13  NUTRIENTS AND OTHER CHEMICALS IN ORDER TO PUSH IT BACK UP

14  BECAUSE THEY WANTED TO DO THEIR CLEANING AT A PH THAT YOU

15  WOULDN'T WANT TO PUT YOUR HANDS IN FOR A VERY LONG PERIOD OF

16  TIME.  I MEAN, I DON'T LET MY SWIMMING POOL GET ABOVE ABOUT

17  7.5 BEFORE I WON'T GO IN IT ANYMORE.

18           AND WE ARE TALKING ABOUT THE PH SCALE IS A

19  LOGARITHMIC SCALE.  SO AT 8, YOU HAVE TEN TIMES THE OH IONS

20  AT 7.  WHEN YOU GET TO 9, IT IS 100 TIMES.  WHEN YOU GET TO

21  9.5, NOW YOU ARE ON YOUR WAY TO A THOUSAND TIMES THE NUMBER

22  OF OH IONS.  AND THE ONLY PERSON THAT HAS GIVEN TESTIMONY ON

23  THAT ISSUE IN THE CASE IS DR. DURKEE.  AND DR. DURKEE'S

24  TESTIMONY IS UNEQUIVOCAL, THAT WHEN YOU ARE TALKING ABOUT PH

25  RANGES ABOVE 9, YOU ARE NO LONGER TALKING ABOUT SOMETHING

1    THAT SOMEONE OF ORDINARY SKILL IN THE ART WOULD CONSIDER TO

2    BE NONCAUSTIC.

3            THE COURT:  ALL RIGHT.  LET ME ASK YOU THIS, AND

4    THEN I AM GOING TO GIVE MR. HARBIN A BRIEF OPPORTUNITY TO

5    REPLY, VERY BRIEF, AND MR. SCHAETZEL, TOO, IF HE HAS

6    ANYTHING THAT HE WOULD LIKE TO SAY, BECAUSE THIS MAY GET

7    BACK INTO HIS AREA.  ON THE INFRINGEMENT, WHAT ABOUT THE --

8    WHERE DO WE STAND?  WHAT IS YOUR RECOLLECTION OF WHERE WE

9    STAND WITH THE CONTRIBUTORY INFRINGEMENT AND THE

10   INFRINGEMENT TO INDUCEMENT, AND IS THERE ANYTHING BRIEF THAT

11   YOU WOULD LIKE TO SAY ABOUT INFRINGEMENT, PERIOD?

12           MR. CAPP:  WELL, WE ARGUED THIS AT MY 52 (C)

13   MOTION AT THE CLOSE OF MY CASE, AND I QUOTED EXTENSIVE

14   PORTIONS OF THE TRANSCRIPT IN MY PROPOSED FINDINGS OF FACT

15   AND CONCLUSIONS OF LAW.  IT IS CLEAR FROM THE BACK AND FORTH

16   THAT YOU AND I HAD DURING THAT THAT WE WERE CONTEMPLATING

17   BOTH DIRECT INFRINGEMENT BY WALTER AND INDIRECT INFRINGEMENT

18   BY ITS CUSTOMERS, BOTH CONTRIBUTORY AND INDUCEMENT.  AND AT

19   THE END OF MY RULE 52 (C) MOTION YOUR COMMENT WAS, MR. CAPP,

20   I AM GOING TO GRANT YOUR MOTION, AND I FIND INFRINGEMENT.

21   YOU DIDN'T SPLIT IT UP INTO DIRECT INFRINGEMENT AND INDIRECT

22   INFRINGEMENT AND INDUCEMENT AND CONTRIBUTORY.  BUT IT IS

23   CLEAR FROM READING THE TRANSCRIPT THAT WE COVERED ALL OF

24   THOSE BASES.

25           THE COURT:  ANYTHING ELSE YOU WANT TO SAY ABOUT IN

1  INFRINGEMENT, IN 25 WORDS OR LESS?

2  MR. CAPP:  I HAVE IT ALL LAID OUT IN MY PROPOSED

3  FINDINGS OF FACT AND CONCLUSIONS OF LAW.

4  THE COURT:  I DON'T MIND YOU REFERRING ME TO

5  SOMETHING THAT I NEED TO READ, BECAUSE MOST OF THE ARGUMENT

6  TODAY HAS BEEN A REFERENCE TO THINGS THAT I NEED TO LOOK AT

7  IN THE TRANSCRIPT OR THE PATENTS.

8  MR. CAPP:  I AM CONTENT TO RELY ON WHAT I SAID IN

9  MY PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW ON THE

10  REMAINING INFRINGEMENT.  I DON'T FEEL A NEED TO ARGUE THAT

11  TO YOU TODAY.  IF I COULD GET ONE LAST WORD IN BECAUSE I

12  NEVER GOT A CHANCE TO TALK ABOUT SECONDARY CONSIDERATION.

13  IF I COULD JUST PASS UP TO THE COURT AND THE COURT'S CLERK,

14  THE MARCH 30TH OPINION OF THE FEDERAL CIRCUIT IN POWER ONE,

15  INC. VERSUS ARTISAN TECHNOLOGIES.  IT IS VERY RECENT, AND IT

16  IS VERY GOOD AUTHORITY, RENEWING THE OLD LAW OR RESTATING

17  THE OLD LAW ABOUT THE STRENGTH OF COPYING EVIDENCE AS A

18  SECONDARY CONSIDERATION OF NONOBVIOUSNESS, WHICH WE HAD

19  HERE, AND ALSO ADVERTISEMENT BY THE INFRINGER THAT TOUTS THE

20  ADVANTAGES OF THE CLAIM CLAIMED INVENTION AS BEING STRONG

21  EVIDENCE OF A SECONDARY CONSIDERATION OF NONOBVIOUSNESS.

22  AND THE INK IS BARELY DRY ON THIS.  THIS IS NEW -- IT IS NOT

23  NEW LAW, BUT IT RESTATES LAW, AND IT'S GOOD STUFF.

24  (BREAK FROM 5:00 P.M. UNTIL 5:05)

25  MR. HARBIN:  I WILL LIMIT IT TO THREE MAIN POINTS.

1    NUMBER ONE, YOUR HONOR, I THINK YOUR INQUIRY ABOUT

2    HAKANSSON-2 AND THE COMMERCIAL SUCCESS OF THE EMBODIMENT OF

3    THAT PATENT IS NOT REALLY RELEVANT, AND IT IS A DANGEROUS

4    PATH TO GO DOWN BECAUSE THERE IS NO EVIDENCE, YOU KNOW, THE

5    INVENTOR WAS IN SWEDEN.  APPARENTLY A SWEDISH COMPANY.

6    THERE IS NO EVIDENCE THAT THEY TRIED TO MARKET IN SWEDEN OR

7    ANYWHERE ELSE, VERSUS USING IT, FOR EXAMPLE, USING IN THEIR

8    OWN MANUFACTURING PROCESS, AND WANTED TO KEEP IT

9    PROPRIETARY.

10            THE COURT:  THERE IS JUST NO EVIDENCE IN THE

11   RECORD.

12            MR. HARBIN:  BUT MORE OVER, YOUR HONOR, REALLY,

13   AND THIS RELATES TO THE SECOND POINT THAT WE ARE ENGAGING IN

14   HINDSIGHT, AND THAT WE DIDN'T HAVE EXPERT TESTIMONY ON,

15   UNDER KSR, EXPERT TESTIMONY IS NOT REQUIRED, BUT WE DID HAVE

16   EXPERT TESTIMONY.  WE HAD EXPERT TESTIMONY FROM DR. ADRIAENS

17   ABOUT CAUSTIC, THAT IF IT WAS CAUSTIC IT WOULD KILL THE

18   MICROBES.  BUT WE ALSO HAD EXTENSIVE EXPERT TESTIMONY FROM

19   DR. -- MR. DURKEE, EVEN AT A LOWER STANDARD, HE GAVE

20   CONTINUED ADMISSIONS THAT THESE PATENT CLAIMS ARE OBVIOUS

21   AND IN MANY WAYS.

22            AND PLAINTIFF'S COUNSEL ACCUSED MR. SCHAETZEL

23   EARLIER OF EMBARRASSING HIM.  I SUBMIT HE DID QUITE THE

24   CONTRARY, HE WAS VERY POLITE AND PROFESSIONAL.  BUT DURKEE

25   DID MAKE ADMISSION AFTER ADMISSION ON THE OBVIOUSNESS ISSUE.

1    SO WE ARE NOT ENGAGING IN HINDSIGHT.  AGAIN, THE PRIOR ART,

2    AS THE PATENT DIDN'T ITSELF ADMITS, HAS EVERY ELEMENT EXCEPT

3    ESSENTIALLY BIOREMEDIATION.  AND THE TAG WORDS THAT THE

4    CLAIM, THE PLAINTIFF PUT ON IT OF BIODEGRADABLE,

5    NONFLAMMABLE, NONCAUSTIC WHICH WE SUBMIT IS INHERENTLY PART

6    OF HAVING A BIOREMEDIATING PARTS WASHER, BUT THE PRIOR ART

7    HAD EVERYTHING ELSE, AND SO WE HAD EXTENSIVE EVIDENCE

8    CLEARLY AND CONVINCING EVIDENCE, AND ALL OF -- THE ONLY

9    POINT OF HAKANSSON IS WHAT SOMEBODY IN THE ART CAN LOOK TO

10   TO TEACH, THAT CAN DISCARD SOME OF HAKANSSON-2 AND THEY CAN

11   LEARN THE RELEVANT PARTS OF IT.  AND THE RELEVANT PART IS,

12   IS YOU CAN -- THERE IS A BIOREMEDIATING PARTS WASHER THAT IS

13   MAINTAINING THE PH AND THE TEMPERATURE, ET CETERA, WITH MORE

14   SIGNIFICANT DISCLOSURE ABOUT BIOREMEDIATION THAN EXISTS IN

15   THE CHEMFREE PATENT.

16            THE FINAL POINT I WOULD LIKE TO MAKE DEALS WITH

17   CHEMFREE'S COMMERCIAL SUCCESS ISSUE, THE LEVEL OF THEIR

18   SALES.  I DO NOT THINK THEY WOULD CLAIM THAT THEIR PRODUCT

19   HAS BEEN A COMMERCIAL SUCCESS, AND I THINK YOU ASKED

20   MR. CAPP A COUPLE OF TIMES, AND HE KEPT SAYING THE SOLVENT

21   WASHERS ARE STILL WHAT IS COMMERCIALLY SUCCESSFUL.  AND IF

22   YOU REMEMBER, YOUR HONOR, THEY DIDN'T CONTEND COMMERCIAL

23   SUCCESS AT TRIAL, AND OBJECTED TO US ARGUING LACK OF

24   COMMERCIAL SUCCESS.  SO I DON'T THINK THEY WOULD CONTEND

25   THAT 15 MILLION IN SALES SINCE 1994 IS A COMMERCIALLY

1    SUCCESSFUL PRODUCT.

2          BUT MOREOVER, YOUR HONOR, THIS WASN'T A CASE WHERE

3    YOU HAD WHAT IS ANOTHER TYPICAL SECONDARY CONSIDERATION,

4    LONG-FELT NEED THAT IS UNABLE TO BE SATISFIED.  TO THE

5    CONTRARY, WHAT YOU HAD IN THIS CASE, WAS A TRADITION OF

6    SOLVENT PARTS WASHERS, NEW MARKET DEMANDS, AGAIN AS I

7    ALLUDED TO THE COURT, REALLY A PERCEIVED MARKET DEMAND THAT

8    WITH THE MONTREAL PROTOCOL, THE INCREASED REGULATION, MOVING

9    TO BIOREMEDIATING PARTS WASHERS IS GOING TO BE A POPULAR

10   ITEM, NOT A TECHNOLOGICALLY DIFFICULT HURDLE.  THERE IS NO

11   EVIDENCE OF THAT.  NO HISTORY OF ANYBODY ELSE TRYING TO

12   SOLVE IT AND BEING UNABLE TO, BUT IT IS GOING TO BE A

13   POPULAR ITEM ON THE MARKET.  THAT HAS NOT HELD TRUE, DESPITE

14   THE ADVERTISING AND EVERYTHING ELSE, YOUR HONOR, THAT HAS

15   NOT HELD TRUE.

16          SO I WOULD SUBMIT THE LEVEL OF SALES DOES NOT SHOW

17   COMMERCIAL SUCCESS, AND I THINK CHEMFREE HAS ALREADY

18   ADMITTED THAT IN THE LITIGATION.  THANK YOU.

19          THE COURT:  OKAY.  MR. SCHAETZEL, DID YOU HAVE

20   ANYTHING THAT YOU WOULD LIKE TO ADD?  WE REALLY DIDN'T GET

21   BACK INTO YOUR AREA, BUT I THINK YOU WERE GOING TO ADDRESS

22   INFRINGEMENT TO THE EXTENT IT REMAINS IN THE CASE.  SO IF

23   THERE IS ANYTHING THAT YOU FEEL YOU NEED TO CORRECT THAT

24   MR. CAPP SAID, OR ANYTHING YOU WOULD LIKE THE ADD ABOUT

25   THAT, I'LL BE GLAD TO HEAR IT.

1          MR. SCHAETZEL:  THANK YOU, YOUR HONOR.  WITH

2     REFERENCE TO INFRINGEMENT, AS BEST I CAN TELL WE HAVE NOT

3     ADDRESSED CONTRIBUTORY AND INDUCEMENT.  AND WE HAVE SOME

4     CLAIMS OUTSTANDING AS TO THE IO 200.  LET ME FIRST TALK

5     ABOUT CONTRIBUTORY AND INFRINGEMENT.  IN THE BACK AND FORTH

6     OF 52 (C) BEFORE YOUR HONOR IN THE COURTROOM, THERE WAS

7     DISCUSSION, AND WE STATED THIS IN OUR BRIEF, ABOUT

8     CONTRIBUTORY INFRINGEMENT.  BUT IT WAS -- THE GENESIS OF IT

9     IS WHAT I FOCUS ON, AND ONE OF THE REASONS I, QUITE FRANKLY,

10    WOULD ASK THE COURT'S GUIDANCE FOR WHAT HAPPENED, IF YOU

11    WILL.

12          THE QUESTION BEFORE THE COURT HAD TO DO WITH THE

13    125 PATENT, WHICH IS A METHOD CLAIM.  AND QUITE FRANKLY,

14    YOUR HONOR, IT IS A LOT LIKE THE MCKESSON SITUATION.  AND

15    YOU SAID TO ME THAT YOU HAD HAD A SITUATION IN THE MEDICAL

16    AREA THAT HAD TO DO WITH CONTROL, AND I DIDN'T UNDERSTAND IT

17    AT THE TIME, AND THEN I SAW THE DECISION AND I SAW YOUR

18    ORDER AND -- WHAT WE WERE TALKING ABOUT, IN REFERENCE TO

19    THAT METHOD CLAIM, WAS WHETHER OR NOT THE FACT THAT WALTER

20    DID ONE STEP AND THE CUSTOMER DID ANOTHER STEP, COULD THERE

21    BE DIRECT INFRINGEMENT BY WALTER.

22          I THINK THAT MR. CAPP UNDERSTOOD US TO THEN BE

23    SOMEHOW MORPHING THAT INTO A CONVERSATION ABOUT CONTRIBUTORY

24    INFRINGEMENT.  THAT WAS CERTAINLY NOT MY UNDERSTANDING OF

25    IT.  FOR EXAMPLE, IN THEIR BRIEF, "WHEN PLAINTIFF IS TALKING

1   ABOUT THE ARGUMENT WE WERE MAKING ABOUT DIRECT INFRINGEMENT,

2   THEY STATE, AND THIS IS IN DOCKET NUMBER 610 AT PAGE 2.  THE

3   ARGUMENT ADVANCED BY DEFENDANTS," WHICH WOULD BE ME, "IN THE

4   MOTION PROCEEDING, WAS THAT DEFENDANTS SHOULD NOT BE LIABLE

5   FOR INDIRECT INFRINGEMENT BECAUSE THEIR CUSTOMERS DID NOT

6   COMMIT DIRECT INFRINGEMENT."

7           NO, SIR, THAT IS NOT WHAT I WAS TRYING TO ARGUE AT

8   LEAST.  WHAT I WAS TRYING TO SAY WAS, WE DO ONE STEP UNDER

9   THE 125 PATENT, THE CUSTOMER DOES ANOTHER STEP, AND OUR

10  ARGUMENT WAS IT WAS A MCKESSON SITUATION, IT IS A

11  MUNIAUCTION SITUATION, WHERE NO ONE PARTY PERFORMS ALL STEPS

12  OF THE PATENT METHOD, AND THEREFORE, THERE IS NO DIRECT

13  INFRINGEMENT BY WALTER.  WHICH WAS OUR POINT, BUT ALSO BY

14  THE CUSTOMER.  IT WOULDN'T BE BY EITHER ONE.  SO THERE IS A

15  MISCOMMUNICATION HERE OF SOME SORT THAT I AM TRYING TO GET

16  MY HANDS AROUND.

17          AND IN ANOTHER SECTION, IN FACT, AT THE ARGUMENT,

18  MY ARGUMENT, YOU KNOW, MR. CAPP STATED, THIS IS ON PAGE 3 OF

19  THE SAME DOCUMENT, QUOTING, MR. CAPP SAYS, "I AM SAYING THAT

20  THERE ARE TWO DIRECT INFRINGERS." HE IS REFERRING TO THE

21  CUSTOMER AND TO WALTER.  "THERE IS ONE THAT THE DEFENDANT

22  DOES HANDS-ON ITSELF IN THE UNITED STATES, AND THEN THERE IS

23  THE PROSPECT THAT THEY CONTRIBUTORILY INFRINGE OR INDUCE TO

24  INFRINGE BY SELLING AND ADVERTISING.  AND MR. SCHAETZEL'S

25  ARGUMENT IS THAT THEY ARE NOT A CONTRIBUTORY INFRINGER

1    BECAUSE THE CUSTOMER DOESN'T PROVIDE -- DOESN'T MEET EVERY

2    STEP."

3           WITH ALL DUE RESPECT, THAT IS WAS NOT MY ARGUMENT.

4    MY ARGUMENT WAS THAT WALTER WAS NOT A DIRECT INFRINGER

5    BECAUSE WALTER AND THE CUSTOMER WERE EACH PERFORMING

6    SEPARATE STEPS OF THE CLAIMED METHOD OF THE 125 PATENT.

7    FROM THAT PERCEPTION OF MY ARGUMENT, WE ARE WHERE WE ARE

8    TODAY.

9           IT WAS NEVER WALTER'S UNDERSTANDING THAT THE RULE

10   52 (C) MOTION MADE BY MR. CAPP ADDRESSED CONTRIBUTORY

11   INFRINGEMENT OR INDUCEMENT TO INFRINGE.  WE DIDN'T ARGUE IT.

12   I CAN TELL YOU, WITHOUT QUESTION, THAT IF WE HAD UNDERSTOOD

13   THAT, WE WOULD HAVE ARGUED QUITE STRENUOUSLY, FOR EXAMPLE,

14   IN THE INDUCEMENT SITUATION THAT THERE IS NO INTENT UNDER

15   THE DSM CASE.  DSM MEDICAL, AND SO ON AND SO FORTH.  WE

16   WOULD HAVE TALKED ABOUT KNOWLEDGE UNDER CONTRIBUTORY

17   INFRINGEMENT AND 271 (C).  WE DIDN'T TALK ABOUT INDUCEMENT,

18   BECAUSE WE APPARENTLY DIDN'T UNDERSTAND.  SO WE WILL DEFER

19   TO THE COURT AND WELCOME THE COURT'S GUIDANCE ON THIS, BUT

20   OUR TAKE OF THE SITUATION WAS THAT WE WERE ADDRESSING DIRECT

21   INFRINGEMENT, NOT CONTRIBUTORY, AND NOT INDUCEMENT.

22          WE ARE HERE TODAY PREPARED TO ARGUE THOSE ISSUES

23   AT THE COURT'S PLEASURE, WE ARE ALSO HERE TO ADDRESS THE

24   REMAINING ISSUES OF INFRINGEMENT IN THE 110 PATENT, WHICH I

25   THINK WOULD INCLUDE DIRECT, CONTRIBUTORY, AND INFRINGEMENT

1   AS IT RELATES, FOR EXAMPLE, TO THE PRESSURE SWITCH ISSUE IN
2   THE IO 200.
3               THE COURT:  OKAY.  WELL, WE HAVE ABOUT RUN OUT OF
4   TIME FOR TODAY, AND I THINK THAT I WILL HAVE TO GO BACK,
5   LOOK AT THAT, AND BASED ON WHAT I SAID THEN, WHICH I QUITE
6   FRANKLY DON'T REMEMBER, AND DECIDE WHAT STILL NEEDS TO BE
7   ADDRESSED.  AND IF SOMETHING FURTHER DOES NEED TO BE
8   ADDRESSED, I WILL SIMPLY GET YOU ON A VERY SHORT TIME FRAME
9   TO SUBMIT YOUR POSITION ON THAT AND VERY SHORT BRIEF.  BUT
10  RIGHT NOW, I AM NOT SURE, I AM NOT SURE WHAT DOES NEED TO BE
11  ADDRESSED.  AND I THINK IT WOULD JUST PERHAPS BE WASTING OUR
12  TIME TO GO INTO THAT TODAY.
13              SO I AM GOING TO RESERVE THAT, IF IT IS NECESSARY,
14  FOR ANOTHER DAY.  YOU BOTH HAVE GIVEN ME A GOOD BIT TO THINK
15  ABOUT TODAY IN ANY EVENT.  MR. CAPP, WHAT DO YOU WANT TO
16  ADDRESS ABOUT -- IS IT MR. MORELAND?
17              MR. CAPP:  WELL, YOUR HONOR, I AM A HUMAN BEING,
18  SO WHEN I SEE A YOUNG ATTORNEY IN HIS SAME POSITION, NOT
19  THAT LONG AGO, HE DOESN'T HAVE A JOB, HE HAS A FAMILY TO
20  FEED, I AM VERY SYMPATHETIC TO HIS PLIGHT.  AS FAR AS
21  ADVOCATING ON HIS BEHALF, I WILL REFER TO MY OFFICE MANAGING
22  PARTNER, MR. JAMESON, WHO IS HERE IN THE COURTROOM.
23              THE COURT:  ALL RIGHT.  THAT WILL BE JUST FINE.
24  BECAUSE I AM NOT SURE WHAT IF ANYTHING I CAN DO BEFORE THAT
25  COMES BEFORE ME ON A MOTION TO DISQUALIFY, IF INDEED IT

1    DOES.  SO I'LL BE GLAD -- IS THERE ANYTHING YOU WOULD LIKE

2    TO ADD TO YOUR LETTER IN THAT REGARD?

3            MR. JAMESON:  WOODY JAMESON.  IT IS AN INTERESTING

4    ISSUE AS TO WHETHER IT IS RIPE OR NOT.  WE HAVE A LETTER TO

5    OUR WRITTEN SUBMISSIONS THIS MORNING, WHICH BASICALLY SAYS

6    IF YOU BRING MR. MORELAND INTO THE FIRM, WE ARE NOT WAIVING

7    OUR RIGHT TO DISQUALIFY DUANE MORRIS FROM REPRESENTING

8    CHEMFREE IN THIS LITIGATION.  AND THEN MR. SCHAETZEL CALLED

9    ME LAST NIGHT AT 6:45 AND SAID WE ARE NOT GOING TO -- WE ARE

10   NOT GOING TO ALLOW THE ETHICAL BARRIER THAT YOU HAVE

11   PROPOSED TO BE KIND OF THE END OF THE ISSUE FROM OUR

12   PERSPECTIVE.  AND SO IN A LOT OF RESPECTS, IT IS LIKE A --

13   IT IS A LITTLE BIT OF LIKE A DECLARATORY JUDGMENT ACTION IN

14   A PATENT CASE WHERE THE THREAT HAS BEEN MADE, AND THEY ARE

15   NOW PUTTING US TO THE TEST, WHICH IS ARE WE WILLING TO HIRE,

16   YOU KNOW, THIS YOUNG MAN AND BRING HIM INTO THE FIRM ONLY TO

17   FIND THAT THIS CLIENT IS GOING TO BE THREATENED OR IS GOING

18   TO HAVE TO DEAL WITH A DISQUALIFICATION MOTION.

19            AND VERY CANDIDLY, YOUR HONOR, I FEEL LIKE

20   ADVOCACY AND MAYBE A LITTLE ANIMOSITY BETWEEN THESE

21   COMPANIES OVER YEARS OF LITIGATION IS GETTING IN THE WAY OF

22   COMMON SENSE.

23            THE COURT:  NO.

24            MR. JAMESON:  AND I MEAN, YOU KNOW, THIS IS A

25   LITTLE BIT OF A SYMPATHETIC PLEA WHICH IS, I MEAN,

1    MR. MORELAND IS A FIFTH YEAR ASSOCIATE WHO IS NOW OUT OF A

2    JOB, THAT HAS A THREE-MONTH-OLD AT HOME, AND WE ARE BEING

3    KIND OF PUT TO A TEST, YOU KNOW, DAVID COME WORK FOR US, AND

4    THEN PUT CHEMFREE AT RISK FOR DISQUALIFICATION.  AND

5    CANDIDLY I JUST DON'T THINK WE CAN DO THAT.  AND IN OUR

6    CONVERSATIONS WITH MR. SCHAETZEL, AND THE TRUTH IS,

7    MR. SCHAETZEL SAID, LISTEN, I WANT TO HELP YOU OUT, I WANT

8    TO HELP DAVID OUT.  I AM VERY FOND OF DAVID.  WE ARE TRYING

9    TO WORK THROUGH THIS ISSUE.  AND WE HAVE ASKED THE QUESTION,

10   POINT BLANK, WHICH IS, YOU KNOW, STEVE, IS THIS ABOUT A

11   HYPOTHETICAL IMPUTED CONFLICT, OR IS THERE REAL HARM THAT

12   CAN BE DONE TO J. WALTER BY DAVID COMING TO WORK FOR OUR

13   FIRM, AND US ERECTING AN ETHICAL BARRIER.  BECAUSE AT THE

14   END OF THE DAY, AS LONG AS J. WALTER AND KING AND SPALDING

15   TRUST DAVID, THAT IS THE END OF THE ANALYSIS.  BECAUSE DAVID

16   IS NEVER GOING TO TALK TO ANYBODY ABOUT THE CASE.

17           THE COURT:  WELL, KING AND SPALDING MAY TRUST HIM

18   AND J. WALTER MAY NOT.  AS YOU MENTIONED, IT HAS BECOME A

19   LITTLE, I DON'T KNOW WHETHER YOU WOULD CALLING IT ANIMOSITY,

20   BUT CERTAINLY LITIGIOUSNESS OVER THE COURSE OF THE CASE.

21           WHAT ABOUT THAT, MR. SCHAETZEL?

22           MR. SCHAETZEL:  YOUR HONOR --

23           THE COURT:  LET ME TELL YOU WHERE I AM WITH IT.  I

24   DON'T FEEL THAT I CAN RULE ON IT BASED ON JUST A LETTER.

25   AND I THINK YOUR CLIENT HAS THE ABSOLUTE RIGHT TO MOVE FOR A

1    DISQUALIFICATION.  I THINK THE ONLY THING THAT I CAN DO TO

2    PERHAPS HELP MR. MORELAND, TO A CERTAIN EXTENT, IS TO GIVE

3    YOU A DEADLINE TO -- WELL, I GUESS HE WOULD HAVE TO -- EVEN

4    IF IT WERE A DECLARATORY JUDGMENT SORT OF SITUATION, I THINK

5    THERE WOULD HAVE TO BE SOME MOTION BEFORE THE COURT, AND I

6    ASSUME THAT THE PROBLEM IS THAT FOR THERE TO BE A MOTION

7    BEFORE THE COURT, OR YOU TO BE REQUIRED TO FILE A MOTION FOR

8    YOUR CLIENT, HE WOULD HAVE TO GO TO WORK FOR OPPOSING

9    COUNSEL.  WHAT ABOUT THAT?

10            MR. SCHAETZEL:  I BELIEVE THAT THAT MAY WELL BE

11   THE SITUATION, YOUR HONOR.  I WOULD MAKE THREE POINTS.

12   FIRST OF ALL, I WILL READILY CONCEDE AND ADMIT THAT,

13   REGARDLESS OF THE OUTCOME OF THIS, BOTH I, THE FIRM, AND THE

14   CLIENT ARE FINE WITH DAVID MORELAND.

15            SECOND OF ALL, THE CLIENT IS IN A DIFFICULT

16   SITUATION HERE.  THIS IS NOT A SITUATION OF THE CLIENT'S

17   DOING WHATSOEVER.  WALTER HAD ABSOLUTELY NOTHING TO DO WITH

18   THIS.  THEY'VE BEEN PRESENTED WITH THIS SITUATION.  AND

19   MANAGEMENT OF THIS CLIENT HAS A BOARD OF DIRECTORS.  THEY

20   HAVE PEOPLE THAT THEY HAVE TO REPORT TO, AND THEY HAVE

21   SERIOUSLY CONSIDERED THE ISSUE AND LOOKED AT THAT FROM THE

22   PERSPECTIVE OF PEOPLE THAT KNOW AND CARE ABOUT DAVID, BUT

23   THEY HAVE TO MAKE THEIR OWN DECISIONS.  AND SO THEY HAVE

24   DONE THAT WHICH, UNFORTUNATELY, I REGRET I THINK LEAVES US

25   IN THE EXACT SITUATION THAT YOU IDENTIFY.

1        MY THIRD POINT IS THAT THIS IS A VERY UNIQUE

2   SITUATION.  I WOULD ASK THE COURT TO UNDERSTAND THAT THIS IS

3   NOT A SITUATION AS IN THE CASE THAT WAS CITED IN THE LETTER

4   WHERE, YOU KNOW, SOMEBODY WAS CONTACTED ABOUT BEING AN

5   EXPERT WITNESS AND THERE WAS A 20-MINUTE TELEPHONE CALL WITH

6   SOME, YOU KNOW, SOME INFORMATION EXCHANGED.  FOR BETTER OR

7   FOR WORSE, MR. MORELAND WAS THE ASSOCIATE ON THIS CASE FOR

8   THE BETTER PART OF TWO YEARS.  THAT COMPLICATES THE

9   SITUATION FAIRLY DRAMATICALLY.  AND IT IS MY HOPE THAT WHILE

10  WE ARE STILL IN THIS SITUATION, THAT PERHAPS WE CAN ADDRESS

11  IT IN OTHER WAYS.

12        BUT I THINK IF THE COURT IS GOING TO TAKE ACTION,

13  I BELIEVE THAT THERE DOES HAVE TO BE A RIPE ISSUE AND THERE

14  DOES HAVE TO BE A MOTION.

15        THE COURT:  I THINK I AGREE WITH YOU.  I CAN'T

16  ISSUE AN ADVISORY OPINION AS TO WHAT MIGHT HAPPEN.  I THINK

17  WHAT I WOULD SUGGEST IS THAT MR. MORELAND GO AHEAD AND JOIN

18  THE PLAINTIFF'S FIRM, AND THEN I WILL GIVE YOU WHAT, FIVE

19  DAYS IN WHICH TO MAKE A MOTION TO DISQUALIFY THEM, AND I

20  WILL SET A VERY QUICK HEARING ON THAT.  AND IF IT DOES

21  APPEAR TO BE SOMETHING THAT THEY COULD BE DISQUALIFIED FOR,

22  AND I WILL ORDER MR. MORELAND NOT TO ADDRESS ANY OF THE

23  MATTERS THAT HAVE BEEN IN THIS CASE IN THE MEANTIME.  THEN

24  WE WILL HAVE A VERY QUICK HEARING ON WHETHER THAT IS A

25  DISQUALIFICATION, AND I SUPPOSE IT WOULD BE WITHOUT SOME

```
1    PREVENTIVE MEASURE SUCH AS THE WALL THAT PLAINTIFF'S COUNSEL

2    RECOMMENDED.  AND I WOULD BE INCLINED ON THAT, AND I DON'T

3    KNOW WHAT THIS IS -- IT HAS CHANGED SINCE I PRACTICED LAW, A

4    LOT OF THINGS LAWYERS DO.  BUT I WOULD BE INCLINED TO

5    REQUIRE OR ALLOW WHATEVER IS THE REASONABLE COURSE OF

6    BUSINESS AMONG LARGER ATLANTA LAW FIRMS IN THAT SITUATION,

7    AND I DON'T KNOW WHAT THAT IS NOW.

8             I THINK AT ONE TIME IT WOULD HAVE BEEN THE WALL.

9    I DON'T KNOW WHETHER IT STILL IS OR NOT.  WHAT ABOUT THAT,

10   MR. JAMESON?  THE RISK THERE IS THAT MR. MORELAND WILL WIND

11   UP JUST AS BAD OFF AS HE IS NOW WITHOUT A JOB UNTIL THE CASE

12   IS RESOLVED.  AND LET ME SAY THIS ABOUT THE CASE BEING

13   RESOLVED.  I AM GOING TO ENTER AN ORDER, I HOPE, AND I

14   EXPECT TO, I'VE BEEN OVER A GOOD BIT OF THE ATTORNEY

15   MATERIAL, AND YOU ALL HAVE GIVEN ME SOME MORE THINGS TO

16   THINK ABOUT, NEXT WEEK.  SO THE CASE IS NOT GOING TO GO ON.

17   I AM EMBARRASSED THAT IT HAS GONE ON AS LONG AS IT HAS.

18   IT'S NOT GOING TO GO ON THAT MUCH LONG LONGER.  BUT WE DO

19   HAVE DAMAGES, AND REMEDY, AND BIFURCATED.

20            MR. JAMESON:  AGAIN, ON THAT POINT, YOUR HONOR, I

21   DOVE INTO THIS LAST NIGHT AT 7 O'CLOCK, AND I AM HERE TODAY

22   WITH A LETTER TO YOU THIS MORNING.  MY UNDERSTANDING IS

23   YOU'VE GOT THE RULES OF PROFESSIONAL CONDUCT, AND THEN

24   YOU'VE GOT A MOTION TO DISQUALIFY.  AND THE RULES OF

25   PROFESSIONAL CONDUCT ARE REALLY ETHICAL STANDARDS.  AND THE
```

1    MOTION TO DISQUALIFY, YOU GET INTO THE VERY ISSUES THAT YOU

2    JUST TALKED ABOUT, WHICH IS HOW LONG HAS THE CASE BEEN

3    PENDING, WHERE IS IT IN THE STAGE OF THE CASE, AND THOSE

4    TYPES OF ISSUE.

5            THE COURT:  AND WOULD SOME SORT OF PREVENTATIVE

6    MEASURE BE SUFFICIENT?

7            MR. JAMESON:  CORRECT.  SO IF YOUR PROPOSAL, AS I

8    THINK I UNDERSTAND IT, WHICH IS WE WOULD LOVE FOR DAVID TO

9    COME WORK FOR US TOMORROW.  AND IF THEY FILE A MOTION TO

10   DISQUALIFY, YOU HAVE ORDERED DAVID TO OBVIOUSLY HAVE NOTHING

11   TO DO WITH THE CASE AND NOT DISCUSS THE CASE WITH ANYBODY IN

12   OUR LAW FIRM, PENDING RESOLUTION OF THE MOTION TO

13   DISQUALIFY; THAT THE RESULTS OF THAT WOULD BE WORSE CASE

14   SCENARIO, DAVID YOU CAN'T HAVE A JOB, YOU CANNOT CONTINUE

15   WITH YOUR JOB AT DUANE MORRIS ABSENT ME HAVING TO DISQUALIFY

16   THE ENTIRE LAW FIRM FROM THE CASE, THEN WE WILL DEAL WITH

17   THAT.  BUT I CAN'T RISK THE LAW FIRM.

18           THE COURT:  AND YOU WON'T BE ANY WORSE OFF --

19           MR. JAMESON:  I CAN'T RISK THE LAW FIRM BECAUSE HE

20   WORKED FOR US FOR ONE WEEK, ABSENT HIM VIOLATING THE COURT

21   ORDER.

22           THE COURT:  I WILL GIVE AN ADVISORY OPINION ON

23   THAT.  ASSUMING THAT I ENTERED THE ORDER THAT ORDERED HIM

24   NOT TO DISCUSS IT IN ANY WAY, ANY MATTER INVOLVING THE CASE

25   AT ALL, UNLESS THERE WAS SOME VIOLATION OF MY ORDER, I CAN'T

1    IMAGINE THAT I WOULD DISQUALIFY THE FIRM.

2              WHAT ABOUT THAT, MR. SCHAETZEL?  AND I WILL EVEN

3    CONSIDER AND PROBABLY SIGN AN ORDER THAT YOU SUGGEST IN THAT

4    REGARD, WITH REGARD TO MR. MORELAND, AND THEN GIVE YOU AND

5    YOUR CLIENT A WEEK TO DECIDE IF YOU WANT TO MAKE A MOTION TO

6    DISQUALIFY, AND SET A REQUIREMENT FOR PLAINTIFF'S COUNSEL TO

7    RESPOND IN SAY FIVE DAYS, AND A HEARING IMMEDIATELY AFTER

8    THAT, OR WITHIN A WEEK OF AFTER THAT.  I DON'T WANT TO SET

9    IT SO QUICKLY THAT YOU ALL DON'T HAVE THE OPPORTUNITY TO

10   PRESENT WHAT YOU WOULD LIKE TO PRESENT.

11             MR. SCHAETZEL:  I THINK TWO THINGS, YOUR HONOR.

12   FIRST OF ALL, I NEED TO REITERATE, THIS IS NOT ABOUT

13   ANIMOSITY BETWEEN CLIENTS, THIS IS ABOUT PEOPLE TRYING TO

14   ABIDE BY AND I THINK MR. JAMESON IS RIGHT, THERE ARE THE

15   ETHICAL CODE OF PROFESSIONAL RESPONSIBILITIES AND THERE IS

16   THE MOTION TO DISQUALIFY, BUT THE ETHICS RULES GET LOOKED AT

17   IN THE MOTIONS TO DISQUALIFY ANALYSIS.

18             THE COURT:  I THINK THAT IS RIGHT.

19             MR. SCHAETZEL:  SO I HAVE TO REITERATE, THIS IS

20   NOT ABOUT ANIMOSITY.  I ALSO NEED TO BE CAREFUL THAT I THINK

21   WE CAN AGREE TO THAT SO LONG AS, QUITE FRANKLY, IN DOING SO

22   WE ARE NOT WAIVING ANY RIGHT THAT OUR CLIENT MAY CARE TO

23   ASSERT IN THE PROCESS.  AND I HAVE TO QUITE HONESTLY THINK

24   FOR A SECOND ABOUT WHETHER OR NOT I WOULD LIKE SOME TIME TO

25   TALK, QUITE FRANKLY.

1           THE COURT:  I THINK THAT IS PROBABLY THE WAY TO

2    GO, AND YOU ALL KEEP TALKING ABOUT THE ETHICAL

3    CONSIDERATIONS, WHAT YOU SEE IS THE ETHICAL CONSIDERATIONS

4    HERE.  YOU CAN'T DISCLOSE ANY OF YOUR CLIENT'S SECRETS OR

5    ATTORNEY/CLIENT INFORMATION.  BUT, I MEAN, THAT'S WHAT I

6    WOULD PROPOSE TO ORDER, SHOULD HE GO AHEAD AND GO TO WORK

7    FOR DUANE MORRIS.

8           MR. SCHAETZEL:  WELL, AND PART OF THE ULTIMATE

9    ISSUE THERE, YOUR HONOR -- AGAIN, I AM NOT PREPARED TO ARGUE

10   THIS.  BUT PART OF THE ULTIMATE ISSUE, AS I UNDERSTAND IT,

11   IS TWO-FOLD.  IT IS, ONE, A PUBLIC PERCEPTION QUESTION

12   ABOUT, YOU KNOW, HOW THE PUBLIC PERCEIVES THE HANDLING OF

13   CONFIDENCES AND SECRETS.  AND A SECOND PART OF IT IS THAT

14   ULTIMATELY IT IS THE CLIENT'S RIGHT TO DECIDE.  SO I NEED --

15          THE COURT:  I HAVE NO DISPUTE WITH THAT.  AND I AM

16   NOT SURE WHAT IT WILL REQUIRE IF THE CLIENT DOES MOVE TO BE

17   PROTECTED IN THAT REGARD, AND THE ETHICAL CONSIDERATIONS OF

18   PERCEPTION.  YOU KNOW, THAT MAY REQUIRE THAT, IF HE STAYS

19   WITH THE FIRM, THE FIRM IS GOING TO BE DISQUALIFIED.  BUT AS

20   I SAID, WHAT I WOULD EXPECT TO BE GUIDED BY, AND YOU ALL MAY

21   SHOW ME I AM WRONG ABOUT THAT, WILL BE WHATEVER YOU PRESENT

22   TO ME SHOWING WHAT THE NORMAL COURSE OF BUSINESS IN THAT

23   SITUATION IS WITH REGARD TO LARGER ATLANTA LAW FIRMS.

24          MR. SCHAETZEL:  TO MY EXPERIENCE, YOUR HONOR, AND

25   AS ONE WHO HAS RECENTLY CHANGED FIRMS, I MEAN, HAVING

1    SOMEONE, YOU KNOW, WHEN YOU MAKE A CHANGE AND THAT THE TWO

2    FIRMS MAY BE OPPOSING EACH OTHER, BUT IT'S, YOU KNOW, A

3    LAWYER IN THE BONDS GROUP, NOT IN THE PATENT GROUP, IT IS A

4    SITUATION WHERE THE ASSOCIATE MOVES FROM ONE PATENT GROUP TO

5    ANOTHER PATENT GROUP WITH THE FIRM THAT IS ON THE OTHER SIDE

6    OF THE CASE, I AM NOT AWARE OF THAT IN ANY SITUATION, WHICH

7    IS ONE OF THE THINGS THAT MAKES IT SO DIFFICULT.  WHAT I

8    WOULD PROPOSE --

9            THE COURT:  I THINK I HAVE HAD THEM EVEN CLOSER

10   THAN THAT, WHEREAS A FIRM IS SOMEHOW INVOLVED IN A CASE,

11   WHERE THEY REPRESENTED THE OPPOSING PARTY IN A MATTER THAT

12   LED UP TO THE CASE, AND I CAN'T REMEMBER EXACTLY HOW THAT

13   WENT, BUT IT WAS SOMETHING THAT I WONDERED IF I WOULD BE

14   SATISFIED WITH THE ATTORNEYS' WILLINGNESS TO SAY I AM NOT

15   GOING TO TELL ANYBODY ABOUT THIS.  BECAUSE I JUST DIDN'T

16   SEE, IF HE WAS INVOLVED IN THE CASE AT ALL, HOW HE COULD NOT

17   BE INFLUENCED BY WHAT HE KNEW.  BUT IF HE WERE NOT INVOLVED

18   IN THE CASE AT ALL, THEN THAT MIGHT BE DIFFERENT.  BUT --

19           MR. SCHAETZEL:  IF I COULD, I WOULD LIKE UNTIL

20   THIS TIME TOMORROW, 2 O'CLOCK TOMORROW, TO SPEAK WITH MY

21   FOLKS AND WE WILL GET BACK.

22           THE COURT:  AND ULTIMATELY IT IS YOUR CLIENT'S

23   DECISION.  I HAVE NO PROBLEM WITH THAT.

24           MR. SCHAETZEL:  WE HAVE EVERY INTEREST IN MOVING

25   THIS ALONG QUICKLY.  AND HE WILL DO SO.

1          THE COURT:  I'VE BEEN WORKING ON MY ORDER IN THE

2     MEANTIME, AND I WILL TRY TO GET YOU ALL AT LEAST A

3     RESOLUTION OF WHAT YOU PRESENTED.  IF YOU AND MR. JAMESON

4     AND I NEED TO MEET AGAIN, THEN I WILL MAKE SOME TIME

5     AVAILABLE.

6          MR. JAMESON:  AND YOUR HONOR, I WAS GOING TO

7     SUGGEST THAT AS WELL.  WE ARE WIDE OPEN TO IDEAS HERE.

8          THE COURT:  IT IS OFTEN AN UNFORTUNATE SITUATION

9     FOR EVERYBODY, BUT THERE ARE CERTAIN RULES THAT ONE HAS TO

10    FOLLOW, AND IT MAY BE THAT YOU GET, YOU KNOW, A HOIST-UP ON

11    THE RULES.

12         LET ME TELL YOU WHAT MY SCHEDULE WILL BE.  I AM

13    GOING TO BE IN ATLANTA TOMORROW, AND I'VE GOT A JUDGE'S

14    MEETING TOMORROW AFTERNOON, AND THERE IS A BENCH AND BAR

15    FUNCTION I THINK I AM GOING TO TOMORROW.  BUT I WOULD BE

16    HERE AFTER THE JUDGE'S MEETING.  I AM NOT GOING TO BE IN THE

17    OFFICE FRIDAY, MY SISTER IS HAVING SOME SERIOUS SURGERY.

18    BUT I WILL BE BACK IN THE OFFICE ALL NEXT WEEK AND WE COULD,

19    IF IT TOOK THAT LONG, MAYBE WE CAN DO IT.

20         MR. JAMESON:  THE BOTTOM LINE IS YOUR PROPOSAL,

21    YOUR HONOR, WE ARE ALL FOR IT.  SO I THINK THE BALL IS IN

22    THEIR COURT TO DECIDE WHETHER THEY ARE WILLING TO GO ALONG

23    WITH IT.

24         THE COURT:  ALL RIGHT.  YOU ALL SEE WHAT YOU CAN

25    WORK OUT.  IF THAT LOOKED APPROPRIATE, THEN MR. SCHAETZEL

1    CAN PRESENT ME AN ORDER TO ENTER, AND I THINK THAT HAS

2    SOMEWHAT MORE EFFECT THAN A MEMO FROM OPPOSING COUNSEL THAT

3    WE ARE NOT GOING TO TALK ABOUT THIS.  MAYBE NOT.  FOLKS

4    DON'T ALWAYS DO WHAT I TELL THEM, I HAVE NOTICED.  AND THEN

5    IF YOU DO OBJECT, WE CAN HAVE A RATHER SPEEDY HEARING ON IT.

6    SO JUST LET ME KNOW WHAT YOU ALL DECIDE.

7                     (HEARING ENDS AT 5:38 P.M.)

8                            * * * * *

9                      REPORTER'S CERTIFICATION

10

11        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

12   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

13

14                         _____

15                         LORI BURGESS
                           OFFICIAL COURT REPORTER
16                         UNITED STATES DISTRICT COURT
                           NORTHERN DISTRICT OF GEORGIA

17

18                         DATE:  JUNE 29, 2010

19

20

21

22

23

24

25

                         U.S. DISTRICT COURT
                         LORI BURGESS, RMR