# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

```
CHEMFREE CORPORATION,          )
                               )
       Plaintiff,              )
                               )  Civil Action No.
v.                             )  1:04-CV-3711(JTC)
                               )
J. WALTER, INC., and           )
J. WALTER COMPANY, LTD.        )
                               )
       Defendants.             )
```

==================================================================

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS
## ALTERNATIVE MOTIONS FOR RECONSIDERATION,
## FOR NEW TRIAL, OR TO ALTER OR AMEND FINDINGS OR JUDGMENT

==================================================================

Submitted by:

DUANE MORRIS LLP

William A. Capp (#108823)
Email: *bcapp@duanemorris.com*

Luke Anderson (#018330)
Email: *landerson@duanemorris.com*

1180 West Peachtree Street
Suite 700
Atlanta, Georgia  30309
Telephone:  (404) 253-6975
Facsimile:  (404) 253-6901

Counsel for Plaintiff
  ChemFree Corporation

## NOTES ON CITATION CONVENTION:

In order to facilitate the review of the record in support of the accompanying motion, Plaintiff's counsel has submitted an accompanying declaration that:

(1) identifies and authenticates certain *Markman* proceeding papers and related correspondence exchanged pursuant to the Local Patent Rules prior to the filing of the Joint Claim Construction Statement;

(2) furnishes (i) excerpts from certain discovery depositions of the experts, and (ii) excerpts from patent prosecution history Joint Trial Exhibits; and

(3) furnishes copies of the two *Hakansson* references from the prosecution history.

Citations to the accompanying Declaration of William Capp are denoted by the abbreviation "CD" followed by a paragraph number and, where applicable, are also followed by a short description of the Exhibit attachment, the Exhibit number, and the page number to the Exhibit.

# **TABLE OF CONTENTS**

I.   INTRODUCTION................................................ 1

II.  "NON-CAUSTIC" REFERS TO THE HEALTH SAFETY AND COMFORT
     OF THE OPERATOR, NOT THE MICROBES........................ 3

     A.   NEGOTIATIONS LEADING TO CONSTRUCTION OF "NON-
          CAUSTIC."........................................... 3

     B.   PROPERLY CONSTRUED, "NON-CAUSTIC" IS DIRECTED TO
          THE HEALTH, SAFETY, AND COMFORT OF THE HUMAN
          OPERATOR OF THE PATENTED PARTS WASHER............... 8

          1.   Specification Support that "Non-Caustic" is
               Directed to Safety and Comfort of the
               Operator....................................... 8

          2.   The Term "Non-Toxic," not "Non-Caustic," is
               Directed to the Health of the Microbes......... 9

          3.   Prosecution History Support For "Non-Caustic"
               Referring to the Health of the Operator........ 9

III. ONCE "NON-CAUSTIC" IS PROPERLY CONSTRUED, HAKANSSON-2
     LACKS A NON-CAUSTIC FLUID............................... 13

     A.   OBVIOUSNESS ANALYSIS REQUIRES APPLICATION OF THE
          CLAIMS – AS PROPERLY CONSTRUED...................... 13

          1.   In Construing Claim Terms, the Court Should
               Discount Expert Testimony...................... 13

          2.   Defendants Improperly Offered Misleading
               Extrinsic Evidence Testimony from Dr.
               Adriaens to Distort the Construction of "Non-
               Caustic.".......................................14

          3.   Pre-Trial Discovery on Non-Caustic Focused on
               the Health, Safety, and Comfort of the
               Operator........................................15

          4.   Defendants Circumvented This Court's Evidence
               Exclusion Rulings in Eliciting Testimony From
               Dr. Adriaens on Inherent Disclosures in
               *Hakansson-2*...................................17

     B.   WHEN PROPERLY APPLIED TO HUMAN TISSUE, THE NON-
          CAUSTIC LIMITATION IS NOT INHERENTLY MET IN
          HAKANSSON-2.........................................19

IV.  DEFENDANTS PRESENTED NO EVIDENCE OF MODIFYING THE PRIOR
     ART WITH A NON-CAUSTIC FLUID – WITH THE REQUISITE
     EXPECTATION OF SUCCESS.................................. 20

|  |  |  |
|---|---|---|
| | A. | PRIOR ART AQUEOUS CLEANING FLUIDS WERE CAUSTIC...... 21 |
| | B. | BIODEGRADATION OF BIODEGRADABLE SURFACTANTS PRODUCES ACID THAT CAN RENDER THE PH LEVEL OF FLUID UNSTABLE...................................... 21 |
| V. | | REQUEST TO AMEND FINDINGS ON SECONDARY CONSIDERATIONS.... 23 |
| | A. | INITIAL SKEPTICISM AND UNEXPECTED RESULTS.......... 23 |
| | B. | LAUDATORY STATEMENTS BY INFRINTER.................. 24 |
| VI. | | PRESUMPTION OF VALIDITY................................. 24 |
| VII. | | CONCLUSION............................................. 25 |

# TABLE OF AUTHORITIES

## Cases:

*Bryan v. Murphy*, 246 F. Supp. 2d 1256, 1258-59 (N.D. Ga. 2003) .... 8

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595,
113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ...................... 13

*Del Rio Dist. v. Adolph Coors Co.*, 589 F.2d 176, 179 n.3
(5th Cir. 1979) ................................................. 2

*Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1358
(Fed.Cir. 2006) ............................................... 23

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464
(Fed.Cir. 1990) ............................................... 24

*In re Berg*, 320 F.3d 1310, 1315 (Fed.Cir. 2003) .................. 12

*Jack Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352, 1361
(Fed.Cir. 2002) ............................................... 18

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205
(Fed.Cir. 2003) ............................................... 24

*Medichem, S.A., v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed.Cir. 2006) ... 20

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349
(Fed.Cir. 2004) ............................................... 11

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.Cir. 2005) .... 8, 12, 13, 15

*Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556 (Fed.Cir. 1986)
*cert denied* 479 U.S. 850 (1986) ............................... 24

*Power-One, Inc. v. Artesyn Tech. Inc.*, 599 F.3d 1343, 1352
(Fed.Cir. 2010) ............................................... 24

*Shaps v. Provident Life & Accident Ins. Co.*, 244 F.3d 876, 885
(11th Cir. 2001) ............................................... 2

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578
(Fed.Cir. 1995) ............................................... 15

*TI Group Automotive Systems (North America), Inc. v. VDO North America, L.L.C.*,
375 F.3d 1126, 1139 (Fed.Cir. 2004) ......................... 13

*Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1382
(Fed.Cir. 2003) ............................................... 18

*Ventana Medical Systems, Inc. v. Biogenix Laboratories, Inc.*, 473 F.3d 1173,
1184 (Fed.Cir. 2006) ......................................... 11

*Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 804
  (Fed.Cir. 1999) ........................................... 7

## **Statutes:**

35 U.S.C. § 282........................................... 24

## **Other Authorities:**

Hicks, Brian N., *Bioremediation: A Natural Solution*, POLLUTION
  ENGINEERING, January 15, 1993 ................................ 21

THE AMERICAN HERITAGE DICTIONARY, 4th ed. ........................ 4, 5

Plaintiff herein submits its brief in support of its accompanying post-trial motions, in the alternative, for reconsideration, for a partial new trial, to alter or amend findings and conclusions, and/or to alter or amend judgment.

## I. INTRODUCTION.

Plaintiff appreciates the hard work that the Court has invested in this case to date.  However, before this case goes up on appeal, Plaintiff prays that the Court will revisit one narrow issue that appeared to be outcome determinative of the decision to invalidate all of Plaintiff's patent claims.  Revisiting this issue now may avoid the cost and delay of an appeal.

Eighteen of Plaintiff's 21 claims are limited to a cleaning fluid that is "non-caustic."  During *Markman*, the Defendants abandoned their proposed construction of "non-caustic" and acceded to Plaintiff's proposed construction.  Inasmuch as the construction was agreed to, the Court was deprived of an opportunity to construe this term in an adversarial setting.

At trial, Defendants changed their position on the meaning of "non-caustic."  What Defendants argued at trial was NOT what they had agreed to.  Defendants "re-construed the construction" in a way that grossly distorted the agreed upon meaning.  That distorted construction, in turn, led to a finding that the claim limitation of a "non-caustic" fluid was satisfied in *Hakansson-2*.

The finding that the non-caustic limitation was met, in turn, led to a finding that the patent claims were invalid as obvious.

Before trial, both parties understood that "non-caustic" was directed to the health, safety, and comfort of the <u>human operator</u>, not the microbes.  However, Defendants knew that they could not prove that *Hakansson-2* had a "non-caustic" fluid if "non-caustic" was directed to human tissue.  So, Defendants went into trial with a strategy to:  (i) distort the meaning of "non-caustic" into something other than what the parties had agreed to; and (ii) circumvent the Court's rulings precluding Defendants from offering evidence regarding whether limitations were "inherently" met in *Hakansson-2*.  The plan was subtle, clever, and, ultimately, has resulted in a gross miscarriage of justice.

Plaintiff requests the Court to alter or amend its findings and conclusions to comport with the originally <u>agreed upon</u> meaning of "non-caustic."  Alternatively, Plaintiff requests the Court to grant a partial new trial, re-open the *Markman* hearing, and construe "non-caustic" in an adversarial setting.  *Del Rio Dist. v. Adolph Coors Co.*, 589 F.2d 176, 179 n.3 (5th Cir. 1979)(courts may grant a new trial when it is reasonably clear that prejudicial error has crept into the record; *Shaps v. Provident Life & Accident Ins. Co.*, 244 F.3d 876, 885 (11th Cir. 2001)(a new trial may be ordered when the interests of substantial justice are at stake).

## II.   "NON-CAUSTIC" REFERS TO THE HEALTH, SAFETY AND COMFORT OF THE OPERATOR, NOT THE MICROBES

### A.   NEGOTIATIONS LEADING TO CONSTRUCTION OF "NON-CAUSTIC."

Pursuant to Local Patent Rule 6.1, the parties exchanged terms for possible *Markman* construction in October and December 2005.  [CD ¶¶ 3-8, Exhibits B-F].  Only Plaintiff sought construction of "non-caustic."  *Id*. at ¶¶ 5, 6.  Next, pursuant to Local Patent Rule 6.2, the parties exchanged "preliminary constructions" on December 12, 2005. [CD ¶¶ 9, 10, Exhibits G, H].  Plaintiff proposed the following construction:

> caustic generally means capable of burning or eroding by chemical action; In the context of the ChemFree patents, non-caustic means that the cleaning fluid does not burn or erode organic tissue, such as the skin of the operator, by chemical action.

[CD Exhibit G. Plaintiff's Preliminary Claim Construction ¶ 9].  Defendants proposed the following construction for the larger phrase – "*a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid*:"

> A water-based fluid that has a **pH less than 12**, contains a surfactant that aids in removing hydrocarbons from metal, the components of which can be broken down into predominantly environmentally safe by-products.

[CD Exhibit H, Defendants' Preliminary Construction, ¶ 10 (emphasis added)].  During December 2005, and January 2006, the parties negotiated over proposed constructions.  [CD ¶¶ 11-13].  On January 13, 2006, Defendants abandoned their construction of

- 3 -

"non-caustic" and acceded to Plaintiff's construction in the following email:

> Our revision accepts your wording, verbatim, of the newly agreed-upon terms R, S, T, U and V.[1]

[CD ¶ 13].  In the final Joint Claim Construction Statement, the parties stipulated to the following construction:

> non-caustic means that the cleaning fluid does not burn or erode organic tissue, such as the skin of the operator, by chemical action.

[Docket 114, Joint Claim Construction Statement, ¶ "U"].  Thus, Defendants abandoned any construction that would have covered a pH range from 12 down to a substantially "neutral" pH level that would not harm a human operator.

The definition of "organic tissue" applies to complex organisms, like humans.  It does not apply to single celled microorganisms.  In a biological setting, "tissue" is defined as:

> An aggregation of morphologically similar cells and associated intercellular matter acting together to perform one or more specific functions in the body.  There are four basic types of tissue: muscle, nerve, epidermal, and connective.

THE AMERICAN HERITAGE DICTIONARY, 4th ed.[2]  Plaintiff could not reasonably have foreseen that its proposed construction could be

---

[1] "Non-caustic" was item "U" in such draft. [CD ¶ 12].

[2] See also *www.biotechmedia.com* – "An aggregate of similar cells and cell material forming one of the structural materials of an organism, e.g. muscle cells form muscle tissue, fat cells form fat deposits, heart cells form the heart and cause the rhythmic beating."

so distorted as to be applied to higher pH levels that are
underlined: harmful to human operators, even if safe for single celled
microbes, for at least the following reasons:

- Microbes are NOT "aggregations" of similar cells;

- Microbes are NOT interconnected with "intercellular matter;"

- Microbes do NOT "act together" to perform "functions;"

- Microbes do NOT "perform functions" ... "in the body" – the
  definition clearly indicating a larger, more complex "body"
  composed of more than a single cell.

- The "basic types" of tissue (e.g. muscle) clearly refer to a
  complex biological organism, like humans, not microbes.

The meaning of "non-caustic" is further informed by the
parties' *Markman* negotiations regarding the meaning of the terms
- "*said fluid being non-toxic to said microorganisms.*" ['835 patent, claim 5;
'125 patent, claim 6]; and – "*to which the fluid is non-toxic.*" ['125 patent,
claim 12].  "Toxic" is defined as:

>  Capable of causing injury or death, especially by chemical
>  action, poisonous.

AMERICAN HERITAGE DICTIONARY.  In contrast, "caustic" is defined as:

>  Capable of burning, corroding, dissolving, or eating away by
>  chemical action.

AMERICAN HERITAGE DICTIONARY.  The term "toxic" connotes "killing" -
as in "poisoning."  The term "caustic" connotes "injuring," not
"killing."  Microbes don't get "injured" - they get "killed."  No

one takes a microbe to the hospital so it can be treated for chemical burns.  If a chemical is harmful to microbes, it is considered "toxic," not "caustic."  During *Markman*, Plaintiff proposed the following construction of "non-toxic."

> non-toxic means not poisonous, not capable of causing injury or death by chemical means; said fluid is non-toxic to said microorganisms means that the fluid is compatible with the microorganisms such that the microorganisms are capable of living within the cleaning fluid.

[CD Ex G, Plaintiff's Preliminary Construction, ¶ 26].  Defendants never proposed a competing construction.  The parties ultimately stipulated to Plaintiff's construction of "*said fluid being non-toxic to said microorganisms.*" [Docket 114, ¶ G].

The terms "*non-caustic*" and "*said fluid being non-toxic to said microorganisms*" both appear as separate limitations in a single claim. ['835 Patent, claim 5; '125 Patent, claim 6].  They are different terms with different meanings.  If "non-caustic" refers to the microbes, then the term becomes redundant of "non-toxic" and loses its meaning and significance to the invention.

An important advantage of Plaintiff's invention was the use of a pH neutral cleaning fluid, as opposed to the higher pH, "caustic" fluids of the prior art.  Plaintiff's pH neutral cleaning fluid made parts washing in an open basin safer and more comfortable for the operator.  Plaintiff's invention can be used without protective clothing such as gloves, goggles, etc.  This

advantage is recognized in the claims by using the term "non-caustic."  The 9.2 plus pH of *Hakansson-1* is sufficiently hazardous that operators using such a fluid in an open basin environment would necessarily have to wear protective clothing.  The Material Data Safety Sheet ("MSDS") for a 9.2 plus pH fluid would necessarily have to warn the operator of this danger and warn the operator to take precautions, such as use protective clothing. Construing "non-caustic" as referring to the microbes instead of the operator thus deprives Plaintiff's invention of a significant advantage over the prior art.  Specifically, <u>it deprives Plaintiff's claims of the benefit of the Examiner's Amendment that distinguished Plaintiff's invention over the prior art, including *Hakansson-1*</u>.

A general rule of claim construction is that - the only terms that need to be construed are those that are in controversy, and only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed.Cir. 1999).  The bottom line here is this - in stipulating to the construction of "non-caustic" in the Joint Claim Construction Statement, <u>Plaintiff did not agree</u> that "non-caustic" was directed to the health of the microbes, as opposed to the operator.  Under the Local Rules of this Court, a motion for reconsideration can be brought where there is a need to

correct a clear error of law or fact. *Bryan v. Murphy*, 246 F.Supp.2d 1256, 1258-59 (N.D.Ga. 2003). Here, the clear error that needs to be corrected is the misconstruction and consequent misapplication of "non-caustic." Consequently, the Court should take one of the following two courses of action: (1) apply the term to human tissue as agreed to in the Joint Claim Construction Statement; or, (2) recognize that the parties never agreed, such that the Court needs to re-open *Markman* and construe the term in an adversarial context.

**B. PROPERLY CONSTRUED, "NON-CAUSTIC" IS DIRECTED TO THE HEALTH, SAFETY, AND COMFORT OF THE HUMAN OPERATOR OF THE PATENTED PARTS WASHER.**

In construing terms, the Court should give primary consideration to the intrinsic record. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.Cir. 2005). Properly construed, "non-caustic" is directed to the health, safety, and comfort of the human operator, not the health of the microbes. Plaintiff's construction is supported by the intrinsic record.

**1. Specification Support that "Non-Caustic" is Directed to Safety and Comfort of the Operator.**

The following passages in the specification support Plaintiff's position that "non-caustic" is directed to the health, safety, and comfort of the human operator.

> An acceptable cleaning fluid, for example and not limitation, is a mixture of pH neutral emulsifiers and surfactants containing no volatile organic compounds,

phosphates, formaldehyde, biocides, or other toxic
materials.  The emulsifier and surfactants are blended in
liquid form to produce a biodegradable, non-toxic, non-
caustic, non-flammable oil dispersant cleaner and degreaser.

[CD Exhibit S, JTX 1, '110 Patent, Col. 6, lines 4 – 11].

the exemplary cleaning fluid is a freely flowing liquid with
a specific gravity of 1.083, a slight pleasant odor, no
flash point, a boiling point of 210° Fahrenheit, a pH of
approximately seven, and which is infinitely soluble in
water.

[CD Exhibit S; JTX 1, '110 Patent, Col. 6, lines 23 – 27].

### 2.    The Term "Non-Toxic," not "Non-Caustic," is Directed to the Health of the Microbes.

The following passages demonstrate that "non-toxic" (not

"non-caustic") is directed to the health of the microbes.

The cleaning fluid is not toxic to the microorganisms such
that the microorganisms survive and reproduce within the
cleaning fluid environment.

['110 Patent, col. 2, lines 18-21 (emphasis added)].

In accordance with the preferred embodiment of the present
invention, the cleaning fluid is compatible with (i.e., is
non-toxic to) the microorganisms such that the
microorganisms are capable of living within the cleaning
fluid 72.

['110 Patent, col. 5, line 65 – col. 6, line 2 (emphasis added)].

### 3.    Prosecution History Support For "Non-Caustic" Referring to the Health of the Operator.

In construing "non-caustic," it is important to recall that

the *Hakansson-1* reference was before the Examiner during

prosecution of all of the patents-in-suit.  The '110 and '491

Patents issued on continuation applications.  During prosecution

- 9 -

of the parent application, *Hakansson-1* was cited by the Examiner in an Office Action. [CD Ex L, JTX-10, p. J-0001693]. On February 6, 1998, an interview took place with the Examiner. The Interview Summary indicates that an agreement was reached, referring to an Examiner's Amendment. [JTX-11, p. J-0001912]. Thereafter, the PTO issued a Notice of Allowability indicating the allowance of pending claims. The Notice imposed an Examiner's Amendment adding the following language to claim 1, "*biodegradable, non-toxic, __non-caustic__, nonflammable oil dispersant cleaner and degreaser*," immediately before the word "fluid." [JTX-11, p. J-0001916]. Under the circumstances, the Examiner's Amendment should be deemed sufficient to render the claims patentable over *Hakansson-1*.

*Hakansson-1* differs from Plaintiff's invention in that it operates at a higher pH level than Plaintiff's pH neutral fluid.

> When the cleaning processes and biodegradation processes are carried out in one and the same bath, the pH-value is preferably adjusted to between 9.0 and 9.5.

[*Hakansson-1*, page 3, lines 4-5]. *Hakansson-1* further teaches a monitoring and metering subsystem that increases the pH of the fluid if it falls to about 9.2. [*Hakansson-1*, p. 3, ll. 5-7]. In contrast, Plaintiff's patents teach a "neutral" operating pH of "approximately seven." ['110 Patent, col. 6. lines 4 - 27]. *Hakansson-2* is completely silent as to the pH range of the fluid. However, because *Hakansson-1* demonstrates that a bioremediation

parts washer does not <u>necessarily</u> operate at a neutral pH,

*Hakansson-2* cannot inherently disclose a pH neutral fluid.

In a subsequent continuation application, the same Examiner
made the following observation in an interview summary.

> It was noted by the examiner that [*Hakansson-2*] and [*Hakansson-1*]
> fail to specifically or inherently disclose in a parts
> washer, a fluid that is a "biodegradable, non-toxic, non-
> caustic, nonflammable oil dispersant cleaner and degreaser".

[Durkee Report, Dkt 467, p. 16, *quoting from* Appl. No. 11/089,305,

Examiner Interview Summary, dated November 1, 2005].  A court may

consider the prosecution history in a subsequent continuation

application in construing terms of an earlier issued patent.  *See*

*Ventana Medical Systems, Inc. v. Biogenix Laboratories, Inc*., 473 F.3d 1173, 1184

(Fed.Cir. 2006), citing *Microsoft Corp. v. Multi-Tech Sys., Inc*., 357 F.3d

1340, 1349 (Fed.Cir. 2004) (recognizing that "the prosecution

history of one patent is relevant to an understanding of the

scope of a common term in a second patent stemming from the same

parent application").

The Examiner's observation that *Hakansson-2* does not

inherently disclose a biodegradable, non-toxic, non-caustic,

nonflammable fluid is contradicted by this Court's finding that

the identical limitation is inherently disclosed in *Hakansson-2*.

> A person of ordinary skill in the art would have realized
> that the use of a biodegradable, non-toxic, non-caustic,
> nonflammable oil dispersant cleaner and degreaser fluid was

necessary for the device to function.  Therefore, all of
these limitations were inherently disclosed in *Hakansson-2*.
[Order, Docket 619, p. 48].  In other words, the Examiner and
this Court reached exactly opposite conclusions.  What then
accounts for these two seemingly irreconcilable conclusions?
Plaintiff submits that the most reasonable explanation is that
the Court used a different *Markman* construction for "non-caustic"
than that used by the Examiner.

PTO Examiners are considered to be persons of scientific
competence in the fields in which they work.  *In re Berg*, 320 F.3d
1310, 1315 (Fed.Cir. 2003).  Here, the Examiner necessarily used
a construction that distinguished Plaintiff's claims from the
*Hakansson* references, allowing the claims to be patentable over
*Hakansson*.  Inasmuch as an Examiner's comments in the prosecution
history is part of the intrinsic public record that should guide
the Court in construing the claims, the Court should have applied
"non-caustic" in a manner that is consistent with that of the
Examiner.  *See Phillips, supra* at 1319 (specification and prosecution
history constitute an "indisputable public record" that guides
claim construction).

### III. ONCE "NON-CAUSTIC" IS PROPERLY CONSTRUED, <u>HAKANSSON-2 LACKS A NON-CAUSTIC FLUID</u>.

**A.   OBVIOUSNESS ANALYSIS REQUIRES APPLICATION OF THE CLAIMS – AS PROPERLY CONSTRUED.**

Patent invalidity analysis is a 2-step process.  The first step involves interpretation of the claims, and the second step involves determining whether the claim limitations as properly interpreted are met by the prior art. *TI Group Automotive Systems, Inc. v. VDO North America, L.L.C.,* 375 F.3d 1126, 1139 (Fed.Cir. 2004).

**1.   In Construing Claim Terms, the Court Should Discount Expert Testimony.**

Expert testimony can be misleading. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In the *Markman* context, it is frequently treated as unreliable.

> a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent ... extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence.

*Phillips*, 415 F.3d *supra* at 1318 (emphasis added).  Moreover, "the effect of that bias can be exacerbated if the expert is not one of skill in the relevant art..." *Id*.  In the instant case, Dr. Adriaens disclaimed expertise in the field of parts washing.

Q  Do you also consider yourself to be an expert in the field of parts washing?

A  I do not.

[Adriaens Jan 2009 dep. p.339; TR 754:4-14].  When Dr. Adriaens'
qualifications regarding parts washing were challenged during *voir
dire* at trial, Defendants represented that they were offering him
only for his expertise in bio-reactor technology.  [TR 752:14-
22].  In short, the case authorities counsel away from receiving
testimony from Dr. Adriaens on the meaning of "non-caustic" as
such term is used in the field of parts washing.

> **2.   Defendants Improperly Offered Misleading Extrinsic
> Evidence Testimony from Dr. Adriaens to Distort
> the Construction of "Non-Caustic."**

In reaching its decision that *Hakansson-2* inherently disclosed
a non-caustic fluid, the Court appeared to rely heavily on the
following testimony from Dr. Adriaens:

Q. AND DO YOU HAVE AN UNDERSTANDING OF WHAT CAUSTIC MEANS IN
THE SENSE OF <u>IN REGARD TO MICROBES</u>?

A. YES.

Q. AND WHAT EFFECT WILL A CAUSTIC SITUATION HAVE ON MICROBES
GENERALLY?

A. CAUSTIC SOLUTIONS WOULD KILL MICROORGANISMS JUST IN THE SAME
WAY AS IT IS ABRASIVE TO HUMAN CELLS, DERMAL CELLS.
ESSENTIALLY THE MAKEUP OF THE MICROBIAL CELL WALL IS THE
SAME, VERY SIMILAR TO THE MAKEUP OF THE HUMAN CELLS. IT IS
ESSENTIALLY THESE CELLS WILL DISSOLVE, WILL DEGRADE, WILL
DIE IN THE PRESENCE OF A CAUSTIC SOLUTION.

[TR 770:20 - 771:5 (emphasis added)].  Note, there is no
testimony here or anywhere else in the record that compares what
pH range of a cleaning fluid is safe for a human operator as
compared to what may be tolerable for a microbe.  Neither is

- 14 -

there any evidence in the record that the pH tolerance of human skin, eyes, respiratory systems, and digestive systems is co-extensive with the pH range that is tolerated by microbes. Nevertheless, the foregoing testimony by Dr. Adriaens was used by Defendants to essentially redefine what "non-caustic" means.

Dr. Adriaens is not qualified to offer an opinion as to what "non-caustic" means to a practitioner in the parts washing art. Second, Dr. Adriaens' testimony, to the extent it is used to "re-construe" the meaning of "non-caustic," is unreliable "extrinsic" *Markman* evidence and should be rejected.

> undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the "indisputable public records consisting of the claims, the specification and the prosecution history," thereby undermining the public notice function of patents.

*Phillips, supra* 1319, quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed.Cir. 1995).  Third, before re-defining "non-caustic" in a way that differed from the originally agreed upon construction, the Defendants should have provided Plaintiff and the Court with reasonable notice of their intentions.

### 3.    Pre-Trial Discovery on Non-Caustic Focused on the Health, Safety, and Comfort of the Operator.

The parties took expert depositions on invalidity issues during May 2008.  Those depositions took place before the Court entered its Orders of August 27 [Docket 414], and December 18, 2008 [Docket 464, pp. 9-10], restricting Dr. Adriaens' ability to

testify at trial concerning:  (i) the *Hakansson-1* reference; (ii) the *Hakansson-2* reference; and (iii) combinability of references, due to deficiencies in his expert report.

Defendants' interrogation of Plaintiff's expert was clearly directed to "non-caustic" impacting the health, safety and comfort of the human operator. [CD Ex. Q, pp. 102-104].  Dr. Durkee testified that the pH 9.2 and above levels of *Hakansson-1* were harmful to the human operator. *Id*.  Dr. Adriaens' April 16, 2008 Report [Docket 354] establishes, beyond any reasonable doubt, that Defendants understood "non-caustic" as applying to the operator, not microbes.  [*See* pp. 48-49 - "*damage to human skin tissue*"].  During his deposition, Dr. Adriaens testified that he would be extremely reluctant to expose bare skin to a pH 9.2 fluid. [CD, Ex. R, pp. 224-227].

Thus, going into trial, Defendants knew that they had no chance of establishing that *Hakansson-2* disclosed a "non-caustic" cleaning fluid if the debate centered on damage to human tissue. So, rather than concede "game over" – they sought to change the game and re-define the meaning of "non-caustic."  To do so, they had to circumvent this Court's evidence exclusion orders.

**4.   Defendants Circumvented This Court's Evidence Exclusion Rulings in Eliciting Testimony From Dr. Adriaens on Inherent Disclosures in *Hakansson-2*.**

Due to Defendants' incessant gamesmanship and glaring deficiencies in Dr. Adriaens' initial expert report, the Court entered a series of exclusionary rulings that should have constrained Defendants from putting on extrinsic evidence that *Hakansson-2* inherently disclosed a non-caustic fluid.  The Court's Order of August 27, 2008 [Docket 414] struck the *Hakansson-1* reference from Dr. Adriaens initial expert report and denied Defendants' motion to amend the report so as to include the *Hakansson-2* reference.  The Order further found Adriaens' report deficient as to whether prior art references could be combined or modified in an obviousness analysis. *Id*. at 15-16.  This Court's Order of December 18, 2008, further clarified that Dr. Adriaens was prohibited from testifying regarding support for his obviousness conclusion not disclosed in his initial report. [Docket 464 at pp. 9-10].  Finally, the Court's *in limine* Order of May 27, 2009, precluded Defendants from introducing evidence at trial that limitations are "inherently" present in *Hakansson-2*. [Docket 552, pp. 1-2].

Defendants disobeyed these Orders during trial.  Dr. Adriaens' examination was carefully crafted to elicit extrinsic evidence testimony as to:  (i) a distorted *Markman* re-

construction of "non-caustic;" and (ii) the "inherent" presence of a "non-caustic" fluid.  If Defendants wanted to pursue this theory, they should have given Plaintiff a timely and forthright response to Interrogatory No. 5 as to the substance of the theory and the witnesses who would testify about it, instead of circumventing the Court's orders and engaging in trial by ambush.

Generally, claim construction is considered to be an iterative process such that the Court can update, amend, or modify its interlocutory *Markman* claim construction ruling at any time until entry of final judgment. *Jack Guttman, Inc. v. Kopykake Enters*., 302 F.3d 1352, 1361 (Fed.Cir. 2002); *Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1382 (Fed.Cir. 2003).  However, if Defendants wanted to depart from the agreement regarding the meaning of non-caustic that was reached back in 2006, they should have been more forthright about it.  As for evidence of inherency to <u>apply</u> the construction of non-caustic, rather than the claim construction itself, Defendants were precluded from introducing such evidence at trial.

In preparing its case for trial, Plaintiff relied on the Court's exclusion orders to constrain the scope of the evidence that would come in.  Plaintiff was unfairly prejudiced by being sandbagged in this manner at trial.  Had Plaintiff known that this was a live issue, it could have easily mustered testimony

from Dr. Brickell and/or Dr. Durkee to clearly establish that the range of pH tolerance for microbes is much greater than that of human beings.  Plaintiff could have more clearly established with overwhelming evidence that microbes can tolerate pH in the range of 10 or more, which pH concentrations are harmful to the skin, eyes, respiratory systems, and digestive systems of humans.

**B.   WHEN PROPERLY APPLIED TO HUMAN TISSUE, THE NON-CAUSTIC LIMITATION IS NOT INHERENTLY MET IN HAKANSSON-2.**

Once properly construed as applying to the health, safety, and comfort of the human operator, there is no evidence that the term "non-caustic" is inherently met in *Hakansson-2*.  The only witness who actually testified about *Hakansson-2* at trial was Dr. Durkee, and his testimony was unequivocal that the non-caustic term is not met in *Hakansson-2*.

> There is no express disclosure in *Hakansson-2* about the nature of its cleaning fluid being "non-caustic." For the following reasons, the attribute of non-caustic is not inherently present in *Hakansson-2*. At the time of the invention, most aqueous-based cleaning fluids were caustic. This required either: (i) cleaning in an enclosed chamber; or (ii) use of protective clothing and safety glasses by operators performing cleaning in open vessels. The disclosure of only a closed chamber embodiment would be understood by someone of ordinary skill that a caustic cleaning fluid may be used in *Hakansson-2.*

[Dkt 467, Durkee Supp. Report, p. 20; see also p. 40].

Dr. Durkee further relied on and agreed with Examiner Stinson's analysis that *Hakansson-2* does not inherently possess a non-caustic fluid.  [Docket 467, pp. 39-40].  Once "non-caustic"

is properly construed and applied, Dr. Durkee's analysis,
opinion, and conclusion are wholly unrebutted by the Defendants.
The missing element of a "non-caustic" fluid is not supplied by
Defendants' secondary reference, *Athey*.  In other words, there is
no evidence in the record that this element, once properly
construed, is found in the prior art.

### IV. DEFENDANTS PRESENTED NO EVIDENCE OF MODIFYING THE PRIOR ART WITH A NON-CAUSTIC FLUID – WITH THE REQUISITE EXPECTATION OF SUCCESS.

An obviousness determination requires not only a reason to
combine elements from different prior art references, but also
that a skilled artisan would have perceived a reasonable
expectation of success in making the invention via that
combination.  *Medichem, S.A., v. Rolabo, S.L.*, 437 F.3d 1157, 1165
(Fed.Cir. 2006).  Once "non-caustic" is properly construed and
applied, it is missing in the prior art and, furthermore,
Defendants offered no evidence that the prior art could be
modified with the requisite "expectation of success."

The evidence introduced during the enablement summary
judgment proceeding and at trial showed that the technology
required to develop Plaintiff's invention is more complicated
than merely dumping a teaspoon of freeze-dried microbes into a
prior-art, sink-on-drum, aqueous parts washer.  The following
facts relating to an expectation of success are undisputed.

**A.   PRIOR ART AQUEOUS CLEANING FLUIDS WERE CAUSTIC.**

In the prior art, aqueous parts cleaning was typically performed using caustic solutions with a pH of 10 to 11 or above. [Durkee, Dkt 337, p. 54; ].   *Hakansson-1* had complex monitoring and metering sub-systems to maintain the pH above 9.2.   Defendants introduced no evidence that parts cleaning (with or without bioremediation capability) was known in the prior art using pH neutral, "non-caustic" surfactant technology.   In particular, Defendants introduced no evidence that aqueous parts cleaning was known in the prior art using pH neutral, biodegradable surfactants that did not also employ the use of biocides to inhibit biological activity that would degrade the surfactants.

**B.   BIODEGRADATION OF BIODEGRADABLE SURFACTANTS PRODUCES ACID THAT CAN RENDER THE PH LEVEL OF FLUID UNSTABLE.**

The early literature on bioremediation taught that acid is produced as a by-product.

> pH may decline in response to the generation of organic acids from metabolic activity.

Hicks, Brian N., *Bioremediation: A Natural Solution*, POLLUTION ENGINEERING, January 15, 1993 (quoted in Durkee, Dkt 337, pp. 150-151).

*Hakansson-1* taught that:

> In the case of large bacteria populations, the pH-value may fall rapidly due to high consumption of emulsifying chemicals and to the generation of acid by dead bacteria. Consequently, in order to prevent the tenside-consumption from becoming excessive, the nutrient solution introduced to the bath may also contain a pH-increasing substance ...

[*Hakansson-1*, p. 8].  Both *Hakansson-1* and *Hakansson-2* possess complex monitoring and metering sub-systems to maintain the pH within a regulated range.  Defendants introduced no evidence at trial that bioremediation, aqueous parts cleaning could take place using pH neutral, "non-caustic" surfactant technology with the requisite "reasonable expectation of success."  Acid lowers pH.  Unchecked acid production can render the pH balance of a cleaning fluid unstable.  Plaintiff is the only party that addressed this issue at trial.  [Durkee, Dkt 337, pp. 142-173].  In view of the conventional wisdom regarding acid generation in bioremediation systems, there was no "reasonable expectation" that a sink-on-a-drum, aqueous parts washer could successfully combine pH neutral, biodegradable surfactant, cleaning chemistry with a bioremediation capability - at the time of the invention.

Defendants' earlier arguments in support of their non-enablement defense effectively preclude their making a straight-faced argument that it would have been "obvious" to modify the prior art with a reasonable expectation of success.  Note their previous arguments regarding how "unpredictable" the art was at the time of the invention.

> Both the biological and chemical components of the alleged ChemFree invention are highly unpredictable ... Here, both the microorganisms and surfactants are unpredictable components of the claimed cleaning solution.

[Dkt 490-2, p. 23; Defendant's Non-Enablement Brief].  Under
Fed.R.Civ.P. 52(b), a party may move to amend findings even if
the modified findings in effect reverse the judgment.  *Golden
Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1358 (Fed.Cir.
2006)(if the trial court has entered an erroneous judgment, it
should correct it).  Here, *Hakansson-2* does not identify a single
cleaning surfactant or a single microbe strain that would even
provide a starting point to modify from, much less suggest that a
modification could be made with a reasonable expectation of
success.  Plaintiff requests the Court to alter or amend its
findings to specifically find that Defendants have failed to
carry their burden to prove that the prior art could be modified
with the requisite reasonable expectation of success.

### V.    REQUEST TO AMEND FINDINGS ON SECONDARY CONSIDERATIONS.

#### A.    INITIAL SKEPTICISM AND UNEXPECTED RESULTS.

Plaintiff put on substantial evidence as to: (i) skepticism
in the industry prior to invention; and (ii) unexpected results.
[Docket 337, pp. 160-173].  This evidence was unrebutted by
Defendants at trial.  Plaintiff requests that the Court make
additional findings as to these secondary considerations of non-
obviousness.  Evidence of initial skepticism and unexpected
results tends to defeat Defendants' case that it would have been
obvious to modify the prior art with an "expectation of success."

B.   LAUDATORY STATEMENTS BY INFRINTER.

Plaintiff requests additional findings with respect to "laudatory statements" by the infringer.   *Power-One, Inc. v. Artesyn Tech. Inc.*, 599 F.3d 1343, 1352 (Fed.Cir. 2010)(infringer's advertisement touting advantages of patented technology is evidence of non-obviousness).   Defendants advertise their infringing product as a "A Revolution In Parts Cleaning." [Plaintiff's Ex. 135].   Defendants' CEO bragged that the pH neutral, bioremediation technology in Defendants' product was "innovative."   [TR 134:14-17].   This evidence merits additional findings and further tips the balance in finding that Plaintiff's patent claims with the "non-caustic" limitation are not obvious and should not be found to be invalid.

## VI.   PRESUMPTION OF VALIDITY.

Issued patents enjoy a presumption of validity.   35 U.S.C. § 282.   Therefore, the burden of proof to establish invalidity is clear and convincing.   *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed.Cir. 2003).   That burden is especially difficult when the prior art was before the examiner during prosecution.   *Hewlett-Packard Co. v. Bausch & Lomb, Inc*., 909 F.2d 1464 (Fed.Cir. 1990); *Polaroid Corp. v. Eastman Kodak Co*., 789 F.2d 1556 (Fed.Cir. 1986)(examiner is entitled to deference when patent challenger relies on same art as during prosecution).

## VII. __CONCLUSION__.

Defendants' change of position on the meaning of "non-caustic" prejudiced Plaintiff and induced the Court to reach an erroneous conclusion as to whether *Hakansson-2* "inherently" disclosed a non-caustic fluid.  Plaintiff is a small, start-up company with a single product line based on new technology that is protected by the patents-in-suit.  The Court's Order, if it goes to judgment, will deprive Plaintiff of its most commercially significant patent protection.  During prosecution, the Examiner imposed an amendment to the fluid limitation of Plaintiff's claims, which distinguished the invention over the prior art, including *Hakansson-1*.  By applying "non-caustic" to microbes instead of the human operator, the Court's order effectively vitiated that Examiner's Amendment that distinguished the invention over the prior art.  The Court should reconsider the meaning of "non-caustic" as a distinguishing characteristic found in the Examiner's Amendment.  In so doing, the Court should find that the 18 claims with the "non-caustic" limitation are not invalid in order to avoid a miscarriage of justice.

Respectfully submitted, this 6th day of July, 2010.

DUANE MORRIS LLP

/s/ *William A. Capp*

William A. Capp
Georgia Bar No. 108823
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2010, I electronically filed the within and foregoing **PLAINTIFF'S BRIEF IN SUPPORT OF ITS ALTERNATIVE MOTIONS FOR RECONSIDERATION, FOR NEW TRIAL, OR TO ALTER OR AMEND FINDINGS OR JUDGMENT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record.

DUANE MORRIS LLP

_/s/ William A. Capp_
William A. Capp
Georgia Bar No. 198823
*bcapp@duanemorris.com*

> In accordance with Local Rule 7.1D,
> counsel for Plaintiff certifies that
> the foregoing has been prepared using
> the font Courier New 12 point.