```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION

 3

 4
   CHEMFREE CORPORATION,        )
 5                              )
                 PLAINTIFF,     )
 6                              )        CIVIL ACTION
            VS.                 )        FILE NO. 1:04-CV-3711-CRW
 7                              )
                                )        ATLANTA, GA
 8   J. WALTER INC.; J. WALTER  )        FEBRUARY 11, 2011
     COMPANY, LTD.,             )        9:00 A.M.
 9                              )
                 DEFENDANT.     )
10   _____)

11

12              TRANSCRIPT OF MOTIONS PROCEEDINGS
             BEFORE THE HONORABLE CHARLES R. WOLLEE
13                UNITED STATES DISTRICT JUDGE

14

15

16   APPEARANCES:
         FOR THE PLAINTIFF:          WILLIAM ARTHUR CAPP
17                                   LUKE ANDERSON
                                     ATTORNEYS AT LAW
18
         FOR THE DEFENDANTS:         STEVE SCHAETZEL
19                                   ANTHONY ASKEW
                                     CHARLES A. PANNELL, III
20                                   ATTORNEYS AT LAW

21

22
   LORI BURGESS, OFFICIAL COURT REPORTER
23   (404) 215-1528

24

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED BY CAT.
```

## INDEX OF EXAMINATIONS

**WITNESS NAME**                                                **PAGE**
THOMAS MCNALLY
   DIRECT BY MR. CAPP   .....................................................15
   CROSS BY MR. SCHAETZEL   ..............................................89
   REDIRECT BY MR. CAPP   ...............................................114

```
1              THE COURT:  I AM JUDGE WOLLEE AND I'LL BE YOUR
2   JUDGE FOR THE DAY.  GOOD MORNING.  LET ME KNOW WHEN YOU ARE
3   ALL SET UP AND READY TO GO, AND AT THAT POINT WE WILL GO IN
4   CAMERA.
5              MR. SCHAETZEL:  MAY IT PLEASE THE COURT, YOUR
6   HONOR.  I AM STEVE SCHAETZEL.  IF WE CAN HAVE TWO MINUTES TO
7   STEP INTO THE MEN'S ROOM.
8              THE COURT:  YES.  AS I SAID A MINUTE AGO, WHEN YOU
9   ARE READY LET ME KNOW AND WE WILL START.  IT IS MY
10  UNDERSTANDING THERE WAS A BIT OF DELAY BECAUSE OF SOME
11  NATURALIZATION PROCEEDINGS WHICH MADE IT DIFFICULT TO GET
12  THROUGH SECURITY.  (PAUSE).
13             MR. SCHAETZEL:  YOUR HONOR, THANK YOU FOR THE
14  ADDITIONAL TIME.  WE DID HAVE TROUBLE GETTING THROUGH
15  SECURITY.  WE APPRECIATE THE COURT'S ASSISTANCE WITH THAT.
16  THE DEFENDANTS ARE PREPARED.
17             THE COURT:  ALL RIGHT.  MR. CAPP?
18             MR. CAPP:  THE PLAINTIFF IS READY, YOUR HONOR.
19             THE COURT:  WE WILL DO A ROLL CALL AT THIS POINT
20  JUST TO MAKE SURE THAT I KNOW WHO ARE THE FOLKS IN THE
21  COURTROOM, AND THEN WE WILL GO IN CAMERA IN A MANNER THAT
22  YOU CAN AGREE UPON, I HOPE.  SO WE CAN TAKE UP THE FIRST OF
23  THE ISSUES HERE TODAY ON BEHALF OF CHEMFREE CORPORATION.
24             MR. CAPP:  YES, YOUR HONOR.  BILL CAPP WITH THE
25  LAW FIRM OF DUANE MORRIS, AND I AM LEAD COUNSEL FOR THE
```

1    PLAINTIFF.  WITH ME IS FRANK MARKS WHO IS THE PRESIDENT OF

2    CHEMFREE.  AND IN THE BACK IS TOM MCNALLY, WHO IS THE

3    VICE-PRESIDENT AND GENERAL MANAGER OF CHEMFREE.  MR. MARKS

4    AND MR. MCNALLY ARE ALSO CO-INVENTORS ON THE PATENT.  IN THE

5    MIDDLE OF THE TABLE IS LUKE ANDERSON, MY LAW PARTNER AT

6    DUANE MORRIS.  TO HIS LEFT AQUONIS JOSHUA, WHO IS MY LEGAL

7    ASSISTANT.

8            THE COURT:  GOOD MORNING.  ON BEHALF OF THE

9    DEFENDANT J. WALTER?

10           MR. SCHAETZEL:  ON BEHALF OF WALTER, YOUR HONOR.

11   I AM STEVE SCHAETZEL WITH THE LAW FIRM OF KING & SPALDING.

12   TO MY LEFT IS MY ASSOCIATE, CHARLES PANEL.  BY BEHIND ME IS

13   MR. TONY ASKEW, MY PARTNER AT KING & SPALDING.  AND TO HIS

14   RIGHT IS MR. TIM HOUGHTON, WHO IS THE PRESIDENT OF

15   J. WALTER.

16           THE COURT:  GOOD MORNING.  THANK YOU.  PLEASE BE

17   SEATED.  AT THE OUTSET, I HAVE GRANTED THE REQUEST FOR AN IN

18   CAMERA HEARING IN ORDER THAT THE PLAINTIFF AND, IF THEY

19   WISH, THE DEFENDANT, PRESENT MATTERS CONCERNING WHY I AM THE

20   JUDGE TODAY, AND NOT THE ORIGINAL TRIAL JUDGE, JUDGE CAMP.

21   IN CAMERA CAN MEAN DIFFERENT THINGS.  MR. CAPP, WHO DO YOU

22   HAVE IN MIND BEING IN THE COURTROOM AND WHO NOT BEING IN THE

23   COURTROOM?  THE COURT REPORTER WILL DESIGNATE THIS AS

24   SEALED.

25           ****** SEALED PROCEEDINGS COMMENCE *****

```
 1              (PROCEEDINGS, IN OPEN COURT)
 2         THE COURT:  THE NEXT PHASE WILL BE TWO ISSUES THAT
 3  HAVE BEEN RAISED.  NUMBER ONE, SHOULD JUDGE WOLLEE CERTIFY
 4  THAT HE IS FAMILIAR WITH THIS RECORD.  I WILL SPEAK TO THAT
 5  NOW.  I FIND COUNSEL HAVE BEEN VERY PROFESSIONAL IN THE WAY
 6  THEY HAVE PROVIDED ME, NOT JUST ON THE RECORD, BUT BY BOXES
 7  OF MATERIALS DELIVERED TO ME AT MY HOME WHERE I LIVE IN
 8  NEVADA.  ALTHOUGH MY OFFICE IS IN DE MOINES, IOWA, I FLY
 9  BACK AND FORTH A LOT.  BUT I HAVE RECEIVED THOSE PAPERS, AND
10  I AM VERY FAMILIAR WITH THEM.  I HAVE READ THEM.  BUT I AM
11  NOT YET READY TO CERTIFY MY COMPLETE FAMILIARITY WITH THE
12  RECORD, BECAUSE I WANT TO HEAR YOUR ORAL ARGUMENTS FIRST AND
13  MAKE SURE THAT I AM FAMILIAR ENOUGH WITH THE FOCUSED ISSUES
14  THAT MUST BE DECIDED HERE THAT I CAN GO BACK AND BECOME EVEN
15  MORE FAMILIAR.
16         THE DECISION I ENTER IN THIS CASE WILL INCLUDE MY
17  CERTIFICATION OF MY BEING VERY FAMILIAR WITH EVERYTHING THAT
18  HAS BEEN PRESENTED TO ME.  SECONDLY, THE QUESTION IS WHETHER
19  WITNESSES SHOULD BE ALLOWED.  I HAVE HELD A TELEPHONE
20  CONFERENCE WITH COUNSEL, AND I SAID THAT I WOULD ALLOW THAT
21  AT THE OUTSET OF TODAY'S HEARING, AND THAT WILL BE THE NEXT
22  PHASE OF THIS PROCEEDING.  I WILL GIVE COUNSEL AN
23  OPPORTUNITY BRIEFLY TO AN OPENING STATEMENT AND WHAT
24  EVIDENCE THAT YOU WISH TO PRESENT.  AND MR. CAPP, RIGHT NOW
25  BEFORE YOU GET TO YOUR OPENING STATEMENT, IF YOU WISH TO
```

1   MAKE ONE AS TO WHAT YOUR EVIDENCE WILL SHOW, WHAT EVIDENCE

2   DO YOU PLAN TO PRESENT?  IS IT JUST THE ONE WITNESS?

3           MR. CAPP:  THAT IS CORRECT, YOUR HONOR.

4           THE COURT:  ALL RIGHT.  AND ON BEHALF OF

5   J. WALTER, DO YOU WISH TO PRESENT EVIDENCE DURING THIS

6   PROCEEDING?

7           MR. SCHAETZEL:  WE DO NOT ANTICIPATE AT THIS TIME

8   PRESENTING ANY EVIDENCE, YOUR HONOR.

9           THE COURT:  DO YOU WISH TO MAKE AN OPENING

10  STATEMENT CONCERNING WHAT THE EVIDENCE WILL BE?

11          MR. SCHAETZEL:  SINCE WE DON'T ANTICIPATE

12  PRESENTING ANY, I THINK WE WILL WAIT TO HEAR WHAT EVIDENCE

13  MR. CAPP OFFERS, AND THEN IF I COULD RESERVE A CHANCE TO

14  MAKE AN OPENING STATEMENT AFTER HIS, I'LL BE PLEASED TO DO

15  SO.

16          THE COURT:  YOU MAY DO SO.  MR. CAPP, I WILL HEAR

17  YOUR OPENING STATEMENT CONCERNING EVIDENCE TO BE PRESENTED

18  AT THIS POST JUDGMENT PROCEEDING.

19          MR. CAPP:  YOUR HONOR, I HAD PREPARED ABOUT A

20  30-MINUTE OPENING STATEMENT WHICH NOT ONLY COVERED THE NEW

21  WITNESS, BUT PRETTY MUCH THE MAIN POINTS ON I WANTED TO MAKE

22  IN THE CASE.  AND I DON'T KNOW THAT YOUR HONOR WANTS TO HEAR

23  THAT RIGHT NOW.  I WOULD LIKE TO PUT MR. MCNALLY ON FOR

24  ABOUT AN HOUR, HOPEFULLY A LITTLE LESS THAN AN HOUR.  HIS

25  PREVIOUS TESTIMONY IN THE CASE IS SCATTERED THROUGHOUT

1    DEPOSITION, THREE OR FOUR DECLARATIONS, AND HIS TRIAL

2    TESTIMONY, AND IT'S PRESENTED IN DIFFERENT CONTEXTS.  WHAT I

3    WOULD LIKE TO DO FOR YOUR HONOR IS TO TAKE ALL OF THAT AND

4    REPACKAGE IT SO YOUR HONOR CAN HEAR FROM THE HORSE'S MOUTH

5    HOW THE INVENTION WAS MADE AND THE PROCESS THAT THE

6    INVENTORS WENT THROUGH, BOTH IN TERMS OF WHAT THEY DID SO

7    THE JUDGE CAN GET A FEEL FOR THE RELATIVE DEGREE OF

8    PREDICTABILITY AND UNPREDICTABILITY?  WHAT IS INVOLVED IN

9    TAKING CHEMISTRY AND MATING IT WITH BIOLOGY SO THAT WHEN YOU

10   PUT THE TWO TOGETHER YOU HAVE THIS INVENTION THAT IT IS

11   ABOUT THE SIZE OF THIS PODIUM HERE, IT IS THE SAME SINK, IT

12   HAS A HOLDING TANK IN IT, BUT THE HOLDING TANK HAS A FLUID

13   THAT CAN SUSTAIN THE LIFE OF MICROORGANISMS, SO THAT WHEN

14   YOU CLEAN A PART AND THE RESIDUE FROM THE PART, THAT THE

15   CONTAMINATION FLOWS DOWN BACK INTO THE TANK, THE

16   MICROORGANISMS ARE IN A BENEFICIAL HOST ENVIRONMENT SO THAT

17   THEY WILL DIGEST THE CONTAMINANTS OVER A LONG PERIOD OF

18   TIME.

19           AND IN DISTINGUISHING OVER THE PRIOR ART, NOT ONLY

20   DOES IT LAST FOR A LONG PERIOD OF TIME, BUT THIS PARTICULAR

21   INVENTION DOESN'T REQUIRE A LOT OF SUPPORT SUBSYSTEMS OF A

22   PRIOR ART WHERE THE PRIOR ART NEEDED TO CONTINUALLY MONITOR

23   THE PH, BUT AN ALKALINE CHEMICALS, METER IN NUTRIENTS, METER

24   IN ADDITIONAL CLEANING CHEMICALS IN ORDER TO REPLACE THOSE

25   WHICH WERE BEING DIGESTED BY THE MICROORGANISMS.  THE OTHER

1    THING THEY WANT THE COURT TO TAKE NOTE OF WHEN YOU HEAR THE

2    TESTIMONY IS THAT CHEMFREE'S INVENTION, FOR THE FIRST TIME

3    THAT THERE IS ANY DOCUMENTARY SUPPORT FOR, MOVED THE

4    CHEMISTRY THAT IS INVOLVED IN WASHING PARTS FROM HARSH

5    CHEMICALS TO A BENIGN NEUTRAL PH.  AND WHAT THAT ALLOWED FOR

6    THE FIRST TIME IN THIS INDUSTRY IS FOR USERS, OPERATORS, TO

7    WASH PARTS WHERE THEY COULD STAND OVER AN OPEN SINK

8    BARE-HANDED AND WASH PARTS FOR HOURS A DAY, DAY AFTER DAY,

9    WITHOUT WORRYING ABOUT THE HEALTH CONCERNS THAT PLAGUE THIS

10   INDUSTRY BEFORE CHEMFREE'S INVENTION.  AND THAT HEALTH ISSUE

11   WAS A CONDITION CALLED DERMATITIS, WHERE THESE PARTS WASHERS

12   THAT WERE USING KEROSENE OR MINERAL SPIRITS OR HARSH AQUEOUS

13   CHEMICALS WOULD DEVELOP SKIN RASHES WHICH WOULD MAKE THEM GO

14   TO THE DOCTOR, IT WOULD MAKE THEM TAKE OFF WORK, IT WOULD

15   MAKE THEM PUT IN FOR WORKERS'COMPENSATION.  SO WE HAVE A

16   COMBINATION HERE OF MOVING CHEMISTRY FROM HARSH CHEMICALS TO

17   BENIGN CHEMICALS, AND AT THE SAME TIME COMING UP WITH A

18   SYSTEM THAT DOESN'T REQUIRE ALL OF THE ELABORATE SUPPORT

19   SYSTEMS THAT EXISTED IN THE PRIOR ART.  AND MR. MCNALLY'S

20   TESTIMONY CAN I THINK PRESENT THAT TO YOUR HONOR IN A FAIRLY

21   SUCCINCT MANNER.

22          THE COURT:  LET ME ASK A SCOPE OF REVIEW TYPE OF

23   QUESTION SO THAT WHEN I PROCEED WITH THE TESTIMONY OF

24   MR. MCNALLY I CAN RECEIVE IT WITH AN UNDERSTANDING OF HOW IT

25   FITS INTO THIS POST JUDGMENT MOTIONS PROCEEDING.  WOULD THE

1    EVIDENCE BE ADMISSIBLE IF I WERE JUDGE CAMP AND HAD NOT

2    RETIRED?  WHAT IS THE PURPOSE OF EVIDENCE AT THIS POINT?  IS

3    IT NEWLY DISCOVERED?  NO.  NOT THAT I UNDERSTAND SO FAR FROM

4    YOUR OPENING STATEMENT.  WHAT IS THE PURPOSE?  IS IT TO

5    SUMMARIZE WHAT HIS PREVIOUS TESTIMONY HAS BEEN?  TRY TO

6    FOCUS ON MY WANTING TO PLACE THIS IN THE PROPER ROLE IN THIS

7    CASE.  WHAT IS THE PURPOSE OF THE EVIDENCE?

8            MR. CAPP:  THE PURPOSE OF THE EVIDENCE IS THAT YOU

9    ARE A NEW JUDGE.  YOU DIDN'T SIT ON THE TRIAL, AND YOU HAVE

10   ABSOLUTE DISCRETION TO HEAR ANY WITNESS YOU WANT TO TO

11   DECLARE AND REQUIRE A NEW TRIAL IF YOU ARE NOT SATISFIED

12   WITH THE RECORD, AND YOU ARE REQUIRED ON REQUEST OF A PARTY

13   TO HEAR A WITNESS BE RECALLED IF HIS TESTIMONY IS MATERIAL

14   AND DISPUTED.  SO BECAUSE YOU ARE A SUCCESSOR JUDGE AND WE

15   HAVE ALREADY MADE A PRESENTATION THAT WE BELIEVE

16   MR. MCNALLY'S TESTIMONY FITS WITHIN THE AMBIT OF MATERIAL

17   AND DISPUTED, YOU ARE REQUIRED UNDER RULE 63 TO HEAR IT AS

18   SUCCESSOR JUDGE, EVEN THOUGH JUDGE CAMP MIGHT NOT, YOU KNOW,

19   REHEAR IT.

20           THE COURT:  THANK YOU.  RESPONSE BEFORE WE HEAR

21   THE TESTIMONY MR. MCNALLY, MR. SCHAETZEL?  DO I PRONOUNCE

22   YOUR NAME CORRECTLY?

23           MR. SCHAETZEL:  YES, SIR.

24           THE COURT:  MY NAME IS FREQUENTLY MISPRONOUNCED.

25   JUST AS AN ASIDE, ORIGINALLY WHEN PRESENTED IN SOME KIND OF

1    PUBLICATION WHO I WAS AND WHAT I WAS ALL ABOUT, THEY SAID MY

2    NAME RHYMED WITH "HOLY."  I KIND OF LIKED THAT, BUT I DIDN'T

3    LIKE "WOLY" SO I TOLD THEM TO CHANGE IT, AND IT RHYMES WITH

4    "BULLY" LIKE "WOOLLY," AND THEY WOULDN'T ACCEPT THAT EITHER.

5    GO AHEAD.

6         MR. SCHAETZEL:  YOUR HONOR, I FREQUENTLY SAY THAT

7    MY NAME RHYMES WITH "PRETZEL," LIKE "SHETZEL."  A SIMILAR

8    APPROACH.

9         THE COURT:  I WILL ACCEPT THAT.

10         MR. SCHAETZEL:  IF I MAY, I WILL FIRST ADDRESS THE

11   WHAT ROLE THIS EVIDENCE IS GOING TO PLAY AND HOW THE

12   EVIDENCE WILL COME IN.  I DO NOT BELIEVE THAT UNLESS THERE

13   IS NEWLY DISCOVERED EVIDENCE THAT THIS WOULD BE ADMISSIBLE

14   BEFORE JUDGE CAMP, NOR DO WE BELIEVE THAT THERE IS ANYTHING

15   IN RULE 63 THAT CONVERTS THAT OTHERWISE INADMISSIBLE

16   EVIDENCE INTO NOW ADMISSIBLE EVIDENCE.  AS I UNDERSTAND RULE

17   63 FROM TAKING A LOOK AT IT, THE QUESTION IS, AS MR. CAPP

18   INDICATED, WHETHER OR NOT THE TESTIMONY IS MATERIAL AND

19   DISPUTED.  IT MAY BE, FOR EXAMPLE, AN ISSUE OF CREDIBILITY.

20   I AM NOT AWARE THAT THERE IS ANY SUCH ISSUE PRESENT HERE.  I

21   DON'T BELIEVE THAT JUDGE CAMP, FOR EXAMPLE, MADE ANY SORT OF

22   A FINDING OR DETERMINATION THAT MR. MCNALLY WAS SOMEHOW NOT

23   CREDIBLE.  I DON'T BELIEVE THAT WE, IF YOU WILL, DISPUTED

24   THE TESTIMONY.  WE MAY HAVE A DIFFERENT VIEW OF WHAT IT

25   PROVES AND HOW IT FITS INTO THE ULTIMATE DECISION IN THE

1    CASE, BUT AS TO, FOR EXAMPLE, MR. MCNALLY SAYING THAT HE IS

2    AN OFFICER OF THE COMPANY, THAT HE PERFORMED THESE TASKS,

3    THAT HE WORKED WITH MR. MCCLUER AND SO ON AND SO FORTH,

4    THERE IS NO, IF YOU WILL, DISPUTE ABOUT THAT UNDERLYING

5    TESTIMONY.  SO I DON'T BELIEVE THAT THIS IS ADMISSIBLE.

6           AND WHAT I UNDERSTAND MR. CAPP TO SAY IS THAT THE

7    TESTIMONY WAS IN DIFFERENT PLACES, SOME OF IT WAS IN

8    DEPOSITION, SOME OF IT WAS AT TRIAL, AND THAT HE WAS GOING

9    TO, IN A SENSE, REPACKAGE IT FOR THE CONVENIENCE OF THE

10   COURT.  THAT IS NOT NEWLY DISCOVERED EVIDENCE.  AND OUR

11   CONCERN IS THAT WE WILL ESSENTIALLY BE RE-OPENING THE

12   RECORD, AND IF THERE IS AN EVIDENTIARY DEFICIENCY AT THIS

13   STAGE THAT THE PLAINTIFF WOULD BE GIVEN AN OPPORTUNITY TO

14   CURE SUCH A DEFICIENCY, AND THEREFORE IMPACT THROUGH THIS

15   POST TRIAL AND RULE 63 PROCEDURE A FINDING THAT SHOULD NEVER

16   HAVE BEEN OPENED, BECAUSE THE EVIDENCE WASN'T THERE IN THE

17   FIRST PLACE, IF YOU WILL.

18          THE DEPOSITIONS THAT I AM AWARE OF WERE, IN LARGE

19   PART, USED TO IMPEACH MR. MCNALLY.  AGAIN, I DON'T KNOW THAT

20   THEY WENT TO SAY THAT THE TESTIMONY WAS DISPUTED, BUT THEY

21   HIGHLIGHTED CERTAIN THINGS IN THE TESTIMONY, AND TO IMPEACH

22   HIM IN THAT REGARD.  SO IN TERMS OF THIS EVIDENCE'S ROLE, WE

23   DO WANT TO BE VERY CAREFUL AS WE GO FORWARD TO BE CERTAIN

24   THAT WE DON'T EXCEED THE BOUNDS OF WHAT IS APPROPRIATELY

25   ADMITTED TO THE COURT.

1            ON THE BROADER SCALE, STEPPING BACK IF YOU WILL

2   FROM JUST THIS ONE WITNESS, AND HOW WE THINK THIS SHOULD

3   PROCEED, THERE ARE THREE MOTIONS FOR RECONSIDERATION, YOUR

4   HONOR.  PAGE ONE OF THE FIRST BRIEF IN SUPPORT OF THE FIRST

5   MOTION ASKS THE COURT TO TAKE A LOOK AT A SINGLE NARROW

6   ISSUE.  THAT WAS THE PREMISE FOR THE MOTION.  WE NOW HAVE A

7   PROPOSED ORDER THAT IS IN EXCESS OF 130 PAGES LONG FROM THE

8   PLAINTIFF THAT ESSENTIALLY ASKS THE COURT TO REDO EVERYTHING

9   THAT WAS DONE BEFORE ON OBVIOUSNESS, AND IN THE FINDINGS

10  THAT THESE ASSERTED CLAIMS ARE OBVIOUS.  WE DON'T BELIEVE

11  THAT THAT'S THE PURPOSE OF THIS HEARING, THAT THAT'S THE

12  PURPOSE OF THIS PROCEDURE.  RATHER, THIS HEARING IS TO FOCUS

13  ON THE THREE REQUESTS FOR RECONSIDERATION, THE THREE

14  MOTIONS.  AND WE HAVE A MOTION FOR LEAVE TO FILE A SURREPLY,

15  BUT THAT IS, IN OUR VIEW, A TAIL ON THE DOG, SO TO SPEAK.

16          THE COURT:  I DIDN'T GET THE LAST --

17          MR. SCHAETZEL:  WE HAVE A MOTION FOR LEAVE TO

18  ACCEPT OUR SURREPLY, BUT THE PROCEDURE HERE WAS THERE WAS A

19  MOTION FOR RECONSIDERATION FILED, THEN A SECOND MOTION FOR

20  RECONSIDERATION FILED, THEN IN REPLIES TO THOSE FIRST TWO

21  MOTIONS WE FELT THAT SOME NEW ISSUES WERE RAISED IN THE

22  PLAINTIFF'S REPLY, AND WE MOVED FOR LEAVE TO FILE A SURREPLY

23  TO THOSE NEW ISSUES.  OUR SURREPLY PROMPTED THE THEN THIRD

24  MOTION FOR RECONSIDERATION, SO THE SURREPLY IS SUBSUMED, IN

25  OUR VIEW, IN THE THIRD MOTION.

1          BUT AS WE SPOKE WITH YOUR HONOR, WE REALIZED IN

2     PREPARING THE PAPERS THAT THERE IS, IF YOU WILL, ANOTHER

3     MOTION THERE, BUT IT IS THIS MOTION FOR LEAVE TO ACCEPT OUR

4     SURREPLY, BUT THE POINTS MADE IN THE SURREPLY ARE SUBSUMED

5     IN THE THIRD MOTION FOR RECONSIDERATION.

6          THE COURT:  NOW I UNDERSTAND.  BUT YOU HAVE ALSO

7     CONTENDED THAT AFTER THE FIRST MOTION THE OTHERS WERE OUT OF

8     TIME.

9          MR. SCHAETZEL:  YES, YOUR HONOR.  WE BELIEVE THEY

10    WERE OUTSIDE THE 28-DAY PERIOD FOR REQUEST FOR

11    RECONSIDERATION, AND THAT IS A BASIS FOR THE COURT TO DENY

12    THOSE MOTIONS IF IT SO CHOOSES.

13         THE COURT:  AND I UNDERSTAND THAT, AND OF COURSE

14    THAT ISN'T AGREED TO BY CHEMFREE, BUT I JUST WANTED TO MAKE

15    SURE THAT YOU ARE STILL CONTENDING THAT WE ARE REALLY

16    PROPERLY ONLY HERE ON THE FIRST OF THE MOTION.

17         MR. SCHAETZEL:  THAT IS OUR POSITION.  YES, YOUR

18    HONOR.

19         THE COURT:  THANK YOU.  YOU MAY BE SEATED.  AND I

20    WILL NOW TAKE THE EVIDENCE, BUT I WILL AT THIS POINT RESERVE

21    RULING ON THE CONTENTION THAT I SHOULDN'T BE RECEIVING THIS

22    AT ALL BECAUSE IT ISN'T NECESSARY, AND WOULD ONLY BE SURPLUS

23    TO WHAT HAS ALREADY BEEN TESTIFIED.  I AM GOING TO RECEIVE

24    IT BECAUSE I THINK IT WILL BE EDUCATIONAL FOR ME TO RECEIVE

25    MR. MCNALLY'S ADDITIONAL PRESENTATION, WHICH I WILL TAKE AS

1    NOT NEWLY DISCOVERED, BUT A WAY OF SUMMARIZING HIS SEVERAL

2    TESTIMONIAL PRESENTATIONS IN PREVIOUS PARTS OF THIS RECORD.

3    AND YOU MAY NOW CALL THE WITNESS.

4              MR. SCHAETZEL:  BEFORE MR. MCNALLY APPROACHES,

5    YOUR HONOR, MAY I ASK A POINT OF PROCEDURE AS WE GO FORWARD?

6              THE COURT:  YES.

7              MR. SCHAETZEL:  IT WOULD BE OUR INTENT, AND AT THE

8    COURT'S DISCRETION, SHOULD WE FEEL THAT FOR EXAMPLE A

9    SUBJECT IS RAISED THAT IS IMPROPER, THAT IS BEYOND THE SCOPE

10   OF WHAT WAS AT TRIAL, I WOULD INTEND TO OBJECT.

11             THE COURT:  YOU MAY, AND I MAY RULE, AND I MIGHT

12   RESERVE RULING.

13             MR. SCHAETZEL:  MY QUESTION WOULD BE IN VIEW OF

14   THE COURT'S LAST STATEMENT, WOULD YOU PREFER THAT WE ACCEPT

15   THAT AS, IF YOU WILL, A STANDING OBJECTION?  I UNDERSTAND

16   THE COURT --

17             THE COURT:  NO.  I LIKE TO RECEIVE OBJECTIONS AS

18   THEY GO ALONG.  IT MAKES A BETTER RECORD FOR THE FEDERAL

19   CIRCUIT, IF THE CASE GETS THERE.

20             MR. SCHAETZEL:  VERY WELL, YOUR HONOR.

21             MR. CAPP:  WE CALL MR. MCNALLY.  AS HE IS COMING

22   TO THE WITNESS STAND, I SIMPLY WANTED TO POINT OUT TO YOUR

23   HONOR THAT IN THE CASE OF GULF CITY VERSUS WILSON SPORTING

24   GOODS, 555 F2D 426 THE 5TH CIRCUIT POINTED OUT THAT ANY

25   JUDGE ON A CASE HAS DISCRETION TO SUPPLEMENT THE RECORD OR

1   ORDER A NEW TRIAL IF HE IS NOT SATISFIED WITH THE RECORD

2   AFTER THE INITIAL JUDGE RESIGNS, SO WHETHER WE EXPAND OR

3   NOT, IT IS CERTAINLY WITHIN YOUR DISCRETION TO RECEIVE IT,

4   DEPENDING UPON YOUR LEVEL OF SATISFACTION WITH THE RECORD AS

5   IT EXISTS, AND I DON'T KNOW THAT YOUR HONOR HAS MADE A FINAL

6   DETERMINATION.

7            THE COURT:  ONCE I HEAR THE EVIDENCE I WILL KNOW

8   WHETHER IT WILL HAVE BEEN EDUCATIONAL AND USEFUL AS

9   ADDITIONAL EVIDENCE GIVEN BY THE WITNESS UNDER OATH.

10            MR. CAPP:  THANK YOU, YOUR HONOR.

11                    MR. THOMAS MCNALLY

12                         SWORN

13                    DIRECT EXAMINATION

14   BY MR. CAPP:

15   A. MY NAME IS THOMAS MCNALLY.

16   Q. YOU ARE CURRENTLY EMPLOYED BY CHEMFREE?

17   A. YES, I AM.

18   Q. WHAT IS YOUR JOB TITLE AT CHEMFREE?

19   A. I AM VICE-PRESIDENT, GENERAL MANAGER, AND DIRECTOR OF

20   CHEMFREE.

21   Q. HOW LONG YOU BEEN EMPLOYED BY CHEMFREE?

22   A. SINCE 1993.

23   Q. HOW MANY PEOPLE ARE EMPLOYED BY CHEMFREE?

24   A. WE HAVE 37 EMPLOYEES.

25   Q. WHERE ARE CHEMFREE'S PHYSICAL FACILITIES LOCATED?

```
1    A. IN A SUBURB OF ATLANTA CALLED NORCROSS, WHICH IS ABOUT 20

2    MILES NORTH OF HERE.

3    Q. WHAT ARE THE ANNUAL SALES FOR THE COMPANY IN ITS LAST

4    FISCAL YEAR?

5    A. A LITTLE BIT OVER 12 MILLION AMERICAN DOLLARS.

6    Q. WHAT PRODUCT LINE IS CHEMFREE IN?

7    A. WE MANUFACTURE AND DISTRIBUTED A LINE OF SINGLE USE

8    SINGLE USER PARTS WASHERS WHICH ARE KNOWN IN THE INDUSTRY AS

9    SINKS ON A DRUM.

10   Q. DO YOU MAKE AND SELL ANY PARTS WASHERS THAT DO NOT

11   INCORPORATE THE BIOREMEDIATION TECHNOLOGY IN THE PATENT IN

12   SUIT?

13   A. WE DO NOT.

14   Q. HOW WOULD YOU DESCRIBE THE MARKET SEGMENT THAT YOUR

15   PRODUCTS COMPETE IN?

16           MR. SCHAETZEL:  WE OBJECT.  THIS DOES GO BEYOND

17   THE SCOPE OF TESTIMONY THAT WAS OFFERED AT TRIAL.

18           THE COURT:  RULING RESERVED.  LET ME JUST TAKE ONE

19   MOMENT.  (PAUSE).  I WAS SUGGESTING A BETTER LINE OF SIGHT

20   FOR THE LAW CLERK WHO HAS BEEN ASSISTING ME.

21   BY MR. CAPP:

22   Q. THE QUESTION IS, HOW WOULD YOU DESCRIBE THE MARKET

23   SEGMENT THAT YOUR PRODUCTS COMPETE IN?

24   A. WE COMPETE IN A SMALL NICHE OF THE PARTS WASHER MARKET

25   WHICH INVOLVES A PARTS CLEANER THAT IS GENERALLY USED BY ONE
```

1   PERSON, AND IT HAS A SINK AND A DRUM THAT HOLDS THE PARTS

2   CLEANER FLUID.  THE PARTS CLEANER FLUID IS CIRCULATED UP

3   INTO THE PART, AND THE USER CLEANS GENERALLY ONE PART AT A

4   TIME.

5   Q. ARE YOU A NAMED INVENTOR ON THE FOUR PATENTS THAT

6   CHEMFREE HAS ASSERTED AGAINST THE DEFENDANTS?

7   A. YES, I AM.

8           MR. CAPP:  WOULD YOU WOULD PULL UP JOINT EXHIBIT

9   1, PLEASE.  I HAVE NOTEBOOKS, YOUR HONOR, IF I CAN PASS UP.

10          THE COURT:  I WELCOME IT.

11          MR. CAPP:  THIS IS A DUPLICATE COPY OF WHAT WE

12  HAVE SENT YOU, BUT --

13          THE COURT:  I WILL PROBABLY LEAVE IT BEHIND.  BUT

14  BECAUSE I DIDN'T BRING THIS ONE WITH ME, I DID BRING A LOT

15  OF PAPERS, BUT NOT THIS ONE.  THIS IS THE POST TRIAL

16  EXHIBITS.  PLAINTIFF'S TRIAL EXHIBITS AND DEFENDANT'S TRIAL

17  EXHIBITS IN CONNECTION WITH PLAINTIFF'S DESIGNATION.  THANK

18  YOU.

19  BY MR. CAPP:

20  Q. LET ME DIRECT YOUR ATTENTION TO JOINT EXHIBIT 1.  DO YOU

21  RECOGNIZE THAT AS A COPY OF THE 110 PATENT WHICH IS ONE OF

22  THE PATENTS IN SUIT?

23  A. YES, I DO.

24  Q. WE WILL HAVE A. J. TO FLIP FORWARD TO PAGE 5 OR 6 TO

25  FIGURE 3.  WILL YOU TAKE THE LASER POINTER AND WALK THROUGH

1    YOUR INVENTION AND JUST EXPLAIN TO THE COURT WHAT IS IN IT,

2    AND WHAT IT DOES?

3    A. THIS IS A DIAGRAM OF THE PARTS CLEANER.  THIS IS THE SINK

4    PORTION.  THE SINK PORTION HAS A GRADUATED BOTTOM TO HOLD A

5    FILTER LAYER.  IT ALSO HOLDS A LEVEL SENSING DEVICE INSIDE.

6    THE LEVEL SENSING DEVICE IS A THERMOSTAT TO CONTROL THE

7    HEATER.  ALSO INCLUDED IS A PUMP THAT PUMPS THE FLUID UP TO

8    THE SPIGOT INTO THE SINK, AND THE USER USES THE FLUID THAT

9    IS FLOWING OUT OF THE SINK, OUT OF THE SPIGOT, TO CLEAN THE

10   PARTS IN WHAT IS KNOWN AS A SINK.  IT IS VERY SIMILAR TO A

11   SINK IN A KITCHEN.  THE FLUID THAT IS IN THE BASE OF THIS

12   MACHINE CONTAINS MICROBES.  THE MICROBES ARE INTRODUCED VIA

13   THE FILTRATION SYSTEM.  THE FLUID IS MAINTAINED AT A

14   TEMPERATURE OF APPROXIMATELY 108 DEGREES FAHRENHEIT.

15   Q. IF YOU WOULD NOW, FLIP I BELIEVE TO THE NEXT PAGE TO

16   COLUMN 1.  A.J., TIGHTEN UP ON LINES 10 THROUGH 42.  DO YOU

17   SEE IN THERE, MR. MCNALLY, THAT YOU MENTION MINERAL SPIRITS?

18   A. YES.

19   Q. WHAT WAS THE DOMINANT CLEANING SOLVENT USED IN PARTS

20   WASHERS IN THE MARKET SEGMENT THAT YOU COMPETE IN AT THE

21   TIME THAT YOU INTRODUCED YOUR INVENTION?

22   A. IN 1993 IT WAS MINERAL SPIRITS.

23   Q. IN ROUGHLY WHAT SHARE OF THE MARKET DID MINERAL SPIRITS

24   PARTS WASHERS HAVE IN 1994?

25            MR. SCHAETZEL:  OBJECTION AGAIN, YOUR HONOR.  THIS

1   IS BEYOND THE SCOPE OF TESTIMONY GIVEN BY THIS WITNESS AT

2   TRIAL.

3           THE COURT:  RULING RESERVED.  YOU MAY ANSWER.

4           THE WITNESS:  I AM SORRY, WILL YOU REPEAT THE

5   QUESTION?

6   BY MR. CAPP:

7   Q. ROUGHLY WHAT SHARE OF THE MARKET DID MINERAL SPIRITS

8   PARTS WASHERS HAVE IN 1994?

9   A. IN 1993-94, MINERAL SPIRITS ENJOYED IN OUR PARTICULAR

10  MARKET NICHE, PROBABLY ABOUT 90 PERCENT OF THE MARKET SHARE.

11  Q. ARE YOU FAMILIAR WITH AN INTERNATIONAL CONVENTION ON

12  ENVIRONMENTAL STANDARDS KNOWN AS THE MONTREAL PROTOCOL?

13  A. YES, I AM.

14  Q. DID THE MONTREAL PROTOCOL BANISH THE USE OF MINERAL

15  SPIRITS IN OPEN BASIN PARTS WASHERS?

16  A. NO, IT DID NOT.

17  Q. DO MINERAL SPIRITS PARTS WASHERS STILL EXIST IN THE

18  MARKETPLACE TODAY?

19          MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  AGAIN,

20  THIS IS TESTIMONY THAT IS GOING WELL BEYOND THE SCOPE THAT

21  WAS GIVEN, BOTH THE PREVIOUS QUESTION AND THE PENDING

22  QUESTION GO BEYOND WHAT THIS WITNESS WAS PROVIDED AT TRIAL.

23          THE COURT:  RULING RESERVED.  YOU MAY ANSWER.

24          THE WITNESS:  I AM SORRY, I DON'T --

25  BY MR. CAPP:

1  Q. DO MINERAL SPIRITS PARTS WASHERS STILL EXIST IN THE

2  MARKETPLACE TODAY?

3  A. YES.

4  Q. WHAT IS THE SIZE OF THE MARKET SHARE THAT MINERAL SPIRITS

5  HOLD TODAY?

6  A. WE ESTIMATE THAT IT IS STILL IN THE NEIGHBORHOOD OF 60 TO

7  70 PERCENT OF SINK-ON-A-DRUM PARTS WASHERS.

8  Q. WHO DO YOU CONSIDER TO BE YOUR BIGGEST COMPETITOR IN THE

9  MARKET?

10  A. A COMPANY OUT THERE CALLED SAFETY-KLEEN.

11  Q. AND WHAT PRODUCT ARE THEY IN?

12  A. SAFETY-KLEEN HAULS HAZARDOUS WASTE AND PLACES MINERAL

13  SPIRITS PARTS WASHERS AS WELL AS, TODAY, AQUEOUS PARTS

14  WASHERS WITH CUSTOMERS.

15  Q. WHAT ARE SOME OF THE ADVANTAGES OF YOUR INVENTION OVER

16  PRIOR ART MINERAL SPIRITS PARTS WASHERS?

17         MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  THIS GOES

18  BEYOND THE SCOPE OF TESTIMONY GIVEN AT TRIAL.

19         THE COURT:  RULING RESERVED.  YOU MAY ANSWER.

20         THE WITNESS:  THE BIOREMEDIATING PARTS WASHER IS

21  SAFER FOR THE USER IN TERMS OF HEALTH AND SAFETY.  IT

22  ELIMINATES THE GENERATION OF HAZARDOUS AIR POLLUTANTS.  IT

23  REDUCES THE AMOUNT OF HAZARDOUS WASTE THAT HAS TO BE HAULED

24  AS A RESULT OF THE PARTS CLEANING OPERATION, AND IT IS LESS

25  EXPENSIVE IN THE LONG RUN THAN MINERAL SPIRITS PARTS

1    WASHERS.

2    BY MR. CAPP:

3    Q. APPROXIMATELY WHEN DID YOU START WORKING ON DEVELOPMENT

4    OF AN ENVIRONMENTALLY FRIENDLY PARTS WASHER?

5    A. IN 1993.

6    Q. DID YOUR ORIGINAL CONCEPT OF A PARTS WASHER INCLUDE A

7    SELF-CONTAINED FLUID RESERVOIR?

8    A. YES, IT DID.

9    Q. DID THE ORIGINAL CONCEPT CONTEMPLATE BIOREMEDIATING

10   CONTAMINANTS IN THE FLUID RESERVOIR?

11   A. NO, IT DID NOT.

12          MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  THIS GOES

13   BEYOND THE SCOPE OF THE TESTIMONY GIVEN AT TRIAL.

14          THE COURT:  RULING RESERVED.  YOU MAY ANSWER.

15          THE WITNESS:  IT DID NOT.

16   BY MR. CAPP:

17   Q. IN 1994, WERE THERE OTHER WAYS TO INTRODUCE THE

18   ENVIRONMENTAL IMAGE BESIDES THE USE OF BIOREMEDIATION?

19   A. YES.

20          MR. SCHAETZEL:  SAME OBJECTION, YOUR HONOR.

21          THE WITNESS:  YES.

22          THE COURT:  RULING RESERVED, AND THE ANSWER HAS

23   BEEN RECEIVED AND THERE WASN'T TIME TO INTERPOSE THE

24   OBJECTION, SO IT MAY STAY IN BEFORE THE ANSWER AND STILL

25   RESERVE RULING.  YOU MAY ASK A NEW QUESTION.

```
 1              MR. CAPP:  YOUR HONOR, IN ORDER TO SPEED THE

 2    PROCESS UP, I AM FINE WITH MR. SCHAETZEL SAYING "SAME

 3    OBJECTION" IN ORDER TO SHORTEN HOW MUCH TIME WE TAKE UP WITH

 4    LENGTHIER --

 5              THE COURT:  WELL, IT PROBABLY ISN'T ALWAYS THE

 6    SAME, SO I PREFER AN INDIVIDUAL OBJECTION.  AND WE WILL

 7    CONTINUE.

 8    BY MR. CAPP:

 9    Q. WHAT OTHER WAYS WERE THERE TO MAKE A PARTS WASHER MORE

10    ENVIRONMENTALLY FRIENDLY IN 1993 AND 1994?

11              MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  GOES

12    BEYOND THE SCOPE OF TESTIMONY AT TRIAL.

13              THE COURT:  RESERVED.

14              THE WITNESS:  THE USE OF ALTERNATIVES TO MINERAL

15    SPIRITS OR OTHER POTENTIALLY HAZARDOUS CLEANERS, AS WELL AS

16    THE IDEA OR CONCEPT TO TRY TO REMOVE CONTAMINANTS FROM

17    WHATEVER THE CLEANERS WERE IN ORDER TO EXTEND THE LIFE OF

18    THE CLEANERS SO THEY WOULDN'T HAVE TO BE CHANGED SO OFTEN.

19    BY MR. CAPP:

20    Q. WHEN DID YOU START EXPERIMENTING WITH BIOREMEDIATING

21    ORGANIC CONTAMINANTS IN A FLUID RESERVOIR?

22    A. IN JANUARY OF 1994.

23    Q. I WILL ASK YOU SOME QUESTIONS NOW THE PERIOD TIME PRIOR

24    TO THAT POINT IN THAT POINT IN 1994  I WANT THAT DIRECT YOUR

25    ATTENTION TO LINES 25 THROUGH 42 OF COLUMN ONE OF THE
```

1   PATENT.  YOU MENTIONED THAT THE USE OF MINERAL SPIRITS HAD

2   MANY DRAWBACKS.  WHAT DID YOU CONSIDER TO BE THE PRIMARY

3   DRAWBACK TO MINERAL SPIRITS?

4           MR. SCHAETZEL:  OBJECTION.  THIS GOES BEYOND THE

5   SCOPE AT TRIAL.

6           THE COURT:  RULING RESERVED.  YOU MAY ANSWER.

7           THE WITNESS:  MINERAL SPIRITS PARTS WASHERS,

8   MINERAL SPIRITS SOMETIMES, BY DEFINITION, CAN BE CONSIDERED

9   TO BE HAZARDOUS.  WHEN YOU ADD CONTAMINANT SUCH AS WHAT YOU

10  ARE CLEANING OFF OF PARTS, THAT MIXTURE OF MINERAL SPIRITS

11  AND CONTAMINANTS CAN BE SUBJECTED TO ALL SORTS OF GOVERNMENT

12  REGULATIONS, INCLUDING RESOURCE RECOVERY AND SO ON, WHICH

13  CAN CAUSE EXTENSIVE LIABILITIES AND EXTENSIVE COSTS FOR THE

14  USERS.

15  BY MR. CAPP:

16  Q. WHAT WAS YOUR ORIGINAL CONCEPT AT SOLVING THAT PROBLEM?

17          MR. SCHAETZEL:  OBJECTION.  GOES BEYOND THE SCOPE

18  AT TRIAL.

19          THE COURT:  OVERRULED.

20          THE WITNESS:  WE TOOK A LOOK AT SOME OF THE THINGS

21  I MENTIONED PREVIOUSLY, WHICH WAS USING OTHER THAN MINERAL

22  SPIRITS, BUT ALSO WAYS OF TAKING THE COME CONTAMINANTS OUT

23  OF MINERAL SPIRITS OR OTHER CLEANERS SO THAT YOU WOULD

24  EXTEND THE LIFE OF THE BATH.

25  BY MR. CAPP:

1  Q. DIRECT YOUR ATTENTION TO LINE 34 OF THE PATENT, AND I

2  WILL READ INTO THE RECORD, I QUOTE, IT IS NOT UNCOMMON FOR

3  WORKERS TO HAVE DERMATITIS AND RESPIRATORY PROBLEMS

4  EXACERBATED BY UNPROTECTED USE OF MINERAL SPIRITS, CLOSED

5  QUOTE.  WHAT IS DERMATITIS?

6        MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  GOES

7  BEYOND THE SCOPE.  AND FOR THE RECORD, I DON'T BELIEVE THAT

8  THE WITNESS AT TRIAL EVER REFERRED TO ANY PORTION OF THIS

9  PATENT IN TESTIMONY AT TRIAL.

10        THE COURT:  RULING RESERVED.  YOU MAY ANSWER.

11        THE WITNESS:  DERMATITIS IS AN IRRITATION OF HUMAN

12  SKIN.  IT CAN BE AS MILD AS A PINKNESS THAT SOME OF US ARE

13  OLD ENOUGH TO REMEMBER DISH PAN HANDS.  BUT IT CAN BECOME

14  SERIOUS.  IT CAN CAUSE SKIN LESIONS, IT CAN CAUSE PERMANENT

15  DAMAGE.  SOME DERMATITIS IS REPARABLE AND SOME IS

16  IRREPARABLE.

17  BY MR. CAPP:

18  Q. IS DERMATITIS A CONDITION THAT IS LIMITED TO THE USE OF

19  MINERAL SPIRITS OR KIND OF DERIVES FROM OTHER CLEANING

20  FLUIDS?

21  A. IT IS NOT LIMITED TO MINERAL SPIRITS, IT CAN ARISE FROM

22  OTHER TYPES OF CLEANERS.

23  Q. HOW DOES THE AMOUNT OF TIME THE USER IS IN CONTACT WITH

24  THE CLEANING FLUID AFFECT HIS OR HER SUSCEPTIBILITY TO

25  CONTRACTING DERMATITIS?

1              MR. SCHAETZEL:  OBJECTION AS TO THE FORM, YOUR

2    HONOR.  THIS GOES BEYOND THE SCOPE AT TRIAL, AND I BELIEVE

3    IT CALLS FOR HEARSAY.

4              THE COURT:  OVERRULED.  YOU MAY ANSWER.

5              THE WITNESS:  THE AMOUNT OF THE TIME THAT THE

6    SUBJECT HAS SKIN EXPOSED TO THE CLEANERS CAN BE VERY

7    CRITICAL, IS VERY CRITICAL, TO THE DEVELOPMENT OF

8    DERMATITIS.

9    BY MR. CAPP:

10   Q. CAN YOU GIVE THE JUDGE AN EXAMPLE OF A COMMON CLEANER

11   PRODUCT THAT WOULD BE SAFE FOR BRIEF PERIODIC USE, SUCH AS

12   WASHING YOUR HANDS BEFORE MEALS, THAT COULD CAUSE SKIN

13   IRRITATION IF USED FOR PROLONGED PERIODS OF TIME EVERYDAY

14   FOR MULTIPLE DAYS AND WEEKS?

15             MR. SCHAETZEL:  OBJECTION, GOES BEYOND THE SCOPE.

16             THE COURT:  WHAT IS THE RELEVANCE OF THE MATTER

17   THAT YOU NOW INQUIRE ABOUT, OTHER WAYS OF WASHING HANDS?

18             MR. CAPP:  WELL, OH, THIS GOES RIGHT TO THE HEART

19   OF THE CASE, YOUR HONOR.

20             THE COURT:  GOOD.  TELL ME HOW IT DOES.

21             MR. CAPP:  THE KEY CLAIM LIMITATION THAT JUDGE

22   CAMP'S RULING TURNED ON WAS A FINDING THAT, IN THE PRIOR

23   ART, A CLEANING FLUID THAT WAS NONCAUSTIC WAS INHERENTLY

24   PRESENT IN THE PRIOR ART.  AND MR. MCNALLY'S TESTIMONY ON

25   CHEMICALS AND HOW IT AFFECTS SKIN AND SUSCEPTIBILITY TO

1   DERMATITIS IS ALL DIRECTED SPECIFICALLY AT THAT ISSUE.

2           THE COURT:  AND HE HAS PREVIOUSLY GIVEN THIS

3   TESTIMONY?

4           MR. CAPP:  YES.  HE WAS ASKED QUESTIONS ABOUT

5   CAUSTIC AND NONCAUSTIC FLUIDS ON THE WITNESS STAND AT TRIAL,

6   AND SPECIFICALLY HOW IT AFFECTED WHETHER IT BURNED AN

7   OPERATOR'S HANDS OR NOT.

8           THE COURT:  SO THIS IS REVISITING THE SAME

9   TESTIMONY PREVIOUSLY GIVEN?

10          MR. CAPP:  YES.  YES, IT IS YOUR HONOR.

11          THE COURT:  OVERRULED AS TO THE OBJECTION THAT YOU

12  MADE BEFORE.  DO YOU HAVE ANOTHER ONE?

13          MR. SCHAETZEL:  NO, YOUR HONOR.  THE OBJECTION WAS

14  TWO-FOLD, IT WAS A HEARSAY OBJECTION ALSO.

15          THE COURT:  OVERRULED.  YOU MAY ANSWER.

16          THE WITNESS:  AND THE QUESTION WAS?  I'M SORRY.

17  BY MR. CAPP:

18  Q. CAN YOU GIVE THE JUDGE AN EXAMPLE OF A CLEANING PRODUCT

19  THAT WOULD BE SAFE FOR BRIEF AND PERIODIC USE SUCH AS

20  WASHING YOUR HANDS BEFORE MEALS, BUT THAT CAUSED SKIN

21  IRRITATION IF USED FOR PROLONGED PERIODS OF TIME THROUGHOUT

22  A DAY OR OVER A PERIOD OF DAYS AND WEEKS?

23          MR. SCHAETZEL:  RENEW THE OBJECTION, YOUR HONOR,

24  FOR THE RECORD.

25          THE COURT:  OVERRULED.  YOU MAY ANSWER.

```
1              THE WITNESS:  YES, IT IS A VERY CLEAR EXAMPLE, AND
2     THAT IS FOR ORDINARY HAND SOAP, PALMOLIVE OR ZEST OR
3     SOMETHING LIKE THAT.  IF YOU WASH YOUR HANDS TWO OR THREE OR
4     FOUR OR FIVE TIMES A DAY, YOU MAY NOT BE SUSCEPTIBLE TO
5     DERMATITIS FROM A CLEANING AGENT LIKE THAT, BUT THE OSHA
6     TEST REQUIRES A FOUR-HOUR EXPOSURE TO THE CLEANING FLUID, IF
7     YOU WERE TO EXPOSE YOUR HANDS TO FOUR HOURS OF ORDINARY HAND
8     SOAP, YOU WOULD PROBABLY DEVELOP DERMATITIS.
9     BY MR. CAPP:
10    Q. DID YOUR INVENTION SEEK TO ADDRESS THE PROBLEM OF A PARTS
11    WASHER USER CONTRACTING DERMATITIS?
12    A. YES.
13              MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  BEYOND THE
14    SCOPE.
15              THE COURT:  RESERVED, AND YOU MAY ANSWER.
16              THE WITNESS:  YES, IT DID.
17    BY MR. CAPP:
18    Q. HOW DID YOU ADDRESS THAT PROBLEM?
19              MR. SCHAETZEL:  SAME OBJECTION.
20              THE COURT:  RULING IN RESERVE.
21              THE WITNESS:  WE SEARCHED FOR CLEANING FLUIDS THAT
22    WOULD HAVE A PH OF BETWEEN 5.5 AND ABOUT 8.5, WHICH WOULD BE
23    BETWEEN 6 AND 8.5, WHICH WOULD GENERALLY NOT CAUSE
24    DERMATITIS IN USERS.
25    BY MR. CAPP:
```

1   Q. IN LATE 1993 WERE YOU ABLE TO FIND ANY PH NEUTRAL AQUEOUS

2   CLEANING FLUID PRODUCTS ON THE MARKET THAT WERE ADVERTISED

3   AND PROMOTED FOR USE IN A PARTS WASHER?

4   A. WE COULD NOT.

5           MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  BEYOND THE

6   SCOPE.

7           THE COURT:  OVERRULED.

8   BY MR. CAPP:

9   Q. NOW I WANT YOU TO LEAVE THE FACTOR OF PH ASIDE.  IN 1993,

10  WAS THERE AN ESTABLISHED MARKET FOR AQUEOUS CLEANING FLUID

11  PRODUCTS THAT WERE ADVERTISED AND PROMOTED FOR USE IN A

12  PARTS WASHER?

13          MR. SCHAETZEL:  SAME OBJECTION.  BEYOND THE SCOPE,

14  YOUR HONOR.

15          THE COURT:  OVERRULED, YOU MAY ANSWER.

16          THE WITNESS:  WE COULD NOT FIND ANY.

17          THE COURT:  WE ARE NOW GOING TO TAKE OUR FIRST

18  RECESS, AND WE WILL BE IN RECESS TILL 10:30, GIVE THE

19  REPORTER A BREAK AND ME A BREAK.  AND WE WILL START AGAIN AT

20  10:30 AND GO UNTIL NOON.

21          (BREAK FROM 10:10 A.M. UNTIL 10:30 A.M.)

22  BY MR. CAPP:

23  Q. MR. MCNALLY, IF THERE WAS NO ESTABLISHED MARKET FOR

24  AQUEOUS CLEANING FLUID PRODUCTS THAT WERE ADVERTISED AND

25  PROMOTED FOR USE IN A PARTS WASHER IN 1993, WHERE DID YOU GO

1   TO FIND CANDIDATE CLEANING FLUIDS FOR USE IN YOUR INVENTION?

2   A. 1993 WAS WELL BEFORE THE INTERNET, BUT THERE WAS AN

3   INDUSTRIAL REGISTER CALLED THE THOMAS REGISTER, WHICH WAS

4   ABOUT 40 VOLUMES OF GREEN COVERED INDUSTRIAL INFORMATION

5   THAT WAS AVAILABLE IN PUBLIC LIBRARIES, SO WE WENT TO THE

6   THOMAS REGISTER TO LOOK UP.

7   Q. AND ABOUT HOW MANY CLEANING FLUID PRODUCTS WERE THERE

8   LISTED IN THE THOMAS REGISTER?

9   A. THERE WERE HUNDREDS IF NOT THOUSANDS OF CLEANING

10  PRODUCTS.

11  Q. HOW DID YOU LOCATE CANDIDATE CLEANING FLUIDS IN THE

12  THOMAS REGISTER FOR USE IN YOUR INVENTION?

13  A. WE LOOKED FOR PHRASES SUCH AS SAFE FOR HUMAN HANDS,

14  BIODEGRADABLE, PHRASES LIKE THAT.

15  Q. DID THE THOMAS REGISTER HAVE AN INDEX ENTRY FOR PARTS

16  WASHER CLEANING FLUIDS?

17  A. IT DID NOT.

18          MR. SCHAETZEL:  OBJECTION.  GOES BEYOND THE SCOPE

19  AT TRIAL.

20          THE COURT:  RESERVED.

21          THE WITNESS:  IT DID NOT.

22  BY MR. CAPP:

23  Q. DID THE THOMAS REGISTER CONTAIN PRODUCT DESCRIPTION?

24  A. YES.  THAT WAS THE PURPOSE OF THE REGISTER, IT WAS TO

25  OFFER THE READER THE OPPORTUNITY TO LOOK THROUGH A NUMBER OF

1    MANUFACTURERS OF DIFFERENT ITEMS AND SOURCES OF THOSE ITEMS

2    TO CONTACT.

3    Q. DO YOU RECALL SEEING ANY PRODUCT DESCRIPTIONS FOR A

4    CLEANING FLUID THAT RECOMMENDED ITS USE IN A PARTS WASHER?

5    A. I DO NOT.

6    Q. NAME SOME OF THE CLEANING FLUID PRODUCTS THAT YOU

7    SELECTED FOR TESTING IN THE PROTOTYPE PARTS WASHER PRIOR TO

8    1994?

9    A. THERE WAS A WIDE RANGE OF --

10           MR. SCHAETZEL:  OBJECTION, YOUR HONOR, THIS GOES

11   BEYOND THE SCOPE AT TRIAL.

12           THE COURT:  RULING RESERVED.  YOU MAY ANSWER.

13           THE WITNESS:  A WIDE RANGE OF CLEANERS SUCH AS

14   GLIDCO, QUAD X, VOLT STOP, MIKE'S BREW, I BELIEVE IT WAS

15   CALLED.  A WIDE VARIETY OF THEM.  WARREN CHEMICAL

16   CORPORATION, AND A SMALL LOCAL COMPANY CALLED I. SCHNEID.

17   BY MR. CAPP:

18   Q. WHAT PRODUCT APPLICATIONS WERE THESE CLEANING FLUIDS

19   RECOMMENDED FOR?

20           MR. SCHAETZEL:  SAME OBJECTION, YOUR HONOR.

21   BEYOND THE SCOPE.

22           THE COURT:  RESERVED.  YOU MAY ANSWER.

23           THE WITNESS:  THESE CLEANERS WERE TYPICALLY ONE

24   SINGLE USE CLEANERS WHICH WHERE THE OBJECT TO BE CLEANED

25   WOULD BE MATCHED WITH AN APPROPRIATE CLEANING FLUID, THEN

1   YOU WOULD CLEAN THE PRODUCT AND RINSE THE CLEANING FLUID

2   DOWN THE DRAIN.

3   BY MR. CAPP:

4   Q. WHAT CHEMICAL PROPERTIES WERE YOU LOOKING FOR IN THE

5   PRODUCT DESCRIPTION?

6   A. WE WERE LOOKING FOR WHAT WOULD BE DESCRIBED AS PH NEUTRAL

7   CLEANERS.  PH NEUTRAL REFERS TO A RANGE OF PH FROM ABOUT 5

8   TO ABOUT 8.5.

9   Q. DID YOU LOOK FOR CLEANING FLUIDS IN A PARTICULAR PH

10  RANGE?

11  A. YES, I BELIEVE I JUST SAID THAT WE LOOKED FOR A RANGE

12  BETWEEN 5 AND 8.5.

13  Q. WHY WERE YOU LOOKING FOR CLEANING FLUIDS IN THAT PH

14  RANGE?

15          MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  GOES

16  BEYOND THE SCOPE AT TRIAL.

17          THE COURT:  RULING RESERVED.

18          THE WITNESS:  PH NEUTRAL CLEANERS ARE GENERALLY

19  CONSIDERED, ARE CONSIDERED, TO BE SAFE FOR HUMAN USAGE, AND

20  TO LOWER THE POSSIBILITY OF DERMATITIS FOR USERS.

21  BY MR. CAPP:

22  Q. AND WAS THAT BEFORE YOU CONSIDERED ADDING MICROORGANISMS

23  TO THE CLEANING FLUID?

24          MR. SCHAETZEL:  SAME OBJECTION.

25          THE COURT:  RULING RESERVED.  YOU MAY ANSWER.

1          THE WITNESS:  YES, IT WAS.

2    BY MR. CAPP:

3    Q. PUT UP PLAINTIFF'S EXHIBIT 530.  MR. MCNALLY IF YOU WOULD

4    TURN TO EXHIBIT 530 IN YOUR NOTEBOOK.  ARE YOU FAMILIAR WITH

5    THIS?

6    A. YES, I AM.

7    Q. IT IS ADDRESSED TO YOU.  DID YOU RECEIVE IT ON OR ABOUT

8    MARCH 17 OF 1994?

9    A. YES, I DID.  IN FACT, I CO-AUTHORED IT.

10   Q. WOULD YOU DESCRIBE THE EVENTS THAT ARE THE SUBJECT OF

11   THIS MEMORANDUM?

12   A. THIS WAS A REPORT THAT JIM MCCLUER AND I SENT TO

13   OURSELVES AND THE OTHER MEMBERS OF THE MANAGEMENT TEAM AT

14   INTELLIGENT SYSTEMS CORPORATION REPORTING THAT WE HAD

15   SUCCEEDED IN REMEDIATING HYDROCARBONS IN A PARTS CLEANER.

16   IN OTHER WORDS, THAT WE HAD MICROBES THAT APPEARED TO BE

17   LIVING IN A SOAP THAT WERE DESTROYING THE CONTAMINANT IN THE

18   FLUID.

19          MR. CAPP:  YOUR HONOR, THIS DOCUMENT IS ALREADY IN

20   THE RECORD ATTACHED TO MR. MCNALLY'S DECLARATION AT DOCKET

21   469-13 AS EXHIBIT L, BUT AT THIS TIME I WOULD LIKE TO TENDER

22   IT INTO EVIDENCE AS EXHIBIT 530.

23          THE COURT:  IT IS ALREADY IN THE RECORD; RIGHT?

24   SO WHY WOULD IT NEED TO BE IN AGAIN?  YOU MAY REFER TO

25   ANYTHING IN THE RECORD IN ASKING QUESTIONS OF THE WITNESS.

1    I WOULD RATHER NOT HAVE ANOTHER DUPLICATE.

2           MR. SCHAETZEL:  IF I MAY ADDRESS, YOUR HONOR?

3           THE COURT:  YOU MAY.

4           MR. SCHAETZEL:  IT'S NOT IN THE TRIAL RECORD.  I

5    BELIEVE THE DOCUMENT THAT WAS JUST REFERRED TO WAS A SUMMARY

6    JUDGMENT DOCUMENT THAT IS A DECLARATION THAT THIS WITNESS

7    FILED IN SUPPORT OF THE PLAINTIFF'S POSITION AT SUMMARY

8    JUDGMENT.  AND I AM SORRY, WITH THE QUESTION PENDING I

9    DIDN'T HAVE TIME TO OBJECT, BECAUSE I WAS LOOKING THROUGH MY

10   NOTES TO SEE IF THIS WITNESS ADDRESSED THIS DOCUMENT AT

11   TRIAL.  AND AS BEST I CAN TELL, THIS WITNESS DID NOT ADDRESS

12   THIS DOCUMENT AT TRIAL.  SO I BELIEVE THAT IS THE REASON

13   THAT IT IS NOW BEING TENDERED.  AND FOR ALL OF THOSE REASONS

14   WE OBJECT TO INCLUDING IT IN THE TRIAL IN RECORD BECAUSE IT

15   WOULD IN FACT AUGMENT.

16          THE COURT:  AND IT IS NOT REFERRED TO IN JUDGE

17   CAMP'S DECISION?  OR SIT?

18          MR. SCHAETZEL:  I WOULD HAVE TO DOUBLE-CHECK, YOUR

19   HONOR.  I DO NOT BELIEVE THAT IT IS.

20          THE COURT:  MR. CAPP, WHAT IS THE PURPOSE OF THIS

21   PARTICULAR DOCUMENT?

22          MR. CAPP:  MR. MCNALLY WAS QUESTIONED ON

23   CROSS-EXAMINATION ABOUT THE ENRETECH FLUID.

24          THE COURT:  DURING TRIAL?

25          MR. CAPP:  DURING TRIAL.  AND THIS SIMPLY ADS SOME

```
1     CONTEXT FOR YOUR HONOR.  AND HE WAS QUESTIONED ABOUT THE

2     SUBJECT MATTER OF THESE DOCUMENTS.  FOR SOME REASON THEY

3     DIDN'T GET IN THE TRIAL RECORD.

4           THE COURT:  WELL, I AM GOING TO RESERVE RULING.

5     BUT AT THIS STAGE I DON'T THINK IT WOULD BE APPROPRIATE FOR

6     ME TO RECEIVE THIS AS ADDITIONAL EVIDENCE.  IT'S NOT NEWLY

7     DISCOVERED, IT IS OBVIOUSLY IN THE RECORD OF THE SUMMARY

8     JUDGMENT, AND I THINK THAT IS DIFFERENT.  SO I DON'T THINK

9     IT WOULD APPROPRIATELY BE CONSIDERED AS PART OF THE TRIAL

10    RECORD.  BUT WE ARE HERE FOR YOU TO BE ABLE TO MAKE YOUR

11    OFFER OF WHATEVER YOU WISH AS EVIDENCE, I WILL RECEIVE IT,

12    BUT SUBJECT TO MY LIKELY SUSTAINING THE OBJECTION.

13          AT THIS TIME, HOWEVER, I WILL RESERVE RULING AND

14    MAYBE SOMETHING WILL HAPPEN HERE THAT WILL CHANGE MY MIND.

15    YOU MAY ANSWER.  WHAT IS THIS DOCUMENT?

16          THE WITNESS:  THIS DOCUMENT IS A REPORT TO THE

17    MANAGEMENT TEAM AT INTELLIGENT SYSTEMS WHICH OWNS CHEMFREE,

18    THAT WE HAD DISCOVERED OR APPARENTLY DISCOVERED MICROBIAL

19    SOAP COMBINATION WHERE THE CONTAMINANTS INTRODUCED TO THE

20    PARTS WASHER BY THE CLEANING PROCESS WERE ACTUALLY BEING

21    DESTROYED INSIDE THE PARTS CLEANER ITSELF.

22          MR. CAPP:  SO DO I UNDERSTAND IT IS PROVERBIALLY

23    ADMITTED SUBJECT TO --

24          THE COURT:  IT IS RECEIVED SUBJECT TO THE

25    OBJECTION.  I HAVE RESERVED RULING, BUT SUGGESTED TO YOU
```

1    THAT IT'S UNLIKELY TO BE GIVEN SUBSTANTIVE WEIGHT.

2              MR. CAPP:  THANK YOU, YOUR HONOR.

3    BY MR. CAPP:

4    Q. MR. MCNALLY, WILL YOU TURN TO PLAINTIFF'S EXHIBIT 531.

5    A. YES, SIR.

6    Q. LET ME GO BACK.  FROM THE DATE OF THE PLAINTIFF'S EXHIBIT

7    530, FROM THAT POINT ON, WERE YOU PRIMARILY FOCUSED ON

8    DEVELOPING A SYSTEM THAT COULD BIOREMEDIATE THE

9    CONTAMINANTS?

10             MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  BEYOND THE

11   SCOPE AT TRIAL.

12             THE WITNESS:  YES.

13             THE COURT:  RULING IS RESERVED.  YOU MAY ASK A NEW

14   ONE.

15   BY MR. CAPP:

16   Q. WHEN YOU FIRST LEARNED ABOUT THE ENRETECH FLUID, WHAT

17   PRODUCT APPLICATION WAS IT INTENDED FOR?

18   A. THE GREEN PANDA ENRETECH SOAP WAS DESIGNED FOR USE IN

19   REMEDIATING WHAT WE CALL NC 2 REMEDIATION.  IN OTHER WORDS,

20   THE EARTH WOULD BECOME CONTAMINATED WITH OIL IN OIL FIELDS

21   OR IN TRUCK STOPS AND PLACES LIKE THAT, AND ENRETECH WAS

22   DESIGNED TO PLOW INTO THE GROUND, THE SURFACTANT WOULD BREAK

23   UP THE OIL, AND THE OIL WOULD THEN BE REMEDIATED OR

24   DESTROYED, CHANGED INTO WATER AND CARBON DIOXIDE BY THE

25   MICROBES THAT WERE IN THAT FLUID.  IT WAS A ONE-TIME USE

1   FLUID FOR NC 2 BIOREMEDIATION.

2   Q. WAS IT REPRESENTED TO YOU BY ENRETECH AS HAVING BEEN

3   DEVELOPED FOR USE IN A PARTS WASHER APPLICATION?

4           MR. SCHAETZEL:  OBJECTION, YOUR HONOR, BEYOND THE

5   SCOPE AT TRIAL.

6           THE COURT:  RULING RESERVED.  ANSWER?

7           THE WITNESS:  NO, SIR.

8   BY MR. CAPP:

9   Q. TURN THE PLAINTIFF'S EXHIBIT 531 NOW.

10  A. YES, SIR.

11  Q. ARE YOU FAMILIAR WITH THIS?

12  A. YES, I AM.  THIS IS ANOTHER ONE THAT I CO-AUTHORED.

13  Q. THIS IS DATED 12 DAYS AFTER PLAINTIFF'S EXHIBIT 530.

14  WOULD YOU DESCRIBE THE EVENTS WHICH ARE THE SUBJECT OF THIS

15  LETTER?

16          MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  BEFORE THE

17  WITNESS RESPONDS, I DON'T BELIEVE THAT THIS DEPARTMENT WAS

18  ADDRESSED BY THIS WITNESS AT TRIAL, AT LEAST NOT IN MY

19  NOTES.  SO I WILL JUST OBJECT TO THE ENTIRE LINE OF

20  QUESTIONS AS GOING BEYOND THE SCOPE AT TRIAL.

21          THE COURT:  MR. CAPP, THE PURPOSE OF THIS EXHIBIT?

22          MR. CAPP:  HE WAS QUESTIONED ABOUT THE SUBSTANCE

23  OF THIS MEMO AND THE TIMING OF IT AT TRIAL.  MR. SCHAETZEL

24  IS CORRECT, THAT IT WASN'T SEPARATELY IDENTIFIED AND

25  ADMITTED INTO EVIDENCE DURING THE TRIAL.

```
1              THE COURT:  RULING RESERVED.  MY RULING IS,
2    HOWEVER, LIKELY TO BE THAT IT WILL NOT BE CONSIDERED
3    SUBSTANTIVELY BECAUSE IT WASN'T IN THE TRIAL RECORD, BUT YOU
4    MAY CONTINUE MAKING YOUR RECORD ON THIS.
5              MR. CAPP:  THANK YOU, YOUR HONOR.
6    BY MR. CAPP:
7    Q. WOULD YOU DESCRIBE THE EVENTS THAT ARE THE SUBJECT OF
8    THIS MEMORANDUM?
9    A. YES.  THE APPARENT SUCCESS OF THE ENRETECH FLUID AT
10   REMEDIATING CONTAMINANTS IN A PARTS WASHER LED US TO SIT
11   DOWN WITH PANDA AND ORDER MORE QUANTITIES OF THE SUBSTANCE
12   SO THAT WE COULD BRING IT OUT TO FIELD TRIALS.  HOWEVER,
13   ENRETECH WAS APPARENTLY NOT ABLE TO DUPLICATE WHATEVER IT
14   WAS THAT THEY SENT US THAT FIRST TIME.  WHICH WERE
15   COMPLETELY UNHAPPY WITH THE CLEANING ABILITY.  WE SENT IT TO
16   A WELL RESPECTED FIRM TO CHECK FOR MICROBES AND IN SOME
17   CASES THERE WERE NO MICROBES IN THE FLUID THAT WE HAD ASKED
18   PANDA TO PRODUCE FOR US.
19             MR. CAPP:  YOUR HONOR, JUST TO BE CLEAR, I WOULD
20   LIKE TO PROVISIONALLY TENDER THIS INTO EVIDENCE SUBJECT TO
21   MR. SCHAETZEL'S OBJECTION AND I WOULD LIKE TO POINT OUT THAT
22   MR. MCNALLY WAS QUESTIONED ON THE SUBJECT MATTER OF THIS
23   MEMORANDUM AT PAGE 427 OF THE TRIAL TRANSCRIPT.
24             THE COURT:  BUT NOT THE MEMORANDUM ITSELF?
25             MR. CAPP:  THE MEMORANDUM ITSELF DID NOT COME IN.
```

1    I AM MORE CONCERNED ABOUT YOUR HONOR HEARING THE EXPLANATION

2    THAT WENT WITH THE MEMORANDUM THAN THE CONTENT OF THE

3    MEMORANDUM ITSELF.

4              THE COURT:  IT IS RECEIVED FOR THAT NARROW

5    PURPOSE.  RULING IS RESERVED ON THE OBJECTION.  BUT IT IS

6    UNLIKELY TO BE GIVEN SUBSTANTIVE VALUE, AND YOU MAY -- I

7    GUESS YOU HAVEN'T ASKED A QUESTION ABOUT IT, SO YOU MAY ASK

8    FURTHER QUESTIONS ABOUT IT.  BUT ALL QUESTIONS ABOUT THIS

9    ARE SUBJECT TO RESERVED RULING ON OBJECTIONS THAT MAY BE

10   MADE.

11             MR. CAPP:  THANK YOU, YOUR HONOR.

12   BY MR. CAPP:

13   Q. MR. MCNALLY, WERE YOU ABLE TO EVENTUALLY RESOLVE YOUR

14   ISSUES WITH ENRETECH?

15   A. WE WERE NOT.

16             MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  BEYOND THE

17   SCOPE OF WHAT WAS OFFERED.

18             THE COURT:  RULING RESERVED.

19             THE WITNESS:  WE WERE NOT ABLE TO DETERMINE WHAT

20   WAS WRONG WITH THE SOAP OR TO GET PANDA TO PRODUCE SOAP THAT

21   WOULD DO WHAT WE WANTED IT TO DO.

22   BY MR. CAPP:

23   Q. HOW SOON AFTER THIS DID YOU MOVE AWAY FROM USING

24   ENRETECH'S CLEANING FLUID?

25   A. ALMOST --

1          MR. SCHAETZEL:  SAME OBJECTION, YOUR HONOR.

2          THE COURT:  RULING RESERVED.

3          THE WITNESS:  ALMOST IMMEDIATELY.

4    BY MR. CAPP:

5    Q. DID YOU EVER FIGURE OUT WHY YOU HAD PROBLEMS WITH THE

6    ENRETECH FLUID?

7          MR. SCHAETZEL:  SAME OBJECTION, YOUR HONOR.

8          THE COURT:  RULING RESERVED.

9          THE WITNESS:  WE NEVER DID FIGURE OUT WHAT THE

10   PROBLEM WAS WITH THE PANDA SOAP.

11   BY MR. CAPP:

12   Q. FROM MARCH OF 1994 UNTIL YOU FILED THE PATENT APPLICATION

13   IN SEPTEMBER, HOW MANY OTHER FLUIDS DID YOU TEST FOR

14   POSSIBLE USE IN THE INVENTION?

15         MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  BEYOND THE

16   SCOPE AT TRIAL.

17         THE COURT:  RESERVED.

18         THE WITNESS:  ABOUT A DOZEN DIFFERENT CLEANING

19   FLUIDS.

20   BY MR. CAPP:

21   Q. AND DID YOU EXPERIMENT WITH FORMULATING YOUR OWN CLEANING

22   FLUID?

23   A. YES, WE DID.

24         MR. SCHAETZEL:  OBJECTION, YOUR HONOR.

25         THE COURT:  RULING RESERVED.

1           THE WITNESS:  YES.  WE DID EXPERIMENT WITH

2    FORMULATING OUR OWN CLEANING FLUIDS.

3    BY MR. CAPP:

4    Q. WHAT CHEMICAL SUPPLIERS DID YOU OBTAIN CHEMICALS FROM?

5           MR. SCHAETZEL:  SAME OBJECTION, YOUR HONOR.

6           THE COURT:  RULING RESERVED.  WE ARE LOOKING AT

7    MARCH OF 1994.  AFTER MARCH OF 1994?

8           MR. CAPP:  THAT IS CORRECT, YOUR HONOR.

9           THE COURT:  I UNDERSTAND.  RULING RESERVED.  YOU

10   MAY ANSWER.  WHAT OTHER CHEMICALS?

11          THE WITNESS:  WE WENT TO THE BIG NAMES IN THE

12   BUSINESS, SUCH AS DUPONT AND DOW AND NCH AND AMERICAN

13   CHEMICAL TO LOOK FOR SURFACTANTS.

14   BY MR. CAPP:

15   Q. DID YOU HAVE ANY DISCUSSIONS WITH PERSONNEL AT DOW OR

16   DUPONT ABOUT WHAT YOU WERE TRYING TO ACHIEVE?

17          MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE.

18          THE COURT:  RULING IS RESERVED.  IS THERE AN

19   EXCEPTION TO HEARSAY ON THAT, THE DISCUSSIONS?

20          MR. CAPP:  I AM MORE CONCERNED WITH NOT THE TRUTH

21   OF THE MATTER ASSERTED BY THE SUBSTANCE OF WHATEVER WAS SAID

22   IN THE CONVERSATION AS OPPOSED TO THE TRUTH OF THE MATTER

23   ASSERTED.

24          THE COURT:  I DON'T KNOW HOW NOT CONSIDERING THE

25   SUBSTANCE WOULD BE RELEVANT.  YOU HAVE ESTABLISHED, SUBJECT

1    TO OBJECTION, THAT HE HAD THESE CONTACTS.  BUT AS TO WHAT

2    INDIVIDUALS SAID IN THOSE CONTACTS WE ARE GETTING PRETTY FAR

3    REMOVED FROM ADMISSIBILITY, I BELIEVE.  BUT I WILL RESERVE

4    RULING.

5          MR. CAPP:  THANK YOU, YOUR HONOR AND I WOULD POINT

6    OUT THIS IS ALL COVERED IN MR. MCNALLY'S DEPOSITION AT PAGE

7    109 AND HIS ENTIRE DEPOSITION TRANSCRIPT CAME INTO THE

8    RECORD DURING THE SUMMARY JUDGMENT PROCEEDINGS.

9          THE COURT:  AND SO THE PURPOSE NOW IS NOT TO

10   EXPAND ON THAT RECORD, BUT TO EMPHASIZE CERTAIN THINGS IN

11   THE TRIAL RECORD.  I JUST WANT TO MAKE SURE I KNOW THE PATH

12   WE ARE ON, WHETHER IT'S TO EMPHASIZE WHAT IS IN THE TRIAL

13   RECORD OR TO ADD TO THE TRIAL RECORD.

14         MR. CAPP:  IN A SENSE IT WILL SUPPLEMENT THE TRIAL

15   RECORD.  THE ISSUE THAT CAME OUT DURING THE TRIAL WAS

16   MR. MCNALLY WAS CROSS-EXAMINED EXTENSIVELY ON THE FACT THAT

17   WHEN THEY LAUNCHED THE PRODUCT AND FILED THEIR PATENT

18   APPLICATION, THEY USED A, QUOTE, UNQUOTE, EXISTING FLUID.

19   AND THIS TESTIMONY WILL HELP CLARIFY HOW THEY GOT TO THE

20   POINT OF USING A, QUOTE, UNQUOTE, EXISTING FLUID.

21         THE COURT:  FOR THAT PURPOSE, YOU MAY CONTINUE

22   ASKING QUESTIONS.  I HAVE RESERVED RULING ON THE PREVIOUS

23   MATTER.  BUT I THINK YOU SHOULD START WITH A NEW QUESTION.

24         MR. CAPP:  ALL RIGHT.

25   BY MR. CAPP:

1    Q. DID YOU HAVE ANY DISCUSSIONS WITH PERSONNEL AT DOW OR

2    DUPONT ABOUT WHAT YOU WERE TRYING TO ACHIEVE?

3           MR. SCHAETZEL:  OBJECTION, YOUR HONOR, FOR THE

4    SAME REASON.  GOES BEYOND THE SCOPE, AND I GUESS --

5           THE COURT:  RULING RESERVED.

6           MR. SCHAETZEL:  AND DID HE HAVE CONVERSATIONS

7    DOESN'T NECESSARILY GO TO THE SUBSTANCE OR THE WEIGHT, WOULD

8    BE MY OBJECTIONS.  IT'S HEARSAY.

9           THE COURT:  MY EXPERIENCE HASN'T HAS BEEN WHEN

10   THEY ASK IF THEY HAVE HAD CONVERSATIONS THEY OFTEN ANSWER BY

11   TELLING WHAT THE CONVERSATIONS WERE.

12          MR. SCHAETZEL:  I WILL MAKE THE OBJECTION TO THE

13   HEARSAY NOW.

14          THE COURT:  AND I WILL RESERVE RULING.  YOU MAY

15   ANSWER.

16          THE WITNESS:  YES.  WE DID HAVE DISCUSSIONS WITH

17   THE REPRESENTATIVES OF THE LARGE CHEMICAL COMPANIES.

18   BY MR. CAPP:

19   Q. AND WHAT WAS THEIR REACTION?

20          MR. SCHAETZEL:  OBJECTION.

21          THE COURT:  RULING RESERVED.

22          THE WITNESS:  THE SELLERS OF MISCELLANEOUS

23   CLEANING FLUIDS SUGGESTED THAT WHAT WE WERE TRYING TO DO WAS

24   MUTUALLY EXCLUSIVE, THEY SUGGESTED THAT EITHER A MICROBE IN

25   A SURFACTANT BLEND WOULD EAT THE SURFACTANT OR THE

1    SURFACTANT WOULD KILL THE MICROBES.

2    BY MR. CAPP:

3    Q. DID YOUR EXPERIENCE WITH DOW AND DUPONT DISCOURAGE YOU

4    FROM PURSUING THE INVENTION?

5              MR. SCHAETZEL:  OBJECTION.  GOES BEYOND THE SCOPE.

6              THE COURT:  RULING RESERVED.

7              THE WITNESS:  WE WERE A LITTLE DISCOURAGED WHEN

8    THE BIG CHEMICAL COMPANY TOLD US WE COULDN'T DO WHAT WE

9    WANTED TO DO.  BUT IT CERTAINLY DIDN'T STOP US FROM TRYING.

10   BY MR. CAPP:

11   Q. DID YOU ALSO EXPERIMENT WITH COMMERCIALLY AVAILABLE

12   CLEANING PRODUCTS?

13   A. YES, WE DID.

14   Q. AND WOULD YOU NAME SOME OF THOSE?

15             MR. SCHAETZEL:  OBJECTION.  GOES BEYOND THE SCOPE

16   AT TRIAL, YOUR HONOR.

17             THE COURT:  RESERVE RULING.

18             THE WITNESS:  THERE WERE LITERALLY A DOZEN

19   PRODUCTS THAT WE TRIED THAT WERE AVAILABLE COMMERCIALLY,

20   PRODUCTS MADE BY PEOPLE LIKE WARREN CHEMICAL CORPORATION, I.

21   SCHNEID, GLIDCO, AND A WHOLE RANGE OF OTHER SUPPLIERS.

22   BY MR. CAPP:

23   Q. WHERE DID YOU FIND THEM?

24   A. OUR GOOD FRIENDS THE THOMAS REGISTER.

25   Q. WERE ANY OF THESE FLUIDS FLAMMABLE?

1    A. YES.

2    Q. WHICH ONES?

3            MR. SCHAETZEL:  OBJECTION.  SCOPE.

4            THE COURT:  RESERVED.

5            THE WITNESS:  IN PARTICULAR THE TURPINES ARE VERY

6    FLAMMABLE.  THERE ARE ALSO FLAMMABLE SURFACTANTS.

7            MR. SCHAETZEL:  MOVE TO STRIKE AS THE ANSWER IS

8    NONRESPONSIVE, YOUR HONOR.

9            THE COURT:  OVERRULED.

10           THE WITNESS:  OKAY.  THERE ARE FLAMMABLE, TENSIDE,

11   THE SAME THING AS SURFACTANTS.  THERE ARE ALSO VERY

12   FLAMMABLE TURPINES.

13   BY MR. CAPP:

14   Q. ALL RIGHT.  YOU MENTIONED THAT YOU ARE AWARE OF

15   SURFACTANTS THAT ARE FLAMMABLE.  CAN YOU NAME ONE?

16           MR. SCHAETZEL:  OBJECTION.  GOES BEYOND THE SCOPE.

17           THE COURT:  RESERVED.

18           THE WITNESS:  YES, I CAN.  ONCE THAT COMES TO MIND

19   IMMEDIATELY IS MADE BY A COMPANY CALLED LUBRISOL.  IT IS

20   CALLED E60.  IT IS SO FLAMMABLE THAT YOU HAVE TO STORE IT

21   AWAY FROM WAREHOUSES.

22   BY MR. CAPP:

23   Q. WERE ANY OF THE COMMERCIALLY AVAILABLE PRODUCTS THAT YOU

24   TESTED IN 1994 ADVERTISED, PROMOTED, OR RECOMMENDED FOR USE

25   IN THE PARTS WASHER APPLICATION?

1          MR. SCHAETZEL:  OBJECTION.  GOES BEYOND THE SCOPE

2   AT TRIAL.

3          THE COURT:  RESERVED.

4          THE WITNESS:  NO, SIR.

5   BY MR. CAPP:

6   Q. DID ANY OF THEM COME WITH MICROBES MIXED INTO THE FLUID?

7          MR. SCHAETZEL:  SAME OBJECTION.

8          THE COURT:  RESERVED.

9          THE WITNESS:  NO.  WE DID NOT FIND ANY CLEANERS AT

10  THAT TIME THAT HAD MICROBES IN THE FLUID.

11  BY MR. CAPP:

12  Q. IN 1994, WERE YOU ABLE TO FIND ANY COMMERCIALLY AVAILABLE

13  CLEANING FLUID PRODUCTS THAT WERE ADVERTISED, PROMOTED, OR

14  RECOMMENDED FOR USE IN A PARTS WASHER APPLICATION?

15          MR. SCHAETZEL:  SAME OBJECTION.

16          THE COURT:  RESERVED.

17          THE WITNESS:  WE WERE NOT ABLE TO FIND A CLEANING

18  FLUID ADVERTISED FOR USE IN PARTS WASHERS.

19  BY MR. CAPP:

20  Q. HOW DID THAT DIFFER FROM THE MARKET THAT EXISTS TODAY?

21          MR. SCHAETZEL:  SAME OBJECTION.

22          THE COURT:  RESERVED.

23          THE WITNESS:  IT IS VERY DIFFERENT TODAY.  IF YOU

24  YOU WERE TO GO TO THE INTERNET EQUIVALENT OF THE THOMAS

25  REGISTER TODAY, YOU WOULD FIND ALL SORTS OF CLEANING FLUIDS

1    ADVERTISED FOR USE IN PARTS CLEANERS, SOME OF WHICH

2    REPORTEDLY HAVE MICROBES IN THEM.

3    BY MR. CAPP:

4    Q. DID ALL OF THE CANDIDATE CLEANING FLUIDS THAT YOU TESTED

5    GIVE ACCEPTABLE CLEANING PERFORMANCE IN A PARTS WASHER

6    APPLICATION?

7            MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  BEYOND THE

8    SCOPE.

9            THE COURT:  RESERVED.

10           THE WITNESS:  NO.

11   BY MR. CAPP:

12   Q. HOW DID YOU TEST FOR THAT?

13           MR. SCHAETZEL:  SAME OBJECTION.

14           THE COURT:  RESERVED.

15           THE WITNESS:  FOR CLEANING ABILITY?

16   BY MR. CAPP:

17   Q. FOR CLEANING ABILITY.  HOW DID YOU TEST FOR THAT?

18   A. BY VISUAL OBSERVATION, WE WOULD TAKE A PART THAT NEEDED

19   TO BE CLEANED, PUT THE SOAP ON IT OR THE SURFACTANT, BLEND

20   WHATEVER IT WAS, AND OBSERVE IF IT BECAME CLEAN.

21   Q. WHEN DID YOU START WASHING, WORKING WITH A PRODUCT KNOWN

22   AS SEAWASH 7 FROM WARREN CHEMICAL COMPANY?

23   A. WE STARTED TESTING SEAWASH 7 APPROXIMATELY THE SPRING OF

24   1994.

25   Q. AT THE TIME YOU FIRST STARTED WORKING WITH SEAWASH 7,

1   WHAT PRODUCT APPLICATION WAS WARREN CHEMICAL COMPANY

2   RECOMMENDING SEAWASH 7 FOR?

3           MR. SCHAETZEL:  OBJECTION.  GOES BEYOND THE SCOPE

4   AND CALLS FOR HEARSAY.

5           THE COURT:  IS THIS BEYOND THE TRIAL TESTIMONY?

6           MR. CAPP:  SEAWASH 7 IS THE PREFERRED EMBODIMENT

7   CLEANING FLUID, HE WAS QUESTIONED ABOUT IT EXTENSIVELY ON

8   CROSS-EXAMINATION AT TRIAL, SO --

9           THE COURT:  THIS SEEMS TO BE SIMPLY A DUPLICATION

10  OF THAT.  BUT I CAN'T TELL UNTIL I'VE HEARD, SO I WILL

11  RESERVE RULING, AND YOU MAY ANSWER.

12          THE WITNESS:  SEAWASH 7 WAS ADVERTISED BY THE

13  MANUFACTURER AS A SURFACE CLEANER.  IN OTHER WORDS, IT

14  WAS -- IT WAS A PH NEUTRAL SURFACE CLEANER, SPECIFICALLY TO

15  CLEAN JUST ABOUT ANY KIND OF SURFACE THAT WOULD GET DIRT.

16  IT COULD BE FOR DEGREASING ENGINES, IT COULD BE FOR CLEANING

17  WATER POTS, THINGS LIKE THAT.  IT WAS DESIGNED FOR A SINGLE

18  USE IN THE SENSE THAT YOU CLEAN THE PART OR THE SURFACE,

19  WHATEVER IT WAS, AND THEN RINSE IT OFF AND SOAP WOULD GO

20  DOWN THE DRAIN.

21  BY MR. CAPP:

22  Q. WAS IT RECOMMENDED FOR ANY PRODUCT APPLICATION THAT

23  INVOLVED THE USE, RECAPTURE OF THE USED FLUID, AND THEN

24  REUSE OF THE FLUID FOR CLEANING?

25          MR. SCHAETZEL:  SAME OBJECTION AND HEARSAY, YOUR

```
 1   HONOR.
 2            THE COURT:  RESERVED.  YOU MAY ANSWER.
 3            THE WITNESS:  NO, SIR.  IT WAS NOT.
 4   BY MR. CAPP:
 5   Q. AFTER YOU MOVED AWAY FROM ENRETECH'S FLUID, HOW DID YOU
 6   GO ABOUT FINDING MICROBES TO USE IN YOUR INVENTION?
 7   A. ONCE AGAIN, WE WENT BACK TO THE THOMAS REGISTER AND
 8   LOOKED FOR THINGS SUCH AS MICROBES, BACTERIA DEGRADERS,
 9   MICROBIAL DEGRADERS, MICROBIAL BLENDS, THINGS LIKE THAT.
10   Q. HOW MANY DIFFERENT MICROBIAL PRODUCTS DID YOU EXPERIMENT
11   WITH?
12            MR. SCHAETZEL:  SAME OBJECTION, YOUR HONOR.
13   BEYOND THE SCOPE.
14            THE COURT:  RESERVED.
15            THE WITNESS:  WE EVENTUALLY SELECTED ABOUT SIX
16   MANUFACTURERS OF MICROBIAL PRODUCTS.  SOME OF THOSE
17   MANUFACTURERS WOULD SPECIFY DIFFERENT BLENDS OF THEIR OWN
18   PRODUCT FOR USE AT DIFFERENT APPLICATIONS.
19   BY MR. CAPP:
20   Q. WERE ANY OF THE MICROBIAL PRODUCTS THAT YOU EXPERIMENTED
21   WITH ADVERTISED, PROMOTED, OR RECOMMENDED FOR USE IN A PARTS
22   WASHER APPLICATION?
23            MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AND
24   CALLS FOR HEARSAY.
25            THE COURT:  RESERVED, AND WHAT IS THE EXCEPTION TO
```

1    THE HEARSAY OBJECTION?

2         MR. CAPP:  IT IS NOT BEING OFFERED FOR THE TRUTH

3    OF THE MATTER ASSERTED, IT IS SIMPLY THAT IT WAS A PUBLIC

4    STATEMENT OF WHAT THE PRODUCT WAS TO BE USED FOR.

5         THE COURT:  OVERRULE THE HEARSAY OBJECTION, BUT

6    RESERVED AS TO WHETHER THIS GOES BEYOND THE APPROPRIATE

7    RECORD IN THIS HEARING.  YOU MAY ANSWER.

8         THE WITNESS:  NONE OF THE MICROBIAL PRODUCTS WERE

9    ADVERTISED FOR USE IN PARTS WASHERS.

10   BY MR. CAPP:

11   Q. BETWEEN MARCH AND SEPTEMBER OF 1994, HOW MANY DIFFERENT

12   COMBINATIONS OF FLUIDS IN MICROBES DID YOU EXPERIMENT WITH?

13   A. ABOUT A DOZEN.

14   Q. DID EACH AND EVERY COMBINATION THAT YOU TESTED WORK

15   SUCCESSFULLY IN THE INVENTION?

16   A. NO.  EACH AND EVERY COMBINATION DID NOT WORK

17   SUCCESSFULLY.

18   Q. DESCRIBE THE INITIAL TESTING THAT YOU DID TO DETERMINE IF

19   MICROBES WOULD REMAIN BIOLOGICALLY ACTIVE IN THE CLEANING

20   FLUID.

21         MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

22   TRIAL.

23         THE COURT:  RESERVED.  YOU MAY ANSWER.

24         THE WITNESS:  THE FIRST TESTS THAT WE WOULD DO

25   WITH THE MICROBES AND A SUGGESTED CLEANER WOULD BE TO GET

1   THE CLEANERS IN THE STRENGTH THAT IT WAS RECOMMENDED BY THE

2   MANUFACTURER.  AND THEN IN OUR LABORATORY, WHICH WAS A

3   TABLE, WE WOULD PUT THE CLEANING FLUID IN A PETRI DISH AND

4   ADD THE MICROBES AND THEN CHECK AT PERIODIC INTERVALS TO SEE

5   IF THE MICROBES WERE GROWING.

6   BY MR. CAPP:

7   Q. AFTER YOU TESTED THE DOZEN OR SO CANDIDATES, WOULD YOU

8   DESCRIBE THE RESULTS FOR THE COURT?

9           MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

10  TRIAL.

11          THE COURT:  RESERVED.  YOU MAY ANSWER.

12          THE WITNESS:  WE INITIALLY ELIMINATED THREE TO

13  FIVE OF THE COMBINATIONS BECAUSE THEY KILLED MICROBES.  AND

14  ONCE WE HAD DETERMINED THAT THERE WERE SOME FLUIDS THAT

15  WOULD NOT KILL THE MICROBES, WE WOULD PROCEED WITH FURTHER

16  TESTING.

17  Q. AFTER YOU DID THE INITIAL TEST TO DETERMINE IF THE -- LET

18  ME GO BACK.  HOW LONG DID THE INITIAL PETRI DISH TEST LAST,

19  WAS THE DURATION?

20          MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

21  TRIAL.

22          THE COURT:  RESERVED.  YOU MAY ANSWER.

23          THE WITNESS:  GENERALLY JUST A FEW DAYS.  IT WAS

24  PRETTY -- WE COULD PRETTY QUICKLY DETERMINE IF THE MICROBES

25  WERE GOING TO GROW OR IF THEY WERE GOING TO BE KILLED BY THE

1    CLEANING FLUID.

2    BY MR. CAPP:

3    Q. AFTER YOU FINISHED THAT TEST AND YOU ELIMINATED SOME

4    WHERE YOU GOT NO BIOLOGICAL GROWTH, DESCRIBE THE NEXT PHASE

5    OF TESTING THAT YOU DID ON THE CANDIDATES THAT SURVIVED THAT

6    FIRST CUT.

7              MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

8    TRIAL.

9              THE COURT:  RESERVED.

10             THE WITNESS:  WE KEPT IN MIND THAT WE WERE LOOKING

11   FOR SOMETHING THAT WOULD CLEAN.  SO AFTER WE DETERMINED THAT

12   MICROBES WOULD LIVE IN THE FLUID, WE WOULD THEN SUBJECT THE

13   FLUID TO CLEANING TESTS TO SEE HOW EFFECTIVE THEY WERE AT

14   CLEANING.

15   BY MR. CAPP:

16   Q. DID YOU ELIMINATE ANY COMBINATIONS FROM FURTHER

17   CONSIDERATION AT THAT STAGE OF THE TEST?

18             MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

19   TRIAL.

20             THE COURT:  RESERVED.

21             THE WITNESS:  YES.  THERE WERE SOME COMBINATION

22   THAT WE ELIMINATED.

23   BY MR. CAPP:

24   Q. SO AT THIS POINT IN TIME, WHAT ARE YOU DOWN TO?  YOU PUT

25   YOUR CANDIDATES THROUGH TWO ROUNDS OF TESTS.

1          MR. SCHAETZEL:  SAME OBJECTION.

2          THE COURT:  RESERVED.

3          THE WITNESS:  WE STARTED WITH A DOZEN, AND

4     ELIMINATED SOME BECAUSE THE SOAP KILLED THE MICROBES, AND

5     ELIMINATED SOME BECAUSE THEY WERE NOT EFFECTIVE CLEANERS.

6     WE CAME DOWN TO THREE COMBINATIONS THAT WE FOUND TO PROVIDE

7     THE RESULTS THAT WE WERE LOOKING FOR.

8     BY MR. CAPP:

9     Q. DID YOU SUBJECT THOSE THREE TO FURTHER TESTING?

10         MR. SCHAETZEL:  SAME OBJECTION.

11         THE COURT:  RESERVED.

12         THE WITNESS:  YES.  WE DID.  THE NEXT STAGE OF

13    TESTING, WHEN WE FOUND THE THREE COMBINATIONS THAT WOULD

14    WORK, WOULD BE TO PURCHASE ENOUGH OF THE MISCELLANEOUS

15    COMPONENTS TO MAKE 25 OR 50 GALLONS SO WE COULD THEN PUT

16    THEM INTO OUR FIELD TEST MACHINES, WHICH WE HAD HALF A DOZEN

17    OF AROUND THE ATLANTA AREA.

18    BY MR. CAPP:

19    Q. HOW LONG DID YOU SUBJECT THE CANDIDATES TO FIELD TESTING?

20         MR. SCHAETZEL:  SAME OBJECTION.

21         THE COURT:  RESERVED.

22         THE WITNESS:  ANYWHERE FROM TWO TO SIX TO EIGHT

23    WEEKS, AND THEN SOME WE LEFT IN THE FIELD.

24    BY MR. CAPP:

25    Q. OF THE THREE FLUID AND MICROBE COMBINATIONS HOW DID THEY

1   COMPARE IN TERMS OF CLEANING EFFECTIVENESS.

2            MR. SCHAETZEL:  SAME OBJECTION.

3            THE COURT:  RESERVED.

4            THE WITNESS:  ONE OF THE COMBINATIONS APPEARED TO

5   CLEAN BETTER THAN THE OTHERS.

6   BY MR. CAPP:

7   Q. WHICH ONE WAS THAT?

8   A. THAT WAS THE SEAWASH 7/LRC 1 COMBINATION.

9   Q. OF THE THREE FLUID MICROBES COMBINATIONS, HOW DID THEY

10  COMPARE IN TERMS OF REMEDIATING HYDROCARBONS?

11           MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

12  TRIAL.

13           THE COURT:  RESERVED.

14           THE WITNESS:  WE DID NOT SEE A GREAT DEAL OF

15  DIFFERENCE BETWEEN ANY OF THE FLUIDS AND HOW THE MICROBES

16  GREW, WHICH WAS AN INDICATION OF BIOREMEDIATION.

17  BY MR. CAPP:

18  Q. WHY DID YOU EVENTUALLY SELECT SEAWASH 7 OVER THE OTHER

19  TWO CANDIDATES FOR THE PREFERRED EMBODIMENT OF YOUR

20  INVENTION?

21  A. IT WAS THE MOST --

22           MR. SCHAETZEL:  SAME OBJECTION.

23           THE COURT:  RESEARCH.

24           THE WITNESS:  IT WAS THE MOST EFFECTIVE CLEANER.

25  BY MR. CAPP:

1  Q. WHEN YOU STARTED INTO THE PROCESS OF TESTING, BEFORE YOU

2  GOT TEST RESULTS, WERE YOU ABLE TO PREDICT IN ADVANCE WHICH

3  COMBINATIONS OF FLUID AND MICROBES WOULD WORK AND WHICH

4  COMBINATIONS WOULD NOT WORK?

5          MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

6  TRIAL.

7          THE COURT:  RESERVED.

8          THE WITNESS:  WE WERE NOT ABLE TO PREDICT JUST BY

9  LOOKING AT THE PRODUCTS.

10  BY MR. CAPP:

11  Q. APPROXIMATELY WHAT PH RANGE DID YOU FIND THE GOOD

12  PERFORMANCE, BOTH IN TERMS OF CLEANING ABILITY AND MICROBIAL

13  ACTIVITY?

14          MR. SCHAETZEL:  SAME OBJECTION.

15          THE COURT:  RESERVED.

16          THE WITNESS:  THE PH RANGE OF WAS APPROXIMATELY 6

17  TO ABOUT 8.5.

18  BY MR. CAPP:

19  Q. DID YOU CONSIDER USING THE PH AS HIGH AS 9.5 TO 10.

20          MR. SCHAETZEL:  SAME OBJECTION.

21          THE COURT:  RESERVED.

22          THE WITNESS:  WE DID NOT CONSIDER PH'S THAT HIGH.

23  BY MR. CAPP:

24  Q. WHY NOT?

25  A. PH'S OF 9 OR ABOVE ARE CONSIDERED IN THE INDUSTRY TO BE

```
1    CAUTIONARY FOR THE REASON THAT EXTENDED EXPOSURE CAN CAUSE
2    DERMATITIS IN HUMAN BEINGS.
3    Q. WHAT IS THE PH RANGE THAT IS COMMONLY ACCEPTED IN YOUR
4    INDUSTRY AS BEING NONCAUSTIC IN TERMS OF NOT CAUSING DAMAGE
5    TO HUMAN SKIN?
6              MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AND
7    CALLS FOR HEARSAY.
8              THE COURT:  RESERVED.
9              THE WITNESS:  THE PH IN THE INDUSTRY OF ABOUT 5.5
10   TO ABOUT 8.5 IS CONSIDERED TO BE SAFE FOR HUMAN USE.
11   BY MR. CAPP:
12   Q. DOES THAT TAKE INTO ACCOUNT THE AMOUNT OF EXPOSURE THAT A
13   USER HAS DURING A DAY AND FROM DAY TO DAY?
14             MR. SCHAETZEL:  SAME OBJECTIONS.
15             THE COURT:  RESERVE RULING.
16             THE WITNESS:  YES.  IT DOES TAKE INTO ACCOUNT THE
17   FREQUENCY OF EXPOSURE TO THE PARTICULAR CHEMICAL.
18   BY MR. CAPP:
19   Q. WOULD YOU TELL THE COURT IN YOUR BUSINESS, IN YOUR
20   INDUSTRY, THE PEOPLE THAT USE YOUR PRODUCTS, WHAT IS THE
21   EXTENT OF EXPOSURE THAT THEY CAN HAVE OVER THE COURSE OF THE
22   DAY, AND THEN FROM DAY TO DAY OVER A WEEK OR A MONTH?
23             MR. SCHAETZEL:  SAME OBJECTION.
24             THE COURT:  RESERVE RULING.  YOU MAY ANSWER.
25             THE WITNESS:  I AM NOT REALLY SURE HOW TO ANSWER
```

```
1    THAT EXCEPT THAT OSHA, THE U.S. GOVERNMENT AGENCY THAT
2    MEASURES THINGS LIKE THAT AND CAUTIONS ABOUT HUMAN EXPOSURE
3    TO CERTAIN PRODUCTS WILL SUBJECT HUMAN SKIN OR RABBIT SKIN
4    OR WHATEVER THEY ARE USING THAT WEEK TO EXPOSURE BY THE
5    CHEMICAL FOR FOUR HOURS TO DETERMINE THAT IT IS HARMFUL.
6    BY MR. CAPP:
7    Q. HOW DOES THE RELATIVE DEGREE OF ALKALINITY CHANGE AS YOU
8    GO FROM A PH OF 8.5 TO A PH OF 9.5?
9            MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT
10   TRIAL.
11           THE COURT:  WHAT IS THE PURPOSE OF THAT QUESTION?
12   HOW DOES IT CHANGE?  I ONLY HAVE A GENERAL SENSE OF WHERE
13   YOU ARE GOING WITH THAT.  WHAT IS THE PURPOSE?
14           MR. CAPP:  I AM SORRY, YOUR HONOR, I DIDN'T DO MY
15   FULL-BLOWN OPENING STATEMENT.  THE KEY REFERENCE, IF MAYBE
16   WE CAN DO THIS -- IT MAY BE BENEFICIAL TO DO A SIDE BAR ON
17   THIS SO IT DOESN'T CREATE THE APPEARANCE THAT I AM TRYING TO
18   COACH THE WITNESS BY ANSWERING YOUR HONOR'S QUESTION IN THE
19   PRESENCE OF THE WITNESS.
20           THE COURT:  I DON'T NEED A SIDE BAR IN A BENCH
21   PROCEEDING, AND I WILL BE ABLE TO SENSE IF THE WITNESS NEEDS
22   AND RECEIVED COACHING.  PERHAPS YOU CAN JUST MAKE THE RECORD
23   AT THIS STAGE.  BUT I AM TROUBLED THAT WE ARE GETTING QUITE
24   A WAYS BEYOND WHAT IS NEEDED HERE AS ADDITIONAL EVIDENCE.
25           MR. CAPP:  THIS GOES RIGHT --
```

1            THE COURT:  IS THERE AN OBJECTION TO THIS?  I

2    THINK THERE WAS AN OBJECTION.

3            MR. SCHAETZEL:  YES, YOUR HONOR.

4            THE COURT:  WHAT IS THE NATURE OF THE OBJECTION?

5    SIMPLY THAT IT GOES BEYOND THE TRIAL RECORD?

6            MR. SCHAETZEL:  I BELIEVE THAT IS THE ONLY

7    OBJECTION I REGISTERED.  I WOULD HAVE TO HEAR THE QUESTION

8    READ BACK.  ALSO I THINK I SAID "SAME OBJECTIONS".  I AM NOT

9    CERTAIN, BUT I THOUGHT IT ALSO CALLED FOR HEARSAY.

10           THE COURT:  LET'S START WITH THE QUESTION AGAIN,

11   WE WILL HAVE AN OBJECTION, AND THEN WE WILL PROCEED.  I

12   DON'T WANT TO DELAY THIS UNDULY.  YOU MAY MAKE YOUR RECORD.

13   BUT I WAS NOT UNDERSTANDING THE PURPOSE.

14           MR. CAPP:  LET ME START BY EXPLAINING THE PURPOSE,

15   THEN I WILL ASK THE QUESTION.  ONE OF THE KEY REFERENCES

16   THAT WAS CITED BY THE EXAMINER DURING THE PROSECUTION

17   HISTORY OF THESE PATENTS WAS A REFERENCE THAT WAS REFERRED

18   TO THROUGHOUT THIS CASE AS HAKANSSAN 1.  IT IS CITED ON THE

19   CASE OF EVERY SINGLE PATENT.  WHEN WE WENT TO GET OUR PATENT

20   ON THE SAME PATENT APPLICATION, WE WENT OVER THE ATLANTIC

21   OCEAN AND WE GOT IT IN EUROPE, HAKANSSAN 1 WAS THE REFERENCE

22   THAT THE EUROPEAN PATENT OFFICE CONSIDERED WHEN TWO

23   COMPETITORS OF CHEMFREE CHALLENGED THE VALIDITY OF

24   CHEMFREE'S EUROPEAN PATENT.  IT HAS A VERY CLEAR TEACHING IN

25   THERE THAT THE RECOMMENDED PH TO BE USED IS BETWEEN 9.2 AND

1    9.5.  IT IS A CLOSED CABINET WASHER.  IT IS NOT ONE THAT IS

2    USED IN AN OPEN BASIN LIKE CHEMFREE'S IS.  AND SO NOW I AM

3    ASKING THE HIM A QUESTION ABOUT WHY DID HE CHOOSE NOT TO USE

4    A PH IN THE SAME RANGE THAT HAKANSSAN RECOMMENDED.

5              THE COURT:  AND NOW YOU MAY MAKE YOUR OBJECTION.

6              MR. SCHAETZEL:  THE OBJECTION IS THAT IT GOES

7    BEYOND THE SCOPE AT TRIAL, AND THE QUESTION IS WHY DID HE,

8    SO I DON'T HAVE A HEARSAY OBJECTION, WHY DID HE USE IT.

9    THAT WOULD BE OKAY.  BEYOND THE SCOPE AT TRIAL.

10             THE COURT:  AND I WILL RESERVE RULING, AND FOR

11   THAT PURPOSE YOU MAY ANSWER.

12             THE WITNESS:  THE QUESTION WAS, WHAT IS THE

13   DIFFERENCE IN -- WHAT IS THE DIFFERENCE IN PH BETWEEN 8.5

14   AND 9.5?  PH IS A LOGARITHMIC SCALE, SO EVERY TIME YOU GO UP

15   A TENTH, YOU ARE GOING UP TEN TIMES.  SO THE PH OF A

16   SUBSTANCE THAT IS 9.5, IS TEN TIMES -- CONTAINS TEN TIMES

17   THE HYDROXYL IONS THAT A SIMILAR SOLUTION WITH A PH OF 8.5

18   HAS.

19   BY MR. CAPP:

20   Q. AS THE GENERAL MANAGER OF A COMPANY THAT SELLS AQUEOUS

21   PARTS WASHERS, CAN YOU SAFELY RECOMMEND TO YOUR CUSTOMERS

22   THAT THEY CAN WASH PARTS IN A 9.5 PH SOLUTION WITHOUT USING

23   PROTECTIVE MEASURES LIKE GLOVES AND GOGGLES?

24             MR. SCHAETZEL:  OBJECTION.  GOES BEYOND THE SCOPE

25   AT TRIAL.

1          THE COURT:  I RESERVE RULING.  YOU MAY ANSWER.

2          THE WITNESS:  I WOULD NOT RECOMMEND THAT TO MY

3    CUSTOMERS.

4          MR. CAPP:  PULL UP JOINT EXHIBIT 15, PLEASE.  YOUR

5    HONOR, IF YOU ARE USING THE NOTEBOOK, WHAT I TRIED TO DO IS

6    I COMPILED THE JOINT EXHIBITS IN THE FRONT HALF OF THE

7    NOTEBOOK, AND THE ONES MARKED AS PLAINTIFF'S EXHIBITS AFTER

8    THAT.  TURN TO PAGE J2988.  WHAT IS THIS?

9          MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

10   TRIAL.

11         THE COURT:  RESERVE RULING.  YOU MAY ANSWER.

12         THE WITNESS:  THAT IS AN ARTICLE ABOUT

13   BIOREMEDIATION THAT WE SENT TO THE PATENT OFFICE WHEN WE

14   FILED OUR PATENT.

15   BY MR. CAPP:

16   Q. HOW DID THIS ARTICLE, HOW DID IT COME TO BE INCLUDED IN

17   THE PROSECUTION HISTORY OF YOUR PATENTS?

18         MR. SCHAETZEL:  OBJECTION.  LACK OF FOUNDATION AND

19   WELL BEYOND THE SCOPE AT TRIAL.

20         THE COURT:  RESERVE RULING.  YOU MAY ANSWER.

21         THE WITNESS:  I HAVE A VICE OF READING TOO MUCH,

22   AND I CAME ACROSS THIS ARTICLE IN 1993-94, SOMEWHERE IN THAT

23   NEIGHBORHOOD, AND I THOUGHT IT WOULD BE OF INTEREST BECAUSE

24   AT THE TIME BIOREMEDIATION MICROBES, ALL OF THAT SORT OF

25   THING, WAS ALMOST LIKE A BLACK ART.  IT WAS JUST NOT

1   WELL-KNOWN.

2   BY MR. CAPP:

3   Q. TIGHTEN UP ON THE BOTTOM SEVEN OR SO LINES OF THE BOTTOM

4   COLUMN.  I WOULD ASK YOU TO -- I WILL QUOTE, IN CONJUNCTION

5   WITH MICROBIAL GROWTH, PH MAY DECLINE IN RESPONSE TO THE

6   GENERATION OF ORGANIC ACIDS FROM METABOLIC ACTIVITY.

7           THE COURT:  YOU HAVE TO SLOW DOWN SO THE REPORTER

8   CAN TAKE EACH WORD.  IT'S A DIFFICULTY FOR REPORTERS, AND

9   THAT IS WHY I CAUTION WHEN YOU ARE READING, YOU DON'T

10  NECESSARILY HAVE TO THINK ABOUT WHAT YOU ARE READING, AND IT

11  GOES FASTER.  BUT IT CAN'T FOR THE REPORTER.  NOW YOU MAY

12  PROCEED.  AND I AM READING WHAT IS IN YELLOW.  YOU DON'T

13  REALLY NEED TO READ IT IN THE RECORD.  YOU HAVE REFERRED TO

14  IT FROM THIS EXHIBIT.

15          MR. CAPP:  ALL RIGHT.  MR. MCNALLY, IN DEVELOPING

16  YOUR INVENTION, DID YOU TEST ANY FLUIDS THAT HAD A PH OR 5

17  OR LESS?

18          MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

19  TRIAL.

20          THE COURT:  RESERVED.

21          THE WITNESS:  WE DID.

22  BY MR. CAPP:

23  Q. WHAT RESULTS DID YOU GET WITH FLUIDS AT A PH OF 5 OR

24  LESS?

25          MR. SCHAETZEL:  SAME OBJECTION.

1                  THE COURT:  RESERVED.

2                  THE WITNESS:  A PH OF 5 OR LESS WAS NOT HOSPITABLE

3      TO THE MICROBES.  WELL, COULD NOT GET THEM TO GROW VERY WELL

4      IN A PH 5 SOLUTION.

5      BY MR. CAPP:

6      Q. DID THE HICKS ARTICLE DISCOURAGE YOU FROM PURSUING THE

7      INVENTION?

8                  MR. SCHAETZEL:  SAME OBJECTION.

9                  THE COURT:  RESERVED.

10                 THE WITNESS:  IT DID NOT.

11     BY MR. CAPP:

12     A. WHY NOT?

13                 MR. SCHAETZEL:  SAME OBJECTION.

14                 THE COURT:  RESERVED.

15                 THE WITNESS:  WE HAD BEEN MONITORING THE PH OF OUR

16     TEST MACHINES, AND WE CONCLUDED THAT HICKS WAS PROBABLY, OR

17     HIPPS, WHATEVER HIS NAME WAS, WAS PROBABLY DOING THINGS AT A

18     BENCH TOP LEVEL.  BECAUSE WHEN YOU PUT 25 GALLONS OF FLUID

19     IN IT WITH A BUNCH OF MICROBES IN IT, THE ACTIVITY THAT

20     WOULD HAVE TO TAKE PLACE WOULD BE FAR GREATER TO LOWER THE

21     PH THAN WAS PRESENT IN A PARTS WASHER.

22     BY MR. CAPP:

23     Q. AFTER YOU STARTED USING SEAWASH 7 CLEANING FLUID AND LRC

24     MICROBES, DID YOU TEST THE PH OF THE FLUID PERIODICALLY?

25                 MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

```
 1    TRIAL.

 2              THE COURT:  RESERVED?

 3              THE WITNESS:  YES, WE DID.

 4    BY MR. CAPP:

 5    Q. HOW LONG DID SOME OF YOUR PARTS WASHERS STAY IN OPERATION

 6    WITHOUT UNDERGOING A COMPLETE FLUID REPLACEMENT?

 7              MR. SCHAETZEL:  SAME OBJECTION.

 8              THE COURT:  RESERVED.

 9              THE WITNESS:  DURING THE TRIAL PERIOD WE HAD

10    MACHINES THAT WOULD NOT REQUIRE CHANGING FLUID OUT FOR MORE

11    THAN A YEAR.

12    BY MR. CAPP:

13    Q. DID YOU MAKE ANY OBSERVATIONS OF THE STABILITY, THE PH OF

14    THE CLEANING FLUID, OVER TIME?

15              MR. SCHAETZEL:  SAME OBJECTION.

16              THE COURT:  RESERVED.

17              THE WITNESS:  YES.  IN THE TEST MACHINES, THE PH

18    WOULD STAY BETWEEN A 7 AND AN 8.

19    BY MR. CAPP:

20    Q. DID YOU FIND THERE WAS A NEED TO BUFFER THE CLEANING

21    FLUID BY ADDING AN ALKALINE CHEMICAL TO THE CLEANING FLUID

22    IN ORDER TO MAINTAIN THE PH WITHIN A STABLE RANGE?

23              MR. SCHAETZEL:  SAME OBJECTION.

24              THE COURT:  RESERVED.

25              THE WITNESS:  WE DID NOT ADD ANY BUFFERS OR ANY
```

1  OTHER CHEMICALS TO KEEP THE PH IN THE RANGE THAT WAS

2  REQUIRED.

3  BY MR. CAPP:

4  Q. ARE THERE STANDARDIZED TESTS IN THE PARTS WASHING

5  INDUSTRY TO TEST THE CLEANING EFFECTIVENESS OF THE FLUID?

6        MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE, AND

7  HEARSAY.

8        THE COURT:  RESERVED.

9        THE WITNESS:  YES, THERE ARE.

10  BY MR. CAPP:

11  Q. DID YOU TEST THE SEAWASH CLEANING FLUID OVER TIME TO

12  DETERMINE WHETHER IT LOST ITS CLEANING EFFECTIVENESS DUE TO

13  CONSUMPTION OF THE SURFACTANTS?

14  A. WE TESTED THE SEAWASH 7 CLEANING EFFICIENCY OVER TIME,

15  AND IT DID NOT DECREASE IN CLEANING EFFICIENCY.

16  Q. OTHER THAN ORGANIC CONTAMINANTS THAT ENTERED THE CLEANING

17  FLUID AS PARTS WERE CLEANED, DID YOU FIND THAT THERE WAS A

18  NEED TO PERIODICALLY ADD NUTRIENTS TO CLEANING FLUID IN

19  ORDER TO KEEP THE MICROBES BIOLOGICALLY ACTIVE?

20        MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

21  TRIAL.

22        THE COURT:  RESERVE RULING.

23        THE WITNESS:  WE WERE NOT REQUIRED TO ADD

24  NUTRIENTS.  THE HYDROCARBONS WASHED OFF OF PARTS SERVED AS

25  PLENTY OF FOOD FOR THE MICROBIAL COLONIES.

1    BY MR. CAPP:

2    Q. WILL YOU PULL UP JOINT EXHIBIT 1, WHICH IS THE 110

3    PATENT, AND TURN TO COLUMN 2, LINE 66 TO 67.  AND I WILL

4    READ THOSE TWO LINES INTO THE RECORD, AND I QUOTE, STILL

5    ANOTHER OBJECT OF THE PRESENT INVENTION IS TO PROVIDE A

6    CLEANING SYSTEM THAT DOES NOT HAVE A TOXIC EFFECT ON USERS,

7    CLOSED QUOTE.  THE QUESTION IS, WAS THE SEAWASH 7 CLEANING

8    FLUID DISCLOSED IN YOUR SPECIFICATION "NONTOXIC TO USERS"?

9    A. YES.  IT WAS SO NONTOXIC THAT WE HAD SALESPEOPLE THAT

10    WOULD OFFER TO DRINK IT IN TRADE SHOWS.

11    Q. ARE THERE SOME SO SURFACTANTS THAT ARE TOXIC TO HUMANS?

12          MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AND

13    CALLS FOR HEARSAY.

14          THE COURT:  RULING RESERVED.  YOU MAY ANSWER.

15          THE WITNESS:  YES.  SOME SURFACTANTS ARE TOXIC.

16    BY MR. CAPP:

17    Q. ARE THERE OTHER PROPERTIES OF CLEANING FLUIDS BESIDES PH

18    THAT CAN CAUSE SKIN IRRITATION?

19          MR. SCHAETZEL:  SAME OBJECTIONS.

20          THE COURT:  RESERVED.

21          THE WITNESS:  YES.  FOR EXAMPLE, IF A CLEANING

22    FLUID IS NOT WATER BASED, IT CAN'T HAVE A PH.  MINERAL

23    SPIRITS, FOR EXAMPLE, YOU CAN'T MEASURE THE PH, BUT IT IS

24    DEMONSTRABLY HARMFUL TO HUMAN SKIN.

25    BY MR. CAPP:

```
1    Q. LET'S TURN TO COLUMN 1 OF THE 110 PATENT, LINES 37 TO 42.

2    DO YOU SEE THERE IS A REFERENCE TO THE FACT THAT YOU HAVE TO

3    DISPOSE OF MINERAL SPIRITS IN GUIDELINES WITH VARIOUS

4    GOVERNMENTAL GUIDELINES AND REGULATIONS?

5    A. YES.

6               MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

7    TRIAL.

8               THE COURT:  WE DON'T HAVE THE QUESTION YET.

9    BY MR. CAPP:

10   Q. WHY DO YOU NEED TO PERIODICALLY REPLACE THE CLEANING

11   FLUID IN A PARTS WASHER?

12              MR. SCHAETZEL:  SAME OBJECTION.

13              THE COURT:  RESERVED.

14              THE WITNESS:  ALL CLEANING FLUIDS WORK BY

15   DISSOLVING WHATEVER HAS TO BE CLEANED OFF INTO ITSELF.  SO

16   THAT IS WHAT WE CALL CONTAMINANT LOAD.  THE MORE THAT IS

17   DISSOLVED INTO THE MINERAL SPIRITS OR ANY OTHER CLEANING

18   SUBSTANCE PRODUCT, THE MORE THE CONTAMINANT GETS IN THERE,

19   THE LESS EFFECTIVE CLEANING THERE IS.  SO OVER TIME, ONCE IT

20   IS FULLY LOADED YOU ARE NOT CLEANING ANYTHING ANYMORE, YOU

21   ARE SPREADING THE DIRT ON THE PART AGAIN.

22   BY MR. CAPP:

23   Q. IS THAT TRUE FOR JUST MINERAL SPIRITS, OR IS IT ALSO TRUE

24   OF PARTS WASHERS THAT USE WATER-BASED CLEANING FLUIDS?

25              MR. SCHAETZEL:  OBJECTION.
```

```
1              THE COURT:  RESERVED.
2              THE WITNESS:  IT IS TRUE OF ALL CLEANING FLUIDS,
3    INCLUDING AQUEOUS.
4    BY MR. CAPP:
5    Q. HOW DID MINERAL SPIRITS PARTS WASHERS COMPARE WITH
6    AQUEOUS PARTS WASHERS WHEN IT COMES TO CARRYING A
7    CONTAMINANT LOAD AND RETAINING CLEANING ABILITY --
8              MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE, AND
9    CALLS FOR HEARSAY.
10             THE COURT:  RULING IS RESERVED.  YOU MAY ANSWER.
11             THE WITNESS:  MINERAL SPIRITS CAN HOLD UP TO FOUR
12   TIMES THE CONTAMINANT LOAD OF WATER BASED FLUIDS.
13   BY MR. CAPP:
14   Q. DID YOU PERSONALLY OBSERVE THIS PHENOMENON WHEN WORKING
15   WITH YOUR EARLIER PROTOTYPES IN LATE 1993?
16             MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE.
17             THE COURT:  OVERRULED, OR RULING RESERVED.  AND
18   THE PURPOSE OF THIS IS THE SAME PURPOSE, TO ELABORATE ON
19   WHAT IS ALREADY IN THE RECORD?
20             MR. CAPP:  YES, YOUR HONOR.  MR. MCNALLY'S
21   DECLARATIONS IN THE ENABLEMENT SUMMARY JUDGMENT PROCEEDING,
22   WHICH THEY CROSS-EXAMINED HIM ON AT TRIAL, WAS PROBABLY IN
23   THE NEIGHBORHOOD OF 100 PAGES OF DECLARATION TESTIMONY, NOT
24   COUNTING EXHIBITS.  SO THIS GIVES AN OPPORTUNITY FOR YOUR
25   HONOR TO HEAR THE SAME TESTIMONY LIVE, AND IF THERE IS AN
```

1    ISSUE ABOUT CREDIBILITY, YOU CAN JUDGE HIS CREDIBILITY

2    TODAY.

3              THE COURT:  WELL, THAT'S A FAIRLY COMPLEX PURPOSE.

4    SO IS THERE AN ISSUE OF ENABLEMENT TODAY, MR. CAPP?

5              MR. CAPP:  I DON'T BELIEVE SO.  BUT THERE WAS --

6    THE TESTIMONY THAT CAME IN WAS CONSIDERED BY JUDGE CAMP.

7    AND IF YOU READ HIS RULING, IT IS CLEAR THAT HE HAD THE

8    EVIDENTIARY RECORD FROM THE ENABLEMENT SUMMARY JUDGMENT

9    PROCEEDING IN HIS MIND WHEN HE WAS RULING ON THE OBVIOUSNESS

10   QUESTION AT TRIAL.  I MEAN, THAT IS CRYSTAL CLEAR FROM

11   READING HIS RULING.

12             THE COURT:  FROM READING HIS RULING.

13             MR. CAPP:  FROM READING THE JUNE 18 DOCKET -- JUNE

14   18, 2009 DOCKET AT 619, HE REFERRED BACK TO THE ENABLEMENT

15   SUMMARY JUDGMENT PROCEEDING AS PART OF HIS SUPPORT FOR HIS

16   OBVIOUSNESS RULING.  SO MOST OF MR. SCHAETZEL'S OBJECTIONS

17   TODAY ABOUT BEING OUTSIDE OF THE RECORD IS ALL STUFF THAT

18   MR. MCNALLY HAD BEFORE JUDGE CAMP A FEW WEEKS BEFORE WE

19   COMMENCED THE TRIAL.  AND NO, WE DIDN'T COMPLETELY REPEAT

20   EVERYTHING, BECAUSE IT WAS ALREADY STILL FRESH IN THE

21   JUDGE'S MIND.

22             THE COURT:  AND YOUR PURPOSE FOR PUTTING IT IN FOR

23   THIS PROCEEDING IS AS A REFERENCE WHAT YOU CONTEND IS HIS

24   THINKING IN DECIDING THE CASE IN JUNE OF 2010?

25             MR. CAPP:  ABSOLUTELY.  MR. MCNALLY'S TESTIMONY,

1    DECLARATION TESTIMONY ON ENABLEMENT, IS STILL RELEVANT TO

2    THE OBVIOUSNESS ANALYSIS BECAUSE IT GOES INTO THE

3    UNPREDICTABILITY IN THE ART, IT GOES INTO HOW MUCH

4    EXPERIMENTATION WAS REQUIRED, WHAT TESTS DID HE PERFORM.

5    SO --

6            THE COURT:  I UNDERSTAND.  AND NOW I WILL GIVE

7    MR. SCHAETZEL THE OPPORTUNITY TO ELABORATE ON HIS OBJECTION

8    TO THIS MATTER.

9            MR. SCHAETZEL:  I DON'T PURPORT TO KNOW WHAT WAS

10   IN JUDGE CAMP'S MIND, SO I HAVE NO COMMENT ON THAT.  OUR

11   POSITION IS THAT THERE WAS A TRIAL, MR. MCNALLY WAS CALLED

12   AS A WITNESS, HE WAS CROSS-EXAMINED, IMPEACHED IF YOU WILL,

13   USING PRIOR SWORN TESTIMONY IN THE FORM OF DEPOSITIONS AND

14   AFFIDAVITS OR DECLARATIONS.  THOSE WERE NOT MADE A PART OF

15   THE RECORD.  THEY WERE NOT PART OF THE TRIAL RECORD AS A

16   RESULT.  SO WHEN WE REGISTER OUR OBJECTION THAT IT IS BEYOND

17   THE SCOPE, WE ARE TRYING TO PRESERVE THAT TRIAL RECORD.  AND

18   THIS QUESTION WAS NOT ONE THAT WAS ASKED AT TRIAL OF

19   MR. MCNALLY, AND SO THEREFORE WE REGISTER THE OBJECTION.

20           THE COURT:  I RESERVE RULING, AND YOU MAY ANSWER

21   IF YOU REMEMBER THE QUESTION FROM ABOUT FIVE MINUTES AGO.

22           THE WITNESS:  I DON'T REMEMBER THE QUESTION.

23   BY MR. CAPP:

24   Q. WE WERE DISCUSSING THE --

25           THE COURT:  JUST ASK THE QUESTION AGAIN OR HAVE IT

1    READ BACK, IF YOU WISH.

2    BY MR. CAPP:

3    Q. THE PHENOMENON OF CONTAMINANT LOAD, AND THE CARRYING

4    ABILITY OF THE MINERAL SPIRITS THROUGH FLUID VERSUS AN

5    AQUEOUS FLUID, DID YOU MAKE ANY PERSONAL OBSERVATIONS ABOUT

6    THE ABILITY OF AN AQUEOUS FLUID TO CARRY A CONTAMINANT LOAD

7    IN 1993?

8                MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

9    TRIAL.

10               THE COURT:  RESERVE RULING.  YOU MAY ANSWER.

11               THE WITNESS:  YES, WE DID OBSERVE HOW QUICKLY

12   AQUEOUS FLUIDS BECAME DIRTY.

13               MR. CAPP:  PULL UP EXHIBIT 75, PLEASE.  YOUR

14   HONOR, THIS IS ALREADY AT THE RECORD AS JOINT EXHIBIT 7 AT

15   PAGE 687, BUT IT IS A MUCH MORE LEGIBLE COPY.

16   BY MR. CAPP:

17   Q. ARE YOU FAMILIAR WITH THIS?

18   A. YES, I AM.

19   Q. HOW ARE YOU FAMILIAR?

20   A. THIS IS A COPY OF A EUROPEAN PATENT APPLICATION THAT WE

21   REFERRED TO AND HAVE BEEN REFERRING TO FOR THE LAST NUMBER

22   OF YEARS AS HAKANSSAN 1.  I FIRST SAW THIS WHEN WE FILED THE

23   PATENT WITH THE U.S. PATENT OFFICE, BUT THEN IN 2004 AND

24   2005 IT WAS BROUGHT UP BY A COUPLE OF COMPETITORS, POTENTIAL

25   COMPETITORS, IN EUROPE AS REASON WHY OUR EUROPEAN PATENTS

```
 1   SHOULD NOT BE ALLOWED.
 2   Q. DID YOU ATTEND THE TRIAL OF THE PROCEEDING IN EUROPE?
 3          MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT
 4   TRIAL.
 5          THE COURT:  RESERVE RULING.  YOU MAY ANSWER.
 6          THE WITNESS:  YES, I DID.
 7   BY MR. CAPP:
 8   Q. HAS THE OPPOSITION PROCEEDING BEEN CONCLUDED?
 9          MR. SCHAETZEL:  SAME OBJECTION.
10          THE COURT:  RESERVED.
11          THE WITNESS:  THE OPPOSITION PROCEEDING HAS BEEN
12   CONCLUDED.
13   BY MR. CAPP:
14   Q. DO YOU STILL RETAIN YOUR EUROPEAN PATENT?
15          MR. SCHAETZEL:  SAME OBJECTION.
16          THE COURT:  RESERVED.
17          THE WITNESS:  THE EUROPEAN PATENT OFFICE JUDICIARY
18   ORGANIZATION IN MUNICH, GERMANY HELD OUR PATENTS TO BE
19   VALID.
20   BY MR. CAPP:
21   Q. GO TO PAGE 2, PLEASE, LINES 2 TO 13, AND I WILL READ A
22   QUOTE INTO THE RECORD.  QUOTE, CONVENTIONAL DEGREASING OF
23   SUCH OBJECTS IS MORE OFTEN THAN NOT EFFECTED WITH A CAUSTIC
24   SODA SOLUTION OR LYE AT HIGH BATH TEMPERATURES, CLOSED
25   QUOTE.  MR. MCNALLY, WHAT PH WOULD YOU ASSOCIATE WITH A
```

1   CAUSTIC SODA SOLUTION OR LYE?

2           MR. SCHAETZEL:  OBJECTION.  GOES BEYOND THE SCOPE

3   AT TRIAL, AND IMPROPER FOUNDATION.  I DON'T UNDERSTAND HOW

4   THE QUESTION RELATES TO WHAT WAS JUST READ INTO THE RECORD.

5           THE COURT:  RESERVE RULING.  YOU MAY ANSWER.

6           THE WITNESS:  A PH OF 11 TO 14 IS CONSIDERED VERY

7   HIGH.

8   BY MR. CAPP:

9   Q. HAVE YOU HAD ANY PERSONAL EXPERIENCE -- LET ME START

10  OVER.  HAVE YOU HAD ANY PERSONAL EXPERIENCES THAT

11  CORROBORATE THAT AQUEOUS PARTS CLEANING, BEFORE YOUR DATE OF

12  INVENTION, WAS TYPICALLY DONE AT A PH OF 10 OR ABOVE?

13          MR. SCHAETZEL:  OBJECTION.  BEYOND THE BEYOND THE

14  SCOPE AT TRIAL AND ASSUMES FACTS NOT IN EVIDENCE.

15          THE COURT:  RESERVE RULING.  YOU MAY ANSWER.

16          THE WITNESS:  YES.

17  BY MR. CAPP:

18  Q. AND WOULD YOU EXPLAIN TO THE COURT YOUR PERSONAL

19  EXPERIENCES ON THIS SUBJECT?

20          MR. SCHAETZEL:  SAME OBJECTIONS.

21          THE COURT:  RESERVE RULING YOU MAY ANSWER.

22          THE WITNESS:  CHEMFREE CORPORATION DOES A LOT OF

23  WORK WITH THE MILITARY.  THE MILITARY HAS SPECIFICATIONS FOR

24  EVERYTHING, AND THERE IS A SPECIFICATION THAT WAS PUBLISHED

25  IN THE LATE 90'S -- EXCUSE ME, IN THE EARLY 50'S CALLED MIL

1    SPEC 29602.

2                    THE COURT:  I WOULD LIKE THAT REPEATED?

3                    THE WITNESS:  MILITARY SPECIFICATION, 29602.  THAT

4    SPEC WAS PURPORTED TO EVALUATE WATER BASED CLEANERS FOR USE

5    BY THE MILITARY.  THAT SPEC THAT THE PH OF CLEANING FLUIDS

6    FOR USE BY THE MILITARY BE 10 OR OVER.  IN THE EARLY 2000'S

7    WERE WORKED WITH THE MILITARY AT PATUXENT NAVAL AIR STATION

8    IN MARYLAND AND WE WERE ABLE TO HELP THEM REWRITE THAT

9    SPECIFICATION, AND IT IS NOW CALLED 29602-A.  AND THAT

10   SPECIFICATION ALLOWS THE USE OF PH NEUTRAL FLUIDS WITH

11   MILITARY GEAR, IF YOU WILL.

12   BY MR. CAPP:

13   Q. A.J., WOULD YOU HIGHLIGHT LINES 35 TO 38 IN PAGE 2 OF

14   PLAINTIFF'S EXHIBIT 75.  AND I WILL QUOTE, PRIOR TO THIS

15   INVENTION, THE USE OF TENSIDES HAS BEEN PROHIBITED BY THE

16   FACT THAT THEIR DEGREASING ABILITY FALLS OFF RAPIDLY WITH

17   INCREASING OIL LEVELS, THEREBY NECESSITATING QUICK

18   REPLENISHMENT OF THE TENSIDES.  BECAUSE OF THE TENSIDE COSTS

19   INCURRED HEREBY, SUCH REPLENISHMENT HAS RENDERED THE PROCESS

20   HIGHLY EXPENSIVE, CLOSED QUOTE.

21        MY QUESTION FOR YOU IS, AT THE TIME OF YOUR INVENTION,

22   HOW QUICKLY WOULD A PH NEUTRAL CLEANING FLUID LOSE ITS

23   CLEANING EFFECTIVENESS DUE TO CONTAMINANT LOAD?

24                    MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

25   TRIAL AND IMPROPER FOUNDATION.

1            THE COURT:  RESERVE RULING, AND YOU MAY ANSWER.

2            THE WITNESS:  I EARLIER TESTIFIED, MENTIONED, THAT

3    MINERAL SPIRITS HOLD FOUR TIMES THE CONTAMINANT LOAD THAT

4    AQUEOUS FLUIDS DO, SO THEREFORE AN AQUEOUS FLUID WOULD

5    BECOME DIRTY AND HAVE TO BE REPLENISHED, REPLACED, MORE

6    OFTEN.  FOUR TIMES MORE RAPIDLY THAN MINERAL SPIRITS.

7    BY MR. CAPP:

8    Q. WHAT WAS THE STANDARD TURN AROUND TIME FOR MINERAL

9    SPIRITS PARTS WASHERS AT THE TIME OF YOUR INVENTION?

10            MR. SCHAETZEL:  SAME OBJECTION, BEYOND THE SCOPE,

11    AND CALLS FOR HEARSAY.

12            THE COURT:  RESERVE RULING.

13            THE WITNESS:  AT THE TIME OF THE INVENTION, THE

14    PRINCIPAL PRACTITIONER OF THE ART, WHICH WOULD BE

15    SAFETY-KLEEN, THE GENERAL CLEANING CYCLE, THEY WOULD CHANGE

16    OUT THE FLUID EVERY FOUR TO FIVE WEEKS.

17    BY MR. CAPP:

18    Q. ALL RIGHT.  SO IF YOU REPLACE THAT FLUID, THE MINERAL

19    SPIRITS FLUID, AND REPLACE IT WHEN YOU HAD A FULL

20    CONTAMINANT LOAD, WHAT WOULD THE TURN AROUND TIME BE FOR AN

21    AQUEOUS FLUID?

22            MR. SCHAETZEL:  SAME OBJECTIONS.

23            THE COURT:  RESERVE RULING.

24            THE WITNESS:  IF YOU CLEAN THE SAME AMOUNT OF

25    PARTS IN A MINERAL BASED FLOOD AS YOU DID IN A HYDROCARBON

1    FLUID, AND IF YOU TAKE THAT MINERAL SPIRITS ARE REPLACED

2    EVERY FOUR TO FIVE WEEKS AND WATER BASED FLUIDS CAN ONLY

3    HOLD A QUARTER OF WHAT THE HYDROCARBON CLEANERS CAN, YOU

4    WOULD HAVE TO REPLACE THE WATER BASED FLUID APPROXIMATELY

5    EVERY WEEK.

6    BY MR. CAPP:

7    Q. GIVEN THE COST OF SURFACTANTS AS REPLACEMENT OF AQUEOUS

8    CLEANING FLUID CONTAINING SURFACTANTS ON A WEEKLY BASIS

9    ACCEPTABLE TO THE MARKET IN 1994?

10             MR. SCHAETZEL:  SAME OBJECTIONS.

11             THE COURT:  RESERVED RULING.  YOU MAY ANSWER.

12             THE WITNESS:  IT IS COMPLETELY UNACCEPTABLE.  IT

13   WOULD BE PROHIBITIVELY EXPENSIVE TO REPLACE YOUR CLEANING

14   FLUID EVERY WEEK.

15   BY MR. CAPP:

16   Q. GIVE THE JUDGE A COST ESTIMATE OF BOTH REPLACEMENT AND

17   DISPOSAL OF THE USE FLUID.

18             MR. SCHAETZEL:  SAME OBJECTIONS.

19             THE COURT:  RESERVE RULING.

20             THE WITNESS:  IT COULD BE AS MUCH AS $300 TO $400

21   IF YOU REPLACE THE FLUID ENTIRELY.  THAT IS JUST THE

22   REPLACEMENT COST OF THE FLUID.  AND THEN HAULING AND

23   DISPOSING OF IT PROPERLY IN ACCORDANCE WITH ALL OF THE U.S.

24   GOVERNMENT REGULATIONS, EVEN IF IT IS JUST GRAY WATER RATHER

25   THAN CONTAMINATED MINERAL SPIRITS, COULD ADD HUNDREDS OF

1   DOLLARS TO THAT COST.

2   BY MR. CAPP:

3   Q. SO WHAT WOULD IT COST ON AN ANNUAL BASIS?

4   A. OH MY GOODNESS, IT WOULD BE --

5          MR. SCHAETZEL:  OBJECTION.

6          THE WITNESS:  IN EXCESS OF $20,000 FOR EVERY PART

7   CLEANER.

8          THE COURT:  THE OBJECTION AND MY RESERVING RULING

9   PRECEDE THE ANSWER, AS COUNSEL DIDN'T HAVE TIME TO OBJECT

10  BEFORE THE ANSWER BEGAN.  LET ME PAUSE FOR A MOMENT AND GO

11  OFF THE RECORD.

12                    (OFF THE RECORD.)

13  BY MR. CAPP:

14  Q. MR. MCNALLY, TO YOUR KNOWLEDGE, WAS THERE ANYONE IN THE

15  MARKETPLACE USING A PH NEUTRAL CLEANING FLUID IN A PARTS

16  WASHER PRIOR TO YOUR DATE OF INVENTION, EARLY 1994?

17         MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

18  TRIAL.

19         THE COURT:  RESERVE RULING.  YOU MAY ANSWER.

20         THE WITNESS:  TO THE BEST OF MY KNOWLEDGE, IN 1994

21  NO ONE WAS USING A PH NEUTRAL AQUEOUS BASED CLEANER.

22  BY MR. CAPP:

23  Q. A.J. PULL UP THE ORDER, DOCKET 619, JUDGE CAMP'S ORDER

24  THAT INVALIDATED ALL 21 PATENT CLAIMS.  TURN TO PAGE 53.

25  WOULD YOU HIGHLIGHT ABOUT TWO/THIRDS OF THE WAY DOWN THE

1    PAGE.  AND I WILL QUOTE, STARTING WITH THE WORD "INDEED."  I

2    QUOTE, INDEED, CHEMFREE'S OWN FEBRUARY 16, 1994 STATUS

3    REPORT INDICATES THAT AS OF THAT DATE AT LEAST THREE OF THE

4    COMPANY'S COMPETITORS WERE DEVELOPING ENVIRONMENTALLY BENIGN

5    MACHINES.  AND THEN THERE IS A REFERENCE TO PLAINTIFF'S

6    EXHIBIT 527.  DO YOU SEE THAT?

7    A. YES, I DO.

8    Q. ALL RIGHT.  WOULD YOU TURN TO PLAINTIFF'S EXHIBIT 527,

9    PLEASE.

10   A. YES, SIR.

11   Q. ARE YOU PERSONALLY FAMILIAR WITH THIS EXHIBIT?

12   A. YES, IT'S A MEMO THAT I ALSO CO-AUTHORED.

13            MR. SCHAETZEL:  OBJECTION, YOUR HONOR.  BEFORE WE

14   GET ANY FURTHER IN THIS, I THINK THIS IS ANOTHER EXHIBIT

15   THAT WAS NOT SHOWN TO THIS WITNESS AT TRIAL, AND SO WE WILL

16   JUST OBJECT TO ALL QUESTIONS POSED TO THIS WITNESS THAT ARE

17   DIRECTED TO THIS EXHIBIT.

18            THE COURT:  YOU SAY IT WASN'T SHOWN TO THE

19   WITNESS, BUT WAS IT IN THE RECORD AT THE TIME?

20            MR. SCHAETZEL:  YOUR HONOR, I ONLY BROUGHT MY

21   RECORDS FOR MR. MCNALLY, AND I DON'T KNOW THE ANSWER TO

22   THAT.  I APOLOGIZE.

23            THE COURT:  ALL RIGHT.

24            MR. CAPP:  JUDGE CAMP CITED TO IT IN HIS ORDER,

25   YOUR HONOR.

1            THE COURT:  THAT DOESN'T ANSWER MY QUESTION.  HE

2    MAY HAVE CITED TO SOMETHING THAT WAS IN RECORD OF THE CASE

3    BUT NOT AT TRIAL.  WHAT I WONDER IS WHETHER THERE, BECAUSE

4    THE OBJECTION WAS THAT THIS WAS NOT USED AT TRIAL, MY

5    QUESTION IS WHETHER YOU KNOW, MR. CAPP, WHETHER THIS WAS A

6    DOCUMENT PRESENTED AT TRIAL AND USED WITH MR. MCNALLY.  WE

7    CAN ALL GO BACK AND CHECK IT, BUT I THOUGHT RIGHT NOW IT

8    WOULD HELP IF I KNEW.

9            MR. CAPP:  I BELIEVE THAT IT WAS, BUT I WOULDN'T

10   STATE MY NEXT PAYCHECK ON IT, YOUR HONOR.

11           THE COURT:  WELL, THEN WHAT WILL BE THE SIZE OF

12   YOUR NEXT PAYCHECK?  WELL, I WILL STRIKE THAT AS IRRELEVANT.

13   BUT BEING NOW A RESIDENT OF NEVADA, I ALWAYS LOOK AT PEOPLE

14   WHO ARE STAKING MONEY, AND SO THAT'S -- NOW I STRIKE FROM

15   THE RECORD EVERYTHING THAT I JUST SAID, BUT IT WILL STAY IN

16   THE RECORD FOR PURPOSES OF APPEAL.  BUT I WILL NOW RESERVE

17   RULING, I WILL HAVE TO DOUBLE-CHECK TO SEE HOW, IF AT ALL,

18   THIS WAS USED AT TRIAL.  YOU MAY NOW ANSWER THE QUESTION,

19   WHICH IS THE EXTENT TO WHICH YOU HAD KNOWLEDGE OF EXHIBIT

20   527.  YOU ARE ACQUAINTED WITH IT?

21           THE WITNESS:  YES, I AM.

22           THE COURT:  SUBJECT TO THE OBJECTION NOW, YOU MAY

23   ASK FURTHER QUESTIONS.

24   BY MR. CAPP:

25   Q. ALL RIGHT.  TURN TO PAGE CHEM 155 PARAGRAPH E.  IF YOU

1    COULD HIGHLIGHT THAT, A. J.

2            THE COURT:  WE ARE BACK TO EXHIBIT 55?

3            MR. CAPP:  THIS IS PLAINTIFF'S EXHIBIT 527.

4            THE COURT:  SORRY, 527.

5            MR. CAPP:  AND THIS IS THE EXHIBIT THAT JUDGE CAMP

6    CITED IN HIS ORDER AT PAGE 53.

7            THE COURT:  RIGHT.  OKAY.

8            MR. CAPP;  THIS IS THE PORTION THAT HE WAS

9    REFERRING TO.

10            THE COURT:  IT IS LISTED AS CHEM 155 AT THE

11    BOTTOM.

12            MR. CAPP:  THAT IS THE BATES PAGE NUMBER, YOUR

13    HONOR.

14            THE COURT:  CONTINUE.

15    BY MR. CAPP:

16    Q. YOU SEE IN PARAGRAPH E, IT MENTIONS SAFETY-KLEEN AND TWO

17    OTHER COMPANIES THAT WERE TRYING TO COME UP WITH AN

18    ENVIRONMENTALLY BENIGN MACHINE?

19    A. YES, SIR, I SEE THAT.

20    Q. AS A CO-AUTHOR OF THIS DOCUMENT, DOES THE TERM

21    ENVIRONMENTALLY BENIGN MEAN THAT THEY WERE DEVELOPING PARTS

22    WASHERS THAT BIOREMEDIATE THE CONTAMINANTS SIMILAR TO THE

23    WAY IT WAS DONE IN YOUR INVENTION?

24            MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

25    TRIAL.

1              THE COURT:  RESERVED.  YOU MAY ANSWER.

2              THE WITNESS:  NO, IT DOES NOT.

3    BY MR. CAPP:

4    Q. WHAT DID YOU MEAN BY USING THE PHRASE ENVIRONMENTALLY

5    BENIGN?

6    A. I BELIEVE IT STATES THAT PARAGRAPH THAT SAFETY-KLEEN AND

7    NCH AND AT LEAST ONE OTHER FIRM ARE INVESTIGATING WATER

8    BASED CLEANERS.

9    Q. DO YOU KEEP TABS ON SAFETY-KLEEN AS A COMPETITOR?

10             MR. SCHAETZEL:  OBJECTION.  BEYOND THE SCOPE AT

11   TRIAL.

12             THE COURT:  RESERVE RULING.  YOU MAY ANSWER.

13             THE WITNESS:  YES.  WE KEEP TABS ON SAFETY-KLEEN.

14   BY MR. CAPP:

15   Q. TO YOUR KNOWLEDGE, HAS SAFETY-KLEEN EVER COMMERCIALIZED

16   THE PARTS WASHER THAT HAS A BIOREMEDIATION CAPABILITY?

17   A. NO, THEY HAVE NOT.

18   Q. HOW ABOUT THE OTHER TWO COMPETITORS MENTIONED IN THIS

19   PARAGRAPH?

20             MR. SCHAETZEL:  SAME OBJECTION.

21             THE COURT:  RESERVE RULING.  YOU MAY ANSWER.

22             THE WITNESS:  WE DON'T EVEN RECOGNIZE THE NAMES IN

23   THE INDUSTRY ANYMORE.

24             MR. CAPP:  YOUR HONOR, AT THIS TIME, BEFORE I PASS

25   THE WITNESS, I WANTED TO ATTEMPT TO REINTRODUCE AN EXHIBIT

1   THAT WAS EXCLUDED BY JUDGE CAMP ON A MOTION IN LIMINE, AND I

2   WANT TO ASK THE COURT TO RECONSIDER THE EXCLUSION RULING OR,

3   ALTERNATIVELY, MAKE AN OFFER OF PROOF.

4              THE COURT:  OBJECTION?

5              MR. SCHAETZEL:  I DON'T NOW WHAT THE DOCUMENT IS

6   YET, YOUR HONOR.

7              MR. CAPP:  IT IS PLAINTIFF'S EXHIBIT 22.

8              THE COURT:  ALL RIGHT.  PLAINTIFF'S EXHIBIT 22 IS

9   TENDERED.  IS THERE AN OBJECTION?

10             MR. SCHAETZEL:  YES, YOUR HONOR, THERE IS.

11             THE COURT:  YOU MAY STATE IT.

12             MR. SCHAETZEL:  YOUR HONOR, THIS SPECIFIC DOCUMENT

13  WAS THE SUBJECT OF A MOTION IN LIMINE THAT WAS FILED BY THE

14  DEFENDANTS IN THIS CASE, AND THE COURT DID EXCLUDE THE

15  DOCUMENT.  IT IS FIRST OF ALL, OBVIOUSLY, A HEARSAY

16  DOCUMENT, IT IS A STATEMENT BY AN EXAMINER AT THE PATENT

17  OFFICE.  MOREOVER, IT IS A STATEMENT BY AN EXAMINER AT THE

18  PATENT OFFICE THAT WAS NOT MADE IN THE PROSECUTION OF ANY OF

19  THE PATENTS THAT ARE NOW AT ISSUE BEFORE THE COURT.  IN

20  PATENT PRACTICE, IT IS PERMISSIBLE TO FILE WHAT ARE KNOWN AS

21  CONTINUATION APPLICATIONS.  AND THE PATENTS AT ISSUE IN THIS

22  CASE ISSUED, AND IN LATER APPLICATIONS, IN CONTINUATION

23  APPLICATIONS, THIS STATEMENT WAS MADE.  AND SO THE HEARSAY

24  STATEMENT FROM THE EXAMINER IS BEING OFFERED ESSENTIALLY FOR

25  THE PROOF OF THE STATEMENT, WHICH WAS THEY WANT THE COURT TO

```
1    ADOPT THE POSITION HERE -- SORRY, I WILL HAVE TO LOOK FOR A
2    SECOND FOR THE EXACT LANGUAGE.  AND I PRESUME MR. CAPP WILL
3    ADDRESS THAT IN A SECOND AS WELL, BUT WHAT PLAINTIFF IS
4    ASKING IS THAT THE EXAMINER'S STATEMENT BE TAKEN AS, IF YOU
5    WILL, FACE VALUE.  AND FOR THOSE REASONS AND I WILL HAVE TO
6    GO PULL THE DECISION ON THE MOTION IN LIMINE, THE COURT
7    EXCLUDED IT BEFORE, AND I DON'T THINK THEY WOULD BE PROPERLY
8    ACCEPTED NOW.
9              MR. CAPP:  I WOULD LIKE TO RESPOND BRIEFLY.
10             THE COURT:  I HAVE HEARD THE OBJECTION TO THE USE
11   OF PLAINTIFF'S EXHIBIT 22.  YOU MAY NOW STATE THE PURPOSE OF
12   USING IT.  YOU ALSO DID THAT EARLIER, BUT I WOULD LIKE IT
13   FOCUSED ON WHAT HAS BEEN OBJECTED TO.
14             MR. CAPP:  WELL, ACTUALLY THERE IS MY RECOLLECTION
15   OF WHAT HAPPENED AT THE TIME OF THE PRETRIAL CONFERENCE WHEN
16   THE MOTION WAS GRANTED, IS THE CONCERN WAS THAT IT WAS
17   BEING -- THERE WAS A HEARSAY OBJECTION IN THE SENSE THAT IT
18   MIGHT HAVE BEEN OFFERED FOR THE TRUTH OF THE MATTER
19   ASSERTED.  AND ON THOSE TENANTS JUDGE CAMP GRANTED THE
20   MOTION IN LIMINE.  HOWEVER, AND I CITE THIS IN GREAT DETAIL
21   IN THE PROPOSED ORDER THAT I GAVE YOUR HONOR.  ONCE WE GOT
22   TO TRIAL, AND DR. DURKEE WAS ON THE STAND, WE HAD A SIDE BAR
23   CONFERENCE WHICH WAS RECORDED.  AND AT THAT TIME WE
24   DISCUSSED WHETHER OR NOT THIS PARTICULAR EXAMINER INTERVIEW
25   SUMMARY COULD COME IN, NOT NECESSARILY FOR THE TRUTH OF THE
```

1    MATTER ASSERTED, BUT FOR INFORMATION THAT AN EXPERT WITNESS

2    COULD PROPERLY RELY ON IN FORMING HIS OPINION AND

3    CONCLUSION.  AND IF YOU LOOK AT JUDGE CAMP'S REMARKS AT THE

4    END OF THAT SIDE BAR CONFERENCE, HE THOUGHT -- HE SAID THAT

5    IT WOULD BE ADMISSIBLE FOR THAT PURPOSE.

6         NOW, THE WAY THIS CAME INTO THE RECORD WAS,

7    DR. DURKEE'S DIRECT EXAMINATION WAS PRESENTED IN DECLARATION

8    FORM THROUGH HIS SWORN EXPERT REPORTS WHERE THE RELEVANT

9    PASSAGE OF THIS WERE QUOTED REPEATEDLY THAT HE RELIED ON

10   THOSE QUOTES IN FORMING HIS OPINION AND CONCLUSION.  SO IN

11   THAT SENSE IT IS ALREADY IN THE RECORD.

12        NOW THAT WE ARE HERE, ONE OF THE THINGS THAT I

13   ASKED FOR IN MY MOTIONS WAS A PARTIAL NEW TRIAL, IF WE NEED

14   IT, SO THAT THE COURT CAN RE-OPEN THE MARKMAN HEARING AND

15   RECONSTRUE THE TERM "NONCAUSTIC" IN AN ADVERSARIAL SETTING.

16   BECAUSE THE WAY "NONCAUSTIC" CAME THROUGH MARKMAN, IT CAME

17   THROUGH WITH A STIPULATED CONSTRUCTION.  BUT THEN WHEN WE

18   GOT INTO TRIAL OR ARGUING THE CASE AFTER TRIAL, THE PARTIES

19   DIVERGED ON WHAT THEY THOUGHT THEIR STIPULATED MEANING

20   MEANT.  SO IF THERE WAS NO MEETING OF THE MINDS SUCH THAT

21   THERE IS AN AMBIGUITY, THAT NEEDS TO BE RESOLVED AT THIS

22   POINT.  NOW WHAT I AM ADDITIONALLY TENDERING THIS EXHIBIT

23   FOR IS THIS IS PROSECUTION HISTORY OF A CONTINUATION

24   APPLICATION WHICH IS RELEVANT TO THE COURT TO CONSTRUE THIS

25   TERM IN AN ADVERSARIAL CONTEXT.  AND THE CASE LAW, AND I

1    CITE IT IN THE PROPOSED ORDER I GAVE YOU, IS THAT WHEN YOU

2    HAD THESE CONTINUATION APPLICATIONS LIKE MR. SCHAETZEL WAS

3    REFERRING TO, THE PROSECUTION HISTORY IN THOSE CONTINUATION

4    APPLICATIONS IS RELEVANT AND CAN BE CONSIDERED IN CONSTRUING

5    TERMS OF AN EARLIER PATENT.  AND THE POINT THAT WE HAVE HERE

6    IS SEPARATE AND APART FROM WHETHER IT IS ADMITTED FOR THE

7    TRUTH OF THE MATTER ASSERTED, IT IS PART OF THE UNDISPUTED

8    PUBLIC RECORD OF THESE PATENTS WHICH, ACCORDING TO A LONG

9    LINE OF CASES FROM THE FEDERAL CIRCUIT, FROM SOUTHWALL TO

10   THE NETRONICS DOWN THROUGH PHILLIPS, OVER AND OVER AGAIN,

11   TALKS ABOUT THE PROSECUTION HISTORY BEING THE UNDISPUTED

12   PUBLIC RECORDS THAT COMPETITORS ARE SUPPOSED TO READ AND

13   RELY ON IN MAKING A DECISION EITHER TO GO TO THE PATENTEE

14   AND TAKE A LICENSE, OR TO TRY AND DESIGN AROUND THE PATENT

15   AND STAY IN THE MARKETPLACE IN A NONINFRINGING MANNER.  AND

16   THIS DOCUMENT, FOR NOTHING ELSE, IS RELEVANT FOR THAT

17   PURPOSE.  AND IT'S ALSO RELEVANT IN THE SENSE THAT OUR

18   EXPERT, DR. DURKEE, CONSIDERED AND RELIED ON THIS IN FORMING

19   HIS OPINION AND CONCLUSION.  SO WHAT I AM TRYING TO DO RIGHT

20   NOW IS OFFER PLAINTIFF'S EXHIBIT 22 INTO EVIDENCE.  AND IF

21   THE HEARSAY OBJECTION IS SUSTAINED AT LEAST FOR THE COURT TO

22   ADMIT IT FOR PURPOSES OF CONTINUING MARKMAN CONSTRUCTION,

23   SEPARATE AND APART FROM THE TRUTH OF THE MATTER ASSERTED.

24   SIMPLY FOR THE FACT THAT IT'S PART OF THE UNDISPUTED PUBLIC

25   RECORD OF THESE PATENTS THAT REFLECTS ON CLAIM CONSTRUCTION.

1          THE COURT:  ANY FURTHER ELABORATION ON YOUR

2    OBJECTION?  BECAUSE WE ARE ALMOST INTO THE SUBSTANCE OF ONE

3    OF THE ISSUES IN THE PENDING MOTIONS, AND WE ARE STILL HERE

4    ON WHETHER TO ALLOW THIS IN EVIDENCE.  BUT YOU MAY ELABORATE

5    IF YOU WISH.

6          MR. SCHAETZEL:  VERY BRIEFLY, YOUR HONOR.  WHILE

7    THE POINT THAT WAS MADE RELATE -- I DO NOT RECALL THE EXACT

8    OUTCOME OF THE SIDE BAR RELATED TO DR. DURKEE, BUT I DO KNOW

9    THIS:  THAT IT DID NOT COME INTO EVIDENCE AT TRIAL.  SO

10   WHATEVER THE OUTCOME OF THAT CONVERSATION, IT'S NOT BEING

11   OFFERED, NOT THROUGH DR. DURKEE, BUT EVIDENTLY THROUGH

12   MR. MCNALLY, WHICH DOESN'T SEEM APPROPRIATE IF THE BASIS FOR

13   IT IS THAT IT WAS SOMETHING THAT COULD HAVE COME IN THROUGH

14   DR. DURKEE, THE EXPERT.  SECONDLY, THAT THE TIMING OF ALL OF

15   THIS, AND I DON'T WANT TO GET INTO -- I MEAN, I STILL

16   BELIEVE THAT THERE IS -- I DON'T WANT TO GET INTO ARGUMENT

17   ON THE SUBSTANCE, BUT AS TO THIS DOCUMENT, IF WHAT WE ARE

18   DOING HERE AND WAS BEING ASKED IS THAT WE RECONSIDER THE

19   COURT'S DECISION TO EXCLUDE IT IN REFERENCE TO OUR MOTION IN

20   LIMINE, AND IN ORDER TO DO THAT THERE IS A VERY HIGH

21   STANDARD FOR RECONSIDERATION.  AND SIMPLY SAYING THAT, WELL,

22   IF IT'S NOT GOING -- I WANT TO HAVE IT IN FOR THE PURPOSE OF

23   BEING ABLE TO ARGUE AT A HEARING THAT WE HAVE NOT YET

24   SCHEDULED ON MARKMAN, IT DOESN'T GET TO THAT HIGH STANDARD

25   OF REQUESTING A RECONSIDERATION OF GETTING A DOCUMENT IN.

1     SO WE THINK IT FAILS ON ITS MERITS AS WELL.

2              THE COURT:  I RESERVE RULING.  YOU MAY COMPLETE

3     YOUR RECORD WITH EXHIBIT 22.  BUT I TAKE IT, AS ESTABLISHED

4     SO FAR, THAT IT WAS NOT IN AS A SUBSTANTIVE EXHIBIT AT

5     TRIAL, AND YOU MAY HAVE THE WITNESS ANSWER QUESTIONS

6     CONCERNING IT.

7              MR. CAPP:  YOUR HONOR, I DON'T HAVE ANY FURTHER

8     QUESTIONS FOR THE WITNESS ON THIS, AS LONG AS I UNDERSTAND

9     THAT IT'S AT LEAST TENDERED INTO THE RECORD

10             THE COURT:  IT IS.  IT IS RECEIVED SUBJECTED TO

11    THE OBJECTION, AND SUBJECT TO THE PURPOSE, AND I HAVE

12    UNDERSTOOD EVERYTHING, ALTHOUGH I WANT TO GO BACK AND

13    DOUBLE-CHECK JUST WHAT WAS SAID AT THE SIDE BAR.  BUT AT

14    THIS POINT I FIND, BASED ON WHAT BOTH OF YOU PRESENTED, THAT

15    IT WAS NOT PART OF THE TRIAL SUBSTANTIVE EVIDENCE.

16             AND NOW YOU MAY CONTINUE WITH YOUR QUESTIONS FOR

17    MR. MCNALLY.

18             MR. CAPP:  ACTUALLY I WOULD LIKE TO CLEAR UP A

19    MISCONCEPTION OF THE COURT ON THAT.  THE DOCUMENTS ITSELF

20    WAS NOT SEPARATELY ADMITTED AS AN EXPERT.  DR. DURKEE'S

21    DECLARATION TESTIMONY WAS ADMITTED, AND HE --

22             A.J., TURN TO PAGE 2, THE NEXT PAGE AFTER THAT,

23    AND FOCUS IN ON THE TOP 7 LINES OF TEXT.

24             THIS PART, YOUR HONOR, WAS QUOTED EXTENSIVELY IN

25    DR. DURKEE'S DECLARATION.  I THINK HE QUOTED IT MAYBE AS

1    MANY AS TEN TIMES IN HIS DECLARATION, AND THIS WAS THE

2    SUBJECT OF THE SIDE BAR WITH JUDGE CAMP.  AND THERE IS THE

3    PASSAGE THAT IS QUOTED IN HIS EXPERT REPORT, AND I QUOTE,

4    "IT WAS NOTED BY THE EXAMINER THAT WIPO 314 AND EPO 342" --

5    AND FOR YOUR HONOR'S BENEFIT, THOSE TWO REFERENCES ARE WHAT

6    WE REFER TO IN THE CASE AS THE HAKANSSAN 1 AND THE

7    HAKANSSAN 2 REFERENCES.  WIPO IS HAKANSSAN 2, EPO IS

8    HAKANSSAN 1.  I WILL CONTINUE MY QUOTATION.  I QUOTE,

9    "--FAIL TO SPECIFICALLY OR INHERENTLY DISCLOSE IN A PARTS

10   WASHER A FLUID THAT IS BIODEGRADABLE, NONTOXIC, NONCAUSTIC,

11   NONFLAMMABLE OIL DISPERSANT CLEANER AND DEGREASER.  WIPO 314

12   AND EPO 342 FAIL TO SPECIFICALLY OR INHERENTLY TEACH THE

13   SAME EVEN THOUGH EMPLOYING WATER."  ACTUALLY I WILL END MY

14   QUOTATION THERE.  THAT IS THE MOST IMPORTANT PART.  SO THAT

15   PART IS ALREADY IN THE RECORD AS PART OF DR. DURKEE'S

16   DECLARATION TESTIMONY FROM TRIAL, YOUR HONOR.

17             THE COURT:  THAT QUOTED PART, BUT NOT THE ENTIRE

18   EXHIBIT?

19             MR. CAPP:  CORRECT, YOUR HONOR.

20             THE COURT:  I UNDERSTAND.  CONTINUE.

21             MR. CAPP:  I AM SORRY, SEPARATE AND APART FROM

22   THAT, THIS DOCUMENT DID COME INTO THE RECORD IN THE CASE

23   WHEN WE HAD THE INEQUITABLE CONDUCT SUMMARY JUDGMENT

24   PROCEEDING.

25             THE COURT:  I AM SPEAKING TO TRIAL.  IF I LOOKED

1    AT ALL OF THE EXHIBITS THAT WERE RECEIVED AT TRIAL, NOT

2    PORTIONS THAT MAY HAVE BEEN QUOTED, IS EXHIBIT 22 IN

3    EVIDENCE?

4            MR. CAPP:  IT'S NOT IN EVIDENCE IN THE TRIAL

5    TRANSCRIPT, IN THE EXHIBITS TENDERED AT TRIAL.  IT IS IN THE

6    RECORD.  THE ENTIRE EXHIBIT IS IN THE RECORD IN THE SUMMARY

7    JUDGMENT PROCEEDINGS IN THE CASE, IT IS ATTACHED AS AN

8    EXHIBIT TO LOU ISAFF'S AFFIDAVIT THAT CAME IN IN THE

9    INEQUITABLE CONDUCT SUMMARY JUDGMENT PROCEEDING, AND JUDGE

10   CAMP RELIED ON THIS AND CITED TO IT IN HIS SUMMARY JUDGMENT

11   RULING WHERE HE GRANTED SUMMARY JUDGMENT IN FAVOR OF THE

12   PLAINTIFF ON DEFENDANT'S INEQUITABLE CONDUCT DEFENSE AND

13   ENTERED RULE 11 SANCTIONS AGAINST THEN DEFENDANT'S COUNSEL

14   FOR EVEN RAISING THE DEFENSE.

15           THE COURT:  RIGHT.  AND AT THIS POINT I SHOULD

16   EXPLAIN WHY I CONTINUALLY REFER TO WHETHER SOMETHING WAS

17   RECEIVED IN TRIAL.  BECAUSE I CERTAINLY HAVE GONE THROUGH A

18   LOT OF PAPERS PROVIDED TO ME, AND I THANK YOU FOR ALL OF IT,

19   IT HAS BEEN VERY COMPLETED, SUCH AS SUMMARY JUDGMENT, SUCH

20   AS MOTIONS IN LIMINE.  BUT WE ARE HERE ON MOTIONS PERTAINING

21   TO THE TRIAL ITSELF AND THE OUTCOME OF THE TRIAL.  GRANTED

22   THERE CAN BE REFERENCES OUTSIDE OF THAT, BUT I GO BACK AGAIN

23   TO WHAT I GUESS WE'VE BEEN TALKING ABOUT FOR 20 MINUTES.

24   EXHIBIT 22 WAS NEVER RECEIVED IN EVIDENCE, AS I UNDERSTAND

25   IT.

```
 1              MR. CAPP:  MARKED AND IDENTIFIED AS SUCH AT TRIAL,
 2     YOUR HONOR, NO.
 3              THE COURT:  THANK YOU.  YOU MAY CONTINUE.
 4              MR. CAPP:  THAT CONCLUDES MY EXAMINATION OF
 5     MR. MCNALLY.
 6              THE COURT:  WE WILL START THE CROSS-EXAMINATION.
 7     DO YOU WANT TO ESTIMATE THE LENGTH?  BECAUSE I WILL FIGURE
 8     ON WHEN WE TAKE OUR MIDDAY BREAK BASED ON WHETHER I THINK
 9     YOU CAN REASONABLY FINISH BEFORE THEN.  I AM A TIME KEEPER
10     AS WELL AS A JUDGE, A REFEREE, OR WHATEVER YOU WANT TO CALL
11     IT.
12              MR. SCHAETZEL:  MAYBE 45 MINUTES, YOUR HONOR.
13              THE COURT:  LET'S TRY TO FINISH BEFORE THE MIDDAY
14     BREAK, BUT PAUSE FOR A MINUTE.  LET'S TAKE FIVE MINUTES.
15     THE REPORTER HAS BEEN HERE VIGOROUSLY TAKING DOWN A LOT OF
16     DIFFICULT MATERIAL.  IN FACT, WE WILL START AGAIN AT NOON.
17     OR WOULD YOU RATHER TAKE THE MIDDAY MEAL BREAK BEFORE YOUR
18     CROSS-EXAMINATION?  I WILL GIVE YOU YOUR CHOICE,
19     MR. SCHAETZEL.
20              MR. SCHAETZEL:  I WOULD APPRECIATE THE CHANCE TO
21     GRAB A SANDWICH, AND THEN --
22              THE COURT:  I THINK MAYBE WE CAN BE MORE EFFICIENT
23     IF WE DO IT THAT WAY.  AND THEN WE WILL FIGURE THAT WE WILL
24     BE BACK AT 1:00, PROBABLY FINISH BY 2:00, AND THEN EACH SIDE
25     WILL HAVE AN HOUR AND A HALF FOR FINAL ARGUMENT, I HAVE
```

1   ACTUALLY ALREADY RECEIVED A CONSIDERABLE AMOUNT OF FINAL

2   ARGUMENT, AND I MIGHT ADD THAT I HAVE FOUND EXTREMELY

3   HELPFUL TWO SETS OF DOCUMENTS:  FIRST, THE BRIEFING DONE IN

4   CONNECTION WITH THE MOTIONS, WHICH WAS BEFORE JUDGE CAMP HAD

5   RETIRED, AND IN PARTICULAR YOUR PROPOSED RULING ON THE

6   MOTIONS WHICH HAVE BEEN RECEIVED JUST IN THE LAST COUPLE OF

7   WEEKS.  AND THAT HAS HELPED ME VERY MUCH.  SO THAT I THINK

8   WHEN WE GET TO THE SUMMATIONS HERE ON THE MOTIONS YOU MAY

9   CONSIDER THAT I HAVE FULLY ALREADY CONSIDERED WHAT YOU'VE

10  PROPOSED AS WHAT I SHOULD RULE.  THANK YOU.  WE ARE IN

11  RECESS UNTIL 1 O'CLOCK.

12              (BREAK FROM 11:52 UNTIL 1:00 P.M.)

13          THE COURT:  CROSS EXAMINATION OF MR. MCNALLY.

14  MR. SCHAETZEL?

15          MR. SCHAETZEL:  THANK YOU.

16                  CROSS-EXAMINATION

17  BY MR. SCHAETZEL:

18  Q. GOOD AFTERNOON, MR. MCNALLY.

19  A. GOOD AFTERNOON.

20  Q. ON YOUR DIRECT EXAMINATION YOU WERE ASKED SEVERAL

21  QUESTIONS ABOUT TESTING THAT YOU DID, AND YOU EVENTUALLY

22  SETTLED ON LRC 1 AND SEAWASH 7; IS THAT CORRECT?

23  A. YES.  THAT'S CORRECT.

24  Q. WHAT IS LRC 1?

25  A. LRC 1 WAS A MICROBIAL BLEND MANUFACTURED BY A COMPANY

1    CALLED LOUISIANA REMEDIATION CORPORATION.

2    Q. BUT YOU DON'T KNOW WHAT THE MICROBIAL COMPONENT OF LRC 1

3    WAS, DO YOU?

4    A. WE KNOW THE FAMILY OF MICROBES THAT WERE INVOLVED IN

5    THE -- EXCUSE ME -- THAT WERE INCLUDED IN LRC 1'S SUITE OF

6    MICROBES.

7    Q. DID YOU KNOW THE TAXONOMIC CLASSIFICATION OF LRC 1 WHEN

8    YOU WERE DOING THE TESTING IN 1994?

9    A. WE DID NOT KNOW THE TAXONOMIC CLASSIFICATION OF THE

10   MICROBES.  WE KNEW THAT THE MICROBES WERE REPUTED TO DEGRADE

11   HYDROCARBONS.

12   Q. IN FACT, THAT IS HOW YOU SELECTED THEM, WAS IT NOT, THAT

13   YOU LOOKED FOR MICROBES THAT DEGRADED HYDROCARBONS?

14   A. THAT IS CORRECT.

15   Q. AND THE CLEANING FLUID THAT YOU ULTIMATELY SETTLED ON WAS

16   SEAWASH 7; IS THAT CORRECT?

17   A. THAT IS CORRECT.

18   Q. YOU DID NOT KNOW THE TAXONOMIC CLASSIFICATION OF

19   SEAWASH 7 EITHER, DID YOU?

20   A. WE DID NOT KNOW THE SPECIFIC CONCENTRATIONS OF EACH OF

21   THE CHEMICALS AND BUILDERS IN SEAWASH 7.

22   Q. SO IN 1994, WHEN YOU DID THE TESTING, YOU DIDN'T KNOW

23   WHAT WAS IN THE SEAWASH 7.  ISN'T THAT CORRECT?

24   A. NO, THAT IS NOT WHAT I SAID.  WE DIDN'T KNOW THE EXACT

25   PERCENTAGE OF ETHOXYLATED ALCOHOLS AND BUILDERS, THE OTHER

1    THINGS THAT GO INTO A CLEANING AGENT, BUT WE KNEW THE

2    FAMILY.  VERY MUCH THE SAME WAY THAT WE KNEW THE MICROBIAL

3    FAMILIES.

4    Q. WHAT WERE THE FAMILIES OF SURFACTANT THAT WERE IN THE --

5    A. ETHOXYLATED ALCOHOLS.

6    Q. DO YOU RECALL IF YOU PUT THAT IN YOUR PATENT?

7    A. I DON'T RECALL WHETHER WE DID OR NOT.

8    Q. THE TESTING THAT YOU DID LED YOU TO THE COMBINATION OF

9    THE MICROBIAL PRODUCT OF LRC 1 AND SEAWASH 7.  THAT IS

10   CORRECT, ISN'T IT?

11   A. THAT IS CORRECT.

12   Q. BUT YOUR PATENT DOESN'T CLAIM JUST SEAWASH 7 AND LRC 1,

13   DOES IT?

14   A. I CAN'T ANSWER THAT BECAUSE I DON'T HAVE ALL OF THE

15   PATENTS MEMORIZED.

16   Q. WELL, LET'S TAKE A LOOK THEN, IF WE CAN, AT JUST THE

17   FIRST PATENT YOU CAN FIND IN YOUR BOOK AT JTX 1.

18   A. OKAY.

19   Q. IF YOU WILL TURN TO CLAIM 1 OF THAT PATENT, WHICH IS ALSO

20   ON THE SCREEN.  YOU ARE WELCOME TO LOOK EITHER WAY,

21   WHICHEVER YOU PREFER.

22   A. I SEE IT.

23   Q. DID YOU FIND CLAIM 1?

24   A. YES.

25   Q. THAT CLAIM IS NOT LIMITED TO SEAWASH 7 AND LRC 1, IS IT?

1    A. ONCE AGAIN, I AM NOT AT A PATENT EXPERT, SO IF THAT'S HOW

2    IT IS INTERPRETED BY PATENT EXPERTS, THEN THAT MUST BE WHAT

3    IT IS.

4    Q. OKAY.  WELL FIRST OF ALL, IS IT YOUR TESTIMONY THAT THIS

5    CLAIM EVEN MENTIONS SEAWASH 7 OR LRC 1?  THOSE WORDS ARE NOT

6    IN THE CLAIM, ARE THEY, SIR?

7    A. THOSE WORDS ARE NOT IN THE CLAIM.

8    Q. WHAT IS YOUR UNDERSTANDING -- IS IT YOUR UNDERSTANDING

9    THAT THIS CLAIM COVERS MORE THAN LRC 1 AND SEAWASH 7?

10   A. YES.

11   Q. IT IS YOUR UNDERSTANDING THAT THE CLAIM COVERS MORE?

12   A. IT IS MY UNDERSTANDING THAT IT DEFINES A BIODEGRADABLE

13   NONTOXIC, NONCAUSTIC, NONFLAMMABLE OIL DISPERSANT CLEANER

14   WITHOUT LIMITATION.

15   Q. WHICH MEANS THAT WOULD BE MORE THAN SEAWASH 7; CORRECT?

16   A. IT COULD BE MORE, YES.  IN FACT, IT WOULD BE MORE THAN

17   SEAWASH 7.

18   Q. AND IT SAYS, FOR EXAMPLE, THE MICROORGANISMS

19   SUBSTANTIALLY SUSTAINED WITHIN AND FLOWING WITH THE FLUID.

20   SO THE WORD MICROORGANISMS THERE WOULD BE MORE THAN LRC 1,

21   WOULD IT NOT?

22   A. YES.

23   Q. NOW, WHEN YOU WERE DOING THE TESTING, YOU DID NOT

24   CONSIDER YOURSELF TO BE A PERSON OF ORDINARY SKILL IN THE

25   PARTS WASHING ART AT THAT TIME, DID YOU?

1  A. BY THE COURT'S DEFINITION, I AM A PERSON OF ORDINARY

2  SKILL.

3  Q. LET'S START IN 1994.

4  A. I HAD A YEAR OF COLLEGE CHEMISTRY AND A YEAR OF COLLEGE

5  BIOLOGY.  SO I WAS DEFINED BY THE COURT AS A PERSON OF

6  ORDINARY SKILL.

7  Q. WELL, MY QUESTION TO YOU IS THIS:  IN 1994 DID YOU

8  CONSIDER YOURSELF TO HAVE BEEN EITHER AT OR ABOVE THE SKILL

9  LEVEL OF SOMEONE WHO MAY HAVE BEEN ACTIVELY ENGAGED IN A

10  TECHNICAL OCCUPATION WITHIN THE PARTS WASHER INDUSTRY?

11  A. I DID NOT.

12  Q. AND IN FACT, WHEN YOU STARTED IN 1993 WITH MR. MCCLUER,

13  YOU DID NOT HAVE AN EXTENSIVE BACKGROUND OR TRAINING OR

14  EXPERIENCE IN THE FIELD OF ENVIRONMENTAL CONTAMINATION IN

15  THE FIELD OF MICROBIOLOGY, DID YOU?

16  A. I DID NOT.

17  Q. IS IT YOUR TESTIMONY TODAY THEN THAT IN 1993-1994, IN

18  THAT TIME FRAME, THAT YOU WERE A PERSON OF ORDINARY SKILL IN

19  THAT TIME FRAME?

20  A. BY THE DEFINITION, AS I UNDERSTAND IT, DR. ADRIAENS AND

21  OTHER PEOPLE THAT TESTIFIED, SAID THE DEFINITION WAS SOMEONE

22  WHO HAD A YEAR OF CHEMISTRY AND A YEAR OF BIOLOGY.  AND IN

23  1994 I HAD BOTH OF THOSE QUALIFICATIONS.

24  Q. BUT MY QUESTION TO YOU IS, DID YOU CONSIDER YOURSELF

25  SOMEONE -- I UNDERSTAND WHAT -- I THINK YOU MIGHT HAVE MEANT

1   TO HAVE SAID DR. DURKEE, BECAUSE DR. ADRIAENS SAID SOMETHING

2   ELSE.  BUT WHAT WAS YOUR CONSIDERATION OF YOURSELF?  ARE YOU

3   SAYING THAT TODAY YOU THINK OF YOURSELF AS BEING AT A HIGHER

4   LEVEL OF SKILL IN THE 1993 AND '94 TIME FRAME THAN YOU DID

5   IN THE PAST?

6   A. I AM NOT SURE I UNDERSTAND THE QUESTION.  DO I THINK I AM

7   BETTER EDUCATED TODAY THAN I WAS IN 1994?  YES.

8   Q. OKAY.  I SIMPLY WANT TO KNOW, HAVE YOU CHANGED YOUR MIND

9   AS TO WHAT YOUR LEVEL OF SKILL WAS IN THE 1993-94 TIME

10  FRAME.

11  A. I DON'T BELIEVE SO.  NO, SIR.

12  Q. SO IN OTHER WORDS, WHEN YOU DID A DECLARATION IN

13  REFERENCE TO THE SUMMARY JUDGMENT PROCEEDING AND YOU SAID

14  THAT YOU DID NOT CONSIDER YOURSELF TO HAVE BEEN EITHER AT OR

15  ABOVE THE SKILL LEVEL OF SOMEONE WHO MAY HAVE BEEN ACTIVELY

16  ENGAGED IN A TECHNICAL OCCUPATION WITHIN THE PARTS WASHER

17  INDUSTRY, THAT IS STILL YOUR TESTIMONY TODAY?

18  A. THAT IS CORRECT.  BUT YOU HAVE TO READ THAT SENTENCE TO

19  READ WHAT IT SAYS.

20  Q. WHAT WAS THE ENRETECH GREEN FLUID?

21  A. IT'S THE FLUID THAT WE REFER TO AS THE PANDA GREEN SOAP.

22  Q. WHAT WAS THE SURFACTANT IN THE PANDA GREEN SOAP?

23  A. WE DO NOT KNOW.

24  Q. THE PANDA GREEN SOAP OR THE ENRETECH GREEN FLUID HAD

25  MICROORGANISMS IN IT, DIDN'T IT?

1    A. THE EARLY SUBMISSIONS FROM ENRETECH APPARENTLY HAD

2    MICROBES IN IT.  BUT AS WE SAID, AND AS WE MENTIONED, AND AS

3    IS IN THE RECORD, THOSE MICROORGANISMS EITHER WERE NOT ADDED

4    OR DIDN'T SURVIVE, OR WE DON'T KNOW WHY IT DIDN'T WORK.

5    Q. IN FACT, I BELIEVE YOU TESTIFIED THIS MORNING YOU SAID

6    THAT YOU WERE COMPLETELY UNHAPPY WITH ITS PERFORMANCE.  I

7    COULD BE MISTAKEN.  THE RECORD WILL BEAR THAT OUT.

8    A. I AM SORRY.  WE WERE PLEASED WITH THE PERFORMANCE

9    BECAUSE, AFTER ALL, THE GREEN PANDA SOAP THAT WAS REPORTED

10   TO HAVE MICROBES IN IT WAS THE ONE THAT, IF THERE IS A

11   EUREKA MOMENT, IT WAS THE ONE THAT SPURRED US TOWARDS THE

12   DEVELOPMENT OF THE BIOREMEDIATING PARTS WASHER.  HOWEVER,

13   SUBSEQUENT ATTEMPTS TO HAVE THE PANDA SOAP FORMULATED BY

14   SOMEONE ELSE AND ADD MICROBES BY SOMEONE ELSE WERE

15   UNSUCCESSFUL BECAUSE THE FLUID STOPPED WORKING.

16   Q. SO THE ENRETECH GREEN FLUID OR THE GREEN PANDA SOAP

17   WORKED, BUT THEN WHEN YOU TRIED TO HAVE IT REFORMULATED BY

18   SOMEONE ELSE, IT DID NOT WORK; IS THAT CORRECT?

19   A. NO.  WE ASKED THE PANDA -- FOR ENRETECH TO DUPLICATE WHAT

20   IT WAS THAT THEY HAD SENT TO US ORIGINALLY, AND THEY COULD

21   NOT.

22   Q. OR AT LEAST THE PERFORMANCE YOU FELT --

23   A. SORRY.  THAT IS RIGHT.  THE INDICATORS OF MICROBIAL

24   GROWTH DISAPPEARED AND THE CLEANING ABILITY WENT AWAY.

25   Q. IT IS TRUE, IS IT NOT, THAT WHEN YOU FIRST USED THE

1   ENRETECH GREEN FLUID OR THE GREEN PANDA SOAP, THAT YOU FOUND

2   IT TO BE HIGHLY EFFECTIVE AND REMEDIATE HYDROCARBONS, DIDN'T

3   YOU?

4   A. IN FACT, WE STARTED USING GREEN PANDA SOAP IN DECEMBER OF

5   1993, AND ENRETECH ALSO MANUFACTURED A MICROBIAL PRODUCT.

6   AND WE SAT DOWN IN DECEMBER, THE WEEK BEFORE CHRISTMAS, OF

7   1993 WITH A GENTLEMAN BY THE NAME OF RICHARD BLACKMORE AND

8   SAID, RICHARD, WHY -- EXCUSE ME, I CAN'T CHARACTERIZE IT AS

9   US AS HAVING SAID THAT.  BUT THE DISCUSSION AROSE, YOU HAVE

10  THE FIBER THAT IS SAID TO CONTAIN MICROORGANISMS AND DEGRADE

11  AND YOU HAVE THE GREEN PANDA SOAP.  HOW ABOUT PUTTING THEM

12  TOGETHER?

13  Q. REGARDLESS OF THAT CONVERSATION, IT'S TRUE, IS IT NOT,

14  THAT WHEN YOU FIRST USED THE GREEN PANDA SOAP, ENRETECH

15  GREEN FLUID, YOU FOUND IT TO BE HIGHLY EFFECTIVE AND

16  REMEDIATE HYDROCARBONS?

17  A. NO, SIR.  THE FIRST TIME WE USED THE GREEN PANDA SOAP IT

18  WAS SIMPLY A CLEANER.  IT WASN'T UNTIL THE JANUARY-FEBRUARY

19  TIME FRAME THAT MICROBES WERE REPUTEDLY ADDED TO THE GREEN

20  PANDA SOAP.

21  Q. AND AT THAT POINT IN TIME IS IT YOUR TESTIMONY THAT YOU

22  THEN FOUND IT TO BE HIGHLY EFFECTIVE AND REMEDIATE

23  HYDROCARBONS?

24  A. THE SAME ST. PATRICK'S MEMO, MARCH 17TH OF 1994, THAT WAS

25  THE SUBJECT OF THE MEMO WHICH WE SAW THIS MORNING.

1    Q. IF YOU COULD TAKE A LOOK AT PTX 527 IN YOUR BOOK.

2    A. PTX?

3    Q. YES.  PLAINTIFF'S EXHIBIT 527.

4    A. 527?

5    Q. YES, SIR.

6    A. YES, SIR.

7    Q. IS THIS WHAT YOU MEAN BY THE -- YOU HAD A HOLIDAY.  WAS

8    IT --

9    A. ST. PATRICK'S DAY.  MARCH 17TH.

10   Q. I THINK THIS IS FEBRUARY 16TH.  IS THIS THE MEMO THAT YOU

11   HAD IN MIND?

12   A. NO, I AM --

13   Q. I JUST NEED TO KNOW IF THIS WAS THE MEMO THAT YOU WERE

14   REFERRING TO.

15   A. NO, WE ARE ON DIFFERENT MEMOS.  IT'S 530.

16   Q. IF YOU WILL LOOK AT 527.

17   A. YES.  I DO.  FEBRUARY 16TH.  YES.

18   Q. TURN TO THE SECOND PAGE UNDER ITEM 2 UNDER CLEANING

19   FLUID.  ISN'T IT TRUE THAT AS OF FEBRUARY 16TH OF 1994 THE

20   ENRETECH GREEN SOLUTION HAD PROVEN TO BE HIGHLY EFFECTIVE

21   AND REMEDIATE HYDROCARBONS, AS IT SAYS THERE?

22   A. THIS CONFIRMS WHAT I SAID EARLIER, THAT BY FEBRUARY WE

23   HAD CHANGED FROM THE ORIGINAL PANDA SOAP TO THE NEW PANDA

24   SOAP THAT REMEDIATED HYDROCARBONS.

25   Q. AND THOSE MICROORGANISMS THAT WERE IN THAT SOAP IN TERMS

1   OF THEIR COMPOSITION WAS UNKNOWN TO YOU, WASN'T IT?

2   A. IT WAS UNKNOWN TO US AT THAT TIME.

3   Q. AND IT WAS ENRETECH THAT PUT THOSE MICROORGANISMS INTO

4   THAT PRODUCT, WASN'T IT?

5   A. THAT IS CORRECT.

6   Q. SO YOU GOT THAT PRODUCT FROM ENRETECH AND YOU RAN IT

7   THROUGH WHAT TESTS?

8   A. WE PUT THE GREEN PANDA SOAP THAT WAS REPUTED TO HAVE

9   MICROORGANISMS INTO IT INTO SEVERAL OF OUR TESTS OR FIELD

10  TEST UNITS OPERATING AT FOUR SITES.

11  Q. AND FROM THOSE TESTS IS HOW YOU DETERMINED THAT IT

12  REMEDIATED HYDROCARBONS AND WAS HIGHLY EFFECTIVE; CORRECT?

13  A. THAT IS CORRECT.  BETWEEN JANUARY 19TH OF 1994 AND MARCH

14  14TH OF 1994.

15  Q. AND MARCH 14TH?  THE MEMO IS DATED FEBRUARY 16TH.

16  A. INDEED.  THIS IS WAS -- THE TESTING TOOK PLACE BETWEEN

17  JANUARY 19TH OF 1994 AND MARCH 14TH OF 1949.  IN FEBRUARY OF

18  1994 WE HAD ALREADY REACHED THE CONCLUSION THAT THEY WERE

19  BIOREMEDIATING.

20  Q. SO IN OTHER WORDS, BETWEEN THREE TO FOUR WEEKS YOU

21  DECIDED THAT IT WORKED GREAT?

22  A. YES, SIR, WE DID.

23  Q. IT IS TRUE, IS IT NOT, THAT THROUGHOUT YOUR DEVELOPMENT

24  OF THE SMART WASHER PRODUCT YOU USED OFF-THE-SHELF PRODUCTS

25  CONTAINING MICROORGANISMS THAT WERE ON THE COMMERCIAL

```
1    MARKET?  IS IT NOT?

2    A. IN THE TESTING PHASE WE DID BUY COMMERCIALLY AVAILABLE

3    MICROBIAL BLENDS.

4    Q. AND SO TO DO THAT YOU LOCATED VENDORS THROUGH THE THOMAS

5    REGISTER; IS THAT CORRECT?

6    A. THAT IS CORRECT.

7    Q. AND THEN IN SEARCHING THROUGH THE THOMAS REGISTER, THE

8    TERMS THAT YOU WOULD SEARCH WITH WERE HYDROCARBON DEGRADERS?

9    IS THAT ONE OF THEM?

10   A. THAT WAS ONE OF THE TERMS, HYDROCARBON DEGRADERS,

11   MICROBIAL BLENDS, EVEN MICROBE BACTERIA.

12   Q. THEN YOU WOULD OBTAIN SAMPLES FROM THOSE VENDORS THAT

13   WEAR LOCATED IN THE THOMAS REGISTER; CORRECT?

14   A. EVENTUALLY USING THE INFORMATION IN THE REGISTER, WE

15   WOULD CALL THE SUPPLIER AND ASK THEM WHAT THEIR PRODUCT WAS

16   REPUTED TO DO.

17   Q. AND YOU USED A SIMILAR PROCESS TO FIND CLEANING FLUIDS;

18   ISN'T THAT CORRECT?

19   A. WE DID.

20   Q. SEARCHED THROUGH THE THOMAS REGISTER FOR DEGREASERS?

21   A. YES.

22   Q. SURFACTANTS?

23   A. YES.

24   Q. BIO CLEANERS?

25   A. BIODEGRADABLE CLEANERS I BELIEVE IS WHAT WE WERE LOOKING
```

1    FOR.

2    Q. I BELIEVE YOU MENTIONED THAT SOME OF YOUR TESTS, YOU

3    FOUND THAT YOU OBTAINED GOOD RESULTS WHEN YOU HAD A PH

4    BETWEEN I BELIEVE YOU SAID 6 AND 8.5; IS THAT CORRECT?

5    A. I BELIEVE THAT IS WHAT I SAID.  YES.

6    Q. BUT WHEN YOU HAD PRODUCTS WHERE THE PH WAS OUTSIDE OF

7    THAT RANGE, YOU DIDN'T FIND THAT YOU HAD GOOD MICROBIAL

8    ACTIVITY, DID YOU?

9    A. WE DID NOT.

10   Q. SO IN OTHER WORDS, IF THE PH WAS BELOW 6 OR ABOVE 8.5,

11   THERE WAS NOT GOOD MICROBIAL ACTIVITY IN THAT PRODUCT, TO

12   YOUR VIEW?

13   A. I CAN'T SAY THAT CATEGORICALLY, BUT GENERALLY THAT WAS

14   THE CONCLUSION THAT WE REACHED, THAT WE SHOULD STAY WITHIN

15   THAT RANGE OF 5.5 TO 7.5 OR -- 8 RATHER, 8.5.

16   Q. DID YOU EVER DO ANY TESTING TO DETERMINE WHY YOU DID NOT

17   OBTAIN GOOD MICROBIAL ACTIVITY OUTSIDE OF THE 6 TO 8.5 PH

18   RANGE?

19   A. WE HAD NO REASON TO TEST ANYTHING LIKE THAT OR WONDER

20   WHY.

21   Q. SO THE ANSWER TO THE QUESTION IS NO; RIGHT?  YOU DID NO

22   TESTING?

23   A. NO.  I'M SORRY, WE DID TESTING, BUT --

24   Q. YOU DID NO TESTING ON THINGS THAT WERE OUTSIDE OF THAT

25   RANGE?

1   A. NO --

2   Q. PLEASE, GO AHEAD.

3   A. WE TESTED OUTSIDE OF THAT RANGE.  WE CONCLUDED THAT THAT

4   RANGE WAS NOT CONDUCIVE, OUTSIDE OF THAT RANGE, TO MICROBIAL

5   GROWTH.  WE WERE PURSUING A MICROBIAL PARTS WASHER.  THERE

6   WAS NO NEED TO, IN OUR VIEW, IN 1993 AND 1994, TO UNDERSTAND

7   WHY THE MICROBES DIDN'T WORK VERY WELL OUTSIDE OF THAT

8   RANGE.

9   Q. I BELIEVE YOU SAID YOU TRIED ABOUT A DOZEN DIFFERENT

10  COMBINATIONS OF MICROBES AND CLEANING FLUIDS.  IS THAT

11  CORRECT?  THIS IS IN THE DEVELOPMENT STAGE NOW BEFORE THE

12  PATENT APPLICATION IS FILED IN DECEMBER OF 1994.

13  A. I THINK I DID CHARACTERIZE IT AS A DOZEN.  IT COULD HAVE

14  BEEN 11, IT COULD HAVE BEEN 14.  IT WAS A NUMBER OF

15  COMBINATIONS.

16  Q. BUT APPROXIMATELY 12?

17  A. APPROXIMATELY 12.  YES, SIR.

18  Q. FOR EACH OF THOSE 12, OR APPROXIMATELY 12, WOULD THE

19  FIRST THING THAT YOU DO, WAS THE FIRST THING THAT YOU DID,

20  TO TEST TO SEE IF THE CLEANING FLUID WOULD ACTUALLY AFFECT

21  CLEANING?

22  A. AND NOW THAT YOU HAVE GOTTEN A LITTLE FURTHER INTO THE

23  QUESTION, WE SELECTED 12 CLEANING FLUIDS, AND HALF A DOZEN

24  MICROBIAL CANDIDATES --

25  Q. OKAY.

1    A. -- THAT WE WOULD TEST.  AFTER ALL, WE ARE TRYING TO MAKE

2    A PARTS WASHER, SOMETHING THAT WOULD CLEAN.  WE WOULD TEST

3    THEM TO SEE IF THEY WOULD CLEAN.

4    Q. THE FIRST THING YOU DID WAS TEST TO SEE IF THE CLEANING

5    FLUID WOULD CLEAN; IS THAT CORRECT?

6    A. YES.

7    Q. SO IS IT FAIR TO SAY THEN THAT, JUST TO HELP ME WITH HOW

8    MUCH YOU DID, THAT YOU DID AT LEAST A DOZEN COMBINATIONS OF

9    A CLEANING FLUID AND A MICROORGANISM?

10   A. ONCE AGAIN, GO BACK TO 1993-1994.  WE IDENTIFIED A DOZEN

11   CLEANERS.  WE TESTED THEM FOR CLEANING EFFICIENCY, AND THEN

12   WE IDENTIFIED HALF A DOZEN PRODUCERS OF MICROBIAL PRODUCTS.

13   AND BASED ON A COMBINATION OF, I ALMOST SAID UNINTUITIVE,

14   BUT JUST OBSERVATION, WE WOULD FIND A CLEANING FLUID THAT

15   WORKED WELL THAT WOULD NOT KILL MICROORGANISMS, AND THEN

16   CARRY THOSE EXPERIMENTS A LITTLE FURTHER.

17   Q. AND I AM TRYING TO UNDERSTAND.  IT SOUNDS LIKE YOU HAD

18   ROUGHLY ABOUT 12 OF THOSE.

19   A. WE HAD ABOUT A DOZEN CLEANERS, BUT I THINK THREE OF THEM

20   OR FOUR OF THEM -- LET ME BACK UP.  WHEN WE IDENTIFIED THE

21   ONES THAT CLEANED FAIRLY WELL, WE HAD ABOUT A DOZEN.  WE

22   WOULD, AT THE BENCH LEVEL, JUST ON A LITTLE TABLE IN OUR

23   OFFICE, PUT A LITTLE OF THE CLEANING FLUID AND SOME OF THE

24   MICROBIAL STUFF.  AND ON THAT BASIS WE REDUCED WHAT WE WOULD

25   CALL THE NEXT TEST LEVEL COMBINATIONS TO SIX.

1   Q. TO SIX?

2   A. YES, SIR.

3   Q. HOW MANY COMBINATIONS DID YOU START WITH?

4   A. I GUESS IT DEPENDS ON YOUR DEFINITION OF COMBINATION.  I

5   AM NOT TRYING TO BE --

6   Q. HOWEVER YOU WANT TO DEFINE IT IS FINE.  I JUST WANT TO

7   UNDERSTAND WHAT YOU DID.

8   A. WE TOOK 12 CLEANING FLUIDS.  AND AT THE BENCH TOP LEVEL

9   WE WOULD INSERT MICROBES INTO THOSE LITTLE PETRI DISHES OF

10  CLEANING FLUID, AND THEN LOOK AT THEM A FEW DAYS LATER.  AND

11  IF THE MICROBES WERE NOT GROWING, WE WOULD ELIMINATE THAT

12  CLEANING FLUID FROM FURTHER CONSIDERATION.  ON THAT BASIS WE

13  CAME UP WITH A HALF A DOZEN WHAT APPEARED TO US TO BE USEFUL

14  COMBINATIONS.

15  Q. IN DEVELOPING THE SMART WASHER, IS IT TRUE THAT YOU TRIED

16  AT LEAST A DOZEN VARIOUS COMBINATIONS OF MICROBE STRAINS AND

17  CLEANING FLUIDS?

18  A. I HAVE TO RELY ON WHAT I JUST SAID.  I DON'T KNOW IF YOU

19  COUNT THAT.  IT IS 12 DIFFERENT COMBINATIONS OF MICROBES, OR

20  IF YOU CAN SAY THAT WE STARTED WITH 12, GOT IT DOWN TO 9,

21  AND THEN DECIDED ONLY 6 WERE WORTHWHILE PURSUING.  SO IS IT

22  12 OR 6, SIR?  I DON'T KNOW.

23  Q. DO YOU RECALL PREPARING A DECLARATION FOR USE IN THIS

24  CASE AT THE SUMMARY JUDGMENT PHASE?

25  A. AT LEAST THREE DECLARATIONS.

1          MR. SCHAETZEL:  OKAY.  MAY I APPROACH THE WITNESS,

2     YOUR HONOR?

3          THE COURT:  YOU MAY.  PROCEED.

4     BY MR. SCHAETZEL:

5     Q. WILL YOU PLEASE TURN TO PARAGRAPH 58 OF THIS DOCUMENT?

6     WELL, FIRST, MR. MCNALLY, IF YOU WILL LOOK AT THE LAST PAGE

7     OF THE TEXT, WHICH IS ON PAGE 39, IS THAT YOUR SIGNATURE?

8     A. YES, IT IS.

9     Q. ALL RIGHT.  THIS IS ONE OF THE DECLARATIONS THAT YOU DID

10    IN THIS CASE, IS IT NOT?

11    A. YES.

12    Q. IF YOU WOULD PLEASE LOOK AT PARAGRAPH 58, WHICH STARTS ON

13    PAGE 21.

14    A. YES, SIR.

15    Q. IT READS:  DURING THE COURSE OF DEVELOPING THE SMART

16    WASHER THROUGH AND INCLUDING THE DATE OF FILING OF THE

17    PATENT APPLICATION, WE TRIED AT LEAST A DOZEN VARIOUS

18    COMBINATIONS OF MICROBE STRAINS AND CLEANING FLUIDS.

19    A. I AGREE WITH THAT STATEMENT.

20    Q. THAT IS WHAT I AM TRYING TO ASK.  IS THAT TRUE?

21    A. YES, SIR.  AND I BELIEVE THAT IS IN COMPLETE CONFORMITY

22    WITH WHAT I JUST TALKED ABOUT.

23    Q. OKAY.  THAT IS FINE.  OF THAT DOZEN, AT LEAST NINE OR TEN

24    OF THEM WORKED FINE, DIDN'T THEY?

25    A. NO.  I THINK THAT AT LEAST SIX OF THEM WORKED OKAY.

1    Q. AND SO THE OTHER SIX DIDN'T WORK OKAY; IS THAT CORRECT?

2    A. THAT IS CORRECT.

3    Q. AND THE OTHER SIX OR SO WERE ELIMINATED?

4    A. THAT IS CORRECT.

5    Q. IF YOU WOULD, PLEASE LOOK AT PARAGRAPH 60.

6    A. OKAY.

7    Q. IT READS, NEXT THE CLEANING FLUID IS TESTED TO SEE IF IT

8    IS TOXIC TO THE MICROBES.  OF THE DOZEN OR SO FLUID MICROBE

9    COMBINATIONS THAT WE SCREENED AND TESTED IN 1994, WE

10   ELIMINATED TWO OR THREE COMBINATIONS FROM CONSIDERATION

11   AFTER THE RESULT OF A SIMPLE TEST OF MIXING SOME MICROBES IN

12   A CLEANING FLUID AT THE DESIRED CONCENTRATION, AND THEN

13   INCUBATING THE SAMPLE ON AN AGAR PLATE.  DOES THAT REFRESH

14   YOUR RECOLLECTION AS TO HOW MANY NUMBERS OR HOW MANY IT WAS?

15   A. YES.

16   Q. HOW MANY WAS IT?

17   A. WE ELIMINATED TWO OR THREE.

18   Q. SO IT WASN'T SIX?

19   A. THAT IS CORRECT.

20   Q. AND IN FACT, THOSE TWO AND THREE, YOU NEVER DID REALLY

21   FULLY ELIMINATE THEM, DID YOU?

22   A. I AM NOT SURE I UNDERSTAND THE QUESTION.

23   Q. ISN'T IT TRUE THAT YOU NEVER CONCLUSIVELY DETERMINED THAT

24   THE OTHER TWO OR THREE WOULD HAVE BEEN TOTALLY INOPERABLE IN

25   A PARTS WASHER FIELD TEST, IT WAS SIMPLY A MATTER THAT YOU

1   SAW MORE ACTIVITY IN THE OTHER NINE OR TEN?

2   A. YES.

3   Q. SO YOU NEVER REALLY ELIMINATED THEM, YOU JUST SAW MORE

4   ACTIVITY IN THE OTHERS?

5   A. I WOULD DEFINE ELIMINATING AS WE STOPPED USING THEM.  IN

6   OTHER WORDS, WE NEVER USED THEM AGAIN.

7   Q. AND IN FACT, YOU DON'T KNOW THAT THEY KILLED THE MICROBES

8   IN THOSE OTHERS AT ALL, DO YOU?

9   A. WE KNOW THAT THOSE COMBINATIONS DID NOT ENCOURAGE

10  MICROBIAL GROWTH.

11  Q. SO BECAUSE WE KNOW AT LEAST THE OTHER NINE OR TEN WERE

12  BETTER; CORRECT?

13  A. CORRECT.  IF WE FOUND SOMETHING THAT WORKED WELL, THERE

14  WAS NO REASON TO CONTINUE TO WORK WITH THE ONES THAT DIDN'T

15  WORK WELL.

16  Q. AND OF THOSE REMAINING NINE OR TEN THAT WORKED OKAY, THEY

17  PROVED OPERABLE IN FIELD TESTS, DIDN'T THEY?

18  A. IN FACT, THEY DID.  AND THIS REFRESHES MY MEMORY.  WE DID

19  NOT ONLY TEST SIX AT FIELD LEVEL, WE DID TEST NINE AT FIELD

20  LEVEL.

21  Q. AND ALL NINE OF THEM WORKED?

22  A. WELL, IT DEPENDS ON YOUR DEFINITION, UNFORTUNATELY, OF

23  THE WORD "WORKED."  SOME WERE BETTER THAN OTHERS.

24  Q. DID ALL NINE OF THEM PROVE TO BE OPERABLE IN THE FIELD

25  TEST?

1   A. ONCE AGAIN, OPERABLE MEANS DID THEY CLEAN PARTS.  IN SOME

2   INSTANCES THEY CLEANED, BUT NOT VERY WELL.  SO DOES THAT

3   MEAN OPERABLE OR NOT, SIR?  I REALLY AM NOT TRYING TO BE --

4   I AM TRYING TO BE REALISTIC.  OUT THERE IN THE REAL WORLD

5   YOU HAVE SIX OR SEVEN THINGS YOU TRY, SOME OF THEM WORK AND

6   SOME OF THEM DON'T WORK.  SO WOULD YOU DEFINE THE ONES THAT

7   DIDN'T WORK AS WELL AS THE OTHERS AS OPERABLE?  THEN IF THAT

8   IS HOW YOU DEFINE THE WORD OPERABLE, THEN I SUPPOSE ALL NINE

9   OF THEM COULD BE DEFINED AS OPERABLE.

10  Q. BUT TO YOU, IN THE 1993 OR 1994 TIME FRAME, THEY PROVED

11  OPERABLE, THOSE NINE, DIDN'T THEY?

12  A. AGAIN, I AM TRYING TO GET TO THE WORD "OPERABLE."  I

13  REALLY DON'T KNOW WHAT YOU MEAN.

14  Q. LOOK AT PARAGRAPH 61, THE FIRST SENTENCE.

15  A. UH-HUH (AFFIRMATIVE).

16  Q. YOU SAID THAT 9 OR 10 OF THE ORIGINAL 12 OR SO

17  COMBINATIONS APPEARED TO BE OPERABLE IN A FIELD TEST.

18  A. OKAY.  I AGREE.  OPERABLE MEANS THAT THEY DIDN'T CRASH

19  AND BURN.  WAS SOME BETTER THAN OTHERS?  YES.

20  Q. IT IS TRUE, IS IT NOT, THAT IN YOUR EXPERIENCE, ONCE A

21  CANDIDATE CLEANING FLUID HAS BEEN IDENTIFIED, A COMMERCIALLY

22  AVAILABLE BIOREMEDIATION PRODUCT WILL BE OPERABLE IN A

23  NONCAUSTIC BIODEGRADABLE NONFLAMMABLE CLEANING FLUID 75 TO

24  80 PERCENT OF THE TIME, WON'T IT?

25  A. AGAIN, I AM NO TRYING TO BE DIFFICULT, BUT THE USE OF THE

1    WORD "OPERABLE" IN THIS INSTANCE, AS YOU JUST USED IT, MEANS

2    WOULD MICROBES GROW IN SEVERAL COMMERCIALLY AVAILABLE

3    CLEANING FLUIDS.  THE ANSWER IS YES.  WOULD YOU HAVE A

4    VIABLE COMMERCIALLY ATTRACTIVE DEVICE, WITH A DEVICE THAT

5    MAY HAVE SUPPORTED THE MICROBES BUT DIDN'T CLEAN WORTH A

6    DARN?  THE ANSWER IS NO.

7    Q. ISN'T IT TRUE THAT FOR YOU OPERABLE MEANT THAT OPERABLE

8    WOULD WORK IN THE FIELD FOR AT LEAST TWO WEEKS?

9    A. WHAT WE MEANT WAS THAT THE MICROBES WOULD NOT DIE OFF FOR

10   TWO WEEKS IN A FIELD TEST.  AGAIN, TWO WEEKS, THREE WEEKS,

11   SIX WEEKS.

12   Q. IF YOU WOULD, SIR, PLEASE TURN TO PARAGRAPH 73 OF YOUR

13   DECLARATION.

14   A. OKAY.

15   Q. LOOK AT THE FIRST SENTENCE.  IT IS TRUE, ISN'T IT, THAT

16   ONCE A CANDIDATE CLEANING FLUID HAS BEEN DETERMINED TO BE

17   EFFECTIVE IN A PARTS WASHER APPLICATION, IN YOUR EXPERIENCE,

18   COMMERCIALLY AVAILABLE BIOREMEDIATION MICROBIAL PRODUCTS

19   PROVE TO BE OPERABLE IN A PH NEUTRAL BIODEGRADABLE

20   NONFLAMMABLE AQUEOUS CLEANING FLUID ABOUT 75 PERCENT, 75 TO

21   80 PERCENT OF THE TIME?

22   A. THE CRITICAL WORD IN THAT SENTENCE IS THE ONE UP HERE

23   THAT SAYS "EFFECTIVE."  IN OTHER WORDS, ONCE THE CLEANING

24   FLUID HAS BEEN DETERMINED TO BE EFFECTIVE, THE EFFECTIVE

25   CLEANING FLUIDS, REMEMBER WE ARE LIMITED IN THE FRONT.  SO

1    WHAT WE ARE TALKING ABOUT IS 75 TO 80 PERCENT OF THE

2    EFFECTIVE CLEANING FLUIDS.

3    Q. AND THE EFFECTIVE CLEANING FLUIDS WERE THE ONES THAT

4    CLEANED; RIGHT?

5    A. SIR?

6    Q. THE EFFECTIVE CLEANING FLUIDS, YOU DID THE TEST AT THE

7    FRONT END TO SEE IF IT CLEANED?

8    A. THAT IS RIGHT.

9    Q. AND WHEN YOU USED THE WORD OPERABLE, YOU MEAN THAT THE

10   MICROBES REMAIN BIOLOGICALLY ACTIVE IN A PARTS WASHER UNDER

11   TYPICAL FIELD CONDITIONS FOR AT LEAST TWO WEEKS WHICH

12   CORRESPONDS TO A PERIOD OF TIME THAT EXCEEDS THE TYPICAL

13   REPLACEMENT CYCLE FOR AQUEOUS PARTS CLEANING FLUID IN A

14   NONBIOREMEDIATION APPLICATION?

15   A. THAT IS CORRECT.

16   Q. NOW, THE TESTS THAT YOU DO TO DETERMINE WHETHER OR NOT

17   THE CLEANING FLUID WILL CLEAN IS A PRETTY SIMPLE TEST, ISN'T

18   IT?

19   A. IT IS A SIMPLE TEST, BUT IT HAS SINCE BEEN ADOPTED BY

20   NASA.

21   Q. AND THE TEST PROCEDURES THAT YOU USED TO DETERMINE THE

22   OPERABILITY OF THE CLEANING FLUID AND THE VIABILITY OF THE

23   MICROBES ARE NOT DIFFICULT, COMPLEX, OR TIME CONSUMING, ARE

24   THEY?

25   A. IF YOU HAVE THE PROPER AGAR PLATES, THEY ARE VERY SIMPLE.

1  Q. AND THEY ARE NOT COMPLEX AND THEY ARE NOT TIME CONSUMING?

2  A. AS I SAID YOU HAVE TO DETERMINE THE AGAR PLATE, WHICH IS

3  APPROPRIATE, THE GROWTH MEDIA WHICH IS APPROPRIATE TO

4  MICROBES THAT ARE HAVE AN APPETITE, IF YOU WILL, FOR

5  HYDROCARBONS.  IN OTHER WORDS, IF YOU DON'T HAVE THE RIGHT

6  AGAR PLATE, YOU CAN'T PROVE ANYTHING.

7  Q. ALL I WANT TO KNOW, SIR, IF YOU LOOK AT PARAGRAPH 74, IF

8  YOU ARE TRYING TO CHANGE YOUR TESTIMONY.

9  A. SIR --

10  Q. IF YOU LOOK AT PARAGRAPH 74.  THE FIRST SENTENCE READS,

11  THE LABORATORY TEST PROCEDURES TO DETERMINE THE OPERABILITY

12  OF THE CLEANING FLUIDS AND THE VIABILITY OF THE MICROBES ARE

13  NEITHER DIFFICULT, COMPLEX, NOR TIME CONSUMING.  THAT IS

14  STILL TRUE, ISN'T IT?

15  A. THAT IS CORRECT.  AND FURTHER ON IN THAT PARAGRAPH, IT

16  SAYS WHAT I JUST SAID, MADE ON A COMMERCIALLY AVAILABLE

17  NUTRIENT AGAR OR ADDED COMMERCIALLY AVAILABLE DIP SLIDES AS

18  PROVIDED BY SPECIFIC PROVIDERS.

19  Q. AND IN THE 1994 TIME FRAME, WHEN YOU WERE LOOKING AT THE

20  PROTOTYPES, YOU WOULD CHECK THOSE PROTOTYPES TO SEE IF THEY

21  WERE WORKING BY DETERMINING IF THE CLEANING FLUID WAS

22  SATURATED WITH THE CONTAMINANT LOAD; ISN'T THAT CORRECT?

23  A. WE WOULD PERFORM A SIMPLE ANALYSIS THAT WAS PROVIDED FOR

24  US AT THE TIME BY A COMPANY CALLED LAW ENGINEERING WHERE YOU

25  TAKE A SAMPLE OF THE FLUID AND YOU MEASURE THE CONTAMINATION

1    OF OIL AND GREASE BY PERCENT.

2    Q. IF YOU WOULD, PLEASE TAKE A LOOK AT PARAGRAPH 86.

3    A. YES.

4    Q. 1994, QUOTING FROM THIS PARAGRAPH, NEITHER MCCLUER NOR I

5    NEEDED SOPHISTICATED EXPERTISE IN BIOLOGICAL LABORATORY

6    TECHNIQUES TO FIGURE OUT WHETHER THE EARLY PRE-PATENT

7    APPLICATION PROTOTYPES OF OUR INVENTION WERE EFFECTIVELY

8    BIOREMEDIATING HYDROCARBONS.  WE COULD TELL FROM THE

9    PERFORMANCE OF OUR TEST UNITS IN THE FIELD THAT THEY WERE

10   WORKING BECAUSE THE CLEANING FLUID DID NOT BECOME SATURATED

11   WITH CONTAMINANTS SO THAT IT NEEDED TO BE REPLACED.  IS THAT

12   CORRECT?

13   A. I AGREE.  I PROBABLY DID NOT ANSWER YOUR QUESTION

14   CORRECTLY, IF THAT IS THE ANSWER YOU WERE LOOKING FOR.  WHAT

15   I WAS TALKING ABOUT WAS THE CONFIRMATION OF THE SIMPLE

16   OBSERVATION THAT THE CLEANING FLUID STAYED ABLE TO CLEAN

17   PARTS OVER EXTENDED PERIODS OF TIME.

18   Q. AND LOOKING TO SEE THAT THE CLEANING FLUID WAS NOT

19   SATURATED WITH CONTAMINANTS IS WHAT YOU DID IN THE 1994 TIME

20   FRAME WITH MR. MCCLUER; ISN'T THAT CORRECT?

21   A. AS I SAID, THERE ARE BOTH ANSWERS IN THIS DOCUMENT WHERE

22   WE TALK ABOUT DOING THE OIL AND GREASE ANALYSES, AND BY

23   SIMPLE OBSERVATION THAT ONE OF OUR -- SEVERAL OF OUR TEST

24   MACHINES USED IN EVERYDAY CLEANING OF PARTS WOULD REMAIN

25   ABLE TO CLEAN PARTS FOR EXTENDED PERIODS OF TIME.

1  Q. AND THAT TEST WAS NOT A HARD TEST EITHER, WAS IT?

2  A. IT WAS OBSERVATION BY A COUPLE OF SHADE TREE MECHANICS.

3           THE COURT:  A COUPLE OF --

4           THE WITNESS:  SHADE TREE MECHANICS.

5  BY MR. SCHAETZEL:

6  Q. IF YOU WOULD, SIR, PLEASE TURN TO, IN YOUR BOOK, WHAT IS

7  IDENTIFIED AT PTX 45.

8  A. YES.

9  Q. WHAT IS THIS DOCUMENT?

10 A. THIS IS A COPY OF A LABEL FROM A BOTTLE OF SEAWASH 7

11 FLUID MANUFACTURED BY WARREN CHEMICAL CORPORATION.

12 Q. AND YOU OBTAINED THE SEAWASH 7 FROM WARREN CHEMICAL IN

13 WHAT TIME PERIOD YOU FIRST OBTAINED IT?

14 A. IN THE SPRING OF 1994.

15 Q. LOOK AT THE LABEL TO THE LEFT-HAND SIDE.

16 A. YES, SIR.

17 Q. DID YOU UNDERSTAND THAT SEAWASH WAS WATER BASED?

18 A. YES.

19 Q. DID YOU UNDERSTAND THAT THE SEAWASH 7 WAS HIGHLY

20 BIODEGRADABLE?

21 A. THAT IS ONE OF THOSE TERMS THAT IN 1994 WAS NOT

22 WELL-DEFINED, HIGHLY BIODEGRADABLE.

23 Q. DID YOU UNDERSTAND THAT IT WAS NONTOXIC?

24 A. YES.  WE DID.

25 Q. DID YOU UNDERSTAND THAT IT WAS OF NEUTRAL PH?

1    A. YES, WE DID.  THE WARREN CHEMICAL CORPORATION WAS OWNED

2    BY A GENTLEMAN BY THE NAME OF CHARLIE WARREN.  AND WE WORKED

3    CLOSELY WITH CHARLIE ON THESE FLUIDS.

4    Q. IF YOU WOULD, I THINK YOU CAN TURN TO THE NEXT DOCUMENT

5    IN THE BOOK, WHICH WAS PLAINTIFF'S EXHIBIT 75.

6    A. YES, SIR.

7    Q. THIS WAS WHAT WAS REFERRED TO THIS MORNING AS

8    HAKANSSAN 1, IS IT NOT?

9    A. IT IS.

10   Q. WHEN WAS THIS DOCUMENT PUBLISHED?

11   A. I WOULD HAVE TO RELY ON THE DATE WHICH WOULD BE --

12   Q. IS IT 1989.

13   A. SEPTEMBER 19TH OF 1988.  SORRY, THAT WAS THE DATE OF

14   FILING.  IS THAT THE SAME AS --

15   Q. LOOK AT JUST THE YEAR.  1989?

16   A. YES, I WAS LOOKING AT THE DATE OF FILING.

17   Q. YOU DO UNDERSTAND, DO YOU NOT, THAT THIS DOCUMENT

18   ACTUALLY CLAIMS A METHOD OF USING A CLEANING FLUID WHERE IT

19   HAS A NEUTRAL PH?

20   A. NO, I AM NOT AWARE OF THAT.

21   Q. IF YOU WOULD, PLEASE, TURN TO THE BACK END OF THE

22   DOCUMENT, THE LAST PAGE, CLAIM 3.  CLAIM 3 RELATES BACK TO

23   CLAIMS 1 AND 2, SO YOU ARE WELCOME TO LOOK AT THOSE.

24   A. RIGHT.  A METHOD, ACCORDING TO ANY OF CLAIMS 1-2

25   CHARACTERIZED BY ADJUSTING THE PH VALUE OF THE TENSIDE

1    SOLUTION TO GREATER THAN OR EQUAL TO 7.

2    A. CORRECT.  GREATER THAN OR EQUAL TO 7.

3    Q. 7 WOULD BE A PH THAT IS NEUTRAL; IS THAT CORRECT?

4    A. THAT IS NEUTRAL.  PREFERABLY BETWEEN 8.5 AND ALKALI PH

5    VALUE.

6    Q. BUT IT ALSO CLAIMS A NEUTRAL PH, DOES IT NOT, OF 7?

7    A. AGAIN, IF THAT IS WHAT THE CLAIM SAYS, THEN THAT IS WHAT

8    IT MUST SAY.

9            MR. SCHAETZEL:  YOUR HONOR, WE HAVE NO FURTHER

10   QUESTIONS, AND I AM WELCOME TO TAKE BACK THE IMPEACHMENT

11   DOCUMENT THAT I USED, THE DECLARATION, FROM THE COURT.

12           THE COURT:  YES, YOU MAY.  REDIRECT EXAMINATION?

13                    REDIRECT EXAMINATION

14   BY MR. CAPP:

15   Q. MR. MCNALLY WILL YOU TURN TO PLAINTIFF'S EXHIBIT 45,

16   PLEASE.

17   A. THE SEAWASH 7 LABEL?

18   Q. RIGHT.

19   A. I'VE GOT IT.

20   Q. DO YOU SEE ON THERE IN THE LEFT-HAND COLUMN THERE IS THE

21   WORD "NONTOXIC"?

22   A. IT DOES NOT SAY -- YES, IT DOES SAY NONTOXIC.

23   Q. NOW, DID SEAWASH 7 COME WITH MICROBES IN THE FLUID?

24   A. NO, IT DID NOT.

25   Q. WHAT WAS YOUR UNDERSTANDING OF WHAT THE WORD "NONTOXIC"

1    WAS REFERRING TO ON THE LABEL OF SEAWASH 7?

2    A. NOT HARMFUL TO HUMANS.

3             MR. CAPP:  NO FURTHER QUESTIONS, YOUR HONOR.

4             THE COURT:  ANYTHING ELSE?

5             MR. SCHAETZEL:  NO YOUR HONOR.

6             THE COURT:  YOU MAY STEP DOWN.  THAT COMPLETES

7    YOUR TESTIMONY.  ANY OTHER EVIDENCE ON BEHALF OF CHEMFREE?

8             MR. CAPP:  NO, YOUR HONOR.

9             THE COURT:  ANY OTHER EVIDENCE ON BEHALF OF

10   J. WALTER?

11            MR. SCHAETZEL:  NO, YOUR HONOR.

12            THE COURT:  ALL RIGHT.  THE EVIDENCE IS NOW

13   COMPLETED.  WE WILL TAKE ABOUT A TEN MINUTE BREAK, AND AT 2

14   O'CLOCK I WILL HEAR FROM CHEMFREE COUNSEL ON THEIR MOTIONS.

15   I WILL GIVE YOU ABOUT AN HOUR TO TRY TO CONFINE YOU TO THAT

16   SO THAT THEN AT ABOUT 3:15 WE WILL HAVE ONE HOUR OF ARGUMENT

17   ON BEHALF OF J. WALTER, AND THEN A REPLY IF NEEDED, AND THAT

18   WILL COMPLETE THE PRESENTATION OF THE HEARING, UNLESS YOU

19   THINK OF SOMETHING ELSE RIGHT NOW THAT YOU BELIEVE NEEDS TO

20   BE PRESENTED.  WE ARE PRETTY MUCH ON OUR TIME TRACK.  WE'LL

21   BE ON BREAK UNTIL 2 O'CLOCK.

22            (BREAK FROM 1:51 UNTIL 2:00 P.M.)

23            THE COURT:  WE ARE HERE ON THE ARGUMENT PHASE OF

24   THE POST JUDGMENT MOTIONS.  ACTUALLY I SHOULDN'T CALL IT

25   POST JUDGMENT, BUT POST DECISION MOTIONS, SINCE NO FINAL

1    JUDGMENT HAS YET BEEN ENTERED.

2            I HAVE INDICATED THAT YOU HAVE TEN DAYS TO PRESENT

3    ANYTHING MORE YOU WANT ON A COUPLE OF SUBJECTS.  AND NOW I

4    AM GOING TO SAY THAT AFTER THE ORAL PRESENTATIONS THIS

5    AFTERNOON I WILL ALLOW BOTH SIDES SIMULTANEOUS TO FILE ONE

6    ADDITIONAL DOCUMENT WHICH WOULD BE POST ARGUMENT ADDITIONAL

7    AUTHORITIES OR POINTS.  YOU MAY DO THAT IN ORDER TO CLEAN UP

8    ANY ISSUE ON WHICH YOU THINK THE RECORD ISN'T YET CLEAR.

9    ANY OBJECTION TO HAVING EACH SIDE SIMULTANEOUS TWO WEEKS FOR

10   THAT PURPOSE?

11           MR. CAPP:  THAT IS AGREEABLE TO THE PLAINTIFF.

12           MR. SCHAETZEL:  NO OBJECTION, YOUR HONOR.

13           THE COURT:  SO YOU WILL KNOW THAT WHEN YOUR ORAL

14   ARGUMENTS ARE DONE, YOU MAY STILL FACE SOME WRITTEN RESPONSE

15   FROM THE OTHER PARTY.  AND SO THAT DEADLINE WILL BE 14 DAYS

16   FROM TODAY, WHICH WOULD RUN US TO THE 25TH OF FEBRUARY.

17           AND NOW I WILL HEAR YOUR CLOSING PRESENTATIONS.

18           MR. CAPP:  THANK YOU, YOUR HONOR.  ALL OF THE POST

19   TRIAL MOTIONS GO TO ONE ISSUE, AND THAT IS THE AFFIRMATIVE

20   DEFENSE OF OBVIOUSNESS UNDER 35 USC 103.  APART FROM THAT

21   ONE DEFENSE THAT CHEMFREE LOST ON, CHEMFREE HAS PREVAILED ON

22   EVERY OTHER ISSUE IN THE CASE, EVERY AFFIRMATIVE DEFENSE,

23   INFRINGEMENT ACROSS THE BOARD OF ALL 21 CLAIMS, ON ALL FOUR

24   ACCUSED PARTS WASHERS.

25           NOW, I UNDERSTAND COMING IN HERE THAT THESE TYPES

1    OF MOTIONS ARE TYPICALLY AN UPHILL BATTLE.  I UNDERSTAND

2    THAT.  BUT I WANT TO REMIND THE COURT THAT JUST FOUR YEARS

3    AGO THE FEDERAL CIRCUIT IN THE GOLDEN BLOUNT CASE, WHICH IS

4    AT 438 F 3D 1354, POINTED OUT THAT A PARTY MAY MOVE TO AMEND

5    THE FINDINGS OF FACT EVEN IF THE MODIFIED OR ADDITIONAL

6    FINDINGS IN EFFECT REVERSE THE JUDGMENT.  IF THE TRIAL COURT

7    HAS ENTERED AN ERRONEOUS JUDGMENT IT SHOULD CORRECT IT.  AND

8    THAT IS WHY WE ARE HERE TODAY, IS THAT JUDGE CAMP IN

9    ENTERING HIS FINDINGS OF FACT AND CONCLUSIONS OF LAW GOT

10   SOME FINDINGS OF FACT SO WRONG THAT WE HAVE AN ERRONEOUS

11   LEGAL CONCLUSION OF PATENT INVALIDITY THAT HAS TAKEN AWAY

12   ALL OF THE COMMERCIALLY VIABILITY OR THE MOST COMMERCIALLY

13   VIABLE PATENT PROTECTION THAT THIS START-UP COMPANY HAD.  IT

14   HAS BASICALLY BEEN NEARLY A FORFEITURE OF THE PATENT

15   PROTECTION, WHICH WAS THE BASIS FOR THIS START-UP COMPANY

16   COMING ALONG.

17           SO WHAT WE HAVE HERE IS MULTIPLE CLEARLY ERRONEOUS

18   FINDINGS OF FACT LEADING TO AN ERRONEOUS FINDING OF PATENT

19   INVALIDITY WHICH HAS WORKED ESSENTIALLY A FORFEITURE ON MY

20   CLIENT'S PATENT PROTECTION.  AND UNDER AUTHORITIES LIKE

21   GOLDEN BLOUNT, THIS IS THE TIME TO FIX IT, NOT ENTER

22   JUDGEMENT, NOT GO UP AND DOWN TO APPEAL TO THE FEDERAL

23   CIRCUIT UNNECESSARILY AND THEN COME BACK FOR THE TRIAL ON

24   DAMAGES.  YOU HAVE AN OPPORTUNITY TO FIX THIS NOW SO WE

25   DON'T HAVE TO TAKE THIS UP AND DOWN MULTIPLE TIMES.

1          SLIDE 2, PLEASE, A.J.  YOUR HONOR, MY CLIENT'S

2     INVENTION IS THE FIRST OF ITS KIND.  IT IS THE FIRST

3     BIOREMEDIATION PARTS WASHER THAT HAS EVER BEEN, TO OUR

4     KNOWLEDGE, COMMERCIALIZED ANYWHERE IN THE WORLD.  NOW, YOU

5     HAVE SEEN SOME PRIOR ART, YOU SEE SOME PAPER PATENTS THAT

6     MAY SAY SOME THINGS IN THEORY.  BUT AS FAR AS WE KNOW, THE

7     HAKANSSAN TECHNOLOGY WAS NEVER SUCCESSFULLY COMMERCIALIZED.

8     WE HAVE NO EVIDENCE OF THAT IN THE RECORD.  THE AMAT PATENT

9     NEVER COMMERCIALIZED.  AS FAR AS WE'VE BEEN ABLE TO

10    DETERMINE, THROUGH DISCOVERY AND TRIAL IN THIS CASE,

11    CHEMFREE IS THE FIRST ENTITY THAT HAS SUCCESSFULLY

12    COMMERCIALIZED AN OPERABLE BIOREMEDIATION PARTS WASHER.

13         AND I JUST WANT YOU TO STOP AND THINK ABOUT THAT

14    FOR A MINUTE.  NOT JUST AS A JUDGE, BUT AS A PERSON.  UNTIL

15    THESE PEOPLE CAME ALONG, THIS SORT OF THING DIDN'T EXIST,

16    AND NOW IT DOES.

17         NOW, WE SAT THROUGH THE CROSS-EXAMINATION OF

18    MR. MCNALLY, AND YOU COULD SEE THE PROGRESSION, AND SO YOU

19    COULD SEE THE ARGUMENT THAT IS GOING TO COME FROM THAT, AND

20    I AM GOING TO ASK YOU NOT TO BUY INTO THAT.  WHAT THEY ARE

21    GOING TO TRY AND DO WITH YOU IS WHAT THEY TRIED TO DO WITH

22    JUDGE CAMP, AND THAT IS TO LEAD YOU INTO A HINDSIGHT

23    ANALYSIS.  OH, IS THAT ALL YOU DID?  OH, IT WAS THAT EASY?

24    OH WELL THEN, IT MUST HAVE BEEN OBVIOUS.  THAT IS THE WRONG

25    PAIR OF GLASSES THAT YOU ARE TO WEAR WHEN YOU ARE DOING AN

1    OBVIOUSNESS ANALYSIS.  YOU ARE NOT TO RETRACE THE INVENTOR'S

2    FOOT STEPS AND SAY, OH, IS THAT ALL YOU DID?  LOOK HOW EASY

3    THAT WAS.  YOUR JOB IS TO TAKE THE EVIDENCE OF WHAT A PERSON

4    OF ORDINARY SKILL IN THE ART, BEFORE THE DATE OF INVENTION,

5    TAKING INTO ACCOUNT THE PRIOR ART THAT FITS WITHIN THE SCOPE

6    AND CONTENT OF THE PRIOR ART, AND DETERMINE WHETHER THAT

7    PERSON WITH THAT ART WOULD FIND IT OBVIOUS TO COME UP WITH

8    THIS INVENTION.  AND THESE DEFENDANTS HAVEN'T PROVEN THAT,

9    AT THE TRIAL AND CERTAINLY NOT BY GOING BACK AND BRIEFING IT

10   AGAIN.

11           A.J., FLIP TO SLIDE 6.  YOUR HONOR, THIS IS THE

12   SECOND PAGE OF THE 125 PATENT.  IT IS JOINT EXHIBIT 4.  AND

13   NOW THERE IS REFERENCES ON THE FACING PAGE, BUT THIS IS THE

14   SECOND PAGE.  IF YOU COUNT THEM ALL UP, THERE ARE HUNDREDS

15   OF PRIOR ART REFERENCES THAT ARE OF RECORD THAT WERE

16   CONSIDERED BY THE EXAMINER.  ON TOP OF THAT, THESE

17   DEFENDANTS, WE FILED THIS LAWSUIT IN LATE 2004, IT GOT

18   STAYED FOR A YEAR AND A HALF BECAUSE THERE WAS AN OWNERSHIP

19   DISPUTE WHERE WE HAD TO GO OFF LINE AND ARBITRATE AN

20   OWNERSHIP DISPUTE WITH OUR CO-OWNER, AND COME BACK A YEAR

21   AND A HALF LATER.  WE DIDN'T HAVE THE MARKMAN HEARING IN

22   THIS CASE UNTIL 2007.  THESE DEFENDANTS HAD ALMOST THREE

23   YEARS, AT LEAST TWO AND A HALF YEARS, TO DO A THOROUGH PRIOR

24   ART SEARCH TO SEE IF THERE IS ANYMORE ART THAT WAS MORE THAN

25   THE HUNDRED THAT ARE ON THE FACE OF THAT PATENT.  THAT IS

1    WHAT THEY HAD TO WORK WITH, TO COME IN FOR ART TO TRY AND TO

2    INVALIDATE THIS PATENT.  THESE PATENTS WERE EXAMINED BY A

3    HIGHLY EXPERIENCED PATENT EXAMINER, FRANKIE STINSON.

4    ALLOWED ALL 11 OF THE PATENTS THAT WE HAVE, FOUR OF WHICH WE

5    ARE ASSERTING IN THE CASE.  HE HAS EXAMINED THESE PATENTS

6    OVER AND OVER AND OVER AGAIN.  HE HAS 11 DIFFERENT PATENTS,

7    INCLUDING THE FOUR THAT WE ARE SUING ON.  AND THESE PATENTS

8    HAVE BEEN ALLOWED OVER THE BEST AVAILABLE PRIOR ART THAT IS

9    THERE.

10           NOW, IF YOU HAD TIME, THE DEFENDANTS HAVE ONLY

11   COME UP WITH TWO PRIOR ART REFERENCES THEY ARE ALLOWED TO

12   ASSERT IN THIS CASE, WHEN YOU TAKE ALL OF THE RULINGS, THAT

13   TWO OUT OF THE MORE THAN 100 HERE.  BUT IF YOU WERE TO GO

14   THROUGH THE ART, HERE IS WHAT YOU WOULDN'T FIND IN THE ART

15   BEFORE CHEMFREE CAME ALONG.  THE FIRST THING YOU ARE NEVER

16   GOING TO FIND IS YOU ARE NOT GOING TO FIND SOMEONE DOING

17   PARTS WASHING USING A PH NEUTRAL CLEANING FLUID.  IT IS

18   UNHEARD OF UNTIL CHEMFREE CAME ALONG.  ANY TIME YOU SEE IN

19   THE PRIOR ART LITERATURE ABOUT CLEANING FLUID, IT IS

20   ALKALINE OR VERY ACIDIC, BUT ALKALINE USUALLY AT A PH OF 9

21   OR ABOVE.  THAT IS FINE FOR A CLOSED CABINET PARTS WASHER.

22   FINE.  BUT WHEN YOU ARE TALKING ABOUT AN OPEN BASIN WHERE A

23   HUMAN BEING, WITH THEIR SKIN IN THE GAME, AND THEY ARE DOING

24   IT FOR HOURS A DAY, AND THAT THAT IS THEIR JOB DESCRIPTION

25   MONDAY THROUGH FRIDAY AND THEY COME BACK THE FOLLOWING

1    MONDAY, IT'S NOT A GOOD IDEA TO HAVE THAT MAN OR WOMAN WITH

2    THEIR HANDS DIPPED IN THAT KIND OF CHEMICAL DAY AFTER DAY

3    AFTER DAY, BECAUSE OF THE DANGER OF GETTING CONTACT

4    DERMATITIS.  CHEMFREE, BY COMING IN WITH SEAWASH 7, WHICH IS

5    NEUTRAL PH, COULD PRETTY MUCH LET THAT PERSON WASH THEIR

6    PARTS ACCORDING TO THEIR NORMAL JOB DESCRIPTION AND THEY

7    DON'T GET DERMATITIS, THEY DON'T HAVE WORKERS'COMP CLAIMS,

8    THEY DON'T LOSE TIME OUT OF WORK.  THAT IS A FIRST.

9          THE NEXT THING YOU WON'T FIND IN THE PRIOR ART IS

10   YOU WILL NOT FIND A SMALL -- ONE OF THESE MALL PARTS WASHERS

11   CALLED A SINK-ON-A-DRUM PARTS WASHER WITH AN INTEGRATED

12   SYSTEM THAT INTEGRATES HEAT, LEVEL CONTROL, A HEATER WITH A

13   THERMOSTAT AND LEVEL CONTROL SYSTEM.  AND THE REASON WHY IS

14   BECAUSE MINERAL SPIRITS YOU DIDN'T HEAT BECAUSE OF THE FIRE

15   HAZARD, AND IN THE EARLY AQUEOUS CLEANERS THERE WAS NO

16   REASON TO KEEP THE HEATER RUNNING.  YOU WOULD TURN IT ON,

17   YOU WOULD WASH IT, AND TURN IT OFF AT NIGHT.  BUT FOR THE

18   FIRST TIME THERE WAS A NEED TO RUN THE HEATER CONTINUOUSLY.

19   AND SO OUR FOLKS CAME IN AND GOT IT TO WORK SAFELY BY

20   INTEGRATING A LEVEL CONTROL SWITCH, A THERMOSTAT WITH THE

21   HEATER, SO THAT YOU COULD MAINTAIN THE BIOLOGICAL CULTURE

22   AND IDEAL TEMPERATURE 24/7 AND HAVE A WORKABLE SYSTEM.  SO

23   THAT IS THE FIRST TIME YOU SEE THAT IN THE PRIOR ART.

24          THIS IS THE FIRST TIME YOU WILL SEE AN ATTEMPT TO

25   INTRODUCE BIOREMEDIATION CAPABILITY INTO ONE OF THESE SMALL

1    PARTS WASHERS.  THE EARLIER ATTEMPTS, YOU ARE TALKING ABOUT

2    YOUR HAKANSSAN 1, YOUR HAKANSSON 2, AND MAYBE YOUR AMAT, ARE

3    ALL VERY VERY LARGE INDUSTRIAL MACHINES, CLOSE CABINETS, AND

4    THEY HAVE VERY COMPLEX SYSTEMS ON THERE TO MONITOR THE PH,

5    AND TO PERIODICALLY ADD SURFACTANTS IN ORDER TO REPLACE

6    DEPLETION OF SURFACTANTS DURING THE OPERATION.  THEY PUT IN

7    ALKALI CHEMICALS FROM TIME TO TIME AFTER THEY MONITOR THE PH

8    IN ORDER TO MAINTAIN THE PH AT A STABLE LEVEL, BECAUSE THE

9    CONCERN WAS THAT YOU WOULD GENERATE SO MUCH ACID DURING THE

10   PROCESS, THAT IT WOULD FALL.

11          SO THIS IS THE FIRST TIME YOU WERE ABLE TO

12   SIMPLIFY THE PROCESS, PUT IT IN A SMALL PARTS WASHER WHERE

13   YOU COULD PUT IT IN A GARAGE AND AN AUTO MECHANIC COULD USE

14   IT, OPERATE IT, AND NOT HAVE TO WORRY ABOUT THE COMPLEXITY

15   THAT WAS IN THE PRIOR ART.

16          NOW, LET'S GET TO THE KEY CLAIM LIMITATION THAT

17   THIS CASE TURNED ON.  GO TO SLIDE 7.  YOUR HONOR, THIS IS

18   CLAIM 1 TO THE 110 PATENT, AND I HAVE HIGHLIGHTED THE CLAIM

19   LIMITATION THAT WAS REALLY THE FULCRUM FOR JUDGE CAMP'S

20   DECISION.  IT IS BIODEGRADABLE, NONTOXIC, NONCAUSTIC,

21   NONFLAMMABLE OIL DISPERSANT CLEANER AND DEGREASER FLUID.  IN

22   THE 125 PATENT THE WORDS ARE CLAIMING A LITTLE DIFFERENTLY

23   AND IT IS IMPORTANT WHEN YOU GO BACK AND LOOK AT THE CASE

24   THAT YOU SEE THE DIFFERENT CONTEXT IN WHICH IT IS USED.  IN

25   THE 110 PATENT AND THE 835 PATENT, YOU WILL ALWAYS SEE

1    NONTOXIC AND NONCAUSTIC RIGHT NEXT TO EACH OTHER JUST

2    SEPARATED BY A COMMA.  WHEN YOU GET TO THE 125 PATENT, YOU

3    WILL SEE AN ENTIRELY SEPARATE PHRASE LATER ON THAT THE FLUID

4    IN THE 125 JUST REFERS TO BIODEGRADABLE, NONCAUSTIC, AND

5    NONFLAMMABLE, AND THEN LATER ON IT WILL SAY TO WHICH IS

6    NONTOXIC TO THE MICROBES.  AND THE SIGNIFICANCE OF THAT,

7    YOUR HONOR, IS THAT IN TWO OF THE PATENTS, "NONTOXIC" IS

8    USED IN A BROAD ENOUGH CONTEXT THAT IT COULD APPLY TO THE

9    MICROBES OR THE OPERATOR.  REMEMBER WE JUST WENT THROUGH

10   THAT ON EXHIBIT 45.  AND I WILL SHOW YOU HOW THAT APPEARS IN

11   DIFFERENT CONTEXTS IN THE SPECIFICATION AS WELL.

12          NOW, ONE OF THE IMPORTANT THINGS I WANT TO POINT

13   OUT ABOUT THIS CLAIM LIMITATION HERE IS THAT THAT WAS NOT

14   DRAFTED BY THE PATENT APPLICANT, THAT WAS DRAFTED BY THE

15   PATENT EXAMINER.  THAT CAME INTO THE PATENT AS AN EXAMINER'S

16   AMENDMENT IN THE VERY VERY FIRST NOTICE OF ALLOWANCE THAT

17   WAS GIVEN WHEN WE FIRST GOT OUR PATENTS, AND IT CAME IN AT A

18   POINT IN TIME WHEN, PRIOR TO THAT POINT IN TIME THE STANDING

19   REJECTION WAS OVER HAKANSSON TECHNOLOGY.  SO WHAT YOU HAD

20   WAS A REJECTION OVER THE HAKANSSON TECHNOLOGY, THEN YOU HAD

21   A TELEPHONE INTERVIEW BETWEEN THE EXAMINER AND CHEMFREE'S

22   PATENT ATTORNEY WHERE THEY REACHED AN AGREEMENT, AND THE

23   AGREEMENT WAS TO NARROW THE FLUID FROM JUST AN OIL

24   DISPERSANT DEGREASER FLUID TO OIL DISPERSANT DEGREASER THAT

25   WAS BIODEGRADABLE, NONCAUSTIC, AND NONFLAMMABLE, BECAUSE IT

1   WAS THOUGHT YOU HAVE TO FIGURE, BY THE EXAMINER AT THAT

2   TIME, THAT THAT IS WHAT YOU NEEDED TO DISTINGUISH OVER

3   HAKANSSON.

4           NOW, WHEN WE GOT INTO THE TRIAL, THE WAY THIS CASE

5   PROGRESSED IS WE'VE GOT LOCAL RULES, WE HAVE INVALIDITY

6   CONTENTIONS, WE GO TO THEIR INVALIDITY CONTENTIONS.  AND

7   THEIR FIRST SET OF INVALIDITY CONTENTION WAS A SINGLE

8   REFERENCE.  IT WAS THE HAKANSSON 2 REFERENCE.  WHICH, IF YOU

9   WILL TAKE THE TIME TO READ BOTH THE REFERENCES, YOUR HONOR,

10  HAKANSSON 1 IS LONGER AND HAS A MORE DETAILED DISCLOSURE OF

11  MICROBES AND CLEANING AGENTS THAN HAKANSSON 2.  WHEN YOU

12  READ HAKANSSON 2, IT'S BASICALLY AN ELECTROMECHANICAL

13  APPARATUS PATENT THAT MAKES A PASSING REFERENCE TO DETERGENT

14  AND A PASSING REFERENCE TO MICROBES.  BUT THERE IS NO WHAT

15  YOU WOULD CONSIDER TO BE AN ENABLEMENT DISCLOSURE OF HOW TO

16  MAKE THE FLUID, OR WHAT THE FLUID IS, OR ANYTHING LIKE THAT.

17          AND ONE OF THE SIGNIFICANT THINGS ABOUT THAT IN

18  THIS CASE IS, AS A DISCOVERY SANCTION, THE DEFENDANTS WERE

19  NEVER PERMITTED TO RELY ON THE HAKANSSON 1 REFERENCE.  THEY

20  TRIED AND THE JUDGE STRUCK IT BECAUSE THEY WERE PLAYING

21  GAMES WITH THE LOCAL RULES.  SO WHEN THEY GOT TO TRIAL THEY

22  WERE ONLY ABLE TO RELY ON HAKANSSON 2.

23          BUT HAKANSSON 2 DOES NOT HAVE ANY SORT OF A

24  DISCLOSURE FROM WHICH YOU CAN DERIVE BIODEGRADABLE,

25  NONTOXIC, NONCAUSTIC, NONFLAMMABLE, EXPRESSLY BECAUSE WHEN

1    THEY CAME TO TRIAL, THEY WERE LIMITED TO TRYING TO PROVE

2    THAT IT WAS PRESENT INHERENTLY.  BUT THE WAY THIS CASE

3    PROGRESSED IS WE GOT THEIR INVALIDITY CONTENTIONS, WE SAW

4    THAT THAT WAS ONLY GOING TO BE MET INHERENTLY, SO WE SENT

5    THEM AN INTERROGATORY.  IT WAS INTERROGATORY NO. 5.  WE

6    ASKED THEM TO DISCLOSE WHAT IS YOUR EXTRINSIC EVIDENCE THAT

7    SHOWS THAT HAKANSSON 2 INHERENTLY HAS THOSE CHARACTERISTICS.

8    THEY GAVE THEM AN EVASIVE NONANSWER.  WE MOVED TO COMPEL

9    DISCOVERY, WE HAD A HEARING IN THIS COURTROOM IN 2007, AND

10   THEIR ATTORNEYS AT THE TIME, THEY WERE BEING REPRESENTED BY

11   A DIFFERENT LAW FIRM AT THE TIME, THEIR ATTORNEYS GOT UP

12   HERE AT THIS PODIUM AND SAID WE SHOULDN'T HAVE TO TELL THEM

13   NOW, YOUR HONOR.  WE WILL TELL THEM, WHEN WE GET TO THE

14   EXPERT REPORT, AND THAT OUGHT TO BE GOOD ENOUGH.  AND SO

15   JUDGE CAMP DIDN'T SANCTION THEM AND DIDN'T COMPEL THEM TO

16   GIVE A MORE DETAILED ANSWER AT THE TIME.  HE TOOK IT FACE

17   VALUE THAT THEY WOULD AUGMENT AND SUPPLEMENT THEIR ANSWER TO

18   INTERROGATORY NO. 5 WHEN THEY GAVE THEIR EXPERT REPORT.

19           SO NOW WE GET TO 2008, AND THERE IS A CHANGE OF

20   COUNSEL.  KING & SPALDING COMES IN, MCKENNA, LONG & ALDRIDGE

21   IS OUT, AND IT IS ABOUT 40 DAYS BEFORE INITIAL REPORTS ARE

22   DUE.  WE GET THEIR INITIAL EXPERT REPORT.  WHAT IS THE

23   REFERENCE THAT IS MISSING FROM IT?  THERE IS NO MENTION OF

24   IT AT ALL.  NO HAKANSSON 2.  IT IS NOT MENTIONED AT ALL.  SO

25   BY THE TIME WE GOT TO PRETRIAL, WE FILED A MOTION IN LIMINE.

```
 1    IT WAS MOTION IN LIMINE NO. 2.  AND WE ASKED JUDGE CAMP,
 2    BASED ON FEDERAL CIVIL PROCEDURE 37, THAT WITH THOSE KIND
 3    OF, YOU KNOW, NONRESPONSIVE DISCOVERY AND EXPERT REPORTS,
 4    THEY SHOULDN'T BE ABLE TO COME TO TRIAL AND PUT ON EXTRINSIC
 5    EVIDENCE, THAT THAT CLAIM LIMITATION WAS MET INHERENTLY.
 6    JUDGE CAMP AGREED, HE GRANTED MOTION IN LIMINE NO. 2.  AND
 7    I'VE GOT ALL OF THESE ORDERS BY DOCKET AND, QUOTE, DETAILED
 8    IN THE PROPOSED FINDINGS THAT I HAVE SENT YOU.  SO IT IS ALL
 9    AVAILABLE TO YOU.  BUT BASICALLY THEY WERE NOT TO COME TO
10    TRIAL AND TRY TO PUT ON EXTRINSIC EVIDENCE THAT THAT CLAIM
11    LIMITATION WAS MET INHERENTLY.  THE PROBLEM WAS, THEY KNEW
12    THEY COULDN'T HAVE A CHANCE OF WINNING THE CASE IF THEY
13    ABIDED BY THAT COURT ORDER, SO THEY WENT OUT OF THEIR WAY TO
14    WORK UP A WAY OF TRYING TO GET EVIDENCE IN THROUGH THEIR
15    EXPERT THAT GOT AROUND THE ORDER, AND APPARENTLY THEY WERE
16    SUCCESSFUL AT IT, THEY GOT IN TWO QUESTIONS ON NONCAUSTIC,
17    THEY GOT IN ONE QUESTION ON NONFLAMMABLE, THAT ENTIRE
18    TESTIMONY TAKES LESS THAN A PAGE OF THE TRANSCRIPT.  IT
19    TAKES PROBABLY LESS THAN A MINUTE.  AND THAT WAS WHAT JUDGE
20    CAMP HUNG HIS HAT ON IN FINDING THAT THAT LIMITATION WAS
21    INHERENTLY MET, THEN HE FOUND THAT ALL OF THE LIMITATIONS
22    WERE MET THEN HE FOUND THAT IT WAS OBVIOUS.  SO BASICALLY
23    THE END RESULT IN THIS CASE TURNS ON THEIR VIOLATION OF AN
24    EVIDENCE EXCLUSIONARY ORDER, AND THEN JUDGE CAMP RELYING ON
25    INADMISSIBLE EVIDENCE AS THE KEY LINCHPIN IN INVALIDATING
```

1   THESE PATENTS.

2            HERE IS THE OTHER THING THAT CAME OUT AT TRIAL, IS

3   WHEN WE GOT TO THE JOINT CLAIM CONSTRUCTION STATEMENT -- AND

4   BY THE WAY, NONCAUSTIC WAS NEVER CONSTRUED BY THE COURT.

5   THAT IS VERY IMPORTANT, YOUR HONOR.  AND IF YOU LOOK AT THE

6   VERY LENGTHY AFFIDAVIT THAT I PUT IN ON OUR FIRST POST TRIAL

7   MOTION, I'VE GOT THE WHOLE SEQUENCE DETAILED, INCLUDING THE

8   NEGOTIATIONS THAT WENT INTO THAT STIPULATION.  ALL OF THE

9   SUPPORTING DOCUMENTS ARE IN THERE, THE E-MAILS ARE IN THERE.

10  IT IS ALL IN THERE.  BUT BASICALLY WHEN WE EXCHANGED

11  PRELIMINARY INSTRUCTIONS, WE CITED ALMOST VERBATIM WHAT WAS

12  STIPULATED TO.  THEY CAME IN WITH SOMETHING THAT BASICALLY

13  SAID NONCAUSTIC MEANS A CLEANING FLUID WITH A PH UNDER 12.

14  AND THEY EFFECTIVELY ABANDONED THAT, AGREED TO OURS, BUT WE

15  NEVER BE CAME IN COURT AND HAD AN ADVERSARIAL MARKMAN

16  PROCEEDING TO INTERPRET THAT CLAIM.

17           A.J., GO TO SLIDE 11.  I WANT TO GO THROUGH ALL OF

18  THESE THREE BULLET POINTS WITH YOU VERY CAREFULLY.  FIRST OF

19  ALL, WHEN YOU LOOK AT ONE OF THE PROBLEMS TO BE OVERCOME BY

20  THIS INVENTION, IT WAS TO REDUCE THE INCIDENCE OF DERMATITIS

21  IN WORKERS.  AND SO THE WAY TO DO THAT WAS WITH A NONCAUSTIC

22  FLUID.  AND SO WHEN IT CAME TIME TO DO THE JOINT CLAIM

23  CONSTRUCTION STATEMENT, HERE IS WHAT THE PARTIES STIPULATED

24  TO.  IT IS THE MIDDLE ONE RIGHT UNDERNEATH THE SECOND YELLOW

25  BLOCK.  HERE IS WHAT WE AGREED TO:  QUOTE, NONCAUSTIC MEANS

1    THAT THE CLEANING FLUID DOES NOT BURN OR ERODE ORGANIC

2    TISSUE, SUCH AS THE SKIN OF THE OPERATOR, BY CHEMICAL

3    ACTION.

4         NOW, I AM THE ONE THAT DRAFTED THAT, YOUR HONOR.

5    AND THE OTHER PARTY THAT AGREED TO IT WAS THE LAW FIRM OF

6    MCKENNA, LONG & ALDRIDGE, AND THEY ARE NOT HERE.  BUT I

7    DON'T KNOW HOW I COULD HAVE BEEN ANY MORE CLEAR ABOUT WHAT

8    THE MEANING OF THAT IS.  WHAT WE ARE TRYING TO DO WITH THE

9    NONCAUSTIC FLUID IS PROTECT THE HEALTH OF THE OPERATOR.

10         WHAT HAPPENED AT THE TRIAL WAS THEY GOT IN A

11    COUPLE OF QUESTIONS WITH THEIR EXPERT SAYING, WELL, WHAT

12    ABOUT NONCAUSTIC?  WHAT DOES THAT DO TO THE MICROBES?  AND

13    DR. ADRIAENS TESTIFIED THAT, WELL, A CAUSTIC SOLUTION WILL

14    HURT THE MICROBES.  AND SOMEHOW BY THE TIME WE GOT TO JUDGE

15    CAMP'S FINDINGS, AND THIS IS AT PAGE 49 OF HIS ORDER, HE

16    GOES:  "A PERSON OF ORDINARY SKILL USING A CLEANING FLUID AT

17    THE TIME OF THE INVENTION WOULD NECESSARILY USE A FLUID

18    WHICH DOES NOT HARM THE MICROBES THUS HAKANSSON 2 INHERENTLY

19    DISCLOSES A NONCAUSTIC FLUID."  NONCAUSTIC HAS NOTHING TO DO

20    WITH THE MICROBES.

21         GO TO THE NEXT SLIDE, A.J.  GO TO SLIDE 19.  I AM

22    TRYING TO SKIP AHEAD BECAUSE YOU ONLY GAVE ME AN HOUR, YOUR

23    HONOR.  THERE IS HAKANSSON.  THIS IS HAKANSSON.  THIS IS THE

24    ONE THAT WAS IN FRONT OF EXAMINER STINSON WHEN HE ALLOWED

25    THE CLAIMS, AND THERE IS A QUOTE FROM PAGE 2.

```
 1              THE COURT:  THIS SAYS HAKANSSON 1.
 2              MR. CAPP:  YOU ARE RIGHT.  HAKANSSON 1.
 3              THE COURT:  GO AHEAD.
 4              MR. CAPP:  THE TENSIDES WILL PROBABLY WORK AT A PH
 5    OF 7 UP TO AN ALKALINE PH VALUE WHICH WILL NOT BLOCK
 6    MICROBIAL GROWTH.  THIS PH VALUE IS AT PRESENT ABOUT 9.5,
 7    BUT MAY CONCEIVABLY INCREASE THROUGH GENETIC MANIPULATION OF
 8    THE MICROORGANISMS.  IT HAD BEEN FOUND THAT GOOD CLEANING
 9    AND DEGREASING RESULTS HAVE BEEN ACHIEVED AT ALKALINE PH
10    VALUES ABOVE 8.5.  SO HERE AGAIN YOU HAVE THE TEACHING THAT
11    THE CONVENTIONAL WISDOM AT THE TIME WAS, IF YOU WANTED TO
12    CLEAN IN A WATER BASED ENVIRONMENT YOU NEED ALKALINE FLUIDS.
13    YOU'VE GOT THAT TEACHING.  AND THEN HERE, THIS IS HAKANSSON
14    TALKING, HE IS SAYING THE LEVEL OF PH WHICH WILL BLOCK
15    MICROBIAL GROWTH IS ABOUT 9.5, OR WE ARE HOPING WE CAN GET
16    IT UP TO 10.
17              NOW, SLIDE 20.  I AM SURE YOUR HONOR IS FAMILIAR
18    WITH THE PH SCALE THAT RUNS FROM ACIDIC TO ALKALINE.  THE
19    LOW NUMBERS ARE ACIDITY, THE HIGH NUMBERS ARE ALKALINE, THE
20    NEUTRAL PH IS 7.  THE PREFERRED RANGE FOR THE HAKANSSON
21    TECHNOLOGY IS 9.2 TO ABOUT 9.4.  IF YOU LOOK AT THE EXAMPLES
22    THEY FLUCTUATE.  SOME GO UP TO 10, SOME MAY GO DOWN TO ABOUT
23    9 OR SO FOR THE PREFERRED RANGE.  CHEMFREE TALKS ABOUT BEING
24    NONCAUSTIC.
25              NOW, WHEN YOU START TALKING ABOUT MICROBES,
```

1    HAKANSSON SAYS YOU DON'T START INHIBITING MICROBIAL GROWTH,

2    AT LEAST IN HIS STRAINS, UNTIL PH 9.5.  WHEN YOU START

3    TALKING ABOUT WHAT IS NONCAUSTIC TO HUMAN SKIN, YOU ARE

4    TALKING ABOUT A RANGE OF ABOUT, YOU KNOW, 5.5 TO 6 ON THE

5    ACIDIC SIDE AND MAYBE 8.5 OR SO ON THE ALKALINE SIDE.  SO

6    WHAT YOU HAVE IS A WINDOW OF ABOUT 8.5 TO 8.6 TO SOMEWHERE

7    IN THE MID 9'S, WHERE THE LITERATURE SAYS YOUR

8    MICROORGANISMS ARE OKAY, BUT WHERE YOUR DERMATOLOGISTS ARE

9    SAYING YOU HAVE A SUBSTANTIAL RISK OF CONTRACTING DERMATITIS

10   IF YOU GO UP INTO THAT RANGE.

11          AND THAT MAY HAVE BEEN, WE DON'T KNOW, BECAUSE I

12   COULDN'T GET EXAMINER STINSON TO TESTIFY, THAT MAY HAVE BEEN

13   THE REASON, OR AT LEAST ONE OF THE REASONS, WHY HE SAID --

14   WHY HE ALLOWED THE CLAIMS AND WHY HE LATER SAID IN HIS 305

15   APPLICATION INTERVIEW SUMMARY THAT NEITHER HAKANSSON 1 NOR

16   HAKANSSON 2 EXPRESSLY OR INHERENTLY DISCLOSES A FLUID THAT

17   IS BIODEGRADABLE, NONCAUSTIC, NONTOXIC, NONFLAMMABLE.

18          NOW, WHAT I JUST SHOWED YOU THERE IS HAKANSSON 1.

19   BUT WOULD YOU GO TO 21?  AND BY THE WAY, WHEN WE SAY

20   HAKANSSON 1 AND HAKANSSON 2, IT IS CLEAR FROM READING IT, IT

21   IS THE SAME INVENTOR.  HAKANSSON 2 IS THE LATER ONE, BUT IF

22   YOU WILL READ IT CAREFULLY YOU WILL SEE IT DOES NOT

23   INCORPORATE BY REFERENCE HAKANSSON 1.  IT DOES NOT

24   INCORPORATE BY REFERENCE.  BUT HERE IS WHAT IT DOES DO.  IF

25   YOU TAKE A LOOK AT THE SLIDE AND TAKE A LOOK AT THE FEATURES

1    THAT I HAVE CIRCLED IN RED, YOUR HONOR, AND READ BOTH THE

2    PATENTS, WHAT YOU WILL FIND IS THAT THOSE ARE MONITORING AND

3    METERING SUBSYSTEMS IN ORDER TO MONITOR THE PH AND ADJUST

4    THE PH.  SO IN THE PREFERRED EMBODIMENT OF HAKANSSON 1, HE

5    TALKS ABOUT THE PH -- HE IS THE ONE THAT DISCLOSES YOU HAVE

6    A PROBLEM WITH ACID GENERATION, WHICH IS WHY HE IS TRYING TO

7    DO THIS IN THE FIRST PLACE, WHEN THE PH DROPS TO ABOUT 89.2

8    ON THE MONITOR, THEN HE SAYS YOU METER IN ALKALI TO PUSH IT

9    BACK IN THE RANGE OF 9.2 TO 9.4.  SO THAT IS HAKANSSON 1.

10         WHEN YOU GET OVER TO HAKANSSON 2, IF YOU WILL SEE

11   THE FEATURES I CIRCLED IN RED, IT TALKS ABOUT THEIR PURPOSE

12   BEING TO MONITOR AND METER TO ADJUST THE PH, BUT IT NEVER

13   SAYS WHAT PH.  IT IS SILENT ON THE PH.  SILENT.  IT DOESN'T

14   SAY ANYTHING.

15         SO HERE IS THE POINT.  GO TO SLIDE 22, YOUR HONOR.

16   IF IT IS POSSIBLE FOR HAKANSSON 1 TO BE CAUSTIC, THEN IT IS

17   IMPOSSIBLE FOR HAKANSSON 2 TO INHERENTLY BE NONCAUSTIC.  I

18   MEAN, IT IS JUST THAT SIMPLE.  IF YOU LOOK AT THE LAW ON

19   INHERENT, ON INHERENCY, SOMEONE OF ORDINARY SKILL IN THE ART

20   WOULD HAVE TO LOOK AT IT AND IMMEDIATELY RECOGNIZE THAT THAT

21   PROPERTY NECESSARILY HAS TO BE PRESENT, IT IS JUST THAT

22   PEOPLE IN THE ART WOULD LOOK AT IT AND IMMEDIATELY KNOW --

23   YOU AND I WOULDN'T KNOW BECAUSE WE ARE NOT IN THE

24   INDUSTRY -- BUT IF HAKANSSON 1 CAN BE CAUSTIC, THEN

25   HAKANSSON 2 CANNOT BE INHERENTLY NOT CAUSTIC, AND THAT IS

```
 1    WHERE JUDGE CAMP GOT IT WRONG.  AND HE GOT IT WRONG ON A
 2    TWO-LEGGED STOOL.  LEG NUMBER ONE IS HE INCORRECTLY APPLIED
 3    "NONCAUSTIC" TO MICROBES INSTEAD OF WHERE IT SHOULD HAVE
 4    BEEN, WHICH WAS THE HEALTH OF THE OPERATOR.  AND THEN THE
 5    SECOND THING IS HE LISTENED TO AND ADMITTED EVIDENCE THAT HE
 6    GAVE ME A RULING IN LIMINE, SAID HE WASN'T GOING TO ALLOW IN
 7    AND CONSIDER.  SO WHAT I AM GOING TO ASK YOUR HONOR TO DO
 8    TODAY WHEN YOU GO BACK THROUGH THIS, I AM GOING TO ASK YOU
 9    TO GO THROUGH THE RECORD, AND I HAVE HIGHLIGHTED THAT
10    TESTIMONY IN THE PROPOSED FINDINGS AND CONCLUSIONS.  FIND
11    THAT TESTIMONY WHERE THEY DELIBERATELY CIRCUMVENTED THE
12    EVIDENCE EXCLUSION ORDER, AND THEN I AM GOING TO ASK YOU TO
13    ENFORCE THE ORDER AND RULE THAT THAT IS INADMISSIBLE, AND
14    THEN I WANT YOU TO GO BACK AND REDO THE GRAND FACTORING
15    ANALYSIS ON WHETHER THESE PATENTS ARE OBVIOUS OR NOT,
16    CONSIDERING JUST THE ADMISSIBLE EVIDENCE.  AND WHEN YOU DO
17    THAT, AT LEAST 18 OF THESE 21 CLAIMS ARE GOING TO BE NOT
18    INVALID.
19            I HAVE USED UP ABOUT HALF OF MY TIME, YOUR HONOR.
20    THERE MAY BE SOMETHING ELSE THAT I WANT TO SAY ABOUT
21    NONCAUSTIC, BUT JUST GIVE ME A SECOND.  (PAUSE).  IF YOU
22    DON'T MIND, I WOULD LIKE TO USE THE REST OF MY TIME ON THE
23    OTHER ISSUES.
24            THE COURT:  YES.  I MEAN, I DON'T MIND.
25            MR. CAPP:  LET'S GO TO THE POWER POINT ON
```

1    ENABLEMENT.  WHEN WE GOT INTO THIS CASE, AND IF YOU HAVE

2    TIME TO GO THROUGH THE RECORD, AND I WOULDN'T BURDEN YOU

3    WITH THAT OTHER THAN TO RECOGNIZE THAT THESE DEFENDANTS OVER

4    AND OVER AND OVER AGAIN KEPT PLAYING GAMES WITH THEIR LOCAL

5    RULE CONTENTIONS, TO FINALLY WE GOT AN ORDER IN PLACE THAT

6    LIMITED TO FOUR REFERENCES, TWO OF THOSE WOUND UP BEING NOT

7    IN THE SCOPE AND CONTENT OF THE PRIOR ART BECAUSE THEY

8    POST-DATED OUR DATE OF INVENTION.  SO WHEN THEY WENT TO

9    TRIAL, YOUR HONOR, THEY COULD RELY PROPERLY ON TWO AND ONLY

10   TWO REFERENCES:  HAKANSSON 2 THAT YOU HAVE SEEN, AND THIS

11   OTHER ONE CALLED ATHEY, WHICH IS NOTHING MORE THAN A 1960'S

12   ERA CLOSED CABINET COMMERCIAL DISHWASHER.  AND ALL THEY DO

13   WITH ATHEY IS THEY GO IN THERE AND THEY CHERRY PICK OUT THE

14   HEATER FLOAT SWITCH AND THERMOSTAT APPARATUS AND SAY, OH,

15   WELL, IT WOULD BE OBVIOUS TO PULL THIS OFF OF ATHEY AND PUT

16   IT ON A PARTS WASHER.  THEREFORE, YOU KNOW, WE'VE GOT ALL OF

17   THE CLAIM LIMITATIONS WE NEEDED.  IT WAS ONE OF THOSE THINGS

18   THAT THEY JUST CHERRY PICKED SOMETHING AND ISOLATED THE

19   REFERENCE AND PLUGGED IT IN SO THEY COULD MEET ALL OF THE

20   CLAIM LIMITATIONS.

21        IF YOU READ HAKANSSON 2 AND ATHEY, IF YOU JUST

22   READ THEM AND ASK YOURSELF, DO THEY DISCLOSE HOW TO MAKE AND

23   USE AN OPERABLE BIOREMEDIATION PARTS WASHER IN TERMS OF DO

24   THEY TELL ME AS A PRACTITIONER HOW TO FORMULATE THE FLUID,

25   WHERE TO GO TO BUY THE FLUID, WHAT MICROBES TO USE, THEY

```
1     DON'T.  BOTH OF THEM ARE SILENT ON THOSE TWO THINGS.  SO
2     THIS IS BASICALLY THE SUBJECT OF OUR SECOND AND OUR THIRD
3     POST TRIAL MOTION.  THE WAY IT CAME UP IN THE SECOND IS WE
4     CHALLENGED WHETHER HAKANSSON AND ATHEY HAD AN ENABLEMENT
5     DISCLOSURE IN THE REPLY BRIEF.  WE POINTED OUT HOW THIS TIED
6     IN TO JUDGE CAMP'S FINDING ABOUT A, QUOTE, UNQUOTE, EXISTING
7     FLUID.  THEY HAVE TO FILE THE SURREPLY BRIEF SO THEY COULD
8     REPLY TO THAT.  I SAID FORGET THAT, HERE IS A WHOLE NEW
9     MOTION ON EXISTING FLUID, YOU CAN BRIEF TO YOUR HEART'S
10    CONTENT ON IT.  SO THAT IS WHY WE WOUND UP WITH THREE
11    MOTIONS INSTEAD OF TWO.
12         GO TO THE NEXT SLIDE, PLEASE.  THERE IS THE --
13    THIS IS ONE OF THE FINDINGS IN JUDGE CAMP'S ORDER THAT IS
14    COMPLETELY ERRONEOUS, AND I WANT YOU TO SEE TWO THINGS.  I
15    WANT YOU TO SEE HOW JUDGE CAMP IN HIS MIND IS GOING BACK TO
16    WHAT HE JUST FINISHED UP DOING ON ENABLEMENT, AND HE IS
17    RELYING ON THAT INFORMATION TO GUIDE HIM IN HIS OBVIOUSNESS
18    ANALYSIS.
19         AND THEN I WANT YOU TO SEE HOW HE GETS TO WHETHER
20    THE PRIOR ART ENABLES THE INVENTION IN TERMS OF THE CLEANING
21    FLUID.  AND HE SAYS, I QUOTE, "JUST AS THE PERSON OF
22    ORDINARY SKILL WAS NOT SUFFICIENTLY TRAINED IN ENVIRONMENTAL
23    SCIENCE TO DEVELOP A CLEANING AGENT WHICH WOULD BOTH CLEAN
24    METAL AND CO-EXIST WITH MICROBES IN THE ENABLEMENT
25    SITUATION, NEITHER WOULD THAT PERSON HAVE BEEN ABLE TO
```

1   CREATE AN APPROPRIATE COMBINATION OF CLEANING FLUID AND

2   MICROBES."  WELL, THAT IS INTERESTING.

3          IF YOU JUST STOP RIGHT THERE.  IN OTHER WORDS,

4   JUDGE CAMP IS SAYING, WELL CHEMFREE, YOU ARE RIGHT, SOMEONE

5   OF ORDINARY SKILL IN THE ART IN PARTS WASHERS AT THE TIME OF

6   THE INVENTION WOULD NOT HAVE HAD WHAT IT TAKES TO COME UP

7   WITH AN OPERABLE COMBINATION OF CLEANING FLUID AND MICROBES,

8   SO WE ARE IN AGREEMENT, YOU KNOW, SO FAR ON THAT.  BUT THEN

9   HE GOES, "HOWEVER, JUST AS THE PERSON OF ORDINARY SKILL

10  PRACTICING THE PATENT WOULD HAVE BEEN HIGHLY MOTIVATED TO

11  CONSULT WITH AN ENVIRONMENTAL ENGINEER," AND HE IS TALKING

12  ABOUT THE ENABLEMENT CONTEXT NOW, HE SAYS, "SO WOULD A

13  PERSON OF ORDINARY SKILL IN DESIGNING AN ENVIRONMENTALLY

14  ACCEPTABLE PARTS WASHER BE MOTIVATED TO CONTACT AN

15  ENVIRONMENTAL ENGINEER FOR HELP IN DETERMINING AN EXISTING

16  FLUID AND USABLE MICROBES TO USE IN AN ENVIRONMENTALLY

17  FRIENDLY PARTS WASHER."  THIS IS ABOUT AS BLATANT AN ERROR

18  AS YOU ARE EVER GOING TO SEE IN A PATENT CASE.  WHEN ONE OF

19  THE KEY FEATURES OF CHEMFREE'S INVENTION WAS COMING UP WITH

20  A SYNERGISTIC COMBINATION OF CHEMISTRY AND BIOLOGY THAT

21  WORKED, AND IT WORKED SO WELL THAT YOU DIDN'T NEED ALL OF

22  THESE EXTRANEOUS MONITORING AND METERING SUBSTANCES OF THE

23  HAKANSSON TECHNOLOGY, AND JUDGE CAMP BASICALLY BACKHANDS

24  THAT AWAY BY SAYING, OH, PHONE A FRIEND, JUST PICK UP THE

25  PHONE, CALL AN ENVIRONMENTAL ENGINEER, AND HE WILL JUST GIVE

1   YOU WHAT TO USE.  THERE IS NO EVIDENCE TO SUPPORT IN THE

2   RECORD FOR THAT.

3           IF YOU WILL LOOK AT DR. ADRIAENS QUALIFICATIONS,

4   IN PARTICULAR IF YOU HAVE TIME TO READ THE FIRST HOUR OF HIS

5   DEPOSITION, WHICH IS DETAILED IN THE MOTION IN LIMINE NO. 1

6   WHERE I CHALLENGED HIS QUALIFICATIONS, I SPENT AN HOUR

7   ASKING HIM ABOUT HIS EXPERTISE AND HIS QUALIFICATIONS TO

8   TALK ABOUT PARTS WASHING, INCLUDING KNOWLEDGE ABOUT FLUID.

9   AND BASICALLY WHEN YOU GET TO CLEANING CHEMISTRY, HE IS

10  IGNORANT, WHICH IS WHY WE CHALLENGED HIS QUALIFICATIONS TO

11  TESTIFY AT TRIAL.  SO THE THEY ONLY PROFFERED HIM, ONCE I

12  OBJECTED TO HIS QUALIFICATIONS FOR TRIAL, JUDGE CAMP SAYS,

13  WHAT ARE YOU PUTTING HIM ON FOR?  THEY JUST RECEIVED -- WE

14  PUT HIM ON TO TALK ABOUT BIOREACTOR TECHNOLOGY.

15          I ASKED HIM POINT BLANK, DO YOU CONSIDER YOURSELF

16  TO BE AN EXPERT IN PARTS WASHING TECHNOLOGY?  AND HE SAID

17  NO.  SO NOW WE'VE GOT AN EXPERT WHO BASICALLY PROFESSES

18  IGNORANCE ABOUT CLEANING FLUID CHEMISTRY, BUT WE HAVE A

19  JUDGE SAYING WE ARE GOING TO HAVE THE PERSON OF ORDINARY

20  SKILL IN THE ART IN PARTS WASHING CALL A PERSON OF ORDINARY

21  SKILL IN THE ART IN ENVIRONMENTAL SCIENCE, AND IN A PHONE

22  CALL HE IS GOING TO GIVE YOU WHAT YOU NEED TO PRACTICE THE

23  INVENTION.

24          I SUBMIT TO YOUR HONOR THAT WHEN YOU ARE TALKING

25  ABOUT INVALIDATING A PATENT, 35 U.S. C. 22, THEY COME WITH A

1    PRESUMPTION OF VALIDITY.  THAT HAS TO BE OVERCOME BY CLEAR

2    AND CONVINCING EVIDENCE.  AND WHEN YOU ARE TALKING ABOUT,

3    OH, JUST CALL SOMEONE AND HE WILL TELL YOU WHAT TO USE, AND

4    THAT'S YOUR ENABLE DISCLOSURE OF THE PRIOR ART, THAT IS

5    BLATANT ERROR, YOUR HONOR, AND THAT SHOULD BE ENOUGH, IN AND

6    OF ITSELF, TO REVERSE THE RESULT IN THIS CASE.  GO TO SLIDE

7    FOUR.

8            THE COURT:  THE QUESTION AT THAT POINT, BECAUSE

9    WE'VE BEEN COMING CLOSER AND CLOSER TO THAT, BUT ASSUME FOR

10   THE MOMENT THAT MY CONCLUSION IS THAT JUDGE CAMP WAS WRONG,

11   AND THAT THE PRESUMPTION OF VALIDITY NOT OVERCOME BY CLEAR

12   AND CONVINCING EVIDENCE SUPPORTS THE PLAINTIFF'S PATENT.

13           MR. CAPP:  AT THAT POINT IN TIME --

14           THE COURT:  THEN WHAT?

15           MR. CAPP:  THEN YOU HAVE TO SAY JUDGE CAMP'S LEGAL

16   CONCLUSION OF INVALIDITY IS INCORRECT, SO I HAVE TO CHANGE

17   HIS LEGAL CONCLUSION, SO MY LEGAL CONCLUSION IS THAT THE

18   PATENTS ARE VALID, NOT INVALID, AND THEREFORE PLAINTIFF IS

19   NOW THE PREVAILING PARTY AND NOW WE GO ON TO DISCOVERY ON

20   DAMAGES AND HAVE A JURY TRIAL ON DAMAGES.

21           THE COURT:  I KEEP THINKING THAT WE ARE REALLY IN

22   SOME UNCHARTERED TERRITORY HERE FOR A SUCCESSOR JUDGE.  I

23   WONDER IF A SUCCESSOR JUDGE, REALLY -- DISTRICT JUDGE.  THE

24   COURT OF APPEALS CAN DO WHAT IT DOES, BUT I WONDER IF A

25   SUCCESSOR JUDGE IS IN ANY APPROPRIATE POSITION TO CHANGE THE

1    RULING, CHANGE THE OUTCOME, AND GO TO A DAMAGES PART OF THE

2    TRIAL.

3              MR. CAPP:  I AM GLAD YOU BROUGHT THAT UP BECAUSE,

4    NUMBER ONE, I AM GOING TO TELL YOU ABSOLUTELY YOU CAN.

5              THE COURT:  THAT IS WHAT IS CITED IN YOUR PROPOSED

6    ORDER, BUT I WANT TO KNOW WHAT AUTHORITY THERE IS FOR THAT.

7              MR. CAPP:  IN THAT TEN-DAY PERIOD THAT YOU HAVE

8    GIVEN ME, I AM GOING TO BRIEF THAT FOR YOU AND I AM GOING TO

9    CITE YOU -- I KNOW I HAVE READ THE CASE LAW, BUT I CAN'T

10   GIVE IT TO YOU OFF THE TOP OF MY HEAD.  BUT I WILL PUT IT IN

11   THAT BRIEF.

12             THE COURT:  I THINK I SAID TWO WEEKS.  AFTER

13   SAYING TEN DAYS, I WILL MAKE IT TWO WEEKS.  14 PLUS 11 WILL

14   BE THE 25TH OF FEBRUARY.  BUT I DON'T FIND THAT CLEARLY

15   ARTICULATED IN THE PROPOSED RULING.  GO AHEAD.

16             MR. CAPP:  I WILL TAKE CARE OF THAT FOR YOU.

17   THANK YOU FOR BRINGING THAT UP.

18             YOUR HONOR, I WANT YOU TO NOTICE THE INCONSISTENT

19   FINDINGS BETWEEN THE RULING ON ENABLEMENT AND THE RULING ON

20   OBVIOUSNESS, BECAUSE IT REALLY SHOWS YOU THAT FROM 2009 TO

21   2010 SOMETHING WAS WRONG IN THE THINKING THAT WENT INTO THIS

22   ORDER.  WHEN WE GOT INTO THIS CASE, WHEN COUNSEL SWITCHED

23   OVER, WHAT AT THE TIME WAS THEIR PRIMARY DEFENSE WAS THAT

24   THE PATENTS WERE NOT ENABLED, SO MUCH SO THAT THEY MOVED FOR

25   SUMMARY JUDGMENT ON THAT.  WE CROSS MOVED AND WE PREVAILED.

1    SO NOW THEY ARE SAYING FORGET ENABLEMENT, WE WILL FOCUS ON

2    OBVIOUSNESS.

3              BUT I WANT YOU TO LOOK AT JUDGE CAMP'S FINDINGS ON

4    ENABLEMENT.  HE FOUND, BASED ON THE EVIDENCE THAT BOTH

5    PARTIES PUT IN, THAT THE PARTIES DO NOT DISPUTE THAT PERSONS

6    OF ORDINARY SKILL IN THE ART OF ENVIRONMENTAL ENGINEERING

7    AND PARTS WASHING WOULD HAVE TO CONDUCT A CERTAIN AMOUNT OF

8    EXPERIMENTATION TO PRACTICE THE PATENTED INVENTION WITH

9    PRODUCTS OTHER THAN LRC 1 AND SEAWASH 7.  SO YOU HEARD

10   MR. MCNALLY ON THE STAND TALKING ABOUT THIS PREFERRED

11   EMBODIMENT.  THEY WERE SAYING THAT IS NOT ENOUGH, YOU SHOULD

12   HAVE TAUGHT MORE, SO THAT THE PATENT WAS ENABLED.  LOOK AT

13   ALL OF THE EXPERIMENTATION THAT YOU HAVE TO DO IF YOU WANT

14   TO PRACTICE THE INVENTION WITHOUT THE PREFERRED EMBODIMENT.

15   AND WE CAN SEE THAT, YES, YOU MIGHT HAVE TO DO AT LEAST SOME

16   EXPERIMENTATION TO COME UP WITH ALTERNATIVE EMBODIMENTS OF

17   THE INVENTION.  BUT WHEN YOU GET TO OBVIOUSNESS, THERE IS NO

18   RECOGNITION OR ACKNOWLEDGEMENT ON JUDGE CAMP'S PART THAT IF

19   YOU TAKE AWAY CHEMFREE'S PATENT AND YOU JUST GIVE THE PERSON

20   OF ORDINARY SKILL IN THE ART THE PRIOR ART, HOW MUCH

21   EXPERIMENTATION DOES HE HAVE TO DO TO PRACTICE THE

22   INVENTION.  HE JUST CONCLUDED, WELL, THAT IT'S JUST OBVIOUS,

23   YOU HAVE ALL OF THE DIFFERENT ELEMENTS IN THE PRIOR ART SO,

24   YOU KNOW, THEREFORE IT IS OBVIOUS.  WE'VE GONE THROUGH AN

25   EVOLUTION ON OBVIOUSNESS IN THE LAST THREE YEARS, FOUR YEARS

1   NOW IN THIS COUNTRY, STARTING WITH KSR, AND KNOW YOU'VE BEEN

2   PART OF IT BECAUSE YOU SAT ON THE PANEL IN AGRIZAP.

3           THE COURT:  WHO ELSE WOULD GET A MOUSE TRAP CASE.

4   ISN'T THAT SOMETHING?  ALTHOUGH IT IS CALLED A RODENT CASE.

5   I COULDN'T BELIEVE MY EYES.  DRIVE ON, EXCUSE ME FOR

6   INTERRUPTING.

7           MR. CAPP:  HERE IS THE POINT.  IS THE WAY THE

8   CASES ARE COMING DOWN, IS THAT IF YOU ARE TALKING ABOUT

9   SIMPLE MECHANICAL TECHNOLOGY WHERE THE MECHANIC CAN LOOK AT

10  PHYSICAL FEATURES AND IMMEDIATELY PREDICT WHAT THEY ARE

11  GOING TO DO IF THEY COMBINE THEM, YOU GO TO THIS KSR THING

12  WHERE YOU SAY IT IS OBVIOUS, BUT KSR LEFT OPEN THIS OBVIOUS

13  TO TRY AVENUE, WHICH HAS TO DO WITH THE SITUATION WHERE THE

14  PERSON OF ORDINARY SKILL IN THE ART IS CONFRONTED WITH A

15  FINITE NUMBER OF PREDICTABLE SOLUTIONS.  AND IF HE IS FACED

16  WITH A FINITE NUMBER OF PREDICTABLE SOLUTIONS, AND THAT

17  FINITE NUMBER OF PREDICTABLE SOLUTIONS IN THE FOLLOW-ON

18  CASES NEED TO BE SMALL OR EASILY TRAVERSED, THEN IT CAN BE

19  OBVIOUS.  BUT IF YOU LOOK AT THE LINE OF CASES THAT GO OVER

20  INTO THE CHEMICAL ARTS AND THE LESS PREDICTABLE ARTS, YOU

21  GET ENTIRELY DIFFERENT RESULT.  YOU DON'T FIND THOSE CASES

22  BEING INVALIDATED ON OBVIOUSNESS BECAUSE OF THE LACK OF

23  PREDICTABILITY IN THE ART.

24          SO THAT WHEN YOU GET INTO A CHEMISTRY, OR IN THIS

25  CASE WE HAVE AN INTERACTION BETWEEN CHEMISTRY AND BIOLOGY

1    WHICH IS UNPREDICTABLE, WHICH THEIR EXPERT ON ENABLEMENT

2    SAID HIGHLY UNPREDICTABLE.  NOW YOU'VE PUSHED YOURSELF INTO

3    OBVIOUS TO TRY, AND YOU HAVE TO ASK YOURSELF THE QUESTION,

4    IS THE PERSON OF ORDINARY SKILL IN THE ART FACED WITH A

5    FINITE NUMBER OF PREDICTABLE SOLUTIONS WHICH ARE SMALL OR

6    EASILY TRAVERSED, AND THE ANSWER IS NO.  YOU CAN GO INTO

7    PRODUCT CATALOGS AND YOU CAN READ THE LITERATURE AND YOU CAN

8    PICK OUT, YOU KNOW, CLEANING FLUIDS AND YOU CAN PICK OUT

9    MICROBES AND YOU CAN LOOK AT ALL OF THE OTHER DIFFERENT

10   THINGS THAT HAKANSSON TOOK INTO CONSIDERATION IN THE 1980'S

11   WHERE HE IS AT A HIGH PH, HE IS METERING IN NUTRIENTS, HE IS

12   METERING IN ALKALI, HE IS METERING IN ADDITIONAL SURFACTANTS

13   IN ORDER TO ADJUST FOR THE POSSIBILITY OF SURFACTANTS BEING

14   DEGRADED ALONG.  IF YOU TAKE A LOOK AT ALL OF THOSE

15   DIFFERENT PERMUTATIONS AND COMBINATIONS OF THINGS THAT YOU

16   HAVE TO TAKE INTO ACCOUNT TO DO ONE OF THESE THINGS, AND

17   DISTILL THAT DOWN INTO A STAND-ALONE, IT IS BY ITSELF A

18   SIMPLE SINK ON A DRUM PARTS WASHER, YOU ARE NOT TALKING

19   ABOUT A FINITE NUMBER OF PREDICTABLE SOLUTIONS WHICH ARE

20   SMALL OR EASILY TRAVERSED.

21          NOW, THE DEFENDANTS ENJOY, YOU KNOW, POKING FUN AT

22   CHEMFREE'S INVENTORS BECAUSE THEY DON'T HAVE PH.D.'S AND

23   THEY DON'T WALK AROUND IN LAB COATS AND ALL OF THAT.  AND

24   MAYBE, JUST MAYBE, THERE WAS A LITTLE SERENDIPITY THAT

25   ENTERED INTO THE DISCOVERY WHICH THEY MADE WHICH ALLOWED

1    THEM TO COME UP WITH THE FIRST PRODUCT OF ITS KIND.  BUT IF

2    YOU LOOK AT SECTION 103 OF THE PATENT CODE VERY CAREFULLY,

3    YOU ARE NOT TO TAKE INTO ACCOUNT THE MANNER IN WHICH THE

4    INVENTION WAS ARRIVED AT IN DETERMINING WHETHER IT IS

5    OBVIOUS OR NOT.  YOU KNOW.  IF IT'S AN ACCIDENTAL DISCOVERY,

6    FINE.  IF IT'S SERENDIPITY, FINE.  IF IT IS JUST PURE DUMB

7    LUCK, FINE.  THE STANDARD IS WHETHER SOMEONE OF ORDINARY

8    SKILL IN THE ART WOULD FIND IT OBVIOUS JUST BASED ON THE

9    PRIOR ART.  AND THAT IS THE ONLY THING THAT YOU ARE SUPPOSED

10   TO LOOK AT.

11          GO TO SLIDE 6.  I WANT TO SUMMARIZE.  I JUST CAME

12   UP WITH A LIST OF ALL OF THE FACTORS YOU COULD TAKE INTO

13   ACCOUNT; WHAT THE DEFENDANTS DIDN'T PROVE ON THIS QUOTE,

14   UNQUOTE, EXISTING FLUID THAT JUDGE CAMP SAID THAT YOU WOULD

15   GET FROM JUST YOUR PHONE-A-FRIEND OR YOUR NEIGHBORHOOD

16   ENVIRONMENTAL SCIENTIST.  THE EXISTING FLUID IS NOT

17   IDENTIFIED IN THE ORDER.  IT'S NOT DISCLOSED IN DEFENDANT'S

18   INVALIDITY CONTENTIONS, IT IS NOT DISCLOSED IN DEFENDANT'S

19   EXPERT REPORTS.  DEFENDANT'S EXPERT REPORT IN THIS CASE WAS

20   STRICKEN AS INADEQUATE UNDER RULE 26.  THE EXPERT HIMSELF

21   DISCLAIMED EXPERTISE IN CLEANING CHEMISTRY.  THE EXPERT DID

22   NOT TESTIFY AT TRIAL AT ALL ON THE EXISTENCE OF SUCH AN

23   EXISTING FLUID.  THERE IS NO DOCUMENT OR EXHIBIT THAT

24   IDENTIFIES OR DESCRIBES IT.  THIS WHOLE THING ABOUT AN

25   EXISTING FLUID IS PURE SPECULATION THAT THE JUDGE BORROWED

1    FROM THE ENABLEMENT ISSUE.  AND THIS IS WHY THIS IS SO

2    IMPORTANT, YOUR HONOR, IS WHEN YOU HAVE A CASE WHERE YOU

3    HAVE AN ENABLEMENT DEFENSE AND AN OBVIOUS DEFENSE, WHAT IS

4    VERY EASY TO FALL INTO IS THIS THING CALLED HINDSIGHT.

5            AND I THINK THAT IS WHAT HAPPENED WITH JUDGE CAMP

6    HERE, IS HE HAD JUST GOTTEN DONE WITH ENABLEMENT, AND HE HAD

7    JUST REACHED THE CONCLUSIONS ABOUT WHAT THE PERSON OF

8    ORDINARY SKILL IN THE ART WOULD DO WITH THE PATENT, AND THEN

9    HE READ, LOOKING THROUGH THOSE ROSE-COLORED GLASSES, HE READ

10   THAT OUT OF THE PRIOR ART, AND HE SAID YOU WOULD DO THE SAME

11   THING WITH THE PRIOR ART.  THAT IS PER SE REVERSIBLE ERROR

12   IN MY OPINION, YOUR HONOR.  BECAUSE ONCE CHEMFREE CAME OUT

13   WITH THEIR PATENT AND PUBLISHED IT, AND YOU HANDED IT TO THE

14   PERSON OF ORDINARY SKILL IN THE ART, HE IS GOING TO PRACTICE

15   THE PATENT ACCORDING TO THE TEACHING THAT IS IN THE PATENT;

16   RIGHT?  AND THE OTHER THING IS, HE IS GOING TO HAVE A

17   REASONABLE EXPECTATION OF SUCCESS IN FOLLOWING THE TEACHINGS

18   OF THE PATENT BECAUSE HE HAS A PATENT THAT TEACHES THAT.

19           THEN IF YOU TAKE THAT AWAY SO HE NO LONGER HAS THE

20   TEACHING OF THE PATENT, AND HE NO LONGER HAS THE REASONABLE

21   EXPECTATION OF SUCCESS DERIVED FROM READING THE PATENT, AND

22   YOU JUST GIVE HIM THE PRIOR ART, NOW THE BURDEN OF PROOF IS

23   ON THEM TO PROVE THAT THAT PERSON WITH JUST THE PRIOR ART

24   WOULD COME UP WITH THE PARTICULAR INVENTION THAT THE

25   PLAINTIFF CAME UP WITH.  AND IF THERE IS EXPERIMENTATION AND

1    MODIFICATION AND COMBINING REFERENCES, THEY WOULD MAKE THOSE

2    PARTICULAR COMBINATIONS, AND THOSE -- THEY WOULD BE

3    MOTIVATED TO MAKE THOSE PARTICULAR MODIFICATIONS WITH A

4    REASONABLE EXPECTATION OF SUCCESS.

5            BUT IN ENABLEMENT THE REASONABLE EXPECTATION OF

6    SUCCESS CAME FROM THE PATENT ITSELF.  AND SO THAT'S WHY I AM

7    SO VERY CONCERNED IN THIS CASE THAT WE'VE GOT A PROBLEM WITH

8    HINDSIGHT WITH JUDGE CAMP JUST FINISHING ENABLEMENT AND HE

9    THOUGHT, WELL, IF IT IS ENABLEMENT IT IS OBVIOUS.  AND I

10   SUBMIT THAT IS PER SE REVERSIBLE ERROR.

11           IT IS AMAZING HOW FAST AN HOUR GOES.  LET'S MOVE

12   ON TO THE POWER POINT ON MOTIVATION.  GO TO SLIDE 2.  YOUR

13   HONOR, THIS IS YOUR BASIC WALK-THROUGH OF HOW YOU DO AN

14   OBVIOUSNESS ANALYSIS.  YOU LOOK AT THE FIRST THREE FACTORS

15   WHERE YOU HAVE THE ORDINARY LEVEL OF SKILL IN THE ART, THE

16   SCOPE AND CONTENT OF THE PRIOR ART, YOUR DIFFERENCE BETWEEN

17   THE PRIOR ART AND THE CLAIMED INVENTION, AND THEN YOU TAKE A

18   LOOK AT, AND YOU ASK YOURSELF THESE THREE QUESTIONS, NO. 1,

19   ARE THE REFERENCES COMBINABLE, IS THERE MOTIVATION TO MAKE

20   THE COMBINATION, AND IS THERE A REASONABLE EXPECTATION OF

21   SUCCESS IN MAKING THAT.

22           GO TO SLIDE 4.  IF YOU GO THROUGH THE TRIAL

23   RECORD, BECAUSE DR. ADRIAENS WASN'T AN EXPERT IN PARTS

24   WASHING, BECAUSE HIS INITIAL EXPERT REPORT WAS STRICKEN, THE

25   DEFENDANTS DIDN'T PUT ON ANY EVIDENCE TO SPEAK OF.  IF YOU

1    LOOK AT DR. ADRIAENS'S TRIAL TESTIMONY AND YOU TAKE OUT HIS

2    QUALIFICATIONS AND YOU TAKE OUT HIS TESTIMONY ON ORDINARY

3    SKILL IN THE ART, WHICH WAS FOUND TO BE INCORRECT, THE REST

4    OF HIS TRIAL TESTIMONY IS ABOUT, DIRECT EXAMINATION, WAS

5    ABOUT FOUR OR FIVE MINUTES AT THE MOST.  HE IS NOT AN EXPERT

6    QUALIFIED IN THE PARTS WASHING ART.  HE ADMITTED THAT ON THE

7    STAND.  HIS EXPERT REPORT ON MAKING COMBINATIONS WAS SO

8    DEFICIENT IT WAS STRICKEN BY COURT ORDER.

9              THE DEFENDANT'S EXPERT REPORT OMITTED HAKANSSON 2,

10   WHICH IS THE PRIMARY REFERENCE.  HE DIDN'T TALK ABOUT IT AT

11   ALL, SO HE WASN'T ALLOWED TO TALK ABOUT IT AT TRIAL.

12   DR. ADRIAENS DIDN'T TESTIFY AT ALL ON MAKING COMBINATIONS ON

13   A MOTIVATION TO COMBINE OR ON EXPECTATION OF SUCCESS.  AND

14   WHEN YOU GOT TO HAKANSSON AND ATHEY AND YOU LOOKED AT ALL OF

15   THEM, THEY DIDN'T HAVE ALL OF THE CLAIM ELEMENTS, SO JUDGE

16   CAMP WENT OUTSIDE OF THEIR TWO REFERENCES AND SAID, OH WELL,

17   WE WILL JUST GO TO THE GENERAL KNOWLEDGE OF THE PERSON OF

18   ORDINARY SKILL IN THE ART AND HE WOULD SUPPLY ALL OF THOSE

19   ADDITIONAL CLAIM LIMITATIONS.  AND SO VOILA, YOU'VE GOT THEM

20   ALL.

21             AND I WANT TO BE CAREFUL ABOUT SAYING THIS,

22   BECAUSE I MAY BE ON THE OTHER SIDE OF THIS ISSUE SOME DAY.

23   I WANT TO BE CLEAR AND BALANCED.  THERE ARE SOME PATENTS

24   THAT ARE SO SIMPLE THAT YOU DON'T NEED AN EXPERT.  YOU CAN

25   READ IT, YOU KNOW, IT COULD BE A KLEENEX BOX OR SOMETHING

1    LIKE THAT --

2              THE COURT:  AND A MOUSE TRAP.

3              MR. CAPP:  -- WHERE A JUDGE CAN READ AND DECIDE

4    THE CASE WITHOUT AN EXPERT.  THIS IS NOT THAT KIND OF A

5    CASE.  WHEN YOU START TALKING ABOUT WHAT IS INVOLVED IN

6    BIOLOGY AND CHEMISTRY, AND ESPECIALLY IF YOU LOOK AT

7    DR. ADRIAENS'S EXPERT REPORT WHERE HE IS TALKING ABOUT HOW

8    UNPREDICTABLE THIS TECHNOLOGY IS, WHEN YOU START GETTING

9    INTO THE QUESTION WOULD SOMEONE OF ORDINARY SKILL IN THE ART

10   BE MOTIVATED TO COMBINE THIS WITH THIS WITH THIS WITH THE

11   REASONABLE EXPECTATION OF SUCCESS -- I KNOW YOU JUDGES ARE

12   SMART GUYS, I UNDERSTAND THAT.  BUT YOU ARE SUPPOSED TO

13   DECIDE THESE CASES BASED ON PUTTING YOUR MIND IN WHAT

14   SOMEONE OF ORDINARY SKILL IN THE ART WOULD DO.  AND IN A

15   CASE LIKE THIS, WHAT YOU WOULD NEED TO DO THAT IS TESTIMONY

16   FROM OR ABOUT THIS PERSON OF ORDINARY SKILL IN THE ART, NOT

17   JUST HIS EDUCATION OF THREE YEARS EXPERIENCE.  WHAT DOES HE

18   DO ON A DAY-TO-DAY BASIS?  WHAT IS THE SCOPE OF ORDINARY

19   CREATIVITY THAT THE SUPREME COURT TALKS ABOUT IN KSR?  WHAT

20   IS THE AMBIT OF ORDINARY CREATIVITY?  IS WHAT WE ARE ASKING

21   THIS PERSON TO DO, COMBINING THESE REFERENCES, DOES THAT

22   FOLLOW AN AMBIT OF ORDINARY CREATIVITY, OR IS IT

23   EXTRAORDINARY TO THE POINT WHERE, GEE, IF HE DOES THAT WE

24   ARE GOING TO GIVE HIM A PATENT?

25             AND JUDGE CAMP, IN MY OPINION, IN THE COMPLETE

1    VACUUM OF HEARING ANY EVIDENCE FROM THEIR EXPERT, TOOK OVER

2    AND APPOINTED HIMSELF EXPERT AND DECIDED THE CASE ON HIS OWN

3    WITHOUT ANY OF THAT SUPPORTING TESTIMONY OF WHO REALLY IS

4    THIS PERSON OF ORDINARY SKILL IN THE ART, WHAT ARE HIS

5    CAPABILITIES REALLY?  HE DIDN'T HAVE THAT.  AND SO HE

6    PROJECTED HIMSELF INTO THE SITUATION, AND I THINK HE GOT IT

7    WRONG.  AND I THINK HE, IN HIS OWN MIND, OVER-PROJECTED THE

8    CAPABILITIES AS A PERSON OF ORDINARY SKILL IN THE ART.  BUT

9    WHATEVER HE DID, IT WAS WITHOUT THE BASIS OF AN EVIDENTIARY

10   RECORD THAT HE COULD -- SURE HE MADE THE FINDINGS, BUT IS

11   THE FINDING SUPPORTED BY EVIDENCE.  AND THE ANSWER TO THAT

12   IS NO, THERE WAS NO EVIDENCE ON IT.

13           IF I CAN JUST HAVE TWO OR THREE MORE MINUTES, YOUR

14   HONOR.

15           THE COURT:  CERTAINLY.  LET ME ALSO COMMENT WHILE

16   YOU ARE GETTING READY FOR YOUR LAST TWO OR THREE MINUTES,

17   THAT BECAUSE I ASK QUESTIONS OR SUGGEST THAT MAYBE I WILL

18   HAVE A PARTICULAR OUTCOME DOESN'T MEAN THAT I HAVE DECIDED

19   THE CASE, BECAUSE I CERTAINLY HAVEN'T.  MY QUESTIONS ARE TO

20   ELICIT YOUR COMMENTS ON WHICH I NEED EDUCATION.  SO IF I ASK

21   YOU QUESTIONS OR IF I ASK COUNSEL FOR J. WALTER QUESTIONS,

22   DON'T READ TOO MUCH INTO THAT.

23           MR. CAPP:  VERY QUICKLY, GO TO SLIDE 9 REAL QUICK.

24   THE FEDERAL CIRCUIT JUST CAME OUT WITH A NEW CASE LESS THAN

25   TWO WEEKS AGO.  NEXT SLIDE.  IT IS TOKAI CORPORATION CASE.

1    I WOULD COMMEND IT TO YOUR HONOR'S READING, BUT BECAUSE

2    BASICALLY --

3              THE COURT:  LET ME WRITE IT DOWN HERE.  I DON'T

4    THINK IT IS IN ANY OF YOUR PREVIOUS --

5              MR. CAPP:  ACTUALLY IT IS, YOUR HONOR.  I HAVE

6    THAT IN MY PROPOSED FINDINGS AND CONCLUSIONS.

7              THE COURT:  OKAY.  IT WILL BE OUT IN THE FEDERAL

8    3RD ONE DAY.  GO AHEAD.

9              MR. CAPP:  THE POINT IS THAT THE FEDERAL CIRCUIT

10   HAS REVISITED THIS ISSUE AND RECENTLY COME BACK AND

11   REAFFIRMED THE NOTION IF YOU ARE A PATENT CHALLENGER AND ALL

12   YOU'VE GOT IN TERMS OF PRIOR ART IS WHAT WAS BEFORE THE

13   EXAMINER, YOU'VE GOT AN ENHANCED BURDEN OF PROOF TO MEET.

14   AND WHEN YOU LOOK AT WHAT JUDGE CAMP RELIED ON, YOU'VE GOT

15   HAKANSSON 2, AND THAT'S EITHER IN THE RECORD, EITHER HAS

16   HAKANSSON 2 OR IT'S SUBSUMED WITHIN A BROADER DISCLOSURE

17   THAN HAKANSSON 1.  SO THE HAKANSSON TECHNOLOGY WAS BEFORE

18   THE EXAMINER.  THE EXAMINER CONSIDERED IT AND THE EXAMINER

19   MADE REJECTIONS OVER IT.

20             AND THEN THE OTHER THING JUDGE CAMP RELIED ON WAS

21   THIS GENERAL KNOWLEDGE OF SOMEONE OF ORDINARY SKILL IN THE

22   ART TO SUPPLY ALL OF THE MISSING STRUCTURAL LIMITATIONS.

23   WELL, ALL OF THAT GENERAL KNOWLEDGE AND STRUCTURAL

24   LIMITATIONS WAS BEFORE THE EXAMINER.  THERE IS 100

25   REFERENCES THERE.  SO THEIR CASE IS BASED ON NOTHING MORE

1    THAN DISCLOSURES THAT EXAMINER STINSON ALREADY CONSIDERED

2    AND ALLOWED THESE PATENTS OVER, AND WE'VE GOT A CASE THAT IS

3    TWO WEEKS, LESS THAN TWO WEEKS OLD THAT SAID, IN THAT

4    SITUATION, YOU'VE GOT AN ENHANCED BURDEN OF PROOF.

5            GO TO SLIDE 10, PLEASE.  IF YOU GO BACK AND READ

6    JUDGE CAMP'S ORDER, THE PRIMARY THING HE HUNG HIS HAT ON FOR

7    A MOTIVATION TO COMBINE WAS THIS INTERNATIONAL ENVIRONMENTAL

8    CONVENTION CALLED THE MONTREAL PROTOCOL, AND THAT SOMEHOW OR

9    ANOTHER THE FACT THAT THERE WAS A CLEAN-UP-THE-ENVIRONMENT

10   MOVEMENT OUT THERE SOMEHOW MAKES ALL INVENTIONS THAT HELP

11   THE ENVIRONMENT CLEAN-UP OBVIOUS.  I WANT TO READ THIS QUOTE

12   TO YOU FROM THE INNOGENETICS, IS THAT THE MERE KNOWLEDGE OF

13   A PROBLEM AND HAVING A MOTIVATION TO SOLVE IT IS ENTIRELY

14   DIFFERENT THAN BEING MOTIVATED TO COMBINE PARTICULAR

15   REFERENCES TO REACH A PARTICULAR CLAIMED INVENTION.

16           AND WHAT YOU DON'T HAVE IN EITHER EVIDENTIARY

17   RECORD FROM THE DEFENDANT OR JUDGE CAMP'S FINDINGS IS HOW OR

18   WHY SOMEONE WOULD BE MOTIVATED TO COMBINE PARTICULAR

19   REFERENCES TO REACH A PARTICULAR CLAIMED INVENTION.  JUST

20   THE FACT THAT WE WANT TO CLEAN UP THE ENVIRONMENT DOESN'T

21   MAKE THIS INVENTION OBVIOUS.

22           SLIDE 12.  THIS IS AT PAGE 58 OF JUDGE CAMP'S

23   ORDER, AND IT IS ANOTHER CLEARLY ERRONEOUS FINDING.  HE SAYS

24   THAT CHEMFREE COMBINED A KNOWN PARTS WASHER DESIGN,

25   SINK-ON-A-DRUM DESIGN, WITH BIOREMEDIATING MICROBES THAT

1    WERE AVAILABLE FROM CERTAIN VENDORS IN THE MARKETPLACE.  THE

2    RESULTING COMBINATION PERFORMED PRECISELY AS ONE WOULD

3    EXPECT, IT RINSED ORGANIC MATTER FROM THE PARTS AND THEN

4    BIODEGRADED THE ORGANIC MATTER.  HE MISSED THE POINT OF THE

5    INVENTION, YOUR HONOR.  IT IS NOT THAT THE CLEANING FLUID

6    CLEANS, AND IT IS NOT THAT THE MICROBES EAT.  IT IS THAT

7    THIS PARTICULAR CLEANING FLUID HAS A SYNERGISTIC EFFECT ON

8    THE USER.  HERETOFORE, YOU EITHER HAD TO CLEAN IN A CLOSED

9    CABINET OR YOU HAD TO PUT ON RUBBER GLOVES AND GOGGLES.  NOW

10   YOU DON'T HAVE TO DO THAT ANYMORE BECAUSE, FOR THE FIRST

11   TIME, WE ARE CLEANING IN A PH NEUTRAL ENVIRONMENT.  IT IS

12   NOT THAT IT CLEANS, IS NOT THAT IT BIODEGRADES, YOU HAVE

13   THIS SYNERGISTIC EFFECT BETWEEN THE OPERATOR AND THE

14   CLEANING FLUID FOR THE FIRST TIME.

15          THE SECOND THING IS YOU'VE GOT A SYNERGISTIC

16   EFFECT BETWEEN THE CHEMISTRY AND THE BIOLOGY.  IT IS NOT

17   JUST THE CLEANING FLUID CLEANS, IT IS NOT JUST THE MICROBES

18   EAT.  IT IS THAT YOU CAN PUT THEM TOGETHER AND THEY CAN BE

19   COMPATIBLE WITH EACH OTHER, SO MUCH SO, AND THIS IS

20   IMPORTANT TOO, SO MUCH SO THAT YOU WOULD NO LONGER NEED THE

21   MONITORING OF HAKANSSON 1 OR THE METERING AND ALKALI

22   CHEMICALS OF HAKANSSON 1 OR THE METERING IN OF ADDITIONAL

23   SURFACTANT, BECAUSE THE MICROBES ARE DEGRADING, THE

24   SURFACTANT IS SO THAT YOU DON'T HAVE TO METER IN NUTRIENTS

25   TO KEEP THEM GOING ANYMORE.  ALL YOU NEED TO DO IS GET THE

1       THING UP AND RUNNING AND FEED THEM CONTAMINANTS AND THE

2       THING RUNS AND RUNS.  AND YOU HEARD MR. MCNALLY, IT CAN RUN

3       FOR UP TO A YEAR.

4              I FEEL LIKE I HAVE OVER-EXTENDED MY WELCOME HERE,

5       YOUR HONOR.  I HAD A BIT ON SECONDARY CONSIDERATIONS.

6       PERSONALLY I FEEL LIKE IT IS COVERED VERY WELL IN THE BRIEFS

7       AND VERY WELL IN THE PROPOSED ORDER.  I MEAN, IT'S BASICALLY

8       THAT JUDGE CAMP WAS SERIOUSLY WRONG ON PUTTING WEIGHT ON THE

9       SECONDARY CONSIDERATION OF A SUBSTANTIALLY CONTEMPORANEOUS

10      INVENTION, LIKE HE WAS JUST GRASPING FOR SOMETHING TO

11      SUPPORTED HIS CONCLUSION.  BUT HE RELIED ON ONE PATENT THAT

12      POST DATED OUR PATENT BY THREE YEARS.  HE RELIED ON SOME

13      THINGS THAT WEREN'T THE INVENTION.  THEY WERE JUST

14      COMPONENTS OF THE INVENTION.  HE RELIES ON UNCORROBORATED

15      TESTIMONY OF AN INTERESTED WITNESS.  I DON'T FEEL LIKE I

16      NEED TO STAND UP HERE FOR 10 TO 15 MINUTES AND ARGUE THAT

17      WHEN I HAVE USED UP MY TIME.

18             THE COURT:  I FOCUS ON THAT AS NOT BEING ORALLY

19      PRESENTED IN DETAIL, BUT ALREADY IN YOUR PROPOSED RULING,

20      AND YOU WILL HAVE TWO WEEKS FROM NOW TO ADD ANYTHING THAT

21      YOU WISH.  THANK YOU.  WE WILL TAKE A BREAK AND START WITH

22      THE DEFENDANT'S PRESENTATION AT 25 MINUTES AFTER 3:00.

23             (BREAK FROM 3:12 P.M. UNTIL 3:25 P.M.)

24             THE COURT:  WE WILL GO BACK ON THE RECORD NOW ON

25      BEHALF OF J. WALTER AND COMPANY, ARGUMENTS IN RESPONSE TO

1    THE MOTIONS.

2              MR. SCHAETZEL:  MAY IT PLEASE THE COURT.

3              THE COURT:  YES.

4              MR. SCHAETZEL:  YOUR HONOR, WE VERY MUCH

5    APPRECIATE THE 10 DAYS OR THE 14 DAYS.  BECAUSE THIS CASE,

6    EVEN WITH THE FILING OF THE REQUEST FOR RECONSIDERATION,

7    CONTINUES TO ENLARGE.  IT STARTED OUT ONE NARROW ISSUE, AND

8    THE SECOND REQUEST IT GOT BROADER, AND THE THIRD REQUEST IT

9    GOT BROADER, AND NOW THERE ARE ADDITIONAL ISSUES THAT ARE

10   RAISED, BOTH TODAY AND IN THAT ORDER.  WHAT WE WOULD LIKE TO

11   DO IS GET BACK TO WHAT WE THINK IS THE FOCUS OF THOSE THREE

12   MOTIONS AND TO TRY AND IF YOU WILL DRILL DOWN ON THOSE

13   MOTIONS AND GET THEM DECIDED WITHOUT HAVING TO GO BACK AND

14   REDO THE ENTIRE OBVIOUSNESS CASE.  BECAUSE THE PRESENTATION

15   THAT WAS JUST MADE WAS ESSENTIALLY A REQUEST FOR THAT, THAT

16   THE COURT REDO THE ENTIRE OBVIOUSNESS DECISION.  WE DON'T

17   THINK THAT IS APPROPRIATE, AND WE DON'T THINK THAT IS WHAT

18   WAS MOVED FOR IN THESE THREE MOTIONS.

19             THE BASIC ISSUES ARE AS FOLLOWS:  MOTION NO. 1,

20   THE DEFINITION OF "NONCAUSTIC," WAS IT PROPERLY APPLIED.

21   ANOTHER BASIC ISSUE IN THAT MOTION, SECONDARY

22   CONSIDERATIONS.  MOTION NO. 2, ANOTHER TWO BASIC ISSUES, IF

23   YOU WILL, WHETHER THE PRIOR ART HAKANSSON 2 REFERENCE WAS AN

24   ENABLEMENT REFERENCE UNDER THE PATENT LAW, AND WHETHER OR

25   NOT THERE WAS SOME SORT OF AN APPLICATION OR A

1   MISAPPLICATION OF THE SO-CALLED OBVIOUS TO TRY TEST.  MOTION

2   NO. 3, THE EXISTING FLUID QUESTION.  DID HAKANSSON 2 A

3   SECOND ISSUE IN MOTION NO. 3 -- DOES HAKANSSON 2 A

4   NONFLAMMABLE FLUID.  AND FINALLY, ONCE AGAIN, SOME

5   ADDITIONAL SECONDARY CONSIDERATION ISSUES, THESE HAVING TO

6   DEAL WITH THE OVERLAND PATENT AND INDEPENDENT DEVELOPMENT BY

7   CB CHEMIE AND SO ON AND SO FORTH.  THOSE ARE THE ISSUES

8   BEFORE THE COURT, AND THOSE ARE WHAT WE WOULD LIKE TO TRY

9   AND ADDRESS FOR THE NEXT FEW MINUTES.

10          ALL OF THOSE ISSUES HAVE A VERY KEY EVENT THAT

11   DICTATES THE OUTCOME.  THAT EVENT IS THE KSR DECISION.  AND

12   THE KSR DECISION FALLS AT A VERY IMPORTANT TIME IN THE

13   TIME-LINE OF EVENTS FOR THIS CASE.  SO THE TIMING, BOTH

14   LEGALLY AND FACTUALLY, IS VERY IMPORTANT.  FIRST, WHAT DID

15   KSR DO?  IT USED TO BE VERY SIMILAR TO WHAT WE JUST SAW IN

16   THE LAST HOUR THAT YOU WOULD LOOK FOR A PRIOR ART REFERENCE

17   THAT USED THE SPECIFIC WORD OR THAT USED A CERTAIN PHRASE,

18   AND FROM THAT WORD OR THAT PHRASE WE WOULD SAY THEREIN LIES

19   THE QUOTE, UNQUOTE, MOTIVATION TO COMBINE.  KSR CHANGED

20   THAT.

21          JUDGE CAMP PAID SPECIAL ATTENTION TO KSR, AND IT

22   IS SHOWN AT PAGES 37 TO PAGE 39 OF HIS ORDER.  HE RECOGNIZED

23   THAT KSR TOOK US OUT OF THIS TAB A SLOT B MENTALITY AND SAID

24   WE CAN LOOK AT WHAT THE PRIOR ART TEACHES, WE WILL TREAT THE

25   PERSON OF ORDINARY SKILL AS A PERSON OF ORDINARY CREATIVITY,

1   AND APPLY THAT STANDARD WITHIN THE CONTEXT OF THE FAMOUS

2   JOHN DEERE ANALYSIS.  AND THAT IS EXACTLY WHAT JUDGE CAMP

3   DID.  HE TOOK INTO ACCOUNT THE NEW STANDARD UNDER KSR, AND

4   THEN APPLIED THE TRADITIONAL GRAHAM V. JOHN DEERE TEST.  IT

5   WAS VERY APPROPRIATE AND VERY, IF YOU WILL, IN A SENSE

6   CONVENTIONAL WAY OF ADDRESSING THE ISSUES.  HE FOLLOWED THE

7   RULES.  KSR -- AND THESE ARE SOME QUOTES THAT I THINK THAT

8   ARE IMPORTANT FOR OUR DETERMINATION IN THIS CASE.  WE NO

9   LONGER CAN -- WE NO LONGER NEED TO FIND PRECISE TEACHINGS

10  DIRECTED TO THE SUBJECTED MATTER OF THE CLAIMS.  KSR FREED

11  US FROM THAT SHACKLE.  WE CAN SIT DOWN AND AGAIN LOOK AT THE

12  TEACHING AND GLEAN THAT FROM THE PERSPECTIVE OF THE PERSON

13  OF ORDINARY SKILL IN THE ART.  THE COURT CAN TAKE INTO

14  ACCOUNT THE INFERENCES AND CREATIVE STEPS THAT A PERSON OF

15  ORDINARY SKILL IN THE ART WOULD EMPLOY.  THOSE ARE THE STEPS

16  THAT JUDGE CAMP TOOK HERE.  HE WASN'T OFF ON A FROLIC.  HE

17  WASN'T MAKING MISTAKES.  HE LOOKED AT KSR AND HE APPLIED

18  THAT TYPE OF RATIONALE TO THE FACT PATTERN THAT WAS IN FRONT

19  OF HIM, AND THAT FACT PATTERN LED HIM TO THE DECISION THAT

20  HE MADE.

21          SO I WOULD LIKE TO QUICKLY GO THROUGH SOME OF THE

22  KEY FACTS THAT GOT US TO THIS POINT.  MR. MARTIN, IF I COULD

23  HAVE THIS TURNED BACK ON, PLEASE.  IT IS IMPORTANT NOT TO

24  BECOME MYOPIC AND LOOK ONLY AT HAKANSSON 2 AND QUOTE,

25  UNQUOTE, THE PRIOR ART.  BECAUSE THE PRIOR ART AT THIS TRIAL

1    DEMONSTRATED SO MUCH MORE.  THERE WERE EVIDENTIARY RULINGS

2    AS TO WHAT COULD BE INTRODUCED AS PRIOR ART, BUT THE

3    EVIDENCE OF RECORD SHOWS A LOT OF THINGS.  FIRST OF ALL,

4    THIS IS FROM PAGE 39 PROPER, 46 OF THE RECORD, FROM

5    DR. DURKEE'S DIRECT TESTIMONY WHICH CAN BE FOUND AT EXHIBIT

6    337.  SORRY, IT IS DOCKET NO. 337 THAT WE WILL USE, BUT HIS

7    DIRECT TESTIMONY WAS INTRODUCED AT TRIAL BY PUTTING IN HIS

8    EXPERT REPORT.

9         THIS IS THE SINK-ON-A-DRUM APPARATUS.  PRIOR ART

10   IN THIS CASE SHOWED THAT IT WAS KNOWN TO HAVE A FLUID, A

11   CLEANING FLUID, IN THE BASE; TO PUMP THAT CLEANING FLUID UP

12   TO THE NOZZLE AND TO WASH THE PARTS IN THE SINK SUCH THAT

13   THE CONTAMINANT WOULD BE REMOVED FROM THE PART AND FALL BACK

14   DOWN INTO THE PRIOR ART WELL, IF YOU WILL, OR THE DRUM,

15   WHICH IS WHERE IT WAS.

16        DR. DURKEE FURTHER SHOWED US THAT IT WAS KNOWN TO

17   PROVIDE AQUEOUS PARTS WASHERS AND IT WAS PART OF THE PRIOR

18   ART.  FOR EXAMPLE, THIS IS FROM HIS TABLE OF CONTENTS.  IN

19   THE CONTEXT OF THE OVERVIEW OF THE STATE OF THE ART PRIOR TO

20   CHEMFREE'S INVENTION, WE ARE NOW TALKING ABOUT THE PRIOR

21   ART, HE ADDRESSES AQUEOUS PARTS WASHING.  THAT WAS PART OF

22   THE PRIOR ART.  AND WITH REFERENCE TO THAT AQUEOUS PARTS

23   WASHING, HE SAID, IN AQUEOUS CLEANING, ONE USES A DETERGENT,

24   A SURFACTANT, OR TENSIDE SUPPLEMENTED BY MECHANICAL FORCE TO

25   LIBERATE THE SOILS FROM PART SURFACES.  YOU WASH IT.  YOU

```
 1    USE A DETERGENT, YOU USE A SOAP, AND YOU WASH IT.  THERE

 2    WERE OTHER THINGS THAT WERE KNOWN IN THE PRIOR ART.

 3              THE COURT:  COUNSEL, YOU'VE HAD A CHANCE TO SEE

 4    THESE?

 5              MR. SCHAETZEL:  HE SAW THEM AT THE LAST CLOSING,

 6    YOUR HONOR.  THEY WERE FROM TRIAL.

 7              THIS IS THE 110 PATENT.  THE HIGHLIGHTED SECTIONS

 8    IN COLUMN 1, APPROXIMATELY LINE 10 AND SO ON.  PARTS WASHERS

 9    ARE WELL-KNOWN AND OFTEN EMPLOYED IN THE CLEANING OF PARTS

10    THAT ARE CONTAMINATED WITH ORGANIC WASTE PRODUCTS.  MOST

11    CONVENTIONAL PARTS WASHERS INCLUDE A BASIN MOUNTED TO THE

12    TOP OF THE TANK.  THE TANK IS PARTIALLY FILLED WITH A

13    MINERAL SPIRITS SOLVENT THAT IS PUSHED FROM THE PUMPED FROM

14    THE TANK THROUGH A CONDUIT THAT DISCHARGES INTO THE BASIN

15    WHERE THE PARTS ARE WASHED, AND IT CARRIES ON IT THE USE OF

16    FILTERS TO CLEAN OUT THE CONTAMINANT WAS AN ISSUE EARLIER IN

17    THE CASE.  EVEN THE DOCUMENT ITSELF, THE PATENTS THEMSELVES,

18    ADDRESSED WHAT WAS IN THE PRIOR ART AT THAT POINT IN TIME.

19              THE TIME-LINE CONTINUES, YOUR HONOR.  IN 1987 --

20              THE COURT:  THIS TOO IS FROM EARLIER?

21              MR. SCHAETZEL:  YES, SIR.

22              THE COURT:  ALL OF THESE FROM EARLIER?

23              MR. SCHAETZEL:  YES.

24              THE COURT:  CONTINUE.

25              MR. SCHAETZEL:  IN 1987 WE HAD THE MONTREAL
```

1    PROTOCOL.  THE MONTREAL PROTOCOL ADDRESSED VOLATILE ORGANIC

2    COMPOUNDS OR VOC'S.  IN 1987 DR. DURKEE, THE PLAINTIFF'S

3    EXPERT, CALLED IT THE LARGEST DISRUPTION EVER IN THE

4    CLEANING INDUSTRY.  IT TURNED THE CLEANING INDUSTRY ON ITS

5    HEAD.  IT PRESENTED NEW CHALLENGES, I BELIEVE WAS THE WORD

6    THAT HE USED, THAT NEEDED TO BE ADDRESSED AS A RESULT OF

7    THIS DRIVE TO STOP USING VOC'S.  TWO YEARS LATER, 1989, WE

8    HAVE THE WRECK OF THE EXXON VALDEZ.  AS A PART OF THAT, VERY

9    PUBLIC DISCLOSURE IS MADE OF THE USE OF BIOREMEDIATION AS A

10   WAY TO CLEAN THINGS, BOTH ON THE SHORE AND AN ATTEMPT TO

11   CLEAN THINGS IN THE WATER.  MICROBES ARE USED IN AN EFFORT

12   TO TRY AND CLEAN UP THE OIL THAT SPILLED UP IN PRINCE

13   WILLIAM SOUND.

14          AS WAS TESTIFIED TO THIS MORNING, WHEN MR. MCNALLY

15   NOTICED IT, IN APPROXIMATELY THE 1989 TIME FRAME, DEPENDING

16   ON, IF YOU ARE LOOKING AT THE DATE IT WAS FILED OR THE DATE

17   THE DOCUMENT WAS ACTUALLY PUBLISHED, HAKANSSON 1 BECAME A

18   REFERENCE.  IT WAS PUBLISHED, THAT WOULD BE THE DATE THAT IT

19   WOULD BE OFFICIALLY A REFERENCE, IT WOULD BE PUBLIC IF YOU

20   WILL.  SO THAT IS 1989, APPROXIMATELY THE SAME TIME AS THE

21   EXXON VALDEZ.

22          1992 COMES ALONG AND WE GET TO THE HAKANSSON 2

23   REFERENCE.  HAKANSSON 2 SHOWS THE -- THIS IS THE FIRST PAGE

24   OF THE PATENT.  THE TIMING, THE 1992 DATE OF PUBLICATION IS

25   UP NEAR THE TOP AND THE FIRST PIECE OF KEY LANGUAGE THAT

1   COMES FROM IT IS RIGHT AT THE VERY BEGINNING OF THE

2   DOCUMENT.  THE INVENTION RELATES TO A DEVICE FOR CLEANING

3   OBJECTS, PREFERABLY OF METAL, FOR REMOVAL OF CONTAMINANTS

4   SUCH AS OIL, GREASE, SOLID PARTICLES AND THE LIKE, BY USING

5   A WASHING LIQUID CONTAINING, ON THE ONE HAND, AN ACTIVE

6   DETERGENT, AND ON THE OTHER HAND MICROORGANISMS FOR REDUCING

7   THE CONTAMINANTS TRANSMITTED FROM THE OBJECT TO THE WASHING

8   LIQUID.  IN OTHER WORDS, IN 1992, A LITTLE BIT SHY OF TWO

9   YEARS BEFORE THE INVENTORS FILED THEIR PATENT APPLICATION,

10  AND THEIR -- THEIR FIRST PATENT APPLICATION, AND A YEAR, AT

11  LEAST A YEAR BEFORE THEY STARTED DOING THEIR EXPERIMENTS, WE

12  HAVE HAKANSSON 2 ALREADY COMBINING MICROORGANISMS WITH A

13  SURFACTANT IN THE CONTEXT OF A PARTS WASHING MACHINE.  THESE

14  INVENTORS CERTAINLY WERE NOT AWARE OF THAT, AND THAT

15  EXPLAINS SOME OF THE POSITIONS THAT ARE TAKEN HERE.  BUT

16  NONETHELESS, THE PRIOR ART REFLECTS THAT IN THE 1992 TIME

17  FRAME THE NOTION OF COMBINING MICROORGANISMS WITH A

18  SURFACTANT IN A PARTS WASHER TO CLEAN PARTS IS ALREADY

19  THERE.  IT'S OUT IN THE -- IT IS OUT IN THE PUBLIC.  IT IS

20  PART OF THE PRIOR ART.  BUT THE REFERENCE PROVIDES MORE THAN

21  THAT PIECE OF INFORMATION.  THE REFERENCE GIVES INSIGHT

22  INTO, JUDGE, HOW WELL-KNOWN THE PROCESS REALLY HAS BECOME.

23        FOR EXAMPLE, ON PAGE 1, THE REFERENCE SAYS, THE

24  CONVENTIONAL CLEANING METHODS FOR THIS PURPOSE, WHICH IS THE

25  CLEANING OF PARTS, THE CONVENTIONAL CLEANING METHOD FOR THIS

1    PURPOSE CAN BE DIVIDED INTO TWO MAIN GROUPS, NAMELY WET

2    CLEANING METHODS AND SOLVENT BASED CLEANING METHODS.  AND WE

3    KNOW ABOUT THE SOLVENT BASED CLEANING METHOD.  THAT IS

4    MINERAL SPIRITS.  THAT IS WHAT THE MONTREAL PROTOCOL IS

5    TRYING TO HELP US ELIMINATE, BECAUSE IT HAS THE VOC'S.  BUT

6    THE WET CLEANING METHODS ARE ESSENTIALLY THE AQUEOUS

7    CLEANING METHODS.  AND WHAT DOES THE REFERENCE SAY ABOUT

8    THAT?  WET CLEANING METHODS COMPRISE THREE KINDS, AND IT

9    GOES STRAIGHT TO VISCOSITY.  ON THE ONE END THE ALKALINE,

10   THE HIGH END, IF YOU WILL.  THE OTHER END ACIDIC.  AND IN

11   THE MIDDLE, BIOLOGICAL.  WET CLEANING METHODS COMPRISE OF

12   ALKALINE, ACIDIC, AND BIOLOGICAL CLEANING METHODS.  AND IT

13   GOES ON TO EXPLAIN THEM.

14           THE START OF THE NEXT PARAGRAPH IT SAYS MOST OF

15   THE WET CLEANING METHODS, THE ALKALINE METHODS WHICH ARE

16   BASED ON SODIUM HYDROXIDES AND EMULSIFIERS, AND SO ON AND SO

17   FORTH.  THE NEXT PAGE, OF THE SAME DOCUMENT, THE ACIDIC

18   CLEANING METHODS ARE USUALLY BASED ON PHOSPHORIC ACID AND A

19   RELATIVELY LARGE CONTENT OR EMULSIFIERS.  SO WE FIRST TALK

20   ABOUT THE HIGH PH ONES, NOW WE ARE TALKING ABOUT THE LOW PH

21   ONES.  AND WHEN YOU GET OVER TO THE NEXT PAGE, 3, THE

22   BIOLOGICAL CLEANING METHODS.  THE BIOLOGICAL CLEANING

23   METHODS UTILIZE, IN AN EXCELLENT MANNER, THE ACTIVITY AND

24   CAPACITY OF THE USED DETERGENT BY CONTINUOUSLY REDUCING THE

25   CONTAMINANTS SUPPLIED TO THE WASHING LIQUID SUCH AS OIL,

1    GREASE, BIOLOGICAL SUBSTANCES, AND SO ON AND SO FORTH.  ALL

2    RIGHT, SO IN THE BIOLOGICAL MIDDLE OF THE ROAD APPROACH,

3    WHAT WE SEE IS THAT IN THE 1992 TIME FRAME IT'S KNOWN TO

4    HAVE, IN THE CONTEXT OF A PARTS WASHER, A MICROORGANISM THAT

5    CAN BE SUSTAINED BY THE DETERGENT FLUID THAT CAN ACCEPT

6    CONTAMINANTS AND THAT CAN CONTINUE TO FUNCTION.  THE

7    REFERENCE CARRIES ON.  WE GET TO PAGE 9.  THE LANGUAGE THAT

8    IS CITED IN OUR PAPERS.  BY PROVIDING THE STEADY STATE FOR

9    THE WASHING LIQUID, SO ON, THE CONTROLLED PH, THE CONTROLLED

10   TEMPERATURE, AND THE SUPPLY OF NUTRIENT ADDITIVES AND AN

11   ACTIVE BIOLOGICAL BACTERIA GROWTH IS OBTAINED FEEDING ON THE

12   CONTAMINANT SUPPLY.  AND THEN AGAIN AT THE END OF THAT

13   PARAGRAPH, YOUR HONOR, SO THAT AN ACTIVE FERMENTATION CAN BE

14   BASED THEREON.

15        WHAT DOES ALL OF THIS SHOW?  THE TEACHING OF

16   HAKANSSON 2, AS SHOWN BY THE DRAWING, IS THAT THE PRIOR ART

17   HAS ALREADY GONE BY AS OF 1992, THE SINK-ON-A-DRUM, PUT

18   MICROBES AND WATER INTO THE DRUM UNIT TECHNOLOGY.  THE STATE

19   OF THE ART HAS ALREADY PASSED WHERE THE INVENTORS WERE.

20   THIS REPRESENTS A MUCH BROADER SCALE, A MUCH BIGGER

21   OPERATION, CLEANING A LOT MORE STUFF.

22        SO FOR EXAMPLE, WILL THERE BE MORE FLUCTUATIONS

23   THAT YOU HAVE TO TAKE INTO ACCOUNT?  YES.  AND AS A RESULT

24   THEY WOULD NEED TO METER THE PH?  THEY WOULD NEED TO DO

25   THINGS BECAUSE THEY ARE NOT JUST DEALING WITH A LITTLE BIT

1  OF OIL EACH DAY IN A SINGLE UNIT, IT IS AN INDUSTRIAL SIZE

2  PIECE OF UNIT.  IT IS AN INDUSTRIAL SIZE PROBLEM.  BUT WHAT

3  IT REFLECTS IS THE PRIOR ART TAKING THAT TECHNOLOGY HAS

4  ALREADY MOVED PAST WHERE THE INVENTORS WERE WORKING IN THE

5  1993 AND 1994 TIME FRAME.

6          NOW, AT TRIAL JUDGE CAMP WAS WITHOUT QUESTION

7  IMPRESSED WITH THE HAKANSSON 2 REFERENCE.  MR. CAPP HAS

8  ALREADY NOTICED AND ADDRESSED THE ISSUE OF BIODEGRADABLE

9  NONCAUSTIC, NONTOXIC, AND NONFLAMMABLE.  WELL, THE FIRST

10  ISSUE IN THE FIRST MOTION IS ONE OF CAUSTICITY.  AND BEFORE

11  I GET THERE, A COUPLE OF OTHER POINTS ON THINGS THAT DID GET

12  MADE.  WELL, IN THE INTEREST OF TIME, LET ME COME BACK TO

13  THAT, YOUR HONOR.

14          AT THE TIME THAT THE INVENTORS DID THEIR WORK, IN

15  THE 1993 TO '94 TIME FRAME, THERE WAS NO DISPUTE THAT THERE

16  WERE AVAILABLE MATERIALS OUT THERE FROM WHICH THEY COULD DO

17  THEIR WORK.  FOR EXAMPLE, ON THE EQUIPMENT ITSELF, THERE WAS

18  ALREADY THE SINK ON THE DRUM.  THERE WAS ALREADY, YOU KNOW,

19  THE PUMP THAT WOULD MOVE THINGS, MOVE THE FLUID THROUGH, THE

20  NOZZLE AND SO ON AND SO FORTH.  ADDING THE HEATER, WELL,

21  THAT WAS SHOWN IN HAKANSSON 2.  HAKANSSON 2 WAS A HEATED

22  UNIT, SO THE HEATER WAS ALREADY THERE.  THE BASIC

23  FUNDAMENTALS, IF YOU WILL, OF THE EQUIPMENT WERE SHOWN TO BE

24  ALREADY THERE.

25          IN ADDITION, IN ORDER TO MAKE THE MATERIALS THAT

1    THEY DID, THEY DIDN'T, IF YOU WILL, CREATE ANYTHING.  IT

2    ISN'T LIKE THEY WENT AND CREATED A MICROBIAL STRING OR

3    CREATED A CLEANER.  AS WE HEARD TODAY, AND WAS TESTIFIED

4    SOME AT TRIAL, WHAT THEY DID IS THEY WENT TO THE THOMAS

5    REGISTER AND IDENTIFIED SUPPLIERS AND THEN OBTAINED

6    MATERIALS FROM THOSE SUPPLIERS.  AND THERE WERE CERTAIN

7    REPRESENTATIONS MADE IN THE VARIOUS MOTIONS, AND AS THINGS

8    WERE -- AS THINGS PROGRESSED THROUGH ENABLEMENT AS TO WHAT

9    WAS AVAILABLE.  SO FOR EXAMPLE, THIS IS FROM THE PLAINTIFF'S

10   STATEMENT OF FACT, DOCKET NO. 469-3 THAT WAS FILED IN

11   CONJUNCTION WITH THEIR MOTION FOR SUMMARY JUDGMENT ON

12   ENABLEMENT THAT WAS SUCCESSFUL, DEFENDANTS OFFER NO

13   EMPIRICAL EVIDENCE TO CHALLENGE CHEMFREE'S POSITION THAT

14   OTHER COMMERCIALLY AVAILABLE BIODEGRADABLE PH NEUTRAL OIL

15   DISPERSANT AND DEGREASER FLUID BESIDES SEAWASH 7 EXISTED AT

16   THE TIME OF THE INVENTION.  IN OTHER WORDS, YOU COULD GO OUT

17   INTO THE MARKETPLACE THROUGH THE THOMAS REGISTER AND GET

18   OTHER CLEANING FLUIDS.  AND THOSE OTHER CLEANING FLUIDS WERE

19   BIODEGRADABLE, PH NEUTRAL, OIL DISPERSANT, AND DEGREASER

20   CLEANING FLUIDS, AND THAT IS CONSISTENT WITH WHAT WAS ARGUED

21   TO THE COURT AT ENABLEMENT.

22          FOR EXAMPLE, IN THE BRIEF FILED IN CONJUNCTION

23   WITH THAT STATEMENT OF FACT, THIS IS FROM PLAINTIFF'S BRIEF,

24   DOCKET 496 PAGE 10 PROPER OF THE BRIEF.  READY AVAILABILITY

25   OF CLEANING FLUIDS.  IN 1994 SEAWASH 7 WAS MERELY ONE OF

1    MANY AVAILABLE CLEANING FLUIDS THAT WAS FORMULATED TO REMOVE

2    OIL AND GREASE CONTAMINANTS FROM SURFACES.  CHEMFREE'S

3    INVENTORS SUCCESSFULLY TESTED AT LEAST FOUR FLUIDS PRIOR TO

4    THE FILE DATE.  SO THERE WERE AT LEAST FOUR OTHER CLEANING

5    FLUIDS OUT THERE THAT WERE SUITABLE THAT THEY COULD USE.

6         WHAT DO WE KNOW OF THE SEAWASH?  WE KNOW THAT IT

7    WAS NONCAUSTIC BECAUSE IT WAS A NEUTRAL PH.  WE KNOW THAT IT

8    WAS BIODEGRADABLE, THAT IT WAS NONFLAMMABLE, AND NONTOXIC.

9    THOSE WERE THE POINTS THAT WERE MADE BEFORE, THOSE WERE THE

10   REPRESENTATIONS THAT WERE MADE AS A PART OF GOING FORWARD IN

11   THE ENABLEMENT CASE, AND THOSE HAVEN'T CHANGED.  THERE WERE

12   AVAILABLE CLEANING FLUIDS IN THE '94 TIME FRAME FOR THEM TO

13   GO OUT AND CHOOSE FOR THEM TO WORK.  THERE WERE AVAILABLE

14   MICROBES IN A VERY SIMILAR FASHION, THIS IS FROM THAT SAME

15   BRIEF, READY AVAILABILITY OF MICROBIAL PRODUCTS.

16        BY THE EARLY 90'S THERE WERE 50 TO 100

17   DISTRIBUTORS OPERATING IN NORTH AMERICA THAT SOLD MICROBIAL

18   PRODUCTS.  IN THEIR STATEMENT OF FACTS, BACK TO DOCUMENT

19   469-3 PAGE 29.  DEFENDANTS OFFER NO EMPIRICAL EVIDENCE TO

20   CHALLENGE CHEMFREE'S POSITION THAT OTHER COMMERCIALLY

21   AVAILABLE MICROBIAL PRODUCTS BESIDES LRC 1 MICROBES EXISTED

22   AS OF THE TIME OF THE INVENTION.  THERE WAS NOTHING INVENTED

23   IN THE COMBINATION OF MICROBE AND A SURFACTANT OR WASHING

24   FLUID WITH A SURFACTANT BECAUSE THAT WAS ALREADY DISCLOSED

25   IN HAKANSSON 2.  THEY COULD GO OUT AND GET OTHER MICROBIAL

1    PRODUCTS TO SUBSTITUTE FOR THAT, AND THEY COULD GO OUT AND

2    GET OTHER CLEANING FLUIDS TO SUBSTITUTE FOR THAT.  IN ORDER

3    TO ADDRESS AN ENABLEMENT, THAT WAS THE POSITION THAT WAS

4    TAKEN.  THE POSITION THAT WAS TAKEN WAS, IT WAS ALL OUT

5    THERE, WE WENT AND GOT IT TOGETHER, WE COULD PUT IT

6    TOGETHER.  AND IT WASN'T AS WAS TESTIFIED TO THIS MORNING,

7    THE TESTS WERE SIMPLE, IT WAS SOMETHING THAT DIDN'T TAKE A

8    LOT OF TIME, IT WAS NOT TIME CONSUMING, NOT EXTENSIVE, SO ON

9    AND SO FORTH.  YOU COULD PULL IT TOGETHER AND CREATE THE

10   INVENTION.

11           SO AT THE TIME THAT THEY WERE DOING THEIR WORK,

12   THE PRIOR ART, WHICH ALSO INCLUDED ATHEY BY THE WAY -- BUT

13   WE WILL LEAVE THAT, THAT IS IN THE PAPERS.  IT IS A

14   DISHWASHER.  THE DISHWASHERS WERE KNOWN AND DISHWASHERS HAD

15   TO WORRY ABOUT PROTECTING THE HEATING ELEMENT FROM BECOMING

16   EXPOSED AND BURNING UP, AND THINGS THAT YOU WOULD BE WORRIED

17   ABOUT, FLAMMABILITY AND SO FORTH.  BY THE TIME YOU GOT TO

18   WHERE THEY WERE, THE STATE OF THE ART AS REPRESENTED BY

19   HAKANSSON 2 HAD ALREADY PROGRESSED PAST WHAT THE INVENTORS

20   ARE DOING, BUT EVEN WHERE THE INVENTORS WERE WORKING, THEY

21   COULD GO OUT IN THE MARKETPLACE AND PULL TOGETHER THE THINGS

22   THAT THEY NEEDED IN ORDER TO CREATE THE INVENTION.

23           MR. CAPP MAKES TWO POINTS.  FIRST OF ALL, HE SAID

24   SAYS, WELL, IT IS HINDSIGHT RECONSTRUCTION, JUST GOING OUT

25   AND TRYING TO PULL AN ELEMENT HERE AND PULL AN ELEMENT THERE

1   AND PUT IT ALL TOGETHER.  NO, IT'S NOT.  IT'S NOT HINDSIGHT

2   RECONSTRUCTION.  BECAUSE THE MARKETPLACE WAS TAKING US, AS A

3   RESULT OF THINGS LIKE THE MONTREAL PROTOCOL, AS A RESULT OF

4   THE EXXON VALDEZ, AS A RESULT OF THINGS LIKE HAKANSSON 1 AND

5   HAKANSSON 2, THE MARKETPLACE WAS MOVING TOWARDS THIS

6   INVENTION.  AND UNDER KSR, THAT IS A VERY IMPORTANT FACT.

7   THAT IS ONE OF THE EXPRESS THINGS THAT KSR SAYS THAT THE

8   COURT SHOULD AND CAN LOOK TO TO DETERMINE MOTIVATION.

9          SO IT WAS NOT THAT JUDGE CAMP WAS ACTING IN

10  HINDSIGHT, OR THAT HE HAD PUT HIMSELF IN A POSITION OF A

11  PERSON OF ORDINARY SKILL IN THE ART.  HE SAW THE WAVE MOVING

12  IN THAT DIRECTION, HE SAW THE EVIDENCE THAT DOCUMENTED THAT

13  WAVE, AND HE RELIED ON IT VERY MUCH IN A FASHION VERY

14  SIMILAR TO THE KSR CASE, TO SAY THAT WAS NOT AN UNOBVIOUS

15  CHANGE FROM WHAT WAS IN THE PRIOR ART.

16         SO WHEN WE PUT THIS IN CONTEXT, WE NOW LOOK AT THE

17  PARTICULAR ISSUES OF THE MOTION.  THE QUESTION IS, IS THERE

18  CLEAR ERROR HERE?  DID JUDGE CAMP COMPLETELY MISS THE BOAT?

19  IS THERE A MANIFEST INJUSTICE?  WELL, LET'S START WITH

20  NONCAUSTIC.  THE DEFINITION THAT WAS GIVEN WAS A DEFINITION

21  THAT WAS NOT LIMITED TO HUMAN SKIN.  IT WAS A DEFINITION

22  THAT INCLUDED ERODING OR INJURING.  THE DEFINITION IS IN OUR

23  PAPERS.

24         THE POINT THAT WE WOULD WANT TO MAKE ON NONCAUSTIC

25  ARE BASICALLY THREE:  FIRST OF ALL, IT WAS A BROAD

1    DEFINITION THAT WAS NOT LIMITED TO HUMAN SKIN.  SECOND OF

2    ALL, IT WAS A DEFINITION THAT NOT ONLY COULD APPLY, BUT IN

3    FACT DID APPLY TO MICROBES.  THINK, PLEASE, TO MR. MCNALLY'S

4    TESTIMONY OF TODAY.  MR. MCNALLY SAID, WELL, WE DID SOME

5    DIFFERENT TESTS, AND IF THE PH WAS BETWEEN 6 AND 8.5, THEN

6    WE FOUND THAT WE GOT GOOD MICROBIAL ACTIVITY.  BUT IF IT WAS

7    LOWER THAN 6 OR IF IT WAS HIGHER, THERE WAS NOT A GOOD

8    GROWTH, AND THEREFORE WE DID NOT HAVE AS GOOD OR GOOD

9    MICROBIAL ACTIVITY.  THE MICROBES ARE BEING INJURED.  THEY

10   ARE NOT ALL BEING KILLED.  THEY ARE BEING ERODED.  THEY ARE

11   LOSING THEIR ABILITY TO GROW.  THAT'S EVIDENCE OF THIS BEING

12   A POTENTIALLY CAUSTIC ENVIRONMENT WITHIN WHICH THEY HAVE

13   TO -- THE MICROBES ARE TRYING TO LIVE AND WORK.

14            THE LAST POINT ON CAUSTICITY IS MR. MCNALLY'S

15   TRIAL AT -- MR. MCNALLY'S TESTIMONY AT TRIAL.  MR. MCNALLY

16   WAS ASKED IN HIS DEVELOPMENT OF THE SMART WASHER MACHINE WHY

17   DID HE CHOOSE A NONCAUSTIC SOLUTION.  AND HE SAID HE WANTED

18   TO HAVE A GOOD ENVIRONMENT FOR THE MICROBES, AND HE WANTED

19   TO HAVE A GOOD LIFE CYCLE OR -- SORRY, A GOOD LIFE -- THE

20   EXACT WORDS ESCAPE ME, I APOLOGIZE.  HE WAS CONCERNED ABOUT

21   THE LIFE OF THE MICROBES IN THE SELECTION OF HIS NONCAUSTIC

22   FLUID.  IT WASN'T DR. ADRIAENS TESTIFYING ABOUT CELL WALLS

23   OR ANYTHING LIKE THAT THAT NECESSARILY LED TO THAT DECISION.

24   THAT TESTIMONY WAS APPROPRIATE, IT WAS A RESPONSE TO

25   DR. DURKEE, IT WAS NOT -- THEY WEREN'T SOME DIFFICULT WORDS,

1    QUITE FRANKLY, THAT WE INTENTIONALLY TRIED TO MISLEAD THE

2    COURT OR ANYTHING LIKE THAT, OR THAT WE WERE VIOLATING

3    ORDERS.  WE CERTAINLY DON'T BELIEVE THAT TO BE THE CASE.

4              AND MORE IMPORTANTLY, YOU COULD TAKE DR. ADRIAENS

5    TESTIMONY AND ALMOST SET IT ASIDE BECAUSE, IF YOU LOOK

6    SIMPLY AT THE TESTIMONY FROM CHEMFREE'S WITNESSES ON

7    CAUSTICITY, IT IS CLEAR THAT THE DEFINITION THAT WAS USED

8    WAS A DEFINITION THAT COULD APPLY TO MICROBES.  AND IN FACT,

9    THE TRUTH OF THE SITUATION IS, THAT IN SELECTING PRODUCT TO

10   SUSTAIN THE MICROBES, THEY WERE CONCERNED ABOUT CAUSTICITY

11   IN DEVELOPING THE SMART WASHER.  THAT IS WHAT CAME AS A

12   RESULT OF THESE TESTS WE WANT TO BE 6 AND 8.5, BECAUSE THAT

13   IS WHERE WE FIND PH NEUTRAL, THAT IS WHERE WE FIND THE BEST

14   MICROBIAL ACTIVITY.  CAUSTICITY MATTERS AS IT RELATED TO THE

15   NEW MICROBES AND THERE IS NO CLEAR ERROR ON THAT FROM JUDGE

16   CAMP.

17             HOW DO WE KNOW THAT HAKANSSON 2 DISCLOSES A

18   NONCAUSTIC FLUID?  A SECOND ISSUE RELATED TO CAUSTICITY IN

19   THE FIRST MOTION.  WE KNOW IT FROM PAGE 9, WHERE THE

20   REFERENCE SPEAKS TO THERE BEING AN ACTIVE FERMENTATION OR

21   ACTIVE BIOLOGICAL GROWTH.  YOU WILL NOT GET, AS DEMONSTRATED

22   BY MR. MCNALLY'S TESTING, AN ACTIVE BIOLOGICAL GROWTH IF THE

23   PH IS TOO HIGH, IF THE PH IS TOO LOW.  HOW DO WE KNOW THAT

24   THE HAKANSSON 2 REFERENCE IS TALKING ABOUT A NONCAUSTIC

25   SOLUTION?  IT IS BECAUSE THAT SOLUTION MUST SUSTAIN AN

1    ACTIVE FERMENTATION OR AN ACTIVE BIOLOGICAL GROWTH, AND THE

2    ABSENCE OF THAT ACTIVE BIOLOGICAL GROWTH -- SORRY -- IN THE

3    ABSENCE OF A PH NEUTRAL, YOU DON'T GET THAT SORT OF A

4    GROWTH, SO THE SOLUTION WAS NONCAUSTIC IN HAKANSSON 2.

5         A FINAL BIG ISSUE IN THE FIRST MOTION AS TO

6    SECONDARY CONSIDERATIONS.  WE THINK IT IS IMPORTANT TO NOTE

7    THAT JUDGE CAMP LOOKED AT THOSE SECONDARY CONSIDERATIONS, HE

8    CREDITED THEM, HE FOUND SOME SECONDARY CONSIDERATIONS THAT

9    HE THOUGHT WERE EVIDENCE OF OBVIOUSNESS, AND SOME SECOND

10   OBJECTIVE CONSIDERATIONS THAT WERE EVIDENCE OF

11   NONOBVIOUSNESS.  REGARDLESS, HE DIDN'T FIND THEM TO BE OF

12   SUCH WEIGHT THAT THEY OVERCAME THE PRIMA FACIE CASE OF

13   OBVIOUSNESS AS IT RELATED TO WHAT WAS TAUGHT BY THE PRIOR

14   ART AND TO THE CLAIMED INVENTION.  SO THEREFORE, THE FIRST

15   POINT AS WITH RELATION TO ALL OF THE SECONDARY CONSIDERATION

16   EVIDENCE OR ARGUMENTS IS THAT JUDGE CAMP CONSIDERED IT, HE

17   LOOKED AT IT.  THIS IS NOT SOMETHING THAT WAS BROUGHT TO HIS

18   ATTENTION AND HE IGNORED.  HE DID CONSIDER IT.

19        SECONDLY AND BRIEFLY, THERE ARE SOME THINGS ABOUT,

20   FOR EXAMPLE, AWARDS THAT WERE WON, OR LAUDATORY STATEMENTS

21   THAT WERE MADE.  IT IS IMPORTANT TO LOOK AND SEE IF THERE IS

22   A NEXUS BETWEEN THE LAUDATORY STATEMENT AND THE AWARD THAT

23   WAS WON AS IT COMPARES TO THE CLAIMED INVENTION.  IF THE

24   LAUDATORY STATEMENT IS SIMPLY WE MAKE A GREAT BIOREMEDIATION

25   PARTS WASHER THAT HAS MICROBES AND A SURFACTANT IN IT, THAT

1    COULD BE SAID OF HAKANSSON 2.  THAT DOESN'T NECESSARILY

2    RELATE TO THE CLAIMED INVENTION ASSERTED BY CHEMFREE.

3    THAT IS NOT WHAT WE HAVE HERE.  THE LAUDATORY STATEMENTS ARE

4    LAUDATORY STATEMENTS, IF YOU WILL, IN THE BROADER CONTEXT.

5    THAT BIOREMEDIATION IS GREAT.  THEY ARE NOT LAUDATORY

6    STATEMENTS THAT GO TO SUCH A DEFINITE AREA THAT YOU SAY, OH,

7    THEY ARE REFERRING TO THE CHEMFREE DEVICE.  FOR EXAMPLE, THE

8    CHEMFREE DEVICE, AS MR. MCNALLY SAID THIS MORNING, IT

9    DELIVERS ITS MICROBES TO THE FLUID BY HAVING A FILTER THAT

10   IT PLACES, SO WHEN THE FLUID FALLS DOWN THROUGH THE FLUID IT

11   WILL DISTRIBUTE OUT ON THE FILTER AND, IN EFFECT, ACTIVATE

12   THE MICROBES, THEN THEY WILL FALL DOWN INTO THE TUB OR THE

13   DRUM.  IT WOULD BE COMPLETELY DIFFERENT IF SOMEONE AT

14   CHEMFREE OR SOMEONE AT WALTER HAD SAID, WELL, WE HAVE A

15   FILTER AND OUR FILTER WORKS THAT WAY AND IT REALLY WORKS

16   GREAT.  BECAUSE THAT IS HOW WE DELIVER THE BIOREMEDIATION

17   PRODUCT TO THE SYSTEM.

18           BUT THAT IS NOT WHAT WALTER DOES.  WHAT WALTER

19   DOES IS WALTER HAS A FLUID WHERE THE MICROBES ARE ALREADY IN

20   IT.  SO FOR EXAMPLE, IF YOU GO TO THE SHELF AND YOU GET

21   WALTER FLUID, IT HAS THE MICROBE PRODUCT ALREADY IN IT, AS

22   OPPOSED TO CHARGING THE FLUID BY HAVING A FILTER THAT YOU

23   REPLACE PERIODICALLY TO PUT NEW MICROBES INTO THE PRODUCT,

24   YOU CAN BUY CHEMFREE FLUID AND IT WILL NOT HAVE ANY

25   MICROBIAL PRODUCT IN IT.  YOU CAN BUY JUST A PLAIN

1   SURFACTANT, IF YOU WILL.  THAT IS WHAT YOU GET, AND THEN

2   WHEN YOU POUR THAT INTO THE SYSTEM IT WILL FLOW OUT OVER THE

3   FILTER, AND THAT IS HOW THE BUGS WILL BE DELIVERED.  IT IS

4   VERY DIFFERENT FROM WHAT WALTER DOES.  WHAT WALTER DOES IS

5   WALTER HAS A FLUID THAT ALREADY HAS THE MICROBES IN IT, AND

6   THAT IS HOW IT GETS SHIPPED OUT AND THAT IS HOW IT GETS

7   STORED ON THE SHELF.  THAT IS A MUCH DIFFERENT TECHNOLOGICAL

8   PROBLEM TO TRY THE KEEP THE BUGS, IF YOU WILL, FROM

9   ACTIVATING TOO EARLY IF IT GETS TOO WARM IN THE STORAGE

10  FACILITY OR WHATEVER.  IT IS A DIFFERENT PROCESS.  AND

11  SIMPLY BY SAYING, WELL, WE THINK WE HAVE A GREAT

12  BIOREMEDIATING PARTS WASHER, THAT IS NOT A LAUDATORY

13  STATEMENT THAT SHOWS A NEXUS BETWEEN THE CLAIMED INVENTION

14  AND THE STATEMENT THAT IS BEING MADE AS A LAUDATORY

15  STATEMENT.  THERE IS NO EVIDENCE OF THAT NEXUS HERE.  AND I

16  THINK THAT IS ONE OF THE REASONS JUDGE CAMP, AFTER HE LOOKED

17  AT THIS, SAID I SEE THAT THE AWARDS ARE GOOD, THE PRAISE IS

18  GOOD, THAT IS A FACTOR UNDER, YOU KNOW, GRAHAM V. JOHN DEERE

19  TEST, BUT HE DIDN'T GIVE IT THAT MUCH WEIGHT FOR THOSE AND

20  OTHER REASONS.

21          I WOULD LIKE TO JUMP TO THE THIRD MOTION, YOUR

22  HONOR.  ONE OF THE ISSUES THERE, IS THE FLUID IN HAKANSSON 2

23  FLAMMABLE OR NONFLAMMABLE.  WELL, HAKANSSON 2 DISCLOSES A

24  HEATED FLUID.  HAKANSSON 2 THEREFORE HAS TO BE CONCERNED

25  WITH FLAMMABILITY.  JUDGE CAMP'S READ OF HAKANSSON 2 WAS SO

1   STRONG THAT THE PERSON OF ORDINARY SKILL IN THE ART THAT

2   KNOWS ABOUT ALL OF THESE EVENTS, THAT KNOWS ABOUT THE

3   CONCERNS OF, YOU KNOW, SAFETY WITH FLAMMABILITY AND SO ON

4   AND SO FORTH, IS GOING TO BE VERY CAREFUL NOT TO USE A

5   FLAMMABLE SOLUTION WHEN IT IS BEING EXPOSED TO A HEATER.

6   THAT WAS, IF YOU WILL, HIS COMMON SENSE READ OF IT, AND THAT

7   IS WHAT KSR PROVIDES.  KSR SAYS YOU CAN LOOK AT THE

8   SITUATION, AND YOU DON'T CHECK YOUR COMMON SENSE AT THE

9   DOOR.  SO ON THE BASIS OF THAT HE SAID I THINK THAT

10  HAKANSSON 2 DISCLOSES A NONFLAMMABLE FLUID.  IT'S NOT

11  NECESSARY TO GO AS FAR AS EVEN JUDGE CAMP DID TO FIND THAT

12  THE USE OF A NONFLAMMABLE FLUID IN THE CHEMFREE INVENTION

13  WAS NOT AN INVENTIVE STEP.  YOU CAN LOOK AT WHAT IS TAUGHT

14  BY HAKANSSON 2, AND YOU CAN SAY HAKANSSON 2 HAS A LITER AND

15  THEREFORE IT WOULD BE CONCERNED WITH FLAMMABILITY, AND WOULD

16  PROBABLY NOT USE A NONFLAMMABLE MATERIAL.  BUT WHAT IS

17  TAUGHT BY THAT?  WHAT IS TAUGHT BY THAT AND THE PRIOR ART,

18  ESPECIALLY THE MONTREAL PROTOCOL, AND SO ON AND SO FORTH, IS

19  WE WANT TO DO EVERYTHING WE CAN FOR SAFETY.

20          DR. DURKEE, FOR EXAMPLE, TESTIFIED THAT YOU ALWAYS

21  WANT TO AVOID FLAMMABILITY.  SO IN THIS CONTEXT, WOULD THE

22  PERSON OF ORDINARY SKILL IN THE ART CHOOSE A FLAMMABLE

23  MATERIAL WHEN SOLVENTS, FOR EXAMPLE, ARE FLAMMABLE AND THE

24  MONTREAL PROTOCOL IS MOVING US AWAY FROM SOLVENTS, WHEN YOU

25  KNOW THAT YOU ARE GOING TO HAVE A HEATER, AND YOU WANT TO

1    TRY AND AVOID IT CATCHING ON FIRE, OR THE UNIT CATCHING ON

2    FIRE OR THE FLUID CATCHING ON FIRE.  IT WOULD BE OBVIOUS

3    JUST COMMON SENSE TO USE A NONFLAMMABLE SOLUTION IN THAT

4    CONTEXT.  THAT IS THE TYPE OF ANALYSIS THAT JUDGE CAMP WENT

5    THROUGH.  THERE WAS EVIDENCE TO THAT EFFECT.  HE RELIED ON

6    THAT EVIDENCE APPROPRIATELY SO, THEREFORE, THERE WAS NO

7    CLEAR ERROR IN DECIDING THAT THE FLUID EITHER AS DISCLOSED

8    BY HAKANSSON 2 WAS NONFLAMMABLE OR THE SELECTION OF A

9    NONFLAMMABLE FLUID BY THESE INVENTORS WOULD HAVE BEEN

10   OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE ART.  JUDGE

11   CAMP WAS SO CONVINCED OF IT IN HAKANSSON 2 HE WENT ALL THE

12   WAY TO SAY THAT HAKANSSON 2 DISCLOSES A NONFLAMMABLE FLUID.

13   BUT YOU CAN SIMPLY TAKE HAKANSSON 2 AS INFORMATION AND LOOK

14   AT THE BROADER CONTEXT AND SAY OF COURSE YOU ARE NOT GOING

15   TO USE A FLAMMABLE FLUID IN SOMETHING THAT IS GOING TO HAVE

16   AN OPEN TOP THAT IS GOING TO HAVE A HEATER IN IT THAT IS

17   GOING TO HAVE A HEATER THAT IF IT FLUID, THAT IF IT CAUGHT

18   FIRE, IT WAS GOING TO HAVE GREAT PROBLEMS.  IT WOULD BE

19   COMMON SENSE NOT TO USE IT.  THAT IS THE ANALYSIS THAT WAS

20   DONE.  THAT ANALYSIS IS PERFECTLY ACCEPTABLE AND IN FACT

21   ENCOURAGED UNDER KSR.

22           IN THE PAPERS THERE ARE QUESTIONS ABOUT WHETHER OR

23   NOT WALTER IS SOMEHOW BEING CONTRADICTORY IN THE POSITIONS

24   THAT IT TOOK AT ENABLEMENT AND AT TRIAL.  AND THE ANSWER TO

25   THAT IS RESOUNDINGLY NO.  THERE IS NO INCONSISTENCY.  STEP

1    BACK FOR A MINUTE AND LOOK AT WHAT ONE MUST PROVE AT

2    ENABLEMENT.  AT THE ENABLEMENT STAGE WHAT CHEMFREE HAD TO

3    SHOW WAS THAT THEY HAD ENABLED THE FULL SCOPE OF THE CLAIMED

4    INVENTION.  THE FULL SCOPE OF THE CLAIMED INVENTION.  AND SO

5    WE WENT OVER WITH MR. MCNALLY THIS MORNING THE CLAIMED

6    INVENTION IS MORE THAN JUST ONE SURFACTANT SUCH AS SEAWASH 7

7    AND ONE MICROORGANISM OR ONE MICROBIAL PRODUCT SUCH AS

8    LRC 1.  IT IS ALL BIODEGRADABLE, NONFLAMMABLE, NONCAUSTIC,

9    NONTOXIC CLEANERS, AND ALL SUITABLE MICROORGANISMS.  SO

10   IT'S, YOU KNOW, 50 TO 100 DISTRIBUTORS, ALL OF THESE IN THE

11   THOMAS REGISTER.  THERE COULD BE HUNDREDS OF CLEANERS, AND

12   WHO KNOWS HOW MANY MICROORGANISMS.  IT COULD BE THOUSANDS OF

13   MICROORGANISMS.  THEY HAD TO ENABLE THE FULL SCOPE OF THAT.

14   OUR POSITION WAS THAT AT THE PERIPHERY OF THAT ENABLEMENT

15   EVERYDAY, YOU HAVE NOT PROVIDED ENOUGH INFORMATION IN THE

16   CHEMFREE PATENT TO ENABLE IT.

17           FOR EXAMPLE, ONE OF THE ISSUES BEFORE WAS LAG

18   PHASE.  IT IS POSSIBLE THAT IN A GIVEN SURFACTANT, WHEN

19   MR. MCNALLY DESCRIBED THE TEST HE WAS DOING, HE WOULD COME

20   BACK AND CHECK IN A WEEK OR A MONTH OR WHATEVER, WELL, IT IS

21   POSSIBLE THAT THIS MICROBE THAT YOU SELECTED WILL ACTIVATE

22   THAT QUICKLY, BUT IT IS ALSO POSSIBLE THAT THAT MICROBE MAY

23   NOT ACTIVATE FOR THREE MONTHS.  AND YOU DON'T KNOW, AND

24   THERE IS NOTHING IN THE PATENT THAT TEACHES US WHAT DO IN

25   THAT SITUATION.  SO OUR POSITION WAS, AT THE PERIPHERY WHEN

1    YOU START, BECAUSE THERE ARE SO MICROORGANISMS OUT THERE

2    THAT DO SO MANY THINGS.  AND THEN WHEN YOU START PUTTING

3    THEM IN ALL OF THESE DIFFERENT CLEANING FLUIDS, YOU MAY WELL

4    FIND SOMETHING OUT HERE THAT DOESN'T WORK THAT IS

5    UNPREDICTABLE, IF YOU WILL, AS YOU THINK IT WILL.  AND SO

6    THEREFORE IF YOU ARE GOING TO ENABLE THE FULL SCOPE OF THAT

7    INVENTION, YOU HAVE TO TEACH ME ABOUT THESE THINGS OUT HERE

8    ON THE PERIPHERY.  YOU HAVE TO EXPLAIN TO ME HOW TO ADDRESS

9    A SITUATION SUCH AS LAG PHASE OR SOME OF THE OTHER THINGS

10   THAT DR. ADRIAENS RAISED.

11          WE MADE THAT ARGUMENT.  THE COURT REJECTED IT.

12   THE COURT ADOPTED CHEMFREE'S POSITION.  AND CHEMFREE'S

13   POSITION WAS, NO, IT'S NOT THAT HARD.  ALL YOU HAVE TO DO

14   ARE PERFORM SOME SIMPLE TESTS.  THE TEST THAT IS TALKED

15   ABOUT THIS MORNING WHERE MR. MCNALLY SAYS FIRST I CHECK TO

16   SEE IF THE CLEANER WORKS, THEN I CHECK TO SEE IF THE CLEANER

17   WILL BE TOXIC TO THE MICROORGANISMS, AND HE DESCRIBED THESE

18   TESTS, AND THE TESTS WHERE HE CONFIRMED THAT THEY ARE NOT

19   EXTENSIVE, THAT THEY ARE NOT TIME-CONSUMING.  AND THEN THERE

20   WAS A TALK ABOUT HOW TO FIGURE OUT ALL OF THE OTHER

21   COMBINATIONS, WHETHER THEY ARE IN THE CENTER OR AT THE

22   PERIPHERY.  THE DOCUMENTS THAT WE LOOKED AT THAT ARE READILY

23   AVAILABLE CLEANERS AND READILY AVAILABLE MICROBES.  JUDGE

24   CAMP SAID, I AGREE WITH YOU, IT IS NOT THAT HARD.  SO THAT

25   MEANT THE CLAIM WAS ENABLED AT THE PERIPHERY, AND OUR

1    POSITION LOST.  NOW, LET'S MOVE FORWARD TO OBVIOUSNESS.

2         OBVIOUSNESS IS THE FLIP SIDE OF THE COIN, BUT IT

3    IS A VERY DIFFERENT FLIP SIDE.  IF THESE CLAIMS, EITHER THE

4    CHEMFREE PATENT CLAIMS, IF THEY READ ON OR ARE OBVIOUS IN

5    VIEW OF A SINGLE COMBINATION OUT THERE IN THE MARKETPLACE,

6    IT DOESN'T HAVE TO BE THE ACTUAL MARKETPLACE, IF THE PRIOR

7    ART TEACHES A SINGLE COMBINATION, SETTING ASIDE THE

8    APPARATUS CLAIMS, THE APPARATUS ISSUE FOR A MINUTE, IF THERE

9    IS A SINGLE COMBINATION OUT THERE, THEN IT IS OBVIOUS.  THAT

10   IS ALL WE NEED TO PROVE FOR OBVIOUSNESS.  IT'S NOT THE SAME

11   ARGUMENT.  IT'S NOT A QUESTION OF WHETHER THE PERSON OF

12   ORDINARY SKILL ALL OF A SUDDEN GOT DUMB.  THAT IS NOT THE

13   POINT.  ENABLEMENT, YOU HAD TO DO THE FULL SCOPE.  AN

14   ARGUMENT WAS AT THE EDGE OF THAT, THAT ARGUMENT FAILED.

15   WHEN WE GOT TO OBVIOUSNESS, WE SAID NO, IF YOU LOOK AT, FOR

16   EXAMPLE, WHAT HAKANSSON 2 TEACHES, IF YOU LOOK AT WHAT HOW

17   IT IS USED AND HOW YOU KNOW PEOPLE WERE TAKING THE

18   SINK-ON-A-DRUM AND JUST ADDING BIOREMEDIATION QUALITIES TO

19   IT, THERE IS A COMBINATION THAT IS OUT THERE.  THAT IS

20   HAKANSSON 2.  HAKANSSON 2 WAS MICROORGANISMS SUSTAINED IN A

21   WASHING FLUID THAT HAD A DETERGENT.  THAT IS THE SURFACTANT.

22   THAT IS THE CHEMISTRY AND THE BIOLOGY THAT MR. CAPP TALKED

23   TO.  IT WAS NOT THAT IT WAS SYNERGISTIC, IT WAS ALREADY

24   DISCLOSED.  IT WAS ALREADY IN HAKANSSON 2.  THAT'S WHAT

25   JUDGE CAMP RELIED ON.  THAT IS WHAT HE SAW IN HAKANSSON 2.

1    THERE IS NO CONTRADICTION IN OUR POSITION.  THEY ARE JUST

2    TWO DIFFERENT ANALYSES.

3         EXISTING FLUIDS.  THAT WAS MR. CAPP'S SECOND POINT

4    TODAY AND IT IS IN THE SECOND MOTION.  IN HIS ORDER I THINK

5    IT IS PRETTY CLEAR FROM A PLAIN READING OF THE ORDER THAT

6    WHEN JUDGE CAMP WAS REFERRING TO EXISTING FLUIDS HE WAS

7    REFERRING TO EXISTING CLEANING FLUIDS THAT DID NOT HAVE

8    MICROBES.  SO FOR EXAMPLE, LIKE SEAWASH 7 WAS AN EXISTING

9    FLUID.  AND AS CHEMFREE REPRESENTED TO THE COURT, THERE WERE

10   OTHER EXISTING FLUIDS OUT THERE THAT YOU COULD GO GET, SO TO

11   SPEAK.  YOU COULD GO GET OTHER CLEANING SOLUTIONS.  SO IT IS

12   BEYOND DISPUTE THAT THERE WERE OTHER CLEANING SOLUTIONS AND

13   OTHER MICROBIAL PRODUCTS AVAILABLE IN THE '93-'94 TIME FRAME

14   FOR THESE INVENTORS TO GO OUT AND CHOOSE FROM.  THE SECOND

15   POINT IS THERE WAS NO EXISTING BIOREMEDIATION FORMULA, OR

16   NOTHING WHERE SOMEONE HAD SUCCESSFULLY COMBINED THE

17   MICROORGANISMS WITH THE SURFACTANT OR THE WASHING SOLUTION.

18        IT IS WRONG ON TWO COUNTS, YOUR HONOR.  FIRST IT

19   IS WRONG BECAUSE HAKANSSON 2 DESCRIBES EXACTLY THAT.

20   HAKANSSON 2 DESCRIBES A MICROORGANISM AND SURFACTANT

21   COMBINATION, AND IT IS WRONG FOR A SECOND REASON.  AS JUDGE

22   CAMP FOUND, THERE WERE PEOPLE IN THIS SPACE WHO WERE LOOKING

23   AT HOW THEY MIGHT BE ABLE TO COMBINE THOSE TWO THINGS AND

24   SELL PRODUCTS DOING IT.  AND IN FACT, THE VERY FIRST

25   EMBODIMENT OF THE CHEMFREE ALLEGED INVENTION WAS MADE WITH

1    THE ENRETECH GREEN FLUID THAT WAS TALKED ABOUT THIS MORNING.

2    THAT IS A PRODUCT WHERE, NOT CHEMFREE, BUT THE SUPPLIER

3    ENRETECH COMBINED THE MICROORGANISM WITH THE CLEANING FLUID.

4    SO WERE THERE EXISTING FLUIDS?  YES.  THERE WERE EXISTING

5    FLUIDS AT BOTH LEVELS.  THERE WERE EXISTING FLUIDS OUT THERE

6    IN THE MARKET PLACE THAT YOU COULD ACTUALLY GO AND BUY FOR

7    THE CLEANING SOLUTION AND FOR THE MICROBIAL PRODUCT.  THERE

8    WAS AN EXISTING FLUID THAT YOU COULD GET IN THE ENRETECH

9    TYPE OF SITUATION WHERE YOU COULD GO AND GET THAT FROM A

10   SUPPLIER, AND THAT IS WHAT THEY DID, AND THAT IS WHAT THEY

11   USED IN THEIR '94 WORK.  AND ALSO THERE WAS AN EXISTING

12   FLUID, IF YOU WILL, IN THE PRIOR ART REPRESENTED BY

13   HAKANSSON 2.  AND IN TERMS OF THE PATENT ANALYSIS, ONE

14   CANNOT JUST DISREGARD THE HAKANSSON 2 DISCLOSURE BY SAYING,

15   WELL, IT'S A PAPER PATENT OR IT WASN'T AN ACTUAL COMMERCIAL

16   UNIT.  THAT IS NOT THE ANALYSIS THAT GETS DONE.  IF IT'S

17   PRIOR ART, IT COUNTS.  IT NEEDS TO BE CONSIDERED.  SO THERE

18   IS YET ANOTHER EXISTING FLUID OUT THERE, AND THAT IS IN THE

19   PRIOR ART REPRESENTED BY HAKANSSON 2.

20          A QUICK WORD ON WHETHER OR NOT HAKANSSON 2 WAS

21   ENABLING.  A LOT OF TIME IN THEIR BRIEF IS SPENT ARGUING

22   THAT HAKANSSON 2 DID NOT ENABLE THE CLAIMED INVENTION, THAT

23   IF YOU HAD THE HAKANSSON 2 REFERENCE, YOU COULD NOT MAKE THE

24   CHEMFREE INVENTION.  THAT ARGUMENT FAILS ON TWO COUNTS.

25   FIRST OF ALL, IT FAILS TO ACKNOWLEDGE THAT HAKANSSON 2 GIVES

1    AS BROAD A DISCLOSURE AS IT IN FACT DOES.  AS JUDGE CAMP

2    FOUND, WE KNOW THAT HAKANSSON 2 DESCRIBES A BIODEGRADABLE

3    FLUID.  EVEN THEIR EXPERT ADMITS THAT.  THIS IS FROM

4    DR. DURKEE'S REPORT, WHICH WAS ADMITTED AT TRIAL, DOCUMENT

5    467.  HAKANSSON 2 CONTAINS FEATURES TO ADD INGREDIENTS,

6    NUTRIENTS TO SUPPORT REPRODUCTION OF THE MICROORGANISMS AND

7    DETERGENTS TO REPLACE THOSE CONSUMED BY THE MICROORGANISMS.

8    IT IS A BIODEGRADABLE DETERGENT BECAUSE IT IS BEING CONSUMED

9    BY THE MICROORGANISMS.  HAKANSSON 2 THEREFORE TEACHES A

10   BIODEGRADABLE FLUID.

11           IS HAKANSSON 2 NONTOXIC?  YES.  HAKANSSON 2 IS

12   NECESSARILY NONTOXIC BECAUSE THE BUGS DON'T DIE.  IT SAYS

13   THAT THE MICROORGANISMS ARE SUSTAINED WITHIN THE FLUID.  ON

14   THE ONE HAND YOU HAVE THE DETERGENT, ON THE OTHER HAND YOU

15   HAVE THE MICROORGANISMS THAT FEED OFF OF THE CONTAMINANT

16   SUPPLY.

17           NO. 3, AS WE HAVE ALREADY TALKED, DOES HAKANSSON 2

18   DISCLOSE A NONCAUSTIC FLUID?  YES, IT DOES.  BECAUSE IF IT

19   WAS A CAUSTIC SOLUTION, THEN THE MICROBES WOULD NOT BE ABLE

20   TO BE AS PART OF AN ACTIVE FERMENTATION.  THEY USE THAT TO

21   ARGUE THAT IS THE WRONG DEFINITION OF CAUSTIC.  NO, IT IS

22   THE RIGHT DEFINITION OF CAUSTIC.  IT WAS THE ONE THAT THEY

23   PROPOSED AND THAT JUDGE CAMP ADOPTED, AND THAT WAS USED BY

24   ALL OF THE PARTIES, SO IT WAS A CORRECT DEFINITION.

25           AND FOURTH, NONFLAMMABLE FLUID.  WE ALREADY TALKED

```
1    ABOUT THAT HAKANSSON, FOR EXAMPLE, HAS A HEATER.  A PERSON
2    OF ORDINARY SKILL IN THE ART WOULD LOOK AT IT AND SAY I
3    DON'T WANT TO CAUSE A FIRE, SO THEREFORE I WILL USE A
4    NONFLAMMABLE FLUID IN HAKANSSON 2.  SO THE FIRST THING, THEY
5    FIRST FAIL ON HAKANSSON 2 IS IT ENABLING REFERENCE, BECAUSE
6    THEY DON'T GIVE CREDIT FOR ALL THAT IT TEACHES.  BUT THE
7    SECOND THING, THE REASON WHY IT FAILS, IS BECAUSE THEY VIEW
8    IT IN ISOLATION.  WHETHER OR NOT THE INVENTION -- WHETHER OR
9    NOT THE PRIOR ART ENABLES THE INVENTION, WHETHER OR NOT A
10   PERSON OF ORDINARY SKILL IN THE ART CAN LOOK AT THE PRIOR
11   ART AND MAKE THE CLAIMED INVENTION IS A FUNCTION OF, NOT
12   JUST A SINGLE REFERENCE, YOU HAVE TO LOOK AT THE PRIOR ART
13   AS A WHOLE.  THAT IS WHAT JUDGE CAMP DID.  THAT IS WHAT IS
14   NOT BEING DONE BY THE PLAINTIFF IN THIS CASE.  THE PLAINTIFF
15   WANTS TO SAY YOU CAN ONLY LOOK AT HAKANSSON AND ATHEY.
16            YOU DON'T REALLY THINK ABOUT ALL OF THE THINGS
17   THAT WERE ALREADY DISCLOSED, YOU DON'T LOOK AT ALL OF THE
18   THINGS LIKE THE MONTREAL PROTOCOL AND HOW THE MARKET WAS
19   GOING IN THAT DIRECTION, AND THE THINGS THAT KSR REQUIRES.
20   IN THAT WAY THE PLAINTIFFS REALLY HOPE TO TAKE US BACK
21   BEFORE KSR AND MAKE US APPLY A TEACHING SUGGESTION
22   MOTIVATION TEST, ALMOST WHERE YOU'VE GOT TO LOOK INTO A
23   SPECIFIC REFERENCE SUCH AS ATHEY OR HAKANSSON 2 AND FIND A
24   WORD OR A PHRASE THAT SAYS COMBINE THESE REFERENCES LIKE
25   THAT.  WE DON'T DO THAT ANYMORE AFTER KSR.  AND THE SECOND
```

1   PROBLEM THERE THAT THEY HAVE IN TERMS OF HAKANSSON 2 BEING

2   AN ENABLING REFERENCE IS IT'S NOT JUST HAKANSSON 2, IT'S THE

3   PRIOR ART AS A WHOLE.

4           FINALLY, YOUR HONOR, AT THE BEGINNING I SAID THAT

5   THERE -- THE TIME-LINE WAS IMPORTANT, BOTH FACTUALLY AND

6   LEGALLY.  SEPTEMBER 30, 1994 CHEMFREE FILES ITS FIRST PATENT

7   APPLICATION.  FEBRUARY 1 OF 2000 THEIR FIRST PATENT THAT IS

8   AT ISSUE IN THIS CASE IS ISSUED.  THEY GET FOUR PATENTS THAT

9   ISSUED BETWEEN FEBRUARY 1 OF 2000 AND SEPTEMBER 17TH OF

10  2002.  EXAMINER STINSON'S COMMENT IS OUT HERE.  IT'S NOT IN

11  THESE FOUR PATENTS, IT IS IN A CONTINUATION PATENT, AND I

12  BELIEVE IT IS IN 2005, SO IT'S MUCH LATER IN TIME.  BUT IT

13  IS STILL BEFORE THE CRITICAL LEGAL EVENT IN THIS CASE, AND

14  THAT CRITICAL LEGAL EVENT IS THE KSR DECISION, WHICH

15  OCCURRED IN 2007.

16          WHEN EXAMINER STINSON MADE ALL OF THESE

17  DETERMINATIONS THAT HE MADE, HE MADE THEM UNDER THE OLD

18  STANDARD.  HE WAS NOT APPLYING KSR.  HE DIDN'T HAVE THE

19  BENEFIT OF KSR.  HE ALSO DIDN'T HAVE THE BENEFIT OF A LOT OF

20  THE PRIOR ART.  FOR EXAMPLE, HE PROBABLY DIDN'T HAVE THE

21  BENEFIT OF THE MONTREAL PROTOCOL OR DR. DURKEE'S TESTIMONY

22  REGARDING THE MONTREAL PROTOCOL OR OF KNOWLEDGE ABOUT WHAT

23  HAPPENS AND WHAT A PERSON OF ORDINARY SKILL IN THE ART WOULD

24  SUSPECT WOULD HAPPEN TO MICROBES IN A CAUSTIC SOLUTION OR

25  HOW MICROBES MAY DIE.  HE WAS WORKING FROM JUST A FEW

1    REFERENCES, HAKANSSON 1 IN PARTICULAR, AND NOT UNDER THE KSR

2    STANDARD.  AND EVEN IF HE HAD BEEN TRYING TO APPLY THE KSR

3    STANDARD, HAD HE HAD IT, HE WOULDN'T HAVE HAD ALL OF THE

4    FACTS.

5              THERE IS, HOWEVER, A PERSON WHO DID HAVE THE

6    BENEFIT OF ALL OF THAT PRIOR ART, AND DID HAVE THE BENEFIT

7    OF THE KSR STANDARD, AND OBVIOUSLY PAID VERY CLOSE ATTENTION

8    TO IT BECAUSE HE CITED IT IN GREAT DETAIL AND QUOTED FROM IT

9    FOR THREE PAGES, AND THAT'S JUDGE CAMP.  AND JUDGE CAMP

10   LOOKED AT THIS AND SAID THIS IS LIKE HAKANSSON 2 -- SORRY,

11   THIS IS LIKE KSR.  IN KSR WE HAD A GAS PEDAL, AND THERE WAS

12   A CABLE THAT WOULD DEFINE THE LOCATION OF THE GAS PEDAL AND

13   SEND THE INFORMATION AS TO HOW MUCH GAS IS GOING TO BE

14   DELIVERED FOR PURPOSES OF A THROTTLE.  THE INVENTOR SAID WE

15   DON'T NEED TO USE THE CABLE ANYMORE, WE WILL JUST USE

16   ELECTRONIC SENSORS.  WE WILL THROW THE SENSOR ON THERE.  AND

17   THERE WAS SOME WORRY ABOUT EXACTLY WHERE IT WOULD FIT.  THAT

18   RECEIVED A PATENT.  TELFLEX, THE PLAINTIFF IN THAT CASE, WAS

19   THE EXCLUSIVE LICENSEE OF THAT PATENT.  THEY LITIGATED WITH

20   KSR.  AND WHAT CAME OUT OF THAT WAS, TRUE WE CANNOT GO INTO

21   THE PRIOR ART AND FIND A SPECIFIC PLACE WHERE THIS SENSOR

22   AND THIS PEDAL ARE PUT TOGETHER.  WE CAN'T FIND THE SPECIFIC

23   REFERENCE THAT SAYS TAKE THIS SENSOR AND PUT IT ON THIS

24   DEVICE AND YOU WILL IMPROVE IT, OR A SPECIFIC REASON, IF YOU

25   WILL, WHY WE SHOULD BE ABLE TO DO THAT.  BUT WHAT DO WE

1    KNOW?  WE KNOW THAT AS THE WORLD MOVES FORWARD, WE ARE

2    REPLACING EVERYTHING WITH ELECTRONICS.  MORE AND MORE TODAY

3    WE ARE REPLACING THINGS WITH AN ELECTRONIC METHOD OF DOING

4    SOMETHING AS OPPOSED TO THE OLD MECHANICAL METHOD OF DOING

5    IT, AND UNDER THAT CONTEXT THE COURT SAID THAT'S NOT

6    INVENTION.  THE MARKET WAS TAKING US IN THAT DIRECTION.

7    COMMON SENSE WAS LEADING US IN THAT DIRECTION.

8            WITH THAT IN MIND, JUDGE CAMP LOOKED AT THIS CASE,

9    HE SAW ALL OF THESE FACTS COMING FORWARD, FROM 1987 AND

10   FORWARD.  HE SAW THE ADMISSIONS THAT THEY MADE IN THE

11   PATENT, SAYING SINK ON A DRUM IS KNOWN, PUMPS ARE KNOWN,

12   FILTERS ARE KNOWN.  HE SAW HAKANSSON 2 AND SAW HAKANSSON 2

13   HAD A HEATER AND A SHUT-OFF VALVE AND ALL OF THAT.  THAT IS

14   ALL KNOWN.  MECHANICS ARE NOT COMPLICATED.  THEN HE LOOKED

15   AND THE CHEMISTRY AND THE BIOLOGY AND HE SAYS, I SEE

16   HAKANSSON 2 ALREADY HAD A MICROBE AND HAKANSSON 2 COMBINED

17   THAT MICROBE WITH THE SURFACTANT, THE DETERGENT, IN THE

18   CONTEXT OF THE PARTS WASHER.  TRUE ENOUGH, IT IS AN

19   INDUSTRIAL UNIT THAT IS GOING TO HANDLE A LOT OF PARTS, SO

20   IT IS GOING TO HAVE SOME NUTRIENT ISSUES AND SO ON AND SO

21   FORTH, BUT HE COULD SEE THE DIRECTION THAT THE MARKET WAS

22   TAKING HIM.  AND HE SAID, GIVEN HOW FAR THE STATE OF THE ART

23   HAS COME UNDER HAKANSSON 2, LOOKING AT WHAT THEY DID, IN THE

24   SAME WAY THAT PUTTING THAT ELECTRONIC SENSOR ON THE GAS

25   PEDAL IS NOT INVENTION, THERE WAS NOT AN INVENTION HERE.

1             FOR THE REASONS THAT WE SUBMIT IN OUR PAPER, YOUR

2    HONOR, AND IN ADDITION TO THOSE THAT WERE JUST GIVEN, THE

3    TEST TO BE APPLIED BY THE COURT HERE IN OUR VIEW IS WHAT THE

4    TEST IS FOR RECONSIDERATION, AND THAT TEST IS WHETHER OR NOT

5    JUDGE CAMP COMMITTED CLEAR ERROR OR THERE IS A MANIFEST

6    INJUSTICE.  THERE IS NO CLEAR ERROR.  IN FACT, IN OUR VIEW

7    THERE IS NO ERROR, AND THERE IS CERTAINLY NO MANIFEST

8    INJUSTICE.  THE CLAIMED INVENTIONS HERE DID NOT RISE TO THE

9    LEVEL OF INVENTION UNDER THE KSR STANDARD.  THE PLAINTIFF'S

10   ARGUMENTS HARKEN BACK TO AN EARLIER TIME BEFORE KSR, BEFORE

11   LEAPFROG, WHERE YOU ARE LOOKING BACK AGAIN FOR TAB A AND

12   SLOT B.  THAT'S NOT THE STATUS OF THE LAW, THAT'S NOT WHAT

13   JUDGE CAMP DID.  RATHER, JUDGE CAMP LOOKED AT THE KSR

14   DECISION.  AND WITH THAT IN MIND, APPLIED A CONVENTIONAL OR

15   STANDARD GRAHAM V. JOHN DEERE ANALYSIS AND HE CAME TO THE

16   CORRECT CONCLUSIONS.  THANK YOU.

17           THE COURT:  IN TWO WEEKS THE PARTIES MAY PRESENT

18   WRITTEN RESPONSES TO THE ORAL ARGUMENTS THAT HAVE BEEN

19   PRESENTED.  AND I HAVE NO RECOMMENDATION ON WHAT YOU SHOULD

20   ADD, ALTHOUGH I WOULD LIKE YOU TO ATTEMPT TO MAKE A BRIEF

21   STATEMENT YOU THINK SHOULD BE IN THE DECISION CONCERNING THE

22   FIRST ISSUE WE TOOK UP TODAY IN CAMERA.  THAT DOES NOT NEED

23   TO BE IN CAMERA, AND YOU DON'T HAVE TO MAKE THAT STATEMENT.

24   BUT IF YOU WISH TO TRY TO ARTICULATE WHAT I WILL PROBABLY

25   PUT IN A FOOTNOTE, YOU MAY.  OTHER THAN THAT, YOU MAY MAKE A

1    RESPONSE ON ANYTHING ELSE, BUT TRY TO MAKE IT CONCISE.

2              THANK YOU.  VERY WELL PRESENTED.  I APPRECIATE THE

3    PROFESSIONALISM THAT HAS BEEN SHOWN IN THIS CASE.  I KNOW

4    JUDGE CAMP IN HIS DECISION MADE A BRIEF COMMENT THAT WAS

5    NEGATIVE.  I AM GOING TO TAKE THAT AS CONCERNING LAWYERS NOT

6    IN THE CASE TODAY.  AND HE WAS NOT IN A POSITION TO COMMENT

7    ON ANYONE'S FAILURE TO BE PROFESSIONAL AT THE TIME.

8              THANK YOU.  CASE SUBMITTED SUBJECT TO TWO WEEKS

9    FROM NOW WHEN YOU WILL PRESENT YOUR FINAL PAPERS.  PLEASE

10   DELIVER THEM TO ME AS YOU HAVE THE BOXES OF OTHER MATERIAL.

11   EVEN THOUGH I CAN GET THEM OFF OF MY ONLINE SYSTEM ONCE IN

12   AWHILE, WE ARE SO FAR WEST IT DOESN'T COME THROUGH VERY

13   CLEARLY, AND IT IS BETTER FOR ME TO GET IT IN HARD COPY, IF

14   THAT'S NOT A PROBLEM.  APPARENTLY IT HASN'T BEEN.

15             THAT CONCLUDES THIS HEARING.  THANK YOU.

16             (END OF HEARING AT 4:31 P.M.)

17                      * * * * *

18             REPORTER'S CERTIFICATION

19       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

20   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21

22                      _____

23                      LORI BURGESS
                         OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
24                       NORTHERN DISTRICT OF GEORGIA

25                           DATE:  FEBRUARY 15, 2011