# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

```
CHEMFREE CORPORATION,          )
                               )
          Plaintiff,           )
                               )   Civil Action No.
v.                             )   1:04-CV-3711(CRW)
                               )
J. WALTER, INC., and           )
J. WALTER COMPANY, LTD.        )
                               )
          Defendants.          )
```

================================================================

## PLAINTIFF'S POST-HEARING BRIEF

## IN SUPPORT OF ITS
## POST-TRIAL MOTIONS TO ALTER OR AMEND
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

================================================================

```
                    Submitted by:

                    DUANE MORRIS LLP

                    William A. Capp (#108823)
                    Email: bcapp@duanemorris.com

                    1180 West Peachtree Street
                    Suite 700
                    Atlanta, Georgia  30309
                    Telephone:  (404) 253-6975
                    Facsimile:  (404) 253-6901

                    Counsel for Plaintiff
                      ChemFree Corporation
```

# **TABLE OF CONTENTS**

I.   DISCUSSION OF OPEN PROCEDURAL QUESTIONS................... 1

   A.   STATEMENT ON RECORD OF REASON FOR SUBSTITUTION OF
        JUDGE.................................................. 1

   B.   AUTHORITY OF SUCCESSOR JUDGE TO REVERSE FINDINGS
        AND CONCLUSIONS OF A PREDECESSOR JUDGE............... 3

        1.   Sitting Judge Can Reverse His Own Rulings on
             Motion or On His Own Initiative................ 3

        2.   Successor Judge's Authority to Alter or Amend
             Findings and Conclusions is Co-Extensive With
             The Authority of the Original Judge............ 4

   C.   ADMISSIBILITY OF MR. McNALLY'S TESTIMONY............. 6

        1.   Admissibility on Rule 63 Recall................ 6

        2.   McNally's Testimony Is Admissible Under
             Plaintiff's Alternative Request for Partial
             New Trial on the Disputed Markman
             Construction of "Non-Caustic."................ 15

II.  ARGUMENT AND CITATION OF AUTHORITY....................... 17

   A.   CONSTRUCTION OF "NON-CAUSTIC."...................... 18

   B.   RELIANCE ON INADMISSIBLE EVIDENCE................... 22

   C.   THE TERM "NON-TOXIC," AS USED IN THE '110 AND '835
        PATENTS IS NOT LIMITED TO MICROBES.................. 23

   D.   DEFENDANTS' SILENCE ON THE SIGNIFICANCE OF THE
        EXAMINER'S AMENDMENT DURING PROSECUTION TO
        DISTINGUISH OVER THE HAKANSSON TECHNOLOGY........... 24

   E.   RELIANCE ON "OTHER" PRIOR ART NOT DISCLOSED IN
        LOCAL RULE INVALIDITY CONTENTIONS OR EXPERT
        REPORTS............................................. 25

   F.   THE ENRETECH FLUID USED IN PLAINTIFF'S
        EXPERIMENTAL PROTOTYPE SUPPORTS THE NON-
        OBVIOUSNESS OF PLAINTIFF'S INVENTION................ 28

   G.   REFERENCE TO "BIOLOGICAL" IN *HAKANSSON-2* CANNOT BE
        INTERPRETED AS SYNONYMOUS WITH NON-CAUSTIC IN
        PLAINTIFF'S PATENT.................................. 31

   H.   REPLY TO DEFENDANTS' CONTENTION THAT THE
        COMPLEXITY OF *HAKANSSON-2* INDICATES THAT THE
        TECHNOLOGY HAD MOVED BEYOND PLAINTIFF'S INVENTION
        BEFORE PLAINTIFF'S DATE OF INVENTION................ 32

I.      REPLY TO DEFENDANTS' CONTENTION THAT CLEANING
        FLUIDS WERE READILY AVAILABLE....................... 38

J.      REPLY TO DEFENDANTS' ARGUMENT REGARDING THE NEXUS
        BETWEEN DEFENDANTS' LAUDATORY STATEMENTS AND THE
        CLAIMED INVENTION................................... 41

K.      REPLY TO DEFENDANTS' ARGUMENT REGARDING THE
        FLAMMABILITY OF HAKANSSON-2'S CLEANING FLUID........ 43

L.      INCONSISTENT POSITIONS DURING ENABLEMENT AND
        OBVIOUSNESS......................................... 46

M.      ARGUMENT THAT ANY "SINGLE COMBINATION" ESTABLISHES
        OBVIOUSNESS......................................... 48

N.      REPLY TO ARGUMENT THAT THE '305 APPLICATION
        EXAMINER INTERVIEW TOOK PLACE BEFORE KSR........... 49

III. CONCLUDING ARGUMENTS................................... 50

A.      DEFENDANTS' LACK OF EVIDENCE....................... 50

        1.      Only Two Prior Art References Within The
                Scope and Content of the Prior Art............. 51

        2.      An Unqualified Expert.......................... 51

        3.      Defendants' Obviousness Case Predicated On An
                Incorrect Person of Ordinary Skill in the
                Art............................................ 53

        4.      An Initial Expert Report Stricken For Failure
                to Comply With Fed.R.Civ.P. 26(a)(2)(B)........ 53

        5.      An Expert Report That Omitted Defendants'
                Primary Invalidity Reference................... 53

        6.      An *In Limine* Ruling Precluding Extrinsic
                Evidence on Inherency.......................... 54

        7.      No Testimony on Scope and Content of the
                Prior Art, Differences Between the Prior Art
                and the Claimed Invention, or Whether
                Multiple References Could Be Combined.......... 55

B.      JUDGE CAMP *SUA SPONTE* FILLED THE VACUUM LEFT BY
        DEFENDANTS' LACK OF EVIDENCE....................... 56

        1.      Error in Misconstruing and Misapplying the
                Meaning of "Non-Caustic.".................... 57

        2.      Error in Finding That Hakansson-2 Would Not
                Be Operable Unless Its Fluid Was Necessarily
                Biodegradable, Non-Toxic, Non-Caustic and
                Non-Flammable.................................. 58

3.  Error in Finding That Purportedly Inherent Properties Would Have Been Obvious To Someone of Ordinary Skill............................... 58

4.  Error in Relying on Inadmissible Evidence That Was Excluded By *In Limine* Ruling. ........... 59

5.  Error in Relying on Unspecified Prior Art Not Timely Disclosed in Defendants' Local Rule Invalidity Contentions......................... 59

6.  Error in Finding Motivation to Combine or Modify The Prior Art.......................... 61

7.  Error in Finding a Reasonable Expectation of Success....................................... 61

8.  Error in Weighing and Applying Secondary Considerations of Non-Obviousness.............. 62

C.  THE COURT NEEDS TO REVERSE JUDGE CAMP'S OBVIOUSNESS RULING TO PREVENT MANIFEST INJUSTICE.... 63

## TABLE OF AUTHORITIES

### Cases

*Abbott Labs v. Sandoz*, 544 F.3d 1341 (Fed.Cir. 2008)..............37, 61

*Agilent Tech., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366 (Fed.Cir. 2009)...32, 50

*Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087,
    2 USPQ2d 1490 (Fed.Cir. 1987) ...............................43

*Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 750 F.2d 1569 (Fed.Cir.
    1984) .......................................................46

*Autogiro Co. of America v. United States*, 384 F.2d 391 (Ct.Cl. 1967) .......25

*Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547 (Fed.Cir.
    1989) .......................................................64

*In re Brown*, 329 F.2d 1006 (CCPA 1964) ...........................64

*Canseco v. United States*, 97 F.3d 1224 (9th Cir. 1996) ..............1, 4

*ChemFree Corp. v. J.Walter, Inc.*, 250 F.R.D. 570 (N.D.Ga. 2007) .....26, 51

*Cross v. IIzuka*, 753 F.2d 1040 (Fed.Cir. 1985) .....................38

*Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*,
    807 F.2d 955 (Fed.Cir. 1986) ...............................56

*Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 106 S.Ct. 1578,89
    L.Ed.2d 817 (1986) .......................................36-37

*Eisai Co. Ltd. v. Dr Reddy's Laboratories, Ltd*. 533 F.3d 1353 (Fed.Cir.
    2008) .......................................................56

*Ekchian v. Home Depot, Inc.*, 104 F.3d 1299 (Fed.Cir. 1997) ...........25

*Eli Lilly and Co. v. Teva Pharmaceuticals USA, Inc.*,
    619 F.3d 1329 (Fed.Cir. 2010) ...............................63

*Emerson Elec. Co. v. General Elec. Co.*, 846 F.2d 1324 (11th Cir. 1988).....10

*Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207 (5th Cir. 1986) ...........3

*Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc.* 237 F.R.D. 106 (D.Del 2006) ....................................................................23

*Gaddy v. Abex Corp.*, 884 F.2d 312 (7th Cir. 1989) ...............2, 10

*Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573 (Fed.Cir. 1997) ....................................................................43

*Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354 (Fed.Cir. 2006) .....................................................................3

*Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426 (5th Cir. 1977)................................................9-10

*Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) ..............................................................37, 50

*In re Hoeksema*, 399 F.2d 269 (CCPA 1968) ..........................64

*Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199 (1st Cir. 1987) ..................................................................10

*Honeywell Int'l, Inc. v. Universal Avionics Systems Corp.*, 488 F.3d 982 (Fed.Cir. 2007) ..............................................................23

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed.Cir. 1986) ...............................................................62

*Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc.*, 545 F.3d 1312 (Fed.Cir. 2008) ...............................................................63

*Inline Connection Corp. v. AOL Time Warner, Inc.* 472 F.Supp.2d 604 (D.Del. 2007) ...............................................................23

*Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363 (Fed.Cir. 2008)48, 61

*Interconnect Planning Corp. v. Feil* 774 F.2d 1132, 227 USPQ 543 (Fed.Cir. 1985) ...............................................................37

*Invitrogen Corp. v. Clontech Labs, Inc.*, 429 F.3d 1052 (Fed.Cir. 2005) .....33

*Jack Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352 (Fed.Cir. 2002) .....15

*In re Kahn*, 441 F.3d 977 (Fed.Cir. 2006) ........................48

*KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007)...28

*Medichem, S.A., v. Rolabo, S.L.*, 437 F.3d 1157 (Fed.Cir. 2006) ..........61

*Mergentime Corp. v. Washington Metro. Area Transit Auth.*, 166 F.3d 1257
   (D.C.Cir. 1999) ...........................................5-7

*Mintel Int'l Group, Ltd. v. Neergheen*, 636 F.Supp.2d 677 (N.D.Ill. 2009)...54

*In re Oelrich*, 666 F.2d 578 (CCPA 1981) ..........................50

*Ortho McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358
   (Fed.Cir. 2008) .................................38, 47, 56

*Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794 (7th Cir. 1961) .......5

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed.Cir. 2007) ..............63

*Estate of Pidcock v. Sunnyland America, Inc.*, 726 F.Supp. 1322 (S.D.Ga.
   1989) ....................................................3

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed.Cir. 2008) .....57

*Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568
   (Fed.Cir. 1996) ..........................................62

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370
   (Fed.Cir. 1999) ..........................................63

*Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566 (Fed.Cir. 1996).......36-37

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed.Cir. 1983) .........62

*Sundance, Inc. v. Demonte Fabricating Ltd*, 550 F.3d 1356 (Fed.Cir.
   2008)(testimony by witness lacking relevant technical
   expertise fails the standard of admissibility under
   Fed.R.Evid. 702) .........................................44

*TCF Film Corp. v. Gourley*, 240 F.2d 711 (3d. Cir. 1957) ...............4

*Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d 1325 (Fed.Cir.
   2010) ................................................31, 50

*Thompson v. Sawyer*, 678 F.2d 257 (D.C.Cir. 1982)....................9

*Tokai Corp. v. Easton Enterprises Inc.*, -- F.3d --, 2011 WL 308370
   (Fed.Cir. January 31, 2011) .......................20, 22, 64

*Trintec Indus., Inc. v. Top-USA Corp.*, 295 F.3d 1292 (Fed.Cir. 2002) ......31

*United States Gypsum Co., v. Schiavo Brothers, Inc.*, 668 F.2d 172 (3d. Cir. 1981) ....................................................4-5

*United States v. Jack T. Camp, Jr.*, 1:10-MJ-1415 (N.D.Ga) ..................2

*Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376 (Fed.Cir. 2003) .....................................................15

*Ventana Medical Systems, Inc. v. Biogenix Laboratories, Inc.*, 473 F.3d 1173 (Fed.Cir. 2006) ...........................................17

*Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576 (Fed.Cir. 1996) ........17

*W.L. Gore Assoc. v. Garlock, Inc.*, 721 F.2d 1540, 220 USPQ 303 (Fed.Cir. 1983) ...........................................37

## Statutes

35 U.S.C. § 103....................................38, 57, 63-64

35 U.S.C. § 103(a)....................................47

35 U.S.C. § 112....................................38

35 U.S.C. § 282....................................26

## Other Authorities

11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2818, at 194 (2d ed. 1995)........6

12 MOORE'S FEDERAL PRACTICE § 59.54[3] (Matthew Bender 3d ed. 1998) ...........................................6

12 MOORE'S FEDERAL PRACTICE § 63.05[1]............................6

Fed.R.Civ.P. 26(a)(2)(B)....................................53

Fed.R.Civ.P. 26(a)(2)(B)....................................27, 53

Fed.R.Civ.P. 52(b)....................................2-3, 15

Fed.R.Civ.P. 63....................................1

LPR 4.3, 4.4 ND Ga. ....................................27-28

Plaintiff ChemFree Corporation herein submits its post-hearing brief in accordance with the Court's oral directive at the conclusion of the hearing on February 11, 2011.

## I.  DISCUSSION OF OPEN PROCEDURAL QUESTIONS.

### A.  STATEMENT ON RECORD OF REASON FOR SUBSTITUTION OF JUDGE.

Federal Rule of Civil Procedure 63 applies after a trial or hearing begins and the original trial judge becomes unable to proceed.  *Canseco v. United States*, 97 F.3d 1224, 1226 (9th Cir. 1996). Rule 63, as amended in 1991, is not limited to cases in which a judge's inability to proceed manifests itself during a trial or hearing.  *Id*.  All that is required is that the trial or hearing shall have commenced and thereafter at any stage of the proceedings the judge is unable to proceed.  *Id*.  This includes motion proceedings initiated after entry of judgment.  *Id*.

The 1991 Advisory Committee notes to Fed.R.Civ.P. 63 state that the reasons for a substitution of judge – "should be stated on the record."  Rule 63, 1991 ADVISORY COMMITTEE NOTES; See also MOORE'S FEDERAL PRACTICE § 63.03[5] ("the reason for a sitting judge's inability to proceed should be stated on the record"). At the hearing on February 11, 2011, the Court invited the parties to suggest language to be included in an order stating the reasons for substitution of the judge in this case.  Pursuant to the Court's direction, Plaintiff offers the following

suggested language to explain why there has been a substitution

of judge in this case.

> The liability phase of this case came before the District Court for the Northern District of Georgia, Judge Jack T. Camp, presiding, during the week of July 13, 2009.  On June 18, 2010, approximately eleven months later, Judge Camp entered findings of fact and conclusions of law. [Docket 619].  Before entry of judgment, Plaintiff filed three successive motions to alter or amend findings and conclusions under Fed.R.Civ.P. 52(b), which motions are addressed in this order.  The motions were briefed during the period between July 6, and November 16, 2010.  Judge Camp resigned from the bench on November 19, 2010, before disposing of the post-trial motions.  The undersigned judge was assigned to this case by intercircuit assignment dated December 27, 2010.  The events and circumstances surrounding the reassignment of Judge Camp's docketed case load are related to the criminal case of *United States v. Jack T. Camp, Jr.*, 1:10-MJ-1415 (N.D.Ga).  In the criminal case, Judge Camp was accused of engaging in multiple felonies, including the use of illegal controlled substances such as marijuana and cocaine and possession of a firearm in connection with the purchase of illegal controlled substances.  The accompanying probable cause affidavit further alleged that Judge Camp solicited and engaged in acts of prostitution with an exotic dancer who also shared in the possession and use of illegal drugs with Judge Camp.  The conduct alleged in the criminal complaint and accompanying affidavit encompassed a period from May until October of 2010, a period of time that included the time that Judge Camp issued the Docket 619 Order that Plaintiff has requested the Court to reconsider in its post-trial motions.[1]

> Plaintiff submits that the foregoing statement is

appropriate under *Gaddy v. Abex Corp.*, 884 F.2d 312 (7th Cir. 1989),

where the presiding judge resigned after entering findings of

---

[1] A true and correct copy of an announcement published on the Northern District of Georgia's web-site stating that re-assignment of Judge Camp's criminal and civil dockets was connected to the criminal case against Judge Camp is attached hereto as Exhibit "A."

fact and conclusions of law and, in addition, disclosed that he had a conflict of interest.

**B.   AUTHORITY OF SUCCESSOR JUDGE TO REVERSE FINDINGS AND CONCLUSIONS OF A PREDECESSOR JUDGE.**

**1.   Sitting Judge Can Reverse His Own Rulings on Motion or On His Own Initiative.**

Rule 52(b) provides that - "[o]n a party's motion filed no later than 28 days after entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly." Fed.R.Civ.P. 52(b). "A party may move to amend the findings of fact even if the modified or additional findings in effect reverse the judgment." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1358 (Fed.Cir. 2006). "Essentially, if the Court 'has entered an erroneous judgment, it should correct it.'" *Estate of Pidcock v. Sunnyland America, Inc.*, 726 F.Supp. 1322, 1333 (S.D.Ga. 1989)(quoting 5A MOORE'S FEDERAL PRACTICE ¶ 52.11[2] (2d ed. 1985). The district court may reverse any or all of its findings in acting on a Rule 52(b) motion. *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986). Moreover, a district court is not limited by the scope of relief requested in a party's Rule 52(b) motion as it is settled law that a district court has discretion to amend any of its own findings, whether or not requested by a party. *Golden Blount, supra*, at 1358 (Fed.Cir. 2006).

**2.   Successor Judge's Authority to Alter or Amend Findings and Conclusions is Co-Extensive With The Authority of the Original Judge.**

At the hearing on February 11, 2011, the Court asked Plaintiff to provide it with legal authority regarding whether a Rule 63 successor judge has power to reverse a decision of his predecessor.  The law is clear that a successor has such power and authority to reverse a decision of his predecessor.

"Rule 63 always permitted a successor judge to decide post-trial motions in a case in which findings of fact and conclusions of law had been filed."  *Canseco v. United States*, 97 F.3d 1224, 1226 (9th Cir. 1996).

> We conclude that where a successor judge is asked by timely and proper motion to reconsider the legal conclusions of an unavailable predecessor, he or she is empowered to reconsider those issues to the same extent that his or her predecessor could have.

*United States Gypsum Co., v. Schiavo Brothers, Inc*., 668 F.2d 172, 176 (3d. Cir. 1981).  "If the judge who made the decision dies or resigns from the court, he obviously is no longer available to consider it and such consideration must perforce be by another judge if it is to be had at all." *TCF Film Corp. v. Gourley*, 240 F.2d 711, 713-714 (3d. Cir. 1957)(affirming successor judge's reversal of a decision by predecessor judge).  "A litigant's right to try to persuade a court that it has erred should not be denied simply because of

the unavoidable unavailability of the judge who rendered the

original decision." *United States Gypsum*, 668 F.2d *supra* at 177.

> ... our duty is to determine whether the judgment of [a
> successor judge] is correct.  In fact we should sustain any
> judgment from which an appeal has been taken if it is
> supported by the record and the law ... Obviously we cannot
> be expected to reverse a correct decision by one district
> judge simply because we find that it is contrary to a prior
> ruling by another district judge in the same case ...

*Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 797 (7th Cir. 1961).

It has been held to be reversible error for a substitute

judge to not at least consider reaching a different conclusion

than the predecessor judge.  *Mergentime Corp. v. Washington Metro. Area Transit

Auth.*, 166 F.3d 1257 (D.C.Cir. 1999).  In *Mergentime*, the successor

judge stated that he would not accept the parties' invitations to

second-guess the conclusions that the original judge had reached

and that he would thus deny all motions that sought to revisit

issues decided by the original judge. *Id*. at 1263.  The

successor judge further cautioned the parties that any arguments

that attempted to second-guess the original judge's opinion –

"will not be considered" and urged the parties "to pursue any

claim of error" with respect to the original judge's ruling on

appeal.  *Id*. at 1263.  To this, the Seventh Circuit assigned

error, reversed and remanded.

> By refusing to consider the post-trial motions, the
> successor judge failed to comply with Rule 63.  After all,
> the original judge could not have refused to consider them.
> Although district courts enjoy wide discretion to grant or

deny post-trial motions [cit. omitted], they cannot refuse
to exercise that discretion. *See* 11 CHARLES A. WRIGHT,
ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE
§ 2818, at 194 (2d ed. 1995)("If the trial judge has failed
to exercise discretion at all, as when he is under the
mistaken apprehension that he has no power to grant the
relief sought, the appellate court can review that decision
and can order the judge to exercise his discretion."); 12
MOORE'S FEDERAL PRACTICE § 59.54[3] (Matthew Bender 3d ed. 1998)
... Since Rule 63 requires a successor judge to stand in the
shoes of the original judge, the successor judge in this
case assumed the original judge's obligation to exercise his
discretion with respect to the contractors' post-trial
motions.  It would be unfair to "deny a litigant's right to
try to persuade the court that it has erred simply because
the judge who rendered the original decision is unavailable
and cannot be called on to reconsider the matter." 12 MOORE'S
FEDERAL PRACTICE § 63.05[1].

*Mergentime*, at 1263-64.

Accordingly, it should be beyond dispute that this Court,
sitting as a successor judge, has plenary authority to alter,
amend, and reverse Judge Camp's decision to the same extent that
Judge Camp could have reconsidered his own decision.  It is
reversible error for a successor judge to fail to at least
consider reversing the decision of the predecessor judge.

> **C.   ADMISSIBILITY OF MR. MCNALLY'S TESTIMONY.**
>
> **1.   Admissibility on Rule 63 Recall.**

Rule 63, among other things, requires the successor judge to
certify familiarity with the record.  Fed.R.Civ.P. 63.  The Rule
also requires the successor judge to make a determination whether
the – "case may be completed without prejudice to the parties."
*Id*.

> ... the new rule thus allows successor judges to avoid
> retrial, but only to the extent they ensure that they can
> stand in the shoes of the predecessor by determining that
> "the case may be completed without prejudice to the
> parties."

*Mergentime Corp. v. Washington Metro. Area Transit Auth*., 166 F.3d 1257, 1263

(D.C. Cir. 1999).  In connection with performing those duties,

the successor judge is required to recall any witness whose

testimony is material and disputed and who is available to

testify again without undue burden.  *Id*. ("... **shall** at the

request of a party ...").  Moreover, separate and apart from the

mandatory recall requirement, the rule also authorizes the

successor judge to - "recall any other witness."

During the hearing on February 11, the Court heard testimony

from one of Plaintiff's inventors, Tom McNally.  Defendants'

counsel objected to almost every question posed to Mr. McNally on

the grounds that the identical question was not asked during

trial.  After carefully searching the extant case law on Rule 63,

Plaintiff has been unable to find a single incident where a court

sustained an objection to a question posed to a witness on recall

under Rule 63 because the same question had not been asked when

the witness first testified during trial.  Certainly, Defendants

have cited no such authority to the Court to date.  Plaintiff

submits that the Court should overrule those objections and admit

and consider Mr. McNally's testimony.

This case has been pending since 2004.  During the six plus year pendency of this case, Judge Camp had the benefit of becoming familiar with the case through, among other things: (i) a *Markman* claim construction hearing; (ii) motions to compel discovery; (iii) motions in limine; (iv) motions to strike expert reports and otherwise challenging the qualifications of experts; (v) summary judgment proceedings on inequitable conduct, inventorship, and enablement; and (vi) a pre-trial hearing. Thus, when the bench trial commenced in July of 2009, Judge Camp already had an accumulated familiarity with the case that is difficult to duplicate from a sterile review of the paper record.

Moreover, this action is not a simple slip-and-fall tort case or a simple suit on a promissory note.  Rather, it is a patent infringement case involving technology that includes a reasonably complex interaction between chemistry and biology. Moreover, it is an obviousness case that requires consideration of whether a person of ordinary skill in the relevant art would be motivated to modify the prior art to achieve the patented invention with a reasonable expectation of success.  This is also a complex question.  In cases involving complex issues, Rule 63 allows, but does not necessarily obligate, a successor judge to enter judgment based on an existing record.

> If the trial judge in a non-jury trial becomes disabled
> before filing findings of fact and conclusions of law, a new
> trial is probably obligatory, absent consent of the parties

to a decision without retrial.  GPO contends that Judge
Waddy's findings of fact and conclusions of law issued from
the bench sufficed to permit Judge Richey to enter judgment.
We need not reach this issue, however, because Rule 63 at
most gives a successor judge the power to enter judgment; it
does not obligate him to do so.  The premise underlying Rule
63 - that the successor judge may be unable to assess with
security the significance or credibility of what his
predecessor heard - is amply justified in complex litigation
such as this.

*Thompson v. Sawyer*, 678 F.2d 257, 269, 270 (D.C.Cir. 1982).

Similarly, in the case of *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555

F.2d 426 (5th Cir. 1977), the original trial judge's decision, on

appeal, was reversed and remanded for additional findings of

fact.  During the appeal process, the original trial judge

resigned from the bench, leaving a Rule 63 successor judge to

preside over the proceedings on remand.  Under the circumstances,

the Fifth Circuit noted that the Rule 63 successor judge had

discretion to make new findings of fact and conclusions of law on

the existing record or, in the successor judge's discretion, the

record could be supplemented or the court could grant a new

trial.

> The district judge who tried the case has resigned from the
> bench.  The judge to whom the case is assigned on remand may
> be able to make new findings of fact and conclusions of law
> on the existing record.  **The record may be supplemented at
> his discretion**. [cit. omitted].  Moreover, if he is
> satisfied that he cannot perform the duties we have given
> him because he did not preside at the trial **or for any other
> reason**, the judge may in his discretion grant a new trial.
> Fed.R.Civ.P.  63.

*Golf City*, 555 F.2d *supra* at 438 (emphasis added).

- 9 -

Read together, the Court's admonition in *Golf City* and the plain language of 63 indicate that a successor judge has broad discretion to recall any witness, supplement the record, or even grant a new trial in keeping with the successor judge's duty to determine that the proceedings can be – "completed without prejudice to the parties."[2]

In the case of *Gaddy v. Abex Corp*. 884 F.2d 312 (7th Cir. 1989), the original trial judge directed a verdict in favor of the defendants at the close of plaintiff's case.  Thereafter, the original trial judge retired while, as in the instant case, a motion to amend findings of fact or for new trial was pending. A successor judge was assigned under Rule 63 who granted the motion for new trial.  After re-trying the case in a bench setting, the Rule 63 successor judge ruled in favor of the plaintiff, thus reaching the opposite conclusion of the original trial judge who had entered a directed verdict.  In granting the motion for a new trial, the successor judge stated that he felt it inappropriate to decide plaintiff's motion to amend findings of fact when he did not preside at the trial.  *Id*. at 315.

---

[2] Prior to the 1991 amendments to Rule 63, a successor judge was required to retry a case absent stipulation of the parties if findings of fact and conclusions of law had not been entered before the predecessor judge became disabled. *Home Placement Serv., Inc. v. Providence Journal Co*., 819 F.2d 1199, 1202 (1st Cir. 1987); *Emerson Elec. Co. v. General Elec. Co*., 846 F.2d 1324, 1326 (11th Cir. 1988).

Moreover, the successor judge noted that the original judge's fact findings were contradictory on their face and that the successor judge had not had the opportunity to observe the parties or their counsel during trial.  On appeal, the Seventh Circuit found that the grant of a new trial was within the discretion of the successor judge.

Apart from the foregoing, the prevailing case authorities provide little guidance as to the scope of oral examination that may be pursued when a witness is recalled under either the mandatory or discretionary recall provisions of Rule 63. Defendants' position appears to be that the oral examination must be strictly limited to counsel asking the exact same questions and the witness giving the exact same answers as occurred at the original trial.  Moreover, Defendants contend that a recalled witness should not be given an opportunity to orally testify regarding subjects that the witness gave declaration testimony on during summary judgment proceedings before trial, even though the witness was cross-examined on such declaration testimony at trial and even though the original trial judge relied on the summary judgment record in deciding the outcome of the bench trial. Defendants cite no authority to support this draconian, and incorrect, view of the recall provisions of Rule 63.

Plaintiff submits that Defendants' extremely narrow interpretation of Rule 63 should be rejected for several reasons.

First, Rule 63 is not limited to a party recalling its own witnesses.  There is nothing to prevent a party from recalling a hostile witness providing that he or she is available within the meaning of Rule 63.  In recalling a hostile witness, even if the hostile witness is interrogated with the exact same questions, there is no guaranty that the witness will give the exact same answer.  Moreover, if the hostile witness answers differently on recall than at trial and is impeached with his or prior answer, there is nothing that would prevent the witness from explaining or expounding on his previous answer, neither would there be any impediment to opposing counsel giving the witness an opportunity to explain a previous answer on re-direct.  Of course, all of these consideration gives the successor judge an opportunity to evaluate the credibility of the witness, which is a primary reason for the recall provision in the rule.

Furthermore (and this goes to *"prejudice to the parties"*), Judge Camp's obviousness ruling is grounded on numerous instances where he ignored his own evidence exclusion orders.  For example, Judge Camp granted Plaintiff's motion *in limine* no. 2, which precluded Defendants from introducing extrinsic evidence that missing features were "inherently" present in Hakansson-2. [Dkt 552, pp. 1-2].  Nevertheless, Judge Camp's obviousness ruling hinged on finding that the cleaning fluid was "inherently" present in

*Hakansson-2* based on inadmissible testimony that Defendants elicited from their expert on the last day of trial.  Similarly, Judge Camp's Orders at Dkt 274, 414, 464, 552, 574 precluded Defendants from relying on prior art that they failed to timely disclose in discovery, yet Judge Camp went beyond Defendants' disclosed prior art references to find that claim elements missing from Defendants' (authorized) prior art references could be found in the "general knowledge of a person of ordinary skill in the art."  [June 18 Order, Dkt 619, p. 51].  Such "general knowledge" was necessarily derived from prior art that Defendants failed to timely disclose during discovery.  In addition, Judge Camp found that knowledge of an unspecified, but purportedly "existing" fluid could be imputed to the person of ordinary skill in the art.  [Dkt 619 Order, p. 46-47].  Such "existing fluid" should have been timely disclosed in Defendants' local rule invalidity contentions during discovery, but was not.

Moreover, Judge Camp's finding regarding "for help in determining" an "existing fluid" is ambiguous.  The language – "for help in determining" – could be interpreted to mean that: (i) a specific, known fluid could be supplied, or (ii) mere starting materials to begin a testing program could be suggested. Judge Camp is no longer available to interpret his own order. Supplementing the record with Mr. McNally's testimony about how the inventors found and used "existing fluids" to test in their

prototype invention should be an invaluable aid to the Court in determining whether and to what extent a practitioner in the art of environmental sciences could, on request, supply "help in determining an existing fluid" to a parts washing practitioner based solely on the teachings of the prior art and without the help of Plaintiff's patent specification. Furthermore, it should be clear from Mr. McNally's testimony on recall that Judge Camp misapprehended the meaning of "environmentally benign" as used in Plaintiff's Exhibit 527, which was authored by Mr. McNally. [Compare Dkt 619, p. 53 to 2/11/11 Transcript, pp. 75:23-79:23].

Finally, at pages 165 to 167 of the 2/11 transcript, Defendants argued that the Court could find that the "non-caustic" limitation in Plaintiff's claims could be established through Mr. McNally's original trial testimony. No it can't. The parties' dispute over Mr. McNally's original trial testimony was clarified during the hearing on February 11, where the Court was available to view and weigh Mr. McNally's credibility.

In summary, Plaintiff submits that McNally's testimony was proper in scope for a witness subject to mandatory recall under Rule 63 and is, therefore, admissible. As such, Plaintiff submits that the Court lacks discretion to disregard it. Alternatively, to the extent that the Court believes that McNally's testimony exceeded the permissible scope of a witness subject to mandatory recall, Plaintiff submits that the Court has

discretion to supplement the record and to consider it in keeping
with the broad discretion given a successor judge under Rule 63.

### 2.   McNally's Testimony Is Admissible Under Plaintiff's Alternative Request for Partial New Trial on the Disputed Markman Construction of "Non-Caustic."

In addition to moving to alter or amend findings and
conclusions under Rule 52(b), Plaintiff has also moved for a
partial new trial on the issue of construction of "non-caustic."
Claim construction is considered to be an iterative process such
that the Court can update, amend, or modify its interlocutory
*Markman* claim construction ruling at any time until entry of
final judgment. *Jack Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352, 1361
(Fed.Cir. 2002); *Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d
1376, 1382 (Fed.Cir. 2003).

Plaintiff never agreed to a construction of "non-caustic"
that contemplated that microbes could possibly be considered as
"organic tissue."  In a biological setting, "tissue" is defined
as:

> An aggregation of morphologically similar cells and
> associated intercellular matter acting together to perform
> one or more specific functions in the body.  There are four
> basic types of tissue:  muscle, nerve, epidermal, and
> connective.

THE AMERICAN HERITAGE DICTIONARY, 4th ed.  Microbes may be
"organisms," but they are not "organic tissue."

> In biology, an organism is any contiguous living system
> (such as animal, plant, fungus, or micro-organism).  In at
> least some form, all organisms are capable of response to
> stimuli, reproduction, growth and development, and
> maintenance of homoeostasis as a stable whole.  An organism
> may either be unicellular (single-celled) or be composed of,
> as in humans, many trillions of cells grouped into
> specialized tissues and organs.

[*http://en.wikipedia.org/wiki/Organism* (8/1/2010)].  Since the meaning of

"non-caustic" was initially stipulated to, such that it has never

been construed by the Court in an adversarial setting, the

current dispute over the meaning of "non-caustic" should lead to

only two possible outcomes, either: (i) Defendants are wrong

about non-caustic applying to microbes; or (ii) the phrase –

"*organic tissue, such as the skin of the operator*" – is ambiguous and needs to be

construed in an adversarial setting.

   To the extent that the Court needs to re-open the record of

the *Markman* hearing to construe "non-caustic" in an adversarial

setting in connection with Plaintiff's motion for a partial new

trial, Plaintiff requests the Court to consider Mr. McNally's

February 11 hearing testimony for such additional purpose.

McNally's testimony regarding the prevalence of contact

dermatitis among users in the parts washer industry should be

relevant and admissible in construing "non-caustic."

   In a similar vein, Plaintiff requests the Court to admit and

consider Plaintiff's Exhibit 22 (the '305 Application Examiner

Interview Summary) as part of the re-opened *Markman* record.

- 16 -

> It was noted by the examiner that WIPO'314 [*Hakansson-2*] and
> EPO'342 [*Hakansson-1*] fail to specifically or inherently
> disclose in a parts washer, a fluid that is a
> "biodegradable, non-toxic, non-caustic, nonflammable oil
> dispersant cleaner and degreaser".  WIPO'314 [*Hakansson-2*]
> and EPO'342 [*Hakansson-1*] fail to specifically or inherently teach
> the same even though employing water.

[Plaintiff's Exhibit 22].  As part of the prosecution history, the '305 Application is part of the "indisputable public record" on which the public is entitled to rely in ascertaining the scope of a patented invention.  *Vitronics Corp. v. Conceptronic, Inc*. 90 F.3d 1576, 1583 (Fed.Cir. 1996).  Although the '305 Application is a continuation application from the patents-in-suit, a court may consider the prosecution history in a subsequent continuation application in construing a common term shared with an earlier issued patent. *See Ventana Medical Systems, Inc. v. Biogenix Laboratories, Inc.*, 473 F.3d 1173, 1184 (Fed.Cir. 2006) citing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed.Cir. 2004) (recognizing that "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application").

## II.   ARGUMENT AND CITATION OF AUTHORITY.

Due to time constraints at the hearing on February 11, Plaintiff did not have an opportunity to orally rebut statements made during Defendants' oral argument.  Plaintiff will take this opportunity to rebut Defendants' oral statements at the hearing.

## A.    CONSTRUCTION OF "NON-CAUSTIC."

It should have been abundantly clear during Defendants'
closing argument that Defendants absolutely depend on the
construction of "non-caustic" encompassing the health of microbes
in order to support their position that the cleaning fluid
limitation is inherently present in *Hakansson-2*. [2/11 Transcript,
pp. 165-168]. In addition, Defendants absolutely depend on
inadmissible testimony that they introduced through Dr. Adriaens
in violation of an *in limine* ruling to establish that the
limitation, as improperly construed, is inherently present.

According to *Hakansson-1*, microbes can biologically function
in a parts washer cleaning fluid at a pH of at least 9.5.

> ... alkaline pH-value which will not block microbial growth.
> This pH-value is, at present, about 9.5 ...

[*Hakansson-1*, p. 2, line 59-62]. Defendants introduced no evidence
at trial that a cleaning fluid of 9.5 pH will not cause contact
dermatitis or some other health concern in a parts washer user.
Thus, a cleaning fluid of *Hakansson-1* (or *Hakansson-2*) at a pH of 9
or above could provide an acceptable host environment for
microbes and still expose the operator to skin damage or other
adverse health effects.



**Figure 1 – Demonstrative Illustration Showing Where ChemFree and Hakansson-1 Respectively Lie on the pH Scale.  Hakansson-1's Preferred Operating Range Of 9.2 to 9.4 pH Is Well Above The "Non-caustic" Range of ChemFree Which Teaches Using a Neutral pH.**

Mr. McNally's testimony on February 11, 2011, corroborated Dr. Durkee's trial testimony[3] that cleaning fluids above 9.0 pH are considered caustic in reference to the skin of an operator.

Q. DID YOU CONSIDER USING THE PH AS HIGH AS 9.5 TO 10.

A. WE DID NOT CONSIDER PH'S THAT HIGH.

Q. WHY NOT?

A. PH'S OF 9 OR ABOVE ARE CONSIDERED IN THE INDUSTRY TO BE CAUTIONARY FOR THE REASON THAT EXTENDED EXPOSURE CAN CAUSE DERMATITIS IN HUMAN BEINGS.

---

[3] I disagree that ... "tenside solution of pH 9-11" ... is within a pH range that persons in the cleaning industry would consider "non-caustic" to a human operator. [Durkee 337, pp. 122-123].

   Q. WHAT IS THE PH RANGE THAT IS COMMONLY ACCEPTED IN YOUR
      INDUSTRY AS BEING NON-CAUSTIC IN TERMS OF NOT CAUSING DAMAGE
      TO HUMAN SKIN?

   A. THE PH IN THE INDUSTRY OF ABOUT 5.5 TO ABOUT 8.5 IS
      CONSIDERED TO BE SAFE FOR HUMAN USE.

   Q. DOES THAT TAKE INTO ACCOUNT THE AMOUNT OF EXPOSURE THAT A
      USER HAS DURING A DAY AND FROM DAY TO DAY?

   A. YES. IT DOES TAKE INTO ACCOUNT THE FREQUENCY OF EXPOSURE TO
      THE PARTICULAR CHEMICAL.

[2/11 Transcript, pp. 54:11-55:17]

   Q. AS THE GENERAL MANAGER OF A COMPANY THAT SELLS AQUEOUS PARTS
      WASHERS, CAN YOU SAFELY RECOMMEND TO YOUR CUSTOMERS THAT
      THEY CAN WASH PARTS IN A 9.5 PH SOLUTION WITHOUT USING
      PROTECTIVE MEASURES LIKE GLOVES AND GOGGLES?

   A. I WOULD NOT RECOMMEND THAT TO MY CUSTOMERS.

[2/11 Transcript, pp. 58:20-59:3].

    As the party challenging the validity of the patent,
Defendants bore the burden to prove their case with clear and
convincing evidence.  *Tokai Corp. v. Easton Enterprises Inc*., -- F.3d --,
2011 WL 308370, *6 (Fed.Cir. January 31, 2011).  Moreover, since
the *Hakansson* technology was before the examiner during
prosecution, that burden is enhanced.  *Id*.  However, there is no
evidence in the record from which the Court can conclude that
*Hakansson-2* inherently discloses a cleaning fluid that is not
harmful to human tissue.

    Defendants' argument that the stipulated construction of
non-caustic encompasses more than just human skin misses the

point.  Plaintiff's patent specification clearly indicates that
the health concerns to users involved more than just skin.

> ... it is not uncommon for workers to have dermatitis
> **and respiratory problems** exacerbated by unprotected use
> of mineral spirits ...

[Joint Exhibit 1, '110 Patent, col. 1, lines 34-36].  Humans have
more kinds of "organic tissue" than just skin.  They also have
eyes, and lungs, and digestive systems that can be adversely
affected by exposure to harsh chemicals.

> ... There are four basic types of tissue: muscle, nerve,
> epidermal, and connective.

THE AMERICAN HERITAGE DICTIONARY, 4th ed.  Thus, use of the
phrase - "organic tissue, such as the skin of the operator" - was
entirely appropriate to account for the various different types
of organic tissue.  However, single celled microbes are not
"organic tissue" and Judge Camp clearly erred by applying the
term "non-caustic" to microbes instead of the human operator.

Finally, and this is just common sense, a fluid that is not
harmful to microbes, but is harmful to the skin and other organic
tissue of the operator should still be considered "caustic."  A
fluid is not "non-caustic" if it harms the operator, regardless
of its effect on microbes.  Judge Camp committed clear error by
failing to take into account the effect of the cleaning fluid on
skin and other organic tissue of the operator.

**B.   RELIANCE ON INADMISSIBLE EVIDENCE.**

It should have been abundantly clear during Defendants'
closing argument that Defendants absolutely depend on
inadmissible evidence to support their position that the "non-
caustic" and "non-flammable" limitations are inherently present
in *Hakansson-2*.  Dr. Adriaens' testimony about causticity and
flammability was not properly disclosed in his expert reports,
nor was it disclosed by Defendants in response to Interrogatory
No. 5.  The Federal Circuit decries such attempts to sandbag an
opponent.

> We have previously cautioned litigants of the pitfalls of
> playing fast and loose with rules of discovery:
>
> > Conclusory expert reports, eleventh hour disclosures,
> > and **attempts to proffer expert testimony without
> > compliance with Rule 26** violate both the rules and
> > principles of discovery, and the **obligations lawyers
> > have to the court**.  Exclusion and forfeiture are
> > appropriate consequences to avoid repeated occurrences
> > of such manipulation of the litigation process.

*Tokai Corp. v. Easton Enterprises Inc*., -- F.3d --, 2011 WL 308370, *4
(Fed.Cir. January 31, 2011)[4] quoting *Innogenetics, N.V. v. Abbott Labs*.,
512 F.3d 1364, 1376 n.4 (Fed.Cir. 2008).  Dr. Adriaens' testimony
was carefully and deliberately crafted to circumvent the Court's

---

[4] A copy of the Federal Circuit's recent decision in *Tokai* is
attached hereto for the convenience of the Court.

pre-trial *in limine* rulings.[5]   The Federal Circuit's admonition regarding – "*obligations lawyers have to the court*" – rightly comdemns the Defendants' deliberate trial strategy in designing Adriaens' direct examination to circumvent the pre-trial *in limine* ruling on inherency.   [Dkt 552, pp. 1-2].

Plaintiff herein repeats and renews its request that the Court enforce the pre-trial *in limine* ruling, strike the inadmissible testimony on inherency, and reconsider the obviousness case in light of the admissible evidence. *Forest Laboratories, Inc. v. Ivax Pharmaceuticals, Inc*. 237 F.R.D. 106, 114 (D.Del 2006)(striking testimony outside of expert report in post-trial motion proceeding); *Honeywell Int'l, Inc. v. Universal Avionics Systems Corp*., 488 F.3d 982, 994-996 (Fed.Cir. 2007); *Inline Connection Corp. v. AOL Time Warner, Inc*. 472 F.Supp.2d 604, 614-615 (D.Del. 2007)(expert not permitted to testify outside of scope of expert report).

### C.   THE TERM "NON-TOXIC," AS USED IN THE '110 AND '835 PATENTS IS NOT LIMITED TO MICROBES.

At page 178 of the 2/11 transcript, Defendants argued that *Hakansson-2's* fluid is non-toxic because the "bugs don't die." Defendants studiously avoided addressing the issue of whether

---

[5] The Court is familiar enough with trial practice to understand that Adriaens' trial testimony on "non-caustic" and "non-flammable" was no accident.   It was carefully planned and rehearsed well in advance of trial.

"non-toxic" as used in the claims of the '110 and '835 Patents
applies to <u>users</u> as well as microbes ("bugs").

> Still another object of the present invention is to provide
> a cleaning system that does not have a **toxic effect on**
> **users**.

['110 Patent, Col 2, lines 66-67 (emphases added)].  Defendants
presented no evidence at trial that the cleaning fluid of
*Hakansson-2* is expressly or inherently non-toxic <u>to users</u>.  The
claim limitations in the '110 and '835 Patents that the cleaning
fluid is "*biodegradable, non-toxic, non-caustic, and non-flammable*" is not met
because defendants failed to prove that *Hakansson-2's* cleaning
fluid is "<u>non-caustic</u>" – and – "<u>non-toxic</u>" – to <u>users</u>.[6]

**D.   DEFENDANTS' SILENCE ON THE SIGNIFICANCE OF THE
EXAMINER'S AMENDMENT DURING PROSECUTION TO DISTINGUISH
OVER THE HAKANSSON TECHNOLOGY.**

Defendants' argument at the hearing on 2/11 studiously
avoided addressing the significance of the Examiner's Amendment
that added the language – "*biodegradable, non-toxic, non-caustic, non-flammable*"
– to the pending claims and which allowed the claims, as amended,
to overcome a rejection based on *Hakansson-1*. [See Joint Exhibit
10, pp. J1690-96; Joint Exhibit 7, p. J854].

---

[6] In contrast, the claims in the '125 Patent qualify the
term '*non-toxic*' as applying to the microbes – for example – "a
biodegradable, non-caustic, non-flammable oil dispersant cleaning
and degreasing fluid that is *non-toxic to the microorganisms*," [Joint
Exhibit 4, '125 Patent, claim 6].

The Examiner's Amendment narrowed the claims so as to render them patentable over the prior art, including the *Hakansson* technology.  "The prior art cited in the file wrapper gives clues as to what the claims do not cover."  *Autogiro Co. of America v. United States*, 384 F.2d 391, 399 (Ct.Cl. 1967).  "By distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."  *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed.Cir. 1997).

One of the advantages of Plaintiff's invention over the prior art is the "user friendliness" of its pH neutral, non-caustic cleaning fluid.  With Plaintiff's invention, users, for the first time, could wash parts without using gloves and goggles and without a substantial risk of contracting dermatitis.  By misconstruing and misapplying the meaning of "non-caustic," Judge Camp's ruling effectively deprived Plaintiff's invention of a significant advantage over the prior art.  Specifically, it deprived Plaintiff's claims of the benefit of the Examiner's Amendment that distinguished Plaintiff's invention over the prior art, including *Hakansson-1*.

### E.   RELIANCE ON "OTHER" PRIOR ART NOT DISCLOSED IN LOCAL RULE INVALIDITY CONTENTIONS OR EXPERT REPORTS.

At pages 154-156 of the 2/11 transcript, Defendants argue that the Court should consider prior art other than *Hakansson-2* and

*Athey*.  During argument, Defendants' counsel projected a page from Dr. Durkee's expert report on the screen using the courtroom ELMO.  Plaintiffs do not deny that Dr. Durkee's report addressed prior art other than *Hakansson-2* and *Athey*, however, Dr. Durkee's report at Docket 337 was prepared before the Court excluded many of Defendants' references as a discovery sanction and, consequently, Dr. Durkee did discuss and distinguish several references that Defendants were not permitted to rely on at trial.

The issue here is not whether "other art" existed.  The Court no doubt recalls that Plaintiff projected page 2 of the '125 Patent on the screen showing that Plaintiff's patent was allowed by the PTO over more than one hundred references.  The issue here is whether Defendants are entitled to rely on art that was not timely disclosed and was excluded as a discovery sanction.

35 U.S.C. § 282 requires patent challengers to disclose the art they intend to rely on to prove invalidity before trial.  By local rule, Defendants must make their invalidity disclosures by pre-set deadlines and disclose not only the references, but how the patent challenger intends to use the references.  *ChemFree Corp. v. J.Walter, Inc.*, 250 F.R.D. 570, 572 (N.D.Ga. 2007).  The local rule requires a patent challenger to disclose discrete

combinations of references that are to be combined in an obviousness analysis.  LPR 4.3, 4.4 ND Ga.  The local rule also requires the patent challenger to disclose a practitioner's motivation to make such a combination. *Id*.

After the Court entered a series of exclusion orders,[7] Defendant was left with *Hakansson-2* and *Athey*.  Defendants knew it was impossible to prove obviousness over those two references, particularly where Defendants' expert report was stricken as inadequate under Fed.R.Civ.P. 26(a)(2)(B).  Consequently, Defendants somehow convinced Judge Camp to ignore his own evidence exclusion orders and consider prior art that was not properly disclosed under the local patent rules.  Judge Camp's findings regarding "general knowledge of a person of ordinary skill in the art" [June 18 Order, Dkt 619, p. 51], and an unspecified "existing fluid" [Id. at pp. 46-47], clearly refer to art other than *Hakansson-2* and *Athey*.

Plaintiff reasonably relied on the pre-trial evidence exclusion orders in preparing its case.  What, after all, is the point of having discovery rules and pre-trial evidence exclusion orders if the restricted party can disregard them with impunity at trial?  Plaintiff submits that Judge Camp erred by relying on

---

[7] [Orders at Dkt 274, 414, 464, 552, 574].

prior art that he had previously ruled was inadmissible at trial as a discovery sanction.

Notwithstanding, the vague references to "general knowledge of a person of ordinary skill in the art" [June 18 Order, Dkt 619, p. 51] and the unspecified "existing fluid" [Id. at pp. 46-47] do not, by any means, establish that Plaintiff's patent claims are obvious.  Rather, at most, they merely indicate that some isolated elements of the invention were known in the prior art.  However, it is settled law that a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.  *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1740, 167 L.Ed.2d 705 (2007).  Defendants were required by Local Patent Rule 4.3 and 4.4 to timely disclose discrete combinations of references <u>and</u> the motivation to combine them.  Defendants presented no evidence at trial as to how someone of ordinary skill in the art would combine multiple references or what the motivation would be to do so.  Judge Camp clearly erred in *sua sponte* filling this vacuum in Defendants' evidentiary presentation.

### F.  THE ENRETECH FLUID USED IN PLAINTIFF'S EXPERIMENTAL PROTOTYPE SUPPORTS THE NON-OBVIOUSNESS OF PLAINTIFF'S INVENTION.

At pages 176-177 of the 2/11 transcript, Defendants incorrectly argue that "there were people in this space who were

looking at how they might be able to combine" microbes and fluids for use in parts washer. Defendants then cited the Enretech green fluid that Plaintiff used in its early prototypes as an example of "*people in this space.*" First of all, the Enretech fluid was not a parts washer fluid. It was intended to be plowed into the ground to remediate soil contamination. [2/11 transcript, pp. 35-36, McNally]. Secondly, it did not work reliably in a parts washer application. [2/11 transcript, pp. 36-39, McNally]. If anything, the Enretech fluid illustrates the difficulties in adapting fluids developed for *in situ* environmental contamination clean-up to a parts washer application. A microbial fluid developed for one-time use to remediate soil contamination does not necessarily work in a parts washer where the fluid is re-used for up to a year. [Durkee 337:75-80, 150-151].

> Practitioners of ordinary skill in the parts washer art that were familiar with *Hakansson-1* & *-2* would not be inclined to modify the traditional, solvent or aqueous, sink-on-a-drum (or similar) parts washer apparatus by combining it with a fluid that had been developed to transport microorganisms to an environmental clean-up site. Environmental clean-up products are designed for a single application. Once the nutrients and/or surfactants in the carrier fluid have served their purpose of transporting the microbes to the clean-up site, it matters not that the surfactants are biologically digested by the microbes along with the hydrocarbon contaminants. Indeed, it is desirable that the microbes biodegrade the surfactants *in situ*, or else the party dumping the fluid onto a contaminated site would merely be substituting one contaminant for another.

[Durkee 337:150].  Dr. Durkee was the only qualified expert who testified on this issue at trial.  His testimony was unrebutted at trial.

The Examiner allowed Plaintiff's claims over references teaching *in situ* remediation microbial fluids.  For example, U.S. Patent 5,354,789 to *Guinn* is directed to a microbial cleaner that comprises at least one hydrocarbon-ingesting microbe strain and a nonionic surfactant and is cited on the face of all of the patents-in-suit.[8]  Plaintiff's expert, Dr. Durkee, distinguished *Guinn* and other environmental contamination clean-up microbial fluids in his report.

> There is no teaching in either *Guinn* or *Kaiser* from which an ordinary practitioner, in 1994, would discern that either *Guinn* or *Kaiser* avoided the pH control issues identified in Hicks, above. Furthermore, there is no teaching in *Guinn* or *Kaiser* that suggests that the pH balance problems identified in *Hakansson* had been solved.

[Durkee 337:150].  Again, Dr. Durkee was the only qualified expert who testified on this issue at trial.

---

[8] See Joint Exhibit 12 – Plaintiff's Non-Provisional Application No. 08/370,898 - excerpts at pp. J2101-11 (Office Action Rejection over *Guinn*); pp. J2156-2158 (U.S. Patent 5,354,789 to *Guinn*); pp. J2193-2208 (Amendment and Response to Office Action distinguishing *Guinn* at pp. J2203-2206

G.    **REFERENCE TO "BIOLOGICAL" IN *HAKANSSON-2* CANNOT BE INTERPRETED AS SYNONYMOUS WITH NON-CAUSTIC IN PLAINTIFF'S PATENT.**

At page 159 of the 2/11 transcript, Defendants argue that *Hakansson-2* refers to three kinds of aqueous cleaning fluids – "alkaline" – "acidic" and "biological," suggesting that "biological" means that it is "in the middle" between alkaline and acidic.   Defendants want the Court to make a leap of faith that "biological" in *Hakansson-2* should be considered as meaning the same thing as "non-caustic" in Plaintiff's patents.   There is no evidentiary basis to make such a leap.   Hakansson's earlier publication, *Hakansson-1*, taught a "biological" system at alkaline pH values that are caustic to human tissue.

> ... alkaline pH-value which will not block microbial growth.
> This pH-value is, at present, about 9.5 ...

[*Hakansson-1*, p. 2, line 59-62].   Thus, "biological" systems can be sufficiently alkaline that they are caustic to human tissue.

Finally, it bears mention that chemical properties other than pH can irritate human tissue.   For example, mineral spirits can cause dermatitis even though, as an organic solvent, it is not considered to have a pH.   ['110 Patent, Col. 1; 2/11 transcript, p. 64, McNally].   *Hakansson-2* does not disclose enough information regarding its fluid to ascertain its chemical properties vis-à-vis human skin and other organic tissue.   The mere possibility that it "might" be non-caustic is insufficient.

> Inherency may not be established by probabilities or possibilities.  The mere fact that a certain thing may result from a given set of circumstances is not sufficient.

*Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d 1325, 1332 (Fed.Cir. 2010), see also *Trintec Indus., Inc. v. Top-USA Corp.*, 295 F.3d 1292, 1295 (Fed.Cir. 2002)(inherency requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art).

Throughout the trial, post-trial briefing, and the hearing on February 11, 2011, Defendants have identified no evidence that a person of ordinary skill in the art of parts washing would recognize that *Hakansson-2* unavoidably teaches a fluid that is safe for extended contact with human skin.

> The very essence of inherency is that one of ordinary skill in the art would recognize that a reference unavoidably teaches the property in question.

*Agilent Tech., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1383 (Fed.Cir. 2009).

> An inherent property must necessarily be present in the invention ... and **it must be so recognized** by persons of ordinary skill in the art.

*Id.* quoting *Hitzeman v. Rutter*, 243 F.3d 1345, 1355 (Fed.Cir. 2001)(emphasis added).

**H.    REPLY TO DEFENDANTS' CONTENTION THAT THE COMPLEXITY OF *HAKANSSON-2* INDICATES THAT THE TECHNOLOGY HAD MOVED BEYOND PLAINTIFF'S INVENTION BEFORE PLAINTIFF'S DATE OF INVENTION.**

At page 160, Defendants argued that the complexity of *Hakansson-2* indicated that the state of the art had "already

passed" where Plaintiff's inventors were at the time of their
invention.  Defendants contend that, since *Hakansson's* technology
is complex, there must have been something simpler that preceded
it.  There is no evidence to support this contention.  It is mere
unsubstantiated attorney argument.  "Unsubstantiated attorney
argument regarding the meaning of technical evidence is no
substitute for competent, substantiated expert testimony."
*Invitrogen Corp. v. Clontech Labs, Inc*., 429 F.3d 1052, 1068 (Fed.Cir. 2005).
If Defendants were correct (they are not), one would expect to
find Plaintiff's invention in the prior art sometime before the
advent of *Hakansson-1* in the mid-to-late 1980's, but no such art
exists.

Embodiments of Plaintiff's invention could remain at a
stable pH for over one year without suffering a downward shift of
pH due to acid generation. ['110 Patent, Col. 7, line 21 –
"extended periods of time"].

> Q. HOW LONG DID SOME OF YOUR PARTS WASHERS STAY IN OPERATION
>    WITHOUT UNDERGOING A COMPLETE FLUID REPLACEMENT?
>
> A. DURING THE TRIAL PERIOD WE HAD MACHINES THAT WOULD NOT
>    REQUIRE CHANGING FLUID OUT FOR MORE THAN A YEAR.
>
> Q. DID YOU MAKE ANY OBSERVATIONS OF THE STABILITY, THE PH OF
>    THE CLEANING FLUID, OVER TIME?
>
> A. YES. IN THE TEST MACHINES, THE PH WOULD STAY BETWEEN A 7 AND
>    AN 8.

[2/11 Transcript, p. 62:5-18, McNally].  Thus, Plaintiff's
invention demonstrated that a bioremediation parts washer could

function for extended periods without the pH, and nutrient, and

tenside monitoring and metering subsystems of *Hakansson*.

[*Hakansson-2*, Figure 1, features 33, 34, 49].  Hakansson followed

the conventional wisdom that acid generation would shift the pH

down.

> In the case of large bacteria populations, the pH-value may
> fall rapidly due to high consumption of emulsifying
> chemicals and to the generation of acid by dead bacteria.
> Consequently, in order to prevent the tenside-consumption
> from becoming excessive, the nutrient solution introduced to
> the bath may also contain a pH-increasing substance suitable
> for tensides ...

[Joint Exhibit 7, p. J694, (Plaintiff Ex. 75) *Hakansson-1*, p. 8,

line 26-29].  *Hakansson* followed the conventional wisdom of the

day in environmental sciences.

> In conjunction with microbial growth, pH may decline in
> response to the generation of organic acids from metabolic
> activity.

[Joint Exhibit 15 – J2988-2991, Hicks et al, *Bioremediation: A Natural*

*Solution*, POLLUTION ENGINEERING, January 15, 1993, quoted in expert

report of Dr. Durkee, Docket 337, pp. 150-151].  The problem of

acid generation in prior art systems was acknowledged by

Defendants' expert, Dr. Adriaens, in his expert report.

> Hakansson is correct that all biodegradation processes
> generate acids (this has been known for 40 years, ever since
> wastewater treatment plants came in operation) resulting
> from the breakdown of any surfactants, hydrocarbons and from
> the decomposition of dead cells.  Hence, pH adjustments are
> desirable as a biodegrading reactor (parts washing tank)
> operates over extended periods.

[Expert Report of Peter Adriaens, PhD, Docket 354, p. 46].

Plaintiff's invention also demonstrated that its system could work without fashioning the holding tank into a conical settling chamber to remove copious quantities of dead bacteria.

> A slurry of dead bacteria and contaminants is also formed, accompanying the washing liquid from the objects in the washing chamber 1. This slurry is allowed to settle in the lower portion of the washing liquid container 14, which is conical and is located below the duct 37, so that in this lower portion a region is formed without any significant movements in the washing liquid. Contributing to this is the fact that the supply line 15 removes washing liquid at a relatively high level from the washing liquid container 14. At the very bottom of the washing liquid container 14, there is a drain pipe 40 with a valve 41 which enables the settled slurry to be removed from the container 14. This should be done continuously or at short intervals in order to prevent anaerobic bacteria growth, which otherwise occurs relatively rapidly.

[*Hakansson-2*, p. 9, lines 21-37].

> In the case of large bacteria populations, the pH-value may fall rapidly as a result of the high consumption of emulsifying chemicals and also as a result of acid generation by dead bacteria ... A high degree of bacteria activity is required when large quantities of organic contaminants enter the bath. **Large numbers of bacteria are also killed therewith**. Certain bacteria species when dead produce toxic substances which are liable to destroy the biological life. Consequently, **it is essential to separate dead bacteria continuously from the cleaning bath**. Since dead bacteria have a low sedimentation rate (about 0.1 m/h) their separation from the bath may at times prove troublesome.

[*Hakansson-1*, p. 3, lines 19-40].

No one solved the problems of excess acid generation and accumulation of dead bacteria identified in the *Hakansson*

technology until Plaintiff's invention.  Plaintiff's discovery,
for the first time, allowed bioremediation to take place in a
small, open-basin, sink-on-a-drum style parts washer.  The law of
obviousness recognizes that simplifying a previously complex
system is an indicia of non-obviousness.

> simplicity does not establish obviousness; indeed,
> simplicity may represent a significant and unobvious advance
> over the complexity of prior devices.

*Sensonics, Inc. v. Aerosonic Corp*., 81 F.3d 1566, 1569 (Fed.Cir. 1996).

*Hakansson-2* is a closed cabinet parts washer that uses high
pressure spray to remove contaminants from parts.  [Joint Exhibit
27, *Hakansson-2*, p. 7, lines 15-17].  Defendants' obviousness
theory cherry picks the bioremediation feature from *Hakansson-2*,
but then disregards the closed cabinet, the high pressure spray,
the pH monitoring and metering subsystems, and the conical
settling chamber and purge valve to remove dead microbes.
Similarly, Defendants' obviousness theory cherry picks just the
integrated heater, thermostat and level control subsystem from
*Athey*, but disregards the fact that it is a closed cabinet, high
temperature, single chamber commercial dishwasher.  The Supreme
Court, in *Dennison Mfg. Co. v. Panduit Corp*., 475 U.S. 809, 106 S.Ct.
1578, 89 L.Ed.2d 817 (1986) recognized that a district court is
not to rely on hindsight, and that -

> in addressing the question of obviousness **a judge must not
> pick and choose isolated elements from the prior art** and

combine them so as to yield the invention in question if such a combination would not have been obvious at the time of the invention.

475 U.S. at 810, quoted in *Abbott Labs v. Sandoz*, 544 F.3d 1341, 1348 (Fed.Cir. 2008). In *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) the Supreme Court recognized that the obviousness inquiry must "guard against slipping into use of hindsight and to resist the temptation to read into the prior art the teachings of the invention in issue." 383 U.S. at 36.

To draw on hindsight knowledge of the patented invention, when the prior art does not contain or suggest that knowledge, is to use the invention as a template for its own reconstruction - an illogical and inappropriate process by which to determine patentability. *W.L. Gore Assoc. v. Garlock, Inc.*, 721 F.2d 1540, 1553, 220 USPQ 303, 312-13 (Fed.Cir. 1983). The invention must be viewed not after the blueprint has been drawn by the inventor, but as it would have been perceived in the state of the art that existed at the time the invention was made. *Interconnect Planning Corp. v. Feil* 774 F.2d 1132, 1138, 227 USPQ 543, 547 (Fed.Cir. 1985).

*Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1570 (Fed.Cir. 1996).

In the complete absence of receiving any competent, qualified expert testimony from the Defendants on combining and modifying the prior art, Judge Camp is guilty of "picking and choosing" isolated elements of the prior art, using Plaintiff's patent as a "template" or "blueprint" to reconstruct the invention. This is the classic "hindsight" analysis, which the Federal Circuit terms an "illogical and inappropriate process" for determining patentability.

The Court should not penalize the Plaintiff's inventors for the manner in which they made their discovery.

> Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103.

> ... at the time of invention, the inventor's insights, willingness to confront and overcome obstacles, and yes, even serendipity, cannot be discounted.

*Ortho McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358, 1364 (Fed.Cir. 2008).  Nor do courts deprive inventors of their discoveries because they are not sophisticated scientists with advanced post-graduate college degrees and, therefore, may not fully comprehend the underlying science of their invention.

> An inventor need not comprehend the scientific principles on which the practical effectiveness of his invention rests, nor is the inventor's theory or belief as to how his invention works a necessary element in the specification to satisfy the enablement requirement of 35 U.S.C. § 112.

*Cross v. IIzuka*, 753 F.2d 1040, 1042 (Fed.Cir. 1985), *citing Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570 (Fed.Cir. 1983).

## I.   REPLY TO DEFENDANTS' CONTENTION THAT CLEANING FLUIDS WERE READILY AVAILABLE.

At page 162 of the 2/11 transcript, Defendants argued that the availability of existing cleaning fluids, as determined during the enablement summary judgment proceeding, supports the obviousness of Plaintiff's invention.  No it does not.

The conventional wisdom in the parts washing industry at the time of the invention taught that caustic, alkaline chemicals

were needed to get parts clean. [Durkee 337:46-59]. ChemFree was at the forefront of moving the parts washing industry in the direction of using cleaning fluids that were pH neutral and safe to use in an open basin cleaning environment.[9] It is no accident that Defendants have been unable to find any prior art parts washing fluids that used non-caustic chemicals in order to promote operator safety.

At the time of the invention, there were hundreds, if not thousands, of cleaning fluids for a wide variety of product applications. [2/11 transcript, p. 29, McNally]. Plaintiff's inventors demonstrated ingenuity by departing from the conventional wisdom of using alkaline, caustic chemicals and adapting a biodegradable, non-toxic, pH neutral (non-caustic), non-flammable cleaning fluid from an unrelated product application to use in an aqueous parts washer that could also bioremediate hydrocarbons. The fact that such cleaning fluids might have "existed," for use in unrelated product applications, does not establish obviousness. *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1740, 167 L.Ed.2d 705 (2007)(a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art).

---

[9] See 2/11 Transcript, pp. 71:9 – 72:11. Mr. McNally's testimony regarding the military revising its parts cleaning specifications from a pH of 10 or more to a neutral pH in light of its experiences with ChemFree.

The following teaching in Plaintiff's patent specification was considered novel in the field of parts washing at the time of the invention:

> In accordance with the preferred embodiment of the present invention, the cleaning fluid 72 is compatible with (i.e., is non-toxic to) the microorganisms such that the microorganisms are capable of living within the cleaning fluid 72.  Additionally, the cleaning fluid 72 tends to remove organic waste from parts washed in the basin 14, as will be discussed in greater detail below. An acceptable cleaning fluid 72, for example and not limitation, is a mixture of pH neutral emulsifiers and surfactants containing no volatile organic compounds, phosphates, formaldehyde, biocides, or other toxic materials.  The emulsifier and surfactants are blended in liquid form to produce a biodegradable, non-toxic, non-caustic, non-flammable oil dispersant cleaner and degreaser.  Further, and for example and not limitation, the exemplary acceptable cleaning fluid 72 contains no known carcinogens, no OSHA (Occupational Health and Safety Act) or DOT (United States Department of Transportation) regulated chemicals, no ingredients requiring SARA (Superfund Amendments and Reauthorization Act) Title III reporting, no RCRA (Solid Waste Disposal Act as amended by the Resources and Conservation Recovery Act of 1976 as amended), hazardous waste chemicals, and no items on the CERCLA (Comprehensive Environmental Response, Compensation and Liability Act) hazardous substance list (based upon the relevant regulations at the time this application was filed).  Additionally, and for example and not limitation, the exemplary cleaning fluid 72 is a freely flowing liquid with a specific gravity of 1.083, a slight pleasant odor, no flash point, a boiling point of 210.degree.  Fahrenheit, a pH of approximately seven, and which is infinitely soluble in water.  In accordance with the preferred embodiment of the present invention, an acceptable example of the cleaning fluid 72 is available from Warren Chemical Corporation of Robert, La., as part number SeaWash 7.

[Joint Exhibit 1, '110 Patent, Col 5, line 65 – Col. 6, line 31].

Adapting a pH neutral fluid like SeaWash-7, that had never before been used in a parts washer product application, and combining it

with bioremediation microbes and the other elements of
Plaintiff's invention constituted an act of invention.

**J.   REPLY TO DEFENDANTS' ARGUMENT REGARDING THE NEXUS
BETWEEN DEFENDANTS' LAUDATORY STATEMENTS AND THE
CLAIMED INVENTION.**

At page 168 of the 2/11 transcript, Defendants argue that
there is an insufficient nexus between the laudatory statements
in their product advertising and the claimed invention.  This
argument is belied by a review of their advertisements.

Defendants' print, web, and video advertising go beyond
merely promoting bioremediation.  They go right at the unique,
novel, user-friendly aspects of Plaintiff's non-caustic cleaning
fluid.  Note the following excerpt from Plaintiff's Exhibit 24:



**Figure 2 – Excerpt from Plaintiff's Exhibit 24**

Defendants juxtapose the words pH neutral (i.e., non-caustic),
non-toxic, biodegradable, and non-flammable together almost as if
copied directly from Plaintiff's patent claims.  The Court will

find Plaintiff's Exhibit 88 of particular interest.  This video features Tonight Show Host Jay Leno with Defendants' CEO, Tim Houghton, who attended the hearing on February 11, 2011.



**Figure 3 – Screen-shot Excerpt from Jay Leno video - Plaintiff's Exhibit 88.**

In the video, Mr. Houghton brags to Jay Leno about how Defendants' cleaning fluid is so user-friendly that workers use Defendants' accused system to wash their hands at the end of the work day.  Mr. Houghton then turns the system on and demonstrates by washing his hands in the cleaning fluid.

Plaintiff's Exhibit 87 is also worth reviewing.  It is another promotional video that touts the advantages of Defendants' accused system over mineral spirits parts washers. The video parodies old-fashioned, black and white, "silent" movies showing a parts washer operator reacting to his work

environment.  Some of the "silent movie" screen captions say

sarcastic things like:

> "Ah! I love the fresh scent of toxic solvent in the
> morning."

> "And I just love the idea of ruining my health in the
> long run."

> "Solvent may be toxic, flammable and hazardous to my
> health, but at least its disposal is quick and easy."

[Plaintiff's Exhibit 87 (video)].  Defendants' advertising

touting the health advantages of Defendants' accused system is

sufficient to establish a nexus for such advertising to

constitute a strong secondary consideration of non-obviousness.

> Several objective indicia, however, warrant consideration in
> this case.  For instance, before this litigation, Baxter
> recognized calibration during dialysis as a significant
> advance.  Baxter touted the advantages of AUTO-ADJUST, as it
> termed automatic recalibration during dialysis, in the
> advertising for the allegedly infringing Baxter SPS 550
> machines.  Baxter's recognition of the importance of this
> advance is relevant to a determination of nonobviousness.
> *See Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1092, 2
> USPQ2d 1490, 1493 (Fed.Cir. 1987).

*Gambro Lundia AB v. Baxter Healthcare Corp*., 110 F.3d 1573, 1579 (Fed.Cir.

1997).

###    K.    REPLY TO DEFENDANTS' ARGUMENT REGARDING THE
             FLAMMABILITY OF HAKANSSON-2'S CLEANING FLUID.

Defendants' entire case on "non-flammable" boiled down to

one inadmissible question and answer at trial.

Q. IN YOUR EXPERIENCE, ARE SURFACTANTS GENERALLY FLAMMABLE OR
   NONFLAMMABLE?

A. THEY ARE NOT FLAMMABLE. I HAVE NOT FOUND ANY EVIDENCE THAT THEY ARE FLAMMABLE.

[TR 771:11-14, Dr. Adriaens].  Plaintiff moves to strike this testimony as inadmissible under the pre-trial *in limine* ruling precluding Defendants from introducing evidence of inherency. [Order, Dkt 552, pp. 1-2].

Whether Dr. Adriaens is aware of it or not, there are surfactants that are highly flammable.  One example is Lubrizol's Sulfochem™ EA-60 and ES-60 surfactants. [2/11 transcript, p. 44, McNally].  Product literature on Lubrizol's surfactants is publicly available on the internet.  Dr. Adriaens is not an expert in parts washing generally or in parts washing chemistry in particular.  *Sundance, Inc. v. Demonte Fabricating Ltd*, 550 F.3d 1356 (Fed.Cir. 2008)(testimony by witness lacking relevant technical expertise fails the standard of admissibility under Fed.R.Evid. 702).  Dr. Adriaens' ignorance of publicly available information on flammable surfactants hardly suffices to meet Defendants' burden of proof of clear and convincing evidence.[10]

In the aftermath of Plaintiff's motion to strike Adriaens' inadmissible testimony, coupled with McNally's testimony about Lubrizol surfactants, Defendants changed their tune on non-

---

[10]Dr. Adriaens' testimony could have been easily refuted at trial had Defendants made the proper pre-trial disclosures during discovery.  The Court should enforce the *in limine* ruling on this matter. [Order, Dkt 552, pp. 1-2].

flammability at the hearing.  During argument on 2/11, Defendants
dropped their argument that *Hakansson-2* is inherently non-flammable
and, instead, argued that it would have been obvious for a
practitioner to use a non-flammable fluid. [2/11 transcript, pp.
170-172].  Defendants argued that a practitioner would never use
a potentially flammable fluid with a heater.  This is mere
attorney argument unsupported by proper evidence.  U.S. Patent
5,492,139 to *Lashmett*, which Plaintiff distinguished during
prosecution, used an aqueous cleaning fluid containing 16 percent
alcohol. [Col 3].[11]  This concentration renders the fluid
flammable.

> *Lashmett's* cleaning fluid is 16 percent alcohol, which persons
> of skill in the art would recognize as flammable.

[Durkee Dkt 337:136-137].  Durkee's testimony on this issue was
unrebutted at trial.  *Lashmett's* parts washing apparatus included a
heater.

> **The heater** 20 is activated to cause the fluid within the
> tank to be heated to the appropriate temperature for causing
> the **maximum vitality and activity of the microorganisms**
> within the fluid.  The preferred range of temperature for
> the fluid should be between 80° and 100°F, and the preferred
> temperature is approximately 90°F.

---

[11]A copy of *Lashmett* may be found at Joint Exhibit 6, pp.
J151-157.

[*Lashmett*, col. 4, lines 15-20 (emphasis added)].[12]  *Lashmett's* use of a heater to warm a flammable fluid to promote microbial activity in a parts washer disposes of Defendants' unsubstantiated attorney argument that a practitioner would have necessarily used a non-flammable fluid at the time of Plaintiff's invention.  The following testimony from Dr. Durkee was unrebutted at trial.

> A person of mere ordinary skill in the art would not be expected to have the expertise to modify *Lashmett's* cleaning fluid so as to reduce the alcohol content to reduce the flammability factor and still have a reasonable expectation of achieving acceptable overall performance for both cleaning and sustainment of microorganisms.

[Durkee Dkt 337:136-137].

## L.   INCONSISTENT POSITIONS DURING ENABLEMENT AND OBVIOUSNESS.

At pages 172 – 174 of the 2/11 transcript, Defendants resurrect their failed argument that every conceivable embodiment of an invention that fits within the scope of a claim must be operable in order for a patent to be "enabled."  This argument is categorically incorrect.

> Even if some of the claimed combinations were inoperative, the claims are not necessarily invalid.  It is not a function of the claims to specifically exclude possible inoperative substances.

*Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 750 F.2d 1569, 1576

(Fed.Cir. 1984).

---

[12]*Lashmett's* application filing date is August 1, 1994, after Plaintiff's invention and, therefore, is not "prior art" to Plaintiff's patents.

Defendants confuse the concepts of difficulty and obviousness, suggesting that any patent that is not difficult to practice must be obvious.  However, just because a practitioner can follow the teachings of an enabled patent to practice an invention does not mean that a practitioner would find it obvious to develop the same invention from just the prior art.  Here again, Defendants invite the Court to engage in improper hindsight analysis.

> Mylan's expert, Dr. Anderson, simply retraced the path of the inventor with hindsight, discounted the number and complexity of the alternatives, and concluded that the invention of topiramate was obvious.  **Of course, this reasoning is always inappropriate for an obviousness test** based on the language of Title 35 that requires the analysis to examine "the subject matter as a whole" to ascertain if it "*would have been obvious at the time the invention was made*."  35 U.S.C. § 103(a) (emphasis added).  In retrospect, Dr. Maryanoff's pathway to the invention, of course, seems to follow the logical steps to produce these properties, but **at the time of invention, the inventor's insights, willingness to confront and overcome obstacles, and yes, even serendipity, cannot be discounted ...** a flexible TSM test remains the primary guarantor against a non-statutory hindsight analysis such as occurred in this case.

*Ortho McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc.*, 520 F.3d 1358, 1364 (Fed.Cir. 2008)(emphasis added).  As noted by the Federal Circuit, retracing the path of the inventor with hindsight is "always inappropriate" for an obviousness test.  However, this is precisely what Defendants invite the Court to do.

**M.   ARGUMENT THAT ANY "SINGLE COMBINATION" ESTABLISHES OBVIOUSNESS.**

At page 175 of the 2/11 transcript, Defendants argued that – "*if there is a single combination out there, then it is obvious.*"   However, once "non-caustic," "non-toxic," and "non-flammable" are properly construed and applied, Defendants have failed to establish the existence of – "*a single combination out there*" – in the prior art.   Otherwise, Defendants' statement is still a gross misstatement of the law. A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.   *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1740, 167 L.Ed.2d 705 (2007).

In order to combine references for an obviousness determination, some kind of reason must be shown as to why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented invention.   *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363 (Fed.Cir. 2008).   "There must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."   *In re Kahn*, 441 F.3d 977, 988 (Fed.Cir. 2006).   "To facilitate review, this analysis should be made explicit."   *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S.Ct. 1727, 1741, 167 L.Ed.2d 705 (2007) *citing Kahn*, 441 F.3d at 988.   In the instant

case, Defendants rely on mere attorney argument, rather than evidence, to attempt to show that the prior art could be combined or modified.

**N.    REPLY TO ARGUMENT THAT THE '305 APPLICATION EXAMINER INTERVIEW TOOK PLACE BEFORE KSR.**

At page 180 of the 2/11 transcript, Defendants argue that the Court should discount the following statement by Examiner Stinson in the prosecution history.

> It was noted by the examiner that WIPO'314 [*Hakansson-2*] and EPO'342 [*Hakansson-1*] fail to specifically or inherently disclose in a parts washer, a fluid that is a "biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser". WIPO'314 [*Hakansson-2*] and EPO'342 [*Hakansson-1*] fail to specifically or inherently teach the same even though employing water.

[Plaintiff's Exhibit 22, '305 Application Examiner Interview Summary, quoted by and relied on by Plaintiff's expert, Dr. Durkee at Dkt 337, pp. 65-66, 73, 81-82, 122, 124, 155, 225, 226, 227, 228; Dkt 467, pp. 16-17, 39-40, 42-43, 55, 57].

Defendants argue that the Court should give Examiner Stinson's 2005 statement little weight because it predated the Supreme Court's 2007 decision in *KSR*.  This argument has no merit.  In *KSR*, the Supreme Court admonished lower courts that the "TSM" or "teaching, suggestion, or motivation" test should not be applied in an overly rigid manner.[13]  The *KSR* case has

---

[13] "Since the TSM test was devised, the Federal Circuit doubtless has applied it in accord with these principles in many

absolutely nothing to do with an whether isolated element of an invention is inherently disclosed in a prior art reference.

Examiner Stinson's statement observes that *Hakansson-1* and *Hakansson-2* do not expressly or inherently disclose – "*in a parts washer*" – a cleaning fluid that is "*biodegradable, non-toxic, non-caustic, and non-flammable.*"  *KSR* did nothing to change the law of inherency. The Federal Circuit decided *Therasense* in 2010.[14]  The Federal Circuit decided *Agilent* in 2009.[15]  Both *Therasense* and *Agilent* cite *In re Oelrich*, 666 F.2d 578 (CCPA 1981) approvingly as stating the correct legal standard for inherency.  The legal standard for inherency has remained constant for the past 30 years. Defendants' presentation at trial did not meet that standard.

### III.   CONCLUDING ARGUMENTS.

#### A.   DEFENDANTS' LACK OF EVIDENCE.

Perhaps the most remarkable thing about the trial of this case is the overall paucity of evidence that Defendants introduced on the issue of obviousness.  Defendants were

---

cases.  There is no necessary inconsistency between the test and the *Graham* analysis.  But a court errs where, as here, it transforms general principle into a rigid rule limiting the obviousness inquiry." *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727, 1732 (2007).

[14] *Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d 1325, 1332 (Fed.Cir. 2010).

[15] *Agilent Technologies, Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1383 (Fed.Cir. 2009).

repeatedly sanctioned during pre-trial discovery for playing games with its local rule disclosure obligations.

> In fact, it appears that the reason for the untimely amendments was gamesmanship in an effort to gain a tactical advantage over Plaintiff.

*ChemFree Corp. v. J.Walter, Inc.*, 250 F.R.D. 570, 573 (N.D.Ga. 2007).  In view of the numerous evidence exclusion orders attributable to Defendants' pre-trial "gamesmanship," Defendants' trial presentation was short on evidence and long on attorney argument.

### 1.   Only Two Prior Art References Within The Scope and Content of the Prior Art.

At the time of the *Markman* claim construction hearing, Defendants' local rule invalidity contentions identified three references, only one of which (*Hakansson-2*) pre-dated Plaintiff's date of invention.  [Docket 49].[16]  Defendants later added *Athey*, a high temperature, closed cabinet, commercial dishwasher apparatus patent.

### 2.   An Unqualified Expert.

Defendants engaged an expert witness from the wrong technical field.

> "QUESTION: DO YOU CONSIDER YOURSELF TO BE AN EXPERT IN THE FIELD OF ENVIRONMENTAL SCIENCE?"

---

[16] The two references that post-dated ChemFree's date of invention were *Sims* (U.S. Patent No. 5,656,156 filing date of June 10, 1994) and *Minkin* (U.S. Patent No. 5,529,080 filing date of May 13, 1994).

"ANSWER: I DO."

"QUESTION: DO YOU ALSO CONSIDER YOURSELF TO BE AN EXPERT IN THE
    FIELD OF PARTS WASHING?"

"ANSWER: I DO NOT."

"QUESTION: DO YOU RECOGNIZE THE FIELD OF PARTS WASHING AND THE
    FIELD OF ENVIRONMENTAL SCIENCES AS TWO SEPARATE FIELDS OF
    SCIENTIFIC ENDEAVOR?"

"ANSWER: SCIENTIFIC ENDEAVOR? THE TWO ARE SEPARATE. YES, THEY
    ARE TWO SEPARATE FIELDS."

[TR, p. 781:15-25, quoting January 28, 2009 deposition transcript
at p. 339].

Dr. Adriaens is an environmental engineer with no expertise
in parts washing technology.  Prior to his engagement as an
expert, he had no experience in designing or developing a parts
washer.[17]  He disclaimed familiarity with fluid temperatures used
in aqueous parts cleaning machines.[18]  He disclaimed familiarity
with cleaning fluid chemistry used in parts washer fluids.[19]
Indeed, he had never even taken a plant tour of a facility that
made parts washers.[20]  Dr. Adriaens never observed a practitioner
in the parts washer industry at or about the time of the
invention in 1994.  He was altogether unfamiliar with the state
of the art in parts washing at time of the invention.

---

[17] May 19, 2008 deposition of Dr. Adriaens, pp. 14-20.

[18] May 19, 2008 deposition of Dr. Adriaens, p. 31.

[19] May 19, 2008 deposition of Dr. Adriaens, pp. 174:5-181:3.

[20] May 19, 2008 deposition of Dr. Adriaens, p. 27.

### 3. Defendants' Obviousness Case Predicated On An Incorrect Person of Ordinary Skill in the Art.

Dr. Adriaens' opinions were based on an incorrect person of ordinary skill.  Dr. Adriaens' skilled artisan came from the field of environmental science. [Dkt 313, p. 9].[21]  In contrast, the correct person of ordinary skill for purposes of an obviousness analysis comes from the field of parts washing.[22]

### 4. An Initial Expert Report Stricken For Failure to Comply With Fed.R.Civ.P. 26(a)(2)(B).

Dr. Adriaens gave an initial expert report that was so materially deficient under the standards of Fed.R.Civ.P. 26(a)(2)(B) that the portions of his report on combining and modifying the prior art were stricken.  Dr. Adriaens was precluded from testifying at trial on combining or modifying the prior art.  [Orders, Dkt 414, pp. 15-16; Dkt 464, p. 9].

### 5. An Expert Report That Omitted Defendants' Primary Invalidity Reference.

Dr. Adriaens' initial expert report omitted mention of Defendants' primary invalidity reference, *Hakansson-2*.  Adriaens

---

[21] "one with a B.S. degree in Environmental Engineering or having equivalent work experience in biological water treatment, and having three years experience equipment in the automotive and equivalent industries."  [Dkt 313, p.9].

[22]"the relevant "art" for the purpose of obviousness is the art of developing and manufacturing parts washers for use in cleaning parts contaminated with organic waste such as hydrocarbons, oil, and grease."  [Order, Dkt 619, p. 43].

did not address *Hakansson-2*, by name, during trial.  When you sift
through Adriaens' trial testimony [TR746+], after you get past
his qualifications, *voir dire*, his erroneous opinion on ordinary
skill in the art, and infringement, his substantive testimony on
obviousness amounts to only a page or two.

### 6.   An *In Limine* Ruling Precluding Extrinsic Evidence on Inherency.

The key limitation in Plaintiff's patent claims, the
"biodegradable, non-toxic, non-caustic, non-flammable" cleaning
fluid limitation, is not expressly present in the prior art,
hence Defendants resort to an inherency theory.  However, as a
discovery sanction, Defendants were precluded, *in limine*, from
presenting extrinsic evidence of inherency at trial.  [Order, Dkt
552, pp. 1-2].  Plaintiff herein repeats and renews its request
that the successor judge strike, as inadmissible, the testimony
that Defendants snuck into the record in an effort to circumvent
the *in limine* ruling.[23]  *Mintel Int'l Group, Ltd. v. Neergheen*, 636 F.Supp.2d
677 (N.D.Ill. 2009)(In a bench trial, a court has leeway to
provisionally admit testimony and to disregard it later if, upon
reflection, it should have been excluded).

---

[23] [TR 770:20 - 771:5 (Adriaens non-caustic); TR 771:11-24,
Adriaens non-flammable; TR 454:9-20 (McNally non-caustic)].

**7. No Testimony on Scope and Content of the Prior Art, Differences Between the Prior Art and the Claimed Invention, or Whether Multiple References Could Be Combined.**

Neither Dr. Adriaens, nor any other defense witness, testified concerning the scope and content of the prior art, or the differences between the prior art and the claimed invention, or whether multiple references could be combined or modified, or whether a person of ordinary skill in the parts washing would be motivated to make a combination or modification, or whether such a modification would be undertaken with a reasonable expectation of success.

Defendants presented no testimony concerning the capabilities of someone of ordinary skill in the art of parts washing.  In particular, Defendants presented no testimony or analysis by which a court could determine the scope of an ordinary practitioner's "ordinary creativity" within the meaning of *KSR*.  *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007).  Moreover, Defendants presented no testimony or analysis from which a court could make an informed determination regarding whether the differences between the prior art and claimed invention presented a "finite number of identified, predictable solutions" within the meaning of *KSR*.  *KSR*, 550 U.S. *supra* at 402-403.  Nevertheless,

the Supreme Court's analysis in KSR presumes that the record
before the time of invention would supply some reasons for
narrowing the prior art universe to a "finite number of
identified, predictable solutions,"

*Eisai Co. Ltd. v. Dr Reddy's Laboratories, Ltd*. 533 F.3d 1353, 1359 (Fed.Cir.
2008). Moreover, this finite number of predictable solutions
must present the person of ordinary skill with options that are
"small" and "easily traversed." *Ortho-McNeil Pharma, Inc. v. Mylan Labs,
Inc.*, 520 F.3d 1358, 1364 (Fed.Cir. 2008).

    **B.**    **JUDGE CAMP *SUA SPONTE* FILLED THE VACUUM LEFT BY
DEFENDANTS' LACK OF EVIDENCE.**

It was into this evidentiary vacuum that Judge Camp ventured
to conduct his obviousness analysis. In the absence of any
evidence as to the capabilities of someone of ordinary skill in
the art of parts washing, Judge Camp necessarily filled the
evidentiary vacuum with his own personal impression of what
seemed obvious to him. However, obviousness must be determined
by reference to a person of ordinary skill in the art as opposed
to what may seem obvious to a judge. *Custom Accessories, Inc. v. Jeffrey-Allan
Industries, Inc.*, 807 F.2d 955 (Fed.Cir. 1986). Regardless of what
may have seemed obvious to Judge Camp, from his own personal
perspective after deciding the enablement issue, there is no
evidentiary foundation to support a legal conclusion that the
Plaintiff's patented invention, as a whole, would have been

obvious to someone of ordinary skill in the art of parts washing at the time the invention was made.  35 U.S.C. § 103.

### 1.    Error in Misconstruing and Misapplying the Meaning of "Non-Caustic."

Judge Camp erred in applying the term "non-caustic" to microbes, when the stipulated construction of "organic tissue, such as the skin of the operator" can only reasonably be applied to complex biological structures, not single celled microbes. Judge Camp overlooked key events in the prosecution history and reached a conclusion that was diametrically opposed to a finding by the examiner.

| Examiner Stinson '305 Application Interview Plaintiff's Exhibit 22 | Judge Camp June 18, 2010 Order |
|---|---|
| It was noted by the examiner that WIPO'314 [*Hakansson-2*] and EPO'342 [*Hakansson-1*] fail to specifically or inherently disclose in a parts washer, a fluid that is a "biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser". | A person of ordinary skill in the art would have realized that the use of a biodegradable, non-toxic, non-caustic, nonflammable oil dispersant cleaner and degreaser fluid was necessary for the device to function. Therefore, all of these limitations were inherently disclosed in Hakansson-2. |

The foregoing two statements cannot be reconciled.  One of them is wrong.  When an attacker simply goes over the same ground travelled by the PTO, part of the attacker's burden is to show that the PTO was wrong in the decision to grant the patent. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed.Cir. 2008).  Defendants failed to meet that burden.

**2.    Error in Finding That Hakansson-2 Would Not Be Operable Unless Its Fluid Was Necessarily Biodegradable, Non-Toxic, Non-Caustic and Non-Flammable.**

Judge Camp overlooked key events in the prosecution history to reach an erroneous conclusion that *Hakansson-2's* fluid necessarily was biodegradable, non-toxic, non-caustic and non-flammable.  The cleaning fluid limitation was added by an Examiner's Amendment that narrowed Plaintiff's pending claims to render them patentable over *Hakansson-1* (and, therefore, also *Hakansson-2*). [Joint Exhibit 10, pp. J1690-96; Joint Exhibit 7, p. J854].

**3.    Error in Finding That Purportedly Inherent Properties Would Have Been Obvious To Someone of Ordinary Skill.**

An inherent feature may be relied upon to establish obviousness only if the inherency would have been obvious to one of ordinary skill in the art. Donald S. Chisum, CHISUM ON PATENTS, § 5.03[3][a][I][A], Matthew Bender © 2006.  Once "non-caustic" is properly construed and applied to the organic tissue of the operator (instead of microbes), there is no evidence to support a conclusion that it would have been obvious to one of ordinary skill in the art that *Hakansson-2's* fluid is inherently non-caustic.  Furthermore, there is no evidence to support a conclusion that that it would have been obvious to one of

ordinary skill in the art that *Hakansson-2's* fluid is inherently non-toxic to users ('110 and '835 Patent claims).

Defendants introduced no evidence that such alleged inherency would have been recognized as obvious by an ordinary practitioner.  Examiner Stinson's above quoted statement in the '305 Application Examiner Interview Summary [Plaintiff's Exhibit 22] makes it impossible for Defendants to carry a burden of proof of clear and convincing evidence that alleged "inherent" properties of *Hakansson-2* would have been obvious to someone of ordinary skill.

>   **4.    Error in Relying on Inadmissible Evidence That Was Excluded By *In Limine* Ruling.**

Judge Camp erred in deciding the case based on inadmissible evidence that the "non-caustic" limitation (as improperly construed) was inherently present in *Hakansson-2*.  Dr. Adriaens' testimony on inherent non-caustic and non-flammable properties was precluded by the pre-trial *in limine* ruling.  [Order, Dkt 552, pp. 102].

>   **5.    Error in Relying on Unspecified Prior Art Not Timely Disclosed in Defendants' Local Rule Invalidity Contentions.**

Judge Camp erred in augmenting Defendants' invalidity references with "general knowledge of a person of ordinary skill in the art." [Dkt 619, p. 51].  Such reliance on "general knowledge" effectively vitiated the Court's pre-trial evidence

exclusion orders that had been entered as a discovery sanction. [Orders at Dkt 274, 414, 464, 552, 574].

Judge Camp erred in augmenting Defendants' invalidity references with knowledge of an unspecified "existing fluid" that was imputed to the person of ordinary skill in the art." [Dkt 619, pp. 46-47].  Expanding the scope and content of the prior art to unspecified (and previously undisclosed) art also vitiated the Court's pre-trial evidence exclusion orders that had been entered as a discovery sanction.  [Orders at Dkt 274, 414, 464, 552, 574].

Although Seawash-7 may have "existed" at the time of the invention.  There is no evidence that it, or any other biodegradable, non-toxic, non-caustic, non-flammable degreaser fluid had ever been used in a parts washer, much less a bioremediating parts washer, before Plaintiff's date of invention.  There is no evidence that a practitioner in either the parts washing art or the environmental sciences art would have known that such a fluid would have been pH stable and otherwise operable in Plaintiff's invention at the time of the invention.  Judge Camp's finding and conclusion reflects improper hindsight analysis borrowed from his enablement analysis. However, enablement dealt with the sufficiency of the teaching of Plaintiff's own patent.  It was improper for Judge Camp to use Plaintiff's own patent as a template or blueprint to pick and

choose isolated elements from the prior art to perform a hindsight reconstruction of Plaintiff's patented invention.

### 6. Error in Finding Motivation to Combine or Modify The Prior Art.

Judge Camp erred in relying on the Montreal Protocol as sufficient motivation to modify the prior art to achieve the patented invention.  Recognition of a need does not render obvious the achievement that meets that need.  *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341, 1348 (Fed.Cir. 2008).  The knowledge of a problem and motivation to solve it are entirely different from a motivation to combine particular references to reach the particular claimed invention. *Innogenetics, N.V. v. Abbott Labs*, 512 F.3d 1363, 1373 (Fed.Cir. 2008).

### 7. Error in Finding a Reasonable Expectation of Success.

An obviousness determination requires not only a reason to combine elements from different prior art references, but also that a skilled artisan would have perceived a reasonable expectation of success in making the invention via that combination.  *Medichem, S.A., v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed.Cir. 2006).  Defendants' own expert, Dr. Adriaens, acknowledged that:

> the selection and testing of candidate surfactants and microorganisms is beyond the level of skill of the person of ordinary skill in the art.

[Expert Report of Peter Adriaens, PhD, Docket 465, p. 31].  Given the acknowledged unpredictability in the art, Judge Camp erred in finding that the prior art could be modified to achieve the patented invention with a reasonable expectation of success. Such finding is not supported by sufficient evidence.

### 8.    Error in Weighing and Applying Secondary Considerations of Non-Obviousness.

Judge Camp's finding that the Overland '147 patent is a 'contemporaneous invention' that serves as a secondary consideration of obviousness is contrary to applicable law. *Overland*, which post-dates Plaintiff by almost three years, is not "contemporaneous" as a matter of law.  *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1380, n.4 (Fed.Cir. 1986).

Judge Camp failed to give proper consideration and weight to Plaintiff's evidence of secondary considerations of unexpected results and laudatory statements.  Such evidence, when combined with the recognized evidence of copying and industry awards and accolades is strong evidence of non-obviousness.

Evidence of "secondary considerations" must always, when present, be considered en route to a determination of obviousness.  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed.Cir. 1983).  Such evidence is often the most probative and determinative of the ultimate conclusion of non-obviousness. *Pro-*

*Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed.Cir. 1996).

### C. THE COURT NEEDS TO REVERSE JUDGE CAMP'S OBVIOUSNESS RULING TO PREVENT MANIFEST INJUSTICE.

On appeal from a bench trial, the ultimate determination of whether an invention would have been obvious under 35 U.S.C. § 103 is a legal conclusion that the Federal Circuit reviews de novo. *Eli Lilly and Co. v. Teva Pharmaceuticals USA, Inc.*, 619 F.3d 1329, 1336 (Fed.Cir. 2010). An obviousness determination is based on underlying factual inquiries that are reviewed on appeal for clear error. *Id*. Plaintiff submits that Judge Camp committed clear error on numerous findings of fact that affected the ultimate legal conclusion of obviousness. Once the successor judge corrects the erroneous fact findings, the overall legal conclusion of obviousness needs to be reconsidered.

An issued patent enjoys a presumption of validity. *Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc.*, 545 F.3d 1312, 1314 (Fed.Cir. 2008). An accused infringer must prove invalidity by clear and convincing evidence. *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370, 1377 (Fed.Cir. 1999). That burden never shifts to the patentee. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed.Cir. 2007). The burden is enhanced when the asserted prior art was

before the PTO during prosecution.  *Tokai Corp. v. Easton Enterprises Inc.*, -- F.3d --, 2011 WL 308370, *6 (Fed.Cir. January 31, 2011).

Under the obviousness statute, a patent claim is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter **as a whole** would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103.  In order to render an invention obvious, the cited prior art as a whole must <u>enable</u> one skilled in the art to <u>make and use</u> the invention. *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed.Cir. 1989).  For purposes of Section 103 obviousness, prior art references must place the claimed invention in the possession of the public. *In re Brown*, 329 F.2d 1006, 1011 (CCPA 1964).  An invention cannot be possessed by the public absent some known or obvious way to make it. *In re Hoeksema*, 399 F.2d 269, 274 (CCPA 1968).  *Hakansson-2* and *Athey*, alone or in combination, do not supply a sufficient enabling disclosure to teach someone of ordinary skill in the parts washing art how to make and use Plaintiff's invention, in general, and how to make a use a parts washer with a biodegradable, non-toxic, non-caustic, non-flammable degreaser fluid, in particular.

Judge Camp's ruling invalidating all 21 of Plaintiff's asserted patent claims has worked manifest injustice on the

Plaintiff.  Judge Camp's order does not analyze Plaintiff's 21 claims on an element-by-element, claim-by-claim, basis.  His order fails to account for differences between and among the claims, such as the fact that "non-toxic" in the '110 and '835 Patents is not limited "to the microorganisms" as it is in the claims of the '125 Patent.  Defendants introduced no evidence that *Hakansson-2's* fluid is inherently non-toxic to users.

Plaintiff is a small, start-up company with a single product line that is protected by the patents-in-suit.  Judge Camp's blanket ruling invalidating all of Plaintiff's claims effectively deprived Plaintiff of its most commercially significant patent protection.  By construing and applying "non-caustic" to the microbes instead of the operator, Judge Camp effectively deprived Plaintiff's invention of a significant advantage over the prior art.  Specifically, it deprived Plaintiff's claims of the benefit of the Examiner's Amendment that distinguished Plaintiff's invention over the prior art, including *Hakansson-1*.

The successor judge has plenary authority to alter, amend, and reverse Judge Camp's ruling to correct clear error and prevent manifest injustice.  The Court should alter or amend Judge Camp's findings of fact and conclusions and, in so doing, should VACATE and REVERSE Judge Camp's legal conclusion of

obviousness.  This case should proceed to discovery and a jury trial on damages.

Respectfully submitted, this 24th day of February, 2011.

DUANE MORRIS LLP

_____/s/ William A. Capp_____
William A. Capp
Georgia Bar No. 108823
*bcapp@duanemorris.com*

700 Atlantic Center Plaza
1180 West Peachtree Street
Atlanta, Georgia  30309
Telephone:  (404) 253-6975
Facsimile:  (404) 253-6901

Counsel for Plaintiff
  ChemFree Corporation

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 24, 2011, a copy of

**PLAINTIFF'S POST-HEARING BRIEF IN SUPPORT OF ITS POST-TRIAL**

**MOTIONS TO ALTER OR AMEND FINDINGS OF FACT AND CONCLUSIONS OF LAW**

was presented to the Clerk of the Court for filing and uploading

to the CM/ECF system which will send e-mail notification to all

counsel of record.


_____/s/ _William A. Capp_____
William A. Capp


> In accordance with Local Rule 7.1D, counsel for Plaintiff certifies that the foregoing has been prepared using the font Courier New 12 point.

# EXHIBIT "A"



## United States District Court
### Northern District of Georgia

### Designation of Judge Hogan in U.S. v. Camp

Senior Judge Thomas F. Hogan of the U.S. District Court for the District of Columbia has been designated to preside over the case of United States v. Jack T. Camp Jr., 1:10-MJ-1415.

The Chief Justice of the United States made the designation on the recommendation of the Judicial Conference Committee on Intercircuit Assignments after Chief Judge Joel F. Dubina of the U.S. Court of Appeals for the Eleventh Circuit requested the assignment of a judge from outside the circuit. The assignment was made in accordance with standard intercircuit assignment procedures and pursuant to Title 28, United States Code, Section 294(d).

Pending resolution of the case, all of Judge Camp's civil and criminal cases will be reassigned to other judges.

HOME
COURT INFORMATION
COURT DIRECTORY
CM/ECF
JURY INFORMATION
LOCAL RULES
STANDING ORDERS
FORMS
PACER
ATTORNEY INFORMATION
NATURALIZATION
PUBLIC INTEREST CASES
EMPLOYMENT
LINKS

This Page Last Updated October 07, 2010

RECENT NOTICES

New Job Posting Available - November 5, 2010

New Job Posting Available - November 18th, 2010

Efile Here

eJuror

**Chief Judge**
Julie E. Carnes

**District Court Executive / Clerk of Court**
James N. Hatten

CONTACT US

te Map | Judicial Misconduct & Disability        Acknowledgements | Legal Policies & Disclaime

# ATTACHMENT

## *Tokai Corp. v. Easton Enterprises, Inc.*,

-- F.3d --, 2011 WL 308370 (Fed.Cir. Jan. 31, 2011).

**H**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Federal Circuit.
TOKAI CORP., Scripto-Tokai, Inc., and Calico
Brands, Inc.,
Plaintiffs/Counterclaim Defendants-Appellants,
v.
EASTON ENTERPRISES, INC., a California
Corporation (doing Business as Easton
Sales) and FLI, Inc., Defendants-Cross Appel-
lants,
and
Fun Line Industries, Inc. and Easton Enter-
prises, Inc., a Nevada Corporation,
Counterclaimants-Appellees.
**Nos. 2010-1057, 2010-1116.**

Jan. 31, 2011.

Appeals from the United States District Court
for the Central District of California, No.
07-CV-0883, Virginia A. Phillips, Judge.

R. Joseph Trojan, Trojan Law Offices, of
Beverly Hills, CA, argued for plaintiffs/
counterclaim defendants-appellants. Of coun-
sel was Dylan C. Dang.

Konrad L. Trope, Chan Law Group LLP, of Los
Angeles, CA, argued for defendants-cross ap-
pellants and counterclaimants-appellees. On
the brief were Thomas T. Chan and Rex
Hwang.

Before NEWMAN, LOURIE, and BRYSON, Cir-
cuit Judges.

LOURIE, Circuit Judge.

**\*1** Tokai Corp., Scripto-Tokai, Inc., and Calico
Brands, Inc., (collectively, "Tokai") appeal from
the decision of the United States District Court
for the Central District of California granting a
motion for summary judgment of invalidity for
obviousness of U.S. **Patents** 5,697,775 (the
"'775 **patent**"); 5,897,308 (the "'308 **patent**");
and 6,093,017 (the "'017 **patent**"). *Tokai Corp.
v. Easton Enters. Inc.,* No. 5:07-cv-00883
(C.D.Cal. Oct. 27, 2009) ("SJ Order"). Easton
Enterprises, Inc. (d.b.a. Easton Sales) and Fun
Line Industries, Inc. (collectively, "Easton")
cross-appeal from the court's claim construc-
tion order, *Tokai Corp. v. Easton Enters. Inc.,
No. EDCV 07-883-VAP, 2009 WL 1582924
(C.D. Cal. June 2, 2009),* and the court's order
granting Tokai's motion to strike Easton's sup-
plemental invalidity contentions, *Tokai Corp. v.
Easton Enters. Inc.,* EDCV 07-00883-VAP,
*2009 WL 2047845 (CD.Cal. July 8, 2009).* Be-
cause the district court correctly granted sum-
mary judgment of invalidity, we affirm. As a
result, we need not decide Easton's cross-ap-
peal.

BACKGROUND

Tokai owns the asserted **patents**, which relate
to safety utility lighters having extended light-
ing rods (useful for lighting barbecue grills, for
example). The asserted **patents** share a prior-
ity date of August 15, 1995. [FN1] The claims
of the asserted **patents** are directed to utility
lighters with automatic child-safety mechan-
isms for preventing accidental ignition. Tokai
competes with Easton in the market for safety
utility lighters. Tokai asserts that it has sold
more than 100 million safety utility lighters in
the United States under one or more of its as-
serted **patents**. *SJ Order,* slip op. at 37. Tokai
also contends that Easton has sold more than
nine million such lighters.

> FN1. The '775 **patent** was filed on Au-
> gust 15, 1995. The '308 **patent** is a
> continuation-in-part of the '775 applica-
> tion. The '017 **patent** is a continuation-
> in-part of a division of the '308 **patent**.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

In July 2007, Tokai sued Easton in the District Court for the Central District of California for infringing the asserted **patents**. Easton counterclaimed for invalidity. At issue are claim 1 of the '775 **patent**; claims 1, 10, and 13 of the ' 308 **patent**; and claims 1, 3, and 4 of the '017 **patent**.

The parties agree that the asserted claims substantially overlap. Each of the asserted independent claims describes a "lighting rod" (*i.e.,* a utility lighter) having a particular "safety device." The differences among the asserted claims arise primarily in the safety-device portion of the claim. Claim 1 of the '775 **patent** exemplifies the asserted claims:

1. A *safety device* in a lighting rod, which lighting rod is provided with a rod-like top end portion and a main body, the rod-like top end portion being provided with a jetting nozzle for jetting out a gas, the main body being provided with:

i) a gas tank,

ii) a valve mechanism for opening and closing a path, through which the gas is supplied from the gas tank to the jetting nozzle,

iii) a piezo-electric unit for generating a discharge voltage for lighting the gas, and

iv) an *operation member,* which is capable of sliding, which has an operating section, and which drives the valve mechanism and the piezoelectric unit in order to carry out a lighting operation, the operating section of the operating member being exposed to the exterior of the main body,

**\*2** the safety device comprising:

a) a *locking member* having an engagement section, which interferes with a portion of the operation member and thereby locks the lighting operation of the operation member, said locking member being capable of moving in a direction, that intersects with the direction along which the operation member moves, and

b) an *urging member,* which urges said locking member to a locking direction,

said locking member being movable to a lock releasing position against the urging force of said urging member,

wherein, with the locking member in the lock releasing position, the lighting operation is carried out by operating the operating section of the operation member, and said locking member automatically returns to the state of the locking as the operation member returns to its original position.

'775 **patent** col.24 l.59-col.25 l.28 (emphases added). As illustrated by the relevant portions of figures 8A and 8B of the '775 **patent**, the claimed utility lighter has a trigger ("operation member" 120) and a safety device, which comprises a "locking member" (125) and a spring ("urging member" 26). To operate the lighter, the user depresses the locking member against the force of the spring and pulls the trigger. When the user releases the locking member, the spring automatically returns the locking member to its initial position, where the trigger is blocked from inadvertent actuation.



In June 2009, the district court issued a claim construction order, after which Easton stipulated that its accused utility lighters infringe all but one of the asserted claims as construed by the court. [FN2] *SJ Order,* slip op. at 3.

FN2. Easton did not stipulate to infringement of claim 4 of the '017 **patent**.

In September 2009, Tokai moved for summary judgment on Easton's counterclaim of invalidity for obviousness, and Easton filed a cross-motion for summary judgment for obviousness of the asserted **patents** over four prior art references. In opposition to Easton's motion, Tokai submitted expert declarations from Dr. Jones (the "Jones declaration") and Mr. Sung (the "Sung declaration"). Easton objected to the declarations, and the district court sustained Easton's objection. *SJ Order,* slip op. at 6-7. The district court noted that Tokai failed to submit written reports from Jones and Sung during expert discovery and that, as a result, Easton was denied an opportunity to depose these witnesses on the subject matter of their expert de-

clarations. The court thus declined to consider either declaration in resolving the parties' summary judgment motions.

On the issue of invalidity, the district court determined that there existed no genuine issue of material fact as to the obviousness of the asserted claims over the four prior art references asserted by Easton: U.S. **Patents** 5,326,256 ("Shike"); 5,199,865 ("Liang"); 5,090,893 ("Floriot"); and 4,832,596 ("Morris"). In doing so, the court applied the four-factor analysis for obviousness under 35 U.S.C. § 103, as set forth in *Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966). First, the court found no genuine issue of material fact regarding the scope and content of the asserted prior art references. *SJ Order,* slip op. at 18-22. Secondly, the court found no material dispute regarding the differences between the prior art and the claimed invention. *Id.* at 23-33. The court found that, with the exception of a single aspect of claims 10 and 13 of the '308 **patent** (discussed further *infra* ), each element of the asserted claims was disclosed in the asserted prior art. *Id.* at 23.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Third, with regard to the level of skill in the art, the district court noted that the parties disagreed sharply. The court determined, however, that the dispute was immaterial, as the court's conclusion on obviousness was the same under either party's asserted level of skill. *Id.* at 36. Finally, the court evaluated Tokai's alleged objective indicia of nonobviousness. Tokai asserted that its commercial success supported patentability, but the court found no nexus between the sales data and the merits of the invention beyond what was available in the prior art. *Id.* at 38-39. The court also found unpersuasive Tokai's asserted evidence that Easton copied the claimed inventions. *Id.* at 40. Based on its analysis of the *Graham* factors, the district court concluded that the asserted claims would have been obvious to one of ordinary skill in the art as of the priority date of the asserted **patents** and entered final judgment on October 23, 2009.

**\*3** Tokai timely appealed from the district court's exclusion of its expert declarations and from the district court's grant of summary judgment of invalidity of the asserted claims. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

### DISCUSSION

**A. The District Court Did Not Abuse Its Discretion by Excluding the Expert Evidence**

We review a district court's decision to exclude evidence under the law of the regional circuit. *Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC,* 597 F.3d 1374, 1379 (Fed.Cir.2010). The Ninth Circuit, the pertinent regional circuit in this case, reviews a district court's decision to exclude evidence on summary judgment for abuse of discretion. *Wong v. Regents of Univ. of Cat.,* 410 F.3d 1052, 1060 (9th Cir.2005).

Tokai argues that the district court abused its discretion by excluding the Jones and Sung declarations. With regard to the Sung declaration, Tokai argues that the court failed to find that Sung was exempt from the written report requirement of Federal Rule of Civil Procedure 26(a)(2)(B). Specifically, Tokai asserts on appeal that Rule 26(a)(2)(B) permits Sung, as an employee of Tokai, to offer an expert declaration without an accompanying written report. Tokai further argues that its failure to submit written expert reports for both Jones and Sung should be excused under Rule 37(c)(1), because Tokai was justified in not providing written reports to rebut Easton's expert testimony.

In response, Easton argues that the district court did not abuse its discretion by excluding the Jones and Sung declarations for failure to comply with the written report requirement of Rule 26(a)(2)(B). With respect to the Sung declaration, Easton argues that its exclusion was not an abuse of discretion, because there is no evidence in the record that Sung was an employee of Tokai. Easton also argues that the district court properly excluded the declarations under Rule 37(c)(1) because Tokai was not justified in failing to submit the written reports and because Easton was prejudiced by its inability to depose Jones and Sung on the subject matter of their declarations. Finally, Easton argues that the two declarations are wholly conclusory, and therefore their exclusion, even if an abuse of discretion, was harmless.

Under Rule 26(a)(2)(B), the disclosure of expert testimony must be accompanied by a written report prepared and signed by the expert witness "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Thus, Rule 26(a)(2)(B) contemplates an employee-expert exception to the written report requirement for "individuals who are employed by a party and whose duties do not regularly involve giving expert testimony." *Torres v. City of Los Angeles,* 548 F.3d 1197, 1214

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(9th Cir.2008).

Rule 37(c)(1) "gives teeth" to the written report requirement of Rule 26(a)(2)(B) by forbidding a party's use of improperly disclosed information at a trial, at a hearing, or on a motion, unless the party's failure to disclose is substantially justified or harmless. *Yeti By Molly Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir.2001). In reviewing the district court's decision to exclude the declarations, we are mindful to give "particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)." *Id.* ("Courts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded.").

*4 With respect to Rule 26(a)(2)(B), Tokai failed to introduce evidence indicating that Sung qualified for the employee-expert exception. Tokai alleges that during the summary judgment hearing it informed the district court of Sung's status as a Tokai employee. The record indicates otherwise. Tokai's counsel stated only that Sung "has personal knowledge of the[ ] **patents**-in-suit because he has dealt with them," and that he "was not obligated to provide an expert report because he was one of ordinary skill in the art." J.A. 2255-56. These statements fail to assert, let alone prove, that Sung was a Tokai employee entitled to exemption from the written report requirement of Rule 26(a)(2)(B). Moreover, even if Sung were a Tokai employee, Tokai failed to introduce evidence indicating that his duties did not "regularly involve giving expert testimony." Rule 26(a)(2)(B). Thus, the district court did not abuse its discretion by declining to exempt Sung from the written report requirement of Rule 26(a)(2)(B).

Regarding Rule 37(c)(1), we agree with the district court that Tokai's failure to adhere to the requirements of Rule 26(a)(2)(B) was neither harmless nor substantially justified.

Tokai does not argue that it lacked the time or ability to prepare and submit the required written reports. Before the close of expert discovery, Tokai acknowledged that it was "fully prepared ... to confront the challenges to its **patents** presented by Easton's Preliminary Invalidity Contentions," which included all four asserted prior art references. Pl.'s Reply to Def.'s Opp. to Mot. to Strike Def.'s Supplemental Invalidity Contentions and to Exclude Prior Art References Thereto at 11, *Tokai Corp. v. Easton Enters., Inc.,* No. 5:07-cv-00883 (C.D. Cal. June 29, 2009), Doc. No. 64. Yet Tokai made a tactical decision not to submit written reports from its experts. J.A. 2255-56. Tokai contends that there was no reason to submit the written reports, because the invalidity portions of Easton's expert report were "effectively gutted" by the court's exclusion of particular prior art references on which Easton's expert relied. Appellants' Opening Br. at 22. This assertion has no merit, however, as Easton relied on its expert report at summary judgment only to establish the appropriate level of skill in the art. *SJ Order,* slip op. at 6-7.

The written report requirement of Rule 26(a)(2)(A) provided reason enough for Tokai to submit the written reports, given that Tokai proffers no justification apart from its own subjective beliefs. We have previously cautioned litigants of the "pitfalls of playing fast and loose with rules of discovery":

> Conclusory expert reports, eleventh hour disclosures, and attempts to proffer expert testimony without compliance with Rule 26 violate both the rules and principles of discovery, and the obligations lawyers have to the court. Exclusion and forfeiture are appropriate consequences to avoid repeated occurrences of such manipulation of the litigation process.

*5 *Innogenetics, N.V. v. Abbott Labs.,* 512 F.3d 1363, 1376 n.4 (Fed.Cir.2008). In addition, Tokai's failure to submit the required written re-

ports prejudiced Easton by preventing Easton from deposing Jones and Sung on the subject matter of their expert testimony. We thus hold that the district court did not abuse its discretion by excluding the Jones and Sung declarations.

Furthermore, even assuming the district court abused its discretion by excluding the Sung declaration, the error was harmless, as the declaration is conclusory and does not raise a genuine issue of material fact. *See, e.g., Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1571 (Fed.Cir.1997) (affirming summary judgment of obviousness because statements of patentee's expert were conclusory and thus failed to raise a genuine issue of material fact).

**B. The District Court Did Not Err by Invalidating the Asserted Claims**

We review *de novo* a district court's grant of summary judgment, drawing all reasonable inferences in favor of the nonmovant. *King Pharms., Inc. v. Eon Labs, Inc.,* 616 F.3d 1267, 1273 (Fed.Cir.2010) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). A claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art. 35 U.S.C. § 103(a) (2006); *Graham,* 383 U.S. at 13-14.

"Summary judgment is as available in **patent** cases as in other areas of litigation." *Cont'l Can Co. USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1265 (Fed.Cir.1991). Moreover, "a district court can properly grant, as a matter of law, a motion for summary judgment on **patent** invalidity when the factual inquiries into obviousness present no genuine issue of material facts." *Ryko Mfg. Co. v. Nu-Star, Inc.,* 950 F.2d 714, 716 (Fed.Cir.1991); *accord Union Carbide Corp. v. Am. Can Co.,* 724 F.2d 1567, 1571

(Fed.Cir.1984); *Chore-Time Equip., Inc. v. Cumberland Corp.,* 713 F.2d 774, 778-79 (Fed.Cir.1983). Whether an invention would have been obvious at the time it was made is a question of law, which we review *de novo,* based on underlying facts, which we review for clear error. *Media Techs. Licensing, LLC v. Upper Deck Co.,* 596 F.3d 1334, 1337 (Fed.Cir.2010), *cert. denied* 79 U.S .L.W. 3201 (Oct. 4, 2010). When the facts underlying an obviousness determination are not in dispute, we review whether summary judgment of invalidity is correct by applying the law to the undisputed facts. *Id.; Karsten Mfg. Co. v. Cleveland Golf Co.,* 242 F.3d 1376, 1384-85 (Fed.Cir.2001).

Tokai first argues that the court failed to impose on Easton an enhanced burden to rebut the presumption of validity of the asserted claims, because some of the asserted prior art references were considered during prosecution of the asserted **patents**. Tokai then asserts that genuine issues of material fact remained regarding the scope and content of the asserted prior art and the differences between the asserted claims and the prior art. Tokai further contends that the district court erroneously failed to credit Tokai's asserted evidence of nonobvious-ness, including commercial success and copying. Finally, Tokai argues that the district court's legal conclusion of obviousness was flawed, because there was no motivation to combine the asserted prior art references and, in any event, combining the prior art references to make the claimed inventions would have required substantial modification of the prior art.

**\*6** In response, Easton argues that the court correctly determined that there is no requirement on the facts of this case for an enhanced burden to overcome the presumption of validity. Easton contends that there is no genuine factual dispute as to the scope and content of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the prior art, and that there are no unpredictable differences between the asserted claims and the prior art. Easton further asserts that the district court correctly determined that the alleged objective indicia did not overcome the showing of obviousness. As a result, Easton argues, the court correctly granted summary judgment of obviousness on the asserted claims.

We agree with the district court that Easton did not have an enhanced burden of overcoming the statutory presumption of validity. Under 35 U.S.C. § 282, each claim of a **patent** shall be presumed valid; an accused infringer must prove invalidity by clear and convincing evidence. *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,* 370 F.3d 1354, 1365 (Fed.Cir.2004). Easton is correct in noting that, although the standard of proof does not depart from that of clear and convincing evidence, a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by the U.S. **Patent** and Trademark Office ("PTO"). For example, we have stated that, " '[w]hen no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job.' " *PowerOasis, Inc. v. T-Mobile USA, Inc.,* 522 F.3d 1299, 1304 (Fed.Cir.2008) (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1359 (Fed.Cir.1984)). An added burden of deference to the PTO is not required, however, with respect to invalidity arguments based on evidence that the PTO did not consider. *Am. Hoist & Derrick Co.,* 725 F.2d at 1360. Here, as the district court found and as Tokai itself acknowledges, not all of the asserted prior art was considered by the PTO. *SJ Order,* slip op. at 12-13. For example, Floriot, a key reference forming part of Easton's challenge to the valid-

ity of each of the asserted claims, was not considered by the PTO during examination of any of the asserted **patents**. In addition, as noted by the district court, the PTO did not consider certain of the other asserted prior art references with respect to each of the asserted **patents**. *Id.* at 10-11. Accordingly, we agree with the district court that an added burden is not required here.

We turn next to the factual inquiries that form the background of any obviousness analysis under 35 U.S.C. § 103. *Graham,* 383 U.S. at 17-18. With regard to the first *Graham* factor, the scope and content of the prior art, the district court correctly found no genuine issue of material fact. The parties do not dispute that utility lighters without a safety device, as exemplified by Shike, were available as of the priority date. *SJ Order,* slip op. at 19. Regarding Liang, the parties agree that this reference discloses a utility lighter with a safety device, in which the safety device must be manually reset to the locking position after each use. *Id.* at 19-20. The parties also agree that Floriot discloses a cigarette lighter with a safety device that automatically resets after each use. Further, as the district court found, the parties do not materially dispute that the safety device in Floriot comprises a blocking member that prevents ignition while in the locked position, a return spring that applies constant pressure on the blocking member to return it to its locked position, and a safety mechanism that resets only after the user ignites the lighter. *Id.* at 21-22. Finally, with respect to Morris, the court correctly perceived no genuine dispute that Morris teaches a cigarette lighter with a safety device mounted on the side of the lighter; that the lighter is operated via sequential action of the user's finger and thumb, first to disengage the safety device, then to ignite the lighter; and that the safety device automatically resets to the locking position after each use. *Id.* at 22.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*7** With regard to the second *Graham* factor, the differences between the asserted claims and the prior art, we again discern no error in the district court's analysis of the parties' contentions. Regarding each of the asserted claims, the court found no dispute that utility lighters, including utility lighters with safety devices, were known in the prior art, as Shike and Liang demonstrate. *Id.* at 23. With respect to claim 1 of the '775 **patent**, the court correctly found no material dispute that Floriot teaches each of the four essential components of the claimed safety device: a locking member that locks the lighter by hindering the movement of the operation member; an urging member that pushes the locking member into the locking position; the ability to operate the lighter by pushing the locking member against the urging force; and the automatic return of the locking member to the locking position after use. *Id.* at 24-27.

Regarding claim 1 of the '308 **patent**, we agree with the district court that this claim is "substantially identical to Claim 1 of the '775 **Patent**," but for the additional limitation of an "unlocking member," which moves the locking member against the urging force of the urging member and is located opposite the operation member. *Id.* at 27. Moreover, the district court found that Easton demonstrated, and Tokai did not refute, that Morris teaches a lighter with such an unlocking member. *Id.* at 28. The district court did not err by finding no material factual dispute that Shike, Floriot, and Morris together disclose each element of claim 1 of the '308 **patent**.

Claim 10 of the '308 **patent** discloses a utility lighter comprising a safety device with a "locking element" and an "unlocking element." This claim is broader than claim 1 of the '775 **patent** and claim 1 of the '308 **patent**, in that it requires neither an urging member nor an automatic return of the locking element to the locking position. The court found no dispute that

Floriot discloses a locking element and that Morris discloses an unlocking element as recited in claim 10 of the '308 **patent**. *Id.* at 30. As the district court correctly found, the only difference between claim 10 and the asserted prior art is the intended position of the hand while operating the lighter: in claim 10, the thumb engages the unlocking element and a finger engages the operation member; in Morris, the intended positions of the finger and thumb are reversed. *Id.* Claim 13, which depends from claim 10, adds an "urging means" limitation, which, as the court discussed in connection with claim 1 of the '775 **patent** and claim 1 of the '308 **patent**, Floriot discloses. *Id.* at 30-31.

Claim 1 of the '017 **patent** claims a utility lighter with a safety device comprising a "locking means," which is rotatable between a locking position and a lock-release position, and an "urging means," which urges the locking means toward the locking position. Tokai does not dispute on appeal the district court's holding that "locking means" corresponds to "[t]he combination of the locking member and the portion of the lighter case on which the locking member is mounted." *Tokai Corp.,* 2009 WL 1582924, at \*7. We agree with the district court that Floriot discloses a rotatable locking means as claimed, and that Floriot further discloses an urging means, as the court discussed in connection with the '775 and '308 **patents**. *SJ Order,* slip op. at 31-32.

**\*8** Claims 3 and 4 of the '017 **patent** are dependent upon claim 1. Claim 3 adds the requirement that the lighting operation can be repeated so long as the locking member is held in the lock-releasing position. The district court correctly found no dispute that Floriot is capable of such repeated lighting. *Id.* at 32. Claim 4 adds the limitation that the locking means has a "locking section," which prevents the lighting operation by engaging with the opera-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion member while in the locking position, and which permits the lighting operation while in the lock-release position by disengaging from the operation member. The district court found, and we agree, that Floriot discloses a blocking member that meets this "locking section" limitation. *Id.* at 33.

In sum, viewing all facts and reasonable inferences in the light most favorable to Tokai, we do not discern any error in the district court's analysis of the second *Graham* factor, the differences between the prior art and the asserted claims. The district court correctly found no dispute that the asserted prior art discloses each element of claim 1 of the '775 **patent**, claim 1 of the '308 **patent**, and claims 1, 3, and 4 of the '017 **patent**. The court also correctly found that the only difference between the asserted prior art and claims 10 and 13 of the '308 **patent** is the intended position of the thumb and finger for operating the lighter.

Although at the district court the parties disputed the third *Graham* factor, the appropriate level of skill in the art, neither party on appeal contends that the court erred by assuming, without deciding, that the level of skill in the art was "an individual showing aptitude in high school shop class, or someone who builds, takes apart, or repairs basic mechanical toys/devices." *SJ Order,* slip op. at 34. We, too, discern no error in the district court's assumption. The standard adopted by the district court was the less sophisticated of the two asserted standards. *Id.* at 36. Since the district court found that the asserted claims would have been obvious to a less sophisticated artisan, then under the facts of this case the court could not have arrived at a different conclusion by adopting the viewpoint of one with greater skill and experience. Accordingly, the parties' disagreement at the district court as to the appropriate level of skill in the art did not create a genuine issue of material fact precluding summary judgment.

With regard to the final *Graham* factor, secondary indicia of nonobviousness, the district court considered Tokai's evidence of commercial success and copying. *Id.* at 37-40. Regarding commercial success, this factor "may have relevancy" to the overall obviousness determination, Graham, 383 U.S. at 18, but a nexus must exist between the commercial success and the claimed invention. *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1311-12 (Fed.Cir.2006) ("Evidence of commercial success ... is only significant if there is a nexus between the claimed invention and the commercial success."). If commercial success is due to an element in the prior art, no nexus exists. *Id.* at 1312; *see also Richdel, Inc. v. Sunspool Corp.,* 714 F.2d 1573, 1580 (Fed.Cir.1983) (holding claimed invention obvious where **patent** holder "failed to show that such commercial success ... was due to anything disclosed in the **patent** in suit which was not readily available in the prior art").

**\*9** Here, Tokai conceded that utility lighters, including child-safe utility lighters, were available in the prior art, *SJ Order,* slip op. at 38, and acknowledged that all utility lighters currently sold are required to have a safety device. J.A.2045. In discussing the marketing and sales of Tokai's utility lighters, Tokai's corporate representative not once referred to the automatic locking feature of Tokai's lighters--i.e., the feature that purportedly distinguishes the claimed inventions from prior art utility lighters. The district court thus held that because Tokai failed to establish a nexus between the automatic safety feature and the alleged commercial success, Tokai's sales data were not pertinent to the court's obviousness determination.

We agree with the district court with respect to the final *Graham* factor. Tokai proffered no evidence from which one could reasonably infer a nexus between its sales data and its util-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:04-cv-03711-CRW   Document 681   Filed 02/24/11   Page 87 of 96

ity lighters' automatic-locking features. *SJ Order,* slip op. at 38-39; *see also Cable Elec. Prods., Inc. v. Genmark, Inc.,* 770 F .2d 1015, 1027 (Fed.Cir.1985) (holding on summary judgment that even though commercial success could be deduced, it deserved no weight because a nexus was not established), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356 (Fed.Cir.1999) (en banc). However, even assuming the existence of a nexus, we see no error in the district court's determination that Tokai failed to establish "that any of these secondary factors are significant," *SJ Order,* slip op. at 37, in light of the strong showing of *prima facie* obviousness, as discussed *infra.* See *Media Tech. Licensing,* 596 F.3d at 1339 ("Even if [the patentee] could establish the required nexus, a highly successful product alone would not overcome the strong showing of obviousness."); *Ryko Mfg. Co.,* 950 F.2d at 719 (holding on summary judgment that the claimed invention was obvious, despite "assum[ing] that a nexus existed," because "secondary considerations did not carry sufficient weight to override a determination of obviousness based on primary considerations").

We further agree with the district court that Tokai's asserted evidence of copying, *viz.,* Easton's stipulation of infringement, is unpersuasive. See *Ecolochem, Inc. v. S. Cal. Edison Co.,* 227 F.3d 1361, 1380 (Fed.Cir.2000) (noting that "a showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations"). Copying "requires evidence of efforts to replicate a specific product." *Wyers v. Master Lock Co.,* 616 F.3d 1231, 1246 (Fed.Cir.2010). A stipulation of infringement, taken alone, is not probative of copying. *See, e.g., Iron Grip Barbell Co., Inc. v. USA Sports, Inc.,* 392 F.3d 1317, 1325 (Fed.Cir.2004).

From the foundation established by the aforementioned factual inquiries, we must determine whether the district court legally erred by invalidating the asserted claims for obviousness. In *KSR,* the Supreme Court stated that, in situations where "the content of the prior art, the scope of the **patent** claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 427 (2007). Such is the case here.

**\*10** The district court correctly found no material factual dispute as to each of the *Graham* factors. By Tokai's own admission, the components required to assemble the claimed inventions are "simple mechanical parts that are well known in the art." Appellants' Opening Br. at 54. While that in itself does not render the claims obvious, *KSR Int'l Co.,* 550 U.S. at 418, it is also undisputed that a need for safer utility lighters was recognized in the art as of the priority date. *E.g.,* '775 **patent** col.1 ll.20-25 (noting that "a need exists for a lighting rod having enhanced safety characteristics" and that, "[t]o satisfy such a need, lighting rods provided with various safety devices have been proposed" in the prior art); Appellants' Combined Reply & Response Br. at 16 ("The district court correctly noted that the [asserted **patents**] identify a need for child-resistant utility lighters.... To be sure, the problem in the art was how to make lighters more safe...."). Furthermore, the parties agree that cigarette lighters and utility lighters are analogous arts. One of ordinary skill would thus be directed to the claimed safety utility lighters by combining available utility lighters with prior art automatic locking mechanisms on cigarette lighters. We have consistently stated that courts "may find a motivation to combine prior art references in the nature of the problem to be solved," and that "[t]his form of motivation to combine evid-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ence is particularly relevant with simpler mechanical technologies." *Ruiz v. A.B. Chance Co.,* 357 F.3d 1270, 1276 (Fed.Cir.2004); *see also Rothman v. Target Corp.,* 556 F.3d 1310, 1319 (Fed.Cir.2009); *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1573 (Fed.Cir.1996).

Accordingly, the undisputed facts in this case--including the state of the prior art, the simplicity and availability of the components making up the claimed invention, and an explicit need in the prior art for safer utility lighters--compel a conclusion of obviousness as to the subject matter of each of the asserted claims. *KSR Int'l Co.,* 550 U.S. at 419-20 ("One of the ways in which a **patent's** subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the **patent's** claims."). A strong case of *prima facie* obviousness, such as that presented here, cannot be overcome by a far weaker showing of objective indicia of nonobviousness. *See Media Tech. Licensing,* 596 F.3d at 1339; *Ryko Mfg. Co.,* 950 F.2d at 719.

Although a need in the prior art for safer utility lighters is not disputed, Tokai contends that the solutions to this problem were "not at all predictable" and required "radical modification" of the asserted prior art. We reject these arguments. One of ordinary skill in the art would not have viewed the subject matter of the asserted claims as unpredictable. As the Supreme Court recognized in *KSR,* the nature of the mechanical arts is such that "identified, predictable solutions" to known problems may be within the technical grasp of a skilled artisan. 550 U.S. at 421; *see also Rothman,* 556 F.3d at 1319 (stating that, in the predictable arts, a claimed invention may be invalidated more readily by showing "a motivation to combine known elements to yield a predictable result"). Moreover, it is undisputed that cigarette light-

ers and utility lighters are analogous arts and that a need for enhanced safety devices had been met in the field of cigarette lighters, as demonstrated by Floriot and Morris. It would have been obvious to one of ordinary skill and creativity to adapt the safety mechanisms of the prior art cigarette lighters, as disclosed in Floriot and/or Morris, to fit a utility lighter as disclosed by Shike, even if it required some variation in the selection or arrangement of particular components. *KSR Int'l Co.,* 550 U.S. at 417 ("When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.").

**\*11** In light of the foregoing, we hold that the asserted claims are invalid as obvious. Specifically, with regard to claim 1 of the '775 **patent,** the court did not err by holding on summary judgment that the claimed subject matter as a whole would have been obvious over Shike and Floriot. Each of the components making up the claimed subject matter existed in the prior art, including the utility lighter, the locking member, the urging member, the ability to move the locking member in a direction opposite the urging force, and the automatic return of the locking member to the locking position following ignition. There was a recognized need in the prior art for safer utility lighters that would have provided one of ordinary skill with a definite reason for modifying the prior art utility lighters exemplified by Shike and Liang. One of ordinary skill would thus have been motivated to adapt these utility lighters to incorporate the automatic safety devices available in the art, as exemplified by Floriot and Morris.

Similarly, the court did not err by holding that the subject matter of claims 1, 10, and 13 of the '308 **patent** would have been obvious over Shike, Floriot, and Morris. The '308 **patent** addresses the same problem as the '775 **patent.** '308 **patent** col.1 ll.23-29. In addition to the

elements of claim 1 of the '775 **patent**, an unlocking member is required by claim 1 of the '308 **patent**. Morris indisputably discloses this element, and Morris, like Shike and Floriot, is analogous art available to the skilled artisan. It therefore would have been obvious for one of ordinary skill to combine the required elements from the asserted prior art to arrive at the subject matter of claim 1 of the '308 **patent**. The required elements of claim 10 of the '308 **patent** include a utility lighter, an example of which is disclosed by Shike; a locking element, an example of which is disclosed by Floriot; and an unlocking element, an example of which is disclosed by Morris. The only missing claim limitation-- the intended position of the finger and thumb when using the lighter--is nothing more than a predictable variation on the prior art. KSR Int'l Co., 550 U.S. at 417. In both the claimed invention and in Morris, the lighter is operated via sequential action of the finger and thumb; a mere reversal in the order of these actions does not confer patentability. Claim 13 of the '308 **patent**, which is dependent upon claim 10, adds the requirement of an urging means, as Floriot discloses. We discern no error in the district court's conclusion that claims 1, 10, and 13 of the '308 **patent** are invalid as obvious.

Finally, regarding the '017 **patent**, the district court did not err by holding the subject matter of claims 1, 3, and 4 obvious over Shike and Floriot. As with the '775 **patent**, each of the elements was found in analogous prior art, including, for claim 1, a utility lighter, a locking means, and an urging means; for claim 3, the added limitation of repeatability of the lighting operation; and for claim 4, the added limitation of a locking section that operates in the specified manner. One of ordinary skill would have had the motivation and capability of adapting and assembling these prior art components in-

to the subject matter of the asserted claims.

CONCLUSION

**\*12** For the foregoing reasons, the district court did not abuse its discretion by excluding the expert reports and did not legally err by determining that the asserted claims are invalid.

AFFIRMED
COSTS

Costs to Easton.

NEWMAN, Circuit Judge, dissenting.

The invention patented by Tokai Corporation is a utility rod lighter of the sort used to light barbeques or fireplaces, having a novel safety mechanism that achieves a new level of child-safety over the prior art. The Tokai lighter displaced previously available child-safety rod utility lighters, and received the ultimate accolade of copying by the competition.

The Tokai lighter has an ingenious safety design, whereby the device is simple to operate by adults but not by children, unlike prior art utility lighters, and locks automatically after use, unlike prior art utility lighters. The Tokai safety structure does not result from direct combination of the prior art. Nonetheless the district court, and now this court, hold on summary judgment that the asserted claims of the Tokai **patents** are invalid for obviousness. I must, respectfully, dissent.

I

The basic structure of a utility rod lighter is illustrated in a **patent** to Shike, cited by the district court as prior art to Tokai's claimed lighter.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 3:04-cv-03711-CRW   Document 681   Filed 02/24/11   Page 90 of 96



Fig. 1

U.S. **Patent** 5,326,256 ("Shike"). Shike shows the typical extended rod for lighting the charcoal or other fuel, and a trigger (18) operated mechanism that causes a piezoelectric unit (20) to discharge voltage that ignites combustible gas released from a gas reservoir (7). Shike **Patent**, col 3. II. 5-15. Although Shike does not have a safety mechanism, utility rod lighters are currently required to have safety features to prevent accidental or uncontrolled ignition, particularly by children.

The typical safety features in utility lighters operate in three steps: first, the user releases a locking mechanism; then the lighter is used, generally by a trigger-initiated ignition mechanism; then the lighter is relocked. For example, the cited prior art **patent** to Liang shows a utility lighter with a safety mechanism that is manually controlled:



Fig. 1

U.S. **Patent** 5,199,865 ("Liang"). As the district court explained, Liang teaches a utility rod lighter with a control knob safety mechanism (3) that "must be manually set to a locking position or operational position, and will not automatically return to a locking position after use." *Tokai Corp. v. Easton Enters. Inc.,* No. 5:07-cv-00883 (C.D.Cal. Oct. 27, 2009) ("*SJ Order* "), slip op. at 20.

In contrast, Tokai's device provides two aspects of childproof safety: first, the device is not operable by a child's hand, and second, it locks automatically after use. The Tokai device requires an adult hand for concurrent two-finger operation, whereby the locking member is

unlocked by the adult thumb while the trigger is simultaneously operated by the adult index finger; these steps must be concurrent, not sequential. After release the mechanism automatically returns to the locked position. The simplicity, the ease of operation, the childproof effectiveness, and the safety of this design displaced the competition. The record states that Tokai has sold more than 100 million of these utility lighters in the United States; Tokai's Vice President testified that large retailers such as Wal-Mart told him that they were purchasing Tokai's lighters because of the improved child safety "as it relates to our mechanism versus the competition."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*13** Tokai asserted Claim 1 of the 5,697,775 (the "'775 **patent**"); Claims 1, 10 and 13 of the 5,897,308 (the "'308 **patent**"); and Claims 1, 3, and 4 of the 6,093,017 (the "'017 **patent**"), all inventions of Saito et al. On summary judgment the district court held all of the asserted claims invalid for obviousness. I cannot agree.

The Tokai '308 **patent** **utility** lighter safety feature is illustrated in the **patent** as follows:



U.S. **Patent** 5,897,308 ("Saito"). As shown by the arrow in Figure 8A, when the user's thumb depresses the lock-releasing button (125c) of the locking member (125), the engagement section of the locking member (125b) moves from the engagement groove (120f) into the operation member or trigger (120), and the shaft (125a) slides along the vertical groove (120e) of the operation member, so that it becomes possible for the trigger to be pulled simultaneously with depression of the lock-releasing button. *Id.* col.16 ll.18-31. After the trigger is pulled and ignition is achieved, on release of the device the spring (26) automatically returns the locking member to the locked position whereby the trigger cannot be pulled. *Id.* col.16 ll.31-33. Claim 10 is directed to the device and its thumb and finger operation:

10. A safety device in a lighting rod, which

lighting rod is provided with a rod-like top end portion and a main body, the rod-like top end portion being provided with a jetting nozzle for jetting out a gas, the main body being provided with:

i) a gas tank,

ii) a valve mechanism for opening and closing a path, through which the gas is supplied from the gas tank to the jetting nozzle,

iii) a piezoelectric unit for generating a discharge voltage for lighting the gas, and

iv) an operation member, which is capable of sliding, which has an operating section, and which drives the valve mechanism and the piezoelectric unit in order to carry out a lighting operation, the operating section of the operating member being exposed to the exterior of the main body in a position to be capable of operational engagement by a fin-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ger of a hand holding the lighting rod,

the safety device comprising:

a) a *locking element* which is disposed inside the main body to be movable between a locking position where it prevents motion of the operation member in a direction to produce the lighting operation and a lock release position where it allows motion of the operation member in a direction to permit the lighting operation, and

b) an *unlocking element* which is exposed to the exterior of the main body at a location *opposite from the operation member so as to be engagable by the thumb of the hand holding the lighting rod* to move the locking element from the locking position to the unlocking position *while a finger of that hand engages the operation section.*

*Id.* col.33 l.44-col.34 l.28 (emphases added).



U.S. **Patent** 4,832,596 ("Morris"). The Morris safety feature consists of a stop member (9) with an inturned wedge portion (12) which, when in the locked position, prevents actuation of the lever (4a) which controls the opening of the lighter's gas valve. The user grasps the lighter in such a manner that the index finger presses at (16), thereby sliding the wedge portion (12) outwardly from underneath the lever (4a), and releasing the gas valve, whereby the gas is ignited by striking the flint wheel. *Id.* at col.3 ll .5-15. This **patent** was cited during ex-

Claim 13 adds the automatic locking limitation that the unlocking element is normally urged away from the lock release position by "urging means ." *Id.* col.34 ll.43-47.

**\*14** The district court held all of the claims invalid for obviousness, based on the combination of the Shike utility lighter, *supra,* which has no safety feature, with the safety features of a cigarette lighter **patent** to Morris, and/or a cigarette lighter **patent** to Floriot. However, these features, if combined, do not produce the Saito device. The Morris cigarette lighter is as follows:

amination, the PTO recognizing the differences in mechanism and operation from the Saito device.

The Floriot lighter also blocks the opening of a gas valve in a flint and wheel cigarette lighter, illustrated as follows:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



U.S. **Patent** 5,090,893 ("Floriot"). The Floriot lighter safety mechanism has a rocking lever (15), shown at the top of Figure 9, that controls the opening of a burner valve, and a blocking lever (24, 24a), shown at the bottom of Figure 6, that blocks the operation of the rocking lever. In operating the Floriot lighter, first the blocking lever is moved to an unblocking position by the thumb, in which position the blocking lever is held by a projection. The thumb then operates the unblocked cigarette lighter using the flint wheel. These are sequential actions, and do not require two-finger coordination. The blocking lever returns to the locked position automatically after operation of the cigarette lighter. *Id.* col.8 ll.13-30.

The district court held that it would have been obvious to a person of ordinary skill, defined for summary judgment purposes as a person with aptitude for high school shop class, to combine the various elements of the prior art to create the Saito device. However, the Saito device is not a simple insertion of the Floriot or Morris cigarette lighter safety mechanism into a utility lighter, as in the combination of known structures exemplified in *KSR International Co. v. Teleflex, Inc.,* 550 U.S. 398 (2007). Where, as here, the features of one reference cannot be substituted into the structure of a second reference, this weighs against obviousness. *See Orthopedic Equip. Co. v. United States,* 702 F.2d 1005, 1013 (Fed.Cir.1983) ("The fact that features of one reference cannot be sub-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

stituted into the structure of a second reference may indicate that the claims were nonobvious in view of the combined teachings of the two references.").

Both Morris and Shike were cited in the '775 **patent**, and the specification of the '308 **patent** recognizes that "the aforesaid safety mechanisms for gas lighters cannot be directly applied to a lighting rod, which has a different structure." '308 **Patent**, col .1 l.52, col.2 ll.1-3. Floriot is cumulative to Morris, in offering a different safety mechanism for a cigarette lighter. "When an attacker simply goes over the same ground travelled by the PTO, part of the *burden* is to show that the PTO was wrong in its decision to grant the **patent**." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360 (Fed.Cir.1984). Defendants have not met this burden.

**\*15** The district court applied an incorrect standard. The determination of obviousness is not whether a person could, with full knowledge of the patented device, reproduce it from prior art or known principles. The question is whether it would have been obvious, without knowledge of the patentee's achievement, to produce the same thing that the patentee produced. This judgment must be made without the benefit of hindsight. It is improper to take concepts from other devices and change them in light of the now-known template of the patented device, without some direction in the prior art that would render it obvious to do so.

In a crowded and competitive field such as this is stated to be, a modification that achieves a valuable improvement is of significance in view of the many entrants seeking commercial advantage. *See In re Hummer,* 241 F.2d 742, 744 (C.C.P.A.1957) ("applicant seeks a **patent** on only a narrow improvement. Progress is as important, however, in crowded arts as well as in those which are in the pioneer stage"). As the *Hummer* court recognized, incremental but un-

obvious improvements serve the public interest, and are included in the purpose of the **patent** incentive.

The obviousness determination often presents a close question, as recognized by Judge Learned Hand: "Courts never tire, or at least in earlier times they did not, of expatiating upon the freshness of insight which observes a little, but fruitful, change which had theretofore escaped detection by those engaged in the field." *Harries v. Air King Products Co.,* 183 F.2d 158, 162 (2d Cir.1950). Precedent guides the decision-maker to take cognizance of the response of the marketplace to the invention. *See Arkie Lures, Inc. v. Gene Larew Tackle, Inc.,* 119 F.3d 953, 957 (Fed.Cir.1997) ("The so-called 'secondary considerations' provide evidence of how the patented device is viewed by the interested public: not the inventor, but persons concerned with the product in the objective arena of the marketplace.... Such aspects may be highly probative of the issue of nonobviousness.") (citing *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538-39 (Fed.Cir.1983)). The Court reiterated in KSR that "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." 550 U.S. at 406 (quoting *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 17-18 (1966)); *see also Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,* 776 F.2d 281, 306 (Fed.Cir.1985) ("Secondary considerations may be the most pertinent, probative, and revealing evidence available to the decision maker in reaching a conclusion on the obviousness/nonobviousness issue.").

Although the district court recognized the commercial success of the Saito utility lighter, the court declined to give it any weight, finding, on summary judgment, that there was no "nexus"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

between the Saito invention and its commercial success. *SJ Order,* slip op. at 38. The court erred in law, for "a prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the **patent**." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed.Cir.1988). The defendants did not dispute Tokai's evidence that its commercial success was due to its improved child-safety mechanism. It was improper for the district court to ignore the principle stated in *Demaco* and then resolve this material factual aspect against Tokai on summary judgment. *See Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1574 (Fed.Cir.1996) (vacating summary judgment of invalidity for obviousness, on the ground that a genuine issue of material fact existed as to whether a commercial success nexus was present).

**\*16** The district court found that "copying is inarguably present here," but stated that it gave no weight to this finding, reasoning that copying is "only equivocal evidence of nonobviousness." *SJ Order,* slip op. at 39-40. [FN1] While it is the province of the district court to determine the weight to be given to evidence of commercial success and copying, such evidence cannot be completely ignored. *See Stratoflex,* 713 F.2d at 1538 ("[E]vidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness. Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not.") (citations omitted); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1555 (Fed.Cir.1983) ( "objective evidence of nonobviousness ... should when present always be

considered as an integral part of the analysis").

FN1. Despite the district court's recognition that Tokai had demonstrated copying, my colleagues find Tokai's evidence of copying "unpersuasive," stating that copying "requires evidence of efforts to replicate a specific product." Maj. Op. at 20. Defendants' internal documentation of its unsuccessful attempts to design around the Saito invention is such evidence. J.A. 1451-1457. The court improperly resolves this factual aspect against Tokai on summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (on motion for summary judgment "the evidence of the non-movant "is to be believed, and all justifiable inferences are to be drawn in his favor").

Tokai's evidence of commercial success and copying of the patented device, taken with the structural differences and the differences in operation between the prior cigarette lighter safety mechanisms and the Saito utility lighter safety mechanism, as well as the differences between the auto-locking Saito mechanism and manual locking prior utility lighters, created at least genuine issues of material fact bearing on obviousness. Summary judgment was improperly assessed by the district court, and is now incorrectly affirmed by this court. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (on motion for summary judgment the court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts).

My colleagues depart from the law governing determination of obviousness. The disputed facts cannot be adversely found on summary judgment. The question at least requires trial.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

### II

Procedural error appears to have disadvantaged the patentee. The district court excluded from consideration on the summary judgment record the declaration of Mr. Kil Young Sung for failure to provide a written expert witness report. Federal Rule 26(a)(2)(B) provides that expert testimony must be accompanied by a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." However, a party's employee who does not meet this Rule need not provide a written expert report. Tokai states that Mr. Sung was indeed an employee exempt from the Rule 26(a)(2)(B) report requirement, and that when the issue was raised in connection with the summary judgment proceeding, Tokai was improperly barred from showing his employee status. I must agree that this procedure was flawed.

**\*17** My colleagues state that the exclusion was "harmless." Maj. Op. at 11. When reviewing an erroneous evidentiary ruling, the Ninth Circuit, whose procedural rules govern, begins with a presumption of prejudice. Obrey v. Johnson, 400 F.3d 691, 701 (9th Cir.2005) ("when reviewing the effect of erroneous evidentiary rulings, we will begin with a presumption of prejudice"). The Sung declaration describes the specially configured elements of the Floriot cigarette lighter, explains their operation, and explains how the Floriot safety mechanism is incompatible with the prior art Shike utility lighter. Mr. Sung, as a designer of both utility lighters and cigarette lighters, offered a reasoned discussion of the prior art and its combination, relevant to the issues before the district court. The district court exceeded its discretion in denying Tokai the opportunity to establish the admissibility of this evidence under Rule 26(a).

### CONCLUSION

The district court referred to the known need for an improved safety mechanism for utility lighters, and stated that this need was a reason to modify the prior art to make Tokai's improved lighter. To the contrary, the continuing need weighs against the obviousness of this successful device.

Nor is it reasonable to trivialize an improvement by its relative simplicity. To the contrary, the fact that this improvement eluded discovery, and that its advantages were immediately apparent to the marketplace and to the competition, weigh in favor of nonobviousness. At a minimum, summary judgment of invalidity was improperly granted. My colleagues err in sustaining that judgment.

--- F.3d ----, 2011 WL 308370 (Fed.Cir.(Cal.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.